## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MATTHEW REEVES,          )
)
     Petitioner,       )
)
vii.                   )     Case No.  1:17-cv-00061-KD-MU
)
JEFFERSON S. DUNN,      )
Commissioner of the Alabama   )
Department of Corrections,    )
)
     Respondent.     )

# VOLUME 3

# State Court – Trial, Clerk's Record and Reporter's Record

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
   CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

**'CAHABA CENTER FOR MENTAL HEALTH**

Name and Case No.: Matthew Reeves   8144

Service Mode: _____

TREATMENT PROGRESS NOTES

Primary Therapist: _____

| DATE | FORMAT-- (1) Current condition of client, (2) Description of session, (3) Progress toward attainment of goal(s), (4) Plans, and (5) next appointment. |
|------|------|
| 8-10-92 | Matthew is an almost 15 year old black male with a Conduct Disorder, ADHD and a Chaotic Home who hasn't been in any trouble with the Law. He reports that his brother Julius is still at the VACCA Campus. Mother request that Juluis be on some medication. Matthew will stay up to 4:30 in the morning watching TV and then gets up at noon. His Grandmother hollers at him quite a bit.<br>MENTAL STATUS EXAM: A friendly, adolescent black male with an earring in his left ear. He is very talkative. Says "I am not depressed".<br>IMPRESSION: ADHD<br>           Conduct Disorder<br>           Chaotic Home<br>PLAN: Increase Imipramine 75 mg  q hs   #90 x 3<br>      RTC  4 months<br><br>Timothy Baltz,M.D.<br>Psychiatrist<br><br>jb<br><br>RECEIVED NOV 3 0 1992<br><br>C:py to J. Scott & D. Stewart<br>11-30-92 |

435

**CAHABA CENTER** FOR MENTAL HEALTH AND MENTAL RETARDATION

1017 Medical Center Parkway ● Selma, Alabama 36701 ● Telephone (205) 875-2100

PATRICIA J. MARTIN
EXECUTIVE DIRECTOR

### CLIENT INFORMATION RELEASE AUTHORIZATION

I, _Matthew Reeves_ , hereby authorize The Cahaba Center

to mutually release and share the following information with _Selma_

_School System_ (agency/individual):

_Reports, Records, Professional Consultations, Evaluations, Assessments,_

_Recommendations, Treatment Plans, Treatment Goals, Treatment Progress._

The purpose and need for this disclosure are : _Coordination of Direct and_

_Access Services._

This consent may be ended at any time by the client, but ending the consent

will not cancel any action that has already been taken as allowed by this

form.  Unless the client wishes to cancel this consent at an earlier time,

it will automatically stop upon the date and/or condition indicated below:

A.  Date _____

B.  Event/Condition _Case Closed_

C.  _____

It is understood that the duration of this consent will not be longer than

would be necessary and reasonable to carry out the purpose for which it is

given.

_11/24/92_
Date signed

_Marnetha Reeves_
Signature of client or person authorized
to sign for client.

_11/24/92_
Date Witnessed

_Loise John, M.S._
Witness

NOTE TO PARTY RECEIVING INFORMATION:  This information has been disclosed to you
from records whose confidentiality is protected by federal law which prohibits y
from making any further disclosure of information without the specific written

*Sent 11-30-92*



# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

## M E M O R A N D U M

TO:     James Carter

FROM:   Milton Slauson

DATE:   November 3, 1993

As per your instruction, Ms. Bettie Jackson has ceased services to
Matthew and Julius Reeves due to concerns for her own personal safety.
The purpose of this memo is to notify you of this fact and to ask if
you have any suggestions regarding the provision of services for these
two youths.

MS:cmr

pc:  Edna Anderson

437



**BYRD ELEMENTARY SCHOOL**

"Where Every Child Is A Winner"

"HISTORIC SELMA"

625 Lapsley Street                                          Selma, Alabama 36701

RECEIVED OCT 27 1993

October 26, 1993

Dr. Milton Slauson
Special Education Coordinator
Washington Street
Selma, Alabama  36701

Dear Sir:

It was quite a shock to learn that Julius Reeves, a homebound
student, was shot in one of his legs Friday, October 15, 1993.
His mother related to me that the drive-by-street-shooting
was anticipated as a result of previous situations that involved
Julius and Matthew.  Ms. Reeves also stated that similar
incidents as Julius' may be anticipated.

However, during my homebound visit with Matthew and Julius
on Monday, October 18, 1993, they came home about ten minutes
after I arrived as their mother was relating the shooting incident
to me.  Matthew came home--appeared to be very angry.  Julius
was with him and was walking with crutches for support.  He
appeared to be fairly calm as I checked his academic assignments
and as he talked to me about the shooting incident.  NOT MATTHEW,
he walked through his house using profanity repeatedly asking for
his gun.  His mother was unable to control his behavior.  I tried
to talk to Matthew about his academic assignments, but he refused
to cooperate with me or his mother.  He told me that he was not
interested in ANYTHING--at that time--BUT FINDING HIS GUN!  It
would be best for me to leave because he was very upset.  I left
their house immediately.

Sincerely,

*Bettie Jackson*

(Mrs.) Bettie J. B. Jackson
Homebound Teacher

Copy to James Carter & Edna Anderson
10-27-93

Mrs. Jackson told me today that Mr. Angel Smith is the probation officer for Matthew Reeves.

I called Mr. Smith today to express my concern for Mrs. Jackson's safety and to see if she could work it out for her to provide "homebound" "services" for Matthew & his brother, Julius, at the probation office. She said she would check with O. Acoff & Judge Walker & let me know.

Julius' probation officer is Mr. Lorraine Capers.

M. Slawson

Probation Office: 874-2556



# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

January 5, 1994

Mr. Ray Thomason
C/O Legal Services Corporation of Alabama
1114 Church Street
Selma, Alabama  36702

Dear Mr. Thomason:

As per your letter of request dated January 3, 1994, I am
supplying you with the academic and disciplinary records which I hold
on your clients, Julius and Matthew Reeves.  Please find these records
accompanying this letter.  If you have questions, just call me at
874-1613.

Sincerely,

Milton Slauson

Milton Slauson, Ph.D.

MS:cmr

pc:  Mr. James Carter
     Mrs. Edna Anderson

# SELMA CITY SCHOOLS

441

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

January 5, 1994

Ms. Marzetta Reeves
2128 Selma Avenue
Selma, AL   36701

Dear Ms. Reeves

The purpose of this letter is to confirm our meeting at Eastside Middle School on Tuesday, January 11 at 1:00 P.M.  I will meet with you and your lawyer along with Mr. Aubrey Larkin and Mrs. Bettie Jackson to discuss the educational placement of your sons, Julius and Matthew. If you have any questions about this letter, just call me at 874-1613.

Sincerely,

Milton Slauson

Milton Slauson, Ph.D.

MS:cmr

pc:  Mr. James Carter
     Mrs. Edna Anderson
     Mr. Aubrey Larkin
     Mrs. Bettie Jackson
     Mr. Ray Thomason

442



# Legal Services Corporation of Alabama

Selma Regional Office   1114 Church Street   P. O. Box 954   Selma, AL 36702   205/875-3770

January 3, 1994

RECEIVED JAN 04 1993

Mr. James Carter
Superintendent of Education
300 Washington St.
P. O. Box F
Selma, AL  36702-0318

Dear Mr. Carter:

I represent Ms. Marzetta Reeves in efforts to secure appropriate special education services for her two children Julius and Matthew Reeves.  Dr. Slauson informed me that you were willing to place the children in alternative school.

Ms. Reeves would like an explanation of why this action is proposed, and whether alternative school is the appropriate, and least restrictive environment for them.  I am requesting a immediate conference with the appropriate school officials and special education personnel involved in these cases in order to resolve the matter.  Please allow me to review the academic and disciplinary record of Julius and Matthew Reeves before the conference.

Your assistance with this matter is greatly appreciated.

Respectfully,

RAY CHARLES THOMASON
Staff Attorney

RCT/ish

cc.   Milton Slauson, Ph.D.
      Ms. Marzetta Reeves

443

RECEIVED DEC 17 1993

*12-17-93*

Date: *2-10-93*

To: *Ms Bettie  Jackson off* ~~School~~         School

From:     Kay G. Alsobrook
          Regional Juvenile Detention Facility School
          P.O. Box 717
          Selma, Alabama 36702

Subject:  Notice Of Transfer

*Matthew  Reeves*                    *12-13-77*
(name)                               (birth date)

was enrolled as a student at the Regional Juvenile Detention Facility
School on *12-03-*                        ,19 *93*     .

Please withdraw this student accordingly. If you have any questions,
please call 874-7483.

Thank you.

*Kay G. Alsobrook*
Kay G. Alsobrook, teacher

KGA/lcw

---

*12-17-93 (Telephone conference)*

*According to Mr. K. Bryant, Superintendent of Regional
Juvenile Detention Facility School, Julius Reeves was
enrolled there 12-10-93. An enrollment status form will
be forwarded to us.*

*Merry Christmas*

444

I called Ray Thomason at Legal Service today to see if he had gotten the materials that I mailed him on parental - students' rights under IDEA and to let him know that Mr. Carter had agreed to let his clients, Tabitha and Matthew Reeves, be served by Mrs. Betty Jackson at the Alternative School. Mr. Thomason told me that he had received the materials but had not had time to look over them. He said that he would call Mrs. Reeves to see if she would accept Mr. Carter's offer or if she wanted to pursue a due process remedy. He said he would call me back.

Milton Slawson
12 - 7 - 93

# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

December 1, 1993

Mr. Ray Thomason
C/O Legal Services
P. O. Box 954
Selma, Alabama  36702

Dear Mr. Thomason:

As per our phone conversation earlier today, I'm sending you copies
of our "Special Education Student and Parent Rights" form and Parents-
Partners in Special Education bulletin.  If you have further questions
about these documents or about the cases of Julius and Matthew Reeves,
please, call me at 874-1613.

Sincerely,

Milton Slauson

Milton Slauson, Ph.D.
Special Education Coordinator

MS:cmr

Enclosures

cc:  Mr. James Carter
     Mrs. Edna Anderson



# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

## M E M O R A N D U M

TO:     Bettie Jackson

FROM:   Milton Slauson

DATE:   November 18, 1993

I spoke with Angela Smith at the Probation Office yesterday concerning Matthew
and Julius Reeves. She told me that Judge Walker said that they had business
to conduct and that they had no room for you to be tutoring in their offices.
Due to the potential for violence and danger that might be experienced by
those working with these youngsters, Mr. Carter and I think it best that they
be dropped from your roll and register. Thanks!

MS:cwc

pc:  James Carter
     Edna Anderson

## DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_____ Grade ___

Staff Member _D Stewart_____ Date _11-_

Approximate time of the incident _12:27_____

Description of the incident _Refused to come to lunch_
_with the group. I asked Mrs. Daniels where he_
_She said he went on upstairs about his own._
_He waited until 12:28 long passed to come to_

### Previous Discipline Action by Teacher:

___Counselor referral     ___Parent conference     ___Seating chan

___Detention with teacher     ___Phone call to parents     ___Special duty

___Discussion with parents     ___Removal of privileges     ___Verbal reprima

___Individual discussion     ___Restitution     ___Work duty

___Other _____

Other Comments: _the room. He then came to me_
_said I was cutting a lie._

_D Stewart_
Staff member

RECEIVED SEP 0 1 1993

## PRINCIPAL'S ACTION

___ Counseled student

___ Referred to counselor

___ Parents called on
    _____

___ Detention
    (Date: _____)

___ Parent conference
    requested

___ Out of school suspension
    _ days

___ Recommendation for expulsion

___ Restitution

___ Letter to parents on
    (Date: _____)

Other comments: _Conference W/superintendent_
_____
_____

J. Scott
11/3/92

## DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_  Grade _7_

Staff Member _M. Roberts_  Date _Oct 27_

Approximate time of the incident _2:22_

Description of the incident _Matthew insisted on leaving the room for his bus. He then said he had to go to the bathroom and got up and walked out. Mrs. Daniels then came to him and he refused to go the way she was_

Previous Discipline Action by Teacher: _leading him to go. (By the kitchen_

*(He was peeping in at the main door)*

____ Counselor referral  ____ Parent conference  ____ Seating change

____ Detention with teacher  ____ Phone call to parents  ____ Special duty

____ Discussion with parents  ____ Removal of privileges  ____ Verbal reprimand

____ Individual discussion  ____ Restitution  ____ Work duty

____ Other _____

Other Comments: _____

_____

_____

_M. Roberts_
Staff member

# PRINCIPAL'S ACTION

_✓_ Counseled student          ___ Out of school suspension
                                   ___ days

___ Referred to counselor      ___ Recommendation for expulsion

___ Parents called on          ___ Restitution
_____

___ Detention                  _✓_ Letter to parents on
    (Date: _____)              (Date: _10-28-92_ )

_✓_ Parent conference
    requested

Other comments: _____

_____

_____

Mr. Roberts,
    I have requested a parental
conference for Thursday, October
29, 1992.

                              S. Shirley
                              10-28-92

# EASTSIDE MIDDLE SCHOOL

MRS J P. SCOTT
PRINCIPAL

400 WASHINGTON STREET
SELMA, ALABAMA 36701
(205) 874-1670

Date:   October 28, 1992

Dear Ms. Reeves                              ,

You are requested to return with your child   Matthew Reeves

on  Thurs day, October      29, 19 92  at   8: 30  A.M. P.M. for a

conference for the purpose of discussing your child's   leaving class

without permission          in      Mrs. Melba Robert's

classroom school.  You are asked to meet with the:

_____  following teacher(s)  _____

____x____  assistant principal

_____  principal

Please Note:  Your child cannot return to Eastside Middle School without you.

*Gerald Shirley*

Gerald Shirley, Assistant Principal

School Office Use Only:  Date of Conference   10 | 29 | 92

DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_       Grade _7_

Staff Member _D Stewart_       Date _10-19-92_

Approximate time of the incident _12:25_

Description of the incident _12:45 Matthew took a picture_
_from beneath Bernard's desk. Anthony had given it to_
_Bernard. Two pictures were present. I asked Matthew_
_to give me the picture. He said "I'll tear it up_
_before I'll give it to you."_

## Previous Discipline Action by Teacher:

___ Counselor referral      ___ Parent conference      ___ Seating change

___ Detention with teacher  ___ Phone call to parents   ___ Special duty

___ Discussion with parents ___ Removal of privileges  ___ Verbal reprimand

___ Individual discussion   ___ Restitution            ___ Work duty

___ Other _____

Other Comments: _____

_____

_D Stewart_
Staff member

_The boys & I were_
_looking for a misplaced book in the back room_
_Matthew & Kirk lemmed Bernard in a place_
_by the aquarium + plants. Both slapped the boys_
_without provocation. ☺_

_D Stewart_

453

## PRINCIPAL'S ACTION

✓ Counseled student

✓ Out of school suspension
__1__ day  10 - 21 - 92

___ Referred to counselor

___ Recommendation for expulsion

___ Parents called on
_____

___ Restitution

___ Detention
(Date: _____)

___ Letter to parents on
(Date: _____)

___ Parent conference
requested

Other comments: _____

_____

_____

Matthew Reeves will be suspended for one day for physically assaulting another student. Suspended for Wednesday, October 21, 1992.

G. Shirley

: 484



# Selma City Schools
## Selma, Alabama

## NOTICE OF SUSPENSION

October 20, 1992
(Date)

Address:

_____ Reaves

_____ Avenue

Selma, A_____ 367__     Home
                        Telephone Number  _____

Dear _____ :

This letter is to inform you that your child, _____
Age_____ Grade_____, has been suspended from _____ school
for _____ days. He/She may return to school on _____.

The reason for your child's suspension from school is as follows:
_____
_____
_____
_____
_____

Because of the serious nature of this offense, it will be necessary for you to accompany your child to the school on _____ at _____, prior to his/her being readmitted to school.

Regards,

_____
Principal

# DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_ Grade _7_

Staff Member _D Stewart_ Date _10-14-92_

Approximate time of the incident _10:30 AM_

Description of the incident _Insubordination - Profanity._
_While trying to reason with him about his work on_
_the board, he refused to cooperate with me. He_
_would not stop writing a letter nor close his notebook_

## Previous Discipline Action by Teacher:

| | | |
|---|---|---|
| ___Counselor referral | ___Parent conference | ___Seating change |
| ___Detention with teacher | ___Phone call to parents | ___Special duty |
| ___Discussion with parents | ___Removal of privileges | ✓Verbal reprimand |
| ___Individual discussion | ___Restitution | ___Work duty |
| ___Other _____ | | |

Other Comments: _He then said "I don't give a damn."_
_He continued to talk and said he would bring his_
_mama up here and he would _____ something on me_
_Further talk included_ __D Stewart__
_____                                    Staff member_
_that he would bring a gun and that would do every_
_thing - He talked very smart w/ Mrs _____, also_


_Re the _____ incident. He claim ___ that_
_he wasn't writing while I was talking_
_to him._

## PRINCIPAL'S ACTION

✓ ___ Counseled student

___ Referred to counselor

___ Parents called on
_____

___ Detention
(Date: _____)

✓ ___ Parent conference
requested  10-15-92

___ Out of school suspension
___ days

___ Recommendation for expulsio.

___ Restitution

___ Letter to parents on
(Date: _10-14-92_)

Other comments: _____

_____

_____

Mrs. Stewart,

I have requested a

parental conference for

Thursday, October 15, 1992.

G. Shirley

457

## EASTSIDE MIDDLE SCHOOL

MRS. J. P. SCOTT
PRINCIPAL

400 WASHINGTON STREET
SELMA, ALABAMA 36701
(205) 874-1670

Date: October 14, 1992

Dear Ms. Reeves _____,

You are requested to return with your child  Matthew Reeves

on  Thurs day, October  15, 19 92 at  8:20  A.M.|P.M. for a

conference for the purpose of discussing your child's  disruptive

behavior _____  in  Mrs. DeVann Stewart's

classroom|school.  You are asked to meet with the:

___x___  following teacher(s)  Mrs. DeVann Stewart

___x___  assistant principal

_____  principal

Please Note:  Your child cannot return to Eastside Middle School without you.

Gerald Shirley
Gerald Shirley, Assistant Principal

School Office Use Only:  Date of Conference  10 | 15 | 92

EASTSIDE MIDDLE SCHOOL

MRS. J. P. SCOTT
PRINCIPAL

400 WASHINGTON STREET
SELMA, ALABAMA 36701
(205) 874-1670

Date: October 14, 1992

Dear Ms. Reeves                    ,

You are requested to return with your child  Matthew Reeves

on  Thurs  day,  October   15, 19 92  at   8:20   A.M.|P.M. for a

conference for the purpose of discussing your child's   disruptive

behavior                     in    Mrs. DeVann Stewart's

classroom|school.  You are asked to meet with the:

____x____  following teacher(s)  Mrs. DeVann Stewart

____x____  assistant principal

_____  principal

Please Note:  Your child cannot return to Eastside Middle School without you.

Gerald Shirley, Assistant Principal

School Office Use Only:  Date of Conference  10 | 15 | 92

459

Dear Missy,

Hey! I

I've been thinging about you

_____ first line to the point

_____ look sexy. And dont

_____ _____

_____ _____ and you

_____ on your dress close trip

Name of Student _Matthew Reeves_    Grade _7_

Staff Member _D. Stewart_    Date _10-5-_

Approximate time of the incident _12:35_

Description of the incident _Insubordination_
_Matthew began talking aloud to me who I_
_wasn't talking to him. I tried to get him to_

## Previous Discipline Action by Teacher:

___Counselor referral    ___Parent conference    ___Seating change

___Detention with teacher    ___Phone call to parents    ___Special duty

___Discussion with parents    ___Removal of privileges    ___Verbal reprimand

___Individual discussion    ___Restitution    ___Work duty

___Other _____

Other Comments: _look toward me and I would like to_
_him. He refused and continued to him. I was_
_not going to let him with a stick. He wouldn't_
_allow me to reason with him. B. Stewart_

Staff member

_He has been most cooperative until today._
_He and Kirk have been too close today. I_
_separated them, they have assignments to_
_not very close to each other._

_Matthew cursed completely,_
_slurred her in class_
_I kept him in class_
_and did outstation_
_him to office._
_D. Stewart_

# DISCIPLINE REFERRAL FORM

461

Name of Student *Matthew Reeves*  Grade *07*

Staff Member *D. Stewart*  Date *12-16-9*

Approximate time of the incident *9:55*

Description of the incident *A fight outside 005*
*A disturbance was heard - a fight between*
*Kid Edwards and Matthew Reeves. Mr. Daniel*
*ran out and asked for help to separate the boys*

## Previous Discipline Action by Teacher:

___Counselor referral    ___Parent conference    ___Seating change

___Detention with teacher    ___Phone call to parents    ___Special duty

___Discussion with parents    ___Removal of privileges    ___Verbal reprimand

___Individual discussion    ___Restitution    ___Work duty

___Other _____

Other Comments: *Mr. Phillips pulled Kid away. Matthew*
*went into room 005 and into the bathroom. He*
*had cuts on his face and his ear ring was torn*
*away causing his ear to bleed.*

Staff member

*I gathered the things on the floor and asked Matt*
*to go to the office w/me. He did so without*
*any fuss. I returned to find the missing ear*
*ring at the scene of the fight.*

*D. Stewart*

*Coach McDonald saw me upstairs and offered his*
*help. I had him get Kid and bring to the office.*

## PRINCIPAL'S ACTION

462

✓ Counseled student

___ Referred to counselor

___ Parents called on
_____

___ Detention
(Date: _____)

___ Parent conference
requested

✓ Out of school suspension
_3_ days Dec. 16 - 18, 1992

___ Recommendation for expulsion

___ Restitution

___ Letter to parents on
(Date: _____)

Other comments: _____
_____
_____

J. Shirley
12-16-92



# Selma City Schools
### Selma, Alabama

## NOTICE OF SUSPENSION

December 16, 1992
**(Date)**

Address:

Ms. Margaret Reeves

Home
Telephone Number _____

Dear _____ :

This letter is to inform you that your child, _____Matthew Reeves_____ _____,
Age_____ Grade_____, has been suspended from ____Eastside High____ school
for _____ days. He/She may return to school on ____Monday, January 4, 1993____.

The reason for your child's suspension from school is as follows:

_____
_____
_____
_____
_____

Because of the serious nature of this offense, it will be necessary for you to accompany your child to the school on ____Monday, Jan. 4, 1993____, at ____8:30 A.M.____, prior to his/her being readmitted to school.

Regards,

P. Scott (R.N.)

/Principal

White - Parent: Yellow - Principal: Pink - Superintendent: Goldenrod - Cumulative Folder: Blue - Attendance Coordinator

According to Kirk Edwards, Matthew Reeves was talking and laughing about an incident that happened after a basketball game at Eastside Middle School on Tuesday night, December 15, 1992. Kirk said Matthew and some other boys wanted to fight his (Kirk's) cousin. Kirk said Matthew spat at the spit did not hit Kirk. The spit fell near Kirk's shoe. A fight erupted.

Kirk Edwards
Statement
el Sh. Ca

465

Edwards approached him and hit/
Pushed Matthew because Kirk heard
that Matthew had fought his
cousin (Kirk's cousin). A fight
erupted.

Matthew
Reeves'
Statement

G. Shirley
12-16-92

466

# DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_____ Grade _07_

Staff Member _Gerald Shirley_____ Date _12-10-97_

Approximate time of the incident _11:00 A.M._

Description of the incident _Matthew Reeves occupied the girls' restroom on the second floor. Girls were in the restroom attempting to use the restroom facilities._

**Previous Discipline Action by Teacher:**

___Counselor referral      ___Parent conference      ___Seating change

___Detention with teacher  ___Phone call to parents  ___Special duty

___Discussion with parents ___Removal of privileges  ___Verbal reprimand

___Individual discussion   ___Restitution           ___Work duty

___Other _____

Other Comments: _____

_____

_____

_Gerald Shirley_
Staff member

_This incident was witnessed by Gerald Shirley._

_N. Shirley_

_12-10-97._

467-

## PRINCIPAL'S ACTION

✓ Counseled student                         ✓ Out of school suspension
                                              _1_ day   12-10-92

___ Referred to counselor                   ___ Recommendation for expulsion

___ Parents called on
    _____                             ___ Restitution

___ Detention
    (Date: _____)                         ___ Letter to parents on
                                                (Date: _____)

___ Parent conference
    requested

Other comments: _____
_____
_____

Matthew Reeves will be suspended for one day for entering the girls restroom while it was being cleaned and used by female students.

Suspended for—
Friday, Dec. 11, 1992.

G. Shirley
12-10-92

468



# Selma City Schools
### Selma, Alabama

## NOTICE OF SUSPENSION

December 10, 1992
_____
(Date)

Address:

Mr. _rzetta Reeves
_____

_____        Home
_____        Telephone Number _____

Dear _____ _____ _____ _____ :

    This letter is to inform you that your child, _Matthew Reeves_____,
Age_____ Grade_____, has been suspended from _Eastside_____ school
for _____ days. He/She may return to school on _Monday, Dec._____.

    The reason for your child's suspension from school is as follows:
_____
_____
_____
_____
_____

    Because of the serious nature of this offense, it will be necessary for you to accompany your child to the school on _Monday, Dec. 14, 1992_____, at _8:00 A.M.___, prior to his/her being readmitted to school.

Regards,

_____

EASTSIDE MIDDLE SCHOOL

DISCIPLINE REFERRAL FOR:

469

Name of Student _Matthew Reeves_ Grade _7_

Staff Member _D. Stewart_ Date _May 20 '92_

Approximate time of the incident _3rd Per. following assembly_

Description of the Incident _In substitute. Matt be-_
_came angry w/Ms. Smith. She asked him to get_
_busy from the water fountain. He followed her_

---

**Previous Discipline Action by Teacher:**

___Counselor referral ___Parent conference ___Seating change

___Detention with teacher ___Phone call to parents ___Special duty

___Discussion with parents ___Removal of privileges ___Verbal reprimand

___Individual discussion ___Restitution ___Work duty

___Other _____

---

Other Comments: _____

_____

_____

_____

                    D. Stewart

                    Staff member

_____

_____

_____

470 -

Matthew Reeves

Nov 15, 1992

*Statement*

1  Matthew went to my desk, eating my chair, opened the top drawer and took a "big" rubber band,

> Mr Smith tried to get him to leave my desk area,
>
> I came in the bathroom to _____ ____

2  Mr _____ gave the assignment, I asked Mr Smith to talk to the boys about project on ___ ___ ___ school and before the _____ _____ to get a drink of water.

3  As I approached my class door I heard Mr Smith trying to get Matthew to sit down, I opened the door to see Matt shooting Jerome (who had crawled into the plants) with the rubber band he had taken from my desk only 15 min earlier.

4  I asked Matt to settle down, He continued to talk and said I was telling lies on him, He refused to accompany me to the principal's

**EASTSIDE MIDDLE SCHOOL**
OFFICE OF THE PRINCIPAL
**SELMA, ALABAMA 36701**

November 20, 1992

Ms. Marzetta Reeves
2128 Selma Avenue
Selma, AL   36701

Dear Ms. Reeves:

We have exhausted all means by which to get Matthew Reeves to behave correctly and respect authority.

Matthew is constantly using profane language and threatening his teacher/aide.

Therefore, I am requesting that before Matthew can return to Eastside Middle School, he must be re-evaluated through psychological testing.

I am sure that you want what is best for all of our children. We cannot have students to continuously disrupt the learning process of others.

If you have any questions, I am available by phone - 874-1670 or by an office visit.

Sincerely,

Mrs. J.P. Scott
Principal

JPS/dhv

# DISCIPLINE REFERRAL FORM

472

Name of Student _Matthew Reece_          Grade _7_

Staff Member _D. Stewart_                Date _11-10-9_

Approximate time of the incident _1 PM_

Description of the incident _Matthew was disrespectful_
_in 7th Grade. He did not want to continue_
_with his reading as she talked, he contin-_
_ues_

Previous Discipline Action by Teacher:

\_\_Counselor referral          \_\_Parent conference      \_\_Seating change

\_\_Detention with teacher      \_\_Phone call to parents   \_\_Special duty

\_\_Discussion with parents     \_\_Removal of privileges   \_\_Verbal reprimand

\_\_Individual discussion       \_\_Restitution            \_\_Work duty

\_\_Other _____

Other Comments: _He has made "Trouble" comments in_
_need of his time this morning_

_D. Stewart_
Staff member

## PRINCIPAL'S ACTION

✓ Counseled student

___ Referred to counselor

___ Parents called on
    _____

___ Detention
    (Date: _____ )

___ Parent conference
    requested

✓ Out of school suspension
  _1_ days

___ Recommendation for expulsion

___ Restitution

___ Letter to parents on
    (Date: _____ )

Other comments: _Matthew Reeves wants to be placed on Homebound Program but will not ask Slauson to hear that request._

_J. Scott_
_11/10/92_

# DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_          Grade _7_

Staff Member _D Stewart_          Date _11-3-92_

Approximate time of the incident _After lunch_

Description of the incident _Left lunch room and went upstairs._

## Previous Discipline Action by Teacher:

___ Counselor referral     ___ Parent conference     ___ Seating change

___ Detention with teacher ___ Phone call to parents ___ Special duty

___ Discussion with parents ___ Removal of privileges ___ Verbal reprimand

___ Individual discussion   ___ Restitution          ___ Work duty

___ Other _____

Other Comments: _____

_____

_D Stewart_
Staff member

I went to the office to see if they (Matt + Kirk) were there. The girl who works the head said she saw them run up the stairs to the upper level. By the time I returned to the classroom, both were seated and acting properly.

TPM Mrs Daniel was talking to the class

## PRINCIPAL'S ACTION

___ Counseled student                 ✓ Out of school suspension
                                          3 days

___ Referred to counselor             ___ Recommendation for expulsion

___ Parents called on
    _____                       ___ Restitution

___ Detention
    (Date: _____)                ___ Letter to parents on
                                          (Date: _____)

___ Parent conference
    requested

Other comments: _____

_____

_____

*Heath*
11/3/92

## DISCIPLINE REFERRAL FORM

Name of Student _Matthew Reeves_                    Grade _7_

Staff Member _D. Stewart     D. Daniels_           Date _11-2-92_

Approximate time of the incident _2:20 PM_

Description of the incident. _Getting student from room to go to the bus. Disrespect for Mrs. Daniels. Matthew cursed Mrs. Daniels in front of students. Mrs. Daniels tried to explain her responsibility. He_

Previous Discipline Action by Teacher:

___Counselor referral        ___Parent conference        ___Seating change

___Detention with teacher    ___Phone call to parents     ___Special duty

___Discussion with parents   ___Removal of privileges    ___Verbal reprimand

___Individual discussion     ___Restitution              ___Work duty

___Other _____

Other Comments: _Refused to tie up w/ Mrs. Daniels in front of bus driver A. Bonner._

_C. Stewart_
Staff member

## PRINCIPAL'S ACTION

\_\_\_ Counseled student                    \_\_\_ Out of school suspension
                                              \_\_\_ days

\_\_\_ Referred to counselor              \_\_\_ Recommendation for expulsion

\_\_\_ Parents called on
_____                             \_\_\_ Restitution

\_\_\_ Detention
     (Date: _____)                \_\_\_ Letter to parents on
                                              (Date: _____)

\_\_\_ Parent conference
     requested

Other comments: *Conference W/superintendent*
_____

_____

*J. Scott
11/3/92*



# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

March 1, 1994

Ms. Angela Smith
C/O Dallas County Courthouse
Probation Office
105 Lauderdale Street
Selma, Alabama  36701

Dear Ms. Smith:

In your letter dated Feb. 23rd, you stated that you had been advised not to release the juvenile records of Matthew Reeves to me due to confidentiality.  I respectfully point out to you that I have followed the guidelines established by P.L.93-380 which is also known as the Buckley Amendment.  I know parents can receive copies of their children's files.  Ms. Marzetta Reeves signed a release form giving you permission to send me copies of Matthew's records.  I sent you this form with the first of the three letters I have sent making this request.

We need to provide Matthew Reeves with an appropriate educational program.  We cannot make this determination without adequate information. His juvenile record would supply us with the information that we need. I'm using this letter to request these records one more time.  If I don't receive them soon, I will be forced to file a complaint with the FERPA Office in Washington, D.C.  Please let me hear from you soon.

Sincerely,

*Milton Slauson*

Milton Slauson, Ph.D.
Special Education Coordinator

cmr

pc: Mr. James Carter
    Mrs. Edna Anderson

  

## Legal Services Corporation of Alabama

Selma Regional Office   1114 Church Street   P.O. Box 954, Selma, Alabama 36702   205/875-3770

March 4, 1994

Dr. Milton Slauson
Special Education Coordinator
300 Washington St.
P. O. Box F
Selma, AL  36702-0318

Dear Dr. Slauson:

This confirms our discussion on the above date of your pending request for the disclosure of Matthew Reeves juvenile records.  you indicated to me that Ms. Reeves had signed a release on January 26, 1994 for the disclosure of her son's juvenile records in order to make them available to you.  I indicated to you that any such action on my client's part would be ill-advised and was done without my knowledge.  I told you that it had come to my attention that Ms. Reeves wished to revoke the above release and that I would confirm this and have her submit the same in writing.

It is my position that placement decisions in this case should be based on school conduct rather than confidential juvenile records.

I request that any future communications with my client come through me.  Your attention to this matter is greatly appreciated.

Respectfully,

RAY CHARLES THOMASON
Staff Attorney

RCT/ish

cc.  Ms. Angela Smith
     Juvenile Probation Office

Copies to James Carter
+Edna Anderson.
3-7-94

Matthew Reeves

| 12-16-92 | Fight with Kirk E. |
| 12-10-92 | Went into girls restroom with girls prese |
| 11-20-92 | Insubordinate to Ms. Daniels – profane language threatening teacher/ai |
| 11-16-92 | Refused to accompany Stewart to principal's office after shooting B. with a rubber band |
| 11-10-92 | Mimicked aide – profanity |
| 11-3-92 | Wandering the bldg., cursing teacher |
| 11-2-92 | Cursed aide |
| 10-27-92 | Refused to obey aide (leaving class) |
| 10-19-92 | Slapped another student |
| 10-14-92 | Refused to obey Teacher, cursed [symbol] + threatened to bring a gun to school |
| 10-5-92 | Insubordination |
| 5-5-92 | Enticing drug use at EE (had a bag of white powder) |
| 5-12-92 | Touching a girl in an inappropriate manner |
| April 1992 | Paragraph about wanting to sell drugs |

EE

CONFIDENTIAL

481

I talked with the school counselor at Booker T. Washington in Mobile today. She could not tell me when Matthew Reeves enrolled in 1993 but did say that he finished the 1992-93 school year there. She is to send me a copy of his report card. Their school has 3 EC teachers. Each EC Teacher teaches 2 subjects. EC students rotate among these EC teachers and go to regular P.E.

M. Slawson

3-21-94

Booker T. Washington       471-2432

CONFIDENTIAL

# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0315
(205) 874-1600

April 22, 1994

Ms. Marzetta Reeves
2128 Selma Avenue
Selma, Alabama   36701

Dear Ms. Reeves:

Our homebound teacher, Mrs. Bettie Jackson, has reported to me that your son, Matthew Reeves, has been uncooperative in her effort to provide him with instructional services. A report that Mrs. Jackson filed with me is attached. If Matthew doesn't become more cooperative quickly, we will be forced to cease services to him. Please encourage him to take his education more seriously. A copy of your parental rights is also attached. If you have questions about this letter, just call me at 874-1613.

Sincerely,

Milton Slauson

Milton Slauson, Ph.D.
Special Education Coordinator

cmr

pc: Mr. James Carter
    Mrs. Edna Anderson
    Mrs. Bettie Jackson
    Ms. Angela Smith

/874-1613                    P. O. BOX F                    August 1993
                             SELMA, AL  36702               #13        483

RECEIVED APR 22 1994                                        04-22-94 (Date Sent)

CONFIDENTIAL        CONFERENCE RECORD

Dear Parents:

This letter will serve as a record of the conference with you on  04-20-94  at,  your home
                                                                   (Date)
_____  regarding  Matthew Reeves  .
         (Place)                               (Student's Name)

Participants (name and title) at the meeting were:

Mrs. Reeves (matthew's mother)      _____

Matthew Reeves                      _____

BJ                                  _____



The issues and changes resolved and/or not resolved are as follows:

_Matthew will do some homework assignments, but he
still refuses to do any work during his class sessions
while I am present. He used profanity today and
said that he is not going to do any class assignment
with a tutor in his home because he wants to be
in school at Eastside. He became very upset, walked out
of his house and would not stop "cussing" (MF words). So I left._ If
you have any questions about the conference or this record, call  874-1623
_Byrd School_ , _7:45_ AM- _3:30_ PM, Monday-Friday.


Sincerely,


Mrs. B. J. Jackson

Education Agency Official

                                                                   8/1/93

Federal and State laws create specific rights for eligible students and responsibilities of parents to protect those rights. The following is an explanation of those rights and the procedural safeguards available to ensure that school systems and parents exercise their responsibilities in ensuring those rights. If you would like a further explanation of any of these rights you may contact your school principal, your superintendent of schools, the special education coordinator in your school system or the Division of Special Education Services, 50 North Ripley Street, Montgomery, AL 36130, telephone: 1-800-392-8020.

RECORDS – 1) Right to inspect and review any educational records relating to the child, which are collected, maintained, or used by the agency. The agency shall comply with a request without unnecessary delay and before any meeting regarding an individualized education program or hearing relating to the identification, evaluation, or placement of the child, and in no case more than 45 days after the request has been made; 2) Right to request that the agency provide copies of those records containing the information if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records; 3) Right to have a representative of the parent review and inspect the records; 4) Right to inspect and review records relating to the child unless the agency has been advised that the parent does not have the authority under applicable state law governing such matters as guardianship, separation, and divorce; 5) Right to inspect and review only the information relating to the child or to be informed of that specific information when education records contain information on more than one child; 6) Right of a public agency to charge a fee for copies of records which are made for parents if the fee does not effectively prevent the parents from exercising their right to inspect and review those records; the agency may not charge a fee to search and retrieve information; 7) Right to be informed of all types and locations of records being collected, maintained, or used by the agency; 8) Right to ask for an explanation of any item in the records; 9) Right to ask for an amendment of any record on the ground it is found inaccurate, misleading, or violates privacy rights; 10) Right to a hearing if the agency refuses to make the requested amendment; 11) Right to have the information amended and be informed in writing of this amendment, if as a result of the hearing, the agency decides that the information is inaccurate, misleading, or otherwise in violation of the privacy or other rights of the child; 12) Right to place in the records a statement commenting on the information or setting forth any reasons for disagreeing with the decision of the agency, if the agency, as a result of a hearing, decides not to amend the child's records; 13) Right to have any explanation placed in the records of the child maintained by the agency as part of the records of the child as long as the record or contested portion is maintained by the agency; and if the records of the child or the contested portion is disclosed by the agency to any party, the explanation must also be disclosed.

INDEPENDENT EVALUATION – 1) Right to an independent educational evaluation; 2) Right to have the independent evaluation considered when placement and program decisions are made; 3) Right to be told where an independent evaluation may be obtained at no expense or low expense; 4) Right to have the agency pay for the independent evaluation if the agency's evaluation is not appropriate; 5) Right to be told the procedures for obtaining an independent evaluation at public expense and the conditions under which such an evaluation may be obtained; 6) Right to an independent evaluation at public expense if requested by a due process hearing officer; 7) Right to the same criteria required of independent evaluations as required of evaluations done by the public agency.

NOTICE – 1) Right to notice before the agency initiates or changes (or refuses to initiate or change) the identification, evaluation, or placement of the child; 2) Right to have that notice in writing, in your native language, or other principal mode of communication, at a level understandable to the general public; 3) Right to have the notice describe the proposed action, explain why it is proposed, describe the options considered, and explain why those other options were rejected; 4) Right to be notified of each evaluation procedure, test record, or report the agency will use as a basis for any proposed action.

CONSENT – 1) Right to give consent before a preplacement evaluation is conducted and before initial placement is made in special education; 2) Right to refuse consent for preplacement evaluation or the initial provision of special education and related services; 3) Right of the agency to proceed, in the absence of consent, to a hearing to determine if the child may be evaluated or initially provided special education and related services; 4) Right of the public agency to evaluate or initially provide special education and related services without the parent's consent if the hearing officer rules in favor of the agency (subject to 34 CFR §300.510-513); 5) Right to revoke consent at any time before the preplacement evaluation or the student's receipt of special education for the first time. The parent's right to revoke consent ceases to be relevant once the preplacement evaluation and initial placement have occurred.

CONFIDENTIALITY OF INFORMATION – 1) Right to restrict access to the child's records by withholding consent to disclose records; 2) Right to be informed before information in the child's file is to be destroyed; 3) Right to be told to whom information has been disclosed.

NAME............. Matthew Reeves

SS#............... 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                    CONFIDENTIAL

FIRST NAME....... Matthew

MIDDLE INITIAL.... G.

LAST NAME........ Reeves

BIRTHDATE........ 12-13-77

RACE............. B

SEX.............. M

LEA.............. 191

SCHOOL CODE....... 0050

GRADE............ 07

ENROLLMENT STATUS. A

MOST RECENT DATE ENROLLED IN SPEC ED
IN THIS LEA....... 09-30-92

FUNDING SOURCE.... 94-142

IF CHAP-I FUNDING
LIST AGENCY.......

LRE.............. 05

EXCEPTIONALITY:

  PRIMARY..... ED EC

  SECONDARY 1.

  SECONDARY 2.

DEAF/BLIND
REGISTRY.....    (IF YES)

VERIFIED BY..... _D B Stewart_____    _Nov 16 92_
                      Signature            Date

September 1992

CONFIDENTIAL

486

```
NAME............. Matthew Reeves

SS#.............. 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

FIRST NAME....... Matthew

MIDDLE INITIAL.... G

LAST NAME........ Reeves

BIRTHDATE........ 12-13-77

RACE............. B

SEX.............. M

LEA.............. 191

SCHOOL CODE...... 0050

GRADE............ 07  08

ENROLLMENT STATUS. A

MOST RECENT DATE ENROLLED IN SPEC ED
IN THIS LEA....... 09-30-92

FUNDING SOURCE.... 94-142

IF CHAP-I FUNDING
LIST AGENCY.......

LRE.............. 05

EXCEPTIONALITY:

  PRIMARY..... EC

  SECONDARY 1.

  SECONDARY 2.

DEAF/BLIND
REGISTRY.....     (IF YES)
```

ADD
8-13-93

RECEIVED FEB 02 1993

RECEIVED FEB 02 1993

VERIFIED BY..... _A. Sewell_____     _____
                        Signature                Date

September 1992

```
NAME............. Matthew Reeves                    CONFIDENTIAL

SS#.............. 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

FIRST NAME....... Matthew

MIDDLE INITIAL.... G

LAST NAME........ Reeves

BIRTHDATE........ 12-13-77                          DELETE
                                                    12-2-93
RACE............. B

SEX............. M

LEA............. 191

SCHOOL CODE...... 0050

GRADE........... 08

ENROLLMENT STATUS. A

MOST RECENT DATE ENROLLED IN SPEC ED
IN THIS LEA....... 08-19-93

FUNDING SOURCE.... 94-142

IF CHAP-I FUNDING
LIST AGENCY.......

LRE............. 05

EXCEPTIONALITY:

  PRIMARY..... EC

  SECONDARY 1.

  SECONDARY 2.

DEAF/BLIND
REGISTRY.....      (IF YES)

LAST REEVAL.... 06-08-92      (DO NOT NEED FOR CHILD COUNT)

INTELLECTUAL
ASSESSMENT
TEST DATE......               (DO NOT NEED FOR CHILD COUNT)


VERIFIED BY..... _____  _____
                         Signature              Date
```

8/1/93

CONFIDENTIAL

Matthew Reese –
– Ms. Marzetta Reese – Mother –

– Parent came, Matthew needs
to continue with Homebound Service
– Have not received notice from
Dr. Carter to discontinue home-
bound services

*Sig*

3/1/05
Mother wants homebound for Matthew said
he can't be trusted at Sch.

*Sig*

## SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT



300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

M E M O R A N D U M

TO:      James Carter

FROM:    Milton Slauson

DATE:    March 24, 1994

I spoke with Jan Autery of Mt. Meigs yesterday about my letter to her
requesting info on Matthew Reeves.  She stated that she had discussed the
case with their attorney and that they could only release educational
records to us.  Based on our inability to get information concerning
Matthew's juvenile file and the likelihood that a violent past is compiled
in such a file, I recommend that you take this case to district court and
attempt to get Matthew Gerro Reeves declared a "danger to others".  I
think this course of action is prudent even though it might be cumbersome.
If we are forced to return him to a school setting and he subsequently
harms someone, we will have done all we could to have prevented it.

Before pursuing this course of action, I urge you to have Aubrey Larkin,
Julia Scott and Gerald Shirley submit to you in writing any statements
that they might have relative to Matthew's propensity toward violence.
We need to finalize something about this case as soon as possible.

cmr

pc:  Edna Anderson

# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

CON...

300 WASHINGTON S
P. O. BOX F
SELMA, AL 36702-03
(205) 874-1600

March 8, 1994

Mrs. Jan Autery
c/o Alabama Dept. of Youth Services
P. O. Box 66
Mt. Meigs, Alabama  36057

Dear Mrs. Autery:

We are currently in the process of attempting to determine the appropriate placement for one of our EC students. His name is Matthew Gerro Reeves (DOB: 12-13-77). We are presently serving him on a homebound basis but his mother wants him placed in an EC class at Eastside Middle School.

Since Matthew has been at Mt. Meigs and other juvenile facilities, I am writing to see if your department can assist us in determining an appropriate special education placement for this student. While I am aware confidentiality requirements prevent you from releasing this youngster's juvenile record, it is critical that we have a general picture of his past behavior before he is returned to a school setting. It would be extremely helpful to the decision-making process if you could let us know if Matthew has a past history of violence, aggression and association with weapons.

Any general information about this pupil's disposition would be appreciated. Please send what you can to me in care of the Selma City Schools, P. O. Box F, Selma, AL  36701. Thank you in advance for your cooperation and assistance.

Sincerely,

Milton Slauson

Milton Slauson, Ph.D.
Special Education Coordinator

cmr

pc: Mr. James H. Carter
    Mrs. Edna Anderson

CONFIDENTIAL

Matthew Reeves –
– Ms. Marzetta Reeves – Mother –

– Parent came, Matthew needs
to continue with Homebound Service
– Have not received notice from
Dr. Carter to discontinue home-
bound services

3/1/95
Mother wants Homebound for Matthew said
he can't be trusted at sch.

CONFIDENTIAL

# SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON ST.
P. O. BOX F
SELMA, AL 36702-0318
(205) 874-1600

## MEMORANDUM

TO:     James Carter

FROM:   Milton Slauson

DATE:   March 24, 1994

I spoke with Jan Autery of Mt. Meigs yesterday about my letter to her requesting info on Matthew Reeves. She stated that she had discussed the case with their attorney and that they could only release educational records to us. Based on our inability to get information concerning Matthew's juvenile file and the likelihood that a violent past is compiled in such a file, I recommend that you take this case to district court and attempt to get Matthew Gerro Reeves declared a "danger to others". I think this course of action is prudent even though it might be cumbersome. If we are forced to return him to a school setting and he subsequently harms someone, we will have done all we could to have prevented it.

Before pursuing this course of action, I urge you to have Aubrey Larkin, Julia Scott and Gerald Shirley submit to you in writing any statements that they might have relative to Matthew's propensity toward violence. We need to finalize something about this case as soon as possible.

cmr

pc:  Edna Anderson



SELMA CITY SCHOOLS

OFFICE OF THE
SUPERINTENDENT

300 WASHINGTON S
P. O. BOX F
SELMA, AL 36702-03
(205) 874-1600

March 8, 1994

Mrs. Jan Autery
c/o Alabama Dept. of Youth Services
P. O. Box 66
Mt. Meigs, Alabama  36057

Dear Mrs. Autery:

We are currently in the process of attempting to determine the appropriate placement for one of our EC students.  His name is Matthew Gerro Reeves (DOB: 12-13-77).  We are presently serving him on a homebound basis but his mother wants him placed in an EC class at Eastside Middle School.

Since Matthew has been at Mt. Meigs and other juvenile facilities, I am writing to see if your department can assist us in determining an appropriate special education placement for this student.  While I am aware confidentiality requirements prevent you from releasing this youngster's juvenile record, it is critical that we have a general picture of his past behavior before he is returned to a school setting.  It would be extremely helpful to the decision-making process if you could let us know if Matthew has a past history of violence, aggression and association with weapons.

Any general information about this pupil's disposition would be appreciated.  Please send what you can to me in care of the Selma City Schools, P. O. Box F, Selma, AL  36701.  Thank you in advance for your cooperation and assistance.

Sincerely,

Milton Slauson

Milton Slauson, Ph.D.
Special Education Coordinator

cmr

pc:  Mr. James H. Carter
     Mrs. Edna Anderson

# NON PRESCRIPTION MEDICINE LOG

RESIDENT _Mathew Reeves_            DOB: _December 17, 1977_

DATE ENTERED: _January 24, 1995_        ALLERGIES: _____

| MEDICINE | AMOUNT | DATE | TIME a.m. or p.m. | STAFF SIGNATURE |
|---|---|---|---|---|
| Renewed 1-3-95 | _Beze_ | | | |
| " 2-27-95 | _Beze_ | | | |
| " 3-31-95 | CBeze | | | |
| " 4-26-95 | CBeze | | | |
| Neosporin | | 5-18-95 | 8:15 | Ann Cooper |
| Renewed 5-30-95 | CBeze | | | |



DEFENDANT'S



**STATE OF ALABAMA**
## DEPARTMENT OF YOUTH SERVICES
## MOBILE GROUP HOME
**563 Stanton Street**
**Mobile, AL 36117**
Telephone: (205) 478-3339

CHANDLER L. BEANE
Facility Director



GEORGE M. PHYFER
Director

January 31, 1995

Ms. Marzetta Reeves
2128 Selma Avenue
Selma, AL  36701

Dear Ms. Reeves:

To assist us in providing health services for your child, please fill in your health insurance information:

INSURANCE: _____ YES   X  NO

COMPANY _____

ADDRESS _____

_____

POLICY NO. _____

Sincerely,

Chandler L. Beane
Director

smm

496

MOBILE GROUP HOME

## CONSENT FOR TREATMENT AND RELEASE OF MEDICAL INFORMATION

Child's Name: _Matthew G. Reeves_   Date of Birth: _12|13|77_

I hereby authorize any physician, hospital, or dentist to provide any examination and/ or treatment as, in his opinion, is necessary for the above-named child. I further authorize any physician, dentist, hospital, or clinic to furnish the Department of Youth Services' Mobile Group Home or its authorized agent any verbal or written information pertaining to the present or past state of health and medical treatment given to my child. I/we also agree to be financially responsible for the care of any pre-existing medical conditions and/or any self-inflicted injuries while in the custody of DYS and give permission for the hospital/physician to file a direct claim to the insurance company or Medicaid on my behalf. I authorize that a photocopy of this release may be considered as valid as the original.

(F)

_Marietta Reeves_                    _2/2/95_        _Mother_
SIGNATURE                            DATE            RELATIONSHIP TO YOUTH

_____        _____        _____
WITNESS                        Date            Address

_205-873-7309_
Telephone number                              _____
                                              Medical Insurance Company

                                              _000 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 4_
_____                       Medicaid Number
Policy Number

Pre-existing medical condition: _has emotional conflict_
_(and have trouble breathing, sensitive, hoarse_
Allergies: _sinus, Prisantinol_                                    _throat)_
Medication: _was taking in_
_for highersactive_

TO: Authorized Physician, Dentist, Hospital, or Clinic

The above-named child is referred to you for medical treatment. It is requested the bill be mailed to the parents/guardian, insurance company, or Medicaid as listed above. In the absence of proper consent for treatment, I am authorizing medical treatment in accordance with Sections 44-1-33, Code of Alabama.

_____        _____
Authorized Agent               Address

_____
Date
_____

TO: _____

Reason for Referral: _____

_____

Diagnosis/Treatment: _____

_____

_____

'497

# MOBILE GROUP HOME

## HEALTH SCREENING

FULL NAME OF RESIDENT: _Matthew Cerro Reeves_   Birthdate: 12 - 13 - 77

COUNTY: _Dallas_          DATE OF SCREENING: 1-26-95

HAS THE RESIDENT EVER:                          Explain if Yes

| | | | |
|---|---|---|---|
| a. | been knocked out | Yes____ No__X__ | |
| b. | had concussion | Yes____ No__X__ | |
| c. | had heat exhaustion or heat stroke | Yes_X_ No____ | heat exhaustion 1 x |
| d. | had a head or neck injury | Yes_X_ No____ | head busted long time ago |
| e. | had a back or spinal injury | Yes____ No__X__ | |
| f. | fainted while doing exercising | Yes____ No__X__ | |
| g. | had chest pain while exercising | Yes____ No__X__ | |

DOES THE RESIDENT:

| | | | |
|---|---|---|---|
| a. | wear glasses or contact lenses | Yes____ No__X__ | |
| b. | wear dental app. or hearing aids | Yes____ No__X__ | |
| c. | have any chronic illnesses (i.e. diabetes, asthma, seizures) | Yes____ No__X__ | |
| d. | have any missing parts (i.e. kidney, fingers) | Yes____ No__X__ | |

HAS THE RESIDENT EVER BROKEN A BONE OR HAD A CAST ON:

| | | | |
|---|---|---|---|
| a. | hand | Yes_X_ No____ | 2 fingers |
| b. | wrist | Yes____ No__X__ | |
| c. | arm | Yes____ No__X__ | |
| d. | foot | Yes____ No__X__ | |
| e. | ankle | Yes____ No__X__ | |
| f. | leg | Yes____ No__X__ | |
| g. | other | Yes____ No__X__ | |

In the past year has the student broken
a bone while playing sports   Yes____ No__X__ _____

ADDITIONAL COMMENTS: _____
_____
_____

Page 2

RESIDENT NAME: _Matthew Reeves_

## A. HAVE YOU EVER:

1. Stayed overnight in a hospital? Yes _X_ No ____ _pneumonia_
2. Had an operation? Yes ____ No _X_
3. Had Asthma, Seizures, Sickle-Cell. Diabetes? Yes ____ No _X_
4. Had High Blood Pressure? Yes ____ No _X_
5. Had a heart murmur or heart problems? Yes ____ No _X_
6. Had a sexually transmitted disease (STD)? Yes ____ No _X_
7. Been treated for a drug problem? Yes ____ No _X_
8. Had a mental or behavioral prob.? Yes ____ No _X_
9. Been stabbed or shot? Yes _X_ No ____ _Stomach_
10. Broken any bones? Yes _X_ No ____ _2 fingers_
11. Thought about killing yourself? Yes ____ No _X_
12. Tried to commit suicide? Yes ____ No _X_
13. Taken medicine every day? Yes _X_ No ____ _hyperactive medication 91-92_

## B. DO YOU HAVE:

1. Medical complaints today? Yes ____ No _X_
2. Allergies (i.e. grass, food, medicine)? Yes _X_ No ____ _Catsup (but still eats it)_
3. Drug Allergies? Yes _X_ No ____ _Penicillin_
4. Chest pains? Yes ____ No _X_
5. Headaches or sinus problems? Yes ____ No _X_
6. Abdominal or stomach pains? Yes ____ No _X_
7. A penile discharge or burning on urination? Yes ____ No _X_
8. Back or joint problems? Yes ____ No _X_
9. All your immunizations (last Tetanus)? Yes _X_ No ____
10. Do you have a dental problem? Yes ____ No _X_
11. Do you have a contagious cond.? Yes ____ No _X_

## C. DO YOU:

| | | Yes | No | |
|---|---|---|---|---|
| 1. | Take any medication now? | | X | |
| 2. | Use contraception? | X | | |
| 3. | Smoke cigarettes? | X | | |
| 4. | Regularly drink alcohol? | | X | |
| 5. | Regularly smoke marijuana? | | X | |
| 6. | Regularly use drugs? | | X | |

7. If drug use, describe types used, method of use, amounts used, frequency of use, date or time of last use, and problems occuring after ceasing use: _Smokes Cigarettes_

## D. FAMILY HISTORY (MOTHER, FATHER, SISTERS, BROTHERS)

| | | Yes | No | |
|---|---|---|---|---|
| 1. | Drug or alcohol problems? | X | | Grandfather drinks alot |
| 2. | Diabetes, Sickle-Cell, Cancer, (Seizures?) | X | | Stepfather |
| 3. | Heart disease/high blood pressure? | X | | Grandmother died w/ hi blood press. |
| 4. | Sudden unexpected death? | | X | |
| 5. | Been shot to death? | | X | |

ADDITIONAL COMMENTS: _____

_____

_Resident Signature_

_Blaire / M.H. Director_
_Signature/Title of Screening Staff_

_1-26-95_
_Date_

Page 4

## INTAKE SCREEN

## MENTAL HEALTH

RESIDENT NAME: _Matthew Reeves_   SSN: _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_

DATE: _____   TIME: _____

RECORDER: _Blane_   COUNTY: _Dallas_

ORIENTATION UNIT: Mobile Group Home

DIRECTIONS: Any question answered with a YES should be explored for what, when, where, why, and how. Circle the response.

1.  Yes  (No)  Have you recently or in the past received treatment or been hospitalized for any mental disturbance(s)/suicidal behaviors?

2.  Yes  (No)  Do you have a problem sleeping at night?

3.  Yes  (No)  Have you ever tried to hurt yourself or commit suicide?

4.  Yes  (No)  Are you currently on any medication?

5.  (Yes)  No  Have you ever tattooed or cut yourself?   187  on right arm

6.  Yes  (No)  Were you drinking or on drugs when you got in trouble?

7.  Yes  (No)  Did your offense involve an assaultive or threatening behavior or the use of a weapon?

8.  Yes  (No)  Were you ever abused physically or sexually?

9.  Yes  (No)  Have you ever heard voices?

10. Yes  (No)  Have you ever participated in activities that would make you at risk for the AIDS virus?

11. (Yes)  No  Have you or your parents seen a psychologist or counselor for any problems?
    Mental Health bldg for counseling (family oriented)

Page 5

## OBSERVATION:

Normal
Abnormal          1.  Behavior (state of consciousness, mental status, appearance, conduct, tremor, sweating)

Yes   No          2.  Body deformities, condition of skin (needle marks, trauma markings, bruises, lesions, jaundice, rashes and infestation)

ADDITIONAL COMMENTS: _____

_____

_____

## DISPOSITION:

_____   1.  Housed with general population and instructed to make sick call for medical and/or dental care.

_____   2.  Housed with general population and prompt referral appointment with health provider.

_____   3.  Referred to appropriate health provider on an emergency basis.

_____   4.  Housed with general population **NO** special medical problems apparent nor reported.

_____   5.  Medical staff notified of special problems.

I have received instruction as to the procedure for obtaining health care (medical, dental, mental health). It has been explained to me and I understand how to obtain health care.

_____          _____
Resident Signature                 Signature/Title of Screening Staff

502

Mathew Gerro Reeves
12-13-77
SS# 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
Medcaid # 00423-15-7683
Male     Age 15
Sinus               Pain in bladder party
A little trouble breath
He is Highperactive
He suffers from Emotion don-tek
He do have permission to mer
4 he can buy his ???
he can call home.
he has one little brother and
one sister younger than him
yes, he can do work
I'll sorry you all need to send
the paper again becauses
lost the Other.
No other insurance
        Ms. Marietta Reeve
        Thanks for your
        Cooperation
P.S. I do give him permission
to go all the ??? to ???

503



**MICHAEL G. FOLEY**
Facility Director

Alabama Youth Services
**MOBILE GROUP HOME**
563 Stanton Road
Mobile, Alabama 36617
Telephone (205) 478-3339



**GEORGE M. PHYFER**
Executive Director

April 13, 1993

Ms. Marzetta Reeves
2128 Selma Avenue
Selma, AL  36701

Dear Ms. Reeves:

To assist us in providing health services for your
son _____, _Mathew_____, please include your health
insurance information:

INSURANCE:  _____YES   __X__ NO

COMPANY  _____

ADDRESS  _____

_____

POLICY NO. _____

Sincerely,

Michael G. Foley
Director

scc

534

CONSENT FOR TREATMENT AND RELEASE OF MEDICAL INFORMATION

Child's Name: _Mathew G. Reeves_   Date of Birth: _12/13/77_

I hereby authorize any physician, hospital, or dentist to provide any examination and/
or treatment as, in his opinion, is necessary for the above-named child. I further
authorize any physician, dentist, hospital, or clinic to furnish the Department of
Youth Services' Mobile Group Home or its authorized agent any verbal or written infor-
mation pertaining to the present or past state of health and medical treatment given
to my child. I/we also agree to be financially responsible for the care of any pre-
existing medical conditions and/or any self-inflicted injuries while in the custody
of DYS and give permission for the hospital/physician to file a direct claim to the
insurance company or Medicaid on my behalf. I authorize that a photocopy of this re-
lease may be considered as valid as the original.

_Marzetta Reeves_   4/15/93   _Mother_
SIGNATURE                DATE   RELATIONSHIP TO YOUTH

_2128 Selma Ave_
Address

WITNESS _____   DATE _____

_872-7209_
Telephone number

_____
Medical Insurance Company

POLICY NUMBER _____

_000 433-15-76834_
Medicaid Number

Pre-existing medical condition: _High perineteni, hi side_
_to go to Mental Health Center in Selma_
Allergies: _Sinus, hay fever_
Medication: _Mellarel 50 mg 2at night_

------------------------------------------------

TO: Authorized Physician, Dentist, Hospital, or Clinic

The above-named child is referred to you for medical treatment. It is requested the
bill be mailed to the parents/guardian, insurance company, or Medicaid as listed
above. In the absence of proper consent for treatment, I am authorizing medical
treatment in accordance with Sections 44-1-33, Code of Alabama.

Authorized Agent _____   Address _____

Date _____

------------------------------------------------

To: _____

Reason for Referral: _____

Diagnosis/Treatment: _____

Physician _____

CLINIC CHART

505

Student... Reeves, Matthew Gewn .. Age.. 15 ..... ID. No............

Entrance Date: .... 2-2-93 .... Alergies: ..... Ketchup ............

| Date | Remarks |
|------|---------|
| 3/1/93 | C/o Lt 3rd finger being jambed. No swelling noted some tenderness noted around the knuckle area. ⊞ Moist heat to finger three times a day. —J. Harris LPN |

```
034-                  MR       SET TH P768
TIME 1410                                      CLINICAL INFORMATION
SRC- THROAT                      DOB:          PHYSICIAN ID.          PATIENT ID.
SW                               12/13/77              WILSON
PATIENT NAME          681-8341      SEX  AGE (YR./MOS.)  ACCOUNT
REEVEY    , MATTHEW    M   015/01     ALABAMA YOUTH SERVICE          01830
PT. ADD.                                                               03
                                      P O BOX 9486                     03
DATE OF SPECIMEN  DATE ENTERED  DATE REPORTED   CHALKVILLE      , AL  35218-
                                                205-681-8341
```

| TEST | RESULT | LIMITS |
|------|--------|--------|

UPPER RESPIRATORY CULTURE        PRELIMINARY REPORT

    ROUTINE ORAL FLORA
    HEAVY GROWTH

        DIRECTOR:    JAMES A DAVIS III     MD
IF YOU HAVE ANY QUESTIONS CONTACT - BRANCH: 205-581-3600 LAB: 800-621-8037
        FINAL REPORT WILL FOLLOW

| PATIENT NAME | | | | PATIENT ID. | | | SPEC. NO. | | SPEC. DATE | |
|---|---|---|---|---|---|---|---|---|---|---|

| BONE | | ELECTROLYTES | | | HEART | | LIVER | | | | LIPIDS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Calcium mg/dl (8.5-10.6) | Phosphorus mg/dl (2.5-4.9) | Sodium mEq/L (135-148) | Potassium mEq/L (3.5-5.5) | Chloride mEq/L (94-109) | LDH IU/L (100-250) | AST (SGOT) IU/L (0-50) | T. Bili mg/dl (0.1-1.2) | GGT (IU/L) (M 0-65) (F 0-45) | ALT (SGPT) IU/L (0-50) | Alk. Phos. IU/L (40-150) | Cholesterol mg/dl < 200 | Triglycerides mg/dl (10-250) |

| PROTEIN | | | | KIDNEY | | THYROID | | | | MISCELLANEOUS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T. Protein g/dl (6.0-8.5) | Globulin g/dl (1.5-4.5) | Albumin g/dl (3.5-5.5) | A/G Ratio (1.1-2.5) | BUN mg/dl (7-26) | Creatinine mg/dl (0.5-1.5) | T4 µg/dl (4.5-12.5) | T3 Uptake % (33-45) | Free T4 Index (1.5-5.6) | TSH µIU/ml (.25-4.50) | Uric Acid mg/dl (M 2.2-8.7) (F 1.5-6.7) | Glucose mg/dl <50 yrs. (60-115) | Iron µg/dl (40-180) |

| HEMATOLOGY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RBC x10⁶/µl (M 4.30-5.60) | HGB g/dl (M 13.5-17.0) | HCT % (M 40-51) | MCV fl (81-95) | MCH pg (27.0-33.0) | MCHC g/dl (32.5-35.5) | Platelets x 10³/µl (150-415) | WBC x 10³/µl (4.1-10.3) | Polys x10³/µl (1.8-7.8) | Bands (0-5%) | Metas (0%) | Lymons x10³/µl (0.7-4.5) | Mono x10³/µl (0.1-1.0) | EOS x10³/µl (0.0-0.4) | BASO x10³/µl (0.0-0.2) |

RESULTS ARE JUDGED IN ACCORDANCE WITH AGE DEPENDENT REFERENCE RANGES WHICH ARE SUMMARIZED ON THE BACK OF THIS REPORT   REPORT

ALAB.   OUTH SERVICES

SCREENING PHYSICAL                    001

FULL NAME OF STUDENT __Matthew Gerro Reeves__   BIRTHDATE __12 - 13-7__
                        FIRST    MIDDLE    LAST              MONTH   DAY
AGE __15__   SEX __Male__   RACE: BLACK __✓__   WHITE____   OTHER____

HAS THE STUDENT EVER:                                      EXPLAIN IF YES
a. been knocked out..........................YES___ NO _✓_ _____
b. had a concussion..........................YES___ NO _✓_ _____
c. stayed overnight in a hospital last yesr...YES _✓_ NO___ _pneumonia_
d. had an operation..........................YES___ NO _✓_ _____

e. had heat exhaustion or heat stroke..(last..YES _✓_ NO___ Shummer play basketball pla
f. had a head or neck injury.................YES _✓_ NO___ stitches in (left) head last
g. had a back or spinal injury..............YES___ NO _✓_ _____
h. had a heart murmur.......................YES___ NO _✓_ _____
i. had high blood pressure..................YES___ NO _✓_ _____
j. had a heart problem......................YES___ NO _✓_ _____
k. fainted while doing exercise.............YES___ NO _✓_ _____
l. had chest pain while exercising..........YES _✓_ NO___ Sucked but quit
m. had wheezing/S.O.B. while exercising......YES _✓_ NO___ when running

DOES THE STUDENT:
a. take medicine every day..................YES___ NO _✓_ _____
b. wear glasses or contact lenses...........YES___ NO _✓_ _____
c. wear dental appliances or hearing aids...YES___ NO _✓_ _____
d. have any allergies.......................YES _✓_ NO___ Ketchup
e. have any chronic illnesses (i.e.diabetes,
     asthma, seizures)......................YES___ NO _✓_ _____

f. have any missing parts (i.e.kidney, fingers).YES___ NO _✓_ _____

HAS THE STUDENT'S MOTHER, FATHER,BROTHERS OR SISTERS EVER HAD ANY HEART PROBLEMS BEF
50 YEARS OF AGE............................YES___ NO _✓_

HAS THE STUDENT EVER BROKEN A BONE OR HAD A CAST ON
a. hand.....................................YES___ NO _✓_ _____
b. wrist....................................YES___ NO _✓_ _____
c. arm......................................YES___ NO _✓_ _____
d. foot.....................................YES___ NO _✓_ _____
e. ankle....................................YES___ NO _✓_ _____
f. leg......................................YES___ NO _✓_ _____
g. other....................................YES___ NO _✓_ _____

IN THE PAST YEAR HAS THE STUDENT BROKEN A BONE
   WHILE PLAYING SPORTS.....................YES___ NO _✓_ BONE_____
                                                         ACTIVITY_____
ADDITIONAL COMMENTS_____

_____

_____

508

## PHYSICAL EXAMINATION

HEIGHT __63¾__ (Ins.) WEIGHT __117__ (lbs.) BLOOD PRESSURE __110/90__ PULSE __78__ beat:
Systolic/diastolic

VISION: Right 20/__30__ Left 20/__30__ Corrected _____ Uncorrected __✓__

Date of last menstrual period _____

|  | CHECK ONE | | EXPLAIN IF ABNORMAL |
|---|---|---|---|
| 1. Skin..........................Normal | | Abnormal | |
| 2. Head and neck.................Normal | | Abnormal | |
| 3. Eyes..........................Normal | | Abnormal | |
| 4. Ears, norse and throat.......Normal | | Abnormal | |
| 5. Teeth and mouth..............Normal | | Abnormal | |
| 6. Lungs and chest..............Normal | | Abnormal | |
| 7. Cardiovascular...............Normal | | Abnormal | |
| 8. Abdomen and Lymphatics.......Normal | | Abnormal | |
| 9. Genitalia/Hernia.............Normal | | Abnormal | |
| 10. Orthopedic Screening: | | | |
| a. upper extremities..........Normal | | Abnormal | |
| b. lower extremities..........Normal | | Abnormal | |
| c. spine and back.............Normal | | Abnormal | |
| 11. Neurological................Normal | | Abnormal | |

ADDITIONAL COMMENTS:

OP 51 Med

Hb Wheezing or running C cl Today

Na T Coltune

Amox 500 rtd #30 → N/C

N/C Any Wheezing

E Mycin 333 rtd #30

EXAM DONE BY _____ DATE _____

__✓__ APPROVED FOR PROGRAM - NO RESTRICTIONS

____ APPROVED WITH RESTRICTIONS _____

____ UNABLE TO PARTICIPATE IN PROGRAM _____

_____ APPROVED BY _____



JAMES N. CALDWELL,
Superintendent

P.O. Box 898
Birmingham, Alabama 35215
Telephone (205) 681-8841

GEORGE W. PHYFE
Director

<u>PATIENT CONSENT TO TREATMENT FORM</u>

_____    _____    _____
Name of Patient            Age        Admission Date/Time

_____
Name and Address of Spouse or Parent

1. I hereby authorize the Department of Youth Services, its
   employees, agents, physicians, dentists, psychiatrists
   and/or such assistants as may be selected by him/her to
   treat the condition(s) which appear indicated by the
   diagnostic studies already performed.

2. Should surgical or diagnostic procedure(s) become
   necessary, I will be informed of them with regard to
   alteration modes of treatment, the risks involved, and
   the nature of the procedure(s) to be done.

3. This in no way constitutes a warranty or guarantee that
   my present condition will be cured; Department of Youth
   Services, its staff and employees will provide me with
   the best possible care available, but no assurance of
   cure is to be assumed.

4. I sign this willingly and voluntarily in full
   understanding of the above, and in so doing I release
   the Department of Youth Services, its directors, its
   staff employees, agents and physicians from any and all
   liability which may arise from this action, whether or
   not foreseen at present.

_____         x Matthew Reeves
Witness                         Patient Signature

_____         2-2-93
Witness                         Date

# STATE OF ALABAMA
# CERTIFICATE OF IMMUNIZATION

(Invalid without proper expiration date)

NAME OF CHILD

DATE OF BIRTH

SIGNATURE OF PARENT OR GUARDIAN

**DIPHTHERIA, TETANUS, PERTUSSIS (DTP, DT, OR Td) VACCINE** (Circle One)

SCHOOL/KINDERGARTEN ENTRY
At least four (4) injections—last dose must be administered after the child's fourth birthday.
DAYCARE/HEAD START ENTRY
At least one (1) dose required on admission. Additional doses at appropriate age schedule.

| DTP/DT/Td | DTP/DT/Td | DTP/DT/Td | DTP/DT/Td | Td Booster |
|---|---|---|---|---|
| Date | Date | Date | Date | Date |
| MO DAY YEAR | MO DAY YEAR | MO DAY YEAR | MO DAY YEAR | DAY YEAR |

**POLIO VACCINE**

SCHOOL/KINDERGARTEN ENTRY
At least three (3) doses—last dose must be administered after child's fourth birthday.
DAYCARE/HEAD START ENTRY
At least one (1) dose required on admission. Additional doses at appropriate age schedule.

| POLIO | POLIO | POLIO | POLIO |
|---|---|---|---|
| Date | Date | Date | Date |
| MO DAY YEAR | MO DAY YEAR | MO DAY YEAR | MO DAY YEAR |

**MMR—MEASLES, MUMPS, RUBELLA COMBINED**
(Required for entry into school and day care/Head Start attendance 15 months of age or older.)

| MMR |
|---|
| Date |
| MO DAY YEAR |

**HIb—HAEMOPHILUS INFLUENZA TYPE b VACCINE**
(Required only for Day Care/Head Start attendees 18 months of age or older and younger than 5 years of age.) (School entry not required.)

| HIb | Other |
|---|---|
| Date | Date |
| DAY YEAR | DAY YEAR |

I certify that the child has received all of the above noted immunizations as required for school or day care attendance and is in compliance with rules set forth by the Alabama State Board of Health.

Authorized Medical Signature          Date

Dallas County Health Dept.
P. O. Box ____

Place of Issue/County Health Dept. ☐ Private Physician/Clinic

Use to school, day care, and Head Start entrees to document children who have completed or in the process of completing their immunizations.

ADPH-F-IMM-50/Rev. 1-89

CAHABA CENTER FOR MENTAL HEALTH

Name and Case No.: Matthew Reeves   8144

Service Mode: _____

TREATMENT PROGRESS NOTES

Primary Therapist: _____

| DATE | FORMAT-- (1) Current condition of client, (2) Description of session, (3) Progress toward attainment of goal(s), (4) Plans, and (5) next appointment. |
|------|------|
| 8-10-92 | Matthew is an almost 15 year old black male with a Conduct Disorder, ADHD and a Chaotic Home who hasn't been in any trouble with the Law. He reports that his brother Julius is still at the VACCA Campus. Mother request that Juluis be on some medication. Matthew will stay up to 4:30 in the morning watching TV and then gets up at noon. His Grandmother hollers at him quite a bit.<br>MENTAL STATUS EXAM: A friendly, adolescent black male with an earring in his left ear. He is very talkative. Says "I am not depressed".<br>IMPRESSION: ADHD<br>        Conduct Disorder<br>        Chaotic Home<br>PLAN: Increase Imipramine 75 mg  q hs   #90 x 3<br>     RTC  4 months<br><br>Timothy Baltz, M.D.<br>Psychiatrist<br><br>jb |

RECEIVED NOV 3 0 1992

Copy to J. Scott & D. Stewart
11-30-92

#16A5**512**
March 1990

SELMA CITY SCHOOLS
SPECIAL EDUCATION PROGRAM
P.O. BOX F
SELMA, AL 36702-0318
(205) 874-1613

VISION SCREENING FORM

STUDENT'S NAME: _Matthew Reeves_

SCHOOL: _East End_

PARENT(S) NAME: _Marzetta Reeves_     GRADE: _____

ADDRESS: _2128 Selma Avenue_     BIRTHDATE: _12/13/77_

KEY:  P = PASS   F = FAIL

SCREENING DATE: _4/29/92_          RECHECK DATE: _____

| | FAR | NEAR | FAR | NEAR |
|---|---|---|---|---|
| BOTH EYES: | 20/20 | 20/20 | | |
| RIGHT EYE: | 20/20 | 20/20 | | |
| LEFT EYE: | 20/20 | 20/20 | | |

Examiner: _M. Jones_          Examiner: _____

Instrument used: _Keystoneview_     Instrument used: _____

REMARKS:                          REMARKS:
__✓__ Within Normal Limits        _____ Within Normal Limits
_____ Needs Recheck              _____ Needs Recheck
_____ With Glasses               _____ With Glasses
_____ Needs Referral             _____ Needs Referral

Resolution of Problem: _____

_____

_____

_____

#16B
March 1990

513

SELMA CITY SCHOOLS
SPECIAL EDUCATION PROGRAM
P.O. BOX F
SELMA, AL 36702-0318
(205) 874-1613

HEARING SCREENING FORM

STUDENT'S NAME: *Matthew Reeves*

SCHOOL: *East End*

PARENT(S) NAME: *Marzetta Reeves*   GRADE: *05*

ADDRESS: *2128 Selma Avenue*   BIRTHDATE: *12/13/77*

KEY:  P = PASS   F = FAIL

HEARING:  Puretone Audiometry/Tympanometry
CRITERIA:  A child fails the screening test if he/she does not respond to any one tone (frequency) at 20dB
hearing level in either ear.

| Screening Date: 4-24-92 | | | | Recheck Date: | | | | |
|---|---|---|---|---|---|---|---|---|
| EAR | HL | FREQUENCY HZ | | | EAR | HL | FREQUENCY HZ | | |
| | | 1000 | 2000 | 4000 | | | 1000 | 2000 | 4000 |
| RE | 20 | 20 | 20 | 20 | RE | 20 | | | |
| LE | 20 | 20 | 20 | 20 | LE | 20 | | | |

Examiner: *Bonner*                Examiner: _____
Audiometer: *Caltion*             Audiometer: _____
Last Calibration Date: *8/1/91*   Last Calibration Date: _____

Tympanometry: RE *normal*         Tympanometry: RE _____
            LE *normal*                       LE _____
Remarks:                          Remarks:
✓ Within Normal Limits            ___ Within Normal Limits
___ Needs Rescreen (within        ___ Needs Rescreen (within
    two weeks)                        two weeks)
                                  ___ Needs Referral

Resolution of Problem: _____



# STATE OF ALABAMA
## CERTIFICATE OF IMMUNIZATION
*(Invalid without proper expiration date)*

515

Birth and Immunization Certificate Verification

I. Name _Reeves, Mathew Cerro_

II. Date of Registration _8/13/87_  Previous School _Clark_

III. Birth Certificate # _101-77-57807_ Date of Birth _12/13/77_
City of _Selma_  State of _AL_

IV. Social Security # _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_

V. Immunization Certificate———— ⊠ YES _8/4/87_

☐ NO——If no, date of expected completion.

( _____ )

---

_Matthew Reeves_                    _12-13-77_                    _Manzella_
Name of Child                        Date of Birth                 Parent or Guardian

I certify that the child named above meets minimum immunization standards and is in compliance with regulations
set forth by the Alabama Department of Public Health.

**CERTIFICATE**

DIPHTHERIA, TETANUS, PERTUSSIS (DTP, DT or Td) VACCINE
At least three (3) injections. It is recommended that at least one dose be administered after the
child's fourth birthday.  | _5_ | Total Doses Received | _6-82_ | Date of Last Dose
POLIO VACCINE
At least three (3) doses of Trivalent Oral Polio vaccine. It is recommended that at least one dose be
administered after the child's fourth birthday.  | Total Doses Received | _6-82_ | Date of Last Dose

**OF**

RUBEOLA (Measles) VACCINE
One (1) dose of vaccine.  | Date Received
RUBELLA (German Measles) VACCINE
One (1) dose of vaccine.  | _2-79_ | Date Received

SINGLE
OR
COMBINATION

MUMPS VACCINE
One (1) dose of vaccine.  | Date Received

_Tom M. Poole_ Administrator
Authorized Medical Signature                             _8-4-87_
                                                          Date

**IMMUNIZATION**

ALABAMA DEPARTMENT OF PUBLIC HEALTH
BUREAU OF CLINICAL SERVICES                   To be filed with School Health Record.

516

_Reeves Matthew_                     _12-13-77_                     _Mrs. _____
Name of Child                          Date of Birth                 Parent or Guardian

    I certify that the child named above meets minimum immunization standards and is in compliance with regulations set forth by the Alabama Department of Public Health.

DIPHTHERIA, TETANUS, PERTUSSIS (DTP, DT or Td) VACCINE
    At least three (3) injections. It is recommended that at least one dose be administered after the child's fourth birthday.    **3** Total Doses Received    **6/82** Date of Last Dose

POLIO VACCINE
    At least three (3) doses of Trivalent Oral Polio vaccine. It is recommended that at least one dose be administered after the child's fourth birthday.    **3** Total Doses Received    **6/82** Date of Last Dose

RUBEOLA (Measles) VACCINE
    One (1) dose of vaccine.    **2/79** Date Received

RUBELLA (German Measles) VACCINE
    One (1) dose of vaccine.    **2/79** Date Received

MUMPS VACCINE
    One (1) dose of vaccine.    Date Received

SINGLE OR COMBINATION

_____                     **8-13-85**
Authorized Medical Signature                     Date

ALABAMA DEPARTMENT OF PUBLIC HEALTH
BUREAU OF CLINICAL SERVICES

To be filed with School Health Record.

ADPH-F-IMM-50/Rev. 1-83

_Matthew Reeves_                _12-13-11_              _L. Reeves_
Name of Child                    Date of Birth              Parent or Guardian

I certify that the child named above meets minimum immunization standards and is in compliance with regulations set forth by the Alabama Department of Public Health.

CERTIFICATE    Exp. 6/92

**DIPHTHERIA, TETANUS, PERTUSSIS (DTP, DT or Td) VACCINE**
At least three (3) injections. It is recommended that at least one dose be administered after the child's fourth birthday.     | 5 | Total Doses Received   | 6-82 | Date of Last Dose

**POLIO VACCINE**
At least three (3) doses of Trivalent Oral Polio vaccine. It is recommended that at least one dose be administered after the child's fourth birthday.     | 5 | Total Doses Received   | 6-82 | Date of Last Dose

**RUBEOLA (Measles) VACCINE**
One (1) dose of vaccine.     | 2-79 | Date Received

**RUBELLA (German Measles) VACCINE**      SINGLE
One (1) dose of vaccine.     OR     | 2-79 | Date Received
                            COMBINATION
**MUMPS VACCINE**
One (1) dose of vaccine.     | 2-79 | Date Received

_S. B. Weldon  P.A._

OF IMMUNIZATION

                              10-9-84
                              Date

e filed with School Health Record.

STATE OF ALABAMA
CERTIFICATE OF LIVE BIRTH

BIRTH NO. 101-       -77  57807

MATHEW GERRO REEVES

MALE       SELMA          DALLAS    02-4023

SELMA       NEW VAUGHAN MEMORIAL HOSPITAL

MARZETTA    (MXM)  REEVES   ALABAMA  01 17:  BLACK

ALABAMA     DALLAS    SELMA      124023

2126 SELMA AVENUE            N/A

_Marzetta Reeves_          75, 1977

_D. A. McDonough_
G. L. McDONOUGH, M.D.
SELMA, ALABAMA              75, 1977

1-3-78    _Forest E. Ludden_

I, Forest E. Ludden, Ed.D., State Registrar of Vital Statistics, certify this is a microfilm copy of an original certificate of birth filed in the Bureau of Vital Statistics, State of Alabama, Department of Public Health, Montgomery, AL, and have caused the official seal of the Bureau of Vital Statistics to be affixed.

_Forest E. Ludden_
Forest E. Ludden, Ed.D., State Re

October 16,

1984

```
 1                    IN THE CIRCUIT COURT OF
                      DALLAS COUNTY, ALABAMA
 2

 3      STATE OF ALABAMA,              *

 4      VS.                                      CC-97-31

 5
        MATTHEW REEVES,
 6                                        FEB 1999
             Defendant.                     Filed
 7                                        W A Kynard,
                                            Clerk
 8                                        Dallas Co.
                                           Circuit
        Before:
 9
                Honorable Thomas ap R. Jones, Circuit Court Judge
10
                    Dallas County Courthouse, Selma, Alabama
11
                        September 17, 1997, January 26 - 31, 1998
12
                        and July 20, 1998
13

14      Appearances:

15          For the State:

16                  Edgar W. Greene, Esquire
                    Greta H. Wilson, Esquire
17
            For the Defendant:
18
                    Thomas Goggins, Esquire
19                  Marvin Wayne Wiggins, Esquire

20

21

22

23

24

25
```

                    Ann H. Armstrong, RPR        COPY

```
 1                           INDEX

 2   September 17, 1997                    Page   7

 3   January 26, 1998 - January 31, 1998   Page  17

 4   Witness                   DE     CE     RDE      RCE

 5   Suppression Hearing:

 6   Pat Grindle              538,   563,    567,

 7                            605    607     609

 8   Marzetta Reeves          568    580     589,593   590

 9   Matthew Reeves           597    599     603       604

10   Trial - Guilt Phase:

11   Joe Little               632

12   Randy Tucker             644    658

13   Sam Johnson              660

14   Greg Wanger, M.D.        662

15   Duane Smith              674

16   Brenda Suttles           682    722     744

17   Joseph Saloom            749    755     756

18   Jason Powell             758    791

19   Richard Ferrell          807

20   Julie Drinkard           810

21   Everlene Williams        813    815

22   Emanuel Suttles          816    855     875,880   877

23   Tameisha Jackson         881    892

24   Yolanda Blevins          894    908     813

25   Latosha Rodgers          914
```

Ann H. Armstrong, RPR

| | | | | |
|---|---|---|---|---|
| 1 | Augustus Lundy | 926 | 930 | |
| 2 | Pat Grindle | 931 | 958 | |
| 3 | Craig Bailey | 961 | 970 | |
| 4 | James Edwards | 971 | 991 | 992 |
| 5 | Gloria Walters | 999 | 1011 | 1013 |
| 6 | Phyllis Rollen | 1013 | | |
| 7 | Penalty Phase: | | | |
| 8 | Pat Grindle | 1118 | | |
| 9 | Marzetta Reeves | 1122 | 1141 | |
| 10 | Kathleen Ronan | 1150 | 1172 | 1178 | 1182 |
| 11 | | | | |
| 12 | Sentencing - July 20, 1998 | | Page 1230 | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

Ann H. Armstrong, RPR

|    |                                              | In Evidence |
|----|----------------------------------------------|-------------|
| 1  | EXHIBITS                                     |             |
| 2  |                                              | In Evidence |
| 3  | Court's Exhibit 1 -- Juror Excuses           |             |
| 4  | State's Exhibits                             |             |
| 5  | 1 - 6 -- Photographs                         | X           |
| 6  | 7  -  Pellets                                | X           |
| 7  | 8  -  Clothing                               | X           |
| 8  | 9  -  Waiver of Rights                       |             |
| 9  | 10  -  Waiver of Rights                      |             |
| 10 | 11  -  Permission to Search Form             | X           |
| 11 | 12  -  Jacket                                | X           |
| 12 | 13  -  White Pants                           | X           |
| 13 | 14  -  Nike Tennis Shoes                     | X           |
| 14 | 15  -  Reebok Tennis Shoes                   | X           |
| 15 | 16  -  Green blue jeans                      | X           |
| 16 | 17  -  Khaki pants                           | X           |
| 17 | 18  -  Sheet                                 | X           |
| 18 | 19  -  Beeper, lighter, cigarette butt       |             |
| 19 | 20  -  Michigan jacket                       | X           |
| 20 | 21  -  Statment of Marzetta Reeves           |             |
| 21 | 22  -  Notes of Pat Grindle                  |             |
| 22 | 23  -  Diamond cluster ring                  | X           |
| 23 | 24  -  US coins                              | X           |
| 24 | 25  -  Green ball cap                        | X           |
| 25 | 26  -  Blue and white towel                  | X           |

Ann H. Armstrong, RPR

| | | |
|---|---|---|
| 1 | 27 - Black leather jacket | |
| 2 | 28 - Adidas tennis shoes | X |
| 3 | 29 - Diagram | X |
| 4 | 30 - Photograph | X |
| 5 | 31 - Photograph | X |
| 6 | 32 - Certificates on canine | X |
| 7 | 33 - Sign out sheet for hunting camp | |
| 8 | 34 - Box that contained shotgun | X |
| 9 | 35 - Box that contained shell | X |
| 10 | 36 - Shell | X |
| 11 | 37 - Shot wadding | X |
| 12 | 38 - Shot wadding | X |
| 13 | 39 - Shotgun | X |
| 14 | 40 - 50 - Photographs | X |
| 15 | 51 - Cancelled Check | X |
| 16 | 52 - Fingerprints -- Brenda Suttles | X |
| 17 | 53 - Fingerprints -- Matthew Reeves | X |
| 18 | 54 - Fingerprints -- Julius Reeves | X |
| 19 | 55 - Fingerprints -- Brenda Suttles | X |
| 20 | 56 - 58 - Photographs | X |
| 21 | 59 - Photograph | |
| 22 | 60 - 72 - Photographs | X |
| 23 | 73 - Photograph | |
| 24 | 74 - 93 - Photographs | X |
| 25 | | |

Ann H. Armstrong, RPR

| | Defendant's Exhibits | In Evidence |
|---|---|---|
| 1 | | |
| 2 | 1 -   Signatures | |
| 3 | 2 -   Arrest Report | |
| 4 | 3 -   Statement of Brenda Suttles | |
| 5 | 4 -   Statement of Brenda Suttles | |
| 6 | 5 -   Jason Powell's records | |
| 7 | 6 -   Court record -- Frank McGill | X |
| 8 | 7 -   Carraway Records - Matthew Reeves | X |
| 9 | 8 -   School Records - Matthew Reeves | X |
| 10 | 9 -   School Records - Matthew Reeves | X |
| 11 | 10 -  Cahaba Center Records - Matthew Reeves | X |
| 12 | 11 -  DYS Records - Matthew Reeves | X |
| 13 | 12 -  Risk Assessment | |
| 14 | 13 -  Mobile Group Home Records | X |
| 15 | 14 -  School Records - Matthew Reeves | X |
| 16 | 15 -  Birth Certificate - Matthew Reeves | X |
| 17 | 16 - 28 - Photographs | X |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Ann H. Armstrong, RPR

1                      September 17, 1997

2          THE COURT:  We're here on pending motions; is that

3    correct?

4          MR. McLEOD:  Yes, sir, Your Honor, two of which -- we

5    recently filed three motions.  I believe that two of them

6    will come up at a more appropriate date at your next docket

7    on this one.  We have, however, filed a motion by

8    recommendation of the Capital Mitigation Resources Program

9    which has been assisting us with this matter because of the

10   tremendous conflicting information we have received through

11   probably I would anticipate more than 150 to 200 pages of

12   material with reference to psychological and psychiatric

13   evaluations, et cetera, for the mitigation phase of this

14   proceeding, we would need the services of a

15   neuropsychiatrist and neuropsychologist that has previously

16   been ordered in other capital cases as Mr. Greene so

17   adequately reminded  me.  And we are asking for the same

18   because in this instance the State has put us on notice that

19   they are going for the death penalty.  And the amount of

20   material that we have received through discovery from the

21   school and the Department of Youth Services is beyond our

22   ability to deal with and feel that Dr. Goff would be

23   competent to deal with that matter.  We are asking for funds

24   for him particularly in light of the exceptional nature of

25   this case and the fact that the State has made it reasonably

1  well known to me that they intend to proceed on not for just

2  life without but for the death penalty.

3      MR. GREENE:  Judge, I don't quite understand what it

4  is that they want Dr. Goff to testify to.  If he's going to

5  testify to something dealing with the Defendant's competency

6  to stand trial or competency at the time of the event, I

7  thought we kind of had some people already doing that.  So I

8  think that's been covered.

9      MR. McLEOD:  No, sir.  That's not the issue.

10     MR. GREENE:  All right.  Then the question then

11 becomes, what is it that you want him to testify to, and I

12 guess that's what I'm asking the Court I guess is to have

13 the convenience of a psychologist to talk about the

14 Defendant's various relationships with people.  I don't

15 think it's particularly pertinent to this matter, especially

16 with the price tag that he's asking the people to pay.  It

17 looks to me like three to five thousand dollars -- maybe it

18 would be better to be an expert rather than the defense

19 attorney.  But I don't see what issue we are dwelling on

20 with that kind of expense.  If it's to help them pick a

21 jury, it's a pretty expensive jury.

22     MR. McLEOD:  I've stated to the Judge I thought, and

23 I apologize if I didn't make myself clear.  This is a

24 mitigation expert who we would expect because of the

25 tremendous amount of discovery material provided to us from

Ann H. Armstrong, RPR

1   the Department of Youth Services, from the schools, from the
2   Youth Services here and all of the psychologicals and all
3   that we do have available that we are going to need someone
4   to assist us in the mitigation phase of this case.  This is
5   not for jury selection.  This is not for competency.  This
6   is for the mitigation phase of the case, and it's going to
7   be a little bit late once we finish the guilt phase of the
8   case to worry about then retaining someone to assist with
9   the preparation of the mitigation phase.
10       MR. GREENE:  I am still taking the same position.
11   This is a helper.  I mean the defense attorney can't read
12   the reports and do whatever he intends to do?
13       THE COURT:  What is it about the information that you
14   have, Mr. McLeod, that requires an expert witness is I think
15   what Mr. Greene is trying to ask.
16       MR. McLEOD:  We have a tremendous amount of
17   conflicting information that has been obtained, Your Honor,
18   that much of which could possibly be beneficial to us in the
19   mitigation phase with reference to Mr. Reeves' prior
20   conduct, prior behavior and prior significant incarcerations
21   in the juvenile system.  And we would request for Dr. Goff
22   to be -- Dr. Goff would want to prior to testifying in a
23   hearing for an opportunity to review all of that material.
24   He will want an opportunity to discuss with the people who
25   are pertinent thereto, and he will want several

Ann H. Armstrong, RPR

1   opportunities to come to Selma to meet with the Defendant

2   prior to the actual trial.  And as Mr. Greene is so well

3   aware in the prior case where the death penalty was imposed

4   very recently, the Court in that case did grant the

5   identical same motion and the identical same order.

6   However, counsel for the defense filed this at a very late

7   date.  They did not file it early on.  And Dr. Goff did not

8   have the time to adequately prepare for that hearing.

9        MR. GREENE:  That sounds like appellate talk to me.

10  I think he did testify that he was prepared, was able to

11  give what testimony he gave which basically had very little

12  to do with anything other than mental retardation.

13       MR. McLEOD:  Mr. Greene, we are talking about the

14  death penalty.

15       MR. GREENE:  I understand that, Mr. McLeod, but my

16  point is you are asking for a whole lot of money to what

17  avail, to help this man testify that the kid didn't do well

18  in school or something?  I mean you've got teachers who can

19  testify to that if that's true.  If all we are doing is

20  hiring a very expensive investigator as to his background

21  and psychology, I think we are wasting everybody's time.

22  And it looks like that's what we did last time.  And that's

23  the reason I challenge it.  If we are on the issue, is the

24  man sane; can he stand trial?  Is the man competent?  Can he

25  stand trial?  Was he competent at the time?  Can he stand

Ann H. Armstrong, RPR

1    trial?  If we are over here to hire you an expensive helper,

2    I think we are paying the two of y'all who are very

3    competent, especially you with your background.

4         THE COURT:  Do you think that this particular expert

5    is someone who can be used in the sentencing phase?

6         MR. GREENE:  He has indicated that's not what he

7    intends to use this for.

8         MR. McLEOD:  I have indicated that's exactly what I

9    want to use him for.  I do not want --

10        MR. GREENE:  In the mitigation phase, I'm sorry,

11   where sentencing is covered.  My apology, you're correct.

12   Well, in the sense, Judge, so can school teachers, mothers,

13   fathers, uncles, aunts, anybody in the world that might have

14   something to say about the Defendant.  It's just a question

15   of the propriety and the necessity of spending that kind of

16   money for an incidental witness is my point.  If there's

17   something pertinent that you think this man is going to

18   develop and evolve into, fine, but I don't think the State

19   is obligated to hire every individual that somebody might

20   come up with to go out and take polls, to get public

21   opinion.  There are just any number of things that have been

22   asked for in these cases.  To ask Dr. Goff to review school

23   records about his maladjustment, I don't know what point he

24   intends to offer him and to what benefit.  That's where I'm

25   coming from.  We have a right to know something.

1      MR. McLEOD:  I've been stating, Mr. Greene, and I

2  will state for your benefit -- I'm sure I don't have to

3  bother the Judge with it, but I have received two to three

4  hundred pages --

5      MR. GREENE:  The Judge is the one that you've got to

6  bother.  I'm not the one that has the ruling authority on

7  that.

8      MR. McLEOD:  You keep saying the same wrong thing.

9  We have received two to three hundred pages of discovery

10  material in the nature of a psychological and a psychiatric

11  information that is going to be exceptionally pertinent at

12  the penalty phase of this proceeding.  Dr. Goff has been

13  certified as an expert with Mr. Greene as the district

14  attorney at the proceeding as an expert in mitigation at a

15  hearing where Mr. Greene and I were both present at.

16      MR. GREENE:  I beg to differ on that one.  I think

17  the mitigation expert was an assistant.  He certainly wasn't

18  qualified as a mitigation expert.  He can testify as to his

19  degrees in psychology.

20      MR. McLEOD:  He was certified as an expert in the

21  case in Bibb County where he was offered for the very same

22  purpose that I want to use him for, and that is for the

23  mitigation phase.

24      MR. GREENE:  To testify to what?

25      MR. McLEOD:  To testify to this Defendant's prior

Ann H. Armstrong, RPR

13

1   problems, to testify as to the prior treatment that has been

2   given to him, to testify as to what logic and justification

3   we can have as to why rather than the death penalty life

4   without would be a very --

5         MR. GREENE:  He can't testify to that.

6         THE COURT:  Why is it that someone other than a

7   neuropsychologist can't be used for that?  Why would not

8   somebody locally be just as effective?

9         MR. McLEOD:  Judge, I am as Mr. Greene very familiar

10  with the recent case in which Dr. Goff testified.  I would

11  have no problem if the Court ordered Dr. Donald Blanton.

12        MR. GREENE:  I go back to my same point.  Neither

13  Blanton nor any other psychologist or psychiatrist is going

14  to get up here and testify that this man should or should

15  not get a penalty of death because of some psychological

16  reason.  He can testify about what he found, what problems

17  the man had.  Whatever benefit that has to the jury is fine.

18  The problem is he's going to be trying to -- what you want

19  to try to do is offer him as some sort of person who is

20  going to tell them because of psychological reasons he

21  should get this or that, and that's for the jury and the

22  Judge.  He's not going to be allowed to testify to that.

23        MR. McLEOD:  He's not going to be allowed to testify

24  --

25        MR. GREENE:  But you can get that same testimony from

Ann H. Armstrong, RPR

14

1    whoever prepared these records or whoever did these tests.

2    You are trying to just get another expensive helper.

3          MR. McLEOD:  Fifteen years of records of which I

4    can't even -- the State just simply dumped them on me.

5          MR. GREENE:  I think that's where we are.

6          THE COURT:  Let me take a look at the records, and

7    then I will make a ruling on your motion.

8          MR. McLEOD:  Thank you, Your Honor.

9          MR. GREENE:  Judge, we have got a motion in there

10   about jurors when we get to that.  It's a standard motion

11   that's filed, and I certainly don't want --

12         THE COURT:  There is a motion for you to disclose any

13   possible basis for disqualification.

14         MR. GREENE:  None.

15         THE COURT:  I would appreciate it if you would

16   respond to that in writing.  Then a motion for you to

17   disclose past or present relationships or ties between you

18   and prospective jurors.

19         MR. McLEOD:  I would ask the Court to hold that in

20   abeyance until we have our venire.

21         MR. GREENE:  I want to address it right now, and that

22   is this motion is far, far too broad.  There is no way that

23   I can get out there and somebody -- they come in later, five

24   years or ten years later and say, well, he knew so-and-so

25   who knew such-and-such that had been prosecuted through the

Ann H. Armstrong, RPR

15

1    child support unit or hadn't or whatever.  And I don't think

2    I'm required to do that.  I think it's a matter of voir

3    dire.  It's just such a broad motion.  There is no way it

4    can be safely referred to.  There is no way I can

5    communicate to that.

6        MR. McLEOD:  I think Your Honor is well aware of the

7    fact that the District Attorney's office, when they get

8    ready for trial has submitted the venire list to quite a few

9    people including his own staff to establish the relationship

10   that he has or his office or law enforcement has had with

11   each and every one of the prospective jurors.  And I think

12   at that point that motion becomes exceptionally relevant to

13   provide us with all possible information.  We do not have

14   access to NCIC.  We don't have access to the state computer

15   system.  Mr. Greene very well uses that in preparing for

16   trials, in getting himself ready.  We have no access to know

17   about any relationship with his, the information he has

18   available to him, and we have no way of ascertaining that

19   until he so chooses to give it to us.  And without a court

20   order, he is not going to choose to give it to us.

21       THE COURT:  What would constitute a relationship?

22   Can you define that for me?

23       MR. McLEOD:  A relationship between him and/or his

24   office with a prospective juror, particularly in

25   relationship where Ms. Moreland has been working with these

Ann H. Armstrong, RPR

16

1   people in an effort to try and recover them restitution.

2   Once they have had an extremely positive relationship with

3   the District Attorney's office, they would have a much

4   higher view of the District Attorney's office and his staff.

5   And those are things we will never know.

6          MR. GREENE:  You can ask.  That's why we have voir

7   dire.

8          MR. McLEOD:  Well, Mr. Greene, we intend to get on to

9   that and some other motions with the next hearing with the

10  Judge.

11         MR. GREENE:  Well, my point is that you have asked

12  for an extremely broad thing that is nothing more than a

13  trap for later on, and I'm not going to let anybody get away

14  with it.

15         THE COURT:  I don't think you're being specific

16  enough in your motion, Mr. McLeod.  I think that if you want

17  to try to ask that he disclose some specific things, that's

18  fine.  But I tend to agree.  All of this is the reason that

19  we have voir dire.  I'm sure you're going to use a great

20  deal of time on voir dire.  And even if you amend your

21  motion or should withdraw that and file another one, I'm not

22  so certain that I'm going to ask them to respond to that.

23  But I will hold that motion in abeyance until another time.

24         MR. McLEOD:  Yes, sir, Your Honor.

25         THE COURT:  What else do we have going on in this

Ann H. Armstrong, RPR

17

1    case that we need to cover?  We have another pre-trial on

2    October 16th?

3        MR. McLEOD:  Yes, sir.  There will be other motions

4    we will have that Mr. Wiggins and I have been discussing and

5    we will have ready at that time.

6        THE COURT:  The case is set for trial January 26th.

7

8                    ----------------------------

9                         January 26, 1998

10       THE COURT:  Ladies and gentlemen, this morning we are

11   going to start a one week term of court for Dallas County.

12   And I will be trying cases from my criminal docket, and

13   Judge Meigs who is seated over here will be trying cases

14   from his civil docket.  This morning we have a number of

15   things to do.  I apologize for the delay in getting started.

16   However, I felt like we needed some security and to take

17   some special security measures.  And in just a few minutes

18   we are going to get started with the jury selection.  The

19   first order of business this morning, let's check the roll,

20   and let's see how many people we have here.  I know most of

21   you who are here should be jurors.  And as your name is

22   called, I'm go to ask that you please give us your mileage

23   one way to the courthouse from your home.

24       (The Clerk called the roll.)

25       THE COURT:  Ladies and gentlemen, we are going to

Ann H. Armstrong, RPR

18

1    start the jury selection process this morning in the case

2    styled State of Alabama versus Matthew Reeves.  This is a

3    criminal case, and the charge is capital murder.  Now the

4    process that we go through today will take most of the day

5    if not all of the day.  I'm going to ask you to bear with us

6    while we go through this process.  We are going to try to

7    use your time as wisely as we can.

8            We are going to go through a general voir dire

9    process this morning.  That is, you will be asked general

10   questions regarding your qualifications to serve as jurors.

11   And then you will be asked other questions regarding your

12   qualifications to serve as jurors in this particular case.

13   At the conclusion of that voir dire process, we will divide

14   those of you who are remaining in the panel into smaller

15   panels, and you will be asked to report back at various

16   times during the day today.  So this morning I anticipate

17   most of the morning will be taken up on the general voir

18   dire, and then later this afternoon hopefully before lunch

19   if not immediately following lunch we will begin our

20   individual voir dire where you will be divided into smaller

21   panels.

22           Now we've got a number of things to do this morning

23   in the way of housekeeping.  I've got questions to ask you.

24   I know that you're not here because you came up and

25   volunteered.  You were sent a subpoena to be here, and we

Ann H. Armstrong, RPR

19

1    certainly understand that you have other things going on in

2    your lives, professional lives and personal lives, and we

3    are going to do the very best we can to make sure that you

4    are not inconvenienced this week.

5         Now you may have heard in the past that in capital

6    murder cases the jurors are sequestered and sent out to the

7    Holiday Inn.  We are not going to do this to you.  So you

8    will be home at night.  I wanted to let you know that from

9    the very beginning.  I'm going to place you under an

10   instruction at this time because there are a number of

11   people who are in and throughout the courthouse who are not

12   related to this particular trial that are here for other

13   matters.  They are here for other courts.  And I'm going to

14   ask you not to discuss the facts of this case as we go

15   through today among yourselves; don't discuss the facts of

16   this case as you learn the facts with anyone in and around

17   this courthouse.  Now should someone approach you during the

18   period of time that we are going through the jury selection

19   process, it's going to be your duty to come to me and tell

20   me this or to notify some other court official that you have

21   been contacted or you have heard something or you have been

22   made aware of something in relation to this case that you

23   think is improper.  Now the purpose of this, of course, is

24   to insure that both the State and the Defense get a fair and

25   impartial trial and make sure that your jury system and our

Ann H. Armstrong, RPR

20

1    jury selection process is protected and certainly not

2    tainted in any way.

3         So that's going to be our process for today.  Again

4    it's going to take most of the day.  I'm going to ask you to

5    please to keep your conversations down as we go through this

6    process this morning.  We will give you ample opportunity to

7    take breaks to get refreshments and to use facilities.  Now

8    there is construction underway out here to your right as you

9    go out of the door.  You came through a metal detector this

10   morning.  That metal detector is here not only for our

11   safety but for your safety as well.  We are going to ask you

12   to please cooperate with the court officials so that they

13   can insure a very safe environment today and throughout this

14   week.

15        Now I've got some questions that I'm going to ask

16   you.  And before I ask you those questions, I'm going to ask

17   that you all of you here for jury service please rise, raise

18   your right hand and take the following oath.

19        (Jury venire was sworn.)

20        THE COURT:  Ladies and gentlemen, in order to qualify

21   for jury service in the state of Alabama there are certain

22   basic qualifications that all of you must meet.  And I'm

23   going to go through those qualification questions with you

24   at this time.  If there are any responses to any question,

25   please raise your hand so that you can be recognized, and

Ann H. Armstrong, RPR

21

1    I'll try to call you up, and we'll get your response on the

2    record.

3         First you must be over the age of nineteen years.  Is

4    there anybody here for jury service who is not over the age

5    of nineteen years?

6         (No response.)

7         THE COURT:  You must be a citizen of the United

8    States.  Is there anyone here who is not a citizen of the

9    United States?

10        POTENTIAL JUROR:  Nathaniel Sanders.

11        THE COURT:  You're not a citizen of the United

12   States?

13        MR. SANDERS:   No.

14        THE COURT:  Where is your citizenship?

15        MR. SANDERS:   Where do I live?

16        THE COURT:  Are you a citizen of the United States?

17        MR. SANDERS:  No, I was born and raised here.

18        THE COURT:  Okay.  Have you ever lived in another

19   country?

20        MR. SANDERS:  No.

21        THE COURT:  Other than the United States of America?

22        MR. SANDERS:  No.

23        THE COURT:  Thank you, Mr. Sanders, if you'll just

24   have a seat.  You also must have been a resident of Dallas

25   County for more than twelve months.  Is there anyone here

Ann H. Armstrong, RPR

22

1    who is either not a resident of Dallas County at this time

2    or you have not been a resident of Dallas County for more

3    than twelve months?

4         (No response.)

5         THE COURT:  You must be able to read, speak,

6    understand and follow instructions given by a judge in the

7    English language.  Is there anyone here who is unable to

8    read, speak, understand and follow instructions given by a

9    judge in the English language?

10        (The following occurred at the bench outside the

11   hearing of the jury venire:)

12        POTENTIAL JUROR:  Eddie Billingsley.  I cannot

13   understand and read too good.

14        THE COURT:  You cannot understand.  Can you

15   understand what I'm saying?

16        MR. BILLINGSLEY:  I can't hardly memorize it, you

17   know.

18        THE COURT:  Can you read?

19        MR. BILLINGSLEY:  Not too well.

20        THE COURT:  Can you read a book?

21        MR. BILLINGSLEY:  No.

22        THE COURT:  Can you read the Bible?

23        MR. BILLINGSLEY:  No.

24        THE COURT:  Did you read the jury summons that

25   brought you here today?

23

1          MR. BILLINGSLEY:  No, my wife read it.

2          THE COURT:  Someone else read that to you?

3          MR. BILLINGSLEY:  Yes.

4          THE COURT:  Mr. Billingsley, you're excused.

5    Anything from Mr. Goggans?

6          MR. GOGGANS:  No, sir.

7          MR. GREENE:  Nothing from the State.

8          THE COURT:  You're excused.

9          POTENTIAL JUROR:  Mattie Savage.  I don't understand,

10   and I can't read.

11         THE COURT:  What is it that you don't understand?

12         MS. SAVAGE:  What you're talking about.

13         THE COURT:  What I'm talking about?

14         MS. SAVAGE:  (Nods head affirmatively).

15         THE COURT:  Okay.  Do you understand the questions

16   that I've asked you?  Have you understood those questions?

17         MS. SAVAGE:  I understand, but I can't read.

18         THE COURT:  You cannot read?

19         MS. SAVAGE:  No.

20         THE COURT:  Did you read the jury summons that

21   brought you here today?

22         MS. SAVAGE:  My daughter read it.

23         THE COURT:  She read it for you?  You can't read any

24   at all?

25         MS. SAVAGE:  (Shakes head negatively).

Ann H. Armstrong, RPR

24

1          THE COURT:  Anything from you Mr. Goggans or Mr.

2   Wiggins?

3          MR. GOGGANS:  No.

4          MR. GREENE:  Nothing from the State.

5          THE COURT:  You're excused.

6          POTENTIAL JUROR:  Nathaniel Sanders, I was saying I

7   cannot read neither.

8          THE COURT:  Did anybody read for you the jury summons

9   that brought you here today?

10          MR. SANDERS:  My daughter, she's out there in the

11   hall.

12          THE COURT:  Anything from you Mr. Goggans and Mr.

13   Wiggins?

14          MR. GOGGANS:  Nothing.

15          MR. GREENE:  Nothing from the State.

16          THE COURT:  You're excused.

17          POTENTIAL JUROR'S GRANDDAUGHTER:  This is Shelly

18   Rattler.  I'm his granddaughter, and he cannot hear.  He's

19   got a hearing problem.

20          THE COURT:  You're Shelly Rattler?

21          MR. RATTLER'S GRANDDAUGHTER:  I'm his granddaughter.

22          THE COURT:  He can't hear?  Mr. Goggans?

23          MR. GOGGANS:  Is he deaf?

24          MR. RATTLER'S GRANDDAUGHTER:  He's been stabbed in

25   the neck, and he can't hear anything, just a little bit.

Ann H. Armstrong, RPR

25

1          MR. WIGGINS:  How do you communicate with him?

2          MR. RATTLER'S GRANDDAUGHTER:  I have to yell loud.

3          THE COURT:  Does he read sign language?

4          MR. RATTLER'S GRANDDAUGHTER:  No.

5          THE COURT:  Okay.  Any questions from you Mr. Goggans

6    for Mr. Rattler's granddaughter?

7          MR. GOGGANS:  No, sir.

8          THE COURT:  Any objection to his being excused at

9    this time?

10         MR. WIGGINS:  No, sir.

11         MR. GREENE:  None from the State.

12         (The following occurred in the presence and hearing

13   of the jury venire:

14         THE COURT:  Is there anyone else who would like to

15   respond to that last question?  The last question again is

16   that you must be able to read, speak, understand and follow

17   instructions given by a judge in the English language?

18         (The following occurred at the bench outside the

19   hearing of the jury venire:)

20         POTENTIAL JUROR:  Maude Stallworth.  What do you want

21   me to say?

22         THE COURT:  Can you read?

23         MS. STALLWORTH:  Yes, I can read some.

24         THE COURT:  Can you read some?

25         MS. STALLWORTH:  I can read some.

Ann H. Armstrong, RPR

26

THE COURT:  Do you read the Bible?

MS. STALLWORTH:  Yes, I know the Bible.  I read the Bible.

THE COURT:  Can you read the jury summons that brought you here today?

MS. STALLWORTH:  Yes, I can.  I ain't never been in nothing like that.  I don't know what you're saying.

THE COURT:  You received something like this blue slip in the mail that told you to be here today?

MS. STALLWORTH:  Yes, sir.

THE COURT:  Were you able to read that?

MS. STALLWORTH:  Yes, I read that.

THE COURT:  Okay.  So you can read, and you can understand and follow instructions that I give you?

MS. STALLWORTH:  Yes, sir.  Some I can understand; some I can't understand.

THE COURT:  What is it that you have not understood this morning?

MS. STALLWORTH:  I have not understood what you come to court this morning.  I didn't know what to say.

THE COURT:  You have not understood what now?

MS. STALLWORTH:  What I did not understand what I come here for.

THE COURT:  You're here as a juror.  Do you understand that?

Ann H. Armstrong, RPR

27

1       MS. STALLWORTH:  I know I have to be a juror, but I

2 didn't understand the rest on the letter.

3       THE COURT:  The rest of what I said?

4       MS. STALLWORTH:  Yes, sir.

5       THE COURT:  Basically what I told you was that you

6 were going to be here today to be go through the jury

7 selection process and that we're going to select a jury

8 today.

9       MS. STALLWORTH:  Yes, sir.

10      THE COURT:  And that there are certain qualifications

11 that you must meet in order for you to serve on a jury.

12      MS. STALLWORTH:  Yes, sir, that's right.

13      THE COURT:  We are going through that which is what

14 we're doing now.  We are trying to make sure that everybody

15 who is here is qualified to serve as a juror.

16      MS. STALLWORTH:  Yes, sir.

17      THE COURT:  So far you've told me that you're over

18 nineteen years of age.

19      MS. STALLWORTH:  No, sir, I'm older than that.

20      THE COURT:  Right.  And you're also a citizen of the

21 United States.

22      MS. STALLWORTH:  Yes, I am a citizen.  This is my

23 home.

24      THE COURT:  You've been a resident of Dallas County

25 for more than twelve months, right?

Ann H. Armstrong, RPR

28

1          MS. STALLWORTH:  Yes, I have.

2          THE COURT:  And you can read, speak, understand and

3     follow instructions given by me?

4          MS. STALLWORTH:  Yes, sir.

5          THE COURT:  You speak the English language; is that

6     correct?

7          MS. STALLWORTH:  Yes, I understand.

8          THE COURT:  So far so good.  Thank you, ma'am.  If

9     you would please have a seat.

10          POTENTIAL JUROR: I got a letter, but I didn't --

11          THE COURT:  Your name?

12          POTENTIAL JUROR:  Emma Webster.

13          THE COURT:  You were here when I gave the oath; you

14     rose and stood and raised your right hand?

15          MS. WEBSTER:  Yes.

16          THE COURT:  Do you read?

17          MS. WEBSTER:  I read a little bit, not too much.

18          THE COURT:  Did you read the jury summons that

19     brought you here today?

20          MS. WEBSTER:  I read that.

21          THE COURT:  Can you read the newspaper?

22          MS. WEBSTER:  Sometimes I can hardly see.  I can't

23     hardly see.  I cannot read too good.

24          THE COURT:  How much can you read?  Can you read?

25          MS. WEBSTER:  Big letters, not too much small

Ann H. Armstrong, RPR

29

1   letters.

2        THE COURT:  Is the problem with your reading the fact

3   that you cannot see it or you can't understand what you see?

4        MS. WEBSTER:  I can't see too good at all.

5        THE COURT:  But if you can see, do you understand

6   what you read?

7        MS. WEBSTER:  Yes, sir.

8        THE COURT:  So you can read; it's not a problem with

9   your reading.  It's a problem with your vision versus your

10  understanding?

11       MS. WEBSTER:  Yes.

12       THE COURT:  Thank you, ma'am.  If you would have a

13  seat, we'll be with you in just a minute.

14       POTENTIAL JUROR:  My problem is that -- Ruby Jones,

15  the part about following your instructions.  According to

16  Matthew the 7th chapter, my religious -- I wouldn't be able

17  to judge.

18       THE COURT:  We're going to ask you those questions

19  later on because that's not basically the general

20  qualification questions that I go through.  But I'm sure

21  that Mr. Goggans and Mr. Wiggins and the attorneys for the

22  State will have some questions for you regarding that if you

23  would answer those questions at the appropriate time.  Thank

24  you, ma'am.

25       POTENTIAL JUROR:  Thomas Acton, I was in an accident

30

1   six weeks ago.  You released me then.  But I'm still taking

2   therapy everyday at 10:00 o'clock.  I wanted to tell you.

3        THE COURT:  Where are you supposed to be taking

4   therapy?

5        MR. ACTON:  Out at the hospital on this side of the

6   hospital, Four Rivers.

7        THE COURT:  What are you taking therapy for?

8        MR. ACTON:  I had an accident, both of my knees and

9   both of my hamstring.

10        THE COURT:  You're supposed to be out there at 10:00

11   o'clock today?

12        MR. ACTON:  Yes, sir, every day.

13        MR. GOGGANS:  It's every day this week?

14        MR. ACTON:  Yes, sir.  They will turn me loose in two

15   weeks.

16        THE COURT:  If you would please have a seat just for

17   a few more minutes.

18        POTENTIAL JUROR:  Melvin Mahan.  I was saying I can't

19   read.

20        THE COURT:  Can you read the newspaper?

21        MR. MAHAN:  No, sir.

22        THE COURT:  Can you read the Bible?

23        MR. MAHAN:  No.

24        THE COURT:  Can you read this summons here?

25        MR. MAHAN:  No, I can't.  My wife read it to me.

Ann H. Armstrong, RPR

31

1       THE COURT:  Any objection?

2       MR. GOGGANS:  How far did you go in school, Mr.

3  Mahan?  How many grades did you complete in school?

4       MR. MAHAN: About three.

5       MR. WIGGINS:  Are you employed anywhere?  Are you

6  working anywhere?

7       MR. MAHAN:  Yes.

8       MR. WIGGINS:  Where?  What kind of work do you do?

9       MR. MAHAN:  In a packing house, just a worker there.

10      MR. WIGGINS:  We object to him being excused.

11      THE COURT:  State your grounds.

12      MR. GOGGANS:  Your Honor, in this particular case --

13  we are familiar with the State's case.  This is not a case

14  where it involves people reading leases or complicated

15  documents or anything like that.  This is basically a case

16  where it's going to be listening to witnesses, looking at

17  photographs, physical objects and listening to the Court's

18  instructions.  It doesn't really involve, you know, reading

19  documents and things like that.  The man obviously has, you

20  know, a responsible job, and he maintains employment.  I

21  don't see any reason to excuse him.  If we are talking about

22  like a securities case or something like that, but it's --

23      MR. GREENE:  The statute requires it.  The statute

24  does require it.

25      THE COURT:  That's a general qualification that he

Ann H. Armstrong, RPR

32

1   must be able to read and have the ability to read.  I think

2   that it's been established that he can't read a paper, and

3   he can't read a Bible, and he couldn't read this jury

4   summons that brought him here today.  I think that he's due

5   to be excused.  Mr. Mahan, you will be excused at this

6   time.  Your objection is overruled.  Thank you, sir.

7        (The following occurred in the presence and hearing

8   of the jury venire:)

9        THE COURT:  Is there anyone else who would like to

10  respond to that question?  You must be able to read, speak,

11  understand and follow instructions given by a Judge in the

12  English language?

13       (The following occurred at the bench outside the

14  hearing of the jury:)

15       POTENTIAL JUROR:  Hager Gibbs, I don't read too well.

16       THE COURT:  How much can you read?  Can you read the

17  summons?

18       MR. HAGER:  I read the summons.

19       THE COURT:  What you were sent?  Can you read the

20  newspaper?

21       MR. HAGER:  A little bit.

22       THE COURT:  All right.  You say a little bit, what do

23  you mean?  How much of it can you read?

24       MR. HAGER:  I have a sixth grade education,  I read

25  here and yonder bits and pieces.

Ann H. Armstrong, RPR

33

1          THE COURT:  Okay.  Can you read the Bible or any part

2     of it?

3          MR. GIBBS:  Some of it.

4          THE COURT:  All right.  Mr. Goggans?

5          MR. GOGGANS:  Mr. Gibbs, are you employed right now?

6          MR. GIBBS:  No, sir.

7          MR. GOGGANS:  What was the last employment you had?

8          MR. GIBBS:  When I was 63.

9          MR. GOGGANS:  Where did you work?

10          MR. GIBBS:  Auburn University.

11          MR. GOGGANS:  What did you do at Auburn?

12          MR. GIBBS:  Milk cows.

13          MR. GOGGANS:  Nothing else.

14          MS. WILSON:  Did you say that you were able to read

15     the jury summons?

16          MR. GOGGANS:  Yes.

17          MS. WILSON:  Did you understand it?

18          MR. GIBBS:  Yes.

19          MS. WILSON:  Do you get the newspaper?

20          MR. GIBBS:  No.

21          MS. WILSON:  How much of the newspaper are you able

22     to read?

23          MR. GIBBS:  I don't know.  I read a little bit of it.

24          MR. WILSON:  Do you understand what you read?

25          MR. GIBBS:  Yes.

Ann H. Armstrong, RPR

34

1          MS. WILSON:  Judge, we would object to him being

2     excused.

3          THE COURT:  Defense?

4          MR. WIGGINS:  No.

5          THE COURT:  We'll excuse you, Mr. Gibbs.

6          Let's talk about Mr. Acton.  He came up a few minutes

7     ago and said he had to be at the hospital for therapy.

8          MR. GOGGANS:  That's going to be every day too.

9          THE COURT:  I'm afraid to interfere with therapy if

10    that's going to have some adverse effect on him physically.

11    Anybody object to me letting him go?

12          MR. GOGGANS:  No.

13          MS. WILSON:  No.

14          THE COURT:  Mr. Acton, we are going to excuse you.

15    Thank you, sir.  And then you're here for Geraldine Turner?

16          MR. COLE:  Yes, sir.

17          THE COURT:  Your name is --

18          MR. COLE:  Lee Arthur Cole.  She had got hurt on her

19    job.  She was under the doctor's care because she is still

20    under the doctor's care, going to therapy three days a week

21    at Four Rivers.  And she was unable to make it this morning.

22          THE COURT:  What is the nature of her injury?

23          MR. COLE:  Back injury.

24          THE COURT:  She suffered that injury on the job?

25          MR. COLE:  Yes, sir.

Ann H. Armstrong, RPR

35

1          THE COURT:  She is still seeing a doctor?

2          MR. COLE:  Yes, sir.

3          THE COURT:  She has not been released by her

4     physician to return to work?

5          MR. COLE:  No, sir.  She turned her over to a

6     specialist in Birmingham.  I had to take her up there.

7          THE COURT:  You're telling me that she's -- since the

8     day of her injury she has not been back to work?

9          MR. COLE:  Yes, sir.  She has been back, but they had

10    let her back off.

11         THE COURT:  When did she get hurt?

12         MR. COLE:  Let's see.  I think it was back in

13    September, sometime back in September.

14         THE COURT:  And then she tried to go back to work?

15         MR. COLE:  Uh-huh.

16         THE COURT:  And how long did she work?

17         MR. COLE:  About three weeks.

18         THE COURT:  Now she's back home again?

19         MR. COLE:  Yes, sir.

20         THE COURT:  And she's not worked since then?

21         MR. COLE:  No, sir.  She has not worked since then.

22         THE COURT:  Who is her physician in Birmingham?

23         MR. COLE:  I really couldn't say.  I told her to give

24    me the medicine bottle so that I could bring it to you.  It

25    had the doctor's name on it, but she gets all of her

Ann H. Armstrong, RPR

36

1    medicine from Wal-Mart where she works at.  I'm pretty sure

2    they can tell you that at the pharmacy.

3            THE COURT:  Hang on just a minute if you would, Mr.

4    Cole.  Let me talk to these lawyers just a minute.

5            MR. WIGGINS:  As long as there is proof and we get

6    some type of documentation of the --

7            THE COURT:  I'll ask her to bring it.  I'm not

8    willing to chase that rabbit.

9            MR. WIGGINS:  No objection.

10           THE COURT:  Will you please provide to us some

11   evidence that she is under the doctor's care?  Did she see a

12   doctor locally?

13           MR. COLE:  She sees one out by the Vaughan.

14           THE COURT:  Who is that?

15           MR. COLE:  It's Dr. Qureshi.

16           THE COURT:  Is he the one that referred her to

17   Birmingham?

18           MR. COLE:  No, sir.

19           THE COURT:  Who referred her up to Birmingham?

20           MR. COLE:  A lady by the name of Susan.  She worked

21   through -- she's from out of -- what's the name, Clanton,

22   somewhere down that way.

23           THE COURT:  If you would please get me a letter from

24   her employer; that would be Wal-Mart?

25           MR. COLE:  That's right.

Ann H. Armstrong, RPR

37

1       THE COURT:  If you would get a letter from her

2  employer that she is currently off because of a work-related

3  injury and under a physician's care, then I think that will

4  be satisfactory.

5       MR. COLE:  Okay.  I'll go out there and get one.

6       THE COURT:  If you would do that and bring it back

7  and let Mr. Kynard have it or someone on his staff.

8       (The following occurred in the presence and hearing

9  of the jury venire:

10       THE COURT:  The next question I have for you is this.

11  Have any of you here for jury service lost your right to

12  vote by a conviction of an offense involving moral

13  turpitude?  Now generally speaking that would be a felony

14  conviction, and a felony would mean a criminal offense or a

15  criminal conviction that carries penitentiary punishment of

16  no less than a year and a day to no more than life

17  imprisonment.  Is there anyone here who has lost their right

18  to vote by a conviction of a felony offense?

19       (No response.)

20       THE COURT:  You must be capable by reason of physical

21  and mental ability to render satisfactory jury service.  Is

22  there anyone here for jury service who because of some

23  physical or mental disability would be considered incapable

24  of rendering satisfactory jury service?  If you have a

25  response to that question, please step up one at the time.

Ann H. Armstrong, RPR

38

1     (The following occurred at the bench outside the

2  hearing of the jury venire:

3     THE COURT:  This is Ms. Moorer, number 145.  Ms.

4  Moorer, you are on a high dosage of Prednazone.  You cannot

5  participate as a juror.  This is according to a doctor with

6  the Kirklands Clinic in Birmingham?

7     MS. MOORER:  Right.

8     THE COURT:  All right.  If you would step over this

9  way and let me ask you a couple of questions.  Please turn

10  your head this way so that this lady can hear what you are

11  saying.  Tell me if you would what your particular problem

12  is?

13     MS. MOORER:  I have pneumonia, organism pneumonia.

14  That's what he says it is.

15     THE COURT:  How long have you suffered from this

16  condition?

17     MS. MOORER:  I've been going up there for about two

18  and a half months or more.  He said it will be from six

19  months to a year before I'm over it.

20     THE COURT:  Do you work?

21     MS. MOORER:  Part-time.

22     THE COURT:  And how are you employed?

23     MS. MOORER:  I'm employed at Phillies Cigar, and I'm

24  on light duty.

25     THE COURT:  What are your hours?

Ann H. Armstrong, RPR

39

1    MS. MOORER: From 3:00 to 11:30.

2    THE COURT: How many days a week?

3    MS. MOORER: Six.

4    THE COURT: And that's currently your schedule?

5    MS. MOORER: Yes.

6    THE COURT: Your doctor has not instructed you to not

7    work?

8    MS. MOORER: He told me that since I'm -- he sent a

9    paper and told me to be on light duty. That was all he

10   said. He said it would be best if I went back to work.

11   THE COURT: Is there anything else that you want to

12   tell me with regard to your condition, your medication or

13   your physician's instructions?

14   MS. MOORER: I'm on fluid pills, and I have two

15   inhalers that I have to do every six hours.

16   THE COURT: Are those inhalers portable?

17   MS. MOORER: Yes.

18   THE COURT: You carry these inhalers with you?

19   MS. MOORER: Yeah.  I have problems breathing too.

20   THE COURT: How often do you take your other

21   medication?

22   MS. MOORER: I have to take it three times a day, my

23   Prednazone. And I'm taking fluid pills twice a day.

24   THE COURT: And your inhaler every six hours?

25   MS. MOORER: I have to take them every six hours.

Ann H. Armstrong, RPR

1        THE COURT:  And does your employer provide --

2        MS. MOORER:  I have Pepcid to take those at night

3   before I go to bed.

4        THE COURT:  Does your employer provide you with

5   sufficient time to take your medication?

6        MS. MOORER:  Uh-huh.

7        THE COURT:  If you're provided that time to take your

8   medication, then your physical ability is okay; is that

9   correct?

10        MS. MOORER:  Uh-huh.

11        THE COURT:  Mr. Goggans?

12        MR. GOGGANS:  I have no questions.

13        MS. WILSON:  No questions.

14        THE COURT:  I'm going to ask you to stay with us, and

15   I'm going to provide you with ample time to take your

16   medication and ample time to take your inhaler.  You just

17   need to let my bailiff know, Mr. Bagley, and he's over to my

18   left, when you need to take your medication.

19        POTENTIAL JUROR:  Channie Surles.  I'm on Prednazone

20   and a pressure pill and asthma.

21        THE COURT:  The Prednazone is regarding your

22   bronchial problem, your problem with your lungs?

23        MS. SURLES:  Yeah.

24        THE COURT:  And your pressure pill is for your high

25   blood pressure?

Ann H. Armstrong, RPR

41

1    MS. SURLES:  Uh-huh.

2    THE COURT:  And then your breathing pills, that's for

3  your asthma?

4    MS. SURLES:  I have breathing pills and asthma pills.

5  I take both.

6    THE COURT:  Okay.  Are you working?

7    MS. SURLES:  No.

8    THE COURT:  Now how long have you been taking all of

9  this medication?

10    MS. SURLES:  I would say about five years from

11  Birmingham, my doctor in Birmingham.  He's from Birmingham.

12  I have to go to Birmingham to the doctor.

13    THE COURT:  Okay.  So as long as you take that

14  medication, you're okay?

15    MS. SURLES:  No, I'm okay.

16    THE COURT:  You're taking it now?

17    MS. SURLES:  Yes, sir.

18    THE COURT:  And if I give you plenty of time to take

19  your medication then, you're going to be okay?

20    MS. SURLES:  Right, yes, sir.

21    THE COURT:  Is there anything else you want to tell

22  me about your condition or your medication?

23    MS. SURLES:  No.

24    THE COURT:  Anything you want to tell me about your

25  instructions, if any, from your physician or your doctor?

Ann H. Armstrong, RPR

1      MS. SURLES:  I haven't been getting instructions from

2  the doctor.

3      THE COURT:  If you would please stay with us, and we

4  will ask you some other questions.

5      MS. STALLWORTH:  Maude Stallworth.  What do you want

6  to know about?

7      THE COURT:  If you are capable by reason of physical

8  and mental ability to render satisfactory jury service?

9      MS. STALLWORTH:  Yes, sir.

10     THE COURT:  You are?

11     MS. STALLWORTH:  Yes, sir.  What did you say?

12     THE COURT:  Are you capable by reason of physical and

13  mental ability?  Are you in good shape mentally and

14  physically?

15     MS. STALLWORTH:  No.  My senses are all right, but

16  I'm on medicine though.

17     THE COURT:  What kind of medicine do you take?

18     MS. STALLWORTH:  High blood pressure pills and fluid

19  pills and Geritol for iron and pressure pills.

20     THE COURT:  You are taking all of that today?

21     MS. STALLWORTH:  I take the pressure pills one in the

22  morning time, and I take the fluid pills one in the morning

23  time, and I take the Geritol two a day.

24     THE COURT:  And then you feel better when you take

25  that medicine?

Ann H. Armstrong, RPR

1     MS. STALLWORTH:  Yes, sir, I do.  It's every day.

2     THE COURT:  You took that today?

3     MS. STALLWORTH:  I took that before I left home.

4     THE COURT:  Do you feel okay today?

5     MS. STALLWORTH:  Yes, sir.

6     THE COURT:  So you don't think that that's going to

7     prohibit you from serving as a juror, do you?

8     MS. STALLWORTH:  No.  No, I don't think so.

9     THE COURT:  Thank you, ma'am.  I would appreciate it

10    if you would please have a seat.

11    Janice Bolden.  You're pregnant.  How far along are

12    you?

13    MS. BOLDEN:  Almost seven months.

14    THE COURT:  And I have a letter here from Dr. Marlow,

15    your attending physician?

16    MS. BOLDEN:  Yes, sir.

17    THE COURT:  He's informing the Court that you should

18    not be serving on jury service.  Have you had any

19    complications with your pregnancy thus far?

20    MS. BOLDEN:  My biggest problem is I'm still sick a

21    lot, and I have to go to the bathroom a lot.

22    THE COURT:  Okay.  And is your sickness more in the

23    morning or afternoon?

24    MS. BOLDEN:  It varies.

25    THE COURT:  Okay.  Do you work?

Ann H. Armstrong, RPR

44

1        MS. BOLDEN:  Yes.

2        THE COURT:  And are you employed on a full-time

3   basis?

4        MS. BOLDEN:  Yes.

5        THE COURT:  Where are you employed?

6        MS. BOLDEN:  J. C. Penny.

7        THE COURT:  Are you supposed to work this week?

8        MS. BOLDEN:  Yes.

9        THE COURT:  I'm going to ask you this question.  I

10  hate to ask you this question.  It's rather personal, but

11  when was the last time that you were sick with regard to

12  your pregnancy?

13       MS. BOLDEN:  Thursday.

14       THE COURT:  And you've been okay since Thursday?

15       MS. BOLDEN:  Well, I have had bad allergies like over

16  the weekend.

17       THE COURT:  I mean with regard to your pregnancy?

18       MS. BOLDEN:  With regard to pregnancy, no.

19       THE COURT:  Thursday was the last time that you were

20  sick?

21       MS. BOLDEN:  Uh-huh.

22       THE COURT:  And did that sickness require you to be

23  out for the entire day or --

24       MS. BOLDEN:  Yes.  I was out the entire day.

25       THE COURT:  You took off the entire day.  Prior to

Ann H. Armstrong, RPR

45

1   Thursday when was the last time that you were sick regarding

2   your pregnancy?

3        MS. BOLDEN:  Prior to Thursday, I was sick Wednesday

4   and Thursday, but Wednesday was like my regular off day

5   anyway.

6        THE COURT:  So you didn't have to miss work?

7        MS. BOLDEN:  No.

8        THE COURT:  So you were sick two days last week?

9        MS. BOLDEN:   Uh-huh.

10       THE COURT:  Let me back up.  Before Wednesday and

11   Thursday, when was the last time that you were sick with

12   regard to your pregnancy?

13       MS. BOLDEN:  Maybe about two weeks prior to that.

14       THE COURT:  And was that sickness for a day or

15   longer?

16       MS. BOLDEN:  It was all day.

17       THE COURT:  Okay.  Mr. Goggans, Mr. Wiggins?

18       MR. GOGGANS:  Did I understand correctly that you are

19   scheduled to work at J. C. Penny this week?

20       MS. BOLDEN:  Yes.

21       MR. GOGGANS:  I don't have any other questions.

22       MS. WILSON:  Is that a full-time job or part-time?

23       MS. BOLDEN:  It's full-time, but my hours have been

24   cut back a little bit because of the pregnancy and having to

25   stand too long.

Ann H. Armstrong, RPR

1      MS. WILSON:  But you're able to do that?

2      MS. BOLDEN:  Other than running back and forth to the

3  bathroom.

4      MS. WILSON:  If the judge gave you frequent breaks to

5  let you go to the bathroom, do you think you could serve as

6  a juror?

7      MS. BOLDEN:  Yeah.

8      THE COURT:  Thank you, ma'am.  Let me ask you to have

9  a seat.  I'll let you know something in just a minute.  Let

10  me keep your letter.

11      Any objection?

12      MR. GOGGANS:  I think she will be fine.  My secretary

13  worked up to the day she had the baby, and she went to the

14  bathroom a lot.

15      THE COURT:  My concern is that she get sick and have

16  to be excused from service.

17      MR. WIGGINS:  She is working full-time.  She is still

18  going to work every day.

19      THE COURT:  If she gets sick, she's going home and

20  we're left with one alternate is what I'm saying.  What does

21  the State say?

22      MS. WILSON:  The State doesn't have an objection to

23  her being excused.

24      THE COURT:  We'll leave her on.

25      POTENTIAL JUROR:  Leo Murry.  I have a problem with

Ann H. Armstrong, RPR

1  my water. I have to go to the rest room about three or four

2  times an hour. And I have got to go now.

3      THE COURT: Do you take medication for it?

4      MR. MURRY: No. I'm under the VA, and I went in.

5  Well, I called in for appointment. So I haven't got it yet.

6  And I went over Friday to see. The doctor wasn't in.

7      THE COURT: The frequency of your problem is three or

8  four times per hour?

9      MR. MURRY: Right.

10      THE COURT: Any questions, Mr. Goggans?

11      MR. GOGGANS: No.

12      MS. WILSON: Do you have a doctor here locally?

13      MR. MURRY: No.

14      MS. WILSON: No further questions.

15      THE COURT: Mr. Murry, after you go out to the

16  restroom, if you would come back and have a seat and let me

17  talk to these lawyers, okay.

18      MR. GOGGANS: Are you working, Mr. Murry?

19      MR. MURRY: I'm self-employed.

20      MR. GOGGANS: What do you do for a living?

21      MR. MURRY: I do bulldoze work. I step off and head

22  back on.

23      MR. GOGGANS: You don't take any medication?

24      MR. MURRY: No, not now.

25      MR. GOGGANS: No other questions.

Ann H. Armstrong, RPR

1        POTENTIAL JUROR:  Calhoun, Willie James Calhoun.  I'm

2   on disability for my back and eyes.   I can't hardly sit on

3   nothing hard too long.

4        THE COURT:  What's the nature of your back injury?

5        MR. CALHOUN:  Disks.

6        THE COURT:  Disks?

7        MR. CALHOUN:  Yes, pain running down my leg.

8        THE COURT:  Sciatic nerve?

9        MR. CALHOUN:  Yeah.

10       THE COURT:  Have you had surgery?

11       MR. CALHOUN:  They wanted to do it, but they hadn't

12   done it yet.

13       THE COURT:  When was the last time that you worked?

14       MR. CALHOUN:  I haven't worked in a long, about 20

15   years.   Dr. Lett and a doctor at the Medical Center are my

16   doctors.

17       THE COURT:  Do you work part-time?

18       MR. CALHOUN:  No.  They are still doing stuff on my

19   back.  I cannot sit on nothing hard too long.

20       THE COURT:  Mr. Goggans, Mr. Wiggins?

21       MR. WIGGINS:  If we provided you with something soft

22   to sit on, would that allow you to sit on the jury?

23       MR. CALHOUN:  Well, no, it's just the pain is still

24   running down my leg, and I can't read.  I can read, but some

25   certain times I can't see the letters because of my eyes and

Ann H. Armstrong, RPR

1    my back.  I used to be a welder.  Sometimes I can see good,

2    and sometimes I can't.

3        MR. WIGGINS:  When the pain comes in the leg, does it

4    stay there, or does it come and go?

5        MR. CALHOUN:  All the time.

6        THE COURT:  Mr. Calhoun, how long a period of time

7    can you sit without having to stand and stretch?

8        MR. CALHOUN:  I can do better standing, but I can't

9    sit too long on something hard.

10       THE COURT:  About how long can you sit?

11       MR. CALHOUN:  About twenty minutes or fifteen, and

12   then I have to move around a little bit, take six hundred

13   milligrams.

14       THE COURT:  Six hundred milligrams of what?

15       MR. CALHOUN:  Aspirin and codeine and something from

16   Dr. Brown.

17       MR. GOGGANS:  Mr. Calhoun, the aspirin with codeine,

18   is that Tylenol 3?

19       MR. CALHOUN:  Yeah.

20       THE COURT:  Anything else?

21       MR. GOGGANS:  That's all.

22       POTENTIAL JUROR:  Sam Williamson.  I have to inquire

23   about a doctor appointment.  I have a problem with my leg,

24   and I was referred to see a dermatologist.  I have a 2:00

25   o'clock appointment tomorrow.  I want to know if this would

1    interfere.

2         THE COURT:  It could possibly.  I'm going to ask you

3    another question in a few minutes that will require you to

4    respond to that.  So if you would please step up when I ask

5    that question.

6         On Lee Murry, any objection?  He had a bladder

7    problem.

8         MR. WIGGINS:  We would object.  We could accommodate

9    him.

10        THE COURT:  Three or four times an hour for the man

11   to go to the bathroom?  We'll be here until December.

12        MR. WIGGINS:  I've only seen him out walk out one

13   time.

14        THE COURT:  We haven't been here that long.  We'll

15   leave him on for awhile and see what happens.  Mr. Calhoun?

16        MS. WILSON:  No objection to him being excused.

17        MR. WIGGINS:  Same objection, Judge, even though I

18   have not seen any of them get up or do anything.

19        THE COURT:  We'll leave all of them in.

20        MS. WILSON:  He's on codeine.

21        THE COURT:  We'll probably expand on some of these

22   questions I'm sure later on.

23        (The following occurred in the presence and hearing

24   of the jury venire:)

25        THE COURT:  Ms. Bolden, Mr. Murry, Mr. Calhoun, if

Ann H. Armstrong, RPR

1   you all would please stay with us at this time.  You're not

2   excused at this time.  The next question I have for you is

3   this.  This is in a way similar to the last question.  Are

4   any of you afflicted with a permanent disease or a physical

5   weakness -- and some of you have responded to the physical

6   weakness question -- whereby you are unfit to discharge the

7   duties of a juror?  If you feel as though that you fall into

8   that category, please step forward at this time.

9         (No response.)

10        THE COURT:  Okay.  The last question I have --as I

11  told you earlier, we realize that you're here because of the

12  summons.  You're not here because you volunteered, and we

13  understand that you have other things to do this week.

14  However, we have to conduct this trial this week, and it's

15  going to require that a number of you be here and serve for

16  jury service or make yourself available for jury service.  I

17  can only defer you to another term of court in the event of

18  some undue hardship, extreme inconvenience or some public

19  necessity.  And the last question for you is this.  Do any

20  of you have any reason why you should be excused from jury

21  service during the present term of court because of some

22  undue hardship, some extreme inconvenience or some public

23  necessity?  If you feel as though you come within one of

24  those three categories, please step forward.  I'm going to

25  ask you all to please keep your conversations down because

52

1    it's hard for us to hear some of the people who are

2    responding to these questions.

3           POTENTIAL JUROR:  Mildred Holmes.  I'm self employed,

4    and I have a kid in college right now.  This would place me

5    in a financial bind.  That's the only income we have as a

6    family.  My income is the only income.

7           THE COURT:  And how are you employed?

8           MS. HOLMES:  I'm a hair stylist.  I am self-employed,

9    so my shop would be closed.  There would be no other income.

10   I don't have any people working for me.

11          THE COURT:  Mr. Goggans?  Mr. Wiggins, do y'all have

12   questions?

13          MR. WIGGINS:  Are you the only one that works at the

14   shop?

15          MS. HOLMES:  Yes.

16          MR. WIGGINS:  A large clientele this week?

17          MS. HOLMES:  Yes.  I have a clientele that I have to

18   maintain.  If I'm gone, they go some place else.

19          MR. WIGGINS:  There is no way to do that after 5:00?

20          MS. HOLMES:  There is no way I can do all of the work

21   that I have to do after 5:00 o'clock.

22          MR. WIGGINS:  I don't have any questions.

23          MS. HOLMES:  My income, my level of income, the bills

24   that I have to pay I couldn't make enough money after 5:00

25   o'clock to even pay my bills.

Ann H. Armstrong, RPR

1       MR. WIGGINS:  What's the name of your business?

2       MS. HOLMES:  Velberta Styling Salon.

3       MR. WIGGINS:  No further questions.

4       MR. GREENE:  Is there some time that would be better

5  than now?

6       MS. HOLMES:  Yes, when my kids are out of college and

7  I don't have to pay.  That would be when.  He has three

8  years.

9       THE COURT:  Anything else?  If you would, please have

10  a seat and we'll let you know something in just a few

11  minutes.

12      Any objection?

13      MR. WIGGINS:  No.

14      MR. GREENE:  No.

15      THE COURT:  Ms. Holmes, you're excused.  Thank you,

16  ma'am.

17      POTENTIAL JUROR:  Stella Williams.  I take care of a

18  sister that has cancer.  She goes to the cancer center in

19  Montgomery, and I'm the only one to take her.

20      THE COURT:  Does she have treatments scheduled this

21  week?

22      MS. WILLIAMS:  Not this week.  See I never know when

23  I have to rush her to the hospital.  She has lung cancer.

24      THE COURT:  And I know that's difficult for you to

25  talk about, but I've got to ask you some questions about

54

1    that.   First of all is this in a progressed stage?

2           MS. WILLIAMS:   Terminal.

3           THE COURT:   And is there anyone at home with her

4    other than you?

5           MS. WILLIAMS:   (Shakes head negatively.)

6           THE COURT:   That's a no?

7           MS. WILLIAMS:   That's a no.

8           THE COURT:   Anything from you, Mr. Goggans, Ms.

9    Wilson, Mr. Greene?

10          MR. GOGGANS:   No, sir.

11          MR. GREENE:   I have nothing.

12          THE COURT:   You're excused.   No objection I presume?

13          MR. GOGGANS:   None.

14          POTENTIAL JUROR:   Sam Williamson.   I have an

15   appointment tomorrow with the dermatologist to see about the

16   growth on my leg at 2:00 o'clock.

17          THE COURT:   And your physician who referred you to

18   him is local; is that correct?

19          MR. WILLIAMSON:   Yes, Dr. Milligan.

20          THE COURT:   Did Dr. Milligan indicate that it was an

21   emergency for you to go and seek this diagnosis immediately?

22          MR. WILLIAMSON:   No, he didn't say it was an

23   emergency, but he is supposed to take a biopsy.

24          THE COURT:   This is tomorrow at 2:00 o'clock.   How

25   long ago did Dr. Milligan make the appointment for you?

Ann H. Armstrong, RPR

1          MR. WILLIAMSON:  A week ago.

2          THE COURT:  A week ago.  And did he indicate to you

3     anything that he thought it may be?

4          MR. WILLIAMSON:  Well, he just, you know, like he

5     really didn't --

6          THE COURT:  Was he alarmed by it?

7          MR. WILLIAMSON:  No.

8          THE COURT:  Are you alarmed by it?

9          MR. WILLIAMSON:  Not really, but it's, you know,

10    giving me a problem that I think should be taken care of.

11         THE COURT:  I guess the question I'm trying to ask

12    you is this.  Other than this particular appointment that

13    you have, do you feel as though you're unduly alarmed

14    because of this biopsy that you feel like you want to go

15    ahead and do this tomorrow, that you couldn't put it off

16    until next week or the week after that?

17         MR. WILLIAMSON:  It's possible that it could be put

18    off.  He's only in on Tuesday, the dermatologist.

19         THE COURT:  But you're not afraid?  I mean it's not

20    keeping you up at night worrying about whether or not this

21    would be a cancerous thing?

22         MR. WILLIAMSON:  No, not really because he indicated

23    -- Dr. Milligan indicated that it probably wasn't, but he

24    wanted to look at it and make sure that, you know,

25    everything was okay.

1    THE COURT:  Your appointment is tomorrow at 2:00

2    o'clock in Montgomery?

3    MR. WILLIAMSON:  No.  It's in Selma at Dr. Tisdale.

4    It's above the drugstore.

5    THE COURT:  All right.  Mr. Williamson, if you would

6    stay with us for a few minutes, let me get back with you.

7    POTENTIAL JUROR:  Rosie Davis.  I work over at the

8    Courtyard Apartments for Mrs. Dorothy Kendall.  She's 97

9    years old, and I have to see after her.  She don't have

10   anyone other than me.

11   THE COURT:  When do you stay with her?

12   MS. DAVIS:  I stay with her from 7:30 in the morning

13   until 1:00 o'clock during the day.

14   THE COURT:  Who stays with her at 1:00?

15   MS. DAVIS:  Sarah come in.  I heard you call her

16   name, but she didn't show up this morning.

17   THE COURT:  A lady named Sarah?  And who is Mrs.

18   Kendall's family?

19   MS. DAVIS:  Her husband was named Hunter Kendall out

20   in Sardis, and she has a daughter-in-law named Lynn Kendall

21   that works over at the doctor's office on Lauderdale.

22   THE COURT:  So she has family in town; is that

23   correct?

24   MS. DAVIS:  Lynn Kendall.

25   THE COURT:  Okay.  Ms Davis, I'm going to ask you to

Ann H. Armstrong, RPR

1    stay with us, okay?

2         MS. DAVIS:  Okay.

3         POTENTIAL JUROR:  George Yocum.  I own Cahaba Valley

4    Timber.  I've got forty employees.  I've got nobody to fill

5    in for me this week.  My brother is sick.  He was unable to

6    come down this week.  I've got four people out this morning.

7         THE COURT:  You have nobody else in management?

8         MR. YOCUM:  We've got one foreman down there to cover

9    the whole plant.  I normally fill in for -- well, I'm a

10   working owner.

11        THE COURT:  Is there anybody that you can --

12        MR. YOCUM:  I have my brother.  He lives in

13   Birmingham, and he wasn't able to come down this week.  He

14   is sick.  He just called me this morning.

15        THE COURT:  Any questions?

16        MR. WIGGINS:  What kind of plant is this?

17        MR. YOCUM:  It's a pallet plant.

18        MS. WILSON:  No questions.

19        THE COURT:  Have a seat.  Let me get back with you.

20        POTENTIAL JUROR:  Carla Moore.  I work at Vaughan

21   Health Care, and they are short on staff.  I also have had a

22   sick child for three months.  She's got a doctor's

23   appointment Thursday, and I really need to be there.  She

24   might have to have some surgery done.

25        THE COURT:  Where is the appointment?

Ann H. Armstrong, RPR

1          MS. MOORE:  At Dr. Reeves.  We've waited for two

2   weeks to get in.

3          THE COURT:  Are you married?

4          MS. MOORE:  No.

5          THE COURT:  And how old is your child?

6          MS. MOORE:  She's ten.

7          THE COURT:  Is there anyone here locally that could

8   take her to that appointment?

9          MS. MOORE:  My mother keeps her, but she does not

10  drive, so no.

11         THE COURT:  You're at Vaughan Health Care, and you're

12  short handed; doctor's appointment Thursday; it's at 8:00

13  o'clock.  Anything else?

14         MS. MOORE:  No.

15         MR. WIGGINS:  Are you a nurse?

16         MS. MOORE:  No, I work in the finance department in

17  administration.

18         MR. GOGGANS:  Is your child sick?

19         MS. MOORE:  Yes.

20         MR. GOGGANS:  What is the matter with your child?

21         MS. MOORE:  She's had Strep for like off and on for

22  three or four months.  They are going to have to look at

23  taking her tonsils out.  We have had this appointment for

24  like two weeks.  I just don't want to miss it.

25         MS. WILSON:  You say your appointment is at 8:00 in

Ann H. Armstrong, RPR

1    the morning?

2         MS. MOORE:  I didn't know what time it started.

3         MS. WILSON:  You could possibly be here at 9:00 or

4    9:30?

5         MS. MOORE:  Possibly, it depends on what all he does.

6         THE COURT:  Anything else?

7         MS. MOORE:  (Shakes head negatively).

8         THE COURT:  If you would please have a seat, I'll be

9    with you in just a few minutes.

10        POTENTIAL JUROR:  Debbie Sorrells.

11        THE COURT:  Ms. Sorrells works for Dr. Deavor and

12   Searcy.  They have an employee out.  I believe it's your

13   office manager?

14        MS. SORRELLS:  (Witness nods head affirmatively).

15        THE COURT:  The office manager's mother is terminally

16   ill.  That takes her out of the office.  She is taking a

17   leave of absence and would create a hardship for Ms.

18   Sorrells to be out for this week.  Mr. Goggans, Mr. Wiggins?

19        MR. WIGGINS:  I don't have anything.

20        MR. GREENE:  Your duties there?

21        MS. SORRELLS:  A receptionist.

22        THE COURT:  Thank you, ma'am.  Have a seat.  I'll

23   let you know something in a minute.

24        POTENTIAL JUROR:  William Patrick.  I'm not wanting

25   to try to get out of jury service as a whole.  If there is

60

1   any way to be differed to a later date, even the first of

2   next month or something, I would appreciate it.

3       THE COURT:  Can you tell me why?

4       MR. PATRICK:  Well, the last two weeks I have had to

5   miss work.  We just were trying to get moved in a

6   manufactured home.  We have had a lot of defects that we

7   found in it.  I've been trying to take care of this stuff

8   myself.  The company that we bought it from is saying that

9   their service guys are tied up at the moment so they can't

10   get out there to us.  I've just been trying to take care of

11   everything myself on that end and in the process had to miss

12   work.

13       THE COURT:  Where do you work, Mr. Patrick?

14       MR. PATRICK:  Thacker Paint, and I work with the City

15   of Selma Fire Department.  And every day that I'm not there,

16   I've worked with Thacker Paint for about ten years.  And I

17   really -- that's my main source of income.  And today was my

18   first day back, and I thought this was just a summons for

19   the selection of jury.  I didn't actually realize that I

20   would  have to serve this week.

21       THE COURT:  Well, you may potentially serve; you may

22   not.

23       MR. PATRICK:  I was just going to check and see if

24   there was any way that I could be deferred to, you know, a

25   later date until I get all of these things straightened out.

Ann H. Armstrong, RPR

1    I would appreciate it.

2          THE COURT:  Any questions?

3          MR. GOGGANS:  Sir, I didn't hear you when you said

4    your name?

5          MR. PATRICK:  William D. Patrick.

6          THE COURT:  If you would, have a seat and I'll let

7    you know something in just a few minutes.

8          POTENTIAL JUROR:  Julia Lewis, I moved here two years

9    ago from Atlanta.  I just don't have transportation, you

10   know, to get back and forth.

11         THE COURT:  Where do you live?

12         MS. LEWIS:  Orrville.

13         THE COURT:  How did you get here today?

14         MS. LEWIS:  My cousin.  I can't afford to pay anybody

15   five or ten dollars a day to bring me back and forth.

16         THE COURT:  Anything else?

17         MR. WIGGINS:  Do you work anywhere?

18         MS. LEWIS:  In Weaver's Processing Plant.

19         MR. WIGGINS:  How do you get back and forth to work?

20         MS. LEWIS:  With my sister.

21         MR. WIGGINS:  She works at the same plant?

22         MS. LEWIS:  Right.

23         MR. WIGGINS:  How far is that from where you live?

24         MS. LEWIS:  About five miles.

25         THE COURT:  Anything else?

1          MR. GREENE:  Nothing from the State.

2          THE COURT:  All right.  Thank you.

3          POTENTIAL JUROR:  John Harris.  I have two concerns,

4    one being directly related with my job.  I'm assistant

5    principal at Southside High School.  And since the death of

6    William Bryant I also have do his job and my job.  Then the

7    thing that -- my other concern, the victim's daughter, works

8    at my office at Southside.

9          THE COURT:  Works at your office?

10         MR. HARRIS:  Uh-huh.

11         THE COURT:  Did the county get anybody out there to

12   help you since Mr. Bryant's death?

13         MR. HARRIS:  No.

14         THE COURT:  So you're --

15         MR. HARRIS:  I'm doing that until May.

16         THE COURT:  You're double duty?

17         MR. HARRIS:  Right.

18         THE COURT:  You don't have much to do this week?

19         MR. HARRIS:  I wish.  Then I have some meetings,

20   prescheduled meetings for block scheduling this week with

21   Mr. May.

22         THE COURT:  Okay.  Let me ask you to answer some of

23   these lawyers' questions.

24         MR. GOGGANS:  No questions.

25         MR. GREENE:  No questions.

Ann H. Armstrong, RPR

1        THE COURT:  Any objection for Mr. Harris?

2        MR. GOGGANS:  No.

3        THE COURT:  Thank you, sir.  He's deferred.

4        POTENTIAL JUROR:  Irene Patterson.  My baby has

5   bronchitis.

6        THE COURT:  Who has your child?

7        MS. PATTERSON:  My mom, she has pneumonia.  I tried

8   to tell him this morning, and she normally keeps him.

9        THE COURT:  Do you work?

10       MS. PATTERSON:  Yes, I work.

11       THE COURT:  How are you employed?

12       MS. PATTERSON:  I work for Dallas County child

13   protection.

14       THE COURT:  And are you going to work this week?

15       MS. PATTERSON:  No.  I'm not going to work this week.

16   I'm not going to be able to work this week.  I had to take

17   off last week with her.  I need to take her to the doctor

18   today.  She is running fever.

19       THE COURT:  And she was sick all last week?

20       MS. PATTERSON:  Yes.

21       THE COURT:  You missed work last week because of

22   that?

23       MS. PATTERSON:  Yes.

24       THE COURT:  Any questions?

25       MR. WIGGINS:  Do you intend to miss work this week?

Ann H. Armstrong, RPR

1      MS. PATTERSON:  Yes, as long as she is sick.

2      MR. WIGGINS:  Any brothers or sisters?

3      MS. PATTERSON:  I have one sister, but she works.

4      MR. WIGGINS:  Did your mother keep the child prior to

5  her getting sick?

6      MS. PATTERSON:  My mother has been keeping her all

7  along.  She just found out she had pneumonia Friday.

8      MR. WIGGINS:  She's going to the doctor this week?

9      MS. PATTERSON:  My mom has an appointment at 3:00.  I

10  need to take my little girl to the doctor as soon as

11  possible.  She coughed all last night because she gave her

12  some antibiotics, but it's not working.

13      MS. WILSON:  How old is your child?

14      MS. PATTERSON:  She's two.

15      MS. WILSON:  Nothing further.

16      THE COURT:  Anything?

17      MR. WIGGINS:  No further questions.

18      THE COURT:  Thank you, ma'am.  If you would have a

19  seat, I'll let you know something.  Any objection?

20      MR. WIGGINS:  None.

21      THE COURT:  Ms. Patterson, thank you, ma'am.  We'll

22  defer you to another term of court.

23      POTENTIAL JUROR:  Loverne Jackson.  I'm a single

24  parent of a ten month old.  I work at Shoney's, and my tips

25  are my only income.

Ann H. Armstrong, RPR

65

1       THE COURT:  Who keeps your child during the day?

2       MS. JACKSON:   A lady, I pay a baby-sitter for my

3   child.

4       THE COURT:  Do you have to pay this baby-sitter?

5       MS. JACKSON:  Yes.

6       THE COURT:  So your income is Shoney's and with the

7   tips that you make there?

8       MS. JACKSON:   That's it.

9       THE COURT:  They pay you an hourly rate?

10       MS. JACKSON:   $2.13 an hour.

11       THE COURT:  Plus your tips?

12       MS. JACKSON:  Uh-huh.

13       THE COURT:  Anything from defense?

14       MR. WIGGINS:  What were your reasons, a child sick or

15   --

16       MS. JACKSON:  No, I work at Shoney's, and our tips

17   are our only income.

18       MR. WIGGINS:  Do you live alone or --

19       MS. JACKSON:  I live -- me and my child live by

20   ourselves.

21       MR. WIGGINS:  Your child was ten months old?

22       MS. JACKSON:  Ten months.

23       MR. WIGGINS:  Any other type of support that you get?

24       MS. JACKSON:  No.

25       MR. WIGGINS:  ADC or anything like that?

Ann H. Armstrong, RPR

1        MS. JACKSON:  No.

2        MR. WIGGINS:  You say when you work, you have to send

3   your child to a baby-sitter?

4        MS. PATTERSON:  He goes to a baby-sitter while I

5   work.

6        MR. WIGGINS:  I have nothing else.

7        MS. WILSON:  Nothing.

8        THE COURT:  Thank you, ma'am.  If you would please

9   have a seat.  I'll be with you in just a few minutes.

10        POTENTIAL JUROR:  Thomas Wilson.  My brother-in-law

11   is getting married Saturday, and the wedding is in Florida

12   on Saturday at 6:00 o'clock in the evening.  We have to

13   leave Thursday to get down there.  I don't want my wife to

14   go  down there by herself, plus plans have already been

15   made, tuxedos paid for.

16        THE COURT:  Any questions?

17        MR. WIGGINS:  Thursday morning or Thursday night?

18        MR. WILSON:  Early Thursday morning.

19        MR. WIGGINS:  How far is that from here?

20        MR. WILSON:  At least eight hundred miles.  It's a

21   fourteen and a half hour drive.

22        THE COURT:  Any objection?

23        MR. WIGGINS:  No.

24        THE COURT:  Thank you, sir.  Be careful going to

25   Florida.

Ann H. Armstrong, RPR

1          POTENTIAL JUROR:  Philip Johnson.  I have a gentlemen

2    coming from Holland today to discuss negotiation of a

3    potential sale of part of my company.  So I'm involved in

4    that.

5          THE COURT:  How long will he be in town?

6          MR. JOHNSON:  Until Friday.

7          THE COURT:  Defense, State?

8          MS. WILSON:  Nothing, Judge.

9          THE COURT:  Is there anybody in your business with

10   you now, Philip?

11         MR. JOHNSON:  Yes.  We have a Korean group and then

12   my partner, Calvin Bowie.

13         THE COURT:  This is something you don't think that --

14   well, you think that it's absolutely necessary for you to be

15   involved?

16         MR. JOHNSON:  (Nods head affirmatively).

17         THE COURT:  We'll excuse you.  Thank you, sir.

18         POTENTIAL JUROR:  Cheryl Dixon.  I have a sick child

19   who I need to take to the doctor for a throat culture this

20   afternoon.

21         THE COURT:  Anything else?

22         MS. DIXON:  No.

23         THE COURT:  Do you have an appointment?

24         MS. DIXON:  No, I've got to call.

25         THE COURT:  What doctor will you go to?

Ann H. Armstrong, RPR

1        MS. DIXON:  Knight.

2        THE COURT:  Do you intend to do that today?

3        MS. DIXON:  This afternoon.

4        THE COURT:  The way our schedule is set up, I think

5    that you'll have time to do that today because later this

6    afternoon we will be dividing into smaller panels.  And

7    you'll be excused and told to be back at a particular time.

8    So if you could stay with us, we can let you know what time

9    to be back, and then you can coordinate that with Dr.

10   Knight.

11       POTENTIAL JUROR:  Fondell Smith.  Willie Johnson,

12   that is my wife's brother.

13       THE COURT:  There's a relationship of the victim?

14   How is that?

15       MR. SMITH:  My wife's brother.

16       THE COURT:  The victim was your brother-in-law.  All

17   right.  We will excuse you for this particular case and

18   excuse you for the remainder of today.  If you would please

19   call our juror information number after 5:00 o'clock

20   tomorrow, there will be further instructions regarding your

21   jury service on other cases.  Okay.  Do you think you can

22   serve this week on jury service for this week?

23       MS. SMITH:  I would like to support my wife at this

24   time this week.

25       THE COURT:  We'll just excuse you from the entire

1     panel.  We'll defer you to another term of court.

2          POTENTIAL JUROR:  Dorothy Mae King.  I just have one

3     question.  What if you know the person's mother?

4          THE COURT:  What if you know the Defendant?

5          MS. KING:  Right.

6          THE COURT:  The lawyers will ask you some questions

7     about how you know that person and whether or not that would

8     have any impact on your ability to be fair and impartial.

9     Those questions will come to you at a later time.

10         POTENTIAL JUROR:  Robert L. Craig.  I manage a

11    medical equipment company.  This week, you know, I'm the

12    only one that can take out the equipment.

13         THE COURT:  Is that your company or someone else's?

14         MR. CRAIG:  I manage it.

15         THE COURT:  Are you the only person there?

16         MR. CRAIG:  I've got a secretary that is there, but

17    she can't take out the heavy equipment.

18         THE COURT:  Give me a little idea of what your

19    business is, what you do?

20         MR. CRAIG:  We take out anything like oxygen,

21    hospital beds, stuff of that nature.

22         THE COURT:  So people call your business and order

23    certain medical supplies, and you supply those medical

24    supplies?

25         MR. CRAIG:  Yes, sir.  And if I could be deferred to

Ann H. Armstrong, RPR

70

1   later date then -- I just didn't catch it this time.  But

2   maybe the next time I could have someone there that would be

3   able to deliver that equipment at that particular time.

4         THE COURT:  Anything else?

5         MR. CRAIG:  That's about it.

6         THE COURT:  Any questions?

7         MR. GOGGANS:  No questions.

8         MS. WILSON:  No questions.

9         THE COURT:  Let me get back with you in just a

10  minute.

11        MR. GOGGANS:  We have no objection.

12        MR. GREENE:  No objection.

13        THE COURT:  Mr. Craig, you're excused.

14        POTENTIAL JUROR:  Lee Young.  I have a problem.  I

15  work.  My mother is at home.  She's in a wheelchair.  She

16  don't have no legs, and I have to get off at lunch, and I

17  have to go and help her get out of the house and take her to

18  my sister's house.

19        THE COURT:  You do this every day?

20        MR. YOUNG:  Yes, sir.

21        THE COURT:  Is anyone in town that could help you do

22  that?

23        MR. YOUNG:  Like sometimes my sister will be off but

24  not today.  She gets out early in the morning.  So I won't

25  be back home.  I have to get her.  I get off at 3:00 o'clock

Ann H. Armstrong, RPR

1   in the evening.   I have to help her get in and out of the

2   chair.   She's in a wheelchair.

3          THE COURT:   But at 12:00 o'clock every day you take

4   your mom to your sister's house?

5          MR. YOUNG:   I help her get out of the house.

6          THE COURT:   Who helps you do this?

7          MR. YOUNG:   One of my other sisters.

8          THE COURT:   Do you meet at your mother's house to

9   take her to another house?

10          MR. YOUNG:   Yeah.

11          THE COURT:   How long does that take?

12          MR. YOUNG:   It takes about 45 minutes.   She has to

13   get in and get out of the house in a wheelchair, get in the

14   car and take her back out.

15          THE COURT:   There is nobody else in the neighborhood

16   that you could get to assist your sister for the next --

17          MR. YOUNG:   Most everybody works, and my brother --

18   he works out of town.   He drives a truck.   It will be two

19   weeks before he gets back in town.

20          THE COURT:   Answer these lawyer's questions if they

21   have any.

22          MS. WILSON:   No questions.

23          MR. GOGGANS:   No questions.

24          THE COURT:   If you would please have a seat, and I'll

25   be with you in just a few minutes.

Ann H. Armstrong, RPR

1        MS. WILSON:  We have no objection.

2        MR. GOGGANS:  No objection.

3        THE COURT:  Mr. Young, thank you, sir.  We'll defer

4    you to another term of court.  You may leave.

5        (The following occurred in the presence and hearing

6    of the jury venire:)

7        THE COURT:  We're going to take a break.  There are

8    people involved in other cases.  Please don't engage in

9    conversations with these people.  Please don't engage in

10   conversation among yourselves regarding this case.  Don't

11   attempt to find out the facts of this case.  Don't attempt

12   to determine anything about this case, and again I remind

13   you, if anybody should approach you or should you hear

14   anything about the facts of this case, please notify me

15   immediately when we return to the court room.

16       Now before I excuse you, let me say this.  If you are

17   involved in another case, Judge Meigs is going to call my

18   docket down in his courtroom in about ten minutes.  So

19   please go down there with your clients, and he'll call the

20   docket and set the other cases for trial for the remainder

21   of the week.

22       (The jury venire was excused.)

23       THE COURT:  Let's start with 220, Sam Williamson.

24       MR. GREENE:  This is the gentleman that needs the

25   biopsy.  He has a doctor's appointment with Tisdale.  I

Ann H. Armstrong, RPR

1    think he'll be fine.  He wasn't that concerned.

2           THE COURT:  I wasn't going to cut him loose.  George

3    Yocum, he runs that pallet place out on 41, and he is the

4    only one out there right now according to his testimony.

5    Nobody to run that place this week.  Any objections?

6           MR. GREENE:  We do.

7           THE COURT:  Any objection?

8           MR. WIGGINS:  No, we don't have any.

9           THE COURT:  We won't cut him loose then.  Carla

10   Moore, Vaughan Health Care, short-handed, child has doctor's

11   appointment at 8:00 a.m. Thursday.  I'm not going to defer

12   her.  Debbie Sorrells, works for Dub Deavor and Searcy, she

13   won't be deferred.  William Patrick, let's see.  City of

14   Selma, some kind problem with his mobile home.  He won't be

15   deferred.  Julia Lewis, number 119, lives in Orrville, no

16   transportation.  If we need to get her into town, I think we

17   can get a deputy to run her in.  I'm sure Harris would

18   appreciate that.  She won't be deferred.  Loverne Johnson,

19   single parent, ten month old child, works at Shoney's, tips

20   only and $ 2.15 cents an hour as income.  Objection?

21          MS. WILSON:  We don't have an objection.

22          THE COURT:  Defense?

23          MR. GOGGANS:  No.

24          THE COURT:  I'll defer her, number 94.  Other than

25   94, nobody made that cut.  Any other people who I have

Ann H. Armstrong, RPR

1    missed?

2         MR. WIGGINS:  Dixon?

3         THE COURT:  I told her when she came up here to stay,

4    didn't I?  I explained to her that she could probably go

5    this afternoon, make an appointment with Dr. Knight, and she

6    would be in a panel so.

7         MR. WIGGINS:  Number 43, Davis.

8         THE COURT:  She's on.  Ms. Kendall has family

9    locally.

10        MR. GREENE:  There was 13.  Ms. King wanted to ask

11   you knowledge about the Defendant or Defendant's mother.

12        THE COURT:  I instructed her that there would be

13   other more pointed questions regarding relationships, et

14   cetera, that y'all would get into.

15        MR. WIGGINS:  Lee Young.

16        THE COURT:  He's already gone.  We have two with

17   physical problems because they had to get up and leave

18   during the first; one with a back problem and the other had

19   a bladder problem.

20        (A recess was taken.)

21        (The following occurred in the presence and hearing

22   of the jury venire:)

23        THE COURT:  Loverne Jackson, we'll defer you to

24   another term of court.  Thank you, ma'am.  Those who

25   responded earlier whose names I wrote down and who I told

Ann H. Armstrong, RPR

1   you I would be back with you, at this time I'm going to ask

2   you to stay with us.  There are another round of questions

3   that we will go through.  And, of course, we will be going

4   through other questions this afternoon.  So at this time I'm

5   going to ask you to stay with us.  I'm going to go through

6   the roll real quickly and make sure that we haven't lost

7   anybody.  We need to make sure we keep up with everybody

8   today.

9         (The clerk called the roll.)

10        THE COURT:  It's real important that everybody be

11  back on time.  I'm going to try to stay on a schedule.  So I

12  would ask you to please stay with me on that schedule.  And,

13  you know, managing a bunch of people like this is not the

14  easiest thing in the world to do.  If you're not back on

15  time and in your seat, it's just going to inconvenience the

16  Court, and it's going to inconvenience other people who are

17  involved in the case.  It's going to inconvenience your

18  fellow jurors.  So please try to be back, and we'll try to

19  maintain a schedule and inconvenience you as little as

20  possible.  And we appreciate that.

21        We are going to go now and proceed with the next

22  round of questions.  And the questions that I have for you

23  at this time are regarding your qualifications to serve as

24  jurors on this particular case.  And I told you

25  earlier that the style of the case was the State of Alabama

1   versus Matthew Reeves.  And I'm going to read to you the

2   indictment that was returned by the January 1997 grand jury

3   against the Defendant Matthew Reeves.

4          The indictment reads as follows.  The State of

5   Alabama, Dallas County.  The grand jury of said county

6   charge before the finding of this indictment Matthew Reeves

7   whose name is otherwise unknown to the grand jury did

8   intentionally cause the death of Willie Johnson by shooting

9   him with a shotgun, and Matthew Reeves caused said death

10   during the time he was in the course of committing a theft

11   of lawful money of the United States, a value of the same

12   being otherwise unknown to the grand jury, the property of

13   Willie Johnson by threatening the imminent use of force

14   against the person of Willie Johnson with intent to compel

15   acquiescence to the taking of or escaping with the property

16   while the said Matthew Reeves was armed with a deadly weapon

17   to-wit, a shotgun in violation of Section 13-A-5-40(a)(2) of

18   the Code of Alabama against the peace and dignity of the

19   state of Alabama.

20          Now as I told you, the questions that I have for you

21   are questions regarding your particular qualifications to

22   serve on this particular jury and this particular case.  In

23   Alabama a capital murder charge if there is a conviction

24   carries a penalty of either life imprisonment without parole

25   or the death penalty.  Now later on today we are going to be

Ann H. Armstrong, RPR

1    asking you some very specific and pointed questions

2    regarding the punishment and the choices of punishment in

3    this case in the event of a conviction. But before we get

4    to that, there are some other matters. I'm going to ask you

5    these basic qualification questions regarding this

6    particular case.

7        Now the attorneys who will be presenting the evidence

8    in this case are seated at the counsel table in front of

9    you, and I'm going to introduce them to you at this time.

10    With the DA's office to my right and to your left is Ed

11    Greene and Greta Wilson. They will be presenting evidence

12    on behalf of the State of Alabama. The attorneys for the

13    defense in this case are Mr. Tommy Goggans and Mr. Marvin

14    Wiggins. Mr. Goggans practices in Montgomery. Mr. Wiggins

15    practices here locally in Selma and generally in this

16    particular circuit. Seated between Mr. Goggans and Mr.

17    Wiggins is Mr. Matthew Reeves.

18        I'll ask you at this time are any of you related by

19    blood or marriage to the Defendant in this case, Matthew

20    Reeves?

21        (No response.)

22        THE COURT: Or are you related by blood or marriage

23    to either of Mr. Reeves' attorneys, Mr. Marvin Wiggins or

24    Mr. Tommy Goggans?

25        (No response.)

1    THE COURT:  Are any of you related by blood or

2    marriage to the prosecutors in this case, Ed Greene or Greta

3    Wilson?

4          (No response.)

5          THE COURT:  Are any of you related by blood or

6    marriage to the alleged victim in this case, Willie Johnson?

7          (No response.)

8          THE COURT:  Have each of you been a resident

9    householder or freeholder of Dallas County for the last

10   preceding six months?

11         (No response.)

12         THE COURT:  Have any of you been indicted within the

13   last twelve months for a felony?  I defined a felony

14   earlier.  A felony is any criminal offense that carries

15   penitentiary punishment of no less than a year and a day to

16   no more than life imprisonment, or have you been indicted

17   within the last twelve months for an offense of the same

18   character as that with which this Defendant is charged, and

19   that is capital murder?

20         (No response.)

21         THE COURT:  Have any of you been indicted within the

22   last twelve months for a felony?

23         (No response.)

24         THE COURT:  Do any of you have a fixed opinion at

25   this time as to the guilt or innocence of the Defendant

Ann H. Armstrong, RPR

1    which would bias your verdict?

2         (No response.)

3         THE COURT:  Are you of you a witness in this case?

4    Do you expect to be called as a witness in this case?

5         (No response.)

6         THE COURT:  Did someone raise their hand and respond

7    to any question that I have asked so far?  Ma'am, would you

8    step forward, please?

9         (The following occurred at the bench outside the

10   hearing of the jury venire:)

11        POTENTIAL JUROR:   Sharon Parker.

12        THE COURT:  You have a fixed opinion?

13        MS. PARKER:  Yes.  My opinion is that I don't believe

14   in capital punishment.  That's my personal conviction.

15        THE COURT:  Let me ask you, Ms. Parker, to respond to

16   the question though that I asked.  Do you have a fixed

17   opinion as to the guilt or innocence of the defendant at

18   this time?

19        MS. PARKER:  Do I feel that he's guilty or innocent?

20   Is that --

21        THE COURT:  Yes.

22        MS. PARKER:  -- what you're saying?  Do I have a

23   fixed opinion at this time regarding guilt or innocence by

24   being here?   No, I apologize.

25        (The following occurred in the presence and hearing

Ann H. Armstrong, RPR

1   of the jury venire:)

2        THE COURT:  Is anyone a witness in this case?  If you

3   are here for jury service, are you a witness in this case,

4   or do you expect to be called as a witness?

5        (No response.)

6        THE COURT:  Were any of you a member of the Dallas

7   County grand jury that returned the present indictment in

8   the case during the January term 1997?

9        (No response.)

10        The COURT:  Do any of you know anything about the

11   facts of this case which would influence your verdict one

12   way other the other?

13        (No response.)

14        THE COURT:  Do any of you know any reason why you if

15   you were selected as a juror in this case could not give

16   both the state and the Defendant a fair and impartial trial

17   based upon what I have asked you up until this point?

18        (The following occurred at the bench outside the

19   hearing of the jury venire:)

20        POTENTIAL JUROR:  Margaret Christian.  I taught

21   Matthew in school last year at the adult learning center at

22   Selma City School Library, and I don't -- I don't think that

23   would -- he along with three of his cousins were in my

24   classes.  And I had them continuously for about the last

25   three years.

Ann H. Armstrong, RPR

1      THE COURT:  Do you feel as though that relationship

2  would affect your ability to render a fair and impartial

3  verdict based upon the evidence in this case?

4      MS. CHRISTIAN:  That's hard.  It's a hard case.  I

5  have known him a long time.  I was real fond of all of them.

6  And when this case came about I honestly thought it can't be

7  the same child that I had in school.  And he was about

8  seventeen when I first met him.  And I don't know,  I see

9  him all the time.  I see the cousins all the time.  And I

10  think -- I just don't -- I don't know.

11      THE COURT:  I understand you have reservations and

12  that it's a difficult task.  The question though is --

13  you've got to search your own heart and tell me whether you

14  think that that relationship and your knowledge of the

15  Defendant would render it impossible for you to be fair and

16  impartial to both the State and the Defendant?

17      MS. CHRISTIAN:  I don't know.  Really that's hard.

18      THE COURT:  I'm going to ask you to stay with us.

19  You think about this question.  There are some other

20  questions.

21      MS. CHRISTIAN:  I don't know if -- I know all the

22  family.  The mother is sitting here, and I've met them all.

23  So I don't know.

24      THE COURT:  Is there anything that you want to ask at

25  this time, or do you want to save your --

1        MR GREENE:  Not at this time, Your Honor.

2        MR. GOGGANS:   We will wait.

3        POTENTIAL JUROR:  Rickey Shelby.  Due to a murder

4    trial with my family member, I have, probably fall under the

5    fixed opinion kind of thing.

6        THE COURT:  Let me ask you a question.  At this time

7    as you sat here this morning in this room, based upon what

8    you have observed, do you have a fixed opinion as to the

9    guilt or innocence of the Defendant?

10        MR. SHELBY:  I do.

11        THE COURT:  And what is your opinion?

12        MR. SHELBY:  I think he's guilty.  He should die

13   because he killed somebody else.

14        THE COURT:  Thank you, sir.  You're excused.

15        (The following occurred in the presence and hearing

16   of the jury venire:)

17        THE COURT:  At this time the attorneys are going to

18   have an opportunity to begin to ask you questions.  This is

19   a part of the process that I'm going to refer to as the

20   general voir dire questions.  Now we only have about twenty

21   minutes to 12:00 o'clock.  I wanted to stop at 12:00 and

22   take a lunch recess for an hour.  I'm going to ask Mr.

23   Greene to begin his general voir dire with you.  Then at

24   12:oo o'clock we will stop.  We will have lunch and then

25   come back at 1:00 o'clock and continue with the general voir

Ann H. Armstrong, RPR

1    dire questions.  At the conclusion of those general voir

2    dire questions we will have you divided into panels, and

3    then we will start to do the individual voir dire questions.

4        MR. GREENE:  Ladies and gentlemen, my name is Ed

5    Greene.  And the judge has introduced me.  Greta Wilson and

6    I will be presenting the evidence in the course of this

7    trial against the Defendant Matthew Reeves on the charge of

8    capital murder, the taking of the life of Mr. Willie Johnson

9    with a shotgun blast in the course of a robbery of money.

10   The purpose of this part of the trial is for the attorneys

11   to ask you questions about your prior experience.  The idea

12   here is not necessarily to pry into your past for the pure

13   joy of it but to try to find out what experiences you have

14   had in living up to this point that might affect your

15   ability to sit on this case with these particular facts and

16   render a fair and honest verdict, fair to the Defendant and

17   fair to this people of this county, fair to this family.

18       There are not any trick questions here.  There aren't

19   any right or wrong answers.  The attempt is to try to elicit

20   from you your experience and for us to then try to judge how

21   that would fit best in this particular case.  Feel free to

22   express yourself, and don't feel like, well, that might be a

23   stupid thing to say.  Go ahead and say it.  Let's get

24   something done here so we will clearly understand it.  The

25   worst thing that could happen is to get two or three days

Ann H. Armstrong, RPR

1    into the trial and find out that one of the attorneys here

2    didn't ask you some question or didn't find out some fact

3    about your prior experiences that is a direct problem and we

4    have to stop and start all over again.  We certainly don't

5    want that to happen.

6         If during the course of the questions some matter is

7    asked that you are a little unsure about and you would

8    prefer to leave your seat and come up to the bench, please

9    don't hesitate to do so.  Just raise your hand and indicate

10   you would like to answer the question somewhat privately

11   there with the judge as opposed to from your seat.  That

12   practice is accepted and practiced here, so please don't

13   hesitate to do so.  During the course of the questioning if

14   you would raise your hand when you have an answer and give

15   your name, it would be most helpful to the court reporter.

16   She would able to then get down exactly who spoke and what

17   they said and at what point.  I realize some of you may have

18   many responses.  Certainly we attorneys can actually

19   remember your name after five or six or seven times.  But

20   please continue to do the same practice at least while

21   during the voir dire.  I apologize to you.

22        The first set of questions that I would like to go

23   over with you is your knowledge, connection or association

24   with the attorneys for the defense and/or the Defendant.

25   The question is very broad in scope.  What I'm trying to

Ann H. Armstrong, RPR

```
 1    find out is if in the past you have had some association or
 2    connection with one of the attorneys, their families.  You
 3    have perhaps been a client of one of the attorneys or maybe
 4    in your job you have been called upon by them to do some
 5    work.  Your families know each other.  You go to the same
 6    church, belong to the same social or political or civic
 7    organization.  You have children that see each other in
 8    school.  You know each other, whatever it is.  I'm trying to
 9    find out if there is some connection in the past.  Maybe you
10    simply just grew up in the same neighborhood.  That was
11    years ago, or maybe you have mutual friends, know each other
12    or maybe you just know them because you saw their names in
13    the paper and realize who they are.  I am trying to be as
14    broad as I can get with this particular question.  So my
15    first question is do any of you here on the jury panel know
16    of or have had an association with the attorney for the
17    defense Tommy Goggans from Montgomery, anybody on the panel
18    that knows of and concerning him or any connection at all?
19         (No response.)
20         MR. GREENE:  The next one is Mr. Marvin Wiggins, an
21    attorney for the defense in this case, if you know him in
22    the broad sense, if you would raise your hands.
23         POTENTIAL JUROR:  Frank Carter.
24         MR. GREENE:  You know Marvin socially?
25         MR. CARTER:  Through work.
```

Ann H. Armstrong, RPR

1       MR. GREENE:  You've been a client of his at some

2  point or had him do some work for you?

3       MR. CARTER:  No, sir, I work at the same firm.

4       POTENTIAL JUROR: John Lockett, I know Mr. Wiggins.

5       MR. GREENE:  Anyone else?

6       (No response.)

7       MR. GREENE:  I will mention the firm.  The firm, of

8  course, is Chestnut, Sanders, Sanders & Pettaway, and that's

9  it.  And there are several people who are associated there.

10  Anybody on the panel who knows and has an association with,

11  however it might be in that real broad sense that I asked it

12  earlier, with anybody in the firm?  You're a client; you're

13  personal friends, you know each other, whatever it might be.

14  That's Mr. Chestnut, Mr. Sanders, Rose Sanders, Collins

15  Pettaway.

16       POTENTIAL JUROR:  I know Collins Pettaway, Juanita

17  Lanier.

18       POTENTIAL JUROR:  Well, at one time lawyer Chestnut

19  has represented me.

20       MR. GREENE:  Done some work for you?  Your name

21  please, ma'am?

22       POTENTIAL JUROR:  Ruby Jones.

23       POTENTIAL JUROR:  John Lockett, I know Mr. Chestnut.

24  I think I know all of them except maybe some of the younger

25  ones.

1    POTENTIAL JUROR:  Mr. Chestnut, I know Mr. Chestnut

2  and Mr. Pettaway.

3    MR. GREENE:  Your name?

4    POTENTIAL JUROR:  Dorothy Mae King.

5    POTENTIAL JUROR:  Norma Bourdon, I have worked with

6  Mrs. Sanders and Mr. Chestnut and Mr. Pettaway.

7    POTENTIAL JUROR:  Patricia Trotter, in my prior job

8  with the bank I had contact with Mr. Chestnut.

9    POTENTIAL JUROR:  I went to school with Mr. Pettaway,

10  Gwendolyn Nettles.

11    POTENTIAL JUROR:  Frank Jones, in my prior job as a

12  wage hour investigator, negotiated compliance with Hank

13  Sanders in one case and with Rose Sanders on another case.

14    POTENTIAL JUROR:  Ted Henry, I know Mr. Chestnut and

15  the Sanders through different community projects and

16  opportunities.

17    THE COURT:  Go ahead, Mr. Greene.

18    POTENTIAL JUROR:  It's her medication is the reason

19  why she had to leave.

20    THE COURT:  Thank you, ma'am.  I appreciate that.  If

21  somebody needs to leave -- if we ask a question when

22  somebody is out of the room, that person may have a answer

23  to the question.

24    MR. GREENE:  Any one else who either knows Mr. Marvin

25  Wiggins or the members of the firm that he is with, has had

Ann H. Armstrong, RPR

1    an association or connection that hasn't previously

2    answered?  Any one else, something you just thought about or

3    something you might remember?

4         (No response.)

5         THE COURT:  Let's go ahead and take a lunch.  I'm

6    going to ask you all to please be back at 1:00 o'clock here

7    in the courtroom.  Now when you come back, we are going to

8    continue with this process.  Mr. Greene will continue with

9    his questions and answer process.  And we are going to take

10   breaks this afternoon.  So you'll have ample time to take

11   breaks.  But if you're a juror, we can't just get up and

12   walk out and come back when we want to.  This isn't a

13   flexible deal.  We've got to all be here.  We've got to all

14   answer the questions, and we have all got to be prompt in

15   returning.  As I told you earlier I'm going to do the very

16   best I can to make sure that you are inconvenienced as

17   little as possible.  At the same time I've got a job to do

18   as the attorneys have a job to do.  And I'm going to ask you

19   all to please observe our orders and our rules.  And please

20   be here on time when I ask you to be back, okay.  Please be

21   back here in the courtroom at 1:00 o'clock.  That's an hour

22   and about 10 minutes.  Thank you very much.

23        (A recess was taken.)

24        THE COURT:  Please answer if your name is called.

25        (The roll was called.)

Ann H. Armstrong, RPR

1          MR. GREENE:  Ladies and gentlemen of the jury panel,

2     when we recessed I had asked you questions concerning your

3     knowledge of the defense attorneys, Mr. Goggans and Mr.

4     Wiggins.  And in covering Mr. Wiggins, I had gotten into the

5     members of the firm that he is employed with, Chestnut

6     Sanders, Sanders and Pettaway.  And I would ask you if any

7     of you had any knowledge or association or connection in a

8     very broad sense with any of the members of the firm.  And

9     several of you have answered.  Are there any since the lunch

10    recess --- after having had time to think about the

11    question, does anybody else have any further answer that

12    they might want to give or some other communication they

13    want to make?

14          POTENTIAL JUROR:  Robert McConnell, about six years

15    ago I was sued by one of Chestnut Sanders clients, by Mr.

16    Chestnut.

17          MR. GREENE:  Anyone else?

18          POTENTIAL JUROR:  Mr. Pettaway belongs to my church.

19          MR. GREENE:  Your name?

20          POTENTIAL JUROR:  Wanda Perkins.

21          POTENTIAL JUROR:  Elizabeth Martin, I also attend

22    church with Collins.

23          MR. GREENE:  Anyone else?

24          (No response.)

25          MR. GREENE:  Ladies and gentlemen, this question

Ann H. Armstrong, RPR

1    deals with the same area.  And if I've got it correctly, I

2    will try to do it from the notes I've made.  People who had

3    some connection, whatever it might be with Mr. Wiggins or

4    the firm he's in -- that was Mr. Carter I think, Mr.

5    Lockett, Ms. Juanita Lanier, Ms. Ruby Jones, Ms. Norma

6    Bourden, is that correct?  Mr. McConnell just recently, Ms.

7    Trotter, Mr. Henry, Ms. King, Ms. Martin, Mr. Frank Jones.

8    Did I miss anybody who had indicated some knowledge?

9         POTENTIAL JUROR:  Darryl King, I had -- Mr.  Pettaway

10   brought two suits up against me last year.

11        MR. GREENE:  Anyone else?

12        (No response.)

13        MR. GREENE:  Do any of you -- first of all, of the

14   names that responded, do any of you feel this knowledge or

15   association, connection, whatever it is or however it came

16   to be puts you in a position that you could not serve in

17   this case and be a fair juror and render a fair verdict?

18   Because you know somebody or you had some connection with

19   somebody or one of the lawyers or members of the firm, it

20   puts you in a position where you just feel like you wouldn't

21   be able to be fair because of your knowledge and

22   relationship?  Does anybody feel that way?

23        POTENTIAL JUROR:  Darryl King.

24        MR. GREENE:  You feel that because of that previous

25   relationship that you just wouldn't be able to render a fair

```
 1    verdict and make a judgment solely on the evidence in the
 2    case?
 3              MR. KING:  Maybe not that, but I have hard feelings
 4    against him.
 5              THE COURT:  You have hard feelings against him
 6    concerning the action that was taken?
 7              MR. KING:  Yes, sir.
 8              THE COURT:  Can you put that aside and make a
 9    judgment based on the guilt or innocence of this Defendant
10    based solely on the evidence from the witness stand as it
11    comes to you?
12              MR. KING:  Yes, sir.
13              MR. GREENE:  Does anyone else feel like whatever --
14    maybe it's a problem like this; maybe it's a friendship;
15    maybe it's whatever.  Does anybody feel like they just
16    cannot serve, make that judgment?
17              (No response.)
18              MR. GREENE:  This is a little step down now.  I'm not
19    really trying to be funny, but I want you to understand that
20    would you because of some relationship that you have given
21    notice of here you would prefer to pass this case up because
22    Marvin is involved or because you know somebody in his firm
23    or because Tommy is involved; you would rather pass this one
24    if you could, if you had a choice and serve on another case
25    that doesn't involve them?  Does anybody find yourself in
```

1      that position?  You might not have that choice, but you

2      would like it.

3            (No response.)

4            MR. GREENE:  Ladies and gentlemen, the next question

5      deals with the Defendant himself, Matthew Reeves seated here

6      in the gray shirt.  Does anybody here know of and concerning

7      him, his family, friends, associates, previously lived in

8      the same neighborhood, as broad as I can make it, had any

9      connection with him or any of his people at any time in the

10     past?  Keep your hands up.  I will work from side to side if

11     that's okay.

12           POTENTIAL JUROR:  Emma Webster, I know his mother and

13     grandmother.

14           POTENTIAL JUROR:  Margaret Christian, I've already

15     stated my association.  Do I need to do it again?

16           POTENTIAL JUROR:  Linda McConnell, I know the

17     Defendant and his mother.

18           POTENTIAL JUROR:  Johnnie Melton, I know him and his

19     mother.

20           POTENTIAL JUROR:  Frank Carter.

21           POTENTIAL JUROR:  Dorothy King, I know his mother.

22           MR. GREENE:   Thank you, Ms. King.  Anyone else on

23     that side?

24           (No response.).

25           MR. GREENE:  Ms. Webster, Ms. Christian, Ms.

1   McConnell, Ms. Melton, Mr. Carter and Ms. King, do any of

2   you feel that this knowledge or association, connection

3   however slight it might be or however a strong it might be

4   puts you in a position where you feel you could not serve in

5   this case and render a fair and honest verdict putting aside

6   any previous knowledge you might have had?  Do any of you

7   feel like you are in a position where you just really

8   shouldn't do that, cannot do that?

9        POTENTIAL JUROR:  Ms. Webster.

10       POTENTIAL JUROR:  Ms. Christian,

11       POTENTIAL JUROR:  Johnnie Melton.

12       MS. GREENE:  Ms. King.  Anyone else?  Mr. Carter, do

13   you feel okay about serving?

14       MR. CARTER:  Yes.

15       MR. GREENE:  Whatever the relationship is, you feel

16   you can serve and put that somewhere else and listen just

17   to what comes out and make a decision?

18       MR. CARTER:  Yes.

19       MR. GREENE:  Ms. McConnell, do you feel comfortable

20   and that you could handle what comes your way?

21       MS. McCONNELL:  I believe I could.

22       MR. GREENE:  There isn't any right or wrong answer.

23   That's something you have to decide and tell us about.  We

24   don't want to get halfway through and say, wait a minute; I

25   can't do this.  But to recap Ms. Webster, Ms. Christian, Ms.

1    Melton, and Ms. King, y'all feel that this understanding,

2    prior knowledge you have, whatever it is, with the Defendant

3    puts you in a position where you are not going to be able to

4    separate that and the case; it's just more than you can do?

5    That's where y'all are?

6           (Indicated in the affirmative.)

7           MR. GREENE:  I've got to recap again.  Anybody on the

8    panel now with reference to the Defendant, any members of

9    his family, any of his friends, associates, have some

10   knowledge or connection with him whatsoever however slight

11   it might be?  Anybody?

12          (No response.)

13          MR. GREENE:   Ladies and gentlemen, this next series

14   of questions deals with your prior experience as with crimes

15   and offenses.  What I'm trying to find out is what

16   experience you have had as being the victim of certain types

17   of crimes where you may have had property stolen from you

18   and property crimes or your home might have been broken into

19   or your car was broken into or you had some type of arson or

20   damage or theft.  And also on the other hand I want to know

21   if you've had some experience in property crimes being the

22   accused party or had a friend or family member who was the

23   accused party in some type of property crime where somebody

24   accused you or had you arrested or you were indicted for

25   stealing something or breaking into something or you had a

1    child or a friend or a family member who had such an

2    experience.  The same thing also with reference to crimes of

3    violence and also with crimes involving drug problems, those

4    three areas.

5         First of all, with reference to property crimes, I

6    wish to know how many of you personally through a family

7    member or a friend have been the victim of a property crime

8    where your property was stolen or damaged or broken into or

9    whatever it is?

10        POTENTIAL JUROR: George Yocum.

11        MR. GREENE:  Would you tell me what kind of property,

12   sir?

13        MR. YOCUM:  Money from our company.

14        POTENTIAL JUROR:  Samuel Clark, broke in my trailer

15   and took my television and VCR.

16        POTENTIAL JUROR:  James Parker, we had a house broken

17   into, electronic equipment.

18        POTENTIAL JUROR:  Lisa Surrett, stolen bicycles.

19        POTENTIAL JUROR:  Charlene Cobb, car broken into too.

20   Were you talking about did it happen to a family member

21   also?

22        MR. GREENE:  Yes.

23        MS. COBB:  My mother has been burglarized, and my

24   husband was just robbed.

25        POTENTIAL JUROR:  Malanda Brown, stolen jewelry and

Ann H. Armstrong, RPR

1    items.

2         MR. GREENE:  Out of your home?

3         MS. BROWN:  Yes.

4         POTENTIAL JUROR:  Curtis Fails.  Electronics stolen

5    out of my home.

6         POTENTIAL JUROR:  Mary Jowers, stolen lawn mower.

7         POTENTIAL JUROR:  John Mott, pistol stolen out of my

8    truck.

9         POTENTIAL JUROR:  Norma Bourdon, home broken into,

10   valuable camera, stereo equipment TV, VCR; place of

11   employment broken into, apprehended before they got out.

12        POTENTIAL JUROR:  Lorrie Lippeatt, everything in the

13   car was taken and the stuff in the cars and laundry

14   detergent, all of that stuff.

15        POTENTIAL JUROR:  Pat Trotter, two cars stolen, three

16   vandalized, and our checks are being forged all over town as

17   we speak.

18        POTENTIAL JUROR:  Windy Clower, someone set fire to

19   our barn on our property.

20        POTENTIAL JUROR:  Frank Jones, battery stolen from

21   personal automobile at place of employment, VCR and

22   microwave stolen.

23        POTENTIAL JUROR:  Janice Bolden, house was broken

24   into and burglarized, set a fire; my car was broken into

25   twice on my job and my sister's house also.

1          POTENTIAL JUROR:  Samuel Williamson, car stolen.

2          POTENTIAL JUROR:  Edward Johnson, rifle stolen.

3          POTENTIAL JUROR:  William Patrick, lawn mower and

4     jewelry, $250 cash.

5          POTENTIAL JUROR:  Sharon Parker, lawn mower was

6     stolen, brand new.

7          MR. GREENE:  Ladies and gentlemen, the converse to

8     that question is how many of you personally through a family

9     member or through a close friend have gone through being the

10    accused party where somebody accused you or swore out a

11    warrant for or whatever accusing you of something or a

12    family member or some friend of taking, breaking into or

13    otherwise committing a property offense?  Has anybody had

14    that kind of experience in your life before today?

15          (No response.)

16          MR. GREENE:  Let's work on drug type offenses now.

17    I'm going to get to alcohol by itself.   When I'm referring

18    to drugs, cocaine, marijuana, other types of illegal or

19    elicit drugs or even abusive prescription drugs.   I want to

20    ask first of all how many of you have had occasion to go

21    through what's generally referred to as the problems

22    associated with drug abuse?  And by that I'm trying to find

23    out if you personally or if your family member or friend

24    have had to deal with the problems either personally or

25    maybe through a family member or you had to deal with

1   somebody you knew very well who had a drug problem and had

2   some treatment for it and difficulty with it to the point

3   that you had to deal with and suffer through what is known

4   as problems associated with drug abuse?  How many you have

5   had that kind of problem in your lifetime prior to coming

6   here today?

7        POTENTIAL JUROR:  Samuel Clark.

8        POTENTIAL JUROR:  Lisa Surrett.

9        POTENTIAL JUROR:  Carolyn Deason.

10        POTENTIAL JUROR:  Linda McConnell.

11        POTENTIAL JUROR:  Margaret Christian.

12        POTENTIAL JUROR:  Marshall Gill.

13        POTENTIAL JUROR:  Windy Clower.

14        MR. GREENE:  Anyone else?

15        POTENTIAL JUROR:  William Patrick.

16        MR. GREENE:   I realize this next question kind of

17   overlaps with what you just said because having to deal with

18   that problem so many times results in criminal charges.  But

19   I want to ask you specifically if you personally or through

20   a family member or a friend have experienced being the

21   accused party in a drug related case where you or a friend

22   or a family member was charged with some drug offense or

23   some related offense, or perhaps it was a property crime or

24   crime of violence that was drug related.  How many of you

25   have had the experience of being the accused party in a drug

Ann H. Armstrong, RPR

1   related case?  Any of you had that with a family member or

2   friend?

3          POTENTIAL JUROR: Marshall Gill.

4          MR. GREENE:  Anyone else?

5          (No response.)

6          MR. GREENE:  The next one is crimes of violence.

7   Crimes of violence of course are rape, robbery, murder,

8   assault, where someone is seriously injured or killed.  And

9   I wish to know first of all if any of you on the panel

10  personally through a family member or a close friend have

11  experienced a crime of violence as a victim where you were

12  injured, a family member or a friend was killed or a robbery

13  occurred or a rape or an assault occurred, something of that

14  nature?  I would also like to know if you were the victim of

15  such a thing, who it was that received the injury, a son or

16  daughter or you yourself or whatever?  If anybody has any

17  problem with this, feel free to address the Court privately

18  if you wish.

19         POTENTIAL JUROR:  Mr. Frank Carter.

20         MR. GREENE:  Who was the victim in the crime?

21         MR. CARTER:  My sister.

22         POTENTIAL JUROR:  Lisa Surrett.

23         MR. GREENE:  Who was the victim, please ma'am?

24         MS. SURRETT:  Myself.

25         POTENTIAL JUROR:  Jan Walker.

1          MR. GREENE:  Victim?

2          MS. WALKER:  First cousin.

3          POTENTIAL JUROR:  John Mott, it was a close friend

4     William Hall.

5          MR. GREENE:  Have any of you other than Mr. Mott

6     experienced a homicide case where someone was killed?

7          POTENTIAL JUROR:  Norma Bourdon, friend of mine's

8     brother was shot and killed in his driveway.

9          POTENTIAL JUROR:  Betty Parnell, I've got an uncle

10    that was killed in a car accident.

11         MR. GREENE:  Was anyone charged in that event, in the

12    auto accident?

13         MS. PARNELL:  Not really.

14         POTENTIAL JUROR:  Windy Clower, my half sister's

15    father-in-law was murdered about a year ago a year and a

16    half ago.

17         POTENTIAL JUROR:  Patricia Trotter, close friend,

18    professor at Mississippi State was murdered.

19         POTENTIAL JUROR:  Julia Lewis, niece and nephew

20    murdered.

21         MR. GREENE:  Was that here, please, ma'am?

22         MS. LEWIS:  Atlanta.

23         POTENTIAL JUROR:  Jacqueline Menifee, a brother.

24         MR. GREENE:  That was a murder, a homicide?

25         MS. MENIFEE:  (Nods head affirmatively).

1    POTENTIAL JUROR:  Janice Bolden, cousin,

2    MR. GREENE:  That was a homicide?

3    MS. BOLDEN:  Yes.

4    POTENTIAL JUROR:  William Patrick, my wife.

5    MR. GREENE:  Homicide?

6    MR. PATRICK:  Robbery.

7    POTENTIAL JUROR:  Nannie Smith, I had a nephew that

8    got killed at Dallas County grammar school in September.

9    POTENTIAL JUROR:  Brother was murdered in his church.

10   MR. GREENE:  Your name, please, ma'am?

11   POTENTIAL JUROR:  Ruby Jones.

12   POTENTIAL JUROR:  Rosie Davis, two first cousins were

13   killed at the same time.

14   MR. GREENE:  Was that here in this area?

15   MS. DAVIS:  (Nods head affirmatively).

16   POTENTIAL JUROR:   I had a daughter on her way back

17   to Montgomery that had an accident.

18   MR. GREENE:  Anyone charged in that?

19   POTENTIAL JUROR:  Well, they are supposed to be.

20   MR. GREENE:  Your name, please, ma'am?

21   POTENTIAL JUROR:  Emma Webster.

22   MR. GREENE:  Your daughter was killed on the way to

23   Montgomery?

24   MR. WEBSTER:  Just about almost killed.

25   MR. GREENE:  In a bad accident and hurt?

1          MS. WEBSTER:  Yes, sir.

2          POTENTIAL JUROR:  Brother was killed, Mr. Chance.

3          MR. GREENE:  Anyone else?

4          (No response.)

5          MR. GREENE:  Ladies and gentlemen, how many of you

6    converse to that question have experienced personally,

7    through a family, friend or family member being the accused

8    party in a crime of violence where you were accused of an

9    assault or homicide or some other type of violent crime you

10   experienced because you were charged or you experienced

11   because a friend of yours was so charged or because a family

12   member was so charged?  If you could raise your hand for me,

13   please.

14         POTENTIAL JUROR:  Carolyn Deason, my son.

15         POTENTIAL JUROR:  Mary Jowers, my husband.

16         POTENTIAL JUROR:  Norma Bourdon, students.

17         POTENTIAL JUROR:  Curtis Fails, brother.

18         POTENTIAL JUROR:  Lisa Surrett, ex-husband.

19         POTENTIAL JUROR:  Wanda Perkins, uncle.

20         THE COURT:  Anyone else who has had that experience?

21         POTENTIAL JUROR:  Marshall Gill, brother.

22         MR. GREENE:  Anyone else?

23         (No response.)

24         MR. GREENE:  Do any of you feel because of any

25   relationship that you have had personally through a family

Ann H. Armstrong, RPR

1    member or friend with any of these criminal acts, either you

2    were on the receiving end or whether you were the accused

3    party or whether you had the experience either through some

4    family member or friend, do any of you feel that that

5    experience puts you in a position where you just simply

6    cannot serve in this case and render a fair and impartial

7    verdict?  Does anybody have a problem like that, something

8    that is just in your mind to the point that you just don't

9    think you could serve on a jury after that experience?  Is

10   anybody in that position?

11        (No response.)

12        POTENTIAL JUROR:  I need to be excused for a minute.

13        THE COURT:  We'll take about a five minutes recess.

14   During the break if you feel that there were things that you

15   want to take up with us that you felt like I needed to

16   respond to questions that had been asked previously, I'm

17   going to give those people a chance to answer those

18   questions here at the bench.  Let me remind you that if you

19   do have a question that you want to respond to outside of

20   the hearing and presence of the other venire members, please

21   just raise your hand and make that known to me, and we will

22   certainly take the time to hear your response here.

23        (The following occurred at the bench outside the

24   hearing of the jury venire:)

25        POTENTIAL JUROR:  Darryl King, in response to Mr.

Ann H. Armstrong, RPR

1    Greene's question, my dad was brutally murdered in Hale

2    County approximately six years ago.

3              MR. GOGGANS:  Judge, can we ask a few follow-up

4    questions about that matter and also the lawsuit matter

5    while he's up here?  You mentioned earlier that a lawsuit

6    had been filed against your company by the Chestnut firm; is

7    that correct?

8              MR. KING:  That's correct.

9              MR. GOGGANS:  What was that case about?

10             MR. KING:  Some deal with an insurance company that I

11   was working with previously.

12             MR. GOGGANS:  Is it still pending?

13             MR. KING:  No, sir.  They both have been settled.

14             MR. GOGGANS:  How long ago was that?

15             MR. KING:  First of this year or well, toward the end

16   of last year.

17             MR. GOGGANS:  How did you feel about the way it came

18   out?

19             MR. KING:  I thought it was frivolous, bullshit.

20             MR. GOGGANS:  You mentioned that your father was

21   murdered.  That was about six years ago?

22             MR. KING:  That's correct.

23             MR. GOGGANS:  Do you think that those two things

24   together of your father having been brutally murdered in

25   Hale County and your having some bad feelings about that

1   lawsuit, the Chestnut firm, do you think that might have any

2   play at all with you sitting as a juror in this case?

3   　　　　MR. KING:  Well, the facts speak for themselves.  As

4   long as the evidence is there, based on the evidence it

5   would be all right.

6   　　　　MR. GOGGANS:  So you don't think you would have any

7   hard feelings one way or the other sitting as a juror in

8   this case?

9   　　　　MR. KING:  No, sir.

10   　　　　MR. GREENE:  No questions from the State.

11   　　　　THE COURT:  Let me make sure.  What you're telling me

12   is that regardless of the fact that your father was murdered

13   and regardless of the fact that you were involved in this

14   lawsuit, you can be fair and impartial in this case; is that

15   correct?

16   　　　　MR. KING:  That's correct.

17   　　　　THE COURT:  Ms. Weedon, I wrote down either your

18   married or maiden name.  I believe you're on the list with

19   another last name.

20   　　　　POTENTIAL JUROR:  Maiden name, it's Janice Mitchell.

21   　　　　THE COURT:  Janice Mitchell?

22   　　　　MS. MITCHELL:  Yes.

23   　　　　THE COURT:  Number 141.  If you would please tell the

24   lawyers what you told me at the break.

25   　　　　MS. MITCHELL:  My husband told me -- he said he was

Ann H. Armstrong, RPR

1    related to the Johnson family.  I don't know exactly what

2    relationship they are.  He said we're cousins or something,

3    but I'm not for sure.  I'm not familiar with that side of

4    the family.  But he did tell me that we were related to the

5    Johnsons.

6         THE COURT:  You can't tell me the degree of that

7    relationship?

8         MS. MITCHELL:  No, I honestly do not know.

9         THE COURT:  This is a kinship that is by marriage?

10        MS. MITCHELL:  Yes.

11        THE COURT:  It's on your husband's side of the

12   family?

13        MS. MITCHELL:  Yes, sir.  The mother's maiden name is

14   Mary Moore.

15        THE COURT:  Any questions?

16        MR. GOGGANS:  I have just a few.  Your husband told

17   you about this relationship?

18        MS. MITCHELL:  Yes.

19        MR. GOGGANS:  When did he tell you that?

20        MS. MITCHELL:  That was right after we first got

21   married.  Mr. Ernest Johnson used to live down the street

22   from us.  He was a good friend of my husband's and also

23   related to him.  And this is the same set of Johnsons.  He

24   was killed during a robbery by three different assailants.

25

1    MR. GOGGANS:  When did you talk to your husband about

2    this?  Was this like today?

3    MS. MITCHELL:   No.  This was right after Mr. Ernest

4    Johnson died which has been over a year ago.

5    MR. GOGGANS:  So it wasn't today you were talking

6    with your husband about this?

7    MS. MITCHELL:  No.  I have not seen my husband in

8    over a month.  That's a whole different case.

9    MR. GREENE:  For the record I'm not familiar with

10   Ms. Weedon, but her maiden name is Moore?

11   MS. MITCHELL:  Mary Moore, Lewis Moore, George Moore.

12   The kinship comes through the name Moore.  It might be a

13   whole different set of Johnsons.  I just wanted to be for

14   sure.

15   MR. GREENE:  We can't shed any light.  We don't have

16   any knowledge about it.  Whatever it is, it's pretty

17   distant.  I appreciate it.

18   THE COURT:  This is Sam Clark?

19   MR. CLARK:  Yes, sir.

20   THE COURT:  Mr. Clark, if you would please -- that's

21   number 32, just tell the lawyers what you told me at the

22   break.

23   MR. CLARK:  Yes, sir.  Approximately three years ago

24   me and my wife had a dispute, and I was arrested and come in

25   front of Judge Walker, and he dismissed it.  I paid court

1  costs.  That should be three years ago this August.  Thank

2  you, sir.

3           (The following occurred in the presence and hearing

4  of the jury venire:)

5           MR. GREENE:  This next question deals with the

6  question of whether or not you have had an experience with a

7  law enforcement officer wherein you felt that the officer

8  was totally out of line and conducted himself in an

9  unprofessional manner to the extent that you felt perhaps it

10  should have been reported or something.  I am not trying to

11  be funny with this.  And I'm not asking you about was it a

12  real pleasant experience to get that last speeding ticket

13  you got.  I know it's not.  I'm not asking about that.  I'm

14  asking for something else, something where this was pretty

15  serious, in your opinion a breach of the standard of duty.

16  We all hold our law enforcement officers to a pretty high

17  standard.  I want to know if any of you have had an

18  experience where you considered it a bad experience to the

19  extent that the officer was totally and completely out of

20  line in your opinion, whatever it was?  Has anybody had such

21  an experience?

22           POTENTIAL JUROR: Jan Walker.

23           POTENTIAL JUROR:  Betty Parnell.  I had a son that

24  got shot in the head not last October, October before last,

25  and I cannot get any information or nothing on my son, you

Ann H. Armstrong, RPR

1  know.  And the guy didn't do nothing to him about doing it.

2  I don't think it was right and fair.  This was an

3       MR. GREENE:  An officer didn't shoot your son?

4       MS. PARNELL:  No.

5       MR. GREENE:  But the problem is that they didn't do

6  anything about your son getting shot?

7       MS. PARNELL:  I don't know anything about it you

8  know.  I feel like I should know something.

9       POTENTIAL JUROR:  Sharon Parker.  I received not one

10  speeding ticket but six speeding tickets on the same day.

11       MR. GREENE:  All from the same fellow?

12       MS. PARKER:  Yes, sir.

13       MR. GREENE:   I know it wasn't fun when you got them.

14  But my question was if you felt this conduct was -- you felt

15  the officer was out of line?

16       MS. PARKER:  Yes.

17       MR. GREENE:  You felt the officer didn't handle it

18  right?

19       MS. PARKER:  Yes, sir.

20       MR. GREENE:  The same person gave you those tickets?

21       MS. PARKER:  Yes, sir, but it was not in this state.

22       MR. GREENE:  Anyone else had such an experience?

23       (No response.)

24       MR. GREENE:   Ladies and gentlemen, the facts of this

25  case will show to you that the death of Mr. Johnson was

1  caused by a shotgun blast to the neck area. I want to know

2  how many of you -- I may have to ask this two different

3  ways. How many of you or someone in your family maintain,

4  keep, have in your home a firearm, a pistol, gun, rifle or

5  whatever it is? How many of you have one in your home? It

6  may not be yours, but it's somebody's that you know about.

7  Let me do it this way. How many of you don't have a firearm

8  in your home?

9          POTENTIAL JUROR: Wanda Perkins.

10         MR. GREENE: Are you opposed to keeping fire arms, or

11  you just never have?

12         MS. PERKINS: I just don't have one.

13         POTENTIAL JUROR: Elizabeth Martin. I have a child,

14  none.

15         POTENTIAL JUROR: Nannie Smith, I don't have one

16  because when I was a child my mother got her leg shot off

17  with one.

18         POTENTIAL JUROR: Linda McConnell, I've got

19  teenagers.

20         POTENTIAL JUROR: Johnnie Melton, I'm afraid of them.

21  I have a fire year old daughter at home.

22         POTENTIAL JUROR: Laura Flennory, I'm afraid of them.

23         POTENTIAL JUROR: Carla Moore, I just don't have one.

24         POTENTIAL JUROR: I don't have one. I ain't never

25  since my husband got killed in 1962, and he had some guns.

Ann H. Armstrong, RPR

1        POTENTIAL JUROR:  Norma Bourdon, don't have one,

2   don't want one.

3        POTENTIAL JUROR:  Thelma Clark, don't want one.

4        POTENTIAL JUROR:  Seymour Cohn, I have golf clubs

5   instead.

6        POTENTIAL JUROR:  Angelica Cobb, I just don't have

7   one.

8        MR. GREENE:  Your reason why is?

9        MS. COBB:  I just don't have one.

10       POTENTIAL JUROR:  Pat Trotter, We have always had a

11  house full of young people.  It was the kids hangout.

12       MR. GREENE:  But you don't have any guns?

13       MS. TROTTER:  No.

14       MR. GREENE:  You're not unfamiliar with them; you

15  just don't have one in your home at this time?

16       MS. TROTTER:  No.

17       POTENTIAL JUROR:  Julia Lewis, I would be afraid of

18  the results if I had to use one.

19       MR. GREENE:  How many of you on the panel at this

20  point in time have children in your home that are in their

21  late teens or early twenties, male or female?  How many of

22  you have got children in your home that are in that age

23  group?

24       POTENTIAL JUROR: Margaret Christian.

25       POTENTIAL JUROR:  Juanita Lanier.

1       POTENTIAL JUROR:  Debbie Sorrells.

2       POTENTIAL JUROR:  Gary Smith.

3       POTENTIAL JUROR:  Mattie Lowe.

4       POTENTIAL JUROR:  Linda McConnell.

5       POTENTIAL JUROR:  Laura Flennory.

6       POTENTIAL JUROR:  Maude Stallworth, grandchildren.

7  I've got a grandchild who is two years old.  I've got one

8  nine years old.

9       MR. GREENE:  Thank you, Ms. Stallworth.

10      POTENTIAL JUROR:  Bruce Posey.

11      POTENTIAL JUROR:  Jessie Gardner.

12      POTENTIAL JUROR:  Carol Gordon.

13      POTENTIAL JUROR:  Betty Sheppard.

14      POTENTIAL JUROR:  Rosie Davis.

15      POTENTIAL JUROR:  Bob McConnell.

16      POTENTIAL JUROR:  Ella Gordon.

17      POTENTIAL JUROR:  John Lockett.

18      POTENTIAL JUROR:  Thelma Clark.

19      POTENTIAL JUROR:  Virginia Savage.

20      POTENTIAL JUROR:  Betty Parnell.

21      MR. GREENE:  Ladies and gentlemen, briefly we expect

22  the facts in this case to show you that Mr. Johnson was

23  killed on the day before Thanksgiving this past year as he

24  towed a group of young people in from an automobile

25  breakdown out at Tyler, that this Defendant, his brother

Ann H. Armstrong, RPR

1    Julius and Ms. Suttles deemed to rob him of the ring that

2    they were going to pay him with and his paycheck that he had

3    gotten that day after he towed them and delivered their car

4    to Selma to be repaired when he parked in an alley way here

5    near the Compress early in the evening after dark. This

6    Defendant shot him through the neck and into his chest area

7    killing him practically instantly. Three of them are

8    arrested in a house when they went to a party that

9    afternoon. Some of you may have read or heard or learned

10   about that. By remembering what you might have seen on

11   television or read in the local paper or talked about at the

12   grocery store or wherever -- that is proper. That is

13   natural. That is what goes on in any community. It is

14   important, however, in this case that we know and understand

15   those of you that may recall things about the facts of this

16   case, what you might have read or have been told about the

17   facts and to be sure that you can separate in your mind that

18   which you may hear if you are called to serve as a juror and

19   sit in this jury box and will hear from this witness stand

20   --- if you can separate that from what you might have heard

21   on the street or from the media, at church or at the grocery

22   store or whatever.

23        So the first thing I want to ask you is how many of

24   you recall learning something before today before me telling

25   you or the judge reading you the indictment before today

1    about this case?  And I don't want to -- it's very important

2    that we don't get into any discussion about what you know or

3    might have read or learned, just yes or no, I do recall that

4    I remember something about some of the facts that were

5    reported in the media or somebody told me.  That's all I

6    need to know.  And I also need to know if any of you feel

7    that your knowledge of those facts puts you in a

8    predisposition about what the true facts are, that you feel

9    you already have got your mind squared away about what

10   happened, and you have not heard any testimony.  Do you

11   understand what we are trying to do here?  How many of you

12   then at this point in time have learned or recall learning

13   something about the facts of this case from some source,

14   whatever it might be, media, friend, a neighborhood or

15   whatever prior to today?  How many of you recall it, raise

16   your hands.  I think we will get the names at this point.

17   If any of feel that you cannot separate the two, what you

18   learned and what you may receive by sworn testimony.  If you

19   feel you cannot do that, you need to let us know that.

20   First of all let's get the names of those who do recall that

21   you learned something about this case.

22          POTENTIAL JUROR:  Annie Horton.

23          POTENTIAL JUROR:  Pat Cammack.

24          POTENTIAL JUROR:  Margaret Christian.

25          POTENTIAL JUROR:  Patti Driggers.

1        POTENTIAL JUROR:   Debbie Sorrells.

2        POTENTIAL JUROR:   Georgette Ruth.

3        POTENTIAL JUROR:   James Morrow.

4        POTENTIAL JUROR:   Juanita Lanier.

5        POTENTIAL JUROR:   Gary Smith.

6        POTENTIAL JUROR:   Willie Calhoun.

7        MR. GREENE:   Do any of y'all feel that you could not

8    put aside that which you might have learned prior to coming

9    here today and render your verdict and your decision in this

10   case if you are called to sit as a juror based solely on

11   what you learn from the sworn witness testimony?   If any of

12   you feel that way, raise your hand.

13       (No response.)

14       MR. GREENE:   Now on this side.

15       POTENTIAL JUROR:   Linda McConnell.

16       POTENTIAL JUROR:   Elizabeth Martin.

17       POTENTIAL JUROR:   Nannie Smith.

18       POTENTIAL JUROR:   Maude Stallworth.

19       POTENTIAL JUROR:   Johnnie Melton.

20       POTENTIAL JUROR:   Darryl King.

21       POTENTIAL JUROR:   James Parker.

22       POTENTIAL JUROR:   Bruce Posey.

23       POTENTIAL JUROR:   Treva Henninger.

24       POTENTIAL JUROR:   Janice Mitchell Weedon.

25       POTENTIAL JUROR:   Jan Walker.

Ann H. Armstrong, RPR

1          POTENTIAL JUROR:  Curtis Fails.

2          POTENTIAL JUROR:  Malanda Brown.

3          POTENTIAL JUROR:  Lisa Surrett.

4          POTENTIAL JUROR:  Frank Carter.

5          POTENTIAL JUROR:  Robert McConnell.

6          POTENTIAL JUROR:  Kathleen Holliman.

7          POTENTIAL JUROR:  Doris Summerlin.

8          POTENTIAL JUROR:  William McCormick.

9          POTENTIAL JUROR:  Mary Jowers.

10         POTENTIAL JUROR:  John Mott.

11         POTENTIAL JUROR:  Melvin Miller.

12         MR. GREENE:  Any of you, ladies and gentlemen, do

13    any of you feel that you will be unable to sit as a juror in

14    this case and put aside this material you might have learned

15    from some other source and put that aside and make a

16    judgment in this case solely on what you learn from the

17    witness stand?  Do all of you feel that you can do that?

18    Let me put it this way.  Does anybody have a problem saying

19    they can do that?  Do you feel like you can sit as jurors

20    and be fair in this case even though you might have read or

21    heard something about it before you got here?  That's what

22    it really comes down to.  See, what you need to do if you

23    sit as a juror, you are supposed to make your mind up about

24    what they tell you from the witness stand and don't hold

25    onto any of that stuff you might have learned from the paper

1  or what you might have learned at the grocery store or in

2  your neighborhood.  Do you think you could put that aside

3  and just listen to the testimony?

4        MR. GREENE:  Over here.

5        POTENTIAL JUROR:  John Lockett.

6        POTENTIAL JUROR:  Ella Gordon.

7        POTENTIAL JUROR:  Norma Bourdon.

8        POTENTIAL JUROR:  Virginia Savage.

9        POTENTIAL JUROR:  Ernest Harrison.

10        POTENTIAL JUROR:  Marilyn Canty.

11        POTENTIAL JUROR:  Ora Pritchett.

12        POTENTIAL JUROR:  Rita Caver.

13        POTENTIAL JUROR:  Sharon Parker.

14        POTENTIAL JUROR:  Janice Bolden.

15        POTENTIAL JUROR:  Jacqueline Menifee.

16        POTENTIAL JUROR:  Everette Smith.

17        POTENTIAL JUROR:  Edward Johnson.

18        MR. GREENE:  Anybody else?

19        (No response.).

20        MR. GREENE:  Lockett, Gordon, Bourdon, Savage,

21  Harrison, Canty, Pritchett, Caver, Parker, Bolden, Menifee,

22  Smith and Johnson?  Anybody else?  Do any of you feel that

23  you would be unable to put aside that which you might have

24  learned prior to coming here today about this case and make

25  your decision solely on what you received from the witness

1   stand?  Do any of you feel you would be unable to separate

2   the two?  Does anybody feel they have got a problem with it?

3          (No response.)

4          MR. GREENE:  Thank you.

5          (The following occurred at the bench outside the

6   hearing of the jury venire:

7          MR. GREENE:  Our next set of questions involve going

8   over people's dates of birth and address verifications,

9   various criminal histories and also some specific questions

10  with some individuals that we think are connected with other

11  individuals that we have prosecuted but not sure whether

12  family members are connected.  Other than that I think we

13  are finished with our voir dire.  We had proposed that we do

14  those two things at the end of y'all's if it's agreeable.

15         THE COURT:  I would like to do the individual in

16  smaller panels.  What I intend to do is when we do get a

17  panel, we can organize the panel in alphabetical order.  And

18  I'm going to ask them to stand and give their name and their

19  employment and their spouses and that type of thing.  It's a

20  little more manageable to do it that way.  It's a little

21  more personal to do it that way.  And then if you want to do

22  that with that group at that time, then I think that would

23  be the appropriate time to do it.  Any objection from the

24  Defense on proceeding in that way?

25         MR. GOGGANS:  No, I don't have any problem with that.

Ann H. Armstrong, RPR

120

1   One thing, Mr. Wiggins and I were just talking.  I don't

2   know about Mr. Wiggins, but I was surprised of the number of

3   hands that went up on the publicity.  I was thinking we

4   would get into publicity once we got into the smaller

5   panels.  I think based on the overwhelming number of people

6   that said they had read, heard or whatever, talked about

7   this case, we probably are going to need to ask each of them

8   what they have heard, what did you read, what did you see.

9   I don't see any other way to do it.

10          THE COURT:  That's fine.  There are a number of

11  people.

12          MR. GOGGANS:  I didn't think it was going to be that

13  many.

14          MR. GREENE:  We had filed a motion concerning voir

15  dire of the jury with reference to any statements the

16  Defendant might have made.  And we would like to bring that

17  up at

18  this time.  And I don't know that that's necessary to be

19  gone into on this.  I just want to get on the record that we

20  did do that.  And I assume --

21          MR. GOGGANS:  I wasn't planning on going into that

22  anyway.

23          THE COURT:  How much time do you think you are going

24  to go need for voir dire?

25          MR. GOGGANS:  An hour.  We want to touch on a few

Ann H. Armstrong, RPR

1 things that we just learned about.  We would want to go over

2 their criminal histories.

3 THE COURT:  We'll do that in the panel.  Let me give

4 them about a fifteen minute break.  We'll come back and

5 start your voir dire.

6 (The following occurred in the presence and hearing

7 of the jury venire:)

8 THE COURT:  That concludes that portion of the voir

9 dire involving the State's questions to you.  In just a few

10 minutes the Defense will have an opportunity to ask you some

11 questions as well.  I'm going to take a fifteen minute

12 recess.  And then when we return, the Defense will have an

13 opportunity to start their voir dire.  It's about 2:30.

14 Please be back in your seats at 10 until 3:00.  We'll go

15 through the roll again.  So please come back in right at 10

16 until 3:00.  Thank you.

17 (A recess was taken.)

18 (The Clerk called the roll.)

19 MR. WIGGINS:  Thank you, Judge.  Good afternoon.  As

20 Mr. Greene told you, this is an opportunity for us to sort

21 of ask you some questions and you respond to us so we can

22 get to know each other.  And Mr. Goggans and I represent

23 Matthew Reeves.  We just want to ask you a few questions so

24 we can become familiar with you.  If I ask a question or Mr.

25 Goggans asks you a question, I would ask you to stand up so

1    the court reporter can hear you.  A lot of times she cannot

2    hear if you're in the back or something happens.  So if you

3    respond to a question, please stand.  Give your name before

4    you respond so we can get your answer.

5          I want to know a little about you all in terms of

6    your social involvement in the community.  Are any of you on

7    this side involved in any kind of civic or social

8    organization, Kiwanis, NAACP, anything like that, involved

9    in any of those organizations?

10         (No response.)

11         MR. WIGGINS:  Little League, anything like that.

12   Anyone in the middle?

13         POTENTIAL JUROR:  James Parker, I coached thirteen

14   and fourteen year old boys last year in the City of Selma.

15         POTENTIAL JUROR:  Darryl King, a member of the Elks

16   and the Moose.

17         POTENTIAL JUROR:  Frank Carter, Blackbelt Arts and

18   Culture Center.

19         POTENTIAL JUROR:  I assisted with my two boys in the

20   Little League, Curtis Failes.

21         POTENTIAL JUROR:  Ruby Jones.  I'm a minister, and I

22   have a community agency, see people.

23         POTENTIAL JUROR:  Elizabeth Martin.  I'm a teacher at

24   Southside High School, and I'm in AEA.

25         POTENTIAL JUROR:  John Mott, Kiwanis Club,

1   Confederate Veterans.

2        POTENTIAL JUROR:  Angelica Cobb, I help with the

3   basketball at the Y.

4        POTENTIAL JUROR:  Seymour Cohn, Kiwanis, Elks Club,

5   Selma Country Club.

6        POTENTIAL JUROR:  Norma Bourdon, I direct after

7   school program at St. Edmund Learning Center.

8        POTENTIAL JUROR:  Frank Jones, Boy Scout worker.

9        POTENTIAL JUROR:  Rita Jennings, husband coaches a

10   Little League ball team here in Selma.

11        MR. WIGGINS:  Anyone on this side actively involved

12   in the military or have been in the military or have family

13   members in the military?

14        POTENTIAL JUROR:  Retired National Guard, 37 years,

15   Frank Jones.

16        POTENTIAL JUROR:  Rita Jennings, father was retired

17   from National Guard.

18        POTENTIAL JUROR:  Judy Golson, husband and my father

19   were in the service.

20        POTENTIAL JUROR:  Pat Trotter, husband was in the

21   service.

22        POTENTIAL JUROR:  Verlisa Baity, husband in the

23   National Guard.

24        POTENTIAL JUROR:  Windy Clower, father was in the

25   National Guard.

Ann H. Armstrong, RPR

1          POTENTIAL JUROR:  Husband and my father were in the

2     military.

3          POTENTIAL JUROR:  Seymour Cohn, U. S. Air Force.

4          POTENTIAL JUROR:  Rita Jennings, father was in the

5     National Guard.

6          POTENTIAL JUROR:  Angelica Cobb, my father was in the

7     Marines.

8          POTENTIAL JUROR:  Frank Jones, National Guard, 37

9     years retired.

10          POTENTIAL JUROR:  Clarence Gilbert, U. S. Army.

11          POTENTIAL JUROR:  Edward Johnson, nine years in the

12     military.

13          POTENTIAL JUROR:  William Patrick, one year active

14     Army, nine years Army National Guard.

15          POTENTIAL JUROR:  Nannie Smith, I have a son in the

16     Navy and a daughter in the Air Force.

17          POTENTIAL JUROR:  Elizabeth Martin, I have a son

18     that's presently in the Army.

19          POTENTIAL JUROR:  Ruby Jones.  I have a husband who

20     was in the Navy and retired and grandson now and the Air

21     Force and three grandchildren in the ROTC whatever and

22     son-in-law, both son-in-laws in the Army.

23          POTENTIAL JUROR:  Darryl King, father was in the

24     Army.  Stepfather was in the Navy, and I have a

25     brother-in-law who was in the Army and now serves in the

1    National Guard.

2        POTENTIAL JUROR:  Maude Stallworth, I'm retired

3    military, working on the job.

4        POTENTIAL JUROR:  Linda McConnell, I have two sisters

5    in the Army Reserves.

6        POTENTIAL JUROR:  Mary Lassiter, grandfather.

7        POTENTIAL JUROR:  Carol Gordon, I have a son in the

8    Marines.

9        POTENTIAL JUROR:  Jessie Gardner, I have a son that

10   is serving in Marines.

11       POTENTIAL JUROR:  Surrett, stepfather retired Air

12   Force; husband Navy, father-in-law, Air Force.

13       POTENTIAL JUROR:  Charlene Cobb, father and uncle

14   both in the Army.

15       POTENTIAL JUROR:  Carolyn Deason, I have a daughter

16   fifteen years in Air Force, and husband is former Navy.

17       POTENTIAL JUROR:  Mary Jowers, husband retired Air

18   Force; son, Army; daughter, Reserves.

19       POTENTIAL JUROR:  Melvin Miller, retired, father.

20       POTENTIAL JUROR:  Joseph Smith, I served in the

21   Marine Corps.

22       POTENTIAL JUROR:  Husband was in the Air Force.

23       MR. WIGGINS:  Your name?

24       POTENTIAL JUROR:  Debbie Sorrells.

25       POTENTIAL JUROR:  Husband was fighter pilot; brother

1   was a volunteer, Pat Cammack.

2        POTENTIAL JUROR:  George Yocum, father was in Army.

3        POTENTIAL JUROR:  Marshall Gill, six years in the

4   Army; father retired Marine Corps.

5        POTENTIAL JUROR:  Ted Henry, in the Army.

6        POTENTIAL JUROR:  Wanda Perkins, I have a cousin that

7   was in service and brother and ex-husband.

8        POTENTIAL JUROR:  Justin Denmark, father and

9   grandfather both served in the Marines.

10       MR. WIGGINS:  Anyone on this aisle ever served as a

11  juror before this case?

12       POTENTIAL JUROR: George Yocum.

13       MR. WIGGINS:  Was that a criminal or civil?

14       MR. YOCUM:  Civil case.

15       MR. WIGGINS:  About how long ago was that?

16       MR. YOCUM:  That was eighteen years.

17       POTENTIAL JUROR:  Margaret Christian, I served in a

18  criminal case and a civil case.  It's been about 15 years

19  for the criminal and about 18 for the civil.

20       MR. WIGGINS:  Anyone in the middle aisle?

21       POTENTIAL JUROR:  Linda McConnell, criminal case.

22       MR. WIGGINS:  About how long ago was that?

23       MS. McCONNELL:  About eight years ago.

24       MR. WIGGINS:  Were you able to reach a verdict in the

25  case?

Ann H. Armstrong, RPR

1    MS. McCONNELL:   Yes.

2    MR. WIGGINS:   Were you able to reach a verdict in the

3    case?

4    MR. YOCUM:   Yes.

5    MS. CHRISTIAN:   Yes.

6    POTENTIAL JUROR:   Surrett, it was a civil case.   We

7    reached a verdict.

8    POTENTIAL JUROR:   Bruce Posey, criminal case, and we

9    reached a verdict.

10    POTENTIAL JUROR:   Robert McConnell, criminal case, we

11    reached a verdict.

12    POTENTIAL JUROR:   Joseph Smith, it was on a criminal

13    case and a civil case, and we did reach a verdict.

14    MR. WIGGINS:   About how long ago was that?

15    MR. SMITH:   Two years.

16    MR. WIGGINS:   Did I omit anyone in the middle aisle?

17    (No response.)

18    POTENTIAL JUROR:   Civil case about twelve or fifteen

19    years ago, and we did reach a verdict.

20    MR. WIGGINS:   Your name?

21    POTENTIAL JUROR:   Frank Jones.

22    POTENTIAL JUROR:   Marilyn Canty, on a civil case.

23    MR. WIGGINS:   Were you able to reach a verdict?

24    MS. CANTY:   Yes.

25    MR. WIGGINS:   About how long ago?

Ann H. Armstrong, RPR

120

1        MS. CANTY:  About seven or eight years.

2        POTENTIAL JUROR:  Judy Golson, it was a civil case.

3   It's been about ten years.

4        POTENTIAL JUROR:  Clarence Gilbert, civil, reached a

5   verdict, over fifteen years ago.

6        POTENTIAL JUROR:  Verlisa Baity, civil, reached a

7   verdict, a couple months ago.

8        MR. WIGGINS:  A couple of you responded to the fact

9   that you had sued before.  Mr. King indicated he had been

10  sued before, either one.  You either sued someone before for

11  any particular reason.  Have you filed a complaint?

12        POTENTIAL JUROR:  Georgette Ruth.  I've got a case

13  going on now.

14        POTENTIAL JUROR:  I served on a jury about 22 years

15  ago.

16        MR. WIGGINS:  Your name?

17        POTENTIAL JUROR:  Mary Calloway.

18        MR. WIGGINS:  Anyone in the middle aisle?

19        POTENTIAL JUROR:  Ruby Jones.

20        POTENTIAL JUROR:  Lisa Surrett, I had a lawsuit about

21  six years ago.

22        POTENTIAL JUROR:  Janice Mitchell, a lawsuit about a

23  year and a half ago.

24        MR. WIGGINS:  It's not still pending, is it?

25        MS. MITCHELL:  No, it's not, completed.

Ann H. Armstrong, RPR

1   POTENTIAL JUROR:  Robert McConnell, civil suit still

2   pending.

3   MR. WIGGINS:  Anyone in this aisle?

4   POTENTIAL JUROR:  Lorrie Lippeatt, and it was

5   probably about eight years ago.

6   POTENTIAL JUROR:  Ella Gordon, about two years ago.

7   MR. WIGGINS:  Still pending?

8   MS. GORDON:  No.

9   POTENTIAL JUROR:  Thelma Clark, about three years

10  ago.

11  MR. WIGGINS:  Anyone else?

12  (No response.)

13  MR. WIGGINS:  Has anyone in this aisle served as a

14  witness before in a trial as a civil or criminal witness in

15  a trial before?  Anyone in the middle?  Have you ever been a

16  witness?

17  POTENTIAL JUROR:  Elizabeth Martin, it's been about

18  probably a couple of months ago.  It was criminal.

19  POTENTIAL JUROR:  Johnnie Melton, I was never called

20  to take the stand, but they were going to use me, but they

21  didn't.

22  MR. WIGGINS:  A civil or criminal?

23  MR. MELTON:  A criminal.

24  POTENTIAL JUROR:  Lisa Surrett, in a civil trial

25  three years ago.

Ann H. Armstrong, RPR

130

1        POTENTIAL JUROR:  Robert McConnell, with the civil

2   case.

3        POTENTIAL JUROR:  John Mott, witness in a civil case.

4        POTENTIAL JUROR:  Melvin Miller, military court

5   martial.

6        POTENTIAL JUROR:  John Lockett, witness in a civil

7   case.

8        POTENTIAL JUROR:  Lorrie Lippeatt, two different

9   occasions; one is criminal and one is for a person I sued, a

10  truck driver.

11       MR. WIGGINS:  A civil case?

12       MS. LIPPEATT:  Uh-huh.

13       MR. WIGGINS:  On this particular case we are going to

14  hear the incident occurred in what they call Crockett Alley.

15  I want to know if anyone on this side is familiar with that

16  area known as Crockett Alley?

17       (No response.)

18       MR. WIGGINS:  Anyone in the middle aisle?

19       POTENTIAL JUROR:  Linda McConnell.

20       POTENTIAL JUROR:  Johnnie Melton.

21       POTENTIAL JUROR:  Frank Carter, Jr.

22       POTENTIAL JUROR:  Melvin Miller.

23       POTENTIAL JUROR:  Judy Golson.

24       POTENTIAL JUROR:  Did you say Crocket Alley?

25       MR. WIGGINS:  Yes.

Ann H. Armstrong, RPR

1    POTENTIAL JUROR: William Patrick.

2    MR. WIGGINS:  Those of you who answered the question

3    that you have knowledge of that particular area, do you live

4    in that area or just have knowledge of it?  Any one that

5    lives in that area?

6    POTENTIAL JUROR:  Linda McConnell.

7    POTENTIAL JUROR:  I lived in that area for two years,

8    Frank Carter.

9    POTENTIAL JUROR:  Johnnie Melton, my mother lives in

10   that area.

11   MR. WIGGINS:  Also you are going to hear something

12   about 2128 Selma Avenue, 2124 Selma Avenue.  Is there anyone

13   who is familiar with that area or lives in that area or have

14   relatives that who live in that area?  I'm going to start on

15   this side.

16   POTENTIAL JUROR:  Gary Smith.

17   MR. WIGGINS:  Are you familiar with it, or do you

18   live --

19   MS. SMITH:  I am familiar with it.  I lived there as

20   a kid thirty years ago.

21   POTENTIAL JUROR:   Linda McConnell, I lived in that

22   area.

23   POTENTIAL JUROR:  Johnnie Melton, familiar with that

24   area.

25   POTENTIAL JUROR:  Mary Ann Lassiter, I used to live

Ann H. Armstrong, RPR

1    in that area.

2         POTENTIAL JUROR:  Frank Carter, I went to school in

3    that area.

4         POTENTIAL JUROR:  Melvin Miller, I have friends that

5    are familiar with that area.

6         POTENTIAL JUROR:  William Patrick, familiar with the

7    area.

8         POTENTIAL JUROR:  Sharon Parker, I live in that area.

9         POTENTIAL JUROR:  Verlisa Baity, my brother-in-law

10   lives in that area.

11        POTENTIAL JUROR:  Betty Parnell, I used to live in

12   that area.

13        POTENTIAL JUROR:  Curtis Fails, I am familiar with

14   that area.

15        MR. WIGGINS:  There was a question earlier about

16   those of you who had any bad experience with police.  Have

17   any of you had a good experience with police to the point

18   that you could consider them to be like calvary come to your

19   rescue?  You favor the police department because they did

20   something for you.  Have any of you had a good experience

21   with the police?

22        POTENTIAL JUROR:  George Yocum.  Most of them are

23   doing their job.

24        POTENTIAL JUROR:  Lisa Surrett, I had one retrieve a

25   bicycle five minutes after it was stolen.

Ann H. Armstrong, RPR

1    POTENTIAL JUROR:  Carolyn Deason, my husband is an
2  ex-policeman, and I worked for the municipal court in Selma
3  for four years.

4    POTENTIAL JUROR:  John Mott, I did reserve officer
5  work about fifteen years ago.

6    POTENTIAL JUROR:  Ruby Jones, and I got a two dollar
7  ticket.  A policeman walked around my car and kept walking,
8  trying to see when he stopped.  But I still had a ticket,
9  but he was nice.

10    POTENTIAL JUROR:  Curtis Fails, police helped my
11  brother get his license back.

12    MR. WIGGINS:  Anyone on this far aisle?

13    (No response.)

14    MR. WIGGINS:  There are some police officers who are
15  going to testify in this particular case.  Is there anyone
16  who has a tendency to believe what police officers say more
17  so than what an individual says?  Anyone who favors the
18  police officer and believes what the officer says just
19  because he's a police officer?  Anyone on this aisle?

20    (No response.)

21    MR. WIGGINS:  Anyone in the middle aisle?

22    POTENTIAL JUROR:  Ruby Jones.  And I have had no
23  terrible experience with the police because I run the
24  halfway house in Montgomery.  I know they do their job the
25  best they can.

Ann H. Armstrong, RPR