# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MATTHEW REEVES,  )
)
    Petitioner,  )
)
viii.  )   Case No.  1:17-cv-00061-KD-MU
)
JEFFERSON S. DUNN,  )
Commissioner of the Alabama  )
Department of Corrections,  )
)
    Respondent.  )

# VOLUME 4

# State Court – Trial, Reporter's Record

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
   CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

1          MR. WIGGINS:  Because of that do you have a tendency

2     to believe what the officers say more so than anybody else?

3          MS. JONES:  Yes.

4          POTENTIAL JUROR:  Maude Stallworth.   I have children

5     at home.  I have two real sick at home.  So I tell them to

6     sweep and they call the police, sweep the floor.  Every time

7     I tell them to sweep up the floor, wash the dishes, they

8     call the police.  And I tell them -- I say, don't do that.

9     I'm having a lot of trouble with the police, but I don't

10    have no more trouble with them.  Every time I tell them

11    that, ain't nothing happened.

12         MR. WIGGINS:  Would that experience you have had with

13    police officers cause you to believe them more than anybody

14    else?

15         MS. STALLWORTH:  Yes.  I tell them ain't nothing

16    happened.

17         MR. WIGGINS:  If an officer testified in this case,

18    will you believe what an officer will say more than anyone

19    else?

20         MS. STALLWORTH:  Uh-huh.

21         MR. WIGGINS:  You would believe the officer?

22         MS. STALLWORTH:  I believe the officer coming.  I

23    called him.

24         MR. WIGGINS:   I'm talking about in this case if an

25    officer testifies in this case, would you believe what he

Ann H. Armstrong, RPR

1    says in this case as opposed to --

2         MS. STALLWORTH:  Yeah.  I believe what he say.

3         MR. WIGGINS:  Anybody else in this aisle?

4         (No response.)

5         POTENTIAL JUROR:  William Patrick, police officers

6    are sworn into office, and I think that you should believe

7    what they say above anybody else.

8         MR. WIGGINS:  Are you saying if they testify in this

9    case, you would believe what they say as opposed to anybody

10   else?

11        MR. PATRICK:  Yes, sir.

12        MR. WIGGINS:  In this particular case we are going to

13   hear something about what we call rap music, and I know a

14   lot of us grew up with some different music, Elvis and the

15   Temptations and Marvin Gaye and all of them.  This

16   generation listens to some other kinds of music, some that

17   we may think is good and some that we may think is bad.  And

18   a lot of the rap music is hard, and it's bad to a certain

19   degree.  I want to know whether or not if anyone on this

20   particular aisle would have any opinion about the type of

21   music our kids are listening to, this rap music, as to

22   whether or not it's a bad influence on our kids.

23        POTENTIAL JUROR:  Patti Driggers.

24        MR. WIGGINS:  You feel like it's bad?

25        MS. DRIGGERS:  (Nods head affirmatively).

1         POTENTIAL JUROR:   Maxine Calloway.

2         POTENTIAL JUROR:  James McCrory.  I think that stuff

3  is terrible.

4         POTENTIAL JUROR:  Margaret Christian, sort of have to

5  sift what your children listen to.

6         POTENTIAL JUROR:   Pat Cammack, I think it pretty

7  bad.  I think it's invasive to other people's lives and too

8  loud and bad language.

9         POTENTIAL JUROR:  Georgette Ruth, some of it is bad.

10        POTENTIAL JUROR:  Ted Henry, I think the lyrics are

11  kind of dangerous really, some of them you hear.

12        POTENTIAL JUROR:   Lawrence Carroll, I think it's

13  bad.

14        POTENTIAL JUROR:   Juanita Lanier, I think it's

15  ridiculous.

16        POTENTIAL JUROR:  Ruby Jones.  Have you ever heard of

17  church rap?  It would be good, but the other stuff shouldn't

18  be on there.

19        POTENTIAL JUROR:  Sorrells, I think some rap music is

20  a bad influence on children.

21        POTENTIAL JUROR:  Curtis Fails, I think that rap

22  music in general has got bad and has got good.   I grew up,

23  started off with rap from way down from -- you've got to

24  teach your kids.  I mean, you know, kids have got to

25  understand that rap music -- don't listen to certain parts

1    of it.  You have to explain to them that they are doing that

2    just for to get the young kids involved in doing wrong

3    things or whatever.  But it's just they fight it every day.

4    You've got to look at life in both ways.   Marilyn Manson

5    is bad.  All of them, you know, have got music.

6           POTENTIAL JUROR:  Melvin Miller, certain rap artists,

7    you know, the way they express their words, I think it's bad

8    for them in the young society.

9           POTENTIAL JUROR:  Edward Johnson, I think all rap is

10   no good.  It's not worth listening to.

11          MR. WIGGINS:  Anyone on this particular aisle over

12   here know a young lady by the name of Brenda Suttles?

13          POTENTIAL JUROR:  Norma Bourdon, I have worked with

14   Ms. Suttles' family for a number of years.

15          POTENTIAL JUROR:  Jacqueline Menifee, she attended

16   the school that I worked at.

17          MR. WIGGINS:  I called her Brenda Suttles.  Her

18   nickname is Bam Bam.  So if I mention Brenda Suttles, I'm

19   also talking about a young lady they call Bam Bam.  Any one

20   else on this aisle?  In the middle aisle?

21          POTENTIAL JUROR:  Janice Mitchell, I knew about her

22   family.

23          POTENTIAL JUROR:  Malanda Brown.

24          MR. WIGGINS:  You said what?

25          MS. BROWN:  I don't care to say it out.

1   (The following occurred at the bench outside the

2 hearing of the jury venire:)

3   MS. BROWN:  I stated earlier that someone broke into

4 my house and took some jewelry.  They said that it was her

5 first cousin.  She was related to her -- the girl that broke

6 into my house.  I think it was Tonya Suttles.  But she was

7 related to her.

8   (The following occurred in the presence and hearing

9 of the jury venire:)

10   POTENTIAL JUROR:  Ella Gordon, in West Selma where I

11 live I knew her over there for just hanging around over

12 there.  I knew her as Bam Bam.  I heard a lot of my children

13 talk about her.

14   POTENTIAL JUROR:  Margaret Christian, I taught her

15 sister.

16   MR. GOGGANS:  I'll let Mr. Wiggins rest his voice a

17 minute and ask you a few more questions.  Y'all were asked

18 earlier if you knew any of the lawyers, some of the

19 participants at this table here.  Do any of you know

20 personally Judge Jones?  Let me start on this side.  We

21 will work over this way going from front towards the back.

22 Mr. Lockett, is that right?  How do you know Judge Jones?

23   MR. LOCKETT:  I'm an attorney through work.

24   POTENTIAL JUROR:  Thelma Clark, my son and Tommy went

25 to school together.

Ann H. Armstrong, RPR

1          MR. GOGGANS:   That's Thelma Clark.   And next to Ms.

2     Clark, your name again?

3          POTENTIAL JUROR:   Judy Golson, I worked at Selma

4     National Bank with Tommy's daddy when he was a child.

5          POTENTIAL JUROR:   Seymour Cohn, his father and I have

6     been friends for many years, and I've known him since he was

7     a little shaver.

8          POTENTIAL JUROR:   Windy Clower, I know of him.

9          POTENTIAL JUROR:   Sam Smitherman, I knew him through

10    politics.

11         POTENTIAL JUROR:   Darryl King, socially and

12    professionally.

13         POTENTIAL JUROR:   Carolyn Deason, I worked two years

14    in municipal court.

15         POTENTIAL JUROR:   Robert McConnell, he's presiding

16    judge in a civil suit that I was involved in.

17         POTENTIAL JUROR:   John Mott, we graduated from high

18    school together.

19         POTENTIAL JUROR:   Annie Horton, I used to work in the

20    Circuit Clerk's office.

21         POTENTIAL JUROR:   Ted Henry, I have known his family

22    all of his life and my life.

23         POTENTIAL JUROR:   James McCrory, I know him as a

24    friend.

25         MR. GOGGANS:   We just had a lady say that she knew

Ann H. Armstrong, RPR

1   Judge Jones from working in the Clerk's office here in the

2   courthouse.  Do any of you know somebody who works in the

3   courthouse here?  Anybody in this section over there?

4        POTENTIAL JUROR:  George Yocum, Judge Johnny Jones.

5        POTENTIAL JUROR:  Margaret Christian, June Meadows,

6   Tommy's secretary.

7        POTENTIAL JUROR:  Ted Henry, Judge Jones and Bill

8   Kynard, lots of them.

9        POTENTIAL JUROR:  James McCrory, Bill Kynard, Judge

10  Jones.

11       POTENTIAL JUROR:  Gary Smith.

12       MR. GOGGANS:  Who do you know, Mr. Smith?

13       MR. SMITH:  Bill Kynard.

14       POTENTIAL JUROR:  Edward Chance, Judge Jones, Bill

15  Kynard.

16       POTENTIAL JUROR:  Ruby Jones.

17       MR. GOGGANS:  Who do you know?

18       MS. JONES:  I know Judge Jones.

19       POTENTIAL JUROR:  Nannie Smith, I know Judge Johnny

20  Jones.

21       POTENTIAL JUROR:  Carla Moore, I know Johnny Jones

22  and Sylvia Odom.

23       POTENTIAL JUROR:  Johnnie Melton, I know several

24  people that work in the courthouse.

25       POTENTIAL JUROR:  Darryl King, Ms. Wilson, Johnny

1    Jones, Sharon Craig.

2           POTENTIAL JUROR:  James Parker, Beverly Miller, she

3    works in the Sheriff's office.

4           POTENTIAL JUROR:  Lisa Surrett, Mr. Kynard is my

5    former landlord.

6           POTENTIAL JUROR:  Robert McConnell, Judge Johnny

7    Jones and his wife Betty.

8           POTENTIAL JUROR:  John Mott, Johnny Jones and quite a

9    few of the deputies at the Sheriff's office.

10          POTENTIAL JUROR:  Kathleen Holliman, I know Judge

11   Jones and then a lot of secretaries that work there.

12          POTENTIAL JUROR:  Charlene Cobb.

13          MS. SURRETT:  Mike Erwin, he's my stepbrother.

14          MR. GOGGANS:  Did you think of somebody else you

15   know?

16          MS. JONES:  My favorite sheriff, the one that's -- I

17   can't recall his name.  He's in here now.

18          MR. McCONNELL:  Sheriff Huffman is my neighbor.

19          MR. GOGGANS:  How about over here in this section?

20   Mr. Lockett, I take it you know a lot of people?

21          MR. LOCKETT:  Most of them.

22          POTENTIAL JUROR:  Dorothy King.

23          MR. GOGGANS:  Ms. King, who do you know in this

24   building?

25          MS. KING:  One of the sheriffs and Susie Watkins.

Ann H. Armstrong, RPR

1       POTENTIAL JUROR:   Norma Bourdon, Judge Walker.

2       POTENTIAL JUROR:   Rita Jennings, Johnny Jones and

3    Warren Kelly.

4       POTENTIAL JUROR:   Seymour Cohn, Johnny Jones, John

5    Swanson, Dale Curry, Joy Christian.

6       POTENTIAL JUROR:   Judy Golson, I know Johnny Jones,

7    and I graduated from high school with Bill Kynard.

8       POTENTIAL JUROR:   Thelma Clark, Susie Watkins.

9       POTENTIAL JUROR:   Betty Parnell, Judge Walker.   Can I

10   be excused for a minute?

11       MR. GOGGANS:   While Ms. Parnell is out for a minute,

12   I'm going to proceed with the same question so she won't

13   miss anything.

14       POTENTIAL JUROR:   Windy Clower, lawyers and Judge

15   Jones.

16       POTENTIAL JUROR:   Pat Trotter, I know John Swanson

17   and Mike Erwin, Johnny Jones and Susan who works in the DA's

18   office.

19       POTENTIAL JUROR:   Frank Jones.   Johnny Jones who is

20   not related and Tommy who is not related.   And I know

21   Sheriff Huffman and several deputies.

22       POTENTIAL JUROR:   Mr. Ed Greene, Johnny Jones.

23       MR. GOGGANS:   Your name, please, sir?

24       POTENTIAL JUROR:   Gerald Dunn and also Bill Kynard.

25       POTENTIAL JUROR:   Sharon Parker, I know Jennifer

1    Reynolds.  She's my sister-in-law, and Judge Walker is my

2    cousin.

3            MR. GOGGANS:  What's your name?

4            MS. PARKER:  Sharon Parker.

5            POTENTIAL JUROR:  Verlisa Baity, I know quite a few

6    people in the courthouse.

7            POTENTIAL JUROR:  Rita Caver, I know Parke Keith.

8            POTENTIAL JUROR:  Bert Ellison, Jennifer Rawls.

9            MR. GOGGANS:  What was your name again?

10           POTENTIAL JUROR:  Virginia Savage.

11           MR. GOGGANS:  We know how many of you know Mr. Greene

12   and Ms. Wilson.  But do any of you know anybody who works in

13   a prosecutor's office, whether that be a state or federal or

14   municipal, any other type of prosecution office?  Do you

15   personally know anybody who works in a prosecutor's office?

16   Let's start over here on this side.  We'll work our way over

17   again.  Does anybody in this section here other than Mr.

18   Greene and Ms. Wilson that we already know about know

19   anybody who works in the prosecutor's office?

20           POTENTIAL JUROR:  John Lockett.

21           POTENTIAL JUROR:  Does it have to be in this State?

22           MR. GOGGANS:  No.  Would you stand and tell us your

23   name and who you know.

24           POTENTIAL JUROR:  Sharon Parker, and I have a cousin

25   in Illinois that works in the prosecutor's office,

Ann H. Armstrong, RPR

1        POTENTIAL JUROR:  Seymour Cohn, I know Susan Moreland

2    Keith.

3        MR. GOGGANS:  How about anybody else in this section?

4        POTENTIAL JUROR:  Frank Jones, I know Susan Moreland

5    Keith too.

6        MR. GOGGANS:  What about the middle section?  Do any

7    of you in the middle section know anybody else who works in

8    the prosecutor's office anywhere, whether it's city, state or

9    federal?

10        (No response.)

11        MR. GOGGANS:  How about in this section over here?

12        POTENTIAL JUROR:  Ted Henry, I know Susan Keith.

13        MR. GOGGANS:  Apart from what you have already told

14    us, are any of you related to or friends with a lawyer,

15    anybody who is working as a lawyer or working for a lawyer?

16    Let's start in the middle section this time.

17        POTENTIAL JUROR:  Nannie Smith, I am friends with

18    Blanchard McLeod, Bob Armstrong and Keith.

19        POTENTIAL JUROR:  Darryl King, Parke Keith and Ham

20    Wilson.

21        POTENTIAL JUROR:  James Parker, I know Mr. McNeill.

22    I coached his little girl in softball and also we became

23    friends.

24        MR. GOGGANS:  You're Mr. Parker?

25        MR. PARKER:  James Parker.

Ann H. Armstrong, RPR

1    POTENTIAL JUROR:  Frank Carter, I know Marvin Wiggins

2  and all lawyers from Chestnut.

3    POTENTIAL JUROR:  Carolyn Deason, I worked four years

4  in the municipal office as a magistrate, and I had a working

5  relationship with lots of lawyers, all of them.

6    POTENTIAL JUROR:  Robert McConnell, Parke Keith and

7  John Pilcher.

8    POTENTIAL JUROR:  Margaret Christian, Parke Keith and

9  Alston Keith.

10    POTENTIAL JUROR:  Maxine Calloway, I have a niece and

11  a nephew, Wyman Gilmore, down in Grove Hill and Wylynn.

12    MR. GOGGANS:  Anyone else in this section?  Mr.

13  Yocum?

14    MR. YOCUM:  Bob Armstrong and Ham Wilson.

15    POTENTIAL JUROR:  Ted Henry, I have lots of friends

16  who are attorneys.

17    POTENTIAL JUROR:  James Morrow, Hawkeye is my first

18  cousin.

19    POTENTIAL JUROR:  Billy Faile, kin to him.

20    MR. GOGGANS:  Your name?

21    POTENTIAL JUROR:  Lawrence Carroll.

22    POTENTIAL JUROR:  Collins Pettaway is my lawyer,

23  Juanita Lanier.

24    POTENTIAL JUROR:  James McCrory, I know Billy Faile.

25    POTENTIAL JUROR:  John Lockett, I know a lot of

Ann H. Armstrong, RPR

1 attorneys.

2  POTENTIAL JUROR:  Norma Bourdon, I know Mr. McLeod,

3 Rose Sanders and just a number of juvenile lawyers.

4  POTENTIAL JUROR:  Angelica Cobb, I know Fred

5 McCormick.

6  POTENTIAL JUROR:  Seymore Cohn, I know too many of

7 them to enumerate.

8  POTENTIAL JUROR:  Frank Jones, Fred McCormick,

9 Vaughan Russell, the two Gambles and several others.

10  POTENTIAL JUROR:  Judy Golson, kin to John Lockett,

11 Charlie Morris and Bob Armstrong, and I know a lot of the

12 lawyers and become acquainted through church.

13  POTENTIAL JUROR:  Rita Caver, Parke Keith is my

14 lawyer.

15  MR. GOGGANS:  Have any of you ever signed a criminal

16 complaint on somebody; in other words, you swore out a

17 warrant on someone to have them arrested?  Have any of you

18 ever done that?  Let's start in this section here.  Anybody

19 over here?

20  POTENTIAL JUROR:  Betty Parnell, signed a warrant on

21 somebody?

22  MR. GOGGANS:  Yes.

23  MS. PARNELL:  I signed a warrant on a friend.

24  MR. GOGGANS:  Anybody in the middle section?  Has

25 anybody in the middle section ever sworn a warrant out on

1   somebody?

2          (No response.)

3          MR. GOGGANS:  How about in this section over on this

4   side?

5          (No response.)

6          MR. GOGGANS:  Now I want to eliminate some of the

7   things that fit into this category, but I want to know

8   others.  I want to know about bumper stickers that you have

9   got on your car or your truck or whatever you drive.  We are

10  going to eliminate things like Auburn or Alabama or whatever

11  school you pull for or whatever school you go to or your

12  children or grandchildren go to.  If you've got a bumper

13  sticker on your car, if you would stand up and tell us what

14  your name is and what your bumper sticker says.

15         POTENTIAL JUROR:  Marshall Gill, Alabama Cattlemen's

16  Association.

17         POTENTIAL JUROR:  Georgette Ruth, I'm a parent of a

18  Terrific Kid.

19         MR. GOGGANS:  And your name again?

20         MS. RUTH:  Georgette Ruth.

21         POTENTIAL JUROR:  Samuel Clark, I have one on the

22  back of my truck that says it is better to plant a tree than

23  cut a logger.

24         POTENTIAL JUROR:  Nannie Smith, I have one that says

25  Jesus saves.

Ann H. Armstrong, RPR

1    POTENTIAL JUROR:  Rosie Davis, Terrific Kid.

2    MR. GOGGANS:  Nobody in this section over here?

3    (No response.)

4    MR. GOGGANS:  I want to ask you a few questions about

5    how you feel about some things you will hear about during

6    the course of the trial if you're on a jury in this

7    courthouse or really any courthouse in this county or state

8    or country.  And again there are no right or wrong answers

9    to any of these questions as long as you do answer if you've

10   got an opinion or if you know something about it or feel

11   something about it.  One of the things that you will hear

12   about and one of the laws that we have is something called a

13   presumption of innocence.  The way that works is this.  When

14   somebody is charged with a crime, when they are accused of

15   doing something, the law says this person is presumed to be

16   innocent.  In other words, when you start out in a case,

17   just because somebody is charged -- when somebody is

18   charged, it is presumed that they are innocent.  It's

19   presumed that they didn't do anything.  Some people don't

20   like that.  We can all think of laws we don't like.  I can

21   probably think of about ten thousand tax laws I don't like.

22   Do any of you have any thought that perhaps it shouldn't be

23   that way, that perhaps it shouldn't be that somebody charged

24   with a crime should be presumed to have done nothing?  Do

25   any of you have any thoughts that it should not be that way?

Ann H. Armstrong, RPR

1   (No response.)

2   MR. GOGGANS:  No one?  Another thing that you will

3 hear about -- and you will hear some law that anybody on a

4 jury would have to follow, which is the burden of proof is

5 on the government in the case.  The Defense in a criminal

6 case does not have any burden of proof at all.  The burden

7 is on the government to prove the case beyond a reasonable

8 doubt.  That's different in a civil case.  In a civil case

9 it is a preponderance of the evidence which means more

10 likely than not.  In a criminal case it is beyond a doubt

11 for which there is a reason.  Do any of you think that

12 perhaps it might be better to have the burden of proof the

13 other way around or perhaps maybe the burden shouldn't be

14 such a high burden of proof, that perhaps it ought to be

15 like in a civil case?  Does anybody have any reservation or

16 any thought that perhaps that might not be such a good law?

17   POTENTIAL JUROR:  Ruby Jones.  I'm a minister, and I

18 have to follow the words in Matthew 7.  I am not able to

19 judge, but I feel like the police that found the evidence

20 ought to be the ones to stand before the judge and make the

21 sentence.  I'm not able to do it.

22   MR. GOGGANS:  Another thing that is the law in this

23 state -- it's not like this in all court proceedings in this

24 country, but it relates to the fact that the jury verdict

25 has got to be unanimous; in other words, everybody on the

Ann H. Armstrong, RPR

1   jury has got to agree on what the verdict is.  Whatever that

2   verdict is, everybody has got to agree that that is what the

3   verdict will be, and that is what is going to be returned to

4   the court when the verdict is announced.  It's not like in a

5   court martial proceeding.  In a court martial they don't

6   have the unanimous jury verdict requirement.  Does anybody

7   think that perhaps we might ought to think about whether or

8   not that's a good thing to do; perhaps it shouldn't be a

9   requirement that all twelve agree and maybe a majority,

10  maybe ten of twelve, something other than the requirement

11  that every single person on the jury agree on a verdict?

12          POTENTIAL JUROR:  Ruby Jones.

13          MR. GOGGANS:  Same reason you just told us?

14          MS. JONES:  I can't agree because the Bible says that

15  you testify to what you see and speak what you know.  So I

16  wouldn't know, and I didn't see it.  And I would have to sin

17  if I say I do, and I can't.

18          MR. GOGGANS:  Melvin Miller, weren't you the

19  gentlemen that sat on a court martial before?

20          MR. MILLER:  Yes, sir.

21          MR. GOGGANS:  Do you think that perhaps the court

22  martial proceeding was a better way to do it, or do you have

23  a problem with the requirement that the jury verdict has to

24  be unanimous?

25          MR. MILLER:  Not really.

Ann H. Armstrong, RPR

1        MR. GOGGANS:  You're sure?

2        MR. MILLER:  Positive.

3        MR. GOGGANS:  That's all.

4        MR. GREENE:  Ladies and gentlemen, a few brief

5   questions.  I need to ask some of you something about your

6   birthrates and your address if I may.  Malanda Brown, Ms.

7   Brown, I've got you at 112B Rangedale Annex, 12-19-71; is

8   that correct?

9        MS. BROWN:  Yes.

10       MR. GREENE:  Mr. Willie Calhoun, 2404 Main Street,

11  Selmont?

12       MR. CALHOUN:  Yes, sir.

13       MR. GREENE:  8-14-41?

14       MR. CALHOUN:  Yes, sir.

15       MR. GREENE:  Thank you, sir.  Mr. James Carson, 45

16  Bibb Street, Selma?

17       MR. CARSON:  Yes, sir.

18       MR. GREENE:  6-24-64?

19       MR. CARSON:  Yes, sir.

20       MR. GREENE:  Edward Chance, Mr. Chance, 3809

21  Merrifield Drive?

22       MR. CHANCE:  Right.

23       MR. GREENE:  2-18-40?

24       MR. CHANCE:  Right.

25       MR. GREENE:  Rosie Davis, 800 Bradford Circle?

152

1    MS. DAVIS:  Right.

2    MR. GREENE:  7-21-50?

3    MS. DAVIS:  Right.

4    MR. GREENE:  William Day, Mr. Day, 9035 Dallas Road

5    30?

6    MR. DAY:  Yes, sir.

7    MR. GREENE:  1-21-64?

8    MR. DAY:  1-22-64.

9    MR. GREENE:  Okay.  Mr. Fails, 24A Hidden Acres?

10   MR. FAILS:  Yes, sir.

11   MR. GREENE:  5-14-67?

12   MR. FAILS:  Yes, sir.

13   MR. GREENE:  Laura Flennory, 44 Bibb Street?

14   MS. FLENNORY:  Right.

15   MR. GREENE:  9-14-57?

16   MS. FLENNORY:  Right.

17   MR. GREENE:  Yolanda Flowers, 3015 Perham?

18   MS. FLOWERS:  Yes, sir.

19   MR. GREENE:  3-23-73?

20   MS. FLOWERS:  Yes, sir.

21   MR. GREENE:  Marshall Gill, 6569 Alabama Highway 22?

22   MR. GILL:  Yes.

23   MR. GREENE:  1-8-56?

24   MR. GILL:  Yes.

25   MR. GREENE:  Carol Gordon, 839 Hood?

Ann H. Armstrong, RPR

153

```
1     MS. GORDON:  Yes.

2     MR. GREENE:  12-27-56?

3     MS. GORDON:  Yes.

4     MR. GREENE:  Ella Gordon, 233 Alabama Avenue?

5     MS. GORDON:  Yes.

6     MR. GREENE:  5-23-51?

7     MS. GORDON:  Yes.

8     MR. GREENE:  Darryl King, Mr. King, 230 Greenbriar?

9     MR. KING:  Yes, sir.

10    MR. GREENE:  1-10-62?

11    MR. KING:  That's correct.

12    MR. GREENE:  Elizabeth Martin, 905A Sheppard?

13    MS. MARTIN:  That's incorrect.

14    MR. GREENE:  Did you live there?

15    MS. MARTIN:  Yes.

16    MR. GREENE:  But that's not correct now?

17    MS. MARTIN:  No.

18    MR. GREENE:  What is your address?

19    MS. MARTIN:  1928 Lagrande Street.

20    MR. GREENE:  11-26-56?

21    MS. MARTIN:  That's correct.

22    MR. GREENE:  Johnnie Melton, 404 St. Ann Street?

23    MS. MELTON:  That's my mailing address.

24    MR. GREENE:  That's not where you live?

25    MS. MELTON:  No, it's not.
```

Ann H. Armstrong, RPR

1        MR. GREENE:  Where do you live?

2        MS. MELTON:  209 Alabama Avenue.

3        MR. GREENE:  Who lives at 404 St. Ann Street?

4        MS. MELTON:  My mother.

5        MR. GREENE:  And you get your mail there?

6        MS. MELTON:  Uh-huh.

7        MR. GREENE:  12-13-62?

8        MS. MELTON:  Yes, sir.

9        MR. GREENE:  Sharon Parker, Ms. Parker, 2328 Selma

10  Avenue?

11        MS. PARKER:  Yes.

12        MR. GREENE:  8-8-63?

13        MS. PARKER:  That is correct.

14        MR. GREENE:  Betty Parnell, 23 Commodore?

15        MS. PARNELL:  Yes.

16        MR. GREENE:  7-14-62?

17        MS. PARNELL:  Yes.

18        MR. GREENE:  William Patrick, 7053 County Road 39?

19        MR. PATRICK:  Correct.

20        MR. GREENE:  3-6-66?

21        MR. PATRICK:  That's correct.

22        MR. GREENE:  Ora Pritchett, Ms. Pritchett, 1017 One

23  Half Griffin?

24        MS. PRITCHETT:  Right.

25        MR. GREENE:  2-22-23?

Ann H. Armstrong, RPR

1        MS. PRITCHETT:  Yes.

2        MR. GREENE:  Gary Smith, 8900 County Road 37?

3        MR. SMITH:  Uh-huh.

4        MR. GREENE:  9-12-53?

5        MR. SMITH:  Right.

6        MR. GREENE:  Samuel Williamson, 498 Dallas Road 342?

7        MR. WILLIAMSON:  Yes.

8        MR. GREENE:  8-9-38?

9        MR. WILLIAMSON:  Yes, sir.

10       MR. GREENE:  Mr. William Patrick, Mr. Patrick, I

11 think you answered awhile ago concerning the testimony of

12 various witnesses that you would tend to believe that a

13 police officer would tell you the truth in a matter; is that

14 how you feel?

15       MR. PATRICK:  Yes, sir.

16       MR. GREENE:  You understand that you are charged if

17 you serve as a juror to receive all witnesses to tell you

18 the truth about what they say on the stand; do you

19 understand that?

20       MR. PATRICK:  Right.

21       MR. GREENE:  Do you understand you are charged with

22 the responsibility of making a judgment about those

23 witnesses as they testify if you are a juror, to make your

24 own mind up individually as to whether or not you believe or

25 don't believe what they are telling you?

156

1          MR. PATRICK:  That's right.

2          MR. GREENE:  And you are prohibited from gathering

3    any group of people including policemen into any package

4    group to say whether you believe or don't believe them; you

5    may rely upon their expertise and training and make your

6    mind up as you hear it?  Do you understand that?

7          MR. PATRICK:  Yes, sir.

8          MR. GREENE:  Can you sit as a juror in this case and

9    receive testimony from law enforcement officers and decide

10   individually as they testify as to whether you believe or

11   don't believe those things that you are being told without

12   categorizing them in a group?  Do you think you can do that?

13         MR. PATRICK:  Yes, sir.

14         MR. GREENE:  Ms. Janice Bolden, Ms. Bolden do you

15   know Alvin or Clarence Bolden?

16         MS. BOLDEN:  Clarence.

17         MR. GREENE:  Are you related to him in any way?

18         MS. BOLDEN:  I think my husband is, yes.

19         MR. GREENE:  Elizabeth Martin, were you called to

20   testify recently in a criminal case involving a homicide?

21         MS. MARTIN:  Yes, I was.

22         MR. GREENE:  Ms. Betty L. Sheppard, do you know or

23   are you related to Peter Sheppard?

24         MS. SHEPPARD:  Yes, that's my brother.

25         MR. GREENE:  Ms. Channie G. Surles, Ms. Surles, do

1   you know or are you related to Francis Surles?

2          MS. SURLES:  Yes.

3          MR. GREENE:  And the relationship?

4          MS. SURLES:  Francis is my son.

5          MR. GREENE:  Ms. Emma Webster, do you know a Theodore

6   or Terry Webster?

7          MS. WEBSTER:  That's my grandson.

8          MR. GREENE:  Mr. Johnnie L. Gilmore, I've got you at

9   170 Dallas Road 347?

10         MR. GILMORE:  176.

11         MR. GREENE:  176?

12         MR. GILMORE:  Yes.

13         MR. GREENE:  Have you lived there for some time?

14         MR. GILMORE:  All of my life.

15         MR. GREENE:  Born 12-20-46?

16         MR. GILMORE:  Correct.

17         MR. GREENE:  Virginia Savage, 3202 Water Avenue, Lot

18   24?

19         MS. SAVAGE:  Yes, sir.

20         MR. GREENE:  5-11-58?

21         MS. SAVAGE:  Yes, sir.

22         MR. GREENE:  That completes it, Your Honor.

23         THE COURT:  Anything from the Defense?  Let me ask

24   you to step up here, please.

25         (An off-the-record discussion was held at the bench

Ann H. Armstrong, RPR

1    outside the hearing of the court reporter and jury venire.)

2        THE COURT:  Folks, we are almost through for the day.

3    I know that you've been asked a lot of questions.  And

4    probably most of the questions that you have been asked you

5    think are irrelevant and have no bearing on what we are here

6    about today.  But if that were the case, of course, I would

7    not allow those questions to be asked.  So the lawyers do

8    have a purpose in asking these questions.  And I want to ask

9    you to please continue to bear with us.

10       Now as I told you this morning, we have concluded a

11   portion of the voir dire in this case.  The other voir dire

12   will be what we refer to as individual voir dire.   That

13   will be an opportunity for these attorneys to ask you

14   questions regarding other matters that are important in this

15   case on an individual basis.  Now we will be conducting that

16   voir dire beginning in the morning at 8:30 a.m.

17       Now what we are going to do with the remaining hour

18   of this afternoon is to divide you into panels.  We are

19   going to determine how many people we have left.  We are

20   going to probably divide you into about four panels and then

21   bring you in at two hour intervals tomorrow.  Hopefully by

22   tomorrow afternoon at this time we will have concluded the

23   individual voir dire and we will be in a position to

24   conclude the jury selection process.  I had hoped that we

25   would be further along than we are.  We are not.  But we are

1    going to take our time moving through this process.  We are

2    not going to rush anything.  We are going to give both the

3    State and the Defense every opportunity to ask as many

4    questions as they deem are necessary.  Now I'm going to ask

5    you to please remain.  We will probably be through in about

6    fifteen or twenty minutes.  Is there anybody that just

7    absolutely has to leave the room?  Ms. Stallworth, you do?

8    I'll excuse you and ask you to please come back as soon as

9    you are through in the bathroom or the telephone or whatever

10   you have to do.  Please come back in so we can -- every time

11   you leave, we have to call the roll as you know.  So if all

12   of you leave, we will have to go back through with the roll

13   call.

14           (The following occurred at the bench outside the

15   hearing of the jury venire:)

16           MR. GREENE:  The State would challenge 31, 108, 113,

17   137, 216 and if the Defense would join us on 199.

18           THE COURT:  Of those let me ask the defense how many

19   do you agree with, if any?

20           MR. GOGGANS:  Number 31, I think she's gone.  I

21   agree.

22           THE COURT:  There is no objection to 31?

23           MR. GOGGANS:  No.  I don't see her being able to

24   serve.  She said she could not.

25           THE COURT:  What are your grounds on 108?

160

1   MR. GREENE:  Can't sit in judgment unless she sees it

2 or witnesses it, and she can't sit in judgment and render a

3 judgment unless she sees it or hears it and so on and so

4 forth.

5   MR. GOGGANS:  That's Ms. Jones.

6   THE COURT:  A response from the Defense on Ruby

7 Jones?

8   MR. WIGGINS:  I think she's probably like any other

9 witness.  She is just deep in her religion.  I don't think

10 it's going to prevent her from listening to the evidence and

11 make a decision based on the evidence.  She just said right

12 now based on her religious beliefs she didn't want to judge

13 them.

14   MR. GOGGANS:  I have found that sometimes when you

15 ask folks that give an answer, when you say, look, all we're

16 doing is asking you to make a decision on whether you've got

17 reasonable doubt as to whether this person did this or not.

18   THE COURT:  We'll deny the challenge at this time.

19 Number 113; 113 was one of the group that cannot -- she

20 knows the Defendant's mother and cannot serve in this case.

21 I had a list of those.

22   MR. GOGGANS:  I wrote that down that she knew Matthew

23 Reeves.

24   THE COURT:  Of the six people, four said they could

25 not serve.  My notes are that with regard to these four.

Ann H. Armstrong, RPR

1      MR. GOGGANS:  I think she's gone.

2      THE COURT:  Let me tell you the group of those four

3  that I have.  They said that they had knowledge of the

4  Defendant or the Defendant's family and/or mother.  They

5  can't separate that from this case.  That was a quote that I

6  jotted down.  That was on 46, 31, 137, 113, 216.

7      MR. GREENE:  I have 216; 46 is Denmark.

8      THE COURT:  216, my bad.  My two looks like a four.

9  It's 216; I'm sorry.  Does the Defense have a strong

10  objection to those?

11      MR. GOGGANS:  As I understand it, you are talking

12  about 216, 31, 137 and 113?

13      THE COURT:  Correct.

14      MR. GOGGANS:  We don't oppose that.

15      THE COURT:  Those will be granted.

16      MR. GREENE:  We raised a question on 199.  We just

17  thought we ought to go ahead and mutually remove her.

18      THE COURT:  We will keep her through tomorrow.

19      MR. GREENE:  Our official grounds on her is that the

20  lady is just not with us.  She is not in this group.  She is

21  not in this particular -- she is not responsive to the

22  question.  Both sides have had to ignore when she gives an

23  answer that is not connected with anything.  She may say

24  something so totally unresponsive to a question that --

25      THE COURT:  Of course, we are through with general

Ann H. Armstrong, RPR

1  voir dire, but I'm going to grant the challenge on 199.  All

2  of the State's challenges are granted.  Defense's

3  challenges?

4       MR. GOGGANS:  I was looking through my notes when we

5  started the State's.  I think we are probably going to have

6  more after we get people in the back and start asking some

7  more questions.  Right now I believe the record is

8  sufficient for us to make a challenge for cause on number

9  112.  This is the man who had been sued by Wiggins law firm

10  and also his father was brutally murdered up in Hale County.

11  His words here about his feelings about the lawsuit brought

12  by Mr. Wiggins' firm was that he thought it was quote, bull

13  shit.  I think he needs to go.  He added that he thought it

14  was, quote bull shit.

15       MR. GREENE:  The man was clear that he could serve,

16  that that would not stop him from serving on this jury.  He

17  could separate the two.  We would oppose the challenge.

18       THE COURT:  I believe I followed that with asking him

19  can he be fair and impartial.

20       MR. GREENE:  You went into depth with him.

21       MR. WIGGINS:  But the gentleman earlier with the

22  question about reservations with the firm, he had a strong

23  reservation with the firm and me being associated with the

24  firm and having sued him.  So I really don't think he should

25  be on.

1    MR. GOGGANS:  I think as a matter of fairness to get

2  a fair and impartial juror under the 16th amendment and

3  Article 1, Section 6 of the State constitution he needs to

4  go.

5    THE COURT:  I will grant your challenge.

6    MR. GOGGANS:  Let me flip through here.  I think as

7  far as it goes, that's all the challenges we have to make

8  right now.

9    (The following occurred in the presence and hearing

10  of the jury venire:)

11    THE COURT:  If I call your name, you are deferred or

12  rather you are excused from hearing this particular case.

13  However, there are other cases that will be tried later on

14  this week with Judge Meigs as soon as we are through with

15  the entire venire.  So you will need to call back tomorrow

16  after 5:00 o'clock.  These people will not have to come back

17  tomorrow.  Margaret Christian, Darryl King, Dorothy King,

18  Johnnie Melton, Maude Stallworth, Emma Webster.  These

19  people will not have to come back in the morning or tomorrow

20  at any time.  Please call back at 5:00.  Mr. Bagley will

21  give you a card with a telephone number on it.  We need you

22  to call that telephone number after 5:00 o'clock to receive

23  further instructions regarding your jury service for the

24  remainder of the week.  Again that's Margaret Christian,

25  Dorothy King, Johnnie Melton, Emma Webster, Maude Stallworth

Ann H. Armstrong, RPR

1    and Darryl King.  Now of those six people are there any

2    questions regarding your jury service?  You do understand

3    you're not to be here tomorrow.

4          Those of you who are remaining, we are going to

5    continue the voir dire process tomorrow.  We will start at

6    8:30.  And in just a few minutes Mr. Kynard is going to call

7    the names of twenty-five people who will need to be here at

8    8:30 in the morning.  He will call a second group of

9    twenty-five names.  After he concludes that group, that

10   group of people will need to be here at 10:30 in the

11   morning.  The third group of names called will need to be

12   here at 12:30.  And then the fourth group of names called

13   will need to be here at 2:30.  Now I hate to confuse you,

14   but it's very important that you listen for your name.  And

15   probably the most important thing that you do is that we

16   will not be in this courtroom tomorrow.  We will be in the

17   annex which is located directly out of this door through the

18   glass corridor into the next building on the second floor.

19   We will be in my courtroom, which is courtroom number two.

20   If your name is called at this time, you will need to be in

21   that courtroom tomorrow morning at 8:30.

22          (Clerk called out names from jury venire list.)

23          THE COURT:  Does anybody not know where they need to

24   report or not know what time?  They need to report at 8:30

25   in the morning.  Now this group of people, please come to

1    that courtroom at 10:30 in the morning.

2        (Clerk called out names from jury venire list.)

3        THE COURT:  Is there anybody in that group that does

4    not know where the courtroom is?  Please call out names for

5    third group which will report at 12:30.

6        (Clerk called out names from jury venire list.)

7        THE COURT:  That group of people will please report

8    at 12:30.  Is there anybody in that group that does not know

9    what time to report?  The last report is at 2:30 in the

10    afternoon.

11        (Clerk called out names from jury venire list.)

12        THE COURT:  That group will please report at 2:30 in

13    the afternoon.  Is there anybody here who does not know

14    where the courtroom is in that group?

15        At this time I'm going to leave you with the

16    following instruction.  It's an instruction that I gave you

17    earlier this morning.  I would ask you to please observe

18    this instruction and abide by this instruction.

19        The law requires that you neither talk to nor

20    communicate with anyone regarding the facts of this case;

21    nor should you allow anyone to communicate with you or

22    discuss the facts of this case with you.  It would be

23    improper for you to have any contact with any person which

24    would in any manner tend to prejudice you either in favor of

25    or against the Defendant or the State.  Don't discuss this

1   case with your spouse; don't discuss this case with any

2   member of your family.  Do not discuss the case with your

3   fellow jurors.  You will hear the evidence in this case.

4   You will try the case upon the testimony that you hear from

5   the witness stand and the law as I give you the law in my

6   charge.  And the law says that no outside influence should

7   be permitted to affect you at all.  And I know all of you

8   want to observe this rule and observe this order and observe

9   the oath that you have taken in this matter.  And I'm sure

10  that you'll not let anything happen which might tend to

11  influence you in this case one way or the other.

12       Now throughout the course of this week, throughout

13  today there have been various members of the media who have

14  come into the courtroom.  I'm going to ask you to please not

15  read the newspaper in the morning.  Don't read any accounts

16  of the proceedings that have taken place today.  If you feel

17  like you have to read the newspaper, please ask a family

18  member to look at the paper first and to make sure that

19  there is not coverage regarding this particular proceeding.

20  Obviously you may pick up something in the newspaper that is

21  a purported fact which either is not proper for you to hear

22  as a juror or perhaps it's inaccurate.  So please do not

23  read the newspaper.

24       In addition to that, I want to warn you that perhaps

25  this would be covered on the TV media.  Perhaps it will be

1   covered by the radio.  Please try to avoid any contact with

2   the media at all.  If anyone should contact you or if you

3   should have any contact or overhear any conversation

4   regarding the facts of this case, if you should accidentally

5   hear a news report or if you should accidentally hear

6   anything about the facts of this case, please let us know

7   that immediately upon your return to the court at the

8   appointed time.

9        Now those people who need to know where the courtroom

10  is, Mr. Bagley here is going to escort those people down.

11  If you would please stand at this time, those who need to

12  know where the courtroom is.  Just follow Mr. Bagley, and

13  he'll show you where to report.

14        (The jury venire was excused.)

15        (The following occurred outside the presence and

16  hearing of the jury venire:)

17        THE COURT:  Let's take some motions.

18        MR. GREENE:  First of all I think to start we have

19  filed a motion in limine asking that the Defense be barred

20  from discussing any statements made by the Defendant,

21  Matthew Reeves.  And we do not intend to offer his statement

22  in our case in chief.  We would ask that not be permitted to

23  -- voir dire is over.  We all agreed we would not be able to

24  refer to it in opening.  We don't intend to offer it.  They

25  certainly can in this case.  That was not on the record.

Ann H. Armstrong, RPR

1    That needs to be included.

2         THE COURT:  We'll go on the record.  And with regard

3    to the motion to suppress the statement, the State has

4    indicated that they do not intend to offer the statement.

5    And the Defense is going to consider that over the course of

6    this evening.

7         MR. GOGGANS:  Correct.

8         THE COURT:  I'm going to consider the State's request

9    that I instruct the Defense not to mention that in the

10   Defense's opening statement.  And I will consider that over

11   the course of this evening.

12        MR. GREENE:  That would also go to prohibit them from

13   bringing, trying to bring it up outside of, as a hearsay

14   statement of evidence.  It would have to come from the

15   Defendant.  That's what our motion is.

16        THE COURT:  In addition to that motion to suppress,

17   however, we will need to conduct a hearing regarding other

18   pieces of evidence that were -- clothing, weapons, the shell

19   that were seized from the Reeves'.

20        MR. GOGGANS:  Related to the search of the residence

21   and related to the arrest of Mr. Reeves.

22        THE COURT:  We'll conduct that hearing.  The Court

23   will instruct the State's witnesses pursuant to a motion for

24   implementation of witness exclusion rule filed by Mr.

25   Goggans and Mr. Wiggins on behalf of the Defendant.  The

1    motion will be granted.  The Court will instruct those

2    witnesses as a group prior to the testimony that they are

3    instructed not to discuss their testimony with other

4    witnesses after their testimony is given.  Also I'm going to

5    instruct the District Attorney to give your witnesses that

6    instruction, reiterate to them the ruling of this Court that

7    they make sure that there is no misunderstanding as to what

8    my ruling is.

9         MR. GREENE:  As to any witnesses that the Defense

10   has, we would ask that they be similarly instructed.  We

11   want to put that in the form of a motion at this time.

12        THE COURT:  I will consider that motion and grant the

13   same.  Those instructions will be given to the Defense.  The

14   motion for precautionary instructions prior to voir dire, I

15   will give a form of this request to each panel prior to

16   individual voir dire.

17        MR. GOGGANS:  That will be satisfactory.  As long as

18   it covers the same point, we are fine.  One other motion

19   for the Court -- I'm not sure this is on the record.

20   There's a motion in limine regarding certain photographic

21   evidence, in particular a video.  That will be of the

22   deceased.  My understanding from talking with Mr. Greene

23   over the last couple of days is that the State is not

24   planning to utilize that piece of evidence.  So that motion

25   is moot.

1    MR. GREENE:  Your Honor, the video covers the search

2  at the residence, the clothing and the weapon and the body

3  itself.  We have deemed, and we don't feel like we would use

4  that.  We will, however, have photographs of the body at the

5  scene, still photographs of the injuries to the body of Mr.

6  Johnson which are quite graphic.

7    THE COURT:  I will rule on those photographs as they

8  come up unless you intend to show them in your opening.

9    MR. GREENE:  No, sir.

10    MR. GOGGANS:  I think we can deal with the still

11  photos as they come up.

12    THE COURT:  Anything else?

13    MR. GOGGANS:  One other, not really motion, a

14  follow-up request of production from the State, one relating

15  to whether or not there are any results of the serological

16  analyses done, blood and whatnot as I didn't -- y'all don't

17  have any?

18    MS. WILSON:  No.  DNA was not completed.

19    MR. GOGGANS:  What about any blood?

20    MS. WILSON:  They could not do blood matching.  That

21  has not been done either.

22    MR. GREENE:  There will not be any of that.

23    MR. GOGGANS:  No testing of the shells?

24    MR. GREENE:  If it's done, we will know it together

25  at the same time.  We don't have any reports to give you,

Ann H. Armstrong, RPR

1    nor do we have any that has been done.

2         MS. WILSON:  We don't have any report from him

3    indicating that he's compared the firing pin to the shots.

4         MR. WIGGINS:  We received a letter from some of the

5    witnesses, in particular, Yolanda Blevins, indicating that

6    the officers seized some of the letters from her, that we

7    have not received.

8         MR. GREENE:  We will see what letters we have got.  I

9    know I've got a letter from somebody.  We will look at that

10   and give you whatever we've got.

11        THE COURT:  Finally, these are all of the notes that

12   my secretary has taken over the course of the last few weeks

13   since this venire came out regarding telephone messages.  We

14   went through this as you know, some formally at one time on

15   the telephone.  I'm going to ask that the court reporter

16   mark these and make these a part of the record.  And I think

17   that unless there is some objection from you all, at this

18   time the Court is going to consider the venire as it stands

19   other than what objections have been on the record today; is

20   that correct?  I'm going to make that a part of the record

21   together with these things that came in today from these

22   people.

23        (Court was adjourned for the day.)

24

25

Ann H. Armstrong, RPR

1        January 27, 1998

2        THE COURT:   Mr. Kynard is going to call the roll and

3   make sure that everybody is here.   Then we'll get started.

4        (The clerk called the roll.)

5        THE COURT:   Ladies and gentlemen, this morning we are

6   going to conclude the jury selection process for this case.

7   And as I told you yesterday we conducted the general voir

8   dire, and this morning we are going to conduct what is known

9   as individual voir dire.   And as I told you yesterday and as

10  you are well aware, this is a capital case.   And because of

11  that, there are two possible penalties for a person who is

12  convicted of a capital offense in the state of Alabama.

13  Those penalties are life imprisonment without the

14  possibility of parole or death.

15       Now Alabama has a two phase trial in those cases in

16  which the death penalty may be imposed, and the same jury is

17  used for both phases.   The first phase is called the

18  innocence or guilt phase.   And in this phase the jury

19  decides whether the State has proven the Defendant guilty of

20  the charged capital offense beyond a reasonable doubt.   Now

21  in making this decision the jury cannot consider the

22  consequences of its verdict or any possible sentence.   If

23  the accused is found not guilty of capital murder, the

24  proceedings are ended at that point for the jury.

25       But if the Defendant is found guilty of capital

1   murder, the jury is brought back for a second phase of the

2   trial, and at that time the jury may hear more evidence and

3   will hear legal instructions and arguments of the attorneys.

4   The jury then recommends to the Court the penalty of life

5   imprisonment without the possibility of parole or death.

6   Now in the state of Alabama the jury merely makes the

7   recommendation.  The ultimate decision is left to the Court

8   as to whether or not the Court will follow the jury's

9   recommendation at a later phase in which the jury is not

10  involved.

11          Now in this case the Defendant, Matthew Reeves, has

12  entered a plea of not guilty and is presumed to be innocent.

13  The State has the burden of proving Matthew Reeves guilty

14  beyond a reasonable doubt.  You will hear further

15  instructions regarding the burden of proof later on if

16  you're selected to hear the facts of this case.

17          As this is a capital case, one possibility if guilt

18  of the charged capital offense is established beyond a

19  reasonable doubt is that the death penalty could under

20  certain circumstances be given.  Because of that

21  possibility, it is proper for the Court to ask you at this

22  time certain questions about your views regarding the death

23  penalty.  This inquiry, however, has no relationship to

24  whether the accused is guilty of the charged capital

25  offense.  Do not conclude merely because an attorney or the

Ann H. Armstrong, RPR

1    Court asks you questions about your attitude about the death

2    penalty that this should be taken as any indication

3    whatsoever that they believe the accused to be guilty or

4    pre-suppose that a finding of guilt will be made.

5         Now we are going to proceed as follows.  There are

6    two questions that I have to ask you, and I've asked these

7    questions in other cases before, and people have different

8    opinions and views regarding the death penalty.  Some people

9    are in favor of it.  Some people are not in favor of it.

10   There are other people who have really not given it enough

11   thought to form an opinion.

12        And that's where we will be this morning.  We will be

13   trying to find out where you are as a person and as an

14   individual with regard to the death penalty.  In order to

15   qualify to serve on this jury, you must be able to give

16   equal consideration to both of those possible sentences.

17   The questions that I ask you are rather confusing, and I'm

18   going to ask these questions to you in open court.  But I'm

19   going to ask you not to respond at this time.  We will then

20   call you into the jury room one at the time.  We will go

21   through these questions again and perhaps rephrase these

22   questions so if there is any question about what we are

23   asking, we will be clear on what we're asking.

24        The first question I'm going to ask you to consider

25   this morning is this.  Is there any member of this jury

Ann H. Armstrong, RPR

1    panel that is so opposed to the death penalty in a capital

2    case that it would restrict or substantially impair the

3    performance of your duties as jurors in accordance with the

4    instructions given you and your oath as a juror?  And the

5    second question that I'm going to ask you to consider is

6    this.  Is there any member of the jury panel that is so

7    opposed to anything less than death for a capital offense

8    that your views would interfere with the performance of your

9    duties in accordance with the instructions given you and

10   your oath as jurors?

11          Now those are the questions that the law requires

12   that I ask of you.  I know they are confusing because when I

13   first read those questions years ago, I had to think about

14   myself just exactly what is being asked in those questions.

15   So I'm going to leave that with you to think about.  We are

16   going to retire to the jury room, and we will begin calling

17   you in one at the time beginning with Ms. Anthony.  And we

18   will ask you certain questions.  Please don't hesitate to

19   speak your mind.  Tell us what you feel, and hopefully we

20   can move through this and get you out of here quickly this

21   morning.  The next panel is due in at 10:30.  And will go

22   through the same process.  I'm also going to ask you to

23   leave us a telephone number where you can be contacted today

24   in the event we should conclude the jury selection process

25   early.  We may be calling you on the phone and asking you to

Ann H. Armstrong, RPR

1    come up to court to begin the opening statements.  If we are

2    not, if we don't finish with the process early enough to do

3    that, then we will be back in the morning at 9:00 o'clock to

4    seat the jury and to begin opening statements.

5         While we are in the jury room and while you're

6    waiting on your turn, I'm going to ask you to please

7    remember and recall the instruction that I gave you

8    yesterday and throughout the day yesterday and last night

9    not to discuss the facts of this case.  Please avoid contact

10   with any witnesses in and throughout the courthouse.  There

11   will be a bailiff here and available to you.  If there is

12   anything that you need, if you need to leave the room,

13   that's fine.  Just let somebody know that you have gone to

14   get a drink or you've gone to the rest room or whatever so

15   that we are not out looking for you when it comes your time.

16   I think we will move through this in the time that I've set

17   aside this morning.  And I hope that if you're here and

18   available when we call you that we can be rather quick about

19   it.  Is there anything from the State or the defense at this

20   time before we retire to the jury room?

21        MR. GREENE:  No, sir.

22        MR. GOGGANS:  We are satisfied with the Court's

23   preliminary instructions.

24        (The following proceedings were held in the jury

25   room:)

Ann H. Armstrong, RPR

1    THE COURT:  This is Donna Anthony.  Ms. Anthony, we

2  are going to ask you several questions this morning.  The

3  first thing I want you to do though is to tell the Court if

4  you are employed and if so where?

5    MS. ANTHONY:  I work part time at Dr. Fuller's and

6  Dr. Russell's.

7    THE COURT:  And are you married?

8    MS. ANTHONY:  Yes.

9    THE COURT:  And what is your husband's name?

10   MS. ANTHONY:  Larry Anthony.

11   THE COURT:  How is Mr. Anthony employed?

12   MS. ANTHONY:  T. S. Lewis and Company in Birmingham.

13   THE COURT:  What kind of company is that?

14   MS. ANTHONY:  Oh, gosh, he's building Visionland in

15 Birmingham, and he's doing all of the underground phone

16 cable.

17   THE COURT:  Let me get your telephone number where

18 you may be reached today.

19   MS. ANTHONY:  872-2254.

20   THE COURT:  Ms. Anthony, these questions that I ask

21 you in order to qualify for this jury, you have got to be of

22 the opinion that or you have got to be able and capable of

23 recommending to the Court the sentence that the law requires

24 in the event of conviction.  You would either have to be

25 capable of recommending either life without parole or the

Ann H. Armstrong, RPR

1    death penalty in this case.  The questions I ask you are

2    rather confusing.  But the first question is are you so

3    opposed to the death penalty in a capital case that it would

4    restrict or substantially impair your performance or your

5    duties as a juror in this case?

6         MS. ANTHONY:  I would really rather not have any part

7    of this at all.

8         THE COURT:  Yes, ma'am.  Well, I would imagine

9    there's 102 other people out there that are of that same

10   opinion.  But the question is regarding your opinion and

11   your feelings.  Are you so opposed to the death penalty in a

12   capital case that it would restrict or substantially impair

13   your performance or your duties as a juror in this case?

14        MS. ANTHONY:  Do you want a yes or no answer?

15        THE COURT:  Yes.

16        MS. ANTHONY:  That is what you want, isn't it?

17        THE COURT:  Yes, ma'am.

18        MS. ANTHONY:  No.

19        THE COURT:  The other question I would have for you

20   is this.  As you know, the other alternative in this case is

21   life without parole.  Are you so opposed to anything less

22   than death; in other words, are you able to consider both of

23   those possible sentences in the event of a conviction, or

24   are you so much in favor of the death penalty that you could

25   not consider the alternative of life without parole?  Do you

1    understand that question?

2         MS. ANTHONY:  I could consider both of them.

3         THE COURT:   I'm going to let Mr. Greene ask you some

4    questions and then Mr. Goggans and Mr. Wiggins or perhaps

5    Ms. Wilson.

6         MS. WILSON:  Ms. Anthony, if I understand you

7    correctly, what you're saying is if you were on this jury

8    and you were convinced beyond a reasonable doubt that

9    Matthew Reeves is guilty of capital murder, you would be

10   able to return a verdict of guilty of capital murder; is

11   that correct?

12        MS. ANTHONY:  I guess.

13        MS. WILSON:  And then assuming that that happens and

14   we move onto the second phase of the trial that the judge

15   was telling you about, what's called the sentencing phase,

16   what you're saying is that you would be able to consider

17   both punishments equally, the death penalty and life without

18   parole?

19        MS. ANTHONY:  Yes.

20        MS. WILSON:  And if I understand you correctly, you

21   could give equal weight to your considerations of each of

22   those sentences; is that what you're saying, or do you

23   generally believe you would choose one over the other, or

24   could you give equal consideration?  I know it's hard

25   because you don't know the facts of the case.

1    MS. ANTHONY:  I don't know anything.  I don't.  Oh,
2    my.

3    MS. WILSON:  What I'm asking you basically is can you
4    tell us that you would give equal consideration to both
5    sentences?

6    MS. ANTHONY:  (Nods head affirmatively).

7    MR. GOGGANS:  Ms. Anthony, I'm Tommy Goggans.  I have
8    one question I would like to ask.  Why is it that you would
9    rather not have any part of this case other than it's
10   something else you would rather be doing?

11   MS. ANTHONY:  I have two small children at home.  I
12   have nobody to keep them.  My husband works out of town.  I
13   need to be at home.

14   MR. GOGGANS:  In Alabama the legislature has defined
15   certain murders as capital murders that are considered by
16   the legislature in a way to be different or worse than other
17   types of murders.  In this particular case the State has
18   charged that this is a capital case.  And what the State is
19   contending is that someone was intentionally killed during
20   the course of a robbery, not an accidental killing or
21   negligent killing but an intentional killing during the
22   course of a robbery.  If the State proves both of those
23   things beyond a reasonable doubt, an intentional killing and
24   that that intentional killing was during a robbery, then it
25   would move to what we call the penalty phase.  If the State

1   fails to prove either or both of those, then the jury

2   doesn't ever get to that point.  Do you think that if you

3   found beyond a reasonable doubt, you don't have any reason

4   to doubt that someone had intentionally killed somebody

5   during the time that they were trying to rob them, do you

6   think that you would be inclined to automatically

7   lean towards the death penalty?  We are not talking about an

8   accidental killing, you know.  This is the killing of

9   someone, an intentional killing in the course of a robbery.

10  Do you think you would automatically lean towards a death

11  penalty?

12       MS. ANTHONY:  I don't know.  I'd rather see them go

13  to jail.  Can I say that?  Y'all don't know how nervous I

14  am.  I'm never done nothing like this in my life.

15       MR. GOGGANS:  In Alabama another thing that we do

16  have the benefit of is it's not just a matter of dumping on

17  twelve jurors to make a decision over what you want to do in

18  this case.  You've got to decide life without parole or

19  death; y'all go at it and have a good discussion, and let us

20  know what you think.  There are guidelines.  The law

21  provides certain guidelines, aggravating factors and

22  mitigating factors; aggravating would be things that would

23  weigh in favor of the death penalty.  Mitigating factors

24  would weigh in favor of a sentence of life without the

25  possibility of parole.  Do you think that given those

Ann H. Armstrong, RPR

1   guidelines that you would have any trouble following what

2   Judge Jones would tell you as to what you're supposed to

3   weigh and how you're to arrive at a decision?  Can you

4   consider both options of death or life without the

5   possibility of parole?

6          MS. ANTHONY:  No.  I wouldn't have any trouble

7   following his guidelines, no.

8          MR. GOGGANS:  No trouble?

9          MS. ANTHONY:  No.

10         MR. GOGGANS:  No other questions.

11         THE COURT:  Anything else?

12         MS. WILSON:  We want to ask her what she may know

13  about the case or heard about the case.

14         THE COURT:  Ms. Anthony, there was a question asked

15  yesterday regarding media coverage, prior knowledge of media

16  coverage.  You didn't respond as having heard anything about

17  this case.  Do you have any prior knowledge of this case by

18  way of media, talking on the street, someone said something

19  to you?

20         MS. ANTHONY:  I don't remember anything about it.

21         MS. WILSON:  That's all.

22         MR. GOGGANS:  I have no questions on that.

23         THE COURT.  Thank you, ma'am.

24         THE COURT:  Verlisa Baity.

25         THE COURT:  Ms. Baity, how are you?

Ann H. Armstrong, RPR

1    MS. BAITY:  Fine.

2    THE COURT:  Ms. Baity, let me ask you a few questions

3  before I let the attorneys ask you questions.  What is your

4  telephone number where we might reach you today?

5    MS. BAITY:  875-4307.

6    THE COURT:  And are you working?

7    MS. BAITY:  Yes.

8    THE COURT:  How are you employed?

9    MS. BAITY:  Bookkeeper at Selma Middle School.

10    THE COURT:  And are you married?

11    MS. BAITY:  Yes.

12    THE COURT:  What is your husband's name?

13    MS. BAITY:  Jeffrey, J-e-f-f-r-e-y Baity.

14    THE COURT:  And is Mr. Baity employed?

15    MS. BAITY:  Yes.

16    THE COURT:  How is he employed?

17    MS. BAITY:  Alabama Forest Commission.

18    THE COURT:  Ms. Baity, I asked you a couple of

19  questions out there a few minutes ago, and I know that they

20  may have been confusing questions.  But under Alabama law in

21  the event of a capital murder conviction in this case, you

22  must be able to give consideration to two possible

23  sentences.  One is the death penalty, and the other is life

24  imprisonment without the possibility of parole.  Not only

25  must you be able to consider those two possibilities, you

Ann H. Armstrong, RPR

1   must be able to make a recommendation to the Court regarding

2   those two possibilities.  And what I need to ask you at this

3   time is are you so opposed to the death penalty that in your

4   opinion it would restrict or substantially impair your

5   performance or your duties as a juror in this case?

6            MS. BAITY:  Do you mean am I against it?

7            THE COURT:  Right.  Are you so opposed to the death

8   penalty that you couldn't consider and ultimately make a

9   recommendation if that's what you felt was the necessary

10  penalty in this case?

11           MS. BAITY:  No, sir.

12           THE COURT:  There are some people out there in the

13  world who think that whenever a death occurs that the only

14  justifiable sentence is death for the person was causing for

15  death.  But in this case you've got to be able to consider

16  not only the death penalty but something less than that, and

17  that is life imprisonment without the possibility of parole.

18  So you can't be overly committed to the death penalty

19  either.  Do you understand what I'm saying?

20           MS. BAITY:  Yes.

21           THE COURT:  And the next question I have is this.

22  Are you so opposed to anything less than death for a capital

23  case or a capital offense that your views would interfere

24  with the performance of your duties?

25           MS. BAITY:  No.

Ann H. Armstrong, RPR

1          THE COURT:  What you're telling the Court is that you

2    could give equal consideration to both of the possible

3    penalties in this case and then based upon the instructions

4    that I gave you make a recommendation of either the death

5    penalty or life without parole?

6          MS. BAITY:  Yes.

7          MS. WILSON:  Ms. Baity, have you ever thought about

8    your feelings about the death penalty before this case?

9          MS. BAITY:  Not really.

10         MS. WILSON:  This is really the first time you've

11    given it a lot of thought?

12         MS. BAITY:  Yes.

13         MS. WILSON:  Well, let's suppose that you are chosen

14    to sit on this jury.  And as Judge Jones told you, there are

15    two phases to this trial.  There is the first phase; that's

16    the guilt phase, and then there's the sentencing phase.  And

17    let's suppose you were on the jury, and you heard the

18    evidence.  And at the end of the evidence if you were

19    convinced beyond a reasonable doubt that Matthew Reeves

20    intentionally caused the death of Willie Johnson during the

21    course of a robbery, would you be able to find him guilty of

22    capital murder?

23         MS. BAITY:  Yes.

24         MS. WILSON:  And then moving to the sentencing phase,

25    if you were -- you would, of course, be on that jury also

Ann H. Armstrong, RPR

1    automatically.  Would you be able to consider equally the

2    imposition of the death penalty as well as life without

3    parole in this sentencing phase?

4         MS. BAITY:  Yes.

5         MS. WILSON:  Would you be able to follow Judge Jones'

6    instruction that there are certain factors you have to

7    consider with each of these sentences, and he will explain

8    all of that to you.  Would you be able to follow his

9    instructions and the law if the facts fit where the death

10   penalty was the appropriate punishment?  Could you vote for

11   the death penalty in this case?

12        MS. BAITY:  Yes.

13        MS. WILSON:  Thank you.

14        MR. GOGGANS:  Ms. Baity, what does your husband for

15   the Forestry Commission?

16        MS. BAITY:  He's a radio operator.

17        MR. GOGGANS:  Just to split a few hairs how you feel

18   about the death penalty.  Judge Jones asked you and has told

19   you that some folks feel that if someone killed somebody,

20   the punishment should automatically be death for that

21   person.  Also I understand that you don't automatically

22   think somebody should die if they're found guilty of killing

23   someone.  But in a capital case in Alabama those cases are

24   different than the other homicide cases.  In this particular

25   case the charge is an intentional killing during the course

Ann H. Armstrong, RPR

1    of a robbery.  An intentional killing is not an accident or

2    gross negligence or anything like that but an intentional

3    killing.  And in addition to that, this intentional killing

4    has got to have an added component; that is, it's got to

5    have been during the course of a robbery.  Would you feel in

6    any way automatically that somebody who is found guilty

7    beyond a reasonable doubt of intentionally killing somebody

8    during the course of a robbery that that person should

9    automatically get the death penalty without considering any

10   other factors?

11        MS. BAITY:  What do you mean?

12        MR. GOGGANS:  Let me give you this example.  In

13   Alabama we don't just dump the decision of whether or not

14   somebody gets life without parole or death on the jury and

15   say okay, you found this person guilty; go back there and

16   let us know what your decision is.  The law has certain

17   guidelines that the jurors are told to apply in making that

18   decision.  There are things call aggravating circumstances

19   that weigh in favor of the death penalty, and there are

20   things called mitigating circumstances which weigh in favor

21   of the sentence of life without the possibility of parole.

22   The jury is given those things that it is to consider in

23   making that decision.  It's not just dumped on the jury.  Do

24   you think you would have any problem considering both sides

25   of this equation and making a decision of life without the

Ann H. Armstrong, RPR

1  possibility of parole or death given the fact that if you

2  were on a jury that would have already found this person

3  guilty of an intentional killing in a robbery?

4       MS. BAITY:  Yes.

5       MR. GOGGANS:  You would not have difficulty following

6  the --

7       MS. BAITY:  I would not.

8       MR. GOGGANS:  Nothing else.

9       MS. WILSON:  I have one additional question.  Did you

10 understand that when Judge Jones said that in the, I mean in

11 the sentencing phase that the jury makes a recommendation,

12 y'all are not the ultimate decision makers.  But you make a

13 recommendation to the Court, and then the Court --

14      MS. BAITY:  Yes.

15      THE COURT:  Ms. Baity, you were asked a question

16 yesterday regarding prior knowledge of this case, and I did

17 not have you as having responded to that question.

18      MS. BAITY:  No, I try not to watch the news.

19      THE COURT:  So you haven't heard anything about this

20 case from anybody?

21      MS. BAITY:  No, sir.

22      THE COURT:  Thank you, ma'am.  Janice Bolden.

23 Ms. Bolden, I need to ask you your telephone number where

24 you may be reached today.

25      MS. BOLDEN:  Well, I may have two, 872-0406 and

Ann H. Armstrong, RPR

1   875-2548.

2       THE COURT:  Are these home or employment or what?

3       MS. BOLDEN:  Employer and at home.

4       THE COURT:  Ms. Bolden, where are you employed?

5       MS. BOLDEN:  J. C. Penney.

6       THE COURT:  And your spouse's name?

7       MS. BOLDEN:  George.

8       THE COURT:  And where is Mr. Bolden employed?

9       MS. BOLDEN:  Bolden Auto Service.

10      THE COURT:  Ms. Bolden, I asked you some questions

11 earlier and asked you to think about those questions.  And

12 now I need to go back through these questions with you.  As

13 you know there are two possibilities of sentencing in the

14 event of a conviction in a capital offense.  One is death,

15 and the other is life without parole.  I've got to ask you

16 questions regarding your feelings about those two sentences.

17 Some people are opposed to the death penalty.

18 Some people are not.  Some people have never really given it

19 much thought.  Then there are other people who think that

20 people who intentionally kill, there is no other sentence

21 other than the death sentence.  There are other people who

22 think other different things.  And I've got to find out

23 where you are on that.

24      So the first question I have for you is this.  Are

25 you so opposed to the death penalty in a capital case that

1  it would restrict or substantially impair your performance

2  as a juror in this case?

3       MS. BOLDEN:  Yes.

4       THE COURT:  Let me ask you a few more questions

5  regarding your opposition to the death penalty.  The trial

6  of this case in the event that there is a conviction of a

7  capital offense will be in two phases, the guilt or

8  innocence phase and then the sentencing phase.  In the

9  sentencing phase there would be other testimony taken,

10  testimony offered for your consideration that would be

11  directly related to aggravating circumstances to bolster the

12  death penalty and mitigating circumstances to favor life

13  without parole.  My question to you is this.  Are you

14  telling me that under no circumstances if you received

15  instructions from the Court, instructions regarding the law

16  in this case that you could not consider and recommend to

17  this Court the penalty of death under any circumstance?

18       MS. BOLDEN:  Yes, I'm telling you that,  My

19  conscience just won't let me do that.

20       THE COURT:  Answer Ms. Wilson's questions.

21       MS. WILSON:  So what you're saying is that under any

22  circumstances no matter how bad you could not impose or

23  recommend the death penalty?

24       MS. BOLDEN:  I could not.

25       MS. WILSON:  You would always recommend life without

Ann H. Armstrong, RPR

1    parole; is that correct, or if you had the choice?

2         MS. BOLDEN:   If I had the choice of the two it would

3    be life without parole.

4         MS. WILSON:   Could you even consider circumstances

5    where you think the death penalty would be appropriate?

6         MS. BOLDEN:   No.

7         MS. WILSON:   So you can't think of any facts at all

8    where the death penalty is appropriate?

9         MS. BOLDEN:   No.

10        THE COURT:   Anything else?

11        MS. WILSON:   That's all.

12        MR. GOGGANS:   Ms. Bolden, I'm Tommy Goggans.   Let me

13   you just a few questions.   What is the basis for your

14   opposition to the death penalty?

15        MS. BOLDEN:   Well, for one I have children of my own.

16   And if something like that were to happen, I wouldn't -- I

17   mean I'm not going to say that killing someone else is

18   wrong, I mean is right, but I wouldn't want to see that

19   happen to my children.

20        MR. GOGGANS:   Is this based on your personal

21   observations or religious beliefs, or you think the system

22   is unfair?

23        MS. BOLDEN:   Personal and religion.

24        MR. GOGGANS:   Now you understand that we all have got

25   civic duties to serve on juries.   You've got to come down

Ann H. Armstrong, RPR

1 here on Monday and Tuesday or however long and, you know,

2 sit to be selected for jury service.  You understand we've

3 all got that duty, right?

4 　　　　MS. BOLDEN:  Yes.

5 　　　　MR. GOGGANS:  And I believe you said that you also,

6 your religious beliefs factor into your opposition to the

7 death penalty?

8 　　　　MS. BOLDEN:  Yes.

9 　　　　MR. GOGGANS:  Your religious beliefs also tell you or

10 do you recall in religious studies that also there may be an

11 obligation to follow civil authorities and follow whatever

12 the law is?

13 　　　　MS. BOLDEN:  Yes.

14 　　　　MR. GOGGANS:  And do you understand that it's

15 important for anybody on trial or it's important for

16 everybody in the community, that juries be comprised and

17 that they be made up of a cross section of the community,

18 people from all walks of life?  Do you understand that?

19 　　　　MS. BOLDEN:  Yes.

20 　　　　MR. GOGGANS:  Do you understand that in Alabama in a

21 capital case if a jury finds somebody guilty of capital

22 murder, the decision of death or life without the

23 possibility of parole is not just dumped in the jury box and

24 say, okay, you found this person guilty; go back there and

25 tell us, you know, talk about it and tell us what your

Ann H. Armstrong, RPR

```
 1   decision is.  In Alabama the law provides guidelines for the
 2   jury to consider in making that decision.  There will be
 3   things that the Court tells the jury about.  These are some
 4   aggravating circumstances, and you consider these as
 5   weighing in favor of the death penalty.  And there are
 6   things called mitigating circumstances, and these factors
 7   weigh in favor of the sentence of life without parole.  And
 8   the jury's decision is made in accordance with those
 9   guidelines.  In other words, it's a matter of applying the
10   guidelines to the facts as the jurors find them.  Do you
11   think that you could as a citizen knowing that you have an
12   obligation to participate as much as possible in serving on
13   juries and that you also have an obligation to follow
14   whatever the law is and follow civil authorities -- do you
15   think that you could do that, whether you like the law or
16   not, you could apply it? I don't like a lot of the tax laws,
17   but I pay my taxes.  Do you think you could do that?
18   Whether you like it or not, do you think you could do it?
19        MS. BOLDEN:  I don't know.
20        MR. GOGGANS:  Nothing else.
21        THE COURT:  Anything from the State?
22        MS. WILSON:  Let me ask you one more follow-up
23   question.  If you were chosen to sit on this jury and the
24   Defendant, Matthew Reeves, was found guilty of capital
25   punishment and then you got to the sentencing phase and you
```

1   were on that jury that had to make a recommendation, would

2   you automatically vote for life without parole, or could you

3   consider the death penalty for this man?

4        MS. BOLDEN:  Life without parole.

5        THE COURT:  Anything else?

6        MR. GOGGANS:  That's all.

7        THE COURT:  She's going to be excused.

8        MR. GOGGANS:  I'm not going to agree, but I'm not

9   going to argue.

10        THE COURT:  You're through for the week.  You came up

11  yesterday.  I understand your condition, and I certainly

12  appreciate it.  Hope you have a good pregnancy.  Thank you.

13  Norma Bourdon.

14        Could I ask you to give me your telephone number

15  where we may reach you this afternoon?

16        MS. BORDEN:  875-6331.

17        THE COURT:  How are you employed?

18        MS. BORDEN:  How am I employed?  I am a religious

19  sister.  I work for the Edmundites.  I run the learning

20  center and the clothing room.

21        THE COURT:  I'm going to ask you this, Sister.  I'm

22  going to ask you this for the record, but please understand

23  that I think I know the answer.  You are not married?

24        MS. BOURDON:  No, I am not.

25        THE COURT:  I wanted to make sure the record is clear

Ann H. Armstrong, RPR

1    on that.  I asked you some questions earlier regarding the

2    possible sentence in this case.  And basically I have to go

3    through this with you to establish a record.  I think I

4    probably can anticipate your answer, but I'm not going to

5    assume that at this time.  In the event of a conviction in a

6    capital case, you know, the two possibilities of sentencing

7    are death and life without parole.  I've got to ask you

8    where you are with that.  The question is are you so opposed

9    to the death penalty in a capital case that it would

10   restrict or substantially impair your performance and your

11   duties as a juror in this case?

12        MS. BOURDON:  I believe it would.

13        MS. WILSON:  So let me just ask you this.  Have you

14   formed your opinion about the death penalty prior to being

15   called as a juror on this case?

16        MS. BOURDON:  I have worked on this for a long time.

17   I've been a part of many peace and justice committees.  I

18   have been in situations where I really had to think hard

19   about it.

20        MS. WILSON:  So this is not a new formed opinion?

21        MS. BOURDON:  No, ma'am.

22        MS. WILSON:  This is something you have contemplated

23   for a long time?

24        MS. BOURDON:  Yes, ma'am.

25        MS. WILSON:  So if I understand you correctly, what

Ann H. Armstrong, RPR

1   you're saying is that you are totally opposed to the death

2   penalty?

3          MS. BOURDON:   I believe so.

4          MS. WILSON:   And you cannot think of any facts or any

5   situation where you think that the death penalty would be an

6   appropriate sentence?

7          MS. BOURDON:   No.   I find it vindictive revenge.   It

8   doesn't accomplish anything.   It's not a deterrent, and it

9   basically says there is no hope.   And I can't abide by that.

10   I have to believe there's hope.

11          MS. WILSON:   Thank you.   I have no further questions.

12          MR. GOGGANS:   We have no questions.

13          THE COURT:   Thank you, ma'am.   If you would please

14   call back this afternoon after 5:00 o'clock.   There should

15   be a message on the recording device regarding your jury

16   service for the remainder of the week.   You are excused

17   regarding this case.   Malanda Brown.

18          Ms. Brown, let me ask you to give me your telephone

19   number where you can be reached this afternoon?

20          MS. BROWN:   875-5815.

21          THE COURT:   Are you employed, Ms. Brown?

22          MS. BROWN:   Yes.

23          THE COURT:   And how are you employed?

24          MS. BROWN:   Heilig-Meyers.

25          THE COURT:   Are you married?

Ann H. Armstrong, RPR

1   MS. BROWN:  No, sir.

2   THE COURT:  Ms. Brown, I asked you questions

3   regarding your thoughts on the death penalty earlier, and I

4   need to ask you those questions and ask you to respond to

5   those.  In the event of a capital conviction in this case,

6   there are two possibilities of a sentence.  You must be able

7   to consider and recommend both of those possibilities in the

8   event of a conviction in this case.  In order for you to

9   qualify to sit on this jury, my question to you first is are

10  you so opposed to the death penalty that in a capital case

11  that it would restrict or substantially impair the

12  performance of your duties as a juror?

13  MS. BROWN:  No, sir.

14  THE COURT:  There are people who feel that death is

15  the only penalty that is justified in an intentional

16  killing.  They would not consider anything less than death.

17  In this case you have got to be capable of considering and

18  recommending something less than death, and that would be

19  life without the possibility of parole.  My question in that

20  regard is are you so opposed to anything less than death

21  for a capital offense that your views would interfere with

22  the performance of your duties?

23  MS. BROWN:  No, sir.

24  THE COURT:  What you're telling me is that if you sit

25  on this jury and you hear the evidence and the jury decides

Ann H. Armstrong, RPR

1   that the Defendant is guilty beyond a reasonable doubt of

2   the offense of capital murder, you would give equal

3   consideration to both of these possible sentences and

4   recommend either one or the other?

5          MS. BROWN:  Yes, sir.

6          MS. WILSON:  When did you form your opinion about the

7   death penalty?  Have you given it much thought before you

8   were summoned?

9          MS. BROWN:  No.

10          MS. WILSON:  This has been something you've given

11   some thought yesterday and today when you realized what type

12   of case this was?

13          MS. BROWN:  Well, I really haven't.  I really haven't

14   given it any thought really.

15          MS. WILSON:  So if you were chosen to sit on this

16   jury and you were to hear the evidence against Matthew

17   Reeves and the State of Alabama proved beyond a reasonable

18   doubt that he was guilty of intentionally killing Willie

19   Johnson during the course of a robbery, would you be able to

20   find him guilty of capital murder?

21          MS. BROWN:  Yes.

22          MS. WILSON:  Then as the Judge told you, in the event

23   that he is found guilty of capital murder, we then go to the

24   second phase of the trial which is the sentencing phase.

25   And do you understand that the jury in that sentencing phase

Ann H. Armstrong, RPR

1  makes a recommendation to the Court that they are not the

2  final say, that they make a recommendation?

3      MS. BROWN:  Yes.

4      MS. WILSON:  And what I understand you're saying is

5  you could give equal consideration; you could consider the

6  death penalty as well as life without parole?

7      MS. BROWN:  Yes.

8      MS. WILSON:  Do you have an opinion as to which way

9  you would lean towards right now?

10     MS. BROWN:  No, I don't.

11     MS. WILSON:  So you are totally open-minded, and it

12  would depend on the law and the instructions as the judge

13  gives to you and the facts of the case?

14     MS. BROWN:  Uh-huh.

15     MR. GOGGANS:  Ms. Brown, what do you do for Heilig

16  Meyers?

17     MS. BROWN:  Cashier.

18     MR. GOGGANS:  Judge Jones mentioned that some folks

19  feel that if somebody intentionally killed someone that

20  person should automatically receive the death penalty.  In

21  Alabama the capital statute separates certain murders as

22  being worse than others in that it's actually more than an

23  intentional killing.  In this particular case the charge is

24  an intentional killing during the course of a robbery.

25  There are really two things that the State has got to prove

Ann H. Armstrong, RPR

1   beyond a reasonable doubt in order to have a jury say that

2   someone is guilty of a capital murder, that it is an

3   intentional killing that is done during the course of a

4   robbery. Do you feel like that if somebody were, that you

5   thought they were guilty beyond a reasonable doubt of having

6   intentionally killed somebody, not accidentally or

7   negligently but intentionally killed somebody during the

8   time they were robbing them, do you feel like that person

9   should automatically get the death penalty?

10       MS. BROWN: I would really want to hear more about it

11   before I make a judgment on it.

12       MR. GOGGANS: In Alabama there are guidelines that

13   help the jury to determine which sentence is appropriate,

14   death or life without the possibility of parole. We don't

15   just tell the jury, well, you found this person guilty; go

16   back there and let us know what you decide. The judge tells

17   you certain things to consider. Aggravating circumstances

18   are things that the law says weigh in favor of the death

19   penalty, and mitigating circumstances are things that weigh

20   in favor of the sentence of life without the possibility of

21   parole. Do you think you would have any trouble following

22   the instructions and considering both sides of the equation

23   in deciding which way you wanted to go?

24       MS. BROWN: No, sir.

25       MR. GOGGANS: No other questions on that.

Ann H. Armstrong, RPR

201

1    THE COURT:  Ms. Brown, you were asked yesterday

2  questions regarding prior knowledge of this case perhaps

3  through the media, talk on the street, family, whoever.  The

4  lawyers need to ask you some more questions regarding that.

5  I think you had responded that you had heard something or

6  read something?

7    MS. BROWN:  No.  After I got in there and heard more

8  about it, I didn't know him.  But we used to work together.

9  I used to work at the Housing Authority, but he was in the

10  maintenance department, and I was up front.  But we never

11  had any contact.  I just knew of him.

12    THE COURT:  That was your prior knowledge, not media

13  coverage?

14    MS. BROWN:  Yeah.

15    THE COURT:  The lawyers may have some questions

16  regarding that relationship.

17    MS. WILSON:  How long ago was it that you worked at

18  the Housing Authority?

19    MS. BROWN:  It's been about three or four years ago.

20    MS. WILSON:  And how often did you see Mr. Reeves?

21    MS. BROWN:  Not him.

22    MS. WILSON:  Willie Johnson.  Okay.  Did you know him

23  personally?

24    MS. BROWN:  No.

25    MS. WILSON:  You knew him as another employee?

Ann H. Armstrong, RPR

1          MS. BROWN:  Uh-huh.

2          MS. WILSON:  At the time of the incident did you hear

3    anybody around Selma Housing Authority talking about it?

4          MS. BROWN:  No, because I wasn't there then.

5          MS. WILSON:  It was before?

6          MS. BROWN:  Yeah.

7          MS. WILSON:  Thank you.

8          MR. GOGGANS:  Ms. Brown, how long did you work for

9    the Housing Authority?

10         MS. BROWN:  About a year, I was just a fill-in at the

11   front desk for them because the lady -- I think it was Betty

12   Carlisle.  She was sick, and I was just filling in for her.

13   It was like for a year.

14         MR. GOGGANS:  I know you said you didn't really know

15   Mr. Johnson.  Do you recall ever having had any dealings

16   with him?

17         MS. BROWN:  No, because he was in the back, and I was

18   up front.  They mostly stay out, you know, repairing stuff

19   in other people's apartments.  I was up front.

20         MR. GOGGANS:  If you had seen him away from work not

21   wearing a uniform, would you have known who he was?

22         MS. BROWN:  No, because I didn't know him.  I just

23   know of him.  I didn't know anything about him.

24         MR. GOGGANS:  Do you think there is any possibility

25   at all that your having worked at the Housing Authority and

Ann H. Armstrong, RPR

 1   we think there would be evidence possibly that he worked

 2   there also, do you think that would have any influence one

 3   way or the other in your sitting on this case?

 4        MS. BROWN:  No, sir.  I didn't say I know him.  I

 5   just know him when I saw him.  I didn't know anything about

 6   him.

 7        MR. GOGGANS:  No other questions.

 8        THE COURT:  Anything else?  Thank you.  I call Willie

 9   Calhoun.

10        Mr. Calhoun, let me ask you to tell me your telephone

11   number where we may reach you this afternoon.

12        MR. CALHOUN:  872-0200.

13        THE COURT:  Do you work, Mr. Calhoun?

14        MR. CALHOUN:  No.

15        THE COURT:  Are you retired?

16        MR. CALHOUN:  Disability.

17        THE COURT:  Have you worked since your disability?

18        MR. CALHOUN:  No, sir.

19        THE COURT:  What did you do prior to the time that

20   you became disabled?

21        MR. CALHOUN:  I was working then.  I was a mechanic

22   then.

23        THE COURT:  You were a mechanic?

24        MR. CALHOUN:  Yes, sir.

25        THE COURT:  Are you married?

Ann H. Armstrong, RPR

1    MR. CALHOUN:  No, sir.  My wife is deceased.

2    THE COURT:  Mr. Calhoun, I asked you some questions a

3  few minutes ago out there regarding your opinion and your

4  feelings about the death penalty.

5    MR. CALHOUN:  Yes, sir.

6    THE COURT:  In this case if you are chosen to hear

7  the facts of the case, in order to be qualified for this

8  jury you must be able to consider and recommend the two

9  sentences in the event of a capital conviction in this case.

10  One is death, and the other is life without parole.  Some

11  people are opposed to the death penalty under any

12  circumstances.  Some people think that if there is an

13  intentional killing that the death penalty is the only

14  justifiable sentence.  And I'm going to ask you your opinion

15  about that.  Okay?

16    MR. CALHOUN:  Yes, sir.

17    THE COURT:  The question that I have for you is this.

18  Are you so opposed to the death penalty in a capital case

19  that it would restrict or substantially impair your

20  performance as a juror?

21    MR. CALHOUN:  Well, I think it would just be the

22  death penalty.

23    THE COURT:  All right, sir.  So it's your feeling

24  that if there is a conviction for a capital offense, it

25  should automatically be a death penalty?

Ann H. Armstrong, RPR

1      MR. CALHOUN:  Yes, sir.

2      THE COURT:  Do you understand that there are two

3   alternatives in the event of a conviction.  One is the death

4   penalty, and the other is life without parole?

5      MR. CALHOUN:  Yes, sir.

6      THE COURT:  Can you give equal consideration to the

7   alternate sentence of life without parole?

8      MR. CALHOUN:  I would say the death penalty.

9      THE COURT:  Okay.  Are you telling me that under no

10   circumstances will you be able to follow my instructions and

11   equally consider the two alternative sentences in this case?

12      MR. CALHOUN:  Yes, sir.

13      THE COURT:  You cannot do that?

14      MR. CALHOUN:  No, sir.

15      THE COURT:  You think that the death penalty is the

16   only justifiable penalty in the event of a conviction?

17      MR. CALHOUN:  Yes, sir.

18      THE COURT:  So is it my understanding and make sure I

19   understand you, Mr. Calhoun, that you are opposed to

20   anything less than death for a capital offense?

21      MR. CALHOUN:  Yes, sir.

22      THE COURT:  And this the feeling is so ingrained in

23   your conscience that you could not give fair consideration

24   to the alternate sentence of life without parole?

25      MR. CALHOUN:  I still say the death penalty.

Ann H. Armstrong, RPR

1          THE COURT:  All right, sir.  Do you have any

2     questions?

3          MS. WILSON:  No, sir.

4          MR. GOGGANS:  I have no questions.

5          THE COURT:  Is there any objection to excusing Mr.

6     Calhoun?

7          MR. GOGGANS:  I was going to make a motion.

8          MS. WILSON:  No objection.

9          THE COURT:  I'm going to ask you to call that number

10    after 5:00 o'clock.  You'll receive further instruction for

11    your jury service later this week.  For purposes of this

12    jury you are excused.   I need Mary Calloway.

13         What is your telephone number where you may be

14    reached this afternoon?

15         MS. CALLOWAY:  874-7186.

16         THE COURT:  Are you employed?

17         MS. CALLOWAY:  No.

18         THE COURT:  And are you married?

19         MS. CALLOWAY:  Yes.

20         THE COURT:  Can you tell me your spouse's name?

21         MS. CALLOWAY:  Frank Calloway.

22         THE COURT:  How is Mr. Calloway employed?

23         MS. CALLOWAY:  Merchant and minister.

24         THE COURT:  Of course, I know Mr. Calloway, what he

25    does.  But for the record would you please tell me his

1   business?

2       MS. CALLOWAY:  One Way Book Store.

3       THE COURT:  Have you been employed during your life

4   time?

5       MS. CALLOWAY:  Yes.

6       THE COURT:  How have you been employed?

7       MS. CALLOWAY:  With the AFTA for seventeen years, and

8   then I was an LPN for Dr. Debardeleben.

9       THE COURT:  So you're now retired?

10      MS. CALLOWAY:  Five years ago.

11      THE COURT:  Would you now consider yourself to be

12   retired?

13      MS. CALLOWAY:  Yes.

14      THE COURT:  Ms. Calloway, I asked you some questions

15   a few minutes ago in the courtroom regarding your feelings

16   about capital punishment, and I'm going to ask you those

17   questions again but hopefully  in a little more concise

18   form.  There are people in our society who are totally

19   opposed to the death penalty.  There are other people in our

20   society who believe that an intentional killing can only be

21   justified by the death penalty.  And I need to ask you some

22   questions about that because if you're selected for this

23   jury and you're qualified to serve on this jury, you must be

24   able to give equal consideration both to life without parole

25   and the death penalty and then make a recommendation of

Ann H. Armstrong, RPR

 1   either of those, either of those two sentences in the event

 2   of a conviction.

 3        So my question to you is this.  Are you so opposed to

 4   the death penalty in a capital case that it would restrict

 5   or substantially impair your performance as a juror in this

 6   case?

 7        MS. CALLOWAY:  No.

 8        THE COURT:  Let me ask it the other way around.

 9   Because there are those people who think that the death

10   penalty is the only penalty that should be pronounced, are

11   you so opposed to anything less than death, for instance,

12   life without parole for a capital offense that your views

13   would interfere with the performance of your duties?

14        MS. CALLOWAY:  No.

15        THE COURT:  So what you're telling me then I'm

16   assuming is that you could hear the evidence and if there is

17   a conviction for a capital offense, you could hear the other

18   evidence regarding the penalty phase of this trial and you

19   could give equal consideration and make a recommendation to

20   the court based upon the evidence and based upon the law as

21   I give it to you as to life without parole and the death

22   penalty?

23        MS. CALLOWAY:  Yes.

24        THE COURT:  Ms. Wilson and Mr. Goggans will have some

25   questions.

1      MS. WILSON: Can you tell me, have you given much

2 thought to your feelings about the death penalty prior to

3 the time that you came here today, yesterday and found out

4 what this case was about?

5      MS. CALLOWAY: Well, I still don't know what it's

6 about exactly, but yes, I have.

7      MS. WILSON: So this is not something you just

8 started thinking about when you realized that this was a

9 capital murder case?

10      MS. CALLOWAY: No.

11      MS. WILSON: And if I understand what you're saying

12 is if you were chosen to serve on this jury and you were

13 convinced beyond a reasonable doubt that Matthew Reeves

14 intentionally took the life of Willie Johnson during the

15 course of a robbery, that you could find him guilty of

16 capital murder?

17      MS. CALLOWAY: Yes.

18      MS. WILSON: And then we move to the second phase of

19 the trial that the judge was saying. There are two phases

20 to this. We have the guilt phase first and then the

21 sentencing. And after finding him guilty of capital murder,

22 then comes the sentencing phase. And if you were convinced

23 based on the facts and the law that the judge gives us that

24 for capital murder the death penalty was the appropriate

25 punishment, would you be able to vote for that?

1   MS. CALLOWAY:  Yes.

2   MS. WILSON:  Now you understand that what that jury

3   does is make a recommendation to the Judge, that the

4   ultimate decision lies with the Court, not with the jury,

5   but it's a pretty strong recommendation coming from that

6   jury?

7   MS. CALLOWAY:  Yes.

8   MS. WILSON:  Okay.  Thank you.

9   MR. GOGGANS:  Ms. Calloway, I know that your husband

10  is a minister.  What denomination is that?

11  MS. CALLOWAY:  Christian, he's pastor at Meadowview

12  Christian Church.

13  MR. GOGGANS:  How long has he been a pastor?

14  MS. CALLOWAY:  Well, about eighteen years.

15  MR. GOGGANS:  Now in Alabama there is a statute that

16  provides that certain murders are called capital murders.

17  It's distinguished from other types of murders.  In this

18  particular case the allegation is that Mr. Reeves

19  intentionally killed someone during the course of a robbery.

20  There are two things that have to be proven.  First it has

21  to be proven beyond a reasonable doubt that there has been

22  an intentional killing, not negligent or accidental or

23  anything like that, but an intentional killing.  And in

24  addition to that in capital cases it also has to be proven

25  beyond a reasonable doubt that the intentional killing was

1   during the course of a robbery, not just an intentional

2   killing by itself, but it's an intentional killing during

3   the course of a robbery.  So it's called an aggravating

4   component in an intentional killing.  Do you think that if

5   you were on a jury and y'all had found beyond a reasonable

6   doubt that a person had intentionally killed someone during

7   the course of a robbery that you would lean toward the death

8   penalty?

9        MS. CALLOWAY:  Well, I don't know without hearing.

10  I don't know for sure.

11       MR. GOGGANS:  In Alabama in a capital case if a jury

12  finds someone guilty of a capital offense this jury is not

13  just sent back in the jury room and told to go and tell us

14  what you want to do about it.  The jury is given

15  instructions and guidance as to how to go about making that

16  decision.  There would be instructions as to aggravating

17  circumstances that could be considered as weighing in favor

18  of the death penalty and mitigating circumstances which

19  would weigh in favor of a sentence of life without the

20  possibility of parole.  Do you think you would have any

21  trouble at all weighing those factors?

22       MS. CALLOWAY:  No, I don't.

23       MR. GOGGANS:  I have no other questions.

24       THE COURT:  Ms. Calloway, do you have any previous

25  knowledge of this case by way of the media, talk around

1    town?

2          MS. CALLOWAY:  No.  I had no idea of what was going

3    on.

4          THE COURT:  You haven't read anything about the case?

5          MS. CALLOWAY:  No.

6          THE COURT:  Anything else?  Thank you ma'am.

7    Patricia Cammack.

8          Can I have a telephone number where I might reach you

9    this afternoon?

10          MS. CAMMACK:  874-9643.

11          THE COURT:  Do you work?

12          MS. CAMMACK:  No.

13          THE COURT:  And can you state your husband's name for

14    the record?

15          MS. CAMMACK:  N. Gillis Cammack, III.

16          THE COURT:  Is he employed?

17          MS. CAMMACK:  Retired.

18          THE COURT:  And for the record would you please tell

19    us what he retired from?

20          MS. CAMMACK:  Auto parts company, an owner with his

21    brother.

22          THE COURT:  During your marriage did you work outside

23    of the home?

24          MS. CAMMACK:  No.  I worked at a Lincoln Mercury part

25    depot out from Detroit, and that is the only time I worked.

1    THE COURT:  Ms. Cammack, when we were in court a few

2    minutes ago I asked you a couple of questions that I asked

3    you to consider, and I need to go through those questions

4    with you and find out your feelings about the death penalty

5    and that type of thing.  In the event of a capital

6    conviction in this case, there are two alternative

7    sentences, life without parole and the death penalty.  In

8    order for you to qualify to sit as a juror in this case,

9    you've got to be able to give equal consideration in

10   recommending to the Court as to both of those sentences.

11   Some people are opposed to the death penalty.  There are

12   others who are opposed to anything less than the death

13   penalty in regard to an intentional killing.  My question to

14   you is this.  Are you so opposed to the death penalty in a

15   capital case that it would restrict or substantially impair

16   the performance of your duties as a juror of this case?

17      MS. CAMMACK:  I would study the facts and go from

18   there.  I've got an open mind about that.

19      THE COURT:  Let me ask you that question in reverse

20   of it.  Are you so opposed to anything less than death in a

21   capital case that your opinion or your views would interfere

22   with the performance of your duties in accordance with the

23   instructions that I give you?

24      MS. CAMMACK:  There again I would listen to all of

25   the facts and go from there.  I've got an open mind about

1    it.

2        THE COURT:  Answer Ms. Wilson's questions.

3        MS. WILSON:  Regarding your feelings about the death

4    penalty, have you thought about your feelings and opinion

5    about the death penalty prior to the time that you were

6    summoned yesterday and found out that this was a capital

7    murder case?

8        MS. CAMMACK:  I've thought about it as long as I've

9    been a grown-up I guess, you know.  I mean you read about

10   things, and it just comes into your brain, and you think

11   what if I had to deal with that.  And I've addressed it.

12       MS. WILSON:  So you feel comfortable in telling us

13   that you could consider the death penalty equally with a

14   life without parole punishment?

15       MS. CAMMACK:  (Nods head affirmatively).

16       MS. WILSON:  What you're saying is that if you are

17   selected to serve on this jury, if after hearing all of the

18   evidence you are convinced beyond a reasonable doubt that

19   Matthew Reeves intentionally killed Willie Johnson during

20   the course of a robbery, you could find him guilty of

21   capital murder?

22       MS. CAMMACK:  yes.

23       MS. WILSON:  Then we would go to the sentencing

24   phase, and you could consider the death penalty as an

25   appropriate punishment?

Ann H. Armstrong, RPR

249

1   have, and that's good.  Now let's put it to the law here and

2   kind of try to carry it forward.  Part of the duty of the

3   jury in a capital murder case is to decide first of all

4   whether the defendant is guilty or not of an intentional

5   killing in the course of another crime.  Assuming we get

6   past that problem, which is the first thing, we are now on

7   to the business of deciding to recommend to the Judge life

8   in the penitentiary without parole or death.  And the jury's

9   job is to take whatever evidence comes in this second

10  hearing, this little mini trial we have about what you ought

11  to recommend.  We get up and talk about it, try to put

12  witnesses up there and try to give you an idea of what to

13  recommend.  The question comes in are you in a position

14  where you just could not recommend death no matter what the

15  evidence showed, or are you in a position where you would

16  say, I would have to listen to it?  Can you help us here?

17          MS. CARTER:  I am not in a position to do it.

18          MR. GREENE:  No matter how bad the facts in this case

19  are?

20          MS. CARTER:   No.

21          MR. GREENE:  No matter how terrible it was, what

22  great loss everybody suffered, you still couldn't recommend

23  death?

24          MS. CARTER:  No.

25          MR. GREENE:  Well, that's a personal thing.  There's

Ann H. Armstrong, RPR

250

1   nothing right or wrong about it.

2        MR. GOGGANS:  Ms. Carter, let me ask you a few

3   questions if I could about why you seem to have some

4   reservations about the death penalty.  Is that based on your

5   feelings that maybe the judicial system is unfair or

6   religious beliefs or what?

7        MS. CARTER:  It's based on religious beliefs.

8        MR. GOGGANS:  Your religious beliefs also tell you

9   that you should obey civil authority and follow whatever the

10  law is where you live.

11       MS. CARTER:  Yes.

12       MR. GOGGANS:  Do you understand that in Alabama there

13  are different degrees or different kinds of murder?

14       MS. CARTER:  Uh-huh.

15       MR. GOGGANS:  For example, you know, if something is

16  not an intentional killing but a reckless killing, that

17  might be not murder but a manslaughter.  And in a capital

18  case the charge is that somebody intentionally killed

19  somebody during the course of a robbery.  There are two

20  parts the State has got to prove.  First they've got to

21  prove an intentional killing, not something that is

22  negligent or reckless or people got in a fight or somebody

23  got provoked or got killed because of that but an

24  intentional, unjustified killing.  If it was just that and

25  nothing more, it would be a plain murder.  In addition to

Ann H. Armstrong, RPR

251

1   that intentional killing, the State to make it capital has

2   got to show that this intentional killing was during the

3   course of a robbery.  Do you understand that we're not

4   talking about just any murder?  We are talking about a

5   capital killing.  Do you understand that?

6        MS. CARTER:  (Nods head affirmatively).

7        MR. GOGGANS:  All right.  Do you also understand that

8   in order to even get to this penalty phase that a jury has

9   first got to be convinced beyond a reasonable doubt that

10  this person did intentionally kill somebody during a

11  robbery.  Do you understand that?

12       MS. CARTER:  Uh-huh.

13       MR. GOGGANS:  It's got to be all twelve folks on the

14  jury agreeing to that.  Do you understand that?

15       MS. CARTER:  Yes.

16       MR. GOGGANS:  Do you also understand that in Alabama

17  that if a jury should happen to find somebody guilty of a

18  capital murder, we don't send you back in the jury room and

19  say, all right; you have found this man guilty; go back

20  there and talk and come back and tell us what you want to

21  do.  What is done is that the judge gives the jury some very

22  careful instructions on how to go about making that

23  decision, tell you what the law is.  You're instructed, here

24  are some things to consider that we think weigh in favor of

25  the death penalty called aggravating circumstances.  Here

Ann H. Armstrong, RPR

252

1   are some things that you have got to consider under the law

2   that we call mitigating circumstances that weigh in favor of

3   the penalty of life without the possibility of parole.  Do

4   you think that you could listen to the evidence and follow

5   the law that the judge tells you you've got to follow?  I

6   mean we all have laws we don't like.  I don't like most tax

7   laws, but I still pay my taxes.  Do you think you could do

8   that?  Could you follow it, whether you like it or not?  Do

9   you think you could follow that law that Judge tells you

10  that you have got to follow?

11        MS. CARTER:  Uh-huh.

12        MR. GOGGANS:  You do?

13        MS. CARTER:  Uh-huh.

14        MR. GOGGANS:  No other questions.

15        MR. GREENE:  In following the law, please, ma'am,

16  does that mean you would abandon your position and be

17  willing to put this man to death if the others voted for

18  that?

19        MS. CARTER:  No.

20        MR. GREENE:  Thank you, ma'am.

21        THE COURT:  Thank you, ma'am.  Ms. Carter, we are

22  going to give you a card.  It's got a telephone number on it

23  and ask you to please call back after 5:00 o'clock today.

24  And there will be other instructions on that message

25  machine, answering machine regarding your service later on

Ann H. Armstrong, RPR

253

1    in the week.  You're excused from this particular case.

2         MR. GOGGANS:  For the record if we can get our

3    objection to the Court excusing her for cause.  We state as

4    grounds under the sixth, eighth, fourteenth amendments to

5    the Constitution, Article 1, Section 6 of the Alabama

6    Constitution and the Witherspoon and Witt cases, we don't

7    think she should be excused.

8         THE COURT:  Rita Caver.

9         Can you tell us a phone number where we can reach you

10   if we need you this afternoon?

11        MS. CAVER:  996-3252.

12        THE COURT:  Are you employed?

13        MS. CAVER:  No.

14        THE COURT:  Have you ever been employed?

15        MS. CAVER:  Not in the last five or six years.

16        THE COURT:  Are you married?

17        MS. CAVER:  Yes.

18        THE COURT:  What's your spouse's name?

19        MS. CAVER:  Neal Caver.

20        THE COURT:  And is he employed?

21        MS. CAVER:  He's pastor for Dallas Avenue Baptist.

22        THE COURT:  Ms. Caver, let me ask you a couple of

23   questions regarding how you feel about the death penalty.

24   Some people out there in society are totally opposed to the

25   death penalty.  They could not recommend that under any

Ann H. Armstrong, RPR

254

1   circumstances for any intentional killing.  There are other

2   people who believe that the death penalty is the only

3   appropriate penalty for an intentional killing.  I'm going

4   to ask you a question regarding how you feel about that.

5   Are you so opposed to the death penalty in a capital case

6   that it would restrict or substantially impair the

7   performance of your duties as a juror?

8          MS. CAVER:  Yes, I'm for the death penalty.

9          THE COURT:  You are for the death penalty?

10          MS. CAVER:  Yes.

11          THE COURT:  So my the question was are you so opposed

12   to the death penalty?  You're not opposed to the death

13   penalty?

14          MS. CAVER:  No.

15          THE COURT:  Okay.  If you're asked to hear the

16   evidence in this case, one of the other alternatives for a

17   sentence that you must consider or would consider is life

18   imprisonment without parole.  But there are people out there

19   who think that the death penalty is the only penalty that

20   justifies an intentional killing and would not consider life

21   imprisonment without parole.  If you are selected to hear

22   the evidence in this case, are you so opposed to anything

23   less than the death penalty that that opinion would

24   substantially impair the performance of your duties as a

25   juror?

Ann H. Armstrong, RPR

255

1         MS. CAVER:  I would have to say yes.  I think if you

2    take a life, your life is lost too.

3         THE COURT:  So you could not give equal consideration

4    to those two penalties if I gave you instructions?

5         MS. CAVER:  No.

6         THE COURT:  You could not do that under any

7    circumstances?

8         MS. CAVER:  No.

9         THE COURT:  All right.  Anything else?

10        MR. GREENE:  Ms. Caver, I think I'm fairly clear what

11   your position is.  I want to ask you these things.  Your

12   feelings are that if a person takes a life intentionally,

13   then a life ought to be put in the balance for it?

14        MS. CAVER:  Right.

15        MR. GREENE:  And the law in this state is there is a

16   second little trial, a mini trial after the decision is made

17   that that person in fact intentionally took a life.  If you

18   are sitting on this jury and you listen to the instructions

19   the Judge has to give you -- and what we attorneys do would

20   be to produce evidence to try to convince you to vote one

21   way or the other, either to recommend death or to recommend

22   life without parole.  But the witnesses tell you good things

23   and bad things about what is going on, whatever we can,

24   whatever is brought that's lawful.  The jury has to listen

25   to that and weigh those things before you make that

256

1    recommendation.  Do you understand that?

2         MS. CAVER:  Uh-huh.

3         MR. GREENE:  In that second trial the request is that

4    you maintain an open mind and weigh both of those things;

5    the good things that say it should not be death and it

6    should be life without parole and the bad things that say it

7    ought to be death.  Can you weigh those and make a

8    recommendation, or are you locked down on one?

9         MS. CAVER:  No.  If he's guilty, then I think that

10   it's death.

11        MR. GREENE:  Thank you, ma'am.

12        MR. GOGGANS:  No questions.

13        THE COURT:  Thank you, ma'am, if you would please

14   take that card from Mr. Kynard and call that telephone

15   number after 5:00 today.  There will be further instructions

16   about your service for the remainder of the week.  You'll be

17   excused on this case.  Edward Chance.

18        Mr. Chance, please have a seat.  Mr. Chance, is there

19   a phone number where I can reach you this afternoon?

20        MR. CHANCE:  I've got a beeper number, and then I've

21   got a home number.

22        THE COURT:  Give me your home number.

23        MR. CHANCE:  875-6689.

24        THE COURT:  And your beeper?

25        MR. CHANCE:  418-8002.

Ann H. Armstrong, RPR

257

1          THE COURT:  And Mr. Chance, are you employed?

2          MR. CHANCE:  Right.

3          THE COURT:  How are you employed?

4          MR. CHANCE:  Insurance.

5          THE COURT:  What company?

6          MR. CHANCE:  Liberty National.

7          THE COURT:  Are you married?

8          MR. CHANCE:  No.

9          THE COURT:  Mr. Chance, I asked you some questions

10   earlier today, and I'm going to go back through those

11   questions with you.  You know this is a capital case.

12          MR. CHANCE:  Right.

13          THE COURT:  There are two alternatives for a sentence

14   in a capital case in the event of a conviction.  One is the

15   death penalty, and the other is life imprisonment without

16   parole.  In order to be qualified to hear the facts of this

17   case, you must be able to equally consider and then

18   recommend those two penalties.  In our society there are

19   people who believe that the death is the only penalty for an

20   intentional killing.  There are other people who believe

21   that under no circumstances should the death penalty be

22   pronounced for an intentional killing.  I want to ask you a

23   question regarding your feelings about the death penalty.

24   Are you so opposed to the death penalty and so opposed to

25   the death penalty in a capital case that it would restrict

Ann H. Armstrong, RPR

258

1   or substantially impair the performance of your duties as a

2   juror in this case?

3          MR. CHANCE:  No.

4          THE COURT:  As I said, some people think that the

5   death penalty is the only penalty for an intentional

6   killing.  They could not and would not consider anything

7   less than that, like life without parole.  So my next

8   question is the reverse almost of that first question.  Are

9   you so opposed to anything less than the death penalty for a

10  capital offense that your views would interfere with your

11  performance of your duties as a juror in this case?

12         MR. CHANCE:  No.

13         THE COURT:  So what you're telling me is that you can

14  take the evidence and equally consider the penalties that

15  are possible in the event of a conviction and that you can

16  keep an open mind and consider both the death penalty and

17  the life without parole penalty; you're not predisposed to

18  any one or the other?

19         MR. CHANCE:  Right.

20         THE COURT:  All right.  Mr. Greene?

21         THE COURT:  Nothing, Your Honor.

22         MR. GOGGANS:  Mr. Chance, do you understand that in

23  Alabama there are different degrees of homicide, and a

24  capital offense involves the charge of an intentional

25  killing during the course of another felony, in this case a

Ann H. Armstrong, RPR

259

1    charge of robbery.  Do you understand that?

2        MR. CHANCE:  Uh-huh.

3        MR. GOGGANS:  It's not just like any homicide case;

4    do you understand that?

5        MR. CHANCE:  Right.

6        MR. GOGGANS:  Do you think if you were on a jury that

7    had found beyond a reasonable doubt that somebody had

8    intentionally killed somebody during the course of a

9    robbery, that you would be inclined to automatically think

10    this person should get the death penalty?

11        MR. CHANCE:  Well, I don't say everybody should get

12    the death penalty that, you know, commits a crime where they

13    killed somebody, but I would just have to consider it.

14        MR. GOGGANS:.  Let me ask you this, Mr. Chance.  Was

15    Jimmy Chance your brother?

16        MR. CHANCE:  Right.

17        MR. GOGGANS:  Do you remember the trial involving

18    your brother's death back in 1988?

19        MR. CHANCE:  Yeah, I think so.  I'm not sure.  We

20    wasn't that close.

21        MR. GOGGANS:  Did you attend the trial?

22        MR. CHANCE:  I can't even remember.

23        MR. GOGGANS:  Let me ask do you remember that I

24    represented the Defendant in that case?

25        MR. CHANCE:  No.

Ann H. Armstrong, RPR

260

1      MR. GOGGANS:  Assume that to be true, and I represent

2  to you that that is true.  Would that have any --

3      MR. CHANCE:  I must have been there.

4      MR. GOGGANS:  Would that bother you at all?

5      MR. CHANCE:  No.

6      MR. GOGGANS:  I have no other questions.

7      MR. GREENE:  Nothing further.

8      THE COURT:  Do you know anything about the facts of

9  this case, Mr. Chance?

10     MR. CHANCE:  No.

11     THE COURT:  Have you read anything about it, heard

12  anything about it around town?

13     MR. CHANCE:  No.

14     THE COURT:  Mr. Chance, I would appreciate it if you

15  would -- if we have not contacted you this afternoon by

16  phone, we are going to ask you to be back at 9:00 o'clock in

17  the morning.  If we do not contact you by phone today, come

18  back at 9:00.  Samuel Clark.

19     THE COURT:  Can I have your telephone number where we

20  may reach you today?

21     MR. CLARK:  Yes, sir.  It's 872-6324.

22     THE COURT:  Is that at home or work?

23     MR. CLARK:  No, sir.  It will be a friend.  I drive a

24  truck, and I'm working down below Montgomery right now.  But

25  these people here can -- it's Christy Smith.  She can notify

261

1    me tonight, you know, if I do go onto work or any time, you

2    know, when I come in.

3         THE COURT:  Where are you employed?

4         MR. CLARK:  Gary Smith Logging, Jemison, Alabama.

5         THE COURT:  Are you married?

6         MR. CLARK:  No, sir.

7         THE COURT:  Mr. Clark, I asked you some questions

8    earlier regarding death penalty, and I'm going to go through

9    those questions with you again.  You know, this is a capital

10   case, and in the event of a conviction there are two

11   possible sentences, life imprisonment without parole or the

12   death penalty.  For you to qualify to hear the facts of this

13   case, you must be able to give equal consideration and be

14   able to recommend those possible sentences or penalties.

15   There are some people in our society who believe that the

16   death penalty is the only penalty that is justified for an

17   intentional killing.  There are people who believe that the

18   death penalty is not justified under any circumstance, be it

19   an intentional killing or anything else.  My question to you

20   with regard to that is this.  Are you so opposed to the

21   death penalty in a capital case that it would restrict or

22   substantially impair the performance of your duties as a

23   juror?

24        MR. CLARK:  No, sir.

25        THE COURT:  All right.  There are some people in our

Ann H. Armstrong, RPR

262

1    society who believe that the death penalty is the only

2    penalty that should be pronounced for an intentional

3    killing, but in this case there are two alternatives as I

4    said, the death penalty and life without parole.  And the

5    second question is this.  Are you so opposed to anything

6    less than the death penalty for a capital case that those

7    views would interfere with your performance of your duties

8    as a juror?  Do you understand that question?

9         MR. CLARK:  No, sir.  I don't think I would be.

10        THE COURT:  So you're telling me that you can give

11   equal consideration to both of the possible penalties in

12   this case, that you're not pre determined or pre disposed to

13   one penalty over the other?

14        MR. CLARK:  Yes, sir.

15        THE COURT:  If you would please answer Mr. Greene's

16   questions and Mr. Goggans' questions.

17        MR. GREENE:  No questions.

18        MR. GOGGANS:  Mr. Clark, do you understand that in

19   Alabama there are different degrees of homicide, different

20   degrees of killings, and capital offenses have been

21   separated into a different level which are considered worse

22   than the others.  Capital cases don't involve anything like

23   an accidental killing or negligent killing or even an

24   intentional killing that's been provoked.  It involves only

25   intentional killings.  Do you understand that?

Ann H. Armstrong, RPR

263

1          MR. CLARK:  Yes, sir.

2          MR. GOGGANS:  Do you understand that in addition to

3    an intentional killing the State has also got to prove some

4    other felony that goes along with it; in this case, the

5    charge of robbery.  They have got to prove an intentional

6    killing during the course of a robbery.  Do you know that

7    distinction in different kinds of killings?

8          MR. CLARK:  Yes, sir.

9          MR. GOGGANS:  Do you think that if you were on a jury

10   that had already found somebody guilty beyond a reasonable

11   doubt of having intentionally killed somebody while they are

12   trying to rob them that you would be inclined to

13   automatically think that person ought to get the death

14   penalty?

15         MR. GREENE:  I would have to object unless you

16   explain that there would be a further hearing.

17         MR. GOGGANS:  Once a determination is made, then you

18   get into another phase where the jury is called upon to make

19   a decision of death or life without the possibility of

20   parole.  But having found that, do you think that you

21   yourself would personally feel like this person ought to

22   automatically get death?

23         MR. CLARK:  No, sir.

24         MR. GOGGANS:  No other questions.

25         THE COURT:  Mr. Clark, do you know anything about the

Ann H. Armstrong, RPR

264

1   facts of this case?

2        MR. CLARK:  No, sir.

3        THE COURT:  Have you read anything about it?

4        MR. CLARK:  No, sir.

5        THE COURT:  You haven't heard any talk about it?

6        MR. CLARK:  No, sir.

7        THE COURT:  Mr. Clark, I appreciate it.  We will

8   either call you this afternoon, but if we do not call you

9   this afternoon, I'm going to ask you to be here in the

10  morning at 9:00 o'clock.  Thelma Clark.

11       Ms. Clark, give me your telephone number, please.

12       MS. CLARK:  874-6209.

13       THE COURT:  And are you employed?

14       MS. CLARK:  No, retired.

15       THE COURT:  What did you do prior to your retirement?

16       MS. CLARK:  Teacher.

17       THE COURT:  With the city or county?

18       MS. CLARK:  The City system.

19       THE COURT:  Are you presently married?

20       MS. CLARK:  No, my husband died two years ago.

21       THE COURT:  What was his name?

22       MS. CLARK:  James Clark.

23       THE COURT:  And how was Mr. Clark employed?

24       MS. CLARK:  The country club.

25       THE COURT:  Ms. Clark, I asked you some questions

Ann H. Armstrong, RPR

1    earlier regarding the death penalty.  As you know this is a

2    capital murder case, and if you're selected to hear the

3    facts of this case, you must be able to consider the two

4    penalties that the law requires in the event of a

5    conviction, and that is the death penalty and life

6    imprisonment without parole.  There are some people who are

7    totally opposed to the death penalty, could not and would

8    not under any circumstances recommend the death penalty for

9    any type of killing.  There are other people in our society

10   who think that the death penalty is the only penalty that

11   should be pronounced for an intentional killing.  And I'm

12   going to ask you some questions regarding that.  And the

13   first question I have for you is this.  Are you so opposed

14   to the death penalty in a capital case that it would

15   restrict or substantially impair your performance or the

16   performance of your duties as a juror?  That is, are you

17   opposed to the death penalty?

18        MS. CLARK:  I am.

19        THE COURT:  And is it my understanding then that you

20   could not pronounce or recommend rather the death penalty

21   under any circumstances in any case at any time anywhere?

22        MS. CLARK:  I am just opposed period.

23        THE COURT:  Is this opinion that you have an opinion

24   that you have had for a considerable length of time or

25   something that you have thought about over the course of the

Ann H. Armstrong, RPR

266

1  last few days?

2      MS. CLARK:  Well, previously when I hear a case on

3  television or something, all of this has been in the news

4  about all of these people bombing and all, I've drawn my

5  conclusion that, you know, and from the Biblical standpoint

6  I just think, you know, it should be God's will and not

7  mine.

8      THE COURT:  So there is not any set of circumstances,

9  there is not any crime or anything that is so bad that you

10 think that a person should pay for that crime with his life?

11     MS. CLARK:  I don't.  I don't believe that.

12     THE COURT:  You don't believe that there is?

13     MS. CLARK:  No.

14     THE COURT:  Anything else?

15     MR. GREENE:  Nothing else.

16     MR. GOGGANS:  No questions.

17     THE COURT:  Thank you, ma'am.  Ms. Clark,  you are

18 excused from this case.  Windy Clower.

19     Ms. Clower, how can I reach you this afternoon?

20     MS. CLOWER:  872-1417.

21     THE COURT:  Are you employed?

22     MS. CLOWER:  It's part-time consultant work just once

23 every three months at the dialysis clinic.

24     THE COURT:  What's the name of the clinic?

25     MS. CLOWER:  It's BMA Dialysis unit.

Ann H. Armstrong, RPR

267

1          THE COURT:   You are married to Dr. Daniel Clower, and

2     he's a physician?

3          MS. CLOWER:   Right.

4          THE COURT:   And what's the name of his group?

5          MS. CLOWER:   Doctors Clinic.

6          THE COURT:   I asked you some questions earlier

7     regarding the death penalty and how you feel about that.

8     And I want to ask you some more questions regarding that.

9     You do know this is a capital case and that in the event of

10    a conviction for a capital offense that the two sentences

11    that are or the two punishments that are provided for under

12    the law is either the death penalty or life imprisonment

13    without parole.   Do you understand that?

14         MS. CLOWER:   Yes, sir.

15         THE COURT:   And if you are selected to hear the facts

16    of this case you must be able to give equal consideration to

17    those two penalties.   There are people in our society who

18    are opposed to the death penalty, who would not under any

19    circumstances recommend a death sentence for an intentional

20    killing.   There are people in our society who believe that

21    the death sentence is the only sentence that is appropriate

22    for an intentional killing.   You have got to be able to give

23    equal consideration not only to the death penalty but to the

24    alternative sentence of life imprisonment without parole.

25    That's what we need to find out about today, and the

Ann H. Armstrong, RPR

268

1    question I have for you is this.  Are you so opposed to the

2    death penalty in a capital case that it would restrict or it

3    would substantially impair the performance of your duties as

4    a juror?

5         MS. CLOWER:  No.

6         THE COURT:  The other question is a little different,

7    but it speaks to people who believe in nothing but the death

8    penalty, nothing less than that.  And my question is this.

9    Are you so opposed to anything less than the death penalty

10   for a capital offense that your views would interfere with

11   the performance of your duties as a juror?

12        MS. CLOWER:  No.

13        THE COURT:  So what you're telling if I'm not

14   mistaken is that if you're selected as a juror in this case

15   and if there was a capital conviction that you could hear

16   and consider and then make a recommendation based upon the

17   evidence that you hear and the law as I give it to you

18   equally, whether it be the death penalty or life

19   imprisonment without parole?

20        MS. CLOWER:  Right.

21        THE COURT:  That you could keep an open mind and not

22   be predisposed to one or the other?

23        MS. CLOWER:  That's right.

24        THE COURT:  Anything?

25        MR. GREENE:  Nothing from the State.

269

1        MR. GOGGANS:.  No questions.

2        THE COURT:  All right.  Have you heard anything about

3   this case or read anything in the newspaper about it?

4        MS. CLOWER:  No.

5        THE COURT:  Do you know anything about the facts or

6   anybody talk to you about the case or anything like that?

7        MS. CLOWER:  No.

8        THE COURT:  Okay.  I'm going to ask you to please be

9   close to the phone this afternoon if you would.  If you do

10  not hear from us this afternoon by phone, please be back

11  here in the morning at 9:00 o'clock.  Angelica Cobb.

12       THE COURT:  Can I get your telephone number where we

13  can reach you this afternoon?

14       MS. COBB:  872-8937.

15       THE COURT:  Is that home?

16       MS. COBB:  Yes, sir.

17       THE COURT:  Are you employed?

18       MS. COBB:  Yes, sir.  I work at the Vaughan in

19  surgery.

20       THE COURT:  Are you an RN?

21       MS. COBB:  No, sir.  I'm a scrub nurse.

22       THE COURT:  Are you married?

23       MS. COBB:  No, sir.

24       THE COURT:  I asked you a question earlier today

25  regarding the death penalty, and I'm going to ask you some

270

1    more questions about that.  As you know this is a capital

2    case, and the two punishments for this offense in the event

3    of a conviction are either the death penalty or life

4    imprisonment without parole.  For you to be qualified to

5    hear the facts of this case, you have got to be able to give

6    equal consideration to both of those penalties and then make

7    a recommendation to the Court.  There are people in our

8    society who believe that the death penalty is the only

9    penalty that should be pronounced for an intentional murder,

10   for an intentional killing.  There are others of us in

11   society who are so totally opposed to the death penalty that

12   they could not consider or recommend that under any

13   circumstances.

14        As you know there are two things that you must

15   recommend or two things that you must consider.  One is the

16   death penalty, and the other is life imprisonment without

17   parole.  And the question I have for you again is this.

18   Are you so opposed to the death penalty in a capital case

19   that it would restrict or substantially impair the

20   performance of your duties as a juror?

21        MS. COBB:  No.

22        THE COURT:  All right.  Let me make sure you don't

23   fall into that category of society that thinks the death

24   penalty is the only penalty.  And in doing so let me ask you

25   this question.  Are you so opposed to anything less than

271

1   death for a capital offense that your views would interfere

2   with the performance of your duties as a juror?

3           MS. COBB:  No, sir.

4           THE COURT:  So you could give equal consideration to

5   both the death penalty and life imprisonment without parole

6   if you're called upon to consider it?

7           MS. COBB:  Yes, sir.

8           THE COURT:  And you're not predisposed to either one

9   or the other?

10          MS. COBB:  No, sir.

11          THE COURT:  You could hear the facts of this case,

12  keep in an open mind and then make a recommendation to the

13  Court based upon the facts as you hear them and based upon

14  the law as I give it to you?

15          MS. COBB:  Yes, sir.

16          THE COURT:  Any questions?

17          MR. GREENE:  None.

18          MR. GOGGANS:  No questions.

19          THE COURT:  Thank you, Ms. Cobb.  Let me ask you one

20  more question.  Have you heard anything about this case,

21  read anything about it in the paper, talked to anybody about

22  it, know any of the facts?

23          MS. COBB:  No, sir, not until yesterday.

24          THE COURT:  When you say not until yesterday, do you

25  mean what you've heard in court?

272

1        MS. COBB:  When I came here today.

2        THE COURT:  You have not heard anything outside of

3   court?

4        MS. COBB:  No.

5        THE COURT:  We'll either call you this afternoon.  If

6   we don't call you this afternoon, please be here at 9:00

7   o'clock in the morning.  Charlene Cobb.

8        Is there a telephone number where I can reach you

9   this afternoon if I needed to?

10       MS. COBB:  Yes, sir, 875-8875.

11       THE COURT:  Is that home or work?

12       MS. COBB:  Home.

13       THE COURT:  Are you employed?

14       MS. COBB:  No.

15       THE COURT:  Are you married?

16       MS. COBB:  Yes.

17       THE COURT:  What is your husband's name?

18       MS. COBB:  Grady Cobb, II.

19       THE COURT:  And is he employed?

20       MS. COBB:  Yes.

21       THE COURT:  Where is he employed?

22       MS. COBB:  Wade Construction.

23       THE COURT:  Have you -- I presume that you work in

24   the home?

25       MS. COBB:  Right.

273

1          THE COURT:  Have you ever worked outside of the home?

2     MS. COBB:  Yes.

3          THE COURT:  Where did you work?

4     MS. COBB:  The last place of employment was Winn

5     Dixie.

6          THE COURT:  I asked you some questions out there a

7     few minutes ago regarding your feelings about the death

8     penalty.  I'm going to ask you those questions again, and

9     we'll talk about that.  You know this is a capital case.

10    And in the event of a conviction there are two sentences

11    that you must be able to consider.  One is the death

12    penalty, and the other is life imprisonment without parole.

13    Some people in our society believe that the death penalty is

14    the only penalty that should be pronounced for an

15    intentional killing.  There are people in our society who

16    believe that the death penalty is under no circumstances an

17    appropriate sentence for any criminal act.  And as you know

18    you are going to be called upon if you are qualified to hear

19    the evidence in this case to possibly consider two sentences

20    or to make two recommendations or a recommendation, either

21    the death sentence or life without parole.  Okay.

22         My question to you is this.  Are you so opposed to

23    the death penalty in a capital case that it would restrict

24    or substantially impair the performance of your duties as a

25    juror?

Ann H. Armstrong, RPR

274

1          MS. COBB:  No.

2          THE COURT:  All right.  As I said you must be able to

3   consider something other than the death penalty too if

4   you're called upon to hear the facts of this case and if

5   there is in fact a conviction for a capital offense, and

6   that is life without parole.  So my next question for you is

7   this.  Are you so opposed to anything less than the death

8   penalty for a capital offense that your views would

9   interfere with the performance of your duties?

10         MS. COBB:  No.

11         THE COURT:  So what you're telling me is that you

12  could hear the evidence in the case if there is a conviction

13  for a capital offense; you could hear other evidence

14  regarding mitigating and aggravating circumstances, and that

15  you would keep an open mind and give equal consideration to

16  both the death penalty and life imprisonment without parole?

17         MS. COBB:  Yes, sir.

18         THE COURT:  You're not predisposed to one or the

19  other at this time?

20         MS. COBB:  No.

21         THE COURT:  Have you read anything about the facts of

22  this case?

23         MS. COBB:  No.

24         THE COURT:  Have you heard anything about the facts

25  of this case?

275

1       MS. COBB:  No.

2       THE COURT:  Did you have any prior knowledge about

3   the facts of this case before yesterday when these lawyers

4   stood up and told you a little bit about what the facts

5   were?

6       MS. COBB:  No.

7       THE COURT:  Okay.  Any questions?

8       MR. GREENE:  None.

9       MR. GOGGANS:  Ms. Cobb, do you think there's any

10   possibility that if you and eleven other people had found

11   beyond a reasonable doubt that somebody had intentionally

12   killed somebody while they were trying to rob them that you

13   would at that point going into the penalty phase of the

14   trial automatically think the person should get the death

15   penalty?

16       MS. COBB:  No.  I want to hear more information.

17       MR. GOGGANS:  No other questions.

18       THE COURT:  Thank you, ma'am.  If we do not call you

19   this afternoon, I'm going to ask you to please be back at

20   9:00 o'clock in the morning.  Seymore Cohn.

21       I need to get a telephone number where I can contact

22   you.

23       MR. COHN:  872-2693.

24       THE COURT:  Is that at home?

25       MR. COHN:  Yes, sir.

Ann H. Armstrong, RPR

276

1        THE COURT:  And Mr. Cohn, you're retired, correct?

2        MR. COHN:  That's correct.

3        THE COURT:  And what business were you in before you

4   retired?

5        MR. COHN:  A travel agency for sixteen years.

6        THE COURT:  And you are married to June Cohn?

7        MR. COHN:  Correct.

8        THE COURT:  And did she work in the business with

9   you?

10       MR. COHN:  Yes, sir.  We were partners.

11       THE COURT:  Both at home and in business?

12       MR. COHN:  At home for quite a few years, some

13   fifty-two I think.

14       THE COURT:  I asked you some questions out there a

15   few minutes ago regarding the death penalty and your

16   feelings about the death penalty, and I'm going to ask you

17   to please answer these questions again for the record.  You

18   understand, Mr. Cohn, that this is a capital case, that in

19   the event of a conviction that the two alternative sentences

20   are life in prison without parole or the death penalty?

21       MR. COHN:  Yes.

22       THE COURT:  Do you understand that in the event that

23   you should be called upon to hear the facts of this case

24   that you must be able to give equal consideration to both of

25   those penalties?

Ann H. Armstrong, RPR

277

1        MR. COHN:  Yes, I think so.

2        THE COURT:  And that you would also in giving that

3   equal consideration be called upon to make a recommendation

4   to the Court after you have heard certain facts; do you

5   understand my question?

6        MR. COHN:  Yes.

7        THE COURT:  The question that I have for you is this.

8   You know, there are people in our society who are totally

9   opposed to the death penalty, would not or could not

10  consider it or recommend it any under any circumstances.

11  There are people in our society who believe that the death

12  penalty is the only penalty that should be pronounced for an

13  accidental killing.  My question to you is this regarding

14  the death penalty.  Are you so opposed to the death penalty

15  in a capital case that it would restrict or substantially

16  impair the performance of your duties as a juror?

17       MR. COHN:  No, I'm not opposed to it under certain

18  circumstances.

19       THE COURT:  Right.  You also if you're called upon to

20  hear this case must be able to consider something other than

21  the death penalty, and that would be life without parole.

22  My question to you is with regard to that.  Are you so

23  opposed to anything less than death for a capital offense

24  that your views would interfere with the performance of your

25  duties as a juror?  In other words, are you a part of the

278

1   segment of society that believes that the death penalty is

2   the only penalty that should be pronounced for a capital

3   offense?

4        MR. COHN:  I don't think it's the only penalty.  It's

5   probably the one I would favor.

6        THE COURT:  That's really what I want to try to

7   determine.  Do you feel as though that you're predisposed to

8   one penalty over the other in the event of a capital

9   conviction?

10        MR. COHN:  Yes.

11        THE COURT:  Okay.  You understand that there are two

12   phases to this trial.  One phase is the guilt or the

13   innocence phase.  The other phase is the sentencing phase,

14   that if there is a conviction during that guilt phase of a

15   capital offense that then you as a juror would move into a

16   penalty phase.  And during the penalty phase of that trial

17   you would hear certain facts and certain circumstances in

18   support of or in mitigation of the particular criminal

19   offense.  And you would hear certain facts and circumstances

20   that we call aggravating circumstances, that based upon

21   those circumstances that you would be called upon then to

22   consider those two penalties.  Are you telling me that you

23   would be inclined to vote for the death penalty regardless

24   of what you hear in that phase of the trial?

25        MR. COHN:  I think the evidence would determine my

279

1  position.  Are you implying that it's up to the jury to make

2  a recommendation to the Court?

3          THE COURT:  That's correct.

4          MR. COHN:  As to the death penalty or life without

5  parole?

6          THE COURT:  In that phase of the trial, the jury has

7  certain evidence in aggravation and in mitigation and that

8  based upon that you would then as a juror make a

9  recommendation to the Court as to whether it would be the

10  death penalty or life imprisonment without parole.

11          MR. COHN:  I would consider the evidence.

12          THE COURT:  So earlier when you told me that you

13  thought the death penalty was the appropriate penalty, can

14  you explain what you meant by that?

15          MR. COHN:  I wouldn't necessarily say it was

16  appropriate.  I would say I would consider it as number one

17  and possibly life as number two.

18          THE COURT:  Do you have any questions?

19          MS. WILSON:  Mr. Cohn, are you telling us however

20  that you could keep an open mind and listen to the evidence

21  and the facts that are presented before you made up your

22  mind as to what the appropriate sentence would be?

23          MR. COHN:  I would like to have an open mind about

24  any problem, and certainly this would be one.

25          MS. WILSON:  So even if you voted to find him guilty

Ann H. Armstrong, RPR

280

1   of capital murder, you're telling us you could still go into

2   that second phase of the trial and listen to the additional

3   evidence which there certainly would be some additional

4   evidence at the penalty phase, and you could keep an open

5   mind before you made your recommendation as to the sentence

6   and listen to all of the evidence and then --

7        MR. COHN:  You are telling me additional evidence?

8        MS. WILSON:  But it wouldn't be all of the evidence.

9   You have two phases of the trial.  You have the guilt phase

10  of the trial and the sentencing phase.  In the guilt phase

11  of the trial you listen to the evidence, and you reach a

12  verdict as to whether he's guilty or not guilty of capital

13  murder.  If you find him guilty of capital murder, then you

14  move into the sentencing phase, another phase where a lot of

15  additional evidence would come to you that would not have

16  come to you in the initial trial, a lot of evidence that's

17  favorable to the Defendant.  And the State would put on

18  evidence that would be unfavorable to the Defendant, but it

19  would be additional evidence.  Can you keep an open mind and

20  listen to all of the additional evidence before you make up

21  your mind as to what the appropriate sentence would be?

22       MR. COHN:  It's very difficult because I've never

23  been subjected to this.

24       MS. WILSON:  Right.  I understand that.  Are you so

25  predisposed to the death penalty that you couldn't keep an

Ann H. Armstrong, RPR

281

1    open mind and consider life without parole?

2         MR. COHN:  I'm not so predisposed.

3         MR. WILSON:  So you're feeling you could keep an open

4    mind and listen to both sides.

5         MR. GOGGANS:  Let me ask you just a few more

6    questions on your views on criminal justice and the death

7    penalty and life without parole.  In Alabama there are

8    different degrees of homicides, everything from criminally

9    negligent homicide on up to capital murders.  A capital

10   murder is one that has been defined by the legislature as

11   being the worst and deserving the most severe punishment,

12   both life without the possibility of parole or death.  The

13   State really has to prove two things in order for there to

14   be a capital conviction.  First the State has to prove an

15   intentional killing, not a killing that's accidental or

16   reckless or, you know, somebody is being provoked but an

17   intentional killing, an unjustified killing.  In addition to

18   that, it has to go further and prove that this intentional

19   killing was during the course of some other felony.  In this

20   instance the State is charging that it was during the course

21   of a robbery.  If it were nothing but an intentional

22   killing, that would just be a a plain murder case.  It would

23   not be capital.

24        If you are on a jury and you and eleven other folks

25   had determined beyond a reasonable doubt that this person

Ann H. Armstrong, RPR

282

1   that was on trial had intentionally killed somebody while

2   they were trying to rob them, do I understand you correctly

3   in saying that you would probably go into that next phase,

4   this penalty phase, thinking that until you heard something,

5   you think that death is going to be the appropriate

6   punishment; is that correct?

7         MR. COHN:  Let the punishment fit the crime.

8         MR. GOGGANS:  Would you tell me if I'm wrong.  Would

9   I be correct in assuming that you would go in before hearing

10  anything else thinking that, well, I think given the fact

11  that we have found this person guilty of an intentional

12  killing during the course of a robbery that death is going

13  to be the appropriate punishment, but I will listen to

14  whatever the defense has to say to convince me otherwise?

15        MR. COHN:  Yeah.  I would want to listen to the

16  evidence.

17        MR. GOGGANS:  Would it be fair to say that you would

18  put the burden on the defense to convince you that death

19  would not be the appropriate punishment?

20        MR. COHN:  Yeah.  I think that the defense has that,

21  has to convince me that that should not be, death would not

22  be the answer.

23        MR. GOGGANS:  No other questions.

24        THE COURT:  Anything else?

25        MS. WILSON:  Nothing further.

Ann H. Armstrong, RPR

283

1        THE COURT:  Mr. Cohn, we appreciate your time.  If

2   you would please take a card here from Mr. Kynard and call

3   that telephone number this afternoon after 5:00 o'clock.

4   There will be further instructions for your jury service for

5   the remainder of the week.  Thank you.  You're excused from

6   this particular case.  Rosie Davis.

7        How are you, Ms. Davis?

8        MS. DAVIS:  Pretty good.

9        THE COURT:  Ms. Davis, can you tell me a telephone

10   number where I might get in touch with you later on today if

11   I need you?

12        MS. DAVIS:  875-7265.

13        THE COURT:  Okay.  And is that home?

14        MS. DAVIS:  That's at home.

15        THE COURT:  Are you employed, Ms. Davis?

16        MS. DAVIS:  Yes.

17        THE COURT:  How are you employed?

18        MS. DAVIS:  I do private sitting for Dorothy Kendall.

19        THE COURT:  Are you married?

20        MS. DAVIS:  I'm a widow.

21        THE COURT:  What was your husband's name?

22        MS. DAVIS:  William Davis.

23        THE COURT:  Was he employed during his lifetime?

24        MS. DAVIS:  Yes, sir.

25        THE COURT:  And can you tell me how he was employed?

284

1        MS. DAVIS:  He worked out at All Lock, and he was a

2    machine operator.

3        THE COURT:  Ms. Davis, I asked you some questions out

4    there a little while ago, and I'm going to ask you some

5    questions regarding your feelings about the death penalty

6    and capital punishment.  This is a capital murder case.  In

7    the event of a conviction, there are two possible

8    sentences, either the death penalty or life imprisonment

9    without parole.  In order for you to qualify to sit as a

10   juror in this case, you must be able to in the event of a

11   conviction consider and recommend to the Court one of those

12   two sentences, either the death penalty or life without

13   parole.  Some people in our society are totally opposed to

14   the death penalty for any killing.  Other people think that

15   the death penalty is the only penalty and could not consider

16   any other penalty other than the death penalty and would not

17   consider life without parole.  I want to ask you your

18   feelings about that.  Are you so opposed to the death

19   penalty in a capital case that it would restrict or

20   substantially impair your ability to perform your duties as

21   a juror?  Basically that question is are you against the

22   death penalty?

23       MS. DAVIS:  Well, it's kind of hard for me to say

24   because you don't want to give the chair; you know, you

25   really don't.  But like I said it's hard for me to judge.

Ann H. Armstrong, RPR

285

1    It's just really hard for me to judge.  I don't know which

2    way to go here.  But if you do something wrong, you know,

3    you have to be punished one way or the other.  That's the

4    way I feel, but I don't want to say give him the chair.  I

5    don't want to say.  You know, I really don't know what to

6    say here.

7         THE COURT:  Let me say this.  I'm not asking you to

8    tell me based upon what you know about the case what you

9    would recommend to the Court because you haven't heard the

10   facts?

11        MS. DAVIS:  Right.

12        THE COURT:  What I'm asking you is have you during

13   the course of your lifetime formed an opinion regarding the

14   death penalty?

15        MS. DAVIS:  Well, life in prison I would say.

16        THE COURT:  Yes, ma'am.  Are you telling me that

17   you're opposed to the death penalty?

18        MS. DAVIS:  Well, yes.

19        THE COURT:  Are you telling me that you are so

20   opposed to the death penalty for a capital case that it

21   would interfere with your ability to serve as a juror in

22   this case?  Keep in mind that if you served as a juror you

23   have got to be able to give equal consideration and possibly

24   even make a recommendation to the Court for the death

25   penalty.  Are you telling me that you can't do that?

Ann H. Armstrong, RPR

1      MS. DAVIS:  I don't think so because like I said this

2  is something that it's hard for me to say.  I don't know

3  anything about it, and I don't want to say, well, yes, give

4  someone the chair.  I just really don't know.

5      THE COURT:  Let me ask it this way.  Is there a

6  circumstance or a set of facts that you believe would

7  justify your recommending to this Court the sentence of

8  death?

9      MS. DAVIS:  Bring that to me again so I can

10  understand.

11      THE COURT:  Is there a set of facts that you can

12  think about, something that happened that would be a

13  criminal offense that you would consider so bad that you

14  think that someone should pay for that particular criminal

15  offense with their life?

16      MS. DAVIS:  Well, I would guess yes.  I would guess I

17  would say yes.

18      THE COURT:  Could you yourself make that

19  recommendation?  Based upon that set of facts could you make

20  that recommendation of death to this Court?

21      MS. DAVIS:  Well, you know, this is putting me in an

22  awkward position here.  But I guess as you take a life, I

23  guess you -- I really don't know what to say.  You all have

24  to just bear with me because this is something I've never

25  had to do or never been around or never heard of, you know,

Ann H. Armstrong, RPR

287

1   no more than somebody said the chair and this and that.

2        THE COURT:  I hate to push you, but I've got to get

3   an answer from you if I can regarding how you feel, and I

4   know that it's very difficult for you.

5        MS. DAVIS:  Right.  It is difficult for me.

6        THE COURT:  But the question is can you recommend the

7   death penalty to this Court?  Can you consider that as a

8   possible penalty in this case and then make a recommendation

9   of that to this Court?

10       MS. DAVIS:  Well, like I say, you know, I would hate

11  to say the chair when you can go with life in prison, you

12  know.  So I guess I would just say life in prison.  I would

13  just say I like that.  That's the only thing I know.

14       THE COURT:  Have you heard anything about the facts

15  of this case?  Have you read anything in the newspaper?

16       MS. DAVIS:  No.  Like I said this is something that

17  happened way back.  I can't even much remember it.

18       THE COURT:  But you do remember reading something in

19  the paper?

20       MS. DAVIS:  No, no, not about it.  This is my first,

21  yesterday when we was here, but I don't receive the paper.

22  I watch the news every now and then.

23       THE COURT:  You have not heard anything or anybody

24  talk about the facts of this case before?

25       MS. DAVIS:  Not as I know of.  You know, if you don't

Ann H. Armstrong, RPR

288

1   know a person, it might not ring a bell to you.  If you

2   heard it, it might not -- it just goes like that.

3        THE COURT:  All right.  Ms. Davis, if you would

4   please answer Mr. Greene's questions.

5        MR. GREENE:  Ms. Davis, am I correct -- you and the

6   judge discussed this at length, but am I correct that your

7   feelings are that you just don't feel like you could

8   recommend the penalty of death for somebody; that's just

9   something you just don't think you could do?

10       MS. DAVIS:  Right.

11       MR. GREENE:  There are some circumstances -- do you

12   feel you could find some facts or circumstances where you

13   would want to do that, or do you feel like you pretty well

14   would always have to go with life without parole?

15       MS. DAVIS:  Well, life without parole, I will say it

16   like that.

17       MR. GREENE:  You do understand that if you are going

18   to serve as a juror in this case, they are going to tell you

19   that you have to be able to first decide if a man is guilty

20   or innocent of the capital murder charge.

21       MS. DAVIS:  Right.

22       MR. GREENE:  Then we have another little trial where

23   we bring more evidence for and against recommendations.  And

24   you have got to be able to recommend either death or life

25   without parole.  So the question then is can you listen to

289

1   all of that stuff and make a fair judgment, or are you

2   pretty well always going to go with life without parole?

3   That's what I'm trying to get to.   Do you know?

4       MS. DAVIS:  Well, I can listen to it.

5       MR. GREENE:  Could you recommend death for this man

6   if in fact the evidence showed it and you thought it so

7   required it?

8       MS. DAVIS:  Well, you said that it would have to be

9   equal, right?

10      MR. GREENE:  You are supposed to listen to all of the

11  evidence and then try to make a decision.  Would that be a

12  job you can do, or have you got to leave it to somebody

13  else?  Could you vote in this case for death?

14      MS. DAVIS:  Well, I will just leave it to somebody

15  else.

16      MR. GREENE:  Is that because you don't want to face

17  it or because you feel like you couldn't weigh them both?

18      MS. DAVIS:  I guess because I wouldn't want to face

19  it.

20      MR. GREENE:  Go ahead.

21      MR. GOGGANS:  Ms. Davis, I guess we could all think

22  of some laws that we don't like.  I don't like tax laws, but

23  come April I pay my taxes like it or not.  It may well be

24  that you don't like the idea of having capital punishment on

25  the books of Alabama law.  But nevertheless it's there.  The

Ann H. Armstrong, RPR

1    capital laws are there.  What that is, it's different than

2    other types of killing cases.  And then you do have

3    accidental, some reckless or grossly negligent, but that's

4    not the type of killing that's involved in a capital case.

5    It's only an intentional killing.  That's what the State has

6    got to show you.  One of the things the State has got to

7    prove is an intentional killing, not reckless or any other

8    kind but an intentional killing.  And more than that the

9    State has got to prove in a capital case some other felony

10   was going along with it; in this case they are charging an

11   intentional killing during the course of a robbery.  If all

12   they had was just an intentional killing with nothing else,

13   that would just be a plain murder case.

14        Now in order to even be on a jury that's considering

15   whether or not somebody is going to be sentenced to life

16   without parole or to death, the jury has first got to have

17   been convinced beyond a reasonable doubt that the person is

18   guilty of the capital offense.  If the jury found the

19   defendant guilty of some lesser included offense, the jury

20   doesn't even reach that point.  But if the jury reaches that

21   point, in having already found that this person has

22   intentionally killed somebody while they were trying to rob

23   them during the course of a robbery, during that phase of

24   the trial there would be evidence presented.  One side and

25   the other would present evidence and their arguments.  And

291

1   the Judge would instruct you on what the law is.  Here's

2   what the law is; here are some aggravating circumstances,

3   and you've got to weigh these as weighing in favor of the

4   death.  And here's some mitigating circumstances, and you've

5   got to weigh these in favor of life without parole.  You

6   make your decision on what the judge tells you the law is

7   whether you like it or not.  Do you think you could do that?

8        MS. DAVIS:  Well, whether I like it or not I think I

9   can do that.

10        MR. GOGGANS:  No other questions.

11        MR. GREENE:  When you say you can do that, are you

12   saying that you could vote to impose death as one of the

13   sentences?

14        MS. DAVIS:  If I have to.

15        MR. GREENE:  All right.  Thank you.

16        THE COURT:  Thank you, ma'am.  Ms. Davis, we will

17   either call you this afternoon, or if we don't call you,

18   please be back at 9:00 o'clock in the morning.  William Day.

19        THE COURT:  Mr. Day, what's your telephone number

20   where I can reach you?

21        MR. DAY:  872-5310.

22        THE COURT:  Do you work, Mr. Day?

23        MR. DAY:  Yes, brick laborer.

24        THE COURT:  Who do you work for?

25        MR. DAY:  Johnny Dennis.

Ann H. Armstrong, RPR

292

1        THE COURT:  And Mr. Day, are you married?

2        MR. DAY:  No sir.

3        THE COURT:  Mr. Day, I asked you some questions out

4   there a few minutes ago.  I want to get your opinion about

5   some things, okay?

6        MR. DAY:  Yes, sir.

7        THE COURT:  You understand that this is a capital

8   murder case?

9        MR. DAY:  Yes, sir.

10       THE COURT:  And that in the event of a conviction

11  there are two possible sentences; one is the death penalty,

12  and the other is life imprisonment without parole?

13       MR. DAY:  Yes.

14       THE COURT:  In order for you to qualify to be a juror

15  in this case, you have got to be able to give equal

16  consideration to both the death penalty and life

17  imprisonment without parole in the event of a conviction.

18  Do you understand that?

19       MR. DAY:  Yes, sir.

20       THE COURT:  You know there are some people in our

21  society who believe that the death penalty is wrong; they

22  oppose it and would not recommend the death penalty under

23  any circumstances?

24       MR. DAY:  Yes, sir.

25       THE COURT:  There are other people in our society who

Ann H. Armstrong, RPR

293

1    believe that if there is an intentional killing that the

2    death penalty is the only penalty that should be pronounced,

3    that they would not under any circumstances consider

4    anything less than the death penalty such as life without

5    parole; do you understand that?

6            MR. DAY:  Yes.

7            THE COURT:  And I need to ask you a question

8    regarding where you fall on that spectrum, okay?

9            MR. DAY:  Yes, sir.

10           THE COURT:  The first question is regarding the death

11   penalty and whether or not you are opposed to the death

12   penalty.  And the question is are you so opposed to the

13   death penalty in a capital case that it would restrict or

14   substantially impair the performance of your duties as a

15   juror?

16           MR. DAY:  No.

17           THE COURT:  Let me make sure that you don't fall

18   within that segment of society that believes that the

19   penalty is the only penalty.  I'm going to ask you the

20   question this way because you've got to be able to consider

21   something other than death, and that is life without parole.

22   The question is this.  Are you so opposed to anything less

23   than death for a capital case, for a capital offense that

24   your views would interfere with the performance of your

25   duties in accordance with the instructions that I give you?

Ann H. Armstrong, RPR

294

1    Are you so opposed to anything less than death?  That means,

2    you know, do you think that the death penalty is the penalty

3    that should be pronounced in every case for an intentional

4    killing, or can you consider something other than that?

5        MS. DAY:  Other than that.

6        THE COURT:  So what you're telling me is that you can

7    consider both the death penalty and life imprisonment

8    without parole; you can consider both of those sentences

9    equally, make a recommendation to the Court that you're not

10   predisposed to one over the other?

11       MR. DAY:  Yes, sir.

12       THE COURT:  Is that correct?

13       MR. DAY:  Yes, sir.

14       THE COURT:  Have you heard anything about the facts

15   of this case?

16       MR. DAY:  No, sir.

17       THE COURT:  Have you ever read anything about it in

18   the newspaper about the facts of this case?

19       MR. DAY:  No, sir.

20       THE COURT:  Was yesterday the first day that you

21   became aware of anything regarding this case?

22       MR. DAY:  Yes, sir.

23       THE COURT:  Any questions?

24       MR. GREENE:  Nothing from the State.

25       MR. GOGGANS:  Mr. Day, if you had found beyond any

Ann H. Armstrong, RPR

1    doubt for which you had a reason that somebody had

2    intentionally killed somebody while they were trying to rob

3    them, would you have any problem considering a sentence

4    other than death?

5            MR. DAY:  No, sir.

6            MR. GOGGANS:  Nothing else.

7            THE COURT:  Mr. Day, I appreciate your time.  And if

8    you would, please stay close to this telephone number.  We

9    may call you this afternoon.  If not, if you do not hear

10   from us, please be back here at 9:00 o'clock in the morning.

11   Carolyn Deason.

12           Ms. Deason, tell me a number where I can reach you.

13           MS. DEASON:  872-0127.

14           THE COURT:  And you are retired, correct?

15           MS. DEASON:  Uh-huh.

16           THE COURT:  You were with the City of Selma for how

17   many years?

18           MS. DEASON:  Four.

19           THE COURT:  Okay.  And you were a city magistrate?

20           MS. DEASON:  Yes.

21           THE COURT:  How were you employed before that?

22           MS. DEASON:  Well, I was in clerical, secretarial

23   work.

24           THE COURT:  Who did you work for?

25           MS. DEASON:  I worked for the Medical Center Hospital

296

```
 1    and for Vaughan.

 2          THE COURT:  Okay.  And you're married to Paul Deason?

 3          MS. DEASON:  Uh-huh.

 4          THE COURT:  He is a retired police officer?

 5          MS. DEASON:  Uh-huh.

 6          THE COURT:  How long was he with the City of Selma?

 7          MS. DEASON:  He wasn't a police officer with the City

 8    of Selma.  He was a dispatcher.  He worked for the federal

 9    government for four years.  He worked for the City of Selma

10    for seven.

11          THE COURT:  In law enforcement?

12          MS. DEASON:  Yes.

13          THE COURT:  He currently has his own business?

14          MS. DEASON:  Selma Upholstery.

15          THE COURT:  That's located down on Selma Avenue and

16    Green?

17          MS. DEASON:  Right.

18          THE COURT:  I asked you a question earlier regarding

19    the death penalty, and I need to go back through that

20    question with you and get your response on the record.  You

21    understand that this is a capital murder case?

22          MS. DEASON:  Yes, sir.

23          THE COURT:  And that in the event that there is a

24    conviction in this case, that the penalties are either life

25    imprisonment without parole or the death penalty?
```

Ann H. Armstrong, RPR

297

1          MS. DEASON:   (Nods head affirmatively).

2          THE COURT:   Do you understand that?

3          MS. DEASON:   Uh-huh.

4          THE COURT:   And if you are to qualify to serve a as

5     juror in this case, you have got to be able to consider both

6     of those penalties and make a recommendation to this Court

7     in the event there is a conviction of a capital offense.   Do

8     you understand that?

9          MS. DEASON:   Uh-huh.

10          THE COURT:   You also understand that there are people

11    out in our society who believe that the death penalty is the

12    only penalty that should be imposed in any intentional

13    killing and that they cannot ever consider anything less

14    than the death penalty.   In other words, they could never

15    consider life without parole; do you understand that?

16          MS. DEASON:   Yes.

17          THE COURT:   You understand also that are other people

18    in our society who are totally opposed to the death penalty

19    under any circumstances and cannot consider and make that

20    recommendation to the Court?

21          MS. DEASON:   (Nods head affirmatively).

22          THE COURT:   My question to you is regarding your

23    particular feeling about the death penalty and where you may

24    fall on that spectrum.

25          MS. DEASON:   I don't believe in the death penalty.

Ann H. Armstrong, RPR

298

1          THE COURT:  Ma'am?

2          MS. DEASON:  I don't believe in the death penalty.

3          THE COURT:  Okay.  Well, you anticipated my first

4    question.  You always have.  The first question is are you

5    so opposed to the death penalty in a capital case that it

6    would restrict or substantially impair the performance of

7    your duties as a juror?

8          MS. DEASON:  Yes.

9          THE COURT:  You are telling me that you are so

10   opposed to the death penalty you cannot even consider that

11   to recommend that under any circumstances?

12         MS. DEASON:  (Shakes head negatively).

13         THE COURT:  Are there any facts that you could

14   consider that are so heinous that the death penalty would be

15   --

16         MS. DEASON:  No.  It's just my conscience, my

17   religious beliefs, and I think it's a crime for anybody to

18   take anybody's else life deliberately.  And I still don't

19   think we should even though someone has done that.  I don't

20   think we have the right to take anybody's life.  That's

21   God's right.  That's just the way I feel about it.  I could

22   not live with myself if I was on a jury that convicted a

23   person of capital murder and he was sentenced to death.  I

24   just couldn't live with it.  Now I have a son, and y'all

25   know for twenty years has been in and out of prison.  And

Ann H. Armstrong, RPR

299

1  maybe that has made me more sympathetic towards the

2  conviction that I have.  But I just can't -- I would just

3  not be able to.  Now if it was any other thing but death, I

4  believe I could look at the situation fairly and squarely

5  and judge it in the way that it needs to be judged openly

6  and what's presented by the Court.  But in a death, no, I

7  cannot do that.

8       THE COURT:  Okay.  Any questions?

9       MR. GREENE:  None.  Thank you, ma'am.

10      MR. GOGGANS:  No questions.

11      THE COURT:  Please take a card.  Call that number

12  after 5:00 o'clock this afternoon.  There will be

13  instructions regarding your jury service for the remainder

14  of the week.  Thank you very much.

15      Challenges?  I think we kind of went through some of

16  these folks.  Let me tell you who the Court has already

17  excused.  The Court has excused number 13, Janice Bolden;

18  14, Norma Bourdon; 20, Willie Calhoun, 23, Marilyn Canty;

19  24, Lawrence Carroll; 27, Tiffany Carter; 28, Rita Caver;

20  31, Margaret Christian; 33, Thelma Clark; 37, Seymour Cohn;

21  45, Carolyn Deason.  The Court has already registered an

22  objection from the defense regarding I believe number 23,

23  Marilyn Canty.  That objection is noted in the record.  At

24  this time does the State have any challenges from this

25  panel?

Ann H. Armstrong, RPR

300

1          MR. GREENE:  No.

2          THE COURT:  Anything from the defense?

3          MR. GOGGANS:  None other than we've already stated.

4          THE COURT:  All right.  So we have fourteen so far.

5     We'll get 42 that we are going to strike.

6          (The following occurred in the presence and hearing

7     of the jury venire:)

8          MR. KYNARD:  The clerk called the roll.

9          THE COURT:  Folks, as you can see, we are moving

10    rather slowly today, and I apologize to you for that.  But

11    I'm hopeful by the end of the afternoon we will have

12    concluded the individual voir dire process, and we'll be

13    ready to select a jury in this case.  It appears that at

14    this time based upon the time that we've taken this morning

15    with the first panel that we will not be able to conclude

16    the selection process this afternoon and begin the opening

17    statements this afternoon as I had anticipated.  However, as

18    you come into the jury room, we are going to get your

19    telephone number where you may be reached this afternoon in

20    the event we do get to that point.  It's looking doubtful

21    that we will get to that point.  But we will get your

22    telephone number.  For those who are not called this

23    afternoon, you will be asked to be back at 9:00 o'clock in

24    the morning.  So I will give you a little more instruction

25    regarding that as we move through the next couple of hours

Ann H. Armstrong, RPR

301

1    of voir dire.

2         Ladies and gentlemen, this is the portion of the jury

3    selection process as I described to you yesterday that we

4    call individual voir dire.  We are going to be asking you

5    questions this afternoon regarding your feelings

6    and your opinions regarding the issue of capital punishment

7    and the death penalty.  And I want to read to you a little

8    preliminary instruction that I have given that I gave this

9    morning to the first panel.

10        In Alabama there are two possible penalties for a

11   person who is convicted of a capital offense.  Those

12   penalties are life imprisonment without the possibility of

13   parole or death.  Alabama has a two phase trial in those

14   cases in which the death penalty may be imposed.  The same

15   jury is used in both phases.  The first phase is called an

16   innocent or guilt phase.  And in this phase the jury decides

17   whether the State has proven the Defendant guilty of the

18   charged capital offense beyond a reasonable doubt.  In

19   making this decision, the jury cannot consider the

20   consequences of its verdict or any possible sentence.  If

21   the accused has been found not guilty of capital murder, the

22   proceedings are ended for the jury.  But, if the Defendant

23   is found guilty of capital murder, the jury is brought back

24   for a second phase of the trial, and at that time the jury

25   will hear more evidence and will hear legal instructions and

302

1    arguments of the attorneys.  Now at that phase the jury

2    recommends to the Court the penalty of life imprisonment

3    without the possibility of parole or death.

4         Ladies and gentlemen, in this case the Defendant

5    Matthew Reeves has entered a plea of not guilty and is

6    presumed to be innocent.  The State has the burden of

7    proving Matthew Reeves guilty beyond a reasonable doubt.  As

8    this is a capital case, one possibility if guilt of the

9    charged capital offense is established beyond a reasonable

10   doubt is that the death penalty could under certain

11   circumstances be given.  Because of that possibility, it is

12   proper for the attorneys and the Court to ask you at this

13   time certain questions about your views regarding the death

14   penalty.  This inquiry, however, has absolutely no

15   relationship to whether the accused is guilty of the charged

16   capital offense.  Do not conclude merely because an attorney

17   or the Court asked questions about your attitude about the

18   death penalty that this should be taken as any indication

19   whatsoever that they believe the accused to be guilty or

20   presuppose that the finding of guilt will be made.

21        Now, ladies and gentlemen, in just a few minutes I'm

22   going to ask you two questions here in open court that the

23   law compels me to ask in these cases.  I am not going to ask

24   you to respond in open court as we did yesterday.  I'm going

25   to ask these questions so that you can think about the

303

1  question, and then I will ask that question again during the

2  individual voir dire in the jury room.  You will be called

3  one at the time in to answer this question and then to

4  engage in conversation regarding your views and your

5  opinions.  Before I ask that question let me preface it with

6  this remark.  As I explained to you, this is a capital case.

7  And in the event of a conviction, the two possible sentences

8  are the death penalty and life imprisonment without parole.

9  To qualify to serve as a juror in this case, you must give

10 equal consideration to both of those possible sentences and

11 then make a recommendation to the Court as to one of those

12 sentences in the event of a conviction.

13      Now there are people in our society who believe that

14 the death penalty is wrong.  There are people in our society

15 who could not and would not under any circumstances consider

16 or recommend the sentence of death for an intentional

17 killing.  On the other hand, there are people in our society

18 who believe that an intentional killing should result in the

19 sentence of death always, that there should not be anything

20 other than a death penalty sentence for someone who is

21 guilty of an intentional killing.  The questions that I ask

22 you are designed to determine where you are in society.

23 They are designed to determine your feelings about the death

24 penalty to determine whether you are opposed to the death

25 penalty and are so opposed to that that you cannot consider

Ann H. Armstrong, RPR

304

1    it.   The questions are designed to determine where you are

2    and what your opinion is.

3         Are you so opposed to the death penalty so much so

4    that you could not under any circumstances ever recommend to

5    the Court the sentence of death?   Are you so in favor of the

6    death penalty that you believe that that is the only penalty

7    that should be imposed for an intentional killing?   In order

8    to be qualified for this jury, you must be able to give

9    equal consideration to both life imprisonment without parole

10   and the death penalty and then make a recommendation to the

11   Court.   We are trying to determine if there are any of you

12   who are predisposed to one position or the other.

13        The question that you will hear in the jury room or

14   the questions will be -- the first one is this.   Are you so

15   opposed to the death penalty in a capital case that it would

16   restrict or substantially impair the performance of your

17   duties as a juror?   The other question I will ask you is

18   this.   Are you so opposed to anything less than death for a

19   capital offense that your views would interfere with the

20   performance of your duties in accordance with the

21   instructions that I give you?   Think about those questions.

22   We'll have an opportunity to discuss them in a little more

23   detail in just a few minutes.   We are going to retire to the

24   jury room.   And when we call you back, we will begin with

25   Mr. George Yocum.

305

1          (The following proceedings were held in the jury

2     room.)

3          THE COURT:  George Yocum.

4          Where can we call you this afternoon if we need you?

5          MR. YOCUM:  875-9101.

6          THE COURT:  And you are employed with -- you have a

7     pallet company?

8          MR. YOCUM:  Yes, Cahaba Valley timber.

9          THE COURT:  And are you married?

10         MR. YOCUM:  Yes, sir.

11         THE COURT:  And your wife's name?

12         MR. YOCUM:  Fran Yocum.

13         THE COURT:  And is she employed?

14         MR. YOCUM:  Bush hog.

15         THE COURT:  George, as I explained to you, this is a

16    capital case.  There are two sentences possible in the event

17    of a conviction, the death penalty and life without parole.

18    You've got to be able to give equal consideration to both of

19    those possible sentences if you're selected to serve on this

20    jury.  As I explained to you, there are some people in our

21    society who are totally opposed to it.  There are people in

22    our society who think that that's the only sentence for an

23    intentional killing.  They could not in any circumstance

24    consider something less than that, such as life without

25    parole.

Ann H. Armstrong, RPR

306

1        The question is are you so opposed to the death

2    penalty in a capital case that it would restrict or

3    substantially impair the performance of your duties as a

4    juror?

5        MR. YOCUM:  No, sir.

6        THE COURT:  The next question then would be are you

7    so opposed to anything less than the death penalty for a

8    capital offense that your views would interfere with the

9    performance of your duties in accordance with the

10   instructions that I give you?

11       MR. YOCUM:  No, sir.

12       THE COURT:  So I'm assuming then from that that you

13   are able to hear and consider the evidence in this case,

14   that you can give fair consideration and equal consideration

15   to both the death penalty and life imprisonment without

16   parole in the event that there is a conviction?

17       MR. YOCUM:  Yes, sir.

18       THE COURT:  That you're not predisposed or

19   predetermined as to one over the other?

20       MR. YOCUM:  No, sir, I'm not.

21       THE COURT:  All right.  Do you know anything about

22   the facts of this case?  Have you read anything in the paper

23   about the facts?

24       MR. YOCUM:  No, sir.

25       THE COURT:  Have you heard any talk about the case?

Ann H. Armstrong, RPR

307

1        MR. YOCUM:  Only in court yesterday.

2        THE COURT:  That was the first time you became aware

3   of it?

4        MR. YOCUM:  Yes, sir.

5        THE COURT:  Is there anything from the State?

6        MR. GREENE:  Nothing from the defense.

7        THE COURT:  Anything from the defense?

8        MR. GOGGANS:  Mr. Yocum, in a capital case in Alabama

9   before a jury is ever called upon to make a decision on

10  whether or not the sentence should be life without parole or

11  death, the jury must first have been convinced beyond a

12  reasonable doubt the person is guilty of this intentional

13  killing during the course of a robbery.  Do you think that

14  if you were in that situation that if you were on some jury

15  that had already found beyond a reasonable doubt that this

16  person had intentionally killed somebody while they were

17  trying to rob them that you would think that that person

18  automatically ought to get the death penalty?

19       MR. YOCUM:  No, sir.

20       THE COURT:  Any other questions?

21       MR. GOGGANS:  Nothing further.

22       THE COURT:  Thank you, Mr. Yocum.  Renita Wright,

23       Ms. Wright, is there a telephone number where we can

24  reach you this afternoon?

25       MS. WRIGHT:  Yes, 874-4003.

Ann H. Armstrong, RPR

308

1    THE COURT:  Ms. Wright, do you work?

2    MS. WRIGHT:  No, sir.

3    THE COURT:  Are you married?

4    MS. WRIGHT:  No, sir.

5    THE COURT:  Have you ever been employed?

6    MS. WRIGHT:  Yes.

7    THE COURT:  How were you employed when you were

8  employed?

9    MS. WRIGHT:  Sir?

10   THE COURT:  How were you employed when you were

11 employed?

12   MS. WRIGHT:  What do you mean by that?

13   THE COURT:  When you did work, what did you do?  Who

14 did you work for?

15   MS. WRIGHT:  Coastal Industries.

16   THE COURT:  Ms. Wright, I asked you some questions

17 out there.  I need to ask you those questions again and ask

18 you to respond to it.  You know this is a capital case, that

19 in the event of a conviction that the possible punishment

20 would be either the death penalty or life imprisonment

21 without parole.

22   MS. WRIGHT:  (Nods head affirmatively.)

23   THE COURT:  There are people who are totally opposed

24 to the death penalty, could not under any circumstances

25 recommend the death penalty.  There are other people in our

Ann H. Armstrong, RPR

309

1  society who believe that the death penalty is the only

2  penalty for an intentional killing.  In order to be

3  considered for this jury you must be able to give equal

4  consideration and then make a recommendation in the event of

5  a conviction of life without parole or the death penalty.

6  The questions I have for you are regarding how you feel

7  about the death penalty.  Okay.  Are you so opposed to the

8  death penalty or so against the death penalty in a capital

9  case that it would restrict or substantially impair the

10  performance of your duties as a juror?

11         MS. WRIGHT:  Opposed.

12         THE COURT:  You're opposed to the death penalty?

13         MS. WRIGHT:  Yes.

14         THE COURT:  Okay.  By saying that, are you telling me

15  that you cannot envision any set of circumstances or facts

16  where you as a juror would recommend to the Court that a

17  person would pay with his life?

18         MS. WRIGHT:  Yeah.

19         THE COURT:  Have you formed your opinion about the

20  death penalty during the course of your life, or has this

21  been something that you did recently within the last few

22  days?

23         MS. WRIGHT:  Recently.

24         THE COURT:  Perhaps as late as yesterday when I told

25  you that you would be considering the death penalty?

1         MS. WRIGHT:  Yes, sir.

2         THE COURT:  And you're against the death penalty?

3         MS. WRIGHT:  Not really.

4         THE COURT:  You're not?  Did you understand my

5  question earlier when I asked it?

6         MS. WRIGHT:  I really don't understand.

7         THE COURT:  You didn't understand the question?

8         MS. WRIGHT:  No.

9         THE COURT:  Let's start over, okay?  Are you against

10  the death penalty?

11         MS. WRIGHT:  No.

12         THE COURT:  Are you in favor of the death penalty?

13         MS. WRIGHT:  In favor.

14         THE COURT:  You're in favor of the death penalty,

15  okay.  If you were selected to sit as a juror in this case,

16  you may be called upon at some point in time to tell me

17  whether or not you think that the Defendant should be

18  sentenced to death or life without parole.  If you are

19  called upon to make that recommendation to me, could you

20  equally consider death and life without parole?

21         MS. WRIGHT:  I guess so.

22         THE COURT:  Do you understand my question?

23         MS. WRIGHT:  A little.

24         THE COURT:  You're in favor of the death penalty?

25         MS. WRIGHT:  (Nods head affirmatively).

311

1    THE COURT:  Which means that you could actually come

2  back and tell me, judge, I vote for the death penalty in

3  this case.

4    MS. WRIGHT:  (Nods head affirmatively).

5    THE COURT:  You can do that?

6    MS. WRIGHT:  (Nods head affirmatively).

7    THE COURT:  You understand that there is also another

8  choice.  There could be another choice for you to vote for

9  life without parole.  If you heard the facts and you had

10  thought that he should be put to death, could you also come

11  back and say judge, I vote for life without parole?

12    MS. WRIGHT:  Yes.

13    THE COURT:  Okay.  So you don't think then if I

14  understand what you are telling me that every situation or

15  every criminal offense wherein there is a death involved --

16  you're not saying that that person who committed that

17  offense should be put to death, are you?

18    MS. WRIGHT:  Not really.

19    THE COURT:  Have you read anything about the facts of

20  this case?

21    MS. WRIGHT:  No.

22    THE COURT:  Have you had any conversations with

23  anybody about the facts of this case?

24    MS. WRIGHT:  No.

25    THE COURT:  The first time you have ever heard

312

1  anything about the facts of case was yesterday; is that

2  correct?

3      MS. WRIGHT:  Yes.

4      THE COURT:  Yes.

5      THE COURT:  Any questions from the State?

6      MR. GREENE:  If I might, Ms. Wright, you've indicated

7  that you were opposed to the death penalty, and then you

8  indicated that you were in favor of the death penalty.  Let

9  me ask you this.  If you were called to sit as a juror in

10 this case and you found that the evidence indicated that the

11 Defendant had committed an intentional killing of another

12 human being in the course of a robbery and you also found

13 that the facts and circumstances at the little hearing that

14 they have after the original determination of guilt or

15 innocence called the penalty hearing, you thought the facts

16 showed that he ought to be put to death, could you vote to

17 put him to death yourself?

18     MS. WRIGHT:  No.

19     MR. GREENE:  Is there something about this case in

20 particular, or is it just all cases that put you in that

21 position?

22     MS. WRIGHT:  Just this one.

23     MR. GREENE:  Do you know what it is about this case

24 that puts you in that position?

25     MS. WRIGHT:  Well, you said he shot him with a

Ann H. Armstrong, RPR

313

1    shotgun, and he died.

2        MR. GREENE:  So what is it about that case that you

3    feel like you couldn't vote to put this man to death?

4        MS. WRIGHT:  I don't even know.

5        MR. GREENE:  You don't really know?

6        MS. WRIGHT:  No.

7        MR. GREENE:  Thank you, ma'am.  That's all.

8        MR. GOGGANS:  Ms. Wright, in Alabama there are

9    different degrees of homicides, different degrees of

10    killing.  The legislature has divided them up according to

11    how bad they think they are, you know, all the way down to

12    like a criminally negligent homicide to something like a

13    manslaughter which is reckless or murder, and then the worst

14    one is what they call capital murder cases.  In a capital

15    case the State has to prove first of all that there have

16    been intentional killings, not a killing that's negligent or

17    reckless or provoked, you know, like maybe someone shot a

18    person who had it coming.  That's not that type.  It's an

19    unjustified, intentional killing.  But in addition to that,

20    there is something more.  It also has to be an intentional

21    killing during the course of some other felony.  In this

22    case the State is saying that there was an intentional

23    killing during the course of a robbery.  If all they had was

24    an intentional killing, it would just be a plain murder

25    case.  What makes it capital is it's an intentional killing

314

1  with the worse situation; it's during the course of a

2  robbery.

3       In order for the jury to ever get to the point where

4  it's called upon to say whether a person should be sentenced

5  to death or sentenced to life without parole, the jury has

6  first got to have found beyond all reasonable doubt that

7  this person intentionally killed somebody during the course

8  of a robbery.  The jury found the person not guilty or

9  guilty of something else and some lesser included offense

10  like murder.  The jury doesn't get to that point.  But if

11  the jury finds this person guilty, then it's called upon to

12  listen to the evidence and arguments and the judge's

13  instructions and determine whether or not the sentence

14  should be death or life without parole.  Do you think if

15  you're in that situation where you have already, you and

16  eleven other folks have already found beyond any reasonable

17  doubt that the person intentionally killed somebody during

18  the robbery that you could listen to the evidence and follow

19  the judge's instructions on whether or not the penalty

20  should be life without parole or death?

21       In those circumstances it's not just, y'all go in

22  there and tell me what you decide.  The judge gives you

23  instructions of, here are things to consider.  You consider

24  these things to weigh in favor of death; you call these

25  aggravating circumstances.  And you consider these things to

315

1    weigh in favor of life without parole.  That's called

2    mitigating circumstances.  You are given guidance.  Can you

3    listen to that evidence and follow the judge's guidance and

4    make a decision whether you want to or not?  Could you do

5    it?

6         MS. WRIGHT:  Yes.

7         MR. GREENE:  If you feel like the death penalty was

8    in order in this case, could you vote for death of this man?

9         MS. WRIGHT:  Yes.

10        MR. GREENE:  We don't have anything else.

11        THE COURT:  Thank you, ma'am.  Samuel Williamson.

12        Is there a phone number where we can reach you this

13   afternoon?

14        MR. WILLIAMSON:  996-8731.

15        THE COURT:  And are you employed, Mr. Williamson?

16        MR. WILLIAMSON:  I'm retired.

17        THE COURT:  And what did you do prior to retirement?

18        MR. WILLIAMSON:  Teacher.

19        THE COURT:  County school?

20        MR. WILLIAMSON:  Public schools.

21        THE COURT:  City or county?

22        MR. WILLIAMSON:  I was with the Boy's Training School

23   in Michigan.

24        THE COURT:  And are you married?

25        MR. WILLIAMSON:  Yes.

316

1   THE COURT:  What is your spouse's name?

2   MR. WILLIAMSON:  Sally Williamson.

3   THE COURT:  And does she work?

4   MR. WILLIAMSON:  No, she's retired also.

5   THE COURT:  What did she retire from?

6   MR. WILLIAMSON:  She was a cook.

7   THE COURT:  Mr. Williamson, I asked you a question

8 out there regarding your feelings about the death penalty,

9 and I'm going to ask you those questions here so that you

10 can respond on the record.  This is a capital case.  And in

11 the event of a conviction, the penalty would either be the

12 death penalty or life imprisonment without parole.  For you

13 to be qualified to serve on this jury, you must be able to

14 give equal consideration to both of those penalties at some

15 point in time if there is a conviction.  In our society,

16 there are, of course, people with different views.  Some

17 people are totally opposed to the death penalty, could not

18 and would not recommend it under any circumstances in the

19 event of a conviction.  There are others in society who

20 think that the death penalty is the only penalty that should

21 be imposed in certain circumstances, could not and would not

22 ever consider anything less than the death penalty such as

23 life without parole.  You must be able to give equal

24 consideration to both of those and then make a

25 recommendation to the Court.  My question to you is this.

Ann H. Armstrong, RPR

317

1   Are you so opposed to the death penalty, so against the

2   death penalty in a capital case that it would restrict or

3   substantially impair your ability to perform your duties as

4   a juror?

5          MR. WILLIAMSON:  No.

6          THE COURT:  Okay.  Well, as I said, there are people

7   out there who think that the death penalty is the only

8   penalty, that they can't consider anything less than the

9   death penalty for an intentional killing.  My question to

10   you is this.  Are you so opposed to anything less than death

11   for a capital offense that your views would interfere with

12   the performance of your duties as a juror?

13          MR. WILLIAMSON:  No, not really.

14          THE COURT:  Okay.  So you're telling me that you

15   could give equal consideration to both the death penalty and

16   life without parole in the event of a conviction in this

17   case and that you could then make a recommendation to the

18   Court as to one or the other of those penalties?

19          MR. WILLIAMSON:  Yes.

20          THE COURT:  You were not predisposed as to one or the

21   other particular penalty?

22          MR. WILLIAMSON:  No.  It would, you know, all depend

23   on the seriousness of the crime.  If it's a provoked and

24   violent crime, well, I would have to make that decision.

25          THE COURT:  So you're saying you would listen to the

Ann H. Armstrong, RPR

318

1    evidence and keep an open mind, base your opinion upon the

2    evidence and the law as I give it to you?

3         MR. WILLIAMSON:  Yes.

4         THE COURT:  Mr. Williamson, have you heard anything

5    about the facts of this case prior to yesterday?

6         MR. WILLIAMSON:  No.

7         THE COURT:  You've not read anything in the paper or

8    heard anything on the radio or heard any talk among your

9    friends or family about the facts of this case?

10        MR. WILLIAMSON:  No.  I'm a sports fanatic.

11        THE COURT:  You didn't hear it unless it was on a

12   sports channel?

13        MR. WILLIAMSON:  Yes, sir.

14        THE COURT:  Any questions?

15        MR. GREENE:  No, sir.

16        MR. GOGGANS:  Just a few.  Mr. Williamson, in Alabama

17   there are different degrees of homicide, different degrees

18   of killing.  And capital cases, the legislature has kind of

19   put them aside in a classification as being the most serious

20   that carries the most serious penalty, either death or life

21   without parole.  First of all the State has to prove that

22   there is an intentional killing.  It is not a reckless

23   killing or a grossly negligent killing or a killing that was

24   provoked.  It's an intentional, unjustified killing.  And on

25   top of that, they have to go further and also show that in

319

1    addition to this killing being intentional, not something

2    accidental or provoked or something like that.  But in

3    addition to the intentional killing, it also has to prove

4    that that killing was in the course of or during a robbery.

5    So if all this was was an intentional killing, that would be

6    a plain murder case.  So there's two things that have to be

7    proven before somebody could be found guilty of a capital

8    offense and before a jury would be called upon to make that

9    decision of death or life without parole.

10          If the jury found the person not guilty or if they

11   found the person guilty of something else, murder or some

12   other lesser included offense, the jury is done.  It doesn't

13   have to make the decision.  Now if you were in a situation

14   where you were on a capital case jury and you and eleven

15   other folks had all found beyond a reasonable doubt that

16   whoever is charged had intentionally killed somebody while

17   they were trying to rob them, do you think you would at that

18   point going into it automatically think the person ought to

19   get the death penalty?

20          MR. WILLIAMSON:  Well, I tell you it would depend on

21   the situation, during the process of the robbery, what

22   happened, I mean what took place.  Was the person defending

23   himself or in a case of the other person was trying to take

24   his life or what.

25          MR. GOGGANS:  Do you understand in a capital case if

Ann H. Armstrong, RPR

320

1   there is a capital conviction and after the arguments, after

2   the evidence and the arguments on what the penalties would

3   be that the judge will give you instructions.  The judge

4   doesn't say, alright; y'all found him guilty; go back in

5   there and talk and come back and let us know what you want

6   to do.  The judge gives instructions and says, okay, look,

7   here are some things that we call aggravating circumstances

8   that weigh in favor of the death penalty.  And here are some

9   things that we call mitigating circumstances that weigh in

10  favor of the penalty of life without parole.  Do you think

11  you would have any problem weighing those things and

12  following the judge's instructions if you had already found

13  that this person intentionally killed them during the course

14  of a robbery and there wasn't any justification for it?  It

15  wasn't an accident or reckless or anything; he essentially

16  killed him while robbing him.  Do you have any problem

17  following the judge's instructions to go ahead and weigh the

18  mitigating factors with --

19        MR. WILLIAMSON:  No.

20        MR. GREENE:  Nothing else from the State.

21        MR. GOGGANS:  Let me ask this, Mr. Williamson.  In a

22  capital case, if a jury has found somebody guilty of a

23  capital offense that was charged that would necessarily mean

24  that they had found that this was intentional, that it

25  wasn't accidental or reckless and they found that it wasn't

321

1   something that the deceased had provoked him into doing, do

2   you think going in you would consider that death would be

3   your first choice option?

4        MR. GREENE:  We object to that.  That question does

5   not indicate that there would be a hearing with evidence

6   concerning a determination of mitigating and aggravating

7   circumstances upon which they are supposed to make that

8   decision.

9        MR. GOGGANS:  Before you hear the evidence and before

10  you hear the argument, do you think just personally you

11  would think that given those options, your first choice

12  would be death?

13       MR. WILLIAMSON:  Before I hear the evidence?

14       MR. GOGGANS:  Right.

15       MR. WILLIAMSON:  No.  I would definitely have to hear

16  some evidence before I make a decision.

17       MR. GOGGANS:  Nothing else.

18       MR. GREENE:  Nothing else.

19       THE COURT:  Thank you, Mr. Williamson.  If we don't

20  call you, please be here at 9:00 o'clock in the morning,

21  John Wilkerson.

22       Is there a telephone number where we can reach you?

23       MR. WILKERSON:  875-4710.

24       THE COURT:  Mr. Wilkerson, how are you employed?

25       MR. WILKERSON:  I'm disabled.

Ann H. Armstrong, RPR

1     THE COURT:  What did you do prior to your disability?

2     MR. WILKERSON:  Truck driver.

3     THE COURT:  And are you married?

4     MR. WILKERSON:  Yes, sir.

5     THE COURT:  What is your wife's name?

6     MR. WILKERSON:  Dorothy Wilkerson.

7     THE COURT:  And is she employed?

8     MR. WILKERSON:  Yes, sir.

9     THE COURT:  How is she employed?

10    MR. WILKERSON:  Wal-mart.

11    THE COURT:  Mr. Wilkerson, I asked you a couple of

12    questions out there a few minutes ago.  I want to go through

13    those with you and get your response on the record.  Okay.

14    You understand that this is a capital case?

15    MR. WILKERSON:  Yes, sir.

16    THE COURT:  That in the event of a conviction in this

17    case, that the penalties or the possible penalties are

18    either the death penalty or life imprisonment without

19    parole.  Do you understand that?

20    MR. WILKERSON:  Yes, sir.

21    THE COURT:  And do you understand that in order for

22    you to sit and consider the evidence in this case to be

23    qualified as a juror in this case, you must be prepared to

24    hear and consider the evidence, consider both the death

25    penalty and life without parole as possibly penalties in

323

1    this case and then make a recommendation to the Court?

2         MR. WILKERSON:  Yes, sir.

3         THE COURT:  Do you understand that?

4         MR. WILKERSON:  Yes, sir.

5         THE COURT:  And you understand that there are people

6    out there in the world who believe that the death penalty is

7    the only penalty that should be imposed for a criminal

8    offense such as an intentional killing?

9         MR. WILKERSON:  Yes.

10        THE COURT:  You understand that they could not and

11   would not under any circumstances be able to consider

12   something less than the death penalty for an intentional

13   killing; they could not consider life without parole.  Do

14   you understand that?

15        MR. WILKERSON:  Yes, sir.

16        THE COURT:  There are some people in our society who

17   are so opposed to the death penalty that they couldn't

18   consider and recommend the death penalty under any

19   circumstances; there are other people out there --

20        MR. WILKERSON:  Yes.

21        THE COURT:  I want to ask you how you feel about

22   this, and I'm going to ask these questions to you again that

23   we posed to you out there a few minutes ago.  The first

24   question is are you so opposed to the death penalty?

25        MR. WILKERSON:  Yes, sir.

Ann H. Armstrong, RPR

324

1        THE COURT:  You're against the death penalty?

2        MR. WILKERSON:  No, sir.

3        THE COURT:  Let's get through with the question.  Are

4   you so opposed to the death penalty in a capital case that

5   it would restrict or substantially impair your performance

6   as a juror in this case?

7        MR. WILKERSON:  No, sir,

8        THE COURT:  All right.  The other question is

9   regarding whether you can consider something less than the

10  death penalty.  And I guess it would be regarding the

11  question as to whether or not you're in that segment of

12  society that believes that the death penalty is the only

13  penalty.  Are you so opposed to anything less than the death

14  penalty for a capital offense that your views would

15  interfere with the performance of your duties in accordance

16  with the instructions that I give you?

17       MR. WILKERSON:  No.

18       THE COURT:  Do you understand the question?

19       MR. WILKERSON:  Not really.

20       THE COURT:  The question is do you consider yourself

21  to be opposed to anything other than death in the event of a

22  conviction?  Can you consider something other than death as

23  a possible sentence in the event of a conviction in a

24  capital case?  Can you consider life without parole as a

25  possible sentence?

Ann H. Armstrong, RPR

325

1        MR. WILKERSON:  Yes, sir.

2        THE COURT:  So what you're telling me is that you can

3    consider equally --

4        MR. WILKERSON:  Yes, sir.

5        THE COURT:  -- the death penalty and life without

6    parole as a possible sentence in the event of a conviction

7    in this case?

8        MR. WILKERSON:  Yes, sir.

9        THE COURT:  You're telling me that you're not

10   predisposed to one over the other?

11       MR. WILKERSON:  No, sir.

12       THE COURT:  Would you hear the facts of the case and

13   wait until all of the facts and evidence is in before you

14   made decision as to a recommendation to the Court?

15       MR. WILKERSON:  Yes, sir.

16       THE COURT:  Have you heard anything about the facts

17   of this case other than what you heard yesterday in open

18   court?

19       MR. WILKERSON:  No, sir.

20       THE COURT:  Have you read anything in the newspaper

21   regarding the facts of this case, or have you heard any talk

22   about the facts of this case?

23       MR. WILKERSON:  No, sir.

24       THE COURT:  Questions from the State?

25       MR. GREENE:  No, sir.

326

1    MR. GOGGANS:  Mr. Wilkerson, just maybe one or two

2  questions.  In a capital case it's different than other

3  homicide cases.  The legislature has set certain types of

4  crimes in a separate category that it considers the most

5  serious of all offenses.  In a capital case in order for the

6  jury to be called upon to determine whether the sentence

7  should be life without parole or death, the jury must first

8  have been convinced beyond a reasonable doubt that the

9  person on trial intentionally killed somebody during a

10  robbery.  If there's something less than an intentional

11  killing, an accident, reckless or provoked or something like

12  that, it doesn't ever get to that.  If the State doesn't

13  prove there's a robbery going with it, it doesn't get there.

14  Do you think that if you were in a situation where you and

15  eleven other folks had found somebody guilty of

16  intentionally killing someone during the course of a robbery

17  that you would automatically think that person should get

18  the death penalty?

19    MR. GREENE:  Same objection.

20    THE COURT:  Overrule the objection.  You may answer.

21    MR. GOGGANS:  Your answer was what?

22    MR. WILKERSON:  No.

23    MR. GOGGANS:  No other questions.

24    THE COURT:  Thank you, sir.  I appreciate it.  If you

25  would please be here at 9:00 o'clock in the morning.  We may

Ann H. Armstrong, RPR

327

1    call you this afternoon to be back, but I doubt it.  It

2    looks like we'll see you at 9:00 o'clock in the morning.

3    Jan D. Walker.

4            Is there a phone number where I can reach you?

5            MS. WALKER:  Yes, 875-5605.

6            THE COURT:  And do you work?

7            MS. WALKER:  Yes.

8            THE COURT:  Where are you employed?

9            MS. WALKER:  Hardee's.

10           THE COURT:  And are you married?

11           MS. WALKER:  No.

12           THE COURT:  Ms. Walker, I asked you some questions

13   out there.  I'm going to ask you these questions so that we

14   can get your response on the record.  You understand that

15   this is a capital case?

16           MS. WALKER:  Uh-huh.

17           THE COURT:  And do you understand that in the event

18   of a conviction that the possible penalties in this case are

19   either the death penalty or life without parole?

20           MS. WALKER:  Yes.

21           THE COURT:  You will have to be able to be qualified

22   to sit as a juror in this case.  In order to be qualified

23   you must be capable of giving equal consideration at the

24   appropriate time to recommend to the Court either the death

25   penalty or life without parole.  There are some people who

1   think that the death penalty is inappropriate under any

2   circumstances, that it should not be imposed under any

3   circumstances.   There are other people who believe that the

4   death penalty should be imposed in all intentional murders.

5   The people who believe that the death penalty should be

6   imposed in all intentional murders could not consider the

7   alternative sentence of life imprisonment without parole.

8   And what I want to ask you is where you fall on that

9   spectrum, okay.   The first question I have for you is this.

10  Are you so totally opposed to the death penalty, or are you

11  so totally against the death penalty in a capital case that

12  it would restrict or substantially impair the performance of

13  your duties as a juror in this case?

14      MS. WALKER:   Well, I feel -- in any case I don't feel

15  that the death penalty should be the answer.   So I don't

16  feel that it should be the death penalty.

17      THE COURT:   So in other words you believe that you

18  are unable to consider the death penalty and make a

19  recommendation to the Court of the death penalty under any

20  circumstance?

21      MS. WALKER:   Yes, sir.

22      THE COURT:   And have you had this opinion for a long

23  time, or is this something that you just recently developed?

24      MS. WALKER:   It's always been that way.

25      THE COURT:   And so you cannot and will not under any

329

1   circumstances consider the death penalty?

2         MS. WALKER:  No, sir.

3         THE COURT:  All right.  Thank you, ma'am.  If you

4   would please take a card.  You're excused from this case.

5   Patricia Trotter.

6         Is there a number where we can reach you?

7         MS. TROTTER:  I will be at work this afternoon,

8   872-8421.

9         THE COURT:  Where do you work?

10        MS. TROTTER:  That's the rehab, the West Alabama

11  Rehab.

12        THE COURT:  Are you married?

13        MS. TROTTER:  Yes, I am.

14        THE COURT:  What's your husband's name?

15        MS. TROTTER:  Norman.

16        THE COURT:  And is he employed?

17        MS. TROTTER:  Yes, he's project engineer at Zeigler

18  Meats.

19        THE COURT:  I asked you some questions out there and

20  asked you to consider those questions.  And I'm going to ask

21  you those questions again on the record so we can get your

22  response.  You understand that this is a capital case, that

23  the penalty in the event of a conviction would either be a

24  death penalty or life imprisonment without parole.  To

25  qualify to serve as a juror in this case, you must be able

Ann H. Armstrong, RPR

330

1   to give equal consideration and then recommend one of those

2   two sentences to the Court, either the death penalty or life

3   without parole.  There are people in our society who are

4   totally opposed to the death penalty.  They could not

5   recommend the death penalty under any circumstances.  There

6   are those people in our society who believe the death

7   penalty is the only appropriate penalty for an intentional

8   killing.  They could not and would not recommend anything

9   less than that such as life without parole under any

10  circumstances.  The questions that I asked you out there and

11  the questions I'm going to ask you now are questions

12  regarding how you feel about the death penalty.  And the

13  first question is this.  Are you so totally opposed to the

14  death penalty in a capital case that it would restrict or

15  substantially impair the performance of your duties as a

16  juror?

17       MS. TROTTER:  No, I'm not.

18       THE COURT:  The other question then is this,  Are you

19  so opposed to anything less than the death penalty for a

20  capital offense that your views would interfere with the

21  performance of your duties as a juror in accordance with the

22  instructions that I give you?

23       MS. TROTTER:  No.

24       THE COURT:  So what you're telling me is that you can

25  consider both the death penalty and life imprisonment

Ann H. Armstrong, RPR

331

1   without parole, that you can consider those equally, that

2   you can make a recommendation to the Court based upon the

3   facts as they are presented to you?

4        MS. TROTTER:  Yes.  In my best efforts I believe I

5   can, yes.

6        THE COURT:  And you're also telling me I presume that

7   you're not predisposed at this time as to the death sentence

8   or a life imprisonment sentence?

9        MS. TROTTER:  No.

10       THE COURT:  You don't lean either way?

11       MS. TROTTER:  No.

12       THE COURT:  That you would wait until all of the

13  facts were before you before you would be able to form a

14  judgment and then make a recommendation?

15       MS. TROTTER:  Yes.

16       THE COURT:  Have you heard anything about the facts

17  of this case, Ms. Trotter?

18       MS. TROTTER:  No, I have not.  We don't subscribe to

19  the paper, and so I am really not aware of any of the facts

20  concerning this.

21       THE COURT:  Have you heard any talk about the case

22  among the people at your --

23       MS. TROTTER:  No, I have not.  I have been employed

24  there since October.  Prior to that I was at home.  I was a

25  housewife.

332

1          THE COURT:  Prior to yesterday had you heard anything

2   about the facts of this case?

3          MS. TROTTER:  No.

4          THE COURT:  Okay.  Anything from the State?

5          MR. GREENE:  No, nothing from the State.

6          MR. GOGGANS:  No questions.

7          THE COURT:  We appreciate it.  We may call you this

8   afternoon, but more than likely we will ask you to be here

9   at 9:00 o'clock in the morning.  Lisa Surrett.

10         Ms. Surrett, is there a telephone number where I can

11  reach you this afternoon?

12         MS. SURRETT:  Yes, 872-2296.

13         THE COURT:  Are you employed?

14         MS. SURRETT:  Yes.

15         THE COURT:  Where do you work?

16         MS. SURRETT:  Campbell Roofing.

17         THE COURT:  Are you married?

18         MS. SURRETT:  Yes.

19         THE COURT:  Your husband's name?

20         MS. SURRETT:  Barry.

21         THE COURT:  And how is he employed?

22         MS. SURRETT:  He's a professional musician.

23         THE COURT:  Ms. Surrett, I asked you some questions

24  earlier regarding your feelings about the death penalty.

25  And I'm going to ask you those questions here so that we can

Ann H. Armstrong, RPR

333

1   get your response on the record.  Okay.  You understand this

2   is a capital case, and in the event of a conviction the two

3   possible sentences would be the death penalty or life

4   imprisonment without parole.  Were you to qualify to sit on

5   a jury in this case, you must be able to give both of those

6   sentences fair and equal consideration and then possibly

7   make a recommendation to me.  There are people in our

8   society who are totally against the death penalty, could not

9   and would not consider it and recommend it under any

10  circumstances.  There are people in our society who favor

11  the death penalty so much that they could not and would not

12  consider anything less than the death penalty in certain

13  circumstances, could not and would not consider life without

14  parole.  You must be able to fairly consider and then

15  recommend both of those.  My question to you is this.

16      First are you so opposed to the death penalty in a

17  capital case that it would restrict or substantially impair

18  the performance of your duties as a juror?

19      MS. SURRETT:  I would have to say yes.

20      THE COURT:  Okay.  There are no circumstances that

21  you can think of in your mind wherein there was a criminal

22  offense committed that you could vote for and recommend to

23  the Court the sentence of death?

24      MS. SURRETT:  No.

25      THE COURT:  Thank you, ma'am, if you would please

Ann H. Armstrong, RPR

334

1    take a card.   Call us at that number this afternoon after

2    5:00.   There will be other instructions regarding your jury

3    service for the remainder of the week.   We appreciate your

4    being here.   Channie Surles.

5         Ms. Surles, is there a telephone number where I can

6    reach you this afternoon?

7         MS. SURLES:   Yes, sir, 875-0854.

8         THE COURT:   And Ms. Surles, are you employed?

9         MS. SURLES:   No, sir.

10        THE COURT:   Are you married?

11        MS. SURLES:   Widow.

12        THE COURT:   And what was your husband's name?

13        MS. SURLES:   Franklin Surles.

14        THE COURT:   And was he employed during his lifetime?

15        MS. SURLES:   Yes, sir, he was working.

16        THE COURT:   How was he employed?

17        MS. SURLES:   He was working in like logs and stuff,

18   hauling logs, and things like that.

19        THE COURT:   I asked you some questions out there

20   about the death penalty, and I need to ask you those

21   questions here so that we can get your response on the

22   record.   You know this is a capital murder case?

23        MS. SURLES:   Yes, sir.

24        THE COURT:   And that the possible punishment in the

25   event there is a conviction in the event the Defendant is

335

1   found guilty would be either the death penalty or life

2   without parole.  And for you to qualify as a juror you must

3   be called upon to make a recommendation to the Court or to

4   me as to the sentence in this case.  You would have to be

5   able to give both fair and equal consideration to the death

6   penalty and life without parole if the Defendant is found

7   guilty.  Do you understand that so far?

8        MS. SURLES:  Yes, sir, I do.

9        THE COURT:  There are people out there in our society

10  who believe that the death penalty is wrong, that it should

11  not be imposed under any circumstances.  There are also

12  people out there who believe that the death penalty is the

13  only answer and the only appropriate punishment when there

14  is for instance an intentional killing.  They could not

15  consider anything other than the death penalty.  They could

16  not consider life without parole.  What I have to ask you is

17  where you are with that issue of the death penalty and

18  whether or not you can consider both of those alternatives

19  if you're called upon to be a juror in this case.  Okay?

20       MS. SURLES:  Yes, sir.

21       THE COURT:  The first question is this.  Are you so

22  opposed to or against the death penalty in a capital case

23  that it would restrict or substantially impair the

24  performance of your duties as a juror?

25       MS. SURLES:  I'm against the death penalty, but --

336

1      THE COURT:  Ma'am, are you so opposed to it?

2      MS. SURLES:  I don't think.  I don't think so.

3      THE COURT:  All right.  You believe that you can hear

4  the facts of this case?

5      MR. SURLES:  Yes.

6      THE COURT:  And you believe that if the facts and the

7  law as you apply the law to the facts require you to vote

8  for death, do you think you can do that?

9      MS. SURLES:  Yes, sir.

10      THE COURT:  Now you also have to be able to consider

11  life without parole?

12      MS. SURLES:  Yes, sir.

13      THE COURT:  Do you think you can hear the facts of

14  this case and the law as I give it to you and if you think

15  it's proper to vote for life without parole?

16      MS. SURLES:  Yes, sir.

17      THE COURT:  You don't automatically believe that the

18  death penalty is right, and you don't automatically believe

19  that life without parole ought to be given; is that correct?

20      MS. SURLES:  No, I didn't say it like that, not life

21  without parole.

22      THE COURT:  Do you understand my question?

23      MS. SURLES:  I understand your question.

24      THE COURT:  All right.  What I'm saying is you don't

25  believe that the death penalty is appropriate in every case,

337

1   do you?

2          MS. SURLES:  No, sir.

3          THE COURT:  You can be fair and consider both death

4   and life without parole?

5          MS. SURLES:  Yes, sir, I can do that.

6          THE COURT:  And vote for the one you think is right?

7          MS. SURLES:  Yes, sir, I can do that.

8          THE COURT:  Have you heard anything about the facts

9   of this case?

10         MS. SURLES:  No, sir.  I haven't ever heard of it

11  before.

12         THE COURT:  Have you read anything in the paper?

13         MS. SURLES:  No, sir.

14         THE COURT:  Was the first time you ever heard

15  anything about the facts of this case yesterday when these

16  lawyers started talking about it?

17         MS. SURLES:  Yes, sir.

18         THE COURT:  Anything else?

19         MR. GOGGANS:  Ms. Surles, let me ask you.  When you

20  told the judge, you didn't say it that way, what were you

21  meaning?

22         MS. SURLES:  About the death penalty, when he asked

23  me that?  Is that what you are asking me?

24         MR. GOGGANS:  Right.  What were you meaning to say?

25         MS. SURLES:  I was meaning to say I would have to

338

1    think about whether I would approve death penalty or what

2    I've got to decide if I was called on the jury.

3        MR. GOGGANS:  You don't know what you are going to do

4    until you hear the evidence?

5        MS. SURLES:  Right.  I can't give you no answer to

6    nothing now.

7        MR. GREENE:  Ms. Surles, if you sat on this case and

8    you thought this evidence showed an intentional killing in

9    the course of a robbery and you thought it showed a very

10   terrible circumstance and you thought maybe the death

11   penalty ought to be in order, would you vote for the death

12   penalty in this case?

13       MS. SURLES:  Yes, sir, if I have to I would.

14       THE COURT:  Thank you, Ms. Surles.  I appreciate it .

15   If we do not call you this afternoon, we are going to ask

16   you to be here at 9:00 o'clock in the morning.   Doris

17   Summerlin.

18       Ms. Summerlin, is there a telephone number where I

19   can reach you this afternoon?

20       MS. SUMMERLIN:  872-6174.

21       THE COURT:  And are you employed?

22       MS. SUMMERLIN:  Uh-huh.

23       THE COURT:  How are you employed?

24       MS. SUMMERLIN:  Jones Oil.

25       THE COURT:  And what do you do there?

339

1          MS. SUMMERLIN:   I'm a store manager.

2          THE COURT:   Are you married?

3          MS. SUMMERLIN:   Uh-huh.

4          THE COURT:   Your husband's name?

5          MS. SUMMERLIN:   Mackie Summerlin.

6          THE COURT:   Does he work?

7          MS. SUMMERLIN:   Yes, American Candy.

8          THE COURT:   Ms. Summerlin, I asked you some questions

9   out there a few minutes ago.   I'm going to ask you these

10  questions again and get you to respond on the record, okay?

11  This is a capital case.   In the event of a conviction there

12  are two possible penalties, the death penalty and life

13  without parole.   For you to be qualified to sit and hear the

14  evidence in this case, you have to be able to give fair and

15  equal consideration to both of those possible sentences if

16  there is a conviction.   There are people in our society who

17  are opposed to the death penalty.   They cannot and will not

18  recommend the death penalty under any circumstances.   There

19  are also people in our society who believe the death penalty

20  is the only appropriate punishment for all intentional

21  killings and that they could not consider anything less than

22  the death penalty.   They could not consider life without

23  parole.   You must be able to consider both of those in order

24  to be qualified to hear the facts of this case.   I'm going

25  to ask you this question first.

Ann H. Armstrong, RPR

340

1      Are you so opposed or against the death penalty in a

2  capital case that it would restrict or substantially impair

3  the performance of your duties as a juror?

4      MS. SUMMERLIN:  Yes.

5      THE COURT:  You're telling me then that under no

6  circumstances can you -- you cannot think of any

7  circumstances where you could vote for or recommend the

8  death penalty?

9      MS. SUMMERLIN:  No.  I don't think we have that

10  right.

11      THE COURT:  All right.  Thank you, ma'am.  Thank you

12  for your time.  Debbie Sorrells.

13      Ms. Sorrells, is there a telephone number that I can

14  reach you at this afternoon?

15      MS. SORRELLS:  875-2134.

16      THE COURT:  And are you employed at Deavor and

17  Searcy?

18      MS. SORRELLS:  Yes, sir.

19      THE COURT:  And your husband's name is?

20      MS. SORRELLS:  Jerry.

21      THE COURT:  And how is Jerry employed?

22      MS. SORRELLS:  Winn Dixie.

23      THE COURT:  I asked you some questions out there a

24  few minutes ago, and I need to ask those questions to you

25  again and get your response on the record, okay?

Ann H. Armstrong, RPR

341

1      MS. SORRELLS:  Okay.

2      THE COURT:  First of all you understand, Ms.

3  Sorrells, this is a capital murder case, that in the event

4  of conviction that the punishment would either be life

5  without parole or the death penalty.  Do you understand

6  that?

7      MS. SORRELLS:  Yes.

8      THE COURT:  In order for you to qualify to hear the

9  evidence in this case you must be able to give fair and

10  equal consideration to both of those possible punishments,

11  okay?

12      MS. SORRELLS:  (Nods head affirmatively).

13      THE COURT:  There are people in our society who are

14  opposed to the death penalty, totally opposed to it, could

15  not and would not recommend it under any circumstances.

16  There are also people in our society who think the death

17  penalty is the only appropriate sentence or punishment for

18  an intentional killing.  They cannot consider anything other

19  than the death penalty such as life without parole.  In

20  order for you to qualify, you have got to be able to

21  consider both of them fairly and equally and give fair

22  consideration to both of them and then make a recommendation

23  to the Court.  So my first question to you is this.  Are you

24  so opposed to the death penalty in a capital case that it

25  would restrict or substantially impair the performance of

Ann H. Armstrong, RPR

342

1    your duties as a juror?

2        MS. SORRELLS:  I really have never thought about

3    those questions, never had to make a decision one way or the

4    other.  I really don't think that I could hand down a

5    recommendation for the death penalty.

6        THE COURT:  Under any circumstances?

7        MS. SORRELLS:  Under any circumstances.

8        THE COURT:  I know you just mentioned to me that you

9    have never really given this much thought, and I can

10   appreciate that.  I think that a lot of people probably

11   don't do that.  They are not called upon to have to make

12   that decision.  Was this a decision that you have made

13   within the last say 24 hours or so since you were called

14   upon to serve as a juror?

15       MS. SORRELLS:  I think it was a decision that I have

16   made since your speech earlier today.  I have never thought

17   about it honestly.  I have never had to think about it or

18   make a decision one way or the other how I felt.

19       THE COURT:  Are you opposed to it simply because you

20   don't want to be faced with that decision, or are you

21   opposed to it because of some conviction?

22       MS. SORRELLS:  Because I don't want to be faced with

23   it.  I don't want to have to hand down a decision that I am

24   responsible for someone having to take someone else's life.

25       THE COURT:  So you think that if you were faced with

Ann H. Armstrong, RPR

343

1   that decision, that you would not be able then to give fair

2   consideration to the death penalty?   When I say fair

3   consideration, you've got to take this a step further and

4   also not only give it fair consideration but then make a

5   recommendation?

6         MS. SORRELLS:   Right.   I think for me to consider it,

7   I would have to know all of the facts and give it a lot of

8   thought.   I really don't think that I could make a decision

9   not knowing the facts and not knowing the circumstances.

10         THE COURT:   Let's assume that the facts and

11   circumstances were so heinous that you felt that the death

12   penalty was in order.   Could you then make that

13   recommendation?

14         MS. SORRELLS:   I'm really not sure.   I'm really not

15   sure if I could or not.

16         THE COURT:   Let me ask you another way.   Are you at

17   this point in time predisposed to the penalty of life

18   without parole rather than the death penalty?

19         MS. SORRELLS:   Yes, sir.

20         THE COURT:   And if you had to weigh the two, do you

21   consider that you are unable to fairly weigh those two and

22   give fair consideration to those two at this point in time?

23         MS. SORRELLS:   At this point in time, my conscience

24   would go to life imprisonment without parole than would be

25   the death penalty.   I'm not saying that my mind could not be

Ann H. Armstrong, RPR

344

1   changed over a period of time.

2        THE COURT:  Have you read anything about the facts of

3   this case prior to coming to court today?

4        MS. SORRELLS:  I remember vaguely reading something

5   in the newspaper.  I don't remember the facts.  I remember

6   vaguely reading something in the newspaper.

7        THE COURT:  Does your recollection of anything that

8   you read -- would that have any bearing on your ability to

9   be fair and impartial in this case?

10       MS. SORRELLS:  No, sir, because like I said, it's

11  vague.  I don't think it would have any bearing on whether

12  or not I could make a decision.

13       THE COURT:  Okay.  I'm going to ask Mr. Greene to ask

14  you some questions, and then Mr. Goggans will have a chance

15  to ask you some questions as well.

16       MR. GREENE:  Ms. Sorrells, I think you had this

17  debate around you pretty good here.  The question comes down

18  to this.  If you are in the jury room do you feel assuming

19  you had all the facts and all the information and it was

20  pretty terrible, and you're there in a position of what to

21  go for, life without parole or death, is there any

22  particular way you are going to go in this?

23       MS. SORRELLS:  The way I feel right now?

24       MR. GREENE:  Well, the way you feel right now about

25  either one or the other to the exclusion of the other?

Ann H. Armstrong, RPR

345

1  That's what we're trying to get around to.  Do you

2  understand that the duty of the jury would be to make a

3  decision and be open minded about that decision one way or

4  the other until you got all the facts, the first hearing

5  about guilt or innocence of capital murder and then the next

6  trial about what should be done, life or death?  There would

7  be two little trials, little hearings.  Your job as a juror

8  would be to weigh them fairly and evenly and make an

9  intelligent decision.  The question is can you make that

10 decision fairly and evenly and come out with death if that's

11 what you think is right or come out with life without parole

12 if that's what you think is right?

13        MS. SORRELLS:  Yes, sir, I can.

14        MR. GOGGANS:  Let me ask you this.  In this case,

15 could you vote to put this man to death?

16        MS. SORRELLS:  Not from what I know right now.

17        MR. GOGGANS:  Assuming you got all the facts?

18        MR. GREENE:  I object to that.

19        MS. SORRELLS:  I would have to say no.

20        MR. GOGGANS:  The question is could you vote to put

21 this defendant to death?  This lady has heard not the first

22 piece of evidence.  I think we can ask her how she feels

23 about --

24        MR. GREENE:  Assuming she had all the facts and

25 information, could she do that?

Ann H. Armstrong, RPR

346

1          THE COURT:  Overrule the objection.  You can answer.

2          MR. SORRELLS:  I would have to say no.

3          MR. GOGGANS:  I think I understand.   I understand

4     it's difficult for you to answer these questions because you

5     don't know what the evidence is, and it's difficult for us

6     to ask these questions because we haven't got any evidence

7     we can tell you about right now.  But I'm just trying to put

8     a little structure on this as best I can to try to

9     understand what your thoughts are.  In Alabama there are

10    different degrees of homicide, the worst being the capital

11    offense.  The legislature has classified those as being of

12    such a nature that the penalty should be the most severe.

13    It should either be life without parole or it should be the

14    death penalty.  In order for a juror or a jury to ever get

15    to the point where it's called upon to enter this second

16    phase called the penalty phase, it must first have found

17    that someone intentionally killed somebody during the

18    commission of some other felony; in this case, they are

19    saying that it was an intentional killing during the course

20    of a robbery.  After that if there is a guilty verdict -- if

21    there's a not guilty verdict or there is a guilty verdict of

22    some lesser included offense, the jury is done.  But if

23    there's a guilty verdict in a capital offense, then the

24    second part starts where there are opening statements;

25    evidence is presented.  There is a closing argument by

347

1  lawyers on both sides, and then the judge gives

2  instructions.  It's not as if the jury having found someone

3  guilty of a capital offense is just sent into the jury room

4  and said, you found the person guilty; now go in there and

5  talk and come back and let us know what you want to do.  The

6  judge gives instructions of how to go about making that

7  decision.  The judge tells you what the law is like in

8  connection with the guilt or innocence phase.  And he tells

9  you about things called aggravating circumstances which

10  weigh in favor of the death penalty, and he tells you about

11  things call mitigating circumstances which weigh in favor of

12  the sentence of life without parole.

13       Regardless of whatever your personal feelings might

14  be and what you think the law might ought to be, we can all

15  think of some law we would change.  But do you think that

16  you could sit through the process, listen to the evidence

17  and listen to the arguments, follow the judge's instruction

18  and make a recommendation based on what you viewed the law

19  to require based upon what you heard during the course of

20  the trial?

21       MS. SORRELLS:  Yes, sir, I could do that.

22       MR. GOGGANS:  No other questions.

23       MR. GREENE:  If you thought it right, you could or

24  could not vote for death?

25       MS. SORRELLS:  If I thought it was right.

348

1          MR. GREENE:  Is that something you could fairly

2     reach?

3          MS. SORRELLS:  Yes, sir.

4          MR. GREENE:  Thank you.

5          THE COURT:  Thank you, Ms. Sorrells.  We appreciate

6     it.  If we don't call you this afternoon, we'll see you at

7     9:oo o'clock in the morning.  Ernest Snow.

8          THE COURT:  Mr. Snow, are you employed?

9          MR. SNOW:  Yes.

10         THE COURT:  How are you employed?

11         MR. SNOW:  Truck driver.

12         THE COURT:  For who?

13         MR. SNOW:  Johnny McBride.

14         THE COURT:  Are you married?

15         MR. SNOW:  Yes.

16         THE COURT:  Your wife's name?

17         MR. SNOW:  Mary Snow.

18         THE COURT:  Is she working?

19         MR. SNOW:  No.

20         THE COURT:  Mr. Snow, I asked you some questions out

21    there regarding your opinion regarding the death penalty,

22    and I'm going to ask you those questions here so we can get

23    your response on the record.  Okay.  You understand that

24    this is a capital murder case?

25         MR. SNOW:  Yes.

Ann H. Armstrong, RPR

1          THE COURT:  And do you understand that in the event

2     that there is a conviction or the defendant is found guilty

3     that the two possible punishments would be the death penalty

4     or life imprisonment without parole?

5          MR. SNOW:  Yes.

6          THE COURT:  Do you understand that to qualify to sit

7     on this jury you must be able to give fair consideration to

8     both of those possibilities, both of those possible

9     sentences?

10         MR. SNOW:  Yes.

11         THE COURT:  And you know there are people out there

12    in our society who are totally opposed to the death penalty.

13    They cannot consider the death penalty as a punishment under

14    any circumstances.

15         MR. SNOW:  Yes.

16         THE COURT:  There also are people in our society who

17    feel the death penalty is the only penalty that is

18    appropriate in an intentional killing or intentional murder?

19         MR. SNOW:  Yes, sir.

20         THE COURT:  Those people can't consider anything

21    other than the death penalty; they cannot consider the

22    alternative sentence of life without parole.  Do you

23    understand that?

24         MR. SNOW:  Yes.

25         THE COURT:  The question I have for you is regarding

Ann H. Armstrong, RPR

350

```
1    your feelings about the death penalty and life without

2    parole.  And the first question I have for you is this.  Are

3    you so totally opposed or against the death penalty in a

4    capital case that it would restrict or substantially impair

5    the performance of your duties as a juror?

6              MR. SNOW:  Do you want me to answer that?

7              THE COURT:  Yes, sir.  Are you opposed to it?

8              MR. SNOW:  It's a tough answer, you know, but the

9    death penalty -- I don't -- my opinion I would say life

10   imprisonment without parole.

11             THE COURT:  Well, does that mean that you're opposed

12   to the death penalty?

13             MR. SNOW:  Well, I don't like to see nobody, you

14   know, somebody killed, you know.  That's my opinion.

15             THE COURT:  If you were a juror in this case, could

16   you vote to recommend the death penalty?

17             MR. SNOW:  No.

18             THE COURT:  Could you vote to recommend the death

19   penalty in any case?

20             MR. SNOW:  I have not ever been on a jury.  I

21   couldn't answer that question and say yes I could or

22   couldn't.  But as far as I can say, that's -- nobody has

23   ever asked me that.

24             THE COURT:  Well, I'm trying to determine if you're

25   opposed to it to the extent that you can't give both the
```

Ann H. Armstrong, RPR

351

1    death penalty and life without parole fair consideration and

2    make a recommendation to me.  And what I need you to tell me

3    is are you so opposed to the death penalty to the extent

4    that it would impair your ability to serve as a juror or

5    that you could not serve as a juror?

6         MR. SNOW:  Well, no, I couldn't.

7         THE COURT:  You could not?

8         MR. SNOW:  In that case I couldn't because I don't

9    --- in my opinion I don't see where I would be serving a

10   fair case you know.  I might say -- deep inside I might be

11   saying I'm for it and then something tells me I'm against

12   it.

13        THE COURT:  Mr. Snow, do you feel as though you could

14   not sit and hear the evidence in this case, follow my

15   instructions and then if the law required you to vote a

16   death sentence?

17        MR. SNOW:  Well, I could sit -- like I said I can sit

18   and follow the instructions.  I would have to.  That's a

19   matter I would have to pray and ask the Lord to give me the

20   right answer.

21        THE COURT:  Right.  But right now as you sit here

22   talking to me today, are you telling me that you cannot vote

23   the death penalty?

24        MR. SNOW:  I can't see whether -- that's a tough

25   question, Your Honor.  I just -- I'm going to be as fair as

352

1    I can be.

2          THE COURT:  Anything else?

3          MR. GREENE:  Mr. Snow, it is a tough question because

4    you're dealing with a case with penalties for somebody who

5    has been killed, and the penalty involves life imprisonment

6    without parole or death.  We are trying to figure out if you

7    can figure out for yourself kind of how you feel about that.

8    Some folks are just against the death penalty; they don't

9    think it should ever be voted, ever, ever, ever, under no

10   circumstance.  Some people feel that way; that's how they

11   feel.  If you serve on the jury in a death case, you can't

12   feel that way.  You've got to be able to vote for it if you

13   think the facts are right.

14         MR. SNOW:  I understand.

15         MR. GREENE:  Other folks feel like it's the only

16   punishment ever to be had.

17         MR. SNOW:  I understand that.

18         MR. GREENE:  They don't think they could ever do

19   anything but that if it's kind of a terrible case, and some

20   folks are opposed to it.  Can you vote if all the facts were

21   right vote to put someone to death?

22         MR. SNOW:  No, I don't think I can.

23         MR. GREENE:  You know that it is your duty if you

24   serve on the jury to do your best to follow the rules of law

25   and the instructions that are given to you.  But if you

Ann H. Armstrong, RPR