# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MATTHEW REEVES,          )
                              )
       Petitioner,      )
                              )
ix.                     )    Case No.  1:17-cv-00061-KD-MU
                              )
JEFFERSON S. DUNN,     )
Commissioner of the Alabama   )
Department of Corrections,    )
                              )
       Respondent.     )

# VOLUME 5

# State Court – Trial, Reporter's Record

| | |
|---|---|
| STEVEN T. MARSHALL<br>ALABAMA ATTORNEY GENERAL | CHARLES A. STEWART III<br>JONATHAN C. "RUDY" HILL |
| AND | BRADLEY ARANT BOULT<br>   CUMMINGS LLP<br>445 Dexter Avenue, Ste 9075<br>Montgomery, AL 36104<br>(334) 956-7700 |
| BETH JACKSON HUGHES<br>ALABAMA ASSISTANT<br>ATTORNEY GENERAL | |
| ADDRESS OF COUNSEL: | OF COUNSEL:<br>Jodi E. Lopez (*pro hac forthcoming*)<br>Ryan M. Sandrock (*pro hac forthcoming*)<br>Ariella Thal Simonds (*pro hac forthcoming*)<br>Melissa O. Evidente (*pro hac forthcoming*)<br>Sonia A. Vucetic (*pro hac forthcoming*)<br>Sidley Austin LLP<br>555 West Fifth Street, Suite 4000<br>Los Angeles, CA 90013<br>(213) 896-6000 |
| Office of the Alabama Attorney General<br>Capital Litigation Division<br>501 Washington Avenue<br>Montgomery, AL  36130<br>(334) 242-7392 | |

1 really don't feel deep down inside that you can do that,

2 then that's what we're trying to find out. You know, we

3 don't want to get in there and you are sitting on the jury

4 and we get halfway through this case and you say, I just

5 cannot do this thing. I'm just -- you know, I'm not going

6 to -- no matter what is happening here, I just cannot do it.

7 Y'all let me go. That's why I need to know how you feel.

8    MR. SNOW: I don't feel like I can. I want to give a

9 fair answer.

10    MR. GREENE: If it came down to it, just wouldn't be

11 able to vote the death penalty?

12    MR. SNOW: No, I wouldn't.

13    MR. GREENE: No matter how strong the facts showed

14 you?

15    MR. SNOW: No.

16    MR. GREENE: It's whatever you think.

17    MR. GOGGANS: Mr. Snow, I'm Tommy Goggans. I think

18 what we're trying to find out is we're trying to find out

19 whether or not you would be fair in applying the law that we

20 have in this case. We can all think of some laws we don't

21 like. I don't like a lot of tax laws, and if you left me to

22 my own devises to decide how much tax I pay, I might pay

23 them twenty-five cents. But the law says I've got to pay

24 more, so I do it. So it's not a matter of deciding what

25 laws we like or whether or not we are going to apply the

354

1   law, whether or not, you know, that's what we think the law

2   should be.  What we are trying to find out is whether or not

3   you are going to be a good juror for this particular case

4   because of the particular law that's involved in this case.

5   You might be a perfectly good juror for this case.  You may

6   be a great juror for some other case and may not be so good

7   for this case.

8        Now in Alabama in capital cases it involves a

9   killing.  It involves somebody having been killed, but there

10  are different degrees of murder.  There are different

11  degrees of homicide and different degrees of killing.  It

12  goes from, you know, like criminally negligent homicide or a

13  plain murder.  The legislature has put one class of them in

14  the capital offense category because they've said those are

15  the worst ones.  They all involve an intentional killing,

16  not an accidental or a reckless killing or a killing because

17  somebody got provoked into doing it but an unjustified,

18  intentional killing.

19       But in addition to that, a capital offense involves

20  something else.  They have got to prove two things.  First

21  they have got to prove the killing was intentional and

22  unjustified.  Second, the State has to prove that it was

23  during the course of some other felony, in this case a

24  robbery.  In order for there to be a capital conviction,

25  there has to be proof to all twelve folks on the jury beyond

1   a reasonable doubt that whoever it is on trial intentionally

2   killed somebody while they were trying to rob them.  If all

3   they show was it was an intentional killing, it's not

4   capital.  It's just a plain murder case.

5        The only time a jury is asked to make that decision

6   of whether or not a person should be sentenced to the death

7   penalty or life without the possibility of parole is if that

8   jury finds beyond a reasonable doubt that the person has

9   intentionally killed somebody during a robbery.  If the jury

10  does that, then the State -- this second phase is called the

11  penalty phase in which the lawyers make opening statements

12  and present evidence and closing arguments.  But one of the

13  things that is most important is the judge gives you

14  guidance on how you go about making your decision.  He tells

15  you what the law is.  It's not like saying to me, Mr.

16  Goggans, why don't you decide how much income tax you have

17  to pay this year.  You know, the law tells me how much money

18  I've got to pay.  And the Court would tell the jury how to

19  go about making this decision.  It's not like they are just

20  going to say, okay, people, you found this person guilty;

21  now go in there, talk and tell us -- come back later and

22  tell us what you want to do.  The Court gives very specific

23  instructions and guidance.

24       The law provides things called aggravating

25  circumstances that the law says weigh in favor of death and

360

1    MR. SMITHERMAN:  Right.

2    THE COURT:  You understand, do you not, sir, that

3    there are people in our society who are totally opposed to

4    the death penalty and who would not and could not under any

5    circumstances recommend that upon a conviction of a capital

6    offense?

7    MR. SMITHERMAN:  That's right.

8    THE COURT:  You also understand that there are other

9    people in our society who believe that the death penalty is

10   the only penalty for an intentional or capital murder?

11   MR. SMITHERMAN:  That's right.

12   THE COURT:  And that those people can't consider

13   anything less than the death penalty such as life without

14   parole; those people who think that the death penalty is

15   appropriate in all cases, they can't consider anything other

16   than that.  Do you understand that?

17   MR. SMITHERMAN:  Do you mean the jury can't?

18   THE COURT:  Well, no, sir, I mean there are people in

19   our society who have that fixed opinion that the death

20   penalty is appropriate and there's nothing else that should

21   be done other than that.

22   MR. SMITHERMAN:  Sure, there are.

23   THE COURT:  We need to find out where you are with

24   regard to that.  And the first question I have for you is

25   regarding the death penalty and how you feel about that.

Ann H. Armstrong, RPR

```
 1   Are you so opposed to the death penalty in a capital case

 2   that it would restrict or substantially impair your ability

 3   to perform or serve as a juror in this case?

 4          MR. SMITHERMAN:  It would not because I believe in

 5   it.

 6          THE COURT:  All right, sir.  And I'll ask you the

 7   other side of that question.  As I said there are people who

 8   think the death penalty is the only appropriate penalty and

 9   wouldn't consider life without parole as something less than

10   the death penalty.  And I would ask you this.  Are you so

11   opposed to anything less than the death penalty for a

12   capital offense that those views would interfere with the

13   performance of your duties in accordance with the

14   instructions that I give you; in other words, are you so

15   committed to the death penalty that you could not consider

16   life without parole?

17          MR. SMITHERMAN:  I would consider all depending on

18   what I hear in the courtroom.

19          THE COURT:  So what you're telling me is that you can

20   hear the evidence and hear the law as I give you the law and

21   fairly consider both of those alternatives?

22          MR. SMITHERMAN:  Right.

23          THE COURT:  That you would not make up your mind

24   regarding that until you have heard the evidence and the law

25   as I have given you the law?
```

Ann H. Armstrong, RPR

1    MR. SMITHERMAN:  Yes, sir.

2    THE COURT:  All right.  Mr. Smitherman, have you read

3 anything about the facts of this case?

4    MR. SMITHERMAN:  No, sir, because I have been out of

5 town.  And I didn't -- the only thing I have seen -- last

6 night I was picking up the basketball game, and I saw

7 something on the news about it.  But before then I didn't

8 know anything about this.

9    THE COURT:  Can you tell me what you heard on the

10 news?

11    MR. SMITHERMAN:  It wasn't nothing I heard.  They

12 showed a picture of this man walking across.

13    THE COURT:  You didn't hear the audio?

14    MR. SMITHERMAN:  No, it was right at the tail end of

15 it.

16    THE COURT:  Okay.  The fact that you saw that -- let

17 me ask you this.  Describe what you saw in that picture.

18    MR. SMITHERMAN:  Really I recognized this young man.

19 That's the young man who is in the gray?

20    THE COURT:  Right.

21    MR. SMITHERMAN:  And he was walking across, and it

22 went by just like that.  It wasn't time to recognize

23 anything else going on because I missed it.  It was at the

24 tail end of it.

25    THE COURT:  Okay.  Did what you see in that image

Ann H. Armstrong, RPR

1     last night on television create in your mind any or did it

2     cause you to form an opinion as to the guilt or innocence of

3     the Defendant at this time?

4          MR. SMITHERMAN:  No.

5          THE COURT:  Do you feel as though the image that you

6     saw on television last night is something that you can set

7     aside; that will not prejudice you, that you can give the

8     State and the Defense a fair and impartial trial?

9          MS. SMITHERMAN:  Oh, yes, sir, I would.  In fact

10    after I turned around, I had forgotten it.

11         THE COURT:  If you would please answer Ms. Wilson's

12    questions.

13         MS. WILSON:  I have no questions.

14         MR. GOGGANS:  Mr. Smitherman, are you related to

15    Mayor Smitherman?

16         MR. SMITHERMAN:  Yes, sir.

17         MR. GOGGANS:  What's your relationship to him?

18         MR. SMITHERMAN:  Brother.

19         MR. GOGGANS:  What is your wife retired from, Mr.

20    Smitherman?

21         MR. SMITHERMAN:  She is retired from the city as

22    payroll clerk.

23         MR. GOGGANS:  Now in Alabama there are different

24    degrees of homicide, the worst being a capital offense.

25    They are not involving any types of killing other than

1    intentional killings, and they are not reckless or

2    accidental or killing somebody because they provoked you or

3    something like that.  They are an unjustifiable intentional

4    killing.  But on top of that the State also has to show that

5    beyond an intentional killing that the killing was during

6    the course of some other felony, and in this case they are

7    saying robbery.  If all they had was an intentional killing

8    and nothing else, it would just be a plain murder case, and

9    the jury wouldn't ever be asked to even consider death or

10   life without parole.

11        If you were on a jury that had found somebody guilty

12   beyond a reasonable doubt of having intentionally killed

13   somebody during a robbery, do you think at that point going

14   into the penalty phase you would automatically think the

15   person should get death?

16        MS. WILSON:  I'm going to object to that.  We have

17   objected again and again.  That's not the -- if you would

18   please --

19        THE COURT:  Explain to the witness that there is

20   another phase.

21        MR. GOGGANS:  There are two phases; first there is

22   the guilt or innocence phase in which first the jury is

23   asked to determine whether or not the first is guilty or

24   innocent of the capital offense.  If the jury find the

25   person not guilty or guilty of some lesser included offense,

1   the jury would be done.  If the jury finds the person guilty

2   of a capital charge, then it goes into this second phase

3   called the penalty phase.  There are opening statements and

4   evidence presented and arguments, and then the judge

5   instructs the jury.  Do you think that somebody who

6   intentionally killed somebody in the course of a robbery

7   just automatically should get the death penalty?

8        MR. SMITHERMAN:  If he intentionally killed him, yes,

9   I do.

10       MR. GOGGANS:  That's a personal viewpoint that you

11   hold?

12       MR. SMITHERMAN:  Yes, sir, if he intentionally killed

13   him, yes, I do.

14       MR. GOGGANS:  Nothing else.

15       MS. WILSON:  Mr. Smitherman, if the judge told you

16   that it was your duty to listen to all of the evidence and

17   there would be evidence on behalf of the defendant as well

18   as additional evidence put forth by the State and that you

19   weren't to make your decision on the penalty phase, that is

20   whether to recommend the death penalty or life without

21   parole until after you had heard all of the evidence, could

22   you keep an open mind and do that?

23       MR. SMITHERMAN:  I can.

24       THE COURT:  So you would not automatically just

25   because he was convicted vote for the death penalty?

1      MR. SMITHERMAN:  I would wait until I hear

2   everything.

3      MS. WILSON:  Thank you.

4      THE COURT:  Anything else?   Mr. Smitherman, we will

5   see you in the morning at 9 a.m.

6      MR. GOGGANS:  We make a motion to excuse juror number

7   195, Mr. Smitherman, as an automatic death penalty juror,

8   <u>Morgan versus Illinois</u> and similar state court cases.

9      MS. WILSON:  He also said that he would keep an open

10   mind.  I don't think the question was complete that you

11   asked him.  I asked you to explain further to the witness

12   regarding what your question was and the intent of your

13   question.  I think that he answered my question that he

14   could keep an open mind throughout the proceeding.  And

15   certainly not a -- I don't think he is somebody that ought

16   to be excluded.

17      THE COURT:  Motion will be denied.  Nannie Smith.

18      Ms. Smith, are you employed?

19      MS. SMITH:  No, sir.

20      THE COURT:  Have you been employed during your

21   lifetime?

22      MS. SMITH:  Somewhere down the road.

23      THE COURT:  Are you retired?

24      MS. SMITH:  No, I'm on total disability.

25      THE COURT:  What did you do prior to your disability?

1          MS. SMITH:  I was a waitress over here at Mae's cafe,

2     and I stayed with the elderly people and took care of them.

3          THE COURT:  Are you married?

4          MS. SMITH:  No.

5          THE COURT:  Ms. Smith, I asked you some questions out

6     here earlier regarding your feelings about the death

7     penalty, and I'm going to ask you these questions and get

8     your response on the record.  You understand that this is a

9     capital murder case, that in the event that the Defendant is

10    found guilty that there are two possible sentences.  One is

11    the death penalty, and the other is life imprisonment

12    without parole.  In order for you to qualify to serve as a

13    juror in this case you must give fair consideration at the

14    appropriate time to the sentence or the recommended sentence

15    of the death penalty or life without parole.  There are

16    people in our society who think that the death penalty is

17    wrong.  They are opposed.  They oppose that idea.  They will

18    not consider the death penalty as appropriate punishment

19    under any circumstances in any case.

20         On the other hand there are people in our society who

21    believe that the death penalty is the only penalty in

22    certain circumstances and will not consider anything less

23    than that, such as life without parole.  The question that

24    I have for you -- and, of course you understand you have got

25    to be able to consider both of those things equally and then

Ann H. Armstrong, RPR

1   make a recommendation based upon the evidence that's

2   presented to you and the law as I give it to you.  So I need

3   to ask you a question about the death penalty, and it's

4   this.  Are you so opposed to the death penalty or against

5   the death penalty in a capital case that it would restrict

6   or substantially impair the performance of your duties as a

7   juror?

8          MS. SMITH:  No, sir.

9          THE COURT:  Likewise, as I said you have to be able

10  to consider something less than the death penalty, such as

11  life without parole.  And so the question I have for you is

12  this.  Are you so opposed to anything less than the death

13  penalty in a capital case that your views would interfere

14  with the performance of your duties in accordance with the

15  instructions that I give you?

16         MS. SMITH:  No, sir.

17         THE COURT:  So what you're telling me is that you can

18  hear the evidence and give equal and fair consideration to

19  both of those particular penalties in the event of a

20  conviction?

21         MS. SMITH:  Right.

22         THE COURT:  That you're not predisposed to vote the

23  death penalty; you're not predisposed to vote for life

24  without parole at this point in time?

25         MS. SMITH:  No.

1     THE COURT:  That you can keep an open mind, hear all

2  of the evidence through the end of the trial and then vote

3  for one of those particular punishments; is that correct?

4     MS. SMITH:  Yes, sir.

5     THE COURT:  Have you read anything about the facts of

6  this case?

7     MS. SMITH:  No, sir.

8     THE COURT:  Was yesterday the first time that you

9  ever heard anything about the facts of this case?

10    MS. SMITH:  Yes, sir.

11    THE COURT:  And did you see anything in the newspaper

12 or hear anything on the radio or TV yesterday?

13    MS. SMITH:  No, sir.  I have a daughter that works

14 for the Selma Times Journal, but I don't get a paper or

15 anything, so I haven't heard anything.  Yesterday was the

16 first time.

17    THE COURT:  Any questions?

18    MS. WILSON:  No, sir.

19    MR. GOGGANS:  No questions.

20    THE COURT:  We would appreciate it if you would

21 please be back at 9:00 o'clock in the morning.  Joseph C.

22 Smith.

23    You are Joseph Smith?

24    MR. SMITH:  Yes, sir.

25    THE COURT:  And Mr. Smith, are you employed?

1          MR. SMITH:  Yes, sir.  I am.

2          THE COURT:  Where do you work?

3          MR. SMITH:  International Paper.

4          THE COURT:  Are you married?

5          MR. SMITH:  No, sir, I am not.

6          THE COURT:  Okay.  Mr. Smith, I asked you some

7   questions out here to consider earlier, and I need to ask

8   you those questions here so we can get your response on the

9   record.  You understand this is a capital murder case and

10  that upon conviction in this case there are two possible

11  sentences.  One is life without parole, and the other is the

12  death penalty.  I need to ask you questions regarding how

13  you feel about the sentence or the punishments in this case.

14  In order to qualify to serve as a juror in this case, you

15  have got to be able to give fair consideration to both life

16  without parole and the death penalty as possible punishment.

17  You cannot be predisposed to one more than the other.  You

18  know, there are certain people in our society who are

19  totally opposed to the death penalty.  They are not going to

20  vote for or recommend the death penalty under any

21  circumstances.  There are people in our society who think

22  that the death penalty is the only appropriate punishment

23  for an intentional killing.  They cannot under any

24  circumstances consider anything less than the death penalty

25  for that killing such as life without parole.  And so I've

```
 1    got to find out where you are in relation to this.

 2         The first question I have for you is this.  Are you

 3    so opposed to the death penalty in a capital case that it

 4    would restrict or substantially impair the performance of

 5    your duties as a juror?

 6         MR. SMITH:  No, sir.

 7         THE COURT:  Likewise, are you so opposed to anything

 8    less than the death Penalty?

 9         MR. SMITH:  No, sir.

10         THE COURT:  So you could consider both the death

11    penalty and life without parole and give each of those fair

12    consideration, and you're not predisposed to either one of

13    those at this point in time?

14         MR. SMITH:  No, sir, I'm not.

15         THE COURT:  You would be able to hear the evidence,

16    take the law as I give the law to you, apply the law to the

17    facts of this case and then after you have heard all of the

18    evidence make a decision regarding the appropriate

19    punishment and recommend that to the Court?

20         MR. SMITH:  Yes, I could.

21         THE COURT:  Have you read anything about the facts of

22    this case?

23         MR. SMITH:  No, sir, I have not.

24         THE COURT:  Did you know anything about the facts of

25    this case prior to your coming to court?
```

1    MR. SMITH: No, sir.

2    THE COURT: Have you seen or heard anything about the

3    facts of this case other than what the lawyers said

4    yesterday in open court?

5    MR. SMITH: No, sir, I have not.

6    THE COURT: All right. Thank you, sir. Anything

7    from the State?

8    MS. WILSON: Nothing.

9    MR. GOGGANS:. Mr. Smith, what do you do at

10   International Paper?

11   MR. SMITH: I am utilities on number 15 paper

12   machine, sir.

13   MR. GOGGANS: Nothing else.

14   THE COURT: Mr. Smith, we appreciate your being here.

15   If you would please be back at 9:00 o'clock in the morning.

16   Gary Smith.

17   Mr. Smith, how are you employed?

18   MR. SMITH: Self employed.

19   THE COURT: What do you do?

20   MR. SMITH: Air conditioning refrigeration.

21   THE COURT: Are you married?

22   MR. SMITH: Yes.

23   THE COURT: Your wife's name?

24   MR. SMITH: Debra Smith.

25   THE COURT: And is she employed?

373

1          MR. SMITH:  Yes, sir.

2          THE COURT:  How is she employed?

3          MR. SMITH:  American Fine Wire.

4          THE COURT:  Mr. Smith, I asked you some questions a

5    little while ago regarding your feelings about the death

6    penalty, and I'm going to get that response on the record at

7    this time.  Okay. You understand this is a capital murder

8    case and that in the event of a conviction, the possible

9    punishment would be the death penalty or life without

10   parole?

11         MR. SMITH:  Yes, sir.

12         THE COURT:  And in order for you to qualify to serve

13   as a juror in this case, you must be able to give fair

14   consideration and recommend to the Court one of those two

15   punishments.  Do you understand that?

16         MR. SMITH:  Yes, sir.

17         THE COURT:  You understand that there are certain

18   people in our society who were totally opposed to the death

19   penalty and cannot recommend that under any circumstances?

20         MR. SMITH:  Yes, sir.

21         THE COURT:  You understand also that there are people

22   in our society who believe that the death penalty is the

23   only appropriate punishment in certain circumstances and

24   cannot even consider something less than that such as life

25   without parole?

Ann H. Armstrong, RPR

374

1          MR. SMITH:  Yes, sir.

2          THE COURT:  Do you understand that?

3          MR. SMITH:  Yes, sir.

4          THE COURT:  The questions that I have to ask you are

5     regarding those two alternatives.  The first question is

6     this.  Are you so opposed to or against the death penalty in

7     a capital case that it would restrict or substantially

8     impair the performance of your duties as a juror?

9          MR. SMITH:  No, sir.

10          THE COURT:  The other question then is regarding your

11     ability to consider something less than the death penalty

12     such as life without parole.  Are you so opposed to anything

13     less than death for a capital offense that your views would

14     interfere with the performance of your duties as a juror?

15          MR. SMITH:  No, sir.

16          THE COURT:  So you can give fair and equal

17     consideration to both of those punishments?

18          MR. SMITH:  Yes, sir.

19          THE COURT:  You're not predetermined or predisposed

20     to vote for one or the other, that you could hear the

21     evidence, apply the law to the facts and then form a

22     decision after all of those facts have been presented to

23     you?

24          MR. SMITH:  Yes, sir.

25          THE COURT:  Have you read anything about the facts of

1    this case?

2           MR. SMITH:  No, sir.

3           THE COURT:  Do you know anything about the facts of

4    this case other than what these lawyers talked about

5    yesterday in open court?

6           MR. SMITH:  No, sir.

7           THE COURT:  Have you seen anything on television or

8    in the newspaper regarding the proceedings yesterday?

9           MR. SMITH:  No, sir.

10          THE COURT:  State?

11          MS. WILSON:  Nothing.

12          MR. GOGGANS:  No questions.

13          THE COURT:  Thank you, Mr. Smith, if you would please

14   come back at 9:00 o'clock in the morning.  Everette Smith.

15          Mr. Smith, are you working?  Are you employed?

16          MR. SMITH:  Yes, sir.

17          THE COURT:  How are you employed?

18          MR. SMITH:  International Paper.

19          THE COURT:  And what do you for I.P.?

20          MR. SMITH:  Process operator one.

21          THE COURT:  Are you married?

22          MR. SMITH:  Yes, sir.

23          THE COURT:  What is your wife's name?

24          MR. SMITH:  Rhonda Smith.

25          THE COURT:  And is she employed?

1          MR. SMITH:  Yes, sir.

2          THE COURT:  How is she employed?

3          MR. SMITH:  Wal-Mart.

4          THE COURT:  Mr. Smith, I asked you some questions a

5    few minutes ago regarding the death penalty.  I want to ask

6    you those questions again and get your response on the

7    record.  You understand this is a capital murder case?

8          MR. SMITH:  Uh-huh.

9          THE COURT:  That in the event of a conviction the

10   possible punishment would be either life without parole or

11   the death penalty?

12         MR. SMITH:  Uh-huh.

13         THE COURT:  Do you understand that?

14         MR. SMITH:  Uh-huh.

15         THE COURT:  You understand that in order to qualify

16   to serve on this jury you must be able to give fair

17   consideration to both of those possible punishments and then

18   make a recommendation of one of the two to me?

19         MR. SMITH:  Uh-huh.

20         THE COURT:  You understand also, Mr. Smith, that

21   there are people in our society who believe that the death

22   penalty is wrong, that they cannot under any circumstances

23   vote for or recommend the death penalty?

24         MR. SMITH:  Uh-huh.

25         THE COURT:  There are also people in our society who

1    believe the death penalty is the only answer and the only

2    appropriate punishment for an intentional killing in some

3    criminal acts.  You understand those people can't consider

4    anything other than the death penalty such as life without

5    parole?  Do you understand that?

6         MR. SMITH:  Uh-huh.

7         THE COURT:  The questions that I have to ask you are

8    regarding where you are in all of that.  Okay.  The first

9    question is this.  Are you so opposed to the death penalty

10   in a capital case that it would restrict or substantially

11   impair the performance of your duties as a juror?

12        MR. SMITH:  No, sir.

13        THE COURT:  The other question then is regarding

14   your ability to consider something less than the death

15   penalty, such as life without parole.  And the question is

16   are you so opposed to anything less than death for a capital

17   offense that your views would interfere the performance of

18   your duties as a juror?

19        MR. SMITH:  No, sir.

20        THE COURT:  So what you're telling me then, Mr.

21   Smith, is that you can hear the evidence and give fair and

22   equal consideration to both the death penalty and life

23   without parole and then make a recommendation to me of one

24   of those punishments?

25        MR. SMITH:  Yes, sir.

Ann H. Armstrong, RPR

1      THE COURT:  And you will do that at a point in time

2  when all of the evidence is in and after the law is read to

3  you and after you have had the opportunity to apply the law

4  to the facts; is that correct?

5      MR. SMITH:  Yes, sir.

6      THE COURT:  You're not predisposed then at this point

7  in time to favor the death penalty over life without parole

8  or life without parole over the death penalty; in other

9  words, you don't have an opinion at this point in time that

10 one is appropriate over the other one?

11     MR. SMITH:  Right.  No, I don't.

12     THE COURT:  In other words, you have got an open

13 mind, and you can keep that open mind until I tell you it's

14 the appropriate time to make a decision?

15     MR. SMITH:  Yes, sir.

16     THE COURT:  Have you heard anything about the facts

17 of this case?

18     MR. SMITH:  No, sir.

19     THE COURT:  Other than what you heard these lawyers

20 tell you yesterday in open court, do you know anything about

21 the facts of this case?

22     MR. SMITH:  No, sir.

23     THE COURT:  Did you see anything in the newspaper or

24 on television last night regarding the facts of this case?

25     MR. SMITH:  No, sir.

1    THE COURT:  The State?

2    MS. WILSON:  Nothing.

3    MR. GOGGANS:  One question.  Mr. Smith, let me ask

4    you if you know any of these people.  Do you know Lonnie

5    Wilson?

6    MR. SMITH:  No, sir.

7    MR. GOGGANS:  Ernest Collins?

8    MR. SMITH:  No, sir.

9    MR. GOGGANS:  Erin Gillery?

10   MR. SMITH:  No, sir.

11   MR. GOGGANS:  Do you know a Joseph Smith?

12   MR. SMITH:  No, sir.

13   MR. GOGGANS:  Nothing else.

14   THE COURT:  Mr. Smith, we appreciate your time, if

15   you would please be back in the morning at 9:00 o'clock.

16   Betty Sheppard.

17   Ms. Sheppard, are you employed?

18   MS. SHEPPARD:  No.

19   THE COURT:  Are you married?

20   MS. SHEPPARD:  No.

21   THE COURT:  Ms. Sheppard, in the last few years have

22   you been employed?

23   MS. SHEPPARD:  Yes, at Morris Seafood.  It closed

24   down a long time ago.

25   THE COURT:  I remember Morris Seafood.  That was

1  quite awhile back.  I asked you to consider some questions

2  a little while ago regarding the death penalty.  I want to

3  ask you those questions so that we can get your response

4  here on the record, okay?

5          MS. SHEPPARD:  Okay.

6          THE COURT:  You understand this is a capital murder

7  case?

8          MS. SHEPPARD:  Yes.

9          THE COURT:  And that if there is a conviction or if

10  the Defendant is found guilty that there are two possible

11  punishments.  One is the death penalty, and the other is

12  life without parole.  Do you understand that?

13          MS. SHEPPARD:  Yes, sir.

14          THE COURT:  And in order for you to be able to sit

15  and hear the evidence in this case, you must be able to,

16  also be prepared to give fair consideration to both of the

17  punishments; that is, the death penalty and life without

18  parole, that you must then after fair consideration being

19  given to those punishments in the event of a conviction make

20  a recommendation to the Court?

21          MS. SHEPPARD:  Yes.

22          THE COURT:  You know, Ms. Sheppard, there are people

23  in our society who are totally opposed to or against the

24  death penalty?

25          MS. SHEPPARD:  Yes.

Ann H. Armstrong, RPR

1     THE COURT:  There are also people in our society who

2   think that the death penalty is the only proper penalty for

3   an intentional killing, that they can't consider anything

4   other than the death penalty such as life without parole.

5   Do you understand that there are people out there like this?

6     MS. SHEPPARD:  Yes.

7     THE COURT:  What I want to do is try to find out what

8   you think and where you are with all of that.  Okay.  And my

9   question first of all is this.  Are you so opposed or

10  against the death penalty in a capital case that it would

11  restrict or substantially impair your performance as a juror

12  in this case?

13    MS. SHEPPARD:  Yes.

14    THE COURT:  You are opposed to it?

15    MS. SHEPPARD:  Yes.

16    THE COURT:  You cannot consider it under any

17  circumstances?

18    MS. SHEPPARD:  No, sir.

19    THE COURT:  Can you tell me why?

20    MS. SHEPPARD:  I ain't got no reason.

21    THE COURT:  You're just opposed to it?

22    MS. SHEPPARD:  Yes.

23    THE COURT:  If you're chosen to sit on this jury and

24  listen to the facts and listen to the law as I give you the

25  law, do you think that you could follow my instructions and

Ann H. Armstrong, RPR

1   then vote the death penalty?

2         MS. SHEPPARD:  Yes.

3         THE COURT:  You could do that?

4         MS. SHEPPARD:  Yes, I could.

5         THE COURT:  Why could you listen to my instructions

6   and vote the death penalty, but you told me you're opposed

7   to it?

8         MS. SHEPPARD:  I have to go by your rulings.

9         THE COURT:  So if you thought that the death penalty

10  was appropriate in a case, you could vote to recommend it?

11        MS. SHEPPARD:  I don't know.  I don't know.

12        THE COURT:  Well, I guess the question, Ms. Sheppard,

13  is are you opposed to it or are you not opposed to it?

14        MS. SHEPPARD:  I don't know what it is.  I don't

15  understand what you're talking about.

16        THE COURT:  You don't know what the death penalty is?

17        MS. SHEPPARD:  No.

18        THE COURT:  Okay.  The death penalty is a punishment

19  that is imposed upon someone who is convicted of an

20  intentional killing while committing some other type of

21  offense; in this occasion the allegation is an intentional

22  killing during a robbery.  And the death penalty means that

23  if this particular person is found guilty of what the State

24  has accused him of, then they could be sentenced to die

25  themselves.

Ann H. Armstrong, RPR

1      MS. SHEPPARD:  That means to electrocute them or

2  something?

3      THE COURT:  Right.

4      MS. SHEPPARD:  Oh, okay.

5      THE COURT:  Do you believe in that?

6      MS. SHEPPARD:  No, I don't.

7      THE COURT:  You couldn't vote to put somebody to

8  death?

9      MS. SHEPPARD:  Not to death, no way.  I might give

10  them life or something but not no death.

11     THE COURT:  Okay.  All right.  Thank you, ma'am.

12  Anything else?

13     MS. WILSON:  Nothing from the State.

14     MR. GOGGANS:.  Ms. Sheppard, you understand that the

15  law of Alabama does provide for a death penalty?

16     MS. SHEPPARD:  I didn't know that.

17     MR. GOGGANS:  After having been here for a couple of

18  days, do you know now that Alabama does have a death penalty

19  law?

20     MS. SHEPPARD:  I know that now.

21     MR. GOGGANS:  We can probably all think of some kind

22  of law we don't like.  You may not like the death penalty

23  law, but you understand that as a citizen of Dallas County

24  and a citizen of the United States that you've got on

25  obligation to follow whatever the law is?

Ann H. Armstrong, RPR

1      MS. SHEPPARD:  Yes.

2      MR. GOGGANS:  And do you understand that in a

3   criminal case that the judge gives jurors instructions on

4   what the law is and what they have got to do; do you

5   understand that?

6      MS. SHEPPARD:  Yes.

7      MR. GOGGANS:  In a capital case there are -- it would

8   be divided up.  First of all you have a trial to determine

9   whether or not the State has got enough evidence for the

10  jury to say beyond a reasonable doubt that the person is

11  guilty of a capital charge.  Do you understand this?

12     MS. SHEPPARD:  Yes.

13     MR. GOGGANS:  If the State doesn't prove that, you

14  know, the jury may find him not guilty or guilty of

15  something else, and then the jury is done.  But if the State

16  convinces the jury that the person is guilty of the capital

17  murder, then it goes to a second little trial called a

18  penalty trial.  Do you understand that?

19     MS. SHEPPARD:  Yes.

20     MR. GOGGANS:  To determine what the penalty is going

21  to be; do you understand that?

22     MS. SHEPPARD:  Yes.

23     MR. GOGGANS:  Do you also understand that in this

24  penalty trial that just like during the other trial that the

25  judge will tell you what the law is; do you understand that?

Ann H. Armstrong, RPR

1        MS. SHEPPARD:  Yes.

2        MR. GOGGANS:  Do you understand that in telling you

3    what the law is that the judge will tell you, here are some

4    things to consider in determining whether this person should

5    be put to death or sentenced to life without parole.  He'll

6    tell you things called aggravating circumstances that weigh

7    in favor of the death penalty and things called mitigating

8    circumstances that weigh in favor of the sentence of life

9    without parole.  Do you know that?

10        MS. SHEPPARD:  Yes.

11        MR. GOGGANS:.  Now regardless of what you think the

12    law might ought to be, do you think that you could sit on

13    the jury and listen to the evidence and pay attention to

14    whatever evidence you believe and didn't believe and what

15    evidence you think had a lot of weight and a little or no

16    weight and follow the judge's instructions and apply the law

17    as he told you it was to those facts?  Do you think you

18    could do this?

19        MS. SHEPPARD:  I don't think so.

20        MR. GOGGANS:  Nothing else.

21        THE COURT:  Thank you, ma'am.  Ms. Sheppard, would

22    you please take a card from Mr. Kynard there and call that

23    telephone number on that card after 5:00 o'clock today.

24    There will be instructions on that card regarding your jury

25    service for the remainder of the week.  You're excused for

Ann H. Armstrong, RPR

1   this particular case.  We appreciate your time.  Virginia

2   Savage.

3          THE COURT:  My secretary gave me a message that James

4   Morrow's wife has to have surgery.  He wants to be there.

5          MR. GREENE:  The State has no objection to excusing

6   him.

7          MR. GOGGANS:  We don't have any objection either.

8          THE COURT:  Ms. Savage, are you employed?

9          MS. SAVAGE:  Yes, sir.

10          THE COURT:  Where do you work?

11          MS. SAVAGE:  Superior Cleaners.

12          THE COURT:  Okay.  And are you married?

13          MS. SAVAGE:  No, sir.

14          THE COURT:  I asked you some questions out there a

15   little while ago regarding the death penalty and your

16   feelings about the death penalty, and now we need to get

17   your response on the record, okay.  Ms. Savage, this is, of

18   course, a capital murder case.  And the possible punishment

19   for this offense is either the death penalty or life

20   imprisonment without parole.  In order for you to qualify to

21   serve as a juror in this case, you must be able to give both

22   of those sentences fair consideration and make a

23   recommendation to the Court at the appropriate time if there

24   is a conviction.  You must make a recommendation of one of

25   those particular punishments, and you must be able to give

Ann H. Armstrong, RPR

1   both of those punishments fair and equal consideration.

2   There are people in our society who are totally opposed to

3   the death penalty.   There are people in our society who

4   think that the death penalty is the only appropriate

5   punishment for certain criminal acts.   Those people who

6   consider the death penalty the only appropriate punishment

7   can't consider life without parole as an alternative

8   sentence.   I need to ask you the questions that I have

9   asked earlier regarding that, okay?

10         The first question is this.   Are you so opposed to

11   the death penalty in a capital case that it would restrict

12   or substantially impair the performance of your duties as a

13   juror?

14         MS. SAVAGE:   No, I'm not.

15         THE COURT:   The next question then is regarding your

16   ability to consider something less than the death penalty,

17   such as life without parole.   Are you so opposed to anything

18   less than the death penalty for a capital offense?

19         MS. SAVAGE:   No, I'm not.

20         THE COURT:   So that that would not impair your

21   ability to be a fair juror; is that correct?

22         MS. SAVAGE:   That is correct.

23         THE COURT:   You're telling me, Ms. Savage, that you

24   can take the evidence as it's presented to you, take the law

25   as I give that to you, apply the facts of the case to the

1   law, and then you can give both of those particular

2   punishments fair consideration and make a recommendation?

3        MS. SAVAGE:  Yes, sir.

4        THE COURT:  From what you are telling me, I'm

5   assuming then that you are not predisposed in favor of one

6   particular punishment over another at this time?

7        MS. SAVAGE:  No, sir.

8        THE COURT:  You're telling me then that you will keep

9   an open mind, that you will hear all of the evidence, and

10  you will hear all of the law before you make up your mind

11  about what the appropriate punishment should be?

12       MS. SAVAGE:  Yes, sir.

13       THE COURT:  Have you heard anything about the facts

14  of this case?

15       MS. SAVAGE:  Just what I read in the newspaper.

16       THE COURT:  And how long ago did you read that?  Was

17  that when it first happened?

18       MS. SAVAGE:  When it first happened.

19       THE COURT:  Have you read anything else in the paper

20  since that time?

21       MS. SAVAGE:  No, sir.

22       THE COURT:  The things that you read in the

23  newspaper, do you think that what you read is going to

24  affect your ability to be fair and impartial in this case?

25       MS. SAVAGE:  No, sir.

Ann H. Armstrong, RPR

1          THE COURT:  Can you set aside what you've read in the

2     newspaper when it happened and hear the facts of this case

3     and base your verdict simply on those facts that you hear

4     from the witness stand and not the facts or what were the

5     reported facts reported in the newspaper?

6          MS. SAVAGE:  Yes, sir, I can.

7          THE COURT:  All right.  Have you heard anything else

8     about the facts of the case other than what was said in open

9     court yesterday?

10          MS. SAVAGE:  No, sir.

11          THE COURT:  You have not seen anything on the news,

12     on the television?

13          MS. SAVAGE:  No, sir.

14          THE COURT:  Haven't heard anything on the radio?

15          MS. SAVAGE:  No, sir.

16          THE COURT:  Okay.  Any questions?

17          MR. GREENE:  How long have you worked?

18          MS. SAVAGE:  Starting in August of last year.

19          MR. GREENE:  Thank you, ma'am.

20          MS. WILSON:  Going to the death penalty, have you

21     ever given that much thought prior to being called as a

22     juror on this case?

23          MS. SAVAGE:  Not too much.

24          MS. WILSON:  Did you have an open mind about death

25     penalty and life in prison without parole prior to being

1    called yesterday?

2         MS. SAVAGE:  Yes, I did.

3         THE COURT:  Anything else?

4         MR. GOGGANS:  Ms. Savage, what do you remember having

5    read in the newspaper?

6         MS. SAVAGE:  What do I remember reading?

7         MR. GOGGANS:  Do you remember what you read in the

8    newspaper?

9         MS. SAVAGE:  I remember this happened Thanksgiving, I

10   mean the day before Thanksgiving or something like that.

11   And the guy, I remember his name and where he was employed

12   and not too much.  I don't remember too much about it.

13        MR. GOGGANS:  Do you remember if you talked with

14   anybody about what you had read?

15        MS. SAVAGE:  No, I don't.

16        MR. GOGGANS:  Do you remember having any thoughts

17   about it after having read it?

18        MS. SAVAGE:  Not too much.

19        MR. GOGGANS:  Nothing else.

20        THE COURT:  Thank you, Ms. Savage, if you would

21   please be back at 9:00 o'clock in the morning.  Georgett

22   Ruth.

23        Ms. Ruth, are you employed?

24        MS. RUTH:  Yes.

25        THE COURT:  Where do you work?

1    MS. RUTH:  Alabama Department of Public Health in

2  Montgomery.

3    THE COURT:  Are you married?

4    MS. RUTH:  No, sir.

5    THE COURT:  Ms. Ruth, I asked you some questions

6  earlier regarding your opinion and your feelings about the

7  death penalty, and we need to now ask those questions to you

8  and get your response on the record, okay?

9    MS. RUTH:  Okay.

10    THE COURT:  You know, Ms. Ruth, this is a capital

11  murder case?

12    MS. RUTH:  Yes.

13    THE COURT:  And that in the event that the Defendant

14  is found guilty, there are two possible punishments; one is

15  the death penalty, and the other is life without parole in

16  the penitentiary.  In order for you to qualify as a juror,

17  you must be able to give fair consideration to both of those

18  possible punishments if there is a conviction.  And then you

19  must make a recommendation as to one of those punishments to

20  the Court.  There are people in our society who are totally

21  opposed to the death penalty.  They will not support the

22  death penalty as a proper punishment in any circumstance.

23  There are other people in our society who think that the

24  death penalty is the only appropriate punishment for certain

25  criminal acts.  Those people can't consider anything other

Ann H. Armstrong, RPR

1    than the death penalty.  They cannot consider an alternative

2    sentence, such as life without parole.

3         If you're selected as a juror in this case and if you

4    are, if there is a conviction, you will be called upon to

5    give both of those punishments fair consideration and make a

6    recommendation to me.  The questions I have for you are

7    regarding the death penalty and life without parole.  The

8    first question is this.  Are you so opposed to the death

9    penalty in a capital case that it would restrict or

10   substantially impair the performance of your duties as a

11   juror?

12        MS. RUTH:  No, sir.

13        THE COURT:  The other question is regarding your

14   ability to consider something other than the death penalty;

15   that is, life without parole, and that would I guess be

16   something less than the death penalty.  And so I'm going to

17   ask you that question.  Are you so opposed to anything less

18   than the death penalty for a capital case that your views

19   would interfere with the performance of your duties in

20   accordance with the instructions that I give you?

21        MS. RUTH:  No, sir.

22        THE COURT:  So what you're telling me then, Mr. Ruth,

23   is that you can consider both of these alternatives in the

24   event of a conviction, that you can give both of those

25   alternatives fair consideration and that you can make a

1    recommendation to me?

2         MS. RUTH:  Yes, sir.

3         THE COURT:  You're telling me also I'm assuming then

4    that you are not predisposed to one particular punishment

5    over the other?

6         MS. RUTH:  No, sir.

7         THE COURT:  Will you keep an open mind and hear all

8    of the evidence and hear all of the law as I give you the

9    law and then after I have instructed you on the law, will

10   you then at that time be prepared to make a recommendation

11   to the Court?

12        MS. RUTH:  Yes, sir, I will.

13        THE COURT:  All right.  Have you read anything in the

14   paper about this case?

15        MS. RUTH:  No, sir.

16        THE COURT:  When it first happened sometime ago do

17   you recall reading anything in the paper then?

18        MS. RUTH:  No, sir.

19        THE COURT:  Have you heard any conversations at

20   church or any of the other places you may go?  Have you

21   heard any conversation regarding the facts of this case?

22        MS. RUTH:  No, sir.  When it first happened I just

23   heard about some kids that had shot some man, and that's all

24   I heard about it.

25        THE COURT:  When you heard about that, what you did

Ann H. Armstrong, RPR

1    hear or do you think that what you heard at that time, would

2    that cause you to be -- would you be able to set that aside,

3    what you heard at that time, and render a fair and impartial

4    verdict based upon the evidence that comes from the witness

5    stand?

6         MS. RUTH:  Yes.

7         THE COURT:  Do you feel as though any of the things

8    that you have heard in the past are going to make it

9    difficult for you to be fair to both the State and the

10   defense?

11        MS. RUTH:  Say that again.

12        THE COURT:  Do you think that anything that you heard

13   in the past would make it difficult for you to be fair to

14   the State and the defense?

15        MS. RUTH:  No, it wouldn't.

16        THE COURT:  Have you seen anything on the TV or heard

17   anything on the radio yesterday about it?

18        MS. RUTH:  (Shakes head negatively).

19        THE COURT:  Anything from the State?

20        MS. WILSON:  No, sir.

21        MR. GOGGANS:  Ms. Ruth, where was it that you heard

22   something about the case?

23        MS. RUTH:  My friend told me in a phone conversation,

24   you know.

25        MR. GOGGANS:  Do you remember who that was you were

Ann H. Armstrong, RPR

1    talking with?

2          MS. RUTH:  I think it was Mary Davis.

3          MR. GOGGANS:  Nothing else.

4          THE COURT:  Thank you, Ms. Ruth.  If you would please

5    be back at 9:00 o'clock in the morning.  Ora Pritchett.  On

6    the record juror 146 is excused with no objection.

7          Ms. Pritchett, do you work?  Are you employed?

8          MS. PRITCHETT:  No.

9          THE COURT:  Are you retired?

10         MS. PRITCHETT:  Uh-huh.

11         THE COURT:  What did you do prior to your retirement?

12         MS. PRITCHETT:  Housekeeping.

13         THE COURT:  And are you married?

14         MS. PRITCHETT:  Widow.

15         THE COURT:  What was your husband's name?

16         MS. PRITCHETT:  Clarence.

17         THE COURT:  What did Mr. Pritchett do prior to his

18   death?

19         MS. PRITCHETT:  He worked at Miller's.

20         THE COURT:  Ms. Pritchett, I asked you some questions

21   out here in open court, and I'm going to ask these questions

22   again to you and get your response on the record, okay?

23         MS. PRITCHETT:  Okay.

24         THE COURT:  This is a capital murder case as you

25   know, and if the defendant is found guilty, there are two

Ann H. Armstrong, RPR

1    possible punishments.  One is the death penalty, and the
2    other is life imprisonment without parole.  For you to sit
3    as a juror in this case, you must be able to give fair
4    consideration to both the death penalty and life without
5    parole if there is a conviction.  I'm going to ask you some
6    questions about that in just a minute.  But, you know, there
7    are people here in our society who are totally opposed to
8    the death penalty for whatever reason.  They could not vote
9    or recommend the death penalty under any circumstance for
10   any criminal offense.  There are people in our society who
11   believe that the death penalty is the only appropriate
12   punishment and that they couldn't recommend anything other
13   than the death penalty for certain criminal offenses since
14   they would not be capable of considering and recommending
15   the lesser punishment like life without parole.  Do you
16   follow me?

17        MS. PRITCHETT:  Yes.

18        THE COURT:  The questions I have for you are
19   regarding your feelings about the death penalty and life
20   without parole because if you're selected to hear the facts
21   of this case, you've got to be able at the appropriate time
22   to consider both of those punishments and make a
23   recommendation to the Court; you've got to consider those
24   punishments equally, okay?

25        MS. PRITCHETT:  Yes.

1    THE COURT:  The first question I have for you is

2  this.  Are you so totally opposed to the death penalty in a

3  capital case that it would restrict or substantially impair

4  the performance of your duties as a juror?

5    MS. PRITCHETT:  I don't think so.

6    THE COURT:  So you're not opposed to the death

7  penalty?

8    MR. PRITCHETT:  No.

9    THE COURT:  You're not against it?

10    MS. PRITCHETT:  No.

11    THE COURT:  The other question then is this, with

12  regard to considering something other than the death

13  penalty, such as life without parole.  You must be able to

14  give that equal consideration.  Are you so opposed to

15  anything less than death for a capital offense that your

16  views would interfere with the performance of your duties as

17  a juror?

18    MS. PRITCHETT:  No.

19    THE COURT:  So in other words, you can hear the

20  evidence, apply the law to the facts, and you can give fair

21  consideration to both of those possible punishments if there

22  is a conviction?

23    MS. PRITCHETT:  Yes.

24    THE COURT:  You can give fair consideration to the

25  death penalty and to life without parole; is that correct?

1    MS. PRITCHETT:  I believe so.

2    THE COURT:  What you're telling me is that you don't

3  lean toward one over the other?

4    MS. PRITCHETT:  Well, if it's necessary, life without

5  parole would be a little better than the electric chair.

6    THE COURT:  Well, sure.  But what I'm saying is can

7  you give fair consideration to both of those possibilities

8  based upon the facts and the evidence?  In other words,

9  you're not predetermined or predisposed to one over the

10  other?  Could you hear the facts and take the law as I give

11  you the law and make the appropriate judgment based on that

12  law and the facts?

13    MS. PRITCHETT:  I believe so.

14    THE COURT:  Okay.  Ms. Pritchett, have you heard

15  anything about the facts of this case other than what was

16  told to you in open court yesterday by the lawyers?

17    MS. PRITCHETT:  No.

18    THE COURT:  Have you seen anything on television

19  about this case, read anything in the newspaper?

20    MS. PRITCHETT:  I haven't read the paper today.

21    THE COURT:  What about back when this thing first

22  happened?

23    MS. PRITCHETT:  I read it.  I saw it on the news.

24    THE COURT:  You read it then and saw it on the news?

25    MS. PRITCHETT:  Uh-huh.

399

1    THE COURT:  Do you think that what you read back then

2  is going to be something that you can't set aside and listen

3  to the evidence as it comes from the witness stand and then

4  give both the State and the defense a fair and impartial

5  trial?

6    MS. PRITCHETT:  I really have done forgot what I

7  read.

8    THE COURT:  So that's not going to affect you at all?

9    MS. PRITCHETT:  It wouldn't bother me at all.  I

10  don't even remember what it was.

11    THE COURT:  Thank you, ma'am.  Anything else?

12    MS. WILSON:  I have a couple questions.  Have you

13  given much thought to your feelings about the death penalty

14  prior to yesterday?

15    MS. PRITCHETT:  No.

16    MS. WILSON:  Did you have an opinion about the death

17  penalty prior to realizing yesterday that you had been

18  summoned for a capital murder case?

19    MS. PRITCHETT:  I really didn't even think about it

20  last night when I got home.

21    MS. WILSON:  I'm talking about before then though.

22  Have you ever talked to anybody, expressed an opinion about

23  your feelings about the death penalty or life without

24  parole?

25    MS. PRITCHETT:  No.

Ann H. Armstrong, RPR

1          MS. WILSON:  Do you know Brian Pritchett?  Is he kin

2     to you?

3          MS. PRITCHETT:   No, I married a Pritchett.

4          THE COURT:  You married him.  Do you know if he's kin

5     to the Lawrence Pritchett?

6          MS. PRITCHETT:  Not that I know of.  There are two

7     sets of Pritchetts here.

8          MS. WILSON:  I think that's all.

9          MR. GOGGANS:  No questions.

10         THE COURT:  Thank you, ma'am, if you would please be

11    back at 9:00 o'clock in the morning.  Bruce Posey.

12         Mr. Posey, are you employed?

13         MR. POSEY:  Yes, sir.

14         THE COURT:  How are you employed?

15         MR. POSEY:  I work for Smith Bakery.

16         THE COURT:  What do you do for them?

17         MR. POSEY:  I'm sales representative.

18         THE COURT:  Are you married?

19         MR. POSEY:  Yes, sir.

20         THE COURT:  What is your wife's name?

21         MR. POSEY:  Bertha.

22         THE COURT:  And is she employed?

23         MR. POSEY:  Yes.

24         THE COURT:  How is she employed?

25         MR. POSEY:  She works at Phillies Cigar Company.

Ann H. Armstrong, RPR

1    THE COURT:  I asked you some questions a little while

2    ago about the death penalty.  I need to ask you those

3    questions here and get your response on the record.  First

4    of all this is a capital murder case as you know.  The

5    possible punishment for this offense in the event of a

6    conviction is either the death penalty or life imprisonment

7    without parole.

8    MR. POSEY:  Right.

9    THE COURT:  If you serve as a juror in this case, you

10   have got to be able to give both of those possible sentences

11   or punishments fair and equal consideration and then make a

12   recommendation to the Court.  There are people in our

13   society who are totally opposed to the death penalty,

14   couldn't recommend it under any circumstances and don't

15   think it's an appropriate punishment for any criminal

16   offense.  There are those who think that the death penalty

17   is the only appropriate punishment for certain criminal

18   offenses, and they can't consider anything other than that

19   and would not and could not consider a lesser sentence such

20   as life imprisonment without parole.

21   In order for you to be able to serve as a juror in

22   this case you have got to give both of those possibilities

23   fair and equal consideration and then make a recommendation

24   to me.  So the question I have for you is this.  First are

25   you so opposed to the death penalty in a capital case that

1  it would restrict or substantially impair the performance of

2  your duties as a juror?

3      MR. POSEY:  No, it wouldn't.

4      THE COURT:  The other question I have for you is

5  regarding your ability to consider something other than the

6  death penalty, such as life without parole.  Are you so

7  opposed to anything less than death for a capital offense?

8      MR. POSEY:  No, not really -- I mean --

9      THE COURT:  Let me finish it.  Are you so opposed to

10  anything less than the death penalty for a capital offense

11  that those views would interfere with your ability to

12  perform your duties as a juror?

13      MR. POSEY:  No, sir.

14      THE COURT:  So what you're telling me is that you can

15  give fair and equal consideration to both of those

16  particular punishments, that you're not predetermined or

17  predisposed to one over the other?

18      MR. POSEY:  No, sir.

19      THE COURT:  You're telling me that you would listen

20  to the facts of the case, apply the law as I give you the

21  law to be to those facts and then at the appropriate time

22  make an appropriate recommendation to the Court?

23      MR. POSEY:  Yes, sir.

24      THE COURT:  Have you read anything about this case?

25      MR. POSEY:  Not recently.

Ann H. Armstrong, RPR

1        THE COURT:  Have you read something about it back

2   when it happened?

3        MR. POSEY:  Yeah, when it first came in the paper and

4   I seen a little bit on TV, but other than that --

5        THE COURT:  WHen you say you saw something on TV, was

6   that back then?

7        MR. POSEY:  Yeah, back then.

8        THE COURT:  You have not seen anything or heard

9   anything recently within the last couple of days?

10        MR. POSEY:  No, sir.

11        THE COURT:  Do you think that what you have heard and

12   what you saw back then would have any affect on your ability

13   to hear the facts of this case at this time?

14        MR. POSEY:  No, sir.

15        THE COURT:  You don't think that what you heard back

16   then would impact your ability to be fair and impartial, to

17   render a fair and impartial verdict, fair to the State or

18   fair to the defense?

19        MR. POSEY:  No, sir.

20        THE COURT:  Because you are supposed to go by the

21   facts as presented.  All right, sir.  Anything else?

22        MS. WILSON:  Nothing from the State.

23        MR. GOGGANS:  Mr. Posey, do you remember what you

24   read in the paper back then?

25        MR. POSEY:  No, sir.  It's been so long.

1      MR. GOGGANS:  You don't remember anything about what

2   you saw on TV?

3      MR. POSEY:  I mean I just remember that, you know, it

4   was the three together, you know.  And, you know, that's

5   all, you know, other than that.  I don't really know, you

6   know, the details as far as anything else.

7      MR. GOGGANS:  Did you form any impression or have any

8   thoughts about it at that time?

9      MR. POSEY:  Well, probably when it first happened,

10  you know, you kind of say, well, you know, he was helping

11  them out, and then it turned out to be something tragic, you

12  know.  But, you know, basically you do that anyway the first

13  time you hear anything.

14     MR. GOGGANS:  Awhile ago when Judge Jones was asking

15  you some questions, I think you said not really, and then he

16  said wait a minute, and then he completed his question.

17  When you said not really, were you going to say anything

18  else?

19     MR. POSEY:  Well, I would have to go back to what the

20  question was.

21     MR. GOGGANS:  Okay.  He was asking whether or not you

22  -- it was along the lines of the question of whether you

23  might fall in the group of people who thought that if there

24  was an intentional killing in the course of some other

25  felony, like a robbery, whether the death penalty would be

1   the only appropriate penalty?

2           MR. POSEY:  Well, I will give you an example.

3           THE COURT:  That wasn't the question.

4           MR. GOGGANS:  Well, I will rephrase the question.

5           THE COURT:  But I don't want you to tell the witness

6   what I said because that's not what I said.  That's what you

7   think I said.  If you want me to ask the question again, I

8   will be glad to do that.

9           MR. GOGGANS:  I was trying to tell him at a point in

10  time when he said not really.

11          THE COURT:  Do you want me to ask the question again?

12          MR. GOGGANS:  I understood his question.  I want to

13  know what he was about to say if he remembers.

14          MR. POSEY:  I don't really remember right off hand

15  what, you know, what the exact question was.

16          MR. GOGGANS:  I understood Judge Jones' question.  I

17  understood his question, but I thought that before he

18  completed the question you were about to say something other

19  than your answer after he completed it.

20          MR. POSEY:  Well, the only thing I can think of that

21  I was going to say was, you know, I've been on two trials

22  sort of like this.  And on the last one, you know, I mean,

23  as of yet I still think the guy was guilty, but you have to

24  go by the facts that were presented.  And in this case you

25  cannot go by whether you think he was guilty.  You have to

1   go by what the facts are, and, you know, that don't really

2   -- you know, to me that don't really sway my opinion one way

3   or the other, just, you know, looking at the facts and how

4   they are presented.  Then you have to make a judgment on the

5   facts that's there.

6          MR. GOGGANS:   Okay.  You were about to give me an

7   example.

8          MR. POSEY:  That was the example I was going to give

9   you just from prior experience, you know, on different

10  trials like that.

11         MR. GOGGANS:  I understood your question.  I

12  understood his answer.  I just wanted to know what he was

13  going to say before you answered the question.

14         MR. POSEY:  I thought the Judge was already finished

15  with the question.  That's the reason I started the answer.

16         THE COURT:  Mr. Posey, thank you very much.  Any

17  questions from the State?

18         MR. POSEY:  None.

19         THE COURT:  We would appreciate it if you would

20  please be back at 9:00 clock in the morning.  Charlotte

21  Pickering.

22         Ms. Pickering, I'm going to ask you some questions

23  for the record.  Okay.  First of all are you employed?

24         MS. PICKERING:  Yes, I am.

25         THE COURT:  And tell us how are you employed?

1          MS. PICKERING:  I work for Dr. Earl Anderson who is a

2     dentist.

3          THE COURT:  And what do you for him?

4          MS. PICKERING:  Office manager.

5          THE COURT:  And are you married?

6          MS. PICKERING:  Yes, I am.

7          THE COURT:  What is your husband's name?

8          MS. PICKERING:  Lee Pickering.

9          THE COURT:  And his employment?

10          MS. PICKERING:  He works for Lance, Incorporated.

11          THE COURT:  A little while ago I asked you some

12     questions out in open court.  I need to get that response on

13     the record.  Okay.  You understand this is a capital murder

14     case, that the two possible penalties for this offense in

15     the event there is a conviction; one is the death penalty,

16     and the other is life imprisonment without parole.  In order

17     to qualify as a juror in this case, you have got to be able

18     to give a fair consideration at the appropriate time to both

19     of those possible punishments, life in prison without parole

20     and the death penalty.  There are people in our society who

21     are totally opposed to the death penalty, cannot consider it

22     and recommend it under any circumstances for any criminal

23     offense.  There are people in our society who believe that

24     the death penalty is the only appropriate and proper

25     punishment for conviction of certain criminal offenses.

Ann H. Armstrong, RPR

1    Those people cannot even consider anything less than the

2    death penalty such as life without parole.  So the question

3    that I have for you regarding the death penalty and your

4    ability to consider something other than the death penalty

5    is this.  First, are you so opposed to the death penalty in

6    a capital case that it would restrict or substantially

7    impair the performance of your duties as a juror?

8         MS. PICKERING:  Well, I have mixed emotions about the

9    death penalty.  You know, my feelings are that if it was

10   like that person killed that person with a gun or however

11   right then and right there and they knew all along they were

12   going to kill that person, then I would have to say yes, I

13   believe in the death penalty for that particular reason.

14        THE COURT:  So what you're saying is it depends on

15   the facts?

16        MS. PICKERING:  Yes.

17        THE COURT:  And if the facts are such that in your

18   opinion based upon the facts and the law as the Court reads

19   to you or give to you the law, if you feel it's appropriate,

20   you can then consider and then recommend the death penalty?

21        MS. PICKERING:  Uh-huh.

22        THE COURT:  You can also think of scenarios where the

23   death penalty may not be appropriate in your mind?

24        MS. PICKERING:  Exactly.

25        THE COURT:  The other question then is this, and this

1   really pertains to your ability to consider something other

2   than the death penalty, such as life without parole.  Are

3   you so opposed to anything less than death for a capital

4   offense that those views would interfere with the

5   performance of your duties in accordance with the

6   instructions that I give to you?

7           MS. PICKERING:  No.

8           THE COURT:  So what you're saying is you can take the

9   facts of this case, take the law as the Court gives you the

10  law and then at the appropriate time make a fair

11  consideration and recommend to this Court as to those

12  punishments?

13          MS. PICKERING:  I would hope I could.

14          THE COURT:  Are you telling me that you at this point

15  in time are not predisposed to one punishment over the

16  other?

17          MS. PICKERING:  Right.

18          THE COURT:  So that at this point in time each of

19  those particular punishments are punishments that you could

20  give fair consideration to; one is not something that you

21  consider more appropriate than the other one?

22          MS. PICKERING:  That's true.

23          THE COURT:  Okay.  Based upon the facts is what you

24  would base your particular decision on?

25          MS. PICKERING:  Exactly.

1        THE COURT:  Have you read anything about the facts of

2  this case?

3        MS. PICKERING:  No, I haven't.

4        THE COURT:  Did you read anything about the facts of

5  this case back when it first happened?

6        MS. PICKERING:  I don't know, no.

7        THE COURT:  Did you engage in any conversations any

8  time before yesterday or yesterday with anyone regarding the

9  facts of this case?

10       MS. PICKERING:  No.

11       THE COURT:  Did you see anything on the news

12  yesterday?

13       MS. PICKERING:  No.

14       THE COURT:  Hear anything on the radio?

15       MS. PICKERING:  No.

16       THE COURT:  Did you see anything in the newspaper?

17       MS. PICKERING:  No.

18       MS. WILSON:  No questions.

19       MR. GOGGANS:  No questions.

20       THE COURT:  We'll see you at 9:00 o'clock in the

21  morning.  Wanda Perkins.

22       Ms. Perkins, are you employed?

23       MS. PERKINS:  Yes.

24       THE COURT:  Where do you work?

25       MS. PERKINS:  Eastside Cab Company.

1        THE COURT:  And what do you do there?

2        MS. PERKINS:  Dispatcher.

3        THE COURT:  Are you married?

4        MS. PERKINS:  No.

5        THE COURT:  Ms. Perkins, I asked you some questions a

6   little while ago to consider, and now I need to ask you

7   those questions and get your response on the record.  You

8   understand, Ms. Perkins, this is a capital murder case?

9        MS. PERKINS:  Yes.

10       THE COURT:  That in the event of a conviction in this

11  case or in the event the defendant is found guilty, there

12  are two possible punishments.  One is the death penalty, and

13  one is life without parole.  In order for you to be

14  considered as a juror in this case to qualify to serve as a

15  juror, you must be able at the appropriate time to give fair

16  consideration to those two penalties in the event of a

17  conviction.  You must be able to give fair consideration to

18  both the death penalty and life imprisonment without parole

19  and then make a recommendation to the Court.

20       There are people in our society who are totally

21  opposed to the death penalty.  They wouldn't consider the

22  death penalty or recommend the death penalty under any

23  circumstances.  There are people in our society who believe

24  that the death penalty is the only proper and appropriate

25  penalty for certain criminal acts.  And they could not

1   consider any other punishment other than the death penalty

2   such as life imprisonment without parole.

3           The questions that I have to ask you are designed to

4   get your opinion or your feelings regarding those two

5   punishments.  The first one is this.  Are you so opposed to

6   the death penalty in a capital case that it would restrict

7   or substantially impair the performance of your duties as a

8   juror?

9           MS. PERKINS:  No.

10          THE COURT:  You're not opposed to the death penalty?

11          MS. PERKINS:  No.

12          THE COURT:  The next question then is regarding your

13  ability to consider something other than the death penalty,

14  such as life without parole.  Are you so opposed to anything

15  less than the death penalty for a capital offense that your

16  views would interfere with the performance of your duties as

17  a juror?

18          MS. PERKINS:  Opposed less?

19          THE COURT:  Ma'am?

20          MS. PERKINS:  You say opposed less than?

21          THE COURT:  Do you understand the question?

22          MS. PERKINS:  No.

23          THE COURT:  Are you able to consider something other

24  than the death penalty as an appropriate sentence?

25          MS. PERKINS:  Yes.

Ann H. Armstrong, RPR

1          THE COURT:  Such as life without parole?

2          MS. PERKINS:  Yes.

3          THE COURT:  So you're telling me that you could

4    consider equally --

5          MS. PERKINS:  Yes.

6          THE COURT:  -- both the death penalty and the penalty

7    of life without parole?

8          MS. PERKINS:  Yes.

9          THE COURT:  That you're not predisposed to favor one

10   over the other?

11         MS. PERKINS:  No.

12         THE COURT:  You're telling me that you could hear the

13   evidence and hear the law as I give you the law, apply the

14   law to the facts and then at the appropriate time consider

15   both of those punishments and make a recommendation to the

16   Court?

17         MS. PERKINS:  Yes.

18         THE COURT:  Is that correct?

19         MS. PERKINS:  Yes.

20         THE COURT:  Have you heard anything about the facts

21   of this case?

22         MS. PERKINS:  No.

23         THE COURT:  Did you hear anything about the facts of

24   the case back when it first happened?

25         MS. PERKINS:  I just heard about it that, you know,

1   something had happened, you know.  That's all I heard.

2        THE COURT:  Did you read that in the paper, or did

3   somebody tell you about it?

4        MS. PERKINS:  I just heard it; somebody just said it.

5        THE COURT:  Do you think that what you heard back

6   then would affect you now in your ability to be fair and

7   impartial to the State and to the Defendant?

8        MS. PERKINS:  No.

9        THE COURT:  Do you think you can hear the facts of

10  this case as the facts come from the witness stand and then

11  render a fair and impartial verdict setting aside anything

12  that you may have already heard about the case?

13       MS. PERKINS:  Yes, sir.

14       THE COURT:  Did you see anything on television about

15  the case yesterday?

16       MS. PERKINS:  No.

17       THE COURT:  Read anything about it in the newspaper

18  yesterday?

19       MS. PERKINS:  No, sir.

20       THE COURT:  Did you hear anything on the radio?

21       MS. PERKINS:  No.

22       THE COURT:  Other than the facts that the lawyers

23  told you about yesterday and what you may have heard long

24  ago, is there anything else that you have heard or know

25  about this case?

415

1        MS. PERKINS:  No.

2        THE COURT:  Okay.  Anything from the State?

3        MS. WILSON:  Ms. Perkins, I think you indicated

4    earlier that your uncle had been involved in some type of

5    homicide.  Who was that?

6        MS. PERKINS:  William Rudolph.

7        THE COURT:  Was that from our area?

8        MS. PERKINS:  From here.

9        THE COURT:  Defense?

10        MR. GOGGANS:  No questions.

11        THE COURT:  Thank you, Ms. Perkins, would you please

12    be back at 9:00 o'clock in the morning.  William Patrick.

13        Are you employed?

14        MR. PATRICK:  Yes.

15        THE COURT:  Where do you work?

16        MR. PATRICK:  City of Selma and also Thacker Paint.

17        THE COURT:  Are you married?

18        MR. PATRICK:  Yes, sir.

19        THE COURT:  Your wife's name?

20        MR. PATRICK:  Jackie A. Patrick.

21        THE COURT:  Is she working?

22        MR. PATRICK:  Yes, sir.

23        THE COURT:  Where does she work?

24        MR. PATRICK:  City of Selma School System.

25        THE COURT:  Okay.  Is she a teacher?

Ann H. Armstrong, RPR

1          MR. PATRICK:  No, sir, she works in the cafeteria.

2          THE COURT:  Mr. Patrick, I asked you some questions

3     earlier and asked you to consider those questions.  And now

4     I need to get your response to those questions on the

5     record.  Okay.  This is a capital murder case.  And as you

6     know, if there is a conviction in this case, there are two

7     possible punishments; one is life without parole, and the

8     other is the death penalty.  In order for you to hear this

9     evidence and be considered as a juror in this case, you must

10    be able to give fair and equal consideration to both of

11    those possible punishments.  You must be able to fairly

12    consider and then recommend the death penalty, and you must

13    be able to fairly consider and then recommend life without

14    parole at the appropriate time.  There are people in our

15    society who are so opposed to the death penalty.  There is

16    also a segment of our society who believes the death penalty

17    is the only appropriate and proper punishment for a

18    particular criminal offense.  They can't consider anything

19    less than the death penalty as appropriate punishment such

20    as life without parole.  You must be able to fairly consider

21    both of those alternatives in order to qualify as a juror in

22    this case.  And I'm going to ask you those questions

23    regarding how you feel again.

24         First of all, are you so opposed to the death penalty

25    in a capital case that it would restrict our substantially

417

1   impair the performance of your duties as a juror?

2        MR. PATRICK:  No, Your Honor.

3        THE COURT:  The other question then is regarding your

4   ability to consider something other than the death penalty,

5   such as life without parole.  That question is are you so

6   opposed to anything less than death for a capital offense

7   that your views would interfere with the performance of your

8   duties in accordance with the instructions that I give to

9   you?  Do you understand that question?  In other words, are

10  you so opposed to or are you a member of that segment of

11  society who thinks that death is the only alternative in a

12  particular case and you couldn't give fair consideration to

13  a lesser sentence such as life without parole?

14       MR. PATRICK:  It's all according to how severe the

15  crime was.

16       THE COURT:  From what you're saying is it would

17  depend upon the facts of the case?

18       MR. PATRICK:  Right.

19       THE COURT:  You're not predisposed to one of those

20  punishments over the other at this time?

21       MR. PATRICK:  No.  Can I ask a question?  Life

22  without parole, does that mean that it would never be

23  changed, where it would possibly be life without the

24  possibility of parole?

25       THE COURT:  You have to ask the legislature about

Ann H. Armstrong, RPR

418

1    that.  But right now as it stands life without parole means

2    life without parole.  And death means just what it says.

3    And the question I have for you is are you a member of that

4    segment of society that is opposed to the death penalty and

5    you can't consider the death penalty as an appropriate

6    punishment; your answer to that question is no?

7           MR. PATRICK:  Right.

8           THE COURT:  The other question that I have for you is

9    are a member of that segment of society who thinks that the

10   death penalty is the only appropriate punishment in a

11   capital case and that you could not consider life without

12   parole as an alternate sentence?

13          MR. PATRICK:   What's the difference in capital

14   murder and murder in the first degree?

15          THE COURT:  The difference for you at this time is

16   that if you find the Defendant guilty of something less than

17   capital punishment, capital murder, your job is finished.

18   If you as a juror find the defendant guilty of a capital

19   offense, then this trial moves into a second phase or a

20   second trial, at which time you will hear other evidence,

21   other law and evidence regarding the mitigation of the death

22   penalty and evidence in aggravating circumstances to support

23   the death penalty.  You would be asked to consider a set of

24   facts and then apply the law to the facts and then make a

25   recommendation to the Court as to whether or not you think

Ann H. Armstrong, RPR

1    that the death penalty or life without parole is

2    appropriate.  If it's a simple murder, then you don't have

3    to consider anything.  Your job is done.  So let me back up

4    and ask you this.  Can you give a fair consideration at the

5    appropriate time if there is a conviction for a capital

6    offense in this case?  Can you give fair consideration to

7    both life without parole as a possible punishment and the

8    death penalty?

9          MR. PATRICK:  I feel like I can.

10         THE COURT:  Do you feel as though you can wait until

11   you've heard all of the facts and wait until you have heard

12   the law as I give you the law and instruct you on what the

13   law is?  Do you think you can wait until that time to make

14   your decision as to the appropriate punishment, or do you

15   feel at this time you're predisposed to one over the other?

16         MR. PATRICK:  It depends on what the facts are.

17   Depending on what the facts are is what really depends on

18   which way I would lean.  Like I said, you know, to me it's

19   all according to, you know, the circumstances.

20         THE COURT:  Let me ask you this.  Knowing that this

21   is a two phased trial, in the event of a capital conviction,

22   knowing that you would first be called upon to decide the

23   guilt or innocence, if you decide that the Defendant is

24   guilty of capital murder, the second phase which is the

25   penalty phase, do you feel as though if you found the

Ann H. Armstrong, RPR

1    Defendant guilty of a capital offense -- do you feel as

2    though you would be predisposed at this point in time before

3    you heard the penalty phase, or do you feel as though you

4    would able to still wait and give fair and equal

5    consideration to the penalties throughout that penalty phase

6    before you made your decision?

7         MR. PATRICK:  I think I could be fair.

8         THE COURT:  Have you heard anything about the facts

9    of this case other than what the lawyers said yesterday in

10   court?

11        MR. PATRICK:  Other than what we heard in court, no.

12        THE COURT:  Do you remember reading anything about

13   the facts of this back when the case was alleged to have

14   taken place?

15        MR. PATRICK:  No, sir.

16        THE COURT:  Have you had any conversation with any

17   people at work about the facts of this case?

18        MR. PATRICK:  No, sir.

19        THE COURT:  Did you hear anything on the radio, see

20   anything on television or read anything in the paper

21   yesterday?

22        MR. PATRICK:  No.

23        THE COURT:  The State may have some questions.

24        MR. GREENE:  No questions.

25        MR. GOGGANS:  I don't have any questions.

Ann H. Armstrong, RPR

1    THE COURT:  Thank you, sir.  We'll see you here at

2    9:00 o'clock in the morning.  Betty Parnell.

3        If you would please have a seat.  Ms. Parnell, are

4    you employed?

5        MS. PARNELL:  Yes.

6        THE COURT:  How do you work?

7        MS. PARNELL:  With American Candy.

8        THE COURT:  Are you married?

9        MS. PARNELL:  No.

10       THE COURT:  Ms. Parnell, I asked you some questions

11   out there in open court a little bit ago to ask you to

12   consider those questions.  And now I'm going to ask those

13   questions to you so we can get your response on the record.

14   Ms. Parnell, you understand this is a capital murder case?

15       MS. PARNELL:  Yes.

16       THE COURT:  Do you understand that if there is a

17   conviction or if the Defendant is found guilty, that there

18   are two possible punishments for this offense?

19       MS. PARNELL:  Yes.

20       THE COURT:  One is the death penalty, and the other

21   is life imprisonment without parole.

22       MS. PARNELL:  Yes.

23       THE COURT:  In order for you to quality to serve as a

24   juror in this case, you must be able to give both the death

25   penalty and life without parole fair consideration and make

Ann H. Armstrong, RPR

1   a recommendation to the Court at the appropriate time; do

2   you understand that?

3        MS. PARNELL:  Yes.

4        THE COURT:  Ms. Parnell, there are people in our

5   society who are totally opposed to the death penalty under

6   any circumstance.  They cannot vote to recommend it for any

7   criminal offense.  There are people in our society who

8   believe that the death penalty is the only appropriate

9   punishment for certain criminal violations.  They cannot

10   consider anything less than the death penalty such as life

11   without parole.  And the questions I have for you are

12   designed to determine what you think about all of this.

13   Okay.  The first question is easy.  Are you so opposed to

14   the death penalty in a capital case that it would restrict

15   or substantially impair your ability to serve as a juror in

16   this case?  Do you understand that question?  Are you

17   against the death penalty so much that you can't discharge

18   your duties as a juror?

19        MS. PARNELL:  I really -- you know, I feel like if he

20   took his life for nothing, you know, that what I feel, he

21   should get the death sentence, you know.

22        THE COURT:  Well, do you know anything about the

23   facts of this case other than what was said to you

24   yesterday?

25        MS. PARNELL:  No, I don't nothing about it.  I don't;

1    no, I ain't heard nothing.

2          THE COURT:  Let's back up then because my question to

3    you is this.  First are you opposed to the death penalty?

4    Do you understand what I'm saying?  Are you against it?  Are

5    you for it?

6          MS. PARNELL:  I would say for it, you know, because

7    he took a life, you know.

8          THE COURT:  The next question is this.  You remember

9    I told you that in order to be qualified as a juror you've

10   got to be able to give fair and equal consideration to both

11   the death penalty and the other penalty of life without

12   parole.  Are you opposed to anything less than death?  Are

13   you opposed to considering life imprisonment without parole

14   if the facts and the law dictate that that should be the

15   sentence in your judgment?

16         MS. PARNELL:  If that's -- if they go with that

17   sentence, I will go along with it, you know, in that sense.

18         THE COURT:  So what you're telling me is that you can

19   give both of those alternatives fair consideration?  You can

20   be fair and equally weigh the death penalty and life without

21   parole?

22         MS. PARNELL:  Yeah, both of them, yeah.

23         THE COURT:  Can you give both of them fair

24   consideration; is that what you're telling me?

25         MS. PARNELL:  Well, I really don't understand.  You

Ann H. Armstrong, RPR

 1  know, like I say I've never been on a jury before. See what
 2  I'm saying, I wasn't there, you know. I don't know what
 3  happened, you know, and stuff. But, you know, I don't know
 4  what to tell you. I really don't.
 5          THE COURT: The first thing you can tell me is
 6  whether you are opposed or in favor of the death penalty.
 7  You told me you were in favor of it?
 8          MS. PARNELL: Yes.
 9          THE COURT: The second thing I need to ask you is
10  whether or not you can vote for something other than the
11  death penalty. Can you vote for life without parole if it's
12  appropriate, if it's right, if it's proper?
13          MS. PARNELL: Yeah.
14          THE COURT: You can consider both of them depending
15  upon the facts?
16          MS. PARNELL: Yes, either one.
17          THE COURT: You can listen to the law and the facts
18  and apply the law to the facts; can you do that, follow my
19  instructions?
20          MS. PARNELL: I can follow your instructions.
21          THE COURT: Okay. You have listened to the facts;
22  you have listened to the law. Do you feel as though you
23  lean towards one more than the other, the death penalty
24  versus life without parole? Do you see what I'm saying?
25          MS. PARNELL: I have not heard no more than what was

```
 1   told to me.

 2           THE COURT:  I'm trying to find out how you feel about

 3   the death penalty in your heart.  Do you think you can give

 4   --

 5           MS. PARNELL:  I wouldn't like nobody to take nothing

 6   -- I've got a life of my own, you know, but I can go with,

 7   you know, that parole in prison, you know, for the rest of

 8   his life, you know, whatever, you know, either one, you

 9   know.  It would depend on -- if somebody else told me it's

10   true -- if it's true that he did it, you know, I would say

11   the death penalty, you know.  That's what I feel.

12           THE COURT:  So you could keep --

13           MS. PARNELL:  If it's something else, I'd say give

14   him life without parole.

15           THE COURT:  So you can keep an open mind; is that

16   right?

17           MS. PARNELL:  Yeah.

18           THE COURT:  And you can hear the facts and follow my

19   instructions?

20           MS. PARNELL:  (Nods head affirmatively).

21           THE COURT:  And then you can give both of those

22   alternative punishments fair consideration; is that correct?

23   Do you understand what I'm saying?  You can think about both

24   of the penalties equally; is that right?

25           MS. PARNELL:  Right.
```

Ann H. Armstrong, RPR

426

1        THE COURT:  And you can recommend to me one of them?

2        MS. PARNELL:  Yes.

3        THE COURT:  You don't have any problem with that?

4        MS. PARNELL:  No.

5        THE COURT:  If you think it should be death, then you

6   don't have a problem voting death; is that right?

7        MS. PARNELL:  No.

8        THE COURT:  If it's life without parole, you think

9   that's a right thing to do, you don't have a problem voting

10  life without parole?

11       MS. PARNELL:  No.

12       THE COURT:  Have you read anything about this case?

13       MS. PARNELL:  No.

14       THE COURT:  Have you heard anything about the case

15  other than what was said to you yesterday in open court?

16       MS. PARNELL:  Well, I be at work, you know.  I be

17  passing people, you know.  We go to lunch and stuff, and,

18  you know, people will be talking.  And I just pass by, you

19  know.  I don't stop and have no conversation.

20       THE COURT:  You haven't heard anything?

21       MS. PARNELL:  No.

22       THE COURT:  Seen anything on TV?

23       MS. PARNELL:  No.

24       THE COURT:  Read anything in the paper?

25       MS. PARNELL:  No, I don't hardly read the paper.

Ann H. Armstrong, RPR

1      THE COURT:  Did you hear anything on the radio?

2      MS. PARNELL:  No.

3      THE COURT:  Anything from the State?

4      MS. WILSON:  No.

5      MR. GOGGANS:  Ms. Parnell, let me ask you a few

6    questions to help me understand where we might be on looking

7    at the death penalty and life without parole.  In a capital

8    case before a jury is ever called upon to make a decision

9    about whether somebody should be sentenced to death or

10   whether they are sentenced to life without parole, first

11   there has got to have been a finding by that jury of guilt

12   of capital murder; in other words, guilt of an intentional

13   killing during the course of a robbery.  We are not talking

14   about an accidental killing or a reckless killing or a

15   killing where someone was provoked.  We are talking about an

16   intentional killing.  And beyond that we are talking about

17   an intentional killing during a robbery.  If it was just a

18   plain intentional killing and nothing else, we would be

19   talking about just a regular murder case.  So before you

20   ever get called upon to even do anything, to hear anything,

21   opening statements or hear any evidence or jury instructions

22   or anything on what the sentence should be, you would first

23   have already had to have determined that the person is

24   guilty of a capital offense.  If you didn't do that, if the

25   person is found not guilty or guilty of something else, you

428

```
 1    wouldn't even need to be there.  If you were in a situation
 2    where you and eleven other folks had already found that
 3    whoever this defendant was had intentionally killed
 4    somebody, an unjustified intentional killing during the
 5    course of a robbery and you hear other evidence and hear the
 6    jury instructions, would you think that this person because
 7    he or she had intentionally killed somebody while trying to
 8    rob that that person should get the death penalty?
 9          MS. WILSON:  I'm going to object.
10          THE COURT:  Sustained.
11          MR. GOGGANS:  Ms. Parnell, if you had already
12    concluded, you have no reason to doubt that this person
13    intentionally killed him during a robbery, would you
14    automatically be inclined to lean towards the death penalty?
15          MS. WILSON:  I object.
16          THE COURT:  Sustained.
17          MR. GOGGANS:  You're going to hear -- a jury in this
18    type of proceeding hears evidence.  It hears evidence of
19    reasons the prosecution thinks the person should get the
20    death penalty; then you hear other reasons why the person
21    ought to get life without parole.  The judge will instruct
22    you on how to weigh those.  You have aggravating
23    circumstances that weigh in favor of the death penalty, and
24    you have mitigating circumstances that weigh in favor of the
25    sentence of life without parole.  Would you, Ms. Parnell, as
```

429

1    you're sitting there after having heard everything -- you've

2    heard all of these instructions because you have found that

3    this person intentionally killed somebody during the

4    robbery; in other words, you found him guilty of capital

5    murder.  Would you be able to put aside that personal

6    feeling that you have and that conviction and consider

7    everything and apply that law, or would you still carry that

8    conviction with you and automatically go for the death

9    penalty?

10         MS. PARNELL:  I would go for the death penalty.  You

11   shouldn't take a life.  My point is my son was shot in the

12   head.  He died, you know, but he came back alive; do you see

13   what I'm saying?  They didn't do nothing to the guy that did

14   it, shot my son, you know.  But I feel like, you know, if

15   you take a life, you know, you should give your life.  You

16   can't take nobody's life and give a life.  You cannot give

17   the life back.  He's dead, you know.  You shouldn't do it.

18   You had no reason to.  Do you see what I'm saying?

19         MR. GOGGANS:  You feel pretty strongly about that?

20         MS. PARNELL:  Yeah.

21         MR. GOGGANS:  No other questions.

22         MS. WILSON:  If the Judge told you though it was your

23   duty to listen to all of the evidence and to weigh the two

24   sentences, to consider life without parole as well as the

25   death penalty and to reserve, not to make a decision until

Ann H. Armstrong, RPR

1    you heard all of the evidence -- and there will be a lot of

2    evidence put forth by the defense and by the State.  Could

3    you wait until you heard all of that evidence before you

4    make up your mind as to what you thought the appropriate

5    sentence would be?

6            MS. PARNELL:  Yes, because I have never heard the

7    case.

8            THE COURT:  Thank you, ma'am.  Ms. Parnell, if you

9    would please be back in the morning at 9:00 o'clock.

10           MR. GOGGANS:  I have a motion on Ms. Parnell to

11   exclude her for cause under Morgan versus Illinois and the

12   cases as an automatic death penalty juror, and the sixth,

13   eighth, and fourteenth amendment and Article 1, Section 6 of

14   the State constitution.

15           THE COURT:  Motion will be denied.  I think this

16   juror has said on a number of occasions that she can give

17   fair consideration to both of the possible punishments.  She

18   could keep an open mind to the end.  So let's get both of

19   these panels in, and we'll give the normal spiel.

20           (The following occurred in the presence and hearing

21   of the jury venire:)

22           THE COURT:  Ladies and gentlemen, it has been moving

23   rather slow today.  I apologize for the inconvenience.  We

24   did take 15 minutes for lunch.  The lawyers were real

25   pleased with me about that.  We are going to conclude the

431

1    jury selection process this afternoon and this evening.  We

2    have got a number of people left to voir dire.  We are close

3    to having a sufficient number of qualified jurors to begin

4    our selection process.  I'm going to have to ask you

5    although to bear with me for the remainder of the afternoon.

6    We are going to proceed with individual voir dire in just a

7    few minutes.

8           Yesterday we concluded the general voir dire, and I

9    told you we would be here today to conduct the individual

10   voir dire so that we can ask you individually your feelings

11   and your opinions with regard to capital punishment, the

12   death penalty and the like.  That's what we have been doing

13   here since 8:30 this morning.

14          In Alabama there are two possible penalties for a

15   person who is convicted of a capital offense.  Those

16   penalties are life in prison without the possibility of

17   parole or death.  In Alabama this is a two phased trial in

18   those cases in which the death penalty may be imposed.  The

19   same jury is used for both phases.  The first phase is

20   called the innocent or guilt phase.  In this case, the jury

21   decides whether the State has proven the Defendant guilty of

22   the charged capital offense beyond a reasonable doubt.  In

23   making that decision, the jury cannot consider the

24   consequences of its verdict or any possible sentence.  If

25   the accused is found not guilty of capital murder, the

432

1   proceedings are ended for the jury.  But if the Defendant is

2   found guilty of capital murder, the jury is brought back for

3   a second phase of the trial.  At that time the jury may hear

4   more evidence and will hear legal instructions and arguments

5   of the attorneys.  The jury then recommends to the Court the

6   penalty of either life imprisonment without parole or death.

7       Now in this case the Defendant Matthew Reeves has

8   entered a plea of not guilty and is presumed to be innocent.

9   The State has the burden of proving Matthew Reeves guilty

10  beyond a reasonable doubt.  This is a capital case.  One

11  possibility if guilt of the charged capital offense is

12  established beyond a reasonable doubt is that the death

13  penalty under certain circumstances be given.  Because of

14  that possibility, it is proper for counsel and the Court to

15  ask you at this time certain questions about your views

16  regarding the death penalty.  This inquiry, however, has

17  absolutely no relationship to whether the accused is guilty

18  of the charged capital offense.  Do not conclude merely

19  because an attorney or the Court asks questions about your

20  attitude about the death penalty that this should be taken

21  as any indication whatsoever that they believe the accused

22  to be guilty or presuppose that the finding of guilt will be

23  made.

24      Now ladies and gentlemen the questions that I will

25  ask you to consider in just a few minutes -- I will not

Ann H. Armstrong, RPR

1   require that you respond to these questions at this time.

2   I'm going to ask these questions to you so that you can

3   consider these questions, and then we will take your

4   response up individually in the jury room.  And we will take

5   those responses on the record.  This as you know is a

6   capital case as I already told you.  The possible sentence

7   ranges from life without parole to the death penalty.  In

8   order for you to qualify and serve as a juror in this case,

9   you must be capable of considering each of those particular

10  punishments.  You must be capable of fairly considering both

11  life without parole and the death penalty.

12      Our society has people in it who have different

13  opinions about the death penalty.  There is a segment of our

14  society that believes that the death penalty is wrong.  They

15  are opposed to the death penalty under any circumstance for

16  any reason regardless of the criminal conduct or the

17  criminal violation.  There are other people in our society

18  who believe that the death penalty is the only proper and

19  appropriate punishment for certain criminal conduct.  Those

20  people do not believe that or cannot consider anything other

21  than the death penalty is appropriate punishment.  They do

22  not consider life without parole as an appropriate alternate

23  punishment.  You must be able to consider fairly both of

24  those punishments.  And those are the questions that I will

25  ask you in the jury room.

```
 1            The first question is going to be this.  Are you so
 2    opposed to the death penalty in a capital case that it would
 3    restrict or substantially impair the performance of your
 4    duties as a juror in accordance with the instructions that
 5    are given you and your oath as jurors?  The other question
 6    is this.  Are you so opposed to anything less than death for
 7    a capital offense that your views would interfere with the
 8    performance of your duties and in accordance with the
 9    instructions given you and your oath as jurors?  Now I'm
10    going to ask you to consider those two questions.  You will
11    be called back into the jury room one at the time to give
12    your response to those questions.  Of course, I will
13    rephrase those questions so that you are a little more
14    understandable.  They are confusing and take some thought to
15    answer.  We are going to retire to the jury room and begin
16    the individual voir dire for the afternoon.  We are going to
17    begin with Justin Denmark.  Mr. Denmark, in just a few
18    minutes we are going to ask you to come back in the jury
19    room.  I'm going to ask you to please not discuss the facts
20    of the case among yourselves at this time.  Don't allow
21    anyone to approach you to discuss the facts with you.
22    Hopefully we will be through in just a little while.
23            (The following proceedings occurred in the jury
24    room.)
25            THE COURT:  One thing I meant to do before we took a
```

435

1    break was to go through that second panel.  Here are the

2    ones that are off on the second panel, number 186, Rickey

3    Shelby; number 187, Betty Sheppard; number 196, Ernest Snow;

4    number 199, Maude Stallworth; number 203, Doris Summerlin;

5    number 205, Lisa Surrett; number 213, Jan Walker, number

6    216, Emma Webster.  I believe all of those who the defense

7    has objected to me excluding, their record is reserved,

8    correct?

9         MR. GOGGANS: I believe it is.

10        THE COURT:  Here are the ones that are still on.

11   Number 160, Betty Parnell; 162, William Patrick; 165, Wanda

12   Perkins; 166, Charlotte Pickering; 167, Bruce Posey; 170,

13   Ora Pritchett; 180, Georgett Ruth; 184, Virginia Savage;

14   189, Everette Smith; 191, Gary Smith; 192, Joseph Smith;

15   193, Nannie Smith; 195, Sam Smitherman; 197, Debbie

16   Sorrells; 204, Channie Surles; 210, Patricia Trotter; 217,

17   John Wilkerson; 220, Samuel Williamson, Jr.; 224, Renita

18   Wright; 225, George Yocum.  I have 34 so far.  Justin

19   Denmark.

20        THE COURT:  Mr. Denmark, how are you?

21        MR. DENMARK:  Fine.  How are you?

22        THE COURT:  Mr. Denmark, are you employed?

23        MR. DENMARK:  No, sir, right now I'm in school.

24        THE COURT:  Where are you in school?

25        MR. DENMARK:  Troy State University in Montgomery.

436

1          THE COURT:  Are you married?

2          MR. DENMARK:  No, sir.

3          THE COURT:  Mr. Denmark, I asked you some questions

4    out there a few minutes ago.  I need to get your response on

5    the record.  These questions are designed to get your

6    opinion regarding capital punishment and the death penalty

7    and the like.  As I said out there, this is a capital

8    punishment, capital murder case.  And the punishment in the

9    event of a conviction would be either life imprisonment

10   without parole or the death penalty.  In order for you to

11   qualify for this jury, you've got to be able to equally

12   consider and then make a recommendation as to either life

13   imprisonment without parole or the death penalty.  As I said

14   there are some people who believe that the death penalty is

15   wrong.  They won't consider it and recommend it under any

16   circumstances for any criminal offense.  Some people think

17   that's the only appropriate sentence and cannot consider

18   anything less than the death penalty such as life without

19   parole.  The first question is this.  Are you so opposed to

20   the death penalty in a capital case that it would restrict

21   or substantially impair the performance of your duties as a

22   juror?

23          MR. DENMARK:  No, sir.

24          THE COURT:  The other question is regarding your

25   ability to consider something other than the death penalty,

Ann H. Armstrong, RPR

1  such as life imprisonment without parole.  Are you so

2  opposed to anything less than death for a capital offense

3  that your views would interfere with the performance of your

4  duties as a juror?

5       MR. DENMARK:  No, sir.

6       THE COURT:  So what you're telling me, Mr. Denmark,

7  is that you can hear the facts of the case and at the

8  appropriate time give fair consideration to both the

9  punishment of life imprisonment without parole and the

10  death penalty in the event there is a conviction?

11       MR. DENMARK:  Yes, sir.

12       THE COURT:  You're telling me that you're not

13  predetermined or predisposed to either one of those

14  particular punishments, that you don't weigh one more than

15  the other?

16       MR. DENMARK:  No, sir.

17       THE COURT:  You don't favor one more than the other?

18       MR. DENMARK:  No, sir.

19       THE COURT:  You can keep an open mind throughout

20  these proceedings and then at the appropriate time consider

21  death and life without parole in the event of a conviction

22  and then make that recommendation to the Court?

23       MR. DENMARK:  Yes, sir.

24       THE COURT:  Have you heard anything about the facts

25  of the case other than what we said yesterday in open court?

438

1      MR. DENMARK:  No, sir.

2      THE COURT:  Read anything in the newspaper or about

3  it when it happened?

4      MR. DENMARK:  No, sir.

5      THE COURT:  Have you had any conversation with

6  anybody about this case?

7      MR. DENMARK:  No, sir.

8      THE COURT:  Did you see anything on TV or hear

9  anything on the radio, read anything in the newspaper

10  yesterday?

11      MR. DENMARK:  No, sir.  I saw one thing on the TV

12  this morning when I turned it on, and it just showed a

13  picture of the Defendant walking out.

14      THE COURT:   And did that create an impression in

15  your mind as to the guilt of the Defendant?

16      MR. DENMARK:  No, sir.  It didn't have any words or

17  anything.  He just was walking.  It was a commercial for

18  Channel 8.

19      THE COURT:  And do you think that you will be able to

20  set aside the image that you saw on television this morning,

21  hear the facts of the case as they come to you from the

22  witness stand and base your verdict solely on those facts as

23  they come from the witness stand?

24      MR. DENMARK:  Yes, sir.

25      THE COURT:  You can set aside any image that you may

Ann H. Armstrong, RPR

1  have seen today?

2         MR. DENMARK:  Yes, sir.

3         THE COURT:  All right, sir.  Any questions?

4         MR. GOGGANS:  Mr. Denmark, what are you studying?

5         MR. DENMARK:  General business.

6         MR. GOGGANS:  Nothing else.

7         THE COURT:  Thank you, Mr. Denmark.  We'll see you at

8  9:00 o'clock in the morning.  Cheryl Dixon.

9         I know you, but I'm going to ask these questions

10  anyway, okay?  You are Cheryl Dixon?

11        MS. DIXON:  Right.

12        THE COURT:  And how are you employed?

13        MS. DIXON:  Dr. D. M. Russell, Jr.

14        THE COURT:  And he's a dentist in town, right?

15        MS. DIXON:  Right.

16        THE COURT:  You are married?

17        MS. DIXON:  Correct.

18        THE COURT:  Your husband's name?

19        MS. DIXON:  David Dixon.

20        THE COURT:  Okay.  And how is he employed?

21        MS. DIXON:  International Paper.

22        THE COURT:  What does he do at I.P.?

23        MS. DIXON:  He works in the paper machine.

24        THE COURT:  We asked you some questions a little

25  while ago regarding your feelings about the death penalty,

1   and now I need to get those, get your response on the

2   record, okay?

3        MS. DIXON:  Okay.

4        THE COURT:  I explained to you that this was a

5   capital murder case and that in the event of a conviction

6   the two possible penalties would be death or life

7   imprisonment without parole, and you understood that?

8        MS. DIXON:  (Nods head affirmatively).

9        THE COURT:  Do you also understand that in order to

10  qualify to serve as a juror in this case, you must be able

11  to hear the facts of the case and then at the appropriate

12  time give fair consideration to both the penalties of death

13  and life without parole in the event of a conviction?

14       MS. DIXON:  Yes.

15       THE COURT:  You understand also, do you not, that

16  there are people in our society who believe that the death

17  penalty is wrong; they are opposed to the death penalty and

18  would not consider or recommend it under any circumstances?

19       MS. DIXON:  Yes.

20       THE COURT:  You also understand that there are people

21  who believe that that is the only appropriate and proper

22  punishment for such a criminal offense?

23       MS. DIXON:  Yes.

24       THE COURT:  And you understand that there are certain

25  people who would not and could not consider anything other

441

1    than the death penalty such as life imprisonment without

2    parole?

3            MS. DIXON:  Yes, sir.

4            THE COURT:  The questions that I have for you are

5    designed to see where you are in that segment of society.

6    The first question is this.  Are you so opposed to the death

7    penalty in a capital case that it would substantially impair

8    or restrict the performance of your duties as a juror?

9            MS. DIXON:  No.

10           THE COURT:  The other question is concerning your

11   ability to consider something other than the death penalty,

12   such as life imprisonment without parole.  Are you so

13   opposed to anything less than death for a capital offense

14   that your views would interfere with the performance of your

15   duties as a juror in accordance with the instructions that I

16   give you?

17           MS. DIXON:  No.

18           THE COURT:  So what you're telling me is that you are

19   able to fairly consider both the death penalty and life

20   imprisonment without parole if there is a conviction?

21           MS. DIXON:  Yes.

22           THE COURT:  You're telling me that you're not

23   predisposed to one particular punishment over the other?

24           MS. DIXON:  Right.

25           THE COURT:  Are you telling me then that you can hear

442

1    the evidence in this case and take the law as I give you the

2    law to be, the instructions on what the law is and then at

3    the appropriate time determine whether or not you can make a

4    recommendation of death or life without parole?

5        MS. DIXON:  Yes.

6        THE COURT:  Have you heard anything about the facts

7    of this case since yesterday in open court?

8        MS. DIXON:  No, sir.

9        THE COURT:  Have you read anything about the facts of

10   this case?

11       MS. DIXON:  No, sir.

12       THE COURT:  When this incident occurred some time

13   ago?

14       MS. DIXON:  No, sir.

15       THE COURT:  Have you heard anything on the radio,

16   seen anything on the television or read anything in the

17   paper yesterday or this morning?

18       MS. DIXON:  No, sir.

19       MS. WILSON:  No questions.

20       MR. GOGGANS:  No questions.

21       THE COURT:  Thank you, Ms Dixon, if you would please

22   be back at 9:00 o'clock in the morning.  Patti Driggers.

23       How are you?

24       MS. DRIGGERS:  Fine.

25       THE COURT:  Ms. Driggers, how are you employed?

1       MS. DRIGGERS:  American Candy Company, accounts

2  receivable clerk.

3       THE COURT:  Are you married?

4       MS. DRIGGERS:  Yes.

5       THE COURT:  Husband's name?

6       MS. DRIGGERS:  Mike Driggers.

7       THE COURT:  And is he employed?

8       MS. DRIGGERS:  Yes, with International Paper.

9       THE COURT:  What does he do at I.P.?

10       MS. DRIGGERS:  He's a powerhouse trainer.

11       THE COURT:  Ms. Driggers, we asked you some questions

12  out there a few minutes ago for you to consider.  Now I want

13  to get your response on the record, okay.  First of all you

14  understand this is a capital murder case and that if there

15  is a conviction in the case, the possible punishment would

16  be life without parole or the death penalty; do you

17  understand that?

18       MS. DRIGGERS:  Uh-huh.

19       THE COURT:  And in order for you to qualify as a

20  juror in this case, you must be able to give fair

21  consideration in the event of a conviction to both of those

22  possible punishments, life without parole and the death

23  penalty.  Do you understand that?

24       MS. DRIGGERS:  Uh-huh.

25       THE COURT:  There are people in our society who

444

1    believe that the death penalty is wrong; they are totally

2    opposed to it.  They would not and could not recommend it

3    under any circumstances for any criminal offense.  There are

4    other people in our society who believe that the death

5    penalty is appropriate and proper and that is the only

6    proper and appropriate punishment for certain criminal

7    offenses.  Those people can't consider anything other than

8    the death penalty.  They can't consider life without parole.

9    The question that I have for you or the questions are

10   designed to determine where you are in that spectrum, okay?

11   And the question I have for you first of all is are you so

12   opposed to the death penalty in a capital case that it would

13   restrict or substantially impair the performance of your

14   duties as a juror?

15        MS. DRIGGERS:  No.

16        THE COURT:  The other question then is regarding your

17   ability to consider something other than the death penalty,

18   such as life without parole.  That question is are you so

19   opposed to anything less than death for a capital offense

20   that your views would interfere with the performance of your

21   duties in accordance with the instructions that I give you?

22        MS. DRIGGERS:  No.

23        THE COURT:  So what you're telling me is that you can

24   consider and fairly consider both of the possible

25   punishments, the death penalty and life without parole, in

Ann H. Armstrong, RPR

1    the event of a conviction in the case?  Is that what you're

2    telling me, that you can fairly consider, fairly and equally

3    consider both of these punishments?

4            MS. DRIGGERS:  You are talking about based upon the

5    evidence?

6            THE COURT:  Sure.

7            MS. DRIGGERS:  Yes, I can.

8            THE COURT:  And that you can make an appropriate

9    recommendation based upon the evidence?

10           MS. DRIGGERS:  Yes.

11           THE COURT:  In other words, you're not predisposed

12   at this time to one penalty or the other penalty; you've got

13   to hear the facts and hear the law, and then you can make a

14   fair and equal consideration and recommendation to the

15   Court?

16           MS. DRIGGERS:  Uh-huh.

17           THE COURT:  Have you heard anything about the facts

18   of this case?

19           MS. DRIGGERS:  Not recently, when it first happened.

20           THE COURT:  Did you read something about it back when

21   it was alleged to have taken place?

22           MS. DRIGGERS:  No.  Someone talked to me about it.

23           THE COURT:  Do you remember who talked to you about

24   it?

25           MS. DRIGGERS:  Yes.  I have a friend who is a school

446

1    teacher who knew about it, and she told me about it.

2         THE COURT:  And did she give you a great deal of

3    detail about the case?

4         MS. DRIGGERS:  Basically what has been mentioned in

5    court.

6         THE COURT:  In court?

7         MS. DRIGGERS:  I mean what you've told, those facts.

8         THE COURT:  Based upon the facts or based upon what

9    you were told by this individual, do you think that you can

10   set aside what was said to you at that time and then hear

11   the facts of the case as they come to you from the witness

12   stand and give both the State and the defense a fair and

13   impartial trial?

14        MS. DRIGGERS:  Yes.

15        THE COURT:  You don't feel as though you have been

16   prejudiced by what was told to you?

17        MS. DRIGGERS:  Maybe.

18        THE COURT:  Tell me why you believe you may have been

19   prejudiced by what was told to you.

20        MS. DRIGGERS:  Well, considering the fact that this

21   was a person who was trying to help someone else, and then

22   their life was taken.

23        THE COURT:  At the time you had your conversation

24   with this particular individual, did you form an opinion as

25   to the guilt or the innocence of the Defendant?

Ann H. Armstrong, RPR

1     MS. DRIGGERS:  I guess so.  I would say they were

2  guilty.

3     THE COURT:  And yesterday when you were here in

4  court, I asked the general question and I'll refer back to

5  it.  Do any of you know anything about the facts of this

6  case which would influence your verdict one way or the

7  other?  And let me restate that question to you at this

8  time.  Do you know anything about the facts of this case --

9  and you have told us that you do -- which would influence

10  your verdict one way or the other?

11     MS. DRIGGERS:  Not at this time, no.

12     THE COURT:  Do you have a fixed opinion as to the

13  guilt or the innocence of the defendant at this time which

14  would bias your verdict?

15     MS. DRIGGERS:  No.

16     THE COURT:  So the things that you were told, the

17  things that you heard will not influence your verdict at

18  this time; is that correct?

19     MS. DRIGGERS:  Yes.

20     THE COURT:  Other than what was said to you, have you

21  heard anything else, read anything else about the facts of

22  this case?

23     MS. DRIGGERS:  No.

24     THE COURT:  The State?

25     MR. GREENE:  Do you feel that you can sit on this

Ann H. Armstrong, RPR

1   jury and put aside anything you might have heard prior to

2   coming here and make your decision solely on what the people

3   tell you from the stand under oath?

4           MS. DRIGGERS:  Yes.

5           MR. GREENE:  You feel comfortable with that?

6           MS. DRIGGERS:  Uh-huh.

7           MR. GOGGANS:  Ms. Driggers, who was it that you were

8   talking to about this?

9           MS. DRIGGERS:  I have a friend who is a school

10  teacher.  Her name is Linda Dolbare.  She had heard it on

11  the news, and we were just discussing it.

12          MR. GOGGANS:  Where is she a teacher?

13          MS. DRIGGERS:  AT Eastside Elementary School.

14          MR. GOGGANS:  Do you remember the occasion that y'all

15  were talking?

16          MS. DRIGGERS:  I think it had just happened, and we

17  were just -- we are close friends, and we live across the

18  street from each other.  And we were just discussing what

19  had happened.

20          MR. GOGGANS:  Do you remember if your friend

21  mentioned that she knew anybody involved in this case?

22          MS. DRIGGERS:  She knew the girl, the girl Bam Bam

23  that y'all referred to yesterday.

24          MR. GOGGANS:  Do you remember if she said anything

25  about anybody involved in the case?

                    Ann H. Armstrong, RPR

1       MS. DRIGGERS:  That she was familiar with her, that

2   she knew her.

3       MR. GOGGANS:  Why is it at that time you had an

4   opinion they were guilty?

5       MS. DRIGGERS:  I guess based upon the facts that was

6   presented.

7       MR. GOGGANS:  With your having talked with your

8   friend and earlier having thought based upon what you had

9   heard at that time that the people were guilty, do you have

10   any discomfort sitting as a juror in this case?

11       MS. DRIGGERS:  I might would have.

12       MR. GOGGANS:  Has anything happened between the time

13   that you talked with your friend back whenever it was you

14   talked with her and coming in here on Monday that has

15   changed your mind?

16       MS. DRIGGERS:  No.

17       MR. GOGGANS:  Nothing else.

18       THE COURT:  Changed your mind about what?

19       MR. GOGGANS:  About whether, the opinion of guilt.

20       THE COURT:  Did you understand that question?

21       MR. GOGGANS:  Let me ask that question.  Has anything

22   happened between the time that you talked with your friend

23   about this and your coming into court Monday -- has anything

24   happened during that time that caused you to change your

25   previous opinion that the people were guilty?

1    MS. DRIGGERS:  No, but I still feel like I can listen

2  to it.  I mean I could listen to the facts of the case to

3  make a decision about that.  I mean any time you hear

4  something, it's -- I guess you kind of base an opinion then,

5  you know.

6    MR. GOGGANS:  No other questions.

7    THE COURT:  Well, let me make sure I understand

8  because what you just said was no, nothing has changed your

9  mind about your opinion that the Defendant was guilty.  And

10 I need to clarify with you.  Do you feel as though at this

11 point in time as you sit here that this Defendant is guilty

12 based upon what you heard, based on the conversation you had

13 with your friend?

14   MS. DRIGGERS:  No, I can't say that right now that

15 he's guilty.

16   THE COURT:  Could you explain to me then the answer

17 to the question that Mr. Goggans asked because I'm confused?

18   MS. DRIGGERS:  Maybe I am too.

19   THE COURT:  I need to know if there is any reason why

20 you believe that you can't give both the State and the

21 Defendant a fair and impartial trial in this case?

22   MS. DRIGGERS:  No.

23   THE COURT:  I need to need to know if you have a

24 fixed opinion at this time as to the guilt or the innocence

25 of the Defendant which would bias your verdict?

451

1        MS. DRIGGERS:  No.

2        THE COURT:  The State?

3        MR. GREENE:  Do you understand that the Court would

4    charge you and you're required if you sit as a juror to

5    assume that the Defendant is clothed with the presumption of

6    innocence until some evidence comes from the stand that

7    proves him guilty; do you agree with that?

8        MS. DRIGGERS:  Yes.

9        MR. GREENE:  No other questions.

10       Mr. GOGGANS:  No other questions.

11       THE COURT:  Thank you, ma'am.  Ms. Driggers, would

12   you please wait in my secretary's office for just a couple

13   of minutes.

14       MR. GOGGANS:  Your Honor, the defense moves to excuse

15   Ms. Driggers because based on her relating the conversation

16   she had with her friend who is a school teacher who

17   apparently taught or at least knew through school one of the

18   defendants in the case, she previously said that she had an

19   opinion back whenever it was she talked that the people were

20   guilty.  She was asked if anything had happened to change

21   her mind from whenever that was to coming into court, and I

22   believe she said no.  Now I do acknowledge that she said

23   that she could listen to the facts and make a decision based

24   upon the facts.  However, I think that the -- I would try to

25   be fair, but I think based on her answers, I think the

Ann H. Armstrong, RPR

1    record would reflect there's a problem with it.  And since

2    the Defense is entitled to a fair and impartial jury under

3    the sixth and fourteen amendments and Article 1, Section 6

4    of the State constitution, we move to excuse her for cause.

5         MR. GREENE:  Our position, Your Honor, is that she

6    has expressed I think the same thing that you asked.  Most

7    anybody in Selma or anybody within the area during that

8    time, they would have so many times a knee jerk reaction to

9    the facts.  Well, you know, those dirty guys, they ought to

10   be strung up or something.  It's a far cry from that kind

11   of conversation and facing the business of being a juror and

12   making a decision about the guilt or innocence.  She has

13   explained in depth her understanding of the position that

14   she is in, and the requirement that the Defendant be

15   presumed innocent.  She had no problem make being a decision

16   based solely on what comes to her from the stand.  I think

17   that's been sufficiently covered.  There is no need to

18   excuse her in this case.

19        THE COURT:  I'm going to grant the defense's

20   challenge.  Ms. Driggers can step back in.

21        Ms. Driggers, we are going to give you a card here.

22   Mr. Kynard has a telephone number there.  If you call that

23   number on that card sometime this evening after 5:00

24   o'clock, there will be a message on there regarding your

25   jury service for the remainder of the week.  You're excused

Ann H. Armstrong, RPR

1    from this particular case.  Gerald Dunn.

2         Mr. Dunn, are you employed?

3         MR. DUNN:  Moore Stewart Ford.

4         THE COURT:  And what do you do at Moore Stewart?

5         MR. DUNN:  Used car sales manager.

6         THE COURT:  And are you married?

7         MR. DUNN:  Uh-huh.

8         THE COURT:  Your wife's name?

9         MR. DUNN:  Joan Dunn.

10        THE COURT:  And is she employed?

11        MR. DUNN:  Yes, sir, Four Rivers.

12        THE COURT:  Mr. Dunn, we asked you to consider a

13   couple of questions a few minutes ago regarding the death

14   penalty.  I'm going to ask you those questions again and get

15   your response for the record.  Okay.  This is a capital

16   murder case, and the penalties in the event of a conviction

17   are either the death penalty or life imprisonment without

18   parole.  In order for to you qualify to serve on this jury,

19   you must be able to give fair consideration to both of those

20   penalties in the event of a conviction.  You must be able to

21   give fair consideration not only to the death penalty but to

22   life imprisonment without parole and then at the appropriate

23   time make a recommendation to the Court as to the sentence.

24   There are people in our society who are totally opposed to

25   the death penalty.  They would not vote for or consider the

454

1    death penalty under any circumstances for any criminal

2    offense.   There are other people in our society who believe

3    that the death penalty is the only appropriate penalty for

4    certain criminal offenses, and those people wouldn't

5    consider anything less than the death penalty.   They won't

6    consider life without parole.   You have got to be able to

7    consider both of those possibilities and give fair and equal

8    consideration to both and then make a recommendation to me.

9    And so the questions I have for you are designed to get your

10   opinion regarding these particular matters.

11        First of all, are you so opposed to the death penalty

12   in a capital case that it would restrict or substantially

13   impair the performance of your duties as a juror?

14        MR. DUNN:  No.

15        THE COURT:  The other question is designed to

16   determine if you can consider something other than death

17   penalty such as life without parole.   The question there is

18   are you so opposed to anything less than death for a capital

19   offense that your views would interfere with the performance

20   of your duties in accordance with the instructions that I

21   give you?

22        MR. DUNN:  No.

23        THE COURT:  So what you're telling me then, Mr. Dunn,

24   is that you can consider and give fair consideration to both

25   the death penalty and life without parole as possible

455

1    punishments in this case if there is a conviction?

2         MR. DUNN:  Yes.

3         THE COURT:  And you're telling me then that you're

4    not predisposed or you don't favor one particular punishment

5    over the other?

6         MR. DUNN:  No, sir.

7         THE COURT:  That they are equal in your particular

8    judgment?

9         MR. DUNN:  Yes.

10        THE COURT:  And you're telling me that you can hear

11   all of the evidence.  Apply the law as I give you the law in

12   the case, and at the appropriate time weigh the evidence and

13   then make an appropriate recommendation?

14        MR. DUNN:  Yes.

15        THE COURT:  Mr. Dunn, have you heard anything about

16   the facts of this case?

17        MR. DUNN:  No, sir.

18        THE COURT:  Other than what the lawyers said

19   yesterday?

20        MR. DUNN:  No, sir.

21        THE COURT:  Did you read anything in the paper about

22   the case back when it first happened?

23        MR. DUNN:  I think I did briefly.  I read so much.

24   Like I told you I know the deceased's granddaddy.  I knew

25   him.

1        THE COURT:  And do you feel as though what you knew

2   about and read about the facts of this case -- do you feel

3   as though that would bias your ability or prejudice your

4   ability to render a fair and impartial verdict in this case?

5        MR. DUNN:  No, sir.

6        THE COURT:  What you have heard or what you may have

7   read would not influence your verdict one way or the other?

8        MR. DUNN:  No, sir.

9        THE COURT:  The fact that you have knowledge of the

10  victim in this case -- and tell me again what that

11  connection is.

12       MR. DUNN:  I just know his grandfather.

13       THE COURT:  Would that present a problem for you?

14  Would you be able to set aside that particular relationship

15  and render a fair and impartial verdict based upon the

16  evidence in the case?

17       MR. DUNN:  Definitely so.

18       THE COURT:  Did you hear anything about this case

19  yesterday on the radio or on the TV?

20       MR. DUNN:  No, sir, I did not.

21       THE COURT:  Did you read anything in the newspaper

22  about this case?

23       MR. DUNN:  No, sir.

24       THE COURT:  All right.  The State?

25       MR. GREENE:  No questions.

Ann H. Armstrong, RPR

457

1          MR. GOGGANS:  Mr. Dunn, how is it again that you know

2     the deceased's grandfather?

3          MR. DUNN:  I sold him an automobile.

4          MR. GOGGANS:  Is that the only way you know him?

5          MR. DUNN:  I sold him an automobile.  That's the only

6     way I know him.

7          MR. GOGGANS:  Do you know anything about a lawsuit

8     that was filed against Moore Stewart by Angela Starr or

9     anything about allegations on the repair of her car?

10          MR. DUNN:  No, sir.  I'm not familiar with any

11     lawsuits.

12          MR. GOGGANS:  Nothing else.

13          THE COURT:  Thank you, Mr. Dunn.  If you would please

14     be back in the morning at 9:00 o'clock.  Curtis Fails.

15          Mr. Fails, are you employed?

16          MR. FAILS:  Yes, sir.

17          THE COURT:  Where do you work?

18          MR. FAILS:  Heilig-Meyers Furniture Store.

19          THE COURT:  And are you married?

20          MR. FAILS:  Yes.

21          THE COURT:  What's your wife's name?

22          MR. FAILS:  Joyce.

23          THE COURT:  And how is she employed?

24          MR. FAILS:  Housewife.

25          THE COURT:  She works at home?

Ann H. Armstrong, RPR

458

| | |
|---|---|
| 1 | MR. FAILS: Uh-huh. |
| 2 | THE COURT: Mr. Fails, I asked you some questions a |
| 3 | little while ago about your feeling about the death penalty, |
| 4 | and now we've got to get your response on the record. You |
| 5 | understand, of course, that this is a capital murder case? |
| 6 | MR. FAILS: Yes, sir. |
| 7 | THE COURT: And in the event of a conviction, the |
| 8 | possible punishment would be either life without parole or |
| 9 | the death penalty? |
| 10 | MR. FAILS: Yes, sir. |
| 11 | THE COURT: You understand you have to be capable of |
| 12 | -- well, in order to qualify for this jury you must be |
| 13 | capable of rendering a fair judgment regarding the death |
| 14 | penalty and life without parole; in other words, those two |
| 15 | punishments, you must be able to give them fair |
| 16 | consideration and make a recommendation. Do you understand |
| 17 | that? |
| 18 | MR. FAILS: Yes, sir. |
| 19 | THE COURT: There are people in our society who are |
| 20 | totally opposed to the death penalty. They could not |
| 21 | consider it or recommend it for any criminal offense. There |
| 22 | are people in our society who believe that the death penalty |
| 23 | is appropriate and proper in any case in which there is a |
| 24 | particular criminal act committed. They can't consider |
| 25 | anything less than the death penalty such as life without |

459

1    parole.  For you to qualify as I said you must be able to

2    consider and then ultimately recommend one of those two.

3    And you have got to fairly and equally consider both.  My

4    question to you is this.  Are you so totally opposed to the

5    death penalty in a capital case that it would restrict or

6    substantially impair the performance of your duties as a

7    juror?

8         MR. FAILS:  No, sir.

9         THE COURT:  The other question then I have is

10   regarding your ability to consider something other than the

11   death penalty like life without parole.  And that question

12   is this.  Are you so opposed to anything less than death for

13   a capital offense that your views would interfere with the

14   performance of your duties as a juror?

15        MR. FAILS:  No, sir.

16        THE COURT:  So I'm assuming that you can hear the

17   evidence and give fair consideration and equal consideration

18   to life without parole and the death penalty and then at the

19   appropriate time make a recommendation to the Court?

20        MR. FAILS:  Yes, sir.

21        THE COURT:  You don't favor one particular punishment

22   over another?

23        MR. FAILS:  No, I don't.

24        THE COURT:  You would wait until all of the evidence

25   was in and all of the law was given to you before you would

Ann H. Armstrong, RPR

1   make a recommendation to the Court or have an opinion as to

2   what the penalty should be; is that correct?

3        MR. FAILS:  Yes, sir.

4        THE COURT:  Have you heard anything about the facts

5   of this case?

6        MR. FAILS:  No, I haven't.

7        THE COURT:  Have you read anything in the newspaper

8   about the facts of the case back when it was alleged to have

9   occurred?

10       MR. FAILS:  What I did, there was a girl in the store

11  that I work with -- she said she knows this guy.  And she

12  said she was acquainted with him.  And then it was in the

13  paper.  And I just looked at it.  I just looked at the big

14  print of it.  I didn't read the details.  I didn't know

15  anything about it until when y'all said something in there

16  because I didn't look at the details.  You know, I looked at

17  the big bold print.

18       THE COURT:  Let me ask you this.  With the knowledge

19  that you gained from whatever it was that you did or

20  whatever it was that you read or with whomever you talked,

21  would that knowledge in your opinion bias you in any way?

22  Would you be able to set that aside and hear the evidence as

23  the evidence comes from the witness stand and then base your

24  verdict solely on that evidence and not anything that you

25  may have heard or read in the newspaper?

1    MR. FAILS:  Yeah, I can do that just from the

2    evidence.  I know -- I understand that it's got to be with

3    the evidence, you know.  You can't just set your own

4    opinion.  That's why we are here.

5         THE COURT:  Other than what the lawyers said about

6    the facts yesterday, did you hear anything on the radio, see

7    anything on the TV or read anything in the newspaper?

8         MR. FAILS:  No, I didn't.

9         THE COURT:  All right, sir.  Anything else?

10        MR. GREENE:  Just briefly.  I think, Mr. Fails, you

11   had indicated earlier that you had I think a brother that

12   was involved in a homicide case?

13        MR. FAILS:  No.  He wasn't involved in a homicide.

14        MR. GREENE:  Tell me what it was.

15        MR. FAILS:  It was that he was arrested for firing a

16   fire arm into a vehicle.

17        MR. GREENE:  Is his name --

18        MR. FAILS:  Aaron Fails, A-a-r-o-n.

19        MR. GREENE:  Thank you.  That's all.

20        MR. GOGGANS:  Mr. Fails, who was it that you talked

21   to at Heilig-Meyers?

22        MR. FAILS:  A girl named Teresa Orr.

23        MR. GOGGANS:  Orr?

24        MR. FAILS:  Uh-huh.

25        MR. GOGGANS:  Do you remember -- you said that she --

462

1   I think you said she knew someone.  Do you remember whether

2   she said she knew the person killed or knew one of the

3   people accused or what?

4           MR. FAILS:  Well, she said she knew this guy, and I

5   really didn't know if it was the same case until she said --

6   I think it's the same case.  She said she knew the guy.  I

7   think they call him Little Willie.  I think that's what she

8   said, Little Willie.  It's the same case.  She said she knew

9   a guy named Little Willie, and that's the only thing I could

10  think about that it might be -- she said the guy's name is

11  Little Willie.

12          MR. GOGGANS:  Do you remember anything else she said?

13          MR. FAILS:   That's all.  She said she had known him

14  for a long time ago, Little Willie.

15          MR. GOGGANS:  Do you remember what, if anything, she

16  might have said about him?

17          MR. FAILS:  Well, she said he was quiet, a quiet guy.

18  That's what she had said.

19          MR. GOGGANS:  No other questions.

20          THE COURT:  The State?

21          MR. GREENE:  Nothing else.

22          THE COURT:  Mr. Fails, we appreciate it.  If you

23  would please be back in the morning at 9:00 o'clock.  Laura

24  Flennory.

25          Ms. Flennory, how are you today?

463

1        MS. FLENNORY:  All right.

2        THE COURT:  Ms. Flennory, are you employed?

3        MS. FLENNORY:  No, sir.

4        THE COURT:  Are you retired?

5        MS. FLENNORY:  No, sir.

6        THE COURT:  What did you do at your last job?  How

7    were you employed?  What did you do at your last job?  Who

8    were you working for?

9        MS. FLENNORY:  I worked at a nursing home.

10        THE COURT:  Are you married?

11        MS. FLENNORY:  No, sir.

12        THE COURT:  Ms. Flennory, we asked you some questions

13    out there regarding your feelings about capital punishment,

14    the death penalty, and I need to ask you those questions and

15    get your response on the record.  Okay.  This as you know is

16    a capital case.  And in the event of a conviction the

17    possible sentences would be the death penalty or life

18    imprisonment without parole.  Do you understand that?

19        MS. FLENNORY:  Yes, sir.

20        THE COURT:  For you to qualify to serve as a juror in

21    this case, at the appropriate time if there is a conviction,

22    you must be prepared to give fair consideration to both of

23    those penalties, life without parole and the death penalty.

24    There are certain segments of our society who are opposed to

25    the death penalty.  They don't agree with the death penalty,

Ann H. Armstrong, RPR

464

1   can't recommend it or consider it under any circumstances

2   for any criminal conduct.   There are other people in our

3   society who believe that the death penalty is the

4   appropriate punishment for all criminal conduct of a certain

5   type.   They can't consider anything other than the death

6   penalty, for instance for an intentional killing or a

7   capital murder.   They can't consider life without parole.

8   And what my questions are designed to do is to find out

9   where are you and what you think, okay.   The first question

10  is this.   Are you so opposed to the death penalty in a

11  capital case that it would restrict or substantially impair

12  the performance of your duties as a juror?   And if you don't

13  understand the question, I can either rephrase it or -- do

14  you understand my question?

15          MS. FLENNORY:   Explain it.

16          THE COURT:   Are you against the death penalty?

17          MS. FLENNORY:   Yes, sir.

18          THE COURT:   Are you against it to the extent that you

19  couldn't consider it under any circumstances?

20          MS. FLENNORY:   Yes, sir.

21          THE COURT:   Is this an opinion that you have had for

22  a long time?

23          MS. FLENNORY:   All of my life.

24          THE COURT:   And what is the basis of that opinion?

25  Why do you think that?

1          MS. FLENNORY:  Well, I mean I don't think it's right.

2          THE COURT:  Okay.  Thank you, ma'am.  Anything else?

3          MR. GOGGANS:  Just a few questions.  Ms. Flennory,

4    do you understand that in Alabama the law does provide that

5    in certain instances the death penalty may be imposed; do

6    you know that?

7          MS. FLENNORY:  Yes, sir.

8          MR. GOGGANS:  Do you understand that before a jury is

9    ever called upon to go into this penalty phase where it

10   hears evidence and hears arguments and hears instructions on

11   whether or not to impose a death penalty and life without

12   parole that it's first got to have been convinced beyond a

13   reasonable doubt that the person was guilty of a capital

14   murder; do you understand that?  In other words, if the jury

15   doesn't find somebody guilty of capital murder, if the jury

16   finds somebody not guilty or guilty of something else, it

17   never gets called upon to go into this penalty phase; do you

18   understand that?

19         MS. FLENNORY:  Yes, sir.

20         THE COURT:  Do you understand that in Alabama in

21   capital cases it's not just any murder; it's not a reckless

22   murder or a negligent murder.  It's an intentional killing

23   during the course of some other felony; in this case, they

24   are saying a robbery.  Do you understand that?

25         MS. FLENNORY:  Yes, sir.

Ann H. Armstrong, RPR

466

1          MR. GOGGANS:  Now do you understand that in capital

2     cases if a jury finds somebody guilty of a capital offense,

3     that the Court doesn't just send the jurors back into the

4     jury room and say, okay, folks, y'all found this person

5     guilty; now go in there and talk it out and tell me; come

6     back and tell us what you have decided.  You will hear

7     arguments, and you will hear evidence, and the judge will

8     tell you, here's what the law is.  Here's how you go about

9     determining what your recommendation is.  Here are some

10    aggravating circumstances; in other words, things that you

11    are supposed to weigh and things that you must weigh in

12    favor of the death penalty, and here are some mitigating

13    circumstances which are things you must weigh in favor of a

14    penalty of life without the possibility of parole.  You go

15    back, and you weigh these things, and you make your

16    recommendation based upon these things which is what the law

17    requires.  Do you understand that?

18         MS. FLENNORY:  Yes, sir.

19         MR. GOGGANS:  Do you think that you could participate

20    in that process and be fair and consider that evidence and

21    follow the judge's instructions on what the law is?

22         MS. FLENNORY:  No, sir.

23         MR. GOGGANS:  Whether you like the law or not, do you

24    think you could follow it?

25         MS. FLENNORY:  No, sir.

1      MR. GOGGANS:  Nothing else.

2      THE COURT:  Thank you, ma'am.  Ms. Flennory, we

3  appreciate you being here.  If you would take that card,

4  there is a telephone number there.  Call that number after

5  5:00 o'clock today, and there will be instructions on that

6  answering machine to where and when to report for your jury

7  service.  You're excused as to this case.  Thank you very

8  much.  Yolanda Flowers.

9      Ms. Flowers, are you employed?

10     MS. FLOWERS:  No.

11     THE COURT:  And what did you do at your last place of

12  employment?

13     MS. FLOWERS:  I worked at Wal-Mart.  I left on

14  maternity leave.

15     THE COURT:  How far along are you?

16     MS. FLOWERS:  No, I left in '96.  My child is a year

17  old now.  When I went back my manager --

18     THE COURT:  I thought you meant you were pregnant

19  now.

20     MS. FLOWERS:  No.

21     THE COURT:  Are you married?

22     MS. FLOWERS:  No, single.

23     THE COURT:  Ms. Flowers, we asked you some questions

24  a few minutes ago regarding the death penalty.  I want to

25  ask you those questions to get your response on the record,

Ann H. Armstrong, RPR

1   okay?

2          MS. FLOWERS:   Okay.

3          THE COURT:   Ms. Flowers, you understand this is a

4   capital murder case, and in the event of a conviction in

5   this case, there are two possible punishments, the death

6   penalty and life imprisonment without parole.   For you to

7   qualify to serve on this particular jury, you must be able

8   to give fair and equal consideration to both of those

9   possible punishments, the death penalty and life

10  imprisonment without parole.   There are people in our

11  society who are totally opposed to the death penalty.   They

12  cannot consider it or recommend it in any case.   There are

13  other people in our society who are, who consider the death

14  penalty to be the only appropriate and proper penalty for

15  certain criminal conduct.   They can't consider anything less

16  than the death penalty.   They can't consider the alternative

17  of life imprisonment without parole.   I'm going to ask you

18  some questions so that I can determine where you are with

19  regard to this issue.   First of all, are you so opposed to

20  the death penalty in a capital case that it would restrict

21  or substantially impair the performance of your duties as a

22  juror?

23         MS. FLOWERS:   No.

24         THE COURT:   The other question then is with regard to

25  your ability to consider something other than or less than

Ann H. Armstrong, RPR

469

1    the death penalty such as life imprisonment without parole.

2    And that question is this.  Are you so opposed to anything

3    less than death for a capital offense that your views would

4    interfere with the performance of your duties as a juror?

5         MS. FLOWERS:  No.

6         THE COURT:  So what you're telling me then, Ms.

7    Flowers, is that you can consider if there is a conviction

8    for a capital offense -- you can give fair and equal

9    consideration to both the death penalty and the penalty of

10   life imprisonment without parole, and you can after you have

11   heard the facts make a recommendation to the Court depending

12   on what the facts and the law are?

13        MS. FLOWERS:  Yes.

14        THE COURT:  You're not predisposed to favor one

15   particular punishment over another; is that correct?

16        MS. FLOWERS:  Yes.

17        THE COURT:  Have you read anything about, heard

18   anything about the facts of this case prior to yesterday?

19        MS. FLOWERS:  Yes, I heard before yesterday.

20        THE COURT:  Before yesterday?

21        MS. FLOWERS:  I read it in the paper.

22        THE COURT:   Read it in the paper, anything else, any

23   other source?

24        MS. FLOWERS:  No.

25        THE COURT:  Do you think that you can set aside what

470

 1    you read in the paper and hear the evidence as the evidence

 2    comes to you from the witness stand and base your judgment

 3    as to the guilt or innocence of the defendant based on that

 4    evidence setting aside what you may have read in the

 5    newspaper?

 6         MS. FLOWERS:  Yes.

 7         THE COURT:  You don't feel as though what you knew

 8    about the case and heard about the case through the

 9    newspaper would affect you or prejudice your ability to be

10    fair and impartial to the State and the defense?

11         MS. FLOWERS:  No.

12         THE COURT:  Did you hear anything about the facts of

13    the case other than what you heard yesterday in open court

14    when these lawyers were talking to you?

15         MS. FLOWERS:  No.

16         THE COURT:  You didn't hear anything on the radio,

17    hear anything on the television or read anything in the

18    newspaper yesterday or this morning?

19         MS. FLOWERS:  No.

20         THE COURT:  The State?

21         MR. GREENE:  Ms. Flowers, you live on Perham?

22         MS. FLOWERS:  Yes.

23         MR. GREENE:  Who all lives there with you?

24         MS. FLOWERS:  My mother and three kids.

25         MR. GREENE:  And you have one child?

Ann H. Armstrong, RPR

```
 1              MS. FLOWERS:  No, I have three.

 2              MR. GREENE:  Three children?

 3              MS. FLOWERS:  Uh-huh.

 4              MR. GREENE:  And how long have you lived there?

 5              MS. FLOWERS:  About 19 years.

 6              MR. GREENE:  Do you know the Janie Suttles and her

 7    family who live on Lavender near you?

 8              MS. FLOWERS:  Yes, I know them because it's close to

 9    my house.  You know, I just know them.

10              MR. GREENE:  How long have you known them?

11              MS. FLOWERS:  It's not like a physical contact.  I

12    don't know them -- I know them because they live in the

13    same, you know --

14              MR. GREENE:  Do you know Bam Bam Suttles, the one

15    they call Bam Bam?

16              MS. FLOWERS:  Yes.

17              MR. GREENE:  And have you known her for some time?

18              MS. FLOWERS:  Yes.

19              MR. GREENE:  Do you know this Defendant?  Have you

20    seen or known him?

21              MS. FLOWERS:  No, I've never seen him.

22              MR. GREENE:  You're not familiar with him or his

23    brother?

24              MS. FLOWERS:  No.

25              MR. GREENE:  When this thing happened, did you have
```

472

1    any conversation with people in your neighborhood about it?

2            MS. FLOWERS:  No.

3            MR. GREENE:  Thank you, ma'am.

4            MR. GOGGANS:  Ms. Flowers, do you know an Emanuel

5    Suttles?

6            MS. FLOWERS:  No.

7            MR. GOGGANS:  Nothing else.

8            THE COURT:  Ms. Flowers, thank you for your time

9    today.  I'm going to ask you to please be back in the

10   morning at 9:00 o'clock.  Jessie Gardner.

11           Ms. Gardner, are you employed?

12           MS. GARDNER:  Yes, I am.

13           THE COURT:  Where do you work?

14           MS. GARDNER:  Cahaba Mental Health.

15           THE COURT:  What do you do?

16           MS. GARDNER:  I'm a trainer.

17           THE COURT:  And are you married?

18           MS. GARDNER:  Yes.

19           THE COURT:  Your husband's name?

20           MS. GARDNER:  Jeffrey Gardner.

21           THE COURT:  And is Mr. Gardner employed?

22           MS. GARDNER:  Yes.

23           THE COURT:  How so?

24           MS. GARDNER:  He's employed at Bush Hog, and he's a

25   machine operator.

Ann H. Armstrong, RPR

1     THE COURT:   A few minutes ago I asked you some

2    questions regarding your feelings about the death penalty.

3    And now I need to ask you to respond to those questions on

4    the record.   You understand that this is a capital case, a

5    capital murder case.   And in the event of a conviction in

6    this case, the possible punishments would be life

7    imprisonment without parole or the death penalty.   For you

8    to qualify to serve on this jury, you must be able to give

9    fair and equal consideration to both life imprisonment

10   without parole and the death penalty and then make a

11   recommendation to the Court as to appropriate punishment

12   after you've heard all of the facts of the case.   There are

13   people in our society who are opposed to the death penalty.

14   They cannot and will not consider or recommend the death

15   penalty in any case for any criminal conduct.   There are

16   other people in our society who believe the death penalty is

17   the only appropriate and proper penalty for punishment for

18   certain criminal conduct.   Those people can't consider

19   anything other than the death penalty.   They can't consider

20   something less than that such as life without parole.   The

21   questions that I have for you are designed to determine

22   where you are with regard to this particular issue.   The

23   first question is this.

24        Are you so opposed to the death penalty in a capital

25   case that it would restrict or substantially impair the

474

1    performance of your duties as a juror?

2         MS. GARDNER:  Yes, I am opposed to it.

3         THE COURT:  Are there any circumstances that you can

4    consider or think of where you would recommend the death

5    penalty in a capital murder case?

6         MS. GARDNER:  Will you repeat that question again?

7         THE COURT:  Are there any circumstances that in your

8    opinion justify the death penalty?  Is there any criminal

9    conduct in your opinion that justifies the death penalty?

10        MS. GARDNER:  Well, to be honest, yes.

11        THE COURT:  So you do think that there would be

12   certain circumstances in which you could vote for the death

13   penalty?

14        MS. GARDNER:  Yes.

15        THE COURT:  Generally speaking though you're opposed

16   to it; is that correct?

17        MS. GARDNER:  Yeah.

18        THE COURT:  If you're presented a set of facts and

19   you are instructed on the appropriate law and you in your

20   opinion believe that the death penalty is appropriate, are

21   you telling me that you then can vote the death penalty?

22        MS. GARDNER:  Yes.

23        THE COURT:  Okay.  You also must be able to consider

24   something other than the death penalty such as life

25   imprisonment without parole, which I think you can do.  But

1    I'm going to ask that question to you.  Are you so opposed

2    to anything less than the death penalty?

3            MS. GARDNER:  No.

4            THE COURT:  So you think that you can at an

5    appropriate time give fair and equal consideration to life

6    imprisonment without parole and the death penalty if the

7    facts are presented to you and the law is presented to you

8    and then make a recommendation to the Court?

9            MS. GARDNER:  Yes.

10           THE COURT:  Do you feel as though you're predisposed

11   to favor one particular penalty over the other?

12           MS. GARDNER:  Well, yeah.

13           THE COURT:  Which one is that?

14           MS. GARDNER:  Life in prison.

15           THE COURT:  But given the appropriate circumstances

16   you could vote for the death penalty?

17           MS. GARDNER:  I could vote for the death penalty.

18           THE COURT:  Have you read anything about the facts of

19   this case?

20           MS. GARDNER:  No.

21           THE COURT:  Did you know anything about the facts of

22   this case before coming into court yesterday?

23           MS. GARDNER:  I remember reading something about it

24   in the paper, but it's been a while back.  And because I

25   don't subscribe to the paper, I haven't been keeping up with

476

1    anything about it.

2        THE COURT:  Do you think that what you read in the

3    paper would bias your ability to be fair and impartial to

4    the State or the defense?

5        MS. GARDNER:  No.

6        THE COURT:  Did you hear anything about this case,

7    the facts of the case on the radio, the TV last night or

8    read about it in the newspaper this morning or yesterday?

9        MS. GARDNER:  No.

10        THE COURT:  The State?

11        MR. GREENE:  You said you worked at the Cahaba Mental

12    Health Center?

13        MS. GARDNER:  Yes, sir.

14        MR. GREENE:  I misunderstood or didn't hear.  What do

15    you do there?

16        MS. GARDNER:  I'm a trainer.

17        MR. GREENE:  What do you train?

18        MS. GARDNER:  I work with children with disabilities.

19    And the ones that need assistance in learning how to walk or

20    speak or whatever, I am trained to work with them, to get

21    them to catch up if they can.

22        MR. GREENE:  And what kind of special educational

23    skills or training do you have to be able to do that job?

24        MS. GARDNER:  A high school diploma, and I'm under

25    training with a speech therapy and occupational PT.

477

1          MR. GREENE:  How long have you been doing that?

2          MS. GARDNER:  I've been doing this for about five

3     years.

4          MR. GREENE:  Your disposition is toward life as

5     opposed to the death penalty; is that correct?

6          MS. GARDNER:  Yes.

7          MR. GREENE:  So if you were sitting on a jury and

8     y'all found the Defendant guilty of capital murder, you

9     would go into that hearing with the feeling or disposition

10    toward the life without parole?  You understand there are

11    two hearings.  There is a trial that decides guilt or

12    innocence.

13         MS. GARDNER:  Right.

14         MR. GREENE:  And then you have another hearing where

15    you get into the issue of what the recommendation to the

16    judge should be, death or life?

17         MS. GARDNER:  Okay.

18         MR. GREENE:  Your position is that you would be going

19    for the life without parole?

20         MS. GARDNER:  Exactly.

21         MR. GREENE:  But you can imagine some horrible cases

22    where you might go for death?

23         MS. GARDNER:  That's right.

24         MR. GREENE:  I understand.  Thank you.

25         MR. GOGGANS:  Ms. Gardner, let me make sure I

1   understand what your position is.  You might prefer a life

2   sentence, life without parole sentence over a death penalty,

3   but am I correct in understanding that if you were a juror

4   in this type of case and you were in a penalty phase that

5   you would keep an open mind and listen to the lawyers'

6   arguments and pay attention to the evidence and whatever the

7   judge instructed you the law was; you would follow that?

8          MS. GARDNER:  Say that again now.

9          MR. GOGGANS:  In the penalty phase -- there are two

10  phases.  First of all, in order to get to the penalty phase

11  the prosecution has got to convince the jury beyond a

12  reasonable doubt that the person is guilty of a capital

13  offense.

14         MR. GREENE:  I don't think this is necessary.

15         MR. GOGGANS:  Well, she said she didn't understand.

16         MR. GREENE:  If that's all you're trying to do, I

17  will concur that she's --

18         MR. GOGGANS:  Okay.  I mean if he's concurring, I'm

19  not going to spend time asking the same questions.

20         THE COURT:  Okay.  Ms. Gardner, we appreciate your

21  time.  If you would please be back in the morning at 9:00

22  o'clock.  Clarence Gilbert.

23         How are you doing?

24         MR. GILBERT:  Fine.

25         THE COURT:  Mr. Gilbert, are you employed?

Ann H. Armstrong, RPR

1        MR. GILBERT:  Yes, sir.

2        THE COURT:  Where do you work?

3        MR. GILBERT:  R. L. Zeigler.

4        THE COURT:  And what do you for Zeigler?

5        MR. GILBERT:  I'm security right now, night watchman,

6    security.

7        THE COURT:  Are you married?

8        MR. GILBERT:  Yes, sir.

9        THE COURT:  Your wife's name?

10        MR. GILBERT:  Peggy.

11        THE COURT:  Is she employed outside of the home?

12        MR. GILBERT:  No.

13        THE COURT:  Mr. Gilbert, I asked you some questions

14    out there a few minutes ago regarding the death penalty, and

15    I need to ask you those questions now and get your response

16    on the record.  This, of course, is a capital murder case,

17    and if there is a conviction in this case, the possible

18    sentences are two, the death penalty or life without parole.

19    In order for you to hear and consider the -- in order for

20    you to qualify as a juror in this case, you must be able to

21    give fair and equal consideration to both of those possible

22    punishments in the event of a conviction.  You must be able

23    to give fair and equal consideration to the death penalty

24    and life without parole and then make a recommendation to

25    the Court.  There are people in our society who are totally

1   opposed to the death penalty as you know.  They will not and

2   cannot consider or recommend a penalty of death under any

3   circumstance.  There are other people in our society who are

4   in favor of the death penalty to the extent that they think

5   it's appropriate in all circumstances involving certain

6   criminal conduct.  They cannot and will not consider

7   anything less than the death penalty in those circumstances.

8   They will not and cannot consider life imprisonment without

9   parole.

10          And as I said you must be able to equally consider

11  those things to qualify as a juror.  So the first question I

12  have for you is, are you so opposed to the death penalty in

13  a capital case that it would restrict or substantially

14  impair the performance of your duties as a juror?

15          MR. GILBERT:  No, sir.

16          THE COURT:  The next question then is regarding your

17  ability to consider something other than the death penalty

18  such as life imprisonment without parole.  The question I

19  have for you is are you so opposed to anything less than

20  death for a capital offense that your views would interfere

21  with the performance of your duties as a juror in accordance

22  with the instructions that I give you?

23          MR. GILBERT:  No, sir.

24          THE COURT:  So Mr. Gilbert, what you're telling me is

25  that you can hear the facts of the case and apply the law to

Ann H. Armstrong, RPR

1  the facts and then at an appropriate time give fair and

2  equal consideration to both life imprisonment without parole

3  and the death penalty?

4        MR. GILBERT:  Yes, sir.

5        THE COURT:  You're not predisposed to favor one

6  particular punishment over the other; is that correct?

7        MR. GILBERT:  After I hear the facts, sir.

8        THE COURT:  You have to hear the facts?

9        MR. GILBERT:  Yes, sir.

10        THE COURT:  But once you have heard the facts, once

11  you have been instructed on the law, you have no problem

12  with giving both of those possible punishments fair and

13  equal consideration and then make a recommendation to the

14  Court?

15        MS. GILBERT:  Yes, sir.

16        THE COURT:  Mr. Gilbert, have you heard anything

17  about the facts of this case prior to yesterday?

18        MR. GILBERT:  No, sir.

19        THE COURT:  Did you read anything in the newspaper

20  about the facts of this case back when it was alleged to

21  have occurred?

22        MR. GILBERT:  If I did, I don't remember, sir.

23        THE COURT:  Have you heard any news report regarding

24  the facts of this case and the proceedings that we were

25  involved in yesterday on the TV or the radio?

1    MR. GILBERT:  When it came on, I walked out of the

2    room, sir.

3    THE COURT:  Did you see any images or hear anything?

4    MR. GILBERT:  Yes, I did.

5    THE COURT:  Tell me if you remember what you heard

6    first of all.

7    MR. GILBERT:  I just heard that they were picking a

8    jury, and I heard the age of the young man.

9    THE COURT:  And did you see any images?

10   MR. GILBERT:  I did not.  I walked out.

11   The COURT:  What you heard on the -- this was on the

12   television?

13   MR. GILBERT:  Yes, sir.

14   THE COURT:  What you heard on the television, did

15   that or would that in any way bias your ability to be fair

16   and impartial in this case?

17   MR. GILBERT:  I didn't hear enough, no, sir.

18   THE COURT:  The State?

19   MS. WILSON:  One question.  Do you know someone by

20   the name of Jason Powell?

21   MR. GILBERT:  I don't think so.

22   MS. WILSON:  Thank you.

23   MR. GOGGANS:  Mr. Gilbert, do you know Louella

24   Shannon?

25   MR. GILBERT:  Not that I know of, sir.

483

1    MR. GOGGANS:  Do you know anything or remember

2    anything about a sexual harassment suit filed against

3    Zeiglers by Ms. Shannon?

4    MR. GILBERT:  I was off that night or day when it

5    happened, and all I have is hearsay.

6    MR. GOGGANS:  What do you remember?  What do you

7    recall about it, about that, or have you heard anything

8    about the course of the litigation?

9    MR. GILBERT:  No, sir.

10    MR. GOGGANS:  Nothing else.

11    THE COURT:  Anything else from the State?

12    MS. WILSON:  Nothing further.

13    THE COURT:  Mr. Gilbert, thank you very much for your

14    time this afternoon.  I'm going to ask you to be here again

15    in the morning at 9:00 o'clock.  Marshall Gill.

16    Mr. Gill, are you employed?

17    MR. GILL:  Self-employed.

18    THE COURT:  What do you do?

19    MR. GILL:  Farm.

20    THE COURT:  Farmer?

21    MR. GILL:  And I own a cafe.

22    THE COURT:  A cafe?

23    MR. GILBERT:  Yes, sir.

24    THE COURT:  What cafe do you own?

25    MR. GILBERT:  Country Cafe, it's in Wetumpka.

Ann H. Armstrong, RPR

1       THE COURT:  Are you married?

2       MR. GILBERT:  No.

3       The COURT:  Mr. Gilbert, I asked you some questions a

4    few minutes ago in open court.  I'm going to ask you those

5    questions and get you to respond, get that response on the

6    record at this time.  Okay.  You know this is a capital

7    murder case, and in the event of a conviction the punishment

8    for this offense would be either life imprisonment without

9    parole or the death penalty.  In order to qualify as a juror

10   in this case, you must be able to hear the facts of the case

11   and then in an appropriate time give fair and equal

12   consideration to those punishments if there is a conviction.

13   Do you understand that?

14       MR. GILL:  Yes, sir.

15       THE COURT:  There are people in our society who are

16   opposed to the death penalty.  They don't believe in the

17   death penalty.  They would not consider it or recommend it

18   under any circumstances.  There are other people in our

19   society who believe that the death penalty is appropriate

20   and proper in all circumstances, and they, therefore, would

21   not consider anything other than the death penalty for

22   certain criminal conduct, such as life imprisonment without

23   parole.  So the question I have for you is this.  First are

24   you so opposed to the death penalty in a capital case that

25   it would restrict or substantially impair the performance of

Ann H. Armstrong, RPR

1    your duties as a juror?

2         MS. GILL:  No.

3         THE COURT:  The next question is regarding your

4    ability to consider something other than the death penalty

5    as proper punishment, and that would be life imprisonment

6    without parole.  This would be a question regarding that

7    segment of society who thinks that the death penalty is the

8    only thing that you should impose, and these people believe

9    that there is nothing other than that death penalty that

10   should be imposed, such as life imprisonment without parole.

11   So that question is this.  Are you so opposed to anything

12   less than death for a capital offense that your views would

13   interfere with the performance of your duties as a juror?

14        MR. GILL:  No.

15        THE COURT:  So what you're telling me is that you

16   could give equal and fair consideration to both of those

17   punishments in the event of a conviction?

18        MR. GILL:  Yes.

19        THE COURT:  That you could after hearing the facts

20   and considering the law as I give you the law, you could

21   give fair and equal consideration to both of those things,

22   both of those punishments and make a recommendation to the

23   Court?

24        MR. GILL:  Yes.

25        THE COURT:  In other words, you're not predisposed to

1   favor one particular punishment over the other?

2         MR. GILL:  No.

3         THE COURT:  Mr. Gill, have you heard anything about

4   the facts of the case?

5         MR. GILL:  No.

6         THE COURT:  Have you read anything in the newspaper

7   perhaps when the event was alleged to have occurred back

8   during Thanksgiving of '96?

9         MR. GILL:  No.

10        THE COURT:  Have you heard anything about the facts

11  of the case on the radio or the television yesterday or this

12  morning?

13        MR. GILL:  No.

14        THE COURT:  Have you read anything in the newspaper

15  either yesterday or today about the facts of this case?

16        MR. GILL:  No.

17        THE COURT:  The State?

18        MR. GREEN:  Mr. Gill, you had indicated earlier I

19  think you had a brother that was involved in some type of

20  homicide or assault or something.  Can you tell me his name?

21        MR. GILL:  Eric.

22        MR. GREENE:  Eric Gill?

23        MR. GILL:  Yes, sir.

24        MR. GREENE:  Was that in this county or some other

25  county?

1    MR. GILL:  Ohio.

2    MR. GREENE:  Okay.  Thank you.

3    MR. GOGGANS:  No questions.

4    THE COURT:  Mr. Gill, I appreciate your time, and if

5  you would please be back at 9:00 o'clock in the morning.

6  Johnnie Gilmore.

7    Mr. Gilmore, are you employed at this time?

8    MR. GILMORE:  I'm self-employed.

9    THE COURT:  What do you do?

10    MR. GILMORE:  I'm a contractor installing septic

11  tanks.

12    THE COURT:  Installing what?

13    MR. GILMORE:  Septic tanks and concrete work.

14    THE COURT:  Are you married?

15    MR. GILMORE:  Yes, sir, I am.

16    THE COURT:  What is your wife's name?

17    MR. GILMORE:  Essie Gilmore.

18    THE COURT:  And does she work outside of the home?

19    MR. GILMORE:  No, sir.

20    THE COURT:  Mr. Gilmore, I asked you some questions

21  in open court a few minutes ago, and I need to now get your

22  response to those questions on the record.  You understand

23  that this is a capital murder case?

24    MR. GILMORE:  Yes, sir.

25    THE COURT:  That if there is a conviction for this

1   capital offense this there are two possible sentences, the

2   death penalty and life imprisonment without parole.  Do you

3   understand that?

4          MR. GILMORE:  I do.

5          THE COURT:  In order for you to qualify to serve on a

6   juror in this case, you must be able to give fair and equal

7   consideration to both of those punishments in the event of a

8   conviction.  You must be able to give fair and equal

9   consideration to the death penalty and life imprisonment

10  without parole.  Do you understand that?

11         MR. GILMORE:  I understand.

12         THE COURT:  There are people in our society, Mr.

13  Gilmore, as you know who oppose the death penalty.  They

14  cannot consider it or recommend it under any circumstances.

15  There are still others in our society who are in favor of

16  the death penalty; they think the death penalty is

17  appropriate and proper in all criminal cases involving

18  certain criminal conduct.  They can't consider anything

19  other than the death penalty such as life imprisonment

20  without parole.

21         If you're called upon to hear the evidence in this

22  case as I said, you must be able to consider both of those

23  alternative punishments.  The questions that I have to ask

24  you are these.  First of all, are you so opposed to the

25  death penalty in a capital case that it would restrict or

```
 1   substantially impair the performance of your duties as a

 2   juror?

 3        MR. GILMORE:  Do I oppose the death penalty?

 4        THE COURT:  Do you oppose the death penalty?

 5        MR. GILMORE:  (Nods head affirmatively).

 6        THE COURT:  You do oppose the death penalty?

 7        MR. GILMORE:  Uh-huh.

 8        THE COURT:  Do you feel as though there are any

 9   circumstances in which you could vote and recommend the

10   death penalty to the Court?

11        MR. GILMORE:  I don't like to, but, you know --

12        THE COURT:  Nobody likes to.  The question is do you

13   feel as though there are any circumstances, that there is

14   any criminal conduct that is so bad in your opinion that you

15   could hear the evidence and after hearing the facts and

16   applying the law to the facts vote for and make a

17   recommendation to this Court of the death penalty?

18        MR. GILMORE:  To be honest with you I don't think I

19   could do it.

20        THE COURT:  So there are no facts that you think that

21   would justify your voting the death penalty?

22        MR. GILMORE:  Not really, sir, I just don't believe

23   in it.

24        THE COURT:  All right, sir.  Any questions?

25        MR. GOGGANS:  Mr. Gilmore, in Alabama the legislature
```

Ann H. Armstrong, RPR

1   has divided homicides up into different degrees, the highest

2   degree being a capital offense which involves only

3   intentional killings which go along with some other felony.

4   In this case the State is saying the other felony is

5   robbery; in other words, an intentional killing during the

6   course of a robbery. It's only if a jury finds somebody

7   guilty of that capital offense of an intentional killing in

8   the course of a robbery that there is this second trial

9   called the penalty trial.

10          You know, if the jury finds a person not guilty or

11  finds a person guilty of something else, that's it. The

12  jury is done, and it never gets to this penalty phase. In

13  the penalty phase the lawyers like in a regular trial, they

14  are going to make opening statements. There will be

15  evidence presented; arguments made, and the judge will tell

16  you what the law is. The judge will tell you that there are

17  ways to go about deciding whether the penalty would be life

18  without parole or death. The judge will tell you about what

19  is called aggravating circumstances that weigh in favor of

20  the death penalty and mitigating circumstances that weigh in

21  favor of the sentence of life without parole and how you go

22  about weighing these and making your determination in

23  accordance with the law.

24          Before you ever get there, the jury has got to have

25  been convinced beyond a reasonable doubt that this killing

1   has been intentional and that it's been during the course of

2   a robbery, not a reckless killing or negligent killing, or

3   some killing that, you know, was provoked.  It's an

4   unjustified, intentional killing during a robbery.  That's

5   what we're talking about in a case like this.  Now do you

6   think that you, Mr. Gilmore, could sit on a jury and whether

7   you like the law or not -- we can all think of some laws we

8   don't like, and you know, we go ahead and follow them.  We

9   may think the speed limit ought to be ten miles an hour, but

10  we still go what the speed limit is.  We may think taxes

11  ought to be lower, but we still pay the higher amount.  Do

12  you think that you could sit on the jury and listen to the

13  arguments and listen to the evidence and whether you like

14  what the law was, do you think you could follow the

15  instructions on what the law was and impose or vote for a

16  sentence of either life without parole or death?

17         MR. GILMORE:  Yes, sir, I think I could do that.

18         MR. GOGGANS:  No other questions.

19         MR. GREENE:  Mr. Gilmore, you understand what you

20  just have been told is basically that somehow or another if

21  you don't follow the judge's instructions you might be doing

22  something wrong; you understand that's not exactly what we

23  are asking.  But what we need to find out is how you feel

24  about the death penalty.  If we get into the course of this

25  trial and you feel strongly that you cannot and just can't

1    impose the death penalty, then that's a problem for this

2    case because it would be just the same problem if you felt

3    that you would always impose the death penalty.  Do you

4    understand what we are asking you?

5         MR. GILMORE:  Yes, sir.

6         MR. GREENE:  So it's not a question of following the

7    law or following the judge's charge as much as it is what is

8    your feeling.  The judge is going to tell you that the jury

9    in a capital case has got to just like he told you earlier

10   weigh them both.  Now if you can't do that, you know,

11   because you feel strongly one way or the other, then you

12   need to let us know.  If you think you really can, fine.

13   But if you cannot, then it's however you feel.

14        MR. GILMORE:  I just don't think I could.

15        THE COURT:  Anything else?

16        MR. GOGGANS:  No other questions.

17        THE COURT:  Thank you very much, sir.  We will excuse

18   you for the consideration in this case.  And if you would,

19   take a card from Mr. Kynard and call that number tomorrow

20   after 5:00 o'clock.  And there will be some instructions

21   regarding your jury service for the remainder of the week.

22        MR. GOGGANS:  I understand the Court's inclination to

23   excuse juror Gilmore based on his response on the death

24   penalty question.  I would like to note the defense's

25   objection to that.  We don't think the record supports an

1    exclusion under <u>Witherspoon</u> or <u>Witt</u> or the sixth, eighth and

2    fourteenth amendments to the United States constitution and

3    Article 1, Section 6 and 15 of the State constitution.

4         THE COURT:  Thank you.  Objection is overruled.  Judy

5    H. Golson.

6         Judy, even though you have known me all of my life, I

7    am asking you these questions.  We have got to get it for

8    the record.  Are you employed at this time?

9         MS. GOLSON:  Yes, sir.

10        THE COURT:  How are you employed?

11        MS. GOLSON:  I'm a buyer for American Candy.

12        THE COURT:  And you are married?

13        MS. GOLSON:  Yes, sir.

14        THE COURT:  What is your husband's name?

15        MS. GOLSON:  Charles Golson.

16        THE COURT:  And his employment?

17        MS. GOLSON:  Norfolk Southern Railroad.

18        THE COURT:  And, yes you have, in fact known me all

19   of my life since I was a little shaver like Mr. Cohn said.

20   I've got to ask you some questions.  I asked you these

21   questions earlier, and now we have to get the response on

22   the record.  As you know this is a capital murder case.  And

23   there are two sentences available to us in the event there

24   is a conviction for this capital offense, the death penalty

25   and life imprisonment without parole.  In order for you to

Ann H. Armstrong, RPR

1    qualify as a juror in this case, you must be able to give

2    fair and equal consideration to both of those alternative

3    punishments in the event of a conviction.

4         There are people in our society who are totally

5    opposed to the death penalty.  They cannot consider or

6    recommend it under any circumstances for any criminal act.

7    There are other people in our society who believe that the

8    death penalty is the appropriate and proper sentence for all

9    criminal conduct of a specific nature.  They cannot consider

10   anything other than the death penalty such as life

11   imprisonment without parole.  You've got to be able to

12   fairly consider each of those alternatives if there is a

13   conviction in this case.

14        My question to you first is this.  Are you so opposed

15   to the death penalty in a capital case that it would

16   restrict or substantially impair the performance of your

17   duties as a juror?

18        MS. GOLSON:  No.

19        THE COURT:  The other question I have for you is this

20   then with regard to considering something less than the

21   death penalty such as life imprisonment without parole.  Are

22   you so opposed to anything less than death for a capital

23   offense that your views would interfere with the performance

24   of your duties as a juror?

25        MS. GOLSON:  No.

Ann H. Armstrong, RPR

1      THE COURT:  So what you're telling me then, Ms.

2   Golson, is that after hearing the facts and considering the

3   law as I give you the law, you can give fair and equal

4   consideration to both of those possible punishments in the

5   event of a conviction, the death penalty and life

6   imprisonment without parole?

7      MS. GOLSON:  I believe I can, yes, sir.

8      THE COURT:  You're telling me then if I'm not

9   mistaken you're not predisposed to favor one particular

10  punishment over the other?

11     MS. GOLSON:  No, sir.

12     THE COURT:  That you would keep an open mind; you

13  would hear the facts and apply the law to the facts and then

14  make your decision at the appropriate time?

15     MS. GOLSON:   I believe so.

16     THE COURT:  Have you heard anything about the facts

17  of this case?

18     MS. GOLSON:  Other than what Mr. Greene said

19  yesterday.

20     THE COURT:  Did you read about the facts or read the

21  newspaper or anything about the events that occurred back

22  around Thanksgiving of '96?

23     MR. GOLSON:  Was this the case where the man who

24  worked at the courthouse was killed?  I don't know, is it?

25  It's not?  Then have I no idea what we are talking about.

Ann H. Armstrong, RPR

```
 1          THE COURT:  Did you hear anything about the facts of
 2   the case other than in the courtroom that the lawyers may
 3   have made statements regarding the facts?  Did you hear
 4   anything about the facts yesterday on the news or radio or
 5   the newspaper?
 6          MR. GOLSON:  No.
 7          THE COURT:  A minute ago you said you believe that
 8   you could when I asked you a couple of questions.  Is there
 9   some hesitation about that?
10          MS. GOLSON:  Well, I've never been in a situation
11   like this.  So I don't know.  I can't say absolutely what I
12   would do one way or the other.
13          THE COURT:  Well, we're not asking you to decide
14   whether you would do one thing or the other.  We're asking
15   you to tell us whether you think you can give fair
16   consideration to both of those alternatives?
17          MS. GOLSON:  Yes.
18          THE COURT:  The State?
19          MR. GREENE:  Ms. Golson, you understand that the way
20   this thing works, the Judge explained it to you real well.
21   But first if you are sitting on a jury, you all would hear
22   evidence about the guilt or the innocence of the defendant
23   on the charge of capital murder, which is intentional
24   killing of someone during the course of a robbery.  You have
25   to decide yeah or nay; he did or didn't do that.  If you
```

Ann H. Armstrong, RPR

1   decide that he did, then there would be another little trial

2   where both sides would present evidence saying that there

3   ought to be the penalty of death or, no, there ought to be

4   the penalty of life without parole.  Your job would be to

5   decide which to recommend.

6       Understanding that procedure do you feel you can

7   receive those evidences in the first trial and in the second

8   trial with an open mind and render whatever verdict you

9   think is proper, or are so locked down on one or the other

10  that you can't really listen to other stuff?  Do you

11  understand?  Did I confuse you?

12      MS. GOLSON:   Would you ask that again?

13      MR. GREENE:  If in the second trial, the second

14  hearing about the penalty, which is the recommendation that

15  you and the other jurors have made to the judge of death or

16  life without parole, you have to decide that assuming he was

17  convicted of capital murder, intentional killing -- deciding

18  that, are you in a position where you would only consider

19  one of those because you just feel so strong about that?

20      MS. GOLSON:  No.

21      MR. GREENE:  You could consider them both based on

22  the evidence showed you, and you would make your mind up?

23      MS. GOLSON:  Yes, sir.

24      MR. GREENE:  I think that's all.

25      MR. GOGGANS:  No questions.

Ann H. Armstrong, RPR

1    THE COURT:  Thank you, Ms. Golson.  Please be back in

2    the morning at 9:00 o'clock.  Carol Gordon.

3        Please be seated.  Ms. Gordon, I'm going to ask you

4    some questions.  First of all, are you employed?

5        MS. GORDON:  Yes.

6        THE COURT:  Where do you work?

7        MS. GORDON:  Meadowview Public.

8        THE COURT:  What do you do at Meadowview Public?

9        MS. GORDON:  A teacher's aid.

10       THE COURT:  And are you married?

11       MS. GORDON:  Divorced.

12       THE COURT:  Ms. Gordon, a few minutes ago we asked

13   you some questions regarding your feelings, your opinion

14   about capital punishment, the death penalty.  I'm going to

15   ask you those questions now so we can get your response on

16   the record.  First of all you understand this is a capital

17   murder case, that in the event of a conviction the

18   punishment for the offense would be either life imprisonment

19   without parole or the death penalty?

20       MS. GORDON:  Uh-huh.

21       THE COURT:  And for you to qualify as a juror in this

22   case, you must be able to give both the death penalty and

23   life imprisonment without parole fair and equal

24   consideration in the event of a conviction.  Do you

25   understand that?

Ann H. Armstrong, RPR

1    MS. GORDON:  Yes.

2    THE COURT:  And you know that there are people in our

3    society who are totally opposed to the death penalty; they

4    can't consider it.  They cannot recommend it under any

5    circumstances for any criminal conduct?  Do you know that

6    there are people like that?

7    MS. GORDON:  I didn't know that.

8    THE COURT:  Well, there are.  Also Ms. Gordon, there

9    are people in our society who think that the death penalty

10   is the only appropriate and proper punishment for certain

11   criminal conduct.  They can't consider anything other than

12   the death penalty such as life imprisonment without parole.

13   Do you know that?

14   MS. GORDON:  Yes.

15   THE COURT:  And so the questions that I have to ask

16   you are designed to determine where you are with regard to

17   that issue.  And let me ask it to you at this time.  First,

18   are you so opposed to the death penalty in a capital case

19   that it would restrict or substantially impair the

20   performance of your duties as a juror?

21   MS. GORDON:  No.

22   THE COURT:  Okay.  The next question is then to

23   determine whether you can consider something other than the

24   death penalty such as life imprisonment without parole.  And

25   that is are you so opposed to anything less than death for a

500

1    capital offense that your views would interfere with the

2    performance of your duties as a juror?  In other words, can

3    you consider as a possible punishment in a capital case life

4    imprisonment without parole?

5          MS. GORDON:  Yes.

6          THE COURT:  So what you're telling me is that you can

7    hear the facts of this case or a case, that you can hear the

8    law as I give you the law and apply the law to the facts and

9    then at the appropriate time give fair and equal

10   consideration to the death penalty and life imprisonment

11   without parole?

12         MS. GORDON:  Yes.

13         THE COURT:  In other words, you are not predisposed

14   to favor one particular punishment over the other?

15         MS. GORDON:  No.

16         THE COURT:  Ms. Gordon, have you heard anything about

17   the facts of this case other than what these lawyers said in

18   court yesterday?

19         MR. GORDON:  No.

20         THE COURT:  Did you read anything about it in the

21   newspaper yesterday or this morning?

22         MS. GORDON:  No.

23         THE COURT:  Did you hear anything about it on the

24   radio or the TV yesterday or this morning?

25         MS. GORDON:  No.

1      THE COURT:  When this incident allegedly took place

2  in 1996 somewhere around the Thanksgiving holidays, do you

3  recall reading anything in the paper at that time?

4      MS. GORDON:  No.

5      THE COURT:  Do you know nothing about the facts of

6  this case?

7      MS. GORDON:  No.

8      THE COURT:  The State?

9      MR. GREENE:  Ma'am, to make sure I understand, are

10  you for the death penalty?  Do you feel like it's a proper

11  punishment?

12      MS. GORDON:  The death penalty?

13      MR. GREENE:  Yes, ma'am.

14      MS. GORDON:  Yes.

15      MR. GREENE:  Okay.  And Ms. Gordon, I may have asked

16  you this before.  I need to ask you again.  My notes don't

17  reflect.  Do you know Jarvis or Octavius Gordon?

18      MS. GORDON:  Who?

19      MR. GREENE:  Jarvis Gordon or Octavius Gordon.

20      MS. GORDON:  Did you say Jarvis Gordon?

21      MR. GREENE:  Yes, ma'am.

22      MS. GORDON:  That's my son.

23      MR. GREENE:  How about Octavius?

24      MS. GORDON:  I don't know that person.

25      MR. GREENE:  All right.  Thank you, ma'am.

1       MR. GOGGANS:  No questions.

2       THE COURT:  Thank you, Ms. Gordon.  If you would

3   please be back in the morning at 9:00 a.m.  Ella Gordon.

4       THE COURT:  Ms. Gordon, let me ask you first of all.

5   Are you employed?

6       MS. GORDON:  Yes.

7       THE COURT:  And where do you work?

8       MS. GORDON:  Selma High cafeteria, Selma City

9   Schools.

10      THE COURT:  And are you married?

11      MS. GORDON:  Yes, sir.

12      THE COURT:  Your husband's name?

13      MS. GORDON:  Ernest Gordon.

14      THE COURT:  And his place of employment?

15      MS. GORDON:  Selma Country Club. grounds keeper.

16      THE COURT:  Ms. Gordon, I asked you a couple of

17  questions in there to consider a little while ago.  Now we

18  need to get your response on the record.  You understand,

19  Ms. Gordon, that this is a capital murder case?

20      MS. GORDON:  Yes, sir.

21      THE COURT:  And do you understand that in the event

22  of a conviction if the Defendant is found guilty in this

23  case, that the possible punishment would be the death

24  penalty or life imprisonment without parole.

25      MS. GORDON:  Yes, sir.

503

1          THE COURT:  In order for you to qualify as a juror in

2     this case, you must be able to give fair and equal

3     consideration to both of those punishments in the event of a

4     conviction; do you understand that?

5          MS. GORDON:  Yes, sir.

6          THE COURT:  You must be able to give fair and equal

7     consideration to both the death penalty and life

8     imprisonment without parole.  Do you understand that?

9          MS. GORDON:  Yes, sir.

10         THE COURT:  There are people in our society who are

11    totally opposed to the death penalty.  They won't consider

12    it or recommend it as appropriate punishment under any

13    circumstances for any criminal conduct.  There are other

14    people in our society who think that the death penalty is

15    the only appropriate and proper punishment for certain

16    criminal conduct.  They can't consider anything less than

17    the death penalty.  They can't consider life without parole.

18    And as I told you, you must be able to consider both of

19    those things.  The questions that I have for you are

20    designed to tell me what your opinion is with regard to the

21    these issues, okay?  And I'm going to ask you these

22    questions.  And if you need for me to clarify these

23    questions, I will.

24         First, are you so opposed to the death penalty or are

25    you against the death penalty in a capital case that it

Ann H. Armstrong, RPR

504

1  would restrict or substantially impair the performance of

2  your duties as a juror?

3      MS. GORDON:  Would you mind reading that again?

4      THE COURT:  The question is this.  Are you opposed to

5  the death penalty, and if you are so opposed to it, are you

6  opposed to it to the extent that it would substantially

7  impair your performance as a juror?

8      MS. GORDON:  No, I'm not opposed to it.

9      THE COURT:  You're not opposed to it.  The next

10 question is designed to determine if you can consider

11 anything other than the death penalty.  Can you consider

12 life without parole?  And that is are you so opposed to

13 anything less than death for a capital offense that your

14 views would interfere with the performance of your duties as

15 a juror?

16     MS. GORDON:  Life with parole?

17     THE COURT:  Life without parole.  In other words, can

18 you consider also life without parole as a possible sentence

19 if there is a conviction for a capital offense?

20     MS. GORDON:  Yes, I could.

21     THE COURT:  So what you're telling me is that you can

22 consider both the death penalty and life without parole; you

23 can give those two punishments, those two alternatives fair

24 and equal consideration under the appropriate circumstances?

25     MS. GORDON:  Yes, sir.

505

1      THE COURT:  You don't have a pre -- you're not

2   predisposed to favor one particular punishment over the

3   other one?

4      MS. GORDON:  No, sir.

5      THE COURT:  You would hear the facts of the case; you

6   would apply the law as I give it to the facts of the case,

7   and then you would make your decision and recommendation at

8   the appropriate time; is that correct?

9      MS. GORDON:  That's correct.

10      THE COURT:  Ms. Gordon, have you heard anything about

11   the facts of this case?

12      MS. GORDON:  I read it in the paper, and some of the

13   children -- my children knew some of the people, yes, in the

14   case.

15      THE COURT:  I'm sorry?

16      MS. GORDON:  My children know -- the people that live

17   not too far from us, I just -- you know, I didn't know them,

18   but they, you know, some of the children -- and the girl --

19   they knew them.   My daughter knows them.

20      THE COURT:  Now the things that you read in the

21   paper, did you read those things in the paper back when the

22   incident occurred?

23      MS. GORDON:  Yes, sir.

24      THE COURT:  Did you read anything in the paper since

25   then?

Ann H. Armstrong, RPR

506

1        MS. GORDON:  No, sir.

2        THE COURT:  Have you heard anything on the radio

3   since then?

4        MS. GORDON:  No, sir.

5        THE COURT:  Seen anything on the TV since then?

6        MS. GORDON:  No, sir.

7        THE COURT:  Heard any conversations regarding this

8   case since yesterday when you came into court and heard the

9   facts of the case discussed?

10       MS. GORDON:  I just heard it yesterday.

11       THE COURT:  What you heard or what you read rather in

12   the newspaper during the holiday season of 1996,

13   Thanksgiving season, what you read in that paper, would that

14   affect your ability to be fair and impartial in any way in

15   this case?

16       MS. GORDON:  No, it wouldn't.

17       THE COURT:  You can listen to the facts as the facts

18   come to you from the witness stand and then in an honest and

19   impartial way determine what you believe to be the truth?

20       MS. GORDON:  Yes, sir.

21       THE COURT:  You can give the State and the defense a

22   fair and impartial trial?

23       MS. GORDON:  Yes, sir.

24       THE COURT:  None of what you read in the paper back

25   then would affect you in any way?

Ann H. Armstrong, RPR

1      MS. GORDON:  No, sir.

2      THE COURT:  The relationship or what the children

3  have told you, would what you have heard from those kids

4  affect you in any way?

5      MS. GORDON:  No, it wouldn't.

6      THE COURT:  That has no impact on your ability to be

7  fair and impartial, listen to the evidence and make your

8  decision based upon the evidence from the witness stand?

9      MS. GORDON:  No, it wouldn't affect me.

10      THE COURT:  Thank you, ma'am.  The State?

11      MR. GREENE:  Ms. Gordon, in dealing with this death

12  penalty, the jury, of course, is called upon in the event

13  they find the defendant guilty of the capital murder charge,

14  which is an intentional killing, would then go into a second

15  trial or hearing about what to recommend.  And there's a

16  little different evidence produced both by the defense and

17  by us concerning what the jury should recommend, either life

18  or death.  If you had the choice between life and death to

19  recommend, would it be your position that you would prefer

20  to recommend the life without parole?

21      MS. GORDON:  Yes.

22      MR. GREENE:  Do you tend to generally -- the word I

23  want to use here is favor that as a punishment as opposed to

24  the death penalty?

25      MS. GORDON:  If I heard the facts and knew about the

1   case and everything, then I would make my decision.

2         MR. GREENE:  I understand.  I'm not trying to enter

3   into any kind of trick question here.  But I sense that

4   there is a feeling on your part about the death penalty.

5   You can abide by it.  You can live with it, but you really

6   are not very much in favor of it as a form of punishment

7   unless it's very, very extreme; is that correct?

8         MS. GORDON:  If it's very, very extreme; that's

9   correct.

10        MR. GREENE:  Okay.  Now in the course of the case you

11  would go into the penalty phase in a position where you

12  would be in favor of life without parole as opposed to the

13  death penalty basically; is that where you are?

14        MS. GORDON:  Yes, basically.

15        MR. GREENE:  Let me move onto the children.  How old

16  are your children that said they knew these people?

17        MS. GORDON:  One of them is 21.  She mostly knew

18  them.

19        MR. GREENE:  And the people you are talking about

20  they knew were the Defendant here and the Suttles girl and

21  all of them?

22        MS. GORDON:  Yes, just knew them.

23        MR. GREENE:  Did they live near y'all?

24        MS. GORDON:  The Suttles -- well, she used to hang,

25  live in the neighborhood over in there.

1        MR. GREENE:  In the general area?

2        MS. GORDON:  Uh-huh.

3        MR. GREENE:  How far from them did you live?

4        MS. GORDON:  I'm on Alabama, and they was up on

5   Selma, about a block.

6        MR. GREENE:  Was that -- how about the Defendant

7   here?

8        MS. GORDON:  I think they used to live over in the

9   neighborhood years ago over on Water, and I was still on

10  Alabama.

11       MR. GREENE:  So your kids all knew them?

12       MS. GORDON:  Yeah.

13       MR. GREENE:  They knew --

14       MS. GORDON:  They went to school I think with some of

15  them, yeah.

16       MR. GREENE:  And when all of this broke and the kids

17  said, I know them, and that sort of thing?

18       MS. GORDON:  Uh-huh.

19       MR. GREENE:  Thank you, ma'am.

20       MR. GOGGANS:  Ms. Gordon, do you remember what it was

21  your children said about the folks that they knew?

22       MS. GORDON:  No, just at the time they just were

23  upset after what they had heard and for them being around

24  there in the neighborhood.  And it just got on their nerves

25  and things, you know.  They just went to talking and

1   telling. They had known them, and the girl was -- my

2   daughter had been in the house with them some nights or

3   something up on Selma. That's all I knew, just friendship

4   of them, you know, the girl now.

5         MR. GOGGANS: Did they say they knew either of the

6   two young men who are charged?

7         MS. GORDON: They went -- they used to be around in

8   there they said, lived around when we first moved there.

9         MR. GOGGANS: As I understand it, these were people

10   that your children knew, not you?

11         MS. GORDON: These are -- the defendant there I think

12   that they knew when we lived over there.

13         MR. GOGGANS: Do you remember if they expressed any

14   opinion or like or dislike about them?

15         MS. GORDON: No, they didn't.

16         MR. GOGGANS: Nothing else.

17         MR. GREENE: Nothing.

18         THE COURT: Thank you, ma'am. If you would, Ms.

19   Gordon, please be back in the morning at 9:00 o'clock. We

20   appreciate your time this afternoon.

21         That's 45 folks.

22         MR. GREENE: Your call.

23         THE COURT: Let's go with that.

24         (The following occurred in the presence and hearing

25   of the jury venire:)

Ann H. Armstrong, RPR

```
1              THE COURT:  Ladies and gentlemen, we have now
2    qualified 45 jurors.  That's a sufficient number for us to
3    conclude the strike process.  Those of you who have not been
4    questioned on an individual basis, we are going to go with
5    these 45.  Those of you who have not been back there with
6    us, we are going to excuse you for the rest of this evening.
7    We are going to stay here though and continue to conclude
8    this process.  There are other things that we've got to do.
9    The jurors will be excused.  I know that you don't want to
10   come back in the morning at 9:00 o'clock, but I'm going to
11   ask you to do that because Judge Meigs will be here to try
12   other cases.  I don't know what he has to try.  You may only
13   be here a few minutes.  I hate to inconvenience you further.
14   But I have to ask you to come back in the event we need to
15   try some other cases.  Tomorrow morning when you do come to
16   court, if there are things that have happened over the
17   course of the last couple of days that have come up that you
18   feel like you have got to attend in your professional lives
19   or in your personal lives, please bring that to Judge Meigs'
20   attention.  He can be a little more flexible now because the
21   nature of the other cases are a little different than the
22   nature of this case.  Some of the excuses and some of the
23   things that I ordinarily would have been able to excuse you
24   or defer you with on yesterday will be things that he can
25   reconsider tomorrow morning, and he will do that.  I
```

Ann H. Armstrong, RPR

512

1    appreciate all of you.  I appreciate your time and certainly

2    your patience.  I know that this is a very difficult process

3    for us to go through.  It inconveniences you, your family,

4    your jobs, your employers.  But without you being here, we

5    can't go through this process.  And it is absolutely

6    necessary that we do so.

7        Once again I want to thank you for your time and your

8    attention and your patience.  And please be back, and if you

9    would, please report to Judge Meigs' courtroom in the

10   morning at 9:00 o'clock, those of you who did not go through

11   the individual voir dire process here.

12       (A recess was taken.)

13       MR. GOGGANS:  At this time the Defense makes a motion

14   pursuant to Batson vs. Kentucky, 14th amendment and related

15   to our state constitution provisions and state statutes on

16   the State's jury selection.  It had I think seventeen

17   strikes.  The first fifteen were by our records black

18   jurors.  And the last two -- 44 was a white male, and number

19   197 was a white female.

20       According to the court records the first strike was

21   26, a black male; 25, a black male; 75, a black female; 204,

22   a black female; 224, a black female; 165, black female; 170,

23   black female; 70, black male; 65, black female; 74, black

24   female; 59, black male; 62, black female; and 43, black

25   female; 184, black female; 15, black female.

1        MR. GREENE:  The State makes the same motion on the

2   grounds that the defense is practicing racial discrimination

3   by using its preemptory strikes to remove white jurors from

4   the panel with the exception of two.

5        THE COURT:  Mr. Greene, if you would, please go

6   through your strikes and give us the race neutral reason.

7        MR. GREENE:  Juror number 1 -- excuse me, the first

8   strike for us, juror number 26.  Frank Carter.  We struck

9   him because he knows the Defendant and works for the defense

10  attorney, with the firm was the notes I made.

11       Strike number 2 was juror number 25, James Carson.

12  Police department reports a series of family violence

13  reports.  The Defendant was extremely reluctant on the death

14  penalty.  He indicated that he did not favor it; he was very

15  confused about whether he could or could not impose it.  We

16  removed him on that ground.

17       The next strike was strike number 3 which was juror

18  number 75, Ella Gordon.  She generally opposed the death

19  penalty but could, has arrest record, had a 21 year old

20  daughter.  The children knew the defendants, lived near in

21  the same neighborhood.  The 21 year old daughter associated

22  with them and knew them and grew up with them and had a

23  series of family violence reports from the police

24  department.  We struck her on those grounds.

25       Strike number 4, juror 204, Ms. Surles.  She is the

514

1    mother of one Frankie Surles.  Frankie Surles is someone I

2    personally prosecuted.  He was a one man terror at one point

3    with some ten pending burglaries, a major criminal in the

4    area.  I know Ms. Surles and have dealt with her, of course,

5    in the course of prosecuting her son.  We certainly wouldn't

6    want her on a jury I was dealing with.

7         The next juror was strike number 5, juror, 224, Ms

8    Wright.  She opposes the death penalty.  Then she favored

9    the death penalty.  Then she was very confused about it.

10   She could not vote to put anyone to death.  She wasn't clear

11   about it.  She lives in Banks Trailer Park, the same age of

12   the defendant and the witnesses.  She is young, single and

13   unemployed.  She seemed to be not with us on the issues that

14   we were about in this case.  We struck her on those grounds.

15        Strike number 6 was 165, Wanda Perkins.  She knows

16   the Defendant and the attorneys in this firm or the defense

17   attorney or the attorneys in the defense attorney's firm.

18   And she has an uncle, William Rudolph who is a defendant in

19   a murder charge.  We struck her on those grounds.

20        Strike number 7 was number 170, Ora Pritchett.  She

21   has a prior criminal record some years back, arrested on two

22   other occasions.  There was some question about a known

23   criminal Brian Pritchett, whether she was connected with him

24   or not.  The biggest problem I thought she had was that she

25   was very clear that she was in favor or go with or be

1    predisposed to life without parole as opposed to the death

2    penalty.  We felt that she would not be a person capable of

3    doing the death penalty.

4         The next strike number 8, juror number 70, Marshall

5    Gill.  Mr. Gill has a brother, Eric Gill, who I think was

6    involved in either a murder or shooting into a building but

7    anyhow, violent crime.  And apparently he has a kinsman who

8    is a defendant in a drug case.  He has a personal arrest

9    record that's quite substantial.  We struck him on those

10   grounds.

11        Strike number 9, juror 65, was Jessie Gardner.  She

12   opposed the death penalty.  She works at Mental Health as a

13   trainer.  We know that the Defendant has been to the Mental

14   Health Center here on at least two occasions.  She

15   centrically should have had some contact with him.  But in

16   any event she was opposed to the death penalty

17        Strike number 10 was juror 74, Carol Gordon.  She has

18   an arrest record of her own.  She is a mother of one Jarvis

19   Gordon who is a person with serious criminal charges that

20   we're presently in the business of prosecuting.

21        Strike number 11 was juror 59, Curtis Fails.  Mr.

22   Fails -- yeah, he is the one that had the brother that was

23   not in the murder charge but in the charge of shooting into

24   on occupied vehicle or building, Aaron Fails.  He has his

25   own series of criminal arrests, I think five in number for

516

1    various misdemeanor offenses, some involving violence.   In

2    the course of voir dire he gave an extensive discussion and

3    speech concerning rap music and the relative position that

4    various people should take on that.   He apparently seemed to

5    be in favor of some of it at least.   We struck him on those

6    grounds.   We do expect the issue or rap music to be

7    something that comes up in the course of this trial.

8          Strike number 12 was number 62, Yolanda Flowers.

9    Police department reports numerous contacts and tickets with

10   her.   She is single, unemployed.   She is close to the age of

11   the Defendant.   She indicated on voir dire that she knows

12   Bam Bam and the Suttles family and lived near them for some

13   period of time during this.   We removed her on those

14   grounds.

15         Strike number 13 was juror 43, Rosie Davis.   She has

16   an arrest record of her own.   It is showing previous

17   criminal charges.   She is opposed to the death penalty.   She

18   is very confused about the entire procedure, and her quote

19   was, leave it for somebody else.   We struck her on those

20   grounds.

21         Strike number 14 was jury 184, Virginia Savage.   Ms.

22   Savage has had several family violence reports filed with

23   the P. D. and is reported to have some individuals that she

24   associates with that are criminals.   The victim's family

25   indicated they knew of her in the past.   In general she was

517

1    somebody that concerned me from the very start as we had

2    this matter.  She had numerous replies with weapons and

3    various other instances as we went through voir dire.  We

4    removed her on that history.

5         Strike number 15 was juror number 15, who was Malanda

6    Brown.  Ms. Brown had an arrest record.  She also -- if I

7    understand the connection worked at Heilig-Meyers where Mr.

8    Fails worked, previous juror number 59 that was struck,

9    number 11.  The two of them had some -- they well may have

10   had some connection.  I don't know.  But her latest arrest

11   was a menacing charge in I think mid '92, '93.

12        And strike number 16 was juror number 44, William F.

13   Day.  Mr. Day was a white male with an arrest record, late

14   in '91 for drunken charges.  He's also known by Detective

15   Grindle to have two individuals that he associates with, one

16   of which we have been trying to prosecute.

17        And the last strike was 197, strike number 17, juror

18   number 197 who was Debbie Sorrells.  Ms. Sorrells indicated

19   that she would oppose the death penalty.  She was somewhat

20   hesitant about it but felt like that she would not be in

21   favor of it.  We removed her on that ground.  That completes

22   our strikes.

23        MR. GOGGANS:  The defense would be happy to state the

24   grounds for our strikes.  Mr. Wiggins and I combined our

25   notes, and we primarily offered my notes, but Mr. Wiggins

1    has some additional notes.  I'll ask him to state anything

2    additional he wrote down.

3           Defense's first strike was number 162, William

4    Patrick, a white male.  We had a number of things that

5    concerned us about Mr. Patrick.  He is employed by the Selma

6    Fire Department, and his wife is employed in the Selma City

7    School System.  The government employment connection

8    concerned us there.  One thing that concerned us greatly was

9    his question during the session in the jury room about

10   whether life without parole actually meant life without

11   parole or a question somewhat to that effect.  That

12   concerned me about his views on the punishment should this

13   case get to the penalty phase.  I thought that his views on

14   the punishment were of great concern to the defense.  Also I

15   believe that he said he had been, either he or somebody he

16   knew, a family member had been a property crime victim as

17   well as a violent crime victim.

18          The next strike was number 192, which was Joseph

19   Smith.  Mr. Smith is a white male.  He worked at

20   International Paper.  Let me find my notes on him.

21          MR. WIGGINS:  He was very young, but our firm sued

22   International Paper on a racial discrimination complaint

23   that recently settled.  And all of those persons were

24   involved in the Selma office and the Hale County office.  We

25   were involved in the discrimination complaint.

1       MR. GOGGANS:  That was another note I had that Mr.

2  Wiggins' firm was involved in suing his company, and he was

3  involved in that.

4       The next strike is number 195, Sam Smitherman.  His

5  brother, of course, is the mayor of the City of Selma.  He

6  is a city employee.  We had concerns about government, city

7  government connections there.

8       MR. WIGGINS:  Also Judge, one of the concerns that he

9  would automatically consider the death penalty.  We had

10  objected to him and asked you to exclude him, and you

11  overruled that.

12       MR. GOGGANS:  We had moved to exclude him on his

13  death penalty views.  The Court overruled that motion.  The

14  next strike was number 29 was Mr. Edward Chance.  Mr.

15  Chance is a white male.  I think he was pretty clear in the

16  voir dire that his brother was murdered a number of years

17  ago, ten to twelve years ago.  I represented the Defendant

18  in that case.  I don't have any specific recollection of

19  whether this particular Chance was in there.  I actually

20  believe he was in and out of the trial, but that was I think

21  fair to say a fairly hostile proceeding.  That was one of

22  the primary reasons I struck him.  Regardless of what he

23  said, my recollection of having been the trial lawyer in

24  that case with Mr. Greene on the other side for four or five

25  days, this was a pretty heated situation.  The next strike

520

1    --

2          MR. WIGGINS:  Also with reference to him, he works

3    with Liberty National here, one of the biggest insurance

4    companies that we sue for fraud.  We have sued his company.

5    We have several pending in Dallas County and throughout the

6    black belt.

7          MR. GOGGANS:  The next strike was number 69, which

8    was Clarence Gilbert.

9          MR. WIGGINS:  Mr. Gilbert works for R. L.  Zeigler

10   Company, and that's another one of those racial and sexual

11   harassment suits that our company filed against Zeigler

12   within the last year.  And Mr. Gilbert again was one that

13   was out there even though he indicated he was not at work on

14   that occasion.  We sued the supervisor out there.  He was

15   one of the ones who was aware of what had happened and

16   refused to comment and get involved in that.

17         MR. GOGGANS:  Also I had a note that Mr. Gilbert was

18   a security guard which would probably put him in a mind set

19   to perhaps lean towards the government in a criminal case.

20   The next strike was number 193, which was Nannie Smith.  She

21   was a white female.  I did have one note that her daughter

22   worked at the Selma Times Journal and a little bit concerned

23   about whether or not or there has been or perhaps would be

24   any communication or any type of thoughts going back and

25   forth about publicity in the case.  But if I can find some

Ann H. Armstrong, RPR

521

1    other notes here.  Also during voir dire yesterday I believe

2    she indicated that her nephew had been killed in September

3    of 1997.  I believe she said at a school.  I'm not sure I

4    heard correctly where, but I do recall that she said that

5    she had a nephew who been killed just last September.

6         The next strike was number 225.  That was George

7    Yocum, a white male.

8         MR. WIGGINS:  Our firm was involved in some racial

9    discrimination complaints against Bush Hog where he

10   indicated his wife worked.

11        MR. GOGGANS:  Another note that I had too as one of

12   the reasons we struck Mr. Yocum is he responded in the

13   affirmative that he or a family member or somebody he knew

14   well was a property crime victim; also he responded in the

15   affirmative on the questions about any type of hostile

16   feelings towards the police or favored testimony of the

17   police -- right now I can't remember which one of those two

18   things that concerned me about Mr. Yocum.

19        The next strike was number 34, which was Windy

20   Clower, a white female.  I had a note here that she worked

21   at a dialysis unit; her husband is a physician.  She knows

22   the judge.  Let me see if I had any other notes here.

23        MR. WIGGINS:  Judge, our office had been involved in

24   a personal injury lawsuit against Goody's Family Clothing.

25   And Dr. Clower is one of the physicians who had treated my

Ann H. Armstrong, RPR

1   client.   And we were unable to get cooperation with Dr.

2   Clower's office in terms of trying to get a deposition to

3   get things done for that particular lawsuit, and we recently

4   settled.

5       MR. GOGGANS:   With the employment of Ms. Clower as

6   well as her husband's, I do consider that.   Also she

7   responded in the affirmative to questions about whether she

8   or family members, somebody she knew had been a property

9   crime victim as well as violent crime victim and also

10  responded in the affirmative in voir dire on questions about

11  problems with somebody using drugs.

12       The next strike was number 166, which was Charlotte

13  Pickering, a white female.   Ms. Pickering's employment was

14  in a dentist's office.   She seemed to be on pretty good

15  terms at least with the Court.   Let me find some other notes

16  on her.

17       MR. WIGGINS:   Also she indicated in response to

18  answer to a question that if the murder was committed with

19  intent and the Defendant had knowledge that he was going to

20  kill the victim, that she would in fact vote for the death

21  penalty.

22       MR. GOGGANS:   The next strike was number 53, which

23  was Gerald Dunn, a white male.

24       MR. WIGGINS:   Our firm currently has a lawsuit

25  pending against Moore Stewart Ford where he works in regards

523

1   to some improper repairs of an automobile that was done out

2   at the service unit.  And it's common knowledge out there in

3   regards to what's going on, but he indicated that he did not

4   have any knowledge of the lawsuit currently pending against

5   Moore Ford Stewart.

6       MR. GOGGANS:  One other thing, he said he knew the

7   deceased's grandfather.  The next strike was number 160

8   which was Betty Parnell, a black female.

9       MR. WIGGINS:  She indicated her son was killed even

10  though nothing had been done.  She felt that if someone had

11  taken the life of another, she believed that his life should

12  be taken also.

13      MR. GOGGANS:  I have a note here that I thought she

14  was either an automatic death penalty juror or very close to

15  being an automatic death penalty juror.  As Mr. Wiggins

16  said, she had responded in the affirmative about

17  having had a relative be a victim of a violent crime.

18      The next strike was number 220, which was Samuel

19  Williamson, a black male.  I have a note that I thought he

20  was bad on the death penalty questions.  He said he had been

21  a property crime victim.

22      MR. WIGGINS:  Judge, he also indicated that if he

23  thought this particular crime was a serious crime and the

24  victim did not provoke the defendant, that he would

25  automatically vote for the death sentence.

Ann H. Armstrong, RPR

1          MR. GOGGANS:  The next strike was number 167, Bruce

2     Posey, a white male.  I think we -- let me look at my notes

3     and make sure I remember.

4          MR. WIGGINS:  I think he indicated that he had

5     previously heard something from the television and the

6     newspaper and indicated that at that particular time he

7     thought it was such a bad event because he had heard that

8     the gentleman was trying to get a ride and all of a sudden

9     these three persons had killed this guy.  So he thought it

10    was real bad at the time.

11         MR. GOGGANS:  The main note I had on Mr. Posey was

12    one of the things he remembered was that the deceased in

13    this case had helped out the three people who are charged

14    with his death by giving them a ride from wherever they had

15    broken down back into Selma.  And that concerned me greatly

16    about having him on the jury if that's one of the things he

17    remembers.  It's probably one of the more pointed things

18    that would come out during the course of the trial.  He

19    already had pre knowledge of that, and that was stuck in his

20    mind.

21         The next strike was number 191, Gary Smith, a white

22    male.  Mr. Smith was a man who was self-employed at an air

23    conditioning refrigerator business.  I have a note that he

24    appeared very strong willed.  And I just had the sense that

25    he, just the direction he was headed was in favor of the

525

1   government.  In my dealing with air conditioner people over

2   the years, they have generally been fairly conservative

3   folks, particularly if they are strong willed.  They may

4   very well be a leader and lead the jury towards the other

5   way that we're trying to go here.

6        The next strike was number 217, which was John

7   Wilkerson, a black male -- no, a white male.  The notes I

8   have on Mr. Wilkerson -- I had a little bit of difficulty

9   following him.  I wasn't real sure exactly where he stood on

10  some things.  I believe he said he was available.  He didn't

11  really didn't get into exactly the nature of that.  I don't

12  recall that.  One of the things that Mr. Wiggins and I

13  talked about is he said that he had previously been a truck

14  driver, and we thought perhaps somebody that had traveled

15  over the road would be somebody who would be extremely

16  sympathetic to somebody who picks up some people that are

17  broken down and tows them in and carries them however many

18  miles and ends up getting shot.  That was the primary

19  reasons that we struck Mr. Wilkerson.  That concerned us a

20  great deal about him.

21       The last strike was number 46, which was Justin

22  Denmark, a white male.  I believe he was the Montgomery

23  student.  I don't believe he said he had any other

24  employment.  I live in Montgomery, and I have lived there

25  most of my life.  I think I can fairly say that TSUM is not

1  known as the hot bed of liberalism.  It's primarily a night

2  school with older adults going there who are for the most

3  part extremely conservative.

4  MR. WIGGINS:  Working during the day and going to

5  school at night, he doesn't do anything in the day but goes

6  to school at night.

7  THE COURT:  Sir?

8  MR. WIGGINS:  TSUM is really for those persons who

9  work during the day and go to school at night.  This

10  particular gentleman did not do anything during the day but

11  was going to school at night.  We were just concerned about

12  what was he really doing in the day that calls him to go to

13  TSUM at night.

14  MR. GOGGANS:  We really couldn't get a handle on this

15  fellow.  He just made us nervous.

16  MR. WIGGINS:  He said he saw a still photo of the

17  Defendant on television; it was really just a flash; he

18  really didn't hear anything.

19  MR. GOGGANS:  Also just for the record we had planned

20  to strike juror number 59, Mr. Fails, a black male; juror

21  number 165, Perkins, a black female; and juror 184, Savage,

22  a black female, but the State struck them.  So we didn't

23  strike them.

24  THE COURT:  All right.  Do either of you want to

25  respond to anything that the other has said thus far?

Ann H. Armstrong, RPR

527

1          MR. WIGGINS:  I do, Judge.

2          THE COURT:  Are you sure?

3          MR. WIGGINS:  I do in reference to the State, in

4     reference to juror 25.  The State indicated that she

5     appeared to be reluctant in favor of the death penalty.

6          THE COURT:  Juror 25 was a male.

7          MR. WIGGINS:  On that juror the State indicated that

8     that person was reluctant in favor of the death penalty.

9     Mr. Greene's comments was that basically that any person you

10    get back there and ask that particular question, initially

11    they are going to disfavor it.  I think that would just be a

12    common rule.  I remember him specifically making that

13    statement in reference to all of the jurors.   I remember

14    him specifically making that statement in reference to all

15    of the jurors.  In reference to juror number 75, she

16    indicated that that particular juror lived in a neighborhood

17    and probably had some family history.  I don't recall him

18    asking that particular juror any particular question about

19    her living in the neighborhood and what effect that might

20    have on this particular trial or her knowledge of the

21    defendant or of the witnesses that lived in that

22    neighborhood.  In reference to juror number 204, he

23    indicated that that was the mother of Frankie Surles.   The

24    only question he particularly asked her, did she know him,

25    Mr. Surles.  He did not go into the relationship or the

1    prosecution or anything like that, how she felt about him

2    having prosecuted that particular person.

3         He indicated that juror 224 did not give clear

4    responses and with was unemployed.  I didn't get into any

5    particular questions about how unclear she was.  It appeared

6    that several jurors were unclear.  He could have

7    specifically asked them to clarify their particular

8    responses.  I do not recall him doing that.  He indicated

9    she was unemployed.  The TSUM student was unemployed, and I

10   do not recall him trying to strike him.  He indicated that

11   she was the same age of the Defendant.  I think the TSUM

12   student was near the same age.  I do not recall him trying

13   to strike him for that particular person.

14        In reference to juror number 170, he indicated that

15   that particular person was familiar with Brian Pritchett.  I

16   do not recall Mr. Greene going into any details or knowledge

17   of Brian Pritchett or the association of Brian Pritchett and

18   whether or not that would affect the person's ability to be

19   fair in this particular case.  In reference to juror number

20   70, he indicated that he had a brother, Eric Gill.  The only

21   question he asked was whether or not do you know Eric Gill.

22   He did not go into any particular detail of the association

23   of Eric Gill or whether or not he had any ill will towards

24   the DA for having done something about that.

25        Juror number 65 indicated that she works at Mental

```
 1    Health.  I do not recall him going into any detail about her
 2    knowledge of this particular Defendant or whether or not she
 3    had any contact with him.  I don't think any records
 4    indicate she had any association with the Defendant at the
 5    Mental Health.  I think if he had that concern, he should
 6    have gone into some type of questions about her association
 7    with the Defendant.
 8          Juror number 74, in reference to something about
 9    Jarvis Gordon, a son, no questions.  He just asked do you
10    know Jarvis Gordon.  He didn't go into the association; he
11    didn't go into how that would affect her ability to be fair
12    nor the association with the district attorney or nothing
13    like that.  He just made a statement, do you know Jarvis
14    Gordon.
15          Juror number 59 is a brother of Aaron Fails, again no
16    question about the association, about the relationship with
17    Aaron Fails and whether or not that casts any light on the
18    DA's office.  He just asked, do you know Aaron Fails.
19          Juror number 62 said she knew Bam Bam lived in the
20    area, no questions about because she knew Bam Bam, lived in
21    the area would affect her ability to be fair or impartial or
22    whether or not that would, if Bam Bam testified had a
23    tendency to believe Bam Bam, but nothing like that.
24          Juror 43, he indicated that that particular juror
25    opposed the death penalty.  That juror specifically stated
```

Ann H. Armstrong, RPR

1    that he could listen to the instructions and make a

2    decision.  Even though he had a reservation, the reservation

3    was similar to all of the other jurors who had a gut feeling

4    reservation but felt that if the crime justified it, they

5    could give the death penalty.  He said she appeared confused

6    and said she would leave it to someone else.  But she

7    clearly stated that if it came down to it, that she could

8    make a decision.

9         Juror 184, he indicated some association with known

10   criminals, and that's probably everybody in Selma that lives

11   in that particular area.  Just because they are associated

12   with a criminal or may live in a criminal's neighborhood,

13   that wouldn't cast any light on whether that person could be

14   fair.  He didn't ask that juror whether or not he or she

15   knew any of the known criminals that he had concern about.

16   And there were several jurors as I can recall, eighty

17   percent that raised their hand about a weapon.  He said they

18   did it just because this juror had a weapon.  There may have

19   been 20 jurors who said they did not have a weapon.  All of

20   the others clearly indicated they either owned one or there

21   was one in their home.

22        He indicated that juror number 15 worked at Heilig-

23   Meyers and apparently knew one of the other jurors that

24   worked at Heilig-Meyers, no questions about their

25   association.  He did not even go into detail whether they

Ann H. Armstrong, RPR

1   knew each other, whether they worked the same shift or

2   nothing.  He just assumed that just because they worked at

3   Heilig-Meyers, that was a reason to strike.

4        Again juror number 44 indicated that the juror was

5   associated with criminals.  Again, no question to that juror

6   about what criminals, where they lived, whether or not this

7   affected their ability.  It could be that they just lived in

8   the neighborhood or had heard of them.  No real questions

9   from the DA's office.

10       Again 197, we are not really questioning because

11  that's a while female.  That concludes our comments.

12       MR. GOGGANS:  I don't have anything to add.

13       MR. GREENE:  In reply Your Honor, we have a question

14  for the defense, but the defense seems to be rather

15  selective in the part of the reasons that were given that

16  they picked out to go with.  Let's see.  On James Carson,

17  number 25, the strike reason once again was that he was

18  opposed to the death penalty.  He was confused and very

19  reluctant to go one way or the other on it and certainly

20  wasn't in favor of it.  Also we had in possession from the

21  police department the reports of family violence.

22       75, Ella Gordon, I have opposed to death penalty, had

23  an arrest record; 21 year old daughter, had a family

24  violence report.  Her children knew the defendants very

25  well, had visited in their home, lived in the area.  I can

 1   continue on with it, but there is no -- you know, he said we

 2   didn't ask about whether or not that might affect her or

 3   not.  I don't think I need to ask anything other than that

 4   we did ask questions about her children, where she lived.

 5   So I feel like that their whole approach to this is very

 6   selective as to what was stated.  That's our rebuttal to

 7   that.

 8        We would like to ask Mr. Wiggins -- I understand that

 9   he struck several jurors here because of sexual or racial

10   suits filed by his firm, some at International Paper; is

11   that correct?

12        MR. WIGGINS:  That's correct.

13        MR. GREENE:  And I understand Mr. Everette Smith, a

14   black male, is still on the panel.  He wasn't removed for

15   those reasons.  Is there some particular reason he wouldn't

16   be removed?

17        MR. WIGGINS:  I don't think he was in a management

18   position.  He was just a regular employee out there.  And in

19   a racial discrimination suit, I wouldn't think a black guy

20   would have any ill feelings towards us for trying to promote

21   racial harmony out at International Paper.  I think he

22   benefits from the fact that I had filed a lawsuit.

23        MR. GOGGANS:  I don't do that much civil work

24   anymore.  It has been my experience that people that you sue

25   have the tendency not to like it.

Ann H. Armstrong, RPR

1          MR. GREENE:  That's all we have, Judge.

2          THE COURT:  Does anybody want to say anything else?

3          MR. GREENE:  No, sir.

4          MR. GOGGANS:  No, sir.

5          THE COURT:  Okay.  The Court is going to deny the

6     Batson motions on both sides.

7          (Court was adjourned.)

8

9

10

11

12                              January 28, 1998

13          THE COURT:  If your name is called -- Mr. Kynard, he

14    will call your name.  If you would please come have a seat

15    in the jury box.

16          MR. KYNARD:  Donna Anthony, Verlisa Baity, Mary

17    Calloway, Patricia Cammack, Samuel Clark, Angela Cobb,

18    Charlene Cobb, Justin Denmark, Cheryl Dixon, Judy Golson,

19    Georgette Ruth, Everette Smith, Debbie Sorrells, Patricia

20    Trotter.

21          THE COURT:  Mr. Greene, Mr. Goggans, Mr. Wiggins, is

22    this your jury?

23          MR. GREENE:  Yes, sir.

24          MR. GOGGANS:  Yes.

25          THE COURT:  Ladies and gentlemen, we are going to

Ann H. Armstrong, RPR

```
 1   begin the trial of this case in just -- well, we're going to
 2   begin this trial this morning.  And in just a few minutes
 3   I'm going to give you some preliminary instructions
 4   regarding our procedures and how we will proceed today and
 5   tomorrow and throughout the remainder of the week on hearing
 6   the testimony in this trial.  Before we do that however,
 7   there are certain matters that we are going to take up
 8   outside of your hearing and outside of your presence.  These
 9   are things that we were unable to accomplish last night.
10   The hour just got late, and it was time to go home.  I'm
11   going to ask you all to please retire to the jury room at
12   this time.  I'm going to try to contact the county
13   commissioners and have them do something about the heat.  I
14   know it's warm up here, and we'll try to get it stopped.  I
15   have no way of controlling it from this courtroom.
16        I'm going to place you under the instruction again or
17   at least remind you of the instruction I previously gave you
18   yesterday and on Monday to not discuss the facts of the case
19   among yourselves.  Please don't allow anyone to discuss the
20   facts of the case with you.  This will be an instruction
21   that will go forward with you throughout the trial of this
22   case.  And I'm going to ask you to please observe this
23   instruction.  If in fact you do hear anything or if anyone
24   approaches you during a recess or a break, please let me
25   know so that we can take care of that.  I believe there is
```

```
 1   coffee in the jury room.  It's probably going to be about a
 2   forty-five minute delay between now and the time we get
 3   started with the opening statement.  If you do need to get a
 4   drink or a soft drink, please step out in the hall and get
 5   your soft drink and then come back into the jury room, and
 6   we will be with you shortly.
 7           (The jury was excused from the courtroom.)
 8           THE COURT:  Let's start first with the pending
 9   motions.  Are all the witnesses available here now who are
10   going to testify?
11           MR. GREENE:  I'll have to be sure, Judge.  Most of
12   them are outside.
13           THE COURT:  Let's get everybody in so I can give them
14   this instruction.
15           When everybody is in one spot, let me know.  We're
16   going to move onto something else.  The first motion is a
17   motion in limine regarding the deceased's good character and
18   impact on guilt or innocence phase.  This motion is to
19   prohibit the State from discussing or referencing the
20   deceased's good character during that guilt or innocence
21   phase.  The motion will be granted as to that phase unless,
22   of course, that particular evidence becomes relevant by way
23   of something that the defense brings forth.  However, that
24   motion is not granted as to a possible penalty phase.
25           MR. GOGGANS:  We intended that to be for the guilt
```

1    and innocence phase.

2         THE COURT:  That's the ruling on that motion.  There

3    was a motion for extraordinary expenses which was filed in

4    open court last night.  That motion was granted.  There is

5    also a motion in limine regarding advice of rights.  That

6    motion will be granted.  The State shall not make reference

7    to the fact that the Defendant was advised of his rights so

8    long as that particular evidence does not become relevant by

9    way of your own evidence.

10        MR. GREENE:  Or something totally changes in the

11   course of the trial, then it may be very relevant.  We

12   understand what you're saying.

13        MR. GOGGANS:  As I understand it right now the State

14   is not intending --

15        MR. GREENE:  We are not going to put it in, so it's

16   immaterial.  It may well be material in the course of the

17   motion to suppress, but that's outside the presence of the

18   jury.  We will deal with that then.

19        THE COURT:  That leaves us with the motion to

20   suppress unless I've missed something that's filed, and I

21   don't see it.

22        MR. GOGGANS:  I think that's everything pending.  We

23   have two motions to suppress which easily can be handled at

24   the same time.  One relates to the search at the Reeves'

25   residence; the other relates to Mr. Reeves' arrest at a

Ann H. Armstrong, RPR

 1  different place.

 2       THE COURT:  There is a motion here in front of me

 3  regarding certain photographic evidence.  I believe the

 4  record is clear regarding that ruling.

 5       MR. GREENE:  I thought we had dealt with that.

 6       MR. GOGGANS:  I think we have, and I think the State

 7  is not intending to use the evidence that I --

 8       MR. GREENE:  We advised that we would show you -- and

 9  you know about the pictures from Dr. Wanger from the post,

10  and those are the same things basically on the video.  They

11  are just stills of what's on the video.

12       MR. GOGGANS:  I'm not saying that the defense will

13  not object to some of the photographs, but I think it can be

14  dealt with individually.

15       MR. GREENE:  You know, I'm not saying we are not

16  going to put in photographs of what's on the video.  The

17  photographs are not of the video but of the deceased's body.

18       THE COURT:  I think then that we have a ruling by way

19  of stipulation or agreement rather, by way of stipulation as

20  to the video.  And the defense will make its appropriate

21  objection on an exhibit by exhibit basis regarding the

22  photographs.

23       MR. GREENE:  We have them if you want to look at them

24  now.

25       THE COURT:  I will look at them while you're doing

Ann H. Armstrong, RPR

1    your motion to suppress.  Are we ready then to proceed?

2                              PAT GRINDLE,

3    after having been duly sworn, was examined and testified as

4    follows:

5                            DIRECT EXAMINATION

6    BY MR. GREENE:

7           Q      State your name and position, please.

8           A      I'm Detective Pat Grindle with the Selma

9    Police Department.

10          Q      Mr. Grindle, in the course of this

11   investigation, you seized certain evidence that we purport

12   to use in this trial.  Among those are the pieces of

13   evidence taken from the -- I will refer to it as the Reeves'

14   home at 2123 Selma Avenue; is that correct?

15          A      That's correct, sir.

16          Q      And what evidence did you take from that home

17   pursuant to this investigation that we are concerned with?

18          A      Multiple pieces of clothing with blood stains

19   on them to include shoes.  Also we took a shotgun from the

20   residence that was under a bed, bed linens that had blood

21   staining on them.

22          Q      All right.  Now we have those pieces, items of

23   clothing here?

24          A      Yes, sir.  I believe they have been brought

25   over.

                        Ann H. Armstrong, RPR

539

```
 1          MR. GREENE:  Mr. Edwards, could you bring those
 2   forward, please, sir?  Judge, it's my intent and purpose to
 3   identify these items that we are fussing over at this time
 4   if that's proper.
 5          Q     While he's bringing those forward -- now
 6   you've removed certain items of clothing and a shotgun?
 7          A     That is correct.
 8          Q     All right, sir.  Now the shotgun is presently
 9   at where, sir?  Who has possession of it?
10          A     Joseph Saloom of the State Forensics Lab.
11          Q     Is that shotgun identifiable by serial number?
12          A     Yes, sir, it is.
13          Q     Would you read that for the record, please?
14          A     It is a 12-gauge Mausberg pump shotgun with a
15   pistol type grip, serial number J866849.
16          MR. GREENE:  We would expect, Your Honor, when Mr.
17   Saloom testifies to offer that item itself.  We won't have
18   to identify it here right now.
19          Q     Now can you identify for us, sir, the items
20   that you seized from the home that are in these boxes that
21   are now being opened by the evidence technician, Mr.
22   Edwards?
23          A     We seized one white and blue Fila jacket.
24          Q     Fila, spell that please.
25          A     F-i-l-a.
```

Ann H. Armstrong, RPR

540

```
 1         Q       Is that located here in any of these boxes?

 2         A       Yes, sir.  It should be labeled as item number

 3    7.

 4         Q       Can you give that to the court reporter and

 5    have her mark it, please.

 6         (State's Exhibit Number 12 was marked for

 7    identification).

 8         Q       What else?

 9         A       Item number 8 which was a pair of white pants

10    with a belt.

11         Q       If I might ask you why you seized these items

12    and the other items you are going to list.  What was the

13    purpose of seizing them?

14         A       These items had blood staining on the

15    clothing, on what appeared to be blood staining.

16         MR. GREENE:  Mark 8, please.

17         (State's Exhibit Number 13 was marked for

18    identification.)

19         A       Item number 9 which was a pair of white and

20    blue Nike tennis shoes.

21         (State's Exhibit Number 14 was marked for

22    identification.)

23         A       Item number 10, which are a pair of white and

24    blue Reebok tennis shoes.

25         (State's Exhibit Number 15 was marked for
```

Ann H. Armstrong, RPR

1    identification.)

2         A       Item number 11 which were a pair of green

3    bluish colored jean type pants.

4         (State's Exhibit Number 16 was marked for

5    identification.)

6         A       Item number 12 which are a pair of gray khaki

7    type pants.

8         (State's Exhibit Number 17 was marked for

9    identification.)

10        A       Item number 16, which is a flower print sheet

11   with blood staining on it.

12        (State's Exhibit Number 18 was marked for

13   identification.)

14        A       Item 18 was found in the pocket of the blue

15   Fila jacket, which is a beeper, a cigar butt and a cigarette

16   lighter.

17        (State's Exhibit Number 19 was marked for

18   identification.)

19        Q       You also seized a shotgun from 2123 Selma

20   Avenue; is that correct?

21        A       That is correct.  That is our item number 17.

22        Q       I asked you earlier.  You seized these because

23   they had blood stains on them or were a weapon; is that

24   correct?

25        A       That is correct.

Ann H. Armstrong, RPR

1      Q       Or were enclosed in the blood stained

2   clothing?

3      A       That is correct.

4      Q       All right, sir.  In the course of your

5   investigation, did these items connect with suspects in the

6   case?

7      A       They did.

8      Q       All right, sir.  Now what led you to 2123

9   Selma Avenue, the Reeves' home?

10      A       On the night of the incident, the canine

11   tracked possibly a blood trail of some type to the residence

12   of 2123.

13      Q       And the residence of 2123 Selma Avenue, how

14   far is it, sir, or where is it with location of and in

15   location of the site where Mr. Johnson's body was found in

16   his truck?

17      A       Mr. Johnson's body was found in the midways of

18   Crockett's Alley.  The residence is 2128 Selma Avenue.  It

19   is approximately through the area that was tracked.  I would

20   estimate no more than fifty to seventy-five yards.

21      Q       All right, sir.  Now his body was discovered

22   about what time?

23      A       If I recall correctly it was in the early

24   morning hours between 1:00 and 2:00 if I'm correct on that.

25      Q       It was on Thanksgiving day itself?

Ann H. Armstrong, RPR

1      A       That is correct.

2      Q       And so that's when you and the dog unit and

3   police arrived somewhere around that time?

4      A       During those times, yes, sir.

5      Q       And the injuries to his body for the record in

6   this suppression hearing is what, sir?

7      A       He had a substantial wound to the neck area.

8      Q       The cause of death?

9      A       It was homicide.

10     Q       And that gunshot wound?

11     A       Yes, sir.

12     Q       Now after the dog tracked to the house, sir,

13  was that the information that you had at that point?

14     A       At that particular time it was the only

15  leading evidence to any type suspect, yes, sir.

16     Q       Was the dog tracking.  Could you see a blood

17  trail out there yourself with the naked eye?

18     A       There were several spots of blood on the

19  roadway, also in the back yard area of one of the residences

20  in close vicinity to this.  And there were visible blood

21  spots, yes, sir.

22     Q       And the house, 2123 Selma Avenue, the Reeves'

23  house, as you -- how many houses are between it and Crockett

24  Alley?

25     A       It's 2128, but it's only one residence between

Ann H. Armstrong, RPR

544

```
 1   the 2128 --

 2        Q        2128, and I'm referring to it as 3?

 3        A        Yes, sir.

 4        Q        Let me be sure.

 5        A        It's 2128.

 6        Q        All right.  There is only one house between --

 7        A        Yes, sir.

 8        Q        And the yard is there.  The back yard of those

 9   houses would be next to the alley and next to the truck?

10        A        That's correct.

11        Q        Where Mr. Johnson's body was found?

12        A        Correct.

13        Q        All right, sir.  Now after observing the blood

14   trail and having the information from the dog tracking, what

15   action did you take on this particular early morning?

16        A        I left from the scene of where the body was

17   located.  I went to the address of 2128.

18        Q        What did you do when you got there?

19        A        Upon arrival at the location I knocked on the

20   door, which was actually two doors on the very front.  I

21   knocked on the door and was greeted by a Ms. Marzetta Reeves

22   who is the owner of the residence.

23        Q        Where did y'all come together or meet?

24        A        On the very front porch of the residence.

25        Q        And did you tell her who you were, or did you
```

1    have uniformed officers with you at that time?

2         A     She was acquainted with me from prior

3    instances in my career as well as the fact that I identified

4    myself to her.  She was very aware of who I was, that I was

5    in law enforcement.

6         Q     And were the other officers with you and

7    present with you in uniform?

8         A     Yes, they were.

9         Q     Did you still have the dog, tracking dog, or

10   was he gone at that point?

11        A     The tracking dog was gone at this time.

12        Q     What did you say to her, and what did she say

13   to you there at the house?

14        A     I advised her, of course, who I was, that I

15   was there for the purpose of, that the dog had tracked to a

16   residence, that I was investigating a shooting incident in

17   Crockett's Alley which was near her residence.  At that

18   point in time I advised her that I was looking for any

19   potential evidence and other such and investigating the

20   thing and advised her, and then I asked her for permission

21   to search.

22        Q     What did she say?

23        A     At that time she said she had nothing to hide

24   and sure was the way she phrased it to me.

25        Q     Did you do something in writing to try to get

1    that written down?

2         A    The first response was verbal, and I verbally

3    advised her I would like to search the residence.  The

4    second was from follow-up.  I did a brief permission to

5    search form in handwriting because I didn't have a routine

6    form with me.  I read it to her.  She read over it, and then

7    she signed it agreeing me to, agreeing to allow the search.

8         Q    Where did -- after you got the oral

9    permission, did y'all begin to -- did you do some searching?

10        A    No, sir.  I went ahead and wrote out the

11   permission to search and had her sign it prior to us going

12   in.

13        Q    Did you do it inside the house or outside the

14   house?

15        A    We were -- the way her porch is located, you

16   have a front door that is directly in front of you.  You

17   have a side door to the right of you.  We did it within the

18   confines of the right-hand side door.

19        Q    All right, sir.  And I show you Exhibit 11,

20   sir.  Is this in fact the written permission that you gave

21   her and asked her to sign?

22        A    Yes, sir, this is.

23        Q    Is that in the same condition now as it was at

24   the time it was completed other than the evidence sticker?

25        A    Yes, that is.

Ann H. Armstrong, RPR

1  MR. GREENE:  We move for the introduction of State's

2  Exhibit 11 if the Court, please.

3  MR. GOGGANS:  For the purposes of this hearing no

4  objection.

5  THE COURT:  It will be admitted.

6  Q  Did she appear to be suffering, sir, from any

7  intoxication or injury, wounds or illness or anything that

8  you were aware of?

9  A  No, sir.

10  Q  You had dealt with her on many other

11  occasions; is that correct?

12  A  In my professional career, yes, sir.

13  Q  Did she appear to be in good shape or

14  understand what y'all were doing out there?

15  A  Yes, sir.

16  Q  And you told her you were there to investigate

17  a shooting, that the dog had tracked a blood trail there,

18  and you wanted to search the house looking for evidence of

19  the shooting?

20  A  That is basically the information I gave her.

21  Q  And she got that information?

22  A  Yes, sir.

23  Q  And she told you she had no objection, and she

24  had nothing to hide?

25  A  Correct.

Ann H. Armstrong, RPR

1          Q       All right, sir.  Did you then conduct the
2     search of the house?
3          A       We did.
4          Q       All right, sir.  Could you tell the Court,
5     sir, what you seized and where?
6          A       During the process of the search we entered
7     the residence.  Upon entry, we seized the items of one white
8     and blue Fila jacket in what is listed by me to be bedroom
9     number one.
10          Q       Now that's got an exhibit number or a number
11     that you put on it.  Could you give us those please?
12          A       Yes, sir.  It would be item number 7.
13          Q       That's your item number 7?
14          A       That is correct.  It was located in the
15     bedroom area of bedroom number one lying on top of a chair
16     next to a bed that had a flowered print sheet on it.
17          Q       Now on that occasion, let me ask you this, did
18     you receive a number of items from that particular bedroom?
19          A       Yes, I did.
20          Q       Would you read off the items and you give your
21     numbers for those items that you received from that bedroom
22     or seized from that bedroom?
23          A       Yes, sir.  We received item number 9 which is
24     a pair of white and blue Nike tennis shoes, item number 10
25     which is a pair of white and blue Reebok tennis shoes, item

1    number 11, which is a green blue jean type pants, item

2    number 12 which were a pair of gray khaki type pants.  That

3    was just within that room.  And also to include at that

4    point in time we recovered item number 17 which is a DFS

5    which was the 12-gauge shotgun.

6           Q       Where was it?

7           A       It was located under the bed that had the

8    flowered print sheet.  We also recovered an item number 16

9    which was the flowered print sheet that was on the bed.

10          Q       All right, sir.  And did Ms. Reeves accompany

11   you about the house as you went through this searching, or

12   did she stay in some other place or go somewhere?

13          A       The best I recall she was in the proximity

14   around us.  This is a two bedroom dwelling.  It's a small

15   dwelling.  She was within sight of us at all times.

16          Q       Who else was there besides Ms. Reeves; do you

17   remember?

18          A       At the time we went to the residence, if I

19   recall correctly she indicated that it was herself, a Tony

20   Hayes, her daughter, Marcy Reeves and her boyfriend, David

21   Irving.

22          Q       Where were these other people?

23          A       At the first entry of the residence if I

24   recall correctly, Mr. Irving was on a couch to the left of

25   the front door.  Ms. Reeves, of course, had met us at the

Ann H. Armstrong, RPR

550

1  door.  I'm not sure where she came from.  Marcy Reeves and

2  Tony Hayes came from the same area of this bedroom that

3  we're talking about.  They walked from that bedroom into the

4  living room area.

5      Q      Matthew and Julius Reeves, were they there?

6      A      They were not.

7      Q      Do you know them to be connected with Ms.

8  Reeves that you were speaking to?

9      A      Yes, I do.

10     Q      And have you had occasion to deal with them at

11 2128 Selma Avenue on other occasions?

12     A      On multiple occasions, yes, sir.

13     Q      On this particular bedroom, sir, could you

14 tell us anything about it, how it was constructed, doors,

15 windows or whatever?

16     A      The residence itself had no doors, interior

17 doors at all.  The only doors within the residence was a

18 bathroom door.

19     Q      This bedroom that you seized these items out

20 of including the shotgun had no door?

21     A      No door whatsoever.

22     Q      Did it have any windows?

23     A      I don't recall there being windows, but there

24 may have been one on the far wall out to the exterior of the

25 residence, but I don't recall.

Ann H. Armstrong, RPR

1      Q      Did it have any other beds in it, or how many

2  beds did it have in it?

3      A      It had two beds, a couch, a refrigerator, two

4  dressers.  It looked like a dressing table as well -- it was

5  like a dresser that had a mirror on it.  I believe there was

6  maybe a table between the two beds, but I'm not positive of

7  that right now.

8      Q      So from that room you received the clothing

9  that -- you seized the clothing that you talked about?

10     A      Correct.

11     Q      And this firearm?

12     A      Correct.

13     Q      What else did you seize in the house?

14     A      Okay.  What I show as being item number 8 in

15  the kitchen area, which you enter through into the kitchen

16  and turn to your left -- there was a pair of white pants

17  with a belt that had blood stains on it.

18     Q      You seized that?

19     A      Yes, sir.

20     Q      How old is Matthew Reeves?

21     A      I don't have his information in front of me,

22  but I estimate his age between nineteen and twenty.

23     Q      How old is Julius Reeves?

24     A      He is seventeen.  And a correction on Matthew

25  Reeves, his age was actually eighteen at the time of the

Ann H. Armstrong, RPR

```
 1   arrest.
 2         Q       Now did you then later have -- during the
 3   course of your investigation after taking these items from
 4   the house, did you then have occasion to interview
 5   individuals at or about the area that you were able to
 6   locate?
 7         A       Yes, I did.
 8         Q       And did you do that after this search?
 9         A       Yes, I did.
10         Q       All right, sir.  And did you learn any further
11   information about possible suspects?
12         A       Yes, I did.
13         Q       And what did you learn?
14         A       After the interviews were completed, of
15   course, with the occupants of the residence, I had learned
16   that an individual by the name of Brenda Suttles or what was
17   referred to us as Bam Bam had been at the residence earlier
18   with another male.  We also learned information that the
19   clothing belonged to Matthew, Julius and possibly this Bam
20   Bam.  We also learned information that earlier and prior to
21   all of this taking place concerning the search and all, that
22   the Marcy Reeves had seen a black male outside of her
23   residence and another black male outside the residence
24   leaning against a car.  That was the initial information we
25   had at this point in time with the witnesses we interviewed
```

Ann H. Armstrong, RPR

1    that particular day.

2         Q      Did you then try to locate Bam Bam or the

3    Suttles person?

4         A      Yes, we did.

5         Q      Did you receive any further information other

6    than what you have related to us prior to going over to or

7    trying to locate the Suttles individual?

8         A      That I recall, that was primarily the most

9    information we had.

10        Q      Now where did you learn or did you know that

11   Bam Bam Suttles lived or stayed?

12        A      She lived on a residence on Lavender Street.

13   I believe it was 314 Lavender.

14        Q      Could you verify that, please?

15        A      Yes, I will.  That is correct.  It was 3414

16   Lavender Street.

17        Q      And did you learn that from witnesses, or did

18   you learn that from previous information and previous

19   dealings?

20        A      The police department files show her at that

21   address.

22        Q      Did you proceed to that address?

23        A      I did.

24        Q      About what time did you get there?

25        A      I estimate it was early morning hours I

```
 1    believe between 5:00 and 6:00.  I'm not positive of that

 2    time.  It would be 5:00 to 6:00 or maybe a little bit later

 3    and maybe a little bit earlier.

 4          Q       When you arrived at the residence, sir, did

 5    you have uniformed officers with you?

 6          A       I had one uniformed officer with me.

 7          Q       So the two of you went, no more than two?

 8          A       No more than two.  Well, there was myself and

 9    also Detective James Walker.

10          Q       Okay.  And a uniformed officer?

11          A       That is correct.

12          Q       When you arrived there, sir, at the residence,

13    prior to entering the residence, did you make any

14    observations or see anything through any windows or openings

15    or doors or anything of that nature?

16          A       Prior to actually entering the residence, I

17    observed Matthew Reeves to the right of the doorway where we

18    had walked up.  He was lying on the couch.  I believe he was

19    facing out actually on the couch.

20          Q       And where were you when you observed that?

21          A       I was standing at the entrance doorway on the

22    front steps of 314 Lavender Street.

23          Q       Had you summoned anyone at that point, or were

24    you preparing to or --

25          A       I had already knocked on the door and was met
```

1   at the door by Brenda Suttles' sister.  I believe her name

2   was Carine.  I'm not positive of that.  And we were standing

3   at the door speaking with her explaining our purpose for

4   being there when we saw Matthew Reeves.

5        Q    All right.  At that point in time what action

6   did you take?

7        A    I immediately entered the residence and

8   apprehended Mr. Reeves.  From that point we attempted --

9        Q    You arrested him there at that time?

10       A    Yes, sir.

11       Q    This Defendant?

12       A    That's correct.

13       Q    Based on what information you had received

14  from the house and what you had learned from these

15  witnesses?

16       A    And including the fact that at that particular

17  time he was laying on the couch and laying next to him on

18  the couch was a jacket that appeared to have blood on it.

19       Q    At that point in time you say you then found a

20  jacket next to him?

21       A    That is correct.

22       Q    Did you seize that?

23       A    We did.

24       Q    And does it appear in this evidence box, sir?

25       A    Yes, it does.

1      Q       Would you get it out and give it to the court

2   reporter and identify it by your number so she can mark it.

3           (State's Exhibit Number 20 was marked for

4   identification.)

5      A       This would be our item number 25 which is a

6   blue and yellow white in color Michigan jacket.

7      Q       You refer to it as the Michigan jacket?

8      A       Yes, sir.  It's a starter type jacket which is

9   similar to a windbreaker.

10     Q       All right, sir.  Did you seize any other item

11  there at that time at the Lavender Street address, the

12  Suttles address?

13     A       No, sir, I did not.

14     Q       All right, sir.  Did you then take -- you took

15  the Defendant, Matthew Reeves, into custody.  Where did you

16  take him?

17     A       I took him to the Selma police department.

18     Q       Did he appear, sir, at that time to be

19  suffering from any injury wound or intoxication or illness

20  that you became aware of or was reported to you?

21     A       No, sir.

22     Q       Did you know him?  Had you dealt with him on

23  other occasions?

24     A       I dealt with him on several occasions in my

25  professional career.

Ann H. Armstrong, RPR

1    Q       And you were familiar with him?

2    A       Yes, sir, I am.

3    Q       And did he know you?

4    A       Yes, he did.

5    Q       All right, sir.  Now approximately what time

6  did you arrive at the police station with him?

7    A       Between the hours of 5:00 to probably 5:20.

8    Q       And did you at that time, sir, tell him what

9  he was charged with?

10   A       I did.

11   Q       And what was that?

12   A       Charged with capital murder.

13   Q       And did you go over his rights with him there

14  at the police station, sir?

15   A       I did.

16   Q       All right, sir.  And did he indicate to you

17  after you went over the quote rights under the Miranda

18  decision that he understood those rights?

19   A       We read our rights from the rights waiver

20  form.  I read him the rights from the rights waiver form,

21  had him read along with me.  He indicated he did understand

22  them, but he would refuse to sign the rights waiver form in

23  any form or fashion but did agree to give me a statement.

24   Q       What did he say?

25   A       I made notes from the original interview.

Ann H. Armstrong, RPR

1   Basically he denied any knowledge of the shooting.

2          Q       What did he say about the rights itself when

3   he said he didn't want to sign anything but he would be

4   willing to have a conversation with you?

5          A       He said he wasn't going to sign nothing, but

6   he would agree to answer my questions.

7          Q       All right, sir.  Did you read him the waiver

8   portion?

9          A       Yes, I did.

10         Q       Did you have the same conversation with him?

11         A       That is correct.

12         Q       All right, sir.  And did y'all engage in a

13  conversation?

14         A       We did.

15         Q       Now during the course of that conversation,

16  sir, after this -- by the way, Exhibit 10, is this the

17  rights waiver that you used on that occasion?

18         A       This is.

19         Q       All right, sir.  And you made notations about

20  refusing to sign and agreed to the interview?

21         A       That is correct.

22         Q       And is this Exhibit 10 in the same condition

23  now as it was when you completed it on that occasion?

24         A       It is.

25         MR. GREENE:  We move for the introduction of 10.

Ann H. Armstrong, RPR

1          MR. GOGGANS:  For purposes of this hearing, no

2     objection.

3          THE COURT:  It will be admitted.

4          Q     And during that conversation, sir, did you

5     have some communication with him concerning a shotgun shell?

6          A     Yes, sir.

7          Q     In a later conversation?

8          A     That came during a follow-up interview.

9          Q     So you had this interview at 5:30 in the

10    morning?

11         A     That's correct.

12         Q     And he understood his rights.  He said he was

13    willing to talk with you but didn't want to sign it?

14         A     Correct.

15         Q     Y'all did whatever you did about that, and

16    then later you had another interview with him?

17         A     That's correct.

18         Q     And was that at 1:00 o'clock on the 28th; is

19    that correct?

20         A     That is correct.

21         Q     Which was the afternoon; is that true?

22         A     That is correct.

23         Q     Did you go over his rights with him again on

24    this occasion?

25         A     I did.

Ann H. Armstrong, RPR

1      Q     This time was he willing to sign the document,

2  or did he sign the document?

3      A     He did.

4      Q     Did he indicate that he understood his rights?

5      A     He did.

6      Q     Did you go over the waiver portion with him?

7      A     I did.

8      Q     Did you on this occasion ask him to sign the

9  waiver portion?

10     A     Yes, sir.

11     Q     Did y'all engage in another conversation?

12     A     Yes, we did.

13     Q     Now on both of these occasions, sir, while you

14  were with him, while he was in your presence, did you offer

15  him any promise or hope of reward, threaten, coerce to get

16  him to speak with you?

17     A     No, sir, I did not.

18     Q     You indicated he wasn't suffering from

19  intoxication, illness or injury or anything that was

20  complained of to you.  Did you offer any promise, hope of

21  reward, threaten, coercion at any point in time during these

22  conversations to get him to speak with you?

23     A     No, sir, I did not.

24     Q     Would you describe his manner and demeanor?

25     A     He appeared to be very calm, controlled, well

1    controlled, understanding what I was telling him, basically

2    a normal conversation.

3        Q       Did you tell him, sir, that it would be better

4    for him if he talked to you or worse for him if he did not?

5        A       No, sir, I did not.

6        Q       Did he at any point in time, sir, ask you to

7    give him a lawyer or stop the conversation or become angry

8    or get in a heated conversation or belligerent in any way?

9        A       No, sir, he did not.

10        Q       None of those things happened during these

11    conversations?

12        A       No, sir.

13        Q       You have dealt with him on other occasions;

14    you have interviewed him before?

15        A       Yes, sir.

16        Q       You have given him his rights before?

17        A       If I recall correctly I believe I have.   I'm

18    not positive.

19        Q       Do you know if he's been given his rights on

20    other occasions?

21        A       Yes, sir.

22        Q       He has been arrested and charged in jail on

23    other occasions?

24        A       Yes, sir.

25        Q       He's not unfamiliar with the criminal justice

Ann H. Armstrong, RPR

1  process?

2       A       No, sir, not at all.

3       Q       And not unfamiliar with being arrested and

4  charged with criminal offenses?

5       A       That's correct.

6       Q       All right, sir.  During the second interview,

7  sir, did you in the course of that go with him to obtain

8  some pieces of evidence?

9       A       I did.

10      Q       What was that?

11      A       We responded back to 2128 Selma Avenue where

12 we recovered after he pointed out to us a shotgun shell that

13 was in the shotgun that was used to shoot the victim.

14      Q       All right.  Now what did you do with that

15 shell, and where is it now?

16      A       The shell was collected by me and transported

17 to Mr. James Edwards.  And then from there, it went to DFS

18 where as I understand it it's still in possession of Joseph

19 Saloom.

20      Q       Dr. Saloom?

21      A       Yes, sir.

22      Q       All right.  Any other items of evidence, sir,

23 that we have not discussed the basis or reasons that you

24 seized them?

25      A       No, sir, I believe that covers everything from

1  2128 Selma Avenue and also 314 Lavender Street.

2      MR. GREENE:  Your Honor, we would move for the

3  introduction of the items previously identified and also the

4  items to yet be identified, the shotgun and the shell.  Your

5  witness, Tommy.

6      MR. GOGGANS:  We ask the Court to defer ruling on

7  that until the conclusion of the hearing.

8                    CROSS EXAMINATION

9  BY MR. GOGGANS:

10     Q     Mr. Grindle, what time was it that you first

11 got the call about the shooting in the alley?

12     A     If you can let me get my incident report.  If

13 I recall correctly I got it between 2:00 to I believe 2:40,

14 somewhere in that time frame.

15     Q     A.M.?

16     A     A.M.

17     Q     Were you at home or at work?

18     A     I was at home.

19     Q     And you got there approximately what time?

20     A     Between the hours of probably I would say 2:00

21 to 2:40 to 2:45, something of that sort.

22     Q     As I understand it, when you went out there,

23 you didn't have an incident report form with you, correct?

24     A     That's referenced to an incident report form?

25     Q     Right.

564

1          A          When I first arrived there, my -- I don't

2     carry incident reports.   The officers do have incident

3     reports.   There were incident reports there.   But me myself

4     I did not have an incident report.

5          Q          What form was it that you were telling us you

6     didn't have?

7          A          That was a permission to search form, a

8     standard permission to search form.

9          Q          You mentioned that some dogs had followed a

10    blood trail.   Did the dogs start their tracking in the alley

11    area?

12         A          The canine officer, when I arrived what he

13    indicated to me -- the track was started somewhere in the

14    vicinity of the truck, and then it followed through there to

15    the 2128 address.

16         Q          Did the dogs also make a hit on 2124 at that

17    same street?

18         A          Not to the best of my recollection, sir.

19         Q          You don't recall that the dogs also went over

20    to 2124 as well as 2128?

21         A          Not that I recall, sir.

22         Q          Now you mentioned that you got Ms. Reeves to

23    sign a form and a follow-up of some sort; is that correct?

24         A          The information I was given by the canine

25    officer led me to 2128.   Therefore, I was following up on

1    that particular information, yes, sir.

2          Q     And as I understand your testimony, you said

3    that Ms. Reeves gave you oral permission to go in and

4    search; is that correct?

5          A     She gave me oral permission as well as she

6    signed the permission to search form that I made out giving

7    me permission to enter the residence.

8          Q     And when is it that you're saying she signed

9    the consent to search form?

10         A     When I went to the residence at 2128 Selma.

11         Q     When did you fill that out?

12         A     The exact time?

13         Q     Right.

14         A     It's not -- I think it's noted on here that I

15   filled it out at 3:15 a.m.

16         Q     You mentioned that at a later point you went

17   over to Brenda Suttles' residence; is that correct?

18         A     Yes, sir.

19         Q     And that her sister answered the door; is that

20   correct?

21         A     That is correct.

22         Q     Approximately how old would you estimate her

23   sister was at the time?

24         A     I would say she was thirty to thirty-five.

25         Q     When you first interviewed Matthew Reeves,

```
 1   that was at the police station?

 2          A      Yes, sir.

 3          Q      Was your interview with Mr. Reeves recorded?

 4          A      No, sir, it was not.

 5          Q      Did you ask him if you could record it?

 6          A      Yes, sir, I did.

 7          Q      What did he say?

 8          A      He said he would not give me a written -- I

 9   mean a recorded statement, but we would give me a written

10   statement.  That was the second interview.  The first

11   interview he said he ain't signing nothing.  He would just

12   give me a statement.

13          Q      Did you ask him if you could tape the first

14   interview?

15          A      Could I tape the first interview?

16          Q      Right.

17          A      His wording in it was he is not signing

18   nothing.  He is not giving anything of that type.  All he's

19   going to do is talk to me.

20          Q      The second interview was how much after in

21   terms of time of the first interview?

22          A      The first interview started at approximately

23   5:30 a.m. in the morning.  The second interview was at 1:00

24   o'clock p.m. in the afternoon.

25          Q      And he is in custody that whole time?
```

Ann H. Armstrong, RPR

```
 1        A       He was.

 2        Q       And as I understand it, on State's Exhibit

 3  Number 10, the first rights form, he refused to sign that,

 4  correct?

 5        A       That's correct.

 6        Q       And said he wouldn't sign anything, didn't

 7  want anything taken, correct?

 8        A       Basically he said he wasn't going to sign

 9  anything.  He agreed to talk to me.  That's the way he left

10  it.

11        Q       And the second interview form at 1:00 o'clock

12  p.m., State's Exhibit Number 9, has a signature of Matthew

13  Reeves on it, correct?

14        A       That is correct.

15        MR. GOGGANS:  Nothing else.

16                    REDIRECT EXAMINATION

17  BY MR. GREENE:

18        Q       Detective Grindle, in the course of both of

19  these interviews for the record, in these cases the

20  Defendant talked to you about what happened in the truck,

21  how the killing occurred?

22        A       On the second interview he did, yes, sir.

23        Q       And he told you he didn't do it; he said

24  somebody else did it?

25        A       That's correct.
```

Ann H. Armstrong, RPR

1        Q       All right, sir.  He told you that Julius and

2   Bam Bam were him?

3        A       That is correct.

4        Q       He named another party as being the actual

5   shooter; is that true?

6        A       That is correct.

7        Q       That party was not Bam Bam and not his

8   brother?

9        A       Not Julius.

10       MR. GREENE:  Thank you, sir.

11       THE COURT:  Anything else?

12       MR. GREENE:  That completes the State's presentation.

13       THE COURT:  Mr. Goggans, call your witnesses.

14       MR. GOGGANS:  The first witness is Marzetta Reeves.

15                       MARZETTA REEVES,

16   after having been duly sworn, was examined and testified as

17   follows:

18                     DIRECT EXAMINATION

19   BY MR. WIGGINS:

20       Q       State your full name for the record.

21       A       My name is Marzetta Reeves.

22       Q       Where do you live, Ms. Reeves?

23       A       2128 Selma Avenue.

24       Q       Do you know Detective Grindle?

25       A       Yes, I do.

1      Q      How do you know him?

2      A      He came to my house and knocked on the door

3  after they left the alley way.

4      Q      Excuse me?

5      A      I know Detective Grindle because he came to my

6  house after they left the alley way.  And they -- all of the

7  officers was all through the alley and all through the side

8  of my house and the other side.

9      MR. GREENE:  Objection, not responsive.

10     THE COURT:  Sustained.

11     Q      Did you know him prior to him coming to your

12  house?

13     A      Yes.

14     Q      Describe to the Court what happened that

15  night.

16     A      Well, what happened that night, like I was

17  saying, they was -- I heard some officers outside.  They was

18  shining lights through the windows and all around the house.

19  And then after awhile, I woke up after the officer knocked

20  on the door.  He knocked on the door.  He told me who he was

21  and everything.  And then he asked me did I know where

22  Matthew and Julius was.

23     Q      When you say he, who are you referring to,

24  Detective Grindle?

25     A      Yes, sir.

Ann H. Armstrong, RPR

```
 1            Q       About what time of the morning was this?

 2            A       I don't know.  I guess about 2:00 something,

 3     1:00 something, 2:00 something.

 4            Q       Who was home with you at that time?

 5            A       My daughter, Marzetta, my friend, David

 6     Irving, and another friend, Tony Hayes.

 7            Q       When you went to the door and you greeted

 8     Office Grindle, continue after that.

 9            A       Officer Grindle asked me had I seen Matthew

10     and Julius Reeves.  And I told him I hadn't seen them since

11     that morning, Wednesday morning.

12            Q       What happened after that?

13            A       Then he said, can I come in and see whether

14     Matthew and Julius are here, and I said, yes, you can.

15            Q       Was anybody else there besides Officer

16     Grindle?

17            A       I believe it was one officer.  I'm not sure.

18     I can't remember, but I know it was him.

19            Q       Do you know whether or not that other person

20     was in a police uniform, or was he dressed similar to

21     Detective Grindle?

22            A       I think -- well, I'm not sure, but I know it

23     was Grindle.  I know Grindle.  I remember Grindle.  We've

24     been so long.

25            Q       When you and Grindle were having this initial
```

Ann H. Armstrong, RPR

1    conversation, where were you?

2         A       In the room where Matthew and Julius sleep.

3         Q       So when he knocked on the door and he asked

4    you where Matthew and Julius were, where was that?

5         A       In the living room coming through the front

6    door.

7         Q       How did get inside the house?

8         A       He asked me could he come in.

9         Q       What did you tell him?

10        A       I said, yes, sir, so he could see was Matthew

11   and Julius at home.

12        Q       Did he ask you anything else prior to coming

13   into the house?

14        A       I don't remember.

15        Q       Why did he ask you to come into the house?

16        A       He was saying that there was a murder.

17   Someone had got shot in the alley.

18        Q       Did he ask you -- strike that.  You said he

19   asked you were they home?

20        A       Yes, sir, or had I seen them.

21        Q       Okay.  When you told him -- strike that.  You

22   told him they weren't there?

23        A       Yes, sir.

24        Q       In the living room?

25        A       Yes, sir.  When I told him they were not

Ann H. Armstrong, RPR

1    there, he said, can I see, and I said, yes, sir.

2         Q       Where did he go?

3         A       He came through the house.  We had to come

4    through the living room.  Then he went through the other

5    side of the house.  He checked the whole house.

6         Q       Was that other officer with him at that time

7    in terms of going through the house?

8         A       I know it was one other.  I don't remember.  I

9    know it was a law enforcement.  I ain't sure who the other

10   man was, but I know it was Detective Grindle.

11        Q       How it is you knew Detective Grindle prior to

12   that night?

13        A       Because he have came to my house before.

14        Q       For any particular reason?

15        A       For different incidences.

16        Q       Did Detective Grindle say anything else to you

17   about wanting to search your house?

18        A       No.  He just asked me could he come in there

19   and see whether Matt and them were in there.

20        Q       He was looking for Matthew?

21        A       Matthew and Julius, Matthew was not there, no,

22   sir.

23        Q       Did he leave after that?

24        A       He still talked to me.

25        Q       What did he say to you?

Ann H. Armstrong, RPR

573

1      A       He was asking me more questions.

2      Q       Were you on probation at the time?

3      A       Yes, sir, I was, and I was afraid.

4      Q       Was there a conversation about your probation?

5      A       He said I was in enough trouble, just tell him

6    where Matt and Julius was, and I didn't know where they was.

7      Q       He said you had been in enough trouble?

8      A       Yeah.  He said, don't you think you have

9    enough trouble, Ms. Reeves and do you really know where Matt

10   and Julius was.  And I said no, I do not, sir.  I do not

11   know where Matt and Julius is.

12     Q       Where were you all when you were having this

13   conversation?

14     A       In the room off of the living room where

15   Matthew and Julius sleep.

16     Q       Where were you in terms of in the room, in a

17   chair, on a bed, on a couch?

18     A       We both were sitting on the bed.

19     Q       Where were the other persons in the house at

20   that time?

21     A       I think it was an officer in there too.  Like

22   I said I don't remember nobody but Detective Grindle, a year

23   and some months, two months.

24     Q       Where were the other kids and the friends in

25   the house?

Ann H. Armstrong, RPR