**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MATTHEW REEVES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| x. | ) | Case No.  1:17-cv-00061-KD-MU |
| | ) | |
| JEFFERSON S. DUNN, | ) | |
| Commissioner of the Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

# VOLUME 6

# State Court – Trial, Reporter's Record

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
    CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

574

1           _____ My daughter and my fiance and her friend was

2      in the living room.

3           Q       Okay.  And what happened after the

4      conversation with you and Detective Grindle?

5           A       He talked to them, my daughter I guess.  I

6      don't remember.

7           Q       Did he say anything else to you about your

8      probation?

9           A       No.  He just said we were going to have to

10     leave to come up to the jail house and answer some

11     questions.

12          Q       I'm going to show you what was marked earlier

13     as State's Exhibit Number 11 and ask you to look at that for

14     me.  Have you seen that document before?

15          A       I signed a blank piece of paper.

16          Q       Looking at State's Exhibit 11, is that your

17     signature on that?

18          A       That looks like my signature, but I signed a

19     blank piece of paper.  It wasn't no writing on the piece of

20     paper, that I let him check the house for Matthew and

21     Julius.  That's all that was supposed to be on the piece of

22     paper that I signed, not that.

23          Q       So you are saying you signed --

24          A       A piece of paper that he check the house for

25     Matt and Julius.

1      Q      This document seems to say that I, Marzetta

2   Reeves, do authorize the Detective Grindle and any other

3   officer he designates to assist him in the search of my

4   residence at 2128 Selma Avenue.  I have been advised as to

5   the fact that Detective Grindle is investigating a shooting.

6   With this in mind I have agreed to allow Detective Grindle

7   to search my residence.  I have not been coerced in any way

8   into giving my permission to Detective Grindle in the search

9   of my residence.

10      A      I said I signed a piece of paper signing that

11   he could come in and check whether Matt and Julius were

12   there.

13      Q      Was the information I just read from State's

14   Exhibit 11 on the document you signed?

15      A      I don't remember seeing that.

16      Q      You were shaking your head when you said that?

17      A      No, sir.  I said I signed a piece of paper

18   stating that Matthew and Julius Reeves was not at home.

19   That's the only thing I remember.  That's the only thing I

20   put my signature on.

21      Q      Did Detective Grindle or any of the other

22   officers at the scene ask for permission to search your

23   residence for any other items?

24      A      They asked me was Matt and Julius at home.

25      Q      Did they ask you could they go into the rooms

Ann H. Armstrong, RPR

576

1    and look for any of the items?

2         A      No, sir.

3         Q      There is an initial on State's Exhibit 11.

4    Look at that.

5         A      Like I said before, I signed a piece of paper

6    for Detective Grindle to see were Matt and Julius there.

7    And I don't remember putting my initials on anything.  I put

8    my name on something.

9         Q      Are those your initials right there?

10        A      My name is right there.

11        Q      So those are not your initials on State's

12   Exhibit 11?

13        A      I don't remember signing no M. R. on there as

14   my initials.

15        Q      Did you see them go into the room and get any

16   items out?

17        A      I seen Detective Grindle ask me about a black

18   and white jacket which both of my boys wear sometimes and an

19   orange and green little thing, a parka like thing you put

20   over your head.   He asked me about them.  He asked me did

21   Matthew and Julius own I think a blue ski jacket or whatever

22   he was describing to me.  I told him no.

23        Q      Where were you when he was showing you those

24   items?

25        A      Well, where he was when he was asking me about

Ann H. Armstrong, RPR

1   those items?

2          Q       Yes, ma'am.

3          A       In the room where we were talking at first.

4          Q       Had he gotten those items before he talked to

5   you?

6          A       No.  The blue ski jacket or whatever, they

7   wasn't there at my house.  The blue, I mean black and white

8   jacket or it looked like a blue with some little dots in it,

9   a white jacket with some dots in it, white or blue -- he

10  asked me about that jacket, and I hold it up for him, and I

11  looked at it.  And he said -- and it was -- and the orange

12  down here and green up here, a pull over shirt, something

13  like a parka jacket.

14         Q       You mentioned that there was a conversation

15  with you and Detective Grindle about your probation.  Did

16  that occur when you were on the porch before Detective

17  Grindle got in your house or where?

18         A       No, sir.  Detective Grindle said to me that,

19  don't you think you're in enough trouble, Ms. Reeves.

20         Q       At what point?

21         A       When he come through the door.

22         Q       As he was coming through the door or when he

23  got --

24         A       When he was talking to me at the door.

25         Q       Did this comment in any way cause you to allow

Ann H. Armstrong, RPR

1    him to come into your house?

2           A      Yes.

3           MR. GREENE:  Objection to leading.

4           THE COURT:  Sustained.

5           Q      How did his comments make you feel?

6           MR. GREENE:  I didn't understand the question.

7           Q      How did his comments make you feel?

8           A      The comment made me feel intimidated because

9    he made me thought that he was thinking I was lying to him,

10   that Matt and Julius was in the house when apparently they

11   was not in the house.

12          Q      Did the Detective discover any items from your

13   house?

14          A      Yes.  They got some items from my house.

15          Q      Did you give them permission to go into the

16   house and retrieve those items?

17          A      No, sir.

18          Q      Do you know whether the items were lying in

19   plain view somewhere in the house?

20          A      No, sir, only the pair of white pants which my

21   son Julius Reeves has a bullet wound in his hip.  I believe

22   the right hip, the inner part.  That's where the blood came

23   from off of them pants.

24          Q      Were you in the room at any time while they

25   were looking for any of the items?

Ann H. Armstrong, RPR

579

1       A       When they got the pants, the white pants off

2  of the side of the kitchen, which there is a room on the

3  side of my kitchen.  When they got those white pants, I was

4  looking at them when they got those.  The other stuff I was

5  sitting down in the living room when they got there.

6       Q       Could you see them getting the other items out

7  of the other rooms?

8       A       No.

9       Q       They didn't call you back there to let you

10 see?

11      A       Before they got -- before he had the men come

12 in and put them in bags, they told me to come back there

13 then.

14      Q       But he did not show you where they had come

15 from in the room?

16      A       He moved the dresser, and that's where they

17 got some shoes and some pants.

18      Q       But I'm saying prior to them finding the items

19 in the house, did they call you back there for you to see

20 where they were?

21      A       I was not back there while they were

22 searching.

23      Q       Were any of the members of the house back

24 there besides the officers?

25      A       Not that I recall.

Ann H. Armstrong, RPR

580

```
 1        Q        Were all of you gathered in the living room?

 2        A        Yes.

 3        Q        Were there any police officers in the living

 4   room with you all?

 5        A        Yes, sir.

 6        Q        Were they different officers than the two that

 7   had come to the house?

 8        A        Yes, sir.

 9        Q        And did they tell you to stay in the living

10   room or what?

11        A        Yes, sir.

12        Q        Who told you to stay in the living room?

13        A        They said it would be best if we stayed in the

14   living room.

15        Q        What is your probation about?

16        A        It was about theft of services; somebody broke

17   a water meter in front of my house which I did not do it;

18   none of my children did it.  But because the water was in my

19   name, I was placed under two years probation.

20        Q        Probation was still in effect at the time

21   Detective Grindle came to the house?

22        A        It's still in effect, sir.

23        MR. WIGGINS:  That's all.

24                        CROSS EXAMINATION

25   BY MR. GREENE:
```

Ann H. Armstrong, RPR

581

1      Q      Now this early morning was Thanksgiving

2  morning, wasn't it?

3      A      I had seen -- are you talking about when the

4  officers came?

5      Q      Uh-huh.

6      A      It was like 2:00 o'clock.

7      Q      Is this your Bible?

8      A      Yes, sir.

9      Q      You brought it up here for some purpose?

10      A      No, I read my Bible every day.

11      Q      Did you bring it when you came see me?

12      A      Yes, sir.

13      Q      You did?

14      A      Yes, sir.

15      Q      Funny, I didn't see it.

16      MR. GOGGANS:  Your Honor, this is totally irrelevant.

17  He is just picking on the witness.

18      THE COURT:  Sustained.

19      MR. GREENE:  You're kind of picking on her bringing

20  --

21      MR. GOGGANS:  For the record she brought it to Mr.

22  Wiggins' office.

23      THE COURT:  I sustain the objection.  Now we've got a

24  long way to go in this trial.  We're not going to be picking

25  around with things.  Let's move on.

Ann H. Armstrong, RPR

582

1        MR. GREENE:  My objection is to that, Judge.

2        THE COURT:  Objection is overruled.

3        Q       What time did Matthew and Julius leave your

4   home the day before the officers came?

5        A       Wednesday, I could not say for certain, sir.

6        Q       Around noon?

7        A       Approximately.

8        Q       All right.  Did you see them anymore?

9        A       No, sir.

10       Q       All right.  And what time did you leave home

11  that day?

12       A       I left about two or three or four hours, about

13  3:00 or 4:00 o'clock that evening because I was --

14       Q       What time did you come back?

15       A       About 9:00 or after 9:00.

16       Q       Sometime after 9:00 maybe?

17       A       It was after 9:00, sir.

18       Q       After 9:00 o'clock?

19       A       Yes, sir.

20       Q       So you weren't there from the middle of the

21  afternoon until sometime after 9:00 o'clock; is that true?

22       A       Yes, sir.

23       Q       All right.  Now Officer Grindle came to the

24  door of your house; is that true?

25       A       Yes, sir.

Ann H. Armstrong, RPR

583

1        Q        And knocked on the door, and you came to the
2    door; is that true?
3        A        Yes, sir.
4        Q        And he asked you if he could go into the
5    house, that he had a shooting or a killing there next to
6    your house; did he tell you that?
7        A        He said he had a shooting in the -- they had a
8    shooting in the alley, and they was in the vicinity.  He
9    wanted to know was Matthew and Julius at home.
10       Q        Did he tell you that the dogs had tracked the
11   blood to your house?
12       A        He didn't say whether he tracked blood or not.
13   He just asked me was Julius or Matthew at home.
14       Q        You don't recall him telling you that the dogs
15   had tracked to your house?
16       A        No, sir.
17       Q        All right.  And did he ask you then if he
18   could come in and look for them and look for evidence in
19   your house?
20       A        He just asked me could he come in and see was
21   Julius and Matthew Reeves was at home.
22       Q        All right, sir.  Let me ask you this now.
23       A        Yes, sir.
24       Q        You testified to this Judge earlier that you
25   signed a piece of paper saying that it was okay for him to

Ann H. Armstrong, RPR

1    come in and look for Matthew and Julius; is that true?

2         A      Yes, sir.

3         Q      You also testified to this Judge a few minutes

4    ago that all you signed was a blank piece of paper; is that

5    true?

6         A      I said --

7         Q      Well, which one of them is true now?  They

8    can't both be true.

9         A      It was a white piece of paper, sir.

10        Q      You said a blank piece of paper, ma'am.

11        MR. GOGGANS:  I object, Your Honor.

12        THE COURT:  Just a minute, Ms. Reeves.

13        A      A clear piece of paper, sir.

14        THE COURT:  Ms. Reeves, just a minute.  Mr. Greene.

15        A      I have a nerve condition.

16        THE COURT:  Just a minute, Ms. Reeves.  Let me

17   instruct Mr. Greene.  I want you to ask a question and allow

18   her an opportunity to answer the question.  When she's

19   concluded her answer, you ask the next question.

20        Q      You testified to this Court a little while ago

21   that you signed a blank piece of paper.  You also testified

22   that you signed a piece of paper only allowing them to come

23   in and look for your sons.  Now which is true, please,

24   ma'am?  Do you have an answer?  Ms. Reeves, isn't it true

25   that the officers came there and told you that they wanted

585

1    to look not only for your sons but for anything that might

2    be in the house to search your house?

3         A    No, they did not.

4         Q    They have been to your house before and done

5    exactly that, have they not?

6         A    Yeah, when my mother was there I reckon.  They

7    didn't come in there when I was in charge of the house.

8    They came in there when Angeline Reeves was in charge of the

9    house, not when Marzetta Reeves was in charge of the house.

10        Q    Now did you see somebody move a couch or a

11   dresser or something and get some shoes; was that something

12   you saw?

13        A    When I went -- when they told me that -- when

14   I seen them, they had moved my dresser from the side of my

15   wall by the -- it's made like this right here.  And it's

16   like an opening, and I have a dresser right there facing the

17   opening.  And the dresser was moved, and the clothes was up

18   under the dresser.

19        Q    All right, sir.  Now did you see them move a

20   dresser and get some shoes?

21        A    I know the shoes wasn't in my floor before

22   they came there.

23        Q    Did you see the officers move a dresser and

24   get some shoes?

25        A    I didn't see the officer move nothing.  I told

Ann H. Armstrong, RPR

586

1   you that.

2        Q       All right.  So when you testified earlier that

3   you saw the officers move a dresser and get some shoes,

4   that's not true, is it?

5        A       Sir?  I said they was in the other room doing

6   whatever they was doing.  They had the officer -- I don't

7   know his name, but he moved the dresser.

8        Q       Did you see that please, ma'am?

9        A       I seen the officers.

10       Q       Did you go in that room and see any of these

11   clothes when you got back after 9:00?

12       A       It wasn't -- the clothes that they found up

13   under the dresser, no, sir.  The shoes they found up under

14   the dresser.

15       Q       Did you see any of these other clothes, the

16   clothes that the officers showed you, the jacket with the

17   blood on it and the coat, the other jacket and the pants and

18   all of that?  They showed you all of that, right?

19       A       The black and white jacket was sitting on my

20   chair, on the chair beside the bed.  And the green and

21   orange thing was sitting on the chair on the side of the

22   bed.

23       Q       So they were sitting on the chair beside the

24   bed; these jackets were; is that true?

25       A       Yes, sir.

587

1          Q          Did you see them after you came back at 9:00

2     o'clock?

3          A          I saw -- Detective Grindle asked me whose

4     jacket was that white and black jacket.  And I said both of

5     my boys wear that jacket.

6          Q          Did you see them when you came back at 9:00

7     o'clock?

8          A          Yes, sir.  They were there when Detective

9     Grindle came there.

10         Q          And you had seen them in the room prior to

11    9:00 o'clock, I mean after 9:00 o'clock.  I'm sorry.

12         A          Yes, sir.

13         Q          You went in the room; there wasn't any lights

14    and looked around?

15         A          Yes, sir.

16         Q          And you observed them hanging on the back of a

17    chair or laying on the bed?

18         A          The jackets were on top of some clothes folded

19    up in the chair.

20         Q          And you noticed the blood on them when you

21    came back after 9:00 o'clock?

22         A          I didn't notice any blood, but Detective

23    Grindle said it looked like a red blood spot that was on the

24    jacket, a little small spec.

25         Q          Julius has a bullet wound in his hip?

Ann H. Armstrong, RPR

588

1      A     Yes, sir.

2      Q     It bleeds a lot?

3      A     When he picks at it.

4      Q     All right, sir.  When did he get this bullet

5  wound?

6      A     He has been in jail a year or so, the year

7  before that.

8      Q     How long before Thanksgiving 1996 did he have

9  this bullet wound in his hip that he picks at?

10     A     I guess about four or five, three or four

11  months.

12     Q     Do you recall coming to my office to talk to

13  me about this case last week?

14     A     Yes, sir.

15     Q     All right.  Did I ask you if you gave the

16  officer permission to come in your house and search?

17     A     Uh-huh.

18     Q     What did you say?

19     A     When you said did I give them permission to

20  come in my house?

21     Q     And search and what did you say?

22     A     Yes, sir.

23     Q     What did you say?

24     A     Yes, sir.

25     Q     Did I show you -- I asked if you signed that

Ann H. Armstrong, RPR

1    to give them permission to come in your house and search?

2          A        There wasn't no writing on that paper.

3          Q        Did I show you this document and ask you if

4    you signed that to let them come in the house to search, and

5    did you say yes?

6          A        Yes, I did.

7          MR. GREENE:  Thank you, ma'am.  That's all.

8                        REDIRECT EXAMINATION

9    BY MR. WIGGINS:

10         Q        Ms. Reeves, when you say yes, sir to Mr.

11   Greene's question, are you saying yes, sir, you signed this

12   document with this writing on it?

13         A        No, sir.

14         MR. GREENE:  Objection, leading.

15         THE COURT:  Overrule the objection.

16         Q        The document you signed, you said it was

17   blank?

18         A        The document I signed -- he showed me a piece

19   of -- I guess it was notebook paper or white, just a white

20   form or whatever.

21         Q        Was it something similar --

22         A        It wasn't nothing on it until he said, well,

23   Ms. Reeves, if I write down on here that you gave me

24   permission to see was Matt and Julius Reeves in the house,

25   would you sign it, and I said, yes I would.

1    Q    Was the document you're talking about similar

2 to the back of State's Exhibit 9, a blank sheet?

3    A    It looked like a blank sheet, yes, sir.  When

4 I said blank sheet, I mean -- see, this one right here has

5 writing on it.  And this one right here doesn't.  That's why

6 -- and then he wrote on this part of the paper that I let

7 him check the house for Matthew and Julius Reeves.

8    Q    You said it did not have any lines on it on

9 State's Exhibit 11?

10    A    No.

11    MR. WIGGINS:  Nothing further.

12                    RECROSS EXAMINATION

13 BY MR. GREENE:

14    Q    Ms. Marzetta Reeves, that's you?

15    A    Yes, sir.

16    Q    Do you remember going and giving a statement

17 to the detective about this case on the morning of the 28th,

18 Thanksgiving morning?

19    A    Like I said after they got whatever they were

20 going to get and they took pictures and whatever they did at

21 the house, then Detective Grindle escorted me and my fiance

22 in one car, and my daughter and her friends were in another

23 car.

24    Q    And y'all went up to the police department?

25    A    Yes, sir.

Ann H. Armstrong, RPR

591

1      Q      And you were interviewed?

2      A      Yes, sir.

3      Q      And you gave a statement?

4      A      Yes, sir.

5      Q      To them?

6      A      They asked me questions, and I answered them.

7      Q      And in that statement Detective Grindle went

8  over coming to your house with you, didn't he?  He asked

9  you about all of that, about him coming there and him --

10     A      He asked me a lot of questions, yes, sir.

11     Q      He asked you, quote I came there tonight, and

12  you answered, yes.  Do you recall that?

13     A      Yes, sir.

14     Q      He asked, I advised you that I was there to

15  investigate a shooting; you said, yes; you told me something

16  had happened.  He said, all right.  Did you voluntarily

17  agree to let me come in the house, and you said, yes, sir.

18  Do you recall that?

19     A      Yes, sir.

20     Q      He said, okay.  You volunteered to let me

21  search the house; you said, yes, sir.  Do you recall that?

22     A      Yes, sir.

23     Q      Okay.  During the search -- Grindle then said,

24  okay, during that search you were aware that we discovered a

25  shotgun, clothing that had blood on it, some tennis shoes

592

1   that had blood on it, some other items.  And you said, I

2   know y'all took a lot of stuff, and I seen the shoes, and I

3   seen the pants with blood on it.  And I said y'all could get

4   the stuff.  Did you say that?  Do you recall that?

5          A       Yes, sir.

6          Q       All right.  And Grindle asked you, the bedroom

7   that I was in that I recovered the shotgun in, whose bedroom

8   was that, and you said it was the one Matthew and Julius

9   sleeps in.

10         A       Yes, they sleep in there.

11         Q       He went on to discuss the clothing with you

12  and talk about whose jacket and whose shoes and so on and so

13  forth and asked you specifically about what clothing

14  belonged to which of your sons; is that true?

15         A       Yes, sir.

16         Q       They went and discussed whose bed it was that

17  they got the gun out from under; is that right?

18         A       Yes, sir.  I guess so.  Like I said, it's been

19  a year and some.  I don't remember.  But I know he got some

20  things out of the house.

21         MR. GREENE:  Would you mark that for us, please,

22  ma'am.

23         (State's Exhibit Number 21 was marked for

24  identification.)

25         MR. GREENE:  For purposes of this hearing we move for

Ann H. Armstrong, RPR

1    the introduction of State's Exhibit 21.

2         MR. GOGGANS:  No objection for purposes of this

3    hearing.

4         THE COURT:  It will be admitted.  Anything else?

5         (Defendant's Exhibit Number 1 was marked for

6    identification.)

7                 REDIRECT EXAMINATION

8    BY MR. WIGGINS:

9         Q     Ms. Reeves, yes, sir, the initials that are on

10   State's Exhibit 11, do you write your R's that way?

11        A     My R's are like that R right there.

12        Q     You say the R right there, are you referring

13   to the R that's in your signature name?

14        A     Yes, sir.

15        Q     Let me show you what I've marked as

16   Defendant's Exhibit Number 1 and ask you on this first page,

17   is that your signature?

18        A     Yes, sir.

19        Q     Is that the way you make your R on

20   Defendant's Exhibit 1?

21        A     That's my handwriting, yes, sir.

22        Q     The second page of Defendant's Exhibit 1, is

23   that your signature?

24        A     Yes, sir.

25        Q     The third page of Defendant's Exhibit 1, is

1    that your signature?

2         A     Yes, sir.

3         Q     The fourth page of Defendant's Exhibit 1, is

4    that your signature?

5         A     Yes, sir.

6         Q     Is that the way you make your R's?

7         A     Yes, sir.

8         MR. WIGGINS:   Nothing further.  We offer these.

9         MR. GREENE:  We object.  If I understand her

10   testimony, she agreed she's signed that paper.  That's her

11   signature.  What's the purpose of that?

12        MR. WIGGINS:  We are showing her signature, and she

13   indicated that the R on State's Exhibit 11 is not her

14   initials.

15        MR. GREENE:  Your contention is that she didn't sign

16   that document?

17        THE COURT:  Their contention is that there is an

18   initial on that State's Exhibit 14 that at the end of the

19   paragraph does not purport to be her initials.  And for the

20   purpose of that, the Court is going to admit Defendant's

21   Exhibit 1.  Anything else?

22        MR. WIGGINS:  No, your Honor.

23        THE COURT:  Anything else?

24        MR. GREENE:  That's all.

25        THE COURT:  Ms. Reeves, is it your testimony that

595

1    when you signed the consent to search that it was a blank

2    like this?

3          A      Yes, sir.

4          THE COURT:  There wasn't anything on it?

5          A      No, sir.

6          THE COURT:  And you just signed a blank form with no

7    writing on it?

8          A      I gave him permission to see was Julius and

9    Matthew in my house.

10         THE COURT:  Look at State's Exhibit 14 with the red

11   tag there.

12         A      Yes, sir.

13         THE COURT:  Is that your signature?

14         A      Yes, sir.

15         THE COURT:  How did your name get on that signature?

16   How did your signature get on that document?

17         A      I don't know, sir.

18         THE COURT:  You said you wrote your name on that

19   form, didn't you?

20         A      I said I wrote my name.

21         THE COURT:  On the blank form?

22         A      Yes, sir.

23         THE COURT:  Is that your signature right there?

24         A      It looks like it.

25         THE COURT:  How did your name get on that form?

Ann H. Armstrong, RPR

1      A      I don't know, sir.

2      THE COURT:  It's a mystery?

3      A      Yes, sir.

4      THE COURT:  All right.  Anything else?

5      MR. GOGGANS:  Nothing else from Ms. Reeves.

6      THE COURT:  We are going to put this jury in recess.

7      (The following occurred in the presence and hearing

8  of the jury:)

9      THE COURT:  This took longer than 45 minutes.  I

10  apologize for the delay.  We still have not concluded the

11  matters that we are taking up outside of your presence.  We

12  anticipate that it may be another thirty minutes perhaps

13  before we conclude that.  I'm going to place you in recess

14  until 11:00 o'clock so you can get out of the jury room and

15  go and do something else in and around the courthouse.

16  Please be back reassembled in the jury room at 1:00 o'clock.

17  Of course, I want to continue to instruct you to avoid any

18  contact with the witnesses; avoid any news report of what's

19  been going on here in the proceedings.  Don't discuss the

20  facts of the case with anyone.  If you all would please

21  retire to the jury room, and you may go out of the jury

22  room.  Please be back at 1:00 o'clock in the jury room.

23      (The jury was excused from the courtroom.)

24                  MATTHEW REEVES,

25  after having been duly sworn, was examined and testified as

```
 1   follows:
 2                      DIRECT EXAMINATION
 3   BY MR. GOGGANS:
 4        Q      You're Matthew Reeves?
 5        A      Yes, sir.
 6        Q      What is your date of birth, Mr. Reeves?
 7        A      12-13-77.
 8        Q      And you need to speak up so this lady here can
 9   get everything down?
10        A      12-13-77.
11        Q      Do you remember the day you were arrested in
12   November of 1996?
13        A      Yes, sir.
14        Q      Do you remember talking with Mr. Grindle at
15   the police station?
16        A      Yes, sir.
17        Q      Do you remember whether or not you said
18   anything to Mr. Grindle about whether you wanted to talk
19   with him?
20        A      I denied it.
21        Q      You need to speak up?
22        A      I denied the Miranda rights at first.
23        Q      When you say you denied the Miranda rights --
24        A      I didn't want to sign.
25        Q      Tell me what you told Mr. Grindle.
```

Ann H. Armstrong, RPR

598

1       A       I told him that I didn't want to sign it.

2       Q       Did you tell him anything about whether you

3   wanted to talk with him the first time he was talking to

4   you?

5       A       I don't recall.

6       Q       Did you talk with him the first time you were

7   with him about 5:30 or so in the morning?

8       A       I can't recall that.

9       Q       Do you remember him talking with you a second

10  time shortly after lunch that day around 1:00 o'clock?

11      A       A short conversation.

12      Q       Do you recall having any discussion with Mr.

13  Grindle after lunch about whether or not you would talk with

14  him?

15      A       Repeat.

16      Q       After lunch when you talked with Mr. Grindle,

17  do you recall whether or not you and Mr. Grindle had any

18  conversation about whether or not you would talk to him?

19      A       (Shakes head negatively.)

20      Q       Did he tell you anything after lunch?  What

21  did he tell you after lunch?

22      A       Nothing, but he asked me again would I sign

23  the Miranda rights.

24      Q       What did you tell him?

25      A       At the first -- after I told Mr. Grindle that

1    I wasn't going to sign the Miranda rights at first, the

2    first time he asked me, he left it there for a minute, and

3    then he asked me again.  After he said -- he said, if I

4    didn't sign the Miranda rights, that I was going to be

5    charged with capital murder and drugs.  And then I signed it

6    the second time.

7         Q       Why did you sign it the second time?

8         A       Due to the fact of the conversation we had.

9         Q       Due to the fact that he told you if you

10   didn't, he was going to charge you with capital murder and

11   drugs?

12        A       Yes, sir.

13        MR. GOGGANS:  No other questions.

14                         CROSS EXAMINATION

15   BY MR. GREENE:

16        Q       At 5:30 that morning, you met with him at the

17   police department, right?

18        A       Yes, sir.

19        Q       He took you in custody over at Bam Bam's

20   house?

21        A       Yes, sir.

22        Q       You were on a couch; is that right?

23        A       Yes, sir.

24        Q       All right.  And you and he entered into a

25   conversation, is that correct, at 5:30 that morning?

Ann H. Armstrong, RPR

```
1        A       Short.

2        Q       Sir?

3        A       Short.

4        Q       Short, long or otherwise, did you enter into a

5    conversation with him?

6        A       Yes, sir.

7        Q       He wrote down on the rights waiver, and you

8    know about rights waivers.  You have seen them before,

9    haven't you?  You've seen these before, haven't you?

10       A       Yes, sir.

11       Q       All right.  Before that day I'm talking about

12   you have been arrested; the police have interviewed you

13   before.  You knew about this stuff?

14       A       None of that.  They didn't have none of them

15   Miranda rights.

16       Q       You have never seen one of these Miranda

17   rights before in your life before this day?

18       A       No, sir.

19       Q       All right.  And you told him that you agreed

20   to talk with him on this occasion, but you didn't want to

21   sign anything; is that true?

22       A       Yes, sir, due to the fact that he said I would

23   be charged with capital murder.

24       Q       You were in fact charged with capital murder

25   at that time, weren't you, sir?
```

Ann H. Armstrong, RPR

```
 1          A       He just showed me a piece of paper with my

 2   name on it saying I'm wanted for murder, no capital murder.

 3          Q       You were arrested at that point; is that

 4   right?

 5          A       Yes, sir.

 6          Q       You'd been charged with murder you say?

 7          A       Yes, sir.

 8          Q       How about capital murder; you say it wasn't

 9   capital?

10          A       No capital.

11          Q       But you agreed to talk with him there that

12   morning, did you not, at 5:30, and you did talk with him,

13   didn't you?

14          A       Not to my knowledge.

15          Q       You didn't discuss anything with Detective

16   Grindle at 5:30 that morning?

17          A       It was in the evening time.

18          Q       Did you discuss anything with him at 5:30?

19          A       Not to my knowledge.

20          Q       So your testimony is you didn't say anything,

21   and y'all didn't have any conversation and nothing was said

22   or done at 5:30 that morning after you were arrested at Bam

23   Bam's and brought to the police station?

24          A       Nothing more than I was arrested for a murder.

25          Q       How about a conversation?  Did y'all talk
```

1    about anything there at the police station?  I want to get

2    it straight now.  I want to understand what you're saying.

3        A      He asked me questions about who was all there

4    and that he know that my -- he said that he knows that my

5    brother had killed the man.

6        Q      Do you understand what I'm asking?  Did you

7    have a conversation, sir?

8        A      No, sir.

9        Q      You didn't talk to him, or did you talk to

10   him?  Which is it?  That's not hard, is it?

11       A      No, it ain't hard, no.

12       Q      You didn't talk to him; you didn't have a

13   conversation?

14       A      No.

15       Q      He didn't ask you where you were or who you

16   were with or where y'all went, what happened at Bam Bam's;

17   he didn't ask you any of that; you didn't talk to him at

18   all?  That's your sworn testimony?

19       A      Not until 12:00.

20       Q      Not until that afternoon?

21       A      No, sir.

22       Q      You didn't tell him at 5:30 that morning that

23   you had been at Bam Bam's house since 4:15 the day before?

24       A      Since what?

25       Q      Did you tell him at 5:30 that morning,

```
 1    Detective Grindle -- did you tell him at 5:30 that morning
 2    that you had been at Bam Bam's since 4:00 o'clock the
 3    afternoon before?
 4           A      Not that I recall.
 5           Q      All right.  And that afternoon around 1:00
 6    o'clock, you signed the rights waiver and gave him a
 7    statement at that time too; you agree with that?
 8           A      Yes, sir.
 9           Q      And at that time you were charged with murder
10    according to you?
11           A      Yes, sir.
12           Q      You were charged with murder when they took
13    you out of Bam Bam's house too, weren't you?
14           A      That's what they showed on the paper.
15           MR. GREENE:   Okay.  That's all.
16                      REDIRECT EXAMINATION
17    BY MR. GOGGANS:
18           Q      Mr. Reeves, one quick question.  Mr. Greene
19    asked you if you had seen a rights form like this one
20    before.  How old were you when you were arrested in the
21    capital, in this case, eighteen; is that right?
22           A      Yes, sir.
23           Q      Now you had been in trouble before, had you
24    not?
25           A      Yes, sir.
```

```
1          Q       You had been in juvenile court with Judge

2   Walker?

3          A       Yes, sir.

4          Q       Now when you had been in trouble in juvenile

5   court, they read you your juvenile rights, didn't

6   they?  They use a different form on the juvenile rights,

7   don't they?

8          A       Yes, sir.

9          Q       Nothing else.

10                      RECROSS EXAMINATION

11  BY MR. GREENE:

12         Q       So you have seen a rights waiver a few times

13  before; isn't that right, sir?

14         A       Being read a rights waiver.

15         Q       Why did you lie about that awhile ago?

16         MR. GOGGANS:  Objection, Your Honor.  That is for the

17  Court to determine whether a witness --

18         THE COURT:  Sustain the objection.  Anything else?

19         MR. GOGGANS:  Your Honor, that's all we have.  For

20  the Court's edification --

21         MR. GREENE:  We have another witness as soon as you

22  finish.

23         MR. GOGGANS:  I'm sorry.  Go ahead.

24         MR. GREENE:  Whenever you finish with this one,

25         MR. GOGGANS:  I have no other questions.
```

Ann H. Armstrong, RPR

1      THE COURT:  Call your next witness.

2      MR. GREENE:  Mr. Grindle.

3      THE COURT:  You're still under oath.

4                        PAT GRINDLE,

5   after having been previously duly sworn was examined and

6   testified as follows:

7                    DIRECT EXAMINATION

8   BY MR. GREENE:

9      Q      On this occasion, you testified you took

10  Matthew Reeves in custody at the Suttles' home around 5:00

11  or so that morning; is that correct?

12     A      That's correct.

13     Q      At that time, sir, what did you charge him

14  with, and did you tell him he was under arrest, or what did

15  you tell him?

16     A      Yes, sir.  I advised him he was under arrest

17  for a capital murder charge.

18     Q      That was based on the scene and the victim and

19  his condition and the homicide; is that correct?

20     A      Yes, sir, what evidence we recovered at that

21  time.

22     Q      Did you take him to the police station?

23     A      Yes, sir.

24     Q      And you went over the rights waiver as you've

25  talked about earlier?

Ann H. Armstrong, RPR

1    A    That's correct.

2    Q    And at that time did you have an interview

3  with him?  Did y'all discuss things?

4    A    Yes, we did.

5    Q    Did you make notes of that particular

6  interview?

7    A    I did.

8    Q    And are those notes there contained in this

9  folder?

10    A    It is.

11    Q    And how long did that interview go on, sir?

12    A    It was a back and forth interview.  He asked

13  me things.  I would ask him things.  I estimate it took at

14  least three hours that we were back and forth with each

15  other.

16    Q    This document that's in this folder, could we

17  have this?  Do we have a copy of it somewhere?

18    (State's Exhibit Number 22 was marked for

19  identification.)

20    Q    Is Exhibit 22, sir, in the same or

21  substantially the same condition now as it was when you

22  completed it on this occasion?

23    A    Yes, sir.

24    Q    Thereafter, did you at any point in time tell

25  him he was going to be charged with capital murder if he

```
 1    didn't talk to you?

 2         A        No, sir.  He was already charged with capital

 3    murder.

 4         Q        You talked to him again that afternoon?

 5         A        That is correct.

 6         Q        The stories varied or differed some?

 7         A        Yes, they did.

 8         Q        The first one was he was at somebody else's

 9    house and didn't know anything about anything?

10         A        That's correct.

11         Q        The second one was he didn't do it, but he was

12    with them?

13         A        That's correct.

14         Q        That's when he led you to the shell?

15         A        That's correct.

16         MR. GREENE:   That's all.

17         (Defendant's Exhibit Number 2 was marked for

18    identification.)

19                        CROSS EXAMINATION

20    BY MR. GOGGANS:

21         Q        Mr. Grindle, you were already familiar with

22    Matthew Reeves and Julius Reeves and his mother, correct?

23         A        Yes, sir.

24         Q        And you were aware at the time you went there

25    that she was on probation for theft of services or something
```

1    like that?

2           A       That doesn't come to ring a bell of being on

3    probation for anything.

4           Q       Let me show you what I've marked as

5    Defendant's Exhibit Number 2.  Is that the arrest report on

6    Matthew Reeves in this case?

7           A       Yes, it is.

8           Q       You were the arresting officer, correct?

9           A       That's correct.

10          Q       And on the back of Defendant's Exhibit Number

11   2, does it not say that Matthew Reeves was arrested after

12   giving a written statement on the homicide that took place

13   in Crockett Alley; is that correct?

14          A       That's correct.

15          Q       And at the top of the form, does it not show

16   the date and day of arrest as being November 28th, 1996 at

17   15:00?

18          A       Military time.

19          Q       That would be 3:00 o'clock in the afternoon?

20          A       That's correct.

21          Q       So according to your documentation the arrest

22   on the capital murder did not take place until after the

23   second conversation you had with him, correct?

24          A       No, sir.  I didn't fill that form out.

25          Q       Do you know who did?

609

```
1        A      I would say by looking at the handwriting I

2   would say it was either Detective Walker or Officer Little.

3        MR. GOGGANS:  I offer Defendant's Exhibit 2.  I have

4   no other questions.

5        MR. GREENE:  No objection.

6        THE COURT:  It will be admitted.

7                      REDIRECT EXAMINATION

8   BY MR. GREENE:

9        Q      That time frame is the booking time; is that

10  correct?

11       A      That is correct.  That's the exact time he

12  would have been booked.

13       Q      And the arrest had already occurred, but you

14  had informed him that morning?

15       A      That's correct.

16       Q      He was in custody and charged with capital

17  murder from that point on?

18       A      That's correct.

19       Q      Y'all held him all day on the charge, and he

20  was booked later that afternoon?

21       A      That's correct.

22       Q      You indicated -- you said you didn't know

23  anything about the mother being on any kind of probation?

24       A      To the best of my knowledge she was not on

25  probation that I know of.
```

Ann H. Armstrong, RPR

```
1          Q       Did you discuss her probation with her?

2          A       Not that I recall. It's not a concern of mine.

3          MR. GREENE:  Thank you.  That's all.

4          THE COURT:  You can step down.  Nothing else.

5          MR. GREENE:  Completed, Your Honor.

6          MR. GOGGANS:  Your Honor, I was going to state before

7    Mr. Greene recalled Mr. Grindle to the stand -- the reason

8    we put Matthew Reeves on related to the statement.  I

9    understand the State is not planning to use that statement

10   during the course of the trial.  However, after the second

11   statement Detective Grindle got Mr. Reeves to take him to

12   the house, and they got the shotgun shell.  If that

13   statement is suppressible, going to get the shotgun shell

14   would be a fruit of that.  That would be suppressible also.

15   That's the only reason that I went into it.  That's the only

16   reason that we put him on.

17         MR. GREENE:  We contend if the Court please, the

18   items that were seized from the home are admissible.  They

19   are based on consent.  I think a demonstration has been made

20   on the witnesses here that the officers did obtain I think a

21   formed and clear consent by people who are very familiar

22   with the criminal justice system.  They did it orally.  They

23   did it in writing.  I think that's supported by the

24   interview later that morning.  I think the other items from

25   the Suttles' house -- of course, this Defendant has no
```

Ann H. Armstrong, RPR

```
1    standing to object whatsoever.  In any event they are a

2    product of his arrest at that time.  And then the last item

3    is the shotgun shell at the home where he takes them back

4    there to that.  I think we demonstrated a rights waiver, a

5    clear understanding and a voluntary communication at that

6    point.

7         MR. GOGGANS:  I won't get into a long argument.

8    We'll, of course, rest on the grounds stated in our motion

9    to suppress.  However, I do want to emphasize with respect

10   to this consent to search form, we think it is very -- the

11   signatures and the letters on these are very significant.  I

12   think it's obvious even to the untrained eye that the

13   initials on this -- not the M, but the R is remarkably

14   different from the R on the signature which is remarkably

15   different from the other R's on the signatures on the

16   Defendant's composite exhibit number 1.  I think that Ms.

17   Reeves' testimony the way I interpret her testimony is that

18   she is saying that she signed a form.  The way I understand

19   her testimony she is not saying that there was nothing on

20   what she signed.  She is just -- as I understand she is

21   saying it wasn't a pre-printed form like State's Exhibit

22   Number 14 with lines and letters and words like that.  It

23   was a plain, white piece of paper with words on it.  She has

24   no recollection of having signed that.  Our contention is

25   that the evidence does not show a properly obtained consent
```

1    to search, and everything from that point forward should go

2    out.

3         MR. GREENE:  All right, sir.  Our only reasoning is I

4    think she has just been untruthful.  She has not testified

5    lawfully and truthfully in this court.  In fact she has

6    perjured herself.  She has given contradictory statements to

7    law enforcement officers that morning.  She admits talking

8    with this prosecutor about this case.  That's all.  That's

9    enough.

10        THE COURT:  All right.  The Court finds the search

11   was a consensual search.  The items from the residence of

12   Ms. Reeves are therefore admissible.  The Court further

13   finds that the statement given by the Defendant, Mr. Reeves,

14   at 5:30 a.m. and the second statement --

15        MR. GOGGANS:  The first one was roughly 5:30 and the

16   second one at 1:00 p.m.

17        THE COURT:  The 1:00 p.m. statement wherein the

18   Defendant was interviewed, the shotgun shell was obtained as

19   a result of that.

20        MR. GREENE:  That's 1:00 o'clock in the afternoon.

21        THE COURT:  The 1:00 p.m. statement was given

22   voluntarily in full compliance with the requirements;

23   therefore, the shell casing -- I understand it to be a

24   casing; is that right?

25        MR. GREENE:  Yes, sir.

Ann H. Armstrong, RPR

1        THE COURT:  It will be admitted.  If we could is

2   there anything else regarding the motion to suppress?

3        MR. GREENE:  The items from Ms. Suttles' house, the

4   coat taken from there.

5        THE COURT:  That is admitted.  That will be admitted.

6        MR. GOGGANS:  I believe that's all that's out there

7   on the motion to suppress.

8        THE COURT:  Let me get these witnesses in here so I

9   can do that instruction on the record prior to your

10  openings.  And then we will take a ten minutes recess and

11  start at 11:00.

12       (A short recess was taken.)

13       THE COURT:  Bring all the witnesses in.  Ladies and

14  gentlemen, those of you who are here and are subpoenaed to

15  testify in this trial, the State of Alabama versus Matthew

16  Reeves, there's been a motion for exclusion of witnesses and

17  also a motion requesting the Court to instruct you regarding

18  your testimony filed on behalf of the Defendant, Matthew

19  Reeves.  At this time, Mr. Goggans, that motion is going to

20  be granted.

21       MR. GREENE:  Judge, the State also is asking any

22  witnesses to be so advised.

23       THE COURT:  The State's motion will be granted as

24  well.  The witnesses will be excluded from the courtroom.

25  But I want to instruct you all regarding your testimony is

1    that once you have testified you are instructed not to

2    discuss your testimony with anyone.  Don't discuss your

3    testimony among yourselves.  It's going to be improper for

4    you to have any conversation with anyone regarding your

5    testimony other, of course, than the attorneys who have you

6    under subpoena.  Violation of this order will result in

7    sanctions.  And with that said I'm going to ask you to step

8    back out.  Is there anything else anybody wants to be

9    instructed about?

10        MR. GOGGANS:  No, sir.  Your Honor, I understand the

11   State is going to have Detective Grindle excluded from the

12   Rule.

13        MR. GREENE:  Yes, sir.

14        MR. GOGGANS:  We also have got -- of course, Ms.

15   Simmons is our investigator.  She's out doing some stuff for

16   us right now.  We don't think she's going to be a witness,

17   but we ask that she be excluded too.

18        THE COURT:  All right.  Y'all get ready, and we'll

19   make opening statements at 11:00 o'clock.

20        (A recess was taken.)

21        (The following occurred in the presence and hearing

22   of the jury:)

23        THE COURT:  We are going to get started now with the

24   opening statements and the testimony in the case.  Our

25   schedule is going to be as follows.  We are going to begin

1   the opening statements and take testimony until 12:00

2   o'clock.  At that time we will take a lunch recess until

3   1:15.  We will come back at 1:15 and resume testimony from

4   1:15 until about 2:30 or quarter of 3:00 and then take an

5   afternoon recess for about fifteen minutes.  We will take

6   testimony from 3:00 or so until about 4:30 or 5:00 o'clock.

7   At that time we will break for the evening.

8          The first order of business today is for me to give

9   you the oath as to this particular case.

10         (Jury and alternate jurors administered the oath of

11  service by the Court.)

12         THE COURT:  Let me read to you the indictment again

13  that was returned by the grand jury during the January 1997

14  term.  It reads as follows:  State of Alabama, Dallas

15  County, the grand jury of said county charge before the

16  finding of this indictment Matthew Reeves, whose name is

17  otherwise unknown to the Grand Jury, did intentionally cause

18  the death of Willie Johnson by shooting him with a shotgun,

19  and Matthew Reeves caused said death during the time that he

20  was in the course of committing a theft of lawful money of

21  the United States, the value of the same being otherwise

22  unknown to the Grand Jury, the property of Willie Johnson by

23  threatening the imminent use of force against the person of

24  Willie Johnson with intent to compel acquiescence to the

25  taking of or escaping with the property while the said

Ann H. Armstrong, RPR

1   Matthew Reeves was armed with a deadly weapon; to wit, a

2   shotgun in violation of Section 13A-5-40(a)(2) of the Code

3   of Alabama against the peace and dignity of the State of

4   Alabama.

5        Ladies and gentlemen, you've already been given some

6   idea about the procedure that we will follow today

7   throughout the course of this trial.  You've already been

8   informed that this is a capital murder trial.  You've been

9   informed that in the event of a conviction of the same it

10  would be a two phase trial wherein the second phase you

11  would consider the recommendation of the penalty.  There

12  will be other instructions if necessary regarding that.

13  However, let me give you the following instructions

14  regarding the guilt or innocence phase that we are starting

15  at this time.

16       First of all, in just a few minutes the attorneys for

17  the State will make an opening statement of their case.

18  Counsel for the Defendant will respond with a statement of

19  their defense.  Now each side will be confined to an outline

20  of the case and a statement of what they expect the evidence

21  to show.  These statements that the attorneys make to you

22  are not evidence but are given to familiarize you with the

23  case so you will be acquainted with the contentions of each

24  side from the very beginning.  Following the opening

25  statements evidence will be presented by witnesses and

1   perhaps by exhibits.  In receiving the evidence, you should

2   bear in mind that as officers of the Court the attorneys

3   have a duty to present evidence on behalf of the parties

4   they represent and to make such objections as they deem

5   proper and to fully argue their party's cause.

6       An attorney's statements are not evidence but are to

7   help you understand the evidence and then apply the law.

8   Therefore, you should consider in your verdict only

9   statements that are supported by the evidence and by the law

10  as given you by the Court.  Likewise, statements made by the

11  Court are not evidence and are not to be so considered by

12  you.  During this trial I will rule on objections by the

13  attorneys as to the admissibility of testimony and other

14  evidence.  You must not concern yourself with the reasons

15  for my rulings since they are controlled or required by law.

16  You're not to speculate as to possible answers to questions

17  which I do not require to be answered.  Additionally, the

18  overruling of objections to evidence is not intended to

19  indicate the weight to be given such evidence by you.

20      Now occasionally during the course of this proceeding

21  as it has already become necessary, it may become necessary

22  for me again to confer with the attorneys outside of your

23  presence and outside of your hearing.  Should I call the

24  attorneys to the bench or should I excuse you from the

25  courtroom, again it will be to resolve a legal point or some

```
 1   other matter which at that point in time may not be proper

 2   for you to hear and consider.  You should not speculate on

 3   the content of any such conference nor allow the conference

 4   or any inference you might draw to affect your verdict.

 5        Following the close of the evidence in the case, the

 6   attorneys will again have an opportunity to address you in

 7   what is called closing argument.  In the argument they will

 8   discuss the evidence and all reasonable inferences to be

 9   drawn therefrom to help guide you to a true and just

10   verdict.  Counsel for the State will open the argument.

11   Counsel for the defense will follow.  Then the State will

12   have an opportunity to close the argument.  At the close of

13   the argument, the Court will state to you the applicable

14   rules to guide you in arriving at your verdict.  And then

15   upon retiring to the jury room to consider your verdict, you

16   will select one of your number as foreperson to moderate

17   your discussions and then to sign and return to the court

18   the verdict arrived at by you.  Is the State ready?

19        MS. WILSON:  The State is ready.

20        THE COURT:  Defense ready?

21        MR. GOGGANS:  The defense is ready.

22        MS. WILSON:  May it please the Court, ladies and

23   gentlemen, as I was introduced to you yesterday, my name is

24   Greta Wilson, and I along with Mr. Greene are going to be

25   presenting the case of the State of Alabama against Matthew
```

1   Reeves.  As the judge has told you he has been charged with

2   capital murder.  He is charged with the intentional killing

3   of Willie Johnson during the course of a robbery.

4        I want y'all to go back with me to November 27th of

5   1996.  It was a Wednesday, the day before Thanksgiving last

6   year.  Willie Johnson who is 38 years old at the time got up

7   and went to work at Selma Housing Authority where he has

8   worked for approximately 20 years.  During the same course

9   of time, Matthew Reeves, the Defendant over here, his

10  brother, Julius Reeves, and Brenda Suttles, who is known as

11  Bam Bam got together and decided they needed to rob somebody

12  that day.  So they went walking to Highland Avenue.  They

13  get in the vicinity of Highland Avenue and Summerfield Road

14  where they flagged down a young man by the name of Jason

15  Powell who is driving by in his car.  Jason turns around,

16  comes back and engaged in a conversation.  Now along with

17  Bam Bam, this Defendant and his brother Julius is Bam Bam's

18  cousin, Emanuel Suttles.

19       They talk to Jason Powell.  They talk Jason Powell

20  into taking them riding.  They all get into Jason's car.

21  Jason is going to tell you that they go to Matilda Lamar's

22  house on Broad Street, to her apartment where Julius Reeves

23  gets out and goes into the house.  He comes back with an

24  object under his jacket.  Jason says he doesn't see that

25  object, but he can tell there is an object under his jacket.

Ann H. Armstrong, RPR

1  Then Julius gets back into the car.  And they ask Jason to

2  start driving out 80 toward Lowndes County.

3       They are heading in that direction when Jason

4  Powell's car starts acting up.  He turns off into a paved

5  road which shortly turns into a dirt road.  It's out in the

6  Tyler area.  The car quits.  They get out of the car.  They

7  put the hood up.  They are trying to find out what is wrong

8  with the car when Duane Smith who is a hunter stops by.  He

9  pulls down the road headed to his hunting camp, Sugar Bottom

10 Hunting camp.  He says he sees this vehicle in the middle of

11 this dirt road, and it's very difficult to get around the

12 vehicle because it's in the middle of the road.  He sees

13 several people out around the vehicle, so he stops, and he

14 asks what's the matter.  And they tell him their car is

15 broken down.  And he looks very quickly to see

16 if it's something that can be fixed relatively quickly and

17 easily.  And Duane Smith is going to tell you that it is not

18 that.  He has agreed to take some hunters, and he's on a

19 deadline.  So he leaves them there telling them that if they

20 are still there when he comes back, he will assist them

21 further.  So he leaves.  He is going to put the time frame

22 between 2:30 and 3:00 p.m. that he sees them broken down.

23      Sometime after that the victim, Willie Johnson, who

24 has cashed his paycheck that day -- we expect you're going

25 to see that paycheck, and it's for a little less than five

Ann H. Armstrong, RPR

1   hundred dollars, that he is headed out to a shed belonging

2   to Roy Moore where he is going to meet a friend of his to do

3   some odd jobs, that he is in his 1990 Ford Ranger pickup

4   truck, that he turns down this same road that the Defendant

5   and his buddies have gone down, that he encounters their car

6   in the same location where Duane Smith is going to tell you

7   he had seen it earlier, that they flag him down, and they

8   ask for his assistance, that he agrees to tow them back.  He

9   has a chain in the back of his truck.  He gets that chain

10  out.  He hooks it to their car.

11       We submit the evidence is going to show you that

12  Julius Reeves hops into the truck with Mr. Johnson, and he

13  pulls them back to Selma.  In fact he pulls them all the way

14  back to Matthew and Julius' residence which is located at

15  2128 Selma Avenue.  We expect the evidence is going to show

16  you that Julius had agreed to pay Mr. Johnson twenty-five

17  dollars for pulling them back, for towing them back, that

18  Julius didn't have that much money.  None of them had that

19  much money.

20       So they get back to this residence.  They don't have

21  the money, so Julius says, let's go to my girlfriend's and

22  get a ring.  I'll give you a ring.  So Willie then goes with

23  Julius, Bam Bam and Matthew to Katrina White's residence,

24  and they get a ring.  And that is to be payment for Mr.

25  Johnson.  In the meantime, however, Matthew has climbed on

1    the back of Mr. Johnson's pickup truck with Bam Bam, and he

2    has gotten a gun, a gun that they had obtained earlier from

3    Matilda Lamar's residence right after they had gotten up

4    with Jason Powell and were planning this robbery or a

5    robbery.  They had a 12-gauge pistol grip shotgun.  Matthew

6    had that shotgun on the back of Mr. Johnson's pickup truck.

7           Julius then again jumps in the front, the cab with

8    Mr. Johnson.  They go out and get this ring.  They come back

9    again to this residence.  However, they tell Mr. Johnson not

10   to stop here.  This is where he has left Jason Powell's car

11   and Jason Powell and Emanuel Suttles prior to going with the

12   others to get the ring.  So they get the ring.  They come

13   back.  They instruct Mr. Johnson to pull into the alley.

14   This is Crockett's Alley right by Dallas Compress.  This is

15   Selma Avenue.  This is Alabama Avenue.  Mr. Johnson pulls up

16   in his truck here.  At this time Matthew Reeves take the gun

17   out, sticks the gun -- there is a glass window on the back

18   of this truck that is open.  He points the gun through that

19   glass on the back of that truck, firing that gun.  The blast

20   hits Willie Johnson in the neck.  He is sitting behind the

21   wheel.  You're going to hear evidence that his head is

22   slightly to the left.  His hands are on the steering wheel.

23   The blast hits him right here.  You will see the wound.  You

24   will see photographs of the wound.  There are pellets

25   embedded in his hands, his arms, his legs.

1    At that time Julius who is sitting in the front of

2    the pickup truck jumps out.  Bam Bam jumps out.  Matthew

3    instructs them to pull Mr. Johnson out of the car and get

4    his money.  After shooting Willie Johnson in the neck, they

5    remove him from the pickup truck and put his body on the

6    ground.  They empty his pockets getting whatever they can

7    find in his pockets.  Then Bam Bam and Julius pick up Mr.

8    Johnson's body and put it back into the pickup truck.  His

9    head is under the steering wheel on the driver's side.  His

10   feet are bent up against the passenger door in the pickup

11   truck.  They then leave.

12       We expect that you're going to hear from Jason Powell

13   who the whole time has been at Matthew's house that he sees

14   Matthew and the others run from the alley around the front

15   of their house.  They come this way.  They come around in

16   this direction into Julius and Matthew's house and that

17   Matthew has the shotgun in his hand, that they run into

18   Matthew's house.  They go into the bathroom, and they start

19   very quickly changing their clothes, that Matthew then

20   stashes the shotgun under Julius Reeves' mattress in Matthew

21   and Julius' bedroom, that they then head out to 2314

22   Lavender Street, to Bam Bam's house, to Lavender Street,

23   that on the way Matthew runs into his girlfriend, Tameisha

24   Jackson, that he tells her if the police ask you any

25   questions, you tell them I've been with you all night.  And

1    then they proceed to Bam Bam's house.

2         You're going to hear from some witnesses that were

3    present in Bam Bam's house.  When these individuals get

4    there, and they are going to tell you that Matthew wants to

5    hear a particular rap song.  They put it on for him and that

6    Matthew starts dancing around showing his little gang signs,

7    doing the pistol sign, boom, boom, bang, bang celebrating

8    what he has just done.  They are going to tell you that they

9    split the money up there, that Bam Bam gets some.  Julius

10   gets some.  Matthew gets some.  The party continues.

11   Matthew makes several statements to several people there

12   telling them what he has just done, bragging about what he

13   has just done.

14         They then leave and go across the river to continue

15   partying.   During this time sometime about 12:30 a.m.

16   Alfred Crowell, who is the security guard at Dallas

17   Compress, he is making his rounds.  As he is making his

18   rounds he observes the pickup truck with no lights on.

19   There doesn't appear to be anyone in it, so he goes on with

20   his rounds.  He comes back about 1:30, the same truck and

21   same location.  He doesn't go to it, but he sees it.  About

22   2:00 he becomes suspicious.  So he calls in a report to the

23   police department about a suspicious vehicle.  The police

24   officers respond.  They come to the truck.  One approaches

25   from the passenger side and one approaches from the driver's

 1  side where they realize a victim is in this car with a large

 2  amount of blood around his head, blood outside the driver's

 3  side of the truck.  They then call for detectives.

 4  Detective Grindle arrives shortly afterwards and Randy

 5  Tucker who was a Selma Police officer who has a canine, a

 6  dog that he uses for trafficking purposes.  This dog

 7  assists in criminal investigations, sniffs drugs, is trained

 8  to sniff blood tracks, scents, that sort of thing.

 9          So Randy Tucker comes with his canine.  He goes to

10  the truck, and the dogs immediately tracks to this

11  residence.  Detective Grindle goes to the residence and

12  knocks on the door.  And then the defendant's mother comes

13  to the door.  He tells her what he is there for, that a man

14  has been murdered and the dog tracked there.  And where are

15  Matthew and Julius and can he come in and look around.  He

16  obtains permission to do that.  He goes in the house where

17  in this residence they found a number of bloody clothing

18  items.  They find a 12-gauge pistol grip shotgun between the

19  mattresses on what is identified to them as Julius' bed.

20  They then go to Bam Bam's residence where they locate the

21  Defendant.

22          We expect you're going to hear from a fingerprint

23  expert who is going to tell you they examined that shotgun,

24  and Matthew Reeves' fingerprints are on that shotgun.  We

25  expect you're going to hear from Bam Bam who has likewise

1   been charged in this case.  And we expect she's going to

2   tell you very much what I have just told you.  We expect

3   you're going to hear from witnesses like Jason Powell.  We

4   think you're going to hear from some of the friends they

5   encounter along the way at the party, after the party.

6        Ladies and gentlemen, once I think you have heard all

7   of this evidence, each one of you will be convinced beyond a

8   reasonable doubt that Matthew Reeves intentionally shot and

9   killed Willie Johnson in the course of robbing Willie

10  Johnson of his paycheck that he had cashed that day, the

11  money he had on him.  I think you will find him guilty of

12  that.  Thank you.

13       MR. WIGGINS:  May it please the Court, ladies and

14  gentlemen, often times in life we are confronted with

15  situations that shatter our mind and our beliefs and more

16  than often times shock our conscience.  Because of the way

17  we were brought up and the way we are taught, certain things

18  just are unbelievable.  And sometimes they are so emotional

19  to us, and they hurt because we as individuals sometimes

20  have such a caring heart.  I'm quite sure that's what you

21  are to hear today because of the death of Mr. Willie

22  Johnson.  But what we must do as individuals and what we are

23  called upon to do is not necessarily with our hearts feel

24  and judge.  You are going to sit here, and in your hearts

25  you are going to be sad.  You are probably going to feel

1    angry and upset because of what happened on this November

2    day.  But what you as jurors have to do and the oath that

3    you have taken this morning is that I'm going to step aside

4    from how I feel and how bad this may be, and I'm going to

5    look to this witness stand right here.  And I'm going to

6    listen to the evidence that comes from that chair.  And I'm

7    going to judge the Defendant, Matthew Reeves, based on what

8    comes from right here and that alone.  After stepping aside

9    from how I feel about what happened, that will be my test as

10   to whether or not Matthew Reeves intentionally shot Willie

11   Johnson in the course of a robbery.  That's how I'm going to

12   judge this case.  It's your oath.  That's what you must do.

13        So let's look at what we expect to come from right

14   here, from this witness stand.  Of course, you are going to

15   hear that days before there was a shotgun at Matilda

16   Lamar's.  She is going to tell you that shotgun was brought

17   to her house not by the Defendant Matthew Reeves but by

18   someone else and left at her house for that time period,

19   that someone came and got the gun from her house, but it

20   wasn't Matthew Reeves.  She never saw Matthew Reeves come to

21   the house to bring the gun or retrieve the gun.

22        After the gun was taken from her house, you are going

23   to hear friends say Matthew, Julius and Bam Bam and a person

24   named Emanuel Suttles who is a cousin of Brenda Suttles --

25   now remember when you hear the name Bam Bam, you are also

Ann H. Armstrong, RPR

1    saying Brenda Suttles.  That's her street name, Bam Bam.

2    Matthew Reeves, his brother, Julius, Bam Bam, and Emanuel

3    Suttles and Jason Powell get together.  They are riding.

4    They break down on the highway.  Duane Smith is going to

5    testify that he confronted them out there on the street that

6    night, a nice truck, nice hunting attire.  He could have

7    been the -- if they were going to rob somebody, why not rob

8    him.  He's out there all alone with them.  They didn't --

9    that is just going to show they didn't have intent to rob

10   because they would have taken advantage of Mr. Smith.

11        Then comes Mr. Johnson.  And at this time the

12   evidence is going to show you and the witnesses are going to

13   testify that it was not Matthew Reeves who had the gun but

14   someone else who had the gun in their possession in the

15   vehicle that they were riding in, that they confronted Mr.

16   Johnson.  Mr. Johnson towed them back into the area that you

17   call 2128 Selma Avenue, that it's not Matthew Reeves who

18   said anything about a robbery.  There's no one talking about

19   robbery.

20        Willie Johnson takes them to get the ring, and they

21   come back.  But remember that Emanuel Suttles and Jason

22   Powell are with them at all times from the time that they

23   get in the car.  They drive down the dirt road.  They

24   confront Duane Smith, and they confront Mr. Johnson.  And

25   Emanuel Suttles and Jason Powell are with them at all times.

```
 1    They come back to the area.  Matthew Reeves, Bam Bam and
 2    Julius and Mr. Johnson leave to go to the residence.  They
 3    come back, and they go to that area called Crockett Alley.
 4    And you are going to hear the testimony there was a gunshot
 5    fired that struck Willie Johnson.  And you're going to hear
 6    Bam Bam or Brenda Suttles testify that it shocked me.  I was
 7    surprised that it happened, had no idea it would happen.
 8    And then she and Julius take the money from Mr. Johnson and
 9    they all leave.
10          And look at when you get the pictures of Mr. Johnson
11    and the experts testifying, Mr. Johnson is going to be
12    sitting on the driver's side of his vehicle.  The experts
13    are going to say his head is slightly tilted to the left,
14    and the bullet wound grazes him as he is slightly turned
15    this way.  And you're going to hear the evidence that on the
16    driver's, on the passenger side of this vehicle as he's
17    looking towards the left, there is going to be on the window
18    on the passenger side someone's palm print on that window.
19    So Mr. Johnson is sitting at the driver's seat slightly
20    looking towards his left, and he's grazed this way, and the
21    palm prints are from the passenger side remember on the
22    window on that side of the vehicle.  The pellet shots are
23    going to be on Mr. Johnson's right leg and on his left leg
24    and on the doorway coming from the passenger side of the
25    vehicle.
```

1    Often times what happens in life that when one gets
2    in trouble, he or she always tries to find the easiest way
3    out.  And you are going to hear Brenda Suttles today tell
4    you her story because she wants out.  She didn't want to
5    come before you and the evidence is going to show and face
6    you like the Defendant.  Emanuel Suttles wants out.  He was
7    there from the beginning on the ride when Jason Powell
8    picked them up, to the dirt road and all the way back to
9    2128 Selma.  He is going to be with them when they return to
10   the house after the shooting.  He is going to be with them
11   when they leave and go down to Brenda Suttles' house.
12   Emanuel Suttles is going with them as they go across the
13   railroad tracks to the other house for a celebration.  He
14   wants out.

15       Jason Powell the evidence is going to show if he
16   comes to testify was the one who picked them up in his car,
17   and he's with them at all times from the moment they stalled
18   on the highway and were brought back by Mr. Johnson to 2128
19   Selma Avenue.  He's with them after the shooting when they
20   run back to the house to change their clothing.  He's there
21   when they leave the residence and go down to Lavender to Bam
22   Bam's house.  He's there right beside them when they go
23   across the railroad tracks and to the other house to
24   celebrate.  He's there, but he wants out.  So he's going to
25   come and tell you something that the evidence is going to

Ann H. Armstrong, RPR

1   show, but he wants a deal.  He doesn't want to be charged.

2   He doesn't want to face you because he'll sit here the

3   evidence is going to show and give you a story.

4          So it's your job to take the evidence that comes from

5   this stand and move aside from what you feel in your heart

6   about how tragic this may be, how sad this may be and listen

7   to whether or not there was a robbery prior to this

8   shooting; is there any evidence from that stand to indicate

9   that there was a robbery prior to the shooting of Willie

10  Johnson; you're not going to get it.  And if you get it, the

11  evidence is going to show you that it's going to come from

12  those people who were right there from the beginning going

13  down when they stalled, back to 2128, back to the

14  celebration across the railroad tracks because they want

15  out.  And the evidence is going to show they will come to

16  you and tell you anything.  And after you've heard the

17  evidence that there is no robbery prior to the shooting, you

18  also are going to hear the evidence that you cannot conclude

19  that Matthew Reeves committed the robbery or intended to

20  commit a robbery prior to shooting Willie Johnson, that

21  Matthew Reeves did not intentionally kill Willie Johnson on

22  that afternoon.  There was someone else there on the

23  afternoon that pulled that trigger.  And the witnesses that

24  are coming to testify the evidence is going to show are

25  going to do everything possible to point the finger at young

1   Matthew Reeves so that they can get out.  So the evidence

2   from this chair is going to help you conclude no robbery

3   prior to the shooting of Willie Johnson.  Matthew Reeves did

4   not pull the trigger of the shotgun because there were other

5   prints, other persons who had possession of the gun.

6   Matilda Lamar is going to tell you she had the gun.  The

7   witnesses are going to tell you Julius Reeves had the gun.

8   Brenda Suttles is going to tell you she had the gun.  Listen

9   to whose fingerprints they put on the gun.  The evidence is

10  going to show they are going to put forward Matthew.  But

11  they are not going to tell you about the other persons who

12  had the gun.

13      And after stepping aside, after stepping aside from

14  your emotions and listening to the evidence, you will

15  conclude that Matthew Reeves did not rob Willie Johnson

16  prior to the shooting and that Matthew Reeves did not pull

17  the trigger of the gun that fatally killed Willie Johnson.

18  Thank you.

19      THE COURT:  Call your first witness.

20              JOE LITTLE, JR.,

21  after having been duly sworn, was examined and testified as

22  follows:

23              DIRECT EXAMINATION

24  BY MR. GREENE:

25      Q       State your name to the ladies and gentlemen of

Ann H. Armstrong, RPR

1       the jury, please.

2               A       Joe Clyde Little, Jr.

3               Q       Your position, please?

4               A       Police detective with the city of Selma.

5               Q       And, sir, how long have you been with the

6       Selma Police Department?

7               A       Approximately four years.

8               Q       And prior to serving in the detective

9       division, did you serve as a patrol officer?

10              A       Yes, sir, I did.

11              Q       And in this particular case, sir, were you

12      serving as a patrol officer on the day before Thanksgiving

13      1996, November 27th and the early morning of Thanksgiving

14      Day, the 28th?

15              A       Yes, sir, I was.

16              Q       On that occasion, sir, what shift were you

17      working?

18              A       Third shift patrol.

19              Q       And the third patrol, sir, runs from when to

20      when?

21              A       From 10:00 p.m. to 6:00 a.m.

22              Q       All right, sir.  And did you have occasion,

23      sir, while on your duty as patrol officer to be dispatched

24      or summoned to Crockett Alley?

25              A       Yes, sir, I did.

634

1      Q      Approximately what time did you receive the

2  dispatch and/or arrive at Crockett Alley?

3      A      I received the call at approximately 2:00

4  o'clock, 2:00 a.m. and just arrived a couple minutes later.

5      Q      And you were dispatched, sir.  You say you

6  received the call.  That would be dispatched from radio to

7  your patrol car?

8      A      Yes, sir.

9      Q      Were you with anyone in your car?

10     A      No, sir.

11     Q      Single patrol?

12     A      Yes, sir.

13     Q      Did anyone else respond, sir?

14     A      Yes, sir.

15     Q      Whom?

16     A      Office Gene Sturdivant.

17     Q      And did y'all arrive more or less

18  simultaneously?

19     A      Yes, sir.  He arrived just moments later.

20     Q      And what was the dispatch, sir?  What were you

21  sent to Crockett Alley for?  What was the purpose of your

22  dispatch?

23     A      It was in reference to a suspicious vehicle.

24     Q      What does a suspicious vehicle mean, sir?

25     A      A car that appears or a vehicle that appears

```
 1   to be out of place.  It's off in its surroundings.
 2        Q        And do you know who had contacted you or who
 3   had called it in, or did you later learn who had called it
 4   in?
 5        A        I later learned that it was the night watchman
 6   or security guard from Dallas Compress, Mr. Crowell I
 7   believe it is.
 8        Q        Mr. Crowell?
 9        A        Yes, sir.
10        Q        Now Crockett Alley, you are familiar with that
11   area?
12        A        Somewhat yes, sir.
13        Q        The alley runs along or near the Dallas
14   Compress warehouses there?
15        A        Yes, sir.
16        Q        In Selma?
17        A        Yes, sir.
18        Q        And it's located here in Selma or Dallas
19   County, Alabama for the record?
20        A        Yes, sir, it is.
21        Q        All right.  Now if you would come here to the
22   this board for just a minute, please, sir.  The problem is
23   you need to do something and let those folks in that corner
24   behind you see it at the same time.  When you arrived, sir,
25   could you point out with, just with your hand where you came
```

1    in on -- first of all, do you recognize this diagram?

2         A       Yes, sir, I do.

3         Q       You have seen it before coming here?

4         A       Not this particular diagram, but I'm familiar

5    with the layout of it.

6         Q       All right.  Does this correctly and accurately

7    depict and portray the general area there in Crockett Alley,

8    the houses there along Selma, 2123 Selma Avenue, et cetera?

9    Does that generally show in some reference to each other

10   that you can recognize and understand?

11        A       Yes, sir, it does.

12        Q       All right, sir.  When you arrived on this

13   occasion, sir, there is an object drawn in what is

14   designated as Crockett Alley?

15        A       Yes, sir.

16        Q       Is this the vehicle, or does this

17   approximately show where the vehicle was in relationship to

18   the other buildings, gateways, fences whatever, as you were

19   called on this occasion?

20        A       Yes, sir, to the best of my knowledge.

21        Q       On this occasion, sir, in which direction or

22   where did you come in on your police cruiser in your

23   uniform?

24        A       I originally arrived in the area on Alabama

25   Avenue and started to pull in at Crockett Alley.  And I

637

1    observed the vehicle there.  It was facing me which is a bad

2    thing to do when you approach a vehicle in that manner.  So

3    I backed up and went around the block to come in from behind

4    the vehicle.

5         Q    You did then come in from behind?

6         A    Yes, sir, I did.

7         Q    And Officer Sturdivant came in from where?

8         A    Yes.  He came in behind just -- we arrived at

9    the alley about the same time.  I can't remember if he was

10   in front or behind me, but we arrived at the same time.

11        Q    All right.  And you were in a uniform and in a

12   marked patrol car?

13        A    Yes, sir.

14        Q    Once again this is in the early morning hours,

15   2:00 something, around 2:00?

16        A    Yes, sir.

17        Q    All right.  Do you see or meet with Mr.

18   Crowell there shortly upon arriving or at any time that you

19   recall?

20        A    Yes, sir, I did meet him at the scene.  When I

21   stopped here at Alabama, I noticed the vehicle.  I know that

22   he generally stays in this area.  I can't remember if I

23   spoke to him there, but I know shortly after finding the

24   scene I did speak with him to get the information.

25        Q    All right.  If you would return back to the

```
 1    chair.

 2           MR. GREENE:   Gentlemen, may we introduce this

 3    diagram.

 4           MR. GOGGANS:   No objection.

 5           (State's Exhibit Number 29 was marked for

 6    identification.)

 7           MR. GREENE:   The State moves for the introduction of

 8    State's Exhibit 29, the diagram of the scene.

 9           THE COURT:   It will be admitted.

10       Q       When you arrived, sir, you drove your vehicle

11    into the alley itself?

12       A       Yes, sir.

13       Q       Were there any other people about or anything

14    going on, or was it very quite?

15       A       No, sir, it was very quiet.

16       Q       And where did you go, sir?

17       A       After pulling in behind the vehicle, Jimmy

18    Sturdivant or Officer Sturdivant and I -- we approached the

19    vehicle as a routine traffic stop first calling in the tag

20    and then approaching it.

21       Q       You called in the tag?

22       A       Yes, sir.

23       Q       Did you get any registration on the tag?

24       A       I don't recall the dispatcher giving it back

25    to us or not.
```

1    Q      And then what happened?  Where did you go?

2    A      We approached the vehicle just like a routine

3 traffic stop.  We didn't see anybody in the vehicle.  We

4 noticed that the lights were off.  And it appeared to have

5 the engine shut off.

6    Q      How about the doors, were they closed?

7    A      The doors were closed.

8    Q      Describe the vehicle for us, an automobile,

9 four passenger, two door, truck, what?

10   A      It was a blue pickup truck, a Ranger model

11 Ford.  It had a tool box on the back and a sliding glass

12 rear window.

13   Q      When you called in the tag number, sir, is

14 that recorded by you, or you just radio it in, and they log

15 it in at the station?

16   A      It's generally radioed in and logged in at the

17 station.

18   Q      All right, sir.  Now the two of you approached

19 the vehicle.  Did you draw your weapons as you approached?

20   A      I don't recall.  I would say that we would

21 based on the scenario or the situation, an unknown vehicle

22 in the middle of the night in a dark alley.  But I can't say

23 that I remember drawing it.

24   Q      And as you approached the vehicle, sir, were

25 the doors opened or closed, or do you recall?

```
 1          A       The doors were closed.

 2          Q       And the motor was off as best you know?

 3          A       Yes, sir.

 4          Q       And did you get to the vehicle?

 5          A       Yes, we did.

 6          Q       And do you recall which side you went on and

 7     which side Sturdivant went on, or were y'all on the same

 8     side or what?

 9          A       Yes, sir.  I approached from the passenger

10     side, and Officer Sturdivant approached from the driver's

11     side.

12          Q       Did you make an observation of the interior of

13     the vehicle?

14          A       Yes, sir, I did.

15          Q       What did you see inside the vehicle, sir?

16          A       I observed what appeared to be a black male

17     slumped over laying across on the seat and what appeared to

18     be some small specs of blood on the interior.

19          (State's Exhibits Number 30 and 31 were marked for

20     identification.)

21          Q       Showing you what's marked for identification

22     as State's Exhibit 30 and 31.  I ask you, sir, if this

23     photograph correctly and accurately depicts and portrays the

24     scene inside the interior of the truck as you saw it; that

25     is, with the body laying there on the seat as it appeared as
```

641

1    you saw it from your side?

2         A    Yes, sir.

3         MR. GREENE:  We move for the introduction of Exhibits

4    31 and 30 if the Court please.

5         MR. GOGGANS:  No objection.

6         THE COURT:  It will be admitted.

7         MR. GREENE:  Permission to exhibit it to the jury.

8         Q    Upon making this observation, sir, what action

9    did you and/or Officer Sturdivant in your presence take at

10   that time?

11        A    Officer Sturdivant advised me that he saw a

12   large puddle or pool of blood on his side next to the

13   driver's door.

14        Q    Did you later see that?

15        A    Yes, sir, I did.

16        Q    Is that depicted in those photographs?

17        A    I believe it was in one of them I believe.

18        Q    After y'all conferred about the pool of blood,

19   what then?

20        A    We notified the dispatcher of the scene so

21   that they could dispatch a supervisor to the scene, and we

22   began to slowly move away from the vehicle so as not to

23   disturb anything.

24        Q    Did you remain -- you and Officer Sturdivant

25   remain at the scene until investigators and other personnel

1    arrived?

2        A       Yes, we did.

3        Q       Did you secure the scene?

4        A       Officer Tucker secured the scene with tape.

5        Q       Now Officer Tucker, who is he, and when did he

6    get there?

7        A       Officer Tucker works with the canine unit for

8    the third shift patrol.  He arrived maybe a minute after

9    myself and Officer Sturdivant.  So just as we observed the

10   scene and backed out of the way, Officer Tucker arrived, and

11   he taped off the area.

12       Q       And so then Tucker was there.  He is the

13   canine officer?

14       A       Yes, sir.

15       Q       And he had his dog with him on that occasion?

16       A       Yes, sir, he did.

17       Q       So the three of y'all are there.  You got the

18   area taped off and secured?

19       A       Yes, sir.

20       Q       And do you remain -- do you leave it and

21   maintain it in that condition until other individuals

22   arrive?

23       A       Yes, sir.

24       Q       Who arrived next, or who arrives in general,

25   not necessarily next?

1       A       Officer David Hopkins, patrol division,

2    Captain Perry, the shift commander that evening, Lieutenant

3    Vancil, and after they arrived, of course, detectives were

4    called out.  Detective Walker responded to the scene.

5    Captain Harrell, chief detective responded.  Then Detective

6    Grindle was called out by Captain Harrell I believe.

7       Q       Grindle then was assigned the case and became

8    the case agent?

9       A       I believe so.  I'm not sure about that.

10      Q       And did you eventually leave this particular

11   area and go back on your patrol duties?

12      A       That was the last call or last scene I had

13   that night.  I worked with it the remainder of my shift.

14      Q       And until the other officers and investigators

15   arrived, then y'all maintained this area for the

16   investigators to come?

17      A       Yes, we did.

18      Q       Were you there, sir, when -- you later learned

19   that, of course, the individual in the truck was Mr. Willie

20   Johnson; is that correct?

21      A       Yes, I did.

22      Q       All right, sir.  Were you there when he was

23   removed from the truck by forensics or any of the

24   investigators?

25      A       No, sir, I was not.


Ann H. Armstrong, RPR

1      Q      All right.  You didn't necessarily take any

2  action to investigate the scene yourself; you merely backed

3  off of it, secured it with Officer Tucker?

4      A      Yes, sir.

5      Q      All right, sir.  Thank you, sir.  Your

6  witness.

7          MR. GOGGANS:  No questions.

8          (The witness was excused from the witness stand.)

9                    RANDY TUCKER,

10 after having been duly sworn, was examined and testified as

11 follows:

12                 DIRECT EXAMINATION

13 BY MR. GREENE:

14     Q      State your name to the ladies and gentlemen of

15 the jury, please.

16     A      Randy Tucker.

17     Q      And where are you employed, sir?

18     A      Selma Police Department.

19     Q      And in what capacity do you serve there, sir?

20     A      Canine officer, work patrol on third shift.

21     Q      Okay.  And third shift is from when to when?

22     A      10:00 p.m. to 6:00 a.m.

23     Q      Did you work last night?

24     A      Yes, sir.

25     Q      So you're a little bit sleepy right now?

645

1       A       Yes, sir.

2       Q       You had occasion, sir, to be dispatched to or

3   answered a dispatch on the 27th of November '96 or the early

4   morning of the 28th, Thanksgiving day involving the death of

5   Mr. Willie Johnson.  You are familiar with that?

6       A       Yes, sir.

7       Q       On that particular night, sir, you were

8   working third shift patrol with your canine?

9       A       Yes, sir.

10      Q       And do you work alone, sir?  That is, are you

11  in a single car unit, or does somebody ride with you?

12      A       Just myself.

13      Q       Yourself and the dog?

14      A       Yes, sir.

15      Q       What's the dog's name?

16      A       Donna.

17      Q       How long have you had the dog?

18      A       Three and a half years.

19      Q       All right sir.  On this occasion, sir, were

20  you specifically dispatched, or did you simply answer as a

21  back-up?

22      A       I responded as a back-up car.  It's part of my

23  -- I'm assigned as a patrol and back-up car.

24      Q       Okay.  When you arrived there, sir, Officer

25  Little and Sturdivant were already there?

Ann H. Armstrong, RPR

1    A    Yes, sir.

2    Q    All right, sir.  Briefly, sir, can you observe

3  this diagram for me?  You might need to come down and look

4  at it.

5    A    Yes, sir.

6    Q    Is this familiar with you?

7    A    Yes, sir.

8    Q    Do you recognize Crockett Alley?

9    A    Yes, sir.

10    Q    The number -- I'm referring now to Exhibit 29.

11  There is what appears to be a vehicle drawn in Crockett

12  Alley.  Does that correspond generally as you recall the

13  relative layout of the houses, 2128 Selma, the back alley

14  ways, the alley, the truck.  Does that all look about where

15  you generally remember it to be on this occasion?

16    A    Yes, sir.  I notice one thing different.

17    Q    Please point that out.

18    A    Right here, this shows a fence.  There was a

19  break in the fence right here about 2126 Selma.  There's a

20  part of the fence that was down.

21    Q    Would you draw a little whatever for us there?

22    A    Right here in this area.

23    Q    All right, sir.  Please have a seat.  After

24  arriving there you conferred with Officer Sturdivant and

25  Little; is that correct?

Ann H. Armstrong, RPR

1          A       Yes, sir.

2          Q       And did you approach the vehicle itself to

3     make any observations of it?

4          A       Yes, sir.

5          Q       All right.  Showing you these photographs 30

6     and 31 and ask you if they generally depict and portray what

7     you saw in the interior of the truck on that occasion?

8          A       Yes, sir.

9          Q       Okay.  Now were you there, sir, when Mr.

10    Johnson's body was removed from the vehicle?

11         A       No, sir.

12         Q       Now after arriving on the scene and conferring

13    with them and observing the scene, you assisted those

14    officers in trying to preserve the scene, putting up tape,

15    keeping any people out that might happen by; did you have

16    any problem with the crowd gathering early on?

17         A       No, sir.

18         Q       All right, sir.  Other officers arrived and

19    investigators came.  The Department of Forensic Sciences

20    came to take care of Mr. Johnson's body and to transport.

21    All of those things happened there during the course of that

22    evening.  How long were you there?  What is the last thing

23    that was happening when you left the best you recall?

24         A       The detectives had arrived, and I don't

25    remember exactly what was going on at the time I left.

1          Q        Did you go back on patrol, or were you --

2          A        I went back on patrol, yes, sir.

3          Q        Before leaving, sir, did you confer with

4    Detective Grindle here about any action you took in your

5    capacity as canine officer?

6          A        I advised them that I had --

7          Q        Just did you confer with them?

8          A        Yes, sir.

9          Q        Now as a canine officer you have the duty and

10   responsibility of maintaining the dog; I think her name is

11   Donna?

12         A        Yes, sir.

13         Q        That dog is your dog or belongs to the City of

14   Selma?

15         A        It belongs to the City of Selma.

16         Q        And what training or background does this

17   canine have that qualifies her to act and serve with you in

18   a law enforcement capacity?

19         A        She's certified through Cortez Academy

20   Training School which is Adrian Cortez.  She is certified

21   through LETS which is law enforcement training specialist.

22   And we have received over 580 hours of certified instruction

23   since the time that I first got her.

24         Q        All right.  Briefly, when you got the dog, the

25   canine, where did you get her from and how old was she?  A

```
1    she or he?

2         A       She, she was two years old.  We got her in La

3    Joya, Texas from Adrian Cortez.  He brought her over from

4    Germany, and he spends time initially training the dog.

5    Then we brought the dog -- I spent two days there in Texas

6    with her.  We brought her to Selma, and I went through 260

7    hours of instruction with me and the dog.

8         Q       Y'all get to know each other fairly well

9    during the course of that?

10        A       Yes, sir.

11        Q       What kind of training do you do?

12        A       We do training for tracking, for criminal

13   apprehension, for building searches, for area searches,

14   handling protection; the dog is trained to protect me.  And

15   she is trained in what we call reasonable force which is

16   where if a person is not showing aggression but stops and

17   does what we tell them, the dog will not bite them.  And she

18   is now certified as a narcotics dog.

19        Q       In tracking, sir, in trying to follow, how do

20   you train -- how did you train this dog, and how do you

21   generally train a dog and what training did you receive with

22   the dog in tracking or following a track?

23        A       The dog already had the basics.  That's when

24   we got her.  What we do is we get different people to lay a

25   track.  And then we come back and follow the path of the
```

1    track that leads to a person who is going to be hiding

2    somewhere.  And we continued and left the track for

3    different lengths of time.  We start out a short period,

4    make your track longer and longer and then add in turns.

5    You start out with a straight line.  Then we started adding

6    a turn to the left, a turn to the right, a different number

7    of turns, different things until you bring in tracks going

8    up to two hours old and having numerous turns and different

9    lengths.

10        Q       How far, sir, with your dog Donna had you

11   progressed in tracking; that is, how long, what distances

12   had y'all been able to cover tracking, turns, et cetera as

13   of Thanksgiving '96?

14        A       We had recovered a gun on a track that was

15   used in a robbery after it had been eight hours since it had

16   occurred.  She had done a track that was over eight hours

17   old.  As far as distance, I couldn't tell.  I know in one of

18   the seminars that we held here we did a track that was over

19   a mile long as part of our training.

20        Q       The practical experience with the dog canine

21   Donna, you indicated you had recovered a weapon.  Any other

22   field exercises that were real that you performed with her?

23        A       There have been several things.  We have

24   tracked people after a robbery, and we have tracked people

25   that have fled from the police, stolen cars.  We have had

1    occasion to find other property, other guns.  There has been
2    several cases where we used a dog to track someone.  We used
3    her last night.

4         Q    Very good.  In the course of receiving the
5    canine, you and she trained together for a number of hours
6    under the supervision of the individual that is the expert
7    in the field that provides the dog; is that correct, when
8    you first get her?

9         A    When we first got her, I spent two days there
10   with him, yes, sir.

11        Q    And then you come back to train with the dog.
12   Does somebody supervise that locally?

13        A    Yes, sir, Tommy Weber.

14        Q    Is he certified with the police department to
15   give this kind of training?

16        A    He is certified through LETS and through
17   Cortez.

18        Q    And in order to keep the dog in a position
19   where it is capable of continuing to perform this and be
20   certified, what do you have to do?  Do you have to maintain
21   a certain length of training or a certain amount of training
22   that is supervised?

23        A    Yes, sir.  We train once a week six to eight
24   hours every week.  We train on Sundays.  And every six
25   months Adrian Cortez comes and take us through an eighty

1   hour course and recertifies the dog.  There's a certificate

2   there where she's been certified under him for basic,

3   intermediate and advanced patrol for 240 hours.

4         Q      These certificates that I hold in my hand, now

5   these pertain to yourself and the dog as to certification of

6   your training and expertise?

7         A      Yes, sir.  These are copies.

8         (State's Exhibit Number 32 was marked for

9   identification.)

10        Q      Exhibit 32 contains a series of certificates

11  and documents pertaining to the training and background of

12  you and the dog; is that correct?

13        A      Yes, sir.

14        MR. GREENE:  We move for the introduction of those

15  for the purposes of showing the expertise of the dog and its

16  handler.

17        MR. GOGGANS:  No objection.

18        THE COURT:  We will admit those documents, and we'll

19  stop at this point for lunch.  We are going to take a recess

20  until 1:15 for lunch.  Let me remind you not to discuss the

21  facts of this case among yourselves.  Don't allow anyone to

22  discuss the facts of the case with you.  Please display your

23  juror button as you go to and from the courthouse.  Keep

24  those on so people will know that you are a juror so that

25  they will not come up and attempt to engage you in

Ann H. Armstrong, RPR

1    conversation.  Should you hear anything or see anything

2    regarding this proceeding here during the lunch recess, it

3    would be your responsibility to tell me that.  Please try to

4    avoid any radio or newspaper account of the proceeding.  You

5    may retire to the jury room and then leave for lunch.

6         (The jury was excused from the courtroom, and a

7    recess was taken.)

8         (The following occurred in the presence and hearing

9    of the jury:)

10        Q    (By Mr. Greene)  I think before the recess we

11   had identified the certificates concerning the training of

12   yourself and the dog Donna; is that correct?

13        A    Yes, sir.

14        Q    All right, sir.  And, sir, in the course of

15   your duties there that night, did you in fact utilize the

16   dog Donna in attempt to do some tracking there at the scene?

17        A    Yes, sir.

18        Q    Now, sir, in tracking with the canine, what is

19   it you are tracking when you are trying to track a human

20   being?  What is the dog following?

21        A    Human scent.

22        Q    And what's the effect of blood, whatever kind

23   of blood it might be?  Does it help, mask, hurt or what?

24        A    It's just a stronger odor, a stronger element

25   of human scent.

1    Q    Okay.  And on this occasion, sir, tell us what
2  you would do in order to get the dog or what you did do and
3  what you should do to get the canine, the dog, to try to
4  track?  Do you give it a command, or do you just turn it
5  loose and let it run or what?

6    A    She's got a leather harness that you put on.
7  And any time you put that on, the dog knows that it's going
8  to track.  I've always used that harness to begin a track
9  with.  Then I take her and present the area.  I just put my
10  hand down where I want her to start, and she'll start
11  smelling it.  Normally when I put the harness on her, I
12  don't even have to present an area to her.  She already
13  starts looking.

14    Q    So you take her to a starting point?
15    A    Yes, sir.

16    Q    Where you think wherever this person was, and
17  you present the area to her, and put the harness on and/or
18  present it to her?

19    A    Yes, sir.

20    Q    And then what?  Do you hold onto her or just
21  follow along behind?

22    A    Just follow behind.

23    Q    Did you have her on a leash?

24    A    Yes, sir.

25    Q    And did in fact on this occasion a tracking

655

1    occur?  Did you and the dog go and follow some scent or

2    trail or some --

3         A      Yes, sir.  You could see where someone had

4    stepped in some blood beside the truck, and that's the area

5    that I started to track.

6         Q      And on this occasion, where did you go with

7    you and the dog and the harness, you and Donna?

8         A      We went down the alley.  We turned into the

9    back yard of the house.  I believe it's 2124 Selma.  We went

10   through that yard, and we ended up at 2128 Selma.

11        Q      Okay.  Let's see.  I think we provided you

12   with a pen earlier.

13        A      Yes.

14        Q      And how long did all of this take?

15        A      Just a couple of minutes.

16        Q      Did you in the course of that go by a tree

17   somewhere?

18        A      Yes, sir.

19        Q      What happened at the tree?

20        A      She showed a lot of interest around the tree

21   as we came by it.

22        Q      And then where did you go?

23        A      We went to the hedge row along the driveway of

24   2128 Selma.  She showed a lot of interest around it.  And

25   then she went towards the front steps of 2128 Selma.

Ann H. Armstrong, RPR

1      Q      Then from where?

2      A      I didn't let her go up on the porch.  We

3  turned around, and we started going back out the other way.

4  And she went to the point where she made her first turn, and

5  she showed a lot of interest there.

6      Q      Could you illustrate for us, sir, by using --

7  I think we provided you with a red pen using some dots or a

8  line or something that would show -- you have a diagram of

9  your own, don't you?

10     A      Yes, sir.

11     Q      You can do it without the diagram?

12     A      Yes, sir.

13     Q      Show us your starting place and then --

14  remember there are people that are going to have to kind of

15  see through you.  So try to do the best you can.

16     A      I started along in here, along the back of the

17  truck.  We went down through here, and we turned right here.

18  We went across this yard here.  It's about 75 feet wide.  We

19  came through here, and this is where the dog first hesitated

20  a little bit before she made a turn, going through this area

21  right here.  There's a tree somewhere in here before you get

22  to the sidewalk.  She showed a lot of interest around that

23  tree.  She made a turn headed this way.  There's a driveway

24  over here with a hedge row.  She went to the hedge row.  She

25  showed a lot of interest around the hedge row, and I believe

1    I went up too far on this diagram.  She came and started

2    heading towards the front of this house here.  And then we

3    went back.  We got here, and she still showed a lot of

4    interest right here.  And you could see a lot of leaves had

5    fallen.  You could see a fresh set of -- not a fresh, but

6    you could see a set of tracks where someone had walked up to

7    the back of the residence also.

8         Q       Did you take the dog up that set of footprints?

9         A       I stopped right here.  This was -- you could

10   see this visually.

11        Q       So what did you then do after you stopped

12   there with the dog?  Did you take her back to the car or

13   undo the harness, pick her up?

14        A       I walked her back to the car and put her up.

15        Q       So starting here she tracked in this red line

16   you have drawn?

17        A       Yes, sir.

18        Q       You think you're too far up here?  Would you

19   correct that?

20        A       She walked around right here, and then she

21   went toward this.  I think actually those two shouldn't be

22   on there.  I went up a little bit too far.

23        Q       So from this point by the truck where you

24   start over to here, the tracking is that somebody went here

25   and up to here?

1      A      (Witness nods head affirmatively).

2      Q      Thank you.  And that tracking leads you to the

3  house at 2128, and that's Selma Avenue; is that right?

4      A      Yes, sir.

5      Q      All right, sir.  Do you know or did you later

6  learn who lived in that house?

7      A      Yes, sir.

8      Q      Who?

9      A      Matthew and Julius Reeves and their mother.

10     Q      All right, sir.  Thank you, sir, very much.

11                     CROSS EXAMINATION

12  BY MR. GOGGANS:

13     Q      Officer Tucker, what kind of dog is Donna?

14     A      A German Shepherd.

15     Q      Did you report to the other officers who was

16  there where all Donna had tracked?

17     A      Officer Hopkins followed me along the track,

18  and I believe I talked to Detective Grindle and gave him the

19  information.

20     Q      So you told him where she had gone to and

21  whatnot?

22     A      Yes, sir.

23     Q      If you could step down here -- and this is at

24  2128 right here.  If you could step up so these folks can

25  see, please.  What is the street number here?

                    Ann H. Armstrong, RPR

659

1      A      I believe that's 2124.  It says 26, but if I'm
2  not mistaken that's 2124.
3      Q      All right.  And as I understand it, Donna
4  followed this red track that you made with the marker just
5  now; is that correct?
6      A      Yes, sir.
7      Q      And she got interested in a tree somewhere?
8      A      Right along in here.
9      Q      If you could please put a little X where you
10 recall the tree being?
11     A      (Witness complies.)
12     Q      And I believe you said she got interested in
13 the hedge row over here on the right-hand side?
14     A      Yes, sir.
15     Q      But initially her track was right along the
16 side of the 2124; is that right?
17     A      Yes, sir.
18     Q      And her first turn was right down here; is
19 that right?
20     A      Out of that yard, actually the first turn is
21 right here.
22     Q      I'm sorry.  The first turn would be to the
23 right coming out of the alley.  Thank you.  Have a seat.  No
24 other questions.
25     MR. GREENE:  Thank you, sir.

Ann H. Armstrong, RPR

1          (The witness was excused from the witness stand.)

2          THE COURT:  Call your next witness.

3          MR. GREENE:  We call Mr. Sam Johnson.

4                          SAM JOHNSON,

5     after having been duly sworn, was examined and testified as

6     follows:

7                        DIRECT EXAMINATION

8     BY MR. GREENE:

9          Q       State your name for the ladies and gentlemen

10    of the jury, please,

11         A       Sam Johnson.

12         Q       Mr. Johnson, in his lifetime did you know

13    Willie Johnson?

14         A       Yes, sir.

15         Q       And what relationship was he to you?

16         A       Nephew.

17         Q       Where did he live, sir?

18         A       Out on county road 78 in Tyler,

19         Q       In the Tyler community?

20         A       Yes, sir.

21         Q       And where did he work?

22         A       Selma Housing Authority.

23         Q       How long did he work there?

24         A       Approximately twenty years.

25         Q       And who did he live with?

1        A        His daddy, Willie James and his mother, Sadie.

2        Q        Okay.  And how old was he on the date of his

3   death?

4        A        Thirty-eight.

5        Q        On that particular day, sir, do you know if he

6   worked that day, if that was a working day?

7        A        Yes, sir.

8        Q        All right, sir.  I want to show you, sir,

9   what's marked for identification as State's Exhibit Number 6

10  and ask you if you can identify this photograph.  I've shown

11  it to you earlier.  I want to know if you can identify this

12  photograph as being your nephew, Willie Johnson?

13       A        Yes, sir.

14       Q        All right, sir.  Does that correctly and

15  accurately depict and portray him and you know that to be

16  him?

17       A        Yes, sir.

18       MR. GREENE:  We move for the introduction of State's

19  Exhibit 6.

20       MR. GOGGANS:  No objection.

21       THE COURT:  It will be admitted.

22       MR. GREENE:  Permission to show it to the jury.

23       THE COURT:  Granted.

24       MR. GREENE:  That's all.

25       MR. GOGGANS:  No questions.

Ann H. Armstrong, RPR

```
1              (The witness was excused from the witness stand.)

2              MR. GREENE:  I call Dr. Wanger.

3                        GREG WANGER, M.D.,

4    after having been duly sworn, was examined and testified as

5    follows:

6                        DIRECT EXAMINATION

7    BY MR. GREENE:

8              Q       State your name for the ladies and gentlemen

9    of the jury, please?

10             A       Gregory Price Wanger.

11             Q       And where are you employed, sir, and in what

12   capacity do you serve?

13             A       I'm employed at the Alabama Department of

14   Forensic Sciences in Montgomery.  I'm employed as the state

15   medical examiner and a physician, and my specialty is

16   forensic pathology.

17             Q       What formal educational background do you

18   have, sir, that qualifies you to perform the duties with the

19   Department of Forensic Sciences as a state medical examiner,

20   sir?

21             A       I received my M.D. degree from Ohio State

22   University in Columbus, Ohio in 1979.  I completed my

23   anatomic and clinical pathology residency at the same

24   institution in 1983.  In 1983 and 1984 I was a medical legal

25   fellow with the Medical College of Virginia in Richmond,
```

Ann H. Armstrong, RPR

1    Virginia.  I was also a Richmond Metropolitan medical

2    examiner during that year.  Following that I was employed as

3    assistant chief medical examiner for the northern region of

4    Virginia and then later the Tide Water region in Norfolk.  I

5    began working in Alabama in the Mobile laboratory since

6    1988.  I worked for eight years and then transferred to the

7    Montgomery office.  I am board certified in anatomic,

8    clinical and forensic pathology and licensed to practice

9    medicine in Virginia and Alabama.  I'm a fellow of the

10   College of American Pathologists, and I'm also on the board

11   of directors of the National Association of Medical

12   Examiners.

13       Q    Sir, in the course of your duties as a state

14   medical examiner, have you been called upon to make

15   examinations -- let me first ask you.  What does a state

16   medical examiner do what is the job?

17       A    We are responsible for determining the cause

18   and manner of death for those persons who die a suspicious

19   or violent death.  The primary tool we use for that is

20   called an autopsy.

21       Q    All right, sir.  That is a medical examination

22   of the body internally and externally to make that

23   determination based upon your medical training and

24   background?

25       A    That is correct.

1    Q    In the course of your duties, sir, you have

2    been called upon to perform this task of examination and to

3    form opinions as an expert in this field on a number of

4    occasions; is that true?

5    A    That's correct.

6    Q    How many bodies of deceased individuals could

7    you tell us that you have had occasion to make such

8    examinations of and give opinions about, sir?

9    A    I have examined approximately three thousand

10   people and testified hundreds of times.

11   Q    Does that include the courts of this state and

12   other states and federal courts?

13   A    Yes, sir, it does.

14   MR. GREENE:  Your Honor, we would like to offer Dr.

15   Wanger as an expert in the field of forensic pathology to

16   testify as to the manner and nature and cause of death in

17   this case.

18   MR. GOGGANS:  No objection.

19   THE COURT:  He will be so considered.

20   Q    First of all, sir, I show you what's marked

21   for identification as State's 6 and ask you if you can

22   identify that as the body of Willie Johnson, Jr. and ask you

23   if you performed an autopsy or postmortem examination on

24   him?

25   A    Yes, sir.  This is the gentleman who was

665

1    identified to me as Willie Johnson, Jr., and this is a copy

2    of a thirty-five millimeter photograph that I took during

3    the autopsy.

4        Q        And your method of identification other than

5    your memory is what, sir?

6        A        He was identified at the scene to Mr. Sparrow

7    who is an investigator in my office.

8        Q        Do you have some method that you can identify

9    from that photograph?

10       A        We assign a number on the ruler.  You'll

11   notice that there's digits 006284 which is the number that's

12   assigned when he came in the door.

13       Q        Okay.  So not only do you have this, but you

14   also have the number in the photograph?

15       A        That's correct.

16       Q        All right, sir.  When did you perform the

17   postmortem, sir?

18       A        November 29th, 1996 from 8:00 to 10:00 a.m.

19       Q        All right, sir.  Could you give us, sir, the

20   age, height, weight, et cetera?

21       A        I was told he was thirty-eight years of age,

22   and his body looked to be approximately that age.  He

23   measured 69 inches in length and weighed 123 pounds.

24       Q        Were there any particular observations about,

25   exterior examinations that you made other than the wound

Ann H. Armstrong, RPR

1    from which he died, any other particular other injuries that

2    you noted in any particular manner?

3         A      No, sir.

4         Q      Now you did take note of a serious injury to

5    his body; is that correct?

6         A      That's correct.

7         Q      And where was that, sir?

8         A      Mr. Johnson had a shotgun wound to his neck.

9    It had penetrated along the right side of the neck.  It had

10   opened up his airway and also perforated the main artery on

11   this side of the neck called the common carotid artery.  And

12   then the pellets had exited -- there were similar small

13   pellet wounds on the surface of the left wrist that had

14   exited out the back of the wrist and the hands, on the

15   thighs, on the front of the left leg and one on the top of

16   the foot.

17        Q      I want to show you, sir, a series of

18   photographs all bearing the same identification number from

19   your lab.  And I will give you first Exhibit 2 and ask if

20   you can tell us if that photograph depicts and portrays

21   correctly and accurately any part of the body of Mr.

22   Johnson that you just testified about?

23        A      Yes, sir, number 2 is a photograph of the left

24   wrist area.  The hand is like this to show the pellet

25   perforations in the wrist on this side.

Ann H. Armstrong, RPR

1    MR. GREENE:  We move for the introduction of 2, if

2  the Court please.

3    MR. GOGGANS:  No objection.

4    THE COURT:  It will be admitted.

5    Q    Let me just do it this way, sir, 5, 4, 3, and

6  1, would you examine all of those and tell us if they

7  correctly and accurately depict and portray the body of Mr.

8  Johnson with reference to the pellet wounds, gunshot,

9  shotgun pellet wounds you've just described?

10    A    Yes, sir.  The last four that you gave me show

11  wounds on the thighs, the left leg and the other side of the

12  wrist and hand.

13    MR. GREENE:  All right, sir.  And we move for the

14  introduction of those exhibits, Your Honor, 1, 3, 4 and 5 I

15  think it is.

16    THE COURT:  It will be admitted.

17    Q    All right, sir.  We are dealing first with

18  Exhibit 2.  You have already identified that.  Which hand is

19  this now, sir?

20    A    This is the left wrist and hand.

21    Q    And the pellets from that photograph show the

22  pellets striking the hand inside or outside, where?

23    A    The inside of the wrist here, and the exits

24  are out the other side on the back of the hand and wrist.

25    Q    Does that give you any indication as to where

Ann H. Armstrong, RPR

1   the hand was with reference to the shot coming through the

2   neck?

3        A       If it's all the same shot, the same firing,

4   then it would have to be somewhere in the vicinity of where

5   the shot came through the neck, somewhere in this area.

6        Q       The hands then would have been perhaps at or

7   near the steering wheel?

8        A       That's certainly possible.  That would put it

9   in the right position.

10       MR. GREENE:  Permission to show it to the jury.

11       THE COURT:  Granted.

12       Q       Now Exhibit 1, sir, what does it depict and

13  portray?

14       A       Exhibit 1 shows the left thigh.  In the center

15  of the photograph is the knee, and the thigh is above it and

16  then the leg below.

17       Q       Does it depict and portray any injuries or

18  wounds?

19       A       Yes, sir.  It shows numerous bird shot type

20  pellets.

21       Q       Into the thigh?

22       A       Yes, sir.

23       Q       Exhibit 4, sir, what does it depict and

24  portray?

25       A       Number 4 is the left leg showing the pellet

1    grazes and penetrations on the front of the leg.

2         Q       Okay.  Exhibit 3?

3         A       Yes, sir, this is the back of the left hand

4    and wrist area showing where the pellets exited.

5         Q       And 5?

6         A       And 5 is the lower part of the right thigh

7    showing the smaller number of pellet holes.

8         Q       These photographs, sir, and the injury to the

9    neck area, the neck area injury comes from which side to

10   which side again?

11        A       From right to left.

12        Q       So if the shot then would have come from

13   somewhere in this area behind, slightly behind and to the

14   side?

15        A       To the side, yes, sir.

16        Q       And down?

17        A       Yes, sir, essentially across on his neck.

18        Q       And then the pellets hit what other parts of

19   his body?

20        A       Again it's the same discharge.

21        Q       Assuming it's the same discharge?

22        A       It hit the wrist.  It hit the thighs and the

23   front of the leg and then on one of the thighs.

24        Q       It came across and down to --

25        A       Yes, sir.

Ann H. Armstrong, RPR

1    Q    Would that be consistent with a sitting

2  position?

3    A    Yes, sir.  That could explain all of the shot

4  in one pattern.

5    Q    Did you remove or take any shot from the body?

6    A    Yes, sir.

7    Q    What did you do with them, sir?

8    A    I sealed them in plastic bags from each of the

9  regions in the body and then put them in our evidence locker

10  at the laboratory where they stayed until yesterday.

11    Q    I'm showing you Exhibit 7.  Are those the

12  shots?

13    A    Yes, sir.  There are three different bags here

14  of lead bird shot that I collected.

15    Q    Is this now in the same condition as it was

16  when you removed it from the body of Mr. Johnson during the

17  postmortem?

18    A    Yes, sir.

19    MR. GREENE:  We move for the introduction of 7.

20    MR. GOGGANS:  No objection.

21    THE COURT:  It will be admitted.

22    Q    Now in the course of this particular shotgun

23  blast, sir, and the resulting injury from it, were you able

24  to make any determination by your observation and

25  examination as to how close or how far the muzzle of the

1    shotgun was from the body of Mr. Willie Johnson, Jr., the

2    deceased?

3         A      Only in a relative sense.  Things that are in

4    contact with the skin, we usually see a lot of disruption of

5    tissue from the gas, and we see a lot of gun powder that

6    comes out with the projectiles.  If it's close we may see a

7    lot of gun powder around the holes.  If it gets far enough

8    away then all we have are the pellets.  We don't see

9    anything other than the pellet injuries.  And that's what we

10   have here.  There really isn't any gun powder that I can see

11   with the naked eye.  That maybe because there wasn't any;

12   that may be because of all the bleeding.  Sometimes when you

13   have a small amount of powder and you have a large artery

14   that's bleeding, essentially you clean the area by the

15   bleeding.  So in any case with the naked eye you couldn't

16   see any powder.

17        Q      So it's very difficult to make any

18   determination as to how close the gun barrel might have

19   been.  It may have been very close, and it may have been

20   some distance away because of the massive bleeding from the

21   wound?

22        A      That's correct.  I can say that I don't

23   believe it's a contact wound; in other words, there is no

24   contact with the skin because the nature of that kind of

25   wound is a much more devastating wound.  But beyond that I

672

1    can't really tell you anything about range.

2         Q       So beyond not being contact, it could be very

3    close; it could be very far away?

4         A       That's correct.

5         Q       The -- I think I want to use the term -- and

6    you please correct me if I'm wrong.  The mechanism, the

7    thing that actually killed Mr. Johnson on this case, some

8    people have a gunshot wound and die of pneumonia resulting

9    from the attempt to treat that; others die because the heart

10   fails because it's severely injured or something.  What was

11   the mechanism that killed him on this occasion?

12        A       Mr. Johnson had a very serious artery that was

13   injured; his main artery from the right side of the neck,

14   the common carotid artery is under high pressure, and he

15   bled to death.

16        Q       How long would it take or did it take him to

17   die in your best opinion?

18        A       I can't give you an exact number.  It varies a

19   lot with individuals.  But certainly when you have a major

20   artery opened like this, if you cannot apply pressure to

21   this and you cannot control the bleeding, it doesn't take

22   very long, certainly minutes and he would be unconscious.

23        Q       How would this injury affect motor skills,

24   ability to move about, try to defend, walk, run away?

25        A       I think it would -- knowing you have a large

1    volume of blood that is leaving, but he also had an airway

2    that was open which would interfere with his breathing.  He

3    may have some several seconds of purposeful activity.  He

4    maybe able to carry out some maneuvers of some sort but not

5    much beyond that.

6          Q      You removed the clothing that he had on this

7    occasion?

8          A      Yes, sir.

9          Q      All right, sir.  I'll show you Exhibit 8, sir.

10   You brought that with you today, sir?

11         A      Yes, sir.

12         Q      It's been maintained in your care, custody and

13   control since you removed it for the autopsy?

14         A      Yes, sir.

15         Q      All right, sir.  And would you look in there,

16   sir, and see if you can find a coat or shirt?

17         A      I didn't bring any gloves today.  I have the

18   gloves in my car.

19         Q      Do you mind if I do it?

20         A      It's up to you.

21         Q      Thank you.  Were in fact, sir, these the

22   clothes that you removed from him on this occasion?

23         A      Yes, sir.

24         Q      This jacket is the jacket that was worn at

25   that time; is that correct?

Ann H. Armstrong, RPR

674

1    A    Yes, sir.  My initials are right there.

2    MR. GREENE:  We move for the introduction of State's

3 Exhibit 8.

4    MR. GOGGANS:  No objection.

5    THE COURT:  It will be admitted.

6    MR. GREENE:  Your witness.

7    MR. GOGGANS:   No questions.

8    (The witness was excused from the witness stand.)

9                    DIRECT EXAMINATION

10 BY MS. WILSON:

11   Q    State your name for the ladies and gentlemen

12 of the jury, please?

13   A    I'm Duane Smith.

14   Q    And where do you live?

15   A    Montgomery.

16   Q    And how are you employed, Mr. Smith?

17   A    I am personnel officer for the Armored Guard

18 now.

19   Q    And what rank do you have with them?

20   A    I'm colonel.

21   Q    And do you recall the day of November 27th,

22 1996?

23   A    Yes, ma'am.

24   Q    That was a Wednesday, the day before

25 Thanksgiving of last year; is that correct?

675

1      A      I can't remember the exact date, but I believe

2   it was the day before Thanksgiving.

3      Q      What did you do that day?

4      A      I went hunting that afternoon.

5      Q      Are you a member of a hunting club in this

6   area?

7      A      Yes, ma'am.

8      Q      And what is the name of it?

9      A      We call it Sugar Bottom Hunting Club.

10      Q      And where is that located?

11      A      I guess it's about ten miles east of here

12   going towards Montgomery; it's close to Tyler.

13      Q      Okay.  Now do you know what time you left home

14   heading to the hunting club that day?

15      A      The exact time no; I know it was after lunch.

16   To the best of my knowledge it was -- when I stopped on the

17   road, it was about, or left there it was around quarter to

18   3:00.  So it takes me about an hour or an hour and fifteen

19   minutes to get from home to the hunting club.

20      Q      Okay.  So sometime before 2:00 or in the area

21   of 2:00 o'clock when you left home?

22      A      Somewhere around that.

23      Q      Okay.  Now was anybody with you or were you

24   alone?

25      A      I was alone.

1    Q       What type of vehicle were you in?

2    A       Black Toyota King Cab, it's a four wheel drive

3    and black.

4    Q       And how were you dressed if you remember?

5    A       Normally if I'm going hunting I normally wear

6    old BTU's.  That's camouflaged hunting clothes.  But I can't

7    remember exactly what I had on.  But ten to one that's

8    probably what I had on, it and a sweat shirt maybe with

9    pants.

10   Q       Okay.  Now as you were going to the hunting

11   camp, what did you encounter?

12   A       I guess about a mile, a mile and a half off of

13   80 there was a car stopped in the middle of the road with a

14   hood up.

15   Q       What type of road was this, paved or dirt?

16   A       It was a dirt road.

17   Q       Okay.  And the car was actually in the middle

18   of the road?

19   A       Yes.

20   Q       In the dirt road.  Do you remember what color

21   the car was?

22   A       It was a bluish, gray, blue gray to the best

23   of my memory.

24   Q       You said the hood was up?

25   A       Yes, ma'am.

```
 1        Q       Was it facing Highway 80, or was it facing the
 2   other way?
 3        A       It was headed towards Highway 80.
 4        Q       And did you see anyone around this vehicle?
 5        A       Yes, ma'am.
 6        Q       And can you describe how many people you saw?
 7        A       To the best of my knowledge there were three,
 8   people, three young people.
 9        Q       Okay.  And what did you do when you saw the
10   vehicle there in the middle of the road with the hood up?
11        A       Well, I pulled up, and the tallest boy -- I
12   pulled up right beside the truck.  I was still in my truck
13   where I could see, sort of see down really -- really I could
14   see down into the, you know, into the engine of the truck.
15   He said his car was skipping or just quit on him.  And
16   anyway, I offered him a few comments to check on, you know,
17   a few things to see if it would crank for him.
18        Q       And did he try any of those things while you
19   were there?
20        A       Yes, ma'am.
21        Q       Did the car ever crank?
22        A       No, ma'am.
23        Q       What, if anything else, did you say to them
24   there on that occasion?
25        A       I was in a hurry because I was in a hurry, and
```

1    I wanted to be -- I was going to meet some other people that

2    I knew were going hunting. And I think it was around a

3    quarter to 3:00. And I believe I provided y'all a document.

4    When we go to our hunting club, we sign out on a sheet of

5    paper when we leave to go to the woods. And then when we

6    come out of the woods we sign out. It's a safety thing to

7    be sure, you know, we don't leave anybody in the woods.

8    We've got a record that I went in and came out.

9         Q       Okay.

10        (State's exhibit Number 33 was marked for

11   identification.)

12        Q       Now how long did it take you to get to the

13   hunting club after you left the area where the car was?

14        A       It's only probably about three more miles,

15   maybe four to the hunting club.

16        Q       So you went there. How long did you stay at

17   the hunting camp before you actually signed out?

18        A       I did leave out one thing you asked me. I did

19   tell them there. I said, look, I'm going up here to meet

20   somebody. And I said, you know, let the car cool off and

21   maybe it will crank. If it doesn't, I'll be back here right

22   at dark or right after dark. And, you know, I'll be glad to

23   carry them for help them or do anything I could. Your other

24   question. When I left the hunting camp, I don't know what

25   time I signed out. I don't remember exactly what is on

1    there.  But if I signed out then, probably within another,

2    you know, I may have sat there and talked to somebody but

3    another ten to fifteen minutes from that I would have been

4    coming back by.  It would have been dark, right at dark.

5            Q       Let me show you what's been marked State's

6    Exhibit Number 33.  I'm going to ask you if you recognize

7    that document?

8            A       Yes, ma'am.

9            Q       Is that a copy of the sign out sheet that you

10   have referred to in your testimony?

11           A       Yes, ma'am.

12           Q       And do you see on this document where your

13   signature is showing the time that you signed out?  Has it

14   been cut off?

15           A       I don't see it on there.  So it must have been

16   after this.

17           Q       So you were the last one that day to sign out

18   from the hunting camp as best you know?

19           A       Well, there could have been another sheet.

20   Somebody else could have been signed out after me.

21           Q       Okay.  All right.  Now when you came back, you

22   came back to the hunting camp and signed back in; is that

23   correct?

24           A       Right.

25           Q       Then you got in your truck, and where were you

Ann H. Armstrong, RPR

1    headed then?

2         A     Back to Montgomery.

3         Q     And when you came back, did you come by the

4    same way you had gone into the hunting camp?

5         A     Yes.

6         Q     When you came back by, did you see the car

7    that --

8         A     No, the car was not there.

9         Q     At any time from the time you left them and

10   went to your hunting camp, did you see them again?

11        A     No, ma'am.

12        Q     Okay.  Did you see any of the individuals that

13   had been around the car when you went back through heading

14   back to Montgomery?

15        A     No, ma'am.

16        Q     All right.  I have no further questions.

17                        CROSS EXAMINATION

18   BY MR. GOGGANS:

19        Q     Colonel Smith, your truck was a black Toyota;

20   is that correct?

21        A     Yes, sir.

22        Q     At the time did your truck have a sticker on

23   the back window outlining a deer head or something like

24   that?

25        A     On the back window.

Ann H. Armstrong, RPR

1      Q      On the back window?

2      A      There is one on it now.

3      Q      Was it on there then?

4      A      Sir, I can't tell you because I gave that one

5   to one of my sons, and I honestly don't know if it was on it

6   at that time or not.

7      Q      Did you have your hunting gear with you?

8      A      Yes, sir.

9      Q      Did you have any type of antenna on your, a

10  telephone antenna or anything like that on your truck?

11     A      There is one on it now.

12     Q      Do you recall if it was there then?

13     A      There was not one -- I don't believe there was

14  one on it at that time.

15     Q      How many different people did you talk with

16  out there?  Was it one person or more than one?

17     A      Just one.

18     Q      Did that person or anybody else out there give

19  you a hard time or hassle you in any way?

20     A      Oh, no, sir very nice.

21     Q      Very nice to you?

22     A      Yes, sir.

23     Q      No other questions.

24     MS. WILSON:  No further questions of this witness.

25     (The witness was excused from the witness stand.)

```
1                    BRENDA SUTTLES,

2  after having been duly sworn, was examined and testified as

3  follows:

4                  DIRECT EXAMINATION

5  BY MR. GREENE:

6        Q      Tell the ladies and gentlemen of the jury your

7  name, please.

8        A      Brenda Suttles.

9        Q      How old are you, Ms. Suttles?

10       A      Twenty-one.

11       Q      Do you know the Defendant over here, Matthew

12 Reeves?

13       A      Yes, sir.

14       Q      Do you have a nickname or a street name?

15       A      Bam Bam.

16       Q      Does he have a nickname or a street name?

17       A      Yes.

18       Q      What are they?

19       A      Little Mack and Troll.

20       Q      Troll?

21       A      Yeah.

22       Q      Okay.  Back in 1996 in November, the day

23 before Thanksgiving and morning of Thanksgiving morning, you

24 recall all that stuff that happened back then; is that true?

25       A      I didn't understand.
```

1    Q    Thanksgiving 1996, do you recall all of that?

2    A    Yes, sir.

3    Q    Where were you living at that time?

4    A    314 Lavender in east Selma.

5    Q    Who all lived there with you?

6    A    Me and my mom and my sisters.

7    Q    How old is your sister?

8    A    My sister is fifteen.

9    Q    Where were Troll or Little Mack here, Matthew?

10   Where was he living, and where was his brother, Julius,

11   living, if you know?

12   A    On Alabama.

13   Q    All right.  Did y'all know each other then?

14   A    Yeah.

15   Q    Now on that day, the day before Thanksgiving,

16   what time did you -- about what time of the day did you get

17   with them if you did?

18   A    I can't tell you exactly the time, but I know

19   it was in the afternoon.

20   Q    All right.  Did you go over to their house on

21   Alabama, or did they come over to your house, or did y'all

22   meet some other place?

23   A    They came over to my house.

24   Q    And where did y'all go to or leave out to go

25   to?

684

| | | |
|---|---|---|
| 1 | A | We went looking for some robberies. |
| 2 | Q | To rob somebody, is that what you just said? |
| 3 | A | Yes, sir. |
| 4 | Q | When did y'all decide to do all of that? |
| 5 | A | At my house. |
| 6 | Q | When you struck out, did you ride in a car, or |

did you go walking?

| | | |
|---|---|---|
| 8 | A | When we first left my house? |
| 9 | Q | Uh-huh. |
| 10 | A | We was walking. |
| 11 | Q | Who all went walking? |
| 12 | A | Me, Matthew, Julius and Emanuel. |
| 13 | Q | Who is Emanuel? |
| 14 | A | My cousin. |
| 15 | Q | How old was he at that time? |
| 16 | A | Fifteen. |
| 17 | Q | Where did y'all walk to? |
| 18 | A | Over there by McDonald's. |
| 19 | Q | So y'all walked from Lavender in east Selma |

over to McDonald's?

| | | |
|---|---|---|
| 21 | A | Yes, sir. |
| 22 | Q | Did y'all walk out behind McDonald's? |
| 23 | A | Yes, sir. |
| 24 | Q | Did you have any particular place to go that |

you wanted to go to do this robbery, any particular place

Ann H. Armstrong, RPR

1    you were going then as you were walking?

2            A       Not at that moment.

3            Q       All right.  When you got over there behind

4    McDonald's, were all of y'all still together; that is, you

5    and Julius and Emanuel and Troll here?

6            A       Yes, sir.

7            Q       While y'all were walking back over there, did

8    you come in contact with somebody?

9            A       Yes, sir.

10           Q       Do you now know what his name was?

11           A       Tony.

12           Q       Huh?

13           A       Tony.

14           Q       I'm sorry.  I don't understand you.

15           A       Tony.

16           Q       Tony.  Do you know his real name?

17           A       No.

18           Q       And how did you come in contact with Tony?

19           A       Tony was driving by.  As he was driving by, he

20   had thrown up a gang sign.  And when he had thrown up a gang

21   sign, Julius Reeves throwed up one back.  And when Julius

22   Reeves throwed up one back, Tony kept driving by.  And as he

23   kept driving by, Julius was yelling, hey, whoo, whoo.  So he

24   kept driving back by.  And then he had turned around and

25   came back.  And when he came back, Julius asked him, said,

1    would you give me and my homies and them a ride.

2           Q       Were all of y'all there standing in a pile?

3           A       Yes, sir.

4           Q       Wanted to give your homies a ride; is that

5    right?

6           A       Yes, sir.

7           Q       What kind of gang sign did he throw up?

8           A       I couldn't tell you.

9           Q       How do you know it's a gang sign?

10          A       I know it's a gang sign.

11          Q       You've seen it before?

12          A       Yeah.

13          Q       Did y'all get in the car?

14          A       Yes, sir.

15          Q       Now who all got in the car?

16          A       Me, Matthew, Julius and Emanuel Suttles.

17          Q       Where did y'all go?

18          A       We went halfway to east Selma.

19          Q       Did y'all discuss the robbing that you had in

20   mind?

21          A       Sir?

22          Q       Did y'all discuss the robbing that you had in

23   mind?

24          A       Yes.

25          Q       Who said what about what on robbing something?

1    A    Julius said, yeah, we can go to White Hall and

2  rob these drug dealers.

3    Q    Drug dealers?

4    A    Yes.

5    Q    At what, White Hall?

6    A    In White Hall.

7    Q    Well, did anybody say, yeah, that's a good

8  idea or no, it ain't or I ain't doing it or anything?

9    A    No, sir.

10   Q    So then what --

11   A    So he was asking the boy -- he said, are you

12 straight on gas.  So he was like, yeah.  Then so he said,

13 I'm going.  Then Tony said, yeah.  And so as we turned

14 around from east Selma, we went somewhere on Broad Street to

15 this brick apartment house and got the gun.

16   Q    Who went and got the gun?

17   A    Julius.

18   Q    Did he go in the apartment house?

19   A    Yes, sir.

20   Q    Did you see where he went?

21   A    Upstairs.

22   Q    You didn't go with him?

23   A    No, sir, I stayed in the car.

24   Q    Was Troll in the car with you there?

25   A    Yeah.

1    Q    Or did he go in?  He stayed in the car?

2    A    He stayed in the car.

3    Q    What about Emanuel, what did he do?

4    A    He stayed in the car.

5    Q    All right.  The guy driving whose car it was,

6    he stayed in the car too?

7    A    Yes, sir.

8    Q    Did Julius come back?

9    A    Yes, sir.

10    Q    Did he bring anything with him?

11    A    Yes, sir.

12    Q    What did he bring?

13    A    A shotgun.

14    Q    Describe it for me.

15    A    It's short with a pistol handle on it, and

16    it's black all over.

17    Q    What did he do with it when he came back into

18    the car?

19    A    He handed it to Little Mack.

20    Q    Little Mack?

21    A    Yeah.

22    Q    I've been using the word Troll, but Little

23    Mack is what you call him; you're talking about Matthew

24    Reeves here?

25    A    Yes, sir.

1    Q    The Defendant?

2    A    Yes, sir.

3    Q    Was he sitting there next to you?

4    A    Sir?

5    Q    Was he sitting next to you or away from you,

6  Little Mack?   In the car where was everybody sitting?

7  That's what I'm trying to ask you.

8    A    Oh, I was -- me and him was sitting on the

9  end.

10   Q    Sitting on the end?

11   A    Yes, sir.

12   Q    All right.  Is that the back seat or the front

13  seat?

14   A    The back seat.

15   Q    Where was Emanuel?

16   A    In the middle.

17   Q    All right.  Where did Julius get, front, back,

18  where?  Where did Julius get when he came?

19   A    In the front.

20   Q    And then did y'all go drive off?

21   A    Did we drive off?

22   Q    Did y'all go away, drive on?

23   A    Yes, sir.

24   Q    Where did you drive to?

25   A    We drove to White Hall.

Ann H. Armstrong, RPR

```
 1          Q      All right.  When you got there or got wherever

 2   it was you thought was White Hall, where did you?

 3          A      We turned -- we made a left on a dirt road.

 4          Q      All right.  Were y'all still in the same

 5   position in the car?

 6          A      Yes, sir.

 7          Q      Whose got the gun?

 8          A      Little Mack.

 9          Q      As you go down the dirt road, now you are

10   supposed to be going somewhere; is that right?

11          A      Yes, sir.

12          Q      Who is giving the directions on where to go?

13          A      Julius.

14          Q      All right.  So you are going down this dirt

15   road, and what happens?

16          A      The car went to acting up.

17          Q      How was it acting?

18          A      Like jerking like it didn't want to pull as he

19   mashed on the gas.

20          Q      Did it stop finally?

21          A      It finally stopped completely.

22          Q      What did y'all do?

23          A      As it finally stopped completely, we got out,

24   and we tried to jump the car off.  But it wouldn't --

25          Q      By jumping it off, you don't mean hooking up
```

Ann H. Armstrong, RPR

```
 1    some sort of wire?

 2         A     No.

 3         Q     You mean pushing it?

 4         A     Pushing the car trying to jump it off.  It was

 5    a stick.

 6         Q     So it wouldn't run?

 7         A     No, it wouldn't start.

 8         Q     Did somebody come by?

 9         A     Yes, sir.

10         Q     Tell us about that.  Who came by or what came

11    by?

12         A     This white guy came by in this two door truck,

13    and Julius got out.  And he yelled to wave this guy down.

14    And when he waved him down, he said, could you tell me

15    what's wrong with this car.

16         Q     Were all of y'all there where you could hear

17    that, you and Little Mack here and Emanuel and everybody?

18         A     Yes, sir.

19         Q     So he asked him if he could tell him what was

20    wrong with the car.  What was said then or done?

21         A     Yeah.  And then he was like, well, I don't

22    know too much about this new model car.  But me and some

23    fellows are fixing to go hunting.  If y'all be here by the

24    time I get back, I will give y'all a ride.

25         Q     All right.  Did he then leave?
```

Ann H. Armstrong, RPR

```
 1          A        Yeah, he left.

 2          Q        All right.  Where was the gun all of this

 3    time?

 4          A        It was in the back on the floor.

 5          Q        Were y'all still in the car, or were y'all out

 6    of the car at this time?

 7          A        We had got out.

 8          Q        Okay.  So what did you do then after the white

 9    fellow left to go hunting?

10          A        We tried to jump the car off again.

11          Q        Did it do any good?

12          A        No, sir.

13          Q        Then what happened?

14          A        We pushed it over to the right side of the

15    dirt road.  Then we all sat in there and just listened to

16    the music.

17          Q        Then what happened?

18          A        And as we sat there, Willie Johnson had pulled

19    up.

20          Q        Now you used the term Willie Johnson.  Did you

21    know him before then?

22          A        No, sir.

23          Q        That's just because you have learned his name

24    since then?

25          A        Yes, sir.
```

Ann H. Armstrong, RPR

```
 1           Q       But he pulled up?    Was he in a car or a truck

 2    or what?

 3           A       He was in a truck.

 4           Q       All right.    Was it still daylight at that

 5    time?

 6           A       Yes, sir.

 7           Q       All right.   When he pulled up, who talked to

 8    him?

 9           A       Julius and Tony got out at the same time then.

10           Q       Did he talk to him?

11           A       Yeah, they flagged him down.

12           Q       Did you hear what they talked about, or they

13    talked away from you where you couldn't hear?

14           A       I heard what they was talking about.

15           Q       Did they ask him to give them some help?

16           A       They was like, could you tell me what's wrong

17    with this car.   Then he said, well, I don't know nothing

18    about no new model cars, but I have a friend up the road who

19    can fix it for you.

20           Q       All right.   So then what happened?

21           A       And so after he had said that, Julius said,

22    are you going to pull us up there.   He was like, yeah, and

23    so he hooked the chains onto the car.   And when he hooked

24    the chains to the car, Julius was like, can I ride with you,

25    and he was like, yeah, I don't mind.   And Julius got in the
```

694

```
1    front seat with him.  Me, Troll, Tony and Emanuel got back

2    in the broke down car.

3         Q      All right.  Now this fellow that came by and

4    stopped, Johnson, did he come by once and talk to y'all and

5    leave and come back, or was it just one time?

6         A      It was just one time.

7         Q      All right.  So he hooked the chain up to it

8    and started towing you to town?

9         A      Yes, sir.

10        Q      And in the broke down car, it was you,

11   Emanuel, this fellow -- what's his name?

12        A      Tony.

13        Q      Tony.  All right.  And is that Jason Powell?

14   Do you know him by that name, or you don't know?

15        A      No.

16        Q      You don't.  And Little Mack here?

17        A      Yes, sir.

18        Q      Where were y'all sitting?

19        A      Matthew was in the front.  Me and Emanuel was

20   in the back.

21        Q      Where is the gun now?

22        A      Still in the back.

23        Q      Are you holding it, or is it just on the

24   floor, or where is it?

25        A      It was on the floor.
```

695

1       Q      So y'all go down the road being towed?

2       A      (Witness nods head affirmatively).

3       Q      And how far are you towed?

4       A      As the guy -- as far as I know when Julius

5 asked him was he going to tow the car to his friend's house,

6 he was like, yeah.  But he ended up passing his friend's

7 house, and so I was like this guy is going to take us

8 halfway to Selma.  But he ended up taking us all the way to

9 Selma.

10      Q      Do you recall y'all stopping anywhere along

11 the way?

12      A      No.

13      Q      Where did y'all end up with the towing?

14      A      At Matthew Reeves' house.

15      Q      Matthew Reeves' house?

16      A      Yes.

17      Q      Was it dark when you got there or still light?

18 Do you remember?

19      A      Still light.

20      Q      Where did the car get towed to, the broke down

21 car?  What place, on the street, in a garage, where?

22      A      In the street, on the side of the street in

23 front of the house.

24      Q      On the side of the street in front of the

25 house?

696

1      A      Yes, sir.

2      Q      Now when y'all arrived there, is everybody

3   pretty much in the same place?

4      A      Yes.

5      Q      Y'all are in the broke down car, and Johnson

6   is up there in the truck towing you, and where is Julius?

7      A      In the truck with Willie Johnson.

8      Q      When y'all get there, does anybody get out of

9   the car or the truck?

10     A      Get out of the truck, Julius.

11     Q      What does he do?  Where does he go?

12     A      He comes to the car.  He was like, well, this

13  guy is going to charge us $25.  Who has the money.

14     Q      He is talking to all of y'all?

15     A      Yeah.

16     Q      All right.  Then what?

17     A      So ain't nobody said nothing.  So he went back

18  to the truck, and he told the guy he will give him three

19  headed cluster --

20     Q      Did you hear that?

21     A      Yes, sir.

22     Q      Y'all could hear what they were talking about?

23     A      Yeah, because Little Mack had his car door, on

24  the side of his car, the door open.

25     Q      So what is he saying to the man?

1        A       He told him, I can give you this three headed

2    cluster ring I got if you take me over to my girlfriend's

3    house to get it.

4        Q       Did the man agree to that?

5        A       Yeah.

6        Q       All right.  So then what happened?

7        A       So he came -- after he told the guy that, he

8    had came back to the car.  And when he came back to the car,

9    he was like, Bam Bam, come and ride with me.  And so as I

10   got on the truck and we was pulling off, that's when Matthew

11   Reeves hopped on the back of the truck with the gun.

12       Q       That's Little Mack we are talking about, this

13   Defendant?

14       A       Yeah, Troll.

15       Q       The gun now, it was on the back seat; is that

16   right?

17       A       Yeah.

18       Q       That's where it was when you got out of the

19   car?

20       A       Yeah.

21       Q       On the back floor board, back seat, where?

22       A       On the back on the floor.

23       Q       And you got on the back of the truck?

24       A       Yes, sir.

25       Q       Little Mack here gets on the back of the

Ann H. Armstrong, RPR

698

```
1    truck?

2         A      Yes, sir.

3         Q      And he has got the gun?

4         A      Yes, sir.

5         Q      How does he bring the gun to the truck?

6         A      Like he is sneaking up, you know, like he is

7    sneaking up behind somebody.  That's how he snuck up on the

8    truck with the gun.

9         Q      How was he holding it?

10        A      Like down on his side.

11        Q      Did he give it to you when he got up to get in

12   the truck?

13        A      No.

14        Q      How did he get in the car with the gun?

15        A      He had grabbed the truck like this, and he had

16   it on the side.  And he had got on the truck.

17        Q      Where did he sit?

18        A      He sat on the passenger side.

19        Q      The passenger side inside the truck or on the

20   back?

21        A      On the back on the passenger side.

22        Q      Where did you sit?

23        A      On the driver's side.

24        Q      Did y'all sit down in the bed?  Did you sit up

25   the side of it, sit on the tool box or sit on a bucket or
```

Ann H. Armstrong, RPR

1   what?

2          A       We sat on the edge of the truck.

3          Q       All right.  Where did y'all go?

4          A       To this girl's house named Katrina.  Her

5   nickname is Muck.

6          Q       Do you know her last name?

7          A       White.

8          Q       Katrina White.  And what did you say her

9   nickname was?

10         A       Muck.

11         Q       All right.  When y'all get -- do you go over

12  to her house?

13         A       Yes, sir.

14         Q       When you get over there, does anybody get out

15  of the truck?

16         A       Yes, sir.

17         Q       Where was Julius all of this time?

18         A       In the truck.

19         Q       He's a passenger?

20         A       Yes, sir.

21         Q       All right.  He gets out.  What does he do?

22         A       He goes to the back of the house.  And when he

23  goes to the back and then he arrives to the front, that's

24  when his girlfriend and her mama is pulling up.

25         Q       Does he go over to them or come back to y'all

1  or what?

2      A     He goes over to them.

3      Q     Do you hear what's being said over there?

4      A     Yes, sir.

5      Q     Do they talk?

6      A     Yeah.  He was like, let me get that.  And then

7  she was, like, well, you want both of them.  He was like,

8  no, I just want the ring.  And so as she gave him the ring,

9  he had got the ring.  So he started helping her tote the

10 baby and the bags in the house.

11     Q     So he does that?

12     A     Yes, sir.

13     Q     Does he come back to y'all?

14     A     Yes, sir.

15     Q     This is Julius we are talking about?

16     A     Yes, sir.

17     Q     When Julius comes back to you and Little Mack,

18 where is Willie Johnson?

19     A     In the truck.

20     Q     All right.  And where are you and where is

21 Little Mack when Julius comes back?

22     A     Little Mack is still sitting on the passenger

23 side; I am still sitting on the driver's side.  I am still.

24     Q     When Julius comes back out of the house, does

25 he have the ring, or do you know or can you tell?

```
 1              A       He had the ring.

 2              Q       What did he do with the ring?

 3              A       As he came out of the house, he walked behind

 4      the truck, and he was like he was going to rob this man.

 5      I'm not going to let him keep my ring.  So me and Troll

 6      ain't saying nothing.

 7              Q       Then what happened?

 8              A       So as he got in the truck, he gave the man the

 9      ring.  And the man put the ring on the tip of his finger

10      because it couldn't go all the way on there.

11              Q       And then y'all drive off?

12              A       We drive off.

13              Q       Now at that time did you understand y'all were

14      going to rob the man?

15              A       Yes, sir.

16              Q       Now as y'all drove off, where did you drive

17      back to?

18              A       Back to Matthew's and Julius' house.

19              Q       How far is it over there to Katrina White's

20      house where y'all got the ring?

21              A       She stays in Smokey City.  I can't tell you

22      how far it is.

23              Q       Smokey City, that's an area behind Bush Hog

24      over there?

25              A       Yes, sir.
```

1      Q       And your house is where?

2      A       In east Selma not too far from Smokey City.

3      Q       And how far from your house to Julius Reeves'

4  house?

5      A       Not too far from the beer company, the

6  Budweiser company.

7      Q       So y'all drive back over then to where?

8      A       To Matthew's and them house.

9      Q       All right.  Where do you go as you get to

10  their house?

11     A       Where do we go?

12     Q       Yeah, as the man, Willie Johnson, drives y'all

13  back to Matthew Reeves and Julius Reeves' house, where do

14  you go?

15     A       We got back to the house.  He had seen his red

16  car across the street, and he was like I don't feel like

17  being bothered.  He said, I am going to this house up in the

18  alley.  So I'm going to drop y'all off in the alley.  So

19  Julius was like, cool.

20     Q       So he drives up the alley?

21     A       (Witness nods head affirmatively).

22     Q       Is it dark now?

23     A       Yeah, a little bit.

24     Q       Anybody else up in the alley?

25     A       Not that I know of.

Ann H. Armstrong, RPR

703

1       Q     I mean do you see anybody up in there?

2       A     No.

3       Q     Y'all drive up in the alley.  He stops the

4  truck at some point, right?

5       A     Yeah.

6       Q     Where were you sitting?

7       A     Behind Willie Johnson.

8       Q     Where is Little Mack?

9       A     Behind Julius.

10      Q     Where is Julius?

11      A     In the front seat.

12      Q     Now y'all are in the bed or back part of the

13  truck, right?

14      A     Yeah, me and Julius, I mean me and Little

15  Mack.

16      Q     And Julius is in the front?

17      A     In the front seat.

18      Q     And Willie Johnson is driving the truck?

19      A     Yes, sir.

20      Q     As far as you know he has still got the ring?

21      A     Yes, sir.

22      Q     And y'all are still planning to rob him as far

23  as you know?

24      A     Yes, sir.

25      Q     When he stops the truck, what happens next?

```
 1   Tell these folks.

 2        A      I was sitting with my head down with the hood

 3   over my head.  And I heard something go pow.  And when I

 4   heard that, and I looked up.  That's when Troll was taking

 5   the gun out of the back of the window.

 6        Q      All right.  Troll, that's Little Mack here?

 7        A      Yes, sir.

 8        Q      That Matthew Reeves?

 9        A      (Witness nods head affirmatively).

10        Q      Is that the same gun y'all had had earlier?

11        A      Yes, sir.

12        Q      He was taking it out of the window?

13        A      Yes, sir.

14        Q      Did the window blow up or break out, or did it

15   just open up?

16        A      No, it was like a window that -- you can slide

17   it open and slide it closed.

18        Q      When you heard the boom, you looked up and saw

19   him pulling it out of the window?

20        A      Out of the window.

21        Q      Who said or did what next?

22        A      Julius -- that's when his brother, Julius,

23   jumped out of the truck.  And he was like, Troll, man, what

24   you done did.  And then Troll was like, man, you tell me --

25   I done shot this man, and y'all ain't going in his pockets
```

1   and get his money.  And so as he got through saying that, I

2   was like, Julius, I was like, don't argue with him.  Just go

3   on his pockets and get the money.  And so I was standing

4   over there by the tree.  And when he went --

5        Q        You had gotten off the truck?

6        A        Yes, sir.

7        Q        You got off the truck?

8        A        (Witness nods head affirmatively).

9        Q        All right.  Could you see the man then?

10       A        Did I see the man?

11       Q        Could you see him, Willie Johnson?

12       A        Yeah.

13       Q        What did he look like?

14       A        He was laying over in the truck like this.

15       Q        Did you see any blood?

16       A        Yeah.

17       Q        You got out and went over to a tree?

18       A        I was standing over there by the tree on the

19  side of the road.

20       Q        Where was Matthew?

21       A        Standing behind the truck.

22       Q        Where was Julius?

23       A        Behind the truck.

24       Q        Matthew said go in his pockets.  Who went and

25  got in his pockets?

1    A       Julius went in his pockets.

2    Q       Did he get anything out?

3    A       Yeah.

4    Q       What?

5    A       Some money.

6    Q       Who did he give the money to?

7    A       Matthew.

8    Q       To get the money out of Mr. Johnson's pocket,

9    did you have to get him out of the truck?

10   A       Yes, sir.

11   Q       Who took him out of the truck?

12   A       Julius.

13   Q       Where was Matthew?

14   A       He was still standing behind the truck.

15   Q       When he pulled him out, when Julius pulled him

16   out of the truck, did he hold him up or fall on the ground

17   or stand him up on the tree or what?

18   A       No.  When he opened the door, he snatched the

19   man out of the truck like he was a dummy, and the man fell

20   to the ground.  He just let him fell from the truck to the

21   ground.

22   Q       Went and got his money?

23   A       Went in his pockets and got his money.

24   Q       He gave the money to who?

25   A       Matthew.

1      Q      Was Matthew at the back of the truck or come

2   up there, or where did he give him the money, or do you

3   know?

4      A      He walked from behind the truck then.

5      Q      Then what did y'all do with Mr. Johnson who is

6   laying there like a dummy?

7      A      Julius was like, Bam Bam -- he said, come and

8   help me.  He was like I can't put the man back in the truck

9   by myself.  And so I helped him put the back man in there.

10  I grabbed Willie Johnson by his shirt, shoulders.  And as I

11  was picking him up from the end where his head is at, blood

12  was dripping on my pants and my shoes.  And so Julius went

13  around to the passenger side and grabbed his foot and slide

14  him in the truck, and we put him back in the truck.  And we

15  closed the doors.

16     Q      Did anybody get the ring, the ring, the thing

17  y'all were going to rob him of?

18     A      Not at that point I didn't see anybody get the

19  ring.

20     Q      You didn't end up with the ring, did you?

21     A      No, sir.

22     Q      Did you ever see the ring again that night?

23     A      No, sir.

24     Q      Where did y'all go, the three of you with his

25  money and the bloody clothes?

Ann H. Armstrong, RPR

708

1        A        As we put Willie Johnson back in the truck, me

2    and Julius ran between his house and his grandma's house.

3    Matthew ran on the back of his house.  All I know is he ran

4    on the back.  We went separate ways.

5        Q        Where did y'all end up?

6        A        We ended up in the front of his house.

7        Q        What did you do?

8        A        I believe one of us kicked the door in.

9        Q        Anyhow, you got in the house?

10       A        Yeah.

11       Q        After you got in the house, what did you do?

12       A        Matthew was like, change clothes.

13       Q        Matthew was talking to y'all?

14       A        Yeah.  He told us to change clothes, to give

15   us the clothes and the shoes.

16       Q        Did you do that?

17       A        Yeah, we did it.

18       Q        What did you have to change into?

19       A        Some of their clothes they gave me.

20       Q        What did you do with the clothes that had

21   blood and the shoes that had blood on them?

22       A        You meant what he did with it.

23       Q        What he did, all right, or anybody did with

24   it, any of the three of you?  What did you do with them,

25   you, he, them or who?

Ann H. Armstrong, RPR

1    A       He took the clothes, and he balled them all

2    up, and he stuffed them under a dresser.  And as he stuffed

3    it under the dresser, he took our shoes, and he put them

4    under the dresser too.  And then after he got through with

5    that, that's when he throwed the gun under the bed ticking.

6        Q       Do you know whose bed he put it under?

7        A       I don't know which one's bed it was.  If I

8    say, I would be lying.

9        Q       What about the clothes?  Do you know who was

10   wearing what kind of clothes?  First of all what were you

11   wearing?

12       A       I was wearing some green Levi's with some

13   clear bottom Reeboks.  That's all I can remember.

14       Q       What was Matthew wearing if you can remember?

15   Let me ask it to you this way.

16       A       I can't remember.

17       Q       Do you remember if anybody had any jackets on?

18       A       Yeah, we all had on jackets.

19       Q       Do you remember what kind of jackets they

20   were?

21       A       Let me see.  (Witness shakes head negatively).

22       Q       All right.  So you don't recall what kind of

23   clothes y'all had on?

24       A       (Witness shakes head negatively).

25       Q       You don't remember who had what on other than

1     what you had on?

2          A      Not really.

3          Q      Did y'all stay at their house then, or did you

4     leave?

5          A      After we got through changing clothes, this

6     girl named Sonya pulled up, and when she had pulled up, she

7     had asked Julius -- she was like, have you got a cigarette,

8     and he was like, no, I ain't got no cigarette. So she left,

9     and we left. We took off running. And as we was running, I

10     was telling Julius -- I said, man, I can't run no further.

11     I can't run no further. He was like, come on, Bam, you can

12     make it. And so I kept telling him, I can't run no further.

13          Q      Where did y'all run to?

14          A      We ran through East End new school parking

15     lot. Then we ran between these houses, and then we ran

16     through this alley where the Budweiser place is at.

17          Q      Where were you going?

18          A      We was going to my house.

19          Q      To your house?

20          A      Yeah.

21          Q      Well now, Emanuel and this fellow that had the

22     car, they didn't go on this trip with y'all over to get the

23     ring, did they?

24          A      No, sir.

25          Q      Where were they when you got back?

Ann H. Armstrong, RPR

```
 1          A        They was still in the car.

 2          Q        The broke down car in front of the Reeves'

 3   house?

 4          A        Yes, sir.

 5          Q        Did they go with you over to y'all's house?

 6          A        Yes, sir.

 7          Q        So when y'all went over to your house or ran

 8   over to your house, it was all five of y'all?

 9          A        Yeah, but we had split up at that time and

10   moment.

11          Q        Where did y'all split up?

12          A        Let me see, what did we split up at, in the

13   alley where the Budweiser place is at.

14          Q        Then did you finally get over to your house?

15          A        Yes, sir.

16          Q        All right.  Now before you left the Reeves'

17   house and went to your house, was there anybody there at the

18   Reeves' house other than Emanuel and the fellow that had the

19   car?

20          A        Are you talking about when we left to go get

21   the ring?

22          Q        When you went in the house and when -- no.

23   When you got back after Willie Johnson had been killed --

24          A        Yes, sir.

25          Q        -- was anybody in that house?  Was Ms.  Reeves
```

1    there or any of her children or any other people?

2         A       I didn't see anything.

3         Q       You didn't see anybody in the house?

4         A       No, sir.

5         Q       When you went over to your house, were there

6    people over there?

7         A       Yes, sir.

8         Q       Who all was over there?

9         A       Me, Molly, my sister, my mom, and the kids.

10        Q       When you got over to your house, did y'all

11   divide up any of the money?

12        A       Not right there at that moment.

13        Q       But while you were there at your house, did

14   you divide it up?

15        A       Yes.

16        Q       All right.  Did you get any of it?

17        A       Yes.

18        Q       How much did you get?

19        A       A hundred dollars.

20        Q       Who did the dividing?

21        A       Matthew.

22        Q       Did he give Julius any?

23        A       Yeah.

24        Q       Do you know how much, if you know?  If you

25   don't know, that's fine?

```
 1        A      No.

 2        Q      If you don't know, that's fine?

 3        A      I can't remember.

 4        Q      Did he give Emanuel or the other guy with the

 5   car any?

 6        A      No.

 7        Q      Why didn't he give them some?

 8        A      Sir?

 9        Q      Why didn't they give them some?

10        A      (Witness shrugs shoulders.)

11        Q      While y'all were at your house, at some point

12   you took a bath, didn't you?

13        A      Yes, sir.

14        Q      Before you took a bath, did y'all do any --

15   did anybody do any dancing there at your house?

16        A      Yes.

17        Q      Who all was dancing?

18        A      Troll.

19        Q      What was he doing when he was dancing?

20        A      He was mocking the way that Willie Johnson had

21   died.

22        Q      What was he doing?  Show us.

23        A      He was dancing like he had died like that.

24        Q      Kind of stand out there and show me what you

25   are talking about.
```

```
 1          A       As the song was playing, he was doing like
 2   this like he had died.

 3          Q       What was the name of the song?

 4          A       Hail Mary by Two Pop.

 5          Q       Did Julius do any dancing with him?

 6          A       He was dancing, but he wasn't mocking Willie
 7   Johnson.

 8          Q       Did you do any dancing with him?

 9          A       No, sir.

10          Q       What about Emanuel?  Did he do any dancing
11   too?

12          A       No, sir.

13          Q       What about the fellow driving the car?

14          A       No, sir.

15          Q       Was anybody making any more signs like they
16   were dancing there at your house?

17          A       I can't remember.

18          Q       All right.  Did other people come to your
19   house?

20          A       This guy came there.  I forgot his name.

21          Q       Did any girls come there?

22          A       Not that I remember.

23          Q       Now after you went and took a bath, you were
24   gone for awhile; is that right?  You were gone away from
25   everybody else?  You were in the bathroom taking a bath?
```

```
 1          A        Yes, sir.

 2          Q        When you came back from your bath, what did

 3   y'all do?  Who all was there?

 4          A        As I was in there bathing, my mom -- I called

 5   my mom in there, and I told her that Matthew had shot

 6   somebody.

 7          Q        So you talked with your mama about all of

 8   this?

 9          A        Yeah.

10          Q        But after you finished your bath, what did you

11   do?

12          A        We had -- I had got dressed.  Then we got

13   ready and went to Smokey City.

14          Q        Who is we now?

15          A        Me, Troll and Julius.

16          Q        Where did you go in Smokey City, over to

17   somebody's house?

18          A        Yes.

19          Q        Do you remember her name or his name?

20          A        I know his name, but I can't pronounce it.

21          Q        All right. What did y'all do over there?

22          A        They had gambled, and Troll was still dancing.

23          Q        Who all was over there, the three of y'all and

24   who else, the girl you can't remember her name and who else?

25          A        It was a couple of us because they was
```

Ann H. Armstrong, RPR

1    gambling.

2         Q        How did y'all get over there?

3         A        We walked.

4         Q        Did you finally leave the Smokey City house?

5         A        Yes, sir.

6         Q        How did you leave?

7         A        Walking.

8         Q        Where did you walk back to?

9         A        We walked around the corner.  And as we walked

10   around the corner, we ran into this girl named Nicky.

11        Q        All right.  And what happened with her?

12        A        He was like Nicky -- Julius was like, Nicky,

13   come and take us to get something to eat.  And then she was

14   like, hold on.  So after she came out of the house she went

15   in, we all had got in the car and went to McDonald's.

16        Q        About what time was that do you reckon?

17        A        If I say I would be lying.  I know it was

18   night.

19        Q        After y'all went to McDonald's and ate, then

20   where did you go?

21        A        We went back by the alley to see did anybody

22   come and did anybody find Willie Johnson.

23        Q        You rode back by to see if anybody had found

24   him?

25        A        Yeah.

```
 1          Q       Was the truck still there, or was it gone?

 2          A       It was still there.

 3          Q       Did y'all go up and inspect it and see if he

 4   was still laying in there?

 5          A       No.

 6          Q       You just rode by?

 7          A       Yes.

 8          Q       Who all was in the car?

 9          A       Me, Matthew, Julius, Nicky and her friend.

10          Q       All right.  Then where did you go?

11          A       We went back to Smokey City.

12          Q       Same house or a different place?

13          A       Same house.

14          Q       And where all did you -- how long did you stay

15   there?

16          A       We stayed there like fifteen more minutes.

17          Q       What did you do while you were there?

18          A       We ate our food.

19          Q       Okay.  Then what?

20          A       Then we left.

21          Q       How did you leave?

22          A       Back on our feet.

23          Q       Then where did you go?

24          A       Back to my house.

25          Q       And you stayed there awhile?
```

```
 1        A       Yes, sir.

 2        Q       Did y'all have anything to drink at this time?

 3        A       No, sir.

 4        Q       What happened next?

 5        A       As we went back to my house, we told Sumpter

 6  Pettaway that we wanted to go across the river.

 7        Q       Sumpter Pettaway?

 8        A       Sumpter Pettaway.

 9        Q       Sumpter Pettaway?

10        A       Yes.

11        Q       Was he with y'all, or when did he get with

12  you, or did he just come up?

13        A       He was at the house when we made it there.

14        Q       So when y'all got back to the house, he was

15  there?

16        A       Yes, sir.

17        Q       And y'all wanted him to take you where?

18        A       Across the river.

19        Q       Who all was we now, you and who?

20        A       Julius and Matthew and Molly and Sumpter.

21        Q       Where did y'all go?

22        A       To this girl named Sintay Blevins' house.

23        Q       Where was it?

24        A       Across the river.

25        Q       What did you do over there?
```

Ann H. Armstrong, RPR

```
 1          A        Before we left east Selma, we had got some
 2    reefer.  And then we went to Selmont, and we got some
 3    powder, some crack cocaine.
 4          Q        And then where?
 5          A        Then we went over to Sintay Blevins' house.
 6          Q        Did you get anything to drink?
 7          A        When we got there, first they had left me and
 8    Molly at Sintay Blevins' house.  And Matthew and Julius left
 9    and went to the package store.
10          Q        Then they came back?
11          A        Yeah.
12          Q        Where were Emanuel and the guy that drove the
13    car?  What happened -- where had they gone?
14          A        They stayed at my house.
15          Q        Did anybody do any dancing or talking while
16    you were all over there across the river?
17          A        No, sir.
18          Q        How long did y'all stay over there with the
19    reefer and the powder and the package store stuff, the
20    whiskey, the beer?
21          A        We stayed over there like an hour.
22          Q        What time did you get home?  Do you know?
23          A        No, sir.
24          Q        When you were -- y'all first got over to your
25    house and Troll here was doing this dancing, did he say
```

Ann H. Armstrong, RPR

720

1    anything about getting a tear drop?

2         A       I remember him saying that, but I can't recall

3    when and where it was.

4         Q       Was it that night?

5         A       Yeah.

6         Q       What did he say about it?

7         A       He said I can earn my tear drop now.

8         Q       What is a tear drop when you earn it?  How do

9    you earn it?

10        A       All I heard is it's when you kill somebody.

11        Q       Now you were at your house the next morning;

12   is that right?

13        A       Yes, sir.

14        Q       And the police came, didn't they?

15        A       Yes, sir.

16        Q       And they got him; is that right?

17        A       Yes, sir.

18        Q       Where were you?

19        A       I was laying in the bed.  And when the cop

20   came over to the bed, he lifted up the cover, and he was --

21   I am looking for Brenda Suttles.  And then he looked in my

22   face.  And he throwed the covers back down.  So I didn't say

23   nothing.  I just laid there.

24        Q       Where was Julius?

25        A       In the closet under the clothes, the dirty

Ann H. Armstrong, RPR

721

1    clothes.

2         Q        When you put Mr. Willie Johnson back in the

3    truck, did anybody have a hold to his feet?

4         A        Now what now?

5         Q        When you put Willie Johnson back in the truck,

6    he was pulled out and got his money --

7         A        Yeah, Julius had his feet.

8         Q        Julius had his feet?

9         A        Yes.

10        Q        And you had the front part?

11        A        Yes, sir.

12        Q        It was pretty much a mess, wasn't it?

13        A        It was disgusting.

14        Q        Where was Troll then?

15        A        Where was Troll?

16        Q        Where was Troll when y'all were putting him

17   back in?

18        A        He was standing up there.

19        Q        Where was the gun?

20        A        In his hand.

21        Q        Okay.  Was Mr. Johnson breathing, making any

22   noises, saying anything to y'all?

23        A        Yeah, he was like gagging.

24        Q        Gagging?

25        A        Yeah.

Ann H. Armstrong, RPR

1      Q      Now for your part in this, you and your

2    attorneys have agreed you're going to plead guilty to

3    murder; is that right?

4      A      Yes, sir.

5      Q      You're going to the penitentiary?

6      A      Yes, sir.

7      Q      This man has got some questions for you.

8      THE COURT:  Before your cross, Mr. Goggans, let's

9    take a brief recess, please, sir.  Ladies and gentlemen,

10   let's take a fifteen minute recess.  Please don't discuss

11   the facts of the case at this time.  Don't allow anyone to

12   discuss the facts of the case with you.  We'll be back in

13   fifteen minutes.

14      (The jury was excused from the courtroom, and a

15   recess was taken.)

16      (The following occurred in the presence and hearing

17   of the jury:)

18                    CROSS EXAMINATION

19   BY MR. GOGGANS:

20      Q      In connection with Mr. Johnson's death, you

21   were charged with capital murder, were you not?

22      A      Yes, sir.

23      Q      And that charge is still pending, correct?

24      MR. GREENE:  Your Honor, I have to object.  If she

25   knows, fine.  She may not understand.

Ann H. Armstrong, RPR

```
 1          Q       I'll ask a few more questions.  Do you
 2   understand that if you were to be convicted of capital
 3   murder that your sentencing would be one of two things, life
 4   without parole or death?  Do you understand that?
 5          A       (Witness nods head affirmatively).
 6          Q       You do?  You need to speak up so this lady can
 7   get it down.  Do you understand that?
 8          A       What did you say now?
 9          Q       You understand that if you were convicted of
10   capital murder, your only two possible sentences would be
11   death or life without parole?
12          A       Yes, sir.
13          Q       You also have two other --
14          MR. GREENE:  I object to anything other than this
15   case.
16          MR. GOGGANS:  Your Honor, as I understand it that's
17   part of her deal.  She has two other cases pending.  May
18   we approach?
19          THE COURT:  Yes, sir.
20          (The following occurred at the bench outside the
21   hearing of the jury:)
22          MR. GOGGANS:  Your Honor, perhaps I misunderstood
23   what the deal is.  But in reviewing the circuit clerk's
24   records, she has this pending capital murder case and two
25   unrelated robbery one cases.  I have not seen any agreement
```

1    in writing, but my understanding was that she was going to

2    end up pleading to a couple of Class A's and getting a

3    couple of life sentences.

4         MR. GREENE:  We have not done anything other than

5    just this one case.

6         THE COURT:  There is no deal on the pending cases?

7         MR. GREENE:  We have got an understanding all the

8    way.  I'm just saying in this case the deal is life.

9         MR. GOGGANS:  I think I have a right to go into these

10   other cases.

11        THE COURT:  Do you have an agreement regarding these

12   other cases?

13        MR. GREENE:  Yes, sir.

14        THE COURT:  Was that agreement part of what you

15   discussed with her when you were discussing this particular

16   case?

17        MR. GREENE:  Yes, sir.

18        THE COURT:  You can go into that.

19        (The following occurred in the presence and hearing

20   of the jury:)

21        Q     Now in addition to the capital murder charge,

22   you also have two other robbery charges, correct?

23        A     Yes, sir.

24        Q     That's correct?

25        A     Yes, sir.

Ann H. Armstrong, RPR

1      Q      And now as I understand it, you have a deal

2  with the State that in exchange for your testifying against

3  Matthew Reeves, the charge of capital murder will be reduced

4  to a lower degree crime, correct?

5      A      Yes.

6      MR. GREENE:  We will be glad to stipulate to that

7  charge of murder.

8      Q      And after that is done, you wouldn't be

9  looking at the death penalty or life without parole,

10  correct?

11      A      Right.

12      Q      You have not entered a plea of guilty yet,

13  have you?

14      A      Sir?

15      Q      You have not entered a plea of guilty to that

16  reduced charge yet, have you?

17      A      Yes.

18      Q      You have?

19      A      (Witness nods head affirmatively).

20      MR. GREENE:  I'll be glad to stipulate that she has

21  not.  We plan to very shortly.  She has not.  Part of the

22  deal is that we will if that will help.

23      Q      Did you hear what Mr. Greene just said, that

24  you have not entered a plea of guilty yet?

25      A      Yeah.

Ann H. Armstrong, RPR

1      Q      Do you now recall that you haven't entered a
2   plea of guilty yet?

3      A      Yeah.

4      Q      So it would be correct that the capital murder
5   charge at least on paper is still pending against you,
6   correct?  Is that correct?   You need to answer so we can
7   hear.

8      A      Yes, sir.

9      Q      And it's your understanding that that's not
10  going to be done until after you testify; is that right?

11     A      Right.

12     Q      Now going back to November 27, you were
13  talking about meeting up with some people earlier in the
14  day.  Do you remember that time that you were talking about?

15     A      Excuse me?  Now what did you say?

16     Q      On November the 27th you told Mr. Greene that
17  some people met up with you or you met up with some people
18  early on in the day.  Do you remember that?

19     A      Yes, sir.

20     Q      Who all was it that you met up with or were
21  walking with?

22     A      They met up with me.  They came over to my
23  house.

24     Q      That was Emanuel.  And who else came to your
25  house?

1    A    Emanuel didn't come to my house.  Emanuel was
2    already at my house.
3    Q    Emanuel is already at your house.  So that's
4    you and Emanuel.  Who else came to your house?
5    A    Julius and Matthew.
6    Q    So that puts you, Emanuel Suttles, Julius
7    Reeves and Matthew Reeves at your house, right?
8    A    Yes, sir.
9    Q    Emanuel is your cousin; is that right?
10   A    Yes, sir.
11   Q    And you're telling the jury that y'all are
12   talking about going out to rob some folks; is that right?
13   A    Yes, sir.
14   Q    Where is it that y'all started walking to
15   again?
16   A    We started walking over there by McDonald's,
17   by McDonald's.
18   Q    Over on Highway 80?
19   A    Yes, sir.
20   Q    Going out toward, like you're going out toward
21   Demopolis?  Do you know where Demopolis is?
22   A    (Witness shakes head negatively).
23   Q    Going out west?
24   A    Liking going out by Captain D's.
25   Q    All right.  Now where is it that you said

1    Julius got this shotgun?

2         A       On Broad Street.

3         Q       Did you see him actually pick the shotgun up?

4         A       Did I actually see him pick it up?

5         Q       Right.

6         A       Yes, I did.

7         Q       All right.  Where is it that you say you saw

8    him pick it up from?

9         A       On Broad Street at the brick apartment house,

10   upstairs house.

11        Q       Did you go in with him?

12        A       No, I did not.

13        Q       So you didn't actually see him pick it up?

14        A       Are you talking about like pick it --

15        Q       Right.

16        A       No.

17        Q       You just saw it in his hands?

18        A       Yes.

19        Q       Where is it that you say he put that shotgun

20   when he got back with it?

21        A       In the back.

22        Q       Who all was in the --

23        A       He gave it to Matthew.

24        Q       All right.  And who all did you say was in the

25   back seat?

Ann H. Armstrong, RPR

729

| | | |
|---|---|---|
| 1 | A | Me, Matthew and Emanuel. |
| 2 | Q | And Julius and who were in the front seat? |
| 3 | A | Tony. |
| 4 | Q | That's Tony Hayes? |
| 5 | A | Is it Tony Hayes? |
| 6 | Q | What is his last name? |
| 7 | A | I don't know his last name. |
| 8 | Q | You don't know.  Now your car broke down |
| 9 | | where? |
| 10 | A | I believe it was in White Hall.  To be honest |
| 11 | | I really can't tell you where it was. |
| 12 | Q | Heading out past Southside School, did you get |
| 13 | | that far? |
| 14 | A | I can't say. |
| 15 | Q | You don't know? |
| 16 | A | I can't say. |
| 17 | Q | You don't know, or you just can't say? |
| 18 | A | I don't know. |
| 19 | Q | Now you saw the white man come up in the |
| 20 | | truck, did you not? |
| 21 | A | Yes, sir. |
| 22 | Q | What did his truck look like? |
| 23 | A | I don't remember. |
| 24 | Q | Who was it that talked to this man? |
| 25 | A | Julius. |

Ann H. Armstrong, RPR

1    Q        Where was he when he was talking to the man?

2    A        He was on the passenger side standing.

3    Q        Of the driver's side?  Where was he?

4    A        On the passenger side.

5    Q        Talking to the man through the window?

6    A        No.  He had got out of the car, and he was

7  standing in like halfway in the car with the door open.  But

8  he was standing up on the ground.

9    Q        By the car y'all were in?

10   A        Yeah.

11   Q        Where were you?

12   A        In the car.

13   Q        You said y'all were listening to some music in

14  the car?  Did I hear you correctly on that?

15   A        At what certain time are you talking about?

16   Q        Well, were you listening to music on the way

17  out towards what you thought was White Hall?

18   A        Yes.

19   Q        What were you listening to?

20   A        I can't remember.

21   Q        Do you remember what other music y'all

22  listened to in the car at any time?

23   A        No.

24   Q        Do you remember what kind of pants Julius had

25  on?

Ann H. Armstrong, RPR

| | | |
|---|---|---|
| 1 | A | Some white Levi's. |
| 2 | Q | Do you know where he got those pants from? |
| 3 | A | No. |
| 4 | Q | Do you remember what kind of jacket Julius had |
| 5 | | on? |
| 6 | A | No. |
| 7 | Q | Do you remember what kind of jacket Matthew |
| 8 | | had on? |
| 9 | A | No. |
| 10 | Q | Do you remember what kind of jacket you had |
| 11 | | on? |
| 12 | A | No. |
| 13 | Q | But you do remember y'all all had on jackets? |
| 14 | A | Yes, sir. |
| 15 | Q | Was is it kind of cold?   Was it cold? |
| 16 | A | It was a little chilly. |
| 17 | Q | Now you mentioned that Matthew said something |
| 18 | | about getting a tear drop.  Do you recall saying that? |
| 19 | A | Yeah. |
| 20 | Q | Do you remember whether he said that before or |
| 21 | | after? |
| 22 | A | After. |
| 23 | Q | He said it afterwards? |
| 24 | A | Yeah. |
| 25 | Q | You mentioned that you saw somebody named |

Ann H. Armstrong, RPR

732

1    Sonya that night.  Do you remember that?

2         A    Yeah.

3         Q    Where was it you first saw her?

4         A    When we was changing clothes and after we got

5    through and got ready to walk out of the door, she was

6    coming in.

7         Q    Toward where Matthew lived?

8         A    Yes, she was coming in the house.

9         Q    She had walked up?

10        A    Yes, sir.

11        Q    Do you know where she lives?

12        A    No, no, sir.

13        Q    Do you know whether she lived a couple or

14   three doors down from there?

15        A    No.

16        Q    I believe you said you saw Matthew get on the

17   truck with the gun; is that right?

18        A    Yes, sir.

19        Q    All right.  Now how is it that you say he was

20   holding this gun and getting on the truck?

21        A    He grabbed onto the truck with his left hand,

22   and he had the gun, and he got up there.

23        Q    So he is holding the gun in his right hand and

24   pulling up with his left hand?

25        A    Yes, sir.

Ann H. Armstrong, RPR

733

1  Q  Do you know what kind of truck this was?

2  A  No, sir.

3  Q  Do you know if he's right handed or left

4 handed?

5  A  Who?

6  Q  Matthew.

7  A  He is left handed.

8  Q  Who all was in the car when it broke down out

9 wherever it was it broke down?

10  A  I did not understand you.

11  Q  Who all was in the car when it broke down?

12  A  Who was all in the car when it broke down?

13  Q  Right.

14  A  Me, Julius, Matthew, and Emanuel and Tony.

15  Q  Y'all got towed back to Selma, right?

16  A  Yes, sir.

17  Q  The car y'all were in was hooked up with a

18 chain; is that right?

19  A  Yes, sir.

20  Q  Was the chain dragging the road?

21  A  Was it dragging the road?

22  Q  Right.

23  A  At certain times it was.

24  Q  When you got back to Selma, as I understand

25 your testimony, you said that you stopped in front of

Ann H. Armstrong, RPR

```
 1    Matthew's house?

 2           A       I did not understand you.

 3           Q       All right.  When you got back to Selma, where

 4    is the first place y'all stopped after the car was towed

 5    back?

 6           A       At Julius and them house.

 7           Q       In front of the house?

 8           A       Yes, sir.

 9           Q       That's on Selma Avenue?

10           A       On Selma Avenue?  I thought it was Alabama.

11           Q       Now after the car was towed back when it

12    stopped in front of the house, where did everybody go?

13           A       Emanuel and Tony stayed in the car.

14           Q       And you, Matthew and Julius got out of the

15    car; is that right?

16           A       Yes, sir.

17           Q       Now you are saying Emanuel and Tony just

18    stayed in this broken down car?

19           A       Yes, sir.

20           Q       Later on y'all got in the truck and went off

21    from there, right?  Is that right?

22           A       (Witness nods head affirmatively).

23           Q       You need to speak up so she can get it down.

24           A       Yes, sir.

25           Q       Did I understand you correctly to say that Mr.
```

1   Johnson was the one who said he was going to pull into the
2   alley?

3          A       Yes, sir.

4          Q       Now after this shotgun blast did I understand
5   you correctly in saying that Julius jumped out of the truck
6   and said, what you done did?  Did I hear you correctly?

7          A       Yes, sir.

8          Q       He about got shot himself, didn't he?

9          A       Huh?

10         Q       He about got shot himself, didn't he?

11         A       I can't tell you.

12         Q       Now when y'all were changing clothes at
13  Matthew's house, when you were talking about that, didn't
14  you say that y'all stuck the clothes underneath a dresser?

15         A       Not y'all.

16         Q       Well, who did that?

17         A       Matthew.

18         Q       But he stuck them under a dresser?

19         A       Yes.

20         Q       How far under the dresser did he stick them?

21         A       To the back, to the very back.

22         Q       Did he just hide them under there where you
23  couldn't see them; is that right?

24         A       Yes, sir.

25         Q       Now you said that the next morning -- it may

Ann H. Armstrong, RPR

1   have still been night, but whenever the police came to your

2   house, do you recall about what time that was?

3        A    I don't remember.

4        Q    Were you still asleep?

5        A    (Witness nods head affirmatively).

6        Q    You were?

7        A    Yes, sir.

8        Q    Who all was there?

9        A    Me, Julius, Matthew, Carlene, Scotty.

10       Q    Did you say Scott?

11       A    Scotty.

12       Q    Scotty?

13       A    And the kids.

14       Q    Now where was Scotty?

15       A    He was in the bed with my sister.

16       Q    And where was Matthew?

17       A    Laying on the couch in my room.

18       Q    And Julius was did you say underneath some

19  clothes?

20       A    At first he was laying in the bed with my

21  sister.

22       Q    I thought that was Scotty.

23       A    Scotty and Julius were laying in the bed.

24       Q    Okay.  But did Julius get up in some clothes

25  at some point?

Ann H. Armstrong, RPR

1    A    Yeah, when the police came he did.

2    Q    The police didn't find him, did they?

3    A    No, sir.

4    Q    And they said they were looking for you?

5    A    They were looking for Brenda Suttles.

6    Q    And you didn't say anything, did you?

7    A    No, sir.

8    Q    Now was anybody else in there with you when

9    the police came and said they were looking for Brenda

10   Suttles?

11   A    Matthew was in there.

12   Q    No, I mean right with you?

13   A    Huh?

14   Q    Was anybody in the room with you?

15   A    Matthew and Molly.

16   Q    And where was Molly?

17   A    She was laying in the bed with me.

18   Q    Scotty and Julius are in bed with your sister;

19   is that right?

20   A    Yes.

21   Q    At some point Julius got under some clothes,

22   and the police didn't find him, correct?

23   A    Correct.

24   Q    Matthew is asleep on the sofa; is that right?

25   A    Yes.

Ann H. Armstrong, RPR

1          Q       And you and Molly are in your bed; is that

2     right?

3          A       Yes.

4          Q       And the kids, we're talking about young kids?

5          A       Yes.

6          Q       Is that everybody in the house now?

7          A       Yes, sir.

8          Q       Now later on at your house after y'all had

9     changed clothes, as I understood it you said y'all went to

10    your house; is that right?

11         A       That's right.

12         Q       Who all was there after y'all left and went

13    over there after changing clothes?

14         A       I didn't understand you.

15         Q       After y'all changed clothes at Matthew's house

16    and went to your house, who all was there?

17         A       Who all was there?  It was Molly, my mom,

18    Carlene, the kids, that's all I can remember.

19         Q       And the police came and got you before you

20    woke up; is that right?

21         A       Came and got me?

22         Q       Well, they came to your house looking for you,

23    right?

24         A       Yeah.

25         Q       You didn't tell them who it was, and they

1    left, right?

2          A        I didn't tell them -- yeah, you're right.

3          Q        And you went to Atlanta for awhile, right?

4          A        (Witness nods head affirmatively).

5          Q        You did?  You need to answer so everybody can

6    hear you.

7          A        Yes, sir.

8          Q        Now I believe you said that earlier in the day

9    when y'all had first got together, and y'all were talking

10   about going out robbing some folks, right?

11         A        Yes, sir.

12         Q        And I believe you said and particularly said

13   y'all were going to White Hall to rob a drug dealer; is that

14   right?

15         A        Right.

16         Q        And I believe you said that Julius said at

17   some point when y'all were in the truck with Mr. Johnson or

18   about to get in the truck with him that he was going to rob

19   the man; is that right?

20         A        Yes, sir.

21         Q        Do you remember talking with Detective Grindle

22   here on December 3rd, about a week after this?

23         A        Yes, sir.

24         Q        Do you remember that he tape recorded the

25   conversation?

Ann H. Armstrong, RPR

```
 1           A       Yes, sir.

 2           Q       Now you did not tell Detective Grindle that

 3   y'all were going to White Hall to rob any drug dealers, did

 4   you?

 5           A       Yes, sir.  That I recall I did.

 6           Q       You didn't tell him that Julius said

 7   beforehand that he was going to rob Mr. Johnson, did you?

 8           A       I can't -- what did you say?

 9           Q       You don't remember telling him that Julius

10   said he was going to rob Mr. Johnson, do you?

11           A       Yes, sir.

12           Q       Let me show you this right here if I could.

13   Do you see right here where you're talking about y'all were

14   walking right here on this page.  It's the second page of

15   the December 3 transcript.  Do you see right there what I'm

16   talking about?

17           A       Right.

18           Q       Yes, ma'am.  Do you see where you said, There

19   was Matthew, and there was Julius, and we were walking.  Do

20   you see where we are talking about here?

21           A       Yes.

22           Q       And Detective Grindle said, uh-huh.  Do you

23   see this next paragraph in here?

24           A       Yeah.

25           Q       Do you see down in here where you said, he was
```

Ann H. Armstrong, RPR

1   talking about gang violence, gangs and banging and all that.

2   So everybody was just chilling.  Do you see that?

3          A       Yes.

4          Q       There is nowhere in here where you said y'all

5   had talked about going to rob some drug dealer in White

6   Hall, is there?

7          A       We were going down there at White Hall.

8          Q       So we got down there at White Hall I believe

9   it was.  I can't remember really where it was.  That's what

10  you're saying.  Do you see anything in here where it says we

11  were going to White Hall for the purpose of robbing a drug

12  dealer?

13         A       No.

14         Q       That's not in there, is it?

15         A       No.

16         Q       It's not?

17         A       No.

18         Q       Do you remember when you were talking with

19  Detective Grindle -- do you remember telling him, so about

20  the time the man had stopped and throwed the car in park,

21  Troll just had, just shot him, boom, just shot the man.

22  Julius had jumped out of the truck like he was fixing to

23  say, man, what you doing?  Do you remember telling him that?

24         A       Yeah.

25         Q       Do you remember talking with Detective Grindle

```
 1   about Julius taking Mr. Johnson out of the truck?

 2          A      (Witness nods head affirmatively).

 3          Q      Do you remember telling him, Julius snatched

 4   the man out by his left, snatched him out, and the man just

 5   fell like a dummy on the ground.  He went in the man's

 6   pocket and got everything out.  Do you remember telling him

 7   that?

 8          A      Yeah.

 9          Q      Now toward the end of your interview -- what

10   time do you recall this interview ending, about 6:35 in the

11   morning?  Would that be about right?  You don't remember?

12          A      No.

13          Q      Do you remember Detective Grindle asking you,

14   when was the first time Matthew talked about doing the

15   robbery on the guy, and you said, he ain't, he ain't talked

16   about it.   Do you remember that?  Do you remember telling

17   Detective Grindle that?

18          A      Excuse me?  Say that again.

19          Q      Do you remember telling Detective Grindle that

20   Matthew did not talk about robbing the guy?

21          A      Right.

22          Q      He didn't, did he?  Is that right?

23          A      Right.

24          Q      Detective Grindle said, he didn't talk; they

25   just did it, and you said, just did it.  Is that right?
```

1    A    Yeah.

2    Q    Detective Grindle said, All right.  Very good.

3  Someone name Martin said, did he say anything to the man

4  before he shot him, and you said, he didn't say nothing to

5  the man.  He just shot the man from behind.  The man didn't

6  look back or nothing.  Do you remember that?

7    A    Yeah.

8    Q    And you said that man didn't know nothing.

9  Detective Grindle said, they just shot him when he robbed

10  him.  And did you say, they just shot that man for nothing;

11  is that right?  Is that right?

12    A    Yeah.

13    Q    So would it be right that the shooting was not

14  for a robbery but just for nothing, right?

15    A    Well, I say it was for nothing because the

16  money that he had, it wasn't worth it.

17    Q    You told Detective Grindle it was for nothing,

18  didn't you?

19    MR. GREENE:  Objection, argumentative, Your Honor.

20  She has answered it.

21    THE COURT:  Overruled.

22    Q    What is Scott's name, full name?

23    A    I couldn't tell you.

24    Q    Did either Jason or Emanuel try to talk you

25  out of robbing anybody?

Ann H. Armstrong, RPR

1       A       Who?

2       Q       Did either Jason or Emanuel try to talk you

3   out of robbing anybody?

4       A       Not that I remember.

5       Q       Do you know if either Jason or Emanuel was

6   around when Julius had the gun?

7       A       Who is Jason?  I'm confused.

8       Q       Well, do you know if Emanuel was around when

9   Julius had the gun?

10      A       Yes.

11      Q       He was?

12      A       (Witness nods head affirmatively).

13      Q       The gun was out in sight when he was around?

14      A       At what point are you talking about?

15      Q       At any point?

16      A       I can't remember.

17      Q       Nothing else.

18                      REDIRECT EXAMINATION

19  BY MR. GREENE:

20      Q       The fellow Jason is the man driving the car;

21  does that help you any?

22      A       Okay.

23      Q       So when the gun was brought out to the car by

24  Julius, the man driving the car was at the car; you were at

25  the car, and Troll here was at the car, and Julius brought

Ann H. Armstrong, RPR

1   the gun out; is that right?

2          A       Yes, sir.

3          Q       That's what you testified to earlier?

4          A       Yes, sir.

5          Q       You talked with Detective Grindle at December

6   the 3rd at 1:40 a.m. and again at 5:55 a.m., twice; is that

7   right?

8          A       Yes, sir.

9          Q       And the first time you talked about this thing

10  in this twenty or thirty page document here, you told him at

11  that time that, Julius says, Let's ride down there.  I know

12  where some boys are at we can just rob.  We can go after

13  some dope?

14         A       Yes.

15         MR. GREENE:  That's all.

16         MR. GOGGANS:  I don't think I have any other

17  questions.  I would like to approach very quickly.

18         (The following occurred at the bench outside the

19  hearing of the jury:)

20         MR. GOGGANS:  Your Honor, Mr. Greene asked the

21  questions about this statement at one something in the

22  morning.  Of course, I'm relatively new to the case.  I

23  haven't seen that statement.  I asked Mr. Wiggins, and he

24  said he didn't have it either.

25         MR. GREENE:  It's supposed to all be in there.  They

Ann H. Armstrong, RPR

1    came and got everything we got.

2         MR. GOGGANS:  We have the 5:55 statement.  That's the

3    statement.

4         MR. WIGGINS:  All we have is the 5:55 statement.

5         MR. GOGGANS:  In light of that, we ask that you give

6    an instruction to the jury to disregard the last question

7    and answer.

8         THE COURT:  Let's take a look at what you have.

9         MR. GOGGANS:  I'll show you what I've got, but I have

10   not seen it.

11        MR. GREENE:  The defense contends that they have not

12   been provided with a statement given by the Defendant, by

13   the witness Suttles if I understand it correctly, the 1:30

14   in the morning statement.  It's actually 1:30 in the

15   afternoon.  It says a.m. on the statement.  No, it says

16   correction.  It's my understanding that all of these

17   witness' statements including now have been copied three

18   times, provided to the defense according to what I

19   understand from the detective.  We have repeatedly copied

20   our file and made available every witness' statement,

21   everything to them.  We have made arrangements to sit down

22   with them, go over the evidence, go over the facts and open

23   the file.  I don't know why they don't have it.

24        MR. GOGGANS:  Of course, I was the last one getting

25   involved in this case.  I got the file from Blanchard McLeod

1   who was counsel before he withdrew from the case.  This

2   statement here -- perhaps we should mark this at some time

3   as an exhibit.  But the statement I have for December 3,

4   1996 is starting at 5:55 a.m.  It's the only one that I got

5   from Mr. McLeod's stuff.  It's my understanding that that's

6   the only thing that Mr. Wiggins has and the only thing that

7   Ms. Simmons has seen here.

8           MR. WIGGINS:  That's correct.

9           MR. GOGGANS:  That's the extent of my knowledge.

10          MR. WIGGINS:  We did receive the entire file.  We

11  copied all of the statements, and they sent us all of the

12  statements.  This is the only thing I've seen.  So I don't

13  know.  I had no knowledge there was another statement.

14          MR. GREENE:  I don't know what anybody can do.  We've

15  made them, copied them.  We have provided them.  I don't

16  know.  I'll be glad to take testimony on that at some point

17  in time.

18          THE COURT:  We've swapped attorneys.  We've done

19  everything else.  Let me ask you this.  Do you expect to use

20  this statement anymore?

21          MR. GREENE:  No, sir.

22          THE COURT:  As far as I know we are through with this

23  witness?

24          MR. GREENE:  Right.

25          THE COURT:  And the last question and answer was

1   what?

2          MR. GOGGANS:  It was the 1:55, whatever, 1:55 p.m.,

3   whatever.  The other statement was that -- the substance was

4   that she had in fact told Detective Grindle that they were

5   going to White Hall to rob some folks.  Julius said that is

6   what her testimony was.  The point is that it's not

7   mentioned in the 5:55 statement.  If you'll notice in this

8   statement, it's a long narrative.  The long narrative goes

9   into the whole series.  But I don't think that there is any

10  reason to hide this.

11         THE COURT:  Why don't we mark these, copy these and

12  mark these at a later time and mark these as Defendant's

13  exhibits for purposes of this discussion and put them in the

14  record.  I will instruct the jury to disregard the last

15  question and answer.

16         (The following occurred in the presence and hearing

17  of the jury:)

18         THE COURT:  Ladies and gentlemen of the jury, I am

19  going to instruct you to disregard the last question and

20  answer that was asked by the prosecution of this witness.

21  You shall not consider that question or the answer in your

22  deliberations.  Any more questions of this witness?

23         MR. GREENE:  We would like to have an objection to

24  the Court's ruling.

25         THE COURT:  All right, sir.

Ann H. Armstrong, RPR

1          MR. GREENE:  We are finished with this witness.

2          THE COURT:  It's noted for the record.  Anything

3    else?

4          MR. GOGGANS:  No, sir.  No more questions.

5          THE COURT:   Thank you.  You can come on down.

6          (The witness was excused from the witness stand.)

7                        JOSEPH SALOOM,

8    after having been duly sworn, was examined and testified as

9    follows:

10                     DIRECT EXAMINATION

11   BY MR. GREENE:

12         Q       Your name and position, please.

13         A       My name is Joe Saloom.   I'm employed with the

14   Alabama Department of Forensic Sciences as a forensic

15   scientist specializing in fire arm and tool mark

16   examination.

17         Q       During the course of your duties, sir, you

18   received certain evidence from I think the Selma Police

19   Department, Detective Grindle as case agent concerning the

20   death of Willie Johnson, Jr.?

21         A       Yes, I did.

22         Q       And the purpose of that was for you to try to

23   make some examinations of the various material that you

24   received?

25         A       Yes, sir.

1          Q      And due to time constraints and case load, you

2     have not been able to do anything with it other than receive

3     it; is that correct?

4          A      That's correct.

5          Q      However, you are in the chain of custody; that

6     is, you received it and kept it for a period of time?

7          A      I have.

8          Q      And have you kept it, sir, in the same

9     condition as it was when you received it?

10         A      Yes, sir.

11         Q      Specifically sir, if we could have the box --

12    we'll have that marked.

13         (State's Exhibit Number 34 was marked for

14    identification.)

15         Q      This is Exhibit 34, sir.  You have received

16    this in the course of your duties?

17         A      Yes, sir, I did.

18         Q      And when did you receive it?

19         A      I received it January 10th, 1997.

20         Q      And it's now in the same and substantially the

21    same condition as it was when you received it?

22         A      Yes, sir, it is.

23         Q      All right, sir.  I would like to ask him to

24    remove it and examine it and make sure it's not loaded, but

25    I don't want to take it out of this box without everybody

1    understanding.

2          MR. GOGGANS:   That's okay.

3          Q      This is an unloaded weapon, sir?

4          A      Yes, sir, it is.

5          Q      And that weapon is now in the same or

6    substantially the same condition as it was when you received

7    it; you brought it here today yourself?

8          A      Yes, sir, it is.

9          Q      All right, sir.  And it's identified to you by

10   your case number and any other methods?

11         A      Just the box that it came in, yes, sir.

12         MR. GREENE:   And for the record, Your Honor, we would

13   move for the introduction of Exhibit 34.

14         MR. GOGGANS:   I don't think they have got the chain

15   yet, but I believe they will connect it up.  Subject to

16   connecting up, no objection.

17         THE COURT:   We will wait until it's connected then.

18         (State's Exhibit Number 35 was marked for

19   identification.)

20         Q      And then Exhibit 35, is that correct, you

21   received at the same time, and this is a shot shell?

22         A      I did not receive this at the same time.  I

23   received this December 13, 1996.

24         Q      Is it now in the same or substantially the

25   same condition it was when you received it, and you brought

1    it here yourself today in that same condition?

2           A       That's correct.

3           Q       When you received both of these items, they

4    were sealed and you presented them to us in front of the

5    jury; is that correct?

6           A       Yes, sir.

7           Q       Could you open 35 for us?  What does it

8    contain?

9           A       It contains a Federal 12-gauge shotgun shell,

10   originally loaded with seven and a half shot.

11          (State's Exhibit 36 was marked for identification. )

12          Q       For the record that's Exhibit 36 that came out

13   of Exhibit 35, the box.  All right, sir.  And the final

14   item, sir, it would be --

15          (State's Exhibits 37 and 38 were marked for

16   identification.)

17          Q       And you've received them in the course of your

18   duties when, sir?

19          A       December 13th, 1996.

20          Q       All right, sir.  You received them in a sealed

21   condition as they are now?

22          A       Yes, sir.

23          Q       From the Selma Police Department?

24          A       I received them from Mr. Phil Landrum.

25          Q       And these contain what, sir?

Ann H. Armstrong, RPR

1        A        Well, according to the bag this one contains a

2    shot wad, and this one contains a shot wad.

3        Q        What is a shot wad, sir?

4        A        It's a plastic filler that's found inside

5    shotgun shells.

6        Q        And would you open those and inspect them to

7    see if they do contain that type of item?

8        A        That one is a shot column that holds the shot.

9    And that's an over powder wad.

10        Q        Sir, in the course of your duties with the

11    Department of Forensic Sciences, you have examined fire

12    arms, made determinations about their ability to operate,

13    whether they are in working order, compare bullets, slugs, X

14    shells, determine if they were fired out of various guns, et

15    cetera?

16        A        That's correct.

17        Q        What we generally refer to you as a fire arms

18    expert which is maybe a colloquial expression, but that's

19    the one we use.  You have certain training and background

20    that allows you to do that.  What is that?

21        A        I have a Bachelor's degree in chemistry which

22    I obtained from Birmingham Southern College.  And I went to

23    graduate school also in chemistry at Mississippi State

24    University.  I was employed for four years as a toxicologist

25    at a private clinical laboratory in Birmingham.  Since I've

1    been with the Department of Forensic Sciences, I have

2    attended several arms courses put on by various companies

3    such as Glock, Remington, Sig, Smith & Wesson.   I spent two

4    years training with four different fire arms examiners

5    within the State of Alabama in examination of fire arms and

6    tool marks evidence.   I have been to four seminars, one week

7    seminars put on by the Association of Fire Arms and Tool

8    Marks Examiners.   Now I've been to a one week school put on

9    by the FBI at the FBI Academy.   I have taught fire arms

10   classes at Enterprise State Junior College for four years.

11   And I'm a certified instructor in rifles, pistols and

12   shotguns by the National Rifle Association.

13        Q      You've been called upon to make opinions and

14   judgments as an expert in numerous examinations, have you

15   not?

16        A      I have.

17        Q      You have been in this business for a number of

18   years?

19        A      I have.

20        Q      You have been called upon to testify as to

21   your findings and opinions in numerous courts, both at the

22   state and federal level; is that correct?

23        A      That's correct.

24        Q      And, sir, in this case as I asked you earlier,

25   you have not been able to due to your case load and time

1    constraints make any examination or determination on any of

2    these items?

3         A     That's correct.

4         Q     Could you tell us, however, sir, that this

5    shotgun shell is a type of shell that would fire in that

6    particular gun?

7         A     It is.

8         Q     Could you tell us, sir, if these, whatever

9    these things are in these little paper bags -- we want to

10   call them waddings, but I think that's not exactly correct

11   as far as you are concerned.  Are they the type of thing

12   that would come out of this particular shell?

13        A     They are.

14        Q     All right, sir.

15        (State's Exhibit Number 39 was marked for

16   identification.)

17        Q     That's Exhibit 39.  All right, sir.  I think

18   I've got everything there.

19                        CROSS EXAMINATION

20   BY MR. GOGGANS:

21        Q     Mr. Saloom, with a pump shotgun, such as

22   State's Exhibit Number 39, in order to chamber a shell, what

23   I call rack, whatever you want to call it, one pulls back

24   the pump; is that correct?

25        A     Well, that depends.  As it is in that

1    condition right now, you can actually place one in the

2    chamber with your hand and push it forward, and it would

3    chamber it also.

4         Q     Now after it's fired, after the shell is

5    fired, if one pulls the pump back, does it not eject the

6    shell?

7         A     It is supposed to, yes, sir.

8         Q     And you didn't test this particular fire arm,

9    did you?

10        A     No, sir, I did not.

11        MR. GOGGANS:  No other questions.

12                    REDIRECT EXAMINATION

13   BY MR. GREENE:

14        Q     Let me follow up on two points, sir.  I don't

15   think I asked you.  Could you tell us from whence you got

16   each of the items, the shotgun, I'm going use to use the

17   word wadding even though that's not correct and the shell.

18        A     Do you mean who I received them from?

19        Q     Yes, sir.

20        A     I received the wadding, the two bags of

21   wadding and the shotgun shell from Forensic Science Bill

22   Landrum who works at our laboratory in Montgomery.  And I

23   received the shotgun from forensic scientist Craig Bailey

24   who also works in our laboratory in Montgomery.

25        Q     Okay.  And as far as this gun itself, sir, is

Ann H. Armstrong, RPR

1    this a legal gun as to length?

2         A     I don't know.  I didn't measure it.

3         Q     All right, sir.  What would be the

4    requirements as you understand the laws in your field of

5    fire arms of the state of Alabama?

6         A     THe barrel would have to be over 18 inches

7    long.

8         Q     This barrel right here?

9         A     Yes, sir.

10        Q     From here to here?

11        A     Yes, sir, or the total length has to be 24 or

12   26 inches.  I can't remember.

13        Q     And when you fired this gun, it doesn't

14   automatically eject the shell?

15        A     It does not.

16        Q     The fired shell stays put if it's working

17   properly?

18        A     That's correct.

19        Q     And you would have to rack it back to eject

20   the shell and rack it forward to put another in?

21        A     That's correct.

22        Q     Of course, you could start out by racking it

23   back and putting one in manually?

24        A     That is correct.

25        Q     All right.  But for it to eject, you have to

Ann H. Armstrong, RPR

```
 1    pull it back and throw it out?

 2            A       That is correct.

 3            Q       A semi-automatic will or gas operated

 4    semi-automatic gun will do it all by itself; is that

 5    correct, but this is not such a gun?

 6            A       That is also correct.

 7            Q       Thank you, sir.  That's all.

 8            MR. GOGGANS:  No other questions.

 9            MR. GREENE:  We would like to excuse him.

10            (The witness was excused from the witness stand.)

11                          JASON POWELL,

12    after having been duly sworn, was examined and testified as

13    follows:

14                        DIRECT EXAMINATION

15    BY MS. WILSON:

16            Q       State your name, please.

17            A       Jason Powell.

18            Q       Jason, how old are you?

19            A       Nineteen.

20            Q       And where do you live?

21            A       Camden.

22            Q       And who do you live in Camden with?

23            A       My sister.

24            Q       Do you have any relatives here in Selma?

25            A       Yes.
```

759

1      Q       And what kind of relatives do you have here in
2  Selma?

3      A       Sister and nephew.

4      Q       Okay.  Now back in 1996, did you have the
5  occasion to come to Selma and stay for a period of time?

6      A       Yes.

7      Q       And when was it that you came to Selma and
8  started staying?

9      A       Around November, beginning of November.

10     Q       Of 1996, is that correct?

11     A       Yes, ma'am.

12     Q       Who did you stay with?

13     A       My sister Etta Blackmon.

14     Q       Okay.  And did you start going to school here
15  also?

16     A       No, ma'am.

17     Q       Okay.  And when you moved here to Selma, did
18  you know anyone other than your sister?

19     A       No.

20     Q       Okay.  Now on November the 27th, 1996, do you
21  recall that day?

22     A       Yes.

23     Q       And what did you do earlier that day?

24     A       Well, I left home, and I went to get some gas.
25  And I saw four people walking on the road when I was on my

Ann H. Armstrong, RPR

1   way back home.

2          Q       Okay.  Let me stop you there.  You left home.

3   Is this your sister's house here in Selma?  Where does she

4   live?

5          A       220 Cedar Drive.

6          Q       Cedar Drive.  Okay.  And where were you going

7   to get gas?

8          A       At the Chevron Station.

9          Q       And was that on Highland Avenue, the corner of

10  Highland and Summerfield?

11         A       It was right off of Summerfield.

12         Q       Now what type of automobile were you driving?

13         A       A Nissan Sentra.

14         Q       What color?

15         A       Gray.

16         Q       And who did that vehicle belong to?  Was that

17  yours?

18         A       Yes, ma'am.

19         Q       You used it?

20         A       Yes, ma'am.

21         Q       Now when you went to -- did you actually get

22  gas that day?

23         A       Yes.

24         Q       Okay.  And then where did you go when you left

25  the gas station?

                    Ann H. Armstrong, RPR

```
 1          A       I was on my way back home.

 2          Q       To Cedar Drive?

 3          A       Yes.

 4          Q       And who, if anyone, did you see on your way

 5   back home?

 6          A       I seen four people walking.

 7          Q       Where were they walking?

 8          A       Across the street, just coming off Cedar.

 9   They were going across Summerfield.

10          Q       What did you do when you saw them?

11          A       I waved at them.

12          Q       And how did you wave to them?   What did they

13   do when you waved to them?

14          A       They waved back.

15          Q       And what happened then?

16          A       When he waved back, my sister had been telling

17   me about I needed to know folks.  So I turned around, and I

18   was going to go talk to them because other folks I spoke to

19   usually look at me like I'm funny or something.  I was going

20   to talk to them.  But when I turned around, they were going

21   towards me.  They were flagging me anyway, so I stopped, and

22   I spoke.  And so he said his name was Little J.  He was the

23   only one that spoke back.  So he asked me what my name was,

24   and I told him my name.

25          Q       What did you tell him your name was?
```

```
 1         A       Jason.

 2         Q       Do you go by any other name?

 3         A       (Witness shakes head negatively).

 4         Q       Have you ever been known by Tony?

 5         A       No, ma'am.

 6         Q       Now when you spoke with Little J., did you

 7   find out who everybody else with Little J. was?

 8         A       Yes, he told me.

 9         Q       And who was that?  Who was with Little J.?

10         A       He told me -- he said the girl's name was Bam

11   Bam, and the guy's name was Troll and a guy named Eman.

12         Q       Do you see Troll in the courtroom, the guy you

13   know as Troll?

14         A       Yes, ma'am.

15         Q       Will you point him out, please?

16         A       Right there.

17         Q       Okay.  And he was with Julius that day when

18   you stopped and talked to Julius or Little J.?

19         A       Yes, ma'am.

20         Q       Okay.  And you said Bam Bam, Little J. and

21   Troll and Eman?

22         A       Yes.

23         Q       Okay.  Now what happened after you started

24   having the conversation with them?

25         A       Little J. asked me would I run them over to
```

Ann H. Armstrong, RPR

763

1   their cousin's house, and I told, yeah, but he would have to

2   show me where to go because I didn't know my way around

3   Selma.

4         Q       So did they in fact get in your automobile?

5         A       Yes, ma'am.

6         Q       And who got where in your automobile?  Who got

7   in the front seat?

8         A       Little J.

9         Q       And did the other three get in the back seat?

10        A       Yes, ma'am.

11        Q       Okay.  And where did y'all go?

12        A       We went to some like brick apartments right

13  across from Victor Nissan.

14        Q       Right across from Victor Nissan, some brick

15  apartments?

16        A       Yes.

17        Q       All right.  And what happened when you got to

18  these apartments?

19        A       Little J. got out and went in, stayed in there

20  for about fifteen minutes, and he came back out and got in

21  the car.

22        Q       And did anybody go in the brick apartments

23  besides Little J.?  Did anybody else go in with him?

24        A       No, ma'am.

25        Q       What did the other people do in your car while

Ann H. Armstrong, RPR

1    Little J. went into the apartment building?

2         A      Sitting in the back talking.

3         Q      Okay.  When Little J. came out, did he have

4    anything with him?

5         A      I didn't -- as far as seeing it, I didn't see

6    nothing that he had out in the open.  But it looked like he

7    had something going like under his arm, under his coat.  But

8    I didn't really pay it no attention.

9         Q      Do you remember what Little J. was wearing at

10   the time he came out?

11        A      Yes.

12        Q      What did he have on?

13        A      He had on a white and blue and yellow coat and

14   some white pants.  I think it was a Michigan coat.

15        (State's Exhibit Number 40 - 42 were marked for

16   identification.)

17        Q      I'm going to show you what's been marked as

18   State Exhibit Number 42 and ask you if you recognize that

19   photograph?

20        A      That's the coat he had on.

21        Q      This is the coat that Little J. had on?

22        A      Yes, ma'am.

23        Q      Okay.  What about State's Exhibit Number 41?

24        A      That's the pants that he had on.

25        Q      State's Exhibit Number 40?

765

1        A       His shoes.

2        Q       These are Little J.'s shoes.  These are what

3    Little J. had on that day when you picked him up and he got

4    in your car?

5        A       Yes, ma'am.

6        MS. WILSON:  We move for the introduction of State's

7    Exhibit Number 40, 41 and 42.

8        MR. GOGGANS:  No objection.

9        THE COURT:  They will be admitted.

10       Q       Now when he came out, you said you saw

11   something under his jacket.  Can you describe for the ladies

12   and gentlemen of the jury what it appeared, what it looked

13   like to you?

14       A       Well, to me it looked like a stick or a gun,

15   but I didn't question it because he didn't say nothing about

16   it.

17       Q       So you couldn't see the object; you just saw

18   the form of the object?

19       A       Yes, ma'am.

20       Q       And to you it looked as if it were a stick or

21   a gun?

22       A       Yes, ma'am.

23       Q       And it was under his coat or his jacket?

24       A       Yes, ma'am.

25       Q       Okay.  When he got back into the car, what did

766

1   he do with that object?

2        A        Well, I was driving, and I didn't really see

3   what he did with it.  But somehow it got back to the back of

4   the car.

5        Q        It got in the back seat of the car?

6        A        Yes.

7        Q        Now after you left the brick apartments over

8   there on Broad Street, where did y'all go?

9        A        Well, we went somewhere towards like going to

10  Montgomery.

11       Q        Okay.  And what was your purpose for going

12  toward Montgomery?

13       A        He said he wanted to go talk to some of his

14  friends.  He asked me would I run him somewhere else.

15       Q        This Little J., he wanted you to run him

16  somewhere else?

17       A        (Witness nods head affirmatively).

18       Q        So y'all get on 80 and start heading in the

19  direction towards Montgomery?

20       A        Yes.

21       Q        Okay.  What happened?

22       A        Well, when we turned -- we took a left to a

23  road.  It was paved at first, but then it came to -- it

24  leads to a dirt road, and my car messed up.

25       Q        Okay.  How did your car mess up?  What was it

```
 1    doing?
 2         A      It just -- I was driving it, and it just cut
 3    off.
 4         Q      Okay.  So your car cut off, and you were on a
 5    dirt road at this time; is that correct?
 6         A      Yes, ma'am.
 7         Q      Do you have any idea of what time of day or
 8    night it was?
 9         A      It could have been in the middle of the day
10    around -- it should have been between 2:00 clock, 1:30 or
11    2:00, somewhere in there.  I'm not for sure about the time.
12         Q      Okay.  But it was after lunch?
13         A      Yes.
14         Q      Okay.  Now when your car just died on you,
15    what did y'all do?
16         A      Basically all of us was trying to see what was
17    wrong with the car.  We looked under the hood and all of
18    that.
19         Q      Okay.  Who got out of the car?
20         A      All of us got out.
21         Q      Okay.  And who went over and opened up the
22    hood?
23         A      Little J.
24         Q      Okay.  And who -- were y'all looking under the
25    engine trying to figure out what was wrong with the car?
```

```
 1          A       Yes, ma'am.

 2          Q       Did you ever get the car running again?

 3          A       Not that day.  Well, yes, I got it running.

 4          Q       But not that day?

 5          A       No, ma'am.

 6          Q       Did anyone pass by during the time y'all were

 7   out there with the hood up looking at the engine?

 8          A       A white guy came past first.

 9          Q       Okay.  And do you remember what type of

10   vehicle he was in?

11          A       I know he was in a truck.

12          Q       He was in a truck?

13          A       Yes, ma'am.

14          Q       Did he stop?

15          A       Yes.

16          Q       And did you have a conversation with him?

17          A       Yes, he stopped.  He asked us what the problem

18   was, and I told him that my car had messed up on me, and I

19   didn't know what it was.  So when he seen what the car was

20   doing, he said it seemed like it had to be -- the car wasn't

21   getting no fire.  And so he said he would go down the road

22   and meet up with some other guys and go hunting.  He would

23   be coming back up the road.

24          Q       And did you see him again that day?

25          A       No.
```

Ann H. Armstrong, RPR

769

1      Q     Okay.  Now after he passed on and went on up

2  the road in his truck, did anyone else pass by?

3      A     A couple of hours later.

4      Q     Now what did y'all do for that next couple of

5  hours before the next person came by?

6      A     Basically we just talked and listened to

7  music.

8      Q     Listened to music and talked.  Okay.  Now you

9  said it was a couple of hours later or so.  And who was the

10  next person that came by?

11      A     A black guy.

12      Q     Okay.  And what type of vehicle was he in?

13      A     He was in a blue truck.

14      Q     In a blue truck.  Did he stop, or did y'all

15  flag him down?

16      A     He stopped.

17      Q     He stopped.  And what was the conversation

18  with him?

19      A     Well, he wanted to know what the problem was;

20  did we need any help.  And we told him the problem, and he

21  asked do we need any help.  Little J. asked him would he

22  pull us up to the paved road, and he said, yes.

23      Q     Okay.  So what did he do after he agreed to

24  pull you up to the paved road?

25      A     Well, he hooked the car up.  He hooked the car

1    up so he could pull it.

2          Q      What did he use to hook the car up with?

3          A      A chain.

4          Q      And where did the chain come from?

5          A      Off his truck.

6          Q      Off his truck?

7          A      (Witness nods head affirmatively).

8          Q      So he hooked your car up, and who got in the

9    truck with him, if anyone?

10         A      Little J.

11         Q      And then were the rest of y'all still in your

12   car?

13         A      Yes.

14         Q      Okay.  And how far did this individual pull

15   you?

16         A      I thought he was going to pull us just up to

17   the paved road, but he pulled us all the way back to Selma.

18         Q      Okay.  Did y'all stop anywhere between where

19   he started pulling you and where you ended up in Selma?

20         A      Not as I can recall.

21         Q      Now when y'all got back to Selma, where did he

22   pull you to?

23         A      In front of Little J's house.

24         Q      In front of Little J. and Matthew's house?

25         A      Yes.

1    Q        Had you ever been there before?

2    A        No.

3    Q        When y'all got to Little J. and Matthew's

4    house, what happened then?

5    A        Little J. got out of truck, and he came to the

6    car.  And he asked all of us do we have some money.  I told

7    him I didn't have no money because I had just brought enough

8    money to get gas.  So then he called Troll and Bam Bam over

9    there, and they were talking.  So then --

10   Q        Okay.  Let me stop you there.  How much money

11   was Little J. looking for?

12   A        Twenty-five dollars.

13   Q        And what was that $25 for?

14   A        For paying the man for towing us back to

15   Selma.

16   Q        Did any of y'all in the car have any money to

17   give towards that $25?

18   A        Not as I know of, no.

19   Q        Okay.  So what was the conversation after

20   y'all didn't have the money?

21   A        After they got through talking, Troll, Bam Bam

22   and Little J., they came back over where me and Eman was and

23   told us they were about to rob the man.

24   Q        Who said that?

25   A        Little J. said it.

Ann H. Armstrong, RPR

```
 1        Q        And where was Troll when Little J. said they
 2    were about to rob the man?
 3        A        Standing up.
 4        Q        Now after Little J. said they were about to
 5    rob the man, what happened then?
 6        A        He asked Bam Bam to go and get the gun out of
 7    the back.  That was the first time I seen the gun.
 8        Q        So who got the gun out of the back of your
 9    car?
10        A        Bam Bam.
11        Q        And what did Bam Bam do with the gun?
12        A        She gave it to Little J.
13        Q        And what did Little J. do with the gun?
14        A        He waited until Troll got on the truck and
15    passed it to Troll and got in the front.
16        Q        Now Little J. -- Bam Bam gave the gun to
17    Little J.  Little J. waited until Matthew, Troll got onto
18    the back of the truck?
19        A        Yeah.
20        Q        Where was Troll sitting on the back of the
21    truck?
22        A        Well, when he got the gun, he was over by the
23    tail gate.
24        Q        He was over by the tail gate?
25        A        Uh-huh.
```

Ann H. Armstrong, RPR

773

```
1        Q        And then what did he do?

2        A        What he did after he got the gun?

3        Q        Where did he move onto the truck?

4        A        On the side like.

5        Q        He was on the side behind the passenger or

6   behind the driver?

7        A        Behind the driver if I'm not mistaken.

8        Q        And where did Bam Bam go?

9        A        She was on the truck.

10       Q        She jumped on the back of the truck too?

11       A        (Witness nods head affirmatively.)

12       Q        And where did Julius gone?

13       A        He was in the front.

14       Q        Okay.  And was Willie still, the driver still

15  behind the wheel of his truck?

16       A        Yes.

17       Q        Did they leave Matthew and Julius' house?

18       A        Yes.

19       Q        Did you know where they were going?

20       A        No.

21       Q        What did you do?

22       A        Well, when they pulled off, I pulled my head

23  down and told Eman they were fixing to mess up.  They were

24  going to get in trouble.

25       Q        And what did you do during the time that they
```

774

1   were gone?

2        A        Sat in the car and talked with the guy called

3   Eman.

4        Q        Okay.  Did anyone come to the car or come to

5   Julius and Matthew's house during the time that they were

6   gone with the man in the truck?

7        A        It was a girl that had -- a girl had left the

8   house.  I asked Eman who she was, and he said that was his

9   sister or something.

10       Q        That was Julius and Matthew's sister?

11       A        Yes.

12       Q        Okay. Is that all you saw?

13       A        Yes.

14       Q        Now how long were they gone?

15       A        Around I would say fifteen or twenty minutes.

16       Q        Okay.  And when they came back, did you see

17   them when they came back?

18       A        Well, I seen -- I seen Bam Bam and Troll.

19   They was on the back of the truck.

20       Q        They were on the back of the truck?

21       A        Yeah.

22       Q        What did you see the truck do?

23       A        It went down past the house a little bit and

24   took a left up in like the little road, the alley like.

25       Q        Okay.  And did you see the truck when it came

Ann H. Armstrong, RPR

1    to a stop?  Could you still see it?

2         A      No.

3         Q      It was pulled up far enough that you couldn't

4    see it from where you were?

5         A      Yes, ma'am.

6         Q      Now where was your car and you at the time you

7    saw the truck pull up into the little road?

8         A      Kind of like right in front of the house.

9         Q      Okay.  Where were you?  Were you in the car or

10   out of the car?

11        A      In the car.

12        Q      You were still in the car?

13        A      (Witness nods head affirmatively).

14        Q      Where was Eman?

15        A      He was in the car.

16        Q      Okay.  Now when you saw the truck pull up into

17   the little road, what, if anything, did you see or hear?

18        A      Well, I say would about no more than five or

19   ten minutes later, we had heard a gunshot.  And then just

20   about -- I would say not over five minutes, not five minutes

21   later they came running from around the corner through a

22   lady's yard.

23        Q      Okay.  Now you said you're sitting there in

24   the car, and you hear a gunshot, one gunshot, several

25   gunshots?

```
 1          A      One.

 2          Q      One.   Okay.   And it's some period of up to

 3    five minutes or so before you see them come back?

 4          A      It couldn't have been five minutes.

 5          Q      Okay.   So it was not even five minutes?

 6          A      No.

 7          Q      And who did you see?

 8          A      Julius, Matthew and Brenda running.

 9          Q      And they were running from what direction?

10          A      Like I would say coming like from this little

11    house down.   Like they came through this side door or

12    something.   They didn't come through the front door.

13          Q      They didn't come through the front door?

14          A      No.

15          Q      This is when they got to Matthew and Julius'

16    house?   What direction did they come from after you heard

17    the gunfire?

18          A      Well, they came running through somebody's

19    yard.

20          Q      Okay.   And did you see any of them with a

21    weapon?

22          A      Matthew.

23          Q      What did Matthew have?

24          A      The gun.

25          Q      And where was the gun that Matthew had?
```

1       A       Where was it?

2       Q       Uh-huh.

3       A       He had it in his hand.

4       Q       He had it in his hand?

5       A       He was running with it.

6       Q       He was running with it?  Okay.  Where did you

7    see Matthew go with the gun?

8       A       In the house.

9       Q       And in whose house?

10      A       Their house.

11      Q       In their house?

12      A       Yes, ma'am.

13      Q       Who else went into Matthew's house besides

14   Matthew?

15      A       The girl and Little J.

16      Q       Little J. and Bam Bam.  They all three ran in

17   the house?

18      A       (Witness nods head affirmatively).

19      Q       What did you do after you saw them run into

20   the house?

21      A       Me and Eman, we walked up to go in the house.

22   And by the time we got in there, they were just about ready

23   to come back out.  But when we stepped in the front door,

24   they had like a little curtain you can see through.  And

25   they was in the room.  And I did see Matthew throw the gun

1    under the bed.

2         Q      Okay.  So you saw Matthew throw the gun under

3    a bed?

4         A      Yes, ma'am.

5         Q      Okay.  Do you know whose bed it was or whose

6    bedroom it was?  Had you ever --

7         A      No.

8         Q      Had you ever been in that house before?

9         A      No, ma'am.

10        Q      Okay.  What were they doing?  You say you saw

11   Matthew do that with the gun.  What were the other ones

12   doing?

13        A      Well, they was getting ready to come out.

14        Q      And was there anything different about them

15   when they were coming out?

16        A      They had changed clothes.

17        Q      They changed clothes?

18        A      (Witness nods head affirmatively.)

19        Q      Do you remember what Matthew had on prior to

20   the time he changed clothes?

21        A      Did you say after the time?

22        Q      Before.  I know he had on some dark pants and

23   a black shirt.

24        (State's Exhibits Number 43 - 45 were marked for

25   identification.)

Ann H. Armstrong, RPR

```
 1        Q      I'm going to show you what has been marked
 2   State's Exhibit 43, 44, and 45.  I'm going to ask you if you
 3   recognize what's depicted in these photographs?
 4        A      This is a shirt.
 5        Q      This is a shirt that who was wearing?
 6        A      Matthew.
 7        Q      Matthew.  What does this depict?
 8        A      Pants.
 9        Q      These are the pants that he had on?
10        A      (Witness nods head affirmatively.)
11        Q      Do you recognize these shoes?
12        A      If I'm not mistaken he had on those shoes.
13        Q      Okay.  And these were all worn by Matthew
14   prior to the time they changed clothes?
15        A      Yes.
16        MS. WILSON:  We move for the introduction of State's
17   Exhibit 43, 44 and 45.
18        MR. GOGGANS:  No objection.
19        THE COURT:  Admitted.
20        Q      Now after they changed clothes, do you recall
21   what they had on?
22        A      No.
23        Q      Okay.  Now do you know what they did with
24   these clothes and these shoes that you stated they had on
25   before they changed?
```

Ann H. Armstrong, RPR

1       A       No, ma'am.

2       Q       Okay.   Now what happened after they changed

3  the clothes?

4       A       Well, they left the house.

5       Q       What did you do?

6       A       I was talking to them, really trying to find

7  out did they hurt the man.   And the girl told me, said they

8  had left him dead.

9       MR. GOGGANS:   Objection to whoever the girl is he's

10  referring to, hearsay, confrontation cross examination.

11       THE COURT:   Sustained.

12       (State's Exhibits Number 46 - 50 were marked for

13  identification.)

14       Q       How far did you get into the house where

15  Matthew and Julius and Bam Bam ran?

16       A       Like right into the door, but I didn't go in.

17       Q       Did you ever make it back to the bedroom where

18  you said you saw Matthew put the gun under a bed?

19       A       No, but I could look right into the bedroom.

20       Q       Okay.   I'm going to show you what's been

21  marked State's Exhibit Number 50 and ask you if recognize

22  that photograph?

23       A       Yes.

24       Q       And what is that photograph of?

25       A       This is the bed he throwed the gun under.

1          Q       This is the bed that you saw Matthew put the

2     gun under?

3          A       Yes.

4          MS. WILSON:   We move for the introduction of State's

5     Exhibit Number 50.

6          MR. GOGGANS:   No objection.

7          THE COURT:   Admitted.

8          Q       Now going back, do you recall what Bam Bam was

9     wearing before the time that she changed clothes?

10         A       Yes.

11         Q       And let me show you what's been marked State's

12    Exhibit 47, 48 and 49.   I'm going to ask you to look at

13    those photographs and see if you recognize the clothing

14    depicted in those photographs?

15         A       Yes.   That's what she had on.

16         Q       This is what who had on?

17         A       Bam Bam.

18         Q       And this is before she went into the bedroom

19    and changed clothes; is that correct?

20         A       Yes.

21         MS. WILSON:   We move for the introduction of State's

22    Exhibit 47, 48 and 49.

23         MR. GOGGANS:   No objection.

24         THE COURT:   It will be admitted.

25         Q       I'm going to show you what's been marked

Ann H. Armstrong, RPR

1    State's Exhibit 46 and ask if you recognize that?

2        A       Well, one of them had a towel around their

3    neck.  I can't recall which one had it around their neck.

4        Q       And does this appear to be the towel that you

5    saw around one of their necks?

6        A       Yes.

7        Q       And when did you see one of them with a towel

8    around their neck?

9        A       When I met them.

10       Q       Earlier that day when they were walking along

11   the street?

12       A       Yes.

13       Q       Did they have it with them the whole time that

14   you were with them?

15       A       Yes.

16       Q       When they came out of the bedroom after

17   changing clothes, did they have the towel then?

18       A       No, ma'am.

19       Q       Do you recall whether or not they had the

20   towel when they came running from around the back of the

21   house?

22       A       No, ma'am, I didn't see it.

23       Q       Okay.  And does this picture depict the towel

24   that you saw them with earlier that day, one of the three of

25   them?

1        A       Yes.

2        MS. WILSON:  We move for the introduction of State's

3   Exhibit 46.

4        MR. GOGGANS:  No objection.

5        THE COURT:  It will be admitted.

6        Q       Now after they came out of the house, where

7   did they go?

8        A       They left -- they said they were going to Bam

9   Bam's house.

10       Q       And did you know where Bam Bam lived?

11       A       No.

12       Q       Had you ever been there before?

13       A       No.

14       Q       What did you do?

15       A       I told the guy Eman to show me where a phone

16   was so I could call my sister.  And he walked me over there

17   to the same neighborhood where they was.

18       Q       So did y'all go with the three of them, or did

19   you and Eman go at a different time?

20       A       Me and Eman, we left after.  They left before

21   we did.  They were running.

22       Q       They were what?

23       A       They were running.

24       Q       They were running.  And did you and Eman run

25   also, or did you walk?

1        A        We walked.

2        Q        You walked.  Okay.  So they ran on ahead of

3   y'all, and then y'all arrived at the house later?

4        A        Yes.

5        Q        When you got to Bam Bam's house, who was

6   there?

7        A        Her mother, her, Troll, Little J., and her

8   sister.

9        Q        Okay.  And what was happening when y'all got

10   to the house?

11        A        Well, when we got in there, when me and Eman

12   got there, they was in the bathroom.

13        Q        What was going on in the bathroom?

14        A        They was talking about how they were going to

15   split the money.

16        Q        Who in the bathroom talking about how they

17   were going to split up the money?

18        A        Well, to me it sounded like Little J. was

19   saying who was going to get what.

20        Q        Do you know who else was in the bathroom

21   besides Little J.?

22        A        Troll and Bam Bam.

23        Q        Troll and Bam Bam?

24        A        Yeah.

25        Q        Okay.  Did you ever see any money?

1       A       Yes, ma'am.

2       Q       And kind of money did you see?

3       A       If I'm not mistaken it could have been about

4    $360.

5       Q       About $360?

6       A       Yes, ma'am.

7       Q       Who had the money when you saw it?

8       A       Little J.

9       Q       And did you see anybody else receive any of

10   that money?

11      A       Yeah, he gave Troll some of it.

12      Q       Okay.  So Troll got some of it.  Did anybody

13   else get any of the money that you saw?

14      A       No.    He gave me sixty dollars, and he told

15   me to give Eman some of it.  But I gave it back to him.  I

16   told him I didn't want anything to do with it.   I told him,

17   they did it.  They can split the money up between them.   I

18   didn't want anything with it.

19      Q       At this point did you know what had happened?

20      A       Yes.

21      Q       And how did you know what had happened?

22      A       Because --

23      MR. GOGGANS:  Objection, Your Honor.  May I

24   approach?

25          (The following occurred at the bench outside the

```
 1    hearing of the jury:)

 2         MR. GOGGANS:  The way the question is worded, I have

 3    absolutely no idea -- there may be an improper hearsay

 4    statement coming.  The way the question is worded we object

 5    on hearsay, confrontation cross examination.

 6         THE COURT:  I will sustain the objection.

 7         (The following occurred in the presence and hearing

 8    of the jury:)

 9         Q    Back at the Reeves' house, did you hear any

10    conversation between the three of them?

11         A    Really they were coming out of the door.

12         Q    Who was doing the talking?

13         A    Matthew.

14         Q    Matthew, and who was Matthew talking to?

15         A    Really he was, you know, saying he made the

16    money.

17         Q    Okay.  What exactly did Matthew say?

18         A    He made the money.

19         Q    He made the money?

20         A    I made the money; I made the money.

21         Q    And how many times did he say that?

22         A    Several times.  I couldn't say how many times

23    he said it, but he said it several times.

24         Q    Okay.  Other than saying I made the money; I

25    made the money, did he say anything else?
```

Ann H. Armstrong, RPR

1      A      Well, when I was trying to find out what

2  happened to the man, I asked them did they hurt the man; did

3  they shoot the man.  The girl said they left him --

4      MR. GOGGANS:  Objection.

5      THE COURT:  Sustained.

6      A      The girl --

7      Q      Okay.  Never mind.  Forget what Bam Bam said.

8  So after Bam Bam said whatever she said, was that before or

9  after Matthew said I made the money; I made the money?

10     A      It was before.

11     Q      So when you got to Bam Bam's house, what

12 happened there?  After they got in the bathroom and split up

13 the money, what happened then?

14     A      They was shooting dice.

15     Q      Who was shooting dice?

16     A      Little J. and another guy was shooting some

17 dice.

18     Q      And what was Matthew doing during this time?

19     A      First he was looking at the dice game, but

20 then when a song came on the radio, he started throwing a

21 gang sign.

22     Q      What song came on the radio?

23     A      Makaveli Hail Mary.

24     Q      Hail Mary?

25     A      Uh-huh.

Ann H. Armstrong, RPR

1    Q        And what did he start doing when that song

2    came on?

3    A        Started throwing up a gang sign.

4    Q        What sign is that?

5    A        FOLK sign.

6    Q        And can you demonstrate what sign that was

7    that you saw him throw?

8    A        (Witness complies.)

9    Q        And what was he doing during the time he is

10   throwing up this gang sign?

11   A        He was throwing different signs and naming

12   them.

13   Q        He was throwing different signs and naming

14   them?

15   A        Yes.

16   Q        Did he do anything else there while that song

17   came on?

18   A        No.  Basically what they usually do when they

19   throw a sign, you know, they act like they are shooting guns

20   and stuff like that.

21   Q        Tell the ladies and gentlemen of the jury what

22   you mean when he was shooting the gun?

23   A        He threw another sign like -- he thew another

24   sign of another gang up, and then they act like he had a gun

25   and he shot it out.

1    Q      Can you show the ladies and gentlemen of he

2   jury what you saw him do?

3    A      Well, it was like he had a gun and was

4   shooting it.

5    Q      Did he say anything at the time he did the gun

6   sign?

7    A      Yes, but I can't recall what he said.

8    Q      You can't recall what he said?

9    A      No.

10    Q      And was this with the music?

11    A      Yes.

12    Q      Was he standing there?  Was he moving about?

13    A      No, like moving to the music.

14    Q      He was moving to the music when he was showing

15   the signs and racking the gun and whatever he was doing with

16   the gun?

17    A      Uh-huh.

18    Q      And he was saying things, but you don't recall

19   what he said?

20    A      No.

21    Q      Now how long did this go on?

22    A      Well, to the middle of the song I would say.

23    Q      What happened after that?

24    A      Well, everybody got interested in the dice

25   game.

```
 1          Q       Okay.  And how long did the three of them stay
 2   there?
 3          A       I would say about forty or forty-five minutes
 4   afterwards, they left.
 5          Q       Okay.  And what did you do?
 6          A       I stayed there and the guy Eman.
 7          Q       Okay.  And did you know where they went?
 8          A       No.
 9          Q       Did you see them again that night?
10          A       No.
11          Q       How much longer did you stay at Bam Bam's?
12          A       Until about 12:30.
13          Q       And then where did you go?
14          A       Home.
15          Q       And how did you get home?
16          A       Bam Bam's sister had asked some guy named
17   Sumpter to take me home.
18          Q       So you caught a ride home?
19          A       Yeah.
20          Q       And what did you do when you got home?
21          A       I went in and told my brother-in-law about my
22   car, and I needed him to go with me and find it so I can get
23   it.
24          Q       So you went back and got your car?
25          A       Yes, ma'am.
```

Ann H. Armstrong, RPR

1    Q      Did you ever go around or down the alley to

2    look at the truck?

3    A      No.

4    Q      So you went back to Matthew Reeves' house and

5    got your car, and then where did you go?

6    A      I got in my car and went home.

7    Q      All right.  And you didn't see Julius or

8    Matthew again that night?

9    A      No.

10   Q      Did you see him the next morning?

11   A      No.

12   MS. WILSON:  That's all.

13                      CROSS EXAMINATION

14   BY MR. GOGGANS:

15   Q      Do you recall when it was that you came up to

16   stay in Selma?

17   A      Sir?

18   Q      When was it that you came up to stay up here

19   in Selma?

20   A      Around the beginning of November.

21   Q      Of 1996?

22   A      Yes, sir.

23   Q      And who were you staying with while you were

24   up here?

25   A      My sister, Etta Blackmon.

1       Q       I'm sorry.  I couldn't hear you.

2       A       My sister, Etta Blackmon.

3       Q       And what address was this?

4       A       220 Cedar Drive.

5       Q       And you're back down in Camden now; is that

6    right?

7       A       I don't understand.

8       Q       You're back down in Camden now; you don't live

9    in Selma anymore?

10      A       No.

11      Q       What are you doing down in Camden?

12      A       I go to school down there.

13      Q       Where are you in school?

14      A       School.

15      Q       Where are you in school?

16      A       I'm not in school at the moment, but I attend

17   school now.

18      Q       Where?

19      A       Wilcox Senior High.

20      Q       What are you doing now?

21          MR. GREENE:  I object to that, Your Honor.  He's not

22   in school, and that's immaterial.

23          THE COURT:  Overruled.  Let me ask y'all to approach

24   the bench.

25          (The following occurred at the bench outside the

Ann H. Armstrong, RPR

1   hearing of the jury:)

2        THE COURT:  I don't mind you asking him questions as

3   long as it's not regarding some suspension or some expulsion

4   from school for which there has not been some type of

5   appropriate charge or conviction I should say.  I don't know

6   where you're going with that.

7        MR. GOGGANS:  If he has got charges hanging over his

8   head, he would have a bias in favor of the state.

9        MR. GREENE:  It's totally unrelated to anything here.

10       THE COURT:  Is there any agreement on this guy?

11   What I'm saying is, is there an appropriate conviction that

12   you're aware of that you can cross examine him on?

13       MR. GOGGANS:  No, I'm not.

14       THE COURT:  The second question is, is there any type

15   of agreement with the Defendant regarding his charges in

16   Wilcox County for his testimony here today?

17       MR. GREENE:  None whatsoever, nor in this case.

18       MR. GOGGANS:  Let me go ahead and state my grounds

19   why I think I should be able to go into this matter, what

20   the criminal charges are if he's in jail.  We think that we

21   are entitled as a matter of Alabama statutory law as well as

22   under the 6th and 14th amendment of the United States

23   constitution and Article 1, Section 6 of the state

24   constitution to be able to cross examine him to show any

25   possible bias that he may have in favor of the State or any

1    prejudice against the defense.  We think certainly if this

2    man has got criminal charges hanging over his head, he

3    wouldn't want to do anything to tick off the State.  But I

4    understand the Court is saying don't go into that.  I wanted

5    to make sure I don't have to ask every single question for

6    you to rule on it.

7          THE COURT:  Sustain the objection based on the fact

8    that number one, there is no agreement regarding this

9    testimony or any charges.  Number two, you can't tell me of

10   any conviction that would be an appropriate conviction for

11   impeachment purposes of his testimony, correct?

12         MR. GOGGANS:  As far as I know there is not.

13         (The following occurred in the presence and hearing

14   of the jury:)

15         Q     Mr. Powell, where was it that you first saw

16   the people that you picked up?

17         A     Out on Summerfield.

18         Q     And I believe you said somebody was waving at

19   you?

20         A     I waved first.

21         Q     You waved first.  Did he wave back?

22         A     Yes.

23         Q     Now I think you said that later on in the

24   evening Matthew was dancing and giving some kind of gang

25   signs; is that correct?

1        A       Yes.

2        Q       You said one of the signs he gave was the

3    Disciple sign?

4        A       Yes.

5        Q       Show us again what that sign is.

6        A       Right there.

7        Q       Let the record reflect he demonstrated what I

8    understand to be the Disciple gang sing.  Now Mr. Powell,

9    back when you saw these people, first saw the people before

10   you picked them up, you said you waved first and somebody

11   waved back.  Now was this waving like waving, or was this an

12   exchange of gang signs?

13       A       We was waving.

14       Q       Just waving; it wasn't a gang sign?

15       A       No, sir.

16       Q       Before you picked these people up, did you

17   know any of them?

18       A       No.

19       Q       Riding in the car, did you hear any talk about

20   going out to White Hall to rob some drug dealers?

21       A       No.  No one said nothing to me about it.

22       Q       I'm sorry.  I couldn't hear you.

23       A       No.

24       Q       No talk about going to White Hall to rob

25   anybody?

```
 1          A       (Witness shakes head negatively).

 2          Q       Now I believe you testified that you saw

 3   Matthew with what you said was either a gun or a stick; is

 4   that right?

 5          A       No, I seen Julius.

 6          Q       Julius with a gun or a stick.  Now where was

 7   it that you first saw that?

 8          A       When he came out of his cousin's house.

 9          Q       And that was in Selma?

10          A       Yes, sir.

11          Q       That was before y'all rode out on Highway 80?

12          A       Yes, sir.

13          Q       All right.  And where is it in your car that

14   he put that gun?

15          A       I didn't see him put the gun in the back, but

16   somehow the gun got to the back, but I didn't see it.

17          Q       It just somehow got back there?

18          A       Yes.

19          Q       Did you see him get in the car with it?

20          A       I didn't see -- I didn't see the gun out in

21   the open, but I knew he had something under there.

22          Q       This is Julius you're talking about?

23          A       Yes.

24          Q       And do you know from where he got that gun?

25          A       No, not really, but I will say he had to bring
```

Ann H. Armstrong, RPR

1    it out because I knew something was under it.

2              Q      Did you take him somewhere to get it?

3              A      He didn't say he was going to get no gun.  He

4    said, you know, take him over to his cousin's house.  He

5    didn't say for what reason.

6              Q      And you're saying he came back with the gun;

7    is that right?  When he came out of the house, he had the

8    gun?  Is that what you're saying?

9              A      Yeah.

10             Q      Who got the gun out of the car?

11             A      Bam Bam.

12             Q      Where did she take it?

13             A      She gave it to Julius.

14             Q      And what did Julius do with it?

15             A      He gave it to Matthew on the back of the

16   truck.

17             Q      He gave it to him on the back of the truck?

18             A      Uh-huh.

19             Q      Matthew was already on the back of the truck?

20             A      Yes.

21             Q      Did you see Matthew get onto the truck?

22             A      Yes.

23             Q      You saw Matthew get on the back of the truck,

24   and you saw Julius give Matthew the gun when he was on the

25   back of the truck; is that right?

```
 1        A       Yes.

 2        Q       Now your car broke down out off of Highway 80;

 3   is that right, somewhere out off of 80?

 4        A       Yeah, on a dirt road.

 5        Q       On a dirt road.  And you got towed back to

 6   Selma; is that right?

 7        A       Yes.

 8        Q       And your car was unhooked in front of Matthew

 9   and Julius' house; is that correct?

10        A       Yes.

11        Q       At that point did you have any plans on how

12   you were going to get your car fixed?

13        A       Any plans on how to get it fixed?

14        Q       Right.

15        A       Well, take it to the Nissan place.

16        Q       I understand later on you left there and went

17   over to Bam Bam's house; is that correct?

18        A       Yes.

19        Q       Did you tell the jury that while you were

20   sitting in the car -- you sat in the car with Eman, right?

21        A       Yes.

22        Q       After the car was unhooked?

23        A       Yes.

24        Q       How long did y'all sit in the car?

25        A       We sat in the car for about fifteen or twenty
```

Ann H. Armstrong, RPR

1    minutes.

2          Q       And from there you went to Bam Bam's?

3          A       Well, yes.

4          Q       Did I understand your testimony correctly to

5    be that while you were sitting in the car you didn't hear a

6    gunshot?

7          A       I did.

8          Q       You did hear a gunshot; that was your

9    testimony?

10         A       Yes.

11         Q       And that was while you were sitting in the

12   car?

13         A       Yes.

14         Q       Do you remember testifying before the grand

15   jury here in Selma in January of 1997?

16         A       I remember testifying before them.  I can't

17   say when it was.  I don't recall.

18         Q       But you do remember testifying?

19         A       (Witness nods head affirmatively).

20         Q       And you were under oath?  Did they swear you

21   in, ask you to swear to tell the truth?  Do you remember

22   that?

23         A       Yes, sir.

24         Q       All right.  Do you remember one of the jurors

25   asking you did you hear the shots, and do you remember

```
 1   telling the jury no, sir?

 2        A      I don't recall saying that.

 3        Q      Are you saying you didn't say that, or you

 4   don't recall saying that?

 5        A      I'm saying I don't remember saying that.

 6        Q      Do you remember telling the grand jury under

 7   oath, I didn't know nothing about nobody getting shot or

 8   anything?

 9        A      No, I didn't know that -- I probably would

10   have answered like that.

11        Q      Do you remember telling the grand jury, I

12   didn't know nothing about nobody got shot or anything?

13        A      No.

14        Q      Do you remember saying that?

15        A      No.

16        Q      Let me let you look over this just a little

17   bit and see if that refreshes your memory.  Start here about

18   page 12 here and just read over that and see if that

19   refreshes your memory any about getting asked that question.

20   Do you remember that now?

21        A      I still don't remember saying I didn't hear

22   shots.

23        Q      On page four do you remember the District

24   Attorney asking you when did you first see the shotgun; do

25   you remember saying, well, when we got back to Selma, when
```

1  we got back to Selma, they were like in front of their

2  house.  Do you remember telling the District Attorney that?

3        A       I don't remember telling them, but I could

4  have told because we was front of their house when I seen

5  it.

6        Q       Now in the back of the truck did I understand

7  you correctly to say that Matthew was on the left side?

8        A       Matthew was on the driver's side.

9        Q       And did I hear you correctly to say that Mr.

10 Johnson was the man who hooked up the car to his truck?

11       A       I didn't know the man.

12       Q       Well, the man in the truck is the one who

13 actually hooked your car up to his truck; is that right?

14       A       Yes.

15       Q       And before that a white man that came by, did

16 I understand you -- who was it that talked with that man?

17 Do you remember?

18       A       Me.

19       Q       You.

20       MR. GOGGANS:  Nothing else.

21       MS. WILSON:  No further questions for this witness.

22       THE COURT:  Thank you, sir.

23       (The witness was excused from the witness stand.)

24       THE COURT:  Ladies and gentlemen, we will stop today

25 at this point and be recessed for the evening.  I'm going to

Ann H. Armstrong, RPR

1   ask you all to please recall the instructions that I have

2   given you throughout these proceedings not to discuss the

3   facts of the case among yourselves.   Please don't discuss

4   the facts of the case with any family members or spouse.

5        Now there has been throughout the course of the

6   proceeding today -- the news media has been in and out.   I

7   anticipate and fully expect there to be some news accounts

8   in the morning in the Selma Times Journal and perhaps the

9   Montgomery Advertiser regarding these proceedings.   Please

10   avoid reading those newspapers tomorrow.   Please avoid any

11   media television coverage of this proceeding tonight and in

12   the morning.   If in fact you are exposed to some type of

13   news coverage, please let me know immediately upon your

14   return to court in the morning.   Please be back in the

15   morning and reassembled in the jury at room 9:00 a.m.   Thank

16   you very much.   I hope you have a good evening.

17        (Court was adjourned for the day.)

18

19

20

21

22

23

24                                January 29, 1998

25

Ann H. Armstrong, RPR