# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MATTHEW REEVES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| xi. | ) | Case No.  1:17-cv-00061-KD-MU |
| | ) | |
| JEFFERSON S. DUNN, | ) | |
| Commissioner of the Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

# VOLUME 7

# State Court – Trial, Reporter's Record

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
    CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

803

1          THE COURT:  Ms. Trotter, how about stepping over this

2    way.  When I arrived in the office this morning, I was

3    approached by Ms. Trotter who is one of our jurors.  She

4    indicated to me at that time that she had recalled during

5    the course of the last evening that the codefendant Julius

6    Reeves had about six or seven years ago stolen her vehicle

7    and that this was or this started a string of events and

8    thefts that also took place in Bibb County that her family

9    was involved in on an intimate basis I guess you would say

10   and that it deeply affected Ms. Trotter and her family, this

11   car theft involving Julius Reeves.  She does not recall

12   whether Matthew was involved.  She does recall the name of

13   Danny Tate and that there were four or maybe five other

14   people involved in the theft and other events that

15   surrounded the theft of this vehicle.

16         Ms. Trotter has indicated to me that she believes

17   that this event and the events that surrounded this theft

18   would have an adverse impact on her ability to be fair and

19   impartial in this case.  And at this time I'm going to

20   excuse Ms. Trotter.  And our first alternate will be taking

21   her place.  Is there any objection?

22         MR. GREENE:  None from the State.

23         MR. GOGGANS:  None from the defense.

24         THE COURT:  There is no objection.  I want to thank

25   you for your time.

Ann H. Armstrong, RPR

804

1          (Ms. Trotter was excused.)

2          MR. GOGGANS:  Your Honor, yesterday when we were

3    discussing the matter about the statements given by witness

4    Brenda Suttles that we had seen.  We would mark them and

5    make that a part of the record.  They will now be marked as

6    Defendant's 3 and 4.  Also with respect to witness Jason

7    Powell, we had a side bar at which the Court ruled that we

8    would not be allowed to ask Mr. Powell questions along the

9    lines of what if any criminal cases he had pending in Wilcox

10   County.  The State said that they were aware that things

11   were pending.  Mr. Wiggins this morning went into the

12   clerk's office and pulled up some computer records that

13   would indicate we think what we would have been able to show

14   had we been able to go into that.  That's marked as

15   Defendant's Exhibit Number 5.  And just for purposes of the

16   record we would like to put that in the record.

17          THE COURT:  Let me ask you a question though because

18   I did rule on your objection or the State's objection to

19   your question regarding Jason Powell's pending charges.  Can

20   you tell me or give me any indication as to how that would

21   be admissible under Alabama rules of evidence?

22          MR. GOGGANS:  It would be admissible to show bias of

23   the witness in favor of the State, that he would have a

24   reason with all of these things hanging over his head to do

25   everything he can to help himself in those cases by

Ann H. Armstrong, RPR

1    testifying in this case.

2         MR. GREENE:  We counter that with the fact that

3    there is no evidence of that.  To impeach a witness you need

4    a conviction of a crime involving moral turpitude or some

5    other evidence to show that the witness has some particular

6    reason, a deal or an understanding, an agreement or

7    something of that nature.  But the mere fact that he's been

8    charged with something is not permitted under the law

9    neither by the State or the defense.

10         THE COURT:  That was my --

11         MR. GREENE:  The man gave these statements back way

12    before he had any charges brought against him.  There is no

13    understanding whatsoever.

14         THE COURT:  Are you telling me that the statement

15    that Jason Powell gave to the police pre-dated the charges

16    that are presently pending?

17         MR. GREENE:  Yes, sir.

18         MR. GOGGANS:  We would say the rule -- we cite

19    Alabama Rules of Evidence 616, impeachment by evidence of

20    bias, prejudice or interest.  I'm reading out of Gamble's

21    Alabama Rules of Evidence trial manual.  This rule retains

22    the preexisting Alabama practice allowing one to impeach a

23    witness with evidence of acts, statements, or relationship

24    indicating bias.  The case cites the bias that may be shown

25    includes both bias for a party and against a party.

806

1    THE COURT:  How do you want to respond to the fact

2  that the statement given pre-dates the charge?

3    MR. GOGGANS:  I think that would go to the weight

4  rather than admissibility.

5    MR. GREENE:  The State's biggest problem in this case

6  we weren't real sure how Mr. Jason was going to respond, and

7  he is now in jail.  And we are now putting him -- we have

8  got to deal with what we've got.

9    THE COURT:  My ruling will stand.  Your exception is

10  noted for the record.

11    (The following occurred in the presence and hearing

12  of the jury:)

13    THE COURT:  Good morning.  It's a little more

14  comfortable in here today.  I don't know why.  I doubt it's

15  from anything that I asked the commission to do.  I did this

16  morning find it necessary to excuse one of the jurors.  And

17  so we will be proceeding at this time with thirteen, and, of

18  course, one is an alternate.  The purpose for this

19  particular juror having been excused, of course, is no fault

20  of her own.  So I don't want you to think that she has done

21  anything wrong.  It's just based on a conversation that I

22  had with her.  I found it appropriate and necessary to

23  excuse her.

24    At this time we are going to proceed with testimony

25  in this case.  We will take testimony through about 10:30,

Ann H. Armstrong, RPR

807

1    take a break then and maybe get a cup of coffee for ten or

2    fifteen minutes, and then we will proceed with testimony up

3    until 12:00 o'clock.  We'll have an hour and a fifteen

4    minutes for lunch, and then our afternoon schedule will be

5    basically the same as yesterday.

6                         RICHARD FERRELL,

7    after having been duly sworn, was examined and testified as

8    follows:

9                        DIRECT EXAMINATION

10   BY MR. GREENE:

11       Q       State your name to the ladies and gentlemen of

12   the jury, please?

13       A       Richard Ferrell.

14       Q       Mr. Ferrell, you are a little hard of hearing

15   you told me?

16       A       Yes, sir, I am.

17       Q       I hope I'm speaking loud enough so you can

18   hear me.  Sir, in his lifetime you knew and worked with Mr.

19   Willie Johnson, Jr.; is that correct?

20       A       Yes, sir.

21       Q       And y'all worked at the what place of

22   business?

23       A       Selma Housing Authority.

24       Q       All right, sir.  You were a supervisor there

25   during the time that he worked there?

                    Ann H. Armstrong, RPR

808

1   A  Yes, sir.

2   Q  All right sir.  And did y'all, sir -- how long

3 had he worked there, sir, at the time of his death?

4   A  He started work there June the 6th, 1977.

5   Q  And did he work continuously there in that

6 department?

7   A  Yes, sir.

8   Q  And on the day before Thanksgiving, sir, of

9 1996, did y'all work that day?

10   A  Yes, sir.

11   Q  And what time did y'all -- I'll use the term

12 knock off or lay off or quit working that day I guess is the

13 best way to put it?

14   A  3:30 that afternoon.

15   Q  Was that a set time, or is that when y'all

16 usually got off, or did y'all do it early because of the

17 holiday coming or what?

18   A  We left thirty minutes early because of the

19 holiday.

20   Q  Okay.  And did in fact Mr. Willie Johnson, Jr.

21 work that day?

22   A  Yes, sir.

23   Q  And did he in fact leave or knock off with the

24 rest of y'all at 3:30?

25   A  Yes, sir.

Ann H. Armstrong, RPR

809

1        Q     All right, sir.  Now on that day, sir, did

2  y'all get paid that particular day?  That's the day before

3  Thanksgiving?

4        A     Yes, sir.  We got paid on the 27th at 1:00

5  o'clock.

6        Q     And how does everybody get paid, and how did

7  they get paid that day?  What do you have do with it if

8  anything?

9        A     I bring the checks from the main office and

10  give them to Ms. Edwards.

11        Q     Who is Ms. Edwards?

12        A     She is the secretary.

13        Q     Okay.

14        A     And at 1:00 o'clock that day, she gave the

15  checks out when everybody came back from lunch.

16        Q     Were you there when everybody got paid?

17        A     Yes, sir, I was.

18        Q     Did you get your check?

19        A     Yes, sir.

20        Q     Did you see Mr. Johnson get his check?

21        A     Yes, sir.

22        Q     I think that's all.

23     MR. GOGGANS:  No questions.

24     MR. GREENE:  Thank you very much.  We would like to

25  excuse this witness.

Ann H. Armstrong, RPR

1          (The witness was excused from the witness stand.)

2          THE COURT:  Call your next witness.

3                        JULIE DRINKARD,

4    after having been duly sworn, was examined and testified as

5    follows:

6                        DIRECT EXAMINATION

7    BY MR. GREENE:

8          Q     Tell us your name, please, ma'am.

9          A     Julie Drinkard.

10         Q     And where are you employed?

11         A     Selma Housing Authority.

12         Q     In what capacity do you serve there?

13         A     I'm an accountant.

14         Q     All right.  And in the courses of your duties

15   there please, ma'am, do you deal with the payroll?

16         A     Somewhat, yes.

17         Q     And in specifics, Mr. Willie Johnson, Jr.

18   worked for the Housing Authority, Mr. Willie Johnson, prior

19   to his death, did he not?

20         A     Yes, that's correct.

21         Q     And he had worked there for a number of years?

22         A     Yes.

23         Q     All right.  And on the day before Thanksgiving

24   of 1996, the employees there at the Authority were paid; is

25   that correct?

                    Ann H. Armstrong, RPR

1       A       That's correct.

2       Q       And was he also paid?

3       A       Right.

4       Q       And did you issue or have dealing with that

5   particular check?

6       A       Not at that time.

7       Q       When did you have dealing with the check,

8   please, ma'am?

9       A       I run the checks off the computer and then put

10  them in envelopes, and then I give them back to my

11  supervisor.

12      Q       Okay.  And do you also receive the checks when

13  they are cashed and returned?

14      A       Yes.

15      Q       All right.  And did you at our request locate

16  Mr. Johnson's check?

17      A       Yes, I did.

18      Q       All right.  Do you have it with you at this

19  time?

20      A       I do.

21      MR. GREENE:  Your Honor, we would like to have the

22  original marked and substitute for that a copy and ask that

23  the copy be marked and the original be attached to it, have

24  y'all seen the original?

25      (State's Exhibit Number 51 was marked for

Ann H. Armstrong, RPR

812

1    identification.)

2         Q      All right.  I'm showing you Exhibit 51 and

3    also with it is the original check you just handed me.

4    Would you compare those two and tell us if in fact that is

5    an exact and correct copy of that check?

6         A      Yes, it is.

7         Q      All right.  And does this check bear, please,

8    ma'am, the endorsing signature on the back?

9         A      Yes, it does.

10        Q      Both the original and the copy?

11        A      Yes.

12        Q      And could you tell us please, ma'am, based on

13   your knowledge and experience and dealing with Mr. Johnson

14   through the years if in fact that's his signature on the

15   back of the check?

16        A      That is his signature.

17        MR. GREENE:  All right.  We move for the introduction

18   of State's Exhibit 51, please, sir.

19        THE COURT:  It will be admitted.

20        MR. GREENE:  At this time I'm going to return the

21   original cancelled check to her so she may leave with it if

22   that's all right.  That's all we have.

23        MR. GOGGANS:  No questions.

24        THE COURT:  Thank you, Ms. Drinkard.  You're excused.

25        (The witness was excused from the witness stand.)

Ann H. Armstrong, RPR

1         THE COURT:  Call your next witness.

2                    EVERLENE WILLIAMS,

3    after having been duly sworn, was examined and testified as

4    follows:

5                    DIRECT EXAMINATION

6    BY MR. GREENE:

7         Q      State your name and your employment, please,

8    ma'am?

9         A      My name is Everlene Williams.  I am employed

10   at the Selma Police Department.  I am a correctional

11   officer.

12        Q      And in that capacity, please, ma'am, is it

13   part of your job to -- is it part of your job to book and/or

14   fingerprint inmates as they are booked into the jail, people

15   that are arrested and charged there, drunk drivers, assaults

16   murders, rapes, whatever comes through?

17        A      Yes, sir.

18        Q      And you are among several different people who

19   do that on your various shifts; is that correct?

20        A      That's correct.

21        Q      And did you please, ma'am, have occasion to

22   take fingerprints of one Brenda Suttles?

23        A      Yes, sir.

24        Q      In the course of your duties?

25        A      Yes, sir.

                  Ann H. Armstrong, RPR

814

1    Q    Do you know her?

2    A    Yes, sir.

3    (State's Exhibit Number 52 was marked for

4    identification.)

5    Q    I'm showing you Exhibit 52 please, ma'am, and

6    ask you if you will examine those cards and tell us what

7    they are?

8    A    These are major case fingerprints.  I did the

9    ones on Brenda Suttles which is called Brenda Bam Bam

10   Suttles.

11   Q    And you know her well?

12   A    Yes, sir.

13   Q    No problem with you knowing who she is and

14   identifying her and knowing that that is her prints?

15   A    No.

16   Q    These cards have basically three containers.

17   You took all of these; is that correct?  No, ma'am, you took

18   one of these?

19   A    Just one.

20   Q    All right.  Did you take this second one?

21   A    Yes, sir.  I did those.

22   Q    All right.  I think that's all.  And this card

23   now, please, ma'am, is in the same or substantially the same

24   condition as it was when you completed it, this card and the

25   palm print card?

815

1       A       Yes, sir.

2       Q       On Brenda Suttles?

3       A       Yes, sir.  It looks like the same.

4       Q       You don't show anything different or changed,

5  do you, in any way?

6       A       No.

7       Q       Other than that big red sticker, of course?

8       A       Yes, sir.  These are the same prints that I

9  did except for the red sticker.

10       Q       Thank you, ma'am.

11       MR. GREENE:  We move for the introduction of State's

12  Exhibit 52 if the Court please.

13       MR. GOGGANS:  No objection.

14       THE COURT:  It will be admitted.

15                         CROSS EXAMINATION

16  BY MR. GOGGANS:

17       Q       Ms. Williams, back in November of '96, did you

18  take any fingerprints from a Jason Powell?

19       MR. GREENE:  We object, Judge.  No, I withdraw that.

20  Go ahead,

21       A       Jason Powell?

22       Q       Yes, ma'am.  Do you recall doing that?

23       A       I can't recall.

24       Q       Do you recall taking fingerprints back in

25  November of '96 from someone named Emanuel Suttles?

```
 1          A       Suttles?

 2          Q       Not Bam Bam but Emanuel Suttles?

 3          A       I think I do.  I'm not one hundred percent

 4    sure.

 5          Q       You don't recall?

 6          A       No, sir.

 7          MR. GOGGANS:  No other questions.

 8          MR. GREENE:  Thank you, ma'am.

 9          (The witness was excused from the witness stand.)

10                        EMANUEL SUTTLES,

11    after having been duly sworn, was examined and testified as

12    follows:

13                        DIRECT EXAMINATION

14    BY MR. GREENE:

15          Q       State your name to the ladies and gentlemen of

16    the jury, please.

17          A       Emanuel Suttles.

18          Q       Mr. Suttles, how old are you?

19          A       Sixteen.

20          Q       Okay.  Do you know the Defendant here, Matthew

21    Reeves?

22          A       Yes, sir.

23          Q       Do you know his brother, Julius?

24          A       Yes, sir.

25          Q       Do you know Brenda Suttles known as Bam Bam?
```

1    A      Yes, sir.

2    Q      What kin is she to you?

3    A      Cousin.

4    Q      All right.  Where were you living, sir, in

5  Thanksgiving 1996?

6    A      314 Lavender.

7    Q      Who all lived there with you?

8    A      Me, Brenda, her sister, and her girlfriend and

9  her mother.

10    Q      All right.  And had you known Matthew prior to

11  that day, Thanksgiving 1996?  Had you seen him, been with

12  him, been around him prior to that day?

13    A      Yes, sir.

14    Q      Matthew and Julius?

15    A      Yes, sir.

16    Q      Did they have any -- did Matthew have a

17  nickname or street name that you knew about?

18    A      Troll or Little Mack.

19    Q      Little Mack or Troll.  What about Julius, did

20  he have any kind of street name or --

21    A      J.

22    Q      J.  Now on the day before Thanksgiving 1996,

23  the day all of this happened, are you with me on this?

24    A      Yes, sir.

25    Q      Were you home that morning, the early part of

Ann H. Armstrong, RPR

818

1    that afternoon?

2           A      Yes, sir.

3           Q      Did Julius and Matthew come over to your

4    house?

5           A      Yes, sir.

6           Q      All right.  Was Brenda, Bam Bam, there

7    somewhere?

8           A      Yes, sir.

9           Q      About what time did they come over to the

10   house?

11          A      About 12:00 noon.

12          Q      That's an estimate on your part?

13          A      Yes, sir.

14          Q      You wasn't writing it down, taking any notes

15   or anything.  All right.  Now were they discussing going

16   somewhere or leaving or going out?

17          A      Yes, sir.

18          Q      What did they talk about?  And by they, I mean

19   Julius, Bam Bam and Matthew?

20          A      Talked about going to make a lick.

21          Q      Make a what?

22          A      A lick.

23          Q      Make a lick.  Well, did you hear them talking

24   about that?

25          A      Yes, sir.

Ann H. Armstrong, RPR

819

1       Q       And were you -- who all was there when they

2   were discussing that besides you and the three of them?

3       A       Willie was outside when they were discussing

4   it.

5       Q       Y'all were outside.  So it was just you and

6   the three of them?

7       A       Yes, sir.

8       Q       Did anybody say where they were going to go

9   make this lick?

10      A       Not at the time.

11      Q       Well, did y'all go get in the car and drive

12  away or walk away, or did somebody come get you or what to

13  go do this lick?

14      A       Walk away.

15      Q       All right.  Did you have any idea where y'all

16  were going at that point?

17      A       No, sir.

18      Q       But you were just going to walk with them?

19      A       Yes, sir.

20      Q       How old were you then?

21      A       Fifteen.

22      Q       Where did y'all walk to?

23      A       Across town behind McDonald's.

24      Q       Across town.  You got over behind McDonald's.

25  That's a pretty good walk, isn't it?

Ann H. Armstrong, RPR

820

1    A    Yes, sir.

2    Q    Did anybody make any reference to why you were

3  walking that far?

4    A    Not that I can remember.

5    Q    As y'all were -- when y'all got over in that

6  general area, do you know where Cedar Park is?

7    A    Yes, sir.

8    Q    You went over where McDonald's is?

9    A    Yes, sir.

10   Q    They are across town from where you live,

11  aren't they?

12   A    Yes, sir.

13   Q    But they are not right next to each other, are

14  they?

15   A    Not exactly.

16   Q    All right.  Did y'all go by Cedar Park?

17   A    Yes, sir.

18   Q    And did you actually go to McDonald's itself?

19   A    No, sir.

20   Q    But you went in that area behind it?

21   A    Yes, sir.

22   Q    Okay.  Over there where the houses are or out

23  there on the street where all the hamburger places are?

24   A    By the houses.

25   Q    While you were over there, did you run into

Ann H. Armstrong, RPR

821

1    anybody with a car?

2          A      Yes, sir.

3          Q      Who?

4          A      Jason Powell.

5          Q      Did you know Jason?

6          A      No, sir.

7          Q      Had you known him before that day?

8          A      No, sir.

9          Q      Did you understand if anyone else in the group

10   knew him?

11         A      Yes, sir.

12         Q      Who was it that was supposed to know him?

13         A      Julius.

14         Q      So you understood Julius knew him or knew

15   something about him?

16         A      Yes, sir.

17         Q      Was it your understanding that y'all were

18   looking for him?

19         A      No, sir.

20         Q      All right.  But did he come by?

21         A      Yes, sir.

22         Q      What happened when he came by?

23         A      They had flagged him down.

24         Q      Who flagged him?

25         A      Julius.

Ann H. Armstrong, RPR

822

1    Q        Where were y'all the best you remember?

2    A        Where were we?

3    Q        Yeah.  Where were you when Julius was flagging

4  down Jason Powell?

5    A        On some street by Cedar Park.

6    Q        Was Jason driving a car or a truck or what?

7    A        A car.

8    Q        Did he stop?

9    A        Yes, sir.

10   Q        Do you remember anything about how he flagged

11 him down or what he did to flag him down?

12   A        No, sir.

13   Q        Did Julius talk to Powell?  Did Julius talk to

14 Powell?

15   A        Yes, sir.

16   Q        Did Bam Bam talk to him, Matthew talk to him,

17 you talk to him while y'all were there on the street?

18   A        I think all of us said something to him.

19   Q        What were y'all talking about?

20   A        Catching a ride.

21   Q        Did he agree to let y'all ride with him?

22   A        Yes, sir.

23   Q        Did you all get in the car?

24   A        Yes, sir.

25   Q        All right.  After you got into the car, did

Ann H. Armstrong, RPR

823

1    you, Bam Bam, Matthew or Julius or Jason say anything about

2    where y'all were going to go or what you were going to do?

3         A       Not that I can remember.

4         Q       All right.  Where did you go?

5         A       To some brick house down by Selma High.

6         Q       Some brick house near what, Selma?

7         A       High.

8         Q       Selma High.  When you got to that house, what

9    happened?

10        A       Julius got out of the car and went in the

11   house.

12        Q       Did anybody else go in with him?

13        A       No, sir.

14        Q       All right.  Did he come back out of the house?

15        A       Yes, sir.

16        Q       When he did, did he bring anything with him

17   that you could see?

18        A       Yes, sir.

19        Q       What did he bring with him?

20        A       A gun.

21        Q       A gun.  What kind of gun?

22        A       Like a sawed off hand gun.

23        Q       You see this gun, don't you?

24        A       Yes, sir.

25        Q       Exhibit 39, did it look like this?

Ann H. Armstrong, RPR

824

1       A     Yes, sir.

2       Q     All right.  When he brought this back to the

3 car, what did he do with it?

4       A     Put it in the car beside him.

5       Q     Where was he sitting?

6       A     In the front seat.

7       Q     Powell was driving?

8       A     Yes, sir.

9       Q     Where were you sitting?

10      A     In the back.

11      Q     Okay.  What part of the back?

12      A     The middle.

13      Q     Where was Bam Bam?

14      A     On the side, I don't know which side.

15      Q     Where was Troll here, Matthew?

16      A     On the other side.

17      Q     What did y'all do then with reference to the

18 car?

19      A     We left.

20      Q     Where did you drive out to?

21      A     Going out towards Southside.

22      Q     Do you know where Southside School is?

23      A     Yes, sir.

24      Q     All right.  Was anybody discussing where you

25 were going or why you were going there that you recall?

825

| | | |
|---|---|---|
| 1 | A | Going down to some drug dealer's house. |
| 2 | Q | What were you going to do there? |
| 3 | A | They were going to rob him. |
| 4 | Q | Did anybody use the word, making a lick again? |
| 5 | A | I can't remember. |
| 6 | Q | Who was talking about robbing drug dealers? |
| 7 | A | Julius. |
| 8 | Q | Anybody else? |
| 9 | A | Not that I remember. |
| 10 | Q | Was that your understanding as y'all drove |

11  out, that you were going with them to rob a drug dealer?

| 12 | A | Yes, sir. |
| 13 | Q | All right.  Y'all drove on out past Southside |

14  School you said?

| 15 | A | Yes, sir. |
| 16 | Q | Did anybody say where the drug dealers were |

17  supposed to live?

| 18 | A | Julius. |
| 19 | Q | Where did he say they were supposed to live? |
| 20 | A | Down towards White Hall. |
| 21 | Q | Have you ever been to White Hall? |
| 22 | A | No, sir. |
| 23 | Q | As y'all got out past Southside School, what |

24  happened next?

| 25 | A | We made a left turn down a dirt road. |

Ann H. Armstrong, RPR

```
 1         Q       Do you think you were at White Hall?

 2         A       I don't know.

 3         Q       You didn't know.  You turned down a dirt road.

 4  All right.  Y'all are going down a dirt road; everybody is

 5  still sitting where they were before?

 6         A       Yes, sir.

 7         Q       Is the gun still up front with Julius, or is

 8  it somewhere else by now?

 9         A       I can't remember.

10         Q       All right.  What happens next?

11         A       The car started acting up.

12         Q       It started acting up?

13         A       Yes, sir.

14         Q       What was it doing?

15         A       Cutting off.

16         Q       Okay.  Did it finally just cut off completely

17  and not run anymore?

18         A       Yes, sir.

19         Q       What did y'all do?

20         A       We tried to get it started back up.  We tried

21  to push it so it will start, but that didn't work.

22         Q       Are y'all still on the dirt road?

23         A       Yes, sir.

24         Q       Did anybody come by?

25         A       A white man in a pickup truck.
```

Ann H. Armstrong, RPR

1      Q      Did they talk to him?

2      A      Yes, sir.

3      Q      Who talked to him?

4      A      All of us.

5      Q      Did he say anything about helping you, push

6  you off, try to fix the car?

7      A      He said he was going down there to meet some

8  hunters.  When he come back, he will try to see if he can

9  help us.

10     Q      So he wasn't able to get y'all started?

11     A      No, sir.

12     Q      He wasn't a drug dealer, so y'all didn't rob

13  him, right?

14     A      No, sir.

15     Q      What did you do next out there on the road

16  now?  The man had left.  The car wouldn't start.  What did

17  you do next?

18     A      Sat back in the car and listened to music.

19     Q      Sir?

20     A      Sat in the car and listened to music.

21     Q      Did you try to get it started again, or did

22  you just give up on it?

23     A      Gave up.

24     Q      What happened next then?  Y'all are sitting

25  there in a broke down car waiting on this fellow to come

Ann H. Armstrong, RPR

828

1    back from hunting I guess.  What happens next?

2          A      First some people in a car came by, but they

3    couldn't do nothing.  So they left.

4          Q      Did they stop?

5          A      Yes, sir.

6          Q      All right.  Then what happened?

7          A      Julius went up to the car and talked to them,

8    but they left.  And that's when another man came by in a

9    pickup truck.

10         Q      Did you later learn what his name was?

11         A      No, sir.

12         Q      Was he the man that later got shot?

13         A      Yes, sir.

14         Q      Was he by himself?

15         A      Yes, sir.

16         Q      Okay.  Then when he came back, when this man

17   came and stopped, who stopped him?

18         A      Julius.

19         Q      How did he stop him?

20         A      He just flagged him down.

21         Q      Where were all of y'all?

22         A      Sitting in the car.

23         Q      Sitting in the car?

24         A      Yes, sir.

25         Q      Do you know where the gun was at that time?

Ann H. Armstrong, RPR

1      A      In the back seat.

2      Q      How did it get to the back seat if you know?

3      A      I can't remember.

4      Q      All right.  Who had the gun at that time?

5      A      Nobody.

6      Q      Was it laying up on the seat, on somebody's

7  lap, in the floor board or up in the back window or under

8  the seat?

9      A      In the floor.

10     Q      It was laying in the floor board.  In front of

11 you, in front of Bam Bam, in front of Matthew, Troll or who,

12 or do you know?

13     A      I can't remember.

14     Q      Did y'all get out when the man stopped?

15     A      Yes, sir.

16     Q      The man's name is Mr. Johnson.  Do you

17 remember that?

18     A      Yes, sir.

19     Q      So when Mr. Johnson stopped, y'all got out or

20 just you or just Julius?

21     A      All of us.

22     Q      Did y'all talk to him or all of you talk to

23 him or one of you talk to him, and what did y'all say?  What

24 all was said?

25     A      Julius asked him if he would tow us back to

830

1   Selma.

2       Q    All right.  Did he say he would?

3       A    Yes, sir.

4       Q    Did he do so?

5       A    Yes, sir.

6       Q    How did he tow you?

7       A    A hook chained up to the car.

8       Q    That's a pretty good tow, isn't it?

9       A    Yes, sir.

10      Q    How far do you reckon it is?

11      A    I don't know.

12      Q    When y'all were towed back to Selma now, where

13 did you sit?

14      A    In the back.

15      Q    Is that in the broke down car or in the back

16 of the truck?

17      A    Broke down car.

18      Q    All right.  Where did Brenda Suttles sit?

19      A    In the back seat.

20      Q    And where did Troll sit?

21      A    In the front.

22      Q    All right.  Where did Jason Powell sit?

23      A    On the driver's side.

24      Q    Where did Julius sit?

25      A    In the truck with Mr. Johnson.

Ann H. Armstrong, RPR

831

1    Q    Where was the shotgun?

2    A    Still in the car.

3    Q    What part of the car if you know?

4    A    The back on the floor board.

5    Q    In front of you, in front of Suttles or who?

6    A    In front of Suttles.

7    Q    Y'all went on back towards Selma.  Did you

8  stop on the way back as you were being towed?

9    A    Yes, sir.

10   Q    Where do you recall y'all stopped?

11   A    In front of a dump site or something, a

12  building or a dump truck.  We stopped there.

13   Q    There was a -- you said a, what, a dump site

14  or a place for dump trucks?

15   A    Yeah, a place for dump trucks.

16   Q    How did y'all come back into Selma?

17   A    Down Old Montgomery Highway.

18   Q    You didn't come down the bypass; you came down

19  the Old Montgomery Highway?  You don't remember?

20   A    No.

21   Q    When you stopped at this dump thing, whatever

22  it was, why did you stop, or do you know why you stopped?

23   A    I don't know.

24   Q    Were you near the big flea market out there?

25   A    Yes, sir.

Ann H. Armstrong, RPR

832

| | | |
|---|---|---|
| 1 | Q | When you stopped, did anybody get out of the |
| 2 | car? | |
| 3 | A | Not out of the car. |
| 4 | Q | Sir? |
| 5 | A | Not out of the car. |
| 6 | Q | Did anybody get out of the truck? |
| 7 | A | Yes, sir. |
| 8 | Q | Who got out of the truck? |
| 9 | A | Julius. |
| 10 | Q | All right.  Did Mr. Johnson get out of the |
| 11 | truck? | |
| 12 | A | No, sir. |
| 13 | Q | What did Julius do when he got out of the |
| 14 | truck? | |
| 15 | A | He came back to the car. |
| 16 | Q | Okay.  And did he say or speak to you and |
| 17 | Matthew, Troll, and Bam Bam and Powell? | |
| 18 | A | He just said something out loud. |
| 19 | Q | Said something out loud? |
| 20 | A | Yes. |
| 21 | Q | Could you hear it? |
| 22 | A | Yes, sir. |
| 23 | Q | Any reason why everybody else couldn't hear |
| 24 | it? | |
| 25 | A | No, sir. |

Ann H. Armstrong, RPR

833

1    Q      What did he say?

2    A      This is who we are going to get.  We are going

3  to get him.

4    Q      You are going to have to be slow and make it

5  so I can understand you.  I didn't quite understand you.

6    A      He said, this is who we are going to rob.  We

7  are going to get this man.

8    Q      This is something --

9    A      This is who we are going to rob.

10   Q      This is who we are going to rob?

11   A      Yeah.

12   Q      We are going to get this man?

13   A      Yes, sir.

14   Q      Did anybody say no or yes or anything?

15   A      They just was agreeing with him.

16   Q      Well, did they say yes or okay?

17   A      Like well do what you've got to do.

18   Q      So at this point now you decide y'all are

19  going to rob him too?

20   A      Me?

21   Q      Uh-huh.

22   A      No.

23   Q      Well, did you tell him you weren't going to go

24  rob him?

25   A      I wasn't going to do nothing.

Ann H. Armstrong, RPR

834

| | | |
|---|---|---|
| 1 | Q | You were just there? |
| 2 | A | Yes, sir. |
| 3 | Q | So what happens next? |
| 4 | A | We went back to Julius and them house. |
| 5 | Q | When y'all are out there at the dumpster, did |

6  you pull off, or did you adjust the chain, or what do you

7  do?

| 8 | A | Julius went and got back in the truck and |

9  pulled off.

| 10 | Q | And y'all went on? |
| 11 | A | Yes, sir. |
| 12 | Q | Where did you go? |
| 13 | A | To Julius and them house. |
| 14 | Q | Where is the car left? |
| 15 | A | In front of Julius and them house. |
| 16 | Q | Did Johnson unhook from the car? |
| 17 | A | Yes, sir. |
| 18 | Q | Get his chain? |
| 19 | A | Yes, sir. |
| 20 | Q | Did Julius get out of the truck when y'all |

21  stopped and parked the car?

| 22 | A | Yes, sir. |
| 23 | Q | Did y'all stay in the car, or did y'all get |

24  out, those of you in the broke down car?

| 25 | A | Get out I think. |

Ann H. Armstrong, RPR

835

1    Q      Did y'all have any discussions or

2  conversations among all of you including Troll here?

3    A      Not that I remember.

4    Q      All right.  After y'all are there at Julius

5  and them house, is there any -- what does everybody do?  Do

6  they go anywhere, stay there, or what do they do next?

7    A      Me and Jason stayed in the car.  And Matthew,

8  Brenda and Julius left with the man.

9    Q      Do you know where they were going or why they

10  left?

11    A      They said something about they was going to

12  somebody's house to get a ring.

13    Q      All right.  Who said that?

14    A      Julius.

15    Q      Who did he say that to, all of you or just

16  some of you or just you?

17    A      He just said that.

18    Q      Sir?

19    A      He just said it to all of us.

20    Q      Where was Mr. Johnson when he said this?

21    A      In the truck.

22    Q      Where were y'all?

23    A      I think we were standing out by the car.

24    Q      Now where did everybody get in the truck when

25  they left, when they drove away?  When Troll here left in

Ann H. Armstrong, RPR

836

1   the truck; Bam Bam left; Little J. left, and Mr. Johnson

2   left.  They all left together in the truck; is that right?

3        A      Yes, sir.

4        Q      Where were they sitting, on the end or out or

5   about the truck?

6        A      Julius was on the passenger side of the truck;

7   Matthew and Brenda was on the back of the truck.

8        Q      Now where was the shotgun?

9        A      Matthew had it.

10       Q      Did you see how this gun got from the back of

11  the car to Matthew on the back of the truck?

12       A      He put it up there.

13       Q      Sir?

14       A      He put it.  He put the gun up there, you know.

15  He hid it so the man wouldn't see it.

16       Q      How did he do that?

17       A      He had it down beside his leg.

18       Q      Show us what you are talking about.  Stand up

19  right here.

20       A      He hid it down beside him like this.

21       Q      So he came out of the car with it according to

22  what you saw?

23       A      When he was coming out of the car going

24  towards the truck, he had it sort of on the side of him like

25  that.

837

1      Q     Then when he got to the truck?

2      A     When he was getting on the truck, he had it on

3  his side.  And when he got on up, he hid it again.

4      Q     How did he get it out of the car, just go over

5  there and get it himself, or did somebody bring it to him,

6  give it to him or what?

7      A     I think Brenda gave it to him.

8      Q     Where were you during all of this time?

9      A     Standing up leaning on the --

10     Q     Where was Jason Powell?

11     A     Beside me.

12     Q     And they drove away?

13     A     Yes, sir.

14     Q     Troll here has got this shotgun; Bam Bam is on

15  the back.  Little J. is in the front, and Mr. Johnson is

16  driving away?

17     A     Yes, sir.

18     Q     Is it getting dark?  Is it still good light or

19  what about this time?

20     A     First dark.

21     Q     They were gone for awhile.  Did they come

22  back?

23     A     Yes, sir.

24     Q     Where did you and Jason Powell stay or go or

25  do while they were gone?

838

| | | |
|---|---|---|
| 1 | A | We sat inside the car. |
| 2 | Q | All right, sir.  Were you sitting inside the |

3  car when they came back?

| | | |
|---|---|---|
| 4 | A | Yes, sir. |
| 5 | Q | Did y'all go anywhere else or just stay there |

6  by the car?

| | | |
|---|---|---|
| 7 | A | Stayed there in the car. |
| 8 | Q | All right.  Did you see them when they came |

9  back in the truck?

| | | |
|---|---|---|
| 10 | A | Yes, sir. |
| 11 | Q | Was it getting dark? |
| 12 | A | Yes, sir, it was dark. |
| 13 | Q | Was there any light out there so you could |

14  see?

| | | |
|---|---|---|
| 15 | A | Yes, sir. |
| 16 | Q | When they came back, could you see Troll here? |
| 17 | A | Yes, sir. |
| 18 | Q | Where was he? |
| 19 | A | Behind Julius. |
| 20 | Q | All right.  He was behind Julius.  Now help me |

21  there.  Is he up in the cab now, or is he still on the back

22  of the truck or what?

| | | |
|---|---|---|
| 23 | A | He was on the back behind him. |
| 24 | Q | All right.  So he's on the back of the truck |

25  behind Julius?

839

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Is that the passenger side or the driver's |
| 3 | side? | |
| 4 | A | The passenger side. |
| 5 | Q | Where is Bam Bam, Brenda? |
| 6 | A | On the driver's side on the back of the truck. |
| 7 | Q | Where is Little J., Julius? |
| 8 | A | Still in the passenger side, the front of the |
| 9 | truck. | |
| 10 | Q | All right.  When they come back where do they |
| 11 | go? | |
| 12 | A | Down the alley. |
| 13 | Q | Was Mr. Johnson still in the truck? |
| 14 | A | Yes, sir. |
| 15 | Q | The same man? |
| 16 | A | Yes, sir. |
| 17 | Q | The man you now know to be Mr. Johnson? |
| 18 | A | Yes, sir. |
| 19 | Q | He was driving, or was somebody else driving? |
| 20 | A | He was still driving. |
| 21 | Q | And they turned and went down the alley? |
| 22 | A | Yes, sir. |
| 23 | Q | Are you and Powell still out there at the car |
| 24 | or in the car? | |
| 25 | A | In the car. |

Ann H. Armstrong, RPR

840

1    Q    Was there anybody else out there?

2    A    Not at that time, no, sir.

3    Q    Okay.  Had somebody been by before they came

4    back, talked to y'all or seen y'all?

5    A    Yes, sir.

6    Q    Who?  Do you know?

7    A    His sister, Marcy.

8    Q    Were they still there, or had they left?

9    A    They left.

10   Q    So you and Jason are sitting there in the car?

11   A    Yes, sir.

12   Q    They turned up in the alley?

13   A    Yes, sir.

14   Q    It's called Crockett's Alley, or you don't

15   know?

16   A    No.

17   Q    What happens next?

18   A    That's when we heard a gunshot.

19   Q    Did you hear one or two or three?

20   A    One.

21   Q    Did that cause you some concern?

22   A    Yes, sir.

23   Q    Did you hear any noise, people talking or

24   yelling or hollering or anything after you heard the shot?

25   A    No, sir.

Ann H. Armstrong, RPR

841

```
 1        Q        Are y'all still in the car, or did y'all get

 2   out?

 3        A        We was still sitting in the car.

 4        Q        After the shot then, what happens next?

 5        A        That's when Matthew and Brenda came running

 6   between their house and the neighbor's house.

 7        Q        They were running?

 8        A        Yes, sir.

 9        Q        Did you see the gun?

10        A        I can't remember.

11        Q        All right.  Where did they run to?

12        A        Inside the house.

13        Q        Did you see Julius?

14        A        Not at the time.

15        Q        Did you see him at any time after you saw them

16   or before you saw them?

17        A        After I saw them, he came from the opposite,

18   the other side of the house.  That would be the left side if

19   you're looking straight at the house.

20        Q        You said you don't remember seeing the gun.

21   Do you recall anybody having the gun at some point in time

22   during this running around the house?

23        A        I can't remember.

24        Q        Sir?

25        A        I can't remember.
```

Ann H. Armstrong, RPR

842

1    Q    When Julius came around, where were Matthew

2    and Bam Bam?

3    A    In the house.

4    Q    Where did he go?

5    A    Who, Julius?

6    Q    Uh-huh.

7    A    He came up on the porch and looked down at the

8    car and told us to come on in.

9    Q    Did he have the gun in his hands?

10   A    No, sir.

11   Q    Did you go in the house?

12   A    Yes, sir.

13   Q    Did Jason go in with you, or did he stay in

14   the car?

15   A    He went in with me.

16   Q    When you got in the house, sir, who had the

17   gun?

18   A    Matthew.

19   Q    All right.  What did he do with it?

20   A    Unloaded it.

21   Q    How did he unload it?

22   A    Just pumped it, and the shell came out.

23   Q    When you got in the house, what was Julius and

24   Matthew doing?

25   A    They were jumping up and hollering.

Ann H. Armstrong, RPR

843

```
 1            Q        Jumping up and hollering?

 2            A        Yeah, like look at all of the stuff we got.

 3            Q        What kind of stuff did they have that they

 4     were talking about?

 5            A        Like money.

 6            Q        Did you see money?

 7            A        Yes, sir.

 8            Q        Who was holding the money?

 9            A        Julius.

10            Q        What were they hollering?

11            A        Like, yeah, look at all the stuff we got, all

12     of the money we got.

13            Q        Holding onto each other?

14            A        Yes, sir.

15            Q        After that did Matthew or Julius say anything

16     to each other about what had happened?

17            A        Yes, sir.

18            Q        Tell us what was said.

19            A        Julius said, Troll, you almost shot me.

20            Q        What did Matthew say back to him?

21            A        No, I didn't because when I shot I aimed the

22     gun straight at his head.

23            Q        What did Julius say?

24            A        I felt the bullet shot.

25            Q        What did they then do?
```

Ann H. Armstrong, RPR

844

```
 1        A       Started changing clothes.

 2        Q       All three of them?

 3        A       Yes, sir.

 4        Q       Did they change clothes?

 5        A       Yes, sir.

 6        Q       When Matthew here took the shell out of the

 7   shotgun, what happened to it?  Do you know?

 8        A       He put it under the mattress.

 9        Q       The shotgun?

10        A       Yes, sir.

11        Q       What happened to the shell?

12        A       I can't remember.

13        Q       All right.  He put it under -- he put it under

14   the mattress.  The shotgun itself, this gun right here he

15   put under the mattress of a bed; is that right?

16        A       Yes, sir.

17        Q       Do you know whose bed it was?

18        A       His.

19        Q       Sir?

20        A       I can't remember.

21        Q       All right.  Now after they put the gun under

22   the mattress and ejected the shell from the gun and they

23   changed clothes, what did they do, Bam Bam, Troll, Little

24   J.?  What did they do?

25        A       We all left.
```

1    Q        And y'all left with them?

2    A        Yes, sir.

3    Q        Where did you go?

4    A        Back to Brenda's house.

5    Q        On the way over there did y'all all go in a

6    group?  Did you separate?

7    A        We separated.

8    Q        On the way over there did you see anybody or

9    meet anybody or talk to anybody?

10   A        We met some girl.

11   Q        You don't know her name?

12   A        No, sir.

13   Q        Who was with you and your group?

14   A        Me, Matthew and Jason.

15   Q        On the way over there or as y'all got started

16   to go over there, did you walk, stroll or run?

17   A        Kind of like jog.

18   Q        Was anybody encouraging you or trying to get

19   you all to run?

20   A        Yes, sir.

21   Q        Who was that?

22   A        Matthew.

23   Q        On the way over there did Matthew talk to or

24   see anybody or talk to anybody?

25   A        Yes, sir.

Ann H. Armstrong, RPR

846

1     Q     Who?

2     A     The girl.

3     Q     The same girl you were talking about?

4     A     Yes.

5     Q     Did you hear what was said between the two of

6  them?

7     A     Yes, sir.

8     Q     What was said?

9     A     He told her if the police asked them anything,

10  for her to tell the police he was with her.

11     Q     Did she reply?  Did she say yeah, nay or go

12  jump in the lake or what?

13     A     She said yes.

14     Q     And y'all went on where?

15     A     To Brenda's house.

16     Q     Did the girl come with you?

17     A     No, sir.

18     Q     When you got over to Bam Bam's house, who all

19  was there?

20     A     Her girlfriend and her mother, and I can't

21  remember the rest.

22     Q     Well, you were there, of course.  Who came

23  with you, Troll here?

24     A     And Jason.

25     Q     Was Little J. over there?

847

1    A      No.

2    Q      Did he come there where y'all were there?

3    A      Yes, sir.

4    Q      Did Bam Bam come there while y'all were there?

5    A      Yes, sir.

6    Q      Now when y'all got over to the house, was

7  anybody talking about what had happened?

8    A      Yes, sir.

9    Q      Who?

10    A      Matthew.

11    Q      What was he saying?

12    A      He had took Brenda's girlfriend in the back

13  and told her what happened.

14    Q      Did you hear that, or is that just what

15  somebody told you?

16    A      I heard it.

17    Q      What did he tell her?

18    A      Something about I got him and I am bad or

19  something like that.

20    Q      Okay.  I heard the part I'm bad.  What was the

21  other part?

22    A      Something about I got him.

23    Q      I got him, and I'm bad?

24    A      Yeah.

25    Q      What did he do with his hands if anything

848

```
 1    during this time?

 2         A       After that he started throwing gang signs.

 3         Q       Did y'all have the music on?

 4         A       Yes, sir.

 5         Q       So what was Troll doing to the music?

 6         A       Throwing gang signs and dancing.

 7         Q       Did you start dancing with him?

 8         A       No, sir.

 9         Q       Did Little J. dance with him?

10         A       No, sir.

11         Q       Bam Bam?

12         A       No.

13         Q       Where did she go?

14         A       In the bathroom.

15         Q       Now at some point in time did y'all go

16    somewhere where there was some money to be divided up while

17    y'all were over there at the house?

18         A       Yes, sir.

19         Q       Where did that take place?

20         A       In the bathroom.

21         Q       In the bathroom, all right.  And you were

22    present?

23         A       Yes, sir.

24         Q       Was Jason present?

25         A       Yes, sir.
```

Ann H. Armstrong, RPR

849

1    Q    Was Troll here present?

2    A    Yes, sir.

3    Q    Was Julius there?

4    A    Yes, sir.

5    Q    What about Bam Bam?

6    A    She was there too.

7    Q    Did y'all get any money?

8    A    No, sir.

9    Q    Who decided y'all wasn't -- by y'all that

10 means you, you and who?

11    A    Jason.

12    Q    But y'all didn't get any?

13    A    No, sir.

14    Q    But y'all were there?

15    A    Yes, sir.

16    Q    Who decided y'all weren't supposed to get any

17 money?

18    A    Julius said we are going to let Troll divide

19 it up since he shot the man.

20    Q    He said, we are going to let Troll divide up

21 because he's the one that shot the man?

22    A    (Witness nods head affirmatively).

23    Q    And what did y'all say to that?

24    A    Nothing, we just left.

25    Q    Y'all left.  Where did you go?

Ann H. Armstrong, RPR

850

| | | |
|---|---|---|
| 1 | A | Back in the room where the music was. |
| 2 | Q | How much money did they have?  Do you know? |
| 3 | A | No. |
| 4 | Q | Okay.  So y'all went back in the main room. |

5  What did the other people do, Troll, Bam Bam and Little J.?

| | | |
|---|---|---|
| 6 | A | They stayed in the bathroom. |
| 7 | Q | How long did they stay in there? |
| 8 | A | I can't remember. |
| 9 | Q | Well, did they finally come out of the |

10  bathroom?

| | | |
|---|---|---|
| 11 | A | Yes, sir. |
| 12 | Q | What happened next? |
| 13 | A | This dude came over, and they started shooting |

14  dice.

| | | |
|---|---|---|
| 15 | Q | Who all was shooting dice? |
| 16 | A | Just Julius. |
| 17 | Q | Julius and some dude? |
| 18 | A | Yes, sir. |
| 19 | Q | Did anybody else join in or watch the game? |
| 20 | A | We just watched. |
| 21 | Q | Was the music playing? |
| 22 | A | Yes, sir. |
| 23 | Q | Did anybody start dancing? |
| 24 | A | After the dice game? |
| 25 | Q | During the game or after the dice game or |

851

1    before the dice game?

2          A    Not during the dice game.

3          Q    How about before?

4          A    Just Matthew.

5          Q    What was he dancing?  What kind of dance was

6    he doing?  Tell us what kind of dance he was doing.

7          A    Like unloading a shotgun.

8          Q    How about standing up and show us.  Can you do

9    that?  Can you stand up right there and show us what you are

10   talking about?

11         A    I don't really know how to do it.

12         Q    What else was he doing?

13         A    Just doing his gang sign.

14         Q    Sir?

15         A    Just doing his gang sign.

16         Q    What kind of gang sign?

17         A    FOLK.

18         Q    What's folk?

19         A    What's folk?

20         Q    Yeah.  Is that a group or a sign or a gang?

21         A    An organization.

22         Q    Do you remember what everybody was wearing?

23   Do you remember what Julius had on that night?  Do you

24   remember what Matthew had on?

25         A    No.

Ann H. Armstrong, RPR

852

1    Q    Do you know what Bam Bam had on?

2    A    No, sir.

3    Q    Sir?

4    A    No, sir.

5    Q    After the dice game was over, where did you

6    go?

7    A    Stayed in the house.

8    Q    And did you stay there all night?

9    A    Yes, sir.

10   Q    Did anybody leave the house?

11   A    Yes, sir.

12   Q    Who left?

13   A    Brenda, Matthew and Julius.

14   Q    Where did Jason Powell go?

15   A    He stayed there with me.

16   Q    Sir?

17   A    He stayed in the house with me.

18   Q    Were you there when Troll or Little J. or Bam

19   Bam came back?

20   A    Yes, sir.

21   Q    When did they come back?

22   A    About an hour later.

23   Q    Did you leave with them again?

24   A    No, sir.

25   Q    Did they stay there or leave out again?

Ann H. Armstrong, RPR

853

| 1  | A | I think they left out again. |
| 2  | Q | And where did -- but you didn't go with them |

that time?

| 4  | A | No, sir. |
| 5  | Q | Were you there when they came back again? |
| 6  | A | Yes, sir. |
| 7  | Q | Were you asleep then, or were you up and saw |

that they came back?

| 9  | A | Up. |
| 10 | Q | All right.  Did they leave again? |
| 11 | A | Not that I remember. |
| 12 | Q | Where did everybody go to sleep if you know? |
| 13 | A | I can't remember. |
| 14 | Q | Where did you sleep? |
| 15 | A | In the back room. |
| 16 | Q | Where did Jason -- where was he? |
| 17 | A | He had left. |
| 18 | Q | Who did he leave with? |
| 19 | A | I don't know. |
| 20 | Q | Did anybody ever get around to doing any |

drinking or doing any drugs while you were over there?

| 22 | A | They had some beer and stuff. |
| 23 | Q | Sir? |
| 24 | A | Some beer and stuff. |
| 25 | Q | Did you drink some beer? |

Ann H. Armstrong, RPR

854

1      A     No, sir.

2      Q     Do you remember anybody having a Michigan

3  jacket, green and yellow that night?

4      A     I can't remember who had it on.

5      Q     Do you remember there was a such a jacket?

6      A     Yes, sir.

7      Q     But you don't remember who had it?

8      A     No, sir.

9      Q     Do you remember a Fila jacket?

10     A     Yes, sir.

11     Q     All right.  Do you remember who had that on?

12     A     No, sir.

13     Q     Did you get any of the money any time that

14  night from Troll or Julius?

15     A     No, sir.

16     Q     Did you go over to that alley and see what had

17  happened over there?

18     A     No, sir.

19     Q     Were you there when the police came the next

20  morning?

21     A     Yes, sir.

22     Q     Did they have you come down to the police

23  station and talk to them?

24     A     Not that morning.

25     Q     When did you go?

Ann H. Armstrong, RPR

855

1        A       Later on that week.

2        Q       Did you tell them what you told us?

3        A       Yes, sir.

4        MR. GREENE:   All right, sir.   Your witness.

5                        CROSS EXAMINATION

6    BY MR. WIGGINS:

7        Q       Flash me some of the gang signs you saw

8    Matthew doing.

9        A       I can't remember too many.

10       Q       You said there was FOLKS, Disciple?

11       A       Yes, sir.

12       Q       How do you know they were what they were?

13       A       I seen other folks doing it.

14       Q       What other folk?

15       A       Like people around my school.

16       Q       People there that night too?

17       A       Nobody other than him.

18       Q       Okay.   You told the jury earlier that when

19   y'all first left, they were talking about getting a lick?

20       A       Yes, sir.

21       Q       You told us that a lick was a robbery, did you

22   not?

23       A       Yes, sir.

24       Q       You indicated to Mr. Greene that you had

25   talked to police the morning after this, right?

856

1     A     I don't know if it was the morning after.

2     Q     But the following day sometime?

3     A     Yes, sir.

4     Q     Do you remember Detective Grindle there asking

5   you some questions?

6     A     Yes, sir.

7     Q     And he asked you the question, were they

8   talking about getting a lick, and you said yes?

9     A     Yes, sir.

10    Q     And you said what do you think they were

11   talking about.  Have you ever heard of a lick called a

12   robbery?  What was your response?

13    A     No.

14    Q     That's what you told this detective, right?

15    A     Right.

16    Q     That day?

17    A     Yeah.

18    Q     But you told Ed and the jury today -- you told

19   them today everything you told Grindle that day; didn't you

20   say that?

21    A     Yes, sir.

22    Q     When you all first met Jason when you all were

23   walking, Jason threw a gang sign, didn't he?

24    A     I don't know.  I can't remember.

25    Q     And didn't Julius throw up a gang sign back to

Ann H. Armstrong, RPR

857

1    Jason?

2        A       I didn't see them throw it.  I can't remember.

3        Q       So you are telling the jury that this stranger

4    just stopped?

5        A       I didn't know.  I saw him flag him down.  I

6    don't recall him throwing up a gang sign.

7        Q       How did he flag him down?

8        A       He threw up his hands.

9        Q       How did he throw up his hands?

10       A       Like that.

11       Q       And you all got in the car?

12       A       Yes, sir.

13       Q       And you said that's when they were talking

14   about the lick?

15       A       Earlier too.

16       Q       And you were there?

17       A       Yes, sir.

18       Q       And you knew what they were going to do?

19       A       Yes, sir.

20       Q       You got in the car with that knowledge, right?

21       A       What?

22       Q       You got in the car knowing that, right?

23       A       Yes, sir.

24       Q       And you headed to rob some drug dealers?

25       A       Yes, sir.

Ann H. Armstrong, RPR

858

1    Q    You're still in the car?  Are you still in the
2    car?
3    A    Yes, sir.
4    Q    Not trying to get out, not trying to go get
5    the police?
6    A    No, sir.
7    Q    Not trying to turn yourself in.  It was Julius
8    who was the one talking about that lick, right?
9    A    Yes, sir.
10   Q    And as y'all were driving down -- you
11   indicated that this first driver came by; the white male
12   came by?
13   A    Yes.
14   Q    Correct?
15   A    Yes, sir.
16   Q    Then you said another driver came by; were
17   there two persons in the car?
18   A    Two.
19   Q    You indicated after the white male came by in
20   the truck there was another vehicle that by came with two
21   persons in it?
22   A    Yes, sir.
23   Q    That car left, and then Mr. Johnson came by?
24   A    Yes, sir.
25   Q    You indicated also that at some point before

Ann H. Armstrong, RPR

859

1    you went on the dirt road that Julius had gone to the house

2    to get the gun?

3         A       Yes, sir.

4         Q       How was Julius carrying the gun when he came

5    out of the house?

6         A       Down beside him.

7         Q       You could see it?

8         A       Yes, sir.

9         Q       And other persons in the car could see it to

10   your knowledge?

11        A       Yes, sir.

12        Q       So you all knew it was a gun?

13        A       Yes, sir.

14        Q       Did you get out of the car at that time?

15        A       (Witness shakes head negatively).

16        Q       Did you go call the police at that time?

17        A       No, sir.

18        Q       And you said he tucked the gun and sat it

19   beside him on the front seat, right?

20        A       Yes, sir.

21        Q       And Jason was driving?

22        A       Yes, sir.

23        Q       Did he put the gun down beside Jason?

24        A       Did he put what?

25        Q       The gun, when he got in the car as a

860

1    passenger, did he put the gun on this side?

2          A      I don't know what side he put it on.

3          Q      But he put it there in the front with him?

4          A      Yes, sir.

5          Q      That's when Jason drove you all around?

6          A      Yes, sir.

7          Q      You also indicated at some point the gun got

8    in the back seat?

9          A      Yes, sir.

10         Q      Didn't know how it had happened?

11         A      No, sir.

12         Q      But you indicated it was near Bam Bam?

13         A      Yes, sir.

14         Q      Was Bam Bam holding it?

15         A      Not that I remember.

16         Q      But she knew it was there?

17         A      Yes, sir.

18         Q      Were y'all listening to any music?

19         A      Yes, sir.

20         Q      What kind of music?

21         A      You are talking about in the car?

22         Q      Yes, sir.

23         A      I can't remember.

24         Q      Rap music?

25         A      Yes, sir.

Ann H. Armstrong, RPR

861

1        Q        Same rap music y'all listen to all the time?

2        A        Yeah.

3        Q        Some of that same rap music you all were

4 listening to when y'all were at Bam Bam's house?

5        A        I don't know if it was the same one or not.

6        Q        Same type?

7        A        Yes sir.

8        Q        And that was Jason's rap music y'all were

9 listening to in the car, right?

10       A        Yes, sir.

11       Q        Matthew didn't put the rap music, set a tape

12 in there, did he?   Did Matthew put the cassette tape in

13 there?

14       A        In where, in the car?

15       Q        Right.

16       A        I don't think so.

17       Q        You also indicated when Jason, that when

18 Julius talked about going to rob somebody, that Matthew and

19 Bam Bam said, they went down with that.   Did they say that?

20       A        Yes, sir.

21       Q        What did you say?

22       A        Nothing.

23       Q        You were coming down.   You stalled.   Mr.

24 Johnson hooked you all up and brought you all back to Selma,

25 right?   You said at some point you all stopped?

Ann H. Armstrong, RPR

862

1          A      Yes.

2          Q      And then Julius, Bam Bam and Matthew and Mr.

3   Johnson leave, right?

4          A      Yes, sir.

5          Q      You and Jason stayed in the car.  Did y'all go

6   call the police?

7          A      No, sir.

8          Q      Did y'all leave?

9          A      No, sir.

10          Q      You said you were concerned at some point?

11          A      Yes, sir.

12          Q      You weren't concerned enough to go call the

13   police?

14          A      No, sir.

15          Q      Then you said that you saw the truck come

16   back?

17          A      Yes, sir.

18          Q      That's when you saw where everyone was sitting

19   on the truck?

20          A      Yes, sir.

21          Q      Where was Matthew on the truck when he came

22   back?

23          A      Behind the passenger, behind Julius on the

24   passenger side on the back of the truck.

25          Q      When they came back, did they stop to talk to

Ann H. Armstrong, RPR

863

1    you all?

2         A    No, sir.

3         Q    Did he drive right by you all, or were they on

4    a different street?

5         A    Right by us.

6         Q    They went right by you all.  Did they say

7    anything?

8         A    No, sir.

9         Q    Did they wave or do anything like that?

10        A    (Witness shakes head negatively).

11        Q    You're shaking your head no?

12        A    Yes.

13        Q    And at some point you said you heard a

14   gunshot?

15        A    Yes, sir.

16        Q    And then you saw Matthew and Bam Bam running?

17        A    Yes, sir.

18        Q    They were running together, right?

19        A    Yes, sir.

20        Q    Bam Bam was right behind Matthew or in front

21   of him?

22        A    I can't remember.

23        Q    But they were together?

24        A    Yes, sir.

25        Q    And then you saw Julius at some point later?

Ann H. Armstrong, RPR

864

1    A    Yes, sir.

2    Q    And that's when Julius called you and Jason?

3    A    In the house.

4    Q    You all went in the house?

5    A    Yes, sir.

6    Q    And went inside one of the rooms?

7    A    Uh-huh.

8    Q    Jason was with you?

9    A    Yes, sir.

10   Q    Do you know which room you all went into?

11   A    Their room.

12   Q    The bedroom?

13   A    Yes, sir.

14   Q    Did Jason leave?

15   A    No, sir.

16   Q    Did you leave?

17   A    No, sir.

18   Q    So you all are in the room, and Julius you

19   said is talking about what he had done?  Julius is talking

20   about what he had done when it happened, the hollering?

21   A    Yes.  All of them were hollering.

22   Q    Julius hollered about having robbed somebody?

23   A    Huh?

24   Q    Julius was hollering about having robbed

25   somebody?

Ann H. Armstrong, RPR

865

```
 1          A        Having robbed somebody?  What do you mean by

 2   that?

 3          Q        What was Julius hollering about?

 4          MR. GREENE:  Objection.  The evidence isn't Julius

 5   hollered about anything.  It presumes a fact not in

 6   evidence.

 7          THE COURT:  Overruled.

 8          Q        You said they were hollering, right?

 9          A        Yes, sir.

10          Q        What were they hollering about?

11          A        Like yeah, I got them.  I mean, yeah, look at

12   all of the stuff we got.

13          Q        Who was saying that?

14          A        All of them.

15          Q        Did you all leave at that time?

16          A        After they changed clothes.

17          Q        I'm talking about Jason.  Did you and Jason

18   decide to leave?

19          A        No, sir.

20          Q        You stayed there?

21          A        Yes, sir.

22          Q        Watched them change clothes?

23          A        Yes, sir.

24          Q        And then you said you all left together?

25          A        Yes, sir.
```

Ann H. Armstrong, RPR

866

```
 1          Q       Julius and Bam Bam ran, right?

 2          A       I don't know if they ran, but I know they

 3    left.

 4          Q       They left together?

 5          A       Yes.

 6          Q       You, Jason, and Matthew were together?

 7          A       Yes, sir.

 8          Q       You say at some point you get to Bam Bam's

 9    house?

10          A       Yes, sir.

11          Q       You mentioned earlier that Bam Bam's

12    girlfriend was there.  What are you talking about

13    girlfriend?

14          MR. GREENE:  Objection, immaterial.

15          Q       Did Bam Bam have a girlfriend?

16          MR. GREENE:  Objection, it's immaterial.

17          THE COURT:  Overruled.

18          Q       Bam Bam's girlfriend like I would have a

19    girlfriend, like that?

20          A       (Witness nods head affirmatively).

21          Q       What's her name?

22          A       Yolanda Blevins.

23          Q       Is that the person they call Molly Blevins?

24          A       Yes, sir.

25          Q       How do you know that's her girlfriend?
```

Ann H. Armstrong, RPR

867

1       MR. GREENE:  Once again, Your Honor, I think we've

2  covered this area sufficiently.  We object to it.

3       THE COURT:  Overruled.

4       Q    Have they been dating a long time?

5       A    Yes, sir.

6       Q    You indicated she stayed at the house; Molly

7  stayed at the house with Bam Bam?

8       A    She stayed at the house with her.

9       Q    You told the jury earlier that the person that

10  lived at the house included the girlfriend, but are you

11  saying that Molly lived at that house with Bam Bam?

12       A    Yes, sir.

13       Q    Do you recall the police coming to the house

14  that night to get Matthew?

15       A    That night?

16       Q    Right, or some time earlier that morning?

17       A    Yes, that next morning.

18       Q    Was anybody in the bed with Bam Bam that

19  morning?

20       A    Yes, sir.

21       Q    Was that Molly, her girlfriend?

22       A    Yes, sir.

23       Q    And you indicated you were in the back room?

24       A    Yes, sir.

25       Q    Who was back there with you?

868

```
1        A      I can't remember.

2        Q      You don't remember who was in the back room

3    with you?  Was somebody in there with you?

4        A      Not that I remember.

5        Q      Where was Julius?

6        A      In the bed with my cousin.   Are you talking

7    about the morning when they came and picked up Matthew,

8    where was he then?

9        Q      I'm sorry.

10       A      What are you talking about?  You asked me

11   where was Julius.

12       Q      That morning?

13       A      At first he was in the bed with my cousin,

14   yeah.

15       Q      Then the cops came, and he went where?

16       A      In the -- he was hiding in the closet under

17   some dirty clothes.

18       Q      You indicated that at some point y'all left

19   Julius and Matthew's house.  You all went to Brenda's house?

20       A      Yes, sir.

21       Q      And that Matthew was doing some type of

22   dancing?

23       A      Yes, sir.

24       Q      What were you doing?

25       A      Standing there watching.
```

Ann H. Armstrong, RPR

869

1      Q     You indicated they said something about he had

2  shot him or something?

3      A     Yes, sir.

4      Q     You indicated earlier that you had given a

5  statement to Detective Grindle some time that day?

6      A     Correct.

7      Q     Detective Grindle was asking you some

8  questions about what Matthew was doing.  He says, once he

9  had gotten there, what did he say or do, and what was your

10  response.

11      A     Nothing.

12      Q     That's what you told Detective Grindle, right?

13      A     Yeah.

14      Q     You said Matthew was just dancing?

15      A     Uh-huh.

16      Q     Didn't say a word?

17      A     No, not at the time he was dancing.

18      Q     Who put the music on that Matthew was dancing

19  to?

20      A     I can't remember.

21      Q     Matthew didn't put it on, did he?

22      A     I can't remember.

23      Q     He didn't bring the tape or the CD with him,

24  did he?

25      A     I don't think so.

Ann H. Armstrong, RPR

870

1      Q      In fact the music was playing when you all got

2  there, right?

3      A      I know some music was playing, but I don't

4  know what.

5      Q      But some kind of rap music though was playing,

6  right?

7      A      I think so.

8      Q      And you indicated that he was doing, that he

9  had a gun or something in his hands pretending like?

10     A      Yes.

11     Q      And that's the kind of music he listens to all

12  the time, isn't it?

13     A      Yes.

14     Q      That's the kind of dance he does all the time,

15  isn't it?

16     A      Yes, sir.

17     Q      So what he was doing, he was just acting out

18  to the music?

19     A      Yes.

20     Q      And you had seen him do that several other

21  times, the shotgun?

22     A      Yeah.

23     Q      That's in that song?

24     A      It is in the song, right.

25     Q      That demonstration in that song he was

Ann H. Armstrong, RPR

871

1    listening to?

2         A      No, just whatever, you know, kind of rap song,

3    I've seen him doing that.

4         Q      You've seen him doing that all the time?

5         A      Yes.

6         Q      And have you seen him do that dance you saw

7    him doing all the time?

8         A      That's all he was doing, mostly doing was kind

9    of moving around and acting like he was pumping a shotgun.

10        Q      You've seen him doing that all the time?

11        A      Yes.

12        Q      He does that all the time when that rap music

13   is on, right?

14        A      Well, any kind of rap music.

15        Q      Are you in a gang?

16        A      No, sir.

17        Q      Let's get this straight.  You are there you

18   say when they are first talking about this robbery.  You are

19   riding in the car.  Then you see the gun.  You heard the

20   shot.  You heard them talking about the incident.  You left

21   with them going to Brenda's house afterwards?

22        A      Right.

23        Q      Were you arrested?

24        A      No, sir.

25        Q      Were you charged with conspiracy or anything

Ann H. Armstrong, RPR

872

1    like that?

2         A       No, sir.

3         Q       You knew about it, and you still weren't

4    charged?

5         A       (Witness shakes head negatively).

6         Q       So when the police talked to you, they allowed

7    you to go?

8         A       Yes, sir.

9         Q       You testified earlier that you said Matthew

10   was saying things.  Did you say that?

11        MR. GREENE:  I'm sorry.  I didn't understand you.

12        Q       You indicated that Matthew was talking and

13   said he shot this guy, right?

14        A       Like while he was dancing?

15        Q       At some point he said that?

16        A       He said he shot the guy?

17        Q       Right.

18        A       Yes, sir.

19        Q       When did he say that?

20        A       I know he said it when we was in the house,

21   and he told Brenda's girlfriend that.

22        Q       Okay.  And did he say why he shot him?

23        A       I can't remember.

24        Q       All right.  Detective Grindle asked you that

25   same question in terms of when he was talking about why he

Ann H. Armstrong, RPR

873

 1   got him, did he say why he did it, and what was your -- read

 2   your response.

 3           A       No.  He didn't say nothing like that.

 4           Q       So he didn't say nothing like why he shot him

 5   then, did he?  He was just dancing?

 6           A       Yeah.

 7           Q       He didn't say he shot him because he robbed

 8   him, did he?

 9           A       What?

10           Q       He didn't say he shot him because he robbed

11   him, did he?

12           A       He shot him because he robbed him?

13           Q       He didn't say that, did he?

14           A       (Witness shakes head negatively.)

15           Q       You have to say something so the court

16   reporter can take down what you say.  When you shook your

17   head, what do you mean, yes or no?

18           A       I can't really understand your question.

19           Q       I'm sorry.  He didn't say he shot him because

20   he robbed him, did he?

21           A       Not because he robbed him.

22           Q       Did he say that, yes or no?

23           A       He didn't say.

24           Q       Do you know what the dance called the Bankhead

25   is?

Ann H. Armstrong, RPR

874

1    A    Yes, sir.

2    Q    Demonstrate that for me.

3    A    It's something like that.

4    Q    Leaning over doing that too?

5    A    Yes, sir.

6    Q    And you do that all the time when you're

7    dancing, right?

8    A    No, sir.  I can't do it.

9    Q    You couldn't do what you just did?

10   A    Not that well.

11   Q    Bam Bam, Matthew would do that all the time

12   when they are dancing, right?

13   A    Yes.

14   Q    And that's just when someone is leaning over

15   or you're leaning over dancing?

16   A    Yes.

17   Q    Just a moment.  The money that you mentioned

18   that they had at the house in the bathroom, they didn't try

19   to give you all any, did they?

20   A    At first they were going to give us some, but

21   they changed their mind.

22   Q    Who changed their mind?

23   A    Julius.

24   Q    You all didn't say anything about it?

25   A    No, sir.

875

```
 1          MR. WIGGINS:  Nothing further, Your Honor.

 2                    REDIRECT EXAMINATION

 3   BY MR. GREENE:

 4          Q       When you talked to Detective Grindle, y'all

 5   had about a thirty page conversation; is that about right?

 6   It went on for awhile; isn't that correct?

 7          A       Yes, sir.

 8          Q       You were asked about -- at some point in time

 9   did Detective Grindle ask you did the Defendant, Troll,

10   over there say why he did it.  And you said, no, he didn't

11   say nothing about that; that's correct, isn't it?

12          A       Yes, sir.

13          Q       Just before that question though, Detective

14   Grindle asked you, how was Troll acting; tell me what he was

15   doing.  What was your answer?

16          A       He just smiled and laughing and talking.

17          Q       And saying what?

18          A       And, yeah, I got that nigger.

19          Q       And what else did you say?

20          A       And all of that.

21          Q       And what else?

22          A       And you know, his eyes were halfway closed,

23   and he was just laughing.

24          Q       His eyes were halfway closed?

25          A       Yes, sir.
```

Ann H. Armstrong, RPR

876

1      Q     And he was just laughing?

2      A     Yes, sir.

3      Q     And stuff?

4      A     Yes, sir.

5      Q     And doing this gang sign?

6      A     Yes, sir.

7      Q     When y'all went in there to split up the

8  money, what was it that Jason, that Julius said about

9  splitting up the money?  What did you tell Detective

10  Grindle?

11      A     They said we are just going to let Troll split

12  it up since he shot the man.

13      Q     Over on page 19 when you talked to Detective

14  Grindle, he asked you, with reference to Troll, so he was

15  dancing to the music doing gang signs.  Why was he doing it,

16  because he had shot the gun?  What was your answer?

17      A     I guess so.

18      Q     All right.  And your next answer was, I guess

19  that's the reason he was doing it.  He was celebrating?

20      A     Yes.

21      Q     Now you also said that when they came in the

22  house, they were jumping up and down and holding onto each

23  other and hollering yeah, yeah, yeah; is this right?

24      A     Yes, sir.

25      Q     Is that what you saw?

Ann H. Armstrong, RPR

877

1     A     Yes, sir.

2     Q     Who was doing that now?

3     A     Brenda, Julius and Matthew.

4     Q     All three of them?

5     A     Yes, sir.

6     Q     And what was Troll saying, Matthew?  What was

7  he saying about it as they were jumping up and down?

8     A     Not too much, you know.  They kept hollering,

9  look at all the money we got.

10    Q     Did he say something about he had shot him; he

11  was bad?

12    A     Yes, sir.

13    Q     Thank you, sir.  That's all.

14                    RECROSS EXAMINATION

15  BY MR. WIGGINS:

16    Q     Mr. Suttles, earlier you had told the jury

17  that Matthew pulled two persons back in the room and told

18  them something when he was back in Brenda's house?

19    A     Yes, sir.

20    Q     You said he pulled two individuals back in the

21  room or pulled them aside and told them something?

22    A     Two?

23    Q     Right.  You said a young lady, somebody named

24  Joyce or George.  When you were at the house, at Brenda's

25  house, what two persons did Matthew talk to about he had

Ann H. Armstrong, RPR

878

1    shot somebody?

2         A      I just remember Molly.

3         Q      Who?

4         A      Molly, Yolanda Blevins.

5         Q      Was there anyone with Yolanda when he went

6    back there?

7         A      I can't remember.

8         Q      You said you overheard this, right?

9         A      Yes, sir.

10        Q      Where did he and Yolanda go when they talked?

11        A      In the room next behind where the music was

12   playing.

13        Q      You were in that room?

14        A      Where the music was.

15        Q      And you could hear from --- the music was on,

16   and they were in another room, and you could hear that?

17        A      Yeah, they was right there.

18        Q      You were right where?

19        A      In the next room right there.

20        Q      Where were you?

21        A      Right there by the wall because I was getting

22   ready to go in the kitchen.

23        Q      And which bedroom in Brenda's house are you

24   talking about they went into?

25        A      The bedroom right beside Brenda's bedroom.

Ann H. Armstrong, RPR

879

1        Q        Page twelve when you were talking to Detective

2   Grindle, you had told the jury earlier that when the man

3   brought you all back to Selma the first time, you and Jason

4   stayed in the car, that Brenda, Julius and Matthew left with

5   the guy and came back?

6        A        Yes, sir.

7        Q        And you saw them?

8        A        Yes, sir.

9        Q        Let's go back to what you told Detective

10  Grindle on page 12.  You said that when Julius came back

11  from the truck talking for him to get out of -- I'm reading

12  it the way it's written, to get him out, to get the gun out,

13  they got out, and Brenda and Matthew got out.  Matthew put

14  the gun on the back of the truck, and they left.  And we

15  ain't seen him come back.  Is that what you told Detective

16  Grindle?

17       A        I probably did.  I can't remember.

18       Q        Okay.  Then you said you heard a shot?

19       A        Yes, sir.

20       Q        So you are trying to say you forgot what you

21  told him back then?

22       A        Not everything.

23       Q        Okay.  Just what you wanted to remember?

24       MR. GREENE:  I object to that, Your Honor.

25       MR. WIGGINS:  Nothing further, Your Honor.

Ann H. Armstrong, RPR

880

1          THE COURT:  Sustain the objection.

2                    REDIRECT EXAMINATION

3    BY MR. GREENE:

4          Q      And you also told Detective Grindle on page 14

5    that when they came around the house, you saw who had the

6    shotgun after the shot, didn't you, up at the top?  So

7    Julius went behind the house, and Matthew and Bam Bam come

8    up beside the house.  You said, yes.  Is that right?  Yeah.

9    Now when they came around the house, who had the gun.  You

10   said Matthew, didn't you?

11         A      Yes, sir.

12         Q      But you didn't remember that awhile ago, did

13   you?

14         A      No, sir.

15         Q      Thank you, sir.  That's all.

16         THE COURT:  Anything else?

17         MR. GREENE:  Nothing from this witness.

18         (The witness was excused from the witness stand.)

19         THE COURT:  Ladies and gentlemen, let's go ahead and

20   take a break.  Let's take 15 minutes.  Please be back and

21   reassembled in the jury room at ten until 11:00 please.

22   Don't discuss the facts of the case among yourselves.  Don't

23   allow anyone to approach you and discuss the facts of the

24   case with you.

25         (A recess was taken.)

Ann H. Armstrong, RPR

1          (The following occurred in the presence and hearing

2    of the jury:)

3                    TAMEISHA JACKSON,

4    after having been duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7    BY MS. WILSON:

8          Q      State your name, please?

9          A      Tameisha Jackson.

10         Q      Now Tameisha, you're going to have to talk

11   louder so each one of these ladies and gentlemen can hear

12   what you have to say, okay.  How old are you, Tameisha?

13         A      Fifteen.

14         Q      And where do you live?

15         A      112 Gregory.

16         Q      And who did you live there with?

17         A      My mama.

18         Q      And are you in school?

19         A      Yes.

20         Q      And where do you go to school?

21         A      Phoenix Center.

22         Q      And do you have any children?

23         A      No.

24         Q      Now do you know Matthew Reeves?

25         A      Yes.

882

```
 1          Q       How do you know Matthew?

 2          A       He stayed around in my neighborhood I used to

 3   stay at.

 4          Q       He used to stay in the neighborhood where you

 5   stayed?

 6          A       Yes.

 7          Q       How long have you known Matthew?

 8          A       For a long time.

 9          Q       Y'all have grown up together basically?

10          A       Yes.

11          Q       Okay.  Now do you recall the day before

12   Thanksgiving of last year, Wednesday before Thanksgiving of

13   last year, the day all of this stuff happened that we're

14   here about?

15          A       Yes.

16          Q       And what was your relationship with Matthew

17   Reeves at that time?

18          A       Boyfriend.

19          Q       And how long had y'all been boyfriend, girl

20   friend?

21          A       For a good while.

22          Q       How old were you at that time?

23          A       I can't remember.

24          Q       Okay.  Thirteen, fourteen, it was a year or so

25   ago, a little over a year ago?
```

Ann H. Armstrong, RPR

883

1    A    Yes.

2    Q    Okay.  Now on this Wednesday morning, do you

3  recall what you did when you woke up that morning?

4    A    I called my friend.

5    Q    And what was your friend's name?

6    A    Latosha.

7    Q    And what's her last name?

8    A    Rodgers.

9    Q    And after you called her, what did you do?

10    A    I put on some clothes.

11    Q    Okay.  After you put on your clothes, did you

12  go anywhere?

13    A    Yes.

14    Q    Where did you go?

15    A    To meet her.

16    Q    Where did you meet Latosha that day?

17    A    At her grandmother's house.

18    Q    Where did her grandmama live?

19    A    On Selma.

20    Q    Where?

21    A    On Selma.

22    Q    Do you know what street?

23    A    Selma Avenue.

24    Q    Is that close to where Matthew and Julius

25  lived?

Ann H. Armstrong, RPR

884

1    A    Yes.

2    Q    And how close?

3    A    Next door.

4    Q    And what color is the house; do you remember?

5    A    Which house?

6    Q    The grandmama's house that you went to?

7    A    Blue.

8    Q    Okay.  And right next to it, is there an alley

9  that runs next to Latosha's grandmother's house?

10   A    Yes.

11   Q    And on the other side of the alley is what,

12  Dallas Compress?

13   A    Yes.

14   Q    And then right beside Latosha's grandmother's

15  house is where Matthew and Julius lived?

16   A    Yes.

17   Q    Now do you know what time it was that you got

18  to her grandmother's house there on Selma Avenue?

19   A    I can't remember.

20   Q    Do you remember whether it was before lunch or

21  after lunch?

22   A    After.

23   Q    And did you see anybody on your way to her

24  grandmother's house?

25   A    No.

Ann H. Armstrong, RPR

885

1      Q     Did you walk by Matthew and Julius' house to

2  get to the grandmother's?

3      A     Yes.

4      Q     And you did not see anybody at Matthew and

5  Julius' house?

6      A     No.

7      Q     Okay.  When you got to her grandmother's

8  house, what did y'all do there?

9      A     We walked back to my house.

10     Q     You and who?

11     A     Latosha.

12     Q     And it was just the two of y'all?

13     A     Yes.

14     Q     And how long did you stay at your house?

15     A     For a few minutes.

16     Q     Okay.  And you left out again.  Where did you

17  go?

18     A     Walking.

19     Q     So y'all just kind of walked around for

20  awhile?

21     A     Yes.

22     Q     Okay.  What was the next thing that you did

23  after y'all walked around for awhile?

24     A     I can't remember.

25     Q     Did you go to anybody else's house during the

Ann H. Armstrong, RPR

886

1   course of that afternoon?

2          A      No.   We just walked around.

3          Q      Okay.   And after you walked around, what did

4   you do?   What was the next time that you saw anybody

5   besides Latosha?

6          A      About first dark.

7          Q      And at about first dark, where were you when

8   you saw somebody else?

9          A      Over at 23 Mechanic.

10         Q      And who did you see there on 23 Mechanic?

11         A      When I got to the house?

12         Q      Yes.

13         A      The people that was in the house.

14         Q      Okay.   And who was in the house?   Can you name

15  those people that were in the house at Mechanic?

16         A      I can't remember everybody that was there.

17         Q      Okay.   Was Matthew there?

18         A      No.

19         Q      Was Julius there?

20         A      No.

21         Q      Was Bam Bam or Brenda Suttles there?

22         A      No.

23         Q      Was Emanuel Suttles there?

24         A      No.

25         Q      Jason Powell?

Ann H. Armstrong, RPR

887

1      A      No.

2      Q      Okay.  Now before you went to Mechanic, had

3  you been back to Matthew and Julius' house?

4      A      No.

5      Q      When you left Mechanic, did you see any of the

6  people I just named?

7      A      Yes.

8      Q      Who was it that you saw?

9      A      Matthew.

10     Q      And where was Matthew when you saw him?

11     A      Coming down the sidewalk.

12     Q      And who was he with?

13     A      Emanuel.

14     Q      He was with Emanuel.  Was he with anybody

15  else, or was it just he and Emanuel?

16     A      Just he and Emanuel.

17     Q      And who were you with when you came out of

18  Mechanic and saw Matthew?

19     A      I was by myself when I came on the porch.

20     Q      What happened when you walked out on the porch

21  and saw Matthew?

22     A      He told me to come walk with him around the

23  corner.

24     Q      And did you in fact walk around the corner

25  with Matthew?

Ann H. Armstrong, RPR

888

1    A    Yes.

2    Q    And what, if anything, did he say to you when

3  y'all walked around the corner?

4    A    He said if anybody comes looking for him, tell

5  him he was with me.

6    Q    Okay.  If anybody comes looking for him, to

7  tell them that he was with you?

8    A    Yes.

9    Q    And did you ask him anymore about what he

10  meant by that?

11    A    No.

12    Q    Did he tell you anything else after making

13  that statement to you?

14    A    He said he will be to my house or either he'll

15  call.

16    Q    He would be to your house later or either

17  he'll call.  Did he say anything else about why he wanted

18  you to say that?

19    A    No.

20    Q    Okay.  Did you ask him any questions about why

21  he wanted you to say that?

22    A    No.

23    Q    Okay.  So after he said he would either come

24  by or call you later, what happened then?  Did he leave?

25  Did you leave?

Ann H. Armstrong, RPR

889

1    A    I went home.

2    Q    You went on home.  Okay.  Did you see Matthew

3  anymore that night?

4    A    After I left home.

5    Q    Okay.  And what time was it that you left

6  home?

7    A    I don't know the exact time.

8    Q    Was it real late?

9    A    It was kind of early.  It wasn't too late.

10   Q    Okay.  And where did you see Matthew this next

11  time?

12   A    On Lavender.

13   Q    On Lavender, was it at Bam Bam's house?

14   A    Yes.

15   Q    Did you actually go to Bam Bam's house?

16   A    Yes.

17   Q    Did you go inside?

18   A    Yes.

19   Q    And who did you see inside Bam Bam's house

20  besides Matthew?

21   A    Her sister and the kids.

22   Q    Okay.  Did you see Julius in there?

23   A    Yes.

24   Q    Did you see Bam Bam in there or Brenda

25  Suttles?

Ann H. Armstrong, RPR

890

1      A      No, but she was in there, but she was in the

2   back.

3      Q      She was in the back.  What was Matthew doing

4   in Bam Bam's house when you got in there?

5      A      Standing up.

6      Q      Where was he standing?  Do you know what part

7   of the house he was in?

8      A      The front part.

9      Q      And was there any music playing?

10     A      Yes.

11     Q      What was he doing?

12     A      Standing up.

13     Q      Was he talking to anyone?

14     A      No.

15     Q      Was he doing anything other than just standing

16   there?

17     A      No.

18     Q      Did you go up and speak with him at that time?

19     A      No.

20     Q      Did you talk to anyone while you were there in

21   Bam Bam's house?

22     A      No.

23     Q      How long did you stay?

24     A      Not that long because we went outside.

25     Q      Who went outside?

Ann H. Armstrong, RPR

891

1      A      Me, Latosha and Matthew.

2      Q      And when you got outside, did Matthew say

3  anything to you?

4      A      No.

5      Q      How did y'all all end up going outside?

6      A      He told Latosha that he had something to tell

7  her.

8      Q      And did you walk out with he and Latosha?

9      A      Yes.

10     Q      And did you hear what he told Latosha?

11     A      No.

12     Q      Where was he and Latosha when he talked with

13 her?

14     A      In the middle of the street.

15     Q      And where were you?

16     A      I was standing down from them.

17     Q      Okay.  So you did not hear what Matthew told

18 Latosha at that time?

19     A      No, sir.

20     Q      Okay.  After he spoke with her, what happened

21 then?

22     A      We left, and we went to the store.

23     Q      You and who?

24     A      Latosha.

25     Q      And what did Matthew do?

Ann H. Armstrong, RPR

892

1        A        He went back in the house.

2        Q        Okay.  Did you have anymore conversation with

3    Matthew that night?

4        A        No.

5        Q        Okay.  And before Matthew went back in the

6    house, did he say anything else to you?

7        A        No.

8        MS. WILSON:  I pass the witness.

9                          CROSS EXAMINATION

10   BY MR. WIGGINS:

11       Q        Are you saying Natasha or Latosha?

12       A        Latosha.

13       Q        I didn't hear where you said she and Matthew

14   went when they talked?

15       A        Sir?

16       Q        You said Matthew had come to her and said he

17   wanted to tell her something.  Where did they go?

18       A        In the middle of the street.

19       Q        So they were in the street?

20       A        Yes.

21       Q        And Matthew was talking to her in the middle

22   of the street?

23       A        Yes, sir.

24       Q        Okay.  And you said Matthew left, and the two

25   of you all left, you and Latosha?

893

1       A     Yes, sir.

2       Q     You also said that when Matthew first saw you

3 on the street, that the two of y'all went around the corner

4 somewhere?

5       A     Yes.

6       Q     Nobody else went around the corner with y'all,

7 right?

8       A     Me, him and Emanuel.

9       Q     Do you know Jason?

10      A     No.

11      Q     Jason wasn't there to your knowledge?

12      A     No.

13      Q     Do you know Matthew's other girlfriend?

14      A     No.

15      Q     Was he dating someone at that house that you

16 went to that day?

17      A     I don't know.

18      Q     Do you know Tameika?

19      A     Excuse me?

20      Q     Do you know a Tameika?

21      A     No, I do not know her.

22      Q     You and Matthew are not dating anymore, right?

23      A     No.

24      MR. WIGGINS:  Nothing further.

25      MS. WILSON:  Nothing further from this witness.

Ann H. Armstrong, RPR

894

1          (The witness was excused from the witness stand.)

2          MS. WILSON:  The State calls Yolanda Blevins.

3                    YOLANDA BLEVINS,

4    after having been duly sworn, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7    BY MS. WILSON:

8          Q     Can you state your name, please.

9          A     Yolanda Blevins.

10         Q     And do you have a nickname?

11         A     Molly.

12         Q     And how old are you, Yolanda?

13         A     Twenty-two.

14         Q     And where do you live?

15         A     Orrville.

16         Q     And who do you live there with?

17         A     My grandmother.

18         Q     Now do you know Brenda Suttles?

19         A     Yes.

20         Q     And do you know her by another name?

21         A     Yes.

22         Q     And what's that?

23         A     Bam Bam.

24         Q     Did you at one time live with Brenda Suttles?

25         A     Yes.

895

1      Q      And when was that?

2      A      It was last year, back then.

3      Q      Back in November of 1996, were you living with

4  Bam Bam at that time?

5      A      Yes.

6      Q      Over on Lavender Street?

7      A      Yes.

8      Q      And who else lived in the house with you and

9  Bam Bam?

10     A      Her mom and sister and some others.

11     Q      Now going back to November the 27th of last

12 year, which was the day before Thanksgiving, it was a

13 Wednesday, do you remember that day?

14     A      Some of it, yes.

15     Q      And at that time you were still staying with

16 Bam Bam?

17     A      Yes.

18     Q      That Wednesday when y'all got up, what

19 happened during the earlier part of that day?

20     A      That Wednesday.

21     Q      That's the day before.

22     A      I don't know what we were doing.  She left I

23 believe.

24     Q      You think that she left?

25     A      Yes.

Ann H. Armstrong, RPR

897

1   evening.   Do you recall about what time it was?

2        A     Getting dark, I believe it was getting dark.

3        Q     Okay.  So it was around dark.  And where were

4   you?

5        A     At the house.

6        Q     And who was there with you?

7        A     The same people, Janie and her folks.

8        Q     Janie Suttles, that is Bam Bam's mother?

9        A     (Witness nods head affirmatively).

10       Q     And her folks, okay.  Now who is the first

11  person that you remember coming to the house?  Did more than

12  one come at the same time?

13       A     I believe it was Little Mack.

14       Q     Who is little Mack?

15       A     Right there.

16       Q     This man sighting right at the table here?

17       A     (Witness nods head affirmatively).

18       Q     Okay.  Do you know Little Mack by any other

19  name?

20       A     That's all I call him.

21       Q     Okay.  Is that Matthew Reeves?

22       A     Yes.

23       Q     Have you ever heard him referred to as Troll?

24       A     Yeah.

25       Q     Now Little Mack came to the house, and did he

Ann H. Armstrong, RPR

898

1    come with someone, or did he come in the house by himself?

2         A    By himself.

3         Q    And where were you at the time that he came in

4    to Bam Bam's house?

5         A    Sitting on the couch.

6         Q    And you were sitting on the couch, had music

7    going.  What, if anything, happened when Little Mack came

8    in?

9         A    What, if anything, happened?

10        Q    Uh-huh.

11        A    What do you mean?

12        Q    When you're sitting on the couch and Little

13   Mack comes into the house --

14        A    He called me.

15        Q    He called you, Little Mack?

16        A    Yes.

17        Q    What did he say?

18        A    He just told me to come in the kitchen.

19        Q    And is this the kitchen of Bam Bam's house?

20        A    Yes.

21        Q    So what did you do when he told you to go into

22   the kitchen?

23        A    I went in there with him.

24        Q    What, if anything, happened or was said when

25   you went into the kitchen with Little Mack?

Ann H. Armstrong, RPR

899

1    A    He told me he had killed somebody.

2    Q    He told you what?

3    A    He had killed somebody.

4    Q    He told you he had killed somebody?

5    A    (Witness nods head affirmatively).

6    Q    What exactly did he say as best you remember?

7    A    He said he shot somebody.

8    Q    He said he shot somebody?

9    A    (Witness nods head affirmatively).

10   Q    When he said that, what did you say to him?

11   A    I didn't believe him.

12   Q    You didn't believe him?

13   A    (Witness shakes head negatively).

14   Q    So what happened then?  Did you tell him you

15   didn't believe him?

16   A    Yes.

17   Q    What did he say?

18   A    He said he did it.

19   Q    He said he did it?

20   A    Yes.

21   Q    And how was he acting?

22   A    He was acting the same to me.

23   Q    Okay.  And did he say anything else other than

24   I did it?  Did he tell you who it was?

25   A    No.

Ann H. Armstrong, RPR

900

```
 1        Q      Did he tell you --
 2        A      It was a man.
 3        Q      Did he tell you how it happened?
 4        A      He shot him.
 5        Q      He shot him.  Did he tell you what he shot him
 6   with?
 7        A      No.
 8        Q      Did he tell you where he was?
 9        A      In a truck.
10        Q      He told you they were in a truck.  Did he tell
11   you how they came to get in the truck with this man?
12        A      Catching a ride.
13        Q      So Matthew told you they had caught a ride.
14   And what else did he tell you?
15        A      That he had shot somebody.
16        Q      Okay.  Did he tell you about anything else
17   happening after he shot him?
18        A      He said something.
19        Q      He said something?
20        A      Yeah.
21        Q      About what?
22        A      He had said a lot of stuff.
23        Q      The best you can remember for us what he was
24   saying.
25        A      I know he told Janie to go back.  He wasn't
```

Ann H. Armstrong, RPR

901

1    talking to her.

2        Q    Now Janie, Bam Bam's mama, came in to where

3    y'all were?

4        A    Yes.

5        Q    And he told her to leave, he wasn't talking to

6    her?

7        A    Yes.

8        Q    Okay.  Now did anyone else come in the kitchen

9    while y'all were there?

10       A    I believe Carlene and them was in there, but

11    they were standing at the door.

12       Q    They were standing at the door.  Did anybody

13    else come to the house while Matthew was in the kitchen

14    talking to you and telling you about killing this man?

15       A    No.

16       Q    Now did you ever see Bam Bam?

17       A    Later.

18       Q    How much later was it that Bam Bam got to the

19    house?

20       A    Probably about thirty minutes.

21       Q    Okay.  Did Matthew -- was Matthew still there

22    when Bam Bam got there?

23       A    Yes.

24       Q    Did Julius ever show up?

25       A    Yes, he came there together.

Ann H. Armstrong, RPR

1     Q     What about Emanuel?

2     A     Who?

3     Q     Emanuel, E-man?

4     A     He came there too.  I think all of the rest of

5  them came there together.

6     Q     Okay.  Now were you still in the kitchen

7  talking to Little Mack when they all arrived?

8     A     No.  We were through talking.

9     Q     Y'all were through talking.  Now other than

10  telling you that they caught a ride with this man in his

11  truck and that he shot him, did he tell you anything else

12  that you remember?

13     A     He didn't say anything more than that.

14     Q     Okay.  Now after everybody else gets at the

15  house, what happens?

16     A     They started playing music.

17     Q     And when they were playing music, what, if

18  anything, did you see Matthew do?

19     A     Dancing.

20     Q     What kind of dancing?

21     A     I don't know what he was doing, what kind of

22  dance it was.

23     Q     Do you remember the song that he was dancing

24  to?

25     A     Hail Mary I believe.

903

1        Q      Hail Mary?  Do you know who performs Hail

2  Mary?

3        A      No.

4        Q      Is that a rap song?

5        A      Makaveli.

6        Q      Makaveli, and is that a rap song?

7        A      Yes.

8        Q      And when he was dancing, was he in the middle

9  of the room, or where was he dancing?

10       A      He was just dancing in the floor.

11       Q      And what was he doing during the time he was

12  dancing?

13       A      Just dancing, throwing up the hand stuff.

14       Q      Throwing up the hands stuff.  Did you

15  recognize any of the hands stuff he was doing?

16       A      I don't know nothing about that.

17       Q      What did you think -- what was it that he was

18  throwing up?

19       A      I guess gang signs.

20       Q      Gang signs.  All right.  Did you ever see him

21  do anything else?

22       A      Not that I can recall.

23       Q      Now after Bam Bam and Julius and them got

24  there, did they ever leave the room and go to another part

25  of the house?

Ann H. Armstrong, RPR

904

1    A    I think they went in the bathroom.

2    Q    Do you know what they did in the bathroom?

3    A    No.

4    Q    You didn't go in the bathroom with them?

5    A    (Witness shakes head negatively).

6    Q    Did you ever see any money?

7    A    No.

8    Q    Now how long did they stay there at the house?

9    A    Somebody came there.  I believe it was

10   Sumpter.

11   Q    Sumpter.  And who left with Sumpter if anyone?

12   A    All of them.

13   Q    That's Little Mack, Julius and Bam Bam?

14   A    And me.

15   Q    And who?

16   A    And me.

17   Q    You left with them.  Where did y'all go?

18   A    Somewhere, somewhere over there by some club.

19   Q    You went over there by some club.  What did

20   y'all do over there?

21   A    I don't know what they were doing.

22   Q    What did you do?

23   A    I was sitting in the car.

24   Q    Did they get out?

25   A    Yes.

Ann H. Armstrong, RPR

905

1      Q     Did they come back with anything?

2      A     Yes.

3      Q     What did they come back with?

4      A     I seen reefer and stuff.

5      Q     Reefer and stuff.  Did you see any cocaine?

6      A     Yes.

7      Q     Did you see any crack?

8      A     Yes.

9      Q     Now who had the reefer and the cocaine?

10     A     Well, I don't know which one had it, but I

11  seen it.

12     Q     What did they do with it?

13     A     I don't know what they did with the powder,

14  but I helped smoke the reefer.

15     Q     You helped smoke the reefer?

16     A     Yeah.

17     Q     But you don't know what happened to the

18  powder; you didn't snort any of the powder?

19     A     No.

20     Q     Now after y'all smoked some of the reefer, did

21  y'all have any beer or whiskey, wine or anything like that?

22     A     Yes.

23     Q     Was everybody drinking?

24     A     (Witness nods head affirmatively).

25     Q     Where did y'all go after that?

Ann H. Armstrong, RPR

906

1    A    Over to my cousin's house.

2    Q    And your cousin's name is --

3    A    Sintay.

4    Q    Sintay Blevins?

5    A    Yes.

6    Q    What did you do over there?

7    A    That's where we was drinking.

8    Q    That's where y'all drank, and is that where

9    you did the reefer too?

10   A    Yes.

11   Q    And how long did y'all stay at Sintay

12   Blevins'?

13   A    About an hour.

14   Q    And where did you go when you left there?

15   A    Back to east Selma.

16   Q    And where did you go?

17   A    Back to the house.

18   Q    Okay.  What happened when you got back to the

19   house?

20   A    The same thing.

21   Q    Just kept on partying?

22   A    (Witness nods head affirmatively).

23   Q    Still drinking, and did you smoke anymore

24   reefer there at your house?

25   A    Yes.

Ann H. Armstrong, RPR

907

```
 1        Q      And how long did this go on?

 2        A      Until we went to bed.

 3        Q      Do you remember what time it was when you went

 4   to bed?

 5        A      No.

 6        Q      Okay.  Now did Matthew say anything else about

 7   what had happened earlier that night?

 8        A      He didn't say it to me.

 9        Q      Not to you?

10        A      No.

11        Q      Did anybody else ever say anything about where

12   the truck was or where the man was or anything like that?

13        A      In an alley.

14        Q      In an alley.  Did anybody go to the alley?

15        A      No.

16        Q      Okay.  Now you have been here since Monday as

17   a witness; is that correct?

18        A      Yes.

19        Q      Yesterday you were here?

20        A      Yes.

21        Q      Is that correct?  Did you see Matthew outside

22   the courtroom yesterday?

23        A      Yes.

24        Q      Did Matthew say or do anything to you when he

25   saw you?
```

Ann H. Armstrong, RPR

908

1    A      He looked at me, and he did like that.

2    Q      Show the ladies and gentlemen of the jury what

3  he did?

4    A      Like that.

5    Q      To his head?   Did he say anything to you when

6  he did that?

7    A      No.

8    MS. WILSON:   I pass the witness.

9                  CROSS EXAMINATION

10  BY MR. WIGGINS:

11   Q      Ms. Blevins, you were at Bam Bam's house that

12  morning you just finished talking about.  Who were you

13  sleeping with?

14   A      Brenda.

15   Q      Did you sleep with her a lot?  Did y'all sleep

16  together a lot in that house?

17   A      Yeah.

18   Q      You testified earlier that Matthew was telling

19  you about the truck, right?

20   A      Yeah.

21   Q      Okay.  And you said he was saying a lot of

22  other stuff.  You said he said a lot of other stuff?

23   A      Yes.

24   Q      Do you remember at some point in '96 when you

25  appeared before what is called a grand jury?

1      A      Sir?

2      Q      Do you remember coming before a witness stand

3   like that before what we call the grand jury?

4      A      Do I remember coming to one?

5      Q      Right.

6      A      No, I don't.

7      Q      You don't remember coming before a group of

8   persons over a year and a half ago?

9      A      Me?

10      Q      Yes.

11      A      No.

12      Q      Okay.  Let me show you this.  Do you remember

13   giving a statement to some witnesses about what had

14   happened?

15      A      Do I remember giving a statement?

16      Q      Right.

17      A      What does that mean?

18      Q      Telling somebody what had happened.

19      A      Not that I can recall.

20      Q      Do you remember that detective over there with

21   that blue jacket on at the table there?

22      A      Yes.

23      Q      Do you remember talking to him?

24      A      Yes.

25      Q      Have you talked to anybody other than him

Ann H. Armstrong, RPR

1    about this case?

2          A      I believe there was another policeman,

3    detective with him.

4          Q      Anybody else?

5          A      Not that I recall.

6          Q      I show you -- that record indicates you talked

7    to the grand jury, and I wanted to show that to you and see

8    whether that would refresh your recollection?

9          A      I don't remember talking to no grand jury.

10         Q      I'm going to show it to you and let you look

11    at it and see whether that refreshes your recollection,

12    okay.  All right.  You're looking at the document.  Can you

13    read that?

14         A      Yes.

15         Q      Do you understand that?

16         A      Yes.  What did you say?  Did I talk to the

17    grand jury?

18         Q      I'm trying to see whether you remember.

19         A      Remember this on this page?

20         Q      Yes.

21         A      Yes, I do.

22         Q      One of the questions that you were asked --

23    you were asked by the grand jury at that time whether or not

24    Julius said anything to you about that, and what was your

25    response?

Ann H. Armstrong, RPR

1     A     No.

2     Q     He didn't tell you anything, right?

3     A     No.

4     Q     And you were asked by the grand jury, did Bam

5 Bam tell you anything?  What was your response?

6     A     No.  Who was the grand jury?

7     Q     The persons that you had come before.

8     A     Talking about them, the grand jury?

9     Q     Not them, no.

10     A     Well, who -- I want to know who the grand jury

11 y'all are talking about.

12     Q     We'll explain that, but at some point you had

13 given this statement you said you just recognized?

14     A     Uh-huh.

15     Q     You had come to talk to some people about the

16 incident.  And there was a District Attorney there asking

17 you some questions about whether you knew anything about

18 what had happened?

19     A     Uh-huh.

20     Q     And were you telling them?

21     A     Yes.

22     Q     And they recorded this statement here that I

23 just showed you?  I know you just read it, and you said you

24 remembered it?

25     A     Yeah.

912

1    Q    That was the grand jury.

2    A    Oh.

3    Q    And they asked you what did Matthew tell you.

4  What was your response?

5    A    He didn't tell me why he shot him. He just

6  told me to get a tear drop.

7    Q    So you told the grand jury back then that

8  Matthew didn't tell you anything about the truck, right?

9    A    (Witness nods head affirmatively.)

10    Q    You just have to spoke up for the court

11  reporter.

12    A    Uh-huh.

13    Q    And that was the only thing you told the grand

14  jury that he said was just to get a tear drop; you're going

15  to have to say it loud.

16    A    I don't know. If I said it, he said it.

17    Q    You said today that when Matthew came to the

18  house, he came by himself?

19    A    Yeah.

20    Q    Jason wasn't with him?

21    A    No.

22    Q    Was Emanuel with him?

23    A    No.

24    Q    And he just walked up in the house?

25    A    (Witness nods head affirmatively).

Ann H. Armstrong, RPR

913

1     Q     Had he been there before?

2     A     Yeah, he had been there before.

3     Q     The people there knew him, right?

4     A     Yeah.

5     Q     And he walked in the house nice and polite,

6 and then he asked for you?

7     A     (Witness nods head affirmatively).

8     Q     And you said he pulled you into the kitchen?

9     A     Walked in the kitchen.

10    MR. WIGGINS:  Nothing further.

11               REDIRECT EXAMINATION

12 BY MS. WILSON:

13     Q     I just have one more question.  When you saw

14 Matthew there in the kitchen, did you notice anything on his

15 clothes or hands?

16     A     I seen blood on his hands.

17     Q     You saw blood on his hands?

18     A     Yes.

19     Q     Thank you.  That's all.

20    THE COURT:  Anything else?

21    MR. WIGGINS:  No, sir.

22    THE COURT:  Thank you, ma'am.  You're excused.

23    (The witness was excused from the witness stand.)

24    THE COURT:  Call your next witness, please.

25                LATOSHA RODGERS,

Ann H. Armstrong, RPR

914

1    after having been duly sworn, was examined and testified as

2    follows:

                            DIRECT EXAMINATION

3

4    BY MS. WILSON:

5           Q       Can you state your name.

6           A       Latosha Rodgers.

7           Q       Latosha, you're very soft spoken.  I'm going

8    to need you to speak up so each one of these ladies and

9    gentlemen over here can hear what you have to say, okay?

10   How old are you, Latosha?

11          A       Seventeen.

12          Q       And where do you live?

13          A       8G Cloverdale Apartment.

14          Q       And who do you live there with?

15          A       My sister.

16          Q       And what is your sister's name?

17          A       Natilda Lamar.

18          Q       Natilda Lamar.  And is that a brick building?

19          A       No.  That's where we used to stay.

20          Q       Okay.  Now where was it that you used to stay

21   in November of 1996?

22          A       2300 Broad Street.

23          Q       Is that close to Selma High school?

24          A       Yes, ma'am.

25          Q       Is that a brick building?

915

| | | |
|---|---|---|
| 1 | A | Yes, ma'am. |
| 2 | Q | Okay.  Now do you know Matthew Reeves? |
| 3 | A | Yes, ma'am. |
| 4 | Q | And how do you know him? |
| 5 | A | We grew up together. |

6      Q      And do you know him by any other name other

7 than Matthew?

8      A      Little Mack, Troll.

9      Q      He goes by Little Mack and Troll.  Do you know

10 his brother, Julius?

11      A      Yes, ma'am.

12      Q      Do you know Bam Bam or Brenda Suttles?

13      A      I have heard of her but not --

14      Q      You didn't know her personally?

15      A      No, ma'am.

16      Q      Would you recognize her if you saw her on the

17 street?

18      A      Yes, ma'am.

19      Q      Okay.  Do you know Yolanda Blevins?

20      A      Yes, ma'am.

21      Q      Okay.  Now the day before Thanksgiving of

22 1996, which was a Wednesday, do you remember what you did

23 that morning?

24      A      Yes, ma'am.

25      Q      What did you do?

Ann H. Armstrong, RPR

916

1       A       I got up, put some clothes and went to east
2   Selma.

3       Q       And who did you go to see in east Selma?

4       A       Tameisha Jackson.

5       Q       Tameisha Jackson?

6       A       Yes, ma'am.

7       Q       At that time were Tameisha Jackson and Matthew
8   Reeves seeing each other?

9       A       I really don't know.  It was on and off.

10      Q       There were going together some?

11      A       Yes.

12      Q       Now when you went to Tameisha Jackson's house,
13  did y'all leave her house and go anywhere?

14      A       Yes, ma'am.

15      Q       And where was that y'all went?

16      A       Just walking.

17      Q       Okay.  And what time was it that y'all started
18  just walking?

19      A       It was about 1:00 or 2:00 o'clock in the
20  evening.

21      Q       1:00 or 2:00 in the evening.  Okay.  Did y'all
22  run into people and just talk and visit and that sort of
23  thing?

24      A       Yes, ma'am.

25      Q       Did you go any time that afternoon to your

Ann H. Armstrong, RPR

1    grandmother's house?

2         A      Yes, ma'am.

3         Q      Now she lives next-door to Matthew and Julius?

4         A      Yes, ma'am.

5         Q      And right next to her house is what, an alley?

6         A      Yes, ma'am.

7         Q      And the other side of the alley is Dallas

8    Compress?

9         A      Yes, ma'am.

10        Q      When y'all went to your grandmother's house

11   that day, did y'all see Julius or Matthew at their house?

12        A      Not earlier.

13        Q      On.  This is sometime earlier that day.  Okay.

14   Now y'all stayed at your grandmother's house awhile.  Then

15   you left there?

16        A      Yes, ma'am.

17        Q      Did you ever go back to the area of your

18   grandmother's house?

19        A      Yes, ma'am.

20        Q      And what time was that?

21        A      Around -- I really don't remember the exact

22   time, but I would estimate it was around 7:30 or 8:00.

23        Q      7:30 or 8:00 p.m.  So it was already dark

24   outside?

25        A      Yes, ma'am.

Ann H. Armstrong, RPR

918

1    Q    And was it you and Tameisha?

2    A    Yes, ma'am.

3    Q    Was anybody else with y'all?

4    A    No, ma'am.

5    Q    And where did you go when you went back to

6    Selma Avenue?

7    A    To the Reeves' house.

8    Q    When you got to the Reeves' house, who was

9    there?

10   A    No one.

11   Q    Did y'all go up and knock on the door?

12   A    Yes, ma'am.

13   Q    Okay.  Did you see anybody parked in front of

14   the house?

15   A    It was a car.

16   Q    A car parked in front of the house.  Was there

17   anybody in the car?

18   A    I don't remember seeing anyone.

19   Q    Okay.  Now you say there was nobody there.

20   Did you leave there?

21   A    No, we was about to leave, and we saw the

22   sister Marzetta coming down the street.  So we stayed in

23   front of the house, and we waited on her to come.

24   Q    Okay.  So Marzetta also known as Marcy, did

25   she go by Marcy?

Ann H. Armstrong, RPR

919

1    A     Yes.

2    Q     She came, and y'all waited on her?

3    A     Yeah.

4    Q     When she got there, what did y'all do?

5    A     We tried to -- we asked her did she want to

6    walk back to east Selma with us, and she said no, she was

7    going to go back to the projects over at her grandmother's

8    where her mother was to help her cook.  And we kept begging

9    her to go, but she told us no.

10   Q     Okay.  So Marcy wouldn't go with y'all.  She

11   was going back to her grandmother's house where her mother,

12   Marzetta Reeves, was?

13   A     Yes, ma'am.

14   Q     Did she leave with y'all, or did she --

15   A     No, ma'am.  She left going on towards the

16   project.

17   Q     So she left before y'all headed back towards

18   the project.  And what did y'all do?

19   A     Go towards east Selma.

20   Q     Now did y'all see any other vehicle come in

21   the area during that time?

22   A     No, ma'am.

23   Q     Did y'all see anybody else around the car or

24   around Julius and Matthew's house other than Marcy?

25   A     Not that I recall.

Ann H. Armstrong, RPR

920

| | | |
|---|---|---|
| 1 | Q | Okay. Y'all headed on foot back to where? |
| 2 | A | East Selma. |

3    Q    East Selma, okay. And as you were going

4  towards east Selma, did you run into anyone?

5    A    We stopped at a friend's house.

6    Q    Can you tell me where this friend's house was,

7  what street?

8    A    On Mechanic.

9    Q    And what happened when you were at this

10  friend's house on Mechanic?

11    A    We stopped and visited. And we was about to

12  go. We were on the front porch, and I told Tameisha that I

13  was going to come back. I was going in the house to let

14  them know I was about to go. And when I went in the house

15  and I came back, and Tameisha was gone.

16    Q    You went in the house to tell them you were

17  leaving, and Tameisha was still on the front porch. When

18  you came back out, Tameisha wasn't on the front porch.

19  Did you see anybody else in front of the house or on the

20  road?

21    A    No, ma'am.

22    Q    So what did you do?

23    A    I left walking going towards around the

24  corner. And as I was going around the corner, I seen

25  Julius, Bam Bam and some other boy walking. And I started

Ann H. Armstrong, RPR

921

1  talking to them.

2        Q      Okay.  And was Matthew with Julius and Bam Bam

3  and the other person?

4        A      No, ma'am.

5        Q      Okay.  So you had a conversation with these

6  three, and then what did you do?

7        A      I turned around, and I walked back towards the

8  friend's house.  And I asked my friend's mother, did she see

9  Tameisha, and she said, yes, she has gone on home.  So I

10 left back going around the corner to Tameisha's house.

11       Q      So you left there to go back to Tameisha's?

12       A      Yes, ma'am.

13       Q      Did you see anybody on your way back to

14 Tameisha's house?

15       A      No.

16       Q      Okay.  Did you meet back up with Tameisha?

17       A      Yes, I went to her house.  She was at home

18 eating.  And as I walked in the house, she opened the door.

19 And she was like -- I don't know what Little Mack did, but

20 she said he told me if I --

21       Q      Okay.  Wait a minute.  Now don't tell us what

22 Little Mack told her.  Okay.  What happened after you had

23 the conversation with Tameisha?

24       A      We left going towards Bam Bam's house.

25       Q      Okay.  So then y'all decided to go over to Bam

Ann H. Armstrong, RPR

922

1   Bam's house?

2         A       (Witness nods head affirmatively).

3         Q       All right.  Did you expect that Matthew might

4   have been at Bam Bam's house?

5         A       No.  I thought Julius was.

6         Q       You thought Julius was?

7         A       Yes.

8         Q       So when you got back to Bam Bam's house, who

9   was there?

10        A       Little Mack, Julius, I think I seen Bam Bam

11  and some other folks.

12        Q       Okay.  And what was going on?  Did you

13  actually go inside the house?

14        A       Yes, ma'am.

15        Q       What did you see when you got in the house?

16        A       They was listening to music.

17        Q       And did you see Little Mack there?

18        A       Yes, ma'am.

19        Q       What was he doing?

20        A       He was -- wait a minute.  I don't remember.

21        Q       Okay.  And how long did you stay in the house?

22        A       I would say about five minutes.

23        Q       Okay.  And where did you go when you went out?

24        A       Right outside.

25        Q       Did anybody come out and talk to you?

Ann H. Armstrong, RPR

923

1    A    Yes, ma'am.

2    Q    And who was that?

3    A    Little Mack.

4    Q    Little Mack?

5    A    Yes, ma'am.

6    Q    Did Little Mack come out by himself?

7    A    Yes.  No, he didn't.  Julius came up with him.

8    Q    Julius came up with him?

9    A    Yes.

10   Q    And what did Little Mack say to you?

11   A    He called me back, told me to come here

12   because he didn't want Tameisha to hear.  And he said, I've

13   got something to tell you.  And then I was like what.  And

14   he was like, promise me that you ain't going to tell

15   anybody.

16   Q    You have to promise me you won't tell anybody?

17   Little Mack said that to you?

18   A    (Witness nods head affirmatively).

19   Q    Okay.  And what did you say?

20   A    I told him I promise I wasn't going to tell

21   anybody.

22   Q    Okay.  And then what did he say?

23   A    I just shot somebody.

24   Q    He said I just shot somebody?

25   A    (Witness nods head affirmatively).

Ann H. Armstrong, RPR

924

1       Q      That's Little Mack?

2       A      (Witness nods head affirmatively).

3       Q      What did you say when he told you he had just

4  shot somebody?

5       A      Stop lying.

6       Q      You told him to stop lying.  What did he say

7  then?

8       A      I'm for real.  I did it.  I just shot somebody

9  in your grandmama's alley.

10      Q      I'm for real.  I did just shot somebody in

11  your grandmama's alley?

12      A      (Witness nods head affirmatively).

13      Q      What did you say?

14      A      Nothing, I just didn't believe him.

15      Q      Did you -- did he say anything else after he

16  told you that?

17      A      (Witness shakes head negatively).

18      Q      Could Julius have heard Matthew telling you

19  that, or were y'all off by yourselves?

20      A      Off by ourselves.

21      Q      Did you have any more conversation with

22  Matthew that night?

23      A      Yeah.  They asked us where we was fixing to

24  go.  We told them we didn't know.  We was just walking.  And

25  they asked -- said something about going to get Marcy and

925

1  going to Katrina's house.

2       Q    Go get Marcy and then go to Katrina White's

3  house.  Do you know who Katrina White is?

4       A    Uh-huh.

5       Q    Who is she?

6       A    Just a friend.

7       Q    She's a friend.  Did y'all ever go to Katrina

8  White's house?

9       A    No.

10      Q    Did you ever get up with Marcy later?

11      A    No.

12      Q    Did you ever see Matthew again that night?

13      A    No.

14      Q    Did you have any more conversation with

15 Matthew about what he had told you?

16      A    No, ma'am.

17      Q    Did you ever go back to your grandmother's

18 house that night?

19      A    Yes.  I had got in a car with her cousin, and

20 he went -- we went to the Reeves' house looking for Little

21 Mack and Julius.  They wasn't there.  We passed by the

22 alley.  We went towards the store.

23      Q    Did you see anything in the alley when you

24 passed by?

25      A    Yeah, we looked, and we seen a -- we thought

Ann H. Armstrong, RPR

926

1      it was a car, but no lights was on.

2           Q      Okay.  So you saw what you took to be a

3      vehicle, but you thought it was a car, not a truck?

4           A      (Witness nods head affirmatively).

5           Q      And it had no lights on, but y'all didn't

6      actually go up to this vehicle; you just drove by?

7           A      Just straight on by, yes, ma'am.

8           Q      Okay.  Thank you.

9           MS. WILSON:  I pass the witness.

10          MR. WIGGINS:  No questions.

11          THE COURT:  Thank you, Ms. Rodgers.  You can step

12     down.  You're excused.

13          (The witness was excused from the witness stand.)

14          THE COURT:  Call your next witness, please.

15                       AUGUSTUS LUNDY,

16     after having been duly sworn, was examined and testified as

17     follows:

18                     DIRECT EXAMINATION

19     BY MR. GREENE:

20          Q      Would you state your name to the ladies and

21     gentlemen of the jury, please.

22          A      Augustus Larry Lundy.

23          Q      And your employment?

24          A      City of Selma.

25          Q      And your job there, sir, your duties?

Ann H. Armstrong, RPR

927

1        A       Chief jailer.

2        Q       In the course of that, sir, it's your

3   responsibility among other things to book people in; that

4   is, to photograph and fingerprint them?

5        A       Right.

6        Q       And in the course of those duties, sir, did

7   you have occasion to make fingerprint cards or what is

8   sometimes referred to as major print cards on the Defendant

9   in this case, Matthew Reeves?

10       A       Yes, sir.

11       Q       And do you see Matthew seated here in the

12  courtroom?

13       A       Yes, sir.

14       Q       Showing you Exhibit 53, sir, is this the card

15  that you made of the Defendant?

16       A       Yes, that's right.

17       Q       All right.  And you made those, and those are

18  his prints?

19       A       Right.

20       Q       And these would have been maintained in the

21  normal files that you would make for this case?

22       A       That's right.

23       Q       In your normal records?

24       A       That's right.

25       Q       And these are in the same condition now other

Ann H. Armstrong, RPR

928

1   than the exhibit sticker as they were when you made them?

2        A      That's right.

3        Q      With the exception of this little notation at

4   the bottom here?

5        A      That's right.

6        Q      You didn't put that on there?

7        MR. GREENE:  Move for the introduction of State's

8   Exhibit 53.

9        MR. GOGGANS:  No objection.

10       THE COURT:  It will be admitted.

11       Q      All right, sir.  With the individual Julius

12  Reeves, sir, I show you Exhibit 54.  Did you in fact take

13  prints from Julius Reeves?  Do you know him, and can you

14  identify him?

15       A      Yes, I can.

16       Q      You have known him for some time?

17       A      Yes.

18       Q      You've known both of these boys; you know them

19  personally?

20       A      Yes, sir.

21       Q      That's fine.  It's just did you know them

22  personally?

23       A      Right.

24       Q      Did you take these prints then, sir, yourself

25  from Julius Reeves?

Ann H. Armstrong, RPR

929

1       A       That's right, I did.

2       Q       And these are in fact his prints?

3       A       Right.

4       Q       You made these for the purposes of this case

5    and in the course of your duties; is that correct?

6       A       Right.

7       Q       And this Exhibit 54 and these prints --this

8    print card is now in the same or in substantially the same

9    condition as it was when you completed it other than the

10   handwriting and the little notation there and the exhibit

11   number?

12      A       That's right.

13      MR. GREENE:  We move for the introduction of Exhibit

14   54.

15      MR. GOGGANS:  No objection.

16      THE COURT:  It will be admitted.

17      Q       Showing you also, sir, a fingerprint card on

18   Brenda Suttles, Exhibit 55, do you know her?

19      A       Yes, I do.

20      Q       Can you identify her?

21      A       Yes.

22      Q       All right, sir.  And you took these prints

23   from her?  This is her card, and this is now in the same or

24   substantially the same condition as it was when you

25   completed it on that occasion?

Ann H. Armstrong, RPR

930

1       A     Yes.

2       Q     These cards and these other cards are all

3  maintained in the normal course of your business at the

4  police department?

5       A     That's right.

6       MR. GREENE:  We move for the introduction of State's

7  Exhibit 55.

8       MR. GOGGANS:  No objection.

9       THE COURT:  It will be admitted.

10      MR. GREENE:  That's all I have.  Your witness.

11                 CROSS EXAMINATION

12  BY MR. GOGGANS:

13       Q     Sir, do you recall if in November, late

14  November or early December of 1996 having taken any

15  fingerprints of Emanuel Suttles or a Jason Powell?

16       A     No, I don't.

17       MR. GOGGANS:  No other questions.

18      (The witness was excused from the witness stand.)

19       THE COURT:  Ladies and gentlemen, we'll go ahead and

20  take a lunch at this time because I think the next two

21  witnesses will be lengthy witnesses.  There is no reason to

22  get started now and then stop at 12:00 clock.  Let's go

23  ahead and talk our hour and fifteen minutes for lunch.

24  Please come back and reassemble in the jury room at 1:00

25  o'clock.  Please recall the instruction that I have given

931

1    you not to discuss the facts of the case with anyone.

2    Please don't allow anyone to discuss the facts of the case

3    with you.  We'll see you back at 1:00 o'clock.

4         (A lunch recess was taken.)

5         (State's Exhibits Number 56 - 85 were marked for

6    identification.)

7                  PAT GRINDLE,

8    after having been duly sworn, was examined and testified as

9    follows:

10              DIRECT EXAMINATION

11    BY MS. WILSON:

12        Q     State your name, please, and tell us how you

13    are employed?

14        A     I'm Detective Pat Grindle with the Selma

15    Police Department.

16        Q     And you're a detective?

17        A     Yes, ma'am, I am.

18        Q     And how long have you been a detective?

19        A     I've been a detective approximately four

20    years.  I'm been employed by the Selma Police Department for

21    over ten years.

22        Q     And what educational background do you have

23    that qualifies you to be a detective with the Selma Police

24    Department?

25        A     I have multiple years of experience as a

932

1    patrolman.   I've got several training courses in criminal

2    investigation including homicide investigation, burglary

3    investigation and robbery investigation.

4         Q       Okay.  And were you working in your capacity

5    as a detective with the Selma Police Department on or about

6    November the 27th, 1996?

7         A       Yes, ma'am, I was.

8         Q       Were you on call that evening or the early

9    morning hours of the 28th?

10        A       We are on call 24 hours a day, but at this

11   particular time, yes, they did call.

12        Q       Okay.  And where did you go, and at what time

13   did you arrive there?

14        A       It was between the hours of 2:00 in the

15   morning and 3:00 in the morning when I received the call

16   from my captain advising me to come to Crockett's Alley

17   which is off of Selma Avenue in the 2000 block, the 2100

18   block.  Then I did after receiving that call respond to the

19   location.

20        Q       Okay.  Now if you don't mind, Detective, if

21   you'll come down, step down, please.  Show the ladies and

22   gentlemen of the jury where it is that you responded to.

23        A       Okay.  This will be the 2000, 2100 block of

24   Selma Avenue.  I responded -- of course, when I initially

25   arrived I could not pull into the alleyway because there

Ann H. Armstrong, RPR

933

1   were police cars here, located there and there.  I stopped

2   here and walked up to a vehicle that was parked here.   And

3   this is Crocket's Alley here.  This is Alabama Avenue here.

4          Q      Okay, if you'll have a seat, please, sir.

5          (State's Exhibits Number 86 - 92 were marked for

6   identification.)

7          Q      I'm going to show you what's been marked

8   State's Exhibit Number 87 and 86.  I'm going to ask you if

9   you recognize what is depicted in those photographs?

10         A      State's Exhibit 86 would be the photograph of

11  the entrance way to the alley leading from Selma Avenue

12  towards Alabama Avenue.  State's Exhibit Number 87 is a

13  picture of the same alleyway but a little further down the

14  alleyway which depicts the opening of a -- it looks like a

15  gate leading into a back yard of what we had found to be

16  2126 or 2124 Selma Avenue.

17         Q      Okay.  Now, sir, if you will again, step down.

18  Can you take these photographs, 86 and 87, and show the

19  ladies and gentlemen of the jury on this diagram what these

20  photographs depict, please?

21         A      This would be State's Exhibit Number 86.  If

22  you'll notice the opening here, there is a stop sign here

23  and another sign here, a building on this corner which would

24  be Dallas Compress.  That stop sign would be located here.

25  This is the entrance.  This is the Dallas Compress building

Ann H. Armstrong, RPR

934

1    here and a sidewalk running across.  You'll notice the

2    sidewalk here.  That's State's Exhibit 86.

3         State's Exhibit Number 87 is a photograph taken at a

4    different angle which is further down the alleyway which

5    depicts a gate here.  This would be that gate.  It also

6    shows a building over here, but it also shows the entrance

7    of the alleyway into Alabama Avenue which is here.

8         Q    Remaining there, I'm going to show you what's

9    been marked State's Exhibit 88 and 89 and ask you if you

10   recognize those photos, please, sir?

11        A    I do.

12        Q    And what does 88 depict, please?

13        A    State's Exhibit Number 88 depicts a photograph

14   taken at an angle photographing the alleyway which shows a

15   building which is Dallas Compress.  You cannot see the stop

16   sign in this picture because it's covered by a tree and a

17   blue residence which is at the corner.  What that would be

18   would be a picture taken at this angle depicting this

19   residence and this entrance to this alleyway and in this

20   general location.

21        Q    Okay.  Through your investigation did you

22   learn that this residence was Latosha Rodger's grandmother's

23   residence?

24        A    I did.

25        Q    Okay.  Now the next photograph.  It's 89.

Ann H. Armstrong, RPR

935

1          A        State's Exhibit Number 89 is a photograph

2    taken directly in front of 2128 Selma Avenue.   It's taken

3    from approximately here facing the residence.

4          Q        And through your investigation did you learn

5    that this was Matthew and Julius Reeves' residence?

6          A        I did.

7          Q        Have a seat back up here, please sir.   Now

8    when you got in the alleyway there sometime between 2:00 and

9    3:00 a.m., what did you do?

10         A        My first initial response is to contact the

11   officer in charge, which would have been my Captain Harrell.

12   Initially I got out of my vehicle and started walking toward

13   the scene which was the pickup truck which had been roped

14   off with police tape.   As I'm approaching it, I'm stopped by

15   another officer which was Officer Tucker.   He advised me of

16   the dog track and what he had discovered in that track.

17   From that point, I went to the truck to view the scene to

18   see what evidence we had at the scene and to confer with my

19   superior to find out what he had learned up to that point in

20   time.

21         Q        Okay.   I have a a number of photographs.   Let

22   me just call the number of these photographs off, State's

23   Exhibits 64, 63, 62, 61, 60, 59, 58, 57, 56, 67, 68, 69, 71,

24   72, 73, 74, 75, and 76.   I'm going to ask you to look at

25   these photographs.   Do you recognize these photographs?

Ann H. Armstrong, RPR

936

1      A      I do.

2      Q      And were these photographs made at the scene

3   of the truck that was located in Crockett's Alley where you

4   went when you received the call that evening?

5      A      All of these photographs here that I've seen

6   so far were made that night except for one.  That's going to

7   be this one here which was made at a later date at the

8   police department.

9      Q      Okay.  Let's take that one out then.  That is

10  State's Exhibit 76.  Okay.  These other photographs were

11  made that night there at the scene; is that correct?

12     A      That is correct.  Also there is one more.  I'm

13  sorry.  This one here would have been made at a later date

14  at the police department.

15     Q      State's Exhibit Number 72 we are taking out.

16  Now do these photographs correctly and accurately depict the

17  scene at it appeared to you when you arrived there that

18  night?

19     A      Yes, it does.

20     Q      Any alterations, changes to these photographs

21  from the scene as you viewed it that night?

22     A      The scene as it originally appeared to me --

23  there were several photographs of that as well as there are

24  some numbers placed there by our evidence technician.  But

25  that is an accurate depiction of the scene.

Ann H. Armstrong, RPR

937

1      Q      Okay.  Now when you got to the truck, did you

2  actually start investigating the truck, its contents and the

3  area around the truck?

4      A      My first initial duty at that time was, of

5  course, to make sure of what was going on.  That was the

6  primary.  I went and talked to my supervisor which was

7  Captain Harrell.  I viewed the vehicle.  I did not collect

8  any evidence at that particular time.  I viewed what

9  evidence was there.  But my initial investigation started at

10  that truck in that alley.

11     Q      I'm going to show you what's been marked

12  State's Exhibit Number 69.  You said that this correctly and

13  accurately depicts the truck after the door had been opened

14  and that photograph taken?

15     A      Yes, ma'am, that's correct.

16     Q      Okay.  Now through your investigation did you

17  learn that when the first officers arrived, was that truck

18  door open or closed?

19     A      Through my investigation I learned it was

20  closed when they first arrived.

21     Q      And the purpose of opening the door was to

22  take a photograph of Mr. Johnson as he appeared in the

23  truck?

24     A      The door was opened I believe when the

25  investigators arrived.  And that had already been done by

Ann H. Armstrong, RPR

938

1   the officers previously.  But this photograph was taken of

2   the door open.  We did not close it.

3        MS. WILSON:  At this time we move for the

4   introduction of State's Exhibit Number 69.

5        MR. GOGGANS:   No objection.

6        THE COURT:  It will be admitted.

7        MS. WILSON:  Ask to be allowed to publish it to the

8   jury.

9        THE COURT:  Yes, ma'am.

10        Q     Did you determine who the man in the truck was

11   at that time?

12        A      We ran a license check on the truck plates

13   which come back to Mr. Johnson.  And we was able to

14   determine through that investigation that it was Willie

15   Johnson, Jr.

16        Q     Okay.  And this photograph, State's Exhibit

17   68, where is that photograph taken?

18        A      This photograph would have been taken from the

19   exterior of the vehicle looking through the passenger side

20   door into the cab area of the truck.

21        MS. WILSON:  We move for the introduction of State's

22   Exhibit 68.

23        MR. GOGGANS:  No objection.

24        THE COURT:  It will be admitted.

25        Q      State's Exhibit 71, what does that depict

Ann H. Armstrong, RPR

939

1    please, Detective Grindle?

2          A        This would be a photograph taken from the

3    exterior of the truck looking into the driver's side of the

4    cab photographing an object in the floor board which turned

5    out to be a wadding from a shot shell.

6          Q        A shot shell which would have -- it's commonly

7    used in what, what type of fire arm?

8          A        What we were able to find out it was a shotgun

9    which is a 12-gauge shotgun.

10          MS. WILSON:  Move for the introduction of State's

11    Exhibit 71.

12          MR. GOGGANS:  No objection.

13          THE COURT:  Admitted.

14          Q        State's Exhibit 67, what does that depict,

15    please?

16          A        This is a photograph of the side of the truck

17    facing the cab area on the driver's side at a further away

18    distance than the one previous.  It depicts the victim

19    laying in the seat face down and a large pool of blood on

20    the ground next to the truck with some streaks of blood

21    coming down the side of the truck.

22          MS. WILSON:  We move for the introduction of State's

23    Exhibit Number 67.

24          MR. GOGGANS:  No objection.

25          THE COURT:  It will be admitted.

940

1      Q      Now State's Exhibits 74 and 75, what do those

2  photographs depict, please?

3      A      These would be the photographs that would have

4  been taken of the steering wheel of the pickup truck, which

5  within the photographs you can see fragmentation of blood, I

6  mean human tissue as well as it looks like it appeared to be

7  shot pellets contained inside the vehicle steering wheel as

8  well as shots that had hit it.

9      MS. WILSON:  I move for the introduction of State's

10  Exhibit 74 and 75.

11      THE COURT:  It will be admitted.

12      Q      State's Exhibit 73, what does that depict,

13  please?

14      A      Okay.  This photograph here, this was another

15  one that was taken at a later time.  This was not taken that

16  particular night.  That was taken by the blood splatter

17  person.

18      Q      Now were photographs made of the area around

19  the truck, Detective?

20      A      Yes, they were.

21      Q      Looking at State's Exhibits 60, 61, 64, 62,

22  63, 56 and 59, do those depict the blood that was around the

23  truck?

24      A      Yes, ma'am, they do.

25      Q      Now specifically looking at State's Exhibit 64

941

1  and 60, does that contain anything else in that photograph

2  of significance?

3      A       Yes.   This is a photograph taken to the

4  driver's side of the pickup truck.  It does show a pool of

5  blood, but in that pool of blood there are coins, U. S.

6  currency type coins that were collected.

7      MS. WILSON:   We move for the introduction of State's

8  Exhibit 51, 60 through 64.

9      THE COURT:  Admitted.

10     Q       Now Detective, let me show you what's been

11 marked Exhibit 57.  What does that depict, please, sir?

12     A       This would be a photograph from a distance

13 behind the truck to the left-hand side which is on the

14 driver's side.  Within the photograph it depicts the side of

15 the truck where the door is open.  It shows a large pool of

16 blood next to the driver's door.  It also shows a secondary

17 pool of blood to the left of that.  It has a green ball cap

18 here which we determined would have been worn by the victim.

19 Also within that you'll notice there is yellow type taping

20 here that is crime scene tape.  That is outlining a diamond

21 ring that was found on the ground next to that pool of

22 blood.

23     Q       And number 58, what does that depict?

24     A       This depicts a close up shot of the diamond

25 ring that was found on the side of the roadway next to those

Ann H. Armstrong, RPR

942

1   objects.  And it also happens to show a piece of the crime

2   scene tape that was surrounding it.

3          MS. WILSON:  We move for the introduction of State's

4   Exhibits 57 and 58.

5          THE COURT:  It will be admitted.

6          Q       Now Detective, after you observed this scene,

7   what did you do then?

8          A       My immediate response, of course, after

9   learning the factors I had at the truck, was to follow-up on

10  the information provided to me by Officer Tucker.  Following

11  up on the information, I responded to 2128 Selma Avenue.

12  Along with me were Officers Joe little, Jimmy Sturdivant and

13  David Hopkins.

14         Q       And where did you proceed to?

15         A       We went to 2128 Selma Avenue.

16         Q       Okay.  And when you got to 2128 Selma Avenue,

17  did you know who lived at that residence?

18         A       Yes, I did.

19         Q       And who was that that you knew who lived

20  there?

21         A       I knew the Reeves family lived there to

22  include Julius Reeves, Matthew Reeves, Ms. Marzetta Reeves

23  as well as their family that lived with them there.

24         Q       And what did you do when you got to the

25  residence?

943

1          A        Immediately we approached the front door.

2    There is actually -- within this residence there are two

3    front doors.  There's a door to the right.  There's a door

4    straight in front of you.  We chose the one straight in

5    front of us to knock on.  We knocked on that door, and we

6    were greeted by I believe the side door by Ms. Marzetta

7    Reeves.

8          Q        If you will please, Detective Grindle step

9    down.  Now was this diagram prepared by you?

10         A        Yes, it was.

11         Q        And what does this diagram depict?

12         A        This depicts the residence of 2128 Selma

13   Avenue as I recall.

14         Q        This is the Reeves' residence that you went to

15   after talking with Officer Tucker?

16         A        That is correct.

17         Q        Okay.  Now tell the ladies and gentlemen --

18   you came from this area to the front of the house.  Describe

19   to them what you were just testifying about the two doors

20   and which door you knocked on?

21         A        Okay.  We came from the, down the sidewalk,

22   come up to the front porch to the front entrance here.  We

23   knocked on this door here.  No one came to the door.  We

24   were greeted in this area here by Ms. Marzetta Reeves.

25         Q        Okay.  And what did you tell Ms. Reeves when

Ann H. Armstrong, RPR

944

1  you got there, when she came to the door?

2        A        We advised her -- of course, she was aware of

3  who I was, but I advised her who I was through the door

4  because she was asking who it was.  At this point in time we

5  advised her that a canine unit had tracked to her residence,

6  that we were there to investigate the shooting incident,

7  that that was our purpose at that particular time is what we

8  told her.

9        Q        Okay.  And what request or what did you ask

10 her?

11       A        At a later point in time during our

12 conversation I asked her permission to search the residence.

13       Q        And what did Ms. Reeves say?

14       A        She gave me an oral consent to search her

15 residence, and then later I filled out a form that, a

16 handwritten type form giving me permission to search, which

17 she read and signed, and I read it to her as well.

18       Q        Okay.  I'm going to show you what's previously

19 been marked State's Exhibit Number 11 and ask you if you

20 recognize that?

21       A        Yes, I do.

22       Q        And what does that purport to be?

23       A        This is the form which I wrote out and had Ms.

24 Reeves read, and she signed it agreeing to give me

25 permission to search her residence.

Ann H. Armstrong, RPR

945

1    Q    And this form was written out by you after
2  such time as she had orally given you consent to search the
3  residence?
4    A    The way the process went was I, of course,
5  announced what our purpose was.  I advised her what I was
6  doing, requested permission to search.  She said I could
7  search.  Due to the significance of the case, I went ahead
8  and did a written form anyway.  I did not have a formal form
9  that we usually use.  I did a written form and had her sign
10  it.
11    MS. WILSON:  We move for the introduction of State's
12  Exhibit Number 11.
13    (The following occurred at the bench outside the
14  hearing of the jury:)
15    MR. GOGGANS:  Your Honor, with respect to these other
16  items that are coming up, all of these were addressed in the
17  suppression hearing, if we could have a continuing objection
18  without having to come up every time Ms. Wilson brings
19  something up.
20    THE COURT:  That will be noted.
21    (The following occurred in the presence and hearing
22  of the jury:)
23    MS. WILSON:  Ask for permission to publish this to
24  the jury.
25    THE COURT:  Yes, ma'am.

Ann H. Armstrong, RPR

946

1      Q      Now after you received the written consent

2  from Ms. Reeves, what did you do?

3      A      Myself and the other officers entered the

4  residence and began to search for any particular evidence

5  that may link back to the original crime scene.

6      Q      And where did you begin this search?

7      A      The search was done in a routine pattern.  We

8  entered the front door.  We went to the living room area of

9  the residence.  Should I show them the diagram?

10     Q      Yes, if you would please step down.

11     A      And after getting permission to search and

12  other such, we entered into the living room area here.  I

13  did not discover anything significant in this area.  There

14  is an entrance into a kitchen area here.  Immediately upon

15  entering into the kitchen area, we discovered a pair of

16  white pants located in this opening here.

17     Q      Okay.  Now I'm going to stop you, and I'm

18  going to show you what's been marked State's Exhibit 81 and

19  82 and ask you if you recognize those photographs?

20     A      Yes, I do.

21     Q      And what is depicted in those photographs?

22     A      This would be a photograph of the white pants

23  that had blood staining and a belt in them at that opening

24  into the kitchen.

25     MS. WILSON:  We move for the introduction of State's

Ann H. Armstrong, RPR

947

1   Exhibit 81 and 82.

2          THE COURT:  It will be admitted.

3          Q      Okay.  Now after you see the white pants and

4   you photograph them, what do you do then, please?

5          A      Okay.  We did not initially take a photograph

6   at that time.  We left the pants where they were.  We moved

7   from the kitchen area after doing a search here.  We moved

8   out of the kitchen area into this area here which was

9   labeled bedroom number one.  And upon entering the bedroom

10  area here, we observed a pair of shoes here that had blood

11  staining on them, a shoe here in front of the dresser area

12  here that had blood staining on it, some pants hanging out

13  from under the dresser here and also on this side here which

14  had blood staining on both of those.  We moved around the

15  room.  During the course of that search of that room we

16  discovered a shotgun under this bed here as well as there

17  was some blood staining on a linen that was on top of this

18  bed here which was a flowered type linen.

19         Q      Okay.  Let's stop.  Let me show you what's

20  been marked State's Exhibit 84 and ask you if you recognize

21  that, please?

22         A      I do.

23         Q      And what does that depict?

24         A      This depicts the dresser that we found the

25  shoe under or next to as well as the pants that were hanging

Ann H. Armstrong, RPR

948

1    out from under it, the pants here and another set of shoes

2    here with blood staining on them.

3         Q    Is this how these items appeared to you on

4    that occasion?

5         A    It did.

6         Q    When y'all took this photograph, had you moved

7    or disturbed these items in any way?

8         A    No, we had not.

9         MS. WILSON:  We move for the introduction of State's

10   Exhibit 84.

11        THE COURT:  It will be admitted.

12        Q    I'm going to show you what has already been

13   marked and introduced as State's Exhibit Number 50.  I'm

14   going to ask you what that photograph depicts, please?

15        A    This is going to depict the bed here that the

16   gun was found under and that had the flowered linen on top

17   of it which at the corner was where the blood staining was.

18        Q    Okay.  Now, what if anything, did you do with

19   this bed during the course of your search?

20        A    During the course of that search we did lift

21   the mattress of that particular bed and discovered the

22   shotgun.  But also I need to add during the search of this

23   room, we discovered a white and blue Fila jacket next to the

24   bed laying on top of the stack of clothes.

25        Q    I'm going to show you what's been marked

Ann H. Armstrong, RPR

949

1   State's Exhibit Number 79 and ask you what that photograph

2   depicts?

3        A      This is me holding up the mattress to the bed

4   showing the shotgun that we discovered.

5        Q      Now is this how you found the shotgun laying

6   when you raised the mattress up?

7        A      Yes, it is.

8        Q      At the time this photograph was made, had you

9   touched or moved or altered this scene in any way?

10       A      We had already lifted that mattress prior to

11  that photograph being taken, and we laid it back down not

12  touching the shotgun.  That was a secondary photograph after

13  we discovered the shotgun before collection of the evidence.

14       MS. WILSON:  Move for the introduction of State's

15  Exhibit 79.

16       THE COURT:  It will be admitted.

17       Q      Now looking at State's Exhibit 83, what does

18  that photograph depict, please?

19       A      This depicts a shot of the chair that was

20  located next to this bed where we discovered the white and

21  blue Fila jacket.  You will see it sitting on top of the

22  stack of clothes on top of that chair.

23       Q      Okay.  And was this how these clothes appeared

24  to you on that occasion?

25       A      Yes, it is.

Ann H. Armstrong, RPR

950

1    Q       Had y'all moved, altered this scene in any way

2    prior to taking this photograph?

3    A       No, we had not.

4    MS. WILSON:  The State moves for the introduction of

5    photograph 83.

6    THE COURT:  It will be admitted.

7    Q       Okay.  You can continue on.

8    A       After doing the search of this particular room

9    which was bedroom number one, we moved into bedroom number

10   two here.  After searching this room we discovered no

11   evidence of any great significance that was linked back to

12   the scene of the pickup truck.  Once completing this search,

13   we contacted Mr. Edwards who is our evidence collection unit

14   to come to the scene to photograph that scene and collect

15   that evidence.

16   Q       Okay.  I'll show you what's been marked as

17   State's Exhibit Number 80.  What does that photograph

18   depict?

19   A       This is a photograph taken at an angle whereas

20   you would have been standing at this doorway roughly in this

21   general vicinity here shooting back across this direction.

22   And it just depicts a view of the room.  It's not an overall

23   view, but it is just a view of the room which shows two

24   beds, which would be bed one here, bed two here.  It also

25   depicts the bed that had the flower covering and the gun

951

1    under it and a second bed here that has a blue covering to

2    it.

3          MS. WILSON:  We move for the introduction of State's

4    Exhibit Number 80.

5          THE COURT:  It will be admitted.

6          Q        Now after you concluded your investigation,

7    your search of this residence and the items that were

8    seized, who actually took those items into custody?

9          A        Mr. James Edwards of our department.

10         Q        Were you present at the time that he did this?

11         A        Yes.

12         Q        Detective Grindle, now after you left the

13   residence where did you go?

14         A        We had four witnesses that were going to be at

15   that particular residence who needed to interviewed.  Two of

16   the witnesses were carried from the scene by patrol

17   officers.  The other two were placed into my car and waited

18   there for me to return while I went around back to where the

19   truck was.

20         Q        Okay.  When you got around back to where the

21   truck was, had Mr. Willie Johnson's body been removed from

22   the truck?

23         A        The truck had -- I mean the body had been

24   removed from the truck.  It was on a gurney awaiting to be

25   placed onto the forensics carrier.

Ann H. Armstrong, RPR

952

1    Q    Now I'm going to show you State's Exhibits 66

2  and 70 and ask you what those photographs depict, please?

3    A    State's Exhibit Number 66 would show the

4  driver's side seat of the pickup truck after the removal of

5  the body.  There's a large pool of blood on that seat that

6  is basically back at the crease where the seat folds

7  forward.  And State's Exhibit Number 70 is a further away

8  shot at the outside of the truck depicting the seat on the

9  driver's side showing the door being open and showing the

10  pool of blood in the seat as well as blood that is on the

11  edge of the door.

12    MS. WILSON:  We move for the introduction of State's

13  Exhibit 56 and 70.

14    THE COURT:  It will be admitted.

15    Q    Now I'm going to show you what has been marked

16  State's Exhibit 77 and 78 and ask you what is depicted in

17  those photographs, please?

18    A    State's Exhibit Number 77 would be a

19  photograph of Mr. Willie Johnson after removal from the

20  pickup truck.  State's Exhibit Number 78 is a photograph of

21  Mr. Johnson as well at a different angle showing him lying

22  on the gurney as well after removal from the truck.

23    MS. WILSON:  The State moves for the introduction of

24  77 and 78.

25    THE COURT:  Any objection?

Ann H. Armstrong, RPR

953

MR. GOGGANS:  None.

THE COURT:  It will be admitted.

Q       Now after you went back to the scene of the truck and you observed Mr. Johnson and his wounds and you saw the truck, what did you do then?

A       After clearing from that particular scene, I still secured it waiting on Mr. Edwards to finish everything at that particular scene.  I carried the witnesses that I had with me to the police department to conduct interviews.

Q       And then once you finished up at the police headquarters, where did you go?

A       Once completing what I was doing at the police department, I left with Detective James Walker and Officer Joe Little and responded to 314 Lavender Street.

Q       Okay.  And who went with you, Detective James Walker?

A       Yes, and Officer Joe Little.

Q       Okay.  And what did you do once you got to 314 Lavender Street?

A       Our intentions at that point in time were to locate three suspects that had been identified to us, which was Matthew Reeves, Julius Reeves and Brenda Suttles.  We arrived at the residence.  We walked to the front door of the residence.  We knocked on it, were greeted at the door by a female I would estimate to be about thirty years old, I

Ann H. Armstrong, RPR

954

1    believe the sister of Bam Bam Suttles named Carlene Suttles.

2        Q        Okay.  And what did you do once you got there

3    and were greeted by Ms. Carlene Suttles?

4        A        Initially when she opened up the door, of

5    course, she asked who was at the door.  We responded with

6    the police.  She opened the door.  We began to explain to

7    her our purpose for being there, and we observed Matthew

8    Reeves lying on the couch to the right of the door face down

9    on the couch.

10       Q        And what did you do?

11       A        We immediately entered the residence and

12   apprehended Mr. Reeves.

13       Q        And did you apprehend anything with Mr. Reeves

14   at that time?

15       A        Yes, there was a blue and yellow type starter

16   jacket which is like a wind breaker laying under Mr. Reeves

17   around the head area which appeared to have blood staining

18   on it.

19       Q        And what did you do with that jacket?

20       A        We collected it as evidence.

21       Q        And was it later turned over to James Edwards,

22   your evidence technician?

23       A        Yes, it was.

24       Q        Now after apprehending Matthew Reeves, did you

25   ever have an occasion to go back to Selma Avenue?

Ann H. Armstrong, RPR

955

1    A       Yes, we did.

2    Q       And did you seize anything there?

3    A       At a later time we seized a shot shell, a 12-

4  gauge shotgun shell.

5    Q       And where was that found, please, sir?

6    A       That was located in the bathroom area of the

7  residence in a garbage can in that bathroom under a sink.

8    Q       I'm going to show you what's been marked as

9  State's Exhibit 36 which was contained in State's Exhibit 35

10  and ask you if you recognize that?

11   A       Yes, I do.

12   Q       And what does that purport to be?

13   A       This appears to be the same shot shell that I

14  removed from the residence at 2128 Selma Avenue.

15   Q       In what part of the house?

16   A       In the bathroom area.

17   Q       Now Detective Grindle, as part of your

18  training have you ever been to any schools on gangs?

19   A       I have attended some training on gangs, yes,

20  ma'am.

21   Q       What did that consist of?

22   A       I went to a week long seminar in Greenville,

23  Alabama I believe is what it was referred to.  I have also

24  since then been checking into gang activity in the Selma

25  area.  I myself and Detective Jon Martin are handling all

Ann H. Armstrong, RPR

1  gang activity for the city of Selma pertaining to any

2  information that we can find and have taken great interest

3  in it since then.

4      Q     Have you ever heard of the gang symbol or

5  term FOLKS?

6      A     Absolutely.

7      Q     Can you tell the ladies and gentlemen what

8  your, through your training, FOLKS, what that is or means?

9      A     FOLKS as I understand it stands for Following

10  Our Lord King Satan.  It's connected with the Disciples gang

11  as well which falls under that, the BGD and IGD gangs which

12  is the Black Gangster Disciple and Insane Gangster Disciple.

13      Q     And what about tear drop, what does tear drop

14  mean?

15      A     A tear drop is commonly a tatoo that one of

16  the gang members will get on his face.  It's just under the

17  tip of the eye.  The tear drop can symbolize one or two or

18  three things, one of which is actually killing someone or

19  losing a close gang member or a close gang member being

20  placed into the penitentiary.

21      Q     Now going back, Detective Grindle, at a later

22  time you took or observed these items that are depicted in

23  65, 76, and 72; is that correct?

24      A     That is correct.

25      Q     Can you tell the ladies and gentlemen of the

957

1   jury what State's Exhibit 65 purports to be?

2        A        Number 65 would be the group of coins that was

3   located in the blood pool next to the pickup truck that we

4   collected.

5        Q        What does 76 purport to be?

6        A        This is a standard type tow chain or a chain

7   that you would use normally that was located in the back of

8   Mr. Johnson's pickup truck at the tail gate.

9        Q        Okay.  And what does 72 depict, please?

10       A        This would be the driver's door which depicts

11  several pellet holes here around the door knob handle where

12  you would roll the window down.  That shows that door handle

13  has actually been broken off in some form or fashion.

14       MS. WILSON:  We move for the introduction of 65, 72,

15  76.

16       THE COURT:  It will be admitted.

17       Q        Now Detective Grindle, at the time you were

18  there at the scene and you saw Mr. Willie Johnson, Jr.'s

19  body after it had been removed from the truck and was lying

20  on the gurney, did you observe his body at that time?

21       A        Yes, I did.

22       Q        Did you notice what type of clothing he had

23  on?

24       A        Yes, he was wearing a work uniform that had

25  labeled on it Selma Housing Authority.

Ann H. Armstrong, RPR

958

1    Q       Did you notice anything unusual about his

2    clothing at that time?

3    A       Yes.  The clothing itself was in a disarray,

4    of course, a large amount of blood on the clothing as well

5    as he had no personal effects on him.  His pockets were

6    turned inside outwards.  Other than that, that's all I can

7    recall.

8    Q       The pockets of what part of his clothing were

9    turned inside outwards?

10   A       Those would be the pants pockets.

11   MS. WILSON:  I pass the witness.

12                   CROSS EXAMINATION

13   BY MR. GOGGANS:

14   Q       Detective Grindle, the chain that you

15   identified in one of the photographs here, when you saw it

16   did it have any fresh scratch marks on it?

17   A       Yes, sir, it did.  It appeared to -- I would

18   say grind marks or something where it had been dragging

19   something.

20   Q       If you could step down.  I've got a question

21   or two about the house.  As I understand it, y'all went in

22   this front door here where it says entrance that is like

23   parallel to the bottom?

24   A       Yes, sir.  Our first contact started here, and

25   we moved from this to this area here.

                Ann H. Armstrong, RPR

959

1    Q    The first place you looked was in this room

2    marked living room?

3    A    Yes, sir, that is correct.

4    Q    The next place you went was where?

5    A    We moved from the living room area here

6    through the doorway here into the kitchen area here.

7    Q    And you looked around in the kitchen area?

8    A    Yes, sir.

9    Q    Did you go in this -- did you look in the

10   storage room?  What's in there?

11   A    We moved to the left here.  We found the pants

12   here.  Within this room here, you could not get into it.  It

13   was jumbled full of bed frames and other such as that.  It's

14   a large amount of -- it just looked like a storage room

15   area.

16   Q    Is this the room with the open place in the

17   ceiling?

18   A    No, sir.  If I recall correctly the room that

19   we are referring to, that's right up in this area where the

20   hole is is going to be here.

21   Q    In the kitchen area?

22   A    I believe that's where it's located, yes, sir.

23   Q    Did y'all go in the bathroom up here in the

24   top right?

25   A    We went into the bathroom after coming through

Ann H. Armstrong, RPR

960

1   here, through here and then through here.

2       Q   All right.  Now this black line here that's

3   going up and down by the living room, in between the living

4   room and the bedroom room, is that a solid wall?

5       A   That's a -- this wall runs the best I can

6   recollect.

7       Q   All the way to the front?

8       A   Yes, sir.  It runs from here to the front.

9   There is a gas heater here, and you come here.  And it's

10   just an entrance way.

11       Q   There are no doors in the house?

12       A   The only door that I recall in the house, of

13   course, were the two front doors and the one door here on

14   the bathroom.  The rest of them, they have no other type way

15   of concealing the room.  It's all just open.

16       Q   But this wall here in between the living room

17   and bedroom one and part of bedroom two is a solid wall, no

18   windows or anything like that?

19       A   Yes, sir.  That's correct as I recall.

20       MR. GOGGANS:  Thank you.  No other questions.

21       MS. WILSON:  I want to introduce these photographs of

22   the outside.  We move for the introduction of State's

23   Exhibit 86 through 92.

24       THE COURT:  It will be admitted.

25       MS. WILSON:  That's all.

Ann H. Armstrong, RPR

961

1         THE COURT:  You can step down.

2         (The witness was excused from the witness stand.)

3         THE COURT:  Call your next witness.

4                    CRAIG BAILEY,

5    after having been duly sworn, was examined and testified as

6    follows:

7                    DIRECT EXAMINATION

8    BY MS. WILSON:

9         Q     Can you state your name and tell us how you

10   are employed, please?

11        A     My name is Craig Bailey.  I work with the

12   Alabama Department of Forensic Sciences in Montgomery.

13        Q     And what is your position with the Department

14   of Forensic Sciences, please, sir?

15        A     I am a forensic scientist.  My actual title is

16   forensic scientist five.  And I work in the area of trace

17   evidence and crime scene investigation.

18        Q     What type of education and background do you

19   have that qualifies you for this position, please, sir?

20        A     I have a bachelor's degree in chemistry from

21   the University of Alabama in Birmingham.  I have a couple of

22   graduate courses from that same school.  I was employed in

23   1971 for the Department and worked in an apprenticeship

24   program for a year there and have received a lot of on-the-

25   job training since that time.

Ann H. Armstrong, RPR

962

1     Q      Okay.  So you have been with the department

2 for how many years now?

3     A      Twenty-five.

4     Q      Have you had the occasion during your tenure

5 as a forensic scientist to testify in the courts of Alabama?

6     A      Yes, ma'am.

7     Q      And have you testified regarding your findings

8 in investigation, criminal investigation?

9     A      Yes, I have.

10     MS. WILSON:  At this time we move for the

11 introduction of Mr. Bailey as a forensic scientist.

12     THE COURT:  He will be so considered.

13     Q      Now did you get a call to come to Selma,

14 Alabama sometime shortly after November 27, 1996?

15     A      Yes, I did.

16     Q      And when did you come, and where did you go

17 please, sir?

18     A      I came on November 29th of 1996 and proceeded

19 to the impound garage at the Selma Police Department.

20     Q      Okay.  And who notified you and requested you

21 to come, please?

22     A      I believe it was Mr. James Edwards, Selma

23 Police Department.  It might have been Detective Grindle.

24 I'm not sure.

25     Q      Okay.  And when you came, you went to the

Ann H. Armstrong, RPR

963

1  impound lot there at the police department.  And what did

2  you see there?

3       A       They showed me a blue Ford Ranger pickup

4  truck.

5       Q       Did you make photographs of that pickup truck?

6       A       Yes, I did.

7       Q       Do you have those with you, please, sir?

8       A       Yes, ma'am.

9       (State's Exhibit Number 93 was marked for

10  identification.)

11       Q       I'm going to show you what has been marked as

12  State's Exhibit 93 and ask you what that photograph depicts,

13  please, sir?

14       A       Yes, ma'am.  This is a photo of the pickup

15  truck looking at the left side.

16       Q       And that is while it is currently housed in

17  the garage there at the Selma police department, right?

18       A       Yes.

19       Q       That's not at the scene where this incident

20  allegedly occurred?

21       A       That's correct.

22       MS. WILSON:  We move for the introduction of

23  State's Exhibit Number 93.

24       MR. GOGGANS:  No objection.

25       THE COURT:  It will be admitted.

Ann H. Armstrong, RPR

964

1      Q       What was your purpose for coming to Selma and

2   examining that truck, please, sir?

3      A       Basically the police department asked me to

4   help out and assist in what we generally term the processing

5   of the vehicle, which includes photographing the vehicle,

6   examining the vehicle for fingerprints and looking to see if

7   there was any pertinent or other evidence associated with

8   the truck in regard to the crime.

9      Q       Okay.  And when you arrived what did you do?

10  What did your examination consist of, please?

11     A       Well, basically just those things.  I dictated

12  some notes of what I observed.  There at the pickup truck I

13  made photographs of the pickup truck of items I found on the

14  truck and inside the truck.  And then we went and we

15  processed the truck for fingerprints.

16     Q       So what did you observe about the truck,

17  please, sir?

18     A       Well, there was a large amount of blood on the

19  interior of the truck, particularly on the driver's side in

20  the seat area and on the threshold of that seat.  There was

21  also a lot of blood and tissue that was on the interior left

22  door; that is, the driver's side interior of the door and on

23  the interior window of that door, blood and biological

24  tissue on the left side of the dash and on the left-hand

25  side of the windshield, interior windshield.

Ann H. Armstrong, RPR

1    Q    And after you made those observations, what
2    did you do then please, sir?
3    A    Well, I made the photographs, and also I
4    should say that we saw some small holes around the window
5    lever area which was broken off by the way.  The lever that
6    rolls up the window was broken off.  There were several tiny
7    holes that were consistent with some type of shot going
8    through there.  And I made photographs of that.  I noted
9    some item of evidence.  I did not collect those.  I left
10   those for someone else to collect.  And we went about
11   processing it for fingerprints.
12   Q    Okay.  Now the pellets or the holes that you
13   saw in the side of the door, did you see that pattern
14   anywhere else inside the truck such as in the dash, the
15   steering wheel, or on the passenger side door?
16   A    There were some holes on the right-hand side
17   seat of the vehicle as I recall.  Now there's a front
18   seating area on the right-hand side that were somewhat
19   similar to these holes but a little bit bigger as I recall.
20   Q    Okay.  Now what other evidence did you see
21   there that you did not seize but you noted?
22   A    There was a wadding that was in the driver's
23   side floor board.  A wadding is a portion of a shotgun
24   shell.  I saw it there.
25   Q    Okay.  You did not seize that; is that

966

1  correct?

2       A       That's correct.  I saw it there, and it's in

3  one of the photographs and whatnot.  Mr. James Edwards with

4  the Selma Police Department should have collected that.  I

5  left that evidence.  We all noted that, and he was going to

6  collect that.

7       Q       Okay.  Did you discover any other evidence

8  there in the vehicle itself?

9       A       Well, other than the blood and the biological

10  tissue -- I did not take samples of those, but those could

11  certainly be considered to be evidence as well possibly,

12  although it seemed obvious to come from the deceased in this

13  case.

14       Q       What about the door lever, you said that the

15  door lever was not attached to the door?

16       A       The door lever was in the floor board of the

17  driver's side.

18       Q       Now is that -- likewise you left that in place

19  too?

20       A       That is correct.

21       Q       Was that near where the shotgun wad was found?

22       A       Yes, ma'am.

23       Q       Same floor board side of the driver?

24       A       That's correct.

25       Q       All right.  And the lever that was obviously

Ann H. Armstrong, RPR

967

1  shot off from the door was on the driver's side, not the

2  passenger's?

3       A       That's correct.

4       Q       Did you notice any broken glass, any windows

5  shot out, anything like that?

6       A       I don't recall broken glass.  No, ma'am, I

7  just don't recall that.

8       Q       Okay.  Now when you processed the vehicle for

9  fingerprints, can you describe to the ladies and gentlemen

10  what that process is, what steps you take to lift

11  fingerprints?

12       A       Basically with this truck, we used fingerprint

13  powder.  We use a silver powder.  We use a black powder.

14  And we use a black powder on light colored surfaces.  We use

15  a silver or gray powder on dark colored surfaces.  We also

16  use a powder that's called magnetic powder.  And this is a

17  powder that has a little wand that magnetizes and yet it

18  will still give off a dusting powder on latent impressions;

19  that is invisible impressions that you can't see until you

20  dust them.  After you dust these prints, it is routine to

21  put a piece of clear tape over it, and you lift the print.

22  And lots of times that's called a tape lift or a lifted

23  impression or a lifted fingerprint.  And you will put that

24  onto a white card or on a black card, whichever gives you

25  the best contrast for the impression that you have lifted.

Ann H. Armstrong, RPR

968

1      Q       And what portions of the truck did you attempt

2  to lift prints off of?

3      A       We dusted the interior of the truck, and we

4  dusted most of the exterior of the truck.  The interior

5  included the windows, the vinyl areas; that is the seating

6  and whatnot.  I believe we also dusted some of the

7  dashboard, steering wheel.  I think there was a mirror that

8  was on the floor board that was not attached up here.  It

9  was down on the floor board.  Then we also dusted areas on

10  the outside of the truck, along the sides of the truck and

11  areas on the hood of the truck, on the sides of the hood and

12  areas on both doors, the outside areas of both doors,

13  particularly around the handles and along the window edge.

14      Q       Now are there some materials that it's easier

15  to get identifiable or matchable prints off of than other

16  areas?

17      A       Yes, ma'am.

18      Q       What areas in the truck did you have more

19  success in getting useable prints from?

20      A       The best prints are usually obtained from

21  something like glass which is a small, hard surface that

22  will take a fingerprint and preserve it very well.  And you

23  can dust it.  It's easy to lift as well.  The next best is

24  like shiny metal, which is on the outside of the truck.  You

25  have more difficulty, but you can still have some success

Ann H. Armstrong, RPR

969

1   with plastic items such as the vinyl on the seats or

2   something of that nature.  The dashboard is difficult.  The

3   steering wheel is always very difficult because it is

4   usually a type of plastic, and it also has a good bit of

5   just grease if you want to call it that or oils from

6   people's hand that drive the truck.

7          Q      Okay.  And the oil from people's hands make it

8   difficult to get useable prints?

9          A      If there's too much oil on there, sure, it

10  sure does.

11         Q      Okay.  Now do you have any idea as to how many

12  prints you were able to lift off of this truck?

13         A      No, ma'am.  I would just say several which

14  means more than four or five or something like that.

15         Q      Who was assisting you in doing this?

16         A      It was Mr. James Edwards who is with the Selma

17  Police Department.

18         Q      What did y'all do with these prints that you

19  lifted from the truck?

20         A      After they were lifted, they are placed on

21  cards.  We identified where we made these lifts from off of

22  the vehicle.  And we initial or sign the card to show that

23  we made these particular lifts, that we took these

24  particulars lifts from the vehicle.

25         Q      Okay.  And once that is done, what do you do

Ann H. Armstrong, RPR

970

1   with these cards with the prints on them?

2        A       Well, I left these in the custody of Mr.

3   Edwards.  Mr. Edwards from my understanding at the time

4   would take them to the Alabama Bureau of Investigation in

5   Montgomery who will do the comparison or examination of

6   these lift prints.

7        Q       Okay.  So you don't take any part in the

8   actual examination and comparison?

9        A       That's correct, of the print itself, no,

10  ma'am, I do not.

11       Q       Your job is merely to try to obtain some

12  comparable prints?

13       A       Yes, ma'am.

14       MS. WILSON:  I pass the witness.

15                    CROSS EXAMINATION

16  BY MR. GOGGANS:

17       Q       Mr. Bailey, do you remember from where on the

18  truck y'all obtained prints?

19       A       I think we got a good many prints off of the

20  back of the truck, along the side, top sides of it.  We

21  probably lifted some off of the, as I recall got some off of

22  the hood area, off the door.  These are all exterior areas.

23  I may have lifted some prints, attempted to lift some prints

24  on the windows inside.

25       Q       When you get -- do I understand it correctly

Ann H. Armstrong, RPR

971

1    that you got some -- you said back.  You talked about around

2    the truck bed, the top of the back truck bed?

3         A     Yes, sir.

4         Q     Do you remember getting any prints from the

5    area of the passenger door?

6         A     I may have, but I don't have a particular

7    recollection.

8         Q     Do you remember getting any off of the

9    passenger side window?

10        A     Again I may have.  I just don't remember.

11        Q     Let me ask this.  Did I understand it

12   correctly that on the prints that y'all lifted, that you

13   marked on a card or whatever you put it on from where you

14   lifted that particular print?

15        A     Yes, sir.

16        MR. GOGGANS:  Nothing else.

17        THE COURT:  Anything else?

18        MS. WILSON:  Nothing further from this witness.

19        (The witness was excused from the witness stand.)

20                    JAMES EDWARDS,

21   after having been duly sworn, was examined and testified as

22   follows:

23                  DIRECT EXAMINATION

24   BY MR. GREENE:

25        Q     State your name and position, please?

Ann H. Armstrong, RPR

972

1      A      My name is James Edwards.  I'm employed with

2  the Selma Police Department as an evidence technician.

3      Q      In that capacity, sir, it's your job to go out

4  to crime scenes, seize and take custody of evidence that's

5  located by officers and also look for and seize evidence

6  yourself?

7      A      Yes, sir, it is.

8      Q      In the course of that do you lift what's

9  called latent or hidden prints?

10     A      Yes, sir.

11     Q      For fingerprinting and comparison?

12     A      Yes, sir, I do not do the comparison.

13     Q      Certainly, but you lift the latents for that

14 purpose.  In this case, sir, you worked with Detective

15 Grindle and also with Department of Forensic Science

16 criminalist Craig Bailey; is that true?

17     A      Yes, sir, I did.

18     Q      Did you have occasion then to go out to the

19 scene at Crockett Alley on the early morning hours of

20 Thanksgiving morning?

21     A      Yes, sir, I did.

22     Q      And during the course of that, sir, did you

23 work with Mr. Bailey to attempt to locate prints on the

24 truck?

25     A      No, sir.  The following day Mr. Bailey came

Ann H. Armstrong, RPR

973

1   down to our department, and then we conducted, lifted

2   fingerprints.

3        Q       Did you do it at the scene, or did you do it

4   somewhere else?

5        A       We done it inside the garage.

6        Q       Tell us how the truck got then from the scene

7   to your garage.

8        A       We had the vehicle towed from Crockett's Alley

9   to the police department.

10        Q       When it arrived at the police department, did

11   you secure it there?

12        A       Yes, sir, I did.

13        Q       And when did it get there, sir, in your best

14   judgment?

15        A       The exact time, sir, I don't know.

16        Q       Your best judgment?

17        A       It was -- the body was picked up.  Then we

18   moved the truck probably I would say around 5:00.

19        Q       And where was it placed, sir?

20        A       It was locked up in the Selma Police

21   Department garage.

22        Q       And was the vehicle, sir, in the same

23   condition when it arrived at the police department as it was

24   when y'all left the scene with it?

25        A       Yes, sir, it was, because I followed the

Ann H. Armstrong, RPR

974

1    wrecker that took it.

2         Q      You followed it all the way in?

3         A      Yes, sir.

4         Q      So nobody could touch it or contaminate it in

5    any way?

6         A      Yes.

7         Q      And did it remain there, sir, in some type of

8    secure position at the police department until y'all were

9    able to quote process it; that is, go over it for latent

10   fingerprints?

11        A      Yes, sir, we did.  We locked the gates to the

12   garage itself.

13        Q      And how long was it, sir, after this that you

14   went back to process it for prints?

15        A      The following day.

16        Q      All right, sir.  The following day, you mean

17   the day after Thanksgiving?

18        A      Yes, sir.

19        Q      And did you and Craig Bailey remove the latent

20   lifts or latent prints from the truck?

21        A      Yes, sir, we did.

22        Q      And do you know how many?

23        A      Yes, sir.  Just a minute.  Let me look at my

24   notes.  We obtained fifteen fingerprint lift cards from the

25   victim's truck.

Ann H. Armstrong, RPR

975

1          Q      And what did you do with those?

2          A      I took them to -- I sealed the envelope and

3    everything, and then on the 10th -- 12-10-96 I took the

4    fingerprint lifts and the fingerprint cards up to the ABI,

5    Alabama Bureau of Investigation.

6          Q      And would that be Ms. Gloria Walters?

7          A      Yes, sir, it would.

8          Q      So you took the latent; that is, the hidden

9    ones, the ones y'all lifted off the truck?

10         A      Yes, sir.

11         Q      Everywhere you thought you found something

12   that looked like a useable, readable print?

13         A      Yes, sir.

14         Q      Whether it was or wasn't; if you thought it

15   was, you took it?

16         A      Yes.

17         Q      What do you basically do; you put the powder

18   out and put some tape on it and lift it up?

19         A      Yes, sir.  You have -- you take the brushes

20   and stuff and then apply the powder to the vehicle, and then

21   the prints are exposed.

22         Q      And you also testified that you took the known

23   print cards with you; is that correct?

24         A      Yes, sir.

25         Q      Would you examine Exhibits 55, 54, 53 and 52

Ann H. Armstrong, RPR

976

1   and see if this is what we are talking about or at least

2   some of the ones that we are talking about?

3       A       Yes, sir, it is.

4       Q       Okay.  So you took these along with the hidden

5   ones; these are the known ones?

6       A       Yes, sir.

7       Q       These exhibits 55, 52, 53 and 54, and you took

8   the latents, the hiddens and delivered them all to her?

9       A       Yes, sir.

10      Q       Were they all in the same condition when you

11  got them to Ms. Walters?

12      A       Yes, sir, they were.

13      Q       She's the person that does the comparison?

14      A       Yes, sir.

15      Q       Now while at the scene that morning, did you

16  receive or did you also yourself secure certain pieces of

17  evidence there around or about the truck?

18      A       Yes, sir, I did.

19      Q       Did you, sir, obtain what I'm going to refer

20  to as shot wads or shotgun shell casings; that is, the

21  material that is inside the shotgun shell that holds the

22  powder, the shot and the other instruments inside of that?

23      A       Yes, sir, I did.

24      Q       And where did you obtain those from, please?

25      A       One was found inside the vehicle on the floor

Ann H. Armstrong, RPR

977

1  board, and the other one was found just if I'm not mistaken

2  right outside the door.

3      Q      Are you checking something to verify that?

4      A      Yes, sir, I am.  Yes, sir, I did.

5      Q      Okay.  You found one where?

6      A      I found one on the driver's side underneath

7  the truck, and I found one on the floor board inside the

8  truck.

9      Q      One outside the truck, the driver's side under

10  the truck?

11      A      Yes, sir.

12      Q      Slightly under the truck?

13      A      Just slightly.

14      Q      And one in the floor board?

15      A      Yes, sir.

16      Q      These are some sort of plastic or cardboard

17  casings?

18      A      Yes, sir.

19      Q      All right, sir.  I show you Exhibits 37 and 38

20  and ask you if you are familiar with them and if you can

21  identify them?

22      A      Yes, sir.  This one right here is a shotgun

23  wad that was underneath the truck.

24      Q      That's number 37?

25      A      Yes, sir.

Ann H. Armstrong, RPR

978

1      Q      All right, sir.

2      A      And this shotgun wad was found on the floor

3   board of the truck.

4      Q      All right, sir.  And you submitted those to

5   the forensics lab?

6      A      Yes, sir, I did.

7      Q      For the purpose of Mr. Saloom to examine?

8      A      Yes, sir.  Those are my initials on the back.

9      Q      These are now in basically the same condition

10  as they were other than being an open package?

11     A      Yes, sir.

12     Q      To when you submitted them?

13     A      Yes, sir.  These are my seals up here,

14  Forensic Science and everything from the bottom.

15     MR. GREENE:  We move for the introduction of 38 and

16  37.

17     MR. GOGGANS:  No objection.

18     THE COURT:  It will be admitted.

19     Q      Now you also received some evidence from

20  Detective Grindle, did you not?  Well, let me -- before we

21  leave the scene, sir, did you obtain some items from the

22  scene itself including item number three, a green ball cap?

23     A      Yes, sir, I did.

24     Q      And you've retained this since that time?

25     A      Yes, sir, I have.

Ann H. Armstrong, RPR

979

1    Q        And would you open that for us briefly, sir?

2    A        (Witness complies.)  A green ball cap.

3    Q        All right, sir.  Now Exhibit number 3, I mean,

4    excuse me, item number 3, Exhibit Number 25 contains a green

5    ball cap.  Is that in fact the green ball cap you seized on

6    that occasion?

7    A        Yes, sir, it is.

8    Q        Same condition now as it was at that time or

9    substantially the same condition?

10   A        Yes, sir, it is.

11   MR. GREENE:  Move for the introduction of Exhibit 25.

12   THE COURT:  It will be admitted.

13   Q        Where was this cap laying?

14   A        The cap was laying right near the truck just

15   off the pavement, off the pavement right there.

16   Q        Okay.  All right, sir.  You also received or

17   took custody of some coins laying there on the ground; is

18   that correct?

19   A        Yes, sir, I did.  There was 68 cents in U. S.

20   currency laying just on the pavement right below the door

21   right there.

22   Q        Okay.  I show you item number 2, which is

23   marked Exhibit Number 24.  Can you tell us if that in fact

24   is the coins that you seized there on that occasion?

25   A        Yes, sir, it is.

Ann H. Armstrong, RPR

980

1      Q     All right, sir.  Are they now in the same or

2  substantially the same condition as they were?

3      A     Yes.

4      Q     You packaged them; they haven't been opened

5  since that time?

6      A     No, sir.

7      MR. GREENE:  Move for the introduction of Exhibit 24.

8      THE COURT:  It will be admitted.

9      Q     You also took custody of, sir, as I understand

10  it item number 1, a diamond ring; is that correct?

11      A     Yes, sir, I did.

12      Q     Showing you item one, Exhibit 23, and ask you

13  if that in fact is that exhibit?

14      A     Yes, sir, it is.

15      Q     And that was found where?

16      A     The ring was found near the truck just right

17  on the edge of the pavement within a couple of inches from

18  the pavement.

19      Q     And this exhibit is still in the sealed

20  condition as you sealed it on that particular occasion; is

21  that correct?

22      A     Yes, sir.  We have opened it and looked at it

23  with the --

24      Q     Defense attorneys and resealed it?

25      A     Yes, sir.

Ann H. Armstrong, RPR

981

1        Q       So it's in the same condition now as it was

2    when you got it?

3        A       Yes, sir.

4        MR. GREENE:  Move for the introduction of Exhibit 23,

5    the ring.

6        THE COURT:  Admitted.

7        Q       Now you also took custody of and received item

8    6 which is Number 26 purporting to be a towel; is that

9    correct?

10       A       Yes, sir, I did.

11       Q       And would you examine that and tell us if that

12   is in fact what that exhibit holds?  Tell us where you got

13   it and tell us if it's in the same condition.

14       A       The towel was found on the shoulder of the

15   victim inside the truck.

16       Q       Can you open that and see if in fact that's

17   what's in there?  Just rip it.  It doesn't matter.

18       A       It is.

19       Q       Is it now in the same or substantially the

20   same condition as it was when you put it in this package?

21       A       Yes, sir, it is.

22       Q       And has this been in your custody since that

23   time in a sealed condition?

24       A       Yes, sir.

25       MR. GREENE:  We move for the introduction of Exhibit

Ann H. Armstrong, RPR

982

1   26.

2           THE COURT:  It will be admitted.

3           Q      All right sir.  Now item number 7, sir, which

4   is Exhibit 12, can you tell us that is, and how you received

5   it and where it came from?

6           A      Item number 7 is the blue and white Fila coat.

7   It was obtained in the first bedroom as we identified as

8   bedroom one laying in a chair next to the bed.

9           Q      Is that what that exhibit contains, sir?

10          A      Yes, sir, it is.

11          Q      Has it been in your care, custody and control

12  since that time?

13          A      This item was sent to a lab and sent back to

14  us.

15          Q      For examination for what purpose?

16          A      DNA testing.

17          Q      Okay.  Any testing done?

18          A      Yes, sir.

19          Q      Did they do any testing and render you a

20  report?

21          A      Yes, sir.  I did not get the report.

22  Detective Grindle got the report.

23          Q      All right.  Do you understand that they didn't

24  do any testing, or do you think they did?

25          A      There was a couple of items we looked at last

Ann H. Armstrong, RPR

983

1    week that we could tell where they had cut the item out.

2         Q    But you don't know of any report, do you?

3         A    No, sir.

4         Q    The fact of the matter is they weren't able or

5    did not complete that work; is that right?  You don't know?

6         A    I don't know.

7         Q    All right, sir.  Do you know whose jacket this

8    was supposed to be?

9         MR. GOGGANS:  Objection, Your Honor.

10        MR. GREENE:  I will withdraw it.  That's fine.

11        Q     Is this document, is this item now in the same

12   or substantially the same condition as it was with the

13   exception of the cutting places from the lab as it was when

14   you got it on this occasion?

15        A    Yes, sir, it is.

16        MR. GREENE:  We move for the introduction of Exhibit

17   12.

18        THE COURT:  It will be admitted.

19        Q    Item 8, 9 and 10 and 11 and 12, sir, can you

20   tell us if you received these items in the course of your

21   duties there in this investigation during that Thanksgiving

22   day, and if so, have you kept them in your care, custody and

23   control and submitted them to the lab for any examination

24   and received them back?

25        A    Yes, sir.

Ann H. Armstrong, RPR

984

1       Q     And are they in the same or substantially the

2  same condition as they were at the time that you picked them

3  up?

4       A     Yes, sir.

5       Q     Would you describe each item for us, please,

6  sir?

7       A     Item number 8 here is a pair of white pants

8  with a belt.  It was found in the kitchen at 2128 Selma

9  Avenue lying on the floor.

10      MR. GREENE:  We move for the introduction of Exhibit

11  13.

12      THE COURT:  It will be admitted.

13       Q     Item number nine?

14       A     Item number nine was a white and blue Nike

15  tennis shoes, and it was found in the bedroom.

16       Q     The purpose of seizing all of these items,

17  they had what appeared to be some sort of blood stains on

18  them?

19       A     Yes, sir, they did.

20       Q     These items, this is Exhibit number what?

21       A     14.

22      MR. GREENE:  Move for the introduction of 14.

23      THE COURT:  It will be admitted.

24       A     Item number ten I have here is one pair of

25  blue and white Reebok shoes with blood stains on them.

Ann H. Armstrong, RPR

985

1      Q     That's Exhibit Number 15?

2      A     Yes, sir.

3      Q     Where were they found?

4      A     They were found in the bedroom right next to a

5 chest of drawers on the floor.

6      Q     Same reason for seizure, apparent blood

7 stains?

8      A     Yes, sir.

9      MR. GREENE:  Move for the introduction of 15.

10     THE COURT:  It will be admitted.

11     Q     Item number what?

12     A     11.

13     Q     That's Exhibit Number 16, what is that, sir,

14 and where was it found?

15     A     It's a pair of green blue jeans; it's blue

16 jean type material type pants, and it was found in the

17 bedroom right next to the edge of the chest of drawers.

18     Q     That's Exhibit Number 16.  The purpose of

19 seizure was blood stain, apparent blood stains?

20     A     Yes, sir.

21     MR. GREENE:  Move for the introduction of 16.

22     THE COURT:  Admitted.

23     A     Item number twelve was a pair of gray type

24 khaki pants.  They were found in the bedroom underneath, not

25 underneath but under the edge of the chest of drawers where

Ann H. Armstrong, RPR

986

1  the shoes and the other stuff was located.

2       Q     Reason for seizure once again, apparent blood

3  stains?

4       A     Yes, sir.

5       Q     And this is Exhibit Number 17?

6       A     Yes.

7       MR. GREENE:  Move for the introduction of same.

8       THE COURT:  Admitted.

9       Q     Item number sixteen, which is Exhibit number

10  18, do you recognize that and tell us where it was seized

11  and what it is?

12       A     It's a flowery type bed sheet.  It's white and

13  red and blue in color, and it was found on the bed on the

14  mattress.  There is two beds in the room.  It was found on

15  the first bed right here.

16       Q     In what house?

17       A     It's 2128 Selma Avenue.

18       Q     Is this exhibit, sir, now in the same or

19  substantially the same condition as it was when you received

20  it other than any item that might have been removed from it

21  by Department of Forensic Sciences for possible DNA testing?

22       A     Yes.

23       Q     You've delivered it and received it back and

24  had it your care and custody since that time?

25       A     Yes, sir.

Ann H. Armstrong, RPR

987

1     MR. GREENE:  Move for introduction of Exhibit 13.

2     THE COURT:  It will be admitted.

3     Q     I show you now what's marked as item number

4  30.  It's Exhibit Number 36 and 35, a box and what appears

5  to be a shot shell.  Did you receive that from Detective

6  Grindle?

7     A     Yes, sir, I did.

8     Q     You submitted that to the Department of

9  Forensic Sciences for their examination?

10    A     Yes, sir, I did.

11    Q     And when you submitted it was it in a sealed

12 condition in this box?

13    A     Yes, sir, I sealed the box.

14    Q     All right, sir.  And does this appear to be

15 the shell?

16    A     Yes, sir.

17    MR. GREENE:  All right, sir.  We move for the

18 introduction of Exhibit Number 35 and 36, the box and the

19 shell.

20    THE COURT:  It will be admitted.

21    Q     I show you now, sir, Exhibit Number 25, excuse

22 me, item number 25, Exhibit Number 20.  Can you tell us what

23 that contains?

24    A     It contains a blue, yellow and white Michigan

25 jacket, and I received that from Detective Grindle.

Ann H. Armstrong, RPR

988

1      Q     Do you know from whence it was received?

2      A     From my notes here it was from Matthew Reeves.

3      Q     The reason for seizing it was blood stains?

4      A     Yes, sir.

5      Q     Has this item been in your care, custody and

6 control other than submission to the lab for examination?

7      A     Yes, sir, it has.

8      Q     And it came back to you?

9      A     Yes, sir.

10      Q     Is it now in the same condition or

11 substantially the same condition as it was from the time you

12 received it until the time you brought it here today?

13      A     Yes, sir, it is.

14      MR. GREENE:  We move for the introduction of State's

15 Exhibit 20.

16      THE COURT:  It will be admitted.

17      Q     And finally, Exhibit Number 29, excuse me,

18 item 29, Exhibit 28 which appear to be a pair of shoes, did

19 you take custody of those, sir?

20      A     Yes, sir, I took custody from Detective

21 Grindle.

22      Q     Have they been in your care, custody and

23 control?

24      A     Yes, sir, they have.

25      Q     The reason for seizure was what?

989

1      A     Possible blood stains.

2      Q     And are these in the same or substantially the

3 same condition now as they were when you received them?

4      A     Yes, sir, they are.

5      MR. GREENE:  Move for the introduction of 28.

6      THE COURT:  It will be admitted.

7      Q     Finally, sir, you received what your item

8 number 17 as I understand it which is Exhibit 39 which is a

9 shotgun; is that correct?

10     A     Yes, sir, it is.

11     Q     And you received that from whom?

12     A     I collected that at the scene.

13     Q     All right, sir.  Where did you get it?

14     A     It was underneath the mattress between the

15 mattress and the box springs of the bed, bedroom number one.

16     Q     Where?

17     A     In the bedroom at 2128 Selma Avenue.

18     Q     All right, sir.  And after receiving it, did

19 you keep it in your care, custody and control?

20     A     Yes, sir, I did.

21     Q     Was it loaded when you got it?

22     A     No, sir.

23     Q     What did you do with it after receiving it,

24 sir?

25     A     Once I received it, I placed it in a bag so no

Ann H. Armstrong, RPR

990

1   one could -- so I couldn't tamper with any prints or

2   anything on the gun.  Once I got it back to my office, I

3   boxed it up and prepared it for Forensic Sciences, ABI and

4   then Forensic Science.

5        Q      What did you -- to whom did you deliver it?

6        A      I delivered the gun to Alabama Bureau of

7   Investigation on 12-10-96.

8        Q      Was that to the fingerprint lab?

9        A      Yes, sir, it was.

10       Q      Ms. Gloria Walters?

11       A      Yes, sir.

12       Q      Okay.  And after she had finished with it, did

13  you leave any further instructions for it to be submitted

14  further?

15       A      Yes, sir.  I asked for it to be printed and

16  then once the printing was done forwarded to Forensic

17  Science.

18       Q      All right, sir.  And, of course, you didn't

19  get the gun back?

20       A      No, sir.

21       Q      You were here when it was brought here by a

22  fire arms expert?

23       A      Yes, sir.

24       Q      Dr. Saloom, is that right?

25       A      Yes, sir.

Ann H. Armstrong, RPR

991

1        Q        When you submitted it, sir, to Ms. Walters,

2   was it in the same or substantially the same condition as it

3   was when you received it?

4        A        Yes, sir.

5        Q        From the bed?

6        A        Yes, sir, it was.

7        Q        And you took special care then to try to

8   preserve any prints that might have been on it?

9        A        Yes, sir.

10       Q        You didn't try to lift prints off of it

11  yourself?

12       A        No, sir.

13       MR. GREENE:  All right, sir.  I think that's all.

14                        CROSS EXAMINATION

15  BY MR. GOGGANS:

16       Q        Mr. Edwards, do you remember from where all on

17  the truck y'all lifted fingerprints?

18       A        I would have to go back and look at it because

19  on the fingerprint cards, once we put the powder and the

20  type on them, we put them on the card.

21       Q        And the cards you turned over to Ms. Walters?

22       A        Yes, sir, I did.

23       Q        Do you remember lifting any from the passenger

24  door or the passenger window?

25       A        The passenger window I do.

Ann H. Armstrong, RPR

992

1     Q      You did?

2     A      Yes, sir, I did.

3     MR. GOGGANS:  Nothing else.

4                    REDIRECT EXAMINATION

5  BY MR. GREENE:

6     Q      The cards she has will bear notes made by you

7  and Bailey to where they were lifted from?

8     A      Yes, sir.

9     Q      Even though she wasn't there for the lifting,

10 your notes in your judgment would be accurate and correct as

11 to what you submitted?

12    A      Yes, sir.  The reason we asked Forensic

13 Science to come down for the fingerprinting, at that time I

14 was not proficient with fingerprinting.  I wanted an expert

15 there.

16    MR. GREENE:  Thank you, sir.

17    THE COURT:  Anything else?

18    MR. GOGGANS:  Nothing else.

19    (The witness was excused from the witness stand.)

20    THE COURT:   Ladies and gentlemen, at this time we

21 will take a fifteen minute recess.  Please don't discuss the

22 facts of the case among yourselves.  Don't allow anyone to

23 approach you and discuss the facts.  If you would please get

24 your soft drink and return back to the jury room.

25    (A recess was taken.)

Ann H. Armstrong, RPR

993

1       (The following proceedings occurred in chambers.)

2       THE COURT:  I explained to the attorneys that Mr.

3   Denmark had had a recollection of Mr. Johnson, the victim in

4   this case.  He disclosed that to me just a few minutes ago.

5   And Mr. Denmark, I'm going to ask these attorneys to

6   basically ask -- well, let me say this.  You tell them what

7   you told me, and then I will let them ask you any questions.

8       MR. DENMARK:  I told him that I knew him from another

9   guy.  I seen him with the family.  I was thinking that I

10  knew the truck and knew the guy.  But I never could picture

11  who it really was until I saw him and his name is Willie

12  too.  He worked for Roy out there.  I've got a key to Roy's

13  shop.  I go up there sometimes and work on my truck and

14  whatever.  Willie helped him, and he and Roy were friends.

15  And he'd come up there a lot when I was working on my truck

16  and stay around and talk.  And we talked about the truck

17  before, how I kept things in tune.  That's just the only way

18  I knew him was from Roy's shop.  I didn't even know this had

19  happened to him.

20      MR. GOGGANS:  When did you start thinking that you

21  might have known the truck?

22      MR. DENMARK:  Last night after they was talking about

23  Tyler because I live out there.  I couldn't ever figure out

24  who it was until I saw that other Willie today.  I asked,

25  what are you doing here?  He said, I'm in there with the

Ann H. Armstrong, RPR

994

1   family.  So I knew it was the same one.  He had always hung

2   around with him and was on good terms with Roy.  He lives

3   out there now.

4        MR. GOGGANS:  What prompted you to tell Judge Jones

5   about it?

6        MR. DENMARK:  I mean I figured y'all would want to

7   know that because the first day whenever y'all asked if

8   anybody knew him or whether we know anything about it.  I

9   didn't know at the time then who it was.

10        MR. GOGGANS:  When is it that you saw this man?  Was

11   it out in the hall?

12        MR. DENMARK:  Uh-huh.

13        MR. GOGGANS:  When did you notice him, a minute ago?

14        MR. DENMARK:  Just a minute ago getting into the

15   elevator or walking down the stairs.  And he was going down,

16   going outside to smoke.

17        MR. GOGGANS:  Are you uncomfortable now?

18        MR. DENMARK:  Not really, I just figured that I

19   needed to tell the Judge because I mean I wasn't close

20   enough to the guy to even know what happened to him.  I

21   hadn't seen him in awhile.

22        MR. GREENE:  May I?  Mr. Denmark, you did -- the

23   person you were talking to that you know that works, I think

24   you said worked with Mr. Roy Moore, this is a person that

25   was in the hallway?

Ann H. Armstrong, RPR

995

1      MR. DENMARK:  Yes.  He's been sitting out there I

2    think.

3      MR. GREENE:  In the courtroom in there?

4      MR. DENMARK:  Yes, sir.

5      MR. GREENE:  Do you know that person fairly well?

6      MR. DENMARK:  Yes, sir.

7      MR. GREENE:  Did you know the deceased in this case

8    at all?

9      MR. DENMARK:  I knew him, but he couldn't tell you my

10   name, and I knew his name was Willie.  That was all I ever

11   knew.

12     MR. GREENE:  How long have you known of and

13   concerning him?

14     MR. DENMARK:  Maybe three years maybe, off and on.  I

15   just saw him around the shop or saw him pass when him and

16   the other Willie would be riding down the road.  I knew

17   Willie would be in there with him.  They were always

18   together.

19     MR. GREENE:  Did you know anything about his family,

20   his background or anything about what he did or where he

21   worked?

22     MR. DENMARK:  No, sir.

23     MR. GREENE:  Have you ever worked with him, been with

24   him, had any contact with him?

25     MR. DENMARK:  No, sir, just when he walked in that

Ann H. Armstrong, RPR

996

1   shop maybe once or twice when we were working on our truck.

2       MR. GREENE:  Does that knowledge put you in a

3   position where you can't serve in this case and make a fair

4   judgment based on what you have heard?

5       MR. DENMARK:  No, sir.

6       THE COURT:  Do you feel uncomfortable?  That's a

7   different question.

8       MR. DENMARK:  No, sir.

9       MR. GREENE:  You haven't heard all of the evidence in

10  this case, but are you still in a position where you can

11  either convict or not convict based on what you decide the

12  evidence is at the end?

13      MR. DENMARK:  Yes, sir.

14      MR. GREENE:  In spite of this connection with this

15  man?

16      MR. DENMARK:  Yes, sir.

17      MR. GREENE:  You could still -- if you thought the

18  evidence warranted it, you could turn the man here loose?

19      MR. DENMARK:  Yes, sir.

20      MR. WIGGINS:  This Willie person that you said you

21  had seen him sitting in the courtroom all day?

22      MR. DENMARK:  I thought I had recognized him, but I

23  never did look really hard until I walked outside and walked

24  right by him.  Then I knew it was him.

25      MR. WIGGINS:  Having recognized him, do you know how

Ann H. Armstrong, RPR

997

1  long he has been in the courtroom?

2      MR. DENMARK:  No, sir.

3      MR. WIGGINS:  The photographs of the truck, is that

4  something that you have seen?

5      MR. DENMARK:  The one today where you could see in

6  the garage, you know, you could see the whole truck.  Really

7  I knew then that it was the same truck I had been in before.

8      MR. WIGGINS:  The relationship with this other

9  Willie, was it a knowledge from going up to Roy Moore's

10 shop?

11     MR. DENMARK:  Me and Roy Moore, we are all real good

12 friends, him and my dad, and I used their shop to get air

13 and tools or whatever, you know.  I've got a key to their

14 shop and everything.  And he has worked for Roy for, I don't

15 know, ten years or more probably.

16     MR. WIGGINS:  What about the fact that this Willie is

17 closely related to the victim?  Would that have any bearing?

18     MR. DENMARK:  I don't even know if he's related to

19 him or, you know -- I don't really know how he's kin to him.

20 It has no bearing on me really.

21     MR. WIGGINS:  If he's up here supporting, in support

22 of the family, that wouldn't have any effect on you?

23     MR. DENMARK:  No, sir.

24     MR. GOGGANS:  You were actually in that truck?

25     MR. DENMARK:  Yes, we used it one time, me and Willie

Ann H. Armstrong, RPR

998

1   out here when we was replacing brake shoes on my truck.  We

2   came to town.  I had to get some new brake shoes,

3        THE COURT:  Anything else?

4        MR. GREENE:  No.

5        THE COURT:  You may take a seat back in the jury

6   room.

7        (Mr. Denmark left the room.)

8        MR. WIGGINS:  I think he has to be excused.

9        THE COURT:  Why?

10       MR. WIGGINS:  Knowledge of the victim, his knowledge

11  of the friend of the victim.  To my knowledge that person

12  has been sitting in the proceedings thus far.

13       THE COURT:  I don't even know who you're talking

14  about out there.

15       MR. WIGGINS:  Something jogs his memory in the

16  photographs of the truck, and then having talked to this man

17  that's here in support of the family -- even though he said

18  he can be fair, we have to believe him.  I just don't think

19  that he is going to be able to set that aside, his knowledge

20  of the victim, his relationship, his riding in the truck.

21       MR. GREENE:  This perhaps is a moot point, but he is

22  the alternate.  He is the second or first alternate.  We

23  don't have to make this decision right this minute.  He may

24  be gone in a matter of hours anyway.

25       MR. WIGGINS:  That's true.

Ann H. Armstrong, RPR

999

1        THE COURT:  We'll do that.  I'll reserve my ruling.

2   If it comes to a decision, we will just have to make a

3   decision.

4        MR. GOGGANS:  Again let me state for the record his

5   constitutional grounds.  He is entitled to a fair and

6   impartial trial based on the 6th and 14th amendment to the

7   U. S. Constitution and Article 1, Section 6 of the state

8   constitution.

9        THE COURT:  We'll get started back in just a few

10  minutes.

11        (The following occurred in the presence and hearing

12  of the jury:)

13                    GLORIA WALTERS,

14  after having been duly sworn, was examined and testified as

15  follows:

16                  DIRECT EXAMINATION

17  BY MR. GREENE:

18        Q      State your name and employment to the ladies

19  and gentlemen of the jury please?

20        A      My name is Gloria Walters.  I am a certified

21  latent print examiner with the Department of Public Safety

22  in Montgomery.

23        Q      All right.  How long have you been employed in

24  that position, please, ma'am?

25        A      I've been in the fingerprint field for

                    Ann H. Armstrong, RPR

1000

1  approximately 24 years; two of that was with the FBI in

2  Washington, D. C., and the remaining time has been with the

3  Alabama Bureau of Investigation, fingerprint division.

4      Q      And you used the term certified.  What is a

5  certified latent print examiner, please, ma'am?

6      A      I'm certified by the international association

7  for identification.  This is a worldwide organization.  In

8  order to be certified by this organization, an individual

9  must not only have experience but have spent enough time in

10 this field that they may pass certification exams.  I am one

11 of less than fifteen hundred examiners in the world.

12     Q      In the years that you have performed this duty

13 and service with the Department of Public Safety, please,

14 ma'am, could you give us an understanding of your

15 educational background, your training and experience, any

16 periodicals, documents or books that you read concerning

17 that and any articles or things that you might have

18 published in and also any seminars, training and ongoing

19 training that you attend?

20     A      Again I have been in the field for

21 approximately 24 years.  I have been certified.  I have a

22 Bachelor of Science degree in criminal justice from Auburn

23 University in Montgomery.  I am constantly updating myself

24 with periodicals and attending seminars and training

25 sessions in different areas of the fingerprint field.

Ann H. Armstrong, RPR

1001

1  Q      In the course of your years in this field

2  please, ma'am, have you been called upon to examine latent

3  lifts and compare them to known prints and also to raise or

4  to try to find prints on various objects; that is, latent

5  prints, and testify as to your comparisons, findings and the

6  determination of the scientific basis for fingerprints?

7  A      Yes, I have.

8  Q      Would you give us any idea how many times you

9  have made such examinations?

10  A      Millions.

11  Q      And could you tell us how many times, give us

12  some estimate as to how many times you have been called upon

13  to testify, not just to give on opinion but to testify as to

14  your opinions and findings?

15  A      I would say hundreds.

16  Q      And have you been called upon, please, ma'am,

17  to so testify in the courts of this state, other states and

18  in the federal system?

19  A      Yes, I have.

20  MR. GREENE:  Now, Your Honor, at this time we would

21  like to offer Ms. Walters as an expert in the field of

22  fingerprints in general, fingerprint identification and the

23  lifting and finding of latent lifts.

24  THE COURT:  She will be so considered.

25  Q      In this particular case, please, ma'am, did

Ann H. Armstrong, RPR

1002

1    you receive from I think Mr. Edwards of the Selma Police

2    Department a series of latent lifts, latent fingerprints or

3    latent lifts supposedly from a truck?

4         A    Yes, I did.

5         Q    Did you also receive from him the known

6    fingerprint cards made at the time of booking or arrest of

7    Brenda Suttles, Matthew Reeves and Julius Reeves?

8         A    Yes, I did.

9         Q    And are those documents there in front of you

10   marked by exhibit numbers?

11        A    Yes.

12        Q    I think you actually have two on who, Brenda;

13   is that right?

14        A    Yes.

15        Q    And is there something on those cards that

16   lets you know that you have dealt with those cards?

17        A    Yes.   These cards bear my latent case number

18   and initials.

19        Q    And that pertains to this particular case?

20        A    That's correct.

21        Q    Now please, ma'am, what is a latent

22   fingerprint?

23        A    A latent print is the reproduction of friction

24   skin regions by the sweat and oil that has been spread over

25   these regions.   The sweat comes from the pours that line the

Ann H. Armstrong, RPR

1003

1  ridges.  The oil comes from these ridges coming in contact

2  with an oily surface.  These ridges when they come in

3  contact with a surface will actually deposit the sweat and

4  oil on that surface.  Then in order to make those latent

5  prints visible, they must be processed in some manner.

6  Latent means hidden.  And a latent print is put down

7  strictly by chance.  So in order to make them for the naked

8  eye to see, they have to be processed.  And the manner in

9  which an object is processed is going to be determined by

10  the surface that we are dealing with.

11       Q       In this particular case, can you tell how --

12  in this case, Mr. Edwards and Mr. Bailey I think actually

13  processed the latents.  Can you tell us how they were

14  processed by looking at them based on your knowledge and

15  expertise?

16       A       They appeared to be powder prints that were

17  lifted and put on a contrasting background.

18       Q       And maybe you ought to help us just a little

19  bit.  What is a powder print?

20       A       A powder print is a print that is on the

21  surface of an item.  We call these surfaces nonporous

22  surfaces, anything that is hard, such as a piece of glass, a

23  can.  These surfaces, the print actually rests on that

24  surface.  Whereas, what we call a porous print is an object

25  that the print is absorbed into the surface.  On nonporous

Ann H. Armstrong, RPR

1004

1   prints, again the print rests on the surface and must be

2   processed in order to make them visible.  And in the

3   majority of instances, this is done by powder.  A small

4   amount of power is placed on the brush, and then the brush

5   is very lightly spread over the surface.  And the powder

6   will actually adhere to the ridge detail which is made up of

7   sweat and oil.

8           And then if you were to just powder it and then

9   something rubbed against it, it can still destroy the print.

10  So in order to make that print stable where it cannot be

11  destroyed, a piece of tape is placed over that print, and

12  actually you lift that print off of an object and place it

13  on a contrasting background depending on the color of the

14  powder you're using.  If you use a light colored powder,

15  such as silver or white or gray, you would use a dark

16  background; whereas, if you use a black powder, you would

17  use a white background.

18          Q       Okay.  Now in this particular case, Mr. Bailey

19  and Mr. Edwards submitted to you a series of latent lifts

20  that they removed from this truck; is that correct?

21          A       They submitted lifts to me that are marked as

22  such.

23          Q       I understand.  You, of course, weren't there

24  when they lifted them; you only got the latents.  But they

25  put the powder on, took the tape and lifted it up and put it

Ann H. Armstrong, RPR

1005

1    on a background and sent it to you?

2         A       That's correct.

3         Q       And they marked them as to where they got them

4    from?

5         A       That's correct.

6         Q       All right, sir.  Of those -- and what I show

7    here is a series of prints.  Can you tell us if you are able

8    to identify any of the prints -- and I'm referring to the

9    truck now -- with any of the known prints that you received

10   from the booking officers with the so-called major print

11   known cards there that are done in black ink?   Let me say

12   this.  Let me ask you this.  If people would go around with

13   black ink on their hands every time they wanted to leave a

14   print, you would get them that looked like those cards,

15   wouldn't you?

16        A       Pretty much.

17        Q       But they don't do that, do they?

18        A       No, not most people.

19        Q       Back to my question.  I'm sorry.

20        A       Your ink prints again are controlled; in other

21   words, a person is taking those prints; whereas, your latent

22   prints are done strictly by chance.  Okay.  Now as far as

23   lifts from the, that were marked from the vehicle, there

24   were two latent fingerprints of value on the lift that was

25   marked R (door of truck).  And these two prints were labeled

Ann H. Armstrong, RPR

1006

1   -- I labeled them latents number three and four, and they

2   were identified with the left ring finger both of Julius

3   Reeves.  Okay.  There was one fingerprint of value on the

4   lift marked R, (door).  And that one was labeled latent

5   number five.  And it was identified with the right middle

6   finger of Julius Reeves.  There were two latent fingerprints

7   of value on the lift marked rear fender on driver's side on

8   top part.  This was labeled latent number -- these are

9   labeled latent number six and seven.  Latent number six was

10   identified as the right middle finger of Brenda Suttles.

11   The latent number seven has been identified as the right

12   ring finger of Brenda Suttles.  Okay.

13        There was one fingerprint of value on the lift marked

14   rear fender on driver's side on top part.  This was labeled

15   latent number eight and has been identified as the left

16   middle finger of Brenda Suttles.  There were two latent

17   fingerprints of value on lift marked top L of P/U bed side

18   labeled latents number nine and ten.  Latent number nine was

19   identified as the left ring finger of Brenda Suttles.

20   Latent number ten was identified as the left middle finger

21   of Brenda Suttles.

22        Q    So you had on the door of the truck prints of

23   Julius Reeves?

24        A    Yes.

25        Q    Okay.  It's looks like three, and then on the

1007

1   rear fender, driver's side and rear fender driver's side

2   top, and top left pickup, you've got fingerprints of Brenda

3   Suttles?

4         A     Correct.

5         Q     All right.  Now did you have some other

6   useable prints --- these are latents that you can see ridge

7   detail in?

8         A     Yes, I did.

9         Q     That you feel like you could make an

10  identification?

11        A     Yes, I did.

12        Q     And you compared these to your knowns, and

13  they didn't match any of these three people?

14        A     I had two palm prints of value, and yes, they

15  did not match any of the inked prints that I was provided.

16        Q     Did you make any comparison to the victim

17  himself?

18        A     No, I did not.

19        Q     So we have no idea whether they are his or

20  whose; is that correct?

21        A     I have no idea whose they are.

22        Q     But they aren't Matthew, Julius or Brenda?

23        A     Correct.

24        Q     Now that, of course, doesn't account for all

25  of the prints that, all of the latent prints that you got

Ann H. Armstrong, RPR

1008

1  because obviously there is some more somewhere.  What

2  happened to them?  Tell us about them.

3        A      There were two prints of value developed on

4  the shotgun.

5        Q      No, I meant on the truck.

6        A      On the truck.  Any lifts that were provided to

7  me that are not listed here contained no latents of value.

8        Q      Now what is a latent that is not of value?

9  Why would it not be of value?  Obviously, Edwards and Bailey

10  thought they were getting something that was good, but what

11  happened?

12        A      In order for me to make a positive

13  identification of a fingerprint or a latent print, it must

14  contain sufficient ridge detail for me to compare that to an

15  ink print.  If an investigator were to find say ridges, then

16  they would lift those and send them to me, and I would

17  determine whether or not they were actually of value and

18  could be compared with an ink print.  These lifts did not

19  contain significant or ridge detail in order for me to be

20  able to positively identify them.

21        Q      Okay.  So these other prints simply -- you're

22  not able to make an identification on them because of the

23  poor quality of the print?

24        A      That's correct.

25        Q      I know that's my summary, but okay.  Now in

Ann H. Armstrong, RPR

1009

1    the course of your duties, you also received I think a 12-

2    gauge shotgun which is I believe marked Exhibit Number 39

3    here, and I believe that our exhibit number is right over

4    plastic; is that right?

5         A    Yes, sir.

6         Q    Did you receive Exhibit Number 39 for the

7    purposes of fingerprinting, please, ma'am?

8         A    Yes, I did.

9         Q    And you received that from Mr. Edwards also?

10        A    Yes, I did.

11        Q    And did you on this weapon attempt to lift

12   prints from it?

13        A    Yes, I did.

14        Q    In other words, you went looking for the

15   latent, the hidden prints that might be there?

16        A    That's correct.

17        Q    How did you do that?

18        A    Well, the first thing I did was actually

19   visually examine the item, and I was able to see ridge

20   detail.  So therefore, I photographed it, what I could see

21   and what I could get on a camera.  Then I placed this

22   particular item in the Super Glue tank and actually fumed

23   it.  It's a method by which the Super Glue is actually

24   heated.  It causes a fume in the -- the fume will actually

25   adhere to the prints.  There is a chemical reaction that

Ann H. Armstrong, RPR

1010

1    will adhere to the prints, and it will cause the prints to

2    be white on the surface or the ridge detail to be white.

3    Once that was done, I photographed the ridge detail that I

4    found.  I then processed it with powder and actually made

5    lifts of the latents of value.  And once I had done that, I

6    reprocessed it and covered it with tape.

7         Q      And how many latent lifts did you find on the

8    shotgun, please, ma'am?

9         A      I found two latent fingerprints of value.

10        Q      And were you -- where were they located?

11        A      There on this part right here.

12        Q      I'll hold it up for you.  They are where?

13        A      This area here.

14        Q      You have tape across it; is that correct?

15        A      That's correct.

16        Q      From here to here?

17        A      Yes, sir.

18        Q      Somewhere in that area.  All right sir.  And

19   are they somewhat still visible?

20        A      Yes, sir.

21        Q      And did you compare those latent lifts that

22   you had made with your known prints that you had received

23   from Mr. Edwards from the three subjects, Julius, Brenda and

24   Matthew Reeves?

25        A      Yes, I did.

Ann H. Armstrong, RPR

1011

1     Q     And were you able to make any identification?

2     A     Yes.  The two fingerprints which I developed

3 on the gun were identified as belonging to Matthew Reeves.

4     Q     And can you tell us from the fingerprints how

5 they were put on, how the gun was being held?

6     A     In this manner.

7     Q     Thank you, ma'am.

8     MR. GREENE:  Your witness.

9                    CROSS EXAMINATION

10 BY MR. GOGGANS:

11     Q     Ms. Walters, do you have with you the photos

12 that you took of the shotgun?

13     A     Yes, I do.

14     Q     May I see those real quick.  The photos that

15 you took of the gun, was that in the area where you found

16 the two latent prints of value?

17     A     Correct.

18     Q     Those were the only two latent prints of value

19 that you found on this shotgun?

20     A     Correct.

21     Q     Now the lift that was labeled number eleven,

22 am I correct in understanding that that was unidentified?

23     A     The lift which I labeled latent number eleven,

24 yes, it's unidentified.

25     Q     And your information on the card that you got,

Ann H. Armstrong, RPR

1012

1  it was labeled as having been lifted on the passenger side

2  window?

3       A       Correct.

4       Q       And the lift that you labeled number twelve

5  was also unidentified, correct?

6       A       Correct.

7       Q       We are talking -- just now we're talking about

8  off the truck; is that correct?

9       A       I don't know where latent number twelve came

10 from.  The lift itself was not labeled, and so therefore I

11 cannot testify as to where that lift came from.

12      Q       You have no idea whose it is or where it came

13 from?

14      A       That's correct.

15      Q       Back to the number eleven that was marked

16 passenger side window, that was a palm print, was it not?

17      A       Correct.

18      Q       And that was a latent palm print of value,

19 correct?

20      A       Right.

21      Q       Did you receive any major print sets or any

22 kind of print sets to compare on a Jason Powell or Emanuel

23 Suttles?

24      A       No, I did not.

25      MR. GOGGANS:  Nothing else.

Ann H. Armstrong, RPR

1013

1                    REDIRECT EXAMINATION

2  BY MR. GREENE:

3        Q      One last question, this number twelve latent

4  that you got along with the truck latents?

5        A      Yes.

6        Q      You do know however -- you said you don't know

7  where it was lifted.  It came with the truck prints, the

8  truck latents.  But you do know that it didn't come off the

9  gun?

10       A      I know it didn't come off the gun because I

11 made the lifts off the gun.

12       Q      Thank you, ma'am.

13       THE COURT:  Anything else?

14       MR. GOGGANS:  That's all.

15       THE COURT:  Thank you, ma'am.  You're excused.

16       (The witness was excused from the witness stand.)

17       THE COURT:  Call your next witness.

18       MR. GREENE:  Ms. Rollen.

19                    PHYLLIS ROLLEN,

20 after having been duly sworn, was examined and testified as

21 follows:

22                    DIRECT EXAMINATION

23 BY MR. GREENE:

24       Q      State your name and position to the jury,

25 please?

Ann H. Armstrong, RPR

1014

1    A    My name is Phyllis T. Rollen.  I'm employed by

2  the Alabama Department of Forensic Sciences in Birmingham,

3  Alabama as a forensic scientist in the area of forensic

4  biology.

5    Q    And in the course of those duties, which

6  contain a myriad of investigative techniques, do you deal in

7  and have you had occasion to investigate and interpret blood

8  stain patterns or interpret those, or have you also had

9  occasion to deal with what we refer to as blood splatter

10  determination?

11    A    Yes.  Part of my job with the Alabama

12  Department of Forensic Sciences is the blood spatter program

13  manager for the State, which includes training in the area

14  of blood stain pattern interpretation, teaching in that area

15  and also in aiding crime scenes.

16    Q    Now do you from time to time even though

17  you're responsible for training others in the areas of blood

18  splatter interpretation -- do you actually go to scenes and

19  work them yourself from time to time?

20    A    I do an awful lot of the time, yes.

21    Q    Okay.  What educational background do you have

22  that qualifies you, please, ma'am, to perform this type of

23  service and your entire service for the Department of

24  Forensic Sciences?

25    A    I have a Bachelor of Science degree in

Ann H. Armstrong, RPR

1015

1   laboratory technology from Auburn University, Auburn,

2   Alabama.  I have always attended graduate level courses in

3   the area of forensic serology, chain reaction in DNA

4   analyses with the FBI Academy in Quantico, Virginia.  I have

5   also attended the basic blood stain pattern course with the

6   Midwestern Association of Forensic Sciences, also blood

7   spatter interpretation workshop with Herbert McDonald from

8   Corning, New York and advanced blood stain pattern

9   interpretation from the police department in Miami, Florida.

10  I am regional vice-president for the International

11  Association of Blood Stain Pattern Analysts and attend that

12  meeting once a year.

13          Q       If I may digress for just a moment.  In

14  addition to blood splatter and blood stain interpretation,

15  blood stain pattern interpretation, what other areas do you

16  work in with the crime lab?

17          A       I work in forensic biology.  And in that

18  section, we examine.  I analyze items of evidence for the

19  presence of blood and other biological fluids, such as semen

20  and saliva.  And these are usually in stain forms.  So we

21  first identify those stains, and then we attempt to blood

22  type these and DNA analysis.

23          Q       Do you testify in DNA cases?

24          A       Yes, I do.

25          Q       Have you participated in the training for DNA

Ann H. Armstrong, RPR

1016

1    around the state?

2         A     Yes.

3         Q     Now with reference to blood splatter or blood

4    stain pattern interpretation, what exactly are you looking

5    for or what is one looking for to try to reach a conclusion

6    as to?

7         A     When blood leaves the body, what it does is

8    take on the laws of ballistics or projectile in motion.  And

9    so usually blood will stay together like any other liquid

10   unless a force is applied to it or unless it hits something.

11   Sometimes if you have a rough surface and blood drips down

12   on it, it will cause some spattering of that blood just

13   because the surface breaks it apart.  In other cases though

14   if you have a certain amount of force behind that blood, it

15   will break the blood apart.  So there are differences in

16   what blood looks like if you have just a blood that's

17   dripped from a bloody finger or you cut your finger and

18   blood pools up and it just drips straight down.  Well, it

19   will take on a particular shape and size based on the fact

20   that there is so much blood before it drips.  Now if you

21   have an injury of some sort, however, that has a large

22   amount of force behind it, such as maybe from a beating or

23   from a gunshot or from a machine injury, then that force

24   that is applied to that wounded area is going to break the

25   blood up into different patterns.  And through research we

Ann H. Armstrong, RPR

1017

1   have seen that the way the blood lands on a particular table

2   or a floor or wall depicts an angle of impact.  And those

3   small stains when they enter that surface can be calculated.

4   And actually what you can do is take the calculation of the

5   width and the length of that blood stain and take the arch

6   sign of it and actually pull back a triangle area from that

7   blood stain to find out where it came from.  So we can use

8   blood stains in that way to find out exactly where the blood

9   stains came from.  And the these are actually blood stains

10  that came from a wound.  So you can place someone's -- say

11  if they have a head injury, you can place that head a

12  certain inches or feet away from a wall or a surface that

13  that blood is deposited on.

14       The other thing you can look at are different

15  characteristics of blood staining patterns.  You can look to

16  see if that blood looks like it's dripped, or if it's

17  splashed, something in the pattern that would look like it

18  would if you spilled a glass of milk or something on the

19  floor.  We can get those same kind of patterns if you have a

20  large amount of blood leaving the body at one time.  You can

21  see contact patterns which would be blood that's being

22  transferred from a bloody object or clothing to another

23  object such as a wall or anything else.  And those would be

24  distinctive patterns also.  So first of all what I do is

25  look at the blood stains that are present to see what could

Ann H. Armstrong, RPR

1018

1   have caused these blood stain patterns and then determine

2   possibilities as to where the blood came from, research the

3   documented injuries of the subject in the case, also look at

4   the surface areas around to see how the blood stain patterns

5   landed on those areas.  And sometimes I will be able to

6   place the wound such as a head wound or a chest wound or

7   whatever in a certain area, in a home or in a vehicle or

8   wherever that subject might be.  Also we can look at

9   patterns that are on the subject to determine whether the

10   subject has been moved or not and things such as that.

11          MR. GREENE:  And at this point we would offer Ms.

12   Rollen to testify as an expert in blood stain pattern

13   determination and interpretation if the Court please.

14          THE COURT:  All right.

15          Q       In this particular case, please, ma'am, you

16   were requested to come assist in the investigation of the

17   death of Mr. Willie Johnson, Jr. here in Selma; is that

18   correct?

19          A       Yes, I was.

20          Q       And you came down I think on December 5th?

21          A       Yes, 1996.

22          Q       Now you came I think to the police department

23   and examined a truck a Ford Ranger truck?

24          A       Yes.

25          Q       And other than the truck itself -- by the way

1  that truck was I think secured in a police department locker

2  or building or something of that nature?

3       A     Yes, it was.

4       Q     You met with Mr. Edwards and Detective Grindle

5  for that examination?

6       A     Yes.

7       Q     And one of the tools you used was the

8  examination of that truck itself?

9       A     That's correct.

10      Q     Could you tell us what other tools you used in

11  this particular case?

12      A     I looked at photographs that had been taken by

13  the Selma Police Department and also had evidence technician

14  James Edwards photograph the areas of the truck that I was

15  interested in.  The other thing that I used was the

16  pathology findings to study the documentation of the wounds

17  to Mr. Johnson.

18      Q     Okay.  Could you tell us, please, ma'am, what

19  you found in any of these areas that you examined, the

20  truck, the wound to Mr. Johnson, the photographs as to what

21  was significant about the blood stained patterns that led

22  you to any interpretation thereon.

23      A     There was a pool of blood that was in the

24  driver's seat of the vehicle.  There were also spattered

25  patterns that were on the dashboard, the steering wheel, the

1020

1    lower interior driver's door, some spatter patterns on the

2    interior driver's window.  There were also some pellets in

3    the steering wheel area.  And there were some spatter

4    patterns on the central area of the driver's seat where the

5    legs would go.  I visualized all of those blood stain

6    patterns and using those and the photographs and the

7    pathology findings was able to determine that Mr. Johnson

8    should have been in my opinion sitting in the front seat of

9    the vehicle either facing forward or with his head slightly

10   to the left toward the driver's window when the injuries

11   were sustained and the blood flowed from him.  The angles of

12   the blood stain patterns that are present on the dash,

13   steering wheel, the dash and door area where the front door

14   opens and closes and also those on the lower interior

15   driver's door indicate that along with the injuries to Mr.

16   Johnson that the -- it appears that the injury was sustained

17   from an area that will, that its trajectory is toward the

18   rear window of the Ranger pickup.

19        Q      Okay.  And did you also determine anything

20   about whether the doors had been shut, closed or reopened or

21   anything of that nature?

22        A      Yes, there was pooling blood on the interior

23   kick panel of the Ranger.  And I examined the lower part of

24   the driver's door, and there were blood stained patterns to

25   indicate there that the blood pooled up with the door shut.

Ann H. Armstrong, RPR

1021

1   However, while the blood was still wet, the door was opened

2   and shut again because the blood that is on the door itself,

3   the lower part of the door splashed back towards the inside.

4   So if the blood had just dripped down and the door was shut,

5   that blood would have just pooled up, and we would not have

6   any kind of impact, projected blood or splashed blood

7   because there would be no reason.  There would no force

8   behind that.  But however, while the blood is still wet, the

9   door appears to have opened and then shut because we do have

10  that pattern that splashes back towards the interior seat of

11  the cab of the truck.

12       Q       Would that give you any indication that Mr.

13  Johnson had been moved out of the truck at some point in

14  time after he was bloodied and injured?

15       A       That could be possible if the door was opened

16  and shut again, yes.

17       Q       So even though the officers and the

18  photographs taken at the time they arrived show him laying

19  on the seat prone if that would be the fact, based on what

20  you found from the blood stained patterns and the

21  interpretation thereof, he was sitting in an upright

22  position under the steering wheel?

23       A       Yes.  He could not have been in that prone

24  position on the front seat when the injuries were sustained

25  and the blood was deposited because it would have looked

Ann H. Armstrong, RPR