# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MATTHEW REEVES,                    )
                                   )
    Petitioner,                )
                                   )
xii.                               )     Case No.  1:17-cv-00061-KD-MU
                                   )
JEFFERSON S. DUNN,                 )
Commissioner of the Alabama        )
Department of Corrections,         )
                                   )
    Respondent.                )

# VOLUME 8

# State Court – Trial, Reporter's Record

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
   CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

1022

1  totally different.  The blood that is deposited on the

2  steering wheel and the door and dash indicate that he is in

3  a sitting position.  And that does go along with the

4  injuries that are documented to his body.

5       Q     And the shot or the death blow came from

6  behind him through the window area, back sliding window?

7       A     Yes.  According to the angles of the blood

8  stained patterns and tissue patterns that are present as

9  well as the pellets that are present in the steering wheel,

10  it would indicate that the shot came from the rear window

11  area.

12       Q     Were you able to determine anything about the

13  hands or his hands from what you saw?

14       A     Based on the pathology findings of the

15  injuries there, it appears that the left hand was possibly

16  in the steering wheel position when the injuries were

17  sustained to that area.

18       Q     With reference to the passenger side of the

19  vehicle, did you find any splatter or anything of that

20  nature on that side?

21       A     No.  There is nothing to indicate there is any

22  blood shed, and I examined, fully examined the passenger

23  side area.  There is a small amount of smeared blood just

24  right above the central arm rest that separates the

25  passenger seat from the driver's seat.  And there is no

Ann H. Armstrong, RPR

1023

1    blood that goes any further than that towards the passenger

2    side of the vehicle.  If there was a shot that originated

3    from say the driver's door, then I would expect blood to go

4    in that direction towards the passenger seat.  And there is

5    not any blood that is indicated there.  So I know that

6    cannot have happened in that respect.  So the blood stained

7    on patterns that are there and the absence of the blood

8    stain, of any blood stains in the passenger side also

9    corroborate my interpretation of the driver's rear window.

10          Q     But the shot came from the driver's rear

11   window while he was in an upright position going in a

12   downward velocity?

13          A     That's right.

14          MR. GREENE:  Thank you, ma'am.

15          MR. GOGGANS:  No questions.

16          THE COURT:  Thank you very much.

17          (The witness was excused from the witness stand.)

18          MS. WILSON:  At this time the State moves for the

19   introduction of State's Exhibit Number 34 which is the box

20   that the gun came in.

21          THE COURT:  It will be admitted.

22          MS. WILSON:  At this time the State rests.

23          THE COURT:  Ladies and gentlemen, at this time the

24   State has rested.  That means they have presented all of the

25   evidence in this case.  And I'm going to ask you to please

1024

1    retire to the jury room for a brief recess. Please do not

2    leave the jury room at this time. This will be a very brief

3    recess. Don't discuss the facts of the case among

4    yourselves at this time, please. And we hopefully will be

5    back in just a few minutes.

6         (The jury was excused from the courtroom.)

7         THE COURT: At this time the Defendant has a motion.

8         MR. GOGGANS: Your Honor, the defense has tendered to

9    the Court and served upon counsel for the state of Alabama a

10   written motion for judgment of acquittal under Rule 20 of

11   the state criminal procedure rules. We move for a judgment

12   of acquittal on the charge of capital murder on the grounds

13   stated therein.

14        THE COURT: Thank you, sir. Response?

15        MR. GREENE: Your Honor, the State feels that it has

16   shown a prima facie case. We have shown the fact that the

17   deceased had funds; his pockets were emptied. There was

18   sworn testimony from non codefendants that money was taken.

19   We have shown testimony from codefendants that he was in

20   fact robbed, testimony from at least two or more people that

21   there was an intent to rob him either of a ring or of money.

22   And that we feel we have borne that burden. We don't think

23   the theory of any mere afterthought of a killing to take

24   something from him is what has been shown here. The

25   evidence is fairly clear that there was an intent to rob the

1025

1  gentleman as I think rob the man as was stated by several of

2  the witnesses.  And at the very least it's certainly a

3  question for the jury to resolve.

4       THE COURT:  Anything else from the defense?

5       MR. GOGGANS:  No, sir.  We will rest on the grounds

6  stated in our view of the state of the evidence.

7       THE COURT:  Motion for judgment of acquittal will be

8  denied.

9       Let's talk for just a few minutes about how we are

10  going to proceed.  Do you want to present evidence this

11  afternoon, Mr. Goggans and Mr. Wiggins?

12       MR. GOGGANS:  Your Honor, I believe we are prepared

13  to rest also.

14       THE COURT:  Do you want to rest on the record?

15       MR. GOGGANS:  Yes, sir.

16       THE COURT:  What I propose to do then as we discussed

17  earlier is let me call the jury back in.  I'll let you rest

18  on the record for the jury.  And then we'll send them home.

19  We can have our charge conference, and we will be prepared

20  to argue and charge in the morning at 9:00 a.m.  Is

21  everybody in agreement?

22       MR. GREENE:  That's fine, Your Honor.

23       MR. GOGGANS:  Very good.

24       (The following occurred in the presence and hearing

25  of the jury:)

1026

1    MR. GOGGANS:  Your Honor, the defense rests on the

2  evidence.

3    THE COURT:  Ladies and gentlemen, the State and the

4  Defendant have now rested their cases.  The Court is going

5  to place you in recess at this time until 9:00 o'clock in

6  the morning.  We have to take up some matters outside of

7  your hearing and presence, and it should take probably the

8  rest of the afternoon for us.  In the morning at 9:00

9  o'clock when you return to the jury room, the attorneys at

10 that time will have an opportunity to argue their cases to

11 you.  At this conclusion of their argument, then I will

12 charge you on the applicable law in the case, and then it

13 will be your duty to deliberate and then to reach a verdict

14 in this case.  I want to remind you again regarding my

15 instruction to please do not discuss the facts of this case

16 with anyone.  Don't allow anyone to approach you and discuss

17 the facts of this case.  It's imperative that you avoid all

18 news media coverage of the proceedings here.  I'm sure that

19 there will be an article in the newspaper tomorrow morning,

20 I'm sure that there will be news coverage tonight on the

21 television and perhaps on the radio.  I cannot tell you how

22 very important it is for us to avoid that type of contact.

23 So please keep that in mind as you go away from the

24 courthouse tonight, and please have no conversations with

25 anyone regarding this case.  And we will see you back here

1    in the morning at 9 a.m.

2              (The jury was excused from the courtroom.)

3              THE COURT:  Mr. Goggans, do you want to make your --

4              MR. GOGGANS:  Your Honor, the defense has also

5    rested.  We renew the motion for judgment of acquittal on

6    the same grounds stated in the written motion filed in open

7    court earlier.

8              THE COURT:  Same response I presume from the State?

9              MR. GREENE:  Yes, Your Honor.

10             THE COURT:  All right.  The motion for judgment of

11   acquittal at the close of the defense's case is denied.

12             (A recess was taken.)

13             THE COURT:  Let's go on the record.  Mr. Goggans and

14   I have had an opportunity to exchange my standard

15   instruction and his requested instructions.  He's reviewed

16   what I typically do, and I have reviewed his requests.  I

17   feel like basically of the thirty-eight requests that the

18   defense has filed, there are four that we should probably

19   talk about specifically -- correction three.  The others I

20   feel are generally covered in my oral charge.

21             Now what I will do for the record is deny the

22   Defendant's requested jury instructions with the exception

23   of 25, 26 and 30 which I want to talk about.

24             MR. GREENE:  The State objects to 25.

25             THE COURT:  Just a minute before we launch off into

1028

1    that. The reason I am denying all except for 25, 26 -- I'm

2    not ruling on 25, 26 and 30 at this time. The reason I am

3    denying those as I said a few minutes ago, I feel like they

4    are adequately covered in my general oral charge. Now there

5    is one thing in my oral charge that I will modify or delete,

6    and that is the charge regarding reasonable doubt. There is

7    a phrase that comes at the conclusion of that that says if

8    after comparing and considering all of the evidence in this

9    case, your minds are left in such a condition that you

10   cannot say you have an abiding conviction to a moral

11   certainty. And I don't have a problem deleting the phrase

12   moral certainty. That's been the request of the defense.

13   And I will let you speak to that if you want to, Mr.

14   Greene.

15        MR. GREENE: I don't have any problem with that.

16        THE COURT: Now for the record do you want to have an

17   exception to my denial of your instructions?

18        MR. GOGGANS: Yes. Let me -- well, perhaps most of

19   them I think probably are covered. What I would like to do

20   is let's talk about 25, 26 and 30, and then I'll just flip

21   through. And if there's one that I don't think is covered

22   by your standard charge, I will state why I think that

23   should be given. Is that okay?

24        THE COURT: Sure, that's no problem. Let's talk

25   about 25 and 26 then.

Ann H. Armstrong, RPR

1029

1    MR. GREENE:  From the State's standpoint, Your Honor,

2  25 is typographically incorrect and should be rejected on

3  that basis.  It is repeated in 26.

4    THE COURT:  That was one of the things that I was

5  going to talk about with you.  I noticed it was redundant.

6    MR. GREENE:  It's redundant, and it's also

7  typographically incorrect if you read it as written.

8    MR. GOGGANS:  Your Honor, 25 and 26 both were related

9  to the state statutory requirement that accomplice

10  testimony be corroborated by other evidence.  I know ages

11  ago, if there was a typo, the Court could reject the charge

12  because of the typo, but I think that's been changed.  But

13  essentially 25 and 26 both relate to the requirement of an

14  accomplice.

15    THE COURT:  Would somebody tell me where the typo is?

16    MR. GREENE:  Yes, sir.  It is not that I'm trying to

17  be technical.  It's just if you read it as it's written it

18  doesn't make any sense.

19    THE COURT:  Well, let's do that.

20    MR. GREENE:  If such corroborative evidence merely

21  shows the commission of the offense of the circumstances

22  thereof.  The word of is wrong.  It should be or.

23    MR. GOGGANS:  Let's change of to or.

24    THE COURT:  The commission of the offense or the

25  circumstances?

Ann H. Armstrong, RPR

1  MR. GREENE:  Yes, sir, because see if you read 26,

2  that's the first paragraph in 26.  They are redundant.  So I

3  see no sense in giving it twice.

4  THE COURT:  Right.  I wasn't going to give them

5  twice.

6  MR. GOGGANS:  That's fine.  If we could go back to 25

7  and 26.

8  MR. GREENE:  Does the Court have any type of charge

9  he intends to give with reference to the corroboration of

10  the accomplice?

11  THE COURT:  No, I don't.

12  MR. GOGGANS:  I think this accomplice corroboration

13  requirement has two parts.  It could be so lacking that as a

14  matter of law it can't even go to the jury.  But if it is

15  still a case where you've got an accomplice testifying

16  against the Defendant, if it's not so bad as a matter of law

17  that it doesn't get to the jury, it still is a question for

18  the jury, and it should be submitted to the jury in that

19  fashion.  It's like Fortier vs. State.  I don't remember the

20  cite.

21  THE COURT:  Well, I'll give one or the other.

22  MR. GOGGANS:  26 then.

23  THE COURT:  You know, I will have to read 26 and

24  digest it.  I did not read it earlier.  I just simply saw

25  that it and 25 were similar.  But my experience is that the

Ann H. Armstrong, RPR

1031

1   longer this stuff is the less they hear.  And I'll be glad

2   to take a look at 26.  But let me read all of it.

3         MR. GOGGANS:  I think you may be right.  Twenty-five

4   might get the point across a little better.

5         MR. GREENE:  As long as you've got or in there.  My

6   other argument is that the standard wording is an accused

7   cannot be convicted solely on the testimony of the

8   accomplice.  The word solely is not in there.  That's the

9   general theory of it.  If that's all there is, the theory is

10  the jury -- if that's all the jury is operating on, it's all

11  they have got.  And then, of course, the Court ought to toss

12  it.  The jury has a right to determine whether or not that

13  is the only evidence.

14        THE COURT:  If you put solely in there, then the

15  other party -- I mean the other part of the sentence -- the

16  phrase takes care of the suggestion that there needs to be

17  something other than the uncorroborated testimony of the

18  accomplice.

19        MR. GOGGANS:  I would amend 25 on the next to the

20  last line and change the of to or and request the Court to

21  give that one.

22        THE COURT:  I will give 25; 26 will be denied.  I'm

23  going to give 30 because we have had so much expert

24  testimony.  I think that they ought to be able to have an

25  instruction with regard to that and their ability to fairly

1  consider that testimony and weigh it the same as they weigh

2  any other testimony.

3      MR. GOGGANS:  Just note the Defense's objection.

4  Since there were experts, we think we are entitled to have

5  the charge given.

6      THE COURT:  I'm going to give it.

7      MR. GREENE:  I thought he just said he was going to

8  give it.

9      MR. GOGGANS:  I'm sorry.

10      THE COURT:  Let's look then --

11      MR. GOGGANS:  If I could just go through and let me

12  just state real quickly what I think are covered in your

13  standard charge.  I think one is more than likely fairly

14  covered in your standard charge, as is number 2.  Number 3 I

15  believe is fairly covered.  Number four, you know, I'm for

16  the most part satisfied with the proposed charge on

17  reasonable doubt.  But one thing that is in four and maybe

18  in a later charge, as I have said that a reasonable doubt

19  can arise from the evidence, and I also put or a lack of

20  evidence.  It's not only what you have heard but what you

21  didn't hear that can create a reasonable doubt.

22      THE COURT:  It's in there.

23      MR. GOGGANS:  If that's in your standard charge,

24  great.

25      THE COURT:  It says not exactly a lack thereof.

1033

1  But it says if you have a doubt, a reasonable doubt of the

2  Defendant's guilt growing out of the evidence or any part of

3  it.

4        MR. GOGGANS:  I would want to go further and say or

5  lack of evidence.  I mean for example, this is the extreme.

6  The State comes in and they give opening statements.  And

7  then they say, we rest.  Well, the lack of the evidence

8  would be a reasonable doubt.

9        THE COURT:  I will add the phrase or lack thereof.

10       MR. GOGGANS:  That will be fine.

11       MR. GREENE:  We have no objection.

12       MR. GOGGANS:  Number five appears to be covered.

13  Number 6, we would request the Court to give that.  I think

14  in this case obviously there is going to be an argument

15  about the element of during the course of a robbery.  And we

16  would request that number 6 be given on that particular

17  reason.  Number 7 is the same thing, lack of evidence.  We

18  just talked about that.  So I think that would be covered.

19       THE COURT:  Let's wait just a hair here.  The

20  standard instruction, pattern jury instruction states what

21  you just requested that I state.  To convict the State must

22  prove beyond a reasonable doubt each of the following

23  elements of an intentional murder during a robbery in the

24  first degree.

25       MR. GOGGANS:  Number 8, we have talked about the

Ann H. Armstrong, RPR

1034

1    phrase or from lack of evidence.  I think that will be

2    covered.  Number 9, I believe will be fairly covered in your

3    presumption of innocence charge.  Number 10 you have covered

4    in your standard charge.  I don't remember whether your

5    standard charge says reasonable doubt may arise from a

6    presumption of innocence.

7         THE COURT:  Yeah, it says that he comes into court

8    with a presumption of innocence which surrounds him

9    throughout the trial of the case, and it even attends him in

10   the jury room until the jury and each and every member of

11   the jury after considering all of the evidence is convinced

12   beyond a reasonable doubt that the Defendant is guilty as

13   charged.

14        MR. GOGGANS:  That's not quite the same as saying a

15   reasonable doubt may arise from the presumption of

16   innocence.

17        THE COURT:  No, it's not the same verbiage, but it's

18   certainly the same concept.

19        MR. GOGGANS:  Note our position that that should be

20   given also as a statement that the reasonable doubt may

21   arise from a presumption of innocence because of the State's

22   due process burden of proving it beyond a reasonable doubt.

23   Number 12 relates to not basing a verdict on suspicion or

24   guess work.  My recollection is that is covered; is that

25   correct?

Ann H. Armstrong, RPR

1035

1    THE COURT:  Yes.  Specifically it says that your

2    verdict must not be based on a guess or a surmise or a whim,

3    or let me read it to you.  The reasonable doubt which

4    entitles an accused to an acquittal is not a mere, fanciful,

5    vague, conjectural or a speculative doubt but a reasonably

6    substantial doubt is that phrase that you, that term

7    reasonably substantial doubt that you have.

8         MR. GOGGANS:  What I'm talking about here is, it says

9    while inferences from the evidence may furnish a basis for

10   proof beyond a reasonable doubt, mere possibility, suspicion

11   or guess work no matter how strong will not overcome the

12   presumption of innocence.  Where I'm coming from on this,

13   you know, a juror may be sitting in the jury box thinking,

14   you know, I think the guy is guilty as sin, but I don't

15   think the evidence is there.  And I want to make it clear to

16   them that they can't base a verdict on suspicion.  You know,

17   personally I've got no doubt whether this person did it,

18   whether I have heard it or not.  And since I don't have a

19   doubt or I'm guessing he did it, I don't want them to think

20   because they've got that strong hunch or that strong gut

21   feeling that they can convict.  And we think that charge

22   would be proper as going along with the appropriate burden

23   of proof as a matter of due process.

24        THE COURT:  All right.

25        MR. GOGGANS:  Number 13, the same statement as to

1036

1   number 13.  A verdict of guilty cannot be based upon the

2   fear that the accused might have committed the offense

3   charged, same thing for number 14.  It references suspicion.

4   I believe 15 is covered in your instruction on requirement

5   that the verdict be unanimous.  Seventeen I think you're

6   covering; 18 I think you're covering, 19 also, 20 also, 21,

7   also, 22 also.  I must have gotten interrupted.  I didn't

8   put a 23; 24 also.  Twenty-five and 26 we have already

9   talked about.  Twenty-seven I believe is covered.

10          THE COURT:  Twenty-eight is covered.

11          MR. GOGGANS:  Twenty-eight is covered for the most

12   part; however, the next to the last paragraph since we have

13   somebody who is actually indicted as a codefendant, we would

14   request that also as being tailored to this particular case.

15   That's the last full paragraph on the second page of number

16   28.

17          THE COURT:  Well, I think that casts undue attention

18   on the testimony, and it would be a comment by the Court

19   regarding the testimony element.  It's not an instruction

20   that in my judgment is appropriate.  I think that the

21   appropriate instruction is what we give, and that is that

22   they are the judges of the facts, that they have the ability

23   to weigh the evidence.  I go into specifics about what they

24   may consider, what they may do in the event they should

25   doubt some testimony for any witness.  I go into specifics

Ann H. Armstrong, RPR

1037

1   about the fact that they can observe the demeanor of the

2   witness, how they appeared while they were on the stand.  So

3   I think to point out to the jury that there are people who

4   have been indicted and who have come forward to testify -- I

5   think that's inappropriate.  That's something that will be

6   more suited for your argument and your ability to persuade

7   the jury.

8        MR. GOGGANS:  Twenty-nine I believe is covered.

9   Thirty we have talked about.  Are you giving an instruction

10  on aiding and abetting?

11       THE COURT:  I haven't planned on it.

12       MR. GOGGANS:  The reason we want 31, we think it's

13  particularly appropriate for this case under the State's

14  theory there were three people involved in this.  And we

15  think it's a matter of due process of having to prove all of

16  the elements in each and every one of them.  Thirty-one

17  should be given since under the State's theory is more than

18  one person was involved in this.

19       THE COURT:  Is the State's theory an aiding and

20  abetting type theory?

21       MS. WILSON:  No.

22       THE COURT:  I think the State's theory is your client

23  was the, participated in both the murder and the robbery and

24  that the intent was formed prior to the event.

25       MR. GOGGANS:  Just note the Defendant's position on

Ann H. Armstrong, RPR

1038

1    that, and our objection to not giving 31 being that we think

2    that under the evidence in this case an aiding and abetting

3    instruction should be given as a matter of state law, as a

4    matter of due process also.  Thirty-two is a lesser included

5    instruction on intentional murder.  It's probably going to

6    be out of the standard charge.  I think I just pulled this

7    from the statute.

8         MR. GREENE:  You want an aiding and abetting charge

9    to explain the theory of the guilt of the others even though

10    they didn't pull the trigger; is that your theory?

11         MR. GOGGANS:  It says, before a Defendant can be

12    criminally responsible for the conduct of others --

13         MR. GREENE:  Even the standard, I mean why -- do you

14    plan to give aiding and abetting under your pattern?

15         MR. GOGGANS:  The judge said no.

16         MR. GREENE:  You are wanting one on the theory that,

17    to show the others are guilty of this crime also, that Bam

18    Bam is equally guilty.  I'm not trying to --

19         MR. GOGGANS:  I'm not concerned about Bam Bam.

20         MR. GREENE:  I just was kind of wondering because I

21    don't think our theory was they aided and abetted anybody,

22    that he was the direct perpetrator.  But I can see where it

23    might be trying to argue to the jury that these other people

24    share in his guilt and/or we have given this other

25    perpetrator a life sentence that you might want aiding and

1039

1  abetting.  That's my thinking as to why it might be

2  pertinent.

3        THE COURT:  I think that's -- what you have in your

4  requested charge 31 is totally inconsistent with the

5  indictment.  It's totally inconsistent with the testimony,

6  and I don't see any --

7        MR. GREENE:  The mere presence, I've got you.

8        THE COURT:  I don't see any reason that we should

9  give that.

10       MR. GOGGANS:  Thirty-two is just a definition of

11  robbery murder.

12       THE COURT:  We are going into that in just a few

13  minutes and look at our standard pattern instruction.

14       MR. GOGGANS:  I would assume that would be covered.

15       MR. GREENE:  If you don't mind, before we leave the

16  aiding and abetting discussion, as I understand they were

17  requesting on 31 basically the accomplice charge.  I would

18  concur that the charge going into mere presence of the scene

19  and so on and so forth -- I don't really think that fits

20  anything we are really dealing with.  I guess you could try

21  to figure out some way it might fit.

22       MR. GOGGANS:  It fits in on the element of taking the

23  man's property.

24       THE COURT:  How is that?

25       MR. GOGGANS:  I mean their evidence is that Julius

Ann H. Armstrong, RPR

1  was the one that went in the pockets.

2       MR. GREENE:  At Matthew's direction.  Unless there is

3  some collateral theory to put it in, I mean I don't think

4  it's -- I concur with the Court's thinking that as far as

5  our theory of the case is he's directly responsible.  We are

6  not saying he aided anybody.  He is the one that did it.

7       MR. GOGGANS:  He ruled with you.

8       MR. GREENE:  Well, I wanted to know if you wanted it

9  for some other reason.  Is that the only reason you wanted

10  it is to deal with him?

11       MR. GOGGANS:  Him and Bam Bam.  All right.

12       MR. GREENE:  I don't care if you give an aiding and

13  abetting charge.  I don't like that one.  I don't think it

14  fits anything we are dealing with here.  It's not an

15  incorrect statement of the law.

16       THE COURT:  You know, I see where you're coming from,

17  Mr. Goggans.  I think that his theory is that his client was

18  there.  He did not physically remove anything from -- there

19  is no evidence that he removed anything from the pockets.

20  My problem with it is that he benefited from the robbery

21  later on, ultimately got the proceeds of the robbery, you

22  know, and that's where I have a hang-up.  I think that's the

23  State's theory, at least that's what I understand the theory

24  of the State to be.

25       MR. GREENE:  Yes, sir.

Ann H. Armstrong, RPR

1041

1    THE COURT:  It doesn't matter whether he went into

2    the pockets on that occasion.  It's the fact that he got the

3    money ultimately, eventually.  Is that not --

4         MR. GREENE:  That's correct.

5         THE COURT:  I think that's going to be misleading to

6    the jury and not a proper statement of the law for these

7    particular facts.  But does anybody else want to say

8    anything about that?  I'm going to stick with my ruling on

9    it.  If y'all want to talk a little bit more about it, we

10   can.

11        MR. GOGGANS:  No, sir.

12        THE COURT:  That's just my thinking on it.

13        MR. GOGGANS:  Thirty-two, we said we were going to

14   talk about definition of capital murder as charged in the

15   indictment.  Thirty-three will probably be in that same

16   discussion.

17        THE COURT:  It is.

18        MR. GOGGANS:  Thirty-four would be in that same

19   discussion; thirty-five, same discussion.  Thirty-six is a

20   lesser included of the plain intentional murder.

21        THE COURT:  We've got that.  That's what I intend to

22   give.

23        MR. GOGGANS:  That's just straight out of the statute

24   that I have.

25        THE COURT:  I read this before.  This was in my

Ann H. Armstrong, RPR

1042

1   preliminary instruction.  If you want me to read it again.

2       MR. GOGGANS:  Thirty-seven?

3       THE COURT:  Yeah.

4       MR. GOGGANS:  Well, I don't really know that that is

5   that big of deal because we haven't had a lot of screaming

6   and yelling anyway.  Thirty-eight I think you'll be

7   covering.

8       THE COURT:  I want you all to take a look at what I

9   intend to give.  There are those two.

10      MR. GOGGANS:  Your Honor, I've read the pattern

11  instruction on robbery murder under this book under 13A-540

12  (a) (2).  I think our charge number 32 is covered in the

13  proposed charge.  However, as respects to 33, 34 and 35,

14  those are out of the Conley case that we cited in the motion

15  for judgment of acquittal which is basically that the

16  robbery is an afterthought.  For example, you kill somebody,

17  and then later on you took some stuff while you were at it.

18  There was no intent to rob beforehand.   That does not

19  constitute capital robbery murder.  What we would propose is

20  to insert 33, 34 and 35 which are all one sentence charges

21  at the end.  And on the same paragraph where the Court is

22  defining during -- where it says during means in the course

23  of the commission or in connection with or immediate flight

24  from the commission of a robbery.  Those are from the Conley

25  vs. State case that was cited in the motion for judgment of

1  acquittal, those propositions of law.

2      THE COURT:  What did the Court say in that case?

3      MR. GOGGANS:  I was looking for my copy, and I can't

4  find it to save my life.

5      THE COURT:  Why is it not clear in here, element

6  number five?  Why is it not clear that in the course of

7  committing or attempting to commit the -- it says theft

8  here.

9      MR. GOGGANS:  I think theft is more appropriate than

10  robbery because you can't rob a dead person.

11      THE COURT:  The Defendant either used force or

12  threatened the imminent use of force against the person with

13  the intent to overcome his physical resistance.  Why isn't

14  it clear in that element that the robbery or the theft must

15  have been committed at the time of the murder rather than as

16  an afterthought?  I don't understand.

17      MR. GOGGANS:  I think that without these instructions

18  I think it needs to be made real clear to the jurors that at

19  the time of the killing there must have been an intent to

20  rob at that time, not at any time after that.

21      THE COURT:  Isn't that argument?

22      MR. GOGGANS:  No, I think that's law.

23      THE COURT:  Well, I think the law is here.  I think

24  what you're asking me to do is to bring, it to make an

25  argument, not an argument but to certainly give greater

1044

1   deference to that particular element to any of the others.

2   I mean why don't we take that element -- why don't we

3   take the other seven elements and, you know, let's expand

4   that as well and explain those other elements.

5        MR. GOGGANS:  Because they are not as big in this

6   case.  No, in the Conley case -- I think it's on 62 through

7   about 63 that they discuss this particular aspect of the

8   robbery murder statute.  The Court -- this is the criminal

9   appeals court.  It says a robbery committed as a mere

10  afterthought unrelated to murder does not sustain a

11  conviction.  They are not talking about argument.  They are

12  talking about sufficient to sustain a conviction.  It's our

13  position that -- I think it's 33, 34 and 35 are correct

14  statements of the law.  They go to a very important element

15  of the offense charged in this case and that as a matter of

16  due process we are entitled to have the jury instructed on

17  each and every element in its particularity.

18       THE COURT:  All right, sir.  Does the State want to

19  respond to that?  Is that a no?

20       MR. GREENE:  I'm sitting here wrestling with this,

21  wrestling with the whole concept.  What we are doing is we

22  are trying to take a point of argument that they intend to

23  make and make sure you charge on it, that it is duly

24  emphasized.  And the pattern instruction covers the entire

25  area.  I guess we could get into this business of he is

1     guilty of capital robbery and murder and start discussing

2     what an intent to rob is, what it takes to have the intent.

3     It can come from the instant that you pull the trigger or

4     anything of that nature.  Thirty-four says the robbery is a

5     mere afterthought unrelated to the murder.  There isn't

6     absolutely anything to sustain that.

7         THE COURT:  Is there anything else?

8         MR. GOGGANS:  No, sir.

9         MR. GREENE:  Do you have that case?

10        MR. GOGGANS:  What it is, it's the Conley case.  I

11    thought I had a copy of it.  I didn't have it.  So I went in

12    the Judge's office and got it and got the reporter out.

13        THE COURT:  I'll look at it tonight and consider it.

14    I am a little hesitant to do that, but generally I think

15    that if you stay with the charge; that is, the pattern

16    charge, you're less likely to have a problem.  And, of

17    course, I want to avoid any problems.

18        MR. GOGGANS:  You know, there was one time something

19    had been in the pattern for ages, and finally somebody got

20    it reversed.

21        THE COURT:  I'm going to instruct my secretary to

22    prepare three verdict forms.  One is guilty of murder during

23    robbery in the first degree as charged in the indictment.

24     The other is not guilty of murder in the first degree as

25    charged in the indictment but guilty of the lesser included

1046

1    offense of murder, which would be felony murder.

2        MR. GOGGANS:  I think it would be just plain

3    intentional murder.

4        MR. GREENE:  I think we all kind of agree that we

5    think we've got either a robbery or killed in the course of

6    that which is capital murder or B, there was no robbery, and

7    there was an intentional murder.

8        MR. GOGGANS:  Mr. Greene and I agree.

9        MR. GREENE:  Felony murder would be that there is a

10   robbery but there was no intentional killing.

11       THE COURT:  You're right.  And then the third

12   alternative would be just the not guilty.

13       MR. GOGGANS:  Right.

14       MR. GREENE:  I think that's where we are.  Do y'all

15   concur?

16       MR. GOGGANS:  Yeah.  That's what I think on the

17   lesser included.

18       THE COURT:  That's true.  That's correct.  Anything

19   else we need to take up?

20       MR. GOGGANS:  Can I see your pattern on intentional?

21       THE COURT:  Do you want to look at this charge on

22   intentional?  It's very basic.

23       MR. GOGGANS:  This looks like it's straight out of

24   the code really.

25            (Court was adjourned for the day.)

Ann H. Armstrong, RPR

1047

1

2

3

4

5

6

7                                    January 30, 1998

8        THE COURT:  The verdict forms have been reviewed by

9   the attorneys, and apparently there is no objection.

10       MR. GOGGANS:  Defense is satisfied.

11       THE COURT:  Yesterday when we were in our charge

12  conference there was a question about the lesser included

13  felony murder versus intentional murder under 13A-6-2 (a)

14  (1), which is what I am going to charge today.  Mr. Goggans,

15  you concur that the felony murder charge would be an

16  inappropriate charge?

17       MR. GOGGANS:  Right.  We had not requested that.  The

18  lesser included, we thought the appropriate charge to the

19  jury would be the regular plain intentional murder.

20       MR. GREENE:  The State concurs with that.

21       THE COURT:  I wanted to make sure that was covered on

22  the record.  There was another matter that I was going to

23  rule on.  That was regarding the Defendant's requested

24  charges 33, 34 and 35.  I don't believe -- I think I told

25  you I was going to rule on that this morning if I'm not

Ann H. Armstrong, RPR

1048

1  mistaken.  After reviewing the pattern instruction regarding

2  capital murder, murder during the commission of a robbery

3  first, I think that the pattern instruction sufficiently

4  covers what you intend for me to give in this charge.  I

5  think that this charge or those charges will give undue

6  attention to that particular element and that the other

7  elements would then seem to be less important.  I also

8  believe that what you're asking is really a matter of

9  argument for the most part, that you can certainly go

10  through the charge and the elements of the charge and

11  highlight that particular element and make that argument

12  that is set forth in 33, 34 and 35.  Based upon that I'm not

13  going to give 33, 34 and 35.

14        MR. GOGGANS:  I understand and respect the Court's

15  ruling.  I simply disagree for the reasons stated on the

16  record yesterday.

17        THE COURT:  Thank you, Mr. Goggans.  I appreciate

18  that.  Is there anything else we need to take up before we

19  bring the jury back in?  Anything from the State?

20        MR. GREENE:  Nothing, Your Honor.

21        THE COURT:  I told you yesterday that I was not going

22  to limit your argument.  I'm certainly not, but let's try to

23  at least keep it within an hour and fifteen minutes.  That

24  would be 45 minutes a side.  If you feel like you need more

25  than that, tell me.  I just want to give the jury an idea of

1049

 1    how long it will be.  Of course, you can divide that time

 2    any way you want to.

 3         MR. GOGGANS:  I have not timed my argument, but I do

 4    not think it will exceed that.

 5         THE COURT:  Mr. Greene, what about you?

 6         MS. WILSON:  I don't think that's a problem, Your

 7    Honor.

 8         (The following occurred in the presence and hearing

 9    of the jury:)

10         THE COURT:  Good morning.  Ladies and gentlemen, at

11    this time we are going to allow the attorneys to make their

12    closing arguments to you.  I anticipate that their argument

13    together both sides will last approximately one hour, no

14    more than an hour and fifteen minutes.  At the conclusion of

15    the argument, I'm going to give you a brief recess.  And

16    then you will be brought back into the courtroom, and I will

17    give you the charge as to the applicable law in this case.

18    Is the State ready?

19         MS. WILSON:  The State is ready.

20         THE COURT:  Is the defense ready?

21         MR. GOGGANS:  Yes.

22         MS. WILSON:  Thank you.  May it please the Court, Mr.

23    Goggans, Mr. Wiggins, the Defendant, ladies and gentlemen, a

24    couple of days ago I came before you in opening statements

25    and told you what the State expected the evidence to show.

1050

1    I told you that I felt like once you had heard the evidence

2    that each of you would be convinced beyond a reasonable

3    doubt that this man intentionally killed Willie Johnson

4    during the course of a robbery.

5           Thanksgiving, the day before Thanksgiving, 1996 most

6    people were preparing for a traditional Thanksgiving day,

7    tying up loose ends, doing last minute grocery shopping,

8    finishing work.  Willie Johnson on that Wednesday went to

9    work at the Selma Housing Authority just as he had done for

10   some twenty years, since he was about 18 years old.  He got

11   paid that day because it was a two day holiday coming up.

12   He cashed his check of some $550.  He then that afternoon

13   heads down to Roy Moore's shed to do some odd jobs with a

14   friend.  Matthew Reeves, Little Mack or Troll, however he is

15   known on the other hand got up that morning forming the plan

16   to do what, to go rob somebody, to get a lick.  So he and

17   his three buddies, Bam Bam, or Brenda Suttles, his brother,

18   Julius, and Emanuel Suttles get together and head out on

19   foot to Highland Avenue to do what, to go find somebody to

20   rob.

21          They meet up with Jason, Jason Powell who has just

22   come here from Camden.  He doesn't know anybody, looking for

23   some friends.  They get together.  Jason agrees to ride them

24   around.  Where do they go?  When they get in the car with

25   Jason, they are going to Julius and Matthew's cousin's

 1   house to get a 12-gauge pistol grip shotgun.  Why do they go

 2   to get this shotgun, because they are looking for somebody

 3   to rob.  They want to get a lick.

 4        So then they decide after they get the shotgun to go

 5   to White Hall or in that vicinity to rob as Bam Bam said, a

 6   drug dealer that Julius knew.  But what happens?  They have

 7   car trouble.  So they don't make it to White Hall.  They

 8   make it to Tyler instead.  They turn off on the dirt road.

 9   The car dies.  They are in the middle of this dirt road

10   stranded.  They are kind of sitting there, what are we going

11   to do.  Shortly thereafter along comes Colonel Duane Smith.

12   He has left his home in Montgomery.  He's in his truck.

13   He's in his hunting clothes.  He pulls up and offers some

14   assistance to these young folks.

15        Now Mr. Wiggins has made the argument if they had

16   intended to rob somebody, that if that was their intent, why

17   didn't they rob him.  Use your common sense.  Here is a man

18   in his hunting clothes going to his hunting camp that's

19   right down the road to take some other people hunting.  How

20   many hunters do you know that have a bunch of cash on them?

21   What do hunters generally have on them?  It isn't cash, but

22   it's a weapon.  These people aren't fools.  They knew that

23   man had a gun with him, and they knew he had hunting clothes

24   on.  He didn't have any money.  He wasn't somebody good to

25   rob.  So they let him go on.

1    They sit there listening to music waiting, and along

2  comes Willie Johnson, Jr. who has worked, cashed his

3  paycheck for some two weeks of work and has his money in his

4  pocket. He's going down to help somebody out. And he sees

5  this car and these young people around the car, and he stops

6  to help. He tries to help them get the car started; the car

7  won't start. So he has got a chain in the back of his

8  truck. He takes that chain out of the back of his truck.

9  He hooks it to their car, and he agrees to tow them over

10  from Tyler area all the way back to Selma. He agrees that

11  he will do it for twenty-five dollars.

12    Now Bam Bam told you, Julius came back and said,

13  twenty-five dollars; do y'all have twenty-five dollars.

14  Nobody in the car had any money. He didn't have twenty-five

15  dollars, but he took the tow. They got back to Julius and

16  Matthew's house where Willie Johnson pulled them all the

17  way. He pulls the car up in front of the house. He gets

18  out and unhooked the chain, puts the chain back in his

19  truck. They don't have the money to pay him. So Julius

20  says, take me across town to my girlfriend's house; I'll get

21  a ring. So as Bam Bam says, Julius motioned her and said,

22  come on. He didn't say that to Matthew. He said that to

23  Bam Bam, come on.

24    Now what does Matthew do? He gets the shotgun and

25  hops on the back of Willie Johnson's truck. Now Emanuel

1053

1    Suttles told you that before they even got to Matthew's

2    house they stopped somewhere between where they broke down

3    in Tyler and Matthew's house, and Julius runs back to them

4    in the car and says, this is the man.  This is the man we

5    are going to rob.  And what does he say to the others in the

6    car, yeah, yeah, smiling.  So then they get back -- they get

7    on the truck.  Bam Bam tells you she gets behind Willie

8    Johnson, Jr. on the back of the truck.  Matthew gets behind

9    Julius who is sitting in the cab.  What do Emanuel and Bam

10   Bam tell you, that Matthew hides the gun and puts it by his

11   side.  He kind of backs onto the truck and puts the,

12   conceals the gun so Willie Johnson won't see it.  Why does

13   he have the gun, because they are going to rob somebody.

14   They are going to go get a lick that day.

15        So they go get the ring.  Bam Bam tells you that

16   Willie gets the ring and puts it on his finger.  It won't go

17   all the way on.  He's got the ring.  He is driving them back

18   to Matthew's house again.  But he goes down the alley,

19   Crockett's Alley.  He pulls up in the alley.  Bam Bam has

20   told you, we had planned to rob this man.  She has got a

21   hood over her head, and what's the next thing she knows?

22   Bam.  She looks up.  What does she tell you she sees?  This

23   man, Troll, Little Mack pulling the shotgun out of the back

24   of Mr. Johnson's truck.  The back window is open, and the

25   window is slid open.  He's pulling the gun out.

Ann H. Armstrong, RPR

1054

1    Julius comes out of the truck. Bam Bam jumps off the

2    truck. What does Matthew say, I shot the man; aren't you

3    going to go get his money. So they go through his pockets.

4    They turn his pockets inside out, take the money off of

5    Willie Johnson. What does Bam Bam tell you? We pull him

6    out. Julius pulls him out. He falls on the ground like a

7    dummy. We get the money. Julius hands the money to

8    Matthew. Matthew tells us to put him back in the truck, I

9    grab him in the head area, and Julius has got his feet. We

10   are trying to stuff him back in the truck, and it's

11   disgusting. His blood is dripping on my pants and on my

12   shoes. There's blood. It's everywhere. He's gagging.

13   It's disgusting. This is a man that is still alive. This

14   is a man whose throat has just sustained a shotgun blast.

15   And what does Bam Bam tell you? It's disgusting.

16   He's dripping blood on my shoes and my pants. They put this

17   man who is gagging back into his truck. They shut the door,

18   and they take off running. They go to Matthew's house.

19   Emanuel and Jason both tell you they see them running

20   around, come into the house. Jason tells you Matthew has

21   got the shotgun as he runs into the house. Emanuel says, I

22   didn't see him with it. I know Julius didn't have the

23   shotgun when he came around the corner, but I saw Matthew

24   with it in the house because I saw Matthew rack the shotgun,

25   take the shell out, lift up the mattress in their bedroom

Ann H. Armstrong, RPR

1055

1    and stuff the gun under the mattress.  Bam Bam tells you the

2    same thing.  Matthew had the gun.  Matthew lifts the

3    mattress; Matthew puts the gun under the mattress.  Matthew

4    tells them to change clothes.

5         What do they do in that room after they motion for

6    Emanuel and Jason to come in?  Hugging and laughing,

7    celebrating; look at all the money; look at the money we

8    got.  What is Willie Johnson doing while they are

9    celebrating, hugging each other, jumping up and down?

10   Gagging.  His life is seeping away in his truck.

11        They leave there.  As they are going out the door,

12   what did Emanuel say?  What does Jason tell you that this

13   man says, I earned the money.  I earned the money.  He said

14   that several times.  I earned the money.  So they go to Bam

15   Bam's house.  Matthew runs into his girlfriend on the way,

16   Tameisha Jackson.  Do you think she wanted to come here to

17   testify to you, ladies and gentlemen?  No.  But what did she

18   tell you?  That he grabbed her, pulled her around the side

19   of the house and said, if anybody comes asking about where I

20   have been, you tell them I've been with you all night.  She

21   didn't ask any questions.

22        He goes over to Bam Bam's house.  Several people are

23   in Bam Bam's house; the music is going.  He goes up to Bam

24   Bam's girlfriend, Yolanda Blevins, also called Molly.  Molly

25   came in here and testified she is Bam Bam's girlfriend.

1  They have a relationship.  Okay.  What does she tell you?

2  That Matthew calls her into the kitchen and says, I just

3  shot somebody; I just shot somebody, a man in a truck.  We

4  got a ride with them.  We shot them.  Then the others come

5  in.  They go in the bathroom.  Julius says, let Troll divide

6  up the money.  He's the one that shot the man.  Let Troll

7  divide up the money.  So they hand out the money.  Matthew

8  gets some.  Julius gets some, and Bam Bam gets some.

9      Then what happens?  More celebration.  Matthew gets

10  out there doing his little dance, racking the gun to the

11  music, jerking like Willie Johnson jerked after he had been

12  shot, flipping his gang signs, a real time to celebrate.  He

13  goes out of Bam Bam's house and runs into Latosha Rodgers.

14  What does he tell Latosha?  Come here; you've got to promise

15  you won't tell anybody.  I want to tell you something.  I

16  just shot a man.  I shot a man.  You know what?  It's in

17  your grandma's alley.  That's where I shot him.

18      They leave there.  They go across the river.  What do

19  they do?  They take Willie Johnson's money, Willie Johnson's

20  hard earned money.  What do they do with it?  Bam Bam told

21  you they buy a little reefer.  They buy a little powder,

22  cocaine and crack, some beer and whiskey.  And the party

23  really starts.  The party goes on and on to who knows how

24  long.  They go back and go to McDonald's and get something

25  to eat.  And they eat their food, and they continue

1057

1   partying.  And then they go and crash at Bam Bam's house

2   where Matthew was arrested early the next morning.

3        During opening statements Mr. Wiggins said you are

4   going to hear some stuff that's going to shock your

5   conscience.  You're going to have feelings of anger.  You're

6   going to have feelings of sadness.  But you have to put all

7   of that aside, and you have to judge Matthew Reeves on the

8   evidence.  Let's talk about feelings.  What kind of person

9   is Willie Johnson?

10        MR. GOGGANS:   Objection, Your Honor, this goes to

11   our motion in limine.

12        THE COURT:  Sustained.

13        MS. WILSON:  Willie Johnson was a hard working man.

14        MR. GOGGANS:  Same objection, Your Honor.

15        THE COURT:  Let me get you all to approach, please.

16        (The following occurred at the bench outside the

17   hearing of the jury:)

18        THE COURT:  Don't get outside of what this evidence

19   has been.

20        MS. WILSON:  Can I say that he was compassionate,

21   that he stopped and helped these people?

22        MR. GOGGANS:  You can say he stopped and helped them,

23   but you cannot characterize it.

24        THE COURT:  You cannot characterize it but merely

25   state what he did.

Ann H. Armstrong, RPR

1    (The following occurred in the presence and hearing

2  of the jury:)

3    MS. WILSON:  Willie stopped and helped these people.

4  He towed them back all the way to Selma from Tyler.   Let's

5  talk about Matthew Reeves.  Did he have a conscience?  Does

6  he have a conscience?  Is he sad?  Was he sad?  Was he

7  concerned?  You've seen him this week.  You've observed him.

8  Have you seen compassion?  Have you seen any feelings

9  whatsoever?  None.  What did Bam Bam tell you?  That they

10  shot him for nothing.  There wasn't enough money.  They

11  didn't have enough money.  They shot him for nothing.

12  Ladies and gentlemen, Matthew Reeves shot Willie Johnson,

13  Jr. for something.  You know what it was.  It was for a good

14  time.  It was for his money so it could provide his drugs,

15  his alcohol and his party and his tear drop, his tear drop,

16  evidence that he shot somebody.  That's why Willie Johnson,

17  Jr. died.  So that man could have a good time and earn a

18  tear drop.

19    MR. GOGGANS:  Judge Jones, counsel, Mr. Wiggins so

20  appropriately stated in opening statements as Ms. Wilson

21  reminded me that often in life we are confronted with

22  situations which shatter our minds and shatter our beliefs.

23  Some things just seem unbelievable.  But he said that you as

24  jurors have got to step aside, step aside from feelings and

25  emotions and base your deliberations and your verdict solely

1059

1   upon the evidence that has come to you by way of this

2   witness stand and solely upon reason and common sense, not

3   based upon feelings or emotion or anger or anything like

4   that.   It's got to be based upon the evidence and your good

5   reason and your good common sense as you evaluate that

6   evidence.   Now why should it be that way?   Why should you

7   step aside from feelings and emotions in making these

8   decisions.

9        Well, for one thing that's the law.   That's the law

10   in the United States and the state of Alabama.   That's what

11   the law is.   That's what is required.   It's what you took an

12   oath to do when you sat in the jury box and when you came in

13   here Monday morning and were asked a lot of questions so we

14   could find out a little bit about you.   It's the law, and

15   it's what you have told us that you would do.   Perhaps more

16   importantly it's the right thing to do.   It's not just to be

17   done because it's on the books.   It's the right thing to do.

18        We must live in a society or we should be able to

19   live in a society that is governed by laws not just by

20   whatever chaos is going on outside the courthouse and out in

21   the streets.   To have an ordered society, the laws must be

22   applied evenly and fairly to everyone.   The least and the

23   great deserve that same protection.   Everyone deserves it,

24   black, white, red, yellow, Gentile, Jew, Muslim, no

25   religion, whatever.   Everyone is entitled to that same

Ann H. Armstrong, RPR

1060

1    protection in this country and in this state and in this

2    county. And you as jurors are people who have got to see

3    that that is what is done in this case and in any other case

4    in which you may be a juror. It's the law, and it's the

5    right thing to do.

6         Later on this morning Judge Jones will instruct you

7    on what law you are to apply to the evidence in this case.

8    And there will be several possibilities of verdicts

9    submitted to you. One verdict form will address whether or

10   not the State has proven beyond a reasonable doubt that

11   Matthew Reeves is guilty of a capital murder and in this

12   instance an intentional killing during the course of a

13   robbery, essentially two things, an intentional killing

14   during the course of a robbery. Another verdict form would

15   be on the lesser included offense of murder, just an

16   intentional killing but not during the course of a robbery,

17   an intentional killing standing alone, not during the course

18   of a robbery. And the third would be consideration of a

19   verdict of not guilty.

20        Stepping aside and looking at this evidence, what

21   should we start with. At what piece of evidence, at what

22   point should we begin evaluating this evidence. I think

23   that has got to be the presumption of innocence. Everyone

24   who is charged with a crime by the government in this nation

25   is presumed to be innocent of that charge. That is a matter

1061

1   of evidence on behalf of anybody accused of a crime.  Judge

2   Jones will tell you that in his charge.  You consider that

3   along with everything else.  Judge Jones will tell you that

4   that presumption of innocence follows somebody accused

5   unless and until you're convinced, all twelve of you who

6   will be deciding this case convinced beyond a reasonable

7   doubt of every single element of the charged offense, not

8   one element, all of them.

9          And the burden of proof, who has got the burden of

10  proof in this?  We know where we are.  We are in the United

11  States.  We are in Alabama.  We are in Dallas County.  The

12  government has got the burden of proof.  In a criminal case

13  somebody accused doesn't have a burden.  That's up to the

14  government to prove beyond a reasonable doubt that the

15  accused did what it says he did or she did.  And that burden

16  of proof is the highest that we have in this country.  It is

17  proof of each element beyond a reasonable doubt.  A

18  reasonable doubt, one reasonable doubt is all it takes to

19  require you to find that the person is not guilty of that

20  charged offense, if there is one doubt to which you can

21  assign a reason.

22         Now the State contends that this evidence shows that

23  Matthew Reeves is guilty of an intentional killing during

24  the course of a robbery.  Now let's talk a little bit about

25  what their evidence is on that.  An intentional killing

Ann H. Armstrong, RPR

1062

1    during the course of a robbery, in evaluating that, you are

2    going to have to evaluate what evidence you have heard and

3    what evidence you saw.  And in doing that, you must evaluate

4    how these witnesses impressed you.  And that's essentially

5    what you do in your everyday life when you are evaluating

6    people who are telling you something.  You observe how they

7    act.  How are they acting when they are on that witness

8    stand testifying?  Do they appear to be serious to you?  Do

9    they appear to be in here as some type of game to them?  Do

10   they have something to gain from being in here?  Do they

11   have some reason that they might favor one side over

12   another?  All of these things are things that are nothing

13   new to you.  These are things that you do in your every day

14   life and that you have done in your every day life for many,

15   many years.  But you have got to consider who it is that is

16   telling you these things.  Why are they in here, and why are

17   they saying these things.  You have got to consider that in

18   evaluating this evidence.  Have these folks said other

19   things different before?  Have they said things to you that

20   they haven't said before?  All of these things go into the

21   mix in evaluating what these witnesses are telling you.

22   Have they told you something that you believe not to be

23   true?

24           And I like to think of people testifying.  And think

25   about just somebody talking to you and telling you something

1063

1   when you are considering everything they say, and you hear

2   that one statement that you just think, you know, I don't

3   think that that fact that they told me about is so.  What is

4   that like?  It's kind of like the 13th strike of a clock.

5   You listen to the clock strike.  It keeps ringing.  And you

6   get to twelve, and then all of a sudden you hear thirteen.

7   And not only do you have doubt about that thirteenth strike,

8   but because that clock has struck thirteen times, because of

9   that thirteenth strike, you begin to doubt the previous

10  twelve strikes.  You can't tell what time it is by a clock

11  that strikes thirteen times.

12       Now what kind of witnesses have testified in this

13  case?  Who has testified in this case?  Well, one of the

14  elements that's got to be proven is this during a course of

15  a robbery element.  Who all has talked about that?  Well,

16  we've got Emanuel Suttles.  Eman has testified.  He hasn't

17  been charged with capital murder.  But on the other hand,

18  does he have something that he has told you about or things

19  from the evidence that might put him in a little pickle with

20  the State in this case?  Has he done anything?  Well, from

21  the evidence we saw that he was pretty well in on this from

22  the beginning.  The evidence seems to indicate that whether

23  he's been charged with it or not, it appears that he was in

24  on some plan, at least according to him and some others of

25  some conspiracy to commit a robbery down at White Hall of

Ann H. Armstrong, RPR

1064

1   some drug dealers.   Might he have reason to want to go

2   overboard to cooperate, to come in hear and say things?   He

3   is certainly not in a position to make the police mad.

4   Consider these things in evaluating their testimony.

5       Consider the same thing for Jason Powell.   He's

6   pretty much in the same type boat.   The evidence I think is

7   there that he also if you believe some of this evidence was

8   in on a conspiracy to commit a robbery.   Whether they have

9   been charged with capital murder or not, whether they have

10  been charged with the murder of Mr. Johnson or not, you know

11  they have certainly got to be thinking, man, I was with

12  these people all of this time.   Assuming that it goes no

13  further than that, they know it looks bad for them.   They

14  have got a reason to come in here and want to help the

15  government in this case.   Think about these things.

16      And Bam Bam, Brenda Suttles, Brenda Suttles is

17  charged with capital murder.   She's also got a couple of

18  other first degree robbery cases hanging out there too.   We

19  know what her deal is.   I mean she's getting away from the

20  capital murder I guess at some point.   It hasn't been done

21  yet.   It hadn't been done when she was testifying, but at

22  some point her deal is you come in here and you testify and

23  you help us out and we are going to knock off that capital

24  murder charge.   You won't be looking at that anymore.   You

25  know she's got a reason.   You know it.   I don't have to talk

1065

1     long about that.  And you consider her demeanor on that

2     witness stand.  Consider how she acted on the witness stand.

3     You saw her.  You're sitting a lot closer than we are.

4         Another thing to consider too about her is you

5     remember she is saying when the police first came to the

6     house, they come in, and they get Matthew pretty quickly.

7     And they come in her room and snatch up the covers and say

8     where is Brenda Suttles, and they leave for whatever reason.

9     They left.  She has got a few days, you know, some time to

10    go off to Atlanta and start collecting her thoughts and come

11    up with, you know, extricate herself as much as she can from

12    the situation.  She keeps adding stuff on as time goes on;

13    as it gets down to it, she keeps adding stuff on.  Consider

14    that also.  Consider the things that she hasn't said before

15    that she has come in and added as time has gone on and has

16    gotten a little pressing for her.

17        How about the testimony that the State witnesses gave

18    you about how the events of this day got started?  Well, Bam

19    Bam says, everybody is together on this thing to go to White

20    Hall and rob some drug dealers.  The evidence is I don't

21    think she had told that to Detective Grindle when she was

22    talking with him a few days after this.  But in any event,

23    that's what she says they were going to do.  And they were

24    going to rob drug dealers, not just anybody.  They were

25    going to rob drug dealers.  You know, you can figure that

Ann H. Armstrong, RPR

1066

1   out.  You want to rob a drug dealer because they are going

2   to have lots of cash around, and they are not in a position

3   to say anything about it anyway.  If you rob somebody, what

4   are they going to do, go to the police and say somebody came

5   at me and stole all the money I made selling cocaine last

6   week.  That's why she is saying they wanted to go and rob a

7   drug dealer.  But she didn't tell that to Grindle.

8        Eman, what does he say about it?  Well, Eman, he also

9   comes in and says, well, yeah, everybody was going out to

10  make a lick.  Previously Detective Grindle asked him what a

11  lick was.  I don't know what a lick is.  I don't know if

12  that's a robbery or not.  You consider these statements that

13  they have made before and what bearing that has on whether

14  or not you can trust what they are telling you.

15       Now Jason, well, he didn't know anything.  He sets

16  out to make friends, remember.  He's up here with his

17  sister.  His sister wants him to meet all of these folks in

18  Selma.  He is just making friends.  He didn't -- you know,

19  he's not any part of this.  He's just making friends.  How

20  did they get together?  Consider the testimony about that.

21  Did it all match up?  What did they tell you about that?

22  Well, Bam Bam says that Julius got Jason to pull over,

23  Jason is the car driver.  He says he got Jason to pull over

24  by throwing up some gang signs.  They are throwing gang

25  signs back and forth.  Eman says he doesn't know anything

Ann H. Armstrong, RPR

1067

1   about any gang signs.  Jason says, well, no, we were just

2   waving.  He's out just making friends.  He's not doing any

3   gang signs.  He's just waving.  He's driving through Selma,

4   and he hasn't been here that long.  He is just going to make

5   some friends.  He is not doing gang signs.  He is just

6   waving.  But remember how quickly he was able to demonstrate

7   how you make the -- I think it was the Disciples gang sign.

8   We asked him, what exactly was it.  He popped it up.  Let me

9   see if I can do it, something like that.  But he did it just

10  like that.  But, of course, he is just making friends.  He

11  is just waving.  Consider that and whether you can believe

12  anything else he says.

13          Now what about the shotgun getting into Jason's car?

14  What did the State's witnesses tell you about that?  What

15  are they telling you?  Are they conflicting with each other?

16  Do you think they are holding back on you or trying to

17  mislead you on that?  What does Jason say about that?  Well,

18  it could have been a stick; coming in with, you know, a gun

19  like that getting into the car in daylight and says, I don't

20  know if it's a gun or not.  It may have been.  But it could

21  have been a stick.  I didn't see any gun.  Not in my car,

22  I'm just out making friends.  Well, Eman says he clearly saw

23  the gun.  Not only did he say he clearly saw the gun, he

24  said he put it in the front seat by Jason who is driving who

25  is just out making friends thinking it's a stick.  Consider

1068

1  those conflicts in the testimony and whether or not you can

2  put trust in what has been told to you.

3      How did the gun wind up in the truck?  How did it

4  wind up in Willie Johnson's truck?  Well, Bam Bam says that

5  Matthew got in the truck holding the gun.  I think she

6  demonstrated that he was getting up something like that

7  holding onto the bed of the truck with his left getting up

8  holding the gun like that.  Well, she demonstrated that he

9  was holding it with his right hand.  She says he's

10  left-handed, and the only prints on the gun were left hand

11  prints.  Now that's different than what Eman is telling you.

12  Eman says, no, he was already on the truck, and Julius

13  handed him the gun.  You have got all of these people

14  supposedly handling this gun, only one matching sets of

15  prints on this gun.  But there are differences there.

16      There are even differences about what these people

17  are telling you about who was where.  Bam Bam is saying,

18  well, I'm on the passenger side of the back seat.  Matthew

19  is on the -- Bam Bam says I'm on the driver's side of the

20  truck bed.  Matthew is on the passenger side.  And I believe

21  it was Eman.  It may have been Jason, but I believe it was

22  Eman that said, no, it was the opposite.  Bam Bam was on the

23  passenger side, and Matthew was on the driver's side.  So

24  we've got conflicts there.

25      And then the question comes up, well, why rob Mr.

1  Johnson.  Well, remember the testimony that Bam Bam tells

2  you.  We are going out to rob some drug dealers out in White

3  Hall.  But then she comes back later and says, well, Julius

4  came back and says, no, we are going to rob Mr. Johnson.

5  This is the guy we are going to rob.  Remember the previous

6  plan; remember the evidence of what happened when the car

7  broke down.  The car breaks down on this dirt road.  I was

8  not real clear where, but anyway it breaks down somewhere

9  toward Montgomery from here on some dirt road.  Colonel

10 Smith stops in his flat Toyota truck, a nice truck.  He says

11 he talked to them and asked a few questions.  They were very

12 polite.  It's not like they were going out just to rob

13 anybody.  Ms. Wilson made the argument to you and made a

14 point that, you know, well, they are not going to rob him.

15 This guy is a hunter.  He's going to be armed.  Well, you

16 know, there's a shotgun in the other car too.

17      But what I want you to remember about that is

18 remember the question that was posed by Mr. Greene to Eman.

19 The question was, you didn't rob him because he wasn't a

20 drug dealer?  That's right.  That was something that Mr.

21 Greene asked Eman, and that was the response.  We didn't rob

22 him because he wasn't a drug dealer.  He is not the guy who

23 is going to have a bunch of cash sitting around who is not

24 in a position to go to the police and say anything about it

25 afterwards anyway.  And the charge is an intentional killing

1070

1  during the course of some plan to rob Willie Johnson, not in

2  the course of some plan to rob some drug dealer out in White

3  Hall or whatever.

4      And what about Mr. Johnson?  What has been told to

5  you about why they were going to rob Willie Johnson?  Well,

6  I think the evidence does show that he had gotten paid at

7  the Housing Authority and had cashed his check that day.

8  Bam Bam was telling about, you know, Julius was taking the

9  money out of the pocket.  He did have some, but what is

10  absent from the evidence before you is that any of them knew

11  he had any cash money before he was shot.  What does Bam Bam

12  tell you, we were to rob him?  What did she say the robbery

13  was going to be for?  Now this is almost nonsense when you

14  think about it; we were going to rob him of the ring.

15  That's what were going to do.  We were going to rob Mr.

16  Johnson of the ring.

17      Now as I recall from the evidence, he tows them back

18  to Selma.  They make a stop, and they make another stop in

19  front of the house.  And at some point around in there,

20  Julius comes up and says, this is -- according to Bam Bam,

21  this is the guy we are going to rob.  We are going to rob

22  him of the ring.  But before we do that, we've got to go get

23  the ring and give it to him.  We are going to rob him of the

24  ring.  But first we've got to go get it and give it to him,

25  and then we will go rob him of it.  That's preposterous.

Ann H. Armstrong, RPR

1071

1  It's that thirteenth strike.  It casts doubt on everything

2  else.  Going to rob him of the ring.  But before they do

3  that, they had to go get it and give it to him.

4       Well, granted maybe they didn't have twenty-five

5  bucks to pay him for towing them back.  But, go get the ring

6  and then rob him of the ring?  That doesn't make any sense.

7  Now if they didn't have the money to pay him, you know, they

8  could stiff him.  They are already back in Selma.  He has

9  already dropped them off.  That story right there is a big

10  loud thirteenth strike about this plan to rob him of the

11  ring.  And another thing too, about this plan to rob Mr.

12  Johnson of the ring.  The ring was found by the police in

13  the alley.  It was found by the police in the alley.  There

14  wasn't any plan.  From the evidence there wasn't any plan

15  like that.

16       Now what about where this happened.  It happened in

17  an alley at night, kind of something you would think would

18  be a good place to do a robbery.  But what is the evidence

19  about why Mr. Johnson was in that alley?  Why was the truck

20  in that alley?  What is the evidence?  Well, according to

21  Bam Bam it was Mr. Johnson himself who said he was going to

22  pull into the alley.  According to their own evidence it's

23  not one of the people on the truck other than Mr. Johnson

24  saying, you've got to pull in the alley to help do a

25  robbery.  This was Mr. Johnson's idea for whatever reason to

1072

1    pull into the alley.

2       What happened in the alley?  What is the evidence

3 before you about what happened in the alley?  And put this

4 next to the other evidence about how it just doesn't make

5 much sense about what Bam Bam is telling you about this plan

6 to rob him of the ring, but first they've got to go get it

7 and give it to him and then somehow rob him of it.  The

8 truck was stopped.  It was already stopped.  Now if there

9 had been some pre planning to rob Mr. Johnson, everybody

10 except Mr. Johnson on that truck would know something is

11 going to happen.  But what is the evidence before you?  What

12 did you hear about that?  Bam Bam tells you that when the

13 shot was fired, Julius jumps out of the truck.  What you

14 done did?  If this had been planned, if a robbery had been

15 planned, he wouldn't be asking what have you done, what you

16 done did.  That wouldn't happen if there had been any talk

17 between them about a robbery.  That doesn't fit with what

18 she's telling you.  And what does she do?  She's standing

19 over by a tree I guess in shock herself.  This is nothing to

20 do with any pre planning of a robbery under this evidence.

21 Everybody would have known about it.  Nobody would have been

22 standing over by a tree and in shock, and nobody would have

23 been jumping out of a truck saying what you done did.

24      And Bam Bam says, Matthew is the one telling them,

25 you know, what to do after the shooting.  Again consider

1  that's coming from Bam Bam.  She said the plan was to rob

2  him of the ring.  But we know from the evidence the ring is

3  found by the police in the alley.  Who was dividing up the

4  money later?  The people that are telling you about that,

5  the other witnesses who were at the house, it was Julius

6  that was dividing up the money.  Eman and Jason seemed to

7  somehow be in on that money too, something else that might

8  make them a little afraid something may happen to them some

9  day.  Jason says he got thirty dollars, but then he gave it

10  back.  Eman says he was going to get it, and Julius changed

11  his mind.  It's obvious that Julius is in charge of that

12  money.

13      After this shooting Bam Bam goes over to the tree in

14  shock.  Julius jumps out and cries, what you done did.  And

15  then Julius and Bam Bam get the money from the pockets.  But

16  that was after the shot that surprised them.  And Bam Bam

17  says afterwards they ran over to Matthew's house, and they

18  got all of these clothes.  They took all of their clothes

19  off and wadded them up and got them all together and stuffed

20  them under a dresser.  I believe it's different from what

21  Detective Grindle told you about they were just out

22  together.  And there's some evidence -- I believe that Bam

23  Bam says she had on some green pants, and I think there's

24  some other evidence that Julius had on some white pants.

25  But there is not much evidence about who's wearing the other

1074

1    stuff and things like that.

2         But what else do we know about what witnesses have

3    told you about what happened at the Reeves' house that's

4    going to throw some light on whether or not you're going to

5    put some trust in what a witness is telling you?  Jason says

6    that he is standing inside the front door at the Reeves'

7    house, and he sees Matthew go in and put the shotgun under

8    the bed.  But remember about how that house is set up.

9    Detective Grindle told you about it.  You go in a front

10   door.  And according to Jason's testimony he is standing

11   inside the front door.  And there's a wall that goes down

12   all the way that way.  There's a door at the end of that

13   room, and the wall extends back that way on the porch and

14   another bedroom.  But the closest door is like down the end

15   of that wall.  Now the bed that that gun was found under is

16   on the other side of that solid wall.  And there are no

17   windows, no nothing that Julius, that Jason Powell could see

18   through that he would be in a position to say, I saw him put

19   that gun under the bed if he is standing in the front door

20   area like he says he was.  It would be like me standing here

21   and saying, I can tell you what I see going on in that jury

22   room right there.  I can't see through that wall.  Jason

23   Powell couldn't see through the wall at that house either.

24        Bam Bam says they all ran together over to her house.

25   Some other people say they were running together.  Molly who

1  is Bam Bam's friend says that Matthew came by himself.  And

2  then there is talk about the dancing.  Bam Bam says that

3  Matthew is dancing like, imitating what she says Mr.

4  Johnson looked like when he was shot.  She says Julius is

5  dancing too, but he wasn't modeling whatever like Mr.

6  Johnson was shot.  But the others put a little bit more

7  light on what was going on afterwards.  Eman is telling

8  about a dance called the Bankhead dance, and he demonstrated

9  it for us a little bit by hanging over and doing like that.

10  It's popular, apparently a popular dance.  Eman says that

11  what Matthew was doing was acting out the words on this rap

12  song that he is listening to doing the Bankhead dance.  And

13  if you have watched NFL football, you can see folks doing

14  dances and shaking their bodies at football games sometimes.

15       But Eman says he is acting out the words to this

16  music doing the Bankhead dance, pumping the shotgun, acting

17  out the words to this music.  Now we are not talking about

18  listening to church music.  We are not talking about

19  listening to the Temptations or Perry Como.  We are not

20  talking about even listening to Atlantis Morrisette.  We are

21  talking about listening to some heavy duty hard core rap

22  music, tough stuff, talking about shooting people, pumping a

23  shotgun.  According to Emanuel -- according to Eman, what is

24  going on here is he's doing the same dance acting out the

25  music.  And Jason says he is dancing like he usually does.

Ann H. Armstrong, RPR

1076

1  Dancing to this kind of rough music like that according to

2  Jason is nothing unusual for Matthew.

3        Now there was talk later on -- the evidence is that

4  there was talk later on about what happened.  But I think

5  you will recall from the evidence of who was doing what kind

6  of talking and who was talking about what.  The person

7  primarily talking about the money and having stuff to do

8  with the money and divvying up money was Julius.  Matthew

9  was talking about the shooting.  The evidence is that's the

10  main thing he was talking about was the shooting.  Bam Bam

11  says that she heard beforehand Matthew say he wanted to get

12  his tear drop.  She says, you get your tear drop when you

13  kill somebody.  Detective Grindle testified similarly.  He

14  said, you know, what this tear drop means in terms of the

15  gang world.  You get that tear drop when you kill someone.

16  Bam Bam heard him talking about it before.  Molly Blevins

17  testified too.  She said what she recalled Matthew talking

18  about, and the only thing she remembers him talking about

19  was that he shot Mr. Johnson to get a tear drop.  Bam Bam

20  did say he shot him for nothing; it wasn't enough money.  But

21  that's not exactly what she said.  The only thing she said

22  before was they shot him for nothing.  She said he had

23  previously been talking about getting his tear drop.  He

24  talked about earning his tear drop.  According to Detective

25  Grindle, you get a tear drop by killing somebody, losing a

1077

1    fellow gang member or going off.  You don't get that tear

2    drop in a robbery according to the evidence.  You get that

3    tear drop in killing.

4        Now this is hard evidence.  I'll be the first one to

5    say that this is a tough case.  It's tough facts to deal

6    with.  You've got to step away.  Step away from it and

7    evaluate it for what it is.  The hard truth is that gangs

8    are out there.  You ain't got to be in a big city.  You

9    ain't got to be in Atlanta or Birmingham to be dealing with

10   gangs.  And they are bad news.  They are up to bad things.

11   In this case we have a rather incredible tale from Bam Bam

12   about the theory of whatever is behind the robbery.  We have

13   other participants who were shocked that Mr. Johnson was

14   shot.  A lot of things indicate no pre planning of any

15   robbery.  Things just don't fit with any pre planning.  The

16   hard truth about this evidence is that Mr. Johnson was just

17   shot for nothing.  That's hard.  That's hard.  But the

18   evidence does not establish beyond a reasonable doubt that

19   he was shot during the course of a robbery.  And in order

20   for there to be a capital conviction, that's what has to

21   have been shown beyond a reasonable doubt, an intentional

22   killing during the course of a robbery.

23       In this case that hasn't been shown beyond a

24   reasonable doubt.  The State has shown that Mr. Johnson's

25   property was taken from him.  The State has shown that

Ann H. Armstrong, RPR

1078

1    Julius took this money from him.  But what it has shown is

2    that the stealing of this money wasn't connected to the

3    shooting.  That was an afterthought.  That thought came

4    after Mr. Johnson had been shot.  And that's not a capital

5    offense.  An intentional killing that is not during a

6    robbery, it's not part of a robbery.  If later on somebody

7    decides, this man has been shot, I think I'll take his

8    property, that's an afterthought.  That's not an intentional

9    killing during the course of a robbery.

10         Now we would like for you to find Matthew Reeves just

11   plain not guilty.  But I think that the most that the

12   State's evidence has shown you beyond a reasonable

13   doubt is that there was an intentional killing of Willie

14   Johnson, Jr. but not during the course of a robbery.  The

15   evidence is that was just an afterthought of Julius and Bam

16   Bam and that Bam Bam and others in a bind, up against the

17   wall, in a sling, whatever you want to call it, are doing

18   everything they can to help themselves, keep themselves out

19   of any trouble that they don't have to be in.  The State has

20   not shown beyond a reasonable doubt that Matthew Reeves is

21   guilty of an intentional killing during the course of a

22   robbery.

23         MR. GREENE:  The Defense has told you this is not an

24   intentional murder during the course of a robbery.  At most

25   it's only a killing of somebody.  When you take this thing

Ann H. Armstrong, RPR

1079

1    and you go out with it, and you tell your three, your two

2    buddies we are to rob this man, he ain't going to keep my

3    ring, and you take it and you go get on the back of a truck

4    and you blow the man's head off and then you get his money

5    and you lose the precious ring in the dark of night and the

6    blood and the gore, that's a robbery.  It's been a robbery

7    since the biblical times.  It's been a robbery throughout

8    history.

9         Oh, it was an afterthought to get his money.  The law

10   doesn't require you as a robber to know what you're going to

11   get out of the man.  I'm going to go rob her as she comes

12   out of the Harco.  I've got my gun; I've got my shell.  I

13   don't know what she's got, but I'm going to get it, your

14   money or your life.  Mr. Johnson's life is what we are here

15   about.

16        They are up here telling you this that is not a

17   capital murder case because they didn't go down and say, oh,

18   yeah, I think he cashed his paycheck today.  Oh, yeah, he

19   has probably got a lot of money.  The deal was they set out

20   that morning to rob somebody.  They rode all over the town

21   here trying to find somebody to rob.  And when the good

22   samaritan came along and pulled them and their broke down

23   car back to Selma, they decided they would pay him off with

24   the ring and take it back and whatever else he had.

25        Y'all, the Defense is designed and charged with

1080

1   defending this man any way he can.

2       MR. GOGGANS:  Objection, Your Honor.  May I

3   approach?

4       MR. GREENE:  Can I finish?

5       (The following occurred at the bench outside the

6   hearing of the jury:)

7       MR. GOGGANS:  Your Honor, I want to object before

8   this went too far.  It seems to me that Mr. Greene is going

9   to suggest to this jury that the only reason I'm making an

10  argument is because I've somehow been appointed in this case

11  to represent Mr. Reeves.  As Mr. Greene well knows I

12  voluntarily took this case.  It's inappropriate to suggest

13  to this jury that somehow I am making this argument just

14  because I've got to.  It's a violation of due process to

15  suggest that.  I ask that the jury be instructed to

16  disregard that last remark.

17      THE COURT:  All right, sir, overruled.

18      (The following occurred in the presence and hearing

19  of the jury:)

20      MR. GREENE:  Within the rules of laws and evidence

21  it is our job to present the evidence against this man.

22  Their argument is that this is no robbery.  It didn't occur.

23  If you blow a man's head off and you go through his pockets

24  and take his money, that's robbery.  It's no joke when they

25  say if it walks like a duck and talks like a duck and looks

Ann H. Armstrong, RPR

1081

1    like a duck, it's a duck.  I just don't understand that

2    argument.  I don't understand the logic of it, and I don't

3    understand the meaning of it.  I don't think it fits under

4    these facts.   Well, they didn't pre plan to get his money.

5    That is not required by law.  And I know I'm repeating

6    myself on that point.  But you've got to understand.  There

7    is no requirement that we prove that there was this

8    conference about what they were going to take from the man

9    before they killed him.

10        Now on an afternoon before Thanksgiving a group of

11   young people, 18, 17, 19, 15 -- they get up about noon,

12   afternoon sometime because that's their life-style.  They

13   tend to stay up all night, and they leave their home, and

14   they wonder about looking for something to steal, something

15   to rob when they come across another fellow in a car.  And

16   they decide to go rob a drug dealer.  It's not in New York

17   City.  It's not in Mobile or Birmingham.  It's here in

18   little Selma down the street down here where we live.  And

19   they go out in the country to carry out this robbery plan of

20   this drug dealer.  Their car breaks down.  They get towed

21   back to town, and they pay the man.  And then they decide to

22   take the man's payment and goods and kill him, vicious,

23   bloody, right here in this town.

24        Somebody said, well, I just can't believe there are

25   people that live like this.  And after they do that, they

1082

1   get his money, and they go change clothes, and they go to a

2   party, and they dance, and they celebrate, and they talk

3   about how his head fell.  And then they go get some reefer

4   and some powder.  And every time Brenda Suttles says that,

5   my skin crawls.  Every time I think of him sitting up there

6   dancing and talking about getting his tear drop -- what kind

7   of people are living here.  It can't be, not here.  That's

8   something they do somewhere else in some great big city.

9   Well, you know, and we know.  It is real.  It did happen.

10  It's right here.

11       There was a live, living, breathing human being who

12  went about his daily affairs who had every right to watch

13  this coming spring blossom out, to go fishing, to plant a

14  garden, to be with his family.  And this man right over

15  here, right there, he took this gun, and he stuck it in the

16  back window of that truck and pulled that trigger and blew

17  his head off.  He took from him his family, his life, his

18  future this coming spring.  And when somebody in that family

19  turns to try to explain this to some far away family member

20  at the next gathering they may have, say Thanksgiving again,

21  why?  Why did they kill him?  Why did they kill Uncle

22  Willie?  What did he do?  Was he in a bar room fight

23  fighting over some woman in a drunken brawl with some man?

24  No.  Was he in a bad drug deal or something that had gone

25  bad and gone off into drugs?  No.  Was he in a burglary

1083

1  where he was breaking in businesses and houses and he got

2  shot by the police and done something terrible?  No.  Was he

3  fighting with one of the neighbors?  No.  What did he do

4  that made him a corpse in a grave?  What did he do to

5  deserve to be executed by Troll over here, Mr. Tear drop?

6  What?

7       He helped some people out whose car broke down and

8  towed them miles back into town.  And for that he got the

9  penalty of death.  For that he turned from a human being, a

10  caring, kind, person into a gurgling, bloody corpse in the

11  middle of a truck.  While I'm on that point, it kind of

12  interested me in the course of this trial, Mr. Tear drop

13  over here says, I done blowed the man's head off, and y'all

14  ain't going to go in his pockets.  I don't think it would

15  have bothered Julius or Bam Bam to go get his money, get the

16  ring or do any of that.  I think it did bother them though

17  because that shotgun made a mess out of a fine person.

18  There was blood and gore and gurgling everywhere.  They just

19  didn't want to get up in there with all of that stuff.  What

20  kind of people are here?

21       What is the law y'all have got to deal with as a

22  jury?  The law is real simple.  The Judge is going to charge

23  you.  Matthew Reeves, Troll, did intentionally kill another

24  human being.  Well, it ain't much more intentional than to

25  do that and fire.  It's just as clear as a bell.  That's

1084

1  deliberate.  You're mean, and you know what's coming out of

2  the end of that barrel, and you know what's happening.  I

3  don't think there's any question about that point.  I don't

4  think the defense will argue that point.

5      While in the course of or during a robbery.  What

6  does while or during the course of a robbery mean?  It means

7  that there was some plan or intent to try to rob somebody.

8  How do you judge what somebody's intent is?  You can look at

9  what they tell you.  You can look at what they do.  You

10  weren't there.  You don't have a tape recorder.  You didn't

11  have a video.  So you have got to use those things, and what

12  do you get?  What is the uncontroverted evidence from this

13  stand from all of the witnesses?  They set out to rob, the

14  whole crew of them, somebody, anybody.  Then they came to

15  get the drug dealer.  Then they decided to rob Mr. Johnson

16  of the ring.  And they all agreed to that from all of the

17  testimony.  And they did in fact rob him.  They took

18  everything he had.  They just lost the ring.  The police

19  found it in the dirt in the blood and the gore and the

20  leaves.  And they go back -- to add further to the intent

21  trying to found out what they meant to do -- and divide up

22  the money and don't give it to the people who weren't with

23  them, right?  The two young boys, the fifteen year old,

24  sixteen and fifteen, Emanuel and Jason, they don't give them

25  any because Troll over here is one that shot him.  They just

1085

1    didn't do nothing.  They stayed back at the car.

2            What does that tell you?  What does that add to it?

3    Then they spend the money and party with the money.  Y'all

4    heard this evidence.  You've listened to it.  I could go

5    over it again.  But I think people get the idea when you sit

6    on the jury you turn deaf, dumb and blind and you can't hear

7    anything.  Y'all heard it all.  But this group of folks have

8    consistently testified to every pertinent point in this

9    thing.  Although they have got differences -- there are

10   things up and down their testimony where they all see or

11   remember different.  You put this many people up in

12   anything, a car wreck out in front of the courthouse, and

13   everybody comes out with a little bit different version.

14   But I'll give you one example, of the business of Mr. Tear

15   drop over here getting on the back of the truck with this

16   gun.  There were, what, two or three differences.  Did

17   Brenda Suttles give it to him out of the car?  Did he get it

18   out of the car?  Did somebody hand it to him as he got on

19   the back of the pickup?  Fine.  What's clear, clear,

20   testimony and memory, that man got on the truck with the

21   shotgun, clear as a bell.  Everybody is straight on that.

22   Who is coming from behind the house after the shot is fired

23   with this gun in his hand?  That man.  Whose fingerprints

24   are on this gun?  That man.  Who's telling one, two, three,

25   four people I killed him; I killed a man?  Who does a dance

1   showing how he flopped over?  That man.   There are problems.

2   There always will be.   There always are.   But you heard

3   them.   You heard when they testified and what they said.

4   You heard them.

5        You listen to the defense that said you've got to

6   step aside from the horror and terror of this.   That's part

7   of this case.   You've got to understand.   You've got to

8   remember this, that there's a live, human being, loved and

9   care for.   It was a good man killed for absolutely nothing,

10  killed by somebody who enjoyed it, who did it so he could

11  brag about it.   He did it so he could be a big man, show his

12  friends and associates, he's the man.

13       When you get in this jury box, you don't step aside

14  from your common sense.   What's your common sense?   That's

15  all the living you've done up to now dealing with people,

16  dealing in the community, living every day with all of the

17  problems and all of the difficulties, all of the good things

18  and the bad.   You bring them right there with them.   And you

19  don't when you put that jury button on all of a sudden turn

20  into a robot.   You bring that right there in that jury box.

21  You listen, and you decide what is real in a real world.

22  And what is real is this group of robbers seized upon

23  somebody they thought was an easy mark and killed him and

24  took everything he had.   And that's what this is all about.

25  And there ain't no bringing him back.   There ain't no doing

1  anything to undo it.  We've just got to deal with what we've

2  got.  And we've got to try to let Mr. Tear drop, Ms. Bam Bam

3  and Julius understand and know that our community and our

4  society will not tolerate this.  We will act on it.  The

5  police department did an excellent job in this case.

6       MR. GOGGANS:  Objection, Your Honor, it's improper to

7  suggest such during closing argument, bolsters the

8  witnesses.

9       THE COURT:  Sustained.

10       MR. GOGGANS:  Ask the jury to disregard that.

11       THE COURT:  The jury will disregard that argument by

12  Mr. Greene.

13       MR. GREENE:  The police department found a body in

14  the alley way in the early morning hours.  With the help of

15  a dog and knowledge, they were able to find people and

16  arrest people that morning.  You have substantial evidence.

17  It's been brought here to you.  All we can do is present it

18  to you as clearly as we can.  All they could do is find it

19  and gather it up.  You didn't ask for this job.  It's part

20  of your citizenship and your duty to listen to the evidence

21  in cases and decide what the facts are.

22       In this case as a representative of this community I

23  say to you the charge here is the offense of an intentional

24  murder during the course of a robbery.  One and one equals

25  two.  They set out to rob in general.  They set out to rob

1088

1  in specific Mr. Willie Johnson, and they took his life

2  intentionally and deliberately during the course of that

3  intent and plan.  One, planned to rob to get the ring or get

4  whatever.  Two, he intentionally killed him, to put him to

5  death.  One and one makes two.  There is nothing easy about

6  it.  The question is what are the facts, what are you

7  dealing with, and what do you know.  And what you know is

8  that on this day Mr. Johnson died from Tear drop so he could

9  party and brag about it.  That's a horrible indictment of

10  our entire society, but it's a fact.  It's a fact we and you

11  have to deal with.  Thank you.

12      THE COURT:  Ladies and gentlemen, at this time we

13  will take a brief recess.  Please retire to the jury room.

14  Don't discuss the facts of the case among yourselves at this

15  time.  Don't leave the jury room.  We will be back in about

16  ten or fifteen minutes, and I'll give you the final charge.

17      (A recess was taken.)

18      (The following occurred in the presence and hearing

19  of the jury:)

20      THE COURT:  Ladies and gentlemen, as I told you my

21  charge will take approximately 30 minutes.  But I want you

22  to please try to listen very carefully to what I have to say

23  to you.  You have now heard all of the evidence in this

24  case.  You have heard the arguments of the attorneys.  And

25  it now becomes the duty of the Court to charge you on the

1089

1    law in the case.  The judge's duty is to decide the law in

2    the case.  The jury's duty is to determine the facts of the

3    case.  I have no opinion as to the facts of this case, and I

4    don't want you to think from any ruling that I have made

5    here today or during the course of this proceeding this week

6    or from anything that I say to you in this charge that I

7    think one way or the other about the facts of this case.

8    You are the sole judges of the facts of this case.

9         Now you should have no interest in the outcome of

10   this case one way or the other.  And as you swore to do in

11   the oath that you took at the beginning, you should base

12   your verdict solely on the evidence in this case.  You're

13   not expected to know the law.  So it's my duty to tell you

14   the law as it applies in order that you can take the law,

15   apply it to the facts as you determine them to be and then

16   arrive at your verdict.

17        Now the first question, of course, is how did this

18   case get to court.  This case came into court by means of an

19   indictment.  The indictment which I read to you already at

20   the beginning of this proceeding and which I will read to

21   you again, it is not evidence in this case.  It is simply a

22   means or a method by which to get this case from the Grand

23   Jury into this court for trial.  And the indictment that I

24   read to you previously and I will read to you again states

25   as follows.  State of Alabama, Grand Jury, or rather State

Ann H. Armstrong, RPR

1   of Alabama, Dallas County, the Grand Jury of said county

2   charge before the finding of this indictment, Matthew

3   Reeves, whose name is otherwise unknown to the Grand Jury,

4   did intentionally cause the death of Willie Johnson by

5   shooting him with a shotgun, and Matthew Reeves caused said

6   death during the time that he was in the course of

7   committing a theft of lawful money of the United States, the

8   value of the same being otherwise unknown to the Grand Jury,

9   the property of Willie Johnson by threatening the imminent

10  use of force against the person of Willie Johnson with

11  intent to compel acquiescence to the taking of or escaping

12  with the property while the said Matthew Reeves was armed

13  with a deadly weapon, to-wit, a shotgun in violation of

14  Section 13A-5-40(a)(2) of the code of Alabama against the

15  peace and dignity of the state of Alabama.  That is signed

16  Roy Johnson, District Attorney for the 4th judicial circuit.

17      Now when this indictment was filed in this court, the

18  Defendant as he had a right to do filed a plea of not

19  guilty.  Now that plea casts the burden of proof on the

20  State of Alabama to convince the jury beyond a reasonable

21  doubt that the Defendant is guilty as charged in the

22  indictment.  The Defendant has no burden of proof

23  whatsoever.  He does not have to prove that he is innocent.

24  He comes into this court with a presumption of innocence.

25  It surrounds him throughout the trial of this case, and it

1091

1   even attends him in the jury room until the jury and each

2   and every member of the jury after considering all of the

3   evidence are convinced beyond a reasonable doubt that the

4   Defendant is guilty as charged in the indictment.  And then

5   and at that time only does he shed that presumption of

6   innocence which has sometimes been referred to as a cloak of

7   innocence.  This presumption of innocence is to be

8   considered by you as evidence in favor of the Defendant, and

9   it should be your endeavor to reconcile all of the facts

10  with this presumption of innocence if you can.

11          Now in this case as I said the burden of proving that

12  the Defendant is guilty as charged rests upon the State.

13  And before a conviction can be had in this case, the State

14  must satisfy each and every member of the jury of the

15  Defendant's guilt.  And unless the State satisfies you of

16  the Defendant's guilt beyond a reasonable doubt, then he is

17  entitled to an acquittal.  The phrase reasonable doubt is

18  self-explanatory.  Efforts to define it do not always

19  clarify the term.  But it may help you some to say that the

20  doubt which would justify an acquittal must be a doubt for

21  which you can assign a reason.  It's not a mere guess or

22  surmise or whim.  It is not a forced or captious doubt.

23  Ladies and gentlemen of the jury, I charge you if you have a

24  reasonable doubt of the Defendant's guilt growing out of the

25  evidence or any part of the evidence or lack thereof, you

1092

1   should acquit him.  If after considering all of the evidence

2   in this case you have an abiding conviction of the truth of

3   the charge, you are convinced beyond a reasonable doubt, and

4   it would be your duty to convict the Defendant.

5        The reasonable doubt which entitles an accused to an

6   acquittal, it is not a mere, fanciful, vague, conjectural or

7   speculative doubt but a reasonably substantial doubt arising

8   from all or any part of the evidence or from the lack of the

9   evidence and remaining after a careful consideration of the

10  testimony, such as reasonable, fair minded and conscientious

11  men and women would entertain under all of the

12  circumstances.  Now you will observe that the State is not

13  required to convince you of the Defendant's guilt beyond all

14  doubt but simply beyond all reasonable doubt.  If after

15  comparing and considering all of the evidence in this case,

16  your minds are left in such a condition that you cannot say

17  you have an abiding conviction of the Defendant's guilt,

18  then you are not convinced beyond a reasonable doubt, and

19  the Defendant would be entitled to an acquittal.

20       Ladies and gentlemen, the Defendant in this case is

21  charged in the indictment with murder during a robbery in

22  the first degree.  At this time I am going to read to you a

23  jury charge pertaining to that particular criminal offense

24  and the elements which constitute murder during a robbery in

25  the first degree.  Ladies and gentlemen, the law states that

1093

1  an intentional murder committed during robbery in the first

2  degree is capital murder.  A person commits an intentional

3  murder if he causes the death of another person and in

4  performing the act or acts which cause the death of that

5  person, he intends to kill that person.  A person commits a

6  robbery in the first degree if in the course of committing

7  or attempting to commit a theft, he uses force against the

8  person or the owner or any person present with intent to

9  overcome his physical resistance or physical power of

10  resistance or threatens the imminent use of force against

11  the person or the owner with intent to compel acquiescence

12  to the taking of or escaping with the property and in doing

13  so he causes serious physical injury to another person.

14      To convict the State must prove beyond a reasonable

15  doubt each of the following elements of an intentional

16  murder during robbery in the first degree.  Number one, that

17  Willie Johnson is dead.  Number two, that the Defendant,

18  Matthew Reeves, caused the death of Willie Johnson by

19  shooting him with a shotgun.  Number three, that in

20  committing the act which caused the death, that in

21  committing the act which caused the death of Willie Johnson

22  the Defendant intended to kill the deceased.  A person acts

23  intentionally when it is his purpose to cause the death of

24  another person.  The intent to kill must be real and

25  specific.

1094

1        Number four, that the Defendant committed or

2    attempted to commit theft of lawful money of the United

3    States.  Number five, that in the course of committing or

4    attempting to commit the theft, the Defendant either used

5    force or threatened the imminent use of force against the

6    person of Willie Johnson with the intent to overcome his

7    physical resistance or physical power to resist or to compel

8    acquiescence to the taking of the property.  And number six,

9    that the murder took place during the robbery.  A person

10   commits a theft of property if he knowingly attains or

11   exerts unauthorized control over the property of another

12   with intent to deprive the owner of his property.  A person

13   acts knowingly with respect to conduct or to a circumstance

14   when he is aware that his conduct is of that nature or that

15   the circumstance exists.  A person acts intentionally with

16   respect to a result or to conduct when his or her purpose is

17   to cause that result or to engage in that conduct.

18       Serious physical injury is physical injury that

19   creates a substantial risk of death or the cause of serious

20   and protracted disfigurement, protracted impairment of

21   health or protracted loss of the function of any body organ.

22   Death by definition would constitute serious physical

23   injury.  The term during means in the course of the

24   commission of or in connection with the commission of the

25   robbery.

1095

1    If you find from the evidence that the State has

2   proved beyond a reasonable doubt each of the above elements

3   of the offense of intentional murder during the robbery in

4   the first degree as charged, then you shall find the

5   Defendant guilty of capital murder.  If you find that State

6   has failed to prove beyond a reasonable doubt any one or

7   more of the elements of the offense of intentional murder

8   during robbery in the first degree, then you cannot find the

9   Defendant guilty of capital murder.

10    Ladies and gentlemen, a lesser included offense that

11   you will be asked to consider is not charged in the

12   indictment, but I will charge you on that lesser included

13   offense of murder at this time.  A person commits the crime

14   of murder if he causes the death of another person, and in

15   performing the act or acts which cause the death of that

16   person he intends to kill that person.  To convict the State

17   must prove beyond a reasonable doubt each of the following

18   elements of murder.  Number one, that Willie Johnson is

19   dead.  Number two, that the Defendant, Matthew Reeves,

20   caused the death of Willie Johnson by shooting him with a

21   shotgun.  And number 3, that in committing the act which

22   caused the death of Willie Johnson, the Defendant acted with

23   intent.

24    A person again acts intentionally when it is his

25   purpose to cause the death of another person.  If you find

1096

1  from the evidence that the State has proved beyond a

2  reasonable doubt each of the above elements of the offense

3  of murder, then you shall find the Defendant guilty of

4  murder.  If you find that the State has failed to prove

5  beyond a reasonable doubt any one or more of the elements of

6  the offense of murder, you cannot find the Defendant guilty

7  of murder.

8       At this time, ladies and gentlemen, let me charge you

9  on the law and the various other things that in my judgment

10  are applicable in this particular trial.  You are aware

11  there was testimony from the accomplice or codefendant in

12  this case, Brenda Suttles.  Let me read to you the charge

13  regarding corroboration of that testimony.  An accused

14  cannot be convicted on the testimony of an accomplice unless

15  corroborated by other evidence tending to connect the

16  accused with the commission of the offense.  And if such

17  corroborative evidence merely shows the commission of the

18  offense or the circumstances thereof, the accused cannot be

19  convicted.

20       You also heard testimony from certain expert

21  witnesses, witnesses who were here with a particular

22  education or experience and offered their testimony and

23  opinion regarding certain matters in connection with this

24  trial.  Let me read to you a charge regarding the expert

25  witnesses and their testimony.  When knowledge of a

Ann H. Armstrong, RPR

1   technical subject may be helpful to a jury, a person having

2   special training or experience in that technical field, one

3   who is called an expert, is permitted to state his or her

4   opinion concerning those technical matters.  Merely because

5   an expert witness has expressed an opinion, however, does

6   not mean you must accept that opinion.  The same as with

7   other witnesses.  It is up to you to decide whether to rely

8   upon it.

9         Ladies and gentlemen, you are to base your verdict in

10  this case on the evidence in this case.  The evidence that

11  is to be considered by you is the testimony, are the

12  exhibits and the presumptions of law that have not been

13  refuted by the law.  You are not to consider as evidence the

14  indictment, the arguments of the attorneys or the rulings of

15  this Court.  Now all twelve of you must agree before you can

16  reach any verdict in this case.  Your verdict must be the

17  verdict of each and every juror.  You are the sole judges as

18  to the weight that should be given to all of the testimony

19  in this case.  It will be your duty to attempt to reconcile

20  the testimony of all of the witnesses so as to make them all

21  speak the truth if this can be done reasonably.  You should

22  take the testimony of the witnesses together with all proper

23  and reasonable inferences therefrom, apply your common sense

24  and then in an honest and impartial way determine what you

25  believe to be the truth.  You should weigh all of the

Ann H. Armstrong, RPR

1098

1 evidence and reconcile it if possible.  But if it cannot be

2 reconciled, you ought to take that evidence which you think

3 is worthy of credit and give it just such weight as you

4 think it is entitled to.

5 　　　You may take into consideration any interest any

6 witness might have in the outcome of this case.  You may

7 take into consideration any bias or prejudice or interest

8 that might have been exhibited to you while a witness

9 testified.  You have a right to consider such things as the

10 demeanor of the witness on the stand.  That is, how they

11 appeared to you while they testified.  Did they testify

12 frankly and straightforwardly or evasively?  These are

13 things that you can consider.  You have the right to

14 consider what basis they had for testifying, how they knew

15 the facts they testified about, whether they had an

16 opportunity to know those facts.  These things you may look

17 to in passing upon the credibility of the witnesses.  If you

18 believe that any material part of the evidence of any

19 witness is willfully false, you may disregard all of the

20 testimony of such witness.

21 　　　Ladies and gentlemen, the guilt of a defendant may be

22 proved by circumstantial evidence as well as by direct

23 evidence.  The test of the sufficiency of the circumstantial

24 evidence is whether the evidence as proved produces a moral

25 conviction to the exclusion of all reasonable doubt of the

1099

1    guilt of the accused whether they are incapable of

2    explanation upon any reasonable hypothesis consistent with

3    his innocence.  Upon circumstantial evidence, ladies and

4    gentlemen, there should not be a conviction unless it

5    excludes every other reasonable hypothesis than that of the

6    guilt of the Defendant.

7         Ladies and gentlemen, evidence has also been

8    introduced in this case for the purpose of impeaching

9    certain witnesses and to discredit their testimony.  The law

10   permits a witness to be impeached in several ways.  For

11   instance, a witness may be impeached by proof of

12   contradictory statements made by the witness while on the

13   stand in this case or by contradictory statements made by a

14   witness at other times or places whether under oath or not.

15   But the fact that a witness has been impeached and

16   successfully impeached does not mean that you must

17   necessarily discard a witness' testimony either in whole or

18   in part for there may be other evidence in the case or other

19   facts and circumstances in evidence which in your judgment

20   may tend to support or corroborate a witness' testimony or

21   some part or parts of it.  And as I have already charged

22   you, you are the sole and exclusive judges of the

23   credibility of the witnesses and the weight that you will

24   accord their testimony.

25         Ladies and gentlemen, the Court charges you that the

Ann H. Armstrong, RPR

1  fact that the Defendant did not testify in this case cannot

2  be considered in determining the Defendant's guilt or

3  innocence.  No inference or conclusion should be drawn by

4  the jury from the fact that the Defendant, Matthew Reeves,

5  was not sworn and put on the witness stand as a witness in

6  his own behalf.  Nor should this fact have any weight with

7  the jury in reaching a verdict.

8       In considering the evidence in this case and in

9  reaching your verdict, you have the right to use your

10  knowledge of men and women and of their affairs and use your

11  common sense.  You acquire your common sense by living,

12  through your day-to-day contacts with your fellow men and

13  women.  Your knowledge of men and women and of their affairs

14  and the knowledge that you gain through your day-to-day

15  experience in life is called common sense.

16       Ladies and gentlemen, your verdict should not be

17  based on sympathy, prejudice or emotion.  It should be on

18  the law and the facts.  To do otherwise would be to violate

19  the solemn oath that you have taken.  Now to aid you in the

20  wording of the proper verdict in this case, the lawyers on

21  both sides have approved the various possible forms of your

22  verdict.  You will, of course, return only one of these

23  verdicts.  And if after you have considered all of the

24  evidence in this case and all proper and reasonable

25  inferences therefrom, you are satisfied beyond a reasonable

1101

1    doubt that the Defendant is guilty of murder during the

2    commission of a robbery in the first degree, then it would

3    be your duty to convict him.  And the form of your verdict

4    would be as follows, we, the jury find the Defendant,

5    Matthew Reeves, guilty of murder during the commission of a

6    robbery in the first degree as charged in the indictment.

7    This jury verdict form is pre printed for you.  Your

8    foreperson will sign the form here on the bottom where the

9    space is provided, and then you will fill in the date as

10   well.

11        On the other hand, if after you have considered all

12   of the evidence in this case and all proper and reasonable

13   inferences therefrom, you are not satisfied beyond a

14   reasonable doubt that the Defendant is guilty of murder

15   during the commission of a robbery in the first degree, but

16   you are satisfied beyond a reasonable doubt that the

17   Defendant is guilty of murder, then it would be your duty to

18   convict him, and the form of your verdict would then be as

19   follows, we, the jury, find the Defendant, Matthew Reeves,

20   not guilty of murder during the commission of a robbery in

21   the first degree as charged in the indictment but guilty of

22   the lesser included offense of murder.

23        On the other hand, if after you have considered all

24   of the evidence in this case and all proper and reasonable

25   inferences therefrom and the law as the Court has given it

1102

1    to you, if from all of that you're not satisfied beyond a

2    reasonable doubt that the Defendant is guilty of either

3    murder during the commission of robbery in the first degree

4    or murder, then it would be your duty to find him not

5    guilty.  And the form of your verdict would be, we, the jury

6    find the Defendant, Matthew Reeves, not guilty.  Again these

7    forms all provide for your foreperson to sign and a place

8    for you to put the date.

9         Now ladies and gentlemen, when you go back into the

10   jury room, you should select one of your number as

11   foreperson.  The duty of the foreperson, of course, is to

12   preside over your deliberations and then to sign the verdict

13   form and the verdict of the jury.  The verdict of the jury

14   as I've already told you must be the verdict of all twelve

15   of you.  When you have arrived at the verdict, you will

16   knock at the door of the jury room.  And you will be

17   returned into the courtroom to give us your verdict.  In the

18   meantime I'm going to ask that you all stay together.  It's

19   absolutely necessary that you do stay together at this time

20   until you have reached a verdict.  This is the last time

21   that I can communicate with you.  I cannot answer questions

22   regarding the facts of the case.  You're the sole judges of

23   the facts of the case.  I can, however, answer questions

24   pertaining to the law as I have charged.  But I cannot

25   answer questions regarding the facts of the case.

1    If a question of law does arise, you may write that

2  question on a piece of paper and give that to the bailiff,

3  and he will give that to me.  I will then confer with the

4  attorneys on the record.  And then if I can respond to the

5  question, I will return you to the courtroom and give you a

6  response.  In just a few minutes I'm going to ask you to

7  retire to the jury room.  At this time do not begin your

8  deliberations.  We are going to deliver to you the evidence

9  in the case.  The things that are in evidence will be

10  brought back to you by the court reporter and the bailiff.

11  At that time you may begin to select your foreperson and

12  then to begin your deliberations.  I know we are approaching

13  the lunch hour.  I'm going to have the bailiff and my

14  secretary give to you a menu.  We are going to bring lunch

15  in to you today so you can work through the lunch hour and

16  continue your deliberations into this afternoon.  What says

17  the State as to the oral charge?

18    MR. GREENE:  Satisfied, Your Honor.

19    THE COURT:  Defense?

20    (The following occurred at the bench outside the

21  hearing of the jury:)

22    MR. GOGGANS:  Your Honor, other than as stated in the

23  charge conference yesterday and in court this morning before

24  the jury came in, we only have one other thing that relates

25  to the Court's instruction that they be, that the doubt be a

Ann H. Armstrong, RPR

1104

1    reasonably substantial doubt.  Our objection to that is that

2    it's an improper statement of the burden of proof.

3    Otherwise, we just simply bring forth the objections we made

4    during the charge conference this morning.

5            THE COURT:  All right, sir.  Anything from the State?

6            MR. GREENE:  That's in the pattern?

7            THE COURT:  It's in my standard.

8            MR. GOGGANS:  Is that overruled too?

9            THE COURT:  Yes, sir.

10           (The following occurred in the presence and hearing

11   of the jury:)

12           THE COURT:  Of course, there are thirteen of you

13   left.  Mr. Denmark, you were the alternate that we do not

14   need.  So I'm going to excuse you at this time.  I want to

15   thank you for your time and your attention here this week.

16   And you're free to go.  You're excused from jury service, of

17   course, and for the week as well.  You may discuss the facts

18   of this case with whomever you wish if anyone approaches you

19   and wants to talk to you about this case.  If you do not

20   want to discuss the case with them, you don't have to but

21   just politely or however you want to tell them that you

22   don't want to talk about it.  But if you would please give

23   your pin to Mr. Bagley.  And Mr. Bagley, I'm going to give

24   you these verdicts forms, and Ms. Sorrells you may have

25   those.  And you may retire to the jury room.  We will bring

1105

1   you the evidence in just a few minutes.

2          (The jury was excused from the courtroom and began

3   their deliberations at 11:20 a.m.)

4          (The jury was returned to read their verdict at 12:55

5   p.m.)

6          THE COURT:  Ladies and gentlemen, I understand you

7   have reached a verdict?

8          FOREPERSON:  Yes, sir.

9          THE COURT:  Ms. Golson, are you the foreperson?

10         FOREPERSON:  Yes, sir.

11         THE COURT:  Would you please rise and read the

12   verdict?

13         FOREPERSON:  We, the jury find the Defendant, Matthew

14   Reeves, guilty of murder during the commission of a robbery

15   first as charged in the indictment.

16         THE COURT:  Thank you.  If you would please hand that

17   verdict form to Mr. Bagley.  Ladies and gentlemen, at this

18   time, I'm going to poll you and to make sure that this is in

19   fact your verdict.  And as I point to you, please

20   acknowledge if this is in fact your verdict?  Ms. Golson,

21   is this your verdict?

22         MS. GOLSON:  Yes, sir.

23         THE COURT:  Mr. Clark, is this your verdict?

24         MR. CLARK:  Yes, sir.

25         THE COURT:  Is this your verdict?

Ann H. Armstrong, RPR

1106

```
 1          JUROR:  Yes, sir.

 2          THE COURT:  Is this your verdict?

 3          JUROR:  Yes, sir.

 4          THE COURT:  Is this your verdict?

 5          JUROR:  Yes, sir.

 6          THE COURT:  Is this your verdict?

 7          JUROR:  Yes, sir.

 8          THE COURT:  Is this your verdict?

 9          JUROR:  Yes, sir.

10          THE COURT:  Is this your verdict?

11          JUROR:  Yes, sir.

12          THE COURT:  Is this your verdict?

13          JUROR:  Yes, sir.

14          THE COURT:  Is this your verdict?

15          JUROR:  Yes, sir.

16          THE COURT:  Is this your verdict?

17          JUROR:  Yes, sir.

18          THE COURT:  Is this your verdict?

19          JUROR:  Yes, sir.

20          THE COURT:  Now your lunch is here.  At this time I'm

21   going to place you in recess for lunch.  Of course, the

22   second phase of the trial will begin shortly after lunch.

23   That will be the penalty phase.  We are going to begin that

24   this afternoon.  Please retire to the jury room.  Your lunch

25   is back there waiting on you.  We'll be back in just a
```

1  little while.  Thank you very much.

2        (The jury was excused from the courtroom.)

3        THE COURT:  We are going to eat lunch and get back

4  together in about thirty minutes.

5        (A recess was taken.)

6        THE COURT:  We are going to now proceed with the

7  penalty phase.  If you would please, Mr. Bagley, bring the

8  jury in.

9        (The following occurred in the presence and hearing

10  of the jury:)

11        THE COURT:  Ladies and gentlemen, the guilt phase of

12  this proceeding concluded earlier this afternoon after you

13  returned a verdict of guilty against the Defendant, Matthew

14  Reeves, for the capital offense of murder during the

15  commission of a robbery in the first degree.  And it now

16  becomes your duty to recommend the sentence that the

17  Defendant, Matthew Reeves, is to receive for the capital

18  offense for which he has been convicted.

19        Alabama law provides that the Defendant convicted of

20  a capital offense shall receive either a sentence of life in

21  prison without parole or a sentence of death.  That is what

22  the capital offense -- that is what a capital offense is.

23  It's a crime for which the Defendant can be sentenced to

24  death or life imprisonment without parole.  Now you're to

25  render an advisory verdict recommending one of those two

1108

1  sentences that the Defendant shall receive based on the law

2  I give you now and later and based on the evidence presented

3  to you in this hearing.

4       The final responsibility under the law for sentencing

5  will be mine.  The law does not in any way presume or permit

6  you to presume that just because the Defendant has been

7  convicted of a capital offense he is to be sentenced to

8  death.  Instead the law provides that whether this or any

9  other capital defendant is to be sentenced to life

10  imprisonment without eligibility for parole or death depends

11  upon the consideration of certain aggravating circumstances

12  that may exist in this case and certain mitigating

13  circumstances that may exist in this case.

14       Now an aggravating circumstance is a circumstance

15  specified by law which indicates or tends to indicate that

16  the Defendant should be sentenced to death instead of life

17  imprisonment without parole.  A mitigating circumstance is a

18  circumstance which indicates or tends to indicate that the

19  Defendant should be sentenced to life imprisonment without

20  parole instead of death.

21       The issue of this sentencing hearing concerns

22  circumstances of aggravation and circumstances of mitigation

23  that you should consider and weigh against each other in

24  deciding what the proper punishment is in this case.  I will

25  further define aggravating circumstances and mitigating

Ann H. Armstrong, RPR

1   circumstances at the end of this hearing and before you

2   render your advisory verdict recommendation.

3       I want to tell you now how we will proceed in the

4   sentencing hearing.  First, one of the prosecutors in just a

5   few minutes will make an opening statement outlining what

6   evidence if any the State expects to introduce at this

7   hearing with respect to the punishment to be imposed.  Then

8   the Defendant's attorney will make an opening statement

9   outlining what evidence if any the Defendant expects to

10  introduce at this hearing with respect to the punishment to

11  be imposed.  Evidence will then be introduced which may be

12  considered by you insofar as it bears upon the punishment

13  recommendation you are to make.  Some of that evidence may

14  relate to the capital offense for which the Defendant has

15  already been convicted.  That does not mean that you should

16  retry his guilt or innocence of that capital offense.

17  Instead any evidence about the capital offense for which the

18  Defendant has already been convicted will be put before you

19  solely to help you decide what aggravating and mitigating

20  circumstances exist in this case and what you recommend the

21  sentence should be.

22      After all of the evidence is in, the attorneys may

23  make their arguments to you regarding the punishment to be

24  imposed.  The Court will then give you further instruction

25  concerning the law applicable to this sentencing hearing.

Ann H. Armstrong, RPR

1    Then you will go to the jury room, deliberate, and arrive at

2    your advisory verdict recommending the punishment to be

3    imposed in this case, either life imprisonment without

4    parole or death.  Before the attorneys speak to you, you

5    should understand that they are not witnesses giving

6    evidence, and they are not judges instructing you on the

7    law.  Their openings statements and closing arguments are

8    intended to help you in understanding the evidence and

9    applying the law.  But their arguments are not evidence and

10   should not be considered as evidence, nor is their function

11   to instruct you on the law.  The Court and the Court alone

12   instructs you on the law.

13       Now occasionally during the course of these

14   proceedings as has been the case, the attorneys will make

15   objections.  That is their duty in representing the parties

16   they represent to make such objections as they deem

17   appropriate, call witnesses as they feel appropriate and

18   then to fully argue their party's cause.  Occasionally as I

19   have done in the past, I will have to talk to the attorneys

20   outside of your hearing and outside of your presence.  If I

21   should call the attorneys to the bench or if I should excuse

22   you from the courtroom again, it will be to resolve some

23   legal matter which might not be proper for you to hear and

24   consider at that time.  Again you should not speculate on

25   the content of any conference, nor should you allow the fact

Ann H. Armstrong, RPR

1     that we have such conference affect your verdict in this

2     case.  Likewise my rulings on objections do not indicate the

3     weight to be given any such evidence.  If I overrule an

4     objection, you should not put any increased weight on the

5     evidence or the answer.  If I sustain an objection, you

6     should not speculate on the possible answers to questions

7     that I do not require to be answered.  At this time Mr.

8     Greene, Ms. Wilson?

9         MR. GREENE:  Ladies and gentlemen of the jury panel,

10    this is the part of the penalty phase where we address you

11    as to what evidence we intend to present to you and what we

12    want you to consider.  It's kind of an opening statement as

13    in the previous trial.  This is the penalty phase of this

14    matter.  As the judge has just informed you, you are charged

15    with the responsibility of making a recommendation to the

16    Court of the penalty of death or the penalty of life without

17    parole.

18        Now you have already determined and decided as a

19    group that the Defendant, Matthew Reeves, Troll, over here

20    did in fact while in the course of a robbery kill Mr.

21    Johnson by shooting him with a shotgun.  The question now is

22    were in fact the acts and the events surrounding that

23    robbery and death so atrocious, so terrible that they

24    require the penalty of death, or are there some matters that

25    mitigate against that, that lessen that, that soften that

1112

1   and require a penalty of less than death, life without

2   parole.  That's the issue you have got to decide among you.

3        In this case the aggravating circumstance that the

4   State presents is that of the offense of an intentional

5   killing during the course of a robbery.  And we contend to

6   you and we'll contend to you at the conclusion of this

7   evidence and argue that this man, Matthew Reeves, Troll,

8   took this life deliberately and intentionally without any

9   justification, as much for his own gratification and

10  braggadocio as for the money that he and his friends were to

11  get.  All that we know about him and all that happened that

12  day requires the ultimate penalty in this case.  At this

13  time, Your Honor, we move for the introduction of the

14  testimony previously entered in this trial on behalf of the

15  State, and we rest.

16       MR. GOGGANS:  We would like to make an opening.

17  Counsel, Judge Jones, by your verdict of guilty of the

18  charged offense, you have found Matthew Reeves guilty of a

19  capital offense, murder during a robbery.  We accept your

20  verdict as we must, but we come before you now to talk about

21  what should be done in response to the crime with which you

22  have found him guilty.  You have two options here.  One

23  option is a recommendation of death by electrocution in the

24  Alabama electric chair at Holman prison.  The other option

25  is life without the possibility of parole in one of the

Ann H. Armstrong, RPR

1113

1   penal institutions in Alabama, neither of which is an

2   inviting proposition.  Of course, death is the ultimate

3   punishment to be imposed for any crime.

4         But you'll hear evidence that Matthew Reeves at the

5   time of this crime was only eighteen and as he sits here

6   today is only twenty.  Life without parole is not an

7   inviting proposition by any means.  You'll hear evidence,

8   and you'll be instructed on how to go about making this

9   decision that you've got to make.  It's going to be a

10  difficult decision, but essentially the process is this.

11  Evidence will be presented to you.  The prosecution will

12  present evidence that it thinks warrants the death penalty.

13  We will present evidence that we think warrants the penalty

14  of life without the possibility of parole.  And you will

15  have to weigh those things and determine what you think the

16  penalty should be under the law.

17        Just because a case is a capital case resulting in a

18  capital conviction does not mean that it is a death penalty

19  case.  If that were so, I mean we wouldn't be here this

20  afternoon.  What it means is that now there has got to be a

21  decision of death or life without the possibility of parole.

22  It does not mean because there has been a capital

23  conviction, the punishment must be death.  We think that

24  when you consider the evidence and you weigh it that you

25  will find the appropriate punishment in this particular case

Ann H. Armstrong, RPR

1    is life without possibility of parole.

2         You heard the evidence, and you've made your decision

3    known.  And you've made your verdict known.  You heard the

4    evidence as to what happened back in November of '96 in

5    Crockett Alley.  I'm not going to stand here and tell you

6    that that was anything pretty, that there was anything nice

7    or anything about that.  That was bad, very bad.  It is a

8    hard, cold reality that things like that happen.  I believe

9    Mr. Greene said that when we are confronted with situations

10   like this and things go on like this, it's a horrible

11   indictment of our society that these things can go on.  And

12   we are inclined to agree with him.

13        And when you look at the evidence in this case,

14   you'll see what all there is going on and not going on, was

15   going on in Matthew Reeves' upbringing.  And we want you to

16   put that together with Matthew Reeves himself to understand

17   what would bring him to the point that he was on that night

18   in Crockett Alley.  You'll hear evidence that Matthew Reeves

19   is what psychologists or psychiatrists call borderline

20   intellectual functioning.  It doesn't mean he's got some

21   severe psychiatric disturbance.  It means he is right on the

22   borderline of being classified as retarded, not insane or

23   anything like that.  But he's on the borderline.

24        You will hear that that has a lot to with how people

25   act in different environmental situations.  You'll hear

Ann H. Armstrong, RPR

```
 1    about the environment that Matthew Reeves grew up in.  You
 2    will hear about lack of resources from all kinds of
 3    different places.  You'll hear about lack of parental
 4    resources, lack of parental involvement.  You'll hear of
 5    lack of school resources.  The school just ran out of
 6    resources for Matthew Reeves.  You'll hear about lack of
 7    social services resources.  You'll essentially hear about
 8    the lack of resources that are needed to raise somebody, to
 9    raise somebody up in the way that they will behave the way
10    people should behave.  And you put these things together
11    with somebody who is borderline functioning, and you are
12    going to have problems.
13         Everybody is going to gravitate toward something.
14    Everybody makes choices.  The question is how capable is
15    this person of making a choice in any situation.  The
16    evidence here will be Matthew Reeves has borderline
17    intellectual functioning.  It's probably not going to be
18    great in any sense.  But the choices that are made will be
19    influenced by the environment factors, how people are
20    raised, et cetera.
21         You will hear evidence that people of his mental
22    functioning are going to gravitate towards something.
23    Everybody gravitates towards something, and some people are
24    going to gravitate towards sports or Boy Scouts or church or
25    whatever is out there that the appropriate resources provide
```

1   for the child growing up.  And Matthew Reeves' situation --

2   all of these things that we might normally think of as every

3   day activities, every day resources you or I might have or

4   we provide for our children weren't there.  The thing out

5   there for Matthew Reeves, the only structure of any sort if

6   you can call it that was a structure of violence, gangs,

7   thug life.  The other resources just weren't there for him

8   for somebody with borderline intellectual functioning.

9         When you put these things together -- there is no

10  justification if you want to find justification.  But we

11  think that you will find an explanation for what happened in

12  Crockett Alley.  This may be a horrible indictment of our

13  society.  But the reality is that's the way it is some

14  places.  If you put somebody out there with borderline

15  intellectual functioning in that environment, they are going

16  to gravitate towards that environment and act out in

17  accordance with that environment the only real thing they

18  know.  When this is all over, when you hear all of the

19  evidence, we are going to ask you to consider it and give it

20  your most thoughtful consideration.  And we'll submit to you

21  that when you do that, that you would view this particular

22  case as a capital case but a capital case in which the

23  appropriate punishment is life without the possibility of

24  parole.

25        MR. GREENE:  The State moves for the introduction of

1   all of the evidence in the previous trial presented and

2   rests.

3        THE COURT:  Any objection to that, Mr. Goggans?

4        MR. GOGGANS:   No, sir, other than what may have been

5   stated in objections previously in the guilt phase.

6        THE COURT:  The State is asking that the evidence

7   that was submitted in the trial of this case previously be

8   considered by you as the evidence of the State in the

9   penalty phase.  Mr. Goggans, you may call your first

10  witness.

11       MR. GOGGANS:  Your Honor, as a preliminary matter the

12  Defendant has marked as exhibits certain documents which

13  have been copied and been provided to the State of Alabama.

14       MR. GREENE:  No objection.

15       MR. GOGGANS:  I will state just very quickly for the

16  record what they are.  Exhibit Number 6 is a court record

17  involving a Frank Jeffrey McGill.  Exhibit Number 7 is a

18  medical record.  Exhibits 8 through 14 are various school

19  and DYS records.

20       THE COURT:  They will be admitted.

21       MR. GOGGANS:  As our first witness we call Detective

22  Grindle.

23       THE COURT:  You're still under oath.

24                 PAT GRINDLE,

25  after having been previously duly sworn, was examined and

1    testified as follows:

2                    DIRECT EXAMINATION

3    BY MR. GOGGANS:

4         Q      You are Detective Pat Grindle, Selma Police

5    Department?

6         A      Yes, I am.

7         Q      Detective Grindle, back in November of '96 you

8    went to Matthew Reeves' house, did you not?

9         A      That is correct.

10        Q      Were some photographs of the house not taken

11   at that time?

12        A      They were.

13        Q      Let me show you what is marked as Defendant's

14   Exhibit 26 and ask you to look at that and if you can

15   identify it and tell us what that is?

16        A      This would be a location of the front door of

17   the Reeves' residence.

18        Q      And what is that on the door?

19        A      There is some graffiti of some type.  It's got

20   different markings and some wording around it.

21        Q      Would you look at Defendant's Exhibit 27 and

22   do the same for us on that, please.

23        A      Yes, sir.  This would have also been a

24   photograph of the front door with graffiti and some markings

25   around it as well.

1    Q        The same for Defendant's Exhibit 28?

2    A        Number 28 would be a rear shed of the house to

3    the left of the shed, and it's got some graffiti with

4    wording on it.  One word is Troll.

5    Q        Defendant's Exhibit 16, if you could do the

6    same thing for that?

7    A        Okay.  This would be the interior of the

8    house, the kitchen area.  It's viewed looking back toward

9    the living room.

10   Q        The same for Exhibit 17, please, Defendant's

11   Exhibit 17?

12   A        17 is the front door of the residence taken

13   from the exterior standing on the sidewalk.

14   Q        Would you do the same for Defendant's Exhibit

15   18, please?

16   A        Yes, sir.  This would be the entrance to the

17   residence standing at the front door facing to take the

18   picture towards the kitchen.

19   Q        What is that hanging up there; do you know?

20   A        Looking at it and not recalling it from exact

21   memory, I think it's an old bed sheet or curtain of some

22   type.

23   Q        Hung up where?

24   A        It's hung up over the door opening.

25   Q        Let me ask you this.  Were there any doors on

1120

1    the interior of this house at all?

2        A       No, sir, only in the bathroom.

3        Q       Would you do the same for State's Exhibit

4    Number 85.

5        A       This would be a photograph as you entered the

6    kitchen, turn to your left facing the storage room.   It's

7    just an opening there showing the ticking and white pants

8    from earlier.

9        Q       And the same for Defendant's Exhibit 19,

10   Detective Grindle?

11       A       This would be a photograph taken from a

12   distance from the resident on the front.   It's facing the

13   front door taking a picture of the front door actually.

14       MR. GOGGANS:  We move for the admission of

15   Defendant's 19, 18, 17, State's Exhibit 85, Defendant's

16   Exhibit 16, 28, 26 and 27.

17       THE COURT:  It will be admitted.

18       Q       Detective Grindle, was there a room in that

19   house that had an open section in the ceiling?

20       A       Yes, sir.  The best I can recall as you enter

21   into the kitchen area, there was an opening in the ceiling

22   to the right corner area I believe of the kitchen.  I can't

23   recall it distinctly, but I believe that's where it was.

24       Q       Let me show you Defendant's's Exhibit Number

25   20 and 21.  Do those pretty much show what you recall seeing

1121

1    there?

2         A       Yes, sir.  That will be accurate to the best

3    of my knowledge.

4         MR. GOGGANS:  All right.  We offer 20 and 21,

5    Defendant's Exhibit 20 and 21.

6         THE COURT:  They will be admitted.

7         Q       Let me show you Defendant's Exhibit Number 22.

8    Does that look familiar to you?

9         A       Yes, sir.  This would be the front of 2128

10   Selma Avenue.

11        Q       Are you familiar with what is shown in

12   Defendant's Exhibit 23?

13        A       To the best of my recollection, yes, sir.

14   This would be the bathroom area as you enter the door and

15   turn to your right.

16        Q       And if you could tell us if you recognize what

17   is shown in Defendant's Exhibit 24?

18        A       Yes, sir.  This would be where you enter the

19   bathroom area, and this would be looking straight ahead.

20        Q       And what about Defendant's Exhibit 25, please

21   sir?

22        A       This would be -- if you were to walk up

23   towards the front of the house, to your left there is a

24   driveway heading towards the shed as one of the other

25   pictures depicts.  And this would be the photograph taken

Ann H. Armstrong, RPR

1122

1  from that distance.

2       MR. GOGGANS:  We offer Defendant's Exhibits 22, 23,

3  24, and 25.

4       THE COURT:  It will be admitted.

5       MR. GOGGANS:  Ask permission to publish, Your Honor.

6  That's all, Detective.  And 21 and 22 if I didn't offer

7  them.  I can't remember whether I did or not.

8       THE COURT:  They are admitted.

9       (The witness was excused from the witness stand.)

10              MARZETTA REEVES,

11  after having been duly sworn, was examined and testified as

12  follows:

13              DIRECT EXAMINATION

14  BY MR. WIGGINS:

15       Q       State your name for the record.

16       A       My name is Marzetta Reeves.

17       Q       Where do you live, Ms. Reeves?

18       A       2128 Selma Avenue.

19       Q       What relationship do you have to Matthew

20  Reeves?

21       A       That's my oldest son.

22       Q       Who lived at that residence with you back in

23  October or November of '96?

24       A       Matthew, Julius, my mother, my daughter,

25  Marzetta, me, my stepdaddy, my two nieces and my nephew and

Ann H. Armstrong, RPR

1123

1    their little girl, my little great niece.

2          Q      Have you lived at that address?

3          A      Off and on, I stayed at other places too.

4          Q      Are you originally from Alabama?

5          A      Yes, sir.

6          Q      Have you been here all of your life, or did

7    you live somewhere else?

8          A      All of my life.

9          Q      How many bedrooms do you have in that house?

10         A      It was four before it started raining.

11         Q      Before what started raining?

12         A      Where he was describing the room had a hole,

13   it rains in that room.

14         Q      How long has it been like that?

15         A      Ever since '96.

16         Q      '96?

17         A      Ever since '96, a little before '96.

18         Q      Has Matthew always lived with you at that

19   residence?

20         A      Yes, sir.

21         Q      Where was he born at?

22         A      Matthew was born in New York.  I brought him

23   down here when he turned one.

24         Q      When he came down at the age of one, who came

25   with you?

Ann H. Armstrong, RPR

1124

1    A    Matthew.

2    Q    Who else?

3    A    My mother, Izelle, my nephew.

4    Q    Were you living in New York at the time or

5    what?

6    A    Yes, sir.  I was raised in New York.

7    Q    And when you came from New York, where did you

8    and Matthew go in terms of living?

9    A    To 2128 Selma Avenue, where my grandmother,

10   Alberta Hill, stayed before she died.

11   Q    Where was Matthew's father?

12   A    He stays in New York.

13   Q    Has he ever been down to live with you all

14   here in Alabama?

15   A    Once or twice since he's been a big child.

16   I think he was fourteen the first time.  The second time he

17   seen him I think Matthew was sixteen.

18   Q    Did he have any kind of communication from the

19   time you left New York until he was fourteen?

20   A    No, sir.

21   Q    Where was Matthew born?

22   A    He was born here, and then I took him to New

23   York.

24   Q    What's his date of birth?

25   A    12-13-77.

Ann H. Armstrong, RPR

1125

1    Q      After he had come here from New York, did

2  Matthew get enrolled in school somewhere?

3    A      Yes, sir.

4    Q      Where was that?

5    A      He went to Clark Elementary.

6    Q      Did he start in any kind of preschool?

7    A      Yes, sir.  He went to Pre-K at Clark

8  Elementary.

9    Q      He went to Pre-K at Clark and somewhere else?

10   A      Yes and at Second Baptist.  He just was in

11 school, you know, something like Head Start at Second

12 Baptist Church.  We have a school in there.

13   Q      Whose church is that?

14   A      It was my auntie's church at the time.

15   Q      Were you all going to that church?

16   A      No, I would go to Green Street Baptist Church.

17 Matthew was baptized at Green Street.

18   Q      Did he go straight through from first grade to

19 the other school?

20   A      Matthew repeated the first grade.  He stayed

21 in first grade two years.  And I believe -- I'm not real

22 sure.  It was either third or fourth grade he repeated

23 school.

24   Q      What happened after the third or fourth grade?

25   A      Well, after then Matthew went to the sixth

Ann H. Armstrong, RPR

1126

1    grade.   Then he was socially promoted to the seventh grade.

2    And then he was at Eastside I believe.

3          Q      What do you mean when you say he was socially

4    promoted?

5          A      The principal and some more people got

6    together and thought that it would be sufficient for him to

7    go to a grade higher because of his grade, I mean age, and

8    his grades were good.

9          Q      When you moved here from New York, what kind

10   of income were you earning?

11         A      When I came here from New York, it was three

12   months before I got on public assistance, and then I got on

13   food stamps and Medicaid.

14         Q      Did you have any other type of income besides

15   public assistance?

16         A      No, sir.

17         Q      And food stamps?

18         A      Other than food stamps, they were three months

19   late in order to process.

20         Q      Back in November of '96, what kind of income

21   did you have?

22         A      Matthew was working.   I was -- my daughter

23   gets public aid, and Julius was getting disability.

24         Q      Are you still getting public assistance and

25   food stamps?

1127

| | | |
|---|---|---|
| 1 | A | For my daughter, yes, sir. |
| 2 | Q | When you came back from New York, how old were |
| 3 | you? | |
| 4 | A | Eighteen. |
| 5 | Q | How old are you today? |
| 6 | A | Thirty-eight. |
| 7 | Q | You mentioned that Matthew repeated the first |
| 8 | grade and then the third grade.  Did he have any other |
| 9 | problems in school? |
| 10 | A | He was having problems.  They put him in some |
| 11 | special classes to help him, like EC student, LD students. |
| 12 | They give them special help one on one. |
| 13 | Q | What time did he start having those kinds of |
| 14 | problems? |
| 15 | A | I guess from first grade because he had to |
| 16 | repeat the first grade. |
| 17 | Q | What time did he start getting help? |
| 18 | A | Well, Matthew was in the second or the third |
| 19 | grade when mental health finally started helping me with |
| 20 | him.  And they gave me some medicine for hyperization |
| 21 | (phonetically).  And he was having little blackout spells, |
| 22 | falling out at school and stuff like that. |
| 23 | Q | How long did he stay with mental health? |
| 24 | A | Until he was sixteen. |
| 25 | Q | How often was he going to mental health? |

1128

1    A       Sometimes twice a week, sometimes three or

2    four times a month.

3    Q       Did he remain on the medication from that time

4    until the age of sixteen?

5    A       No, because he was on -- he went to boot camp.

6    They didn't distribute the medicine to him there.  He went

7    to -- I forgot what it was.  It was kind of a group home

8    there in Mobile.

9    Q       During his early grades, did you have any

10   problems with him in school?

11   A       No.  The teacher said he was doing really

12   good, but considering he had slow progress in some things.

13   But he was making good grades.

14   Q       What about when he got up in the higher

15   grades?

16   A       I got compliments from his teachers, but they

17   still wanted to give him one on one help in school.

18   Q       You mentioned that he went to Eastside school?

19   A       Yes, sir.

20   Q       How long did he go there?

21   A       He stayed there until he was in the 8th grade,

22   and then he was having problems when he was in the 8th grade

23   at the school.  So they didn't let him go to school anymore.

24   He got -- Ms. Betty Jackson was a tutor, and she was coming

25   back and forth to my house.

Ann H. Armstrong, RPR

1129

1       Q     What do you mean they wouldn't let him go back

2  to school no more?

3       A     They didn't give me no apparent reason.  They

4  just told him he couldn't come back.

5       Q     Were you able to get him in any other school

6  in the city?

7       A     No, sir.

8       Q     What about in the county?

9       A     He went to -- he didn't go to a public school

10  or a county school.  He went to GED classes.  They tried to

11  get his GED.  Then after he left -- while he was in the

12  group home in Mobile, after he left there, he went to the

13  Job Corps, and he got some certificates in brick.  He got a

14  certificate in welding and got a certificate in auto

15  mechanic and stuff like that.

16       Q     He learned those while he was in those

17  institutions?

18       A     Yes, sir.

19       Q     When they kicked him out of school at

20  Eastside, what kind of schooling did he get?

21       A     None other than maybe the tutor came maybe

22  twice and maybe three times a week.  Betty Jackson as I

23  stated, she was a tutor.  And she came to the house maybe

24  two or three times a week.

25       Q     What else did he do besides --

1130

1    A      That was all, special education.  That's all.

2    Q      What was he doing to help him learn and all of

3 that?

4    A      Well, nothing, I basically worked with him

5 myself.

6    Q      How far did you go in school?

7    A      I got to the 12th grade.

8    Q      Did anyone else assist you like DHR or

9 anything like that?

10    A      No more than the check they were sending me.

11 That's all.

12    Q      There was no one else coming out to visit

13 Matthew or visit you?

14    A      No.  The only time I could get some help from

15 DHR was when I -- like I had to take him to mental health or

16 either to the doctors.  And then I had a friend -- when I

17 stayed at Craig Field, I had a friend.  Her name is Louise

18 Perryman.  She would take me back and forth to the doctor

19 with my children.

20    Q      What did Matthew visit mental health for?

21    A      He had a hyperization problem.  And like I

22 said he had some learning disabilities.

23    Q      He wasn't there because he was seeing or

24 hearing anything, was he?

25    A      Yes, sir.  He would tell me -- this place of

Ann H. Armstrong, RPR

1131

1   sleeping on top of the bed like normal kids would.  Matthew

2   -- sometimes in the morning time I would find him up under

3   the bed, sleeping up under his bed.  He would be up under

4   the bed, but his cover would be under there with him.  He

5   would sleep that way.

6           Q       Did he ever explain to you why he was doing

7   that?

8           A       He would say he was seeing things.

9           Q       What did he say?

10          A       I never did see what he was seeing, but he

11  said he was seeing things.

12          Q       What was he telling you he was seeing?

13          A       Men and monsters and things going on in his

14  head.

15          Q       What did you try and do to get him help for

16  that?

17          A       Like I said, the only thing I knew of was to

18  take him to his therapist and let him talk it out, try to

19  find out what was going on with him.  I tried to get them to

20  put him in a place where he could get medical assistance and

21  medical help with his head and stuff from the fall out

22  spells and from the things he was talking about he was

23  seeing things and stuff.

24          Q       Who did you ask for help?

25          A       I was asking -- I would ask my case workers,

Ann H. Armstrong, RPR

1   and I would ask the mental health folks if they could help

2   me get him in a program or facility to get him some help.

3          Q       How was Matthew and his relationship with you?

4          A       Matthew, he cannot -- for a good little while

5   Matthew could not express himself.  What I mean, say he

6   loved me or something like that, but he would always draw me

7   pictures like flowers or little cards or stuff saying he

8   loved me.

9          Q       How was he in relation with his sisters and

10  brothers?

11         A       The same way with them except for his brother

12  and him was like they didn't get along at first.  They like

13  was -- my baby son was like a rival to Matthew.

14         Q       Matthew is the oldest?

15         A       Matthew is the oldest.  Julius is the baby

16  boy.

17         Q       Who is bigger, Matthew or Julius?

18         A       Julius is much bigger and much taller than

19  Matthew.

20         Q       How was Matthew in relation to the other

21  members in the household?

22         A       He got along fine with them.  But everything

23  -- when Matthew was a small child, everything mostly that he

24  did like little bitty kids do.  Sometimes he got scolded a

25  lot and got whipped a lot from my mother and his aunties and

1133

1    stuff.  They really scolded him a lot.

2         Q       When Matthew was growing up, was he in any

3    type of church or anything like that?

4         A       Like I said Matthew was baptized in the Green

5    Street Baptist.  He has been going to that church ever since

6    he was a little boy.

7         Q       Was he going on a regular basis?

8         A       Yeah, every Sunday we went there.

9         Q       What was he doing in the church, activities?

10        A       The pastor would come and get him and take him

11   places with him.  Sometimes he was in the Boy Scouts and a

12   few more badges and stuff.

13        Q       You indicated at some point Matthew went away

14   to a group home?

15        A       Yes, sir.

16        Q       What caused that?

17        A       He had a fight I think.  I'm not sure, but I

18   think it was about a fight.

19        Q       Did that occur at the time he got kicked out

20   of school or before he got kicked out of school?

21        A       He was kicked out of school.

22        Q       Was he in that kind of trouble when he was in

23   school?

24        A       Not all the time.

25        Q       Do you know some of the places he was sent to

Ann H. Armstrong, RPR

1134

1     because of his conduct?

2          A      Yes, sir.  He was sent to Chalkville to boot

3     camp.  Like I said he was sent to Mobile to a group home.

4     He was sent to Opelika, which is Lee County I think, out

5     there at the juvenile before they moved it out of Selma.

6          Q      Would you say he's been sent to quite a few

7     places in the State of Alabama?

8          A      Yes, sir.

9          Q      How did Matthew respond to having gone to

10    those places?

11         A      Well, as far as I know when Matthew was in the

12    group home, they were writing me letters saying he was doing

13    fine.  He was emotionally developing pretty good.  He was

14    going to an abuse counselor or whatever.

15         Q      Abuse counselor did you say?

16         A      Yeah, you know, where they scream and yell and

17    get their feelings out, stuff like that.

18         Q      Do you know whether or not he was having any

19    problems at any of these group homes and stuff he had been

20    to?

21         A      She gave him a good -- I got -- like I said

22    they gave him a good recommendation at the group home.  And

23    then there are ones that helped him with the Job Corps.

24    That's when he got the certificates in welding and got the

25    certificates in auto mechanic.

1135

1    Q    Would you say he did better in those group

2  homes and those institutions than he did when he got kicked

3  out of school and remained at home?

4    A    When he got kicked out and remained at home he

5  didn't like being at home.  He wanted to be up in the school

6  facility.  He didn't want home.  I tried and tried as hard

7  as I could to get him back in a school.

8    Q    Who did you go for assistance trying to get

9  him back in school?

10    A    Legal Aid.

11    Q    They could not help you?

12    A    No, sir.

13    Q    Did Matthew respond well to those

14  institutions?

15    A    As far as I know of, what they were sending

16  me.

17    Q    Did he open up more after that or anything

18  like that?

19    A    Yes.  When Matthew left the group home and Job

20  Corps, Matthew came home.  He got no more -- he was having

21  some -- he stayed out of trouble a good little while before

22  his brother Julius came home.

23    Q    Where was Julius?

24    A    He was locked up.

25    Q    How long was it from the time that Matthew

Ann H. Armstrong, RPR

1136

1    stayed at home until Julius came back?

2        A      I really couldn't say, but it was like I guess

3    three or four or five months, in between the time.

4        Q      You mentioned that Matthew was earning some

5    income from somewhere?

6        A      Yes, sir.  Matthew had went to work for Mr.

7    Ellis' construction company.  He was doing roofing work for

8    him and some carpentry work for him.

9        Q      How did he respond to that?

10        A      Very well.  He got up at 6:00, 5:30 sometimes

11    in the morning and be ready by 6:00 o'clock.  When the men

12    blowed outside for him, he was ready.

13        Q      Was he working at the time that Julius

14    returned?

15        A      Yes, sir.

16        Q      Okay.  What effect did --

17        A      Sometimes.

18        Q      What effect did Julius' return have on

19    Matthew?

20        A      When Julius returned -- he didn't want --

21    Matthew had been shot then.  He had got shot in his head.

22    And I guess he got afraid that his brother would get shot

23    again because Julius had been shot prior to him being shot.

24    Julius had been shot.  My baby son had been shot three

25    times.

Ann H. Armstrong, RPR

1137

1     Q      You say your baby son.  You're talking about

2   Julius?

3     A      Julius Reeves.

4     Q      Julius and Matthew had been shot.  Let's talk

5   about that.

6     A      Well, Matthew got shot.  It was on the front

7   porch of my residence.  And when he got shot, when I finally

8   -- because I opened the door one time, and then I closed it.

9   And then I opened the door again, and I realized that it was

10  him on the front porch taking his elbows and trying to get

11  to the door to tell me that he had been shot.  Then he was

12  in a pool of blood.  I then got him and put pressure towards

13  his head, hold his hands and told him it would be all right.

14    Q      Do you know when this was that he got shot?

15    A      Sir?

16    Q      Do you know what date it was, what year it was

17  he got shot?

18    A      This was three, maybe three -- let's see.  It

19  was three or four months prior before this incident with

20  this man, with Mr. Johnson.

21    Q      Where was he shot on his body?

22    A      Matthew was shot right here.

23    Q      What happened after he was shot in terms of

24  him coming back home or staying in the hospital, or what?

25    A      He stayed in ICU for a couple of, about two or

1138

1    three days, two days I know of before I was able to get to

2    him. I believe it was a day before I could get there because

3    I didn't go until that Saturday.  Matt stayed in the

4    hospital two days before I could get to where he was.

5         Q       After that gunshot, what happened to Matthew?

6         A       After he had got shot, Matt was staying close

7    to him.  Matt would tell me where he would go and where he

8    wasn't going to go until like I said, until my baby boy came

9    home.  Then that Wednesday before the incident with --

10        Q       We are going to get to that, before you go

11   ahead.  After he had gotten shot, do you know if he was on

12   medication or anything like that?

13        A       Yes, the people in Birmingham put him on 550

14   milligrams of pain medicine.  I don't remember what kind of

15   pain medicine it was, but I know it was 550 milligrams

16   because I went to Carter drugstore and got the prescription

17   filled when I got here that Sunday.

18        Q       Do you know if he was still taking that

19   medication during the time of this incident back in November

20   of '96?

21        A       Well, that Wednesday morning I know for sure I

22   seen him with the bottle to get his pill out of it to take

23   it that morning.

24        Q       Was anybody there in the home with you other

25   than you, your grandmother to help you with Matthew and

1139

1     Julius?

2         A     There wasn't nobody there but me and my mother

3     and my stepfather as I stated.  My sister, me and my mother

4     helped raise my sister's three children too.

5         Q     During that time was Matthew involved in a

6     gang?

7         A     That's what they told me.

8         Q     What about from the stuff you saw at the house

9     or anything like that?

10         A     The stuff I saw?

11         Q     Did you see anything at the house that would

12     say he was involved in a gang or anything like that?

13         A     Matthew didn't -- like I said, he didn't show

14     me nothing like that around me.

15         Q     Did he ever cuss at you or fight with you or

16     anything like that?

17         A     Maybe once or twice.  He was angry at someone

18     else, and he came home and took it out on me.

19         Q     Did you have any problems with him cussing you

20     around the house?

21         A     When he was angry about like I said come in

22     the house -- if he was angry he will just take it out on

23     anybody he sees.

24         Q     What about drinking or smoking?

25         A     Matthew didn't drink around me.

1140

1    Q    What about smoking any type of drugs?

2    A    Smoking, maybe smoke a cigarette outside the

3  house.

4    Q    Let's go to this Wednesday or the day before

5  Thanksgiving.  When did you see Matthew that day?

6    A    Well, I seen Matthew that morning until I

7  guess about 11:00 or 12:00.  I don't know.  Between the

8  hours of -- I seen him until 10:00 or 11:00 or 12:00 o'clock

9  that day because I was up cooking my Thanksgiving dinner and

10 my dinner for that night.

11   Q    Did you have a conversation -- what was your

12 last conversation with Matthew that day?

13   A    He said mom, I'm so hungry.  I want something

14 to eat.  I said, well, Matthew I'm fixing some food now.

15 And then Julius left out of the door, and Matt said, that's

16 all right, mama.  I'll see you when I get back, and he went

17 behind Julius.

18   Q    Did you see him any more that day?

19   A    No, sir.

20   Q    Why are you saying that Matthew was fine until

21 the time Julius came home?

22   A    Because he changed.

23   Q    How did he change?

24   A    He would go and not tell me how long he was

25 going to be or nothing like that.  He had me worried.

Ann H. Armstrong, RPR

1141

1    Q    Who was he with when he was doing that, when

2  he was not telling you where he was?

3    A    Him and Julius would be at home.  Where they

4  go and who they were with, I don't know.

5    Q    Do you have any problems out of Julius or

6  something?

7    A    Lots of them.

8    Q    How did Matthew and Julius get along during

9  this time period?

10    A    They got closer.

11    Q    Did Matthew have any influence on Julius?

12    A    No.  I wouldn't say Matthew had any influence

13  on Julius.   He would try to tell him to do right.

14    Q    Did Julius have any influence on Matthew?

15    A    Yes.

16    Q    How is that?

17    A    Because he didn't want his brother -- Matthew

18  didn't want his baby brother out of his eyesight.

19    MR. WIGGINS:  We have nothing further.

20                 CROSS EXAMINATION

21  BY MR. GREENE:

22    Q    Ms. Reeves, when was it that Julius went off?

23    A    I don't know exactly.  What he was doing, he

24  was going out -- Julius was going back and forth to jail a

25  lot.

Ann H. Armstrong, RPR

1142

1    Q      Well, he not only went to jail, but he went

2  off for a while, didn't he?

3    A      Yeah.   Julius went --

4    Q      My question was do you remember when that was?

5    A      No sir.   I don't remember when it was, what

6  year.

7    Q      Matthew went off for awhile too, didn't he?

8    A      Both of them did, sir.

9    Q      What all did they do to get sent off?

10   A      Lots of things.

11   Q      Did they steal cars?

12   A      That's what they said, sir.

13   Q      Break in houses?

14   A      I don't know nothing about that.

15   Q      Fighting folks?

16   A      Sir?

17   Q      Fight with folks, assault people?

18   A      Yes, they were fighting.

19   Q      Drugs?

20   A      What do you mean, sir?

21   Q      Drugs, possess drugs, have drugs?

22   A      Oh, they have been arrested but not found

23  guilty of it, whatever.

24   Q      Were they both off at the same time?

25   A      Sometimes, sir.

1143

1   Q   How old was Matthew the first time he got in

2   serious trouble and had to go to court?

3   A   They were very young, sir.  I don't remember

4   their ages.

5   Q   Eleven, twelve?

6   A   I guess about nine, maybe nine.

7   Q   Would it surprise you that Matthew would

8   contend he has been using marijuana since he was twelve?

9   Would you know anything about that?

10   A   No, sir.  I know that he would come in the

11   house, and I noticed his eyes might be red.  But like I

12   said, sir, my son did no drugs in front of me, drunk no

13   alcohol in front of me.

14   Q   Now you had quite a go of it with Matthew in

15   school, didn't you?

16   A   Yes, sir.

17   Q   Y'all had a lot of trouble, didn't you?

18   A   Yes, sir.

19   Q   All of these reports that they introduced up

20   here awhile ago were some of the records of some of the

21   problems they had; is that right?

22   A   Matthew had a lot of problems at school, sir.

23   Q   Problems with the teachers, cussing them,

24   using profanity?

25   A   I don't know nothing about that.

Ann H. Armstrong, RPR

1144

1    Q      Well, if the report shows that, you wouldn't

2  dispute it, would you?

3    A      No, I wouldn't, sir.

4    Q      Hitting the other children on the bus, you

5  wouldn't dispute that, would you, if that's what the report

6  shows?

7    A      I wouldn't dispute nothing that they have

8  proven, sir, because I know he was having a lot of problems

9  at school, sir.

10   Q      Refusing to obey the teachers when he was,

11 back in '92, when he was fifteen?

12   A      I wouldn't dispute it, sir.

13   Q      Touching the girls in the wrong and

14 inappropriate way; you wouldn't dispute that either, would

15 you?

16   A      Not if they say so, sir.

17   Q      Do you know about this letter he wrote in

18 April of '92 talking about drugs and how he wanted to deal

19 with them?

20   A      No, sir.

21   Q      It says what Matthew wants to do, I want to

22 sell drugs like all my life, the fast life because my cousin

23 wants me to.  Something else, more money than I do.  So why

24 lose money than gain money.  That's how I got my suits.

25 That's how I got my $3200 car; thanks, but no thanks.  Did

1145

1    he write that to the teachers?  You don't know about it?

2        A    No.

3        Q    If that's in the records, you wouldn't dispute

4    it, would you?

5        A    If you say so, sir.

6        Q    You talked awhile ago about Julius and Matthew

7    being served by the school system on a homebound basis.

8    They kicked them both out of school?

9        A    Sir?

10       Q    They kicked them both out of school, didn't

11   they?

12       A    Yes, sir.

13       Q    That was from Knox over to Eastside, and they

14   kicked them out of East End?

15       A    What?

16       Q    They kicked them out of Eastside, didn't they?

17       A    They withdrawed them from Eastside.

18       Q    And they put them in the alternative school,

19   right?

20       A    Sir?

21       Q    They put them in the alternative school?

22       A    No, sir.  They was on -- both of them was on

23   home bound.

24       Q    But they couldn't handle them in the

25   alternative school, so they put them in home bound?

Ann H. Armstrong, RPR

1146

1        A      They didn't even try to put them in the

2  alternative school, sir.

3        Q      What happened to the home bound attempt?

4        A      Well, as far as I know sir, they were doing

5  their -- the lady was doing her job, and my children were

6  doing their work, sir.

7        Q      Is that what happened?   You're sure of that?

8        A      As far as I know of, sir.

9        Q      Who was the lady that was going to do the home

10  bound program?

11        A      Who was the lady that do the home bound

12  program?

13        Q      That was doing the home bound program for

14  them.   You met her, didn't you?   She came to your house?

15        A      Her name is Betty Jackson.

16        Q      All right.   Didn't there come a time when she

17  refused to come back to your house?

18        A      After Julius was shot in his leg, sir.

19        Q      And that was the reason?

20        A      That's what she told me, sir.

21        Q      If the report shows that she filed this, that

22  during my home bound visit with Matthew and Julius on

23  Monday, October 18th, 1993 they came home about ten minutes

24  after I arrived as their mother was relating the shooting

25  incident to me.   Matthew came home, appeared very angry.

Ann H. Armstrong, RPR

1147

1    Julius was with him and was walking on crutches.  He

2    appeared to be fairly calm, and he talked to me about the

3    shooting incident, not Matthew.  He walked through the house

4    using profanity repeatedly asking for his gun.  His mother

5    was unable to control his behavior.  I tried to talk with

6    Matthew about his academic assignment, but he refused to

7    cooperate with me or his mother.  He told me he was not

8    interested in anything at that time but finding his gun.  It

9    would be best for me to leave because he was upset.  I left.

10   Were you there for that incident?

11        A        I don't know, sir.  I couldn't recall.

12        Q        Tell me about his gun.  What kind of gun did

13   he have that he couldn't find?

14        A        I don't know Matthew had no gun, sir.

15        Q        This teacher wouldn't -- you don't think she

16   would lie about that, would she?

17        A        I don't know, sir.  Like I said, I know of

18   Matthew had no gun.

19        Q        She didn't come back after that, did she?

20        A        What?

21        Q        She didn't come back to the home bound service

22   anymore, did she?  They withdrew her from that, didn't they?

23        A        I guess so, sir.

24        Q        In October of '92, the report from the teacher

25   is, was insubordinate.  He used profanity while the teacher

1148

1    was trying to reason with him on his work on the board; he

2    refused to cooperate.  He wouldn't stop writing a letter and

3    close his notebook.  He said, I don't give a damn and

4    continued to talk and said he would bring his mama up there,

5    and she would put something on me.  He further indicated

6    that he would bring a gun and that that would do everything.

7    Did he talk to you about going up there and getting on a,

8    talking to a teacher named Stewart?

9         A    No, sir.

10        Q    Did Ms. Stewart request you to come up for a

11   parent, teacher conference?

12        A    I talked to Ms. Stewart on two or three

13   occasions.

14        Q    Did you meet with Mr. Shirley, the principal

15   about this?

16        A    Yes, sir.

17        Q    Did he tell you your son had threatened a

18   teacher?

19        A    He said he was having some problems with

20   Matthew.  He didn't go through any details, sir.

21        Q    Did you know about the letter he wrote the

22   teacher saying, hey, missy.  I've been thinking about you.

23   You look sexy and talked about her dress.  Did they talk to

24   you about that in October of '92?

25        A    No, sir.

1149

1    Q        Did they call you and talk to you in December

2    of '92 where they had Matthew in there occupying the girl's

3    restroom on the second floor while the girls were in there

4    and they had to get him out?  Did Shirley call you about

5    that?

6    A        No, not to my recollection, sir.

7    Q        Did they suspend him for that?

8    A        No, sir.

9    Q        If the record shows he was suspended, you

10   wouldn't disagree with it, would you?

11   A        No, sir.

12   Q        Now you don't recall when he went off through

13   the juvenile court, do you?

14   A        No, sir.  I know that my son has been off

15   several times.

16   Q        But he did come back?

17   A        Yes, sir.

18   Q        And he continued to have some problems, didn't

19   he?

20   A        Some problems, yes, sir.

21   Q        And then he turned eighteen?

22   A        Yes, sir.

23   Q        And he continued to have problems?

24   A        Yes, sir.

25   Q        And here we are?

Ann H. Armstrong, RPR

1150

1       A       Yes, sir.

2       Q       Thank you, ma'am.

3       MR. WIGGINS:  Nothing further, Your Honor.

4       (The witness was excused from the witness stand.)

5                       KATHLEEN RONAN,

6   after having been duly sworn, was examined and testified as

7   follows:

8                       DIRECT EXAMINATION

9   BY MR. GOGGANS:

10      Q       Tell the jury your name, please, ma'am.

11      A       Kathleen Ann Ronan.

12      Q       What is your profession?

13      A       I'm a clinical psychologist.

14      Q       Where are you employed?

15      A       I am employed primarily at Taylor Hardin

16  Secure Medical Facility, which is a psychiatric facility for

17  criminal offenders in Tuscaloosa, Alabama.  I also have a

18  private practice there.

19      Q       What is your educational background?

20      A       I graduated from the University of Arkansas

21  with a Bachelors degree in psychology in May of 1981.  That

22  was with honors.  I went straight into graduate school at

23  the University of Alabama and received my doctoral degree in

24  December of 1987 after having completed all of the

25  requirements of the degree as well as a one year internship

1151

1    at the Veteran's Administration Medical Center, Miami,

2    Florida.

3         Q       Beyond your formal education and internship,

4    have you received any certifications of any sort?

5         A       Yes, sir.  I am licensed to practice

6    psychology in the State of Alabama.  I was licensed at the

7    very first opportunity which was in May of 1988.  I am also

8    a certified forensic examiner which is a certification that

9    is given by the State of Alabama for psychologists or

10   psychiatrist who have received specialized training to

11   conduct evaluations for the Court, such as competence to

12   stand trial, mental state at the time of the alleged

13   offense.

14        Q       Now explain what the difference is between

15   forensic psychology and just a general psychology practice?

16        A       Well, in terms of evaluations, there is some

17   major differences.  For instance, in my private practice if

18   someone wants to come -- if someone comes in and I'm doing

19   an evaluation to help them figure out what their problems

20   are and how we might solve those problems, what's going on

21   that led them there, and we make a plan to treat that.  In

22   forensics, which would be any type of psychology that has to

23   do with the law, usually the client is the Court, the judge,

24   the jury, the legal system, and the Defendant is the

25   individual who is being examined.  So usually that person is

1152

1    there not necessarily of their own choice, and they are

2    certainly not there to set up some type of treatment plan.

3    The Court has asked some type of specific question about the

4    Defendant that they want answered; for instance, is this

5    person able to stand trial; what was their mental condition

6    at the time that the offense was committed.  Were they able

7    to waive their Miranda rights?  Was there any type of

8    psychiatric factors that should be considered by the Court?

9    And those types of evaluations are very different.

10    Frequently, a Defendant will want the outcome to be in their

11    own best interest.  So they may want to lie about things, or

12    they may want to down play things, or they may want to try

13    to fake a mental illness.

14        Q    Do you have any training to deal with things

15    such as that?

16        A    Absolutely.  That's part of, certainly part of

17    the certification process is that we receive three days of

18    intensive training on how to conduct just these types of

19    evaluations, issues that are looked at, ways to detect

20    malingering, how to address the issues that would be before

21    the Court.  We are also required each year to complete

22    continuing education showing that we are keeping up with the

23    latest in the area.

24        Q    Have you testified in courts in Alabama

25    before?

1153

1     A     Yes, sir, many times.

2     Q     Any approximation?

3     A     Approximately 150 at this time.

4     Q     Approximately how many forensic examinations

5   have you done?

6     A     Well, I've been employed at Taylor Hardin

7   since I got out of school.  I'm starting my eleventh year,

8   and I believe that the count is close to 700 forensic

9   evaluations.

10     MR. GOGGANS:  We offer Dr. Ronan as an expert in

11   forensic psychology.

12     MR. GREENE:  No objection.

13     THE COURT:  She will be so considered.

14     Q     Dr. Ronan, did you have an occasion in 1997,

15   June of 1997 to conduct a forensic evaluation of Matthew

16   Reeves?

17     A     Yes, sir.  He had been court ordered to

18   participate in an outpatient evaluation of his competence to

19   stand trial and mental state at the time of the alleged

20   offense.  And that was completed at Taylor Hardin Secure

21   Medical Facility on June the 3rd, 1997.

22     Q     How do you go about doing a forensic

23   evaluation?

24     A     Well, there are several steps and phases to a

25   forensic evaluation.  Certainly this is one in which we rely

1154

1   on a great deal of outside information.  So we ask that all

2   parties provide us with as much information as they have

3   available.  For instance, the District Attorney's office

4   will send us all of the investigative reports, police

5   reports, witnesses' statements, coroner's statements.

6   Whatever they have available, we ask for that information.

7   Any or all of it could have some bearing on someone's mental

8   condition.  We are having to go back and reconstruct what

9   someone's mental state was like at a time other than when

10  you're seeing them.  Most cases occur two or three years

11  before they actually come to us for evaluation.  I think

12  maybe in one case out of some 700 I've done have I actually

13  seen someone a couple of days after the alleged offense

14  occurred.  Usually it's several years.  So we are trying to

15  get as much information, outside information to go back and

16  get a picture of this person.

17          As well we will ask the defense attorneys to provide

18  us with as much information as they have.  If they are aware

19  that a person has a prior psychiatric history or had

20  troubles in school or a juvenile history, any information

21  they have.  We will also during the interview with the

22  person usually find out that there are other agencies that

23  have records on them.  We will request those by consent.

24  Sometimes we will request a judge's order to receive that.

25          Q       Is it common standard practice in the field of

Ann H. Armstrong, RPR

1155

1      forensic psychology to rely upon these documents and

2      information that you received?

3              A       It's most necessary to have outside

4      information.  That is one of the ways that -- for instance,

5      if a person has never shown any mental illness symptoms in

6      their life and they suddenly are standing in front of you

7      trying to describe symptoms and you have all of this

8      documentation showing that they have had no problems before,

9      they have been evaluated before, then you would be less

10     inclined to believe that indeed they do have the mental

11     illness.  So it's very important we receive a lot of or as

12     much background information as we can.

13             Q       Did you receive any such background

14     information in connection with your forensic evaluation of

15     Matthew Reeves?

16             A       Yes, I did.  What I had available, of course,

17     was the investigative reports and all of the information

18     from the district attorney's office, police reports,

19     witness' statements.  There were several codefendants in the

20     current case.  And I had the statements from all of the

21     codefendants.  I did have some information that had been

22     provided by the defense attorney's office.  I believe it was

23     a different defense attorney to start out with.

24             Q       Mr. McLeod?

25             A       When I started the evaluation, yes, sir.

1156

1    I also had prior school records that dated back many, many

2    years.  I had some records from the Department of Youth

3    Services which would be basically the juvenile system, some

4    information from the group home where he had been placed on

5    two occasions as well as some records from Cahaba Mental

6    Health Center as well.  I did intellectual testing during my

7    evaluation and, of course, an interview that had several

8    components to it.  There were some other records that were

9    reported to me by Mr. Reeves that he had been shot in the

10   head I believe and the shoulder and had received treatment

11   at Carraway Medical Center.  And he said that he been

12   hospitalized in the psychiatric unit of Selma Medical Center

13   which I believe is now Four Rivers.  And we requested those

14   records through written consent and tried to follow up on

15   that.  And we never received any information from Selma

16   Medical Center.  You did receive the Carraway records which

17   I reviewed prior to entering here today.

18        Q        And you said you did not receive the records

19   from the Selma --

20        A        We received no information from them

21   whatsoever.  Usually if someone has not been a patient, we

22   will get a form back that says we have no record that this

23   individual has ever been seen by this agency.  We didn't

24   even receive that.

25        Q        So you just got no response from them?

Ann H. Armstrong, RPR

1157

1    A       That's correct.

2    Q       Did you likewise conduct some type of

3    interview or examination of Mr. Reeves?

4    A       Yes, sir.  I spent approximately two hours

5    with Mr. Reeves interviewing him.  There is several

6    components to the interview.  First we tried to get some

7    idea about somebody's background.  That has a dual purpose.

8    Not only does it give you an idea of where they are coming

9    from, but it is asking questions that aren't necessarily as

10   difficult and kind of establishes some kind of rapport with

11   them so you can go on during the evaluation.

12   Q       What is the next step?

13   A       And I want to back up here and say that prior

14   to any interview, an individual is informed as to what the

15   evaluation is about and how they the information can be used

16   so that they don't get any notions that you are trying to

17   help them and thus they spill their guts and then later, you

18   know, get upset with you if they get a report that's

19   different.  We are very clear that this evaluation is being

20   done by court order for the Court.  All parties get a copy

21   of the evaluation.  All parties can call me to testify.  All

22   parties can use the report in court if they choose to do so

23   or if it is legally allowed so that a defendant has a clear

24   idea as to what the evaluation is about.  They are not

25   misled.

1158

1    Q    So in other words, make it clear that you're

2  not just hired to say whatever he wants you to say?

3    A    Right.  Many times we will get a defendant who

4  will say, well, you're here to help me.  And we don't want

5  them to be misguided.  No we are not here to help you.  We

6  are here to help the Court understand about you.

7    Q    What is your next step, Dr. Ronan?

8    A    The next step is to conduct what we call

9  mental status examination.  This is to see how an individual

10 is functioning right now.  Can they concentrate?  Are they

11 attentive to the topics of discussion?  Are they showing any

12 kind of mental illness symptoms that would make them unable

13 to communicate effectively.  Do they know where they are?

14 Do they know who they are?  Do they know what the date is,

15 why they are talking to you?  What is their general fund of

16 information?  Do they know things that, you know, most of us

17 have grown up with and know really well, like the colors of

18 the American flag or in what direction does the sun rise?

19 Do they have just some basic information available?  If

20 given a hypothetical social situation, can they reason what

21 they are supposed to do?  So we get an idea as to whether or

22 not the person has any major interference due to some kind

23 of psychiatric symptoms.  And then and I ask them

24 specifically about symptoms.  And have you ever had

25 hallucinations, seen or heard things other people tell you

1159

1   they can't see or hear or had any firm beliefs that are not

2   based on reality such as delusions?  And I will go through

3   basically all of the symptoms that a person might

4   experience.

5        At that point, I usually will ask the person to tell

6   me everything that they can recall about the time that the

7   offense took place.  Some people say they can't remember.

8   Some people will give a detailed account.  Some people will

9   go on and on and on for a very long time talking about it.

10   It depends.  In Mr. Reeves' case he did give me a detailed

11   but somewhat brief explanation about his behavior during

12   that time frame.

13        The very final step is to administer what is called

14   the competency to stand trial assessment instrument, which

15   is basically a structured interview asking the person what

16   they know about court procedures.  For instance, what is

17   capital murder?  What does that mean?  What could happen to

18   you if you were found guilty?  How do you think your case is

19   going to turn out and why?  What does a defense attorney do?

20   What is his main role?  What is the role of the District

21   Attorney?  What is a plea bargain, a whole realm of

22   different questions to see if this person understands about

23   the court process and what they're facing.  And usually at

24   that point the evaluation is concluded unless there is any

25   further testing.  Now in Mr. Reeves' case I did give him one

Ann H. Armstrong, RPR

1160

1   part of the Wexler Intelligence Test.

2        Q       Now did you go through all three of these

3   steps?

4        A       Yes, sir.

5        Q       Phases with Matthew Reeves?

6        A       Yes, sir.

7        Q       Based on your review of the records that you

8   obtained and your talking with Mr. Reeves, what did you

9   determine about his background?

10       A       Well, I didn't get as much information from

11  him about his background, but there certainly was extensive

12  documentation about his background.  He came from a very

13  turbulent upbringing.  There was not a great deal of

14  structure in the home or guidance or supervision.  He

15  presented with a number of behavioral difficulties in

16  school.  There was constant attempts on the part of the

17  school to communicate with his mother -- the father was not

18  present in the home -- in order to try to get him into

19  appropriate programs and to control his behaviors.

20       Q       When you say turbulent upbringing, what do you

21  mean?

22       A       Well, turbulence in my opinion would mean that

23  there was not a lot of structure, that a child basically

24  raises themselves.  They may run in and out of the home or

25  on the streets, not have a lot of structure.  They may be

1161

1  subjected to abusive situations, neglectful situations.

2  There was no stability of relationships for the child.  They

3  were in an environment which would I guess under normal

4  conditions be considered pretty dangerous.

5        Q      I take it you found evidence of that in the

6  documents you reviewed?

7        A      Yes, sir, I did.

8        Q      Would you give us some examples of that

9  please, ma'am?

10        A      Well, for instance, there was one point when

11  -- I believe it was either DYS or the school system -- not

12  DYS.  The juvenile system had done an investigation due to

13  excessive truancy from school.  He just wasn't going to

14  school.  And what they found is that he and his brother were

15  roaming the streets.  There was no supervision, that no one

16  seemed to care whether he made it to school or not.  Another

17  instance that would exemplify turbulence is at one point

18  they were doing home schooling.  There was a teacher who

19  went to the home to teach him and his brother.  And the

20  teacher became fearful for her own life after the younger

21  brother was shot in a drive by shooting that seemed to be

22  gang related.  And that teacher was scared that she might be

23  harmed in some manner.  I believe also the younger brother

24  on one occasion screamed at the teacher and threatened harm

25  to her.  So just the environment in and of itself was of

1162

1   such a nature that the teacher requested that she no longer

2   have to go back to teach them.

3          Q      Did you receive any information or

4   documentation as to emotional problems of anybody else in

5   the household?

6          A      Yes.

7          Q      What is that?

8          A      His -- well, I know that his younger brother

9   had also been involved with the juvenile system and had

10  shown behavioral difficulties in school.  It was always

11  indicated from the documentation that his mother had a

12  drinking problem.  And the family on one occasion had been

13  referred to the Cahaba Mental Health Center to receive

14  counseling there.  And the mother just didn't follow up.

15  She didn't follow up with the school's recommendations or

16  the school's requests to come in and talk about the problem.

17  She didn't follow up with taking him to the Mental Health

18  Center.  On one occasion he was diagnosed with ADHD, which

19  is attention deficient hyperactivity disorder and was placed

20  on medication.  But there was no follow-up to take him back

21  to insure that he continued to receive the medication.

22         Q      Exactly what is attention deficit

23  hyperactivity disorder?

24         A      It is a condition that is diagnosed for

25  children.  It's one that has been pretty popular here in

Ann H. Armstrong, RPR

1  recent years.  A lot of people are getting that diagnosis.

2  A true attention deficit hyperactivity disorder will

3  manifest itself in children being unable to sit still,

4  unable to control their behavior.  They will have aggressive

5  outbursts, a lot of impulsivity.  They can't sit still.

6  They are constantly into things.  And it's caused by a

7  chemical imbalance.

8       And the way that you found out if someone has that

9  chemical imbalance, basically it's when they are prescribed

10  medication and respond to it.  I know that I've seen a lot

11  of children in my private practice that, you know, teachers

12  may believe have ADHD that won't respond to medication, and

13  there are other types of emotional things going on for them.

14  But for those who truly have ADHD -- it's usually a high

15  number of instances.   It's a precursor to a more severe

16  mental illness down the road, usually bipolar disorder which

17  is manic depression.

18       Q     You mentioned that he was prescribed a

19  medication for that?

20       A     He was prescribed a medication called

21  Imipramine.  Usually Ritalin is what is prescribed, but for

22  whatever reasoons that I did not have in the notes as to why

23  he was prescribed Imipramine.  Imipramine is an

24  anti-depressant.  It's been around a long time, but it has

25  been effective in controlling ADHD in some children.

1164

1    Q        And as I understand it, ADHD is essentially a

2   chemical imbalance of some sort?

3    A        Yes, sir.

4    Q        And the medication balances out the imbalance?

5    A        Yes, sir.

6    Q        And if the medication is not administered,

7   that imbalance continues; is that --

8    A        That's correct.

9    Q        Okay.  Did you make any determination or make

10  any findings as to whether or not there was any compliance

11  with the medication prescriptions?

12    A        Well, the documentation from the Mental Health

13  Center was that the family just simply didn't come in, did

14  not respond to either phone calls or written requests to

15  return to their appointments, and eventually the file was

16  closed.  So I didn't have any information to indicate that

17  the prescription was ever filled or that he took the

18  medication for any length of time.

19    Q        I believe you mentioned that you gave Matthew

20  Reeves some type of intelligence test of some sort?

21    A        Yes, sir.

22    Q        What did you administer to do that?

23    A        Well, the most widely used intelligence test

24  is called the Wexler Intelligence Scale.  And there is a

25  child's version, and there is an adult's version.  And he

1   received the child, the adult's version this time.  He had

2   received the child's version in the past.

3        Q       What were the results of your testing?

4        A       I gave him a verbal portion only.  I didn't

5   give him the entire test because the verbal portion taps

6   into the issues that were being asked by the Court,

7   somebody's ability to understand, their verbal reasoning,

8   more so than the eye, hand coordination part of it.  The

9   results showed that he was in what we call the borderline

10  range of intelligence meaning that he was two steps or two

11  what we call standard deviations below normal.  And it's the

12  borderline of mental retardation.  The verbal IQ score that

13  I got was -- I believe it was a 74.  And he had received the

14  child's version of the same test when he was young, and his

15  verbal IQ then was 75.  So that just shows that basically

16  nothing had happened.  His IQ had stayed about the same.

17       Q       Would that indicate to you as a forensic

18  examiner that there was no malingering going on?

19       A       Well, at least as far as performance on the

20  test -- and I didn't get any idea that he was trying to

21  malinger.  Basically the information he provided me was very

22  consistent with the background information I had.  He

23  actually owned up to using drugs, a whole lot more to me

24  than he had in the past.  And that performance on the test,

25  yes, if someone was trying to really fake something, they

1 probably would have performed a lot worse.

2      Q     When we say malingering, we are --

3      A     Faking a mental illness, yes, and I didn't

4 really see evidence of that.

5      Q     And the information that you gathered by way

6 of interviewing and reviewing documents, did you come across

7 anything of significance as to any external means of

8 controlling his behavior?

9      A     Yes.  There was something that I thought was

10 fairly important.  He was placed in a group home by DYS,

11 which is Department of Youth Services.  That's after someone

12 has been adjudicated as a serious juvenile offender.  The

13 crime that was committed was assault.  I don't have any

14 details about that assault.  However, he was placed in a

15 group home on two occasions.  On both occasions he did

16 little things.  He acted out in little ways but for the most

17 part responded positively to the structure there.  And the

18 way the group homes are set up or this particular group home

19 was set up is that there are certain behavior expectations.

20 The person has got to get up, make their bed.  They are not

21 going to be disruptive in school.  If they do the tasks or

22 jobs that they are assigned to do, then they get privileges.

23 And if they don't, then they stay on a more restrictive

24 level.  He seemed to respond pretty well to that.  Again

25 there were little things, but they weren't nearly at the

Ann H. Armstrong, RPR

1167

1    level of the reports from school or home.

2           Q      What about outside of that tightly structured

3    setting, did you see any significant external means of

4    control apart from that in his life?

5           A      Well, he was involved in -- I think there were

6    two significant controls.  One was his younger brother who

7    in this case actually seems like the older brother.  I think

8    the younger brother actually was I think a little more savvy

9    and bright and aggressive.  And Matthew seemed to kind of

10   follow his lead a great deal.  The other was -- he was

11   involved in gang activity.

12          Q      Let me ask you.  We all know Julius Reeves is

13   the younger brother?

14          A      Yes, sir.

15          Q      You mentioned gang activity.  Is there any --

16   could that be considered some type of structure for someone

17   to gravitate to?

18          A      Yes, sir.  It's not uncommon in doing an

19   evaluation to see individuals who may have a lot of loose

20   structure at home become heavily involved in gang

21   activities.  And that becomes kind of like a subculture; in

22   other words, some kind of, some expected behaviors in the

23   gangs become what these young people will strive for.  And

24   because this is who they are relating with, you know, going

25   out and shooting someone becomes nothing to them.  It

Ann H. Armstrong, RPR

1  doesn't have the same meaning as it does for you and me.

2      Q      Did you note -- did you form any conclusions

3  about the consistency or inconsistency of his parenting and

4  discipline apart from the structured setting at DYS?

5      A      I think there was a great deal of information

6  available from the schools of repeated attempts to try to

7  help the situation out basically.  And I got the sense that

8  there really was not much of a response, as well as the

9  investigations that indicated that the kids were roaming the

10  street.  I really got the sense that there wasn't very much

11  discipline or structure at home.

12      Q      Did it appear that eventually the school just

13  ran out of resources?

14      A      It seemed to be that, yes.

15      Q      Let me ask, Dr. Ronan.  Would a person who

16  lacks consistent parenting, consistent discipline, who has a

17  lower level of intelligence, borderline level, for instance,

18  be more susceptible to influence of gangs and what not?

19      A      Most certainly.  That's why most of the

20  programs these days that are for our young people are trying

21  to gear towards giving them a sense of themselves in the

22  sense of being able to say no to outside things that aren't

23  good for them.

24      Q      In terms of evaluating his intellectual

25  functioning, can you tell us essentially what your findings

1169

1    were there as to whether he was suspicious or anything of

2    that nature, paranoid?

3          A       In terms of his intellectual functioning?

4          Q       Well, or environment factors, did you find

5    anything of that nature in that vein?

6          A       One of my diagnoses is that he has a

7    personality disorder, and part of that personality disorder

8    is that he has paranoid features.  I call this adaptive

9    paranoia, but it has become part of his personality.  When

10   you're in an environment that is dangerous to you and you

11   are trying to survive, you start developing a heightened

12   sense of being careful and cautious and not trusting, not

13   trusting people, of believing people are out to harm you or

14   hurt you in some manner.  And there was evidence of that in

15   his personality.

16         Q       Did you form any conclusion as to whether or

17   not the home environment was functional or dysfunctional?

18         A       I think it's quite evident it was

19   dysfunctional.

20         Q       Would it be fair to say that a person's

21   intelligence and environment work together in affecting that

22   person's life?

23         A       Certainly.

24         Q       How would you say that Matthew -- based on

25   what you found how would you say that Matthew Reeves'

Ann H. Armstrong, RPR

1    intelligence and environment affected his life as far as

2    functioning?

3         A      Well, in several ways.  I believe Mr. Reeves

4    developed a personality disorder which may not have been

5    there had he been raised in what we could call a normal

6    environment.  The intellectual problems would always be

7    there.  But there are people who have his intelligence level

8    that work, have jobs, that have families, that consistently

9    do fine.  But for Mr. Reeves, he -- a personality disorder

10   is a set of patterns of how we respond to everything around

11   us that is maladaptive.  You know, all of us have certain

12   traits that make us who we are.  But unless we are

13   constantly getting ourselves into trouble because of how we

14   act and who we are, it wouldn't be considered a personality

15   disorder.  For Mr. Reeves, he developed a personality

16   disorder.  And I diagnosed him as having a mixture of

17   anti-social paranoia and borderline features.  And an anti-

18   social would be someone who repeatedly will violate legal

19   boundaries or social boundaries with disregard to

20   consequences.  With someone who is paranoid, I believe I've

21   described them before.  They have a heightened sense of

22   mistrust of things going on around them.  Someone who has a

23   borderline aspect of their personality disorder usually will

24   misread social cues.  They have difficulties in getting or

25   establishing normal close bonds with people.  They will

1  either get overly close with you and then pull you away, or

2  they will withdraw.  They will act out to try to get you to

3  come to their rescue, any number of things like that.

4       Q      Is it fair to say that the environment

5  factors and the intelligence factors can go into the mix

6  together and have to be considered together?

7       A      Yes, sir.  Someone certainly of a higher

8  intelligence level might be able to pull themselves out

9  because usually they just have -- they're born with better

10  coping abilities.  Someone who has a lower intelligence just

11  doesn't have the same coping abilities available to them

12  that someone of a normal intelligence would have.

13       Q      Is it fair to say that these diagnoses that

14  you made, anti-social, borderline intelligence -- is it fair

15  to say that your diagnoses are a result of a combination of

16  intellectual functioning as well as his environment?

17       A      Yes, it would certainly be part of how he got

18  to where he is.

19       MR. GOGGANS:  Nothing else, Your Honor.

20       THE COURT:  Let's take a brief recess before the

21  State's cross examination.   We'll take about a 15 minute

22  recess.  If you would please retire to the jury room.

23       (A brief recess was taken.)

24       (The following occurred in the presence and hearing

25  of the jury:)

Ann H. Armstrong, RPR

1172

1   THE COURT:  If I understand it, the State has got an

2   opportunity to cross examine Dr. Ronan at this time,  And

3   there are some things that we are going to have to take up

4   outside of your hearing and presence before we can proceed

5   to the closing arguments, and some other things that we need

6   to do before you're able to finish the sentencing phase of

7   this case.  Our time is not going to allow us to proceed

8   over through the evening to get to that.  So we will come

9   back in the morning at 9:00 o'clock.  If I thought we could

10   conclude this evening, I would.  But it's not possible at

11   this time.  Ms. Wilson?

                    CROSS EXAMINATION

13   BY MS. WILSON:

14   Q       You stated that you received information from

15   the DA's office and the school medical records and other

16   records that you reviewed; is that correct?

17   A       Yes.

18   Q       Okay.  Based upon that you learned that he had

19   quite an extensive criminal history; is that correct?

20   A       Yes.

21   Q       And he in fact told you himself he had

22   numerous adults arrests, generally Class C felonies I think

23   is in your report?

24   A       That's what he said.  They were Class C

25   felonies or misdemeanors, yes.  I don't recall that I

1173

1  actually had an NCIC, but there certainly was a history of

2  the juvenile arrests and arrests as an adult.

3      Q       Also through those school records and other

4  records provided to you, there were a lot of resources that

5  were available to Matthew as he was growing up; isn't that

6  correct?

7      A       Yes.

8      Q       And a lot of resources, a lot of people trying

9  to help Matthew as he grew up; is that correct?

10     A       Yes.

11     Q       You stated that he had a turbulent upbringing.

12  And one example you gave was about the home bound teacher,

13  Ms. Jackson, who came to the house.  And I think you stated

14  that she didn't want to come back because she was afraid of

15  Julius?

16     A       I said that the main reason was there had been

17  a drive-by shooting.  I can't recall if it was Matthew or

18  Julius that had been shot.  But if I'm not mistaken, it was

19  Julius.  It may have been Matthew that had threatened her on

20  one occasion.

21     Q       In the records that were provided, the home

22  bound teacher, Ms. Jackson, states that Julius appeared

23  fairly calm as I checked out his academic assignments, not

24  Matthew.  He walked through the house using profanity

25  repeatedly asking for his gun.  He told me he was not

Ann H. Armstrong, RPR

1   interested in anything at that time but finding his gun.  It

2   would be best for me to leave because he was very upset.

3   So it was Matthew that was --

4         A      Yes.

5         Q      Not Julius.  You also stated that he suffers

6   from ADHD?

7         A      That was a prior diagnosis for him.  I did not

8   give him that diagnosis.

9         Q      Okay.  Based on that prior information.  Let

10   me ask you this.  How many children would you estimate

11   between the years of six and eighteen suffer from ADHD?

12         A      Who are diagnosed or who actually suffer?

13   Right now there is a huge over diagnosis of that.  And so of

14   the children who actually suffer, I can't recall the

15   statistics.  I want to say it's in the neighborhood of five

16   to six percent.

17         Q      Of all children between those ages?

18         A      Yes.

19         Q      So it's a very common, common assessment of

20   children?

21         A      It is commonly diagnosed.  It is not a common

22   diagnosis.

23         Q      I thought you said five percent of all

24   children between those ages --

25         A      Five percent isn't common.  I mean something I

Ann H. Armstrong, RPR

1175

1    would consider common would be fifty percent.

2        Q      Okay.

3        A      But it's commonly diagnosed because it's

4    overdiagnosed in many, many cases.

5        Q      So in this instance Matthew may not have

6    actually suffered from ADHD?

7        A      That's correct.  One of the ways that we would

8    have been able to tell that is if he had remained on

9    medication and had improved on medication.  Then you could

10   tell if he had the true chemical imbalance that's ADHD.

11       Q      But that was not -- you can't say that he

12   actually suffers from that today?

13       A      That's correct.  I am just reporting the data

14   that I had available.

15       Q      And you stated that his IQ was borderline

16   range?

17       A      That's correct.

18       Q      So he wasn't actually mentally retarded?

19       A      He was not in a level that they would call him

20   mental retardation, no.

21       Q      Neither was Julius, was he?

22       A      I don't recall Julius right offhand.

23       Q      If you had in your --

24       A      I did his evaluation, but I can't recall that

25   one.

Ann H. Armstrong, RPR

1176

1       Q       And if you had that he falls within the range

2 of low average range of intelligence?

3       A       I'm sorry.

4       Q       You stated in your report as to Julius that he

5 fell within the low average range?

6       A       That's a standard deviation above borderline.

7       Q       So it's not far above borderline though; it's

8 still not average?

9       A       No. It's not average.

10       Q       Now you also stated that you reviewed some

11 medical records regarding a head injury, gunshot wound to

12 the head that Matthew sustained.

13       A       I reviewed those just today, yes, ma'am.

14       Q       You state in your report that regarding these

15 injuries, he wasn't diagnosed with a concussion on either

16 occasion. I think he was busted in the head one time and

17 got stitches and then shot in the head one time.

18       A       That was by his report. He said he could not

19 recall having been diagnosed as having had a concussion. I

20 did not have those records available at that time.

21       Q       Okay. Actually the injury that he sustained

22 was not very serious as a result of the gunshot wound, was

23 it?

24       A       Well, his skull was fractured.

25       Q       Didn't it travel just along under the skin and

1    exit?

2         A      It did, but when a skull is fractured, I would

3    consider that fairly serious.  He was not in critical

4    condition or did not, you know, was not in the threat of

5    loss of life.

6         Q      Right.

7         A      But he was still struck hard enough that his

8    skull had a small fracture.  And, yes, it traveled down and

9    then into the clavicle I believe.

10        Q      And he didn't have any neurological damage as

11   a result of it either?

12        A      According to the medical records, the CT scan

13   was normal, and the gross neurological examination did not

14   show any damage.

15        Q      Okay.  At the time that you saw him, the two

16   hour period of time that you saw him, you stated that his

17   grooming and hygiene was good?

18        A      Yes.

19        Q      He was cooperative and polite throughout the

20   evaluation?

21        A      He was.

22        Q      There was no evidence of any type of major

23   psychiatric disorder?

24        A      That was my opinion.

25        Q      His thought productivity was normal within

1 structure, I mean within structure, logical and relevant.

2 His speech was normal, no delusional information, or he

3 denied ever experiencing delusions?

4      A      That's correct.

5      Q      And cognitively, a few areas of below normal

6 functioning were noted, although no severe deficits were

7 observed?

8      A      That's correct.

9      Q      His memory was intact, recent and remote?

10      A      Yes.

11      Q      Fully oriented to person, place, month, day,

12 year, day of week, et cetera?

13      A      Yes.

14      Q      You stated you found no information to

15 indicate that he ever suffered from any type of major

16 psychiatric disorder?

17      A      That's correct.

18      MS. WILSON:   That's all.

19                    REDIRECT EXAMINATION

20 BY MR. GOGGANS:

21      Q      Doctor, what do you mean by major psychiatric

22 disorder?

23      A      A disorder that would so grossly impair

24 somebody's overall functioning such as schizophrenia.

25 That's a thought disorder, when a person loses contact with

1  reality, major depression of a severe nature where somebody

2  can't get out of bed.  They can't think.  They can't think

3  straight.  They can't concentrate.  Bipolar disorder, manic

4  depression where someone becomes so hyperactive that they

5  are completely out of control, cannot control themselves,

6  might spend all of their money or go on a drinking binge and

7  some really off the wall types of things.

8      Q      In reviewing the medical records from Carraway

9  Hospital, where did you determine this head injury was?

10  What part of the brain?

11      A      It was the left, what we call the temporal

12  frontal area.  The drawing showed it -- the drawings

13  actually showed it to be on the right, but all of the

14  reports indicated it was on the left, and that would be

15  about right here.

16      Q      And do the reports indicate that the

17  projectile like went through the skull?

18      A      It did not go through the skull.

19      Q      But did it crack the skull?

20      A      It said that there was a mild fracture

21      Q      And the area that the projectile hit, I mean,

22  that part of the brain, what does it affect?

23      A      The front or frontal lobe generally is what

24  helps us control ourselves or control impulsivity as well as

25  our abstract reasoning.  Abstract non-verbal reasoning is

Ann H. Armstrong, RPR

1180

1  housed in that part of our brain.  That would be

2  understanding.  I'm trying to think of an example,

3  understanding how to put difficult puzzles together,

4  something that would be very abstract, not concrete.

5      The left part of our brain really houses much of our

6  verbal abilities.  When you get right up in that area,

7  that's not necessarily all of our -- all of our verbal

8  abilities are about right there.  When you get up close to

9  the front, you might have just a bit of a verbal problem.

10     Q      In your practice have you ever noted or found

11 loss of intellectual functioning as a result of some type of

12 accident without some corresponding x-ray or physical

13 documentation of such?

14     A      Yes, sir.  There is a whole field called

15 neuropsychology that has developed and is becoming quite

16 popular.  That is that frequently when someone receives a

17 blow to the head, it may knock you out, but later when you

18 get an MRI or CT scan, it doesn't show any kind of problems

19 with the brain.  The brain might look normal.  However, you

20 yourself might have some real severe problems.  You might

21 not be able to remember as good as you could, or you might

22 not be able to do math.  I had someone who was an excellent

23 seamstress.  She owned her own shop and designed clothes and

24 sewed and was hit in this part of the head.  And the CT scan

25 showed her to be normal.  However, she couldn't sew anymore.

1181

1  It was like learning to ride a bike all over again.  And

2  what neuropsychological evaluation does is it goes in and

3  looks at the actual pattern of the abilities through

4  testing.  And the tests that are given measure all different

5  parts of the brain, and you look at the entire pattern.  Is

6  everything normal?  Are there some areas that are lower,

7  and usually the area -- by looking at the areas that are

8  lower, you can see that someone has lost some capabilities.

9  I have encountered that on several occasions with someone

10  who has had a pituitary gland tumor that has been removed.

11  The pituitary gland is kind like right in the middle of our

12  brain.  And they frequently will go in through your nose to

13  remove it.  And usually CT scans and MRI's are going to show

14  that things are normal.  However, just the displacement of

15  the brain because of the growth of the tumor and going in to

16  remove that is traumatic enough to the brain that a person

17  can lose some of their function.  Brain cells don't

18  regenerate.  Once they are gone, they are gone.  But they

19  have to pretty much be gone in a big area for it to show up

20  on a CT scan, or there has to be blood in the area.

21       Q       Dr. Ronan, you mentioned that it did appear

22  from the documentation, resources were available for

23  Matthew.  Did your review of the documentation indicate that

24  those resources that were available actually got delivered

25  to him or that he actually got delivered to the resources?

1    A    Not always.

2    Q    Would that be environmental factors that

3  caused those resources not to get connected up with him?

4    A    Primarily the lack of response on the part of

5  his mother.

6    MR. GOGGANS:  No other questions.

7                    RECROSS EXAMINATION

8  BY MS. WILSON:

9    Q    One follow up.  This head injury, gunshot

10  wound occurred, what two and a half months before the

11  incident that you evaluated him for?

12    A    I know that it occurred beforehand.  I can't

13  recall the date.

14    Q    The impulsivity and all of the other problems

15  that he had in school as a youngster, that gunshot wound had

16  nothing to do with all of those behavior problems, did it?

17    A    All of that was before any type of gunshot

18  wound.

19    MS. WILSON:  That's all.

20    MR. GOGGANS:  Nothing else.

21    (The witness was excused from the witness stand.)

22    MR. GOGGANS:  One other thing, we offer Defendant's

23  Exhibit Number 15 which is a blow-up of the birth

24  certificate which is included in one of those exhibits.

25    MR. GREENE:  No objection.


                    Ann H. Armstrong, RPR

1   THE COURT:  That will be admitted.   Ladies and

2   gentlemen, that concludes the penalty phase of the trial

3   with the exception of the closing arguments, the final

4   arguments of the attorneys and then the instruction that I

5   will have for you regarding the applicable law in the case.

6   The Court has got to go through some things with the

7   attorneys.  I think it's going to be a rather lengthy

8   dialogue.  Rather than to ask you to wait in the jury room,

9   I'm not certain how long it will take.  I think the best

10  thing is for us to come back in the morning at 9:00 o'clock.

11  I don't want to put any time constraints on the attorneys

12  regarding their closing arguments.  I don't typically do

13  that.  I do ask them to keep them generally to about an hour

14  and fifteen minutes.  But I just feel as though after we

15  have done that, after I have given them the charge and then

16  after we get through with our conference that we are going

17  to take up in just a few minutes, it's going to be late

18  before we can even begin the closing arguments with you.  So

19  that's the reason that I'm going to ask you to come back at

20  9:00 in the morning.  And I certainly appreciate your time.

21  I appreciate your attention this week and your patience.

22  Please bear with us just another maybe half a day.  And we

23  will hopefully conclude this tomorrow morning, tomorrow mid

24  day.

25       Please observe the instruction that I have given you.

Ann H. Armstrong, RPR

1   Don't discuss the facts of the case at home with your family

2   members or your spouse.  Please avoid any media coverage.  I

3   know media has been represented here today and throughout

4   the course of the proceeding.  Please avoid any television

5   coverage of the earlier proceedings, the guilt phase of the

6   trial.  There will be a good deal of coverage I'm sure.  So

7   please avoid all of that.  We'll see you back in the morning

8   at 9:00 o'clock.

9           (The jury was excused from the courtroom.)

10          THE COURT:  Let's go through this.  I submitted to

11  the attorneys a pattern instruction.  I'm having a hard time

12  thinking right now.  I submitted to the attorneys a pattern

13  instruction regarding the instruction that I would give to

14  the jury at the conclusion of the penalty phase of the

15  trial.  And Mr. Goggans and Mr. Wiggins have both submitted

16  the requested instructions that they want me to consider.

17  And I have gone through these instructions.  And it's my

18  opinion that all of the instructions that you have submitted

19  are covered in that pattern instruction that I exchanged

20  with you earlier.  All of those instructions are covered

21  with the exception of perhaps number one, number twelve and

22  numbers twenty-one through twenty-six.  And at this time I'm

23  going to mark those that are included in our submitted

24  instructions as not given with the exception that I just

25  enumerated.  And those are the ones we will discuss on the

1  record.

2      MR. GOGGANS:  It's my understanding that with respect

3  to the Defendant's requested instructions for the penalty

4  phase, that with the exception of the ones that you just

5  mentioned, that being one, twelve and twenty-one through

6  twenty-six, that you're going to fairly cover them

7  otherwise?

8      THE COURT:  Yes, sir.

9      MR. GOGGANS:  With respect to number one, it's the

10  Defendant's position that this is an appropriate --

11      MR. GREENE:  One is given.  You did say that you were

12  giving one?

13      THE COURT:  No, sir.  I said those were the only ones

14  -- I thought earlier you had indicated to me that you had

15  opposed number one.  I put a clip on one, twelve and

16  twenty-one through twenty-six, and I thought we would cover

17  that on the record.

18      MR. GOGGANS:  Maybe Mr. Greene doesn't oppose one.

19      MR. GREENE:  I still oppose it, but at this point I

20  don't intend to argue about it.  Have you got something to

21  cite to him?

22      MR. GOGGANS:  I've probably got one in one of these

23  books somewhere.

24      THE COURT:  Well, I'm going to give it.  I think the

25  preliminary instruction that I gave them earlier says that

1186

1    in a sense, but I will give number one.

2        MR. GOGGANS:  Your Honor, our position on charge

3    number twelve essentially is that if from the evidence they

4    can have mercy on the Defendant, they would be able to do

5    so.  Our basis for that would be we think that it's a matter

6    of eighth amendment and fourteenth amendment law.  The jury

7    in a capital case should be free to consider genuinely felt

8    compassion and sympathy which are natural byproducts of the

9    evidence in mitigation if they so find and cite to the case

10    California vs. Brown, 479 U.S. 538 (1987), Drake vs. Kemp,

11    762 F.2d 1449 (11th Cir. 1985), Wilson vs. Kemp, 777 F.2d

12    621 (11th Cir. 1985), Buttrum vs. Black, 721 F.Supp 1268

13    (N.D.Ga. 1989).  That's our position on it.

14        THE COURT:  Well, I can reserve that for in the

15    morning if you all want to turn it over in your mind

16    tonight.

17        MR. GREENE:  We would appreciate it.

18        MR. GOGGANS:  Your Honor, on 21, 22, 23, 24, 25 and

19    26, we submit that the items or factors referenced in there

20    have been recognized as mitigating circumstances.  What we

21    would suggest to the Court is that immediately after the

22    Court begins telling the jury what mitigating circumstances

23    are and what mitigating circumstances that they must

24    consider is go ahead and give them a nonexclusive list of

25    mitigating circumstances.  We think there is evidence to

1   support each of those referenced in these charges and then

2   at the conclusion give the standard charge that they can

3   consider anything else they find.

4        THE COURT:  What mitigating circumstances that I must

5   give?

6        MR. GOGGANS:  Well, one of them is that --

7        MR. GREENE:  The ones that are in the statute that

8   are pertinent.

9        MR. GOGGANS:  Well, right, I don't want anything from

10  the statute that's not pertinent.  I think the only one in

11  the statute that would be submitted would be the impairment

12  of mental function.  I think that is the only one that is

13  listed in the statute, specifically listed in the statute

14  that should be given to the jury.  The others that we have

15  in our submitted requested charges are nonstatutory factors

16  which as a matter of law carry equal weight or whatever

17  weight the jury wants to give it.

18       THE COURT:  Twenty-two through twenty-six will

19  definitely be given.  There was some discussion about

20  twenty-one.

21       MR. GREENE:  That was the age factor.  I think we

22  resolved that finally.  We are going to give it, and we

23  would just simply argue the results of it.  And the point is

24  that we talked about the fact that evidence came in showing

25  a substantial juvenile record.  I think we have concluded

1   that we would follow that, and we will just argue it.

2       MR. GOGGANS:  I think that would go more towards the

3   State's argument and the weight the jury should attach to

4   that particular mitigating factor.

5       MR. GREENE:  The case law sounds awful good, but

6   we'll leave it alone.

7       THE COURT:  Well, again, if you all want to burn the

8   midnight oil and find something definitive, then I'll

9   certainly consider that or reconsider that in the morning.

10   But as it stands right now I will give 21 through 26, one

11   and twelve.

12       MR. GOGGANS:  Otherwise, I think we are square on the

13   charge.

14       THE COURT:  All right.  We'll see you in the morning

15   at 9:00.

16       (Court was adjourned for the day.)

17

18

19                          January 31, 1999

20       THE COURT:  Mr. Goggans filed a motion in limine.

21       MS. WILSON:  I certainly think that we are entitled

22   to comment on the Defendant's demeanor during the course of

23   this trial.  That has nothing to do with whether he took the

24   stand or not.  We certainly would not mention whether he

25   took the stand in his own behalf.  But they certainly have

Ann H. Armstrong, RPR

1     had the opportunity to observe his demeanor in the

2     courtroom. I think I would certainly be entitled to discuss

3     that.

4            THE COURT: What is it that you want to say?

5            MS. WILSON: Just that he has shown absolutely no

6     remorse, that he has just sat there. He's not sorry for

7     what he's done. I think I'm entitled to argue that.

8            THE COURT: You made the comment about that in

9     closing argument, and I anticipated an objection from Mr.

10     Goggans. I wondered about that. I really didn't think that

11     it was appropriate. I don't think it's appropriate now for

12     you to comment on the facts that he sat there and hasn't

13     shown any remorse. You know, to me that borders on -- it's

14     in a gray area. It sounds to me like you're commenting on

15     his refusal to, his attorney's decision not to take the

16     stand and testify in his own behalf. I think you may want

17     to -- I'm going to grant your motion in limine. I think you

18     need to stay away from that.

19            (The following occurred in the presence and hearing

20     of the jury:)

21            THE COURT: Good morning, ladies and gentlemen. At

22     this time the attorneys will have an opportunity to make

23     their closing arguments to you in this penalty phase.

24            MS. WILSON: May it please the Court, Mr. Goggans,

25     Mr. Wiggins, ladies and gentlemen. In a short while you all

1190

1  are going to be called upon to make a very tough decision.

2  You are going to be called upon to make an advisory verdict

3  as to what the appropriate sentence is for Matthew Reeves

4  for intentionally taking the life of Willie Johnson, Jr.  It

5  is a tough decision.  It's not going to be an easy one.

6  It's probably going to be one of the toughest decisions that

7  each of you will ever make in your life.

8       But as a citizen of Dallas County, as a person, a law

9  abiding person, you are called upon to participate in the

10  legal system.  I know you are not here because you

11  volunteered for this.  You're here because you were

12  summoned.  You have an opportunity to make a statement.  You

13  have an opportunity to participate in how you want your

14  community to be.

15       Every citizen should have the right to go to the

16  grocery store, to go to Wal-Mart, to go to McDonald's on a

17  Wednesday at noon and feel safe and not have to worry about

18  predators like Matthew Reeves sitting out there looking for

19  you to rob and murder.  Every citizen has that right.  This

20  is your community.  This is your McDonald's, and you have

21  that right.

22       Unfortunately Matthew Reeves is taking that right

23  away.  He certainly took that right away from Willie

24  Johnson, Jr.  Willie Johnson, Jr. did nothing more than go

25  to work, get his paycheck and head out to a location in

1191

1   Tyler to help somebody else out, saw somebody in need and

2   stopped to help them.  What is our society coming to?  A man

3   stops to help a group of people that he thinks need help,

4   and what is his payment?  This is his payment, ladies and

5   gentlemen, to be shot in the neck, blasted in the neck by a

6   shotgun, to be stuffed in his truck while he is gagging and

7   the blood is pouring out of his neck.  To be left stuffed in

8   his truck, that is the payment that this man got.

9        Now you are called upon to make a tough decision.

10  You are called upon to decide what is the punishment that

11  this man deserves for doing this to Willie Johnson.  Death

12  or life in prison without parole.  Who decided Willie

13  Johnson's fate?  Did he have the opportunity to have a five

14  or six day proceeding?

15        MR. GOGGANS:  Objection, Your Honor.  May I approach?

16        (The following occurred at the bench outside the

17  hearing of the jury:)

18        MR. GOGGANS:  The prosecution's comments about having

19  a five or six day proceeding is clearly a reference to the

20  Defendant having exercised his constitutional right to a

21  trial.  It's an improper comment and in violation of due

22  process of law in the federal and state constitution.  I'm

23  also inclined to move for a mistrial, but I do request that

24  the Court instruct the jury to disregard that comment as

25  being improper.

Ann H. Armstrong, RPR

1192

1   THE COURT:  The comment was made about Mr. Johnson,
2   not your client.
3   MR. GOGGANS:  She said he did not have a right to a
4   five or six day proceeding.
5   MS. WILSON:  That's what I said, Mr. Johnson did not.
6   THE COURT:  I'm going to deny your motion.  I'm not
7   going to give an instruction to the jury.
8   (The following occurred in the presence and hearing
9   of the jury:)
10   MS. WILSON:  Matthew Reeves decided Willie Johnson's
11   fate, and he did it intentionally.  He did it
12   premeditatedly, and he did it for the purpose of getting
13   whatever belongings he could from Mr. Johnson so that he
14   could go out and party, smoke reefer, do a little cocaine,
15   do a little dancing, partying and earn his tear drop.
16   Ladies and gentlemen, Matthew Reeves deserves the ultimate
17   penalty in this case.
18   The defense yesterday tried to intimate to you that
19   he came up from a poor family, that he had no resources,
20   that he didn't have a chance, that he was borderline
21   retarded; therefore, he is a victim of our society.  He is a
22   victim of his situation.  That is not true.  You listened to
23   Matthew's mother tell you that from the young age of five
24   years old there were resources available to that man
25   starting with preschool.  From that point on there were a

Ann H. Armstrong, RPR

1  number of resources available to him, mental health.  The

2  school used every resource they had available, including

3  home bound private tutors when they couldn't keep him in the

4  school situation because of his behavior.  And Matthew

5  Reeves pushed it all away.  He refused that assistance.  He

6  refused that help.  He chose his path.  He chose not to take

7  advantage of what was available to him.  And he chose that

8  at an early age, and he followed that path right up until

9  the time that he murdered Willie Johnson, Jr.

10      He has a criminal history that you will be able to

11 look at.  Look at those school records.  It is all

12 aggressive, violent, anti-social behavior that this man has

13 exhibited from his first early days in schooling.  He was

14 sent to group homes.  He has gotten counseling.  He has had

15 a Christian background.  He has had opportunities for every

16 bit of this, Boy Scouts, everything.  And he ignored every

17 bit of it.  He turned it all aside.  He refused it.  He

18 chose his path.  He made his decisions.

19      And now you are faced with making a decision, a very

20 important decision.  And I know it's going to be a tough one

21 for you.  But the only decision that is right here is to

22 give him the ultimate punishment, and that is the death

23 penalty.  You can do it.  You can make a stand here.  And

24 you can participate in how your community exists so that

25 every one, every citizen is safe to go to McDonald's without

1194

1  worrying about a bunch of Matthew Reeves out there lying in

2  wait to rob and murder them.  So please do your duty and

3  give him the ultimate sentence, the ultimate penalty for

4  what he has done to a good and decent man.  Thank you.

5      MR. WIGGINS:  May it please the Court, Ms. Wilson,

6  Mr. Greene, ladies and gentlemen, this day and this hour and

7  more importantly this moment you must make a decision.  You

8  have heard the facts.  You've determined what the facts are,

9  and you have applied the law, and you have rendered your

10  decision based on the facts and based on the law.  And now

11  you must make a decision from your heart.  No one can tell

12  you what's in your heart.  I don't know your life

13  experience.  I don't know what it is that brought you here

14  to this point in life.  But you in your heart know what life

15  has been for you.

16      What we do today cannot change what happened to

17  Willie Johnson.  Nothing I can say to you or to his family

18  can erase that day or ever change the Christmases and the

19  Thanksgivings and the days to come in their lives.  If I

20  could, if you could, if society could, we would.  But the

21  fact remains we cannot.  So we are faced with the decision

22  today in our hearts what must we do.  What can we do?  What

23  will you do to stop the Matthew Reeves and save the Willie

24  Johnsons?  Will it be death?  Will you decide to take that

25  kid, Matthew Reeves, at the age of twenty and strap him to

Ann H. Armstrong, RPR

1   an electric chair and sap his life away?  Will you decide to

2   do that?  You could, but should you in your heart make that

3   decision, or will you decide to give Matthew Reeves life in

4   prison without the possibility of parole, without ever being

5   able to get out no matter how old he becomes?  No matter how

6   many years he lives, no matter what happens to him, he will

7   never ever have the possibility of coming to your

8   McDonald's, your Wal-Mart and your community again.

9        Will you make that decision?  Must you make that

10  decision?  That's the decision that you should make, Matthew

11  Reeves, life in prison without ever having a chance to get

12  out, never ever being on the streets of Selma again.  Sixty,

13  seventy, ninety, a hundred years old, Matthew Reeves shall

14  remain behind bars where he should be.   Behind the bars of

15  our prison with every other person regardless of their size,

16  regardless of their weight, that's where Matthew Reeves

17  belongs.  That's a decision you should make.  Put him there,

18  and give him no chance to get out.

19        I know we sit, and we think because of our society

20  how cruel it is and how sad it is that we have people like

21  Matthew Reeves out there.  Sure, this is America.  Sure,

22  this is Selma.  But no matter what we do, no matter how we

23  live in society, the good that I do, the evil is always

24  present.  It's going to always be there because this is how

25  the world has allowed society to be.  I don't know why it

1196

1   was Willie Johnson.  I can't answer that question because I

2   wasn't there.   And I don't know why God did or allowed it

3   to happen the way it happened.  Only God knows that, and

4   only God can answer that question we raise.

5        Why did Matthew Reeves pull that trigger?  God can

6   only answer that question because there was a passage in the

7   Bible where there was a little child who had this disease

8   and a sickness that he would never recover from.  And the

9   community wondered who is it that's responsible for this

10  child.  What is it in life that caused this child to be this

11  way?  Was it because his parents had sinned?  They asked

12  Jesus was it because of something this child had done that

13  he suffers from this condition?  Jesus responded, no.  The

14  child is this way that the power of God may be manifested

15  through the lives of that child and his parents.  Somehow

16  God has to find a way to manifest himself through what

17  happened on November of '96.

18       I make no excuse.  I present you no justification for

19  what happened to Willie Johnson.  I can't think of any

20  reason why it could happen, none.  But I stand like you

21  searching in my heart why, why did it happen.  We know it

22  takes a village to raise a child as the old African proverb

23  says.  We know there are some who grew up in situations

24  where there is poverty all around; there are gangs all

25  around.  There is trouble everywhere.  He doesn't have any

Ann H. Armstrong, RPR

1197

1  father, and they make it.  We can point to countless others

2  who made it through the system, whose conditions were worse

3  than Matthew's, and they made it.  And then you can point to

4  countless others whose conditions were the same as Matthew's

5  and they didn't make it.  So what reasons do we offer as to

6  why some make it through and others don't.  We cannot answer

7  that.  We cannot determine.  Why is life like that?  Somehow

8  God has so graced us to endure certain things.  He's graced

9  you to endure what you endure, and he has graced you to

10  handle what you handle.  Others are not graced to deal with

11  situations the way we are.  And because of the measure of

12  grace that is given to each of us, we respond accordingly.

13  But that does not make an excuse to grab a gun and pull a

14  trigger and take the life of another.

15      And so we come to this moment and to this hour.  We

16  face the life of Matthew Reeves.  Matthew Reeves' life is in

17  your hands.  His life is there.  The State has given it to

18  you through our process of justice.  Matthew Reeves made a

19  choice in November of '96.  He had Willie Johnson's life in

20  his hands.  Matthew decided as you determine the facts to be

21  that because of his upbringing, because of how he feels,

22  because of his experience he would take that life.  Without

23  judging it, without even thinking, without giving the grace,

24  without extending a hand to Willie Johnson he decided to

25  take Mr. Johnson's life.  You stand as Matthew did.  Will

1 | you be like Matthew?  Will you take a life as Matthew did?

2 | Will you pull the trigger like Matthew did, or will you

3 | think?  Will you extend the grace?  Will you extend the life

4 | in your heart, in your mind?  Don't be like Matthew.  Don't

5 | pull that trigger because of your upbringing, because of the

6 | way you have lived.  Because of what is in your heart, grant

7 | life to Matthew, the life he didn't grant to Willie Johnson.

8 | Grant him that life, not life on the street, not life at

9 | home, not life at McDonald's.  Grant him that life in prison

10 | no matter how long he should live.  Give him that life.

11 |     I know the Bible admonishes us that thou shall not

12 | kill, and we should not kill.  Matthew should not have

13 | killed.  And I know the Bible says unto every purpose under

14 | heaven there is a season.  There is a time to be born, and

15 | there is a time to die.  There is a time to live, and there

16 | is a time to kill.  There's a time to heal; there's a time

17 | to plant, and there's a time to pluck up that which has been

18 | planted.  Today you choose what time it is.  Is it time to

19 | electrocute Matthew, or is it time to let him live?  In your

20 | heart decide that time for Matthew Reeves.

21 |     You heard the psychiatrist or the psychologist as she

22 | talked about Matthew's upbringing.  You heard her talk about

23 | the resources that were there and the resources that were

24 | not there.  You heard Ms. Reeves talk about first grade, his

25 | failing that.  He went on through the system, and the third

1199

1  grade, he failed that.  And in the eighth grade at Eastside

2  School because of his violent behavior, because of his

3  condition, because he just wouldn't listen, wouldn't pay

4  attention, didn't want to be in that environment he was

5  kicked out of school at Eastside.  And then after he was

6  kicked out of school, they tried home schooling, tried

7  sending someone to his home to give him a chance and the

8  assistance.  And you heard about the letter that Ms. Wilson

9  read that you're going to see that the young lady talked

10 about how his brother Julius in the house and how calm he

11 was and how Matthew came in raging talking about his gun and

12 cussing and using profanity, and it was when she was

13 listening to Julius' brother talk about how Julius had been

14 shot.  And then you are going to see the letter of November

15 18th, 1993 that the Selma school system wrote the young lady

16 that had experienced that that day, and how they told her,

17 we agree, it is in your best interest for you not to be in

18 that environment with Matthew.  And as of this day, we

19 terminate those services to Matthew Reeves.  This is the

20 last day, the last time the hand was extended to Matthew

21 Reeves to educate him, to train him, to get him those

22 resources that he needed.

23     You are going to see another letter that Ms. Wilson

24 talked about in April of 1992 when Matthew was asked who is

25 it that you want to be, what is it that you want to become.

1200

1   Do you want to fly and soar like Michael Jordan; do you want

2   to tee the ball like Tiger Woods, that Matthew in his

3   experience and his upbringing, this is what he wrote.  I

4   want to sell drugs and like all my life live the fast life

5   because my cousin want to.  Something else, I make more

6   money at this than I do at home.  This is Matthew in April

7   of '92 telling what he wanted to be like.

8          And whose fault is that?  Is it his mother, Ms.

9   Reeves, who because there was no husband in a home to help

10  her, because she had a 12th grade education and didn't know

11  how to do it?  Is it her who did the best she could with the

12  resources she had?  Is it her fault?  Or is it the State's

13  fault who provided what they could with the little money

14  that they could who did step in and take Matthew out of his

15  environment and put him in another environment, who tried to

16  send him to boot camp, to foster care, and did what they

17  could and then after the eighth grade cut it all off and

18  said live at home, live on the street and raise yourself.

19  Is it the State's fault, or is it Matthew's fault for not

20  knowing how to reach out and take advantage of the things

21  that were being offered to him, for rejecting the

22  counseling, the tutoring, not knowing how to respond to the

23  fact that he needed help, not realizing that his mental

24  condition would one day cause him to do that that has

25  brought him here today.  Is it his fault, or is it all of

1   our faults that we have kids like that, that we allow to

2   grow up and go through the system and get to that point, and

3   then come as the State has done today and ask you to kill

4   him because he has grown up in that environment; he has

5   grown up through the system environment, and then he commits

6   the ultimate act that society deems horrible.  And then here

7   comes the State with all of its power and all of its

8   resources now and asks you to do something that wasn't done

9   back then.  But now they want you to put Matthew Reeves in

10  the electric chair.

11          Sure, you didn't pull the trigger; you didn't cause

12  Matthew to pull the trigger.  You weren't there.  His mother

13  wasn't there.  She didn't cause him to pull that trigger.

14  The State wasn't there.  They didn't pull the trigger.

15  Matthew pulled the trigger.  But what caused Matthew to pull

16  that trigger?  Probably the same thing that is going to

17  cause you to make that decision to electrocute him or to put

18  him in life in prison for the rest of his life.

19          And so I ask you today.  Will it be an eye for an eye

20  or a tooth for a tooth?  Will you exchange Matthew's life

21  for Mr. Johnson's life?  I know that was the law.  But glory

22  be to God that we are no longer under the law.  We are under

23  grace.  We are under grace.  And I ask you that that grace

24  be extended to Matthew, that the mercy and the grace that's

25  in your heart be granted to Matthew Reeves.  Sure, he didn't

1202

1   grant that grace to Willie.  Sure, he didn't extend that

2   mercy to Willie.  But you have something to do that Matthew

3   didn't do.  Don't pull that trigger.  Don't put that plug in

4   that socket.  Don't place Matthew Reeves in that chair.

5        And last ladies and gentlemen, as I pondered this

6   trial, I could only think about one great passage in the

7   Bible.  And there was an occasion in the Bible when this

8   woman was caught in adultery.  And the law then was that if

9   such a person was caught in adultery, she deserved to be

10   killed because the relationship with a husband and wife was

11   held so high that no one dared defy that relationship

12   because what God had put together, no man should be able to

13   put asunder.  And they held that relationship so high that

14   anyone who was found to have committed such an act deserved

15   to die.

16        And so this woman had been discovered to have

17   committed that act.  So what they did is they brought that

18   woman before Jesus and reminded Jesus of what the law said

19   because Jesus himself had come to fulfill the law.  And they

20   knew when they brought him to the law, he who had come in

21   the name of the law would execute the law.  And so there

22   stood this woman before Jesus.  And you know the story, of

23   how Jesus kneeled on his knees listening to the accusations

24   and bowed his head.  And he stooped down and wrote on the

25   ground.  Scholars of the Bible can't say what Jesus wrote.

1203

1    They are unable to imagine what Jesus was thinking.  But he

2    never said a word.  He just wrote, never looked up.  He

3    heard the accusations, and he knew what they were talking

4    about.  But he stooped down, and he wrote.

5         So what I ask today is that you stoop down as Jesus

6    did, stoop down to Matthew's level, stoop down to where he

7    is and do what Jesus did.  Jesus when he rose, he said the

8    fact is the law does say he who commits such an act of

9    adultery deserves to die.  And so the fact is that because

10   you have found Matthew Reeves guilty of death, he faces the

11   electric chair.  But the truth of the matter is does he have

12   to go to the electric chair.  And the truth of the matter

13   was, was Jesus to judge that woman?  The fact was she was

14   caught in the act of doing what the law prohibited.  But the

15   truth was Jesus was there to stoop down.  The fact is you

16   have found Matthew Reeves guilty, but the truth is will you

17   electrocute him.  The fact was she deserved to die because

18   she had committed the act.  But the truth is that Jesus said

19   where are thou accusers, and neither do I condemn thee.

20        The fact is today that in November of 1996 Matthew

21   Reeves as you have so found took the life of Willie Johnson.

22   But the truth today, the truth today is does Matthew Reeves

23   deserve the electric chair?  The truth is for grace and

24   mercy be extended to Matthew.  Will you stand as Jesus

25   stood?  Will you stoop as Jesus did?  Will you stand?  And I

1204

1    know we all want to do something in response to what

2    happened to Willie Johnson.  We all want to change the

3    way our society is.  We all want to do something about our

4    young people.  We all are tired of what we face every day,

5    and we are sick of what we see on our television.  And we

6    are even afraid sometimes because of who they are and what

7    they might do.  And those are the facts of how we live.  But

8    the truth is what we are dealing with.  The truth is in my

9    heart and my soul.  Can you find a way to give Matthew

10   Reeves life in prison without ever having the possibility,

11   ever having an opportunity to get out?  That is the truth.

12   Ladies and gentlemen, thank you.

13       MR. GREENE:  Ladies and gentlemen, this is an

14   interesting comment that the defense has just made to you.

15   You have been told that you are killers like Matthew and

16   Godless creatures if you even consider the penalty of death.

17   Now I beg to differ.  Matthew, Troll, he took that shotgun

18   -- and I know it is not pretty -- and did this to a live,

19   innocent human being, somebody that people care and love and

20   depend on for this.  It's not what you in that box are

21   about, nor is it proper to even consider likening what you

22   are charged with doing in representing the community here.

23   You are not some creature who rises in the middle of the

24   afternoon and roams the streets of Selma looking for

25   something to steal and having found it is prepared to do

1205

1  whatever it takes to get it, including using that weapon to

2  do this to the first likely subject he comes up to and then

3  takes that blood money and uses it up as quickly as he got

4  it with reefer and cocaine and alcohol and parties into the

5  early morning hours, and yeah, sleeps on into the next day,

6  and when that is gone arises again and goes out and looks

7  for somebody else.

8      What you are doing here is trying to deal with that

9  as a member of this community.  We have talked about God,

10  and we have talked about Jesus, and we have talked about all

11  of the Sunday school lessons in the world.  We have talked

12  about truth.  We want to deal with the truth,  What is

13  really going on?  What this is over here at this table is

14  not some young person going through his life at church or

15  with a family or at a job but a person who I think the

16  psychiatrist described as unstructured, not under any

17  restrictions.  Did I not hear her say, killing has no

18  restrictions on him as it does on you and I, influenced by

19  gangs.  Didn't I hear gang, FOLKS, Followers of our Lord and

20  King Satan.  That's what we have got over here.

21      We can talk about biblical phrases.  We can talk

22  about Moses and the Ten Commandments coming down with thou

23  shall do no murder.  And the people had sinned grievously,

24  and he tossed those tablets given by God down, and God

25  destroyed the people for their sin.  We can talk about all

1206

1  of that.  But that's not real.  It's beliefs and thoughts.

2  What we have got to deal with is what do we have and what

3  has happened in this case.  We are dealing here with death.

4  That's what we are talking about here this morning, death,

5  death of an innocent person for the almighty dollar, for the

6  thrill, for fun.  We are talking about death for Troll, a

7  stone cold killer who killed so he can dance, so he can get

8  a tear drop, so he can buy reefer, so he can party.

9       His whole life -- his whole life has been nothing but

10  violence, turbulence, lawlessness.  And we come, and we say

11  oh, but it's not his fault, the poor misguided young boy.

12  He's not very bright.  He had a bad mother.  And I'm sure

13  some teacher spanked him, and he probably was fussed at, and

14  it's not his fault.  Now y'all, that's the most ridiculous,

15  ludicrous thing I hear spouted constantly this day and time.

16  There are people just like this man all over our country

17  running factories, having families, going to schools,

18  working every day bringing home paychecks and living a good,

19  solid productive life, not this man.  Not this man, never in

20  his life.  He must be crazy; no, he's not.  It's clear as a

21  bell.  It's a guy who sat up there and told us there is

22  nothing wrong with him from that standpoint.  He's not

23  psychotic.  He has no mental disease or defect.  He is not a

24  mental problem.  He is a totally immoral, lawless,

25  unstructured individual who has no restrictions on his

1207

1   conduct, no restrictions, none.

2   So you say, well, are we going to exchange a life for

3   another life?  No, I'm not asking you to do any exchanging.

4   We are not in a bartering business.  We are up here about

5   our society, the society we live in.  We are up here about

6   real dead people.  We are talking about the penalty of

7   death.  Why?  Well, one, we want to stop by penalty of death

8   this lawless creature.  We don't want to gamble on two tear

9   drops.  Number two, we want to let the other Trolls in the

10  world know that society will and can in an extreme case act

11  extremely.  You do this; you take an innocent human being

12  and you execute them; be prepared to pay with your life.

13  Know that and know that is the rule because otherwise chaos

14  reigns, and the Trolls of the world can move in their

15  unstructured life feeling no remorse, only look at me; did

16  you see how his head flopped when I shot him.

17  And also we want families, uncles, fathers, brothers

18  to know that they don't have to go get their guns and their

19  neighbors and go out and find these people and take the law

20  into their own hands to bring justice and order to a

21  community.  We want them to know that society will act in an

22  extreme case with an extreme penalty.  We want them to rest

23  assured that it will and can happen in order that we live in

24  a society where the Trolls of the world don't run it for us,

25  where we live in a society where you don't have to worry

Ann H. Armstrong, RPR

1208

1    about a night coming out of your house because bullets may

2    be flying or Troll may be waiting around the corner because

3    he ran out of reefer and cocaine because you go to Harco to

4    buy you some medicine at night.  He may be standing in the

5    corner with his shotgun waiting to take your purse or your

6    billfold.  That's why we are dealing with him.

7         What is it in his life -- the judge is going to tell

8    you that you are supposed to weigh the aggravating and the

9    mitigating circumstances.  Those are words that have always

10   left me kind of empty.  But what is it about Troll's life,

11   what is it that mitigates in favor?  That letter that was

12   just read to you a few minutes ago, I make more money than I

13   do at home, so why lose money and get more money.  That's

14   how I get my suits.  That's how I got my $3200 car.  Thanks,

15   but no thanks, April 1992, Matthew Reeves.  Matthew Reeves

16   in the girl's bathroom; Matthew Reeves touching a girl

17   inappropriately; Matthew Reeves threatening the teacher with

18   a gun; Matthew Reeves kicked out of school.  Matthew Reeves

19   home schooled, threatened and scared the teacher half to

20   death; she wasn't going back.  Matthew Reeves goes to the

21   juvenile authorities; Matthew Reeves goes again to the

22   juvenile authorities; Matthew Reeves charged with assault.

23   Matthew Reeves in jail, on and on and on.

24        Matthew Reeves, a man who will kill you, take your

25   money, party with you, wake up and start it over again.

1209

 1  That's Matthew Reeves.  It doesn't exist.  It cannot be, not

 2  in our society.  Well, you know different.  You know what he

 3  is.  You know what he has been.  And you know one other

 4  thing.  You know what he is going to be.  It's nothing easy

 5  talking about death.  Your job is to make a decision to

 6  recommend to this Court what should be done.  Your job is to

 7  represent the community.  That's what you're sitting on

 8  there as a juror for.  Yeah, you bring yourself here;

 9  you are real.  You are a human being.  But you also speak

10  for the community and the society that we have.  So it's an

11  added burden.  It's not just you.

12         The defense attorney made a comment awhile ago, and I

13  will remind you.  You can look on television, and you say,

14  oh, my Lord in heaven, this is horrible; they are robbing

15  people in the streets.  They are murdering people, blowing

16  up things.  We have got to do something about that.  Well,

17  by the luck of the draw, you were selected to sit on this

18  jury, your day, your time to do something about it.

19         Now an innocent man trying to help somebody was

20  turned into a bloody, horrible corpse for a few dollars

21  while a totally lawless individual could go party with his

22  friends all night.  That's as cold blooded and as senseless

23  as it gets.  That stone cold killer sits over there at that

24  table, and he's done nothing but this his entire life.

25  Let's don't gamble on two tear drops.  It's not fun.  It's

1210

1   not easy.   It's something that hurts.   It's something that

2   bothers you.   It's got to.   It bothers anybody.   But you

3   have to stand strong and remember you are representing the

4   community.   You are representing everybody that has to live

5   here.   Stone cold killers cannot be allowed to do what they

6   do and what he's done in this case.   You must be strong

7   enough to impose the penalty of death to recommend that to

8   this Court.   There is nothing in this entire case that

9   mitigates in his favor, not even his age.   He has done

10  nothing but crime after crime after crime.   Yeah, maybe

11  society did fail.   Maybe the law enforcement system failed.

12  Maybe we didn't do a good enough job of getting him locked

13  up and put away a long time ago.   Everybody wanted to take

14  one more chance, and now Mr. Johnson paid with his life.

15  Let's don't do that again.   Thank you.

16        THE COURT:   Ladies and gentlemen, it is the intent of

17  the laws of Alabama that the death penalty sentencing scheme

18  provide a meaningful basis for distinguishing the few cases

19  in which the death penalty is imposed and cases which it is

20  not.   You must decide if this particular case is one of

21  those few cases distinguishable from the many in which a

22  death sentence by electrocution is appropriate.

23        The law of this state does provide for the punishment

24  of capital offenses for which the Defendant has been

25  convicted.   It provides either death by electrocution or

1211

1  life imprisonment without parole.  The law also provides

2  that which of those two punishments should be imposed on the

3  Defendant depends on whether any aggravating circumstance

4  exists in this case and if so whether that outweighs any

5  mitigating circumstances that exist in this case.

6       An aggravating circumstance is a circumstance

7  specified by law which indicates or it tends to indicate

8  that the Defendant should be sentenced to death.  A

9  mitigating circumstance is any circumstance whether

10  specified by law or not it indicates or tends to indicate

11  that the Defendant should be sentenced to life imprisonment

12  without parole instead of death.  A mitigating circumstance

13  does not have to be a defense for the capital offense, nor

14  does it have to be a legal justification or excuse for a

15  capital offense.  Instead it is simply any circumstance that

16  indicates or tends to indicate the Defendant should not be

17  sentenced to death.

18       The issue at this sentencing hearing concerns

19  circumstances of aggravation and circumstances of mitigation

20  that you should consider and weigh against each other in

21  deciding what the proper punishment should be in this case.

22  In making your decision concerning what the punishment

23  should be, you must determine whether any aggravating

24  circumstances existed.  If so, you must determine whether

25  any mitigating circumstances or aggravating circumstances

1212

1  exist.   In making your determination concerning the

2  existence of aggravating and mitigating circumstances, you

3  should consider any evidence presented at the sentencing

4  hearing which is relevant to the existence of aggravating

5  and mitigating circumstances.   The law of this state

6  provides a list of aggravating circumstances which may be

7  considered by the jury in deciding the punishment if the

8  jury is convinced beyond a reasonable doubt from the

9  evidence that such aggravating circumstance exists in the

10  case.   If the jury is not convinced beyond a reasonable

11  doubt based upon the evidence that one or more of the

12  aggravating circumstances exists, then the jury must

13  sentence the Defendant to life imprisonment without parole

14  regardless of whether there are any mitigating circumstances

15  in the case.   The burden of proof is on the State to

16  convince you beyond a reasonable doubt of the existence of

17  any aggravating circumstance before you can consider the

18  aggravating circumstances.

19       I will now define to you the term reasonable doubt.

20  The term reasonable doubt means a doubt for which there is a

21  reason growing out of the evidence.   The evidence upon which

22  a reasonable doubt about an aggravating circumstance may be

23  based is any evidence about that circumstance which you have

24  heard or seen during the sentencing hearing.   A reasonable

25  doubt about an aggravating circumstance may arise from all

1213

1    of the evidence or from any part of the evidence or from a

2    lack or failure of the evidence.  A reasonable doubt is an

3    actual doubt.  It does not mean a doubt which rises from

4    some mere whim or from any groundless surmise or guess.

5    While the law requires you to be satisfied of the existence

6    of an aggravating circumstance beyond a reasonable doubt, it

7    prohibits you from going outside the evidence to hunt up

8    doubts.  In other words, to find that an aggravating

9    circumstance does not exist by the term beyond a reasonable

10   doubt does not mean absolute certainty.  There is no such

11   thing as absolute certainty in human affairs.

12        On the other hand, if after a full and fair

13   consideration of the evidence presented in the hearing,

14   there remains in your mind a real doubt about whether on

15   aggravating circumstance exists, then you should find that

16   aggravating circumstance does not exist.  If there does not

17   remain in your mind a real doubt about whether an

18   aggravating circumstance exists, then you should find that

19   aggravating circumstances do exist.

20        I will now give you the aggravating circumstance

21   which you may consider in determining the Defendant's

22   sentence if you find that the State has proven it exists

23   beyond a reasonable doubt through the evidence presented to

24   you.  I remind you again that the mere fact that I am

25   instructing you on this aggravating circumstance does not

Ann H. Armstrong, RPR

1214

1   mean that it exists.  It does not mean that I am of the

2   opinion that it exists.  That issue is for you to determine.

3   The aggravating circumstance which you may consider in this

4   case if you find from the evidence that it has been proven

5   beyond a reasonable doubt is that the capital offense was

6   committed while the Defendant was engaged in the commission

7   of robbery in the first degree.

8        The law of the state of Alabama defines robbery in

9   the first degree as follows.  A person commits the crime of

10  robbery in the first degree if in the course of committing a

11  theft he uses or threatens the imminent use of force against

12  the person or the owner of the property or any person

13  present with intent to overcome his physical resistance or

14  physical power of resistance and either causes serious

15  physical injury to another or is armed with a deadly weapon.

16       The law governing your consideration of this

17  aggravating circumstance the State contends exists in this

18  case is the same law that you applied at the first phase of

19  this trial.  Your finding that the Defendant is guilty of

20  capital murder entailed the finding that the Defendant was

21  guilty of robbery in the first degree.  And I will not

22  repeat the description of the law related to that offense

23  now.  It is for you to determine how much weight to give to

24  that particular matter.

25       As I stated to you before the burden of proof is upon

1215

1  the State to convince each and every one of you beyond a

2  reasonable doubt of the existence of any aggravating

3  circumstance considered by you in determining what the

4  punishment is to be in this case.  This means that before

5  you can even consider sentencing the Defendant to death,

6  each and every one of you must be convinced beyond a

7  reasonable doubt based on the evidence of the existence of

8  the aggravating circumstance that I have defined for you.

9  The Defendant does not have to disprove anything about the

10  aggravating circumstance.  The burden of proof is wholly

11  upon the State to prove such a circumstance.  You may not

12  consider any other circumstances in aggravation.  You may

13  not consider any of the aggravating circumstances I have

14  defined for you unless you're convinced by the evidence and

15  beyond a reasonable doubt that the aggravating circumstance

16  existed.

17       If you should find that no aggravating circumstance

18  has been proven beyond a reasonable doubt to exist in this

19  case, then you must stop your deliberations at that point

20  and return a verdict recommending the sentence of life

21  imprisonment without parole.  In that event you need not

22  concern yourself with whether any mitigating circumstance or

23  circumstances exist in this case.  If you do find beyond a

24  reasonable doubt that the aggravating circumstance I defined

25  for you does exist in this case, then you must proceed to

1216

1    consider and determine whether any mitigating circumstances

2    exist in this case.  Even if you find one or more

3    aggravating circumstances beyond a reasonable doubt, you may

4    impose a sentence of life imprisonment without the

5    possibility of parole for any reason.  You need not find a

6    mitigating circumstance in order to impose a sentence of

7    life imprisonment without parole.  Nothing in the law

8    forbids you from extending mercy out of compassion or belief

9    that life imprisonment without the possibility of parole is

10   sufficient punishment under all of the circumstances in this

11   case.

12        The law in this state also provides a list of some of

13   the mitigating circumstances which you may consider.  But

14   that list is not a complete list of mitigating

15   circumstances.  There are others as I will instruct you

16   later.  I will now read to you a list of some of the

17   mitigating circumstances which you may consider if you find

18   from the evidence in trial or in sentencing hearing that

19   such mitigating circumstances exist in this case.  Number

20   one, the capacity of the Defendant to appreciate the

21   criminality of his conduct or to conform his conduct to the

22   requirements of the law were substantially impaired could be

23   a mitigating circumstance.  If you find that the Defendant

24   was only eighteen years old at the time of the offense, you

25   must consider that to be a mitigating circumstance.  If you

1217

1  find that there were more participants in the crime than

2  just the Defendant and that another participant received or

3  will receive more lenient treatment, you must consider this

4  as a mitigating circumstance.

5     If you find that the Defendant grew up in a poor home

6  environment, you must consider that to be a mitigating

7  circumstance.  If you find that the Defendant lacked

8  appropriate developmental resources in growing up, you must

9  consider that to be a mitigating circumstance.  If you find

10  that the Defendant's level of intelligence is on the

11  borderline, you must consider that to be a mitigating

12  circumstance.  If you find that the Defendant when placed in

13  a structured environment has responded positively, you must

14  consider that to be a mitigating circumstance.

15     In addition to the mitigating circumstances that were

16  specified in the law and those that I just read to you,

17  mitigating circumstances shall include any aspect of a

18  Defendant's character or record and any circumstance through

19  the defense that the Defendant offers as a basis for a

20  sentence of life imprisonment without parole instead of

21  death.

22     The Court charges you, ladies and gentlemen of the

23  jury, that in determining as to whether the Defendant shall

24  receive as punishment death by electrocution or life without

25  parole, you are entitled to consider as each individual

1218

1   juror your experiences in life and other relevant factors

2   which you have obtained throughout the years.  The Court

3   charges you that the burden of proof is on the State of

4   Alabama to prove to you beyond a reasonable doubt that the

5   Defendant should receive as punishment death by

6   electrocution or imprisonment or life without parole.  The

7   mitigating circumstance considered by you should be based

8   upon the evidence that you have heard.  The burden of

9   disproving it by a preponderance of the evidence means that

10   you are to consider that the mitigating circumstance does

11   exist unless taking the evidence as a whole it is more

12   likely than not that the mitigating circumstance does not

13   exist.  Now when the factual existence of an offered

14   mitigating circumstance is in dispute, the State shall have

15   the burden of disproving the factual existence of that

16   circumstance by a preponderance of the evidence.  It is for

17   you to say whether or not there was a factual dispute about

18   any mitigating circumstance.

19       The process of weighing aggravating and mitigating

20   circumstances against each other in order to determine the

21   proper punishment, it is not a mechanical process.  Your

22   weighing the circumstances against each other should not

23   consist of merely adding up the number of aggravating

24   circumstances and comparing that number with the total

25   number of mitigating circumstances.  In addition to the

1219

1   mitigating circumstances I just read to you, you may also

2   consider as a mitigating circumstance any aspect of the

3   Defendant's character or life and any of the circumstances

4   of the capital offense which tends to indicate that the

5   Defendant should not be sentenced to death. A mitigating

6   circumstance does not have to be included in the list which

7   I read to you in order for you to consider that particular

8   mitigating circumstance.

9        A mitigating circumstance considered by you should be

10   based on the evidence that you have heard. If the factual

11   existence of an offered mitigating circumstance is in

12   dispute, the State shall have the burden of disproving the

13   factual existence of that circumstance by a preponderance of

14   the evidence of the evidence. And the burden of disproving

15   it by a preponderance of the evidence means that you are to

16   consider that a mitigating circumstance does exist unless

17   taking the evidence as a whole it is more likely than not

18   that the mitigating circumstance does not exist.

19        Therefore, if there is a factual dispute over the

20   existence of a mitigating circumstance, then you should find

21   and consider that mitigating circumstance unless you find

22   the evidence is such that it is more likely than not that

23   the mitigating circumstance does not exist. Only an

24   aggravating circumstance must be proven beyond a reasonable

25   doubt. And as I have stated to you many times the burden of

1220

1   proof is on the State of Alabama to convince you from the

2   evidence beyond a reasonable doubt that such an aggravating

3   circumstance does exist.

4           In determining what the true facts are concerning the

5   existence of aggravating and mitigating circumstances, you

6   are limited to the evidence that is presented during this

7   hearing.  The evidence does not include statements made by

8   the attorneys in the course of this hearing.  What the

9   lawyers have said both for the State and for the Defendant

10  is not evidence in this case.  What the lawyers have argued

11  to you is not evidence in this case.  Evidence is testimony

12  of witnesses under oath through the witness stand which you

13  have heard during this hearing.  Evidence also includes any

14  exhibits or documents that have been introduced during this

15  hearing.  Evidence does not include anything that you have

16  heard of this case outside of this courtroom.  As I have

17  instructed you before, if you have heard anything at all

18  about this case before this hearing began or outside of the

19  courtroom after this hearing began, then you must put what

20  you have heard out of your mind.  You're not to consider

21  that.  It is not evidence.  It would not be proper for you

22  to consider.

23          You are the sole and exclusive judges of the

24  evidence, of its weight and its sufficiency and of the

25  credibility of the witnesses.  You, the jury, are to

Ann H. Armstrong, RPR

1221

 1   determine the weight you will give to the testimony of the

 2   witnesses that you have heard.  Among other things you may

 3   consider, if any you may consider, is any interest, any

 4   bias, any prejudice or any relationship or any other factor

 5   associated with the witness if in your judgment it would

 6   tend to a keep a witness from telling the truth.  You may

 7   consider the witness' appearance and demeanor in determining

 8   what weight or what credibility you will give to the

 9   testimony of that witness.

10        In considering the evidence in this case and arriving

11   at a decision about whether an aggravating or mitigating

12   circumstance exists in this case, you have the right to use

13   your common sense and your every day knowledge of human

14   affairs and human conduct.  In reaching your findings

15   concerning the aggravating and mitigating circumstances in

16   this case and in determining what to recommend that the

17   punishment in this case should be, you must avoid any

18   influence of passion, prejudice or any other arbitrary

19   factor.  Your deliberations and your verdict should be based

20   upon the evidence you have seen and heard and the law as I

21   have instructed you.  There is no room for influence of

22   passion, prejudice or other arbitrary factors.  While it is

23   your duty to follow the instruction which I have given to

24   you, no statement, question, ruling or remark or other

25   expression that I have made at any time during this hearing

1222

1   is intended to indicate an opinion of what the facts are or

2   what the punishment should be.  It is your responsibility to

3   determine the facts and then recommend the punishment.   In

4   doing so, you should not be influenced in any way by what

5   you imagine to be my views on this subject.

6        Ladies and gentlemen, to consider an aggravating

7   circumstance, it is necessary that the jury unanimously

8   agree upon its existence.  All twelve of you must be

9   convinced beyond a reasonable doubt that an aggravating

10  circumstance exists in order for you to, for any of you to

11  consider that aggravating circumstance in determining what

12  the sentence should be.  However, it is not necessary for

13  there to be a unanimous agreement on the existence of a

14  mitigating circumstance before you can consider it in

15  setting punishment.  If you as an individual juror find

16  under the law as I have given it to you a mitigating

17  circumstance exists, then you can individually consider it

18  and weigh it against any aggravating circumstances

19  regardless of whether any other juror agrees with you about

20  the existence of that mitigating circumstance.   There must

21  be a unanimous agreement on the existence of a particular

22  aggravating circumstance before it can be considered by any

23  juror.  There need not be a unanimous agreement on the

24  existence of any particular mitigating circumstance before

25  it can be considered.

1223

1   The process of weighing aggravating and mitigating

2   circumstances against each other in order to determine the

3   proper punishment, as I have said it is not a mechanical

4   process.  Your weighing the circumstances against each other

5   should not consist merely of adding up the number of

6   aggravating circumstances and comparing that number with the

7   total mitigating circumstances.  The law of this State

8   recognizes that it is possible in at least some situations

9   that one or a few aggravating circumstances might outweigh a

10  large number of mitigating circumstances.  The law in this

11  State also recognizes that it is possible in at least some

12  situations that a large number of aggravating circumstances

13  might be outweighed by one or a few mitigating

14  circumstances.  In other words, the law contemplates that

15  different circumstances may be given different weights and

16  values in determining the sentence in a case.  And you, the

17  jury, are to decide what weight or what value is to be given

18  to a particular circumstance in determining the sentence in

19  light of all the other circumstances in the case.  You must

20  do that in the process of weighing the aggravating

21  circumstances or circumstance against the mitigating

22  circumstances or circumstance.

23  Ladies and gentlemen, to bring back a verdict

24  recommending the punishment of death, at least ten of your

25  number must vote for death.  In other words, a verdict of

1224

```
 1    death must be either unanimous or eleven for death and one
 2    for life without parole or ten for death and two for life
 3    without parole.  Any number less than ten cannot recommend
 4    the death penalty.  To bring back a verdict recommending a
 5    sentence of life without parole there must be a concurrence
 6    of at least seven of your number for that sentence.  In
 7    other words, for a verdict to be returned recommending life
 8    imprisonment without parole, it must be either unanimous or
 9    eleven for life without parole and one for death, ten for
10    life without parole and two for death, nine for life without
11    parole and three for death or eight for life without parole
12    and four for death or seven for life without parole and five
13    for death.  Any number less than seven cannot recommend life
14    without parole.
15         The fact that the determination of whether ten or
16    more of you can agree to recommend a sentence of death or
17    seven or more of you can agree to recommend a sentence of
18    life in prison without parole can be reached by a single
19    ballot should not influence you to act hastily or without
20    due regard to the seriousness of this proceeding.  You
21    should hear and consider the views of your fellow jurors.
22    Before you vote you should carefully weigh, sift, and
23    consider the evidence and all of it realizing that a human
24    life is at stake.  You should bring to bear your best
25    judgment on the sole issue which is before you, that is the
```

1225

1   issue of whether the Defendant should be sentenced to life

2   imprisonment without parole or death.   Life imprisonment

3   without parole means life imprisonment without parole.   It

4   is the law of this State that if you sentence the Defendant

5   to life imprisonment without parole, he will never be

6   paroled.   In addition to the recommendation of death or

7   life imprisonment without parole, your verdict form must

8   contain the numerical vote, not who voted which way, but the

9   actual count.

10        Now ladies and gentlemen, if after a full and careful

11  consideration of all of the evidence in this case you're

12  convinced beyond a reasonable doubt that at least one

13  aggravating circumstance does exist and you're convinced

14  that that aggravating circumstance outweighs the mitigating

15  circumstances, your verdict would be, we, the jury,

16  recommend the Defendant, Matthew Reeves, to be punished by

17  death.   The vote is as follows.   There is a blank by the

18  word death.   There is a blank by the words life without

19  parole.   You will fill in the number or the numerical count,

20  and that verdict form would then be signed by your

21  foreperson.   This is the verdict form that you'll be handed

22  in just a few minutes.   You will see the blank here where

23  you put your numerical vote.

24        However, if after a full and fair consideration of

25  all of the evidence in this case, you determine that any

1226

1   mitigating circumstances outweigh any aggravating

2   circumstances that exist and you're not convinced beyond a

3   reasonable doubt that at least one aggravating circumstance

4   does exist your verdict would be to recommend the punishment

5   of life imprisonment without parole. And the form of your

6   verdict would be, we, the jury, recommend that the

7   Defendant, Matthew Reeves, be punished by life imprisonment

8   without parole. And the vote is as follows. Again a line

9   or blank by death and a blank by the words life without

10   parole and numerical count, of course, to be filled in on

11   this form as well. The foreperson, of course, will sign

12   this form as your verdict.

13       When you have arrived at your verdict, it will be

14   necessary for you to return to the courtroom and give us

15   your verdict. The verdict forms as I have already shown to

16   you have been provided and prepared by me. You will, of

17   course, return only one of these verdicts in accordance with

18   the instructions that I have given to you. What says the

19   State as to the charge?

20       MR. GREENE: Satisfied.

21       MR. GOGGANS: Your Honor, the only thing we have is

22   on the reasonable doubt instruction, we have the same

23   objection in this phase that we had in the guilt phase and

24   just bring forward the same grounds on using reasonably

25   substantial.

1227

1    THE COURT:  Thank you, overruled.

2    THE COURT:  Ladies and gentlemen, I'm going to ask

3    you to retire to the jury room and begin your deliberations.

4         (The jury was excused from the courtroom and began

5    their deliberations at 10:35 a.m.)

6         (The jury was returned to the courtroom at 11:25 to

7    return their verdict)

8    THE COURT:  Ladies and gentlemen, have you reached an

9    advisory verdict in the penalty phase of this trial?

10   MS. GOLSON:  Yes, sir.

11   THE COURT:  Please read the verdict.

12   MS. GOLSON:  We, the jury, recommend that the

13   Defendant, Matthew Reeves, be punished by death.  The vote

14   is as follows, death, ten; life without parole, two.

15   THE COURT:  Thank you, ma'am.  At this time I'm going

16   to go through and ask you if this is in fact the correct

17   count.

18   THE COURT:  Is this correct count?

19   JUROR:  Yes, sir.

20   THE COURT:  Is this correct?

21   JUROR:  Yes, sir.

22   THE COURT:  Is this correct?

23   JUROR:  Yes, sir.

24   THE COURT:  Is this correct?

25   JUROR:  Yes, sir.

1228

1    THE COURT:  Is this correct?

2    JUROR:  Yes, sir.

3    THE COURT:  Is this correct?

4    JUROR:  Yes, sir.

5    THE COURT:  Is this correct?

6    JUROR:  Yes, sir.

7    THE COURT:  Is this correct?

8    JUROR:  Yes, sir.

9    THE COURT:  Is this correct?

10   JUROR:  Yes, sir.

11   THE COURT:  Is this correct?

12   JUROR:  Yes.

13   THE COURT:  Is this correct?

14   JUROR:  Yes.

15   THE COURT:  Is this correct?

16   JUROR:  Yes.

17   THE COURT:  Ladies and gentlemen, I want to thank you

18   all for your time and your attention.  I can't tell you how

19   much I appreciate everything that you have done this week.

20   I know it's been a very difficult week.  It's been very

21   inconvenient for you all.  You may step into the jury room.

22   If you would please wait there for me, I'll be with you in

23   just a few minutes.

24   Mr. Goggans and Mr. Greene, would y'all step up.

25   (The following occurred at the bench outside the

1229

1    hearing of others in the courtroom:)

2         THE COURT:  The jurors were concerned that he had

3    been taking notes during the individual voir dire regarding

4    their places of employment, their homes, et cetera.  And I

5    wanted to know if he has any notes.

6         MR. GOGGANS:  We have all of his notes.  He has

7    filled out note pads.  The lawyers have the note pads.

8         THE COURT:  You are going to keep those?

9         MR. GOGGANS:  Right.

10        THE COURT:  You yourself, not him?

11        MR. GOGGANS:  Well, either Marvin or I will.

12        THE COURT:  Okay.  I just wanted to tell them that.

13        (The following occurred in the presence and hearing

14   of all:)

15        THE COURT:  If you all would please stay here, I'll

16   be back in just a few minutes.

17        (A short recess was taken.)

18        THE COURT:  Mr. Goggans and Mr. Wiggins.  Mr. Reeves,

19   the jury has found you guilty of murder during the

20   commission of a robbery in the first degree.  At this time I

21   adjudge you to be guilty as found by the jury of murder

22   during robbery in the first degree.  And I will order that a

23   pre-sentence investigation be prepared, a report be

24   prepared.  And at this time I'm not going to set it for

25   sentencing until we have an idea of how long that

1230

1   pre-sentence report is going to take.  But in any event

2   sentencing will be set within the next ninety days.  All

3   right.  You all are excused.

4           (Court was adjourned.)

5

6

7

8

9                               July 20, 1998

10          THE COURT:  Has the State had an opportunity to

11  review the pre-sentence report or defense?

12          MR. GREENE:  Yes, sir, Your Honor.

13          MR. GOGGANS:  Your Honor, the defense has reviewed

14  the report also.  With respect to the report, the report

15  indicates no record of any type of mental abnormality.  Of

16  course, the Court will recall the evidence and the testimony

17  in the course of the penalty phase of the trial,

18  particularly that of Dr. Ronan indicating mental

19  deficiencies on Mr. Reeves' part.

20          MR. GREENE:  I think the report indicated they just

21  didn't have any reports that she was aware of.  So

22  therefore, they weren't included in the report.  But I think

23  that issue was deeply covered at trial.

24          THE COURT:  I believe it was covered in the penalty

25  phase, and there should be exhibits if I'm not mistaken

Ann H. Armstrong, RPR

1        MR. GOGGANS:  Yes, sir.

2        THE COURT:  That were introduced in support of that

3  and, of course, part of the record.  Does the State want to

4  present anything with regard to the sentencing?

5        MR. GREENE:  Judge, on behalf of the State, of

6  course, the Court heard this trial.  We do not want to

7  present any evidence.  We are all here.  The family is here

8  and most interested, of course, in this case and the

9  sentence and would like to make comments at the appropriate

10  time.

11       MR. GOGGANS:  Your Honor, the defense has no

12  additional evidence to offer.  We presented evidence to the

13  jury and the Court during the penalty phase of the trial

14  back in January, and we rely on that same evidence and the

15  same arguments made back then.

16       THE COURT:  Mr. Greene?

17       MR. GREENE:  Your Honor, at this time on behalf of

18  the family that is here and on behalf of the State and

19  investigating officers, the Court has heard the case, heard

20  the arguments concerning the Defendant's history and

21  background, the viciousness of this case, the deliberateness

22  of it.  And we ask that the Court follow the matters put

23  forth by the jury and sentence this Defendant to death.

24       THE COURT:  Anything else from the State?

25       MR. GREENE:  No, sir.

1232

1  THE COURT:  Mr. Reeves, the jury in this case found

2  you guilty of capital murder.  That would be murder during

3  the commission of a robbery in the first degree.  The Court

4  does find you guilty of that.  And I ask you if there is

5  anything you wish to say as to why the sentence of law

6  should not be imposed against you at this time?

7  MR. REEVES:  No, sir.

8  THE COURT:  This is a case that -- the Court has

9  heard six days of testimony, five days of testimony.  In

10  addition to that I heard the evidence of mitigating

11  circumstances, and I have also considered the evidence of

12  aggravating circumstances required by law.  This is a case

13  that involved a man named Willie Johnson who was a good

14  Samaritan on November 26th, 1996.  He stopped by the side of

15  the road to assist this Defendant and others who he believed

16  to be in need of assistance.  A short time after that this

17  Defendant placed a shotgun to this man's neck and took his

18  life.  And the co-defendants then robbed him of about $500.

19  The only evidence that I can consider in mitigation

20  of this offense and that I have considered is the evidence

21  of your age and your youthfulness, Mr. Reeves.  But I'm

22  afraid that evidence is not a mitigating factor to the

23  extent that it would in any way outweigh the aggravating

24  circumstances that exist in this case.  Based upon that, Mr.

25  Reeves, the Court will sentence you to death.  The

Ann H. Armstrong, RPR

1233

1    sentencing order will also reflect that you will be ordered

2    to pay the costs of this court, the assessments to the

3    Alabama Crime Victim's Compensation Commission.  You will

4    also be required to reimburse the State of Alabama the costs

5    of your court appointed counsel.  Of course, there is an

6    automatic appeal in this case.  You have forty-two days to

7    accomplish that.

8                        ----------------------------

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ann H. Armstrong, RPR

1234

CERTIFICATE

STATE OF ALABAMA

COUNTY OF DALLAS

    I, Ann H. Armstrong, Registered Professional Reporter and Notary Public, Official Court Reporter in and for the Fourth Judicial Circuit, Dallas County, Alabama, do hereby certify that I reported the foregoing proceedings in the matter of State of Alabama vs. Matthew Reeves, CC-97-31. in the Circuit Court of Dallas County, Alabama.

    The foregoing _1233_ pages are a true and correct transcript of the said proceedings.

    This the _20th_ day of _February_, 1999.




                          _Ann H Armstrong_
                          Ann H. Armstrong, RPR
                          Official Court Reporter
                          Fourth Judicial Circuit




Ann H. Armstrong, RPR

| State of Alabama<br>Unified Judicial System<br><br>Form ARAP 13 | CERTIFICATE OF COMPLETION<br>REPORTER'S TRANSCRIPT | Page Number<br><br>1235 |
| --- | --- | --- |

**TO:**   **The Clerk of the Court of Criminal Appeals**          **Fax: (334) 242-4689**
      **P. O. Box 301555**
      **Montgomery, Alabama 36130-1555**

**Criminal Appeals Case Number**          **CR** _____ **-** _____

   Matthew Reeves                    v.   State of Alabama
**Appellant's Name**                    **Appellee**

On appeal from the:   [ XX ] Circuit Court of
            [    ] District Court of   ~~Dallas~~        County
            [    ] Juvenile Court of

**Trial Court Case Number**   ___CC-97-31_____

**Notice of Appeal Date**  _1/12/99_____

   I, ___Ann H. Armstrong_____, certify that I have this date completed and
filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings
in the above referenced case that were reported by me and were specifically designated by the appellant for
inclusion on the Reporter's Transcript Order.   The transcript, which is numbered serially in the upper right-hand
corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and
the testimony of the witnesses.   The original transcript concludes with the original of this notice and the copies of
the transcript conclude with copies of this notice.   The page number appearing in the upper right-hand corner of
this certificate is the last page of my portion of the transcript in this case.

Done this the _20th_ day of _February_, _1999_.

_Ann H Armstrong_
**Court Reporter**

---

**FILING AND SERVICE OF THIS FORM:**   Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of
this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel
for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the
district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on
the municipal prosecutor rather than the attorney general and district attorney.

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 14          11/91 | CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK | Appellate Case Number |
|---|---|---|

| TO:  THE CLERK OF<br>       THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:  JANUARY 12, 1999 |
|---|---|

**APPELLANT**

MATTHEW REEVES

v.   STATE OF ALABAMA

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of ___217___ pages) ( SEVEN volumes of MORE 210 pages each ~~XXXXXXXXXXXXXXXXXXXX~~ ~~XXXXXXXpages~~) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

Dated this ___2___ day of ___March___ . 19_99_ .

_____
Circuit Clerk

W. A. Kynard

MATTHEW REEVES                          [

    APPELLANT,                      [

                          [

VERSUS                                  [   IN THE CIRCUIT COURT OF DALLAS COUNTY, ALABAMA.

                          [

STATE OF ALABAMA                        [   CASE NO. CC-97-31

    APPELLEE,                       [

## CLERK'S CERTIFICATE OF EXHIBITS

    I, W. A. Kynard, as Clerk of the Circuit Court of Dallas County, Alabama, do hereby certify that the following exhibits:

**STATE'S EXHIBITS**

| | | | |
|---|---|---|---|
| 1 /6 Photographs | | 29 / | Diagram |
| 7 / Pellets | | 30 / | Photograph |
| 8 / Clothing | | 31 / | Photograph |
| 12 / Jacket | | 34 / | Box that contained shotgun |
| 13 / White Pants | | 35 / | Box the contained shell |
| 14 / Nike Tennis Shoes | | 36 / | Shell |
| 15 / Reebok Tennis Shoes | | 37 / | Shot Wadding |
| 16 / Green Blue Jeans | | 38 / | Shot Wadding |
| 17 / Khaki Pants | | 39 / | Shotgun |
| 18 / Sheet | | 40 / 50 | Photographs |
| 20 / Michigan Jacket | | 56 / 58 | Photographs |
| 23 / Diamond Cluster Ring | 60 / 72 | Photographs |
| 24 / US Coins | | 74 / 93 | Photographs |
| 25 / Green Ball Cap | | | |
| 26 / Blue and White Towel | | | |
| 28 / Adidas Tennis Shoes | | | |

**DEFENDANT'S EXHIBITS**

16 / 28 Photographs

are bulky and incapable of being photocopied into the records on appeal.  These exhibit will by reained by the trial court and will not be forwarded under separate cover unles so ordered by the court of criminal appeals.

Witness my hand this ___2___ day of ___March___ . 1999 .

_W. A. Kynard_
       CLERK