# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MATTHEW REEVES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.  1:17-cv-00061-KD-MU |
| | ) | |
| JEFFERSON S. DUNN, | ) | |
| Commissioner of the Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

# VOLUME 9

# State Court – Direct Appeal, Briefs and Orders

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
    CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

IN THE ALABAMA COURT OF CRIMINAL APPEALS

MATTHEW REEVES,                 )
                                )
        Appellant,              )
                                )
v.                              )
                                )    Case No. CR-98-0777
                                )
STATE OF ALABAMA,               )
                                )
        Appellee.               )


ON APPEAL FROM THE CIRCUIT COURT FOR
DALLAS COUNTY, ALABAMA

BRIEF OF APPELLANT MATTHEW REEVES

ORAL ARGUMENT REQUESTED


THOMAS M. GOGGANS
S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36102
(334)-834-2511

Attorney for Appellant
Matthew Reeves

## TABLE OF CONTENTS

Table of Authorities.........................1

Statement of the Case.......................6

Issues.......................................6

Statement of Facts..........................14

Argument....................................29

Conclusion..................................62

Request for Oral Argument...................62

Certificate of Service......................63

TABLE OF AUTHORITIES

Cases:

Barclay v. Florida, 463 U.S. 939 (1983).............58

Bell v. State, 385 So.2d 78 (Ala.Crim.
        App. 1980)....................................40

Berger v. United States, 295 U.S. 78 (1935).....51, 52

Bracewell v. State, 506 So.2d 354 (Ala.Crim.
        App. 1988)....................................43

Brannon v. State, 549 So.2d 532 (Ala.Crim.
        App. 1989)................................29, 31

Brooks v. Francis, 716 F.2d 780 (11th Cir.
        983)......................................54, 55

Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985)..52, 56

Caffie v. State, 516 So.2d 822(Ala.Crim.
        App. 1986)....................................32

Cage v. Louisiana, 498 U.S. 39 (1990)..........59, 60

Caldwell v. Mississippi, 472 U.S. 320 (1985)....53, 54

California v. Ramos, 463 U.S. 992 (1983)...........54

Chavers v. State, 361 So.2d 1106 (Ala. 1978)....34, 36

Commonwealth v. Spallone, 267 Pa.Super. 486,
        406 A.2d 1146 (1979)..........................34

Connolly v. State, 500  So.2d 57 (Ala.Crim.
        App. 1985)....................................34

Coon v. State, 494 So.2d 184 (Ala.Crim.App.
        1978)...............................33, 34, 36

Davis v. Alaska, 415 U.S. 308 (1974).......39, 40, 41

Douglas v. Alabama, 380 U.S. 415 (1965)............40

Draper v. United States, 358 U.S. 307 (1979).......31

Eddings v. Oklahoma, 455 U.S. 104 (1982).......54, 59

Furman v. Georgia, 408 U.S. 238 (1972)..............58

Gardner v. Florida, 430 U.S. 349 (1977).............54

Godfrey v. Georgia, 446 U.S. 420 (1980).............41

Gord v. State, 475 So.2d 900 (Ala.Crim.App. 1985)...31

Gregg v. Georgia, 428 U.S. 153 (1976)..............41

Green v. Georgia, 442 U.S. 95 (1979)...............59

Hance v. Zant, 696 F.2d 940 (11th Cir. 1983).......54

Henry v. United States, 361 U.S. 98 (1959).........31

Herriot v. State, 337 So.2d 165 (Ala.Crim.
        App. 1976)....................................30

Illinois v. Rodriquez, 497 U.S. 177 (1990).........30

Katz v. United States, 389 U.S. 347 (1967).........29

Knight v. State, 675 So.2d 487 (Ala.Crim.
        App. 1996)................................46, 48

Kuenzel v. State, 577 So.2d 474 (Ala.Crim.
        App. 1990), aff'd, 577 So.2d 531
        (Ala. 1991), cert denied,
        502 U.S. 886 (1991)...........................43

Ex parte Lasley, 505 So.2d 1263 (Ala. 1987).....47, 50

Leach v. State, 31 Ala.App. 390,
        18 So.2d 285, cert. denied,
        245 Ala. 539, 18 So.2d 289 (1944).........46, 49

Ex parte Ledbetter, 404 So.2d 731 (Ala. 1981)...46, 49

Lockett v. Ohio, 438 U.S. 586
        1978)....................53, 54, 56, 57, 58, 59

Martin v. State, 548 So.2d 488 (Ala.Crim.
     App. 1988), aff'd, 548 So.2d 496
     (Ala.), cert. denied, ____ U.S. ___,
     110 S.Ct. 419, 107 L.Ed.2d 383 (1989).........43

Ex parte McGee, 383 So.2d 205 (Ala. 1980).......33, 36

Morgan v. Illinois, 504 U.S. 719 (1992)............43

Murray v. State, 396 So.2d 125 (Ala.Crim.
     App. 1981)...................................29

Olden v. Kentucky, 488 U.S. 227 (1988).............41

Ex parte O'Leary, 438 So.2d 1372 (Ala. 1983)....46, 49

Ex parte O'Leary, 417 So.2d 232 (Ala. 1982).....46, 49

Oregon v. Kennedy, 456 U.S. 667 (1982).........52, 56

Padgett v. State, 668 So.2d 78 (Ala.Crim.
     App. 1995)...................................34

People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr.
     702 (1982)................................52, 56

People v. Schindler, 114 Cal.App.3d 178,
     170 Cal.Rptr. 461 (1980)..................52, 56

Pointer v. Texas, 380 U.S. 400 (1965)......:.......39

Scheneckloth v. Bustamonte, 412 U.S. 218 (1973).....30

Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978)...52, 56

State v. Freeman, 605 So.2d 1258
     (Ala.Crim.App. 1992)..................46, 47, 49

State v. Lindsey, 404 So.2d 466 (La. 1981)......53, 57

Ex parte Stewart, 659 So.2d 122 (Ala. 1993).....46, 49

Taylor v. Alabama, 457 U.S. 687 (1982).............31

Tucker v. Francis, 732 F.2d 1054
     (11th Cir. 1984)..............................54

Tucker v. Zant, 724 F.2d 882 (11th Cir. 1984)...55, 56

United States v. Lewis, 592 F.2d 1282
        (5th Cir. 1979)............................53, 56

United States v. Liddy, 509 F.2d 428
        (D.C.Cir. 1974)...........................52, 56

United States ex rel. Macon v. Yeager,
        476 F.2d 613 (3d Cir. 1973)...............52, 56

United States v. Matlock, 415 U.S. 164 (1974).......30

United States v. McDonald, 620 F.2d 559
        (5th Cir. 1980)...........................52, 56

United States v. Mullinelli-Navis, 111 F.3d 983
        (1st Cir. 1997)...............................41

United States v. Pritchett, 699 F.2d 317
        (6th Cir. 1983)...............................41

United States v. Stewart, 93 F.3d 189
        (5th Cir. 1996)...............................41

United States v. Vargas, 933 F.2d 701
        (9th Cir. 1991)...............................41

United States v. Williams, 556 F.2d 1242
        (D.C.Cir. 1977).........................:...52, 56

Woodson v. North Carolina, 428 U.S. 280 (1976)......58

Zant v. Stephens, 462 U.S. 862 (1983)...............58

Code Sections:

Ala. Code § 12-21-137...............................41

Court Rules:

A.R.E. 611(b)......................................40

A.R.E. 616.........................................40

Law Review Articles:

4

Sixteenth Annual Review of Criminal
   Procedure: United States Supreme
   Court and Courts of Appeal 1985-1986,
   75 Geo.L.J. 713, 1081 n. 2509 (1987)..........40

Twenty-Seventh Annual Review of Criminal
   Prodedure, 86 Geo.L.J. 1153 (1998)...........40

Balske, Prosecutorial Misconduct During
   Closing Argument: The Art of Knowing
   When and How to Object and Avoiding
   the "Invited Response" Doctrine,
   37 Mercer L.Rev. 1033 (1986).................51

Celebreeze, Prosecutorial Misconduct:
   Quelling the Tide of Imrpoer Comment
   to the Jury, 35 Cleveland State L.
   Rev. 237 (1987)..............................50

DeFoor, Prosecutorial Misconduct in
   Closing Argument, 7 Nova L.J. 443 (1983)......50

Comment, Prosecutorial Misconduct:
   The Limitations Upon the Prosecutor's
   Role as an Advocate, 14 Suffolk U. L.
   Rev. 1095 (1980).............................50

## STATEMENT OF THE CASE

Appellant Matthew Reeves was charged with capital murder in an indictment in the Circuit Court of Macon County.  The indictment charged Reeves with a robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6).  Reeves was found guilty as charged.  (C. 219, R. 1105).  The jury recommended 10-2 that Reeves be put to death.  (C. 220, R. 1227).  The Circuit Court of Dallas County adjudged Reeves guilty of capital murder and sentenced him to death.  (C. 233-239, R. 1232). This appeal ensued.

## ISSUES

WHETHER ITEMS SEIZED FROM APPELLANT REEVES' ROOM WITHOUT A WARRANT WERE FRUITS OF A CONSTITUTIONALLY INFIRM SEARCH.

Brannon v. State, 549 So.2d 532 (Ala.Crim.App. 1989)

Herriot v. State, 337 So.2d 165 (Ala.Crim.App. 1976)

Illinois v. Rodriquez, 497 U.S. 177 (1990)

Katz v. United States, 389 U.S. 347 (1967)

Murray v. State, 396 So.2d 125 (Ala.Crim.App. 1981)

Scheneckloth v. Bustamonte, 412 U.S. 218 (1973)

6

_United States v. Matlock_, 415 U.S. 164 (1974)


WHETHER APPELLANT REEVES' ARREST WAS WITHOUT PROBABLE CAUSE THUS POISONING THE POLICE OFFICERS' SUBSEQUENT RETRIEVAL OF INCRIMINATING EVIDENCE.

_Brannon v. State_, 549 So.2d 532 (Ala. 1989)

_Caffie v. State_, 516 So.2d 822 (Ala.Crim.App. 1986)

_Draper v. United States_, 358 U.S. 307 (1979)

_Gord v. State_, 475 So.2d 900 (Ala.Crim.App. 1985)

_Henry v. United States_, 361 U.S. 98 (1959)

_Taylor v. Alabama_, 457 U.S. 687 (1982)


WHETHER THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON "THEFT AFTERTHOUGHT."

_Chavers v. State_, 361 So.2d 1106 (Ala. 1978)

_Commonwealth v. Spallone_, 267 Pa.Super. 486, 489, 406 A.2d 1146 (1979)

_Connolly v. State_, 500  So.2d 57 (Ala.Crim.App. 1985)

_Coon v. State_, 494 So.2d 184 (Ala.Crim.App. 1978)

_Ex parte McGee_, 383 So.2d 205 (Ala. 1980)

_Padgett v. State_, 668 So.2d 78 (Ala.Crim.App. 1995)

_United States v. Lewis_, 592 F.2d 1282 (5th Cir. 1979)

7

WHETHER THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT
THE JURY ON COMPLICITY.

Chavers v. State, 361 So.2d 1106 (Ala. 1978)

Coon v. State, 494 So.2d 184 (Ala.Crim.App.
1978)

Ex parte McGee, 383 So.2d 205 (Ala. 1980)

United States v. Lewis, 592 F.2d 1282 (5th
Cir. 1979)

WHETHER THE ACTIONS OF THE TRIAL JUDGE IN PROHIBITING
THE DEFENSE FROM DISCREDITING A PROSECUTION WITNESS BY
QUESTIONING HIM ABOUT BEING IN JAIL AND HAVING PENDING
CRIMINAL CHARGES DEPRIVED APPELLANT REEVES OF HIS
RIGHT OF CONFRONTATION AND CROSS EXAMINATION.

Bell v. State, 385 So.2d 78 (Ala.Crim.App.
1980)

Davis v. Alaska, 415 U.S. 308 (1974)

Douglas v. Alabama, 380 U.S. 415 (1965)

Olden v. Kentucky, 488 U.S. 227 (1988)(per
curiam)

Pointer v. Texas, 380 U.S. 400 (1965)

United States v. Mullinelli-Navis, 111 F.3d
983 (1st Cir. 1997)

United States v. Pritchett, 699 F.2d 317,
321 (6th Cir. 1983)

United States v. Stewart, 93 F.3d 189 (5th
Cir. 1996)

United States v. Vargas, 933 F.2d 701 (9th
Cir. 1991)

Sixth Amendment to the United States
Constitution

Article I, § 6, Alabama Constitution of 1901

Ala. Code § 12-21-137

A.R.E. 611(b)

Sixteenth Annual Review of Criminal
Procedure: United States Supreme Court and
Courts of Appeal 1985-1986, 75 Geo.L.J. 713,
1081 n. 2509 (1987)

Twenty-Seventh Annual Review of Criminal
Prodedure, 86 Geo.L.J. 1153, 1714-1715
(1998)


WHETHER THE LACK OF A STANDARD OR MEASURE FOR
DETERMINING WHETHER AGGRAVATING CIRCUMSTANCES SO
OUTWEIGH MITIGATING CIRCUMSTANCES AS TO SUPPORT A
DEATH SENTENCE VIOLATED APPELLANT REEVES'S RIGHTS TO
PROTECTION FROM CRUEL AND UNUSUAL PUNISHMENT, DUE
PROCESS OF LAW AND EQUAL PROTECTION OF THE LAW.

Godfrey v. Georgia, 446 U.S. 420 (1980)

Gregg v. Georgia, 428 U.S. 153 (1976)

THE TRIAL COURT ERRED IN NOT EXCUSING FOR CAUSE AN
"AUTOMATIC DEATH PENALTY" JUROR.

Bracewell v. State, 506 So.2d 354
(Ala.Crim.App. 1988)

Kuenzel v. State, 577 So.2d 474
(Ala.Crim.App. 1990), aff'd, 577 So.2d 531
(Ala. 1991), cert denied, 502 U.S. 886
(1991)

Martin v. State, 548 So.2d 488 (Ala.
Crim.App. 1988), aff'd, 548 So.2d 496
(Ala.), cert. denied, _____ U.S. ___, 110
S.Ct. 419, 107 L.Ed.2d 383 (1989)

Morgan v. Illinois, 504 U.S. 719 (1992)

9

WHETHER A JUROR'S FAILURE TO DISCLOSE THAT APPELLANT'S
BROTHER WAS SUSPECTED OF STEALING HER CAR DEPRIVED
APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY.

Knight v. State, 675 So.2d 487
(Ala.Crim.App. 1995)

Ex parte Lasley, 505 So.2d 1263 (Ala. 1987)

Leach v. State, 31 Ala.App. 390, 18 So.2d
285, cert. denied, 245 Ala. 539, 18 So.2d
289 (1944)

Ex parte Ledbetter, 404 So.2d 731 (Ala.
1981)

Ex parte O'Leary, 438 So.2d 1372 (Ala. 1983)

Ex parte O'Leary, 417 So.2d 232 (Ala. 1982)

State v. Freeman, 605 So.2d 1258
(Ala.Crim.App. 1992)

Ex parte Stewart, 659 So.2d 122 (Ala. 1993)


WHETHER A JUROR'S FAILURE TO DISCLOSE THAT HE KNEW THE
DECEASED DEPRIVED APPELLANT REEVES OF HIS RIGHT TO AN
IMPARTIAL JURY.

Knight v. State, 675 So.2d 487
(Ala.Crim.App. 1995)

Ex parte Lasley, 505 So.2d 1263 (Ala. 1987)

Leach v. State, 31 Ala.App. 390, 18 So.2d
285, cert. denied, 245 Ala. 539, 18 So.2d
289 (1944)

Ex parte Ledbetter, 404 So.2d 731 (Ala.
1981)

Ex parte O'Leary, 438 So.2d 1372 (Ala. 1983)

Ex parte O'Leary, 417 So.2d 232 (Ala. 1982)

State v. Freeman, 605 So.2d 1258 (Ala.Crim.App. 1992)

Ex parte Stewart, 659 So.2d 122 (Ala. 1993)


WHETHER THE PROSECUTION'S MISCONDUCT IN THE GUILT PHASE CLOSING ARGUMENT DEPRIVED APPELLANT REEVES OF RIGHT GUARANTEED HIM BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Berger v. United States, 295 U.S. 78 (1935)

Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985)

Lockett v. Ohio, 438 U.S. 586 (1978)

Oregon v. Kennedy, 456 U.S. 667 (1982)

People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982)

People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980)

Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978)

State v. Lindsey, 404 So.2d 466 (La. 1981)

United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974)

United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973)

United States v. McDonald, 620 F.2d 559 (5th Cir. 1980)

United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977)

Balske, _Prosecutorial Misconduct During Closing Argument: The Art of Knowing When and How to Object and Avoiding the "Invited Response" Doctrine_, 37 Mercer L.Rev. 1033 (1986)

Celebreeze, _Prosecutorial Misconduct: Quelling the Tide of Imrpoer Comment to the Jury_, 35 Cleveland State L. Rev. 237 (1987)

DeFoor, _Prosecutorial Misconduct in Closing Argument_, 7 Nova L.J. 443, 448 (1983)

Comment, _Prosecutorial Misconduct: The Limitations Upon the Prosecutor's Role as an Advocate_, 14 Suffolk U. L. Rev. 1095 (1980)

WHETHER THE PROSECUTION'S MISCONDUCT DURING THE PENALTY PHASE OF THE PROCEEDING DEPRIVED APPELLANT REEVES OF A FUNDAMENTALLY FAIR HEARING AND DUE PROCESS.

_Brooks v. Francis_, 716 F.2d 780 (11th Cir. 1983)

_Brooks v. Kemp_, 762 F.2d 1383 (11th Cir. 1985)

_Caldwell v. Mississippi_, 472 U.S. 320 (1985)

_California v. Ramos_, 463 U.S. 992 (1983)

_Eddings v. Oklahoma_, 455 U.S. 104 (1982)

_Gardner v. Florida_, 430 U.S. 349 (1977)

_Hance v. Zant_, 696 F.2d 940 (11th Cir. 1983)

_Lockett v. Ohio_, 438 U.S. 586 (1978)

_Oregon v. Kennedy_, 456 U.S. 667 (1982)

_People v. Fabert_, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982)

Zant v. Stephens, 462 U.S. 862 (1983)

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON REASONABLE DOUBT.

Cage v. Louisiana, 111 S.Ct. 328 (1990)

## STATEMENT OF FACTS

Appellant Reeves was charged in Dallas with a robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark. This Defendant shot him through the neck and into his chest area killing him practically instantly. Three of them are arrested in a house when they went to a party that afternoon."

(R. 113-114). Jurors were also asked if they knew Appellant Reeves or any member of his family. (R. 93-

14

94).  Juror Trotter did not disclose that she knew or knew of Appellant Reeves or his brother Julius.  Juror Denmark did not disclose that he knew Mr. Johnson.

In the jury selection process jurors were questioned about their views on capital punishment. The questioning of Juror Parnell was, in part, as follows:

> THE COURT: ... Ms. Parnell, you understand this is a capital murder case?
>
> MS. PARNELL: Yes.
>
> THE COURT: Do you understand that if there is a conviction or if the Defendant is found guilty, that there are two possible punishments for this offense?
>
> MS. PARNELL: Yes.
>
> THE COURT: One is the death penalty, and the other is life imprisonment without parole.
>
> MS. PARNELL: Yes.
>
> THE COURT: In order for you to qualify to serve as a juror in this case, you must be able to give both the death penalty and life without parole fair consideration and make a recommendation to the Court at the appropriate time; do you understand that?
>
> MS. PARNELL: Yes.
>
> THE COURT: Ms. Parnell, there are people in our society who are totally opposed to the death penalty under any circumstance. They cannot vote to recommend it for any criminal offense. There are people in our society who believe that the death penalty is the only appropriate punishment for certain criminal

15

violations. They cannot consider anything less than the death penalty such as life without parole. And the questions I have for you are designed to determine what you think about all of this. Okay. The first question is easy. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair your ability to serve as a juror in this case? Do you understand that questions? Are you against the death penalty so much that you can't discharge your duties as a juror?

MS. PARNELL: I really – you know, I feel like if he took his life for nothing, you know, that what I feel, he should get the death sentence, you know.

THE COURT: Well, do you know anything about the facts of this case other than what was said to you yesterday?

MS. PARNELL: No, I don't nothing about it. I don't; no, I ain't heard nothing.

THE COURT: Let's back up then because my question to you is this. First are you opposed to the death penalty? Do you understand what I am saying? Are you against it? Are you for it?

MS. PARNELL: I would say for it, you know, because he took a life, you know.

THE COURT: The next question is this. You remember I told you that in order to be qualified as a juror you've got to be able to give fair and equal consideration to both the death penalty and the other penalty of life without parole. Are you opposed to anything less then death? Are you opposed to considering life imprisonment without parole if the facts and the law dictate that that should be the sentence in your judgment?

MS. PARNELL: If that's – if they go with that sentence, I will go along with it, you know, in that sense.

THE COURT: So what you're telling me is that you can give both of those alternatives fair consideration? You can be fair and equally weigh the death penalty and life without parole?

MS. PARNELL: Yeah, both of them, yeah.

THE COURT: Can you give both of them fair consideration, is that what you're telling me?

MS. PARNELL: Well, I really don't understand. You know, like I say I've never been on a jury before. See what I'm saying, I wasn't there, you know. I don't know what happened, you know and stuff. But, you know, I don't know what to tell you. I really don't.

THE COURT: The first thing you can tell me is whether you are opposed or in favor of the death penalty. You told me you were in favor of it?

MS. PARNELL: Yes.

THE COURT: The second thing I need to ask you is whether or not you can vote for something other than the death penalty. Can you vote for life without parole if it's appropriate, if it's right, if its proper?

MS. PARNELL: Yeah.

THE COURT: You can consider both of them depending upon the facts?

MS. PARNELL: Yes, either one.

THE COURT: You can listen to the law and the facts and apply the law to the facts; can you do that, follow my instructions?

17

MS. PARNELL: I can follow your instructions.

THE COURT: Okay. You have listened to that facts; you have listened to the law. Do you feel as though you lean towards one more than the other, the death penalty versus life without parole? Do you see what I'm saying?

MS. PARNELL: I have not heard no more than what was told to me.

THE COURT: I'm trying to find out how you feel about the death penalty in your heart. Do you think you can give –

MS PARNELL: I wouldn't like nobody to take nothing – I've got a life of my own, you know, but I can go with, you know, that parole in prison, you know, for the rest of his life, you know, whatever, you know either one, you know. It would depend on – if somebody else told me it's true – if it's true that he did it, you know, I would say the death penalty, you know. That's what I feel.

THE COURT: So you could keep –

MS. PARNELL: If it's something else, I'd say give him life without parole.

THE COURT: So you can keep an open mind; is that right?

MS. PARNELL: Yeah.

THE COURT: And you can hear the facts and follow my instructions?

MS. PARNELL: (Nods head affirmatively).

THE COURT: And then you can give both of those alternative punishments fair consideration; it that correct? Do you understand what I'm saying? You can think

18

about both of the penalties equally; is that
right?

MS. PARNELL: Right.

THE COURT: And you can recommend to me one
of them?

MS. PARNELL: Yes.

THE COURT: You don't have any problem with
that?

MS. PARNELL: No.

THE COURT: If you think it should be death,
then you don't have a problem voting death,
is that right?

MS. PARNELL: No.

THE COURT: If it's life without parole, you
think that's a right thing to do, you don't
have a problem voting life without parole.

MS. PARNELL: No.

. . .

MR. GOGGANS: You're going to hear – a jury
in this type of proceeding hears evidence.
It hears evidence of reasons the prosecution
thinks the person should get the death
penalty; then you hear other reasons why the
person ought to get life without parole. The
judge will instruct you on how to weigh
those. You have aggravating circumstances
that weight in favor of the death penalty,
and you have mitigating circumstances that
weigh in favor of the sentence of life
without parole. Would you, Ms. Parnell, as
you're sitting there after having heard
everything – you've heard all these
instructions because you have found that
this person intentionally killed somebody
during the robbery; in other words, you
found him guilty of capital murder. Would

19

you be able to put aside that personal feeling that you have and that conviction and consider everything and apply that law, or would you still carry that conviction with you and automatically go for the death penalty?

MS. PARNELL: I would go for the death penalty. You shouldn't take a life. My point is my son was shot in the head. He died, you know, but he came back alive; do you see what I'm saying? They didn't do nothing to the guy that did it, shot my son, you know. But I feel like, you know, if you take a life, you know, you should give you life. You can't take nobody's life and give a life. You cannot give the life back. He's dead, you know. You shouldn't do it. You had no reason to. Do you see what I am saying?

MR. GOGGANS: You feel pretty strongly about that?

MS. PARNELL: Yeah.

MR. GOGGANS: No other questions.

MS. WILSON: If the Judge told you though it was your duty to listen to all of the evidence and to weight the two sentences, to consider life without parole as well as the death penalty and to reserve, not to make a decision until you heard all of the evidence – and there will be a lot of evidence put forth by the defense and by the State. Could you wait until you heard all of that evidence before you make up your mind as to what you thought the appropriate sentence would be?

MS. PARNELL: Yes, because I have never heard the case.

20

(R. 421-430).   A defense motion to excuse Juror Parnell for cause based upon her death penalty views was denied.   (R. 430).

The State of Alabama's theory of prosecution at trial was essentially that Appellant Reeves, his brother Julius Reeves, and Brenda "Bam-Bam" Suttles had intentionally killed Willie Johnson by shooting him with a shotgun and robbed him.

Appellant Reeves filed motions to suppress evidence prior to trial.   (C. 113-116, 126-127). Evidence at a suppression hearing indicated the following:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found.   (R. 542).   Grindle said that the dog tracked to the backyard of a house near Appellant Reeves' house and to Appellant Reeves' house.   (R. 542-543).   Grindle testified that he went to Reeves house.   (R. (R. 544).   Reeves' mother, Marzetta Reeves, answered the door.   (R. 544). Matthew Reeves and Julius Reeves were not there.   (R. 549, 570).   According to Grindle, Marzetta Reeves gave

him permission to come and search the house.[1]   (R. 545-546).   Grindle and other police officers went in and searched throughout the house.   They seized a number of items from Matthew and Julius Reeves' bedroom.   (R. 548-549).   Among those items were blood stained articles of clothing and a shotgun.   (R. 548-549). The prosecution did not elicit evidence that Ms. Reeves had authority to consent to the search of Appellant Reeves' room.

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles' house. (R. 553-554).   Brenda "Bam-Bam" Suttles' sister answered the door.   (R. 555).   When the door was opened, the officers saw Appellant Reeves asleep on a sofa.   (R. 554).   They entered immediately and arrested Reeves. (R. 555).

Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions:   (R. 552-567).   On the second occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom.   (R. 552, 607).

---

[1] Marzetta Reeves' recollection as to the "consent" differed markedly from Grindle's.   (R. 568-596).

The Circuit Court of Dallas County overruled motions to suppress evidence.  (R. 612-613).

Brenda "Bam-Bam" Suttles, pursuant to a plea bargain agreement with the prosecution, (R. 722-725), testified against Appellant Reeves at trial.  She went into great detail as to the events leading up, surrounding, and after Johnson's death.  (R. 682-749). Among the details she recited were the following:

Johnson had towed them and others – Jason Powell and Emmanuel Suttles – Powell's broken down car from White Hall back to Selma.  (R. 692-694).  She said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley.[2]  (R. 700-702).  She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab.  (R. 693-694).  She said that she was

_____

[2] With respect to the alley, she said: "He had seen this red car across the street, and he was like I don't feel like being bothered.  He said, I am going to this house up in the alley.  So, I'm going to drop y'all off in the alley."  (R. 702).

sitting with her head down and heard a pow and that
when she looked up, Matthew Reeves was pulling the
shotgun back out of the rear window of the truck.  (R.
704).  She said that Julius Reeves jumped out of the
truck and said:  "Troll [Matthew Reeves], what you
done did?"  (R. 704).  She recalled that she had told
the police that afterwards, Julius Reeves had jumped
out of the truck, pulled Johnson out of the truck, and
gone through his pockets and got everything out.  (R.
743).  Brenda Suttles recalled telling the police that
Matthew Reeves had killed Johnson for nothing.  (R.
743).  She recalled that during that night Matthew
Reeves had said that by killing Johnson he would get a
gang tear drop — something given for killing someone.
(R. 720).

Jason Powell also testified against Appellant
Reeves.  The trial court did not allow the defense to
question Powell about his being in jail and having
criminal charges hanging over him at the time of his
testimony.  (R. 792-794, 804-806).  Powell did say
during his testimony that Julius Reeves had said to
Matthew Reeves that he had almost shot him.  (R. 843).

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

> "She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle.
>
> "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case."

(R. 803). Ms. Trotter was then excused from the jury. (R. 803).

Juror Denmark was on the trial jury as an alternate. Juror Denmark disclosed the following in the midst of the trial:

> "I told him [the judge] that I knew him from another guy. I seen him with the family. I was thinking that I knew the truck and knew the guy. But I never could picture who it really was until I saw him and his name is Willie too. He worked for Roy out there. I've got a key to Roy's shop. I go up there sometimes and work on my truck and whatever. Willie helped him, and he and he and Roy were friends. And he'd come up there a lot

25

> when I was working on my truck before, how I
> kept things in tune.  That's just the only
> way I knew him was from Roy's shop.  I
> didn't even know this had happened to him."

(R. 993).  Juror Denmark went on to say that he began

thinking about the truck as follows:

> "Last night when they were talking about
> Tyler because I live out there.  I couldn't
> figure out who it was until I saw that other
> Willie today.  I asked, what are you doing
> here?  He said, I'm in there with thefamily.
> So I knew it was the same one.  He had
> always hung around with him and was on good
> terms with Roy.  He lives out there now."

(R. 993-994).  Juror Denmark was an alternate juror

and was excused before jury deliberations. (R. 1104).

During its closing argument, one of the

prosecutors put to the jury: "The Defense is designed

and charged with defending this man any way he can."

(R. 1079-1080).  The trial court overruled a defense

objection to that argument.  (R. 1080).

The trial court refused to give the following

written requested defense jury instructions:

Number 33: "An accused is not guilty of capital

robbery-murder where the intent to rob was formed only

after the deceased was killed."  (C. 213, R. 1042-

1045, 1047-1048).

Number 34: "A robbery committed as a mere

**afterthought** and unrelated to a murder will not

sustain a conviction of capital robbery-murder."   (C.

214, 1042-1045, 1047-1048).

Number 35: "An accused is not guilty of a capital

robbery-murder where the intent to steal was formed

only after the deceased was killed."   (C. 215, R.

1042-1045, 1047-1048).

Number 31:

"Before a defendant can be held criminally
responsible for the conduct of others it is
necessary that such defendant have willfully
associated himself in some way with the
crime and have willfully participated in it.
Mere presence at the scene of a crime and
even knowledge that a crime is being
committed are not sufficient to establish
that a defendant either directed or aided
and abetted in the crime.   You must find
beyond a reasonable doubt that a defendant
was a willful participant and not merely a
knowing spectator."

(C. 211, R. 1037-1038).

The trial court's instruction on reasonable doubt

in the guilt phase was as follows:

"The reasonable doubt which entitles an
accused to an acquittal, is not a mere,
fanciful, vague, conjectural or speculative
doubt but a reasonably substantial doubt
arising from all or part of the evidence or
from a lack of the evidence and remaining
after a careful consideration of the
testimony, such as reasonable, fair minded
and conscientious men and women would
entertain under all the circumstances.   Now
you will observe that the State is not
required to convince you of the Defendant's
guilt beyond all doubt but simply beyond all

27

> reasonable doubt.  If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092).

Reeves was found guilty as charged.  (C. 219, R. 1105).

At the penalty phase, the prosecution relied upon its evidence in the guilt phase and submitted robbery as an aggravating circumstance.  (R. 1116-1117). Appellant Reeves elicited evidence that he was only eighteen years old at the time of the offense, that he grew up in a poor home environment, that he lacked appropriate developmental resources growing up, that his level of intelligence was only borderline, and that when placed in structured environments, he responded positively. (C. 268-519, Defendant's Exhibits 6, 7, 8, 11, 13, 14, R. 1118-1182).

In closing argument in the penalty phase, one of the prosecutor's argued to the jury:

> "Now you are called upon to make a tough decision.  You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or Life in prison without the possibility of parole.  Who decided Willie

Johnson's fate?  Did he have the opportunity
to have a five or six day proceeding?"  (R.
1191).  The trial court overruled a defense
objection and request for curative
instruction.

(R. 1191-1192).

The trial court did not charge the jury on any
measure or standard by which aggravating circumstances
must outweigh mitigating circumstances in order to
warrant recommendation or imposition of a death
penalty.

The jury recommended 10-2 that Appellant Reeves
be put to death.  (C. 220, R. 1227).  The trial court
followed the jury's recommendation and sentenced
Appellant Reeves to death.  (C. 233-239, R. 1232).

## ARGUMENT

ITEMS SEIZED FROM APPELLANT REEVES' ROOM WITHOUT A
WARRANT WERE FRUITS OF A CONSTITUTIONALLY INFIRM
SEARCH.

Subject to only a few exceptions, the Fourth and
Fourteenth Amendments to the United States
Constitution dictate that a search without a warrant
issued upon probable cause is unreasonable.  Katz v.
United States, 389 U.S. 347, 357 (1967); Brannon v.
State, 549 So.2d 532, 536 (Ala.Crim.App. 1989); Murray
v. State, 396 So.2d 125, 128 (Ala.Crim.App.

1981)(hereinafter "Murray").   A warrantless search may be justified upon a showing of valid consent. However, to justify a warrantless search on the basis of consent, the prosecution has the burden of establishing by clear and convincing evidence that the consent was given freely and voluntarily. Scheneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Murray, 396 So.2d at 129; Herriot v. State, 337 So.2d 165 (Ala.Crim.App. 1976).   Courts have upheld consent by third parties where the third party is found to have joint access or control over the place searched. See, United States v. Matlock, 415 U.S. 164, 171-172 (1974).   However, the prosecution bears the burden of establishing that common authority exists.   See, Illinois v. Rodriquez, 497 U.S. 177, 181 (1990).

In the suppression hearing in this case, the prosecution did not elicit even conflicting evidence that Marzetta. Reeves had authority to consent to the search of Appellant Reeves' room.   For that reason, evidence seized therefrom and all fruits thereof should not have been admitted into evidence.

APPELLANT REEVES' ARREST WAS WITHOUT PROBABLE CAUSE
THUS POISONING THE POLICE OFFICERS' SUBSEQUENT
RETRIEVAL OF INCRIMINATING EVIDENCE.

An arrest is valid only if made upon probable
cause.  Henry v. United States, 361 U.S. 98 (1959);
Draper v. United States, 358 U.S. 307 (1979).
Evidence obtained after an illegal arrest must be
excluded as a fruit of the poisonous tree unless
intervening events break the causal connection so that
the taint is purged.  Taylor v. Alabama, 457 U.S. 687
(1982).  Appellant Reeves asserts that his leading
police officers to a shotgun shell was the fruit of a
warrantless arrest lacking probable cause.

"An officer has probable cause to make an arrest
when, at the time the arrest is made, the facts and
circumstances within his knowledge, and of which he
has reasonably trustworthy information, are sufficient
to lead a prudent person to believe that the suspect
is committing or has committed an offense."  Gord v.
State, 475 So.2d 900, 902-903 (Ala.Crim.App. 1985).
"Mere suspicion in a police officer's mind that an
offense has been committed is not enough to justify a
warrantless arrest."  Brannon v. State, 549 so.2d 532
(Ala. 1989).  An arrest not supported by probable
cause is violative of the Fourth and Fourteenth

31

Amendments to the United States Constitution.  Caffie

v. State, 516 So.2d 822, 828-829 (Ala.Crim.App. 1986),

citing, Dunaway v. New York, 442 U.S. 200 (1979).

The suppression hearing evidence was as follows:

Selma Police officer Pat Grindle related that a

dog had tracked blood from an alley where Willie

Johnson's body was found.  (R. 542).  Grindle said

that the dog tracked to the backyard of a house near

Reeves' house and to Reeves' house.  (R. 542-543).

Grindle testified that he went to Reeves house.  (R.

(R. 544).  Reeves' mother, Marzetta Reeves, answered

the door.  (R. 544).  Matthew Reeves and Julius Reeves

were not there.  (R. 549, 570).  According to Grindle,

Marzetta Reeves gave him permission to come and search

the house.  (R. 545-546).  Grindle and other police

officers went in and searched throughout the house.

They seized a number of items from Matthew and Julius

Reeves' bedroom.  (R. 548-549).  Among those items

were blood stained articles of clothing and a shotgun.

(R. 548-549).

From Reeves residence, Grindle and the other

officers went to Brenda "Bam-Bam" Suttles's house.  (R.

553-554).  Brenda "Bam-Bam" Suttles' sister answered

the door.  (R. 555).  When the door was opened, the

32

officers saw Matthew Reeves asleep on a sofa.  (R. 554).  At that point, they did not have probable cause but only suspicion.  Nevertheless, they entered immediately and arrested Appellant Reeves. (R. 555). Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions.  (R. 552-567). On the second occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom.  (R. 552, 607).  This evidence was the fruit of Appellant Reeves' illegal arrest and, thus, should have been suppressed.


THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE "THEFT AFTERTHOUGHT."

    The defendant in a criminal case has a due process right to have his jury instructed upon any material hypothesis which the evidence in his favor tends to establish.  Ex parte McGee, 383 So.2d 205 (Ala. 1980).  In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider a defense, the court must construe the evidence most favorable to the defendant.  Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978), citing, United States v. Lewis,

33

592 F.2d 1282, 1286 (5th Cir. 1979).  Proper written
instructions which are supported by any evidence,
however weak, insufficient, or doubtful in credibility
must be given.  Chavers v. State, 361 So.2d 1106, 1107
(Ala. 1978); Coon v. State, 494 So.2d 184, 186
(Ala.Crim.App. 1978).

Here, Appellant Reeves' position at trial was
that the theft was a mere afterthought.  Under Alabama
law, a theft committed as a "mere afterthought" will
not sustain a capital murder conviction.  A felony is
considered an "afterthought" when there is no intent
to commit the felony before or at the time of a
murder.  Therefore, an accused cannot be convicted of
capital murder where "he forms felonious intent only
after he commits the killing." Connolly v. State, 500
So.2d 57, 62 (Ala.Crim.App. 1985)(quoting,
Commonwealth v. Spallone, 267 Pa.Super. 486, 489, 406
A.2d 1146, 1147 (1979)). See also, Padgett v. State,
668 So.2d 78, 83-85 (Ala.Crim.App. 1995)(where there
was evidence in a capital case that the intent to
commit the accompanying felony, rape, was formed after
the victim was killed, the defendant was entitled to a
jury instruction on abuse of a corpse). Here, there
was some evidentiary support for Appellant Reeves'

defense that the evidence as to the "robbery" indicates only a "robbery" as an "afterthought."  For example, there was evidence Johnson had towed Appellant Reeves, Julius Reeves, Brenda "Bam-Bam" Suttles, Jason Powell and Emmanuel Suttles and Powell's broken down car from White Hall back to Selma.  (R. 692-694).  Brenda Suttles said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley. (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab.  (R. 693-694). She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck.  (R. 704).  She said that Julius Reeves jumped out of the truck and said:  "Troll [Matthew Reeves], what you done did?"  (R. 704).  She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets

and got everything out.  (R. 743).  Brenda Suttles
recalled telling the police that Matthew Reeves had
killed Johnson for nothing.  (R. 743).  She recalled
that during that night Matthew Reeves had said that by
killing Johnson he would get a gang tear drop –
something given for killing someone.  (R. 720).

Jason Powell testified that Julius Reeves had
said to Matthew Reeves that he had almost shot him.
(R. 843).

Thus, Appellant Reeves was entitled to have the
jury so instructed as requested in his charges
numbered 33, 34, 35.


THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY
ON COMPLICITY.

The defendant in a criminal case has a due
process right to have his jury instructed upon any
material hypothesis which the evidence in his favor
tends to establish.  Ex parte McGee, 383 So.2d 205
(Ala. 1980).  In order to determine whether the
evidence is sufficient to necessitate an instruction
and allow the jury to consider a defense, the court
must construe the evidence most favorable to the
defendant.  Coon v. State, 494 So.2d 184, 186

(Ala.Crim.App. 1978), citing, United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979). Proper written instructions must be given which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978); Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

In this case, Appellant Reeves was charged with capital murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). Under that Code section, the jury had to be satisfied that the prosecution has proven beyond a reasonable doubt (1) a "robbery" in the first degree or an attempt thereof as defined by § 13A-8-41; (2) an intentional "murder" as defined by § 13A-6-2(a)(1); and (3) that the murder was committed "during" the robbery in the first degree i.e., that the murder was committed in the cause of or in connection with the commission of or in the immediate flight from the commission of the robbery in the first degree. According to the State's theory of prosecution, Appellant Reeves, Julius Reeves, and Brenda "Bam-Bam" Suttles committed the crime. The evidence could have supported a defense argument that though Appellant Reeves had killed Johnson he did not rob him along

with Julius Reeves and Brenda "Bam-Bam" Suttles. For example, there was evidence Johnson had towed Appellant Reeves, Julius Reeves, Brenda "Bam-Bam" Suttles, Jason Powell and Emmanuel Suttles and Powell's broken down car from White Hall back to Selma. (R. 692-694). Brenda Suttles said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley. (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab. (R. 693-694). She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck. (R. 704). She said that Julius Reeves jumped out of the truck and said: "Troll [Matthew Reeves], what you done did?" (R. 704). She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets and got everything out. (R. 743). Brenda Suttles

recalled telling the police that Matthew Reeves had killed Johnson for nothing.  (R. 743).  She recalled that during that night Matthew Reeves had said that by killing Johnson he would get a gang tear drop — something given for killing someone.  (R. 720).

Jason Powell testified that Julius Reeves had said to Matthew Reeves that he had almost shot him. (R. 843).

Thus, Appellant Reeves was entitled to a have the jury instructed on complicity as requested in charge 31.


THE ACTIONS OF THE TRIAL JUDGE IN PROHIBITING THE DEFENSE FROM DISCREDITING A PROSECUTION WITNESS BY QUESTIONING HIM ABOUT BEING IN JAIL AND HAVING PENDING CRIMINAL CHARGES DEPRIVED APPELLANT REEVES OF HIS RIGHT OF CONFRONTATION AND CROSS EXAMINATION.

Jason Powell testified against Appellant Reeves. The trial court did not allow the defense to question Powell about his being in jail and having criminal charges hanging over him at the time of his testimony. (R. 792-794, 804-806).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront witnesses against him. Davis v. Alaska, 415 U.S. 308 (1974); Pointer v. Texas, 380 U.S. 400

(1965). <u>Accord</u>, Article I, § 6, Alabama Constitution of 1901.  A primary interest protected by the right of confrontation is that of cross examination. <u>Davis v. Alaska</u>, 514 U.S. 308 (1974); <u>Douglas v. Alabama</u>, 380 U.S. 415 (1965).  A.R.E. 611(b) provides: "The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness...."  A.R.E. 616 provides: "A party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case."

"A trial court's authority to control interrogation of witnesses is limited by the confrontation clause of the Sixth Amendment and the right of confrontation."  <u>Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1985-1986</u>, 75 Geo.L.J. 713, 1081 n. 2509 (1987). <u>See</u>, <u>Bell v. State</u>, 385 So.2d 78 (Ala.Crim.App. 1980).  "When cross-examining a witness, the defendant must be permitted to test both the witness's credibility and the witness's knowledge of the facts bearing on the defendant's guilt or innocence." <u>Twenty-Seventh Annual Review of Criminal</u>

40

Prodedure, 86 Geo.L.J. 1153, 1714-1715 (1998); Olden v. Kentucky, 488 U.S. 227 (1988)(per curiam); Davis v. Alaska, 415 U.S. 308 (1974); United States v. Mullinelli-Navis, 111 F.3d 983, 982 (1st Cir. 1997); United States v. Stewart, 93 F.3d 189, 193 (5th Cir. 1996); United States v. Pritchett, 699 F.2d 317, 321 (6th Cir. 1983); United States v. Vargas, 933 F.2d 701, 706 (9th Cir. 1991).  Recognizing these principles, Ala. Code § 12-21-137 provides: "The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him." In this case, the actions of the trial court in stopping the defense from discrediting this witness by asking about his being in jail and having pending criminal charges deprived Appellant Reeves of his right to confrontation and cross-examination.

THE LACK OF A STANDARD OR MEASURE FOR DETERMINING WHETHER AGGRAVATING CIRCUMSTANCES SO OUTWEIGH MITIGATING CIRCUMSTANCES AS TO SUPPORT A DEATH SENTENCE VIOLATED APPELLANT REEVES'S RIGHTS TO PROTECTION FROM CRUEL AND UNUSUAL PUNISHMENT, DUE PROCESS OF LAW AND EQUAL PROTECTION OF THE LAW.

The hallmark of modern death penalty jurisprudence is "guided discretion" afforded to the sentencer.  Gregg v. Georgia, 428 U.S. 153 (1976).  To pass constitutional muster, a capital sentencing

41

scheme must provide: 1) "clear and objective standards" 2) "specific and detailed guidance," and 3) "an opportunity of rational review of the 'process for imposing a sentence of death'." Godfrey v. Georgia, 446 U.S. 420, 428 (1980).  In addition, appropriate appellate review is integral to the constitutionality of any death penalty system. Gregg v. Georgia, 482 U.S. 153 (1976).

Alabama's capital scheme does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty.  In this case, the trial court did not charge the jury on any measure or standard. The absence of a standard and the trial court's failure to so charge the jury in this case conflicts with the aforementioned requirements of constitutional capital jurisprudence.

Without a measure or standard, jury verdicts and sentencing decisions are certainly based on disparate bases in violation of the right to equal protection of the law under the Fourteenth Amendment to the United States Constitution and Article 1, §§ 1, 6, and 22 of the Alabama Constitution of 1901.

42

Without a standard in Alabama and in this case, constitutionally required guidance is wholly absent. The result is an arbitrary imposition of the death penalty.  This is violative of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 6, and 22 of the Alabama Constitution of 1901.

THE TRIAL COURT ERRED IN NOT EXCUSING FOR CAUSE AN "AUTOMATIC DEATH PENALTY" JUROR.

In Morgan v. Illinois, 504 U.S. 719 (1992), the Supreme Court of the United States held that in capital cases jury venire members who would automatically vote for the death penalty must be excluded for cause.  Accord, Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert denied, 502 U.S. 886 (1991); Martin v. State, 548 So.2d 488 (Ala. Crim.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, ____ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Bracewell v. State, 506 So.2d 354 (Ala.Crim.App. 1988).

Here, Appellant Reeves was charged in the Circuit Court of Dallas County with capital murder.  (C. 5-6). Juror Parnell's voir dire responses indicated that

once she found someone guilty of intentionally killing someone she would consider only the death penalty. (R. 421-430). Nevertheless, the trial court overruled a defense motion to excuse her for cause.   (R. 430). That action impermissibly infringed upon Appellant Reeves' due process right to a fair and impartial jury under the Fourteenth Amendment to the United States Constitution.


A JUROR'S FAILURE TO DISCLOSE THAT APPELLANT'S BROTHER WAS SUSPECTED OF STEALING HER CAR DEPRIVED APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY.

In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark. This Defendant shot him through the neck and into his chest area killing him practically instantly.  Three of them are arrested in a house when they went to a party that afternoon."

44

(R. 113-114).   Jurors were also asked if they knew Appellant Reeves or any member of his family.   (R. 93-94).   Juror Trotter did not disclose that she knew or knew of Appellant Reeves or his brother Julius.

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

> "She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves.  She does not recall whether Matthew was involved.  She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle.

> "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case."

(R. 803).

It is a "basic constitutional premise that every person is entitled to an impartial jury.  As stated in the Sixth Amendment to the United States Constitution: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an

impartial jury in the state and district wherein the crime shall have been committed.'"  Knight v. State, 672 So.2d 487 (Ala.Crim.App. 1995).  "It is fundamental to our system of impartial justice that '"[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."'"  State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992)(hereinafter "Freeman"), quoting, Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala. 1983), quoting in turn, Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982)(hereinafter "O'Leary"). "Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'"  Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944).  If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions. Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993);

O'Leary, 417 So.2d at 240; Freeman, 605 So.2d 1259.

This test casts a "light burden" on the defendant.

Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987).

Here, Juror Trotter failed to disclose that Appellant Reeves' brother was suspected of stealing her car.  Under the circumstances, Appellant Reeves was prejudiced.  The matter inquired about was quite clear.  The jurors were asked if they knew any members of Appellant Reeves family.  (R. 93-94).  Juror Trotter did not say she did.  (R. 93-94).  As to Juror Trotter, the matter of inquiry was not remote in time. As to Juror Trotter, the matter was very material. According to the State's theory of prosecution both Matthew Reeves were involved in the capital murder of Willie Johnson.  Juror Trotter obviously harbored ill feelings about the matter.

This record clearly shows possible prejudice to Appellant Reeves in the jury selection process.  Juror Trotter's failure to disclose that Appellant Reeves' brother was suspected of stealing her car deprived Appellant Reeves of his right to an impartial jury.


A JUROR'S FAILURE TO DISCLOSE THAT HE KNEW THE DECEASED DEPRIVED APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY.

47

In voir dire of prospective jurors, the essential

allegations were summarized by one of the prosecutors

as follows:

> "We expect the evidence to show that
> Mr. Johnson was killed on the day before
> Thanksgiving this past year as he towed a
> group of young people in from an automobile
> breakdown out in Tyler, that this Defendant,
> his brother Julius and Ms. Suttles deemed to
> rob him of the ring that they were going to
> pay him with and his paycheck that he had
> gotten that day after he towed them and
> delivered their car to Selma to be repaired
> when he parked in an alley way here near the
> Compress early in the evening after dark.
> This Defendant shot him through the neck and
> into his chest area killing him practically
> instantly.  Three of them are arrested in a
> house when they went to a party that
> afternoon."

(R. 113-114).

Juror Denmark did not disclose that he knew

the deceased.   In the middle of trial, the

defense learned that he did.

It is a "basic constitutional premise that every

person is entitled to an impartial jury.  As stated in

the Sixth Amendment to the United States Constitution:

'In all criminal prosecutions, the accused shall enjoy

the right to a speedy and public trial, by an

impartial jury in the state and district wherein the

crime shall have been committed.'"  Knight v. State,

48

675 So.2d 487 (Ala.Crim.App. 1995).  "It is fundamental to our system of impartial justice that '"[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."'"  State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992)(hereinafter "Freeman"), quoting, O'Leary, 438 So.2d at 1373, quoting in turn, Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982).  "Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'"  Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944). If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions.  Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993); Ex parte O'Leary, 417 So.2d at 240; Freeman 605 So.2d 1259.  This test casts a "light burden" on the

defendant.  Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987).

Juror Denmark's failure to disclose that he knew the deceased deprived Appellant Reeves of his right to an impartial jury.

THE PROSECUTION'S MISCONDUCT IN THE GUILT PHASE CLOSING ARGUMENT DEPRIVED APPELLANT REEVES OF RIGHTS GUARANTEED HIM BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

"The public prosecutor occupies a difficult role in our criminal justice system." Celebreeze, Prosecutorial Misconduct: Quelling the Tide of Imrpoer Comment to the Jury, 35 Cleveland State L. Rev. 237 (1987).  To be sure the prosecutor must zealously advocate the position of the State.  But, because the prosecutor is advocating the position of the State -- "a theoretically impartial sovereign," Comment, Prosecutorial Misconduct: The Limitations Upon the Prosecutor's Role as an Advocate, 14 Suffolk U. L. Rev. 1095 (1980) – the prosecutor must exercise the great powers and sanctions of the prosecutorial position with discretion and fairness.  "In short his obligation is to see that 'justice is done.'" DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova

50

L.J. 443, 448 (1983)(emphasis added).  Thus, as an advocate, the prosecutor:

> "may prosecute with earnestness and vigor —
> indeed, he should do so.  But, while he may
> strike hard blows, he is not at liberty to
> strike foul ones.  It is as much his duty to
> refrain from improper methods calculated to
> produce a wrongful conviction as it is to
> use every legitimate means to bring about a
> just one."

Berger v. United States, 295 U.S. 78, 88 (1935).  When a prosecutor's conduct deprives a defendant of a fair trial, the defendant's right to due process is violated.  See, Berger v. United States, 295 U.S. 78 (1935).

"[B]ecause jurors are impressed with the cloak of state authority in which judges and prosecutors are wrapped, the impact of [an improper] comment is likely to be devastating."  Balske, Prosecutorial Misconduct During Closing Argument: The Art of Knowing When and How to Object and Avoiding the "Invited Response" Doctrine, 37 Mercer L.Rev. 1033, 1050-1051 (1986).  The Supreme Court of the United States has stated:

> "It is fair to say that the average jury, in
> a greater or lesser degree, has confidence
> that these obligations, which so plainly
> rest upon the prosecuting attorney, will be
> faithfully observed.  Consequently, improper
> suggestions, insinuations, and especially,
> assertions of personal knowledge are apt to

51

carry much weight against the accused when
they should properly carry none."

Berger v. United States, 295 U.S. 78 (1935).

A general category of argument prohibited by
courts is that of improperly spotlighting the defense
strategy.  See. e.g., Brooks v. Kemp, 762 F.2d 1383,
1408 (11th Cir. 1985); Oregon v. Kennedy, 456 U.S. 667
(1982); United States v. McDonald, 620 F.2d 559 (5th
Cir. 1980); Semma v. Solem, 573 F.2d 1027 (8th Cir.
1978); United States v. Williams, 556 F.2d 1242
(D.C.Cir. 1977);  United States v. Liddy, 509 F.2d 428
(D.C.Cir. 1974); United States ex rel. Macon v.
Yeager, 476 F.2d 613 (3d Cir. 1973);  People v.
Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982);
People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr.
461 (1980).

In this case, one of the prosecutor's argued to
the jury: "The Defense is designed and charged with
defending this man any way he can."  (R. 1079-1080).
This argument was improper and deprived Appellant
Reeves of a fair trial in violation of the Fourteenth
Amendment to the United States Constitution and
Article I, § 6 of the Alabama Constitution of 1901.

Further, because this was a capital proceeding,
and because the effect of this comment was to inject
an extraneous factors other than "the character and
record of the individual offender and the
circumstances of the particular offense," See, Lockett
v. Ohio, 438 U.S. 586 (1978), a separate Eighth
Amendment violation was committed.  This is, because
there is a risk that this extraneous factor diverted
jurors from their primary responsibility, it is
possible that the death sentence recommended and
imposed was the product of an arbitrary factor.
Lcokett v. Ohio, 438 U.S. 586 (1978); State v.
Lindsey, 404 So.2d 466 (La. 1981).


THE PROSECUTION'S MISCONDUCT DURING THE PENALTY PHASE
OF THE PROCEEDING DEPRIVED APPELLANT REEVES OF A
FUNDAMENTALLY FAIR HEARING AND DUE PROCESS.

Under the Eighth Amendment to the United States
Constitution, the decision whether a defendant is to
live or die must be based upon "consideration of the
character and record of the individual offender and
the circumstances of the particular offense." Lockett
v. Ohio, 438 U.S. 586 (1978).  See also, Caldwell v.
Mississippi, 472 U.S. 320 (1985).  Moreover, the
Fourteenth Amendment to the United States Constitution

53

right to a fundamentally fair trial prohibits the
prosecutor from urging a jury to impose a sentence of
death for improper or irrelevant reasons.   Tucker v.
Francis, 732 F.2d 1054 (11th Cir. 1984), citing,
Brooks v. Francis, 716 F.2d 780 (11th Cir. 1983), and
Hance v. Zant, 696 F.2d 940, 951 (11th Cir. 1983).

Closing arguments in capital cases must receive a
"greater degree of scrutiny" than those in non-capital
cases.  Caldwell v. Mississippi, 472 U.S. 320 (1985),
quoting, California v. Ramos, 463 U.S. 992, 998-999
(1983).  The sentencing process should facilitate the
responsible and reliable exercise of sentencing
discretion.  Caldwell v. Mississippi, 105 S.Ct. at
2469-2640 (plurality opinion), citing, Eddings v.
Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438
U.S. 349 (1977)(plurality opinion); Gardner v.
Florida, 430 U.S. 349 (1977)(plurality opinion);
Woodson v. North Carolina, 428 U.S. 280 (1976).  The
sentencing decision must not be the product of passion
or prejudice.  Gardner v. Florida, 430 U.S. 349, 358
(1977);  In Hance v. Zant, 696 F.2d at 952, the United
States Court of Appeals for the Eleventh Circuit
stated that "a dramatic appeal to gut emotion has no
place in the courtroom, especially in a case involving

the penalty of death.  A sentence imposed after such an appeal cannot be carried out."  In so holding, the Eleventh Circuit made clear that the prosecution's argument in sentencing proceedings will be held to a different standard that argument at guilt proceedings. Tucker v. Zant, 724 F.2d 882, 886 n.2 (11th Cir. 1984).  That is, though a conviction may be upheld in the face of improper argument by the prosecution, a death sentence entered after similar argument may be set aside, because the jury in a capital case must not be influenced by any arbitrary factors.  Brooks v. Francis, 716 F.2d at 788.

The Eleventh Circuit summed up its rule for more closely scrutinized penalty-phase prosecutorial misconduct as follows:

> "The prosecutor's actions at the sentencing phase of this trial are viewed differently [than those at the guilt phase].  At the sentencing phase of the trial, the jury may not be influenced by any arbitrary factors. A prosecutor may not incite the passions of a jury when a peson's life hangs in the balance."

Brooks v. Francis.  Thus, the Constitution will not permit argument on issues extrensic to the crime or the criminal aimed at inflaming the jury's passions, playing on its fears, or otherwise goading it into an

55

emotional state more receptive to a call for imposition of death and 'invit[ing] the jury to decide the life-death verdict in a frenzied and emotional atmosphere.'" <u>Tucker v. Zant</u>, 714 F.2d at 888.

A general category of argument prohibited by courts is that of improperly spotlighting the defendant's exercise of his right to counsel and defense strategy and that it is somehow wrong to provide defendants more procedural safeguards than their victims. <u>See</u>. <u>e.g.</u>, <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1408 (11th Cir. 1985); <u>Oregon v. Kennedy</u>, 456 U.S. 667 (1982); <u>United States v. McDonald</u>, 620 F.2d 559 (5th Cir. 1980); <u>Semma v. Solem</u>, 573 F.2d 1027 (8th Cir. 1978); <u>United States v. Williams</u>, 556 F.2d 1242 (D.C.Cir. 1977);  <u>United States v. Liddy</u>, 509 F.2d 428 (D.C.Cir. 1974); <u>United States ex rel. Macon v. Yeager</u>, 476 F.2d 613 (3d Cir. 1973);  <u>People v. Fabert</u>, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982); <u>People v. Schindler</u>, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980).

In this case, one of the prosecutor's argued to the jury in the penalty phase:

> "Now you are called upon to make a tough
> decision.  You are called upon to decide
> what is the punishment that this man

deserves for doing this to Willie Johnson. Death or Life in prison without the possibility of parole.  Who decided Willie Johnson's fate?  Did he have the opportunity to have a five or six day proceeding?"  (R. 1191).  This argument was improper and deprived Appellant Reeves of a fair trial in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 6 of the Alabama Constitution of 1901.

Further, because this was a capital proceeding, and because the effect of this comment was to inject an extraneous factors other than "the character and record of the individual offender and the circumstances of the particular offense," See, Lockett v. Ohio, 438 U.S. 586 (1978), a separate Eighth Amendment violation was committed.  This is, because there is a risk that this extraneous factor diverted jurors from their primary responsibility, it is possible that the death sentence recommended and imposed was the product of an arbitrary factor. Lockett v. Ohio, 438 U.S. 586 (1978); State v. Lindsey, 404 So.2d 466 (La. 1981).


THE TRIAL COURT ERRED IN FAILING TO CONSIDER APPELLANT REEVES' LOW LEVEL OF INTELLIGENCE AS A MITIGATING CIRCUMSTANCE.

"[B]ecause there is a qualitative difference between death and any other permissible form of

57

punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate sentence in a specific case.'" Zant v. Stephens, 462 U.S. 862 (1983), quoting, Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  Since Furman v. Georgia, 408 U.S. 238 (1972), the decisions of the Supreme Court of the United States have made clear that the states may impose this ultimate sentence only if they follow procedures designed to assure reliability in sentencing determinations.  Barclay v. Florida, 463 U.S. 939 (1983)(Stephens, Powell, J.J. concurring). Due to this heightened standard of reliability in capital sentencing procedures, involving consideration of both consistency and fairness to the accused, capital sentencing procedures must be tailored to provide for "an individualized determination on the basis of character of the individual and the circumstances of the crime." Zant v. Stephens, 462 U.S. 862 (emphasis in original).

In Lockett v. Ohio, 438 U.S. 586 (1978) (hereinafter "Lockett"), the Supreme Court of the United States held that "the eighth and fourteenth amendments require that the sentencer . . . not be

precluded from considering as a mitigating factor, any aspect of a defendant's character and any of the circumstances of the offense that the defendant proffers as the basis for a sentence less than death." See also, Green v. Georgia, 442 U.S. 95 (1979); Eddings v. Oklahoma, 455 U.S. 104 (1984). Thus, relevant mitigating evidence is not limited to statutory mitigating factors, but includes any evidence which may be fit within two general categories mentioned in Lockett.

n this case, the defense presented evidence that Appellant Reeves' level of intelligence was only borderline. (R. 1165). The trial court did not consider this as a mitigating circumstance. This ran afoul of the aforementioned principles.


THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON REASONABLE DOUBT.

In Cage v. Louisiana, 498 U.S. 39 (1990), the Supreme Court of the United States reversed the defendant's conviction because the trial court unconstitutionally suggested through its instruction a higher degree of doubt than reasonable doubt. The trial court's instruction in that case, which defined

reasonable doubt for the jury as an "actual substantial doubt" and stated that what was required was "moral certainty".

The Supreme Court judged that although perhaps jurors could understand the definition of reasonable doubt as a whole as given in the instruction, it was the Court's view that "the instruction was contrary to the 'beyond a reasonable doubt' requirement articulated in In re Winship, 397 U.S. 358, 364 (1970)." The Court explained that the common meaning of the word "substantial" suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. "When those statements are then considered with the reference to 'moral certainty' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Cage.

Here, the trial court's instruction or reasonable doubt in the guilt phase was as follows:

"The reasonable doubt which entitles an accused to an acquittal, is not a mere, fanciful, vague, conjectural or speculative doubt but a reasonably substantial doubt arising from all or part of the evidence or

from a lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair minded and conscientious men and women would entertain under all the circumstances.  Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt but simply beyond all reasonable doubt.  If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092).  This instruction did not satisfy the requirements of due process. Further, because this was a capital case, a separate Eighth Amendment violation was committed.

61

## CONCLUSION

Based upon the foregoing, Appellant Matthew Reeves urges this Court to reverse the judgment of the Circuit Court of Dallas County and set aside his judgment of conviction and sentence of death.

Thomas M. Goggans
S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36130
(334)-834-2511

Attorney for Appellant
Matthew Reeves

## REQUEST FOR ORAL ARGUMENT

This is a death penalty case out of Dallas County.  The case tried over a course of six days.  Appellant Reeves argues reversible errors in these contentious proceedings under 13 separate headings.  Many of the issues are complex.  Oral argument would be a significant aid in honing in further on points which might be of interest or concern to this Court.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy

of the foregoing upon:

    William H. Pryor
    Office of the Attorney General
    11 South Union Street
    Montgomery AL 36130

By placing the same in the United States mail,

first class postage prepaid and properly

addressed on this the 24th day of May, 1999.

                            Thomas M. Goggans

63

CR-98-0777

# IN THE ALABAMA COURT OF CRIMINAL APPEALS

## MATTHEW REEVES,

### APPELLANT,

### VS.

## STATE OF ALABAMA,

### APPELLEE.

## ON APPEAL FROM THE CIRCUIT COURT OF DALLAS COUNTY, ALABAMA

---

## BRIEF AND ARGUMENT

---

### OF

**BILL PRYOR**
**ATTORNEY GENERAL**

### AND

**THOMAS F. PARKER IV**
**ASSISTANT ATTORNEY GENERAL**

ATTORNEYS FOR APPELLEE

Office Of The Attorney General
**Capital Litigation Division**
Alabama State House
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

CR-98-0777

IN THE ALABAMA COURT OF CRIMINAL APPEALS

MATTHEW REEVES,

APPELLANT,

VS.

STATE OF ALABAMA,

APPELLEE.

ON APPEAL FROM THE CIRCUIT COURT OF
DALLAS COUNTY, ALABAMA

---

BRIEF AND ARGUMENT

---

OF

BILL PRYOR
ATTORNEY GENERAL

AND

THOMAS F. PARKER IV
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

Office Of The Attorney General
Capital Litigation Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................i

TABLE OF AUTHORITIES...............................................................v

STATEMENT OF THE CASE .......................................................... 1

ISSUES PRESENTED ON APPEAL ................................................3

STATEMENT OF THE FACTS ........................................................5

ARGUMENT ....................................................................................15

    I.    THE TRIAL COURT PROPERLY DENIED
        REEVES'S MOTION TO SUPPRESS ITEMS
        SEIZED FROM HIS ROOM BASED ON A
        SEARCH CONDUCTED AFTER HIS MOTHER,
        THE OWNER OF THE HOUSE, GAVE WRITTEN
        AND ORAL CONSENT TO SEARCH. ..................15

    II.    PROBABLE CAUSE EXISTED TO ARREST
        REEVES, AND THE SHOTGUN SHELL
        SUBSEQUENTLY DISCOVERED WAS
        PROPERLY ADMITTED INTO EVIDENCE..........................24

    III.    THE TRIAL COURT PROPERLY REFUSED
        TO INSTRUCT THE JURY ON "THEFT
        AFTERTHOUGHT" WHERE THERE WERE
        NO FACTS TO SUPPORT REEVES'S
        CONTENTION THAT THE ROBBERY WAS
        A MERE AFTERTHOUGHT TO THE MURDER,
        AND WHERE REEVES'S "THEFT
        AFTERTHOUGHT" THEORY WAS CONTRARY
        TO THE LAW AS APPLICABLE TO THE FACTS
        OF THIS CASE ................................................29

        A.    Reeves's Request For An Instruction
            On Theft Afterthought Was
            Unsupported By The Evidence ..................30

        B.    The Theft Afterthought Instruction
            Sought By Reeves Was Contrary To The
            Law As Applicable To The Facts In This Case ......... 37

C.   Reeves's attempt to characterize the crime as theft rather than robbery was an incorrect interpretation of law .............................43

IV.   THE TRIAL COURT'S DECISION NOT TO INSTRUCT THE JURY ON COMPLICITY WAS PROPER, AND WAS NOT AN ABUSE OF DISCRETION .................................................................46

A.   There Is No Basis In The Facts To Support Reeves's Illogical Request For A Complicity Instruction ...........................................49

B.   Complicity Would Not Be A Defense In This Case, And The Instruction On Complicity Requested By The Defense Would Be Logically Contrary To The Argument Proffered By Defense ...............................53

V.   THE TRIAL COURT PROPERLY LIMITED REEVES'S CROSS-EXAMINATION, CONCERNING CHARGES PENDING IN ANOTHER JURISDICTION AGAINST A PROSECUTION WITNESS, WHERE IT WAS SHOWN THAT THERE WAS NO DEAL OR UNDERSTANDING BETWEEN PROSECUTORS AND THE WITNESS, THAT THE CHARGES WERE UNRELATED TO REEVES'S CASE, AND THAT THE WITNESS'S STATEMENT WAS TAKEN BEFORE THE CHARGES AROSE...........................................................58

VI.   ALABAMA HAS REJECTED A REQUIREMENT FOR A STANDARD TO WEIGH MITIGATING VERSUS AGGRAVATING CIRCUMSTANCES.....................74

VII.   THE TRIAL COURT PROPERLY DENIED REEVES'S MOTION TO EXCLUDE A JUROR WHO STATED SHE COULD FOLLOW THE COURT'S INSTRUCTIONS AND CONSIDER BOTH THE DEATH PENALTY AND LIFE WITHOUT PAROLE AS POSSIBLE PUNISHMENTS ..............................................................76

VIII.   THE TRIAL COURT'S DECISION TO EXCUSE
        A JUROR WHO RECALLED THAT
        APPELLANT'S BROTHER WAS SUSPECTED
        OF STEALING HER CAR DID NOT DEPRIVE
        APPELLANT REEVES OF HIS RIGHT TO AN
        IMPARTIAL JURY, ESPECIALLY WHERE
        JUROR WAS EXCUSED BEFORE
        DELIBERATIONS, AND REEVES DID NOT
        OBJECT OR ASK FOR REMEDY .......................87

IX.     AN ALTERNATE JUROR'S REALIZATION
        THAT HE KNEW A FRIEND OF THE VICTIM
        DID NOT DEPRIVE REEVES OF HIS RIGHT
        TO AN IMPARTIAL JURY WHERE THE
        JUROR, AS AN ALTERNATE, WAS
        EXCUSED PRIOR TO DELIBERATIONS ...........................95

X.      UNDER THE LEGAL STANDARD FOR
        EVALUATING CLAIMS OF PROSECUTORIAL
        MISCONDUCT, THERE WAS NO SUCH
        IMPROPER CONDUCT AT TRIAL DURING
        THE GUILT PHASE ........................................108

XI.     UNDER THE LEGAL STANDARD FOR
        EVALUATING CLAIMS OF PROSECUTORIAL
        MISCONDUCT, THERE WAS NO SUCH
        IMPROPER CONDUCT DURING THE
        PENALTY PHASE ..........................................114

XII.    THE TRIAL COURT PROPERLY USED
        ITS DISCRETION WHERE IT FOUND
        THAT LOW INTELLIGENCE DID NOT
        EXIST AS A MITIGATING FACTOR IN
        REEVES'S SENTENCING PHASE..................................117

XIII.   THE TRIAL COURT PROPERLY INSTRUCTED
        THE JURY ON REASONABLE DOUBT.............................122

CONCLUSION .......................................................... 126

CERTIFICATE OF SERVICE ............................................. 127

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. State*, 354 So. 2d 1156 (Ala. Crim.
App. 1977), cert. denied,
354 So. 2d 1161 (Ala. 1977) ........................................................... 66

*Arthur v. State*, 711 So. 2d 1031 (Ala. Crim.
App. 1996), aff'd, 711 So. 2d 1097 (Ala. 1997) ............................... 120

*Baker v. State*, 344 So. 2d 547 (Ala. Crim. App. 1977) ................... 41, 44

*Bankhead v. State*, 585 So. 2d 97 (Ala. Crim.
App. 1989), aff'd in relevant part, remanded
on other grounds on reh., 585 So. 2d 112, 127
(Ala. 1991), aff'd on return to remand,
625 So. 2d 1141 (Ala. Crim. App. 1992),
rev'd on unrelated grounds,
625 So. 2d 1146 (Ala. 1993) ........................................................... 110

*Barbee v. State*, 395 So. 2d 1128 (Ala. Crim. App. 1981) ...................... 77

*Beavers v. State*, 565 So. 2d 688 (Ala. Crim. App. 1990) ...................... 61

*Beck v. Ohio*, 379 U.S. 89 (1964) ........................................................... 25

*Bender v. State*, 687 So. 2d 219 (Ala. Crim. App. 1996) ........................ 18

*Biddie v. State*, 516 So. 2d 846 (Ala. 1987) ........................................... 16

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990) ...................................... 75

*Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) ................................. 113

*Bruton v. United States*, 391 U.S. 123 (1968) ......................................... 61

*Bufford v. State*, 382 So. 2d 1162 (Ala. Crim. App. 1980) .............. passim

*Burgess v. State*, 1998 WL 802619
(Ala. Crim. App. 1998) ................................................. 25, 102, 121

*Burton v. State*, 651 So. 2d 641 (Ala. Crim.
App. 1993), aff'd, 651 So. 2d 659
(Ala. 1994), cert. denied, 514 U.S. 1115 (1995) ............................ 111

*Bush v. State*, 695 So. 2d 70 (Ala. Crim. App. 1995) ........................... 120

*Cage v. Louisiana*, 498 U.S. 39 (1990) ................................................. 123

*Capps v. Collins*, 900 F.2d 58 (5th Cir. 1990) ......................................61

*Carroll v. State*, 599 So. 2d 1253 (Ala. Crim.
     App. 1992), affd, 627 So. 2d 874 (Ala. 1993),
     cert. denied, 510 U.S. 1171 (1994) ............................................... 120

*Chapman v. California*, 386 U.S. 18 (1967) ....................................passim

*Clark v. Dugger*, 834 F.2d 1561 (11th Cir. 1987)...................................61

*Clark v. State*, 451 So. 2d 368 (Ala. Crim. App. 1984)....................passim

*Clements v. State*, 370 So. 2d 708 (Ala. Crim.
     App. 1978), affirmed in pertinent part,
     370 So. 2d 723 (Ala. 1979).................................................. 38, 41, 44

*Clemons v. State*, 720 So. 2d 961 (Ala. Crim. App. 1996) ..................... 18

*Clisby v. State*, 456 So.2d 105 (Ala. 1984),
     cert. denied 470 U.S. 1009 (1985) ............................................... 121

*Cobern v. State*, 142 So. 2d 869 (Ala. 1962) ........................ 38, 40, 42, 43

*Cochran v. State*, 500 So. 2d 1161 (Ala. Crim.
     App. 1984), affd in pertinent part, remanded on
     other grounds, 500 So. 2d 1179 (Ala.1985),
     affd on return to remand, 500 So. 2d 1188
     (Ala. Crim. App. 1985), affd, 500 So. 2d 1064
     (Ala. 1986), cert. denied,  481 U.S. 1033 (1987)............................. 121

*Connolly v. State*, 500 So. 2d 57 (Ala. Crim. App. 1986) ............ 37, 39, 41

*Cook v. State*, 384 So. 2d 1158 (Ala. Crim. App. 1980)........................ 102

*Coral v. State*, 628 So. 2d 954 (Ala. Crim. App. 1992) ........................ 109

*Crowe v. State*, 435 So. 2d 1371 (Ala. Crim. App. 1983).................. 38, 40

*Daniel v. State*, 623 So. 2d 438 (Ala. Crim. App. 1993)....................... 109

*Daniels v. State*, 650 So. 2d 544 (Ala. Crim. App. 1994) ........................55

*Darden v. Wainwright*, 477 U.S. 168 (1986) ............................... 108, 110

*Davis v. Alaska*, 415 U.S. 308 (1974)....................................................60

*Davis v. State*, 536 So. 2d 110 (Ala. Crim. App. 1988)................... 41, 124

*Delaware v. Fensterer*, 474 U.S. 15 (1985)..............................................61

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ...............................passim

*Dill v. State*, 600 So. 2d 343 (Ala. Crim. App. 1991) ...............................17

*Dobyne v. State*, 672 So. 2d 1319 (Ala. Crim. App. 1994).......................18

*Donnelley v. DeChristoforo*, 416 U.S. 637 (1975) .................................108

*Duren v. State*, 590 So. 2d 360 (Ala. Crim.
     App. 1990), affd, 590 So. 2d 369 (Ala. 1991),
     cert. denied, 503 U.S. 974 (1992) .................................. 108, 109, 110

*Dutton v. Brown*, 812 F.2d 593 (10th Cir. 1987)....................................79

*Dutton v. Maynard*, 484 U.S. 836 (1987) ..............................................79

*Eddings v. Oklahoma*, 455 U.S. 104 (1982).............................................75

*Ensor v. Wilson*, 519 So. 2d 1244 (Ala. 1987)..................................passim

*Ex parte Alabama*, 698 So. 2d 238 (Ala. 1997) .......................................94

*Ex parte Allstate Ins. Co.*, 401 So. 2d 749 (Ala. 1981)..........................112

*Ex Parte Clements*, 370 So. 2d 723 (Ala. 1979)................................41, 44

*Ex parte Guerdon Industries, Inc.*,
     373 So. 2d 322 (Ala. 1979) ............................................................112

*Ex parte Harrell*, 470 So. 2d 1309 (Ala. 1985) ..............................17, 120

*Ex parte Harris*, 428 So. 2d 124 (Ala. 1983) ........................................112

*Ex parte Jefferson*, 473 So. 2d 1110 (Ala. 1985)....................................66

*Ex Parte Johnson*, 620 So. 2d 709 (Ala. 1993) ...........................................41

*Ex parte Jones*, 20 So. 2d 859 (Ala. 1945) ...........................................112

*Ex Parte McGee*, 383 So. 2d 205 (Ala. 1980)...........................................30, 49

*Ex parte Rutledge*, 523 So. 2d 1118 (Ala. 1988) ...........................................77

*Ex parte Womack*, 435 So. 2d 766 (Ala. 1983) ...........................................17

*Francis v. Dugger*, 908 F.2d 696 (11th Cir. 1990)...............60, 61, 62, 63

*Franklin v. Lynaugh*, 487 U.S. 164 (1988)...........................................74

*Freeman v. Hall*, 238 So. 2d 330 (Ala. 1970) ...........................................91, 104

*Gord v. State*, 475 So. 2d 900 (Ala. Crim.
    App. 1985), <u>cert</u>. <u>denied</u> 475 So. 2d 900 (Ala. 1985) ........................25

*Graham v. State*, 494 So. 2d 916 (Ala. Crim. App. 1986) ......................55

*Gray v. Mississippi*, 481 U.S. 648 (1987) ...........................................79

*Greene v. McElroy*, 360 U.S. 474 (1959) ...........................................60

*Greenhill v. State*, 1999 WL 254493 (Ala. Crim. App. 1999)...............125

*Guthrie v. State*, 689 So. 2d 935 (Ala. Crim. App. 1996) ......................102

*Gwin v. State*, 425 So. 2d 500 (Ala. Crim.
    App. 1982), <u>writ</u> <u>quashed</u>, 425 So. 2d 510 (Ala. 1983) ....................77

*Haber v. Wainwright*, 756 F.2d 1520 (11th Cir. 1985)...........................61

*Hagood v. State*, 588 So. 2d 526 (Ala. 1987) ...................................16, 79

*Haisten v. Kubota Corp.*, 648 So. 2d 561
    (Ala. 1994) ...................................................90, 92, 104, 106

*Hallford v. State*, 548 So. 2d 526 (Ala. Crim.
    App. 1988), <u>aff'd</u>, 548 So. 2d 547 (Ala. 1989),
    <u>cert</u>. <u>denied</u>, 493 U.S. 945 (1989) ...........................................40, 41

*Haney v. State,* 603 So. 2d 368 (Ala. Crim. App. 1991), aff'd, 603 So. 2d 412 (Ala. 1992), cert. denied, 507 U.S. 925 (1993) ............................................ 118, 120

*Harrell v. State,* 470 So. 2d 1303 (Ala. Crim. App. 1984), aff'd, 470 So. 2d 1309 (Ala. 1985), cert. denied, 474 U.S. 935 (1985) ............................................ 120

*Harrington v. California,* 395 U.S. 250 (1969) .......................................... 28

*Harris v. Alabama,* 513 U.S. 504 (1995) ............................................ 74, 75

*Harris v. State,* 329 So. 2d 618 (Ala. Crim. App. 1976) ........................ 102

*Henderson v. State,* 584 So. 2d 841 (Ala. Crim. App. 1990), remanded on other grounds, 584 So. 2d 862 (Ala. 1991), aff'd on remand, 587 So. 2d 1071 (Ala. Crim. App. 1991) ....................................... 111

*Herring v. State,* 540 So. 2d 795 (Ala. Crim. App. 1988) ........................ 57

*Hooks v. State,* 534 So. 2d 329 (Ala. Crim. App. 1987), aff'd, 534 So. 2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050 (1989) ............................................ 17, 109

*Hudson v. 3M Farms,* 689 So. 2d 147 (Ala. Civ. App. 1996) ........... 90, 104

*Illinois v. Rodriguez,* 497 U.S. 177 (1990) ............................................. 18

*Irvin v. Dowd,* 366 U.S. 717 (1961) ....................................................... 78

*Jacks v. State,* 364 So. 2d 397 (Ala. Crim. App. 1978), cert. denied, 364 So. 2d 406 (Ala. 1978) ............................. 55, 56, 57

*Jackson v. State,* 1999 WL 339263 (Ala. Crim. App. 1999) .............passim

*James v. State,* 681 So. 2d 269 (Ala. Crim. App. 1996) ........................ 19

*Jenkins v. State,* 627 So. 2d 1034 (Ala. Crim. App. 1992) ........... 115, 117

*Johnson v. State,* 60 So. 2d 818 (Ala. 1952) ....................................passim

*Johnston v. State,* 497 So. 2d 844 (Ala. Crim. App. 1986) .................... 78

*Jones v. Goodwin,* 982 F.2d 464 (11th Cir. 1993) ................................. 62

*Jones v. State*, 600 So. 2d 424 (Ala. Crim. App. 1992) ........................ 109

*Kinard v. Carter*, 518 So. 2d 1248 (Ala. 1982) ........................ 90, 91, 104

*Kinder v. State*, 515 So. 2d 55 (Ala. Crim. App.1986) ............................ 78

*Kuenzel v. State*, 577 So. 2d 474 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 531 (Ala. 1991), cert. denied, 502 U.S. 886 (1991) ........................................... 18, 117

*Land & Associates Inc. v. Simmons*, 562 So. 2d 140 (Ala. 1989) ........................................................ 93, 107

*Land v. State*, 678 So. 2d 224 (Ala. 1996) ........................................... 120

*Langham v. State*, 494 So. 2d 910 (Ala. Crim. App. 1986) ..................... 78

*Leach v. State*, 18 So. 2d 285 (Ala. 1994) ...................................... 90, 103

*Leonard v. State*, 551 So. 2d 1143 (Ala. Crim. App. 1989) ........... 102, 103

*Lockett v. Ohio*, 438 U.S. 586 (1978) ........................................... 119, 121

*Loggins v. State*, 1999 WL 254457 (Ala. Crim. App. 1999)................... 120

*Mahan v. State*, 508 So. 2d 1180 (Ala. Crim. App. 1986)....................... 78

*Maples v. State*, 1999 WL 171220 (Ala. Crim. App. 1999) ................... 112

*Martin v. Mansell*, 357 So. 2d 964 (Ala. 1978) ................................. passim

*McMillian v. State*, 594 So. 2d 1253 (Ala. Crim. App. 1991) ................ 124

*Melson v. State*, 1999 WL 171370 (Ala. Crim. App. 1999)............ 102, 103

*Miller v. State*, 602 So. 2d 488 (Ala. Crim. App. 1992) ........................... 18

*Mitchell v. State*, 480 So. 2d 1254 (Ala. Crim. App. 1985)................... 112

*Moore v. Illinois*, 434 U.S. 220 (1977).............................................. 28

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................ 76

*Motes v. State*, 356 So.2d 712 (Ala. Crim. App.),
cert. denied, 356 So. 2d 720 (Ala. 1978) ............................................ 77

*Nobis v. State*, 401 So. 2d 191 (Ala. Crim. App. 1981),
cert. denied, 401 So. 2d 204 (Ala. 1981) .......................................... 77

*Oregon v. Kennedy*, 456 U.S. 667 (1982) ........................................... 113

*Parker v. State*, 198 So. 2d 261 (Ala. 1967) ........................................ 66

*Perryman v. State*, 558 So. 2d 972
(Ala. Crim. App. 1993) ....................................................... 77, 78, 79

*Pierce v. State*, 1999 WL 102252 (Ala. Crim. App. 1999) ............... 91, 105

*Price v. State*, 383 So. 2d 884 (Ala. Crim. App. 1980),
cert. denied, 383 So. 2d 888 (Ala. 1980) .......................................... 76

*Proffitt v. Florida*, 428 U.S. 242 (1976) ............................................ 75

*Racine v. State*, 275 So. 2d 655 (Ala. 1973) ....................................... 111

*Reed v. Montgomery*, 341 So. 2d 926 (Ala. 1976) ............................... 112

*Reed v. Tucker*, 598 So. 2d 840 (Ala. 1992) .................................. 90, 104

*Rieber v. State*, 663 So. 2d 985 (Ala. Crim. App. 1994) ................. 18, 19

*Roberts v. State*, 1997 WL 272419
(Ala. Crim. App. 1997) ................................................. 17, 40, 54, 55

*Ross v. Oklahoma*, 487 U.S. 81 (1988) ............................................ 93, 94

*Rutledge v. State*, 523 So. 2d 1087
(Ala. Crim. App. 1987), rev'd on other grounds,
523 So. 2d 1118 (Ala. 1988) ......................................................... 111

*Samra v. State*, 1999 WL 398917 (Ala. Crim. App. 1999) ..................... 16

*Sanders v. Scarvey*, 224 So. 2d 247 (Ala. 1969) ............................ 90, 103

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ................................ 18

*Siebert v. State*, 562 So. 2d 586 (Ala. Crim. App. 1989), aff'd, 562 So. 2d 600 (Ala. 1989), cert. denied, 498 U.S. 963 (1990) .............................................. 76, 77

*Slaton v. State*, 680 So. 2d 909 (Ala. 1996) ......................................... 125

*Sockwell v. State*, 675 So. 2d 4 (Ala. Crim. App. 1993) ...................... 124

*Sparks v. State*, 450 So. 2d 188 (Ala. Crim. App. 1984) ......................... 77

*Stone v. Estelle*, 556 F. 2d 1242 (5th Cir. 1977) ................................... 113

*Stringfellow v. State*, 485 So. 2d 1238 (Ala. Crim. App. 1986) .............. 78

*Talley v. State*, 687 So. 2d 1261 (Ala. Crim. App. 1996) ............... 93, 107

*Taylor v. State*, 666 So. 2d 36 (Ala. Crim. App. 1994), aff'd on return to remand, 666 So. 2d 71 (Ala. Crim. App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120 (1996) ............................ 110

*Thomas v. State*, 460 So. 2d 207 (Ala. Crim. App. 1983), affirmed, 460 So. 2d 216 (Ala. 1984) .......................... 38, 40, 42, 111

*Thornton v. State*, 527 So. 2d 143 (Ala. Crim. App. 1987) ..................... 69

*Travis v. State*, 1997 WL187121 (Ala. Crim. App. 1997) ............... 92, 106

*Twilley v. State*, 472 So. 2d 1130 (Ala. Crim. App. 1985) .................... 109

*U. S. v. Ellzey*, 936 F.2d 492 (10th Cir. 1991) ...................................... 63

*U.S. v. Madruga*, 810 F.2d 1010 (11th Cir. 1987) ............................... 101

*Union Mortg. Co. Inc. v. Barlow*, 595 So. 2d 1335 (Ala. 1992) .............. 104

*United States v. Butler*, 792 F. 2d 1528 (11th Cir. 1986), cert. denied, 479 U.S. 933 (1986) .......................... 17

*United States v. Hasting*, 461 U.S. 499 (1983) ................................ 28, 61

*United States v. Kopituk*, 690 F.2d 1289 (11th Cir. 1982), cert. denied, 463 U.S. 1209 (1983) ......................................... 61

*United States v. Matlock*, 415 U.S. 164 (1974) ............................... 18, 19

*United States v. Nobles*, 422 U.S. 225 (1975) ........................................... 28

*United States v. Young*, 470 U.S. 1 (1985) ........................................ 17, 90

*Victor v. Nebraska*, 511 U.S. 1 (1994) ................................................. 124

*Wainwright v. Witt*, 469 U.S. 412 (1985) ................................................ 79

*Wallace by Inman v. Campbell*, 475 So. 2d 521 (Ala. 1985) ................ 104

*Wasko v. Singletary*, 966 F.2d 1377 (11th Cir. 1992) ........................... 61

*Webster v. State*, 100 So. 201 (Ala. App. 1924) ..................................... 67

*Whitlow v. State*, 509 So. 2d 252 (Ala. Crim. App. 1987) .................... 109

*Williams v. State*, 601 So. 2d 1062 (Ala. Crim. App. 1991) .................. 18

*Williams-Johns Co. v. Johns*, 355 So. 2d 706 (Ala. 1978) .................... 112

*Windsor v. State*, 683 So. 2d 1042 (Ala. 1996) .......................... 39, 41, 42

*Woodall v. State*, 730 So. 2d 627 (Ala. Crim. App. 1997) .................... 102

*Woodard v. State*, 489 So. 2d 1 (Ala. Crim. App. 1986) ................... 66, 67

**Statutes**

<u>Code of Alabama</u>
Section 12-16-150(7) .................................................................. 76
Section 13A-2-23 ..................................................................... 55
Section 13A-5-40(a)(2) ........................................................... 1, 39
Section 13A-5-48 ..................................................................... 75
Section 15-10-3(3) .................................................................... 25

<u>United States Code</u>
28 U.S.C. Section 2111 ............................................................... 27

**Other Authorities**

McElroy's Alabama Evidence
Sections 149.01(9) and (10) ........................................................ 66

**Rules**

Alabama Rules of Appellate Procedure
Rule 45A.............................................................................passim

Alabama Rules of Evidence
Rule 403 ...............................................................................68

## STATEMENT OF THE CASE

Matthew Reeves was convicted of capital murder during robbery in the first degree in the Circuit Court of Dallas County, Alabama. Circuit Court Judge Thomas R. Jones presided over the six-day jury trial.

On January 30, 1997, the Dallas County Grand Jury indicted Reeves "for intentionally caus[ing] the death of Willie Johnson by shooting him with a shotgun...during the time that he was in the course of committing a theft of lawful money of the United States, ...by threatening the imminent use of force against the person of Willie Johnson, with intent to compel acquiescence to the taking of or escaping with the property, while the said Matthew Reeves was armed with a deadly weapon, to-wit: a shotgun, in violation of Section 13A-5-40(a)(2) of the Code of Alabama. (C. 5) Willie Johnson was killed on November 27, 1996.

The District Attorney for Dallas County handled the prosecution. Reeves was arraigned on February 20, 1997, and entered a plea of not guilty and not guilty by reason of mental disease or defect. (C. 21)

Jury selection began on January 26, and 27, 1998. Presentation of the evidence took three days, from January 28 to 30, 1998. The jury returned a guilty verdict on January 30, 1998. (C. 4)

The sentencing phase began on January 30, 1998, and the jury recommended death on January 31, 1998.  (C. 4)  The trial court sentenced Reeves to death on July 20, 1998.  (C. 233)

Notice of appeal was filed on January 12, 1999.  (C. 243)

## ISSUES PRESENTED ON APPEAL

I. DID THE TRIAL COURT PROPERLY DENY REEVES'S MOTION TO SUPPRESS ITEMS SEIZED FROM HIS ROOM BASED ON A SEARCH CONDUCTED AFTER HIS MOTHER, THE OWNER OF THE HOUSE, GAVE WRITTEN AND ORAL CONSENT TO SEARCH.

II. DID PROBABLE CAUSE EXIST TO ARREST REEVES, AND WAS THE SHOTGUN SHELL SUBSEQUENTLY DISCOVERED PROPERLY ADMITTED INTO EVIDENCE.

III. DID THE TRIAL COURT PROPERLY REFUSE TO INSTRUCT THE JURY ON "THEFT AFTERTHOUGHT" WHERE THERE WERE NO FACTS TO SUPPORT REEVES'S CONTENTION THAT THE ROBBERY WAS A MERE AFTERTHOUGHT TO THE MURDER, AND WHERE REEVES'S "THEFT AFTERTHOUGHT" THEORY WAS CONTRARY TO THE LAW AS APPLICABLE TO THE FACTS OF THIS CASE.

IV. DID THE TRIAL COURT'S DECISION NOT TO INSTRUCT THE JURY ON COMPLICITY WAS PROPER, AND WAS NOT AN ABUSE OF DISCRETION.

V. DID THE TRIAL COURT PROPERLY LIMITED REEVES'S CROSS-EXAMINATION, CONCERNING CHARGES PENDING IN ANOTHER JURISDICTION AGAINST A PROSECUTION WITNESS, WHERE IT WAS SHOWN THAT THERE WAS NO DEAL OR UNDERSTANDING BETWEEN PROSECUTORS AND THE WITNESS, THAT THE CHARGES WERE UNRELATED TO REEVES'S CASE, AND THAT THE WITNESS'S STATEMENT WAS TAKEN BEFORE THE CHARGES AROSE.

VI. HAS ALABAMA REJECTED A REQUIREMENT FOR A STANDARD TO WEIGH MITIGATING VERSUS AGGRAVATING CIRCUMSTANCES

VII. DID THE TRIAL COURT PROPERLY DENY REEVES'S MOTION TO EXCLUDE A JUROR WHO STATED SHE COULD FOLLOW THE COURT'S INSTRUCTIONS AND CONSIDER BOTH THE DEATH PENALTY AND LIFE WITHOUT PAROLE AS POSSIBLE PUNISHMENTS.

VIII.  DID THE TRIAL COURT'S DECISION TO EXCUSE A JUROR WHO RECALLED THAT APPELLANT'S BROTHER WAS SUSPECTED OF STEALING HER CAR DEPRIVE APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY, ESPECIALLY WHERE JUROR WAS EXCUSED BEFORE DELIBERATIONS, AND REEVES DID NOT OBJECT OR ASK FOR REMEDY.

IX.  DID AN ALTERNATE JUROR'S REALIZATION THAT HE KNEW A FRIEND OF THE VICTIM DEPRIVE REEVES OF HIS RIGHT TO AN IMPARTIAL JURY WHERE THE JUROR, AS AN ALTERNATE, WAS DISMISSED PRIOR TO DELIBERATIONS.

X.  WAS THERE IMPROPER PROSECUTORIAL CONDUCT AT TRIAL DURING THE GUILT PHASE UNDER THE LEGAL STANDARD FOR EVALUATING CLAIMS OF PROSECUTORIAL MISCONDUCT.

XI.  WAS THERE IMPROPER PROSECUTORIAL CONDUCT DURING THE PENALTY PHASE UNDER THE LEGAL STANDARD FOR EVALUATING CLAIMS OF PROSECUTORIAL MISCONDUCT?

XII.  DID THE TRIAL COURT PROPERLY USE ITS DISCRETION WHERE IT FOUND THAT LOW INTELLIGIENCE DID NOT EXIST AS A MITIGATING FACTOR IN REEVES'S SENTENCING PHASE.

XIII.  DID THE TRIAL COURT PROPERLY INSTRUCT THE JURY ON REASONABLE DOUBT?

4

## STATEMENT OF THE FACTS

On November 27, 1996, the day before Thanksgiving, the appellant Matthew Reeves, an eighteen-year-old permanently expelled from school, and his younger brother Julius walked to the home of Brenda Suttles in Selma, Alabama around noon. (R. 683) According to Brenda Suttles and Emanuel Suttles, her cousin, the two of them and the Reeves brothers left the house on foot to look for robbery victims shortly after noon. (R. 684, 819) After walking for some time, a man named Jason Powell noticed them while he was driving around; introduced himself to them; and agreed to give them a ride in his car. In the car, they discussed going to White Hall, Alabama for the sole purpose of robbing drug dealers. (R. 686, 759) They stopped by a Broad Street apartment to pick up a gun. Julius Reeves entered the apartment, and brought back a shotgun to the car. (R. 687, 763-765, 823) When Julius Reeves returned to the car, he passed the shotgun to Matthew Reeves. (R. 688) While in the car, Julius discussed openly their plan to rob a drug dealer in White Hall. (R. 825)

Next, the group drove toward White Hall on Highway 80, and turned down a dirt road where their car broke down. (R. 690, 766) At some point, a man in a truck, later identified as Duane Smith, stopped to check on them but drove on. (R. 676, 691, 768) After a couple of hours, Willie Johnson, the victim, stopped to lend assistance. (R. 692, 769, 828) Willie Johnson agreed to tow them back to Selma, and Julius joined Johnson in the truck while the other four rode in the car being towed. (R.

5

693, 769) Johnson stopped briefly on the way, during which time, Julius walked back to the car and told the group in the car that Johnson was the person that would be their robbery victim. (R. 833) Julius then returned to the truck and Johnson towed them back to the front of the Reeves's house and unhooked their car from his truck. (R. 695, 771)

At this point, Julius informed the others that they needed twenty-five dollars to pay Johnson for the towing, but they had no money. (R. 696) Julius offered Johnson a ring instead of the money, but told Johnson that he must take him to his girlfriend's house to get the ring. (R. 697) Johnson agreed, and Julius entered the truck while Brenda Suttles and Matthew Reeves climbed into the back of the truck. (R. 697, 772) Matthew Reeves concealed the shotgun behind his leg as the truck pulled away, while Emanuel Suttles and Jason Powell remained behind with the broken down car. (R. 697, 836) After reaching the home of his girlfriend, Julius retrieved the ring and returned to the truck. Julius told Matthew and Brenda Suttles that he was not going to let Johnson keep the ring, but said that they were going to rob him instead. (R. 701) Brenda Suttles acknowledged that, at this point, they all understood they would rob Johnson. (R. 701)

After Julius climbed back into the truck, Johnson drove the three back to the Reeves's house. (R. 702) Emanuel Suttles and Jason Powell, who stayed at the Reeves's house with the car, testified that they saw the truck drive by and turn down the alleyway behind the Reeves's house

6

just after dark. (R. 840, 772) Brenda Suttles recounted that just as the truck stopped in the alleyway, she heard a "pow" and saw Matthew Reeves pulling the shotgun back from the truck's sliding rear window. (R. 704) Julius jumped out of the truck cab and asked what Matthew had done. Matthew directed Julius to empty Johnson's pockets as he lay dying in a pool of blood. (R. 704) Julius, at Matthew Reeves's direction, dragged Johnson's dying body from the truck, emptied his pockets and gave the money to Matthew. Brenda Suttles acknowledged that, while they were emptying Willie Johnson's pockets, he was still gasping for air and "gagging" on his own blood. (R. 721) They then tossed the bleeding and now lifeless body back into the truck. (R. 706)

Jason Powell and Emanuel Suttles, who remained at the car in front of the Reeves's house, simultaneously heard the gunshot coming from the alleyway and, a short time later, they saw the Reeves brothers and Brenda Suttles running from the alleyway through the yard and into the Reeves's house. (R. 775, 841) They both noticed that Matthew Reeves was carrying the shotgun. (R. 775, 842)

Brenda Suttles testified that, when they arrived at the Reeves's house, the three of them changed their clothes and Matthew Reeves put the shotgun under the bed. (R. 708-710) During this time, Emanuel Suttles and Powell entered the house and both witnessed Matthew placing the gun under the bed. (R. 777, 843) Also, at this time, Emanuel Suttles heard Matthew state that he aimed the gun at Johnson's head.

and witnessed the Reeves brothers and Brenda Suttles literally jumping for joy at their accomplishment in the killing and robbing of Johnson. (R. 843) The group then separated, but later reunited at the Suttles's house. (R. 710)

On the way to the Suttles's house, Matthew stopped to talk with his thirteen-year old girlfriend, Tameisha Jackson, and told her to lie to the police and say he was with her all day, should the police question her. (R. 846, 888) Upon their arrival at the Suttles's house, Matthew, Julius, and Brenda Suttles entered the bathroom to divide the money, approximately $360 (R. 785), they garnered from the robbery. (R. 712, 784, 848) Throughout the course of the evening, Matthew Reeves boasted several different times of the brutal killing. Matthew told Yolanda Blevins that he shot someone, and that the killing would earn him a gang teardrop. (R. 899, 912) Blevins also noticed that Matthew had blood on his hands that he apparently had not even bothered to wash. (R. 913) Matthew Reeves also made statements to Emanuel Suttles (R. 847) and Latosha Rodgers (R. 923) boasting of the brutal slaying.

In addition, defense counsel elicited testimony on cross-examination at various points during the trial that Matthew Reeves flashed gang signs several times that day to various friends and bystanders. (R. 855-857, 794-795) Defense counsel also argued in closing that the killing of Willie Johnson was to obtain a "gang teardrop", a tattoo obtained for killing another person or losing a fellow gang

8

member. (R. 1076-1077) This information was also elicited by the prosecutor during the State's case on direct examination.[1] (The defense, however, never objected, and it appears that establishing appellant's membership in a gang was part of the defense strategy).

Later, on the same evening as the shooting, the Reeves brothers and Brenda Suttles purchased marijuana, cocaine, and alcohol, which they consumed throughout the night at a party while dancing and listening to music. (R. 904) Brenda Suttles testified that, while dancing, Matthew Reeves began to repeatedly mock the way that Willie Johnson died. (R. 713) In the early morning hours of Thanksgiving Day, November 28, 1996, the group retired to the Suttles's house.

Around 2:00 a.m. in the morning, approximately seven hours after the shooting, Officers Little and Sturdivant of the Selma Police Department responded to a report of a suspicious vehicle in the alleyway behind the Reeves's house. (R. 634) The officers approached the car and noticed a black male slumped across the seat and blood on the interior of the car. (R. 640) Officer Tucker, who had just arrived with his canine, secured the scene with tape. (R. 641) Officer Tucker and his canine then tracked a trail from the bloody area around the truck for roughly

---

[1] "Even if the trial court's actions did not totally remove the prejudice occasioned by the prosecutor's questions, any deficiency in the court's actions was rendered harmless when defense counsel repeatedly broached the appellant's gang membership." *Walker v. State*, 631 So. 2d 294, 296 (Ala. Crim. App. 1993)

9

seventy-five yards to the Reeves's residence (through the yard and to the front steps), and then returned to the crime scene. (R. 655)

Detective Grindle arrived on the scene between 2:30 and 3:00 a.m., and began his inspection of the crime scene. (R. 932) Grindle observed the victim's body inside the truck (R. 935), found a wadding from a shotgun shell in the floorboard (R. 939), found a diamond ring in a pool of blood near the truck (R. 941), and later noticed that the victim's pockets had been turned inside out. (R. 958) After he was informed that the canine unit had tracked to a house across the alleyway, Grindle and several other officers proceeded to the house. (R. 935, 942) Detective Grindle knew the house to be Ms. Reeves's residence because of his numerous previous dealings with the Reeves family. (R. 942)

Upon arrival, the officers knocked on the door and were greeted by the owner of the house, Ms. Reeves. (R. 943) Detective Grindle advised Ms. Reeves that they were investigating a shooting and that the canine unit had tracked to her residence. (R. 944) At this time, Ms. Reeves gave oral consent to search her house and also signed a written form giving consent to search her residence. (R. 944, C. 252, State's Exhibit 11) The officers then began the search and discovered in the kitchen a pair of white pants with what appeared to be blood stains. (R. 946) Next, the officers searched the first bedroom, which had no door and was visible from the living area, and found bloodstained clothes, shoes, and linens,

10

which were in plain view, as well as a shotgun under the bed. (R. 947-948)

Next, Detective Grindel questioned those at Ms. Reeves's house and learned that the bloody clothes belonged to Matthew Reeves, Julius Reeves, and Brenda Suttles, and that all three had been at the house earlier. After obtaining the address from police records, Grindle proceeded to 314 Lavender Street, the home of Brenda Suttles. (R. 953) Carlene Suttles, variously identified as Brenda's aunt or sister, greeted them at the door, and when the door was opened, the officers noticed Matthew Reeves on the couch, just to the right of the door. (R. 953-954) Matthew Reeves was then apprehended and a blood-stained jacket Reeves had balled up as a headrest was collected. (R. 954) After a subsequent interview with Matthew Reeves, Detective Grindle returned to Ms. Reeves's house and retrieved a shotgun shell from the bathroom. (R. 955)

Dr. Wagner, a forensic pathologist at the Department of Forensic Sciences, autopsied Johnson's body and determined that Johnson had sustained a shotgun wound to the neck. (R. 666) Wagner determined that Johnson was shot from behind, while in a seated position, and probably bled to death over the course of several minutes. (R. 670-672)

Gloria Walters, a latent print expert with the Department of Forensic Sciences, undertook an analysis of fingerprints found at the scene. Fingerprints matching Julius Reeves's were taken from the door of

11

victim's truck. (R. 1006) Fingerprints matching Brenda Suttles's were lifted from the driver's side rear fender of the victim's truck. (R. 1006) In addition, fingerprints matching Matthew Reeves, the appellant, were found on the shotgun. (R. 1011) Finally, Joseph Saloom, a specialist in firearms with the Alabama Department of Forensic Sciences, testified that the waddings and the shell discovered by police are the type that would be fired by the shotgun found under Matthew Reeves's bed.

During the guilt phase of the trial, the defense rested without offering any testimony or evidence. The jury was excused from the courtroom at 11:20 a.m., and given menus to order lunch. At 12:55 p.m., the jury returned with a verdict finding Matthew Reeves guilty of murder during the commission of a robbery first degree. The jury took an hour and thirty-five minutes to eat lunch, and find Reeves guilty of capital murder.

During the penalty phase, Reeves introduced evidence in three general categories; evidence concerning his home life, evidence concerning his disruptive and criminal behavior in and out of school, and evidence concerning his mental capacity. The meager evidence in each of these categories, however, offered little in the way of mitigation.

The first category of evidence that Reeves introduced during the penalty phase involved his home life. First, Ms. Reeves described the four-bedroom house he grew up in, and how she always provided a home for him. (R. 1123) Next, Ms. Reeves explained that "he got along fine"

12

with the other members of the family. (R. 1132)  Finally, Ms. Reeves described the various times Matthew spent at various youth homes after numerous behavioral and criminal disturbances. (1134-1135)

The second general category of evidence Reeves introduced during the penalty phase concerned his disruptive and criminal behavior, in and out of school.  First, Ms. Reeves stated that when Matthew "was angry he will just take it out on anybody he sees." (R. 1139)  Next, Ms. Reeves testified, and Reeves introduced records that Matthew had been arrested for stealing cars, crack cocaine possession, and assault (R. 1142), as well as three burglary charges, two assault charges, criminal mischief, and carrving a concealed weapon. (C. 303)  Finally, Reeves introduced evidence that he was disciplined at school, for among other things; fighting, "touching girls in the wrong places" (C. 406), and "enticing boys to use drugs" (C. 406).  In 1993, the principal at Reeves's school sent a letter to the school superintendent that stated in part "[i]n the interest of safety of our students and the preservation of our academic process, I respectfully recommend that Matthew and Julius Reeves be enrolled in the Homebound Program and/or the Alternative School for the 1993-94 school year.  This recommendation is based on the criminal and violent behavior of these boys at school, home, and in the community." (C. 408).

The third general category of evidence that Reeves introduced during the penalty phase involved his mental capacity.  Dr. Ronan testified that although Reeves's intelligence was borderline (R. 1171), he

13

was not mentally retarded. (R. 1175)  Dr. Ronan also stated that "there are people who have his intelligence level that work, have jobs, that have families, and that consistently do fine. (R. 1170)

After hearing testimony during the penalty phase, the jury was excused at 10:35 a.m. to begin deliberations.  The jury returned at 11:25 a.m., less than an hour later, with a recommendation that Reeves receive the death penalty by a vote of ten to two.  (R. 1227)  On July 20, 1998, the trial court sentenced Reeves to death.  (R. 1232, C. 233)  This appeal followed.

**ARGUMENT**

**I.   THE TRIAL COURT PROPERLY DENIED REEVES'S MOTION TO SUPPRESS ITEMS SEIZED FROM HIS ROOM BASED ON A SEARCH CONDUCTED AFTER HIS MOTHER, THE OWNER OF THE HOUSE, GAVE WRITTEN AND ORAL CONSENT TO SEARCH.**

In issue I (Appellant's Brief at 29-30)[2], Reeves argues that items from his room were seized as a result of an unconstitutional search. The trial court, however, did not commit error by admitting these items into evidence. The search of Reeves's room was based on the voluntary oral and written consent of his mother (R. 588-589, 942, C. 252, State's Exhibit 11), the owner of the house (R. 569), and the "reasonable belief" of Detective Grindle that Ms. Reeves had authority or "common authority" to consent to the search. Therefore, the search of Reeves's room, which had no door, and was visible from the living area (R. 550), was properly conducted.

In his appeal, Reeves argues, for the first time, that the State did not show that Ms. Reeves had the authority to consent to the search of Matthew Reeves's room during the suppression hearing. Reeves's attempted to claim in his motion to suppress and in the suppression hearing that Ms. Reeves did not voluntarily consent, or give proper consent, to the search of Matthew Reeves's room, thereby acknowledging that Ms. Reeves had authority to give consent to the search. After the

---

[2] Because Reeves does not enumerate the issues in his brief, the State will include the page numbers with the appropriate issue numbers as an aid to this Court.

trial court properly overruled Reeves's motion to suppress, Reeves failed to object on the grounds that the State did not show Ms. Reeves had authority to give consent to that search. This claim is presented for the first time on appeal, therefore, this claim must be reviewed under the plain error standard. A.R.A.P. Rule 45A.

This claim should be precluded from review because of the inconsistent positions Reeves took at trial and now upon appeal. In *Samra v. State*, the Alabama Court of Criminal Appeals recently held that "[e]ven in Capital cases, a party cannot assume inconsistent positions at trial and on appeal." *Samra v. State*, 1999 WL 398917, at *7 (Ala. Crim. App. 1999). In the trial court, Reeves argued that Mrs. Reeves's consent to search was not voluntary—thereby conceding her authority to consent. Now, on appeal, Reeves claims that what he conceded by implication was not proved. Such material inconsistency precludes review on appeal.

Even if this court were to not hold this issue to be precluded, it is still due to be denied. In *Hagood v. State*, the Alabama Supreme Court held that in order to preserve an objection for appeal "[t]he objection must be specific enough to point out the alleged error so as to allow the judge to correct the error." *Hagood v. State*, 588 So. 2d 526, 533 (Ala. 1987), quoting *Biddie v. State*, 516 So. 2d 846 (Ala. 1987). "In considering what constitutes 'plain error' in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what constitutes 'plain error'." *Dill v. State*, 600 So. 2d 343 (Ala. Crim. App.

16

1991); see also *Ex parte Harrell*, 470 So. 2d 1309, 1313 (Ala. 1985); *Ex parte Womack*, 435 So. 2d 766, 769 (Ala. 1983). The United States Supreme Court has held that the plain error doctrine "should be used to correct only 'particularly egregious errors', those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' In other words, the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result'." *United States v. Young*, 470 U.S. 1, 15 (1985).

"Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." *United States v. Butler*, 792 F. 2d 1528, 1535 (11th Cir. 1986), cert. denied, 479 U.S. 933 (1986). Furthermore, the plain error doctrine requires that the "claimed error not only affects 'substantial rights' [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice." *Young*, 470 U.S. at 16; see also *Roberts v. State*, 1997 WL 272419, at *2 (Ala. Crim. App. 1997)("the plain error exception to the contemporaneous-objection rule is to be 'used sparingly' "); *Hooks v. State*, 534 So. 2d 329, 351-352 (Ala. Crim. App. 1987), aff'd, 534 So. 2d 371 (Ala. 1988), cert. denied, 488 U.S 1050 (1989). "While the

17

failure to object at trial does not preclude this Court's review of Reeves's claim, it does weigh against any claim of prejudice." *Clemons v. State*, 720 So. 2d 961, 966 (Ala. Crim. App. 1996); *Dobyne v. State*, 672 So. 2d 1319, 1324 (Ala. Crim. App. 1994); *Williams v. State*, 601 So. 2d 1062, 1066 (Ala. Crim. App. 1991); *Kuenzel v. State*, 577 So. 2d 474, 489 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 531 (Ala. 1991), cert. denied, 502 U.S. 886 (1991).

It is well established that a warrantless search pursuant to a valid consent is constitutionally permissible, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); that "[t]he question whether a consent to a search is voluntary is a question of fact for the trial court to determine, based upon the totality of the circumstances", *Bender v. State*, 687 So. 2d 219, 221 (Ala. Crim. App. 1996); see also *Miller v. State*, 602 So. 2d 488, 491 (Ala. Crim. App. 1992); and that a warrantless search is justified where "permission to search was obtained from a third-party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," *United States v. Matlock*, 415 U.S. 164, 171 (1974); see also *Rieber v. State*, 663 So. 2d 985, 990 (Ala. Crim. App. 1994)("Certainly the appellant's mother had authority to consent to the search because she owned the mobile home.").

"Common authority rests on mutual use of the property by persons generally having joint access or control for most purposes." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); see also *James v. State*,

18

681 So. 2d 269, 272 (Ala. Crim. App. 1996), quoting *Rieber v. State*, 663

So. 2d 985, 990 (Ala. Crim. App. 1994), aff'd, 663 So. 2d 999, (Ala.

1995), cert. denied, 516 U.S. 995, (1995).  In order for a warrantless

search based on third-party consent to be valid, either the person giving

consent must actually have authority or "common authority" to give the

consent, *Matlock*, 415 U.S. at 171, or the officer conducting the search

must "reasonably believe" that the third party giving consent has

authority or "common authority", *Rodriguez*, 497 U.S. at 188.

In the present case, both possibilities are satisfied.  Ms. Reeves

gave consent to search her home both orally and in writing. (R. 588-589,

942, C. 252. State's Exhibit 11) In addition to having signed the consent

to search form (C. 252, State's Exhibit 11), Ms. Reeves gave the following

testimony at the suppression hearing.

> MR. GREENE: [prosecutor]: Do you recall
> coming to my office to talk to me about this case
> last week?
>
> MS. REEVES: Yes, sir.
>
> MR. GREENE: All right. Did I ask you if you gave
> the officer permission to come in *your* house and
> search?
>
> MS. REEVES: Uh-huh.
>
> MR. GREENE: What did you say?
>
> MS. REEVES: When you said did I give them
> permission to come in *my house*?
>
> MR.GREENE: And search and what did you say?

19

MS. REEVES: Yes, sir.

MR. GREENE: What did you say?

MS. REEVES: Yes, sir.

(R. 588)(emphasis added)

Later in the suppression hearing, after what appears to be some confusion in Ms. Reeves's testimony, she continues:

MR. GREENE: And you gave a statement?

MS. REEVES: Yes, sir.

MR. GREENE: To them?

MS. REEVES: They asked me questions and I answered them.

MR. GREENE: And in that statement Detective Grindle went over coming to *your house* with you didn't he? He asked you about all that, about him coming there and him—

MS. REEVES: He asked me a lot of questions, yes sir.

MR. GREENE: He asked you, quote I came there tonight, and you answered yes. Do you recall that?

MS. REEVES: Yes sir.

MR. GREENE: He asked, I advised you that I was there to investigate a shooting; you said yes; you told me something had happened. He said alright. Did you voluntarily agree to let me come in the house, and you said, yes sir. Do you recall that?

MS. REEVES: Yes, sir.

20

> MR. GREENE: He said okay. You volunteered to let me search the house; you said yes, sir. Do you recall that?
>
> MS. REEVES: Yes, sir.
>
> MR. GREENE: Okay. During the search—Grindle then said, okay, during that search you were aware that we discovered a shotgun, clothing that had blood on it, some tennis shoes that had blood on it, some other items. And you said, I know y'all took a lot of stuff, and I seen the shoes, and I seen the pants with blood on it. And I said ya'll could get the stuff. Did you say that? Do you recall that?
>
> MS. REEVES: Yes, sir.

(R. 591-592)(emphasis added)

Thus, Ms. Reeves, who as owner of the house had authority, voluntarily consented to the officer's search. Even if Ms. Reeves had only joint authority with Matthew Reeves, which the defense has never claimed, her consent to the search would have been a proper exercise of her common authority.

In addition, Detective Grindle "reasonably believed" that Ms. Reeves had authority or "common authority" to consent to the search on the morning of the crime. Ms. Reeves acknowledged that she knew Detective Grindle prior to the time of this search because he had come to her house several times before for different incidences. (R. 569-572) Detective Grindle also testified he knew the Reeves family, and Ms. Reeves in particular, because he had dealt with her and her sons before

21

on multiple occasions and knew the house to be her residence. (R. 545, 550)

In his brief, Reeves argues that "in the suppression hearing in this case, the prosecution did not elicit even conflicting evidence that Marzetta Reeves had authority to consent to the search of Matthew Reeves's room." (Appellant's Brief at 30) In fact, the prosecution and defense both elicited such testimony at several different points:

1) From the direct examination of Ms. Reeves at the suppression hearing.

> Q: State your full name for the record
>
> A: My name is Marzetta Reeves.
>
> Q: Where do you live, Ms. Reeves?
>
> A: *2128 Selma Avenue.* [The house searched by the police after gaining Ms. Reeves's consent.](R. 568)

2) From the direct examination of Ms. Reeves at the suppression hearing.

> Q: Do you know Detective Grindle?
>
> A: Yes, I do.
>
> Q: How do you know him?
>
> A: He came to *my house* and knocked on the door after they left the alley way. (R. 569)

3), 4) From the direct examination of Ms. Reeves during the suppression hearing.

Q:  Excuse me?

A:  I know Detective Grindle because he came to *my house* after they left the alley way.  And they—all of the officers was all through the alley and all through the side of *my house* and the other side. (R. 569)

5) From the direct examination of Detective Grindle at the suppression hearing.

Q:  All right, sir.  Now after observing the blood trail and having the information from the dog tracking, what action did you take on this particular early morning?

A:  I left from the scene of where the body was located.  I went to the address of *2128 [Selma Avenue- Ms. Reeves's residence.]*

Q:  What did you do when you got there?

A:  Upon arrival at the location I knocked on the door, which was actually two doors on the very front.  I knocked on the door and was greeted by *a Ms. Marzetta Reeves who is the owner of the residence.* (R. 544)

6) In addition, the written consent to search form admitted into evidence at the suppression hearing contained the following language:

I Marzetta Reeves do authorize Det. P. Grindle
and any other officers he designates to assist
him in the search of *my residence at 2128 Selma*
Ave.  I have been advised as to the fact that Det
Grindle is investigating a shooting.  With this in

23

> mind I have agreed to allow Det Grindle *to*
> *search my residence.* I have not been coerced in
> any way into giving my permission to Det
> Grindle in the *search of my residence.*

(C. 252, State's Exhibit 11)(emphasis added)

This testimony, as well as the written consent-to-search form, fully supports the decision of the trial court to deny Reeves's motion to suppress. This decision was based on Ms. Reeves's voluntary consent, her holding of authority or "common authority" over the residence, and Detective Grindle's "reasonable belief" that Ms. Reeves had the authority or "common authority" to consent to the search of the residence. Therefore, no error and certainly no plain error, occurred when the trial court denied Reeves's motion to suppress.

## II. PROBABLE CAUSE EXISTED TO ARREST REEVES, AND THE SHOTGUN SHELL SUBSEQUENTLY DISCOVERED WAS PROPERLY ADMITTED INTO EVIDENCE.

In issue III (Appellant's Brief at 31-33), Reeves mistakenly claims that his arrest was without probable cause, and that the shotgun shell subsequently discovered was improperly admitted into evidence. There was, however, probable cause to make the arrest, and the shotgun shell was properly admitted into evidence. Alternatively, if error occurred in the arrest of Reeves, the shotgun shell was of negligible import, and, thus, any error was certainly harmless error.

"An officer has probable cause to make an arrest when, at the time the arrest is made, the facts and circumstances within his knowledge, and of which he has reasonably trustworthy information, are sufficient to

lead a prudent person to believe that the suspect is committing or has committed an offense." *Gord v. State*, 475 So. 2d 900, 902-903, (Ala. Crim. App. 1985), cert. denied 475 So. 2d 900 (Ala. 1985), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). In addition, it is well settled that "[p]olice officers may arrest an individual without a warrant if a felony has been committed and they have reasonable cause (probable cause) to believe that the person arrested committed this felony." [§ 15-10-3(3), Ala. Code 1975]. A police officer has probable cause to arrest when he has knowledge of circumstances such as would lead a reasonable man of ordinary caution, acting impartially, reasonably, and without prejudice, to believe the person arrested is guilty. In determining whether [the police] had probable cause to arrest the defendant, the court must deal with probabilities which are not technical, but factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, would act. Probable cause does not mean a sufficient quantum of evidence to support a conviction." *Burgess v. State*, 1998 WL 802619, at *28 (Ala. Crim. App. 1998)(citations omitted).

In this case Detective Grindle was aware of substantial evidence to support a finding that there was probable cause to arrest Reeves.

1) The canine unit tracked a trail of blood from the crime scene in the alleyway, for approximately fifty yards, to the front porch of the Reeves residence. (R. 542)

25

2) There was a visible trail of blood from the crime scene to the Reeves residence. (R. 543)

3) Subsequent to a search of the Reeves residence, Detective Grindle discovered a twelve-gauge shotgun underneath the bed of Reeves, a blue jacket and two pairs of shoes with bloodstains, a pair of jeans with bloodstains, and a pair of khaki pants with bloodstains, all in Matthew Reeves's bedroom. (R. 539-541)

4) Detective Grindle discovered a pair of white pants and a belt in the kitchen with bloodstains on them. (R. 551)

5) Detective Grindle knew the Reeves's because of numerous previous dealings with them. (R. 550)

6) After questioning Ms. Reeves and the other occupants of the house, Detective Grindle learned that Brenda Suttles had been at the residence earlier. (R. 552)

7) Detective Grindle learned that the bloody clothing belonged to Matthew and Julius Reeves and Brenda Suttles. (R. 552)

8) Detective Grindle retrieved the address of Brenda Suttles from the police department files. (R. 553)

This amounted to substantial trustworthy evidence, more than adequate enough to support Detective Grindle's finding of probable cause to arrest Matthew Reeves.  Detective Grindle also had reliable information that Matthew Reeves was in the company of Brenda Suttles, and, thus, proceeded to the Suttles's residence where he effected the arrest of

Matthew Reeves. Thus, the trial court's ruling that Detective Grindle's arrest was based upon probable cause was proper and no error occurred.

Alternatively, if the State were to concede (which it does not) that error occurred, it would certainly amount to harmless error, under *Chapman v. California*, 386 U.S. 18 (1967).

In *Chapman,* the United States Supreme Court was "urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary." *Chapman,* 386 U.S. 18 at 21. The United States Supreme Court expressly declined to adopt such a rule, stating, *inter alia,* that "[a]ll 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' 28 U.S.C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman v. California,* 386 U.S. 18, 21-22, (1967).

27

Thus, in *Chapman*, the United States Supreme Court rejected the argument that "all federal constitutional errors, regardless of their nature or the circumstances of the case, require reversal of a judgment of conviction. The Court reasoned that in the context of a particular case, certain constitutional errors, no less than other errors, may have been 'harmless' in terms of their effect on the fact finding process at trial." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Since *Chapman*, the United States Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684; *United States v. Hasting*, 461 U.S. 499, 508-509 (1983) (improper comment on defendant's silence at trial); *Moore v. Illinois*, 434 U.S. 220, 232 (1977) (admission of identification obtained in violation of right to counsel); *Harrington v. California*, 395 U.S. 250 (1969) (admission of nontestifying codefendant's statement).

The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. *United States v. Nobles*, 422 U.S. 225, 230 (1975).

28

The only evidence garnered after the arrest and subsequent statement of Matthew Reeves was a used shotgun shell, discovered in the Reeves residence.  At trial, this shell was only marginally linked to the crime as "the type of shell that would fire in that particular gun." (R. 755) No other determination was made concerning the shell or the gun because of time constraints placed on the Alabama Department of Forensic Sciences.  Because the shell was not tied directly to the crime, it was of little import.  Therefore, if error occurred in admitting the shell into evidence (error the State believes did not occur), the error would certainly fall under the *Chapman* harmless-error doctrine.

### III.   THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY ON "THEFT AFTERTHOUGHT" WHERE THERE WERE NO FACTS TO SUPPORT REEVES'S CONTENTION THAT THE ROBBERY WAS A MERE AFTERTHOUGHT TO THE MURDER, AND WHERE REEVES'S "THEFT AFTERTHOUGHT" THEORY WAS CONTRARY TO THE LAW AS APPLICABLE TO THE FACTS OF THIS CASE.

In issue III (Appellant's Brief at 33-36), Reeves contends incorrectly that the trial court erred in refusing to instruct the jury on "theft afterthought".  Reeves's contention is incorrect for three reasons.  First, his contention is unsupported by the facts.  There was no evidence introduced that indicated the robbery of Johnson was an afterthought, and there was substantial evidence that a robbery was contemplated and discussed at numerous times before and during the commission of the murder.  Second, Reeves's contention is contrary to the law.  Even if the robbery had not been contemplated or committed before the murder, it

29

occurred as part of a continuous series of actions and, therefore, the murder was committed during the commission of a robbery. Third, Reeves apparently attempted at trial to distinguish between theft and robbery. Although this is not an issue on appeal, it does merit a brief discussion.

A. <u>Reeves's Request For An Instruction On Theft Afterthought Was Unsupported By The Evidence</u>.

The Alabama Supreme Court has stated "[t]he defendant has the right to request instructions based upon any material hypothesis which the evidence in his favor tends to establish." *Ex Parte McGee*, 383 So. 2d 205 (Ala. 1980), quoting *Johnson v. State*, 60 So. 2d 818 (Ala. 1952). In this case, however, *Reeves neither presented any substantive evidence that he was not involved in the criminal conduct, nor did Reeves elicit any such evidence on cross-examination.* Thus, Reeves presented no evidence in support of his "theft afterthought" theory. Conversely, the State not only presented substantial evidence that the robbery of Johnson was discussed before and during the murder, but also that the robbery was orchestrated by Matthew Reeves and that Matthew Reeves benefited directly from the robbery and murder.

Reeves puts forward two instances of testimony, taken out of context, that he purports would support his request for a "theft afterthought" instruction. First, Reeves states in his brief that Brenda Suttles testified that "Julius Reeves had jumped out of the truck, pulled

30

Johnson out of the truck, and gone through his pockets, and got everything out." (Appellant's Brief at 35-36)  What Reeves conveniently does is take that testimony completely out of context to advance a completely inaccurate proposition that Julius Reeves, Matthew Reeves's younger brother, independently robs Johnson.  The complete testimony of Suttles on this point is as follows:

> MR. GREENE [prosecutor]: When he stops the truck, what happens next? Tell these folks.
>
> SUTTLES:  I was sitting with my head down with the hood over my head.  And I heard something go pow.  And when I heard that, and I looked up. That's when Troll was taking the gun out of the back of the window.
>
> MR. GREENE:  All right.  Troll, that's Little Mack here?
>
> SUTTLES:  Yes, sir.
>
> MR. GREENE:  [Is] [t]hat Matthew Reeves?
>
> SUTTLES: (witness nods head affirmatively)
>
> MR. GREENE:  Is that the same gun ya'll had earlier?
>
> SUTTLES:  Yes, sir.
>
> MR. GREENE:  He was taking it out of the window?
>
> SUTTLES:  Yes, sir.
>
> MR. GREENE:  Did the window blow up or break out, or did it just open up?
>
> SUTTLES:  No, it was like a window that—you can slide it open and slide it closed.

31

MR. GREENE:  When you heard the boom, you looked up and saw him pulling it out of the window?

SUTTLES:  Out of the window.

MR. GREENE:  Who said or did what next?

SUTTLES:  Julius—that's when his brother, Julius, jumped out of the truck.  And he was like, Troll, man, what you done did.  *And then Troll was like, man, you tell me—I done shot this man, and ya'll ain't going in his pockets and get his money.*  And so as he got through saying that, I was like, Julius, I was like, don't argue with him.  Just go on his pockets and get the money.  And so I was standing over there by the tree.  And when he went—

MR. GREENE:  You had gotten off the truck?

SUTTLES:  (witness nods head affirmatively)

MR. GREENE:  All right.  Could you see the man then?

SUTTLES:  Did I see the man?

MR. GREENE:  Could you see him, Willie Johnson?

SUTTLES:  Yeah.

MR. GREENE:  What did he look like?

SUTTLES:  He was laying over in the truck like this.

MR. GREENE:  Did you see any blood?

SUTTLES:  Yeah.

MR. GREENE:  You got out and went over to a tree?

32

SUTTLES:  I was standing over there by the tree on the side of the road.

MR. GREENE:  Where was Matthew?

SUTTLES:  Standing behind the truck.

MR. GREENE:  Where was Julius?

SUTTLES:  Behind the truck.

MR. GREENE:  *Matthew said go in his pockets. Who went and got in his pockets?*

SUTTLES:  *Julius went in his pockets.*

MR. GREENE:  Did he get anything out?

SUTTLES:  Yeah.

MR. GREENE:  What?

SUTTLES:  Some money.

MR. GREENE:  *Who did he give the money to?*

SUTTLES:  *Matthew.*

(R. 703-706)(emphasis added)

From this testimony it is clear that Matthew Reeves not only shot and killed the victim, Mr. Johnson, but also that he orchestrated the robbery by first ordering the others to rob him and then having the others turn over the money to him.  Reeves conveniently excerpted the one segment of the testimony that acknowledged Julius Reeves emptied the victim's pockets, but left out that Matthew Reeves ordered his little brother Julius and Suttles to rob Johnson and that the others then complied and turned the money over to Matthew Reeves.

33

The second instance of testimony that Reeves takes out of context that he mistakenly argues supports his request for a "theft afterthought" instruction also involves the testimony of Brenda Suttles.  Reeves states that "Suttles recalled telling police that Matthew Reeves has killed Johnson for nothing" (Appellant's Brief at 39)  Again, this statement is taken out of context and belies the facts.  The complete and accurate testimony on the subject, including the statement discussed by Reeves in his brief is as follows:

> MR. GOGGANS [defense counsel]:  Detective Grindle said, All right.  Very good.  Someone named Martin said, did he say anything to the man before he shot him, and you said, he didn't say nothing to the man.  He just shot the man from behind.  The man didn't look back or nothing.  Do you remember that?
>
> SUTTLES:  Yeah.
>
> MR. GOGGANS:  So would it be right that the shooting was not for a robbery but just for nothing, right?
>
> SUTTLES:  *Well, I say it was for nothing because the money that he had, it wasn't worth it.*

(R. 743)(emphasis added)

The statement by Suttles obviously means that the robbery was not worth the murder because the amount of money was so small.  Reeves apparently attempts to assert either that robbery and murder of a victim for a small amount of money legally amounts to robbery for "nothing" or that because the murder and robbery garnered a small

34

amount of money, there was no intent to rob and murder Willie Johnson. Each argument would amount to an untenable and unrealistic position.

Although there was absolutely no evidence or testimony to support Reeves request for a "theft afterthought" instruction, the State provided substantial evidence both that the robbery of Johnson was discussed at numerous times before it occurred, and that Matthew Reeves directed and benefited from the robbery.  The relevant testimony was as follows:

1) Brenda Suttles acknowledged that *they discussed openly their intent to rob Mr. Johnson* (R. 701).

2) Brenda Suttles testified that she left her house with Matthew and Julius Reeves for the *expressed purpose of looking for robbery victims.* (R. 684)  Emanuel Suttles also testified about their discussions concerning their efforts to look for robbery victims. (R. 818)

3) Brenda Suttles testified that, on the day of the murder of Johnson, she discussed *finding a robbery victim* in Whitehall, Alabama with Matthew Reeves. (R. 686)  Emanuel Suttles testified to the same discussion. (R. 825)

4) Brenda Suttles testified that Julius Reeves informed her and Matthew Reeves *that Willie Johnson would be the victim of the robbery.* (R. 701) Emanuel Suttles testified to the same discussion. (R. 833)

5) Brenda Suttles testified *that Matthew Reeves ordered Julius Reeves to empty Mr. Johnson's pockets.* (R. 706)

35

6) Emanuel Suttles testified that he heard Matthew Reeves state that he aimed the shotgun at Mr. Johnson's head, and witnessed the Reeves brothers and Brenda Suttles literally jumping for joy at their accomplishment in the robbing and killing of Mr. Johnson. (R. 843)

7) Brenda Suttles testified that *Matthew Reeves divided the money garnered from the robbery of Johnson.* (R. 712)

8) Jason Powell testified that he overheard Matthew Reeves talking about how to divide up the money, and that *Matthew Reeves stated that he made the money* and apparently that is why he was the one to decide who received money from the robbery and murder of Johnson. (R. 784)  Emanuel Suttles testified to the same discussion. (R. 849)

9) The fingerprints of Matthew Reeves were the only fingerprints found on the shotgun. (R. 1011)

10) Brenda Suttles testified she saw Matthew Reeves pulling the shotgun back from the truck window immediately after she heard the shotgun blast. (R. 704)

Reeves would only be entitled to an instruction on "theft afterthought" if there were some evidence or testimony that supported his "material hypothesis".  Reeves failed to proffer any evidence or testimony that would support a "theft afterthought" instruction, and the State supplied substantial evidence that showed the robbery of Willie Johnson was discussed and planned, and that Matthew Reeves benefited directly from the robbery and murder.  Therefore, the trial court's

36

decision to deny Reeves's request for a "theft afterthought" instruction was a proper use of discretion and should be upheld.

B. **The Theft Afterthought Instruction Sought By Reeves Was Contrary To The Law As Applicable To The Facts In This Case.**

The trial court was correct in refusing to instruct the jury on "theft afterthought" not only because the instruction was not supported by any facts, but also because the instruction was contrary to the law as applicable to this case. Reeves states in his brief that an accused cannot be convicted of capital murder where he forms felonious intent only after he commits the killing (Appellant's Brief at 34), citing *Connolly v. State*, 500 So. 2d 57 (Ala. Crim. App. 1986) as support. This single statement from *Connolly* does not accurately reflect the decision in *Connolly*, which discussed a murder and subsequent robbery as comprising one continuous transaction.

> "In his confession, Bufford admitted killing Cooper in anger because the victim verbally abused him. However, Bufford contended that it was not until after the killing that he thought of taking the victim's wallet and car and fleeing. *Bufford v. State*, 382 So. 2d 1162, 1170 (Ala. Crim. App. 1980).
>
> In *Bufford*, this Court found that, '[t]he jury could have reasonably inferred from the circumstances of the case that the appellant decided to rob and kill the victim and to use his vehicle and money to escape.' *Bufford*, 382 So. 2d at 1170. Thus, there was sufficient evidence presented to support 'the jury's conclusion that this was not merely a killing in the heat of anger followed by a larceny of the wallet and vehicle as

37

a mere afterthought.' *Bufford*, 382 So. 2d at 1170-71 (emphasis added).

As the Alabama Supreme Court held in *Cobern v. State*, 142 So.2d 869 (Ala. 1962), 'the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' *Clements v. State*, 370 So. 2d 708, 713 (Ala. Crim. App. 1978), affirmed in pertinent part, 370 So. 2d 723 (Ala. 1979); *Clark v. State*, 451 So. 2d 368, 372 (Ala. Crim. App. 1984). To sustain any other position 'would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' *Thomas v. State*, 460 So. 2d 207, 212 (Ala. Crim. App. 1983), affirmed, 460 So. 2d 216 (Ala. 1984).

Although a robbery committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction under Ala. Code §13A-5-40(a)(2) for the capital offense of murder-robbery, see *Bufford v. State*, supra, *O'Pry v. State*, 642 S.W. 2d 748 (Tex. Crim. App. 1981), the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. *Crowe v. State*, 435 So. 2d 1371, 1379 (Ala. Crim. App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. *Cobern v. State*, 142 So. 2d 869, 871 (Ala. 1962). The defendant's intent to rob the victim can be inferred where '[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.' *Thomas v. State*, 460 So. 2d 207, 212 (Ala. Crim. App. 1983), affirmed, 460 So. 2d 216 (Ala. 1984). See also *Cobern v. State*, 142 So. 2d 869 (Ala. 1962);

38

*Crowe v. State*, 435 So. 2d 1371 (Ala. Crim. App. 1983); *Bufford v. State*, 382 So. 2d 1162 (Ala. Crim. App. 1980),

*Connolly v. State*, 500 So.2d 57, 63 (Ala. Crim. App. 1986).

In addition, Reeves argues incorrectly that "a theft committed as a mere afterthought will not sustain a capital murder conviction." (Appellant's Brief at 34)  This is clearly a misstatement of the law, made by leaving off a significant part of the court's statement on this issue. The Alabama Supreme Court only begins with the principle that a robbery that was committed as a "mere afterthought" *and unrelated to the murder* "would not sustain a conviction for capital murder under Ala. Code § 13A-5-40(a)(2) (1975) for the capital offense of murder-robbery...," *Windsor v. State*, 683 So. 2d 1042, 1059 (Ala. 1996) (emphasis added); see also *Bufford v. State*, 382 So. 2d 1162 (Ala. Crim. App. 1980); *Jackson v. State*, 1999 WL 339263, at *35-36 (Ala. Crim. App. 1999); *Johnson v. State*, 620 So. 2d 679, 699-700 (Ala. Crim. App. 1992), rev'd on unrelated grounds, 620 So. 2d 709 (Ala. 1993).  It is the exceptions to the beginning proposition, or the additions thereto, that govern most robbery-murder cases.

The Alabama Court of Criminal Appeals clarified the doctrine endorsed in *Windsor* by adding "[h]owever, the appellant's intent to rob the victim may lawfully and correctly be inferred where the killing and the robbery were part of a continuous chain of events." *Jackson v. State*, 1999 WL 339263, at *35-36 (Ala. Crim. App. 1999), quoting *Hallford v.*

39

*State*, 548 So. 2d 526 (Ala. Crim. App. 1988), aff'd,  548 So. 2d 547 (Ala. 1989), cert. denied, 493 U.S. 945 (1989).

The Alabama Supreme Court recently in *Roberts v. State*, quoted approvingly this Court's holdings concerning murder preceding a robbery as part of a continuous transaction:

> "[Ala. Code] §13A-5-39(2) (1975) defines 'during' as 'in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof.' The Court of Criminal Appeals has stated that *'[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.'* Johnson v. State, 479 So. 2d 1377, 1380 (Ala. Crim. App. 1985). See also *Clark v. State*, 451 So. 2d 368 (Ala. Crim. App. 1984), cert. denied, 451 So. 2d 368 (Ala. Crim. App. 1984)"

*Roberts v. State*, 1999 WL 96051, at *7 (Ala. 1999) (emphasis added)

Similarly, the Alabama Court of Criminal Appeals ruled recently that when the robbery and killing form a continuous chain of events, the " 'defendant's intent to rob the victim can be inferred.' " *Jackson v. State*, 1999 WL 339263, at *35 (Ala. Crim. App. 1999) quoting *Thomas v. State*, 460 So. 2d 207, 212 (Ala. Crim. App. 1983), affirmed, 460 So. 2d 216 (Ala. 1984). See also *Cobern v. State*, 142 So. 2d 869 (Ala. 1962); *Crowe v. State*, 435 So. 2d 1371 (Ala. Crim. App. 1983); *Bufford v. State*, 382 So. 2d 1162 (Ala. Crim. App. 1980), cert. denied, 382 So. 2d 1175 (Ala. 1980); *Clements v. State*, 370 So. 2d 708 (Ala. Crim. App. 1978), affirmed

in pertinent part, 370 So. 2d 723 (Ala. 1979). *Connolly*, 500 So. 2d at 63. *Hallford v. State*, 548 So. 2d 526, 534-35 (Ala. Crim. App. 1988), aff'd, 548 So. 2d 547 (Ala. 1989), cert. denied, 493 U.S. 945 (1989); *Johnson v. State*, 620 So. 2d 679, 699-700 (Ala. Crim. App. 1992) rev'd on unrelated grounds by *Ex Parte Johnson*, 620 So. 2d 709 (Ala. 1993); *Windsor v. State*, 683 So. 2d 1042, 1058-1059 (Ala. 1996).

In addition, the fact that the victim was dead at the time the property was taken would not militate the crime of robbery if the intervening time between the murder and the taking formed a continuous chain of events. *Clark v. State*, 451 So. 2d 368, 372 (Ala. Crim. App. 1984); see also *Baker v. State*, 344 So. 2d 547 (Ala. Crim. App. 1977); *Clements v. State*, 370 So. 2d 708 (Ala. Crim. App. 1978), aff'd in pertinent part, *Ex Parte Clements*, 370 So. 2d 723 (Ala. 1979); *Bufford v. State*, 382 So. 2d 1162, 1170 (Ala. Crim. App. 1980), cert. denied, 382 So. 2d 1175 (Ala. 1980); *Johnson v. State*, 620 So. 2d 679, 699-700 (Ala. Crim. App. 1992), rev'd on unrelated grounds, 620 So. 2d 709 (Ala. 1993); *Davis v. State*, 536 So. 2d 110, 112 (Ala. Crim. App. 1988); *Connolly v. State*, 500 So. 2d 57, 63 (Ala. Crim. App. 1986); *Jackson v. State*, 1999 WL 339263, at *35-36 (Ala. Crim. App. 1999); *Windsor v. State*, 683 So. 2d 1042, 1058 (Ala. 1996).

The Alabama Supreme Court has further held that "the intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to

41

the killing." *Windsor v. State,* 683 So. 2d 1042, 1058-1059 (Ala. 1996),

quoting *Clark v. State,* 451 So. 2d 368 (Ala. Crim. App. 1984), cert.

denied,  451 So. 2d 368 (Ala. 1984).  See also *Jackson v. State,* 1999 WL

339263, at *35-36 (Ala. Crim. App. 1999); *Johnson v. State,* 620 So. 2d

679, 699-700 (Ala. Crim. App. 1992), rev'd on unrelated grounds, 620

So. 2d 709 (Ala. 1993).

     The Alabama Supreme Court stated in *Windsor* the policy reasons

that militate against "theft afterthought": "[w]hile the violence or

intimidation must precede or be concomitant with the taking, it is

immaterial that the victim is dead when the theft occurs.   To sustain

any other position 'would be tantamount to granting to would-be robbers

a license to kill their victims prior to robbing them in the hope of

avoiding prosecution under the capital felony statute.' " *Windsor v. State,*

683 So. 2d 1042, 1058-1059 (Ala. 1996), quoting *Thomas v. State,* 460

So. 2d 207, 212 (Ala. Crim. App. 1983), aff'd, 460 So. 2d 216 (Ala. 1984).

See also *Jackson v. State,* 1999 WL 339263, at *35-36 (Ala. Crim. App.

1999); *Johnson v. State,* 620 So. 2d 679, 699-700 (Ala. Crim. App. 1992),

rev'd on unrelated grounds, 620 So. 2d 709 (Ala. 1993).

     Thus, "[t]he jury may infer from the facts and circumstances that

the robbery began when the accused attacked the victim and the capital

offense was consummated when the defendant took the victim's property

and fled." *Windsor v. State,* 683 So. 2d 1042, 1058-1059 (Ala. 1996),

quoting *Cobern v. State,* 142 So. 2d 869, 871 (Ala. 1962).  See also

42

*Jackson v. State*, 1999 WL 339263, at \*35-36 (Ala. Crim. App. 1999); *Clark v. State*, 451 So. 2d 368, 372 (Ala. Crim. App. 1984); *Johnson v. State*, 620 So. 2d 679, 699-700 (Ala. Crim. App. 1992), rev'd on unrelated grounds, 620 So. 2d 709 (Ala. 1993). Here, Matthew Reeves shot the victim as part of a planned robbery, and then immediately ordered his brother to go through the victim's pockets. Therefore, "theft afterthought" is inapplicable here.

C.   Reeves's attempt to characterize the crime as theft rather than robbery was an incorrect interpretation of law.

At trial Reeves apparently attempted to draw an incorrect distinction between robbery and theft which carried over into his request for a "theft afterthought" instruction rather than a "robbery afterthought" instruction. In his attempt to draw a distinction between robbery and theft at trial, Reeves argued that "I think theft is more appropriate than robbery because you can't rob a dead guy." (R. 1043) This attempt to draw a distinction was contrary to the facts and the law. In addition, while Reeves requested a "theft afterthought" instruction, he did not also request a lesser-included theft charge, which would appear to be a logical extension of his attempt to mischaracterize the crime that occurred.

First, this interpretation is contrary to the law. Reeves shot Johnson immediately before ordering the robbery, and thus the situation comprises a continuous chain of events. "In *Cobern v. State,* 142 So. 2d 869 (Ala. 1962), the Alabama Supreme Court held that the fact that the

43

victim was dead at the time the property was taken would not militate the crime of robbery if the intervening time between the murder and the taking formed a continuous chain of events." *Clark v. State*, 451 So. 2d 368, 372 (Ala. Crim. App. 1984); <u>see</u> <u>also</u> *Baker v. State*, 344 So. 2d 547 (Ala. Crim. App. 1977); *Clements v. State*, 370 So. 2d 708 (Ala. Crim. App. 1978), <u>aff'd</u>, <u>in</u> <u>pertinent</u> <u>part</u>, *Ex Parte Clements*, 370 So. 2d 723 (Ala. 1979); *Bufford v. State*, 382 So. 2d 1162, 1170 (Ala. Crim. App. 1980), <u>cert.</u> <u>denied</u>, 382 So. 2d 1175 (Ala. 1980).

Second, this interpretation is contrary to the facts of this case. During the trial, Brenda Suttles's testimony was uncontradicted, and as follows:

> MR. GREENE [prosecutor]:  When you put Mr. Johnson back in the truck, did anybody have a hold to his feet?
>
> SUTTLES:  Now what now?
>
> MR. GREENE:  When you put Willie Johnson back in the truck, he was pulled out and got his money—
>
> SUTTLES:  Yeah, Julius had his feet.
>
> MR. GREENE:  Julius had his feet?
>
> SUTTLES:  Yes.
>
> MR. GREENE:  And you had the front part?
>
> SUTTLES:  Yes, sir.
>
> MR. GREENE:  It was pretty much a mess, wasn't it?

44

SUTTLES:  It was disgusting.

MR. GREENE:  Where was Troll [Matthew Reeves] then?

SUTTLES:  Where was Troll?

MR. GREENE:  Where was Troll when ya'll were putting him back in?

SUTTLES:  He was standing up there.

MR. GREENE:  Where was the gun?

SUTTLES:  In his hand.

MR. GREENE:  *Okay.  Was Mr. Johnson breathing, making any noises, saying anything to y'all?*

SUTTLES:  *Yeah, he was like gagging.*

MR. GREENE:  *Gagging?*

SUTTLES:  *Yeah.*

(R. 721)(emphasis added)  It is clear that Mr. Johnson was still attempting to breath, and gagging after the group had completed the robbery and were tossing Johnson's body back into the truck.  Thus, Reeves's attempt to distinguish between robbery and theft was, in addition to other things, incorrect because Mr. Johnson was still alive at the completion of the robbery.

Therefore, in conclusion, the trial court properly used its discretion in refusing to give a "theft afterthought" instruction.  The decision was correct not only because there was no evidence or testimony that would have supported Reeves's request for the instruction, but also because the

45

instruction was contrary to the law as applicable to the facts of this case, and because Reeves's attempt to characterize the crime as a theft rather than a robbery was unsubstantiated by evidence or the law. Thus, Reeves's claim is without merit and should be denied.

## IV.   THE TRIAL COURT'S DECISION NOT TO INSTRUCT THE JURY ON COMPLICITY WAS PROPER, AND WAS NOT AN ABUSE OF DISCRETION.

In issue IV (Appellant's Brief at 36-39), Reeves seemingly argues that the trial court erred by refusing to give an instruction on complicity to the jury. This argument is without merit for many reasons. First, Reeves's argument is unsupported by and contrary to the facts. Second, complicity would not be a defense in this case, and the instruction on complicity requested by the defense would be logically contrary to the argument proffered by defense.

The instruction on complicity requested by Reeves was as follows:

> "Before a defendant can be held criminally responsible for the conduct of others it is necessary that such defendant have willfully associated himself in some way with the crime and have willfully participated in it. Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted in the crime. You must find beyond a reasonable doubt that a defendant was a willful participant and not merely a knowing spectator."

(C. 211, Defendant's requested jury charge number 31)

46

The confusion created by Reeves's request for the complicity instruction and the reasons it was requested is evident in the trial court's conference concerning the instructions that were to be given.

> MR. GOGGANS:  The reason we want 31 [the instruction on complicity], we think it's particularly appropriate for this case under the State's theory there were three people involved in this.  And we think it's a matter of due process of having to prove all of the elements in each and every one of them.  Thirty-one should be given since under the State's theory [there] is more than one person involved in this.
>
> THE COURT:  Is the State's theory an aiding and abetting type theory?
>
> MS. WILSON [prosecution]:  No.
>
> THE COURT:  I think the State's theory is your client was the, participated in both the murder and the robbery and that the intent was formed prior to the event.
>
> MR. GOGGANS:  Just note the Defendant's position on that, and our objection to not giving 31 being that we think that under the evidence in this case an aiding and abetting instruction should be given as a matter of state law, as a matter of due process also.  Thirty-two is a lesser included instruction on intentional murder.  It's probably going to be out of the standard charge.  I think I just pulled this from the statute.
>
> MR. GREENE [prosecution]:  You want an aiding and abetting charge to explain the theory of guilt of the others even though they didn't pull the trigger; is that your theory?
>
> MR. GOGGANS:  It says, before a defendant can be criminally responsible for the conduct of others—

47

MR. GREENE:  Even the standard, I mean why—do you plan to give aiding and abetting under your pattern?

MR. GOGGANS:  The judge said no.

MR. GREENE:  You are wanting one on the theory that, to show the others are guilty of this crime also, that Bam Bam is equally guilty.  I'm not trying to—

MR. GOGGANS:  I'm not concerned about Bam Bam.

MR. GREENE:  I just was kind of wondering because I don't think our theory was they aided and abetted anybody, that he was the direct perpetrator.  But I can see where it might be trying to argue to the jury that these other people share in his guilt and/or we have given this other perpetrator a life sentence that you might want aiding and abetting.  That's my thinking as to why it might be pertinent.

THE COURT:  I think that's—what you have in your requested charge 31 is totally inconsistent with the indictment.  It's totally inconsistent with the testimony, and I don't see any—

MR. GREENE:  The mere presence, I've got you.

THE COURT:  I don't see any reason we should give that.

(R. 1037-1039).  It is clear from the conference that both the trial court and the prosecution were understandably baffled by Reeves's request for the instruction on complicity.

48

A.   There Is No Basis In The Facts To Support Reeves's Illogical
     Request For A Complicity Instruction.

     Initially, Reeves's argument that the trial court should have

instructed the jury on complicity fails because there is no basis in the

facts to support the request for a complicity instruction as part of the

illogical defense strategy.  Reeves's own argument concerning the facts

on this issue begins with "[t]he evidence could have supported a defense

argument that though Appellant Reeves had killed Johnson he did not

rob him along with Julius Reeves and Brenda 'Bam-Bam' Suttles."

(Appellant's Brief at 38)  This statement is not only nonsensical,

especially when requesting a complicity charge, but inaccurate and

incomplete.  It is true, as Reeves's own statement admits, that the

evidence was overwhelming and uncontradicted that Reeves was the one

that shot Willie Johnson in the back of the head and neck.  It is not true,

however, that the evidence could have supported the defense argument

that Reeves did not participate in the robbery of Johnson.

     "The defendant has the right to request instructions based upon

any material hypothesis which the evidence in his favor tends to

establish." *Ex Parte McGee*, 383 So. 2d 205, 206 (Ala. 1980), quoting

*Johnson v. State*, 60 So. 2d 818 (Ala. 1952).  In this case, the State

presented substantial evidence that Reeves was involved directly in, and

benefited directly from the robbery of Willie Johnson.  *Reeves neither*

*presented any substantive evidence that he was not involved in the*

49

*criminal conduct, nor did Reeves elicit any such evidence on cross-examination.* Reeves's request for a complicity instruction was nonsensical because the evidence showed without contradiction that Reeves was not only a principal actor in the criminal conduct, but the primary one. Reeves first murdered Johnson, then ordered the others to empty his pockets, and, finally, had the others turn over the money to him. Thus, Reeves was not entitled to his request for an instruction on complicity because there were no substantive facts in support of his theory. The relevant testimony was as follows:

1) Brenda Suttles acknowledged that she, Julius, and Matthew Reeves *discussed openly their intent to rob Mr. Johnson.* (R. 701)

2) Brenda Suttles testified that she left her house with Matthew and Julius Reeves for the *expressed purpose of looking for robbery victims.* (R. 684) Emanuel Suttles also testified about their discussions concerning their efforts to look for robbery victims. (R. 818)

3) Brenda Suttles testified that, on the day of the murder of Johnson, she discussed *finding a robbery victim* in Whitehall, Alabama with Matthew Reeves. (R. 686) Emanuel Suttles testified to the same discussion. (R. 825)

4) Brenda Suttles testified that she, Matthew Reeves, and Julius Reeves discussed the decision *that Willie Johnson would be the victim of the robbery.* (R. 701) Emanuel Suttles testified to the same discussion. (R. 833)

50

5) Brenda Suttles testified *that Matthew Reeves ordered Julius Reeves to empty Mr. Johnson's pockets.* (R. 706)

6) Emanuel Suttles testified that he heard Matthew Reeves state that he aimed the shotgun at Mr. Johnson's head, and witnessed the Reeves brothers and Brenda Suttles literally jumping for joy at their accomplishment in the robbing and killing of Mr. Johnson. (R. 843)

7) Brenda Suttles testified that *Matthew Reeves divided the money garnered from the robbery of Johnson.* (R. 712)

8) Jason Powell testified that he overheard Matthew Reeves talking about how to divide up the money, and that *Matthew Reeves stated that he made the money* and apparently that is why he was the one to decide who received money from the robbery and murder of Johnson. (R. 784) Emanuel Suttles testified to the same discussion. (R. 849)

9) The fingerprints of Matthew Reeves were the only fingerprints identified on the shotgun. (R. 1011)

10) Brenda Suttles testified she saw Matthew Reeves pulling the shotgun back from the truck window immediately after she heard the shotgun blast. (R. 704)

This amounted to overwhelming evidence that Reeves was directly involved in and benefited from the murder and robbery of Willie Johnson. Reeves puts forward two instances of testimony, taken out of context, that he purports would support his request for a complicity charge. First, Reeves states in his brief that Brenda Suttles testified that "Julius

51

Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets, and got everything out." (Appellant's Brief at 38)  What Reeves conveniently does is posit a self-serving summary of the events, conveniently omitting significant facts in order to advance a completely inaccurate proposition that Julius Reeves independently robs Johnson.  Reeves leaves out those portions of Suttles's testimony where she states that Matthew Reeves orders the others to empty the victims pockets (R. 704-705), and where Matthew Reeves retrieves the money taken from the victim.  (R. 706)  (See detailed summary of testimony in discussion of issue III).

From this testimony it is clear that Matthew Reeves not only shot and killed the victim, Mr. Johnson, but also that he orchestrated the robbery by first ordering the others to rob him and then having the others turn over the money to him.  Reeves conveniently excerpted the one segment of the testimony that acknowledged Julius Reeves emptied the victim's pockets, but left out that Matthew Reeves ordered the others to rob Johnson and that the others then complied and turned the money over to Matthew Reeves.  Thus, the evidence showed that Matthew Reeves was not a passive or secondary actor; he was the primary one.

The second instance of testimony that Reeves takes out of context that he mistakenly argues supports his request for a complicity instruction also involves the testimony of Brenda Suttles.  Reeves states that "Suttles recalled telling police that Matthew Reeves has killed

Johnson for nothing." (Appellant's Brief at 39)  Again, this statement is taken out of context, and belies the facts.  What Suttles actually states is *"Well, I say it was for nothing because the money that he had, it wasn't worth it."* (R. 743)(emphasis added)

The statement by Suttles obviously means that the robbery was not worth the murder because the amount of money was so small. Reeves apparently attempts to assert that either that robbery and murder of a victim for a small amount of money legally amounts to robbery for "nothing" or that because the murder and robbery garnered a small amount of money, there was no intent to rob and murder Willie Johnson.  Each argument would amount to an untenable and unrealistic position.  Because there was absolutely no evidence or testimony to support Reeves argument in favor of a complicity instruction, the trial court properly used its discretion when it refused Reeves request for the instruction.

B.   Complicity Would Not Be A Defense In This Case, And The Instruction On Complicity Requested By The Defense Would Be Logically Contrary To The Argument Proffered By Defense.

The trial court properly refused Reeves's request not only because there was *no* factual support for his request, but also because the complicity instruction he requested was logically contrary to the argument offered by the defense.  Thus, there was no factual or logical rationale for instructing the jury on complicity on behalf of the defense.

53

Reeves's begins his illogical argument to explain why an instruction on complicity should have been given by the trial court by stating "[t]he evidence could have supported a defense argument that *though Appellant Reeves had killed Johnson* he did not rob him along with Julius Reeves and Brenda "Bam-Bam" Suttles." (Appellant's Brief at 37-38)(emphasis added).  The evidence and testimony overwhelmingly showed that Reeves killed Johnson, and thus, the State would agree with the first half of Reeves's contention—that the evidence did support the defense argument that Reeves killed Johnson.  The second half of Reeves's contention—that Matthew Reeves was not involved in the robbery of Johnson—is, however, erroneous.  It is unequivocally demonstrated above that Reeves killed Johnson, directed the robbery, and exacted the proceeds from the robbery.  There is no need to determine the veracity of the second contention of Reeves's argument, however, because the concession Reeves makes in the first contention (that he killed Johnson) means, by the very nature of the instruction on complicity that Reeves requests, that Reeves is complicit in the robbery of Johnson.  Thus, the instruction that Reeves irrationally requests would establish exactly what Reeves claims it would disestablish.  The Alabama Supreme Court recently ruled precisely on this issue in *Roberts v. State*, by stating:

> [Ala. Code] §13A-5-39(2) defines 'during' as 'in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt

54

> thereof.' The Court of Criminal Appeals has stated that '[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.' *Johnson v. State*, 479 So. 2d 1377, 1380 (Ala. Crim. App. 1985). See also *Clark v. State*, 451 So. 2d 368 (Ala. Crim. App. 1984), cert. denied, 451 So. 2d 368 (Ala. Crim. App. 1984).

*Roberts v. State*, 1999 WL 96051, at *7 (Ala. 1999) (emphasis added).

According to the Alabama Code, Complicity is defined as:

> A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
> (1) He procures, induces or causes such other person to commit the offense; or
> (2) He aids or abets such other person in committing the offense; or
> (3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make.

Ala. Code § 13A-2-23 (1975).

Alabama has abolished any distinction between principals and accessories. *Daniels v. State*, 650 So. 2d 544, 563 (Ala. Crim. App. 1994). See also *Jacks v. State*, 364 So. 2d 397, 402-403 (Ala. Crim. App. 1978), cert. denied, 364 So. 2d 406 (Ala. 1978)(participant in illegal venture for one purpose becomes one for all purposes where the additional crimes are the proximate, natural, and logical result of the adventure upon which the actors engaged with a common purpose.) *Graham v. State*, 494 So. 2d 916, 921 (Ala. Crim. App. 1986)("Any words or acts of a person

which contribute to the commission of a crime, which are intended to incite or encourage the commission of that crime, make that person liable for the crime as a principal.").

Additionally, this Court has stated that "[w]hen two or more persons enter upon an unlawful purpose with a common intent to aid and encourage each other with anything within their common design, they are each criminally responsible for everything which may consequently and subsequently result from that unlawful purpose, whether specifically contemplated or not." *Jackson v. State*, 1999 WL 339263, at *38 (Ala. Crim. App. 1999) In *Jacks v. State*, the Alabama Court of Criminal Appeals outlined comprehensively the guidelines for criminal accountability concerning accomplices and complicity:

> And this criminal accountability extends, not alone to the enterprise, adventure, or encounter in which the conspirators are engaged, but it takes in the proximate, natural, and logical consequences of such adventure. This, because all men are presumed to intend the proximate, natural, and logical consequences of acts intentionally done; and one who is present, encouraging or ready to aid another in such conditions, must be presumed to be cognizant of that other's intention, to the extent above expressed. If such conspiracy, or community of purpose, embrace the contingency that a deadly encounter may ensue, with the common intention, express or implied, to encourage, aid, or assist, even to the taking of life, should the exigencies of the encounter lead up to that result; then, as a general rule, the act of one becomes the act of all, and the one who encourages, or stands ready to assist, is alike guilty with the one who perpetrates the violence. And such community of purpose, or conspiracy,

56

> need not be proved by positive testimony. It
> rarely is proved. The jury are to determine
> whether it exists, and the extent of it, from the
> conduct of the parties, and all the testimony in
> the cause.
>
> We have said the accomplice, equally with
> the actor, is responsible for the acts done, if they
> are the proximate, natural, and logical result of
> the adventure upon which they enter with
> common purpose.

*Jacks v. State*, 364 So. 2d 397, 402 (Ala. Crim. App. 1978), cert. denied,

364 So. 2d 406 (Ala. 1978).   "[w]here there is no conflict in the

testimony, the question of whether a witness is an accomplice is a

question of law for determination by the trial court." *Herring v. State*, 540

So. 2d 795, 798 (Ala. Crim. App. 1988).

In this case, the trial court showed a proper use of discretion when

it declined to instruct the jury according to Reeves's requested complicity

instruction.  Reeves's argument in support of a complicity instruction

fails both because there was no factual support for the instruction, and

because Reeves's complicity instruction was contrary to the law as

applicable to the facts of this case.  Therefore, Reeves claim is without

merit and the trial court committed no error.

Even if we were to concede (which the State does not), that the trial

court erred in refusing Reeves's request for a jury instruction on

complicity, the error would not warrant reversal.  In this case the Court

should find that the supposed error would fall under the *Chapman*

harmless-error doctrine. *Chapman v. California*, 386 U.S. 18 (1967).

The trial court's decision not to instruct the jury on complicity would certainly amount to harmless error, if any error at all. Because of the nature of the facts in this case, an instruction on complicity would only have made it more likely that Reeves would be convicted of capital murder. Reeves's argument that a complicity instruction would have been helpful to the defense because "the evidence could have supported a defense argument that though Appellant Reeves had killed Johnson he did not rob him along with Julius Reeves and Brenda "Bam-Bam" Suttles" (Appellant's Brief at 37-38) is nonsensical. The instruction on complicity would have only served to show that if the State did not prove Matthew Reeves was involved directly in the robbery, which it did, Matthew Reeves would have still been considered complicit in its occurrence. Thus, Reeves's contention that the trial court erred in not giving the defense requested complicity instruction is without merit and should be denied.

**V. THE TRIAL COURT PROPERLY LIMITED REEVES'S CROSS-EXAMINATION, CONCERNING CHARGES PENDING IN ANOTHER JURISDICTION AGAINST A PROSECUTION WITNESS, WHERE IT WAS SHOWN THAT THERE WAS NO DEAL OR UNDERSTANDING BETWEEN PROSECUTORS AND THE WITNESS, THAT THE CHARGES WERE UNRELATED TO REEVES'S CASE, AND THAT THE WITNESS'S STATEMENT WAS TAKEN BEFORE THE CHARGES AROSE.**

In issue V (Appellant's Brief at 39-41), Reeves argues that the trial court improperly limited his attempts to cross-examine Jason Powell, a minor prosecution witness, concerning charges pending against him. The pending charges, however, were in another county, were unrelated to

58

the Reeves case, and there was no deal or understanding between the prosecutor and Powell concerning his testimony. In addition, Powell's initial statement was made prior to the origination of the charges, and thus, the charges had no impact on his statement, which was substantially the same as his testimony. Therefore, the trial court was proper in limiting Reeves's attempt to cross-examine Powell in regards to the unrelated and immaterial charges pending against Powell in another county.

Powell's original statement was given prior to the origination of the charges that were pending against him at Reeves's trial, and, thus, was not influenced by those charges. It is evident from the record that both the prosecution and defense had access to Powell's prior statement, but there was no attempt to use that statement to impeach Powell's testimony at trial. At a conference with the trial court the following exchange occurred:

> MR. GREENE: The man gave these statements back way before he had any charges brought against him. There is no understanding whatsoever.
>
> THE COURT: Are you telling me that the statement that Jason Powell gave to the police pre-dated the charges that are presently pending?
>
> MR. GREENE: Yes, sir.

(R. 805). Thus, both parties were aware of Powell's prior statement. Had Powell's testimony been affected by the pending charges, his testimony

59

would surely have been contradictory to his original statement.

Consequently, Reeves could have impeached the witness using the prior

statement about any inconsistencies.  The fact that Reeves did not

impeach Powell by his prior statement shows that Powell's testimony was

substantially the same as the as the statement he gave to police prior to

the origination of the charges.

The United States Supreme Court has "recognized that the

exposure of a witness' motivation in testifying is a proper and important

function of the constitutionally protected right of cross-examination."

*Davis v. Alaska*, 415 U.S. 308, 316-317 (1974), citing *Greene v. McElroy*,

360 U.S. 474, 496 (1959).

> It does not follow, of course, that the
> Confrontation Clause of the Sixth Amendment
> prevents a trial judge from imposing any limits
> on defense counsel's inquiry into the potential
> bias of a prosecution witness.  On the contrary,
> trial judges retain wide latitude insofar as the
> Confrontation Clause is concerned to impose
> reasonable limits on such cross-examination
> based on concerns about, among other things,
> harassment, prejudice, confusion of the issues,
> the witness' safety, or interrogation that is
> repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 683 (1986); see also *Francis v.*

*Dugger*, 908 F.2d 696, 701 (11th Cir. 1990).   In addition, the Court in

*Van Arsdall* held that "the Confrontation Clause guarantees an

opportunity for effective cross-examination, not cross-examination that is

effective in whatever way, and to whatever extent, the defense might

wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), quoting

*Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). "As we have

stressed on more than one occasion, the Constitution entitles a criminal

defendant to a fair trial, not a perfect one." *Van Arsdall*, 475 U.S. at 681;

see also *United States v. Hasting*, 461 U.S. 499, 508-509 (1983); *Bruton*

*v. United States*, 391 U.S. 123, 135 (1968).

The Court of Appeals for the Eleventh Circuit recently explained

that "the Sixth Amendment only protects cross-examination that is

relevant." *Wasko v. Singletary*, 966 F.2d 1377, 1381 (11th Cir. 1992);

see also *Delaware v. Van Arsdall*, 475 U.S. 673, 679, (1986)(trial court

retains wide latitude under the Confrontation Clause to limit marginally

relevant testimony); *Francis v. Dugger*, 908 F.2d 696, 702  (11th Cir.

1990); *Capps v. Collins*, 900 F.2d 58, 60-61 (5th Cir. 1990)(there is "no

constitutional right to present irrelevant evidence"); *Clark v. Dugger*, 834

F.2d 1561, 1565 (11th Cir. 1987)(habeas relief not warranted because

excluded cross-examination was irrelevant); *Haber v. Wainwright*, 756

F.2d 1520, 1522-23 (11th Cir. 1985), quoting *United States v. Kopituk*,

690 F.2d 1289, 1337 (11th Cir. 1982), cert. denied,  463 U.S. 1209

(1983)("The information sought to be elicited must be relevant"); *Beavers*

*v. State*, 565 So. 2d 688, 689-90 (Ala. Crim. App. 1990)("extent of cross-

examination on irrelevant facts, for the purpose of testing bias or

credibility of the witness's testimony, is a matter resting largely in the

discretion of the trial court, [whose] ruling will not be disturbed unless it

61

appears that it has abused its discretion to the prejudice of the complaining party"); *Jones v. Goodwin*, 982 F.2d 464, 469 (11th Cir. 1993)("right to cross-examine is not, however, absolute").

In *Francis v. Dugger*, the defendant contended that the state trial court's decision not to allow him to cross-examine Deborah Wesley, concerning her then pending second-degree murder charge, violated his Sixth Amendment right of confrontation.  Francis argued that the district court erred when it held the confrontation clause error to be harmless beyond a reasonable doubt.  The Court of Appeals in *Francis* held "that the trial court did not err when it prohibited Francis's counsel from cross-examining Wesley concerning her pending murder charge. Francis's proposed line of inquiry into Wesley's 'bias or motive' was, given the factual context of the pending charge, marginally relevant and, therefore, inadmissible." *Francis v. Dugger*, 908 F.2d 696, 702 (11th Cir. 1990); see also *Van Arsdall*, 475 U.S. at 679.  "The charge against Wesley ...was wholly unrelated to the crime for which Francis was being tried. Moreover, although Francis's counsel deposed Wesley prior to her testimony, Francis did not offer any evidence or proffer of a deal with the state.  Finally, as the Florida Supreme Court concluded, Francis did not proffer 'what answer [Wesley] would give or how her answer would be relevant to prove a material fact other than her bad character or propensity toward violence.' " *Francis*, 908 F.2d at 702.  Also "other witnesses corroborated Wesley's testimony, Francis's counsel subjected

Wesley to extensive cross-examination bearing on her credibility, and the state, as previously noted, presented overwhelming evidence of Francis's guilt." *Francis*, 908 F.2d 696, 702 (11th Cir. 1990).

In *U. S. v. Ellzey*, the 10th Circuit limited the defense's cross-examination concerning charges pending against a prosecution witness in the absence of evidence of a plea agreement between the prosecutor and the witness and evidence of a change in testimony. The Court explained that:

> Firstly, there is absolutely no testimony in this proffer from which a jury could infer that there is any suggestion that he might receive any favorable consideration by anyone connected with this case in reference to the charges in exchange for favorable testimony to the government.

> As a matter of fact, and so far as the testimony is concerned, the testimony, all that it does is it buttresses other testimony to the same effect.... So that there is no suggestion at all that this witness is doctoring his testimony in any way whatsoever.

> And if relevant by any stretch of the imagination, if the matter of the state indictment against him is relevant by any stretch of the imagination, I would exclude it on 403 grounds, on the grounds that the probative value of that testimony, the testimony concerning the state charges, is greatly outweighed by the possible prejudice to the state, to the government, and also by a confusion of the issues.

*U. S. v. Ellzey*, 936 F.2d 492, 495-496 (10th Cir. 1991).

In the instant case, the trial court ruled properly when it similarly prohibited Reeves's from cross-examining Powell, a prosecution witness,

concerning pending criminal charges for several reasons. First, Powell's testimony was cumulative, and certainly not integral to the State's case. Second, the charges pending against Powell were in another county. Third, the pending charges were irrelevant in part because Powell's original statement was taken prior to the time the charges arose, and his later testimony coalesced with his original statement. Fourth, the pending charges were wholly unrelated to Reeves's case. Finally, there was no proffer made by defense to show that the State had arranged any sort of deal or arrangement with Powell in exchange for his testimony. In fact, the State affirmatively denied the existence of any deal or that any consideration was offered in exchange for Powell's testimony. After the State objected to Reeves's inquiry into the pending charges, the parties conferenced with the trial judge.

> THE COURT: I don't mind you asking questions as long as it's not regarding some suspension or some expulsion from school for which there has not been some type of appropriate charge or conviction I should say. I don't know where you're going with that.

> MR. GOGGANS: If he has got charges hanging over his head, he would have a bias in favor of the State.

> MR. GREENE: *It's totally unrelated to anything here.*

> THE COURT: Is there any agreement on this guy? What I'm saying is, is there an appropriate conviction that you're aware of that you can cross-examine him on?

> MR. GOGGANS: No, I'm not.

THE COURT: The second question is, is there any type of agreement with the defendant regarding his charges in Wilcox County for his testimony here today?

MR. GREENE: *None whatsoever, nor in this case.*

The trial court then concludes the conference.

THE COURT: Sustain the Objection based on the fact that number one, *there is no agreement regarding this testimony or any charges.* Number two, you can't tell me of any conviction that would be an appropriate conviction for impeachment purposes of his testimony, correct?

MR. GOGGANS: *As far as I know there is not.*

(R. 793-794)(emphasis added)

The following day the trial court then revisited this claim on its own initiative at a conference that was held outside the presence of the jury:

THE COURT: Let me ask you a question though because I did rule on your objection or the State's objection to your question regarding Jason Powell's pending charges. Can you tell me or give me any indication as to how that would be admissible under Alabama rules of evidence?

MR. GOGGANS: It would be admissible to show bias of the witness in favor of the State, that he would have a reason with all of these things hanging over his head to do everything he can to help himself in those cases by testifying in this case.

MR. GREENE: We counter that with the fact that there is no evidence of that. To impeach a

65

witness you need a conviction of a crime involving moral turpitude or some other evidence to show that the witness has some particular reason, a deal or understanding, an agreement or something of that nature. But the mere fact that he's been charged with something is not permitted under the law neither by the State or the defense.

THE COURT: That was my—

MR. GREENE: The man gave these statements back way before he had any charges brought against him. *There is no understanding whatsoever.*

(R. 804-805) (emphasis added)

In *Woodard v. State*, the Alabama Court of Criminal Appeals held that "the subject of the cross-examination must be such as 'would reasonably give rise to an inference that the witness is biased.' The fact that a witness has merely been indicted for an offense unrelated to the crime charged against the accused is not such a bias creating fact." *Woodard v. State*, 489 So. 2d 1, 2 (Ala. Crim. App. 1986), quoting C. Gamble, McElroy's Alabama Evidence §§ 149.01(9) and (10) (3rd ed. 1977). See also *Ex parte Jefferson*, 473 So. 2d 1110, 1115 (Ala. 1985) ("whether a defendant has been guilty of wrongful conduct or the commission of an offense for which there has been no conviction is not a proper inquiry."); *Parker v. State,* 198 So. 2d 261, 265 (Ala. 1967); *Anderson v. State*, 354 So. 2d 1156, 1160 (Ala. Crim. App. 1977), cert. denied, 354 So. 2d 1161 (Ala. 1977)

66

In a prosecution for violating the prohibition law, evidence that charges of a similar nature were pending against a state witness "was not relevant for any purpose" and did not "have a tendency to show bias or interest of the witness in favor of the cause or the person on trial." *Webster v. State*, 100 So. 201 (Ala. App. 1924); see also *Smith v. State*, 48 So. 668, 669 (1909).

"The general rule prevailing in a great majority of jurisdictions is that, subject to certain exceptions hereinafter noted, it is not permissible to show that a witness has been arrested, or that he has been charged with or prosecuted for a criminal offense, or confined in jail or prison, or to inquire as to such fact upon cross-examination, where no conviction is shown, for the purpose of impairing his credibility." *Woodard v. State*, 489 So. 2d 1, 2 (Ala. Crim. App. 1986).

Clearly, where the State has entered into an agreement for testimony, the jury should be apprised of that fact so that they can weigh that factor when judging a witness's credibility. Where a witness is granted consideration in exchange for testimony, there should be an opportunity for the defense to delve into the possibility of bias on the part of a witness. In Reeves's case, however, there was no consideration or deal by the State in exchange for Jason Powell's testimony. The State affirmatively denied the existence of any deal or consideration (R. 804-805), and the defense made no proffer of evidence that would even hint at such a deal by the State. Therefore, this Court should find that in the

67

absence of any deal or consideration for testimony on the part of the State, the trial court should be allowed discretion to limit cross-examination that is speculative, confusing to the jury, and marginally relevant or irrelevant. Ala. R. Evid. 403. The trial court's proper limitation of Reeves's attempt to confuse the jury with unsubstantiated and irrelevant cross-examination of Powell should be affirmed, and does not warrant reversal.

Even if we were to concede (which the State does not), that the trial court erred in limiting Reeves's cross-examination of Powell concerning the charges pending against him in another jurisdiction, the error would not warrant reversal. In this case, the Court should find that the supposed error would fall under the *Chapman* harmless error doctrine. *Chapman v. California*, 386 U.S. 18 (1967). (See issue II for *Chapman* harmless-error discussion).

The Alabama Supreme Court and this Court have acknowledged that cross-examination procedures and errors fall under the Chapman harmless-error doctrine. *"Harrington*, which we have expressly reaffirmed on more than one occasion..., demonstrates that *the denial of the opportunity to cross- examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986)(emphasis added)(citations omitted). In *Thornton v. State,* this Court acknowledged that "the United States Supreme Court [had] decided that '*Davis* does not

68

support an automatic reversal rule' and held 'that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman v. California*, 386 U.S. 18 (1967) harmless error analysis.'" *Thornton v. State*, 527 So. 2d 143, 144-145 (Ala. Crim. App. 1987).

In *Thornton* this Court held that "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Thornton v. State*, 527 So.2d 143, 144-145 (Ala. Crim. App. 1987), quoting *Delaware v. Van Arsdall*, 475 U.S. at 684.

In the instant case, Powell's testimony was relatively insignificant, was certainly cumulative (Brenda and Emanuel Suttles testified to the same facts), was corroborated by other evidence and testimony on material points, and was not contradicted by any other evidence or

69

testimony.  In addition, the prosecution's case was overwhelmingly strong.

In each material aspect of Powell's testimony there was a cumulative effect and other testimony and evidence corroborated the testimony of Powell.  Powell's material testimony and its corroboration and cumulative effect is as follows:

1) Powell testified that Julius Reeves entered a Broad Street apartment and came back carrying a shotgun. (R. 763-765) This testimony was corroborated by the testimony of both Brenda Suttles (R. 687) and Emanuel Suttles (R. 823).

2) Powell testified that Matthew Reeves, Julius Reeves, and Brenda Suttles left in the truck with Mr. Johnson, the victim, some fifteen minutes before the shooting, while he (Powell), and Emanuel Suttles remained behind. (R. 772)  This testimony is corroborated by the testimony of both Brenda Suttles (R. 697) and Emanuel Suttles (R. 836), as well as the fingerprints of Julius Reeves and Brenda Suttles that were found on the victim's truck, and the fingerprints of Matthew Reeves that were found on the shotgun (R. 1006, 1011).

3) Powell testified that he heard a gunshot coming from the alleyway the victim was found in, and then saw Matthew Reeves, Julius Reeves, and Brenda Suttles running from the alleyway. He also testified that Matthew Reeves was carrying the shotgun. (R. 775)  This testimony was corroborated by both Brenda Suttles (R. 708) and Emanuel

70

Suttles (R. 841-842), as well as evidence that Matthew Reeves's

fingerprints were the only prints found on the shotgun (R. 1011).

4) Powell testified that he witnessed Matthew Reeves placing the shotgun

under a bed at the Reeves's house. (R. 777)  This testimony was

corroborated both by Brenda Suttles (R. 708-710) and Emanuel

Suttles (R. 843), as well as evidence that the shotgun was later found

under the bed by Detective Grindle during a subsequent search of the

house (R. 947-948).

5) Powell testified that he witnessed Matthew Reeves, Julius Reeves, and

Brenda Suttles dividing up the money they stole from Mr. Johnson (R.

784).  This testimony is corroborated both by Brenda Suttles (R. 712)

and Emanuel Suttles (R. 848).

Thus, even if Powell's testimony was excluded, there would still be at

least two, and sometimes three or more, separate instances of testimony

or evidence on each facet of Powell's testimony that was material.

Although each of the issues Powell testified to would have been

before the jury without his testimony, due to the corroborative testimony

and evidence, the overall strength of the prosecution's case was found in

the testimony and evidence distinguishable from Powell's testimony.

Much of this evidence and testimony is discussed in the statement of

facts found in this brief, but a concise summary would prove useful here:

1) The fingerprints of Matthew Reeves were the only fingerprints

identified on the shotgun. (R. 1011)

71

2) The fingerprints of Julius Reeves and Brenda Suttles were found on the victim's truck. (R. 1006)

3) A canine unit tracked a trail of blood from the victim's truck (where his body was found), to the front porch of the Reeves's residence. The trail of blood was less than seventy-five yards, from the alleyway behind the Reeves's residence. (R. 655)

4) Brenda Suttles testified she saw Matthew Reeves pulling the shotgun back from the truck window immediately after she heard the shotgun blast. (R. 704)

5) Brenda Suttles testified that Matthew Reeves ordered Julius Reeves to empty Mr. Johnson's pockets. (R. 706)

6) Emanuel Suttles testified that he heard Matthew Reeves state that he aimed the shotgun at Mr. Johnson's head, and witnessed the Reeves brothers and Brenda Suttles literally jumping for joy at their accomplishment in the robbing and killing of Mr. Johnson. (R. 843)

7) On the day of the murder, Matthew Reeves told Yolanda Blevins that he shot someone and that he would obtain a "gang teardrop" for the killing. (R. 899, 912)

8) On the day of the murder, Blevins noticed that Matthew Reeves had blood on his hands that he had not bothered to wash off. (R. 913)

9) Matthew Reeves made statements to Emanuel Suttles (R. 847), and Latosha Rodgers (R. 923), boasting of the brutal killing of Mr. Johnson.

72

10) After a search of the Reeves's residence, Detective Grindle discovered bloodstained clothes, shoes, and linens, as well as a shotgun under a bed. (R. 946-948)

11) A shotgun shell of the type that would be used in the shotgun was found in the Reeves's residence. (R. 955)

12) Brenda Suttles acknowledged that they discussed openly their intent to rob Mr. Johnson. (R. 701)

This evidence shows that the strength of the prosecution case was unrelated to Powell's testimony, and, thus, Powell's testimony was not essential.

Using the *Chapman* standard, any error committed by the trial court in limiting Reeves's cross-examination of Powell concerning pending charges was "harmless error". Powell's testimony was certainly cumulative, and merely coalesced with the testimony of other witnesses and evidence. In addition, as shown above, the State's case was overwhelming. All of the material facts in the testimony of Powell were already before the jury, because of the testimony of two other witnesses to essentially the same facts, as well as the physical evidence. Finally, there was no testimony introduced that contradicted Powell's testimony, instead, Powell's testimony merely replicated the testimony of others.

In conclusion, the State contends that the trial court's limitation of Reeves's cross-examination of Powell concerning pending charges in another county that were unrelated to the Reeves's case, and about

73

which there was no agreement or deal with the State, was proper. Even if this court finds that decision to be in error, however, it would certainly fall under the Chapman "harmless error" doctrine. Thus, the decision of the trial court does not necessitate reversal, and the conviction and sentence should stand.

## VI.   ALABAMA HAS REJECTED A REQUIREMENT FOR A STANDARD TO WEIGH MITIGATING VERSUS AGGRAVATING CIRCUMSTANCES.

For the first time on appeal, Reeves challenges the lack of a standard in Alabama for weighing mitigating versus aggravating circumstances. (Appellant's Brief at 41-43)  Therefore, this claim must be reviewed under the plain error standard. A.R.A.P. Rule 45A. (See plain error discussion in issue I).

Principles cited recently by this Court address this claim. This claim was recently addressed and rejected by the United States Supreme Court, which held as follows: "...We have rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.' " *Harris v. Alabama*, 513 U.S. 504, 511-515 (1995), quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer.  See, e.g., *Blystone v. Pennsylvania*, 494 U.S. 299, 306-

74

307 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 113-115 (1982); *Proffitt v. Florida*, 428 U.S. 242, 257-258 (1976).

"The Alabama statute provides that the weighing process 'shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison,' Ala. Code §13A-5-48 (1994), which is no less than what the Constitution requires." *Proffitt*, 428 U.S. at 258. The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case. See *Eddings v. Oklahoma*, 455 U.S. 104, 112, (1982)("[A] consistency produced by ignoring individual differences is a false consistency"); *Smith v. State*, 1997 WL 779039, at *18-20 (Ala. Crim. App. 1998).

Reeves does not attempt to tell this Court what standard is mandated by the opinions he cites. Neither does he show any prejudice by this claimed error. Because Reeves's claim is contrary to the requirements of the holding of the United States Supreme Court in *Harris v. Alabama*, 513 U.S. 504 (1995), and Ala. Code § 13A-5-48, it is due to be denied.

**VII.   THE TRIAL COURT PROPERLY DENIED REEVES'S MOTION TO EXCLUDE A JUROR WHO STATED SHE COULD FOLLOW THE COURT'S INSTRUCTIONS AND CONSIDER BOTH THE DEATH PENALTY AND LIFE WITHOUT PAROLE AS POSSIBLE PUNISHMENTS.**

In issue VII (Appellant's Brief at 43-44), Reeves contends that jury venire member Parnell should have been excluded as an automatic death penalty juror under *Morgan v. Illinois*, 504 U.S. 719 (1992).  The trial court, however, was correct in denying Reeves's motion to exclude Parnell, because Parnell stated several times that she could consider life without parole (R. 423, 424, 425, 426, 430) and follow the trial court's instructions (R. 424, 425, 430).

The Alabama Code provides that a prospective juror can only be excused for cause when the juror "has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict." Ala. Code §12-16-150(7) (1975).  The Alabama Court of Criminal Appeals and the Alabama Supreme Court have repeatedly held that the standard of review on appeal is that, "a trial court's ruling on a challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless there is a clear showing of an abuse of discretion by the trial court." *Siebert v. State*, 562 So. 2d 586, 595 (Ala. Crim. App. 1989), aff'd, 562 So. 2d 600 (Ala. 1989), cert. denied, 498 U.S. 963 (1990). See also *Price v. State*, 383 So. 2d 884, 886 (Ala. Crim. App. 1980), cert. denied, 383 So. 2d 888 (Ala. 1980); *Motes v. State*, 356 So.2d 712, 718

76

(Ala. Crim. App.), cert. denied, 356 So. 2d 720 (Ala. 1978); *Ex parte Rutledge*, 523 So. 2d 1118, 1120 (Ala. 1988). Thus, the trial court's ruling on a challenge for cause should only be disturbed where there is a clear showing of an abuse of discretion.

When examining a trial court's ruling on a challenge for cause, this court has stated that "[a] proper challenge for cause exists only when a prospective juror's opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence." *Siebert v. State*, 562 So. 2d 586, 595 (Ala. Crim. App. 1989), aff'd, 562 So. 2d 600 (Ala. 1989), cert. denied, 498 U.S. 963 (1990); see also *Sparks v. State*, 450 So. 2d 188 (Ala. Crim. App. 1984); *Clark v. State*, 443 So. 2d 1287 (Ala. Crim. App. 1983); *Gwin v. State*, 425 So. 2d 500 (Ala. Crim. App. 1982), writ quashed, 425 So. 2d 510 (Ala. 1983).

In *Nobis v. State*, 401 So. 2d 191, 197 (Ala. Crim. App. 1981), cert. denied, 401 So. 2d 204 (Ala. 1981), this court stated "A 'fixed opinion' which will bias a verdict is one that is a conviction or prejudgment, a strong or deep impression which closes the mind of a juror and combats the testimony and resists its force." (Citations omitted.) Such a "strong or deep impression" or "opinion must be so fixed as that it would bias the verdict a juror would be required to render." *Perryman v. State*, 558 So. 2d 972, 977 (Ala. Crim. App. 1993). See also *Barbee v. State*, 395 So. 2d 1128, 1130-31 (Ala. Crim. App. 1981). "It is sufficient if the juror can lay

77

aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). But see *Langham v. State*, 494 So. 2d 910, 913 (Ala. Crim. App. 1986) (the defendant must show "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality").

"Thus, even though a prospective juror admits to a potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error." *Perryman*, 558 So. 2d at 977.  See also *Kinder v. State*, 515 So. 2d 55, 61 (Ala. Crim. App. 1986) (juror stated that "he would not allow his opinion to influence his decision"); *Mahan v. State*, 508 So. 2d 1180, 1181 (Ala. Crim. App. 1986) (no jurors responded when asked if they would have a problem with an instruction that they were to presume defendant innocent until proven guilty); *Johnston v. State*, 497 So. 2d 844, 849 (Ala. Crim. App. 1986)(a juror "is not disqualified if he states that he can find a true verdict on the evidence alone"); *Stringfellow v. State*, 485 So. 2d 1238, 1241 (Ala. Crim. App. 1986) (juror stated that she would ""try real hard" to base her verdict on the evidence in the case).

In *Perryman*, "the juror in question clearly stated she would have reservations about believing the appellant if his testimony was contradictory to any testimony given by law enforcement officers.  She also expressed doubt about her ability to render an honest verdict if

78

alcohol was involved.  But, upon further questioning by the trial judge,

the defense attorney and the prosecutor, the juror stated that she would

not allow her personal beliefs to interfere with her decision as to the guilt

or innocence of the appellant." *Perryman* 558 So. 2d at 977.

    Recently, in *Hagood v. State*, the Alabama Court of Criminal

Appeals stated, "The proper standard for determining whether a

prospective juror may be excluded for cause because of his or her views

on capital punishment is 'whether the juror's views would prevent or

substantially impair the performance of his duties as a juror in

accordance with his instruction and his oath.' " *Hagood v. State*, 1998

WL 473540, at \*4 (Ala. Crim. App. 1998), quoting *Wainwright v. Witt*, 469

U.S. 412, 424 (1985); *Gray v. Mississippi*, 481 U.S. 648, 658 (1987). In

addition, the United States Supreme Court has stated that "'[t]he crucial

inquiry is whether the venireman could follow the court's instructions

and obey his oath notwithstanding his views on capital punishment.'"

*Hagood v. State*, 1998 WL 473540, at \*4 (Ala. Crim. App. 1998), quoting

*Dutton v. Brown*, 812 F.2d 593, 595 (10th Cir. 1987), cert. denied, *Dutton*

*v. Maynard*, 484 U.S. 836 (1987).

    In this case, the trial court's questioning of jury venire member

Parnell proceeded as follows:

> THE COURT: Ms. Parnell, I asked you some
> questions out there in open court a little bit ago
> to ask you to consider those questions.  And
> now I'm going to ask those questions to you so
> we can get your responses on the record.  Ms.

79

Parnell, you understand this is a capital murder case?

MS. PARNELL: Yes.

THE COURT: Do you understand that if there is a conviction or if the defendant is found guilty, that there are two possible punishments for this offense?

MS.PARNELL: Yes.

THE COURT: One is the death penalty, and the other is life imprisonment without parole.

MS. PARNELL: Yes.

THE COURT: In order for you to qualify to serve as a juror in this case, you must be able to give both the death penalty and life without parole fair consideration and make a recommendation to the Court at the appropriate time; do you understand that?

MS.PARNELL: Yes.

THE COURT: Ms. Parnell, there are people in our society who are totally opposed to the death penalty under any circumstance. They cannot vote to recommend it for any criminal offense. There are people in our society who believe that the death penalty is the only appropriate punishment for certain criminal violations. They cannot consider anything less than the death penalty such as life without parole. And the questions I have for you are designed to determine what you think about all of this. Okay. The first question is easy. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair your ability to serve as a juror in this case? Do you understand that question? Are you against the death penalty so much that you can't discharge your duties as a juror?

80

MS. PARNELL: I really—you know, I feel like if he took his life for nothing, you know, that what I feel, he should get the death sentence, you know.

THE COURT: Well, do you know anything about the facts of this case other than what was said to you yesterday?

MS. PARNELL: No, I don't know nothing about it. I don't; no, I ain't heard nothing.

THE COURT: Let's back up then because my question to you is this. First are you opposed to the death penalty? Do you understand what I'm saying? Are you against it? Are you for it?

MS.PARNELL: I would say for it, you know, because he took a life, you know.

THE COURT: The next question is this. You remember I told you that in order to be qualified as a juror you've got to be able to give fair and equal consideration to both the death penalty and the other penalty of life without parole. Are you opposed to anything less than death? Are you opposed to considering life imprisonment without parole if the facts and the law dictate that that should be the sentence in your judgment?

MS.PARNELL: *If that's—if they go with that sentence, I will go along with it, you know, in that sense.*

THE COURT: So what you're telling me is that you can give both of those alternatives fair consideration? You can be *fair and equally weigh the death penalty and life without parole?*

MS.PARNELL: *Yeah, both of them, yeah.*

THE COURT: Can you give both of them fair consideration; is that what you're telling me?

MS. PARNELL: Well, I really don't understand. You know, like I say I've never been on a jury before.  See what I'm saying, I wasn't there, you know.  I don't know what happened, you know, and stuff.  But, you know, I don't know what to tell you. I really don't.

THE COURT:  The first thing you can tell me is whether you are opposed or in favor of the death penalty.  You told me you were in favor of it?

MS. PARNELL: Yes.

THE COURT: The second thing I need to ask you is whether or not you can vote for something other than the death penalty.  *Can you vote for life without parole if it's appropriate, if it's right, if it's proper?*

MS.PARNELL: *Yeah.*

THE COURT: *You can consider both of them depending on the facts?*

MS. PARNELL*: Yes, either one.*

THE COURT: You can listen to the law and the facts and apply the law to the facts; *can you do that, follow my instructions?*

MS. PARNELL: *I can follow your instructions.*

THE COURT: Okay. You have listened to the facts; you have listened to the law.  Do you feel as though you lean towards one more than the other, the death penalty versus life without parole?  Do you see what I'm saying?

MS. PARNELL: I have not heard no more than what was told to me.

THE COURT: I'm trying to find out how you feel about the death penalty in your heart.  Do you think you can give—

82

MS. PARNELL: I wouldn't like nobody to take nothing—I've got a life of my own, you know, but I can go with, you know, that parole in prison, you know, for the rest of his life, you know, whatever, you know, either one, you know. It would depend on—if somebody else told me it's true—if it's true that he did it, you know, I would say the death penalty, you know. That's what I feel.

THE COURT: So you could keep—

MS. PARNELL: If it's something else, I'd say give him life without parole.

THE COURT: *So you can keep an open mind; is that right?*

MS. PARNELL: *Yeah.*

THE COURT: *And you can hear the facts and follow my instructions?*

MS. PARNELL: *(nods head affirmatively)*

THE COURT: And then you can give both of those alternative punishments fair consideration; is that correct? Do you understand what I'm saying? *You can think about both of the penalties equally; is that right?*

MS. PARNELL: *Right.*

THE COURT: And you can recommend to me one of them?

MS. PARNELL: Yes.

THE COURT: You don't have any problem with that?

MS. PARNELL: No.

THE COURT: If you think it should be death, then you don't have a problem voting death; is that right?

MS. PARNELL: No.

THE COURT: *If it's life without parole, you think that's a right thing to do, you don't have a problem voting life without parole?*

MS. PARNELL: *No.*

(R. 421-426)(emphasis added)

Later in her individual voir dire, Juror Parnell responds to questions by defense counsel.

MR. GOGGANS: Ms. Parnell, let me ask you a few questions to help me understand where we might be on looking at the death penalty and life without parole. In a capital case before a jury is ever called upon to make a decision about whether somebody should be sentenced to death or whether they are sentenced to life without parole, first there has got to have been a finding by that jury of guilt of capital murder; in other words, guilt of an intentional killing during the course of a robbery. We are not talking about an accidental killing or a reckless killing or a killing where someone was provoked. We are talking about an intentional killing. And beyond that we are talking about an intentional killing during a robbery. If it was just a plain intentional killing and nothing else, we would be talking about just a regular murder case. So before you ever get called upon to even do anything, hear anything, opening statements or hear any evidence or jury instructions or anything on what the sentence should be, you would first have already had to have determined that the person is guilty of a capital offense. If you didn't do that, if the person is found not guilty or guilty of something else, you wouldn't even need to be there. If you were in a situation where you and eleven other folks had already

84

found that whoever this defendant was had intentionally killed somebody, an unjustified intentional killing during the course of a robbery and you hear other evidence and hear the jury instructions, would you think that this person because he or she had intentionally killed somebody while trying to rob that person should get the death penalty?

MS.WILSON: I'm going to object.

THE COURT: Sustained.

MR. GOGGANS: Ms. Parnell, if you had already concluded, you have no reason to doubt that this person intentionally killed him during a robbery, would you automatically be inclined to lean towards the death penalty?

MS. WILSON: I object.

THE COURT: Sustained.

MR. GOGGANS: You're going to hear—a jury in this type of proceeding hears evidence. It hears evidence of reasons the prosecution thinks the person should get the death penalty; then you hear other reasons why the person ought to get life without parole. The judge will instruct you on how to weigh those. You have aggravating circumstances that weigh in favor of the death penalty, and you have mitigating circumstances that weigh in favor of the sentence of life without parole. Would you, Ms. Parnell, as you're sitting there after having heard everything—you've heard all of these instructions because you have found that this person intentionally killed somebody during the robbery; in other words, you found him guilty of capital murder. Would you be able to put aside that personal feeling that you have and that conviction and consider everything and apply that law, or would you still carry that conviction with you and automatically go for the death penalty?

85

MS. PARNELL: I would go for the death penalty. You shouldn't take a life. My point is my son was shot in the head. He died, you know, but he came back alive; do you see what I'm saying? They didn't do nothing to the guy that did it, shot my son, you know. But I feel like, you know, if you take a life, you know, you should give a life. You cannot give the life back. He's dead, you know. You shouldn't do it. You had no reason to. Do you see what I'm saying?

MR. GOGGANS: You feel pretty strongly about that?

MS. PARNELL: Yeah.

MR. GOGGANS: No other questions.

MS. WILSON: If the Judge told you though it was your duty to listen to all of the evidence and to weigh the two sentences, to consider life without parole as well as the death penalty and to reserve, not to make a decision until you heard all of the evidence—and there will be a lot of evidence put forth by the defense and by the State. Could you wait until you heard all of that evidence before you make up your mind as to what you thought the appropriate sentence would be?

MS. PARNELL: Yes, because I have never heard the case.

THE COURT: Thank you ma'am. Ms. Parnell, if you would please be back in the morning at 9:00 o'clock.

MR. GOGGANS: I have a motion on Ms. Parnell to exclude her for cause under Morgan versus Illinois and the cases as an automatic death penalty juror, and the sixth, eighth, and fourteenth amendment and Article I, Section 6 of the State constitution.

THE COURT: Motion will be denied. I think this juror has said on a number of occasions that

she can give fair consideration to both of the
possible punishments. She could keep an open
mind to the end. So let's get both of these
panels in, and we'll give the normal spiel.

(R. 426- 430)

It is plain from the record that jury venire member Parnell states
on several occasions that she is capable of considering both life without
parole and the death penalty. She also states that she is willing and able
to follow the court's instructions and render a verdict based solely on the
evidence and the law.

This Court should only disturb a trial court's decision not to grant
a challenge for cause where an abuse of discretion is shown. This
testimony clearly supports the trial court's refusal to dismiss jury venire
member Parnell for cause. Accordingly, this Court should find that the
trial court did not abuse its discretion when it properly refused Reeves's
challenge for cause of jury venire member Parnell,

**VIII. THE TRIAL COURT'S DECISION TO EXCUSE A JUROR
WHO RECALLED THAT APPELLANT'S BROTHER WAS
SUSPECTED OF STEALING HER CAR DID NOT DEPRIVE
APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY,
ESPECIALLY WHERE JUROR WAS EXCUSED BEFORE
DELIBERATIONS, AND REEVES DID NOT OBJECT OR ASK FOR
REMEDY.**

In issue VIII (Appellant's Brief at 44-47), Reeves argues that his
right to an impartial jury was infringed when Juror Trotter failed to recall
during voir dire that the defendant's brother had stolen her vehicle six or
seven years before. Juror Trotter stated without contradiction that she
had only recalled the occurrence the night before she brought the

87

information to the attention of the trial court. The trial court then excused Juror Trotter, well before the beginning of deliberations. Because Reeves neither made an objection, nor moved for a mistrial, this court should review this issue only for "plain error". A.R.A.P. Rule 45A. (See plain error discussion in issue I).

For a claim to be successful under plain error review, the appellant's claim must pass a two-prong test: there must be an error that affects a *substantial* right of the appellant *and* the error must have had an unfair and prejudicial impact on the jury's deliberations. As demonstrated below, there was no error, and certainly no plain error, in jury venire member Trotter's failure to recollect during voir dire an incident involving the defendant's brother from six or seven years previous, or in the trial court's decision to excuse Juror Trotter.

During voir dire the trial court asked jurors whether they knew the defendant or his family. (R. 93-94) At that time Juror Trotter did not recall a previous incident involving the defendant's brother, and, therefore, did not answer. (R. 93-94) During the trial, but significantly before deliberations began, Juror Trotter said she remembered the incident involving the defendant's brother, and immediately brought the fact to the trial court's attention before the trial resumed in the morning. The conference with the court proceeded as follows:

> THE COURT: Ms. Trotter, how about stepping
> over this way. When I arrived in the office this
> morning, I was approached by Ms. Trotter who is
> one of our jurors. She indicated to me at that

88

time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that it deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle. Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case. And at this time I'm going to excuse Ms. Trotter. And our first alternate will be taking her place. Is there any objection?

MR. GREENE: None from the State.

MR. GOGGANS: *None from the defense.*

THE COURT: There is no objection. I want to thank you for your time.

(R. 803)(emphasis added)

Juror Trotter was excused well before the end of the trial and the beginning of deliberations, and replaced with an alternate juror. The juror was excused immediately after arriving at court the morning after she recalled the events involving the defendant's brother. Thus, the juror had no opportunity to influence other jurors, and this fact is uncontroverted. Because Juror Trotter could not have influenced the deliberations in this case, Reeves's challenge fails the second prong of *Young*, which requires that a "claimed error" must have "an unfair

89

prejudicial impact on the jury's deliberations." *United States* v. *Young*, 470 U.S. at 16.

The Alabama Supreme Court has held that inconsistent, erroneous, or incomplete responses by a juror during voir dire do not by itself show prejudice to a party, and does not necessarily call for a new trial or reversal on appeal. "Neither *Sanders v. Scarvey*, 224 So. 2d 247 (Ala. 1969), *Leach v. State*, 18 So. 2d 285 (Ala. 1994), nor the original opinion in the instant case, is authority for the proposition that on voir dire any failure of any prospective juror to respond properly to any question regardless of the excuse or circumstances entitles a party to a new trial or reversal of the case on appeal." *Kinard v. Carter*, 518 So. 2d 1248, 1252 (Ala. 1982), quoting *Martin v. Mansell*, 357 So. 2d 964, 967 (Ala. 1978).

The Alabama Supreme Court has consistently held that, where a claim is based on inconsistent, erroneous, or incomplete responses by a prospective juror during voir dire, the question is whether it is probable that the appellant has been prejudiced. "We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant." *Hudson v. 3M Farms*, 689 So. 2d 147, 149 (Ala. Civ. App. 1996); *Haisten v. Kubota Corp*, 648 So. 2d 561, 564 (Ala. 1994); *Reed v. Tucker*, 598 So. 2d 840, 841 (Ala. 1992); *Ensor v. Wilson*, 519 So. 2d 1244, 1263 (Ala.

90

1987); *Kinard v. Carter*, 518 So. 2d 1248, 1252 (Ala. 1987; *Martin v. Mansell*, 357 So. 2d 964, 967 (Ala. 1978); *Freeman v. Hall*, 238 So. 2d 330, 335 (Ala. 1970).

This court recently held in *Pierce v. State*, that where "there is no evidence that the jurors did not truthfully answer the questions asked during voir dire, there is no indication that the appellant was deprived of his right to strike a jury from impartial prospective jurors. Thus, there is no basis for a finding that the jurors' actions might have unlawfully influenced the verdict." *Pierce v. State*, 1999 WL 102252, at *13 (Ala. Crim. App. 1999). Juror Trotter did not recall the defendant's brother during voir dire and, thus, answered the questions truthfully, to the best of her knowledge.

In this case, Reeves has no claim to "probable prejudice" because Juror Trotter was excused significantly prior to deliberations, took no part in deliberations, or the decision of the case, and had no contact with the remaining jurors after she remembered the incident. Thus, Juror Trotter could not have affected the jury's deliberations or the verdict reached in this case in any substantive way.

Also, various factors have been delineated to help determine whether or not prejudice has occurred. "Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired

about, the ambiguity of the question propounded, the prospective jurors inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." *Hudson*, 689 So. 2d at 149; *Haisten*, 648 So. 2d at 564; *Reed*, 598 So. 2d at 841; *Ensor*, 519 So. 2d at 1263-1264.

Applying the factors discussed above to this case, it is clear that Reeves was not prejudiced. The incident recalled by Juror Trotter occurred six or seven years before the trial, and was thus temporally remote, and as a result, more easily forgotten. Although the question during voir dire at issue was unambiguous and material, Juror Trotter's failure to answer was not willful because she only recalled the connection to Matthew Reeves's brother later during the trial. Juror Trotter makes this apparent when she informs the court promptly after her recollection. (R. 803)

In *Martin*, the Court held that "we are mindful of the heavy responsibility placed on the trial court to maintain the statutory right which parties have to a full and truthful disclosure by jurors on voir dire. However, we must also be aware of inadvertent concealment and failure to recollect on the part of prospective jurors." *Martin v. Mansell*, 357 So. 2d 964, 967 (Ala. 1978); see also *Travis v. State*, 1997 WL187121, at *4 (Ala. Crim. App. 1997)(where the Alabama Court of Criminal Appeals refused to find error when juror answered during voir dire that he did not "know" victim, but admitted after trial that he "knew of" victim).

92

"Furthermore, the Supreme Court of Alabama has determined that whether a party is prejudiced by the failure of a juror to answer on voir dire is 'a matter primarily within the discretion of the trial court. In the absence of a showing of an abuse of discretion, the ruling of the trial court thereon will not be reversed.' " *Talley v. State*, 687 So. 2d 1261, 1271 (Ala. Crim. App. 1996), quoting *Land & Associates Inc. v. Simmons*, 562 So. 2d 140, 148 (Ala. 1989).

Contrary to Reeves's claim, the action of the trial court prevented Reeves from being prejudiced by this juror. According to the trial court, "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case." (R. 803) This was not a situation of possible prejudice by a juror—she informed the trial court that it "would have an adverse impact" on her. Therefore the action of the trial court *sua sponte* to remove this juror inured to Reeves's benefit, not to his prejudice.

Reeves also argues that the trial court's action erroneously impaired Reeves's right of peremptory strikes. He does not explain how this affected his right of peremptory strikes, nor could he. While this issue is not properly present in this case, the State again takes this opportunity to urge this Court to adopt the holding of *Ross v. Oklahoma*, also a capital murder case, in which the United States Supreme Court held:

93

> Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (citations omitted). Alabama has not yet adopted the rationale in *Ross*, but the time to do so has come. See *Ex parte Alabama*, 698 So. 2d 238 (Ala. 1997) (See, J., dissenting).

The trial court's decision to excuse Juror Trotter significantly before deliberations began was necessary and proper. Because Reeves neither objected, nor moved for a mistrial or a new trial, this claim should be reviewed only for plain error. Juror Trotter neither participated in deliberations, nor spoke with other jurors about her recollection concerning Reeves's brother. Therefore, it is difficult to comprehend how Reeves could have been prejudiced or how the trial court's decision to excuse Juror Trotter from the jury panel could have had an "unfair prejudicial impact" on the jury's deliberations. Because there was no error and certainly no plain error in the trial court's decision to excuse Juror Trotter, this issue does not warrant reversal and the trial court's decision should not be disturbed.

94

**IX.    AN ALTERNATE JUROR'S REALIZATION THAT HE KNEW A FRIEND OF THE VICTIM DID NOT DEPRIVE REEVES OF HIS RIGHT TO AN IMPARTIAL JURY WHERE THE JUROR, AS AN ALTERNATE, WAS EXCUSED PRIOR TO DELIBERATIONS.**

In issue IX (Appellant's Brief at 47-50), Reeves argues that an alternate juror's realization during trial, that he knew a friend of the victim, even though the alternate juror was excused prior to deliberations, deprived Reeves of his right to an impartial jury. Juror Denmark, an alternate, recognized a member of the courtroom audience, and through him realized that he had met the victim on a couple of occasions. Alternate Juror Denmark promptly notified the trial court of his recollection and the following proceedings took place in chambers:

> THE COURT: I explained to the attorneys that Mr. Denmark had had a recollection of Mr. Johnson, the victim in this case. He disclosed that to me just a few minutes ago. And Mr. Denmark, I'm going to ask these attorneys to basically ask—well, let me say this. You tell them what you told me, and then I will let them ask you any questions.
>
> MR. DENMARK: I told him that I knew him from another guy. I was thinking that I knew the truck and knew the guy. But I never could picture who it really was until I saw him and his name is Willie too. He worked for Roy out there. I've got a key to Roy's shop. I go up there sometimes and work on my truck and whatever. Willie helped him, and he and Roy were friends. And he'd come up there a lot when I was working on my truck and stay around and talk. And we talked about the truck before, how I kept things in tune. That's just the only way I knew

95

him was from Roy's shop.  I didn't even know this had happened to him.

MR. GOGGANS [defense]:  When did you start thinking that you might have known the truck?

MR. DENMARK:  Last night after they was talking about Tyler because I live out there.  I couldn't ever figure out who it was until I saw that other Willie today.  I asked, what are you doing here?  He said, I'm in there with the family.  So I knew it was the same one.  He had always hung around with him and was on good terms with Roy.  He lives out there now.

MR. GOGGANS:  What prompted you to tell Judge Jones about it?

MR. DENMARK:  I mean I figured y'all would want to know that because the first day whenever y'all asked about it.  I didn't know at the time who it was.

MR. GOGGANS:  When is it that you saw this man?  Was it out in the hall?

MR. DENMARK:  Uh-huh.

MR. GOGGANS:  When did you notice him, a minute ago?

MR. DENMARK:  Just a minute ago getting into the elevator walking down the stairs.  And he was going down, going outside to smoke.

MR. GOGGANS:  Are you uncomfortable now?

MR. DENMARK:  Not really, I just figured that I needed to tell the Judge because I mean I wasn't close enough to the guy to even know what happened to him.  I hadn't seen him in awhile.

MR. GREENE [prosecution]:  May I?  Mr. Denmark, you did—the person you were talking to that you know that works, I think you said

96

worked with Mr. Roy Moore, this is a person that was in the hallway?

Mr. DENMARK: Yes. He's been sitting out there I think.

MR. GREENE: In the courtroom there?

MR. DENMARK: Yes, sir.

MR. GREENE: Do you know that person fairly well?

MR. DENMARK: Yes, sir.

MR. GREENE: Did you know the deceased in this case at all?

MR. DENMARK: I knew him, but he couldn't tell you my name, and I knew his name was Willie. That was all I ever knew.

Mr. GREENE: How long have you known of and concerning him?

MR. DENMARK: Maybe three years maybe, off and on. I just saw him around the shop or saw him pass when him and the other Willie would be riding down the road. I knew Willie would be in there with him. They were always together.

MR. GREENE: Did you know anything about his family, his background or anything about what he did or where he worked?

MR. DENMARK: No, sir.

MR. GREENE: Have you ever worked with him, been with him, had any contact with him?

MR. DENMARK: No, sir, just when he walked in that shop maybe once or twice when we were working on our truck.

MR. GREENE: Does that knowledge put you in a position where you can't serve in this case and

97

make a fair judgment based on what you have heard?

MR. DENMARK: No, sir.

THE COURT: Do you feel uncomfortable? That's a different question.

MR. DENMARK: No, sir.

MR. GREENE: You haven't heard all of the evidence in this case, but are you still in a position where you can either convict or not convict based on what you decide the evidence is at the end?

MR. DENMARK: Yes, sir.

MR. GREENE: In spite of this connection with this man?

MR. DENMARK: Yes, sir.

MR. GREENE: You could still—if you thought the evidence warranted it, you could turn the man here loose?

MR. DENMARK: Yes, sir.

MR. WIGGINS [defense]: This Willie person that you said you had seen him sitting in the courtroom all day?

MR. DENMARK: I thought I had recognized him, but I never did look really hard until I walked outside and walked right by him. Then I knew it was him.

MR. WIGGINS: Having recognized him, do you know how long he has been in the courtroom?

MR. DENMARK: No, sir.

MR. WIGGINS: The photographs of the truck, is that something that you have seen?

98

MR. DENMARK:  The one today where you could see in the garage, you know, you could see the whole truck.  Really I knew then that it was the same truck I had been in before.

MR. WIGGINS:  The relationship with this other Willie, was it a knowledge from going up to Roy's shop?

MR. DENMARK:  Me and Roy Moore, we are all real good friends, him and my dad, and I used their shop to get air or tools or whatever, you know.  I've got a key to their shop and everything.  And he has worked for Roy for, I don't know, ten years or more probably.

MR. WIGGINS:  What about the fact that this Willie is closely related to the victim?

MR. DENMARK:  I don't even know if he's related to him or, you know—I don't really know if he's kin to him.  It has no bearing on me really.

MR. WIGGINS: If he's up here supporting, in support of the family, that wouldn't have any effect on you?

MR. DENMARK:  No, sir.

MR. GOGGANS:   You were actually in that truck?

MR. DENMARK:  Yes, we used it one time, me and Willie out here when we was replacing brake shoes on my truck.  We came to town.  I had to get some new brake shoes.

THE COURT: Anything else?

MR. GREENE: No.

THE COURT:  You may take a seat back in the jury room.

MR. WIGGINS:  I think he has to be excused.

99

THE COURT:  Why?

MR. WIGGINS:  Knowledge of the victim, his knowledge of the friend of the victim.  To my knowledge that person has been sitting in the proceedings thus far.

THE COURT:  I don't even know who you are talking about out there.

MR. WIGGINS:  Something jogs his memory in the photographs of the truck, and then having talked to this man that's here in support of the family—even though he said he can be fair, we have to believe him.  I just don't think that he is going to be able to set that aside, his knowledge of the victim, his relationship, his riding in the truck.

MR. GREENE:  This perhaps is a moot point, but he is the alternate.  He is the second or first alternate.  We don't have to make this decision right this minute.  He may be gone in a matter of hours anyway.

MR. WIGGINS:  That's true.

THE COURT:  We'll do that.  I'll reserve my ruling.  If it comes to a decision, we will just have to make a decision.

MR. GOGGANS:  Again let me state for the record his constitutional grounds.  He is entitled to a fair and impartial trial based on the 6th and 14th amendment to the U.S. Constitution and Article I, section 6 of the state constitution.

(R. 993-999).

Although Reeves did state a general objection, he did not make it clear what he is objecting to; the trial court's decision to withhold its ruling, the juror remembering the victim, that Alternate Juror Denmark is on the jury, or perhaps that Reeves has not received a fair and

impartial trial.  In addition, Reeves did not state how he has been prejudiced or what action the trial court should take to remedy whatever it is that he finds objectionable. Nowhere in his objection did Reeves mention the jury, the truthfulness of the juror, or his claim, as stated in his brief, that his right to use his discretion wisely in peremptory strikes has somehow been violated.  It is difficult to imagine how the trial court could comprehend what specific grounds Reeves complained of, or what possible remedy to consider, in response to the highly general objection that Reeves is entitled to a fair and impartial trial. The United States Court of Appeals for the Eleventh Circuit has stated that "[w]e ought not, and do not, expect some sort of ritualistic incantation from trial lawyers to make an effective objection;  but we can and do expect plain talk sufficient to direct the presiding officer's attention to the existence of an objection and to the specific ground that underlies the objection." *U.S. v. Madruga*, 810 F.2d 1010, 1014 (11th Cir. 1987)  In addition, the Court in *Madruga* stated "[w]e decline to add the duty to interpret imaginatively what lawyers say to the long list of responsibilities of magistrates and other trial judges.  In this case, what was actually said to the magistrate was too vague." Id.

Alabama courts have similarly held that the lack of a specific objection requires that the question be reviewed only for plain error;

> "While no specific ground was stated, it appears
> that Melson's objection at trial was based on the
> ground that the answer called for hearsay.  We
> are assuming this because Melson's counsel

101

> raised a hearsay objection to a similar question that the prosecutor posed to Laverty on direct examination. Melson's objection to the complained-of comment at trial did not appear to be on the ground now argued on appeal, i.e., that the answer constituted an improper reference to Melson's bad character.
>
> Thus, for this reason as well, Melson has failed to properly preserve anything for appellate review; therefore, our review will be for plain error."

*Melson v. State*, 1999 WL 171370, at *51 (Ala. Crim. App. 1999). See also *Leonard v. State*, 551 So. 2d 1143 (Ala. Crim. App. 1989)(a defendant is bound by the grounds of the objection at trial and cannot change those grounds on appeal); *Burgess v. State*, 723 So. 2d 742, 768 (Ala. Crim. App. 1997)(Burgess's failure to object specifically meant claim was reviewable only for plain error); *Woodall v. State*, 730 So. 2d 627, 649 (Ala. Crim. App. 1997)(objection without specificity concerning evidence means record was reviewable only for plain error); *Guthrie v. State,* 689 So. 2d 935, 943 (Ala. Crim. App. 1996)(objection at trial that prosecutor should not argue the law does not preserve claim on appeal that prosecutor misstated the law); *Cook v. State*, 384 So. 2d 1158, 1160 (Ala. Crim. App. 1980)(specific grounds for objection waive all grounds not specified, and the trial judge will not be placed in error on grounds not assigned in an objection); *Harris v. State*, 329 So. 2d 618, 620 (Ala. Crim. App. 1976)("Only those grounds of objection presented to the trial court can serve as a basis for a reversal of its action").

102

In addition, the trial court never made a ruling, because it was not required to. In *Leonard v. State*, this court ruled on this precise issue by stating "[h]ere, not only was the objection untimely, and general with no specific grounds, but there was no adverse ruling on the objection. An adverse ruling by the trial judge is a preliminary requirement to preservation of error and appellate review." *Leonard v. State*, 551 So.2d 1143, 1145-1146 (Ala. Crim. App. 1989)(citations omitted); see also *Melson v. State*, 1999 WL 171370, at *12 ("Because there is no adverse ruling from which Melson can appeal, we will review this claim pursuant to the plain error rule").

Therefore, because Reeves's raises this claim specifically for the first time on this appeal, and did not object specifically during trial, this court should review this issue only for "plain error". A.R.A.P. Rule 45A. (See discussion of plain error in issue I).

For a claim to be successful under plain error review, the appellant's claim must pass a two-prong test: there must be an error that affects a *substantial* right of the appellant *and* the error must have had an unfair and *prejudicial impact* on the *jury's deliberations*.

The Alabama Supreme Court has held that inconsistent, erroneous, or incomplete responses by a juror during voir dire does not by itself show prejudice to a party, and, thus, does not necessarily call for a new trial or reversal on appeal. "Neither *Sanders v. Scarvey*, 224 So. 2d 247 (Ala. 1969), *Leach v. State*, 18 So. 2d 285 (Ala. 1994), nor the

103

original opinion in the instant case, is authority for the proposition that on voir dire any failure of any prospective juror to respond properly to any question regardless of the excuse or circumstances entitles a party to a new trial or reversal of the case on appeal." *Kinard v. Carter*, 518 So. 2d 1248, 1252 (Ala. 1982), quoting *Martin v. Mansell*, 357 So. 2d 964, 967 (Ala. 1978), quoting *Freeman v. Hall*, 238 So. 2d 330, 335-336 (Ala. 1970).

The Alabama Supreme Court has consistently held that, where a claim is based on inconsistent, erroneous, or incomplete responses by a prospective juror during voir dire, the question is whether it is probable that the appellant has been prejudiced. "We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in *probable prejudice* to the movant". *Hudson v. 3M Farms*, 689 So. 2d 147, 149 (Ala. Civ. App. 1996) (emphasis added); *Haisten v. Kubota Corp.*, 648 So. 2d 561, 564 (Ala. 1994); *Reed v. Tucker*, 598 So. 2d 840, 841 (Ala. 1992); *Union Mortg. Co. Inc. v. Barlow*, 595 So. 2d 1335, 1342 (Ala. 1992); *Ensor v. Wilson*, 519 So. 2d 1244, 1263 (Ala. 1987); *Kinard v. Carter*, 518 So. 2d 1248, 1252 (Ala. 1987); *Wallace by Inman v. Campbell*, 475 So. 2d 521, 522 (Ala. 1985); *Martin v. Mansell*, 357 So. 2d 964, 967 (Ala. 1978); *Freeman v. Hall*, 238 So. 2d 330, 335 (Ala. 1970).

104

In addition, this court recently held in *Pierce v. State*, 1999 WL 102252, at *13 (Ala. Crim. App. 1999), that where "there is no evidence that the jurors did not truthfully answer the questions asked during voir dire, there is no indication that the appellant was deprived of his right to strike a jury from impartial prospective jurors. Thus, there is no basis for a finding that the jurors' actions might have unlawfully influenced the verdict." *Freeman*, 605 So. 2d at 1260. Alternate Juror Denmark did not recall having met the victim on a couple of occasions during voir dire, and did not know that the acquaintance he later recognized at trial was a friend of the victim, and, thus, answered the questions truthfully, to the best of his knowledge. It is important to note that Alternate Juror Denmark stated clearly that he only barely knew of the victim, that they had met on a couple of occasions, and that this knowledge would have no impact on his ability to serve as an impartial juror. Thus, even had Alternate Juror Denmark taken part in deliberations and the verdict, Reeves would have no claim to prejudice.

In this case, Reeves has no claim to probable prejudice because Juror Denmark was, as an alternate juror, was excused prior to deliberations, and took no part in deliberations or the decision of the case. The trial court reserved its ruling because the case was to be handed over to the jury for deliberations less than an hour later. When testimony concluded shortly thereafter, Alternate Juror Denmark was released from service because he was an alternate. Thus, Alternate

105

Juror Denmark could not have affected the jury's deliberations or the verdict reached in any substantive way.

Various factors have been delineated to help determine whether or not prejudice has occurred. "Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective jurors inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." *Hudson*, 689 So. 2d at 149; *Haisten*, 648 So. 2d at 564; *Reed*, 598 So. 2d at 841; *Union*, 595 So. 2d at 1342; *Ensor*, 519 So. 2d at 1263-1264; *Martin*, 357 So. 2d at 967; *Freeman*, 238 So. 2d at 335. Applying the factors discussed above to this case, it is clear that Reeves was not prejudiced. Alternate Juror Denmark's failure to recall the victim was certainly not willful, and he promptly notified the trial court when he recalled having met the victim on a couple of occasions.

In *Martin*, the Court held that "we are mindful of the heavy responsibility placed on the trial court to maintain the statutory right which parties have to a full and truthful disclosure by jurors on voir dire. However, we must also be aware of inadvertent concealment and failure to recollect on the part of prospective jurors." *Martin v. Mansell*, 357 So. 2d 964, 967 (Ala. 1978); see also *Travis v. State*, 1997 WL 187121, at *4

106

(Ala. Crim. App. 1997)(where the Alabama Court of Criminal Appeals refused to find error when juror answered during voir dire that he did not "know" victim, but admitted after trial that he "knew of" victim). "Furthermore, the Supreme Court of Alabama has determined that whether a party is prejudiced by the failure of a juror to answer on voir dire is 'a matter primarily within the discretion of the trial court. In the absence of a showing of an abuse of discretion, the ruling of the trial court thereon will not be reversed' ". *Talley v. State,* 687 So. 2d 1261, 1271 (Ala. Crim. App. 1996), quoting *Land & Associates Inc. v. Simmons,* 562 So. 2d 140, 148 (Ala. 1989).

There was no error, and certainly no plain error caused by Alternate Juror Denmark's recollection during the trial that he had met the victim on a couple of occasions through a mutual friend. Alternate Juror Denmark, as an alternate, was excused prior to deliberations, and thus had no impact on the jury's deliberations or decision. Reeves contends erroneously that his right to an impartial jury was somehow violated, but fails to demonstrate in any substantive way how it is even remotely possible that this occurred. Whatever would have, or could have happened concerning Alternate Juror Denmark, the same jury of twelve would have heard and decided Reeves's case, and, thus, there are no grounds to disturb Reeves's conviction and sentence.

### X.  UNDER THE LEGAL STANDARD FOR EVALUATING CLAIMS OF PROSECUTORIAL MISCONDUCT, THERE WAS NO SUCH IMPROPER CONDUCT AT TRIAL DURING THE GUILT PHASE.

In issue X (Appellant's Brief at 50-53), Reeves claims incorrectly that one innocuous comment by the prosecutor at his trial amounts to prosecutorial misconduct, and that this comment violated his right to due process.  The comment, however, was not of a nature that it could possibly have influenced the jury, or the jury's decision, and, thus, Reeves's claim is due to be denied.

In this case, Reeves contends that the prosecutors statement that "the Defense is designed and charged with defending this man any way he can" (R. 1079-1080) amounts to prosecutorial misconduct.  At trial, Reeves objected only on the grounds that the statement by the prosecutor violated his right to due process.  Therefore, his additional claim on appeal that the comment was a violation of the Eighth Amendment should be reviewed only for "plain error" according to A.R.A.P. Rule 45A.

The United States Supreme Court has held that "[i]n judging a prosecutor's closing argument, the standard is whether the argument 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 182 (1986), quoting *Donnelley v. DeChristoforo*, 416 U.S. 637 (1975); accord *Duren v. State*, 590 So. 2d 360, 364 (Ala. Crim. App. 1990), aff'd, 590 So. 2d 369 (Ala. 1991), cert. denied, 503 U.S. 974 (1992).  "To justify reversal

108

because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted." *Twilley v. State*, 472 So. 2d 1130, 1139 (Ala. Crim. App. 1985). See also *Jones v. State*, 600 So. 2d 424, 424 (Ala. Crim. App. 1992); *Coral v. State*, 628 So. 2d 954, 985 (Ala. Crim. App. 1992). Furthermore, in order for prosecutorial misconduct to support a reversal, the appellant must show that his or her rights were prejudiced by the alleged misconduct. *Daniel v. State*, 623 So. 2d 438, 443 (Ala. Crim. App. 1993); see also *Whitlow v. State*, 509 So. 2d 252, 256 (Ala. Crim. App. 1987)(a prosecutor's comments directed solely at appellant's counsel are not so likely to be prejudicial to the point of reversal). Thus, Reeves must show that the alleged misconduct so substantially prejudiced him as to result in a denial of due process.

In reviewing claims of improper prosecutorial argument, comments made by the prosecutor must be evaluated in the context of the entire trial, *Duren v. State*, 590 So. 2d at 364, and each case must be judged on its own merits, *Hooks v. State*, 534 So. 2d 329, 354 (Ala. Crim. App. 1987), aff'd, 534 So. 2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050 (1989). This Court has also held that:

> ...In reviewing allegedly improper prosecutorial comments, conduct, and presenting of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. *Whitlow v. State*, 509 So. 2d 252, 256 (Ala. Crim. App. 1987); *Wysinger v. State*, 448 So. 2d 435, 438 (Ala. Crim. App. 1983); *Carpenter v. State*, 404 So. 2d 89, 97 (Ala. Crim.

109

> App. 1980), cert. denied, 404 So. 2d 100 (Ala.
> 1981). Moreover, this Court has also held that
> statements of counsel in argument to the jury
> must be viewed as delivered in the heat of
> debate; such statements are usually valued by
> the jury at their true worth and are not expected
> to become factors in the formation of the verdict.
> *Orr v. State*, 462 So. 2d 1013, 1016 (Ala. Crim.
> App. 1984); *Sanders v. State*, 426 So. 2d 497,
> 509 (Ala. Crim. App. 1982)

*Bankhead v. State*, 585 So. 2d 97, 106 (Ala. Crim. App. 1989), aff'd in relevant part, remanded on other grounds on reh., 585 So. 2d 112, 127 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd on unrelated grounds, 625 So. 2d 1146 (Ala. 1993). See also *Duren v. State*, 590 So. 2d at 364.

Statements made by attorneys during the course of a trial are never to be considered as evidence and the United States Supreme Court considers this to be an important factor in denying a claim of improper comment during a closing argument. *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)("The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that arguments of counsel were not evidence."). Jurors are presumed to follow their instructions. *Taylor v. State*, 666 So. 2d 36, 71 (Ala. Crim. App. 1994), aff'd on return to remand, 666 So. 2d 71 (Ala. Crim. App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120 (1996). Here, the trial court appropriately instructed the jury that the comments and arguments of attorneys were not to be considered

110

evidence. (R. 1097) Thus, Reeves must make a showing of prejudice strong enough to overcome the presumption that the jury, following its instructions, did not consider the arguments of counsel as evidence in reaching its decision.  Reeves has failed to meet that burden.

"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." *Rutledge v. State*, 523 So. 2d 1087, 1100 (Ala. Crim. App. 1987), rev'd on other grounds, 523 So. 2d 1118 (Ala. 1988).  See also *Burton v. State*, 651 So. 2d 641, 652 (Ala. Crim. App. 1993), aff'd, 651 So. 2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115 (1995).  Thus, it is not error for a prosecutor to argue a different interpretation of the evidence as "[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way." *Henderson v. State*, 584 So. 2d 841, 857 (Ala. Crim. App. 1990), remanded on other grounds, 584 So. 2d 862 (Ala. 1991), aff'd on remand, 587 So. 2d 1071 (Ala. Crim. App. 1991). Furthermore, "[c]ontrol of closing argument rests in the broad discretion of the trial court, and the trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse." *Thomas v. State*, 601 So. 2d 191, 193 (Ala. Crim. App. 1992).  Thus, wide discretion is allowed the trial court in regulating the arguments of counsel. *Racine v. State*, 275 So. 2d 655, 656 (Ala. 1973).  Here, the trial judge who

111

heard the prosecutor's comment, inflection and emphasis, denied

Reeves's general objection. (R. 1080)

Matters resting in the sound discretion of the trial court will not be disturbed absent a clear abuse of discretion. *Ex parte Allstate Ins. Co.,* 401 So. 2d 749, 751 (Ala. 1981); accord, *Ex parte Guerdon Industries, Inc.,* 373 So. 2d 322, 324 (Ala. 1979); *Williams-Johns Co. v. Johns,* 355 So. 2d 706, 707 (Ala. 1978). Furthermore, the trial court is presumed not to have abused its discretion. *Ex parte Jones,* 20 So. 2d 859, 862 (Ala. 1945). In order "[t]o establish an abuse of discretion, it must be shown that the trial court committed a clear or palpable error." *Reed v. Montaomeru,* 341 So. 2d 926, 939, (Ala. 1976), citing to *Ex parte Jones,* 20 So. 2d at 862. Thus, in order to overcome the presumption against judicial error and prevail on a claim of prosecutorial misconduct, Reeves must also clearly demonstrate that the trial court committed palpable error in the utilization of its broad discretion in regulating the arguments of counsel.

"In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." *Maples v. State,* 1999 WL 171220, at *47 (Ala. Crim. App. 1999), quoting *Mitchell v. State,* 480 So. 2d 1254, 1257-58 (Ala. Crim. App. 1985). Also, "[w]hen the evidence of the defendant's guilt is strong, the defendant must show that the trial court's error was prejudicial." *Ex parte Harris,* 428 So. 2d 124, 125 (Ala. 1983).

112

Reeves cites several cases in an effort to support his claim that one isolated and relatively innocuous statement by the prosecutor somehow prejudiced him. These cases, however, where they can be found by the citations given, are either markedly dissimilar to the present case, or are arguments in support of the State's position that this statement either was not error or was harmless error: *Brooks v. Kemp*, 762 F.2d 1383, 1408 (11th Cir. 1985)(errors by prosecutor in closing argument would not warrant reversal unless their absence would have, in reasonable probability, changed outcome, and prosecutor's improper expressions of personal belief in capital punishment, discussion of his policy of rarely seeking death penalty, claim that defendant's death would save money, and overreaching "war on crime" speech did not render sentencing hearing fundamentally unfair); *Oregon v. Kennedy*, 456 U.S. 667 (1982)(asking expert witness if reason that witness had never done business with defendant was "because he is a crook" was not intended to provoke a mistrial.); *Stone v. Estelle*, 556 F. 2d 1242 (5th Cir. 1977)(while prosecutor's questioning and comment to jury relating to defendant's post-arrest exercise of constitutional rights to have an attorney and to remain silent was unwarranted, such comments, which were not directed at defendant's essential claim of self-defense, did not deny him due process and were harmless beyond reasonable doubt).

Here, it is difficult to imagine that one isolated comment by the prosecutor during the guilt phase that "the Defense is designed and

113

charged with defending this man any way he can" could have influenced "the finding of the jury" and Reeves has made no showing that this comment was "prejudicial" or involved "substantial prejudice". In addition, the evidence in this case was overwhelming, and, thus, the comment certainly had no effect on the outcome of the trial. Therefore, Reeves's claim that this isolated comment by the prosecutor diverted jurors from their primary responsibility is without merit and due to be denied.

### XI. UNDER THE LEGAL STANDARD FOR EVALUATING CLAIMS OF PROSECUTORIAL MISCONDUCT, THERE WAS NO SUCH IMPROPER CONDUCT DURING THE PENALTY PHASE.

In issue XI (Appellant's Brief at 53-57), Reeves incorrectly claims that one innocuous comment by the prosecutor during the penalty phase amounted to prosecutorial misconduct of such import that it would now warrant reversal. At trial, Reeves argued that the comment was an improper reference to his having exercised his constitutional right to a trial, and a violation of due process, even though the comment was in reference to the victim, Willie Johnson. In this appeal Reeves now argues that the comment by the prosecutor violated a multitude of his rights, each of which are distinct from an improper reference to his having exercised his constitutional right to a trial. Therefore, this claim should be reviewed only for "plain error" according to Rule 45A of the Alabama Rules of Appellate Procedure. (See plain error discussion in issue I).

114

At Reeves's trial, the prosecutor stated as follows:

> MS. Wilson: Now you are called upon to make a tough decision. You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or life in prison without parole. Who decided Willie Johnson's fate? Did he have the opportunity to have a five or six day proceeding?

> MR. GOGGANS: Objection, Your Honor. May I approach?

> (The following occurred at the bench outside the hearing of the jury):

> MR. GOGGANS: The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial. It's an improper comment and in violation of due process of law in the federal and state constitution. I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper.

> THE COURT: The comment was made about Mr. Johnson, not your client.

> MR. GOGGANS: She said he did not have a right to a five or six day proceeding.

> MS. WILSON: That's what I said, Mr. Johnson did not.

> THE COURT: I'm going to deny your motion. I'm not going to give an instruction to the jury.

(R. 1191-1192)

In *Jenkins v. State*, the Alabama Court of Criminal Appeals addresses a prosecutor's argument that was similar to the one used in the instant case, though much more extensive:

115

The appellant also argues that the following comment incorrectly urged the jury not to use sympathy in their decision making: "We don't want vengeance at all. Nobody ever asked for vengeance, and I hope I haven't insinuated that in any manner. We don't want vengeance. And I speak on behalf of everybody connected with this case. We want you to be fair to that defendant right there. I want you to be fair. *I want you to have the same amount of mercy on him when you go back there and deliberate his fate that he had on Tammy Hogeland the morning of the 18th out there on that bank on the side of I-59 when he strangled the life out of her. That's all we ask. If you will do that, show him the same amount of mercy he showed Tammy, you will return a death penalty recommendation in this case.*"

This court addressed a similar argument in *Kuenzel*, supra. Judge Bowen stated: "[i]n *California v. Brown*, 479 U.S. 538 (1987), the Supreme Court decided that 'an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penal phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution.' *California v. Brown*, 479 U.S. at 539", *Kuenzel*, 577 So. 2d at 496, (emphasis added in *Kuenzel*). See also *Saffle v. Parks*, 494 U.S. 484 (1990).

"On the basis of these decisions, we find no plain error in the prosecutor's comments against mercy and sympathy. 'In order to obtain relief [from an alleged misstatement of the law by a prosecutor], ... petitioner must show that: (1) the prosecutor in fact misstated the law; and (2) the misstatement rendered the trial fundamentally unfair.' " *Kuenzel*, 577 So. 2d at 498 (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1091 (11th Cir. 1987), aff'd on rehearing, 844 F.2d 1464, 1468-69 (11th Cir. 1988), cert. denied, 489 U.S. 1071 (1989). The prosecutor's

116

comments were not incorrect statements of the law. No error occurred here.

*Jenkins v. State*, 627 So. 2d 1034, 1051 (Ala. Crim. App. 1992) (emphasis added).

In *Kuenzel*, the Alabama Court of Criminal Appeals held that a prosecutor's comments during the penalty phase calling on the jury to show the defendant the same mercy he showed his victim was not plain error. The prosecutor stated in part "[a]nd you think about what happened down there on that occasion. What happened to Linda Offord. I submit to you, she didn't have time to plead for mercy or sympathy. Because it didn't involve that down there, then it ought not involve this here." *Kuenzel v. State*, 577 So. 2d 474, 495 (Ala. Crim. App. 1990), aff'd, 577 So.2d 531 (Ala. 1991).

Here, Reeves's claim that a reference to the victim violated his rights and would thus warrant reversal is erroneous. This isolated comment was not error, and certainly not plain error. Therefore, Reeves's claim is due to be denied.

## XII. THE TRIAL COURT PROPERLY USED ITS DISCRETION WHERE IT FOUND THAT LOW INTELLIGENCE DID NOT EXIST AS A MITIGATING FACTOR IN REEVES'S SENTENCING PHASE.

In issue XII (Appellant's Brief at 57-59), Reeves mistakenly argues that the trial court erred when it did not consider a supposed low level of intelligence of Reeves to be a mitigating factor. The trial court, in fact, considered the issue, but found that the supposed low level of intelligence did not exist as a mitigating factor. The finding of the trial

117

court, therefore, was a proper use of discretion and should not be disturbed.

Reeves mistakenly argues that "[t]he trial court did not consider [low intelligence] as a mitigating factor." (Appellant's Brief at 59) This is simply a misstatement of the record. The trial court allowed Reeves to introduce what evidence he wished to on the subject, and clearly considered the issue, but found that low intelligence did not exist in this case as a mitigating factor. In *Haney v. State*, the Alabama Court of Criminal Appeals held that "[t]he fact that the court did not make such a finding [of a mitigating factor] does not mean that it did not consider the evidence offered. On the contrary, it indicates that the trial court did not find that the evidence was mitigating. We find no abuse of the trial court's discretion in this regard." *Haney v. State*, 603 So. 2d 368, 389 (Ala. Crim. App. 1991), aff'd, 603 So. 2d 412 (Ala. 1992), cert. denied, 507 U.S. 925 (1993).

In his charge to the jury during the penalty phase, the trial court stated *inter alia*, the following:

> THE COURT: If you find that the Defendant grew up in a poor home environment, you must consider that to be a mitigating circumstance. If you find that the Defendant lacked appropriate developmental resources in growing up, you must consider that to be a mitigating circumstance. *If you find that the Defendant's level of intelligence is on the borderline, you must consider that to be a mitigating circumstance.*

(R. 1217)(emphasis added)

118

Thus, the jury was made aware that they were required to consider low or borderline intelligence as a mitigating factor. The trial court also explained just prior to its sentencing that it considered the evidence of mental deficiency on the part of Reeves that was introduced at trial:

> MR. GOGGANS[defense]: Your Honor, the defense has reviewed the report also. With respect to the report, the report indicates no record of any type of mental abnormality. Of course, the Court will recall the evidence and the testimony in the course of the penalty phase of the trial, particularly that of Dr. Ronan indicating mental deficiencies on Mr. Reeves's part.
>
> MR. GREENE: I think the report indicated they just didn't have any reports that she was aware of. So therefore, they weren't included in the report. But I think that issue was deeply covered at trial.
>
> THE COURT: *I believe it was covered in the penalty phase, and there should be exhibits if I'm not mistaken.*
>
> MR. GOGGANS: Yes, sir.
>
> THE COURT: That were introduced in support of that and, of course, part of the record. Does the State want to present anything with regard to the sentencing?

(R. 1231)

Although the trial court is required to "not be precluded from considering as a mitigating factor, any aspect of a defendant's character and any of the circumstances of the offense that the defendant proffers as the basis for a sentence less than death", *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the trial court is not required to find the existence of

119

any mitigating factor that Reeves claims.  In *Loggins v. State*, this Court held that "[a]lthough the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer." *Loggins v. State*, 1999 WL 254457, at *16 (Ala. Crim. App. 1999); see also *Carroll v. State*, 599 So. 2d 1253, 1272 (Ala. Crim. App. 1992), aff'd, 627 So. 2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171 (1994); *Ex parte Harrell*, 470 So. 2d 1309, 1318 (Ala. 1985), cert. denied, 474 U.S. 935 (1985); *Arthur v. State*, 711 So. 2d 1031, 1091 (Ala. Crim. App. 1996), aff'd, 711 So. 2d 1097 (Ala. 1997), *quoting Bush v. State*, 695 So. 2d 70, 89 (Ala. Crim. App. 1995).  Also in *Loggins*, this Court stated "[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." *Loggins v. State*, 1999 WL 254457, at *16 (Ala. Crim. App. 1999).  See also *Harrell v. State*, 470 So. 2d 1303, 1308 (Ala. Crim. App. 1984), aff'd, 470 So. 2d 1309 (Ala. 1985), cert. denied, 474 U.S. 935 (1985);  "It is not required that the evidence submitted by the accused as a non statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer." *Land v. State*, 678 So. 2d 224, 241 (Ala. 1996), *quoting Haney v. State*, 603 So. 2d 368, 389 (Ala. Crim. App.

120

1991); see also *Cochran v. State*, 500 So. 2d 1161, 1176 (Ala. Crim. App. 1984), aff'd in pertinent part, remanded on other grounds, 500 So. 2d 1179 (Ala.1985), aff'd on return to remand, 500 So. 2d 1188 (Ala. Crim. App. 1985), aff'd, 500 So. 2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033 (1987).

"In keeping with the dictates of the United States Supreme Court in *Lockett v. Ohio*, 438 U.S. 586 (1978), the sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances." *Clisby v. State*, 456 So.2d 105, 108 (Ala. 1984), cert. denied 470 U.S. 1009 (1985).

Although Reeves attempted to show that a low level of intelligence existed, there is minimal evidence that it did, and significant evidence for the trial court to find that it did not. Reeves's own forensic psychologist stated: "But there are people who have his intelligence level that work, have jobs, that have families, that consistently do fine." (R. 1170) In addition, Reeves's forensic psychologist stated that "Matthew Reeves was not in a level that they would call him mental retardation, no." (R. 1175)

In *Burgess v. State*, the trial court had noted evidence of Burgess's low intelligence, but declined to find Burgess's low intelligence as a mitigating factor. Upon review, this Court held that "[a] trial court is

121

required to consider all evidence a defendant offers as mitigation... [but] [w]hether the proffered evidence is found to mitigate the crime, however, is a decision that rests in the trial court's discretion." *Burgess v. State*, 723 So. 2d 742, 768 (Ala. Crim. App. 1997)

Reeves's charge that the trial court did not consider the evidence proffered in support of finding low intelligence as a mitigating factor is inaccurate. The trial court considered the evidence submitted, but found that a low level of intelligence did not exist as a mitigating factor. Thus, because there was conflicting evidence concerning the mental capacity and intelligence of Reeves, the trial court was perfectly within its discretion to find that low intelligence did not exist as a mitigating factor. Therefore, there was no abuse of discretion by the trial court and Reeves claim to the contrary is due to be denied.

## XIII. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON REASONABLE DOUBT.

In issue XIII of his brief (Appellant's Brief at 59-61), Reeves argues that the trial court committed reversible error in instructing the jury on reasonable doubt. The instruction by the trial court on reasonable doubt, however, was proper. The trial court instructed the jury on reasonable doubt as follows:

> "The reasonable doubt which entitles an accused to an acquittal, it is not a mere, fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from all or any part of the evidence or from the lack of the evidence and remaining after a careful consideration of the testimony, such as

122

> reasonable, fair minded and conscientious men and women would entertain under all of the circumstances. Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt but simply beyond all reasonable doubt. If after comparing and considering all of the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt and the Defendant would be entitled to an acquittal."

(R. 1092)

Reeves argues that this instruction violates the requirements of due process and relies on *Cage v. Louisiana*, 498 U.S. 39 (1990). In *Cage*, the Supreme Court held that a Louisiana trial court's reasonable doubt instruction impermissibly suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard of *In re Winship*, 397 U.S. 358, 364 (1970). The instruction in *Cage* provided in relevant part:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of the doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or the lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.*

123

> It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty*.

*Cage*, 498 U.S. at 40 (emphasis supplied by the Court).

The court's instruction on reasonable doubt in this case, however, is comparable to that used in the later case of *Victor v. Nebraska*, 511 U.S. 1 (1994). In *Victor*, the United States Supreme Court held that the reference to substantial doubt alone was not sufficient to render the instruction unconstitutional. *Victor*, 511 U.S. at 20.

This Court held similarly that "Although the words actual and substantial were used in the instant instruction, they do not, in our view cause the same problem that the Court found with the instruction in *Cage*." *McMillian v. State*, 594 So. 2d 1253, 1283 (Ala. Crim. App. 1991); see also *Sockwell v. State*, 675 So. 2d 4, 23 (Ala. Crim. App. 1993)(where this court held "it was the use of all three phrases ['grave uncertainty', 'actual and substantial doubt', and 'moral certainty'], in conjunction with each other that the Supreme Court determined was unconstitutional in *Cage*"); *Davis v. State*, 720 So. 2d 1006, 1020 (Ala. Crim. App. 1998)(where this court held "As long as the charge as a whole correctly conveyed the definition of reasonable doubt and was not confusing or misleading, it will be upheld, even if it includes some of the language condemned in *Cage*.").

124

Furthermore, this Court recently held in *Greenhill v. State* that "[t]he trial court in the instant case did use the words 'actual and substantial doubt' and 'moral certainty'; however, it did not use the phrase 'grave uncertainty.' This case is clearly distinguishable from *Cage.* We find that taken as a whole the reasonable doubt instruction correctly conveyed the concept of reasonable doubt to the jury. The trial court's instruction on the presumption of innocence, burden of proof, and weighing of evidence support our finding. We conclude that there is no reasonable likelihood that the jury applied the instructions in such a manner as to violate the appellant's constitutional rights" *Greenhill v. State,* 1999 WL 254493, at *7 (Ala. Crim. App. 1999); see also *Slaton v. State,* 680 So. 2d 909, 919 (Ala. 1996).

The Court's instruction in the instant case did not include either the use of the term "grave uncertainty", or a reference to "moral certainty" rather than evidentiary certainty, two of the phrases found to be problematic in *Cage.* In addition, the trial court's instruction was virtually identical to the Alabama pattern jury instructions, excepting that the court removed the phrase "and to a moral certainty" (R. 1028) at Reeves's request. The trial court's instruction correctly conveyed the concept of reasonable doubt and there is no likelihood that the jury incorrectly applied the reasonable doubt standard. Therefore, no reversible error occurred.

125

## **CONCLUSION**

Matthew Reeves has failed to establish that he is entitled to relief on any of the claims raised on appeal.  For all of the reasons presented above, this Court should affirm the capital murder conviction and death sentence imposed by the Circuit Court of Dallas County.

Respectfully submitted,

BILL PRYOR   (PRY002)
ALABAMA ATTORNEY GENERAL

THOMAS F. PARKER IV   (PAR018)
ASSISTANT ATTORNEY GENERAL

126

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of July, 1999, a copy of the foregoing was served on the attorney for the appellant by placing the same in the United States Mail, first class postage prepaid and addressed as follows:

    Thomas Goggans
    P. O. Box 1307
    Montgomery, AL 36102

THOMAS F. PARKER IV
ASSISTANT ATTORNEY GENERAL

**ADDRESS OF COUNSEL:**

Office of the Attorney General
Capital Litigation Division
Alabama State House
11 South Union Street
Montgomery AL  36130-0152
(334) 242-7408

7548TP&MM

127