# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MATTHEW REEVES,         )
                                   )
        Petitioner,        )
                                   )
vi.                        )    Case No.  1:17-cv-00061-KD-MU
                                   )
JEFFERSON S. DUNN,      )
Commissioner of the Alabama   )
Department of Corrections,    )
                                   )
        Respondent.     )

# VOLUME 10

# State Court – Direct Appeal, Briefs and Orders

STEVEN T. MARSHALL
ALABAMA ATTORNEY GENERAL

AND

BETH JACKSON HUGHES
ALABAMA ASSISTANT
ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Alabama Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7392

CHARLES A. STEWART III
JONATHAN C. "RUDY" HILL

BRADLEY ARANT BOULT
   CUMMINGS LLP
445 Dexter Avenue, Ste 9075
Montgomery, AL 36104
(334) 956-7700

OF COUNSEL:
Jodi E. Lopez (*pro hac forthcoming*)
Ryan M. Sandrock (*pro hac forthcoming*)
Ariella Thal Simonds (*pro hac forthcoming*)
Melissa O. Evidente (*pro hac forthcoming*)
Sonia A. Vucetic (*pro hac forthcoming*)
Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000



**ORIGINAL**

FILED

SEP − 1 2000

CLERK
A COURT CRIMINAL APPEALS

### IN THE ALABAMA COURT OF CRIMINAL APPEALS

| | | |
|---|---|---|
| MATTHEW REEVES, | ) | |
| Appellant, | ) | |
| v. | ) | Case No. CR-98-0777 |
| STATE OF ALABAMA, | ) | |
| Appellee. | ) | |

## ON APPEAL FROM THE CIRCUIT COURT OF DALLAS COUNTY, ALABAMA

## APPELLANT'S APPLICATION FOR REHEARING, RULE 39(K), A.R.A.P. MOTION AND BRIEF IN SUPPORT OF APPLICATION FOR REHEARING

Thomas M. Goggans
Ala. S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36102
PH: (334)-834-2511
FX: (334)-834-2512

Attorney for Appellant
Matthew Reeves

IN THE ALABAMA COURT OF CRIMINAL APPEALS

MATTHEW REEVES,            )
                          )
        Appellant,         )
                          )
v.                        )   Case No. CR-98-0777
                          )
STATE OF ALABAMA,          )
                          )
        Appellee.          )

### APPELLANT'S APPLICATION FOR REHEARING AND RULE 39(K), A.R.A.P. MOTION

Appellant Matthew Reeves applies for a rehearing in this case. As grounds, Appellant Reeves asserts that this Court has misread the record, misinterpreted the law, and misapplied the law to the facts in this case. Appellant Reeves' brief in support of this application is filed contemporaneously herewith.

Pursuant to Rule 39(k), A.R.A.P., Appellant Reeves moves this Court to include the following facts in an opinion on rehearing:

\*\*\*

Appellant Matthew Reeves was charged in Dallas County with robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark. This Defendant shot him through the neck and into his chest area killing him practically

1

instantly. Three of them are arrested in a house
when they went to a party that afternoon."

(R. 113-114). Jurors were also asked if they knew Appellant
Reeves or any member of his family. (R. 93-94). Juror Trotter did
not disclose that she knew or knew of Appellant Reeves or his
brother Julius. Juror Denmark did not disclose that he knew Mr.
Johnson.

In the jury selection process jurors were questioned about
their views on capital punishment. The questioning of Juror Parnell
was, in part, as follows:

> THE COURT: ... Ms. Parnell, you understand this is
> a capital murder case?
>
> MS. PARNELL: Yes.
>
> THE COURT: Do you understand that if there is a
> conviction or if the Defendant is found guilty, that
> there are two possible punishments for this offense?
>
> MS. PARNELL: Yes.
>
> THE COURT: One is the death penalty, and the
> other is life imprisonment without parole.
>
> MS. PARNELL: Yes.
>
> THE COURT: In order for you to qualify to serve
> as a juror in this case, you must be able to give both
> the death penalty and life without parole fair
> consideration and make a recommendation to the
> Court at the appropriate time; do you understand
> that?
>
> MS. PARNELL: Yes.
>
> THE COURT: Ms. Parnell, there are people in our
> society who are totally opposed to the death penalty
> under any circumstance. They cannot vote to
> recommend it for any criminal offense. There are
> people in our society who believe that the death
> penalty is the only appropriate punishment for
> certain criminal violations. They cannot consider
> anything less than the death penalty such as life

2

without parole. And the questions I have for you are designed to determine what you think about all of this. Okay. The first question is easy. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair your ability to serve as a juror in this case? Do you understand that questions? Are you against the death penalty so much that you can't discharge your duties as a juror?

MS. PARNELL: I really – you know, I feel like if he took his life for nothing, you know, that what I feel, he should get the death sentence, you know.

THE COURT: Well, do you know anything about the facts of this case other than what was said to you yesterday?

MS. PARNELL: No, I don't nothing about it. I don't; no, I ain't heard nothing.

THE COURT: Let's back up then because my question to you is this. First are you opposed to the death penalty? Do you understand what I am saying? Are you against it? Are you for it?

MS. PARNELL: I would say for it, you know, because he took a life, you know.

THE COURT: The next question is this. You remember I told you that in order to be qualified as a juror you've got to be able to give fair and equal consideration to both the death penalty and the other penalty of life without parole. Are you opposed to anything less then death? Are you opposed to considering life imprisonment without parole if the facts and the law dictate that that should be the sentence in your judgment?

MS. PARNELL: If that's – if they go with that sentence, I will go along with it, you know, in that sense.

THE COURT: So what you're telling me is that you can give both of those alternatives fair

3

consideration? You can be fair and equally weigh the death penalty and life without parole?

MS. PARNELL: Yeah, both of them, yeah.

THE COURT: Can you give both of them fair consideration, is that what you're telling me?

MS. PARNELL: Well, I really don't understand. You know, like I say I've never been on a jury before. See what I'm saying, I wasn't there, you know. I don't know what happened, you know and stuff. But, you know, I don't know what to tell you. I really don't.

THE COURT: The first thing you can tell me is whether you are opposed or in favor of the death penalty. You told me you were in favor of it?

MS. PARNELL: Yes.

THE COURT: The second thing I need to ask you is whether or not you can vote for something other than the death penalty. Can you vote for life without parole if it's appropriate, if it's right, if its proper?

MS. PARNELL: Yeah.

THE COURT: You can consider both of them depending upon the facts?

MS. PARNELL: Yes, either one.

THE COURT: You can listen to the law and the facts and apply the law to the facts; can you do that, follow my instructions?

MS. PARNELL: I can follow your instructions.

THE COURT: Okay. You have listened to that facts; you have listened to the law. Do you feel as though you lean towards one more than the other, the death penalty versus life without parole? Do you see what I'm saying?

4

MS. PARNELL: I have not heard no more than what was told to me.

THE COURT: I'm trying to find out how you feel about the death penalty in your heart. Do you think you can give –

MS PARNELL: I wouldn't like nobody to take nothing – I've got a life of my own, you know, but I can go with, you know, that parole in prison, you know, for the rest of his life, you know, whatever, you know either one, you know. It would depend on – if somebody else told me it's true – if it's true that he did it, you know, I would say the death penalty, you know. That's what I feel.

THE COURT: So you could keep –

MS. PARNELL: If it's something else, I'd say give him life without parole.

THE COURT: So you can keep an open mind; is that right?

MS. PARNELL: Yeah.

THE COURT: And you can hear the facts and follow my instructions?

MS. PARNELL: (Nods head affirmatively).

THE COURT: And then you can give both of those alternative punishments fair consideration; it that correct? Do you understand what I'm saying? You can think about both of the penalties equally; is that right?

MS. PARNELL: Right.

THE COURT: And you can recommend to me one of them?

MS. PARNELL: Yes.

THE COURT: You don't have any problem with that?

5

MS. PARNELL: No.

THE COURT: If you think it should be death, then you don't have a problem voting death, is that right?

MS. PARNELL: No.

THE COURT: If it's life without parole, you think that's a right thing to do, you don't have a problem voting life without parole.

MS. PARNELL: No.

...

MR. GOGGANS: You're going to hear – a jury in this type of proceeding hears evidence. It hears evidence of reasons the prosecution thinks the person should get the death penalty; then you hear other reasons why the person ought to get life without parole. The judge will instruct you on how to weigh those. You have aggravating circumstances that weight in favor of the death penalty, and you have mitigating circumstances that weigh in favor of the sentence of life without parole. Would you, Ms. Parnell, as you're sitting there after having heard everything – you've heard all these instructions because you have found that this person intentionally killed somebody during the robbery; in other words, you found him guilty of capital murder. Would you be able to put aside that personal feeling that you have and that conviction and consider everything and apply that law, or would you still carry that conviction with you and automatically go for the death penalty?

MS. PARNELL: I would go for the death penalty. You shouldn't take a life. My point is my son was shot in the head. He died, you know, but he came back alive; do you see what I'm saying? They didn't do nothing to the guy that did it, shot my son, you know. But I feel like, you know, if you take a life, you know, you should give you life. You can't take nobody's life and give a life. You cannot give the life back. He's dead, you know. You shouldn't

6

do it. You had no reason to. Do you see what I am saying?

MR. GOGGANS: You feel pretty strongly about that?

MS. PARNELL: Yeah.

MR. GOGGANS: No other questions.

MS. WILSON: If the Judge told you though it was your duty to listen to all of the evidence and to weight the two sentences, to consider life without parole as well as the death penalty and to reserve, not to make a decision until you heard all of the evidence – and there will be a lot of evidence put forth by the defense and by the State. Could you wait until you heard all of that evidence before you make up your mind as to what you thought the appropriate sentence would be?

MS. PARNELL: Yes, because I have never heard the case.

(R. 421-430).  A defense motion to excuse Juror Parnell for cause based upon her death penalty views was denied.  (R. 430).

The State of Alabama's theory of prosecution at trial was essentially that Appellant Reeves, his brother Julius Reeves, and Brenda "Bam-Bam" Suttles had intentionally killed Willie Johnson by shooting him with a shotgun and robbed him.

Appellant Reeves filed motions to suppress evidence prior to trial.  (C. 113-116, 126-127).  The motion to suppress evidence seized in a search of Appellant Reeves' residence stated:

"1.  In November of 1996, government agents searched the residence of Defendant Matthew reeves and seized certain items therefrom.

"2. The aforementioned search was conducted without probable cause, without a properly issue[d] search warrant, without proper consent or beyond the scope of any consent given."

"3. The seizure of items from Defendant Reeves' residence was a fruit of violations of the proscriptions against unreasonable searches and seizures of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, § 5 of the Alabama Constitution of 1901; Ala. Code § 15-5-1 et seq.; and Rule 4, A.R.Cr.P."

(C. 126).

Evidence at a suppression hearing indicated the following:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found. (R. 542). Grindle said that the dog tracked to the backyard of a house near Appellant Reeves' house and to Appellant Reeves' house. (R. 542-543). Grindle testified that he went to Reeves house. (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door. (R. 544). Matthew Reeves and Julius Reeves were not there. (R. 549, 570). According to Grindle, Marzetta Reeves gave him permission to come and search the house.[1] (R. 545-546). Grindle and other police officers went in and searched throughout the house. They seized a number of items from Matthew and Julius Reeves' bedroom. (R. 548-549). Among those items were blood stained articles of clothing and a shotgun. (R. 548-549). The prosecution did not elicit evidence that Ms. Reeves had authority to consent to the search of Appellant Reeves' room.

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles' house. (R. 553-554). Brenda "Bam-Bam" Suttles' sister answered the door. (R. 555). When the door was opened, the officers saw Appellant Reeves asleep on a sofa. (R. 554). They entered immediately and arrested Reeves. (R. 555).

Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions. (R. 552-567). On the second occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom. (R. 552, 607).

The Circuit Court of Dallas County overruled motions to suppress evidence. (R. 612-613).

---

[1] Marzetta Reeves' recollection as to the "consent" differed markedly from Grindle's. (R. 568-596).

8

Brenda "Bam-Bam" Suttles, pursuant to a plea bargain agreement with the prosecution, (R. 722-725), testified against Appellant Reeves at trial. She went into great detail as to the events leading up, surrounding, and after Johnson's death. (R. 682-749). Among the details she recited were the following:

Johnson had towed them and others -- Jason Powell and Emmanuel Suttles -- Powell's broken down car from White Hall back to Selma. (R. 692-694). She said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley.[2] (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab. (R. 693-694). She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck. (R. 704). She said that Julius Reeves jumped out of the truck and said: "Troll [Matthew Reeves], what you done did?" (R. 704). She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets and got everything out. (R. 743). Brenda Suttles recalled telling the police that Matthew Reeves had killed Johnson for nothing. (R. 743). She recalled that during that night Matthew Reeves had said that by killing Johnson he would get a gang tear drop -- something given for killing someone. (R. 720).

Jason Powell also testified against Appellant Reeves. The trial court did not allow the defense to question Powell about his being in jail and having criminal charges hanging over him at the time of his testimony. (R. 792-794, 804-806). Powell did say during his testimony that Julius Reeves had said to Matthew Reeves that he had almost shot him. (R. 843).

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

"She indicated to me at that time that she had recalled during the course of the last evening that

---

[2] With respect to the alley, she said: "He had seen this red car across the street, and he was like I don't feel like being bothered. He said, I am going to this house up in the alley. So, I'm going to drop y'all off in the alley." (R. 702).

9

the codefendant Julius Reeves had about six or
seven years ago stolen her vehicle and that this was
or this started a string of events and thefts that also
took place in Bibb County that her family was
involved in on an intimate basis I guess you would
say and that deeply affected Ms. Trotter and her
family, this car theft involving Julius Reeves.  She
does not recall whether Matthew was involved.  She
does recall the name of Danny Tate and that there
were four or maybe five other people involved in
the theft and other events that surrounded the theft
of the vehicle.

"Ms. Trotter has indicated to me that she believes
that this event and the events that surrounded this
theft would have an adverse impact on her ability to
be fair and impartial in this case."

(R. 803).  Ms. Trotter was then excused from the jury.  (R. 803).

Juror Denmark was on the trial jury as an alternate.  Juror
Denmark disclosed the following in the midst of the trial:

"I told him [the judge] that I knew him from another
guy.  I seen him with the family.  I was thinking that
I knew the truck and knew the guy.  But I never
could picture who it really was until I saw him and
his name is Willie too.  He worked for Roy out
there.  I've got a key to Roy's shop.  I go up there
sometimes and work on my truck and whatever.
Willie helped him, and he and he and Roy were
friends.  And he'd come up there a lot when I was
working on my truck before, how I kept things in
tune.  That's just the only way I knew him was from
Roy's shop.  I didn't even know this had happened
to him."

(R. 993).  Juror Denmark went on to say that he began thinking
about the truck as follows:

"Last night when they were talking about Tyler
because I live out there.  I couldn't figure out who it
was until I saw that other Willie today.  I asked,
what are you doing here?  He said, I'm in there with
the family.  So I knew it was the same one.  He had

10

always hung around with him and was on good
terms with Roy.  He lives out there now."

(R. 993-994).  Juror Denmark was an alternate juror and was
excused before jury deliberations. (R. 1104).

During its closing argument, one of the prosecutors put to
the jury: "The Defense is designed and charged with defending this
man any way he can."  (R. 1079-1080).  The defense objected as
follows:

"It seems to me that Mr. Greene [prosecutor] is
going to suggest to the jury that the only reason I'm
making an argument is because I've somehow been
appointed in this case to represent Mr. Reeves.  As
Mr. Greene well knows I voluntarily took this case.
It's inappropriate to suggest to this jury that
somehow I am making this argument just because
I've got to.  It's a violation of due process to
suggest that.  I ask that the jury be instructed to
disregard that last remark. "

(R. 1080).  The trial court overruled a defense objection to that
argument.  (R. 1080).

The trial court refused to give the following written
requested defense jury instructions:

Number 33: "An accused is not guilty of capital robbery-
murder where the intent to rob was formed only after the deceased
was killed." (C. 213, R. 1042-1045, 1047-1048).

Number 34: "A robbery committed as a mere afterthought
and unrelated to a murder will not sustain a conviction of capital
robbery-murder."  (C. 214, 1042-1045, 1047-1048).

Number 35: "An accused is not guilty of a capital robbery-
murder where the intent to steal was formed only after the
deceased was killed." (C. 215, R. 1042-1045, 1047-1048).

Number 31:

"Before a defendant can be held criminally
responsible for the conduct of others it is necessary
that such defendant have willfully associated
himself in some way with the crime and have

11

willfully participated in it.  Mere presence at the
scene of a crime and even knowledge that a crime is
being committed are not sufficient to establish that a
defendant either directed or aided and abetted in the
crime.  You must find beyond a reasonable doubt
that a defendant was a willful participant and not
merely a knowing spectator."

(C. 211, R. 1037-1038).

The trial court's instruction on reasonable doubt in the guilt
phase was as follows:

"The reasonable doubt which entitles an accused to
an acquittal, is not a mere, fanciful, vague,
conjectural or speculative doubt but a reasonably
substantial doubt arising from all or part of the
evidence or from a lack of the evidence and
remaining after a careful consideration of the
testimony, such as reasonable, fair minded and
conscientious men and women would entertain
under all the circumstances.  Now you will observe
that the State is not required to convince you of the
Defendant's guilt beyond all doubt but simply
beyond all reasonable doubt.  If after comparing and
considering all of the evidence you cannot say you
have an abiding conviction of the Defendant's guilt,
then you are not convinced beyond a reasonable
doubt, and the Defendant would be entitled to an
acquittal."

(R. 1092).

Reeves was found guilty as charged.  (C. 219, R. 1105).

At the penalty phase, the prosecution relied upon its
evidence in the guilt phase and submitted robbery as an
aggravating circumstance. (R. 1116-1117).  Appellant Reeves
elicited evidence that he was only eighteen years old at the time of
the offense, that he grew up in a poor home environment, that he
lacked appropriate developmental resources growing up, that his
level of intelligence was only borderline, and that when placed in
structured environments, he responded positively. (C. 268-519,
Defendant's Exhibits 6, 7, 8, 11, 13, 14, R. 1118-1182).

In closing argument in the penalty phase, one of the prosecutor's argued to the jury: "Now you are called upon to make a tough decision. You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or Life in prison without the possibility of parole. Who decided Willie Johnson's fate? Did he have the opportunity to have a five or six day proceeding?" (R. 1191). The defense objected as follows: "The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial. It's an improper comment and is in violation of due process of law in the federal and state constitution. I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper." (R. 1191). The trial court overruled a defense objection and request for curative instruction. (R. 1192).

The trial court did not charge the jury on any measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty. The defense had requested that the trial court charge the jury: "Before you may return a sentence of death, you must be convinced beyond a reasonable doubt based on the consideration of the aggravating and mitigating circumstances and the evidence introduced in this case at either the innocence/guilt phase o[r] the sentencing phase, that death by electrocution is the appropriate sentence to be imposed on the defendant in this case." (C. 153).

The jury recommended 10-2 that Appellant Reeves be put to death. (C. 220, R. 1227). The trial court followed the jury's recommendation and sentenced Appellant Reeves to death. (C. 233-239, R. 1232).

BASED UPON THE FOREGOING and the reasons stated in his contemporaneously filed brief, Appellant Matthew Reeves urges this Court to withdraw its decision of August 25, 2000 and to reverse the judgment of the Circuit Court of Dallas County issuing an opinion containing the facts set forth in his Rule 39(k), A.R.A.P. motion.

13

Thomas M. Goggans
Ala. S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36130
(334)-834-2511

Attorney for Appellant
Matthew Reeves

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

William H. Pryor, Jr.
Thomas F. Parker, IV
Office of the Attorney General
11 South Union Street
Montgomery AL 36130

by placing the same in the United States mail, first class postage prepaid

and properly addressed on this the 1st day of September, 2000.

Thomas M. Goggans

14

IN THE ALABAMA COURT OF CRIMINAL APPEALS

MATTHEW REEVES,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Appellant,　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　) Case No. CR-98-0777
　　　　　　　　　　　　　　　　)
STATE OF ALABAMA,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Appellee.　　　　　　　　)

APPELLANT'S BRIEF IN SUPPORT OF APPLICATION FOR REHEARING

ITEMS SEIZED FROM APPELLANT REEVES' ROOM WITHOUT A
WARRANT WERE FRUITS OF A CONSTITUTIONALLY INFIRM SEARCH.

　　　　Subject to only a few exceptions, the Fourth and Fourteenth Amendments
to the United States Constitution dictate that a search without a warrant issued
upon probable cause is unreasonable.  Katz v. United States, 389 U.S. 347, 357
(1967); Brannon v. State, 549 So.2d 532, 536 (Ala.Crim.App. 1989); Murray v.
State, 396 So.2d 125, 128 (Ala.Crim.App. 1981)(hereinafter "Murray").  A
warrantless search may be justified upon a showing of valid consent.  However, to
justify a warrantless search on the basis of consent, the prosecution has the burden
of establishing by clear and convincing evidence that the consent was given freely
and voluntarily.  Scheneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Murray,
396 So.2d at 129; Herriot v. State, 337 So.2d 165 (Ala.Crim.App. 1976).  Courts
have upheld consent by third parties where the third party is found to have joint
access or control over the place searched.  See, United States v. Matlock, 415 U.S.
164, 171-172 (1974).  However, the prosecution bears the burden of establishing
that common authority exists.  See, Illinois v. Rodriquez, 497 U.S. 177, 181
(1990).

1

In the suppression hearing in this case, the prosecution did not elicit even conflicting evidence that Marzetta. Reeves had authority to consent to the search of Appellant Reeves' room.  This Court in its opinion posited that Appellant Reeves had not put the trial court on notice that this was an issue.  That is simply not so.  In the motion to suppress,  Appellant Reeves stated:

> 1.  In November of 1996, government agents searched the residence of Defendant Matthew reeves and seized certain items therefrom.

> "2.  The aforementioned search was conducted without probable cause, without a properly issue[d] search warrant, without proper consent or beyond the scope of any consent given."

> "3.  The seizure of items from Defendant Reeves' residence was a fruit of violations of the proscriptions against unreasonable searches and seizures of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, § 5 of the Alabama Constitution of 1901; Ala. Code § 15-5-1 et seq.; and Rule 4, A.R.Cr.P."

(C. 126).  It should be beyond question that the prosecution has the burden of proving that a warrantless search was legally justified.  See, Ex parte Hergott, 588 So.2d 911 (Ala. 1991); Ex parte Kennedy, 486 So.2d 493 (Ala. 1986).  Appellant Reeves' motion was more than sufficient to put the prosecution on notice that it had the burden of showing Marzetta Reeves' authority to  consent to the search and the trial court on notice that that was an issue.   The evidence seized and all fruits thereof should not have been admitted into evidence.  The admission of that evidence was error both regular and plain.

APPELLANT REEVES' ARREST WAS WITHOUT PROBABLE CAUSE
THUS POISONING THE POLICE OFFICERS' SUBSEQUENT RETRIEVAL
OF INCRIMINATING EVIDENCE.

An arrest is valid only if made upon probable cause. Henry v. United
States, 361 U.S. 98 (1959); Draper v. United States, 358 U.S. 307 (1979).
Evidence obtained after an illegal arrest must be excluded as a fruit of the
poisonous tree unless intervening events break the causal connection so that the
taint is purged. Taylor v. Alabama, 457 U.S. 687 (1982). Appellant Reeves
asserts that his leading police officers to a shotgun shell was the fruit of a
warrantless arrest lacking probable cause.

"An officer has probable cause to make an arrest when, at the time the
arrest is made, the facts and circumstances within his knowledge, and of which he
has reasonably trustworthy information, are sufficient to lead a prudent person to
believe that the suspect is committing or has committed an offense." Gord v.
State, 475 So.2d 900, 902-903 (Ala.Crim.App. 1985). "Mere suspicion in a
police officer's mind that an offense has been committed is not enough to justify a
warrantless arrest." Brannon v. State, 549 so.2d 532 (Ala. 1989). An arrest not
supported by probable cause is violative of the Fourth and Fourteenth
Amendments to the United States Constitution. Caffie v. State, 516 So.2d 822,
828-829 (Ala.Crim.App. 1986), citing, Dunaway v. New York, 442 U.S. 200
(1979).

The suppression hearing evidence was as follows:

Selma Police officer Pat Grindle related that a dog had tracked blood from
an alley where Willie Johnson's body was found. (R. 542). Grindle said that the

3

dog tracked to the backyard of a house near Reeves' house and to Reeves' house. (R. 542-543). Grindle testified that he went to Reeves house. (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door. (R. 544). Matthew Reeves and Julius Reeves were not there. (R. 549, 570). According to Grindle, Marzetta Reeves gave him permission to come and search the house. (R. 545-546). Grindle and other police officers went in and searched throughout the house. They seized a number of items from Matthew and Julius Reeves' bedroom. (R. 548-549). Among those items were blood stained articles of clothing and a shotgun. (R. 548-549).

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles's house. (R. 553-554). Brenda "Bam-Bam" Suttles' sister answered the door. (R. 555). When the door was opened, the officers saw Matthew Reeves asleep on a sofa. (R. 554). At that point, they did not have probable cause but only suspicion. Nevertheless, they entered immediately and arrested Appellant Reeves. (R. 555). Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions. (R. 552-567). On the second occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom. (R. 552, 607). This evidence was the fruit of Appellant Reeves' illegal arrest and, thus, should have been suppressed.


THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE "THEFT AFTERTHOUGHT."

The defendant in a criminal case has a due process right to have his jury instructed upon any material hypothesis which the evidence in his favor tends to

establish.  Ex parte McGee, 383 So.2d 205 (Ala. 1980).  In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider a defense, the court must construe the evidence most favorable to the defendant.  Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978), citing, United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979).  Proper written instructions which are supported by any evidence, however weak, insufficient, or doubtful in credibility must be given.  Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978); Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

Here, Appellant Reeves' position at trial was that the theft was a mere afterthought.  Under Alabama law, a theft committed as a "mere afterthought" will not sustain a capital murder conviction.  A felony is considered an "afterthought" when there is no intent to commit the felony before or at the time of a murder.  Therefore, an accused cannot be convicted of capital murder where "he forms felonious intent only after he commits the killing."  Connolly v. State, 500  So.2d 57, 62 (Ala.Crim.App. 1985)(quoting, Commonwealth v. Spallone, 267 Pa.Super. 486, 489, 406 A.2d 1146, 1147 (1979)).  See also, Padgett v. State, 668 So.2d 78, 83-85 (Ala.Crim.App. 1995)(where there was evidence in a capital case that the intent to commit the accompanying felony, rape, was formed after the victim was killed, the defendant was entitled to a jury instruction on abuse of a corpse).     Here, there was some evidentiary support for Appellant Reeves' defense that the evidence as to the "robbery" indicates only a "robbery" as an "afterthought."  For example, there was evidence Johnson had towed Appellant Reeves, Julius Reeves, Brenda "Bam-Bam" Suttles, Jason Powell and Emmanuel

5

Suttles and Powell's broken down car from White Hall back to Selma. (R. 692-694). Brenda Suttles said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley. (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab. (R. 693-694). She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck. (R. 704). She said that Julius Reeves jumped out of the truck and said: "Troll [Matthew Reeves], what you done did?" (R. 704). She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets and got everything out. (R. 743). Brenda Suttles recalled telling the police that Matthew Reeves had killed Johnson for nothing. (R. 743). She recalled that during that night Matthew Reeves had said that by killing Johnson he would get a gang tear drop – something given for killing someone. (R. 720).

Jason Powell testified that Julius Reeves had said to Matthew Reeves that he had almost shot him. (R. 843).

Thus, Appellant Reeves was entitled to have the jury so instructed as requested in his charges numbered 33, 34, 35.

6

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON COMPLICITY.

The defendant in a criminal case has a due process right to have his jury instructed upon any material hypothesis which the evidence in his favor tends to establish. Ex parte McGee, 383 So.2d 205 (Ala. 1980). In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider a defense, the court must construe the evidence most favorable to the defendant. Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978), citing, United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979). Proper written instructions must be given which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978); Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

In this case, Appellant Reeves was charged with capital murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). Under that Code section, the jury had to be satisfied that the prosecution has proven beyond a reasonable doubt (1) a "robbery" in the first degree or an attempt thereof as defined by § 13A-8-41; (2) an intentional "murder" as defined by § 13A-6-2(a)(1); and (3) that the murder was committed "during" the robbery in the first degree i.e., that the murder was committed in the cause of or in connection with the commission of or in the immediate flight from the commission of the robbery in the first degree. According to the State's theory of prosecution, Appellant Reeves, Julius Reeves, and Brenda "Bam-Bam" Suttles committed the crime. The evidence could have supported a defense argument that though Appellant Reeves had killed Johnson he did not rob him along with Julius Reeves and Brenda "Bam-Bam" Suttles. For

7

example, there was evidence Johnson had towed Appellant Reeves, Julius Reeves,

Brenda "Bam-Bam" Suttles, Jason Powell and Emmanuel Suttles and Powell's

broken down car from White Hall back to Selma. (R. 692-694). Brenda Suttles

said that after dropping off Jason Powell and Emmauel Suttles in front of

Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for

payment to Johnson for his assistance and wound up in an alley. (R. 700-702).

She remembered that Julius Reeves was in the passenger seat of the truck cab,

that she was on the driver's side of the truck bed, and that Matthew Reeves was

on the passenger side of the truck cab. (R. 693-694). She said that she was sitting

with her head down and heard a pow and that when she looked up, Matthew

Reeves was pulling the shotgun back out of the rear window of the truck. (R.

704). She said that Julius Reeves jumped out of the truck and said: "Troll

[Matthew Reeves], what you done did?" (R. 704). She recalled that she had told

the police that afterwards, Julius Reeves had jumped out of the truck, pulled

Johnson out of the truck, and gone through his pockets and got everything out.

(R. 743). Brenda Suttles recalled telling the police that Matthew Reeves had

killed Johnson for nothing. (R. 743). She recalled that during that night Matthew

Reeves had said that by killing Johnson he would get a gang tear drop –

something given for killing someone. (R. 720).

    Jason Powell testified that Julius Reeves had said to Matthew Reeves that

he had almost shot him. (R. 843).

    Thus, Appellant Reeves was entitled to a have the jury instructed on

complicity as requested in charge 31.

THE ACTIONS OF THE TRIAL JUDGE IN PROHIBITING THE DEFENSE FROM DISCREDITING A PROSECUTION WITNESS BY QUESTIONING HIM ABOUT BEING IN JAIL AND HAVING PENDING CRIMINAL CHARGES DEPRIVED APPELLANT REEVES OF HIS RIGHT OF CONFRONTATION AND CROSS EXAMINATION.

Jason Powell testified against Appellant Reeves.  The trial court did not allow the defense to question Powell about his being in jail and having criminal charges hanging over him at the time of his testimony.  (R. 792-794, 804-806).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront witnesses against him. Davis v. Alaska, 415 U.S. 308 (1974); Pointer v. Texas, 380 U.S. 400 (1965). Accord, Article I, § 6, Alabama Constitution of 1901.  A primary interest protected by the right of confrontation is that of cross examination. Davis v. Alaska, 514 U.S. 308 (1974); Douglas v. Alabama, 380 U.S. 415 (1965).  A.R.E. 611(b) provides: "The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness...." A.R.E. 616 provides: "A party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case."

"A trial court's authority to control interrogation of witnesses is limited by the confrontation clause of the Sixth Amendment and the right of confrontation." Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1985-1986, 75 Geo.L.J. 713, 1081 n. 2509 (1987). See, Bell v. State, 385 So.2d 78 (Ala.Crim.App. 1980).  "When cross-examining a witness,

9

the defendant must be permitted to test both the witness's credibility and the witness's knowledge of the facts bearing on the defendant's guilt or innocence." Twenty-Seventh Annual Review of Criminal Prodedure, 86 Geo.L.J. 1153, 1714-1715 (1998); Olden v. Kentucky, 488 U.S. 227 (1988)(per curiam); Davis v. Alaska, 415 U.S. 308 (1974); United States v. Mullinelli-Navis, 111 F.3d 983, 982 (1st Cir. 1997); United States v. Stewart, 93 F.3d 189, 193 (5th Cir. 1996); United States v. Pritchett, 699 F.2d 317, 321 (6th Cir. 1983); United States v. Vargas, 933 F.2d 701, 706 (9th Cir. 1991).  Recognizing these principles, Ala. Code § 12-21-137 provides: "The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him."  In this case, the actions of the trial court in stopping the defense from discrediting this witness by asking about his being in jail and having pending criminal charges deprived Appellant Reeves of his right to confrontation and cross-examination.

THE LACK OF A STANDARD OR MEASURE FOR DETERMINING WHETHER AGGRAVATING CIRCUMSTANCES SO OUTWEIGH MITIGATING CIRCUMSTANCES AS TO SUPPORT A DEATH SENTENCE VIOLATED APPELLANT REEVES'S RIGHTS TO PROTECTION FROM CRUEL AND UNUSUAL PUNISHMENT, DUE PROCESS OF LAW AND EQUAL PROTECTION OF THE LAW.

The hallmark of modern death penalty jurisprudence is "guided discretion" afforded to the sentencer.  Gregg v. Georgia, 428 U.S. 153 (1976).  To pass constitutional muster, a capital sentencing scheme must provide: 1) "clear and objective standards" 2) "specific and detailed guidance," and 3) "an opportunity of rational review of the 'process for imposing a sentence of death'." Godfrey v. Georgia, 446 U.S. 420, 428 (1980).  In addition, appropriate appellate

10

review is integral to the constitutionality of any death penalty system. Gregg v. Georgia, 482 U.S. 153 (1976).

Alabama's capital scheme does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty. In this case, the trial court did not charge the jury on any measure or standard. The absence of a standard and the trial court's failure to so charge the jury in this case conflicts with the aforementioned requirements of constitutional capital jurisprudence.

Without a measure or standard, jury verdicts and sentencing decisions are certainly based on disparate bases in violation of the right to equal protection of the law under the Fourteenth Amendment to the United States Constitution and Article 1, §§ 1, 6, and 22 of the Alabama Constitution of 1901.

Without a standard in Alabama and in this case, constitutionally required guidance is wholly absent. The result is an arbitrary imposition of the death penalty. This is violative of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 6, and 22 of the Alabama Constitution of 1901.


THE TRIAL COURT ERRED IN NOT EXCUSING FOR CAUSE AN "AUTOMATIC DEATH PENALTY" JUROR.

In Morgan v. Illinois, 504 U.S. 719 (1992), the Supreme Court of the United States held that in capital cases jury venire members who would automatically vote for the death penalty must be excluded for cause. Accord, Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.

11

1991), <u>cert</u> <u>denied</u>, 502 U.S. 886 (1991); <u>Martin v. State</u>, 548 So.2d 488 (Ala.

Crim.App. 1988), <u>aff'd</u>, 548 So.2d 496 (Ala.), <u>cert</u>. <u>denied</u>, ____ U.S. ___, 110

S.Ct. 419, 107 L.Ed.2d 383 (1989); <u>Bracewell v. State</u>, 506 So.2d 354

(Ala.Crim.App. 1988).

 Here, Appellant Reeves was charged in the Circuit Court of Dallas County

with capital murder. (C. 5-6).  Juror Parnell's voir dire responses indicated that

once she found someone guilty of intentionally killing someone she would

consider only the death penalty. (R. 421-430).  Nevertheless, the trial court

overruled a defense motion to excuse her for cause.  (R. 430).  That action

impermissibly infringed upon Appellant Reeves' due process right to a fair and

impartial jury under the Fourteenth Amendment to the United States Constitution.


A JUROR'S FAILURE TO DISCLOSE THAT APPELLANT'S BROTHER
WAS SUSPECTED OF STEALING HER CAR DEPRIVED APPELLANT
REEVES OF HIS RIGHT TO AN IMPARTIAL JURY.

 In voir dire of prospective jurors, the essential allegations were

summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on
> the day before Thanksgiving this past year as he towed a group of
> young people in from an automobile breakdown out in Tyler, that
> this Defendant, his brother Julius and Ms. Suttles deemed to rob
> him of the ring that they were going to pay him with and his
> paycheck that he had gotten that day after he towed them and
> delivered their car to Selma to be repaired when he parked in an
> alley way here near the Compress early in the evening after dark.
> This Defendant shot him through the neck and into his chest area
> killing him practically instantly.  Three of them are arrested in a
> house when they went to a party that afternoon."

12

(R. 113-114).  Jurors were also asked if they knew Appellant Reeves or any member of his family.  (R. 93-94.)  Juror Trotter did not disclose that she knew or knew of Appellant Reeves or his brother Julius.

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

> "She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves.  She does not recall whether Matthew was involved.  She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle.
>
> "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case."

(R. 803).

It is a "basic constitutional premise that every person is entitled to an impartial jury.  As stated in the Sixth Amendment to the United States Constitution:  'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury in the state and district wherein the crime shall have been committed.'"  Knight v. State, 672 So.2d 487 (Ala.Crim.App. 1995).  "It is fundamental to our system of impartial justice that '"[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."'"  State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992)(hereinafter "Freeman"), quoting, Ex parte O'Leary, 438 So.2d 1372, 1373

13

(Ala. 1983), quoting in turn, Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982)(hereinafter "O'Leary").  "Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'"  Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944).  If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions.  Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993); O'Leary, 417 So.2d at 240; Freeman, 605 So.2d 1259.  This test casts a "light burden" on the defendant.  Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987).

Here, Juror Trotter failed to disclose that Appellant Reeves' brother was suspected of stealing her car.  Under the circumstances, Appellant Reeves  was prejudiced.  The matter inquired about was quite clear.  The jurors were asked if they knew any members of Appellant Reeves family.  (R. 93-94).  Juror Trotter did not say she did.  (R. 93-94).  As to Juror Trotter, the matter of inquiry was not remote in time.  As to Juror Trotter, the matter was very material.  According to the State's theory of prosecution both Matthew Reeves were involved in the capital murder of Willie Johnson.  Juror Trotter obviously harbored ill feelings about the matter.

This record clearly shows possible prejudice to Appellant Reeves in the jury selection process.  Juror Trotter's failure to disclose that Appellant Reeves'

14

brother was suspected of stealing her car deprived Appellant Reeves of his right

to an impartial jury.

A JUROR'S FAILURE TO DISCLOSE THAT HE KNEW THE DECEASED
DEPRIVED APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL
JURY.

In voir dire of prospective jurors, the essential allegations were

summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was
> killed on the day before Thanksgiving this past year as he towed a
> group of young people in from an automobile breakdown out in
> Tyler, that this Defendant, his brother Julius and Ms. Suttles
> deemed to rob him of the ring that they were going to pay him with
> and his paycheck that he had gotten that day after he towed them
> and delivered their car to Selma to be repaired when he parked in
> an alley way here near the Compress early in the evening after
> dark. This Defendant shot him through the neck and into his chest
> area killing him practically instantly. Three of them are arrested in
> a
> house when they went to a party that afternoon."

(R. 113-114).

Juror Denmark did not disclose that he knew the deceased.   In the

middle of trial, the defense learned that he did.

It is a "basic constitutional premise that every person is entitled to an

impartial jury. As stated in the Sixth Amendment to the United States

Constitution: 'In all criminal prosecutions, the accused shall enjoy the right to a

speedy and public trial, by an impartial jury in the state and district wherein the

crime shall have been committed.'"  Knight v. State, 675 So.2d 487

(Ala.Crim.App. 1995). "It is fundamental to our system of impartial justice that

'"[p]arties have a right to have questions answered truthfully by prospective jurors

15

to enable them to exercise their discretion wisely in exercising their peremptory strikes."'" State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992)(hereinafter "Freeman"), quoting, O'Leary, 438 So.2d at 1373, quoting in turn, Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982). "Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'" Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944). If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions. Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993); Ex parte O'Leary, 417 So.2d at 240; Freeman 605 So.2d 1259. This test casts a "light burden" on the defendant. Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987).

Juror Denmark's failure to disclose that he knew the deceased deprived Appellant Reeves of his right to an impartial jury.


THE PROSECUTION'S MISCONDUCT IN THE GUILT PHASE CLOSING ARGUMENT DEPRIVED APPELLANT REEVES OF RIGHTS GUARANTEED HIM BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

"The public prosecutor occupies a difficult role in our criminal justice system." Celebreeze, Prosecutorial Misconduct: Quelling the Tide of Imrpoer Comment to the Jury, 35 Cleveland State L. Rev. 237 (1987). To be sure the prosecutor must zealously advocate the position of the State. But, because the

16

prosecutor is advocating the position of the State -- "a theoretically impartial

sovereign," Comment, <u>Prosecutorial Misconduct: The Limitations Upon the</u>

<u>Prosecutor's Role as an Advocate</u>, 14 Suffolk U. L. Rev. 1095 (1980) – the

prosecutor must exercise the great powers and sanctions of the prosecutorial

position with discretion and fairness.  "In short his obligation is to see that 'justice

is done.'"  DeFoor, <u>Prosecutorial Misconduct in Closing Argument</u>, 7 Nova L.J.

443, 448 (1983)(emphasis added).  Thus, as an advocate, the prosecutor:

> "may prosecute with earnestness and vigor – indeed, he should do
> so.  But, while he may strike hard blows, he is not at liberty to
> strike foul ones.  It is as much his duty to refrain from improper
> methods calculated to produce a wrongful conviction as it is to use
> every legitimate means to bring about a just one."

<u>Berger v. United States</u>, 295 U.S. 78, 88 (1935).  When a prosecutor's conduct

deprives a defendant of a fair trial, the defendant's right to due process is violated.

<u>See</u>, <u>Berger v. United States</u>, 295 U.S. 78 (1935).

"[B]ecause jurors are impressed with the cloak of state authority in which

judges and prosecutors are wrapped, the impact of [an improper] comment is

likely to be devastating."  Balske, <u>Prosecutorial Misconduct During Closing</u>

<u>Argument: The Art of Knowing When and How to Object and Avoiding the</u>

<u>"Invited Response" Doctrine</u>, 37 Mercer L.Rev. 1033, 1050-1051 (1986).  The

Supreme Court of the United States has stated:

> "It is fair to say that the average jury, in a greater or lesser degree,
> has confidence that these obligations, which so plainly rest upon
> the prosecuting attorney, will be faithfully observed.
> Consequently, improper suggestions, insinuations, and especially,
> assertions of personal knowledge are apt to carry much weight
> against the accused when they should properly carry none."

<u>Berger v. United States</u>, 295 U.S. 78 (1935).

A general category of argument prohibited by courts is that of improperly spotlighting the defense strategy.  See. e.g., Brooks v. Kemp, 762 F.2d 1383, 1408 (11th Cir. 1985); Oregon v. Kennedy, 456 U.S. 667 (1982); United States v. McDonald, 620 F.2d 559 (5th Cir. 1980); Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978); United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977); United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974); United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973); People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982); People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980).

In this case, one of the prosecutor's argued to the jury: "The Defense is designed and charged with defending this man any way he can." (R. 1079-1080). ).  Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. Washington v. State, 448 So.2d 404 (Ala. 198).  The requirement of objections should not be employed woodenly but should be applied where its application will serve the ends for which it was designed rather than being made a trap.  See, Henderson v. United States, 425 F.2d 134, 144 (5th Cir. 1970).  Here, the defense objected as follows:

> "It seems to me that Mr. Greene [prosecutor] is going to suggest to the jury that the only reason I'm making an argument is because I've somehow been appointed in this case to represent Mr. Reeves. As Mr. Greene well knows I voluntarily took this case.  It's inappropriate to suggest to this jury that somehow I am making this argument just because I've got to.  It's a violation of due process to suggest that.  I ask that the jury be instructed to disregard that last remark. "

This objection was certainly specific enough to point out to the trial judge the error complained of herein so as to allow him to correct the error. In any event, this was plain error. This argument was improper and deprived Appellant Reeves of a fair trial in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 6 of the Alabama Constitution of 1901.

Further, because this was a capital proceeding, and because the effect of this comment was to inject an extraneous factors other than "the character and record of the individual offender and the circumstances of the particular offense," See, Lockett v. Ohio, 438 U.S. 586 (1978), a separate Eighth Amendment violation was committed. This is, because there is a risk that this extraneous factor diverted jurors from their primary responsibility, it is possible that the death sentence recommended and imposed was the product of an arbitrary factor. Lcokett v. Ohio, 438 U.S. 586 (1978); State v. Lindsey, 404 So.2d 466 (La. 1981).


THE PROSECUTION'S MISCONDUCT DURING THE PENALTY PHASE OF THE PROCEEDING DEPRIVED APPELLANT REEVES OF A FUNDAMENTALLY FAIR HEARING AND DUE PROCESS.

Under the Eighth Amendment to the United States Constitution, the decision whether a defendant is to live or die must be based upon "consideration of the character and record of the individual offender and the circumstances of the particular offense." Lockett v. Ohio, 438 U.S. 586 (1978). See also, Caldwell v. Mississippi, 472 U.S. 320 (1985). Moreover, the Fourteenth Amendment to the United States Constitution right to a fundamentally fair trial prohibits the

19

prosecutor from urging a jury to impose a sentence of death for improper or irrelevant reasons. Tucker v. Francis, 732 F.2d 1054 (11th Cir. 1984), citing, Brooks v. Francis, 716 F.2d 780 (11th Cir. 1983), and Hance v. Zant, 696 F.2d 940, 951 (11th Cir. 1983).

Closing arguments in capital cases must receive a "greater degree of scrutiny" than those in non-capital cases. Caldwell v. Mississippi, 472 U.S. 320 (1985), quoting, California v. Ramos, 463 U.S. 992, 998-999 (1983). The sentencing process should facilitate the responsible and reliable exercise of sentencing discretion. Caldwell v. Mississippi, 105 S.Ct. at 2469-2640 (plurality opinion), citing, Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 349 (1977)(plurality opinion); Gardner v. Florida, 430 U.S. 349 (1977)(plurality opinion); Woodson v. North Carolina, 428 U.S. 280 (1976). The sentencing decision must not be the product of passion or prejudice. Gardner v. Florida, 430 U.S. 349, 358 (1977); In Hance v. Zant, 696 F.2d at 952, the United States Court of Appeals for the Eleventh Circuit stated that "a dramatic appeal to gut emotion has no place in the courtroom, especially in a case involving the penalty of death. A sentence imposed after such an appeal cannot be carried out." In so holding, the Eleventh Circuit made clear that the prosecution's argument in sentencing proceedings will be held to a different standard that argument at guilt proceedings. Tucker v. Zant, 724 F.2d 882, 886 n.2 (11th Cir. 1984). That is, though a conviction may be upheld in the face of improper argument by the prosecution, a death sentence entered after similar argument may be set aside,

20

because the jury in a capital case must not be influenced by any arbitrary factors.

Brooks v. Francis, 716 F.2d at 788.

The Eleventh Circuit summed up its rule for more closely scrutinized penalty-phase prosecutorial misconduct as follows:

> "The prosecutor's actions at the sentencing phase of this trial are viewed differently [than those at the guilt phase]. At the sentencing phase of the trial, the jury may not be influenced by any arbitrary factors. A prosecutor may not incite the passions of a jury when a peson's life hangs in the balance."

Brooks v. Francis. Thus, the Constitution will not permit argument on issues extrensic to the crime or the criminal aimed at inflaming the jury's passions, playing on its fears, or otherwise goading it into an emotional state more receptive to a call for imposition of death and 'invit[ing] the jury to decide the life-death verdict in a frenzied and emotional atmosphere.'" Tucker v. Zant, 714 F.2d at 888.

A general category of argument prohibited by courts is that of improperly spotlighting the defendant's exercise of his right to counsel and defense strategy and that it is somehow wrong to provide defendants more procedural safeguards than their victims. See. e.g., Brooks v. Kemp, 762 F.2d 1383, 1408 (11th Cir. 1985); Oregon v. Kennedy, 456 U.S. 667 (1982); United States v. McDonald, 620 F.2d 559 (5th Cir. 1980); Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978); United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977); United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974); United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973); People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982); People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980).

In this case, one of the prosecutor's argued to the jury in the penalty phase:

> "Now you are called upon to make a tough decision.  You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson.  Death or Life in prison without the possibility of parole.  Who decided Willie Johnson's fate?  Did he have the opportunity to have a five or six day proceeding?"

(R. 1191).

Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. <u>Washington v. State</u>, 448 So.2d 404 (Ala. 198).  The requirement of objections should not be employed woodenly but should be applied where its application will serve the ends for which it was designed rather than being made a trap.  <u>See, Henderson v. United States</u>, 425 F.2d 134, 144 (5th Cir. 1970).  Here, the defense objected as follows:

> "The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial.  It's an improper comment and is in violation of due process of law in the federal and state constitution.  I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper."

(R. 1191).

This objection was certainly specific enough to point out to the trial judge the error complained of herein so as to allow him to correct the error. In any event, this was plain error.  This argument was improper and deprived Appellant Reeves of a fair trial in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 6 of the Alabama Constitution of 1901.   Further, because this was a capital proceeding, and because the effect of this comment was

22

to inject an extraneous factors other than "the character and record of the individual offender and the circumstances of the particular offense," See, Lockett v. Ohio, 438 U.S. 586 (1978), a separate Eighth Amendment violation was committed.  This is, because there is a risk that this extraneous factor diverted jurors from their primary responsibility, it is possible that the death sentence recommended and imposed was the product of an arbitrary factor.  Lockett v. Ohio, 438 U.S. 586 (1978); State v. Lindsey, 404 So.2d 466 (La. 1981).


THE TRIAL COURT ERRED IN FAILING TO CONSIDER APPELLANT REEVES' LOW LEVEL OF INTELLIGENCE AS A MITIGATING CIRCUMSTANCE.

"[B]ecause there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate sentence in a specific case.'" Zant v. Stephens, 462 U.S. 862 (1983), quoting, Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  Since Furman v. Georgia, 408 U.S. 238 (1972), the decisions of the Supreme Court of the United States have made clear that the states may impose this ultimate sentence only if they follow procedures designed to assure reliability in sentencing determinations.  Barclay v. Florida, 463 U.S. 939 (1983)(Stephens, Powell, J.J. concurring). Due to this heightened standard of reliability in capital sentencing procedures, involving consideration of both consistency and fairness to the accused, capital sentencing procedures must be tailored to provide for "an individualized determination on the

23

basis of character of the individual and the circumstances of the crime." <u>Zant v. Stephens</u>, 462 U.S. 862 (emphasis in original).

In <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978) (hereinafter "Lockett"), the Supreme Court of the United States held that "the eighth and fourteenth amendments require that the sentencer . . . not be precluded from considering as a mitigating factor, any aspect of a defendant's character and any of the circumstances of the offense that the defendant proffers as the basis for a sentence less than death." <u>See</u> <u>also</u>, <u>Green v. Georgia</u>, 442 U.S. 95 (1979); <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1984). Thus, relevant mitigating evidence is not limited to statutory mitigating factors, but includes any evidence which may be fit within two general categories mentioned in <u>Lockett</u>.

n this case, the defense presented evidence that Appellant Reeves' level of intelligence was only borderline. (R. 1165). The trial court did not consider this as a mitigating circumstance. This ran afoul of the aforementioned principles.


THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON REASONABLE DOUBT.

In <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990), the Supreme Court of the United States reversed the defendant's conviction because the trial court unconstitutionally suggested through its instruction a higher degree of doubt than reasonable doubt. The trial court's instruction in that case, which defined reasonable doubt for the jury as an "actual substantial doubt" and stated that what was required was "moral certainty".

The Supreme Court judged that although perhaps jurors could understand the definition of reasonable doubt as a whole as given in the instruction, it was the Court's view that "the instruction was contrary to the 'beyond a reasonable doubt' requirement articulated in In re Winship, 397 U.S. 358, 364 (1970)." The Court explained that the common meaning of the word "substantial" suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. "When those statements are then considered with the reference to 'moral certainty' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Cage.

Here, the trial court's instruction or reasonable doubt in the guilt phase was as follows:

> "The reasonable doubt which entitles an accused to an acquittal, is not a mere, fanciful, vague, conjectural or speculative doubt but a reasonably substantial doubt arising from all or part of the evidence or from a lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair minded and conscientious men and women would entertain under all the circumstances. Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt but simply beyond all reasonable doubt. If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092). This instruction did not satisfy the requirements of due process. Further, because this was a capital case, a separate Eighth Amendment violation was committed.

CONCLUSION

BASED UPON THE FOREGOING, Appellant Matthew Reeves urges this Court to withdraw its decision of August 25, 2000 and to reverse the judgment of the Circuit Court of Dallas County issuing an opinion containing the facts set forth in his Rule 39(k), A.R.A.P. motion.

Thomas M. Goggans
Ala. S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36130
(334)-834-2511

Attorney for Appellant
Matthew Reeves

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

William H. Pryor, Jr.
Thomas F. Parker, IV
Office of the Attorney General
11 South Union Street
Montgomery AL 36130

by placing the same in the United States mail, first class postage prepaid and properly addressed on this the 1st day of September, 2000.

Thomas M. Goggans



RELEASED

OCT 27 2000

CLERK
ALA COURT CRIMINAL APPEALS

NOTICE:  This opinion is subject to formal revision before publication in the advance sheets of Southern
Reporter.  Readers are requested to notify the Reporter of Decisions, Alabama Appellate Courts, 300 Dexter
Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that
corrections may be made before the opinion is printed in Southern Reporter.

# ALABAMA COURT OF CRIMINAL APPEALS

## OCTOBER TERM, 2000-2001

---

### CR-98-0777

---

### Matthew Reeves

### v.

### State

### Appeal from Dallas Circuit Court
### (CC-97-31)

### On Application For Rehearing

LONG, Presiding Judge.

This court's opinion of August 25, 2000, is withdrawn, and the following opinion is substituted therefor.

The appellant, Matthew Reeves, was convicted of murder made capital because it was committed during the course of a robbery in the first degree.  See § 13A-5-40(a)(2), Ala. Code 1975.  The jury, by a vote of 10-2, recommended that the appellant be sentenced to

EXHIBIT A

CR-98-0777

death.   The trial court accepted the jury's recommendation and sentenced the appellant to death.

The State's evidence tended to show the following.   On November 27, 1996, the appellant (who was 18 years old at the time) and his younger brother, Julius, visited Brenda Suttles and Suttles's 15-year-old cousin, Emanuel, at Suttles's house on Lavender Street in Selma.   There, according to Suttles, everyone agreed to go out "looking for some robberies."   (R. 684.)   Shortly after noon that day, the foursome left Suttles's house on foot and walked to a nearby McDonald's restaurant, where they saw Jason Powell driving by in his car.   The appellant's brother, Julius, flagged Powell down, and Powell agreed to give the group a ride.

Brenda Suttles and Emanuel Suttles testified that after the foursome got into Powell's car, Julius Reeves suggested that they go to White Hall, a town in neighboring Lowndes County, to rob a drug dealer.   According to Brenda Suttles, everyone in the car agreed to the plan.   (Powell, who also testified at trial, denied hearing the discussion about a robbery.)   Before leaving Selma, the group stopped at an apartment on Broad Street.   Julius Reeves went inside the apartment and returned to the car a short time later carrying a shotgun, which he handed to the appellant.   With Powell driving, the group then headed for White Hall.

Before they reached White Hall, however, Powell's car broke down on a dirt road off Highway 80.   Shortly thereafter, a passing motorist, Duane Smith, stopped and told the group that he was in a

- 2 -

CR-98-0777

hurry to meet some friends to go hunting, but that he would return around sunset and would take them to get help then. For the next couple of hours, the group sat in Powell's car and listened to music, until another passing motorist, Willie Johnson, stopped in his pickup truck and offered to tow Powell's car to Selma. Using some chains that he kept in his pickup truck, Johnson hooked Powell's car to the back of his truck. With Julius Reeves riding in the truck with him and the others in Powell's car, Johnson towed the car to the Selma residence where the appellant and Julius lived with their mother.

When they arrived at the Reeveses' house, Julius Reeves got out of Johnson's truck and told the others that Johnson wanted $25 for towing them. However, no one had any money to pay Johnson. Julius Reeves then offered to give Johnson a ring as payment if Johnson would drive him to his girlfriend's house to get the ring. Johnson agreed and he unhooked Powell's car from his truck. According to Jason Powell and Emanuel Suttles, Julius Reeves at this point told the others that Johnson was going to be their robbery victim. While Jason Powell and Emanuel Suttles stayed behind with Powell's car in front of the Reeveses' house, Julius Reeves got back in the cab of the truck with Johnson, and Brenda Suttles climbed into the rear bed of the truck. Testimony indicated that when Johnson started the truck, the appellant jumped into the rear bed of the truck with the shotgun, hiding the weapon behind his leg as he did so.

- 3 -

CR-98-0777

When they arrived at Julius's girlfriend's house in Johnson's truck, Julius went inside and retrieved the ring he had promised to give Johnson as payment.  According to Brenda Suttles, when Julius came out of the house, he walked to the rear of Johnson's truck and told her and the appellant that he was not going to let Johnson keep the ring.  After Julius got back in the cab of the truck, Johnson drove everyone back to the Reeveses' house.

Jason Powell and Emanuel Suttles, who had remained at the house with Powell's car, testified that sometime around 7:00 p.m., they saw Johnson's truck drive by the house and turn into an alley -- known as Crockett's Alley -- behind the house.  According to Brenda Suttles, who was in the rear bed of the truck with the appellant, just as the truck came to a stop in the alley, she heard a loud "pow" sound.  (R. 704.)  Suttles testified that when she looked up, the appellant was withdrawing the barrel of the shotgun from the open rear window of the truck's cab.  Johnson had been shot in the neck and was slumped over in the driver's seat. Suttles testified that Julius Reeves jumped out of the truck's cab and asked the appellant what he had done, and that the appellant then told Julius and Suttles to go through Johnson's pockets to "get his money."  (R. 704.)  Suttles stated that Julius then pulled Johnson out of the truck and went through his pockets, giving the money he found in the pockets to the appellant.  After Julius had gone through Johnson's pockets, Suttles helped him put Johnson back

- 4 -

CR-98-0777

in the truck's cab.  According to Suttles, Johnson was bleeding heavily and making "gagging" noises.  (R. 721.)

Jason Powell and Emanuel Suttles testified that they heard the gunshot after Johnson's truck pulled into Crockett's Alley and that a short time later they saw the appellant, Julius Reeves, and Brenda Suttles run out of the alley and into the Reeveses' house. The appellant was carrying a shotgun, they said.  They followed the appellant, Julius Reeves, and Brenda Suttles into the Reeveses' house and saw the appellant place the shotgun under a bed in his bedroom.  The appellant told Julius and Brenda Suttles to change out of their bloodstained clothes and shoes, and he took the clothes and shoes and stuffed them under a dresser in his bedroom. According to Emanuel Suttles, as the appellant, Julius, and Brenda changed their clothes, they were "jumping and hollering" and celebrating about "all the stuff [they] got" from Johnson.  (R. 842.)  Jason Powell testified that he heard the appellant say, "I made the money."  (R. 786.)

After changing their clothes, the appellant, Julius Reeves, and Brenda Suttles ran to Suttles's house.  On the way, the appellant stopped to talk to his girlfriend, telling her that if she should be·questioned by the police, to tell them that he had been with her all day.  At Suttles's house, the appellant divided the money taken from Johnson -- approximately $360 -- among himself, Julius Reeves, and Brenda Suttles.  Testimony indicated that throughout the evening, the appellant continued to brag about

- 5 -

CR-98-0777

having shot Johnson.   Several witnesses who were present at Suttles's house that evening testified that they saw the appellant dancing, "throwing up" gang signs, and pretending to pump a shotgun.  Brenda Suttles testified that as the appellant danced, he would jerk his body around in a manner "mock[ing] the way that Willie Johnson had died."  (R. 713.)  The appellant was also heard to say that the shooting would earn him a "teardrop," a gang tatoo acquired for killing someone.  (R. 720.)

Yolanda Blevins, who was present during the post-shooting "celebration" at Suttles's house, testified that the appellant called her into the kitchen and told her that he had shot a man in a truck after catching a ride with him.  Blevins noticed that there was what appeared to be dried blood on the appellant's hands. LaTosha Rodgers, who was also present at Suttles's house, testified that the appellant told her that he had "just shot somebody" in the alley.  (R. 924.)

At around 2:00 a.m. on November 28, 1996 (approximately seven hours after the shooting), Selma police received a report of a suspicious vehicle parked in Crockett's Alley.   When police officers investigated, they found Johnson's body slumped across the seat of his pickup truck.  There was a pool of blood on the ground on the driver's side of the truck.  Several coins and a diamond ring were on the ground near the truck.  On the floorboard of the truck, police found wadding from a shotgun shell.  The pockets of Johnson's pants had been turned inside out and were empty.

- 6 -

CR-98-0777

Testimony at trial indicated that Johnson was a longtime employee of the Selma Housing Authority and that on the afternoon of November 27, 1996, he had cashed his paycheck, which had been in the amount of $500.

At the shooting scene on the morning of November 28, police also discovered a trail of blood leading from Johnson's truck to the Reeveses' house. Randy Tucker, a canine-patrol officer with the Selma Police Department, testified that his dog tracked the blood trail from the pool of blood next to Johnson's truck, down Crockett's Alley, through the yard at 2126 Selma Avenue (the residence next to the alley), and ultimately to the front steps of the Reeveses' house at 2128 Selma Avenue.

Pat Grindle, the detective in charge of investigating Johnson's murder, went to the Reeveses' house after learning that the blood trail led there. Det. Grindle testified that he obtained the consent of the appellant's mother, Marzetta Reeves, to search the house. In a bedroom shared by the appellant and Julius, Det. Grindle found bloodstained clothes and bloodstained shoes; under a bed in this bedroom, Det. Grindle found a shotgun. In searching the kitchen, Det. Grindle found a pair of bloodstained pants. After making these discoveries, Det. Grindle questioned Marzetta Reeves and several other persons who were in the house at that time. Det. Grindle stated that he learned that the bloodstained clothes and shoes belonged to Julius Reeves, Brenda Suttles, and the appellant. Det. Grindle then went to Suttles's house in an

- 7 -

CR-98-0777

attempt to locate the three.  At Suttles's house, Det. Grindle found the appellant lying on a couch in a front room.  The appellant was placed under arrest, and the officers seized a balled-up bloodstained jacket he was using as a headrest on the couch.  Det. Grindle later returned to the Reeveses' residence, where he seized a 12-gauge shotgun shell from a garbage can in the bathroom.

An autopsy revealed that Johnson had died from a shotgun wound to his neck that severed the carotid artery, causing him to bleed to death over a period of several minutes.  Bloodstain patterns in Johnson's truck indicated that he was sitting upright in the driver's seat, facing forward, when he was shot from behind, through the open rear window.  The bloodstain patterns also indicated that the driver's side door had been opened and closed shortly after Johnson was shot.

Testimony indicated that the appellant's fingerprints were found on the shotgun that Det. Grindle had seized from under the bed in the appellant's bedroom.  Brenda Suttles's and Julius Reeves's fingerprints were found on a fender of Johnson's truck.  Joseph Saloom, a firearms expert with the Alabama Department of Forensic Sciences, testified that the shotgun shell seized from the bathroom at the Reeveses' residence was of the type commonly fired from the shotgun seized from the appellant's bedroom.  Saloom stated that the shotgun-shell wadding found on the floorboard of

- 8 -

CR-98-0777

Johnson's truck was of the type commonly found in the kind of shotgun shell seized from the bathroom at the Reeveses' residence.

On appeal, the appellant raises several issues, many of which he did not raise by objection in the trial court. Because the appellant was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So. 2d 343 (Ala.Crim.App. 1991), aff'd, 600 So. 2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So. 2d 474 (Ala.Crim.App. 1990), aff'd, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

Rule 45A, Ala.R.App.P., provides:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

"Plain error" is error "so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So. 2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148 1152 (5th Cir. 1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's

- 9 -

CR-98-0777

deliberations." <u>Hyde v. State</u>, [Ms. CR-95-2036, January 30, 1998] ___ So. 2d ___, ___ (Ala.Crim.App. 1998), aff'd, [Ms. 1971109, March 10, 2000] ___ So. 2d ___ (Ala. 2000). This court has recognized that "'the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" <u>Burton v. State</u>, 651 So. 2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So. 2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting <u>United States v. Young</u>, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting, in turn, <u>United States v. Frady</u>, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). With these principles in mind, we address each of the issues the appellant raises on appeal.

I.

The appellant contends that the trial court should have removed prospective juror B.P. for cause because, he says, her responses during voir dire "indicated that once she found someone guilty of intentionally killing someone she would consider only the death penalty." (Appellant's brief to this court, pp. 43-44.) We disagree.

In <u>Taylor v. State</u>, 666 So. 2d 36 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), we stated:

> "'A prospective juror may not be excluded
> from a capital case for personal opposition to

- 10 -

CR-98-0777

the death penalty unless the juror's beliefs
would "'prevent or substantially impair the
performance of his duties as a juror in
accordance with his instructions and his
oath.'"  Wainwright v. Witt, 469 U.S. 412,
424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841
(1985)(footnote omitted).  On the other hand,
"[a] venire member who believes that the death
penalty should automatically be imposed in
every capital case should be excused." Martin
v. State, 548 So. 2d 488, 491 (Ala.Cr.App.
1988), affirmed, 548 So. 2d 496 (Ala.), cert.
denied, 493 U.S. 970, 110 S.Ct. 419, 107
L.Ed.2d 383 (1989).  Accord, Bracewell v.
State, 506 So. 2d 354, 358 (Ala.Cr.App.
1986).'

"Kuenzel v. State, 577 So. 2d 474, 484-85 (1990),
affirmed, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S.
886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

     "'The proper standard for determining
whether a prospective juror may be excluded
for cause because of his or her views on
capital punishment is "whether the juror's
views would 'prevent or substantially impair
the performance of his duties as a juror in
accordance with his instructions and his
oath.'" Wainwright v. Witt, 469 U.S. 412, 105
S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v.
Mississippi, 481 U.S. 648 [at 657-58], 107
S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987).  "The
crucial inquiry is whether the venireman could
follow the court's instructions and obey his
oath, notwithstanding his views on capital
punishment." Dutton v. Brown, 812 F.2d 593,
595 (10th Cir.), cert. denied, Dutton v.
Maynard, 484 U.S. 836, 108 S.Ct. 116, 98
L.Ed.2d 74 (1987). A juror's bias need not be
proved with "unmistakable clarity" because
"juror bias cannot be reduced to question-and-
answer sessions which obtain results in the
manner of a catechism." Id.

     "'A trial judge's finding on whether or
not a particular juror is biased "is based
upon determinations of demeanor and
credibility that are peculiarly within a trial
judge's province." Witt, 469 U.S. at 429, 105
S.Ct. at 855.  That finding must be accorded

- 11 -

CR-98-0777

> proper deference on appeal.  <u>Id</u>.  "A trial
> court's rulings on challenges for cause based
> on bias [are] entitled to great weight and
> will not be disturbed on appeal unless clearly
> shown to be an abuse of discretion."  <u>Nobis v.
> State</u>, 401 So. 2d 191, 198 (Ala.Cr.App.),
> cert. denied, <u>Ex parte Nobis</u>, 401 So. 2d 204
> (Ala. 1981).'

> "<u>Martin v. State</u>, 548 So. 2d 488, 490-91 (Ala.Cr.App.
> 1988), affirmed, 548 So. 2d 496 (Ala. 1989), cert.
> denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383
> (1989)."

666 So. 2d at 46-47.  Further,

> "[A] veniremember's personal feelings as to the law are
> immaterial unless those feelings are so unyielding as to
> preclude the veniremember from following the law as given
> in the court's instructions. 'A veniremember who believes
> that the death penalty should automatically be imposed in
> every capital case should be excused.' <u>Martin v. State</u>,
> 548 So. 2d 488, 491 (Ala.Crim.App. 1988), aff'd, 548 So.
> 2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419,
> 107 L.Ed.2d 383 (1989). <u>However, veniremembers who favor
> the death penalty should not be excused for cause where
> they indicate they can follow the court's instructions.
> Id.</u>"

<u>Smith v. State</u>, 698 So. 2d 189, 198 (Ala.Crim.App. 1996), aff'd,

698 So. 2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385,

139 L.Ed.2d 300 (1997)(emphasis added).

> "Even though a prospective juror may initially admit
> to a potential for bias, the trial court's denial of a
> motion to strike that person for cause will not be
> considered error by an appellate court if, upon further
> questioning, it is ultimately determined that the person
> can set aside his or her opinions and try the case fairly
> and impartially, based on the evidence and the law. <u>Knop
> v. McCain</u>, 561 So. 2d 229 (Ala. 1989); <u>Siebert v. State</u>,
> 562 So. 2d 586 (Ala.Cr.App. 1989), <u>affirmed</u>, 562 So. 2d
> 600 (Ala.), <u>cert. denied</u>, 498 U.S. 963, 111 S.Ct. 398,
> 112 L.Ed.2d 408 (1990); <u>Perryman v. State</u>, 558 So. 2d 972
> (Ala.Cr.App. 1989).  Only when a prospective juror's
> testimony indicates a bias or prejudice so fixed or deep-
> seated that that person cannot be impartial and objective

- 12 -

CR-98-0777

must a challenge for cause be granted by the trial court. <u>Knop</u>, supra; <u>Siebert</u>, supra; <u>Perryman</u>, supra."

<u>Ex parte Land</u>, 678 So. 2d 224, 240 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).

Although the record reflects that B.P. expressed strong support for the death penalty at times during the voir dire examination, the record also reflects that she stated on several occasions that she could give equal and fair consideration to both the death penalty and life imprisonment without parole as possible punishments. She repeatedly stated that she would listen to the facts and the law as instructed by the trial court and that she could follow the trial court's instructions. She also stated that if appropriate, she could recommend life imprisonment without the possibility of parole. In denying the appellant's challenge for cause as to B.P., the trial court said: "I think this juror has said on a number of occasions that she can give fair consideration to both of the possible punishments. She could keep an open mind to the end." (R. 430.) Accordingly, the trial court did not abuse its discretion in denying the appellant's challenge for cause as to juror B.P.

II.

The appellant contends that he was deprived of his right to a fair trial by an impartial jury because, he says, two jurors, who sat on the jury for a portion of his trial, but who were excused by the trial court before the guilt-phase deliberations began, failed

- 13 -

CR-98-0777

to respond candidly to questions posed during the voir dire examination.

The record reflects that on the morning of the second day of trial, after the State had called its first eight witnesses, juror P.T. approached the trial judge to inform him that she had remembered that the appellant's brother Julius had stolen her car some six or seven years earlier. The following then occurred outside the presence of the remaining members of the jury:

> "[The Court]: [P.T.], how about stepping over this way. When I arrived in the office this morning, I was approached by [P.T.] who is one of our jurors. She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis, I guess you would say, and that it deeply affected [P.T.] and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of this vehicle.
>
> "[P.T.] has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case. And at this time I'm going to excuse [P.T.]. And our first alternate will be taking her place. Is there any objection?
>
> "[Prosecutor]: None from the State.
>
> "[Defense counsel]: None from the defense."

(R. 803.)

Subsequently, during the afternoon recess on the second day of trial, juror J.D. also approached the trial judge to inform him

- 14 -

CR-98-0777

that he had remembered that he knew the victim, Willie Johnson.

The following then occurred in the judge's chambers:

> "[The Court]:  I explained to the attorneys that [J.D.]
> had had a recollection of Mr. Johnson, the victim in this
> case.  He disclosed that to me just a few minutes ago.
> And [J.D.], I'm going to ask these attorneys to basically
> ask -- well, let me say this.  You tell them what you
> told me, and then I will let them ask you any questions.
>
> "[J.D.]:  I told him that I knew him from another guy.
> I seen him with the family.  I was thinking that I knew
> the truck and knew the guy.  But I never could picture
> who it really was until I saw him and his name is Willie,
> too.  He worked for Roy out there.  I've got a key to
> Roy's shop.  I go up there sometimes and work on my truck
> and whatever.  Willie helped him, and he and Roy were
> friends.  And he'd come up there a lot when I was working
> on my truck and stay around and talk.  And we talked
> about the truck before, how I kept things in tune.
> That's just the only way I knew him was from Roy's shop.
> I didn't even know this had happened to him.
>
> "[Defense counsel]: When did you start thinking that you
> might have known the truck?
>
> "[J.D.]:  Last night after they was talking about Tyler
> because I live out there. I couldn't ever figure out who
> it was until I saw that other Willie today.  I asked,
> 'What are you doing here?'  He said, 'I'm in there with
> the family.'  So I knew it was the same one.  He had
> always hung around with him and was on good terms with
> Roy.  He lives out there now.
>
> "[Defense counsel]:  What prompted you to tell Judge
> Jones about it?
>
> "[J.D.]:  I mean I figured y'all would want to know that
> because the first day whenever y'all asked if anybody
> knew him or whether we know anything about it.  I didn't
> know at that time then who it was.
>
> "[Defense counsel]: When is it that you saw this man?
> Was it out in the hall?
>
> "[J.D.]:  Uh-huh.
>
> "[Defense counsel]: When did you notice him, a minute
> ago?

- 15 -

CR-98-0777

"[J.D.]: Just a minute ago getting into the elevator or walking down the stairs.  He was going down, going outside to smoke.

"[Defense counsel]: Are you uncomfortable now?

"[J.D.]:  Not really, I just figured that I needed to tell the Judge because I mean I wasn't close enough to the guy to even know what happened to him.  I hadn't seen him in a while.

"[Prosecutor]: May I?  [J.D.], you did -- the person you were talking to that you know that works, I think you said worked with Mr. Roy Moore, this is a person that was in the hallway?

"[J.D.]:  Yes.  He's been sitting out there I think.

"[Prosecutor]:  In the courtroom in there?

"[J.D.]:  Yes, sir.

"[Prosecutor]:  Do you know that person fairly well?

"[J.D.]:  Yes, sir.

"[Prosecutor]: Did you know the deceased in this case at all?

"[J.D.]:  I knew him, but he couldn't tell you my name, and I knew his name was Willie.  That was all I ever knew.

"[Prosecutor]:  How long have you known of and concerning him?

"[J.D.]:  Maybe three years maybe, off and on.  I just saw him around the shop or saw him pass when him and the other Willie would be riding down the road.  I knew Willie would be there with him.  They were always together.

"[Prosecutor]:  Do you know anything about his family, his background, or anything about what he did or where he worked?

"[J.D.]:  No, sir.

"[Prosecutor]:  Have you ever worked with him, been with him, had any contact with him?

- 16 -

CR-98-0777

"[J.D.]: No, sir, just when he walked in that shop maybe once or twice when we were working on our trucks.

"[Prosecutor]: Does that knowledge put you in a position where you can't serve in this case and make a fair judgment based on what you have heard?

"[J.D.]: No, sir.

"[The Court]: Do you feel uncomfortable? That's a different question.

"[J.D.]: No, sir.

"[Prosecutor]: You haven't heard all of the evidence in this case, but are you still in a position where you can either convict or not convict based on what you decide the evidence is at the end?

"[J.D.]: Yes, sir.

"[Prosecutor]: In spite of this connection with this man?

"[J.D.]: Yes, sir.

"[Prosecutor]: You could still -- if you thought the evidence warranted it, you could turn the man here loose?

"[J.D.]: Yes, sir.

"[Defense counsel]: This Willie person that you said you had seen him sitting in the courtroom all day?

"[J.D.]: I thought I had recognized him, but I never did look really hard until I walked outside and walked right by him. Then I knew it was him.

"[Defense counsel]: Having recognized him, do you know how long he has been in the courtroom?

"[J.D.]: No, sir.

"[Defense counsel]: The photographs of the truck, is that something that you have seen?

"[J.D.]: The one today where you could see in the garage, you know, you could see the whole truck. Really, I knew then that it was the same truck I have been in before.

- 17 -

CR-98-0777

"[Defense counsel]:   The relationship with this other Willie, was it a knowledge from going up to Roy Moore's shop?

"[J.D.]:  Me and Roy Moore, we are all real good friends, him and my dad, and I used their shop to get air and tools or whatever, you know.  I've got a key to their shop and everything.  And he has worked for Roy for, I don't know, 10 years or more probably.

"[Defense counsel]:  What about the fact that this Willie is closely related to the victim?  Would that have any bearing?

"[J.D.]:  I don't even know if he's related to him or, you know -- I don't really know how he's kin to him.  It has no bearing on me really.

"[Defense counsel]:  If he's up here supporting, in support of the family, that wouldn't have any effect on you?

"[J.D.]:  No, sir.

"[Defense counsel]:  You were actually in that truck?

"[J.D.]:  Yes, we used it one time, me and Willie out here when we was replacing brake shoes on my truck.  We came to town.  I had to get some new brake shoes.

"[The Court]:  Anything else?

"[Prosecutor]:  No.

"[The Court]:  You may take a seat back in the jury room."

(R. 993-98.)  Following this exchange, the appellant's counsel moved to have juror J.D. excused from the jury.  Because juror J.D. was an alternate juror, however, the trial court reserved ruling on the appellant's motion until the end of trial.  The record reflects that juror J.D. was dismissed as an alternate before deliberations.

On appeal, the appellant contends that he was denied his right to a fair trial by an impartial jury when jurors P.T. and J.D.

- 18 -

CR-98-0777

failed to disclose during voir dire examination that they knew Julius Reeves and the victim Johnson, respectively.  The appellant maintains, and the record reflects, that when prospective jurors were asked during voir dire examination whether they knew the appellant or any member of his family, P.T. did not respond.  We note, however, that prospective jurors were never asked during the voir dire examination whether they knew the victim, although they were briefly informed of the facts of the case and the names of the people involved, including the victim's name.  We also note that the appellant did not object when P.T. disclosed that Julius Reeves had stolen her car, when J.D. disclosed that he knew Johnson, or when the trial court removed these jurors before deliberations. Nor did the appellant assert this particular claim in his motion for a new trial.  Although the appellant moved to have juror J.D. excused when J.D. first indicated that he had known the victim, and the trial court initially reserved ruling on the motion, the trial court nevertheless excused juror J.D. just before deliberations; thus, there is no adverse ruling from which the appellant can appeal.  Because this particular claim was never presented to the trial court and because the trial court never ruled on the only motion made by the appellant raising this issue, we review this claim under the plain-error rule.  See Rule 45A, Ala.R.App.P.  We find no error, plain or otherwise.

There is simply no possibility that the appellant was harmed by the failure of P.T. or J.D. to disclose during the voir dire

- 19 -

CR-98-0777

examination that P.T. knew Julius Reeves or that J.D. had known the victim Johnson.  It is clear from the record that neither P.T. nor J.D. willfully withheld the information and that they merely failed to recollect at the time of voir dire examination their remote connections with Julius Reeves and Johnson.  Both came forward and informed the trial court as soon as they remembered the connections.  Moreover, both P.T. and J.D. were excused from the jury before the guilt-phase deliberations began.  There is no evidence indicating, and the appellant does not even allege, that P.T. or J.D. informed any of the other jurors who ultimately sat on the jury about their connections with the case, or that any of the other jurors were influenced by P.T. and J.D.'s connections with the case or by the fact that the two were excused before deliberations.  Jurors were instructed several times throughout the trial not to discuss the case among themselves or with anyone else, and jurors are presumed to follow the instructions they are given.  See, e.g., Taylor v. State, 666 So. 2d 36 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).  Accordingly, we find no error, much less plain error, as to this claim.

### III.

The appellant contends that the trial court erred in denying his motion to suppress several items of evidence that were seized from his bedroom at his mother's residence.

- 20 -

CR-98-0777

At the suppression hearing, Det. Grindle testified that on the morning of November 28, 1996, after he was called to the scene of the shooting in Crockett's Alley, he learned that Officer Randy Tucker's dog had tracked a trail of blood to a house at 2128 Selma Avenue. Det. Grindle had had prior dealings with the Reeves family, and he knew that that address was the address of the appellant's mother, Marzetta Reeves, and that the appellant and Julius Reeves lived at that address with their mother. Shortly after learning that the dog had tracked the trail of blood to the Reeveses' house, Det. Grindle went to the house and knocked on the front door. Marzetta Reeves answered. Det. Grindle testified that after he identified himself, he told Ms. Reeves that he was investigating a shooting and that a dog had "tracked" to her residence. According to Det. Grindle, he then asked Ms. Reeves if she would consent to a search of her house. Det. Grindle stated that Ms. Reeves orally consented to the search and told him that "she had nothing to hide." (R. 545.) Det. Grindle then wrote out a consent form on a piece of paper. He stated that Ms. Reeves read the form and signed it. The signed consent form was admitted into evidence at the suppression hearing (and later during the trial) without objection. The consent form read as follows:

> "I, Marzetta Reeves, do authorize Det. P. Grindle and any other officers he designates to assist him in the search of my residence at 2128 Selma Avenue. I have been advised as to the fact that Det. Grindle is investigating a shooting. With this in mind, I have agreed to allow Det. Grindle to search my residence. I have not been coerced in any way into giving my permission to Det. Grindle in the search of my residence."

- 21 -

CR-98-0777

(C. 252.)

Det. Grindle and another officer conducted the search of the residence. Det. Grindle stated that he found several items of bloodstained clothing, bloodstained shoes, and a shotgun in a bedroom that the appellant and his brother Julius shared. In addition, he found a pair of bloodstained pants in the kitchen. Det. Grindle stated that there was only one internal door inside the house -- to the bathroom. According to Det. Grindle, there was no door to the kitchen or to the bedroom shared by the appellant and Julius.

Marzetta Reeves denied that she gave Det. Grindle consent to search her house. According to Ms. Reeves, Det. Grindle never asked for her consent to search the house, but instead asked only if he could look inside the house for the appellant and Julius. Ms. Reeves claimed that Det. Grindle then had her sign a blank piece of paper, which she said she believed to be consent to search the house for her sons, not a consent to conduct a general search. Ms. Reeves maintained that the search of her house was conducted without her consent.

On appeal, the appellant does not argue that his mother did not consent to the search of her house. Instead, he contends that "the prosecution did not elicit even conflicting evidence that Marzetta Reeves had authority to consent to the search of the appellant Reeves's room." (Appellant's brief to this court, p. 30.) In the trial court, however, the appellant did not raise the

- 22 -

CR-98-0777

issue whether his mother had authority to consent to the search of

his bedroom; rather, he argued that his mother never consented to

the search of her house.  Because the claim the appellant raises on

appeal was not presented to the trial court, we review it under the

plain-error rule.  See Rule 45A, Ala.R.App.P.

In Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___

So. 2d ___ (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on

other grounds, [Ms. 1980810, July 21, 2000] ___ So. 2d ___ (Ala.

2000), we stated the following regarding the authority of a parent

to consent to the search of a child's bedroom in the parents' home:

> "Burgess's contention that his mother did not have
> authority to consent to a search of his bedroom is
> likewise without merit.  As this court stated in Taylor
> v. State, 491 So. 2d 1042 (Ala.Cr.App. 1986):
>
> > "'"[T]he parent's rights are 'superior to
> > the rights of children who live in the house,'
> > which means ... that the parent's consent
> > would be effective even when the child was
> > present and objecting."  W. LaFave, 2 Search
> > and Seizure § 8.4 (1978).  "Even if a minor
> > child, living in the bosom of his family, may
> > think of a room as 'his,' the overall
> > dominance will be in his parents."  United
> > States v. Di Prima, 472 F.2d 550, 551 (1st
> > Cir. 1973).
> >
> > "'"If a son or daughter,
> > whether or not still a minor, is
> > residing in the home of the parents,
> > generally it is within the authority
> > of the father or mother to consent
> > to a police search of that home
> > which will be effective against the
> > offspring.  This is unquestionably
> > so as to areas of common usage, and
> > is also true of the bedroom of the
> > son or daughter when a parent has
> > ready access for purposes of
> > cleaning it or when because of the

- 23 -

CR-98-0777

> minority of the offspring the parent
> is still exercising parental
> authority. Because in the latter
> circumstances the parent's rights
> are 'superior to the rights of
> children who live in the house,' a
> parent's consent would prevail even
> if the child were present and
> objecting and even if the child had
> taken special measures in an effort
> to ensure he had exclusive use of
> the area searched." W. LaFave, 1
> <u>Criminal Procedure</u> § 3.10(e)
> (1984).'

"491 So. 2d at 1045."

____ So. 2d at ___.

At the time of the search, the appellant was 18 years old and was living in his mother's house. The appellant concedes that his mother consented to the search of her house, including his bedroom. As the appellant's parent, Ms. Reeves clearly had the authority to consent to the search of the appellant's bedroom, which, lacking a door, was readily accessible to Ms. Reeves and to anyone else in her house. Accordingly, the trial court properly allowed the State to introduce the items of evidence seized from the appellant's bedroom. There was no error, plain or otherwise, in admitting this evidence.

IV.

The appellant contends that the trial court erred in denying his motion to suppress evidence in the form of a shotgun shell seized from the Reeveses' house following the appellant's arrest.

In a post-arrest statement to police -- which was not introduced into evidence by the State -- the appellant directed

- 24 -

CR-98-0777

Det. Grindle to a shotgun shell in a garbage can in the bathroom of the Reeveses' house; the shell was admitted into evidence at trial. The appellant argues that he was arrested without probable cause, that the shotgun shell was the fruit of this illegal arrest, and that, consequently, his motion to suppress the shell should have been granted.   (Appellant's brief to this court, p. 33.)   We disagree.

As noted above, Det. Grindle testified at the suppression hearing that he went to the Reeveses' house on the morning of November 28 based on Officer Tucker's information that a dog had tracked a trail of blood from the shooting scene in Crockett's Alley to the house.  After the Reeveses' house was searched that morning, Det. Grindle interviewed four people, one of whom was the appellant's mother, who were present at the house at the time of the search.  From these interviews, Det. Grindle learned that the bloodstained clothing and shoes found in the house during the search belonged to the appellant, his brother Julius, and Brenda Suttles.  Det. Grindle also learned that Brenda Suttles had been at the Reeveses' house earlier in the day with another male.  From police department files, Det. Grindle obtained Suttles's address and proceeded to her house in an attempt to locate her, Julius Reeves, and the appellant.  Det. Grindle testified that when he arrived at Suttles's house, in the morning hours of November 28, he knocked on the door, and Suttles's sister answered.  Through the doorway, Det. Grindle said, he saw the appellant lying on a couch.

- 25 -

CR-98-0777

He then entered the residence, arrested the appellant, and seized a bloodstained jacket that was on the couch where the appellant had been lying.   Neither Brenda Suttles nor Julius Reeves was apprehended at that time.

"Section 15-10-3(3), Ala. Code 1975, provides that an officer may arrest an individual without a warrant when a felony has been committed and he has reasonable cause to believe that the individual arrested committed the felony." Sockwell v. State, 675 So. 2d 4, 13 (Ala.Crim.App. 1993), aff'd, 675 So. 2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).   "[R]easonable cause has been equated with probable cause." Daniels v. State, 534 So. 2d 628, 651 (Ala.Crim.App. 1985), aff'd, 534 So. 2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), opinion after remand, 534 So. 2d 658 (Ala.Crim.App. 1987), aff'd, 534 So. 2d 664 (Ala. 1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989). "'The rule of reasonable or probable cause is a "practical, nontechnical conception,"'" id., quoting Tice v. State, 386 So. 2d 1180, 1183 (Ala.Crim.App.), cert. denied, 386 So. 2d 1187 (Ala. 1980), and "[t]he level of evidence needed for a finding of probable cause is low." State v. Johnson, 682 So. 2d 385, 387 (Ala. 1996).   "'"Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief

- 26 -

CR-98-0777

that' an offense has been or is being committed."'" State v. Johnson, 682 So. 2d at 388, quoting Young v. State, 372 So. 2d 409, 410 (Ala.Crim.App. 1979), quoting, in turn, Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Put another way, "[p]robable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty." Sockwell, 675 So. 2d at 13. "'An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... "Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."'" State v. Johnson, 682 So. 2d at 387-88, quoting Stone v. State, 501 So. 2d 562, 565 (Ala.Crim.App. 1986), overruled on other grounds, Ex parte Boyd, 542 So. 2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).

> "'In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act....' Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). '"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."' Id. 'Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.' Cox v. State, 489 So. 2d 612 (Ala.Cr.App. 1985)."

Dixon v. State, 588 So. 2d 903, 906 (Ala. 1991). See also Minor v. State, [Ms. CR-95-1968, October 29, 1999] ___ So. 2d ___, ___ (Ala.Crim.App. 1999), rev'd on other grounds, [Ms. 1990235, June 2,

- 27 -

CR-98-0777

2000] ___ So. 2d ___ (Ala. 2000); and McWhorter v. State, [CR-93-1448, August 27, 1999] ___ So. 2d ___, ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1990427, August 11, 2000] ___ So. 2d ___ (Ala. 2000). "In making the determination as to whether probable cause exists for a warrantless arrest, we must examine the totality of the circumstances surrounding the arrest." Sockwell, 675 So. 2d at 13, quoting Daniels, 534 So. 2d at 651.

Here, based on the knowledge he had accumulated through his investigation, Det. Grindle had probable cause to arrest the appellant at Suttles's house on the morning of November 28, 1996. There was a trail of blood leading from where Johnson's body was found to the Reeveses' house. Bloodstained clothing and shoes, reportedly belonging to the appellant, Julius Reeves, and Brenda Suttles, were found in the appellant's bedroom in the Reeveses' house. In addition, a shotgun was found under the appellant's bed. Wadding from a shotgun shell was found on the floorboard of Johnson's truck at the shooting scene. When Det. Grindle arrived at Brenda Suttles's house, he found the appellant lying on a couch. Next to the appellant on the couch was a bloodstained jacket. These facts and circumstances were sufficient to lead "a reasonable person of ordinary caution, acting impartially" to believe that the appellant had participated in Johnson's shooting. There was probable cause to arrest the appellant. Accordingly, the trial court did not err in denying the appellant's motion to suppress the

- 28 -

CR-98-0777

shotgun shell that the appellant directed Det. Grindle to after his arrest.

V.

The appellant contends that the trial court improperly limited his cross-examination of Jason Powell, who testified for the State. Specifically, he argued that he should have been permitted to cross-examine Powell regarding charges pending against him in order to show that Powell was biased in favor of the State.

The record reflects that sometime after Johnson's body was discovered, Powell gave police a statement in which he recounted the events of November 27, 1996. Although that statement is not included in the record on appeal, it appears from the record that Powell's testimony at trial was substantially the same as the statement he gave to police. When cross-examining Powell at trial, the appellant's counsel attempted to impeach Powell by questioning him about criminal charges pending against him in Wilcox County. Apparently, at the time of the appellant's trial, Powell was in jail awaiting a trial on those charges. When the prosecutor objected to defense counsel's inquiry into this subject, the following occurred outside of the jury's hearing:

> "[The Court]:  I don't mind you asking him questions as long as it's not regarding some suspension or some expulsion from school for which there has not been some type of appropriate charge, or conviction I should say. I don't know where you're going with that.
>
> "[Defense counsel]:  If he has got charges hanging over his head, he would have a bias in favor of the State.
>
> "[Prosecutor]:  It's totally unrelated to anything here.

- 29 -

CR-98-0777

"[The Court]:  Is there any agreement on this guy?  What I'm saying is, is there an appropriate conviction that you're aware of that you can cross-examine him on?

"[Defense counsel]:  No, I'm not.

"[The Court]:  The second question is, is there any type of agreement with [Powell] regarding his charges in Wilcox County for his testimony here today?

"[Prosecutor]:  None whatsoever, nor in this case.

"[Defense counsel]:  Let me go ahead and state my grounds why I think I should be able to go into this matter, what the criminal charges are if he's in jail.  We think that we are entitled as a matter of Alabama statutory law as well as under the 6th and 14th Amendments of the United States Constitution and Article 1, Section 6, of the state constitution to be able to cross-examine him to show any possible bias that he may have in favor of the State or any prejudice against the defense.  We think certainly if this man has got criminal charges hanging over his head, he wouldn't want to do anything to tick off the State.  But I understand the Court is saying, 'don't go into that.'  I wanted to make sure I don't have to ask every single question for you to rule on it.

"[The Court]:  Sustain the objection based on the fact that, number one, there is no agreement regarding this testimony or any charges.  Number two, you can't tell me of any conviction that would be an appropriate conviction for impeachment purposes of his testimony, correct?

"[Defense counsel]:  As far as I know, there is not."

(R. 793-94.)   The appellant's counsel then continued cross-examining Powell without referring to any pending charges.  At the conclusion of Powell's testimony, court was recessed for the day.

When the trial resumed the next morning, the following exchange occurred:

"[Defense counsel]:  Also, with respect to witness Jason Powell, we had a sidebar at which the Court ruled that we would not be allowed to ask Mr. Powell questions along the lines of what, if any, criminal cases he had pending in Wilcox County.  The State said that they were aware

- 30 -

CR-98-0777

that things were pending.   [Cocounsel for the defense]
this morning went into the clerk's office and pulled up
some computer records that would indicate we think what
we would have been able to show had we been able to go
into that.   That's marked as Defendant's Exhibit Number
5.   And just for purposes of the record, we would like to
put that in the record.

"[The Court]:  Let me ask you a question, though, because
I did rule on your objection or the State's objection to
your question regarding Jason Powell's pending charges.
Can you tell me or give me any indication as to how that
would be admissible under Alabama Rules of Evidence?

"[Defense counsel]:  It would be admissible to show bias
of the witness in favor of the State, that he would have
a reason with all of these things hanging over his head
to do everything he can to help himself in those cases by
testifying in this case.

"[Prosecutor]:  We counter that with the fact that there
is no evidence of that.  To impeach a witness, you need
a conviction of a crime involving moral turpitude or some
other evidence to show that the witness has some
particular reason, a deal or an understanding, an
agreement or something of that nature.  But the mere fact
that he's been charged with something is not permitted
under the law, neither by the State or the defense.

"[The Court]:  That was my --

"[Prosecutor]:  The man gave these statements [to the
police] back way before he had any charges brought
against him.  There is no understanding whatsoever.

"[The Court]:  Are you telling me that the statement that
Jason Powell gave to the police predated the charges that
are presently pending?

"[Prosecutor]:  Yes, sir.

"[Defense counsel]:  We would say the rule -- we cite
Alabama Rules of Evidence 616, 'Impeachment by Evidence
of Bias, Prejudice, or Interest.'  I'm reading out of
Gamble's Alabama Rules of Evidence Trial Manual.  'This
rule retains the preexisting Alabama practice of allowing
one to impeach a witness with evidence of acts,
statements, or relationship indicating bias.'  The case
cites the bias that may be shown includes both bias for
a party and bias against a party.

- 31 -

CR-98-0777

"[The Court]:  How do you want to respond to the fact that the statement given predates the charge?

"[Defense counsel]:  I think that would go to the weight rather than admissibility.

"[Prosecutor]:  The State's biggest problem in this case, we weren't real sure how Mr. Powell was going to respond, and he is now in jail.  And we are now putting him -- we have got to deal with what we've got.

"[The Court]:  My ruling will stand.  Your exception is noted for the record."

(R. 804-06.)

It is well settled that "[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him," McMillian v. State, 594 So. 2d 1253, 1261 (Ala.Crim.App. 1991), remanded on other grounds, 594 So. 2d 1288 (Ala. 1992), opinion after remand, 616 So. 2d 933 (Ala.Crim.App. 1993), citing Perry v. Brakefield, 534 So. 2d 602 (Ala. 1988), and § 12-21-137, Ala. Code 1975, and that a party should be given "wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge." Williams v. State, 710 So. 2d 1276, 1327 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).  It is equally well established, however, "that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme

- 32 -

CR-98-0777

cases of abuse." Long v. State, 621 So. 2d 383, 388 (Ala.Crim.App. 1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So. 2d 688, 689 (Ala.Crim.App. 1990). "The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating." Newsome v. State, 570 So. 2d 703, 714 (Ala.Crim.App. 1989). "On appeal, the party claiming an abuse of such discretion bears the burden of persuasion." Ross v. State, 555 So. 2d 1179, 1180 (Ala.Crim.App. 1989), quoting Hembree v. City of Birmingham, 381 So. 2d 664, 666 (Ala.Crim.App. 1980).

Rule 616, Ala.R.Evid., provides that "[a] party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case." Generally, this rule permits cross-examination, and the introduction of independent evidence, regarding statements, acts, or relationships indicating bias or prejudice, including arrests, indictments, and pending charges that have not resulted in convictions even though such "bad acts" are generally inadmissible under Rules 608 and 609, Ala.R.Evid. See, e.g., C. Gamble, McElroy's Alabama Evidence, § 149.01(8)(a) (5th ed. 1996). However, the arrests, indictments or pending charges must have a tendency to show bias or prejudice on the part of the witness in order to be admissible.

- 33 -

CR-98-0777

Here, there is nothing in the record to suggest that the pending charges against Powell would have biased him in favor of the State. As the State correctly points out in its brief to this court, the record suggests that Powell's testimony at trial was substantially the same as the statement he gave police shortly after Johnson's body was found; this statement was made before the charges were brought against Powell in Wilcox County. Furthermore, although "[i]t is always permissible to cross-examine a witness to ascertain his interest, bias, prejudice or partiality concerning the matters about which he is testifying ... [t]he fact that a witness has merely been indicted for an offense unrelated to the crime charged against the accused is not such a bias-creating fact." Woodward v. State, 489 So. 2d 1, 2 (Ala.Crim.App. 1986). Only where "'the offenses are factually related or where the particular facts furnish a reasonable inference of interest or bias" is the fact that a witness has charges pending a proper subject of cross-examination. Beavers v. State, 497 So. 2d 612, 617 (Ala.Crim.App. 1986), quoting Woodward, 489 So. 2d at 2. See also Baker v. State, 568 So. 2d 374 (Ala.Crim.App. 1990); and Moody v. State, 495 So. 2d 104 (Ala.Crim.App.), cert. denied, 495 So. 2d 110 (Ala. 1986). Here, the appellant has failed to show that the charges pending against Powell were "factually related" to the charge against the appellant, nor has he pointed to facts furnishing a reasonable inference of Powell's bias in favor of the State. Finally, there is absolutely no evidence of any agreement

- 34 -

CR-98-0777

between the State and Powell pursuant to which Powell would testify at the appellant's trial in exchange for leniency with regard to the charges pending against him, and the prosecutor asserted at trial that there was, in fact, no such agreement. Accordingly, we hold that the trial court did not err in limiting the appellant's cross-examination of Powell regarding unrelated pending charges against him.

VI.

The appellant contends that the trial court's instruction to the jury on reasonable doubt violated the principles of <u>Cage v. Louisiana</u>, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In its oral charge, the trial court instructed the jury on reasonable doubt as follows:

"Now in this case, as I said, the burden of proving that the defendant is guilty as charged rests upon the State. And before a conviction can be had in this case, the State must satisfy each and every member of the jury of the defendant's guilt. And unless the State satisfies you of the defendant's guilt beyond a reasonable doubt, then he is entitled to an acquittal. The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. But it may help you some to say that the doubt which would justify an acquittal must be a doubt for which you can assign a reason. It's not a mere guess or surmise or whim. It is not a forced or capacious [sic] doubt. Ladies and gentlemen of the jury, I charge you if you have a reasonable doubt of the defendant's guilt growing out of the evidence or any part of the evidence or lack thereof, you should acquit him. If, after considering all of the evidence in this case, you have an abiding conviction of the truth of the charge, you are convinced beyond a reasonable doubt, and it would be your duty to convict the defendant.

"The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural

- 35 -

CR-98-0777

> or speculative doubt, but a <u>reasonably substantial doubt</u>
> arising from all or any part of the evidence or from the
> lack of the evidence and remaining after a careful
> consideration of the testimony, such as reasonable, fair-
> minded and conscientious men and women would entertain
> under all of the circumstances.  Now, you will observe
> that the State is not required to convince you of the
> defendant's guilt beyond all doubt, but simply beyond all
> reasonable doubt.  If, after comparing and considering
> all of the evidence in this case, your minds are left in
> such a condition that you cannot say you have an abiding
> conviction of the defendant's guilt, then you are not
> convinced beyond a reasonable doubt, and the defendant
> would be entitled to an acquittal."

(R. 1091-92.)  (Emphasis added to the phrase complained of by the

appellant.)  The appellant's counsel objected to the court's use of

the phrase "reasonably substantial doubt" because, he said, the use

of that phrase misstated and lessened the prosecution's burden of

proof.  The trial court overruled the objection.

It is well settled that "[t]he Due Process Clause of the

Fourteenth Amendment 'protects the accused against conviction

except upon proof beyond a reasonable doubt of every fact necessary

to constitute the crime with which he is charged.'"  <u>Knotts v.</u>

<u>State</u>, 686 So. 2d 431, 459 (Ala.Crim.App.), opinion after remand,

686 So. 2d 484 (Ala.Crim.App. 1995), aff'd, 686 So. 2d 486 (Ala.

1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706

(1997), quoting <u>In re Winship</u>, 397 U.S. 358, 364, 90 S.Ct. 1068, 25

L.Ed.2d 368 (1970).  In <u>Cage v. Louisiana</u>, the United States

Supreme Court held that an instruction that equated "reasonable

doubt" with "grave uncertainty," and "actual substantial doubt" and

stated that what was required to convict was a "moral certainty,"

could have led a reasonable juror to interpret the instruction to

- 36 -

CR-98-0777

allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in <u>Victor v. Nebraska</u>, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), "the Court 'made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.'" <u>Knotts</u>, 686 So. 2d at 459, quoting <u>Victor</u>, 511 U.S. at 6, 114 S.Ct. 1239 at 1243, quoting, in turn, <u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991). The constitutional question is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the <u>Winship</u> standard." <u>Victor</u>, 511 U.S. at 6, 114 S.Ct. at 1243. In addition, the Supreme Court made it clear in <u>Victor</u> "that, while it did not condone the use of the <u>Cage</u> terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if '"taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury."'" <u>Lawhorn v. State</u>, 756 So. 2d 971, 985 (Ala.Crim.App. 1999), quoting <u>Victor</u>, 511 U.S. at 22, 114 S.Ct. at 1251, quoting, in turn, <u>Holland v. United States</u>, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See also <u>Taylor v. State</u>, 666 So. 2d 36, 56 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)("'Use of some but not

- 37 -

CR-98-0777

all of the terminology found offensive in <u>Cage</u> does not automatically constitute reversible error.'"); and <u>Sockwell v. State</u>, 675 So. 2d 4, 23 (Ala.Crim.App. 1993), aff'd, 675 So. 2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996)("It was the use of <u>all three phrases in conjunction</u> with each other that the Supreme Court determined was unconstitutional in <u>Cage</u>." (Emphasis added.)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of "reasonable doubt" was correctly conveyed to the jury, we will not find error. See, e.g., <u>Knotts</u>, supra.

Here, the trial court's charge, as a whole, correctly conveyed the concept of reasonable doubt to the jury; it did not lessen the State's burden of proof. The trial court's mere use of the phrase "reasonably substantial doubt" cannot be equated with the instruction condemned in <u>Cage</u>, where the reasonable-doubt instruction contained the phrase "actual substantial doubt" as well as the phrases "grave uncertainty" and "moral certainty." See, e.g., <u>Dobyne v. State</u>, 672 So. 2d 1319 (Ala.Crim.App.), opinion after remand, 672 So. 2d 1353 (Ala.Crim.App. 1994), aff'd, 672 So. 2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)(upholding a charge using the phrase "reasonably substantial doubt" because it "contained none of the terms that the United States Supreme Court found questionable in <u>Victor</u> and reversible in <u>Cage</u>"). The reasonable-doubt instruction

- 38 -

CR-98-0777

in this case was not misleading or confusing, and there was no reasonable likelihood that the jury applied the instruction in an unconstitutional manner. Accordingly, we find no error as to this claim.

VII.

The appellant contends that the trial court erred in refusing to instruct the jury on complicity, under which theory the appellant was an accomplice, rather than the principal, in the commission of the crime. The appellant argues that he was entitled to such an instruction because, he says, "[t]he evidence could have supported a defense argument that although appellant Reeves had killed Johnson, he did not rob him." (Appellant's brief to this court, p. 37.) In refusing to give the complicity instruction requested by the appellant, the trial court stated that the instruction would be "misleading to the jury and not a proper statement of the law for these particular facts." (R. 1041.)

"'A trial court has broad discretion in formulating its jury instructions, provid[ed] they are an accurate reflection of the law and facts of the case.'" Hemphill v. State, 669 So. 2d 1020, 1021 (Ala.Crim.App. 1995), quoting Coon v. State, 494 So. 2d 184 (Ala.Crim.App. 1986). Although it is well settled that "[a] defendant is entitled to have the trial court instruct the jury on his theory of defense," Padgett v. State, 668 So. 2d 78, 85 (Ala.Crim.App.), cert. denied, 668 So. 2d 88 (Ala. 1995), it is equally well established that "[t]he trial judge may refuse to give

- 39 -

CR-98-0777

a requested jury charge when the charge is either fairly and substantially covered by the trial judge's oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law." Harris v. State, [Ms. CR-98-2452, April 28, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000).

Here, there was no evidence to support a charge on complicity based on a theory that the appellant was an accomplice rather than the principal in the commission of the crime. The State's theory of the case was that the appellant was the actual perpetrator of both the murder and the robbery of Johnson. The State presented evidence showing that on the afternoon of November 27, 1996, the appellant, his brother Julius, and Brenda Suttles met and planned a robbery they intended to commit on that day; that, later that day, when the vehicle they were riding in broke down and Johnson offered to tow them back to Selma, Julius told the appellant and Brenda Suttles that Johnson was to be their robbery victim; that the appellant subsequently shot Johnson and then told Julius and Suttles to search Johnson's pockets for money; and that the appellant later divided the money they had taken from Johnson among himself, Julius, and Suttles. There was simply no theory of the evidence from which a reasonable jury could have concluded that the appellant was "merely" an accomplice in Johnson's murder and robbery. The complicity instruction requested by the appellant

- 40 -

CR-98-0777

would have been misleading and confusing, and the trial court properly refused to give it.

Moreover, even if some evidence had been presented to support a theory of complicity, we fail to see any harm to the appellant from the trial court's refusal of the appellant's requested charge. The distinction between a principal and an accomplice has been abolished in Alabama; accomplices are considered as guilty as principals and may be punished the same as principals. Even if evidence had been presented to support a theory that the appellant was an accomplice rather than the principal actor in the murder, the appellant still could have been convicted of capital murder and sentenced to death. In fact, it is arguable that the complicity instruction requested by the appellant would have increased the likelihood of the appellant's being convicted of capital murder because it would have allowed the jury to find him guilty of that offense either as an accomplice or as a principal. Accordingly, there was no reversible error in the trial court's refusal to give the appellant's requested instruction on complicity.

VIII.

The appellant also contends that the trial court erred in refusing to instruct the jury on "robbery [as an] afterthought." At trial, the appellant requested several instructions relating to the general principle of law that robbery as a mere afterthought and unrelated to the murder cannot sustain a conviction for capital murder. However, the trial court refused to give the instructions

- 41 -

CR-98-0777

requested by the appellant, finding that it was sufficient to give jurors the pattern jury charge on capital murder because the pattern charge adequately conveyed the principle that it was necessary for the murder to have occurred "during" a robbery in order to sustain a conviction for capital murder.

In <u>Freeman v. State</u>, [Ms. CR-95-2080, April 30, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1981565, March 10, 2000] ___ So. 2d ___ (Ala. 2000), we stated the following regarding robbery as an "afterthought":

> "'The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing. <u>Davis v. State</u>, 536 So. 2d 110 (Ala.Crim.App. 1987), aff'd, 536 So. 2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); <u>Magwood v. State</u>, 494 So. 2d 124 (Ala.Crim.App. 1985), aff'd, 494 So. 2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
>
> "'"As the Alabama Supreme Court held in <u>Cobern v. State</u>, 273 Ala. 547, 142 So. 2d 869 (1962), 'the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' <u>Clements v. State</u>, 370 So. 2d 708, 713 (Ala.Crim.App. 1978), aff'd in pertinent part, 370 So. 2d 723 (Ala. 1979); <u>Clark v. State</u>, 451 So. 2d 368, 372 (Ala.Crim.App. 1984). To sustain any other position 'would be tantamount to

- 42 -

CR-98-0777

granting to would-be robbers a
license to kill their victims prior
to robbing them in the hope of
avoiding prosecution under the
capital felony statute.' <u>Thomas v.
State</u>, 460 So. 2d 207, 212,
(Ala.Crim.App. 1983), aff'd, 460 So.
2d 216 (Ala. 1984).

"'"Although a robbery committed
as a 'mere afterthought' and
unrelated to the murder will not
sustain a conviction under §
13A-5-40(a)(2) for the capital
offense of murder-robbery, see
<u>Bufford v. State</u>, [382 So. 2d 1162
(Ala.Cr.App.), cert. denied, 382 So.
2d 1175 (Ala. 1980)]; <u>O'Pry v.
State</u>, [642 S.W.2d 748 (Tex.Cr.App.
1981)], the question of a
defendant's intent at the time of
the commission of the crime is
usually an issue for the jury to
resolve. <u>Crowe v. State</u>, 435 So. 2d
1371, 1379 (Ala.Crim.App. 1983).
The jury may infer from the facts
and circumstances that the robbery
began when the accused attacked the
victim and the capital offense was
consummated when the defendant took
the victim's property and fled.
<u>Cobern v. State</u>, 273 Ala. [at] 550,
142 So. 2d [at] 871 (1962). The
defendant's intent to rob the victim
can be inferred where 'the
intervening time, if any, between
the killing and robbery was part of
a continuous chain of events.'
<u>Thomas v. State</u>, 460 So. 2d at 212.
... See also <u>Cobern v. State</u>; <u>Crowe
v. State</u>; <u>Bufford v. State</u>; <u>Clements
v. State</u>."'

"<u>Bush v. State</u>, 695 So. 2d 70, 118-19 (Ala.Crim.App.
1995), aff'd, 695 So. 2d 138 (Ala.), ___ U.S. ___, 118
S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting <u>Hallford v.
State</u>, 548 So. 2d 526, 534-35 (Ala.Crim.App. 1988),
aff'd, 548 So. 2d 547 (Ala.), cert. denied, 493 U.S. 945,
110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting in turn

- 43 -

CR-98-0777

> Connolly v. State, 500 So. 2d 57, 63 (Ala.Crim.App. 1985), aff'd, 500 So. 2d 68 (Ala. 1986)."

___ So. 2d at ___.  The Alabama Supreme Court has stated that "'[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.'"  Ex parte Roberts, 735 So. 2d 1270, 1277 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999), quoting Johnson v. State, 479 So. 2d 1377, 1380 (Ala.Crim.App. 1985), and citing Clark v. State, 451 So. 2d 368 (Ala.Crim.App.), cert. denied, 451 So. 2d 368 (Ala. 1984).

Here, the trial court properly instructed the jury that in order to convict the appellant of capital murder, the State had to prove that the murder was committed "during the robbery."  (R. 1094.)  The trial court defined "during the robbery" as "in the course of the commission of or in connection with the commission of the robbery."  (R. 1094.)  With these instructions, the trial court adequately conveyed to the jury the facts under which it could, and could not, find the appellant guilty of capital murder.

As we stated in Woods v. State, [Ms. CR-97-0027, December 10, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999):

> "Although this court has held that the taking of property as a mere afterthought to a murder will not support a capital murder conviction under §13A-5-40(a)(2), Bufford v. State, 382 So. 2d 1162 (Ala.Cr.App.), cert. denied, 382 So. 2d 1175 (Ala. 1980), we have not held that the trial court must use the term 'mere afterthought' in its jury instructions on

- 44 -

CR-98-0777

> robbery-murder. The trial court more than adequately
> instructed the jury that the robbery had to occur
> 'during' the course of the murder."

___ So. 2d at ___. See also Roberts v. State, 735 So. 2d 1244 (Ala.Crim.App. 1997), aff'd 735 So. 2d 1270 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999); Ex parte Windsor, 683 So. 2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Jenkins v. State, 627 So. 2d 1034 (Ala.Crim.App. 1992), aff'd, 627 So. 2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).

Moreover, there was no evidence that the robbery of Johnson was an "afterthought." Rather, as noted in Part VII of this opinion, all the evidence showed that the appellant, his brother Julius, and Brenda Suttles set out on November 27, 1996, to rob someone. They openly discussed driving to White Hall to rob a drug dealer there; however, after the vehicle they were riding in broke down, they decided to rob Johnson, who had stopped to help and to tow them back to Selma. Intending to make Johnson the robbery victim, the appellant got into the rear bed of Johnson's pickup truck with a shotgun. Later, after they pulled into Crockett's Alley, the appellant shot Johnson and then told Julius and Suttles to search Johnson's pockets for money. The appellant subsequently divided the money taken from Johnson among himself, Julius, and Suttles and was heard to brag that he had "made the money." Clearly, the robbery was not a "mere afterthought," but instead was, with the murder, part of one "continuous chain of events."

- 45 -

CR-98-0777

Because there was no evidence to support the theory that the robbery was a mere afterthought, unrelated to Johnson's murder, and because the jury was properly instructed that it could convict the appellant only if it found that the murder occurred "during" a robbery, the trial court did not err in denying the appellant's request for a specific instruction on "robbery [as an] afterthought."

IX.

The appellant contends that the prosecutor engaged in misconduct during both the guilt phase and the sentencing phase of the trial.

Initially, we note that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So. 2d 97, 106 (Ala.Crim.App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993). See also Henderson v. State, 583 So. 2d 276, 304 (Ala.Crim.App. 1990), aff'd, 583 So. 2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.

- 46 -

CR-98-0777

2d at 107, quoting <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting, in turn, <u>Donnelly v. DeChristophoro</u>, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." <u>Roberts v. State</u>, 735 So. 2d 1244, 1253 (Ala.Crim.App. 1997), aff'd, 735 So. 2d 1270 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." <u>Bankhead</u>, 585 So. 2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, <u>McCullough v. State</u>, 357 So. 2d 397, 399 (Ala.Crim.App. 1978), and that court is given broad discretion in determining what is permissible argument." <u>Bankhead</u>, 585 So. 2d at 105.

### A.

During closing arguments at the guilt phase of the trial, the appellant's counsel argued to the jury that, although the appellant had shot and killed Johnson, the robbery was a "mere afterthought." In the rebuttal closing argument that followed, the prosecutor made these remarks:

> "They are up here telling you that this is not a capital murder case because they didn't go down and say, 'Oh, yeah, I think he cashed his paycheck today. Oh, yeah, he has probably got a lot of money.' The deal was

- 47 -

CR-98-0777

> they set out that morning to rob somebody. They rode all
> over the town here trying to find somebody to rob. And
> when the good Samaritan came along and pulled them and
> their broke-down car back to Selma, they decided they
> would pay him off with the ring and take it back and
> whatever else he had.
>
> "Y'all, the defense is designed and charged with
> defending this man any way he can."

(R. 1079-80.)  The appellant's counsel objected to the prosecutor's

remarks, arguing that they suggested to the jury that the only

reason defense counsel was making an argument on the appellant's

behalf was that he had been appointed to represent the appellant

and was required to make such an argument.   The trial court

overruled the objection, and the prosecutor continued rebuttal

closing argument as follows:

> "Within the rules of law and evidence, it is our job
> to present the evidence against this man. Their argument
> is that this is no robbery. It didn't occur. If you
> blow a man's head off and you go through his pockets and
> take his money, that's robbery. It's no joke when they
> say if it walks like a duck and talks like a duck and
> looks like a duck, it's a duck. I just don't understand
> that argument. I don't understand the logic of it, and
> I don't understand the meaning of it. I don't think it
> fits under these facts."

(R. 1080-81.)

On appeal, the appellant argues, for the first time, that the

prosecutor's remarks "improperly spotlight[ed] the defense

strategy." (Appellant's brief to this court, p. 52.)  Because this

particular argument was not presented to the trial court, we review

the appellant's claim only for plain error.   See Rule 45A,

Ala.R.App.P.

- 48 -

CR-98-0777

The prosecution is entitled to "spotlight the defense's strategy," and a prosecutor's remarks during closing argument pointing out the flaws in the defense's theory of the case do not constitute improper argument. "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So. 2d 1087, 1100 (Ala.Crim.App. 1987)(citation omitted), rev'd on other grounds, 523 So. 2d 1118 (Ala. 1988). The remarks complained of by the appellant were part of the prosecutor's legitimate argument that the evidence did not support the defense's theory that the robbery of Johnson was a "mere afterthought." We find no error here, plain or otherwise.

B.

During closing arguments at the sentencing phase of the trial, the prosecutor commented to the jury as follows:

> "Now you are called upon to make a tough decision.
> You are called upon to decide what is the punishment that
> this man deserves for doing this to Willie Johnson.
> Death or life in prison without parole.  Who decided
> Willie Johnson's fate?  Did he have the opportunity to
> have a five- or six-day proceeding?"

(R. 1191.)

On appeal, the appellant contends that by asking the jury to consider whether the victim Johnson had been afforded a five- or six-day trial (as the appellant was being afforded) before his fate was decided, the prosecutor improperly "inject[ed] an extraneous factor other than the 'character and record of the individual

- 49 -

CR-98-0777

offender and the circumstances of the particular offense,' ... divert[ed] jurors from their primary responsibility ... [and made it] possible that the death sentence recommended and imposed was the product of an arbitrary factor." (Appellant's brief to this court, p. 57, quoting, in part, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).) At trial, the appellant did not object to the prosecutor's comments on this ground; therefore, we review this claim only for plain error. Rule 45A, Ala.R.App.P.

We have reviewed the complained-of comment, both in the context of the entire closing argument and in the context of the entire trial, and we find no error. See Jenkins v. State, 627 So. 2d 1034, 1051 (Ala.Crim.App. 1992), aff'd, 627 So. 2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994); Holladay v. State, 549 So. 2d 122, 131 (Ala.Crim.App. 1988), aff'd, 594 So. 2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). The prosecutor's comment would have been valued by the jury at its true worth -- as having been uttered in the heat of debate -- and could not be expected to have become a factor improperly influencing the jury's sentencing recommendation. See Duren v. State, 590 So. 2d 360, 364 (Ala.Crim.App. 1990), aff'd, 590 So. 2d 369 (Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). Moreover, the jury was properly instructed that the arguments of counsel were not evidence, and that its sentencing recommendation was not to be influenced by passion, prejudice, or any other

- 50 -

CR-98-0777

arbitrary factor.  The jury is presumed to follow the trial court's instructions.  See Taylor v. State, 666 So. 2d 70 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).  We find no error, plain or otherwise, as to this claim.

### X.

The appellant contends that Alabama's capital sentencing scheme is unconstitutional because, he says, it "does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty."  (Appellant's brief to this court, p. 42.)  According to the appellant, "the absence of a standard and the trial court's failure to so charge the jury" renders capital sentencing in Alabama unconstitutional. (Appellant's brief to this court, p. 42.)  Because the appellant is presenting this claim for the first time on appeal, we review it under the plain-error rule.  Rule 45A, Ala.R.App.P.

In Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988), the United States Supreme Court rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."  "Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or

- 51 -

CR-98-0777

mitigation, to be considered by the sentencer." Harris v. Alabama, 513 U.S. 504, 511, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004 (1995).

The jury in this case was properly instructed by the trial court as to weighing the aggravating circumstances and the mitigating circumstances. See Tyson v. State, [Ms. CR-98-0267, February 4, 2000] ___ So. 2d ___ (Ala.Crim.App. 2000). Accordingly, we find no error, much less plain error, as to this claim.

                              XI.

The appellant contends that the trial court "erred in failing to consider [the appellant's] low level of intelligence as a mitigating circumstance." (Appellant's brief to this court, p. 57.) Although in his motion for a new trial the appellant generally argued that the trial court had "failed to properly consider mitigating circumstances in this case" (R. 231), he did not present the trial court with the specific claim he now raises on appeal; therefore, we review the claim under the plain-error rule. See Rule 45A, Ala.R.App.P. We find no error, plain or otherwise.

> "In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process."

CR-98-0777

Ex parte Hart, 612 So. 2d 536, 542 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).   "'While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'"   Ex parte Slaton, 680 So. 2d 909, 924 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So. 2d 97, 108 (Ala.Crim.App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala.Crim.App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993).   "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact."   Harrell v. State, 470 So. 2d 1303, 1308 (Ala.Crim.App. 1984), aff'd, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).

> "'A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)(quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So. 2d 348 (Ala. 1992); Haney v. State, 603 So. 2d 368 (Ala.Cr.App. 1991), aff'd, 603 So. 2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122

- 53 -

CR-98-0777

> L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So. 2d 1253 (Ala.Cr.App. 1992), aff'd, 627 So. 2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So. 2d 36 (Ala.Cr.App. 1985), aff'd, 500 So. 2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).'"

Wilson v. State, [Ms. CR-97-2569, November 19, 1999] ___ So. 2d ___, ___ (Ala.Crim.App. 1999), quoting Williams v. State, 710 So. 2d 1276, 1347 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v. State, [Ms. CR-94-1733, August 27, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999).

The sentencing order in this case shows that the trial court considered all of the mitigating evidence offered by the appellant. The record reflects that during the sentencing phase of the trial, the trial court did not limit or restrict the appellant in any way

- 54 -

CR-98-0777

as to the evidence he presented or the arguments that he made.   In
its sentencing order, the trial court treated each statutory
mitigating circumstance listed in § 13A-5-51, Ala. Code 1975;
determined the existence or nonexistence of each circumstance; and
made specific findings of fact regarding each circumstance.
Although the trial court did not list and make findings as to each
nonstatutory mitigating circumstance offered by the appellant, it
specifically found two nonstatutory mitigating circumstances to
exist:  (1) that the appellant "grew up in a poor home environment
and ... lacked appropriate developmental resources in growing up";
and (2) that the appellant, "when placed in a structured
environment, respond[ed] positively." (C. 238.)  (The trial court
noted, however, that the evidence relating to the second of these
nonstatutory mitigating circumstances also suggested that the
appellant had "the ability to conduct himself properly and not
engage in criminal conduct, [but instead] voluntarily chose that
course of conduct.")  Further, in that portion of the sentencing
order where the trial court discussed its reasoning for not finding
the existence of the statutory mitigating circumstance that "the
capacity of the defendant to appreciate the criminality of his
conduct or to conform his conduct to the requirements of law was
substantially impaired," the trial court expressly indicated that
it had considered the appellant's "low intellectual level." (C.
237.)  Also, during the sentencing phase of the trial, the trial
court specifically instructed the jury that it must consider as a

- 55 -

CR-98-0777

mitigating circumstance the appellant's proffered evidence of his "borderline" intelligence. (R. 1217.) Thus, we conclude that the trial court fully complied with Lockett and its progeny and that it considered the evidence of the appellant's "borderline" intelligence offered by the appellant in mitigation.

We note that although there was evidence indicating that the appellant's overall IQ was 74, which would place the appellant in the "borderline range of intelligence," the appellant presented no evidence that he was mentally retarded or that he suffered from any major psychiatric disorder. Clearly, the trial court considered the appellant's proffered evidence of his low intellectual level, but concluded that this evidence did not rise to the level of a mitigating circumstance. The trial court's findings in this regard are supported by the record.

Because it is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented by the appellant in mitigation, that the trial court did in fact consider all such evidence, and that the trial court's findings are supported by the evidence, we find no error, plain or otherwise, in the trial court's findings regarding the nonstatutory mitigating circumstances.

## XII.

In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to the appellant's capital-murder conviction and the death sentence, whether or not

- 56 -

CR-98-0777

brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or the sentencing phase of the trial.

We have reviewed the appellant's sentence in accordance with § 13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving the appellant's capital-murder conviction, we shall also review the propriety of the death sentence.  This review shall include our determination of the following:  (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case.  Section 13A-5-53(b), Ala. Code 1975, requires that, in determining whether death is the proper sentence, we assess (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

After the jury found the appellant guilty of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975.  After hearing evidence concerning aggravating and

- 57 -

CR-98-0777

mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended, by a vote of 10-2, that the appellant be sentenced to death.

Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence the appellant to life imprisonment without parole or to death, as the jury recommended. The trial court ordered and received a written presentence-investigation report, as required by § 13A-5-47(b). At the conclusion of the hearing, the trial court entered specific written findings concerning the aggravating circumstances enumerated in § 13A-5-49, Ala. Code 1975, the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and the appellant's participation in the offense.

In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murder was committed while the appellant was engaged in the commission of a robbery, see § 13A-5-49(4), Ala. Code 1975. The trial court found the existence of two statutory mitigating circumstances: (1) that

- 58 -

CR-98-0777

the appellant had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975; and (2) that the appellant was 19 years old at the time of the offense, see § 13A-5-51(7), Ala. Code 1975.[1]   The trial court also heard testimony regarding the appellant's character and record and any of the circumstances of the offense that the appellant offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975.   In this regard, the trial court found that the following evidence presented by the appellant constituted nonstatutory mitigation:   (1) evidence that the appellant "grew up in a poor home environment and that he lacked appropriate developmental resources in growing up;" and (2) evidence that "when placed in a structured environment, [the appellant] responds well." (C. 238.)

The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances.   Accordingly, the trial court sentenced the appellant to death.   The trial court's findings concerning the

[1]The record reflects that the appellant was actually 18 years old at the time of the offense -- the offense was committed two weeks before his 19th birthday.   The appellant was 20 years old at the time of trial.

- 59 -

CR-98-0777

aggravating circumstance and the mitigating circumstances are supported by the evidence.

The appellant was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(2), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. E.g., Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999); Clemons v. State, 720 So. 2d 961 (Ala.Crim.App. 1996), aff'd, 720 So. 2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State, 710 So. 2d 1276 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); McNair v. State, 706 So. 2d 828 (Ala.Crim.App. 1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Henderson v. State, 583 So. 2d 276 (Ala.Crim.App. 1990), aff'd, 583 So. 2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Kuenzel v. State, 577 So. 2d 474 (Ala.Crim.App. 1990), aff'd, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So. 2d 151 (Ala.Crim.App. 1988), aff'd, 545 So. 2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So. 2d 526 (Ala.Crim.App. 1988), aff'd, 548 So. 2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So. 2d 110 (Ala.Crim.App.

- 60 -

CR-98-0777

1987), aff'd, 536 So. 2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); and Cochran v. State, 500 So. 2d 1161, (Ala.Crim.App. 1984), aff'd in part, rev'd in part, 500 So. 2d 1179 (Ala. 1985), aff'd on return to remand, 500 So. 2d 1188 (Ala.Crim.App.), aff'd, 500 So. 2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of murder made capital because it was committed during the commission of a robbery.   McNair, supra.

After carefully reviewing the record of the guilt phase and the sentencing phase of the appellant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.   We conclude that the findings and conclusions of the trial court are amply supported by the evidence.   We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances and that death is the appropriate sentence in this case.   Considering the appellant and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

For the reasons stated above, the appellant's conviction and the sentence of death are affirmed.

APPLICATION FOR REHEARING DENIED; OPINION OF AUGUST 25, 2000, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.

- 61 -

CR-98-0777

McMillan, Cobb, Baschab, and Fry, JJ., concur.

98-777

IN THE SUPREME COURT OF ALABAMA
November 6, 2000



NOV - 6 2000

CLERK
COURT CRIMINAL APPEALS

1000234

Ex parte Matthew Reeves.  MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR
WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS (In re:  Matthew Reeves v.
State of Alabama) (Dallas Cir.Ct.No.: CC-97-31) (Low'r.App.Ct.No.: CR-98-0777)

<u>NOTICE</u>

Petitioner granted to and including November 17, 2000, to file the
petition for writ of certiorari and brief in support thereof.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appears(s) of record in said
Court.
Witness my hand this 6th day of November, 20 00

Clerk, Supreme Court of Alabama

IN THE SUPREME COURT OF ALABAMA

MATTHEW REEVES,                          )
                                         )
        Petitioner-Appellant,            )
                                         )
vs.                                      )   S.C. No. _1000234_
                                         )
STATE OF ALABAMA,                        )
                                         )
        Respondent-Appellee.             )

## PETITION FOR A WRIT OF CERTIORARI
## TO THE ALABAMA COURT OF CRIMINAL APPEALS
## (CRIMINAL APPEALS CASE NO. CR-98-0777)
## (DALLAS COUNTY CIRCUIT COURT NO. 97-31)

Petitioner Matthew Reeves petitions this Court to issue a writ of certiorari to the Alabama Court of Criminal Appeals.

1.  Petitioner-Appellant Matthew Reeves was charged with capital murder in an indictment in the Circuit Court of Dallas County. The indictment charged Reeves with a robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). Reeves was found guilty as charged. (C. 219, R. 1105). The jury recommended 10-2 that Reeves be put to death. (C. 220, R. 1227). The Circuit Court of Dallas County adjudged Reeves guilty of capital murder and sentenced him to death. (C. 233-239, R. 1232). The Alabama Court of Criminal Appeals affirmed on August 25, 2000. On October 27, 2000, the Alabama Court of Criminal Appeals overruled an application for rehearing and issued a substitute opinion.

2.  A copy of the Alabama Court of Criminal Appeals' October 27, 2000 opinion is attached as Exhibit A.

1

3.   Verified Statement of Facts[1]:  Petitioner-Appellant Matthew Reeves requested that the Alabama Court of Criminal Appeals include the following facts in an opinion on rehearing:

*\*\**

Appellant Matthew Reeves was charged in Dallas County with robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark.  This Defendant shot him through the neck and into his chest area killing him practically instantly.  Three of them are arrested in a house when they went to a party that afternoon."

(R. 113-114).  Jurors were also asked if they knew Appellant Reeves or any member of his family.  (R. 93-94).  Juror Trotter did not disclose that she knew or knew of Appellant Reeves or his brother Julius.  Juror Denmark did not disclose that he knew Mr. Johnson.

In the jury selection process jurors were questioned about their views on capital punishment. The questioning of Juror Parnell was, in part, as follows:

THE COURT: ... Ms. Parnell, you understand this is a capital murder case?

MS. PARNELL: Yes.

---

[1] Counsel verifies that this statement of facts is a verbatim reproduction of the facts requested to be included by the Alabama Court of Criminal Appeals in an opinion on rehearing.

2

THE COURT: Do you understand that if there is a conviction or if the Defendant is found guilty, that there are two possible punishments for this offense?

MS. PARNELL: Yes.

THE COURT: One is the death penalty, and the other is life imprisonment without parole.

MS. PARNELL: Yes.

THE COURT: In order for you to qualify to serve as a juror in this case, you must be able to give both the death penalty and life without parole fair consideration and make a recommendation to the Court at the appropriate time; do you understand that?

MS. PARNELL: Yes.

THE COURT: Ms. Parnell, there are people in our society who are totally opposed to the death penalty under any circumstance. They cannot vote to recommend it for any criminal offense. There are people in our society who believe that the death penalty is the only appropriate punishment for certain criminal violations. They cannot consider anything less than the death penalty such as life without parole. And the questions I have for you are designed to determine what you think about all of this. Okay. The first question is easy. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair your ability to serve as a juror in this case? Do you understand that questions? Are you against the death penalty so much that you can't discharge your duties as a juror?

MS. PARNELL: I really – you know, I feel like if he took his life for nothing, you know, that what I feel, he should get the death sentence, you know.

THE COURT: Well, do you know anything about the facts of this case other than what was said to you yesterday?

3

MS. PARNELL: No, I don't nothing about it. I don't; no, I ain't heard nothing.

THE COURT: Let's back up then because my question to you is this. First are you opposed to the death penalty? Do you understand what I am saying? Are you against it? Are you for it?

MS. PARNELL: I would say for it, you know, because he took a life, you know.

THE COURT: The next question is this. You remember I told you that in order to be qualified as a juror you've got to be able to give fair and equal consideration to both the death penalty and the other penalty of life without parole. Are you opposed to anything less then death? Are you opposed to considering life imprisonment without parole if the facts and the law dictate that that should be the sentence in your judgment?

MS. PARNELL: If that's – if they go with that sentence, I will go along with it, you know, in that sense.

THE COURT: So what you're telling me is that you can give both of those alternatives fair consideration? You can be fair and equally weigh the death penalty and life without parole?

MS. PARNELL: Yeah, both of them, yeah.

THE COURT: Can you give both of them fair consideration, is that what you're telling me?

MS. PARNELL: Well, I really don't understand. You know, like I say I've never been on a jury before. See what I'm saying, I wasn't there, you know. I don't know what happened, you know and stuff. But, you know, I don't know what to tell you. I really don't.

THE COURT: The first thing you can tell me is whether you are opposed or in favor of the death penalty. You told me you were in favor of it?

4

MS. PARNELL: Yes.

THE COURT: The second thing I need to ask you is whether or not you can vote for something other than the death penalty. Can you vote for life without parole if it's appropriate, if it's right, if its proper?

MS. PARNELL: Yeah.

THE COURT: You can consider both of them depending upon the facts?

MS. PARNELL: Yes, either one.

THE COURT: You can listen to the law and the facts and apply the law to the facts; can you do that, follow my instructions?

MS. PARNELL: I can follow your instructions.

THE COURT: Okay. You have listened to that facts; you have listened to the law. Do you feel as though you lean towards one more than the other, the death penalty versus life without parole? Do you see what I'm saying?

MS. PARNELL: I have not heard no more than what was told to me.

THE COURT: I'm trying to find out how you feel about the death penalty in your heart. Do you think you can give –

MS PARNELL: I wouldn't like nobody to take nothing – I've got a life of my own, you know, but I can go with, you know, that parole in prison, you know, for the rest of his life, you know, whatever, you know either one, you know. It would depend on – if somebody else told me it's true – if it's true that he did it, you know, I would say the death penalty, you know. That's what I feel.

THE COURT: So you could keep –

5

MS. PARNELL: If it's something else, I'd say give him life without parole.

THE COURT: So you can keep an open mind; is that right?

MS. PARNELL: Yeah.

THE COURT: And you can hear the facts and follow my instructions?

MS. PARNELL: (Nods head affirmatively).

THE COURT: And then you can give both of those alternative punishments fair consideration; it that correct? Do you understand what I'm saying? You can think about both of the penalties equally; is that right?

MS. PARNELL: Right.

THE COURT: And you can recommend to me one of them?

MS. PARNELL: Yes.

THE COURT: You don't have any problem with that?

MS. PARNELL: No.

THE COURT: If you think it should be death, then you don't have a problem voting death, is that right?

MS. PARNELL: No.

THE COURT: If it's life without parole, you think that's a right thing to do, you don't have a problem voting life without parole.

MS. PARNELL: No.

...

MR. GOGGANS: You're going to hear – a jury in this type of proceeding hears evidence. It hears

evidence of reasons the prosecution thinks the person should get the death penalty; then you hear other reasons why the person ought to get life without parole. The judge will instruct you on how to weigh those. You have aggravating circumstances that weight in favor of the death penalty, and you have mitigating circumstances that weigh in favor of the sentence of life without parole. Would you, Ms. Parnell, as you're sitting there after having heard everything – you've heard all these instructions because you have found that this person intentionally killed somebody during the robbery; in other words, you found him guilty of capital murder. Would you be able to put aside that personal feeling that you have and that conviction and consider everything and apply that law, or would you still carry that conviction with you and automatically go for the death penalty?

MS. PARNELL: I would go for the death penalty. You shouldn't take a life. My point is my son was shot in the head. He died, you know, but he came back alive; do you see what I'm saying? They didn't do nothing to the guy that did it, shot my son, you know. But I feel like, you know, if you take a life, you know, you should give you life. You can't take nobody's life and give a life. You cannot give the life back. He's dead, you know. You shouldn't do it. You had no reason to. Do you see what I am saying?

MR. GOGGANS: You feel pretty strongly about that?

MS. PARNELL: Yeah.

MR. GOGGANS: No other questions.

MS. WILSON: If the Judge told you though it was your duty to listen to all of the evidence and to weight the two sentences, to consider life without parole as well as the death penalty and to reserve, not to make a decision until you heard all of the evidence – and there will be a lot of evidence put forth by the defense and by the State. Could you wait until you heard all of that evidence before you

7

make up your mind as to what you thought the appropriate sentence would be?

MS. PARNELL: Yes, because I have never heard the case.

(R. 421-430). A defense motion to excuse Juror Parnell for cause based upon her death penalty views was denied. (R. 430).

The State of Alabama's theory of prosecution at trial was essentially that Appellant Reeves, his brother Julius Reeves, and Brenda "Bam-Bam" Suttles had intentionally killed Willie Johnson by shooting him with a shotgun and robbed him.

Appellant Reeves filed motions to suppress evidence prior to trial. (C. 113-116, 126-127). The motion to suppress evidence seized in a search of Appellant Reeves' residence stated:

"1. In November of 1996, government agents searched the residence of Defendant Matthew reeves and seized certain items therefrom.

"2. The aforementioned search was conducted without probable cause, without a properly issue[d] search warrant, without proper consent or beyond the scope of any consent given."

"3. The seizure of items from Defendant Reeves' residence was a fruit of violations of the proscriptions against unreasonable searches and seizures of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, § 5 of the Alabama Constitution of 1901; Ala. Code § 15-5-1 et seq.; and Rule 4, A.R.Cr.P."

(C. 126).

Evidence at a suppression hearing indicated the following:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found. (R. 542). Grindle said that the dog tracked to the backyard of a house near Appellant Reeves' house and to Appellant Reeves' house. (R. 542-543). Grindle testified that he went to Reeves house. (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door. (R. 544). Matthew Reeves and Julius Reeves were not

8

there. (R. 549, 570). According to Grindle, Marzetta Reeves gave him permission to come and search the house.[2] (R. 545-546). Grindle and other police officers went in and searched throughout the house. They seized a number of items from Matthew and Julius Reeves' bedroom. (R. 548-549). Among those items were blood stained articles of clothing and a shotgun. (R. 548-549). The prosecution did not elicit evidence that Ms. Reeves had authority to consent to the search of Appellant Reeves' room.

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles' house. (R. 553-554). Brenda "Bam-Bam" Suttles' sister answered the door. (R. 555). When the door was opened, the officers saw Appellant Reeves asleep on a sofa. (R. 554). They entered immediately and arrested Reeves. (R. 555).

Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions. (R. 552-567). On the second occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom. (R. 552, 607).

The Circuit Court of Dallas County overruled motions to suppress evidence. (R. 612-613).

Brenda "Bam-Bam" Suttles, pursuant to a plea bargain agreement with the prosecution, (R. 722-725), testified against Appellant Reeves at trial. She went into great detail as to the events leading up to, surrounding, and after Johnson's death. (R. 682-749). Among the details she recited were the following:

Johnson had towed them and others – Jason Powell and Emmanuel Suttles – Powell's broken down car from White Hall back to Selma. (R. 692-694). She said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley.[3] (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of

---

[2] Marzetta Reeves' recollection as to the "consent" differed markedly from Grindle's. (R. 568-596).

[3] With respect to the alley, she said: "He had seen this red car across the street, and he was like I don't feel like being bothered. He said, I am going to this house up in the alley. So, I'm going to drop y'all off in the alley." (R. 702).

the truck bed, and that Matthew Reeves was on the passenger side of the truck cab. (R. 693-694). She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck. (R. 704). She said that Julius Reeves jumped out of the truck and said: "Troll [Matthew Reeves], what you done did?" (R. 704). She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets and got everything out. (R. 743). Brenda Suttles recalled telling the police that Matthew Reeves had killed Johnson for nothing. (R. 743). She recalled that during that night Matthew Reeves had said that by killing Johnson he would get a gang tear drop – something given for killing someone. (R. 720).

Jason Powell also testified against Appellant Reeves. The trial court did not allow the defense to question Powell about his being in jail and having criminal charges hanging over him at the time of his testimony. (R. 792-794, 804-806). Powell did say during his testimony that Julius Reeves had said to Matthew Reeves that he had almost shot him. (R. 843).

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

> "She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle.

> "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case."

(R. 803). Ms. Trotter was then excused from the jury. (R. 803).

10

Juror Denmark was on the trial jury as an alternate.  Juror Denmark disclosed the following in the midst of the trial:

"I told him [the judge] that I knew him from another guy.  I seen him with the family.  I was thinking that I knew the truck and knew the guy.  But I never could picture who it really was until I saw him and his name is Willie too.  He worked for Roy out there.  I've got a key to Roy's shop.  I go up there sometimes and work on my truck and whatever.  Willie helped him, and he and he and Roy were friends.  And he'd come up there a lot when I was working on my truck before, how I kept things in tune.  That's just the only way I knew him was from Roy's shop.  I didn't even know this had happened to him."

(R. 993).  Juror Denmark went on to say that he began thinking about the truck as follows:

"Last night when they were talking about Tyler because I live out there.  I couldn't figure out who it was until I saw that other Willie today.  I asked, what are you doing here?  He said, I'm in there with the family.  So I knew it was the same one.  He had always hung around with him and was on good terms with Roy.  He lives out there now."

(R. 993-994).  Juror Denmark was an alternate juror and was excused before jury deliberations. (R. 1104).

During its closing argument, one of the prosecutors put to the jury: "The Defense is designed and charged with defending this man any way he can." (R. 1079-1080).  The defense objected as follows:

"It seems to me that Mr. Greene [prosecutor] is going to suggest to the jury that the only reason I'm making an argument is because I've somehow been appointed in this case to represent Mr. Reeves.  As Mr. Greene well knows I voluntarily took this case.  It's inappropriate to suggest to this jury that somehow I am making this argument just because I've got to.  It's a violation of due process to suggest that.  I ask that the jury be instructed to disregard that last remark. "

11

(R. 1080).  The trial court overruled a defense objection to that argument.  (R. 1080).

The trial court refused to give the following written requested defense jury instructions:

Number 33: "An accused is not guilty of capital robbery-murder where the intent to rob was formed only after the deceased was killed."  (C. 213, R. 1042-1045, 1047-1048).

Number 34: "A robbery committed as a mere afterthought and unrelated to a murder will not sustain a conviction of capital robbery-murder."  (C. 214, 1042-1045, 1047-1048).

Number 35: "An accused is not guilty of a capital robbery-murder where the intent to steal was formed only after the deceased was killed."  (C. 215, R. 1042-1045, 1047-1048).

Number 31:

"Before a defendant can be held criminally responsible for the conduct of others it is necessary that such defendant have willfully associated himself in some way with the crime and have willfully participated in it.  Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted in the crime.  You must find beyond a reasonable doubt that a defendant was a willful participant and not merely a knowing spectator."

(C. 211, R. 1037-1038).

The trial court's instruction on reasonable doubt in the guilt phase was as follows:

"The reasonable doubt which entitles an accused to an acquittal, is not a mere, fanciful, vague, conjectural or speculative doubt but a reasonably substantial doubt arising from all or part of the evidence or from a lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair minded and conscientious men and women would entertain

12

under all the circumstances. Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt but simply beyond all reasonable doubt. If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092).

Reeves was found guilty as charged. (C. 219, R. 1105).

At the penalty phase, the prosecution relied upon its evidence in the guilt phase and submitted robbery as an aggravating circumstance. (R. 1116-1117). Appellant Reeves elicited evidence that he was only eighteen years old at the time of the offense, that he grew up in a poor home environment, that he lacked appropriate developmental resources growing up, that his level of intelligence was only borderline, and that when placed in structured environments, he responded positively. (C. 268-519, Defendant's Exhibits 6, 7, 8, 11, 13, 14, R. 1118-1182).

In closing argument in the penalty phase, one of the prosecutor's argued to the jury: "Now you are called upon to make a tough decision. You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or Life in prison without the possibility of parole. Who decided Willie Johnson's fate? Did he have the opportunity to have a five or six day proceeding?" (R. 1191). The defense objected as follows: "The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial. It's an improper comment and is in violation of due process of law in the federal and state constitution. I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper." (R. 1191). The trial court overruled a defense objection and request for curative instruction. (R. 1192).

The trial court did not charge the jury on any measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty. The defense had requested that the trial court charge the jury: "Before you may return a sentence of death, you must be convinced beyond a reasonable doubt based on

13

the consideration of the aggravating and mitigating circumstances and the evidence introduced in this case at either the innocence/guilt phase o[r] the sentencing phase, that death by electrocution is the appropriate sentence to be imposed on the defendant in this case." (C. 153).

The jury recommended 10-2 that Appellant Reeves be put to death.  (C. 220, R. 1227).  The trial court followed the jury's recommendation and sentenced Appellant Reeves to death.  (C. 233-239, R. 1232).

4.   The writ should issue on the following grounds:

a.   _The decision of the Alabama Court of Criminal Appeals presents a question not specifically addressed by this Court regarding a parent's authority to consent to a warrantless search of an eighteen year old son's room which the Alabama Court of Criminal Appeals resolved in a manner conflicting with decisions of the United States Supreme Court and the appellate courts of this state._.

Though Ala. Code 26-1-1-1 provides that a person does not attain the age of majority until the age of 19 years, for purposes of criminal prosecutions, a person is an adult at the age of 18 years.  The Alabama Court of Criminal Appeals held that as the parent of 18 year old Matthew Reeves, his mother had authority to consent to a search of his room.  (October 27, 2000 opinion, p. 24).  In Ex parte Burgess, ___ So.2d ___ (Ala. 2000)(WL 1006958), this Court affirmed a similar holding of the Alabama Court of Criminal Appeals. But, this Court did not specifically address the holding in its opinion.  This is an important issue which should be specifically addressed by this Court.

14

The Supreme Court of the United States and this Court have held that the prosecution bears the burden of establishing that a third party has authority to consent. See, Illinois v. Rodriquez, 497 U.S. 177, 181 (1990); Ex parte Hergott, 588 So.2d 911 (Ala. 1991); Ex parte Kennedy, 486 So.2d 493 (Ala. 1986). The Alabama Court of Criminal Appeals held that as the parent of 18 year old Matthew Reeves, his mother had authority to consent to a search of his room. (October 27, 2000 opinion, p. 24). But, apart from the relationship, the prosecution did not elicit sufficient evidence that Marzetta. Reeves had authority to consent to the search of Petitioner-Appellant Reeves' room. Without sufficient record evidence of Marzetta Reeves' authority to consent, the holding of the Alabama Court of Criminal Appeals conflicts with the above cited cases regarding authority to consent and the burden of proving the same.

   b. *The decision of the Alabama Court of Criminal Appeals conflicts with prior decisions regarding the sufficiency of stated grounds of objections. (Consent to search issue)*

   The Alabama Court of Criminal Appeals held that Petitioner-Appellant Reeves had not raised the issue of whether his mother had authority to consent to a search of his room. (October 27, 2000 opinion, pp. 22-23). Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. Ex parte Washington, 448 So.2d 404 (Ala. 1984). In his motion to suppress, Petitioner-Appellant Reeves stated:

   "1. In November of 1996, government agents searched the residence of Defendant Matthew reeves and seized certain items therefrom.

"2.  The aforementioned search was conducted without probable cause, without a properly issue[d] search warrant, without proper consent or beyond the scope of any consent given."

"3.  The seizure of items from Defendant Reeves' residence was a fruit of violations of the proscriptions against unreasonable searches and seizures of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, § 5 of the Alabama Constitution of 1901; Ala. Code § 15-5-1 et seq.; and Rule 4, A.R.Cr.P."

(C. 126).  This was more than sufficient to put the prosecution on notice that it

had the burden of showing Marzetta Reeves' authority to consent to the search

and the trial court on notice that that was an issue.  The Alabama Court of

Criminal Appeals holding to the contrary conflicts with prior holdings that

objections need be only be specific enough to point out the alleged error so as to

allow the judge to correct the error

   c.  *The admission of evidence seized pursuant to a search of*

*Petitioner-Appellant Reeves' room constituted plain error which the Alabama*

*Court of Criminal Appeals failed to recognize as prejudicial.*

   The Supreme Court of the United States and the appellate courts of this

state have held that the prosecution bears the burden of establishing that a third

party has authority to consent to a search without a warrant.  See, Illinois v.

Rodriquez, 497 U.S. 177, 181 (1990); Ex parte Hergott, 588 So.2d 911 (Ala.

1991); Ex parte Kennedy, 486 So.2d 493 (Ala. 1986).

   Police seized a number of items of incriminating evidence in a search of

Petitioner-Appellant Matthew Reeves' and Julius Reeves' bedroom.  (R. 548-

549).  Among those items were blood stained articles of clothing and a shotgun.

(R. 548-549).  In the suppression hearing in this case, the prosecution did not

16

elicit evidence that Marzetta Reeves had authority to consent to the search of Petitioner-Appellant Reeves' room. The evidence seized and all fruits thereof should not have been admitted into evidence. The admission of that evidence was plain error which was prejudicial to Petitioner-Appellant Reeves.

> d. *The decision of the Alabama Court of Criminal Appeals is contrary to prior decisions of the Supreme Court of the United States and appellate courts of this state regarding probable cause for arrests.*

The United States Supreme Court has held that an arrest is valid only if made upon probable cause. Henry v. United States, 361 U.S. 98 (1959); Draper v. United States, 358 U.S. 307 (1979). "An officer has probable cause to make an arrest when, at the time the arrest is made, the facts and circumstances within his knowledge, and of which he has reasonably trustworthy information, are sufficient to lead a prudent person to believe that the suspect is committing or has committed an offense." Gord v. State, 475 So.2d 900, 902-903 (Ala.Crim.App. 1985). "Mere suspicion in a police officer's mind that an offense has been committed is not enough to justify a warrantless arrest." Brannon v. State, 549 So.2d 532 (Ala. 1989). An arrest not supported by probable cause is violative of the Fourth and Fourteenth Amendments to the United States Constitution. Caffie v. State, 516 So.2d 822, 828-829 (Ala.Crim.App. 1986), citing, Dunaway v. New York, 442 U.S. 200 (1979). Evidence obtained after an illegal arrest must be excluded as a fruit of the poisonous tree unless intervening events break the causal connection so that the taint is purged. Taylor v. Alabama, 457 U.S. 687 (1982).

Here, the Alabama Court of Criminal Appeals held that there was "probable cause to arrest [Petitioner-A]ppellant [Reeves … and that] the trial court did not err in denying … [Petitioner-Appellant Reeves'] motion to suppress the evidence that … [Petitioner-Appellant Reeves directed … [the police] to after his arrest." (October 27, 2000 opinion, pp. 28-29). But, the suppression hearing evidence was as follows:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found. (R. 542). Grindle said that the dog tracked to the backyard of a house near Reeves' house and to Reeves' house. (R. 542-543). Grindle testified that he went to Reeves house. (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door. (R. 544). Matthew Reeves and Julius Reeves were not there. (R. 549, 570). According to Grindle, Marzetta Reeves gave him permission to come and search the house. (R. 545-546). Grindle and other police officers went in and searched throughout the house. They seized a number of items from Matthew and Julius Reeves' bedroom. (R. 548-549). Among those items were blood stained articles of clothing and a shotgun. (R. 548-549).

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles's house. (R. 553-554). Brenda "Bam-Bam" Suttles' sister answered the door. (R. 555). When the door was opened, the officers saw Matthew Reeves asleep on a sofa. (R. 554). At that point, they did not have probable cause but only suspicion. Nevertheless, they entered immediately and arrested Reeves. (R. 555). Reeves was taken in, and, according to Grindle, read

18

his Miranda rights on two occasions.  (R. 552-567).  On the second occasion,
Reeves took Grindle and other officers to a shell fired from the shotgun retrieved
from his bedroom.  (R. 552, 607).

In the face of this evidence, the holding of the Alabama Court of Criminal
Appeals on this issue is contrary to the above cited cases regarding probable
cause.

e. _The decision of the Alabama Court of Criminal Appeals is
contrary to prior decisions regarding the sufficiency of evidence mandating jury
instructions. (robbery afterthought instruction)_

The defendant in a criminal case has a due process right to have his jury
instructed upon any material hypothesis which the evidence in his favor tends to
establish.  Ex parte McGee, 383 So.2d 205 (Ala. 1980).  This Court and the
Alabama Court of Criminal Appeals have previously held that proper written
instructions which are supported by any evidence, however weak, insufficient, or
doubtful in credibility must be given.  Chavers v. State, 361 So.2d 1106, 1107
(Ala. 1978); Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

Here, Petitioner-Appellant Reeves' position at trial was that the theft was a
mere afterthought.  There was evidentiary support for Petitioner-Appellant
Reeves' defense that the evidence as to the "robbery" indicated only a "robbery"
as an "afterthought."  But, the Alabama Court of Criminal Appeals, apparently
confusing this issue with a sufficiency of evidence for a conviction issue and
referencing previous decisions regarding the sufficiency of evidence for a
conviction, recited the prosecution's evidence which supported a contrary position

19

and held that "the trial court did not err in denying ... [Petitioner-Appellant

Reeves'] request for a specific instruction on 'robbery [as an] afterthought."

(October 27, 2000 opinion, p. 46).  This holding of the Alabama Court of

Criminal Appeals is contrary to the above cited cases holding that proper written

instructions which are supported by any evidence, however weak, insufficient, or

doubtful in credibility must be given.

   f. _The decision of the Alabama Court of Criminal Appeals is_

_contrary to prior decisions regarding the sufficiency of evidence mandating jury_

_instructions. (Complicity instruction)_

   The defendant in a criminal case has a due process right to have his jury

instructed upon any material hypothesis which the evidence in his favor tends to

establish.  Ex parte McGee, 383 So.2d 205 (Ala. 1980).  This Court and the

Alabama Court of Criminal Appeals have previously held that proper written

instructions which are supported by any evidence, however weak, insufficient, or

doubtful in credibility must be given.  Chavers v. State, 361 So.2d 1106, 1107

(Ala. 1978); Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

   Here, the evidence supported a defense argument that although Petitioner-

Appellant Reeves had killed the deceased, he did not rob him along with his co-

defendants.  But, the Alabama Court of Criminal Appeals recited the

prosecution's evidence which supported a contrary position (October 27, 2000

opinion, p. 40) and  held that the trial court properly refused to charge the jury on

complicity.  (October 27, 2000 opinion, p. 40-41).  This holding of the Alabama

Court of Criminal Appeals is contrary to the above cited cases holding that proper

20

written instructions which are supported by any evidence, however weak, insufficient, or doubtful in credibility must be given.

     g.  *The decision of the Alabama Court of Criminal Appeals is contrary to decisions of the Supreme Court of the United States and appellate courts of this state regarding the right of confrontation and cross examination.*

The Supreme Court of the United States has held that the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront and cross examine witnesses against him. Davis v. Alaska, 415 U.S. 308 (1974); Pointer v. Texas, 380 U.S. 400 (1965); Douglas v. Alabama, 380 U.S. 415 (1965). As stated by the Alabama Court of Criminal Appeals in this case (October 27, 2000 opinion, p. 32) and before in McMillian v. State, 594 So.2d 1288 (Ala. 1992), opinion after remand, 616 So.2d 933 (Ala.Crim.App. 1998) "[a] party is entitled to a thorough and sifting cross examination of the witness against him." Ala. Code Section 12-21-137. Further, "a party should be given 'wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge." Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App. 1996), aff'd 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).

    Here, the Alabama Court of Criminal Appeals held that the trial court did not err in not allowing the defense to question a prosecution witness' being in jail and having criminal charges hanging over him at the time of his testimony.

(October 27, 2000 opinion, p35).  This holding of the Alabama Court of Criminal

Appeals conflicts with the above cited cases regarding the right to confront and

cross examine witnesses.

       h.  *The lack of a standard or measure for determining whether aggravating circumstances so far  outweigh mitigating circumstances as to support a death sentence constituted plain error which the Alabama Court of Criminal Appeals failed to recognize as prejudicial.*

       To pass constitutional muster, a capital sentencing scheme must provide:

1) "clear and objective standards" 2) "specific and detailed guidance," and 3) "an

opportunity of rational review of the 'process for imposing a sentence of death'."

Godfrey v. Georgia, 446 U.S. 420, 428 (1980).  In addition, appropriate appellate

review is integral to the constitutionality of any death penalty system. Gregg v.

Georgia, 482 U.S. 153 (1976).  Alabama's capital scheme does not specify a

measure or standard by which aggravating circumstances must outweigh

mitigating circumstances in order to warrant recommendation or imposition of a

death penalty.  Without a measure or standard, jury verdicts and sentencing

decisions are certainly based on disparate bases in violation of the right to equal

protection of the law under the Fourteenth Amendment to the United States

Constitution and Article 1, §§ 1, 6, and 22 of the Alabama Constitution of 1901.

In this case, the trial court did not charge the jury on any measure or standard. The

absence of a standard and the trial court's failure to so charge the jury in this case

conflicts with the aforementioned requirements of constitutional capital

jurisprudence and constitutes plain error prejudicial to Petitioner-Appellant Reeves.

  i. *The decision of the Alabama Court of Criminal Appeals conflicts with prior decisions of the United States Supreme Court and Alabama appellate courts regarding the exclusion of automatic death penalty jurors.*

   The Supreme Court of the United States and the appellate courts of this state have held that in capital cases jury venire members who would automatically vote for the death penalty must be excluded for cause. Morgan v. Illinois, 504 U.S. 719 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert denied, 502 U.S. 886 (1991); Martin v. State, 548 So.2d 488 (Ala. Crim.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, ____ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Bracewell v. State, 506 So.2d 354 (Ala.Crim.App. 1988). In this case, Juror Parnell's voir dire responses indicated that once she found someone guilty of intentionally killing someone she would consider only the death penalty. (R. 421-430). The Alabama Court of Criminal Appeals held that there was no error in the trial court's overruling a defense motion to excuse her for cause. (R. 430). This holding of the Alabama Court of Criminal Appeals is contrary to the above cited decisions.

  j. *Jurors' failure to respond candidly to voir dire questions constituted plain error which the Alabama Court of Criminal Appeals failed to recognize as prejudicial.*

   This Court has stated that "[w]here the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he

is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'" Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944).  If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions.  Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993); O'Leary, 417 So.2d at 240; Freeman, 605 So.2d 1259.

Here, one juror failed to disclose that Petitioner-Appellant Reeves' brother was suspected of stealing her car.  Another juror failed to disclose that he knew the deceased.  The Alabama Court of Criminal Appeals held no error in this. (October 27, 2000 opinion, p. 20).  This holding conflicted with the above cited cases.

k.  *The decision of the Alabama Court of Criminal Appeals conflicts with prior decisions regarding the sufficiency of stated grounds of objections.  (Prosecution arguments)*

The Alabama Court of Criminal Appeals held that Petitioner-Appellant Reeves had not properly objected to improper prosecution arguments at trial. (October 27, 2000 opinion, pp. 48, 50).  Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. Ex parte Washington, 448 So.2d 404 (Ala. 1984).  With respect to a prosecution guilt phase argument improperly spotlighting a defense strategy, the defense objected as follows:

"It seems to me that Mr. Greene [prosecutor] is going to suggest to the jury that the only reason I'm making an argument is because

24

> I've somehow been appointed in this case to represent Mr. Reeves. As Mr. Greene well knows I voluntarily took this case. It's inappropriate to suggest to this jury that somehow I am making this argument just because I've got to. It's a violation of due process to suggest that. I ask that the jury be instructed to disregard that last remark"

(R. 1080). With respect to a prosecution penalty phase argument improperly spotlighting the defendant's exercise of his right to counsel and defense strategy and suggesting that it is somehow wrong to provide defendants more procedural safeguards than their victims, the defense objected as follows:

> "The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial. It's an improper comment and is in violation of due process of law in the federal and state constitution. I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper."

(R. 1191). These objections were specific enough to point out to the trial judge the errors complained of herein so as to allow him to correct the error. The holding of the Alabama Court of Criminal Appeals regarding the sufficiency of the objections is contrary to the above cited cases.

    1.  *The decision of the Alabama Court of Criminal Appeals is in conflict with prior decisions regarding improper prosecution arguments. (Guilt phase) And, even if not properly objected to, the arguments constituted plain error prejudicial to Petitioner-Appellant Reeves.*

When a prosecutor's conduct deprives a defendant of a fair trial, the defendant's right to due process is violated. See, Berger v. United States, 295 U.S. 78 (1935). A general category of argument prohibited by courts is that of improperly spotlighting a defense strategy. See. e.g., Oregon v. Kennedy, 456

U.S. 667 (1982).  In this case, one of the prosecutor's argued to the jury: "The defense is designed and charged with defending this man any way he can."  (R. 1079-1080).  This argument was improper and deprived Petitioner-Appellant Reeves of a fair trial.  Further, because this was a capital proceeding, and because the effect of this comment was to inject an extraneous factors other than "the character and record of the individual offender and the circumstances of the particular offense," See, Lockett v. Ohio, 438 U.S. 586 (1978), a separate Eighth Amendment violation was committed. The Alabama Court of Criminal Appeals held that there was no error, plain or otherwise.  (October 27, 2000 opinion, p. 49).  This holding conflicts with the above cited cases.  Even if not properly objected to, this would constitute plain error prejudicial to Petitioner-Appellant Reeves.

   m. _The decision of the Alabama Court of Criminal Appeals is in conflict with prior decisions regarding improper prosecution arguments._ _(Penalty phase) And, even if not properly objected to, the arguments constituted plain error prejudicial to Petitioner-Appellant Reeves._

   Under the Eighth Amendment to the United States Constitution, the decision whether a defendant is to live or die must be based upon "consideration of the character and record of the individual offender and the circumstances of the particular offense." Lockett v. Ohio, 438 U.S. 586 (1978).  See also, Caldwell v. Mississippi, 472 U.S. 320 (1985).  Moreover, the Fourteenth Amendment to the United States Constitution right to a fundamentally fair trial prohibits the prosecutor from urging a jury to impose a sentence of death for improper or

irrelevant reasons.  Tucker v. Francis, 732 F.2d 1054 (11th Cir. 1984), citing, Brooks v. Francis, 716 F.2d 780 (11th Cir. 1983), and Hance v. Zant, 696 F.2d 940, 951 (11th Cir. 1983).  Closing arguments in capital cases must receive a "greater degree of scrutiny" than those in non-capital cases.  Caldwell v. Mississippi, 472 U.S. 320 (1985), quoting, California v. Ramos, 463 U.S. 992, 998-999 (1983).  A general category of argument prohibited by courts is that of improperly spotlighting the defendant's exercise of his right to counsel and defense strategy and that it is somehow wrong to provide defendants more procedural safeguards than their victims.  See. e.g., Oregon v. Kennedy, 456 U.S. 667 (1982).

In this case, one of the prosecutor's argued to the jury in the penalty phase:

"Now you are called upon to make a tough decision.  You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson.  Death or Life in prison without the possibility of parole.  Who decided Willie Johnson's fate?  Did he have the opportunity to have a five or six day proceeding?"

(R. 1191).  This argument was improper and deprived Appellant Reeves of a fair trial.  Further, because this was a capital proceeding, and because the effect of this comment was to inject an extraneous factors other than "the character and record of the individual offender and the circumstances of the particular offense," See, Lockett v. Ohio, 438 U.S. 586 (1978), a separate Eighth Amendment violation was committed.  The Alabama Court of Criminal Appeals held that there was no error, plain or otherwise.  (October 27, 2000 opinion, p. 51).  This holding

conflicts with the above cited cases.  Even if not properly objected to this would constitute plain error prejudicial to Petitioner-Appellant Reeves.

m.  *The decision of the Alabama Court of Criminal Appeals is in conflict with prior decisions of the Supreme Court of the United States regarding mitigating evidence.*

In Lockett v. Ohio, 438 U.S. 586 (1978), the Supreme Court of the United States held that "the eighth and fourteenth amendments require that the sentencer . . . not be precluded from considering as a mitigating factor, any aspect of a defendant's character and any of the circumstances of the offense that the defendant proffers as the basis for a sentence less than death." See also, Green v. Georgia, 442 U.S. 95 (1979); Eddings v. Oklahoma, 455 U.S. 104 (1984). Thus, relevant mitigating evidence is not limited to statutory mitigating factors, but includes any evidence which may be fit within two general categories mentioned in Lockett.  In this case, the defense presented evidence that Petitioner-Appellant Reeves' level of intelligence was only borderline.  (R. 1165).  The trial court does not appear to have considered this as a mitigating circumstance.  The Alabama Court of Criminal Appeals held that this was not error, plain or otherwise. (October 27, 2000 opinion, p. 56.  This holding conflicts with the above cited cases.

n.  *The decision of the Alabama Court of Criminal Appeals conflicts with Cage v. Louisiana.*

In Cage v. Louisiana, 498 U.S. 39 (1990), the Supreme Court of the United States reversed the defendant's conviction because the trial court

28

unconstitutionally suggested through its instruction a higher degree of doubt than reasonable doubt. The trial court's instruction in that case defined reasonable doubt for the jury as an "actual substantial doubt" and stated that what was required was "moral certainty".

Here, the trial court's instruction or reasonable doubt in the guilt phase was as follows:

> "The reasonable doubt which entitles an accused to an acquittal, is not a mere, fanciful, vague, conjectural or speculative doubt but a reasonably substantial doubt arising from all or part of the evidence or from a lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair minded and conscientious men and women would entertain under all the circumstances. Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt but simply beyond all reasonable doubt. If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092). The Alabama Court of Criminal Appeals held that there was no error in this instruction. (October 27, 2000 opinion, p. 39). This holding conflicts with Cage.

BASED UPON THE FOREGOING, Petitioner-Appellant Matthew

Reeves urges this Court to proceed under its rules to reverse the Alabama Court of

Criminal Appeals.

Thomas M. Goggans
Ala. S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36130
PH: (334)-834-2511
FX: (334)-834-2512

Attorney for Petitioner-Appellant
Matthew Reeves

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

William H. Pryor, Jr.
Thomas F. Parker, IV
Office of the Attorney General
11 South Union Street
Montgomery AL 36130

Lane Mann, Clerk
Alabama Court of Criminal Appeals
P.O. Box 310555
Montgomery AL 36130

by placing the same in the United States mail, first class postage prepaid and

properly addressed on this the 17th day of November, 2000.

Thomas M. Goggans

30



NOTICE: This opinion is subject to formal revision before publication in the advance sheets of _Southern Reporter_. Readers are requested to notify the Reporter of Decisions, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in _Southern Reporter_.

# ALABAMA COURT OF CRIMINAL APPEALS

## OCTOBER TERM, 2000-2001

---

### CR-98-0777

---

Matthew Reeves

v.

State

Appeal from Dallas Circuit Court
(CC-97-31)

<u>On Application For Rehearing</u>

LONG, Presiding Judge.

This court's opinion of August 25, 2000, is withdrawn, and the following opinion is substituted therefor.

The appellant, Matthew Reeves, was convicted of murder made capital because it was committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 10-2, recommended that the appellant be sentenced to

EXHIBIT A

CR-98-0777

death.  The trial court accepted the jury's recommendation and sentenced the appellant to death.

The State's evidence tended to show the following.  On November 27, 1996, the appellant (who was 18 years old at the time) and his younger brother, Julius, visited Brenda Suttles and Suttles's 15-year-old cousin, Emanuel, at Suttles's house on Lavender Street in Selma.  There, according to Suttles, everyone agreed to go out "looking for some robberies."  (R. 684.)  Shortly after noon that day, the foursome left Suttles's house on foot and walked to a nearby McDonald's restaurant, where they saw Jason Powell driving by in his car.  The appellant's brother, Julius, flagged Powell down, and Powell agreed to give the group a ride.

Brenda Suttles and Emanuel Suttles testified that after the foursome got into Powell's car, Julius Reeves suggested that they go to White Hall, a town in neighboring Lowndes County, to rob a drug dealer.  According to Brenda Suttles, everyone in the car agreed to the plan.  (Powell, who also testified at trial, denied hearing the discussion about a robbery.)  Before leaving Selma, the group stopped at an apartment on Broad Street.  Julius Reeves went inside the apartment and returned to the car a short time later carrying a shotgun, which he handed to the appellant.  With Powell driving, the group then headed for White Hall.

Before they reached White Hall, however, Powell's car broke down on a dirt road off Highway 80.  Shortly thereafter, a passing motorist, Duane Smith, stopped and told the group that he was in a

- 2 -

CR-98-0777

hurry to meet some friends to go hunting, but that he would return around sunset and would take them to get help then.  For the next couple of hours, the group sat in Powell's car and listened to music, until another passing motorist, Willie Johnson, stopped in his pickup truck and offered to tow Powell's car to Selma.  Using some chains that he kept in his pickup truck, Johnson hooked Powell's car to the back of his truck.  With Julius Reeves riding in the truck with him and the others in Powell's car, Johnson towed the car to the Selma residence where the appellant and Julius lived with their mother.

When they arrived at the Reeveses' house, Julius Reeves got out of Johnson's truck and told the others that Johnson wanted $25 for towing them.  However, no one had any money to pay Johnson. Julius Reeves then offered to give Johnson a ring as payment if Johnson would drive him to his girlfriend's house to get the ring. Johnson agreed and he unhooked Powell's car from his truck. According to Jason Powell and Emanuel Suttles, Julius Reeves at this point told the others that Johnson was going to be their robbery victim.  While Jason Powell and Emanuel Suttles stayed behind with Powell's car in front of the Reeveses' house, Julius Reeves got back in the cab of the truck with Johnson, and Brenda Suttles climbed into the rear bed of the truck.  Testimony indicated that when Johnson started the truck, the appellant jumped into the rear bed of the truck with the shotgun, hiding the weapon behind his leg as he did so.

- 3 -

CR-98-0777

When they arrived at Julius's girlfriend's house in Johnson's truck, Julius went inside and retrieved the ring he had promised to give Johnson as payment. According to Brenda Suttles, when Julius came out of the house, he walked to the rear of Johnson's truck and told her and the appellant that he was not going to let Johnson keep the ring. After Julius got back in the cab of the truck, Johnson drove everyone back to the Reeveses' house.

Jason Powell and Emanuel Suttles, who had remained at the house with Powell's car, testified that sometime around 7:00 p.m., they saw Johnson's truck drive by the house and turn into an alley -- known as Crockett's Alley -- behind the house. According to Brenda Suttles, who was in the rear bed of the truck with the appellant, just as the truck came to a stop in the alley, she heard a loud "pow" sound. (R. 704.) Suttles testified that when she looked up, the appellant was withdrawing the barrel of the shotgun from the open rear window of the truck's cab. Johnson had been shot in the neck and was slumped over in the driver's seat. Suttles testified that Julius Reeves jumped out of the truck's cab and asked the appellant what he had done, and that the appellant then told Julius and Suttles to go through Johnson's pockets to "get his money." (R. 704.) Suttles stated that Julius then pulled Johnson out of the truck and went through his pockets, giving the money he found in the pockets to the appellant. After Julius had gone through Johnson's pockets, Suttles helped him put Johnson back

- 4 -

CR-98-0777

in the truck's cab.  According to Suttles, Johnson was bleeding heavily and making "gagging" noises.  (R. 721.)

Jason Powell and Emanuel Suttles testified that they heard the gunshot after Johnson's truck pulled into Crockett's Alley and that a short time later they saw the appellant, Julius Reeves, and Brenda Suttles run out of the alley and into the Reeveses' house. The appellant was carrying a shotgun, they said.  They followed the appellant, Julius Reeves, and Brenda Suttles into the Reeveses' house and saw the appellant place the shotgun under a bed in his bedroom.  The appellant told Julius and Brenda Suttles to change out of their bloodstained clothes and shoes, and he took the clothes and shoes and stuffed them under a dresser in his bedroom. According to Emanuel Suttles, as the appellant, Julius, and Brenda changed their clothes, they were "jumping and hollering" and celebrating about "all the stuff [they] got" from Johnson.  (R. 842.)  Jason Powell testified that he heard the appellant say, "I made the money."  (R. 786.)

After changing their clothes, the appellant, Julius Reeves, and Brenda Suttles ran to Suttles's house.  On the way, the appellant stopped to talk to his girlfriend, telling her that if she should be questioned by the police, to tell them that he had been with her all day.  At Suttles's house, the appellant divided the money taken from Johnson -- approximately $360 -- among himself, Julius Reeves, and Brenda Suttles.  Testimony indicated that throughout the evening, the appellant continued to brag about

- 5 -

CR-98-0777

having shot Johnson.   Several witnesses who were present at Suttles's house that evening testified that they saw the appellant dancing, "throwing up" gang signs, and pretending to pump a shotgun.  Brenda Suttles testified that as the appellant danced, he would jerk his body around in a manner "mock[ing] the way that Willie Johnson had died."  (R. 713.)  The appellant was also heard to say that the shooting would earn him a "teardrop," a gang tatoo acquired for killing someone.  (R. 720.)

Yolanda Blevins, who was present during the post-shooting "celebration" at Suttles's house, testified that the appellant called her into the kitchen and told her that he had shot a man in a truck after catching a ride with him.  Blevins noticed that there was what appeared to be dried blood on the appellant's hands. LaTosha Rodgers, who was also present at Suttles's house, testified that the appellant told her that he had "just shot somebody" in the alley.  (R. 924.)

At around 2:00 a.m. on November 28, 1996 (approximately seven hours after the shooting), Selma police received a report of a suspicious vehicle parked in Crockett's Alley.   When police officers investigated, they found Johnson's body slumped across the seat of his pickup truck.  There was a pool of blood on the ground on the driver's side of the truck.  Several coins and a diamond ring were on the ground near the truck.  On the floorboard of the truck, police found wadding from a shotgun shell.  The pockets of Johnson's pants had been turned inside out and were empty.

- 6 -

CR-98-0777

Testimony at trial indicated that Johnson was a longtime employee of the Selma Housing Authority and that on the afternoon of November 27, 1996, he had cashed his paycheck, which had been in the amount of $500.

At the shooting scene on the morning of November 28, police also discovered a trail of blood leading from Johnson's truck to the Reeveses' house. Randy Tucker, a canine-patrol officer with the Selma Police Department, testified that his dog tracked the blood trail from the pool of blood next to Johnson's truck, down Crockett's Alley, through the yard at 2126 Selma Avenue (the residence next to the alley), and ultimately to the front steps of the Reeveses' house at 2128 Selma Avenue.

Pat Grindle, the detective in charge of investigating Johnson's murder, went to the Reeveses' house after learning that the blood trail led there. Det. Grindle testified that he obtained the consent of the appellant's mother, Marzetta Reeves, to search the house. In a bedroom shared by the appellant and Julius, Det. Grindle found bloodstained clothes and bloodstained shoes; under a bed in this bedroom, Det. Grindle found a shotgun. In searching the kitchen, Det. Grindle found a pair of bloodstained pants. After making these discoveries, Det. Grindle questioned Marzetta Reeves and several other persons who were in the house at that time. Det. Grindle stated that he learned that the bloodstained clothes and shoes belonged to Julius Reeves, Brenda Suttles, and the appellant. Det. Grindle then went to Suttles's house in an

- 7 -

CR-98-0777

attempt to locate the three. At Suttles's house, Det. Grindle found the appellant lying on a couch in a front room. The appellant was placed under arrest, and the officers seized a balled-up bloodstained jacket he was using as a headrest on the couch. Det. Grindle later returned to the Reeveses' residence, where he seized a 12-gauge shotgun shell from a garbage can in the bathroom.

An autopsy revealed that Johnson had died from a shotgun wound to his neck that severed the carotid artery, causing him to bleed to death over a period of several minutes. Bloodstain patterns in Johnson's truck indicated that he was sitting upright in the driver's seat, facing forward, when he was shot from behind, through the open rear window. The bloodstain patterns also indicated that the driver's side door had been opened and closed shortly after Johnson was shot.

Testimony indicated that the appellant's fingerprints were found on the shotgun that Det. Grindle had seized from under the bed in the appellant's bedroom. Brenda Suttles's and Julius Reeves's fingerprints were found on a fender of Johnson's truck. Joseph Saloom, a firearms expert with the Alabama Department of Forensic Sciences, testified that the shotgun shell seized from the bathroom at the Reeveses' residence was of the type commonly fired from the shotgun seized from the appellant's bedroom. Saloom stated that the shotgun-shell wadding found on the floorboard of

- 8 -

CR-98-0777

Johnson's truck was of the type commonly found in the kind of shotgun shell seized from the bathroom at the Reeveses' residence.

On appeal, the appellant raises several issues, many of which he did not raise by objection in the trial court. Because the appellant was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So. 2d 343 (Ala.Crim.App. 1991), aff'd, 600 So. 2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So. 2d 474 (Ala.Crim.App. 1990), aff'd, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

Rule 45A, Ala.R.App.P., provides:

"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

"Plain error" is error "so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So. 2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148 1152 (5th Cir. 1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's

- 9 -

CR-98-0777

deliberations." <u>Hyde v. State</u>, [Ms. CR-95-2036, January 30, 1998] ___ So. 2d ___, ___ (Ala.Crim.App. 1998), aff'd, [Ms. 1971109, March 10, 2000] ___ So. 2d ___ (Ala. 2000). This court has recognized that "'the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" <u>Burton v. State</u>, 651 So. 2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So. 2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting <u>United States v. Young</u>, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting, in turn, <u>United States v. Frady</u>, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). With these principles in mind, we address each of the issues the appellant raises on appeal.

I.

The appellant contends that the trial court should have removed prospective juror B.P. for cause because, he says, her responses during voir dire "indicated that once she found someone guilty of intentionally killing someone she would consider only the death penalty." (Appellant's brief to this court, pp. 43-44.) We disagree.

In <u>Taylor v. State</u>, 666 So. 2d 36 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), we stated:

> "'A prospective juror may not be excluded
> from a capital case for personal opposition to

- 10 -

CR-98-0777

the death penalty unless the juror's beliefs would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Wainwright v. Witt</u>, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)(footnote omitted). On the other hand, "[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused." <u>Martin v. State</u>, 548 So. 2d 488, 491 (Ala.Cr.App. 1988), affirmed, 548 So. 2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Accord, <u>Bracewell v. State</u>, 506 So. 2d 354, 358 (Ala.Cr.App. 1986).'

"<u>Kuenzel v. State</u>, 577 So. 2d 474, 484-85 (1990), affirmed, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

"'The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Wainwright v. Witt</u>, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); <u>Gray v. Mississippi</u>, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." <u>Dutton v. Brown</u>, 812 F.2d 593, 595 (10th Cir.), cert. denied, <u>Dutton v. Maynard</u>, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." <u>Id.</u>

"'A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." <u>Witt</u>, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded

- 11 -

CR-98-0777

proper deference on appeal.   Id.   "A trial
court's rulings on challenges for cause based
on bias [are] entitled to great weight and
will not be disturbed on appeal unless clearly
shown to be an abuse of discretion." Nobis v.
State, 401 So. 2d 191, 198 (Ala.Cr.App.),
cert. denied, Ex parte Nobis, 401 So. 2d 204
(Ala. 1981).'

"Martin v. State, 548 So. 2d 488, 490-91 (Ala.Cr.App.
1988), affirmed, 548 So. 2d 496 (Ala. 1989), cert.
denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383
(1989)."

666 So. 2d at 46-47.  Further,

"[A] veniremember's personal feelings as to the law are
immaterial unless those feelings are so unyielding as to
preclude the veniremember from following the law as given
in the court's instructions. 'A veniremember who believes
that the death penalty should automatically be imposed in
every capital case should be excused.' Martin v. State,
548 So. 2d 488, 491 (Ala.Crim.App. 1988), aff'd, 548 So.
2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419,
107 L.Ed.2d 383 (1989). However, veniremembers who favor
the death penalty should not be excused for cause where
they indicate they can follow the court's instructions.
Id."

Smith v. State, 698 So. 2d 189, 198 (Ala.Crim.App. 1996), aff'd,

698 So. 2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385,

139 L.Ed.2d 300 (1997)(emphasis added).

"Even though a prospective juror may initially admit
to a potential for bias, the trial court's denial of a
motion to strike that person for cause will not be
considered error by an appellate court if, upon further
questioning, it is ultimately determined that the person
can set aside his or her opinions and try the case fairly
and impartially, based on the evidence and the law. Knop
v. McCain, 561 So. 2d 229 (Ala. 1989); Siebert v. State,
562 So. 2d 586 (Ala.Cr.App. 1989), affirmed, 562 So. 2d
600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398,
112 L.Ed.2d 408 (1990); Perryman v. State, 558 So. 2d 972
(Ala.Cr.App. 1989).  Only when a prospective juror's
testimony indicates a bias or prejudice so fixed or deep-
seated that that person cannot be impartial and objective

- 12 -

CR-98-0777

must a challenge for cause be granted by the trial court. <u>Knop</u>, supra; <u>Siebert</u>, supra; <u>Perryman</u>, supra."

<u>Ex parte Land</u>, 678 So. 2d 224, 240 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).

Although the record reflects that B.P. expressed strong support for the death penalty at times during the voir dire examination, the record also reflects that she stated on several occasions that she could give equal and fair consideration to both the death penalty and life imprisonment without parole as possible punishments. She repeatedly stated that she would listen to the facts and the law as instructed by the trial court and that she could follow the trial court's instructions. She also stated that if appropriate, she could recommend life imprisonment without the possibility of parole. In denying the appellant's challenge for cause as to B.P., the trial court said: "I think this juror has said on a number of occasions that she can give fair consideration to both of the possible punishments. She could keep an open mind to the end." (R. 430.) Accordingly, the trial court did not abuse its discretion in denying the appellant's challenge for cause as to juror B.P.

II.

The appellant contends that he was deprived of his right to a fair trial by an impartial jury because, he says, two jurors, who sat on the jury for a portion of his trial, but who were excused by the trial court before the guilt-phase deliberations began, failed

- 13 -

CR-98-0777

to respond candidly to questions posed during the voir dire examination.

The record reflects that on the morning of the second day of trial, after the State had called its first eight witnesses, juror P.T. approached the trial judge to inform him that she had remembered that the appellant's brother Julius had stolen her car some six or seven years earlier. The following then occurred outside the presence of the remaining members of the jury:

"[The Court]: [P.T.], how about stepping over this way. When I arrived in the office this morning, I was approached by [P.T.] who is one of our jurors. She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis, I guess you would say, and that it deeply affected [P.T.] and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of this vehicle.

"[P.T.] has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case. And at this time I'm going to excuse [P.T.]. And our first alternate will be taking her place. Is there any objection?

"[Prosecutor]: None from the State.

"[Defense counsel]: None from the defense."

(R. 803.)

Subsequently, during the afternoon recess on the second day of trial, juror J.D. also approached the trial judge to inform him

- 14 -

CR-98-0777

that he had remembered that he knew the victim, Willie Johnson.
The following then occurred in the judge's chambers:

"[The Court]: I explained to the attorneys that [J.D.] had had a recollection of Mr. Johnson, the victim in this case. He disclosed that to me just a few minutes ago. And [J.D.], I'm going to ask these attorneys to basically ask -- well, let me say this. You tell them what you told me, and then I will let them ask you any questions.

"[J.D.]: I told him that I knew him from another guy. I seen him with the family. I was thinking that I knew the truck and knew the guy. But I never could picture who it really was until I saw him and his name is Willie, too. He worked for Roy out there. I've got a key to Roy's shop. I go up there sometimes and work on my truck and whatever. Willie helped him, and he and Roy were friends. And he'd come up there a lot when I was working on my truck and stay around and talk. And we talked about the truck before, how I kept things in tune. That's just the only way I knew him was from Roy's shop. I didn't even know this had happened to him.

"[Defense counsel]: When did you start thinking that you might have known the truck?

"[J.D.]: Last night after they was talking about Tyler because I live out there. I couldn't ever figure out who it was until I saw that other Willie today. I asked, 'What are you doing here?' He said, 'I'm in there with the family.' So I knew it was the same one. He had always hung around with him and was on good terms with Roy. He lives out there now.

"[Defense counsel]: What prompted you to tell Judge Jones about it?

"[J.D.]: I mean I figured y'all would want to know that because the first day whenever y'all asked if anybody knew him or whether we know anything about it. I didn't know at that time then who it was.

"[Defense counsel]: When is it that you saw this man? Was it out in the hall?

"[J.D.]: Uh-huh.

"[Defense counsel]: When did you notice him, a minute ago?

- 15 -

CR-98-0777

"[J.D.]:  Just a minute ago getting into the elevator or walking down the stairs.  He was going down, going outside to smoke.

"[Defense counsel]:  Are you uncomfortable now?

"[J.D.]:  Not really, I just figured that I needed to tell the Judge because I mean I wasn't close enough to the guy to even know what happened to him.  I hadn't seen him in a while.

"[Prosecutor]:  May I?  [J.D.], you did -- the person you were talking to that you know that works, I think you said worked with Mr. Roy Moore, this is a person that was in the hallway?

"[J.D.]:  Yes.  He's been sitting out there I think.

"[Prosecutor]:  In the courtroom in there?

"[J.D.]:  Yes, sir.

"[Prosecutor]:  Do you know that person fairly well?

"[J.D.]:  Yes, sir.

"[Prosecutor]:  Did you know the deceased in this case at all?

"[J.D.]:  I knew him, but he couldn't tell you my name, and I knew his name was Willie.  That was all I ever knew.

"[Prosecutor]:  How long have you known of and concerning him?

"[J.D.]:  Maybe three years maybe, off and on.  I just saw him around the shop or saw him pass when him and the other Willie would be riding down the road.  I knew Willie would be there with him.  They were always together.

"[Prosecutor]:  Do you know anything about his family, his background, or anything about what he did or where he worked?

"[J.D.]:  No, sir.

"[Prosecutor]:  Have you ever worked with him, been with him, had any contact with him?

- 16 -

CR-98-0777

"[J.D.]: No, sir, just when he walked in that shop maybe once or twice when we were working on our trucks.

"[Prosecutor]: Does that knowledge put you in a position where you can't serve in this case and make a fair judgment based on what you have heard?

"[J.D.]: No, sir.

"[The Court]: Do you feel uncomfortable? That's a different question.

"[J.D.]: No, sir.

"[Prosecutor]: You haven't heard all of the evidence in this case, but are you still in a position where you can either convict or not convict based on what you decide the evidence is at the end?

"[J.D.]: Yes, sir.

"[Prosecutor]: In spite of this connection with this man?

"[J.D.]: Yes, sir.

"[Prosecutor]: You could still -- if you thought the evidence warranted it, you could turn the man here loose?

"[J.D.]: Yes, sir.

"[Defense counsel]: This Willie person that you said you had seen him sitting in the courtroom all day?

"[J.D.]: I thought I had recognized him, but I never did look really hard until I walked outside and walked right by him. Then I knew it was him.

"[Defense counsel]: Having recognized him, do you know how long he has been in the courtroom?

"[J.D.]: No, sir.

"[Defense counsel]: The photographs of the truck, is that something that you have seen?

"[J.D.]: The one today where you could see in the garage, you know, you could see the whole truck. Really, I knew then that it was the same truck I have been in before.

- 17 -

CR-98-0777

"[Defense counsel]:   The relationship with this other Willie, was it a knowledge from going up to Roy Moore's shop?

"[J.D.]:  Me and Roy Moore, we are all real good friends, him and my dad, and I used their shop to get air and tools or whatever, you know.  I've got a key to their shop and everything.  And he has worked for Roy for, I don't know, 10 years or more probably.

"[Defense counsel]: What about the fact that this Willie is closely related to the victim?  Would that have any bearing?

"[J.D.]:  I don't even know if he's related to him or, you know -- I don't really know how he's kin to him.  It has no bearing on me really.

"[Defense counsel]:   If he's up here supporting, in support of the family, that wouldn't have any effect on you?

"[J.D.]:  No, sir.

"[Defense counsel]:  You were actually in that truck?

"[J.D.]:  Yes, we used it one time, me and Willie out here when we was replacing brake shoes on my truck.  We came to town.  I had to get some new brake shoes.

"[The Court]:  Anything else?

"[Prosecutor]:  No.

"[The Court]:  You may take a seat back in the jury room."

(R. 993-98.)  Following this exchange, the appellant's counsel moved to have juror J.D. excused from the jury.  Because juror J.D. was an alternate juror, however, the trial court reserved ruling on the appellant's motion until the end of trial.  The record reflects that juror J.D. was dismissed as an alternate before deliberations.

On appeal, the appellant contends that he was denied his right to a fair trial by an impartial jury when jurors P.T. and J.D.

- 18 -

CR-98-0777

failed to disclose during voir dire examination that they knew Julius Reeves and the victim Johnson, respectively. The appellant maintains, and the record reflects, that when prospective jurors were asked during voir dire examination whether they knew the appellant or any member of his family, P.T. did not respond. We note, however, that prospective jurors were never asked during the voir dire examination whether they knew the victim, although they were briefly informed of the facts of the case and the names of the people involved, including the victim's name. We also note that the appellant did not object when P.T. disclosed that Julius Reeves had stolen her car, when J.D. disclosed that he knew Johnson, or when the trial court removed these jurors before deliberations. Nor did the appellant assert this particular claim in his motion for a new trial. Although the appellant moved to have juror J.D. excused when J.D. first indicated that he had known the victim, and the trial court initially reserved ruling on the motion, the trial court nevertheless excused juror J.D. just before deliberations; thus, there is no adverse ruling from which the appellant can appeal. Because this particular claim was never presented to the trial court and because the trial court never ruled on the only motion made by the appellant raising this issue, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P. We find no error, plain or otherwise.

There is simply no possibility that the appellant was harmed by the failure of P.T. or J.D. to disclose during the voir dire

- 19 -

CR-98-0777

examination that P.T. knew Julius Reeves or that J.D. had known the victim Johnson. It is clear from the record that neither P.T. nor J.D. willfully withheld the information and that they merely failed to recollect at the time of voir dire examination their remote connections with Julius Reeves and Johnson. Both came forward and informed the trial court as soon as they remembered the connections. Moreover, both P.T. and J.D. were excused from the jury before the guilt-phase deliberations began. There is no evidence indicating, and the appellant does not even allege, that P.T. or J.D. informed any of the other jurors who ultimately sat on the jury about their connections with the case, or that any of the other jurors were influenced by P.T. and J.D.'s connections with the case or by the fact that the two were excused before deliberations. Jurors were instructed several times throughout the trial not to discuss the case among themselves or with anyone else, and jurors are presumed to follow the instructions they are given. See, e.g., Taylor v. State, 666 So. 2d 36 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Accordingly, we find no error, much less plain error, as to this claim.

### III.

The appellant contends that the trial court erred in denying his motion to suppress several items of evidence that were seized from his bedroom at his mother's residence.

- 20 -

CR-98-0777

At the suppression hearing, Det. Grindle testified that on the morning of November 28, 1996, after he was called to the scene of the shooting in Crockett's Alley, he learned that Officer Randy Tucker's dog had tracked a trail of blood to a house at 2128 Selma Avenue.   Det. Grindle had had prior dealings with the Reeves family, and he knew that that address was the address of the appellant's mother, Marzetta Reeves, and that the appellant and Julius Reeves lived at that address with their mother.   Shortly after learning that the dog had tracked the trail of blood to the Reeveses' house, Det. Grindle went to the house and knocked on the front door.  Marzetta Reeves answered.  Det. Grindle testified that after he identified himself, he told Ms. Reeves that he was investigating a shooting and that a dog had "tracked" to her residence.  According to Det. Grindle, he then asked Ms. Reeves if she would consent to a search of her house.  Det. Grindle stated that Ms. Reeves orally consented to the search and told him that "she had nothing to hide."  (R. 545.)  Det. Grindle then wrote out a consent form on a piece of paper.  He stated that Ms. Reeves read the form and signed it.  The signed consent form was admitted into evidence at the suppression hearing (and later during the trial) without objection.  The consent form read as follows:

> "I, Marzetta Reeves, do authorize Det. P. Grindle and any other officers he designates to assist him in the search of my residence at 2128 Selma Avenue.  I have been advised as to the fact that Det. Grindle is investigating a shooting.  With this in mind, I have agreed to allow Det. Grindle to search my residence.  I have not been coerced in any way into giving my permission to Det. Grindle in the search of my residence."

- 21 -

CR-98-0777

(C. 252.)

Det. Grindle and another officer conducted the search of the residence.  Det. Grindle stated that he found several items of bloodstained clothing, bloodstained shoes, and a shotgun in a bedroom that the appellant and his brother Julius shared.  In addition, he found a pair of bloodstained pants in the kitchen. Det. Grindle stated that there was only one internal door inside the house -- to the bathroom.  According to Det. Grindle, there was no door to the kitchen or to the bedroom shared by the appellant and Julius.

Marzetta Reeves denied that she gave Det. Grindle consent to search her house.  According to Ms. Reeves, Det. Grindle never asked for her consent to search the house, but instead asked only if he could look inside the house for the appellant and Julius. Ms. Reeves claimed that Det. Grindle then had her sign a blank piece of paper, which she said she believed to be consent to search the house for her sons, not a consent to conduct a general search. Ms. Reeves maintained that the search of her house was conducted without her consent.

On appeal, the appellant does not argue that his mother did not consent to the search of her house.  Instead, he contends that "the prosecution did not elicit even conflicting evidence that Marzetta Reeves had authority to consent to the search of the appellant Reeves's room."  (Appellant's brief to this court, p. 30.)  In the trial court, however, the appellant did not raise the

- 22 -

CR-98-0777

issue whether his mother had authority to consent to the search of his bedroom; rather, he argued that his mother never consented to the search of her house.  Because the claim the appellant raises on appeal was not presented to the trial court, we review it under the plain-error rule.  See Rule 45A, Ala.R.App.P.

In Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So. 2d ___ (Ala.Crim.App. 1998), aff'd in pertinent part, rev'd on other grounds, [Ms. 1980810, July 21, 2000] ___ So. 2d ___ (Ala. 2000), we stated the following regarding the authority of a parent to consent to the search of a child's bedroom in the parents' home:

> "Burgess's contention that his mother did not have authority to consent to a search of his bedroom is likewise without merit.  As this court stated in Taylor v. State, 491 So. 2d 1042 (Ala.Cr.App. 1986):
>
>> "'"[T]he parent's rights are 'superior to the rights of children who live in the house,' which means ... that the parent's consent would be effective even when the child was present and objecting."  W. LaFave, 2 Search and Seizure § 8.4 (1978).  "Even if a minor child, living in the bosom of his family, may think of a room as 'his,' the overall dominance will be in his parents."  United States v. Di Prima, 472 F.2d 550, 551 (1st Cir. 1973).
>>
>> "'"If a son or daughter, whether or not still a minor, is residing in the home of the parents, generally it is within the authority of the father or mother to consent to a police search of that home which will be effective against the offspring.  This is unquestionably so as to areas of common usage, and is also true of the bedroom of the son or daughter when a parent has ready access for purposes of cleaning it or when because of the

- 23 -

CR-98-0777

> minority of the offspring the parent
> is still exercising parental
> authority. Because in the latter
> circumstances the parent's rights
> are 'superior to the rights of
> children who live in the house,' a
> parent's consent would prevail even
> if the child were present and
> objecting and even if the child had
> taken special measures in an effort
> to ensure he had exclusive use of
> the area searched." W. LaFave, 1
> <u>Criminal Procedure</u> § 3.10(e)
> (1984).'

"491 So. 2d at 1045."

___ So. 2d at ___.

At the time of the search, the appellant was 18 years old and was living in his mother's house. The appellant concedes that his mother consented to the search of her house, including his bedroom. As the appellant's parent, Ms. Reeves clearly had the authority to consent to the search of the appellant's bedroom, which, lacking a door, was readily accessible to Ms. Reeves and to anyone else in her house. Accordingly, the trial court properly allowed the State to introduce the items of evidence seized from the appellant's bedroom. There was no error, plain or otherwise, in admitting this evidence.

IV.

The appellant contends that the trial court erred in denying his motion to suppress evidence in the form of a shotgun shell seized from the Reeveses' house following the appellant's arrest.

In a post-arrest statement to police -- which was not introduced into evidence by the State -- the appellant directed

- 24 -

CR-98-0777

Det. Grindle to a shotgun shell in a garbage can in the bathroom of the Reeveses' house; the shell was admitted into evidence at trial. The appellant argues that he was arrested without probable cause, that the shotgun shell was the fruit of this illegal arrest, and that, consequently, his motion to suppress the shell should have been granted.  (Appellant's brief to this court, p. 33.)  We disagree.

As noted above, Det. Grindle testified at the suppression hearing that he went to the Reeveses' house on the morning of November 28 based on Officer Tucker's information that a dog had tracked a trail of blood from the shooting scene in Crockett's Alley to the house.  After the Reeveses' house was searched that morning, Det. Grindle interviewed four people, one of whom was the appellant's mother, who were present at the house at the time of the search.  From these interviews, Det. Grindle learned that the bloodstained clothing and shoes found in the house during the search belonged to the appellant, his brother Julius, and Brenda Suttles.  Det. Grindle also learned that Brenda Suttles had been at the Reeveses' house earlier in the day with another male.  From police department files, Det. Grindle obtained Suttles's address and proceeded to her house in an attempt to locate her, Julius Reeves, and the appellant.  Det. Grindle testified that when he arrived at Suttles's house, in the morning hours of November 28, he knocked on the door, and Suttles's sister answered.  Through the doorway, Det. Grindle said, he saw the appellant lying on a couch.

- 25 -

CR-98-0777

He then entered the residence, arrested the appellant, and seized a bloodstained jacket that was on the couch where the appellant had been lying.   Neither Brenda Suttles nor Julius Reeves was apprehended at that time.

"Section 15-10-3(3), Ala. Code 1975, provides that an officer may arrest an individual without a warrant when a felony has been committed and he has reasonable cause to believe that the individual arrested committed the felony." Sockwell v. State, 675 So. 2d 4, 13 (Ala.Crim.App. 1993), aff'd, 675 So. 2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).  "[R]easonable cause has been equated with probable cause." Daniels v. State, 534 So. 2d 628, 651 (Ala.Crim.App. 1985), aff'd, 534 So. 2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987), opinion after remand, 534 So. 2d 658 (Ala.Crim.App. 1987), aff'd, 534 So. 2d 664 (Ala. 1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989). "'The rule of reasonable or probable cause is a "practical, nontechnical conception,"'" id., quoting Tice v. State, 386 So. 2d 1180, 1183 (Ala.Crim.App.), cert. denied, 386 So. 2d 1187 (Ala. 1980), and "[t]he level of evidence needed for a finding of probable cause is low." State v. Johnson, 682 So. 2d 385, 387 (Ala. 1996).  "'"Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief

- 26 -

CR-98-0777

that' an offense has been or is being committed."'" State v. Johnson, 682 So. 2d at 388, quoting Young v. State, 372 So. 2d 409, 410 (Ala.Crim.App. 1979), quoting, in turn, Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). Put another way, "[p]robable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty." Sockwell, 675 So. 2d at 13.   "'An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest]....   "Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."'" State v. Johnson, 682 So. 2d at 387-88, quoting Stone v. State, 501 So. 2d 562, 565 (Ala.Crim.App. 1986), overruled on other grounds, Ex parte Boyd, 542 So. 2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989).

> "'In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act....' Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949).   '"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."' Id.   'Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.' Cox v. State, 489 So. 2d 612 (Ala.Cr.App. 1985)."

Dixon v. State, 588 So. 2d 903, 906 (Ala. 1991).   See also Minor v. State, [Ms. CR-95-1968, October 29, 1999] ___ So. 2d ___, ___ (Ala.Crim.App. 1999), rev'd on other grounds, [Ms. 1990235, June 2,

- 27 -

CR-98-0777

2000] ___ So. 2d ___ (Ala. 2000); and McWhorter v. State, [CR-93-1448, August 27, 1999] ___ So. 2d ___, ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1990427, August 11, 2000] ___ So. 2d ___ (Ala. 2000). "In making the determination as to whether probable cause exists for a warrantless arrest, we must examine the totality of the circumstances surrounding the arrest." Sockwell, 675 So. 2d at 13, quoting Daniels, 534 So. 2d at 651.

Here, based on the knowledge he had accumulated through his investigation, Det. Grindle had probable cause to arrest the appellant at Suttles's house on the morning of November 28, 1996. There was a trail of blood leading from where Johnson's body was found to the Reeveses' house. Bloodstained clothing and shoes, reportedly belonging to the appellant, Julius Reeves, and Brenda Suttles, were found in the appellant's bedroom in the Reeveses' house. In addition, a shotgun was found under the appellant's bed. Wadding from a shotgun shell was found on the floorboard of Johnson's truck at the shooting scene. When Det. Grindle arrived at Brenda Suttles's house, he found the appellant lying on a couch. Next to the appellant on the couch was a bloodstained jacket. These facts and circumstances were sufficient to lead "a reasonable person of ordinary caution, acting impartially" to believe that the appellant had participated in Johnson's shooting. There was probable cause to arrest the appellant. Accordingly, the trial court did not err in denying the appellant's motion to suppress the

- 28 -

CR-98-0777

shotgun shell that the appellant directed Det. Grindle to after his arrest.

## V.

The appellant contends that the trial court improperly limited his cross-examination of Jason Powell, who testified for the State. Specifically, he argued that he should have been permitted to cross-examine Powell regarding charges pending against him in order to show that Powell was biased in favor of the State.

The record reflects that sometime after Johnson's body was discovered, Powell gave police a statement in which he recounted the events of November 27, 1996. Although that statement is not included in the record on appeal, it appears from the record that Powell's testimony at trial was substantially the same as the statement he gave to police. When cross-examining Powell at trial, the appellant's counsel attempted to impeach Powell by questioning him about criminal charges pending against him in Wilcox County. Apparently, at the time of the appellant's trial, Powell was in jail awaiting a trial on those charges. When the prosecutor objected to defense counsel's inquiry into this subject, the following occurred outside of the jury's hearing:

> "[The Court]:  I don't mind you asking him questions as long as it's not regarding some suspension or some expulsion from school for which there has not been some type of appropriate charge, or conviction I should say. I don't know where you're going with that.
>
> "[Defense counsel]:  If he has got charges hanging over his head, he would have a bias in favor of the State.
>
> "[Prosecutor]:  It's totally unrelated to anything here.

- 29 -

CR-98-0777

"[The Court]:  Is there any agreement on this guy?  What I'm saying is, is there an appropriate conviction that you're aware of that you can cross-examine him on?

"[Defense counsel]:  No, I'm not.

"[The Court]:  The second question is, is there any type of agreement with [Powell] regarding his charges in Wilcox County for his testimony here today?

"[Prosecutor]:  None whatsoever, nor in this case.

"[Defense counsel]:  Let me go ahead and state my grounds why I think I should be able to go into this matter, what the criminal charges are if he's in jail.  We think that we are entitled as a matter of Alabama statutory law as well as under the 6th and 14th Amendments of the United States Constitution and Article 1, Section 6, of the state constitution to be able to cross-examine him to show any possible bias that he may have in favor of the State or any prejudice against the defense.  We think certainly if this man has got criminal charges hanging over his head, he wouldn't want to do anything to tick off the State.  But I understand the Court is saying, 'don't go into that.'  I wanted to make sure I don't have to ask every single question for you to rule on it.

"[The Court]:  Sustain the objection based on the fact that, number one, there is no agreement regarding this testimony or any charges.  Number two, you can't tell me of any conviction that would be an appropriate conviction for impeachment purposes of his testimony, correct?

"[Defense counsel]:  As far as I know, there is not."

(R. 793-94.)   The appellant's counsel then continued cross-examining Powell without referring to any pending charges.  At the conclusion of Powell's testimony, court was recessed for the day.

When the trial resumed the next morning, the following exchange occurred:

"[Defense counsel]:  Also, with respect to witness Jason Powell, we had a sidebar at which the Court ruled that we would not be allowed to ask Mr. Powell questions along the lines of what, if any, criminal cases he had pending in Wilcox County.  The State said that they were aware

- 30 -

CR-98-0777

that things were pending.   [Cocounsel for the defense]
this morning went into the clerk's office and pulled up
some computer records that would indicate we think what
we would have been able to show had we been able to go
into that.   That's marked as Defendant's Exhibit Number
5.  And just for purposes of the record, we would like to
put that in the record.

"[The Court]:  Let me ask you a question, though, because
I did rule on your objection or the State's objection to
your question regarding Jason Powell's pending charges.
Can you tell me or give me any indication as to how that
would be admissible under Alabama Rules of Evidence?

"[Defense counsel]:  It would be admissible to show bias
of the witness in favor of the State, that he would have
a reason with all of these things hanging over his head
to do everything he can to help himself in those cases by
testifying in this case.

"[Prosecutor]:  We counter that with the fact that there
is no evidence of that.   To impeach a witness, you need
a conviction of a crime involving moral turpitude or some
other evidence to show that the witness has some
particular reason, a deal or an understanding, an
agreement or something of that nature.   But the mere fact
that he's been charged with something is not permitted
under the law, neither by the State or the defense.

"[The Court]:   That was my --

"[Prosecutor]:   The man gave these statements [to the
police] back way before he had any charges brought
against him.   There is no understanding whatsoever.

"[The Court]:  Are you telling me that the statement that
Jason Powell gave to the police predated the charges that
are presently pending?

"[Prosecutor]:  Yes, sir.

"[Defense counsel]:  We would say the rule -- we cite
Alabama Rules of Evidence 616, 'Impeachment by Evidence
of Bias, Prejudice, or Interest.'   I'm reading out of
Gamble's <u>Alabama Rules of Evidence Trial Manual</u>.  'This
rule retains the preexisting Alabama practice of allowing
one to impeach a witness with evidence of acts,
statements, or relationship indicating bias.'   The case
cites the bias that may be shown includes both bias for
a party and bias against a party.

- 31 -

CR-98-0777

"[The Court]: How do you want to respond to the fact that the statement given predates the charge?

"[Defense counsel]: I think that would go to the weight rather than admissibility.

"[Prosecutor]: The State's biggest problem in this case, we weren't real sure how Mr. Powell was going to respond, and he is now in jail. And we are now putting him -- we have got to deal with what we've got.

"[The Court]: My ruling will stand. Your exception is noted for the record."

(R. 804-06.)

It is well settled that "[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him," McMillian v. State, 594 So. 2d 1253, 1261 (Ala.Crim.App. 1991), remanded on other grounds, 594 So. 2d 1288 (Ala. 1992), opinion after remand, 616 So. 2d 933 (Ala.Crim.App. 1993), citing Perry v. Brakefield, 534 So. 2d 602 (Ala. 1988), and § 12-21-137, Ala. Code 1975, and that a party should be given "wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge." Williams v. State, 710 So. 2d 1276, 1327 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). It is equally well established, however, "that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme

- 32 -

CR-98-0777

cases of abuse." Long v. State, 621 So. 2d 383, 388 (Ala.Crim.App. 1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So. 2d 688, 689 (Ala.Crim.App. 1990). "The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating." Newsome v. State, 570 So. 2d 703, 714 (Ala.Crim.App. 1989). "On appeal, the party claiming an abuse of such discretion bears the burden of persuasion." Ross v. State, 555 So. 2d 1179, 1180 (Ala.Crim.App. 1989), quoting Hembree v. City of Birmingham, 381 So. 2d 664, 666 (Ala.Crim.App. 1980).

Rule 616, Ala.R.Evid., provides that "[a] party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case." Generally, this rule permits cross-examination, and the introduction of independent evidence, regarding statements, acts, or relationships indicating bias or prejudice, including arrests, indictments, and pending charges that have not resulted in convictions even though such "bad acts" are generally inadmissible under Rules 608 and 609, Ala.R.Evid. See, e.g., C. Gamble, McElroy's Alabama Evidence, § 149.01(8)(a) (5th ed. 1996). However, the arrests, indictments or pending charges must have a tendency to show bias or prejudice on the part of the witness in order to be admissible.

- 33 -

CR-98-0777

Here, there is nothing in the record to suggest that the pending charges against Powell would have biased him in favor of the State. As the State correctly points out in its brief to this court, the record suggests that Powell's testimony at trial was substantially the same as the statement he gave police shortly after Johnson's body was found; this statement was made before the charges were brought against Powell in Wilcox County. Furthermore, although "[i]t is always permissible to cross-examine a witness to ascertain his interest, bias, prejudice or partiality concerning the matters about which he is testifying ... [t]he fact that a witness has merely been indicted for an offense unrelated to the crime charged against the accused is not such a bias-creating fact." Woodward v. State, 489 So. 2d 1, 2 (Ala.Crim.App. 1986). Only where "'the offenses are factually related or where the particular facts furnish a reasonable inference of interest or bias" is the fact that a witness has charges pending a proper subject of cross-examination. Beavers v. State, 497 So. 2d 612, 617 (Ala.Crim.App. 1986), quoting Woodward, 489 So. 2d at 2. See also Baker v. State, 568 So. 2d 374 (Ala.Crim.App. 1990); and Moody v. State, 495 So. 2d 104 (Ala.Crim.App.), cert. denied, 495 So. 2d 110 (Ala. 1986). Here, the appellant has failed to show that the charges pending against Powell were "factually related" to the charge against the appellant, nor has he pointed to facts furnishing a reasonable inference of Powell's bias in favor of the State. Finally, there is absolutely no evidence of any agreement

- 34 -

CR-98-0777

between the State and Powell pursuant to which Powell would testify at the appellant's trial in exchange for leniency with regard to the charges pending against him, and the prosecutor asserted at trial that there was, in fact, no such agreement. Accordingly, we hold that the trial court did not err in limiting the appellant's cross-examination of Powell regarding unrelated pending charges against him.

VI.

The appellant contends that the trial court's instruction to the jury on reasonable doubt violated the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In its oral charge, the trial court instructed the jury on reasonable doubt as follows:

"Now in this case, as I said, the burden of proving that the defendant is guilty as charged rests upon the State. And before a conviction can be had in this case, the State must satisfy each and every member of the jury of the defendant's guilt. And unless the State satisfies you of the defendant's guilt beyond a reasonable doubt, then he is entitled to an acquittal. The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. But it may help you some to say that the doubt which would justify an acquittal must be a doubt for which you can assign a reason. It's not a mere guess or surmise or whim. It is not a forced or capacious [sic] doubt. Ladies and gentlemen of the jury, I charge you if you have a reasonable doubt of the defendant's guilt growing out of the evidence or any part of the evidence or lack thereof, you should acquit him. If, after considering all of the evidence in this case, you have an abiding conviction of the truth of the charge, you are convinced beyond a reasonable doubt, and it would be your duty to convict the defendant.

"The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural

- 35 -

CR-98-0777

> or speculative doubt, but a <u>reasonably substantial doubt</u>
> arising from all or any part of the evidence or from the
> lack of the evidence and remaining after a careful
> consideration of the testimony, such as reasonable, fair-
> minded and conscientious men and women would entertain
> under all of the circumstances.  Now, you will observe
> that the State is not required to convince you of the
> defendant's guilt beyond all doubt, but simply beyond all
> reasonable doubt.  If, after comparing and considering
> all of the evidence in this case, your minds are left in
> such a condition that you cannot say you have an abiding
> conviction of the defendant's guilt, then you are not
> convinced beyond a reasonable doubt, and the defendant
> would be entitled to an acquittal."

(R. 1091-92.)  (Emphasis added to the phrase complained of by the appellant.)  The appellant's counsel objected to the court's use of the phrase "reasonably substantial doubt" because, he said, the use of that phrase misstated and lessened the prosecution's burden of proof.  The trial court overruled the objection.

It is well settled that "[t]he Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'"  <u>Knotts v. State</u>, 686 So. 2d 431, 459 (Ala.Crim.App.), opinion after remand, 686 So. 2d 484 (Ala.Crim.App. 1995), aff'd, 686 So. 2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), quoting <u>In re Winship</u>, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  In <u>Cage v. Louisiana</u>, the United States Supreme Court held that an instruction that equated "reasonable doubt" with "grave uncertainty," and "actual substantial doubt" and stated that what was required to convict was a "moral certainty," could have led a reasonable juror to interpret the instruction to

- 36 -

CR-98-0777

allow a finding of guilt based on a lesser degree of proof than that required by the Due Process Clause. Subsequently, in <u>Victor v. Nebraska</u>, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), "the Court 'made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.'" <u>Knotts</u>, 686 So. 2d at 459, quoting <u>Victor</u>, 511 U.S. at 6, 114 S.Ct. 1239 at 1243, quoting, in turn, <u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73, 112 S.Ct. 475, 482, 116 L.Ed.2d 385, n. 4 (1991). The constitutional question is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the <u>Winship</u> standard." <u>Victor</u>, 511 U.S. at 6, 114 S.Ct. at 1243. In addition, the Supreme Court made it clear in <u>Victor</u> "that, while it did not condone the use of the <u>Cage</u> terminology in reasonable doubt instructions, the use of such terminology does not automatically render instructions unconstitutional if '"taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury."'" <u>Lawhorn v. State</u>, 756 So. 2d 971, 985 (Ala.Crim.App. 1999), quoting <u>Victor</u>, 511 U.S. at 22, 114 S.Ct. at 1251, quoting, in turn, <u>Holland v. United States</u>, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See also <u>Taylor v. State</u>, 666 So. 2d 36, 56 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)("'Use of some but not

- 37 -

CR-98-0777

all of the terminology found offensive in _Cage_ does not automatically constitute reversible error.'"); and _Sockwell v. State_, 675 So. 2d 4, 23 (Ala.Crim.App. 1993), aff'd, 675 So. 2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996)("It was the use of _all three phrases in conjunction_ with each other that the Supreme Court determined was unconstitutional in _Cage_." (Emphasis added.)). Thus, in reviewing the reasonable-doubt instruction in this case, we do so in the context of the trial court's charge as a whole; as long as the concept of "reasonable doubt" was correctly conveyed to the jury, we will not find error. See, e.g., _Knotts_, supra.

Here, the trial court's charge, as a whole, correctly conveyed the concept of reasonable doubt to the jury; it did not lessen the State's burden of proof. The trial court's mere use of the phrase "reasonably substantial doubt" cannot be equated with the instruction condemned in _Cage_, where the reasonable-doubt instruction contained the phrase "actual substantial doubt" as well as the phrases "grave uncertainty" and "moral certainty." See, e.g., _Dobyne v. State_, 672 So. 2d 1319 (Ala.Crim.App.), opinion after remand, 672 So. 2d 1353 (Ala.Crim.App. 1994), aff'd, 672 So. 2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996)(upholding a charge using the phrase "reasonably substantial doubt" because it "contained none of the terms that the United States Supreme Court found questionable in _Victor_ and reversible in _Cage_"). The reasonable-doubt instruction

- 38 -

CR-98-0777

in this case was not misleading or confusing, and there was no reasonable likelihood that the jury applied the instruction in an unconstitutional manner.   Accordingly, we find no error as to this claim.

VII.

The appellant contends that the trial court erred in refusing to instruct the jury on complicity, under which theory the appellant was an accomplice, rather than the principal, in the commission of the crime.  The appellant argues that he was entitled to such an instruction because, he says, "[t]he evidence could have supported a defense argument that although appellant Reeves had killed Johnson, he did not rob him."  (Appellant's brief to this court, p. 37.)   In refusing to give the complicity instruction requested by the appellant, the trial court stated that the instruction would be "misleading to the jury and not a proper statement of the law for these particular facts."  (R. 1041.)

"'A trial court has broad discretion in formulating its jury instructions, provid[ed] they are an accurate reflection of the law and facts of the case.'" Hemphill v. State, 669 So. 2d 1020, 1021 (Ala.Crim.App. 1995), quoting Coon v. State, 494 So. 2d 184 (Ala.Crim.App. 1986).   Although it is well settled that "[a] defendant is entitled to have the trial court instruct the jury on his theory of defense," Padgett v. State, 668 So. 2d 78, 85 (Ala.Crim.App.), cert. denied, 668 So. 2d 88 (Ala. 1995), it is equally well established that "[t]he trial judge may refuse to give

- 39 -

CR-98-0777

a requested jury charge when the charge is either fairly and substantially covered by the trial judge's oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law." Harris v. State, [Ms. CR-98-2452, April 28, 2000] ___ So. 2d ___, ___ (Ala.Crim.App. 2000).

Here, there was no evidence to support a charge on complicity based on a theory that the appellant was an accomplice rather than the principal in the commission of the crime.  The State's theory of the case was that the appellant was the actual perpetrator of both the murder and the robbery of Johnson.  The State presented evidence showing that on the afternoon of November 27, 1996, the appellant, his brother Julius, and Brenda Suttles met and planned a robbery they intended to commit on that day; that, later that day, when the vehicle they were riding in broke down and Johnson offered to tow them back to Selma, Julius told the appellant and Brenda Suttles that Johnson was to be their robbery victim; that the appellant subsequently shot Johnson and then told Julius and Suttles to search Johnson's pockets for money; and that the appellant later divided the money they had taken from Johnson among himself, Julius, and Suttles.  There was simply no theory of the evidence from which a reasonable jury could have concluded that the appellant was "merely" an accomplice in Johnson's murder and robbery.  The complicity instruction requested by the appellant

- 40 -

CR-98-0777

would have been misleading and confusing, and the trial court properly refused to give it.

Moreover, even if some evidence had been presented to support a theory of complicity, we fail to see any harm to the appellant from the trial court's refusal of the appellant's requested charge. The distinction between a principal and an accomplice has been abolished in Alabama; accomplices are considered as guilty as principals and may be punished the same as principals. Even if evidence had been presented to support a theory that the appellant was an accomplice rather than the principal actor in the murder, the appellant still could have been convicted of capital murder and sentenced to death. In fact, it is arguable that the complicity instruction requested by the appellant would have increased the likelihood of the appellant's being convicted of capital murder because it would have allowed the jury to find him guilty of that offense either as an accomplice or as a principal. Accordingly, there was no reversible error in the trial court's refusal to give the appellant's requested instruction on complicity.

## VIII.

The appellant also contends that the trial court erred in refusing to instruct the jury on "robbery [as an] afterthought." At trial, the appellant requested several instructions relating to the general principle of law that robbery as a mere afterthought and unrelated to the murder cannot sustain a conviction for capital murder. However, the trial court refused to give the instructions

- 41 -

CR-98-0777

requested by the appellant, finding that it was sufficient to give jurors the pattern jury charge on capital murder because the pattern charge adequately conveyed the principle that it was necessary for the murder to have occurred "during" a robbery in order to sustain a conviction for capital murder.

In <u>Freeman v. State</u>, [Ms. CR-95-2080, April 30, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999), aff'd, [Ms. 1981565, March 10, 2000] ___ So. 2d ___ (Ala. 2000), we stated the following regarding robbery as an "afterthought":

> "'The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing. <u>Davis v. State</u>, 536 So. 2d 110 (Ala.Crim.App. 1987), aff'd, 536 So. 2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); <u>Magwood v. State</u>, 494 So. 2d 124 (Ala.Crim.App. 1985), aff'd, 494 So. 2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).

> "'"As the Alabama Supreme Court held in <u>Cobern v. State</u>, 273 Ala. 547, 142 So. 2d 869 (1962), 'the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' <u>Clements v. State</u>, 370 So. 2d 708, 713 (Ala.Crim.App. 1978), aff'd in pertinent part, 370 So. 2d 723 (Ala. 1979); <u>Clark v. State</u>, 451 So. 2d 368, 372 (Ala.Crim.App. 1984). To sustain any other position 'would be tantamount to

- 42 -

CR-98-0777

granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' <u>Thomas v. State</u>, 460 So. 2d 207, 212, (Ala.Crim.App. 1983), aff'd, 460 So. 2d 216 (Ala. 1984).

"'"Although a robbery committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see <u>Bufford v. State</u>, [382 So. 2d 1162 (Ala.Cr.App.), cert. denied, 382 So. 2d 1175 (Ala. 1980)]; <u>O'Pry v. State</u>, [642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. <u>Crowe v. State</u>, 435 So. 2d 1371, 1379 (Ala.Crim.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. <u>Cobern v. State</u>, 273 Ala. [at] 550, 142 So. 2d [at] 871 (1962). The defendant's intent to rob the victim can be inferred where 'the intervening time, if any, between the killing and robbery was part of a continuous chain of events.' <u>Thomas v. State</u>, 460 So. 2d at 212. ... See also <u>Cobern v. State</u>; <u>Crowe v. State</u>; <u>Bufford v. State</u>; <u>Clements v. State</u>."'

"<u>Bush v. State</u>, 695 So. 2d 70, 118-19 (Ala.Crim.App. 1995), aff'd, 695 So. 2d 138 (Ala.), ___ U.S. ___, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting <u>Hallford v. State</u>, 548 So. 2d 526, 534-35 (Ala.Crim.App. 1988), aff'd, 548 So. 2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting in turn

- 43 -

CR-98-0777

Connolly v. State, 500 So. 2d 57, 63 (Ala.Crim.App. 1985), aff'd, 500 So. 2d 68 (Ala. 1986)."

___ So. 2d at ___. The Alabama Supreme Court has stated that "'[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.'" Ex parte Roberts, 735 So. 2d 1270, 1277 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999), quoting Johnson v. State, 479 So. 2d 1377, 1380 (Ala.Crim.App. 1985), and citing Clark v. State, 451 So. 2d 368 (Ala.Crim.App.), cert. denied, 451 So. 2d 368 (Ala. 1984).

Here, the trial court properly instructed the jury that in order to convict the appellant of capital murder, the State had to prove that the murder was committed "during the robbery." (R. 1094.) The trial court defined "during the robbery" as "in the course of the commission of or in connection with the commission of the robbery." (R. 1094.) With these instructions, the trial court adequately conveyed to the jury the facts under which it could, and could not, find the appellant guilty of capital murder.

As we stated in Woods v. State, [Ms. CR-97-0027, December 10, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999):

"Although this court has held that the taking of property as a mere afterthought to a murder will not support a capital murder conviction under §13A-5-40(a)(2), Bufford v. State, 382 So. 2d 1162 (Ala.Cr.App.), cert. denied, 382 So. 2d 1175 (Ala. 1980), we have not held that the trial court must use the term 'mere afterthought' in its jury instructions on

- 44 -

CR-98-0777

robbery-murder.  The  trial  court  more  than  adequately
instructed  the  jury  that  the  robbery  had  to  occur
'during' the course of the murder."

___ So. 2d at ___.  See also Roberts v. State, 735 So. 2d 1244
(Ala.Crim.App. 1997), aff'd 735 So. 2d 1270 (Ala.), cert. denied,
___ U.S. ___, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999); Ex parte
Windsor, 683 So. 2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171,
117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Jenkins v. State, 627 So.
2d 1034 (Ala.Crim.App. 1992), aff'd, 627 So. 2d 1054 (Ala. 1993),
cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).

Moreover,  there  was  no  evidence  that  the  robbery  of  Johnson
was  an  "afterthought."    Rather,  as  noted  in  Part  VII  of  this
opinion,  all  the  evidence  showed  that  the  appellant,  his  brother
Julius,  and  Brenda  Suttles  set  out  on  November  27,  1996,  to  rob
someone.  They openly discussed driving to White Hall to rob a drug
dealer  there;  however,  after  the  vehicle  they  were  riding  in  broke
down,  they  decided  to  rob  Johnson,  who  had  stopped  to  help  and  to
tow  them  back  to  Selma.    Intending  to  make  Johnson  the  robbery
victim,  the  appellant  got  into  the  rear  bed  of  Johnson's  pickup
truck  with  a  shotgun.    Later,  after  they  pulled  into  Crockett's
Alley,  the  appellant  shot  Johnson  and  then  told  Julius  and  Suttles
to  search  Johnson's  pockets  for  money.    The  appellant  subsequently
divided  the  money  taken  from  Johnson  among  himself,  Julius,  and
Suttles  and  was  heard  to  brag  that  he  had  "made  the  money."
Clearly,  the  robbery  was  not  a  "mere  afterthought,"  but  instead
was,  with  the  murder,  part  of  one  "continuous  chain  of  events."

- 45 -

CR-98-0777

Because there was no evidence to support the theory that the robbery was a mere afterthought, unrelated to Johnson's murder, and because the jury was properly instructed that it could convict the appellant only if it found that the murder occurred "during" a robbery, the trial court did not err in denying the appellant's request for a specific instruction on "robbery [as an] afterthought."

IX.

The appellant contends that the prosecutor engaged in misconduct during both the guilt phase and the sentencing phase of the trial.

Initially, we note that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So. 2d 97, 106 (Ala.Crim.App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala.Crim.App. 1992), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993). See also Henderson v. State, 583 So. 2d 276, 304 (Ala.Crim.App. 1990), aff'd, 583 So. 2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.

- 46 -

CR-98-0777

2d at 107, quoting <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting, in turn, <u>Donnelly v. DeChristophoro</u>, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).  "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." <u>Roberts v. State</u>, 735 So. 2d 1244, 1253 (Ala.Crim.App. 1997), aff'd, 735 So. 2d 1270 (Ala.), cert. denied, ___ U.S. ___, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." <u>Bankhead</u>, 585 So. 2d at 106.  "Questions of the propriety of argument of counsel are largely within the trial court's discretion, <u>McCullough v. State</u>, 357 So. 2d 397, 399 (Ala.Crim.App. 1978), and that court is given broad discretion in determining what is permissible argument." <u>Bankhead</u>, 585 So. 2d at 105.

A.

During closing arguments at the guilt phase of the trial, the appellant's counsel argued to the jury that, although the appellant had shot and killed Johnson, the robbery was a "mere afterthought." In the rebuttal closing argument that followed, the prosecutor made these remarks:

> "They are up here telling you that this is not a
> capital murder case because they didn't go down and say,
> 'Oh, yeah, I think he cashed his paycheck today.  Oh,
> yeah, he has probably got a lot of money.'  The deal was

- 47 -

CR-98-0777

they set out that morning to rob somebody. They rode all over the town here trying to find somebody to rob. And when the good Samaritan came along and pulled them and their broke-down car back to Selma, they decided they would pay him off with the ring and take it back and whatever else he had.

"Y'all, the defense is designed and charged with defending this man any way he can."

(R. 1079-80.) The appellant's counsel objected to the prosecutor's remarks, arguing that they suggested to the jury that the only reason defense counsel was making an argument on the appellant's behalf was that he had been appointed to represent the appellant and was required to make such an argument. The trial court overruled the objection, and the prosecutor continued rebuttal closing argument as follows:

"Within the rules of law and evidence, it is our job to present the evidence against this man. Their argument is that this is no robbery. It didn't occur. If you blow a man's head off and you go through his pockets and take his money, that's robbery. It's no joke when they say if it walks like a duck and talks like a duck and looks like a duck, it's a duck. I just don't understand that argument. I don't understand the logic of it, and I don't understand the meaning of it. I don't think it fits under these facts."

(R. 1080-81.)

On appeal, the appellant argues, for the first time, that the prosecutor's remarks "improperly spotlight[ed] the defense strategy." (Appellant's brief to this court, p. 52.) Because this particular argument was not presented to the trial court, we review the appellant's claim only for plain error. See Rule 45A, Ala.R.App.P.

- 48 -

CR-98-0777

The prosecution is entitled to "spotlight the defense's strategy," and a prosecutor's remarks during closing argument pointing out the flaws in the defense's theory of the case do not constitute improper argument. "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So. 2d 1087, 1100 (Ala.Crim.App. 1987)(citation omitted), rev'd on other grounds, 523 So. 2d 1118 (Ala. 1988). The remarks complained of by the appellant were part of the prosecutor's legitimate argument that the evidence did not support the defense's theory that the robbery of Johnson was a "mere afterthought." We find no error here, plain or otherwise.

B.

During closing arguments at the sentencing phase of the trial, the prosecutor commented to the jury as follows:

> "Now you are called upon to make a tough decision. You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or life in prison without parole. Who decided Willie Johnson's fate? Did he have the opportunity to have a five- or six-day proceeding?"

(R. 1191.)

On appeal, the appellant contends that by asking the jury to consider whether the victim Johnson had been afforded a five- or six-day trial (as the appellant was being afforded) before his fate was decided, the prosecutor improperly "inject[ed] an extraneous factor other than the 'character and record of the individual

- 49 -

CR-98-0777

offender and the circumstances of the particular offense,' ... divert[ed] jurors from their primary responsibility ... [and made it] possible that the death sentence recommended and imposed was the product of an arbitrary factor." (Appellant's brief to this court, p. 57, quoting, in part, <u>Lockett v. Ohio</u>, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).) At trial, the appellant did not object to the prosecutor's comments on this ground; therefore, we review this claim only for plain error. Rule 45A, Ala.R.App.P.

We have reviewed the complained-of comment, both in the context of the entire closing argument and in the context of the entire trial, and we find no error. See <u>Jenkins v. State</u>, 627 So. 2d 1034, 1051 (Ala.Crim.App. 1992), aff'd, 627 So. 2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994); <u>Holladay v. State</u>, 549 So. 2d 122, 131 (Ala.Crim.App. 1988), aff'd, 594 So. 2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). The prosecutor's comment would have been valued by the jury at its true worth -- as having been uttered in the heat of debate -- and could not be expected to have become a factor improperly influencing the jury's sentencing recommendation. See <u>Duren v. State</u>, 590 So. 2d 360, 364 (Ala.Crim.App. 1990), aff'd, 590 So. 2d 369 (Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). Moreover, the jury was properly instructed that the arguments of counsel were not evidence, and that its sentencing recommendation was not to be influenced by passion, prejudice, or any other

- 50 -

CR-98-0777

arbitrary factor.  The jury is presumed to follow the trial court's instructions.  See <u>Taylor v. State</u>, 666 So. 2d 70 (Ala.Crim.App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).  We find no error, plain or otherwise, as to this claim.

## X.

The appellant contends that Alabama's capital sentencing scheme is unconstitutional because, he says, it "does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty." (Appellant's brief to this court, p. 42.)  According to the appellant, "the absence of a standard and the trial court's failure to so charge the jury" renders capital sentencing in Alabama unconstitutional. (Appellant's brief to this court, p. 42.)  Because the appellant is presenting this claim for the first time on appeal, we review it under the plain-error rule.  Rule 45A, Ala.R.App.P.

In <u>Franklin v. Lynaugh</u>, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988), the United States Supreme Court rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." "Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or

CR-98-0777

mitigation, to be considered by the sentencer." <u>Harris v. Alabama</u>, 513 U.S. 504, 511, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004 (1995).

The jury in this case was properly instructed by the trial court as to weighing the aggravating circumstances and the mitigating circumstances. See <u>Tyson v. State</u>, [Ms. CR-98-0267, February 4, 2000] ___ So. 2d ___ (Ala.Crim.App. 2000). Accordingly, we find no error, much less plain error, as to this claim.

XI.

The appellant contends that the trial court "erred in failing to consider [the appellant's] low level of intelligence as a mitigating circumstance." (Appellant's brief to this court, p. 57.) Although in his motion for a new trial the appellant generally argued that the trial court had "failed to properly consider mitigating circumstances in this case" (R. 231), he did not present the trial court with the specific claim he now raises on appeal; therefore, we review the claim under the plain-error rule. See Rule 45A, Ala.R.App.P. We find no error, plain or otherwise.

> "In <u>Lockett v. Ohio</u>, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, <u>Lockett</u> does not require that all evidence offered as mitigating evidence be found to be mitigating. <u>Lockett</u> provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process."

- 52 -

CR-98-0777

<u>Ex parte Hart</u>, 612 So. 2d 536, 542 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). "'While <u>Lockett</u> and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'" <u>Ex parte Slaton</u>, 680 So. 2d 909, 924 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting <u>Bankhead v. State</u>, 585 So. 2d 97, 108 (Ala.Crim.App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala.Crim.App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993). "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." <u>Harrell v. State</u>, 470 So. 2d 1303, 1308 (Ala.Crim.App. 1984), aff'd, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).

> "'A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)(quoting <u>Lockett v. Ohio</u>, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. <u>California v. Brown</u>, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); <u>Ex parte Henderson</u>, 616 So. 2d 348 (Ala. 1992); <u>Haney v. State</u>, 603 So. 2d 368 (Ala.Cr.App. 1991), aff'd, 603 So. 2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122

- 53 -

CR-98-0777

L.Ed.2d 687 (1993).   Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.  <u>Carroll v. State</u>, 599 So. 2d 1253 (Ala.Cr.App. 1992), aff'd, 627 So. 2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).   See also <u>Ex parte Harrell</u>, 470 So. 2d 1309 (Ala.), <u>cert. denied</u>, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).  Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.  <u>Morrison v. State</u>, 500 So. 2d 36 (Ala.Cr.App. 1985), aff'd, 500 So. 2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).'"

<u>Wilson v. State</u>, [Ms. CR-97-2569, November 19, 1999] ___ So. 2d ___, ___ (Ala.Crim.App. 1999), quoting <u>Williams v. State</u>, 710 So. 2d 1276, 1347 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).  The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence.  See, e.g., <u>Ingram v. State</u>, [Ms. CR-94-1733, August 27, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999).

The sentencing order in this case shows that the trial court considered all of the mitigating evidence offered by the appellant. The record reflects that during the sentencing phase of the trial, the trial court did not limit or restrict the appellant in any way

- 54 -

CR-98-0777

as to the evidence he presented or the arguments that he made.  In
its sentencing order, the trial court treated each statutory
mitigating circumstance listed in § 13A-5-51, Ala. Code 1975;
determined the existence or nonexistence of each circumstance; and
made specific findings of fact regarding each circumstance.
Although the trial court did not list and make findings as to each
nonstatutory mitigating circumstance offered by the appellant, it
specifically found two nonstatutory mitigating circumstances to
exist:  (1) that the appellant "grew up in a poor home environment
and ... lacked appropriate developmental resources in growing up";
and (2) that the appellant, "when placed in a structured
environment, respond[ed] positively."  (C. 238.)  (The trial court
noted, however, that the evidence relating to the second of these
nonstatutory mitigating circumstances also suggested that the
appellant had "the ability to conduct himself properly and not
engage in criminal conduct, [but instead] voluntarily chose that
course of conduct.")  Further, in that portion of the sentencing
order where the trial court discussed its reasoning for not finding
the existence of the statutory mitigating circumstance that "the
capacity of the defendant to appreciate the criminality of his
conduct or to conform his conduct to the requirements of law was
substantially impaired," the trial court expressly indicated that
it had considered the appellant's "low intellectual level."  (C.
237.)  Also, during the sentencing phase of the trial, the trial
court specifically instructed the jury that it must consider as a

CR-98-0777

mitigating circumstance the appellant's proffered evidence of his "borderline" intelligence. (R. 1217.) Thus, we conclude that the trial court fully complied with <u>Lockett</u> and its progeny and that it considered the evidence of the appellant's "borderline" intelligence offered by the appellant in mitigation.

We note that although there was evidence indicating that the appellant's overall IQ was 74, which would place the appellant in the "borderline range of intelligence," the appellant presented no evidence that he was mentally retarded or that he suffered from any major psychiatric disorder. Clearly, the trial court considered the appellant's proffered evidence of his low intellectual level, but concluded that this evidence did not rise to the level of a mitigating circumstance. The trial court's findings in this regard are supported by the record.

Because it is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented by the appellant in mitigation, that the trial court did in fact consider all such evidence, and that the trial court's findings are supported by the evidence, we find no error, plain or otherwise, in the trial court's findings regarding the nonstatutory mitigating circumstances.

XII.

In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to the appellant's capital-murder conviction and the death sentence, whether or not

- 56 -

CR-98-0777

brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or the sentencing phase of the trial.

We have reviewed the appellant's sentence in accordance with § 13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving the appellant's capital-murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b), Ala. Code 1975, requires that, in determining whether death is the proper sentence, we assess (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

After the jury found the appellant guilty of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning aggravating and

- 57 -

CR-98-0777

mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended, by a vote of 10-2, that the appellant be sentenced to death.

Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence the appellant to life imprisonment without parole or to death, as the jury recommended. The trial court ordered and received a written presentence-investigation report, as required by § 13A-5-47(b). At the conclusion of the hearing, the trial court entered specific written findings concerning the aggravating circumstances enumerated in § 13A-5-49, Ala. Code 1975, the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and the appellant's participation in the offense.

In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murder was committed while the appellant was engaged in the commission of a robbery, see § 13A-5-49(4), Ala. Code 1975. The trial court found the existence of two statutory mitigating circumstances: (1) that

- 58 -

CR-98-0777

the appellant had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975; and (2) that the appellant was 19 years old at the time of the offense, see § 13A-5-51(7), Ala. Code 1975.[1]  The trial court also heard testimony regarding the appellant's character and record and any of the circumstances of the offense that the appellant offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975.  In this regard, the trial court found that the following evidence presented by the appellant constituted nonstatutory mitigation:   (1) evidence that the appellant "grew up in a poor home environment and that he lacked appropriate developmental resources in growing up;" and (2) evidence that "when placed in a structured environment, [the appellant] responds well."  (C. 238.)

The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances.  Accordingly, the trial court sentenced the appellant to death.  The trial court's findings concerning the

_____

[1]The record reflects that the appellant was actually 18 years old at the time of the offense -- the offense was committed two weeks before his 19th birthday.  The appellant was 20 years old at the time of trial.

- 59 -

CR-98-0777

aggravating circumstance and the mitigating circumstances are supported by the evidence.

The appellant was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(2), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. E.g., <u>Hardy v. State</u>, [Ms. CR-95-0589, March 26, 1999] ___ So. 2d ___ (Ala.Crim.App. 1999); <u>Clemons v. State</u>, 720 So. 2d 961 (Ala.Crim.App. 1996), aff'd, 720 So. 2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); <u>Williams v. State</u>, 710 So. 2d 1276 (Ala.Crim.App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); <u>McNair v. State</u>, 706 So. 2d 828 (Ala.Crim.App. 1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); <u>Henderson v. State</u>, 583 So. 2d 276 (Ala.Crim.App. 1990), aff'd, 583 So. 2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); <u>Kuenzel v. State</u>, 577 So. 2d 474 (Ala.Crim.App. 1990), aff'd, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); <u>Brownlee v. State</u>, 545 So. 2d 151 (Ala.Crim.App. 1988), aff'd, 545 So. 2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); <u>Hallford v. State</u>, 548 So. 2d 526 (Ala.Crim.App. 1988), aff'd, 548 So. 2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); <u>Davis v. State</u>, 536 So. 2d 110 (Ala.Crim.App.

CR-98-0777

1987), aff'd, 536 So. 2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); and Cochran v. State, 500 So. 2d 1161, (Ala.Crim.App. 1984), aff'd in part, rev'd in part, 500 So. 2d 1179 (Ala. 1985), aff'd on return to remand, 500 So. 2d 1188 (Ala.Crim.App.), aff'd, 500 So. 2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of murder made capital because it was committed during the commission of a robbery. McNair, supra.

After carefully reviewing the record of the guilt phase and the sentencing phase of the appellant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances and that death is the appropriate sentence in this case. Considering the appellant and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

For the reasons stated above, the appellant's conviction and the sentence of death are affirmed.

APPLICATION FOR REHEARING DENIED; OPINION OF AUGUST 25, 2000, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.

- 61 -

CR-98-0777

McMillan, Cobb, Baschab, and Fry, JJ., concur.

IN THE SUPREME COURT OF ALABAMA

MATTHEW REEVES,                          )
                                         )
        Petitioner-Appellant,            )
                                         )
v.                                       )        S.C. No. 1000234
                                         )
STATE OF ALABAMA,                        )
                                         )
        Respondent-Appellee.             )


ON APPEAL FROM THE CIRCUIT COURT OF
DALLAS COUNTY, ALABAMA


PETITIONER-APPELLANT MATTHEW REEVES'
BRIEF IN SUPPORT OF A PETITION FOR A WRIT OF CERTIORARI TO
THE ALABAMA COURT OF CRIMINAL APPEALS
(CRIMINAL APPEALS CASE NO. CR-98-0777)
(DALLAS CIRCUIT COURT NO. CC-97-31)


Thomas M. Goggans
Ala. S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36102
PH: (334) 834-2511
FX: (334) 834-2512

Attorney for Petitioner-Appellant
Matthew Reeves

# TABLE OF CONTENTS

Table of Authorities......................................................................3

Statement of the Case..................................................................6

Issues...........................................................................................6

Statement of Facts.....................................................................14

Argument....................................................................................26

    ITEMS SEIZED FROM PETITIONER-APPELLANT REEVES'
    ROOM WITHOUT A WARRANT WERE FRUITS OF A
    CONSTITUTIONALLY INFIRM SEARCH.................................26

    PETITIONER-APPELLANT REEVES' ARREST WAS
    WITHOUT PROBABLE CAUSE THUS POISONING THE
    POLICE OFFICERS' SUBSEQUENT RETRIEVAL OF
    INCRIMINATING EVIDENCE..............................................28

    THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT
    THE JURY ON THE "THEFT AFTERTHOUGHT."...................30

    THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT
    THE JURY ON COMPLICITY...............................................32

    THE ACTIONS OF THE TRIAL JUDGE IN PROHIBITING
    THE DEFENSE FROM DISCREDITING A PROSECUTION
    WITNESS BY QUESTIONING HIM ABOUT BEING IN JAIL
    AND HAVING PENDING CRIMINAL CHARGES DEPRIVED
    APPELLANT REEVES OF HIS RIGHT OF CONFRONTATION
    AND CROSS EXAMINATION................................................35

    THE LACK OF A STANDARD OR MEASURE FOR
    DETERMINING WHETHER AGGRAVATING
    CIRCUMSTANCES SO OUTWEIGH MITIGATING
    CIRCUMSTANCES AS TO SUPPORT A DEATH SENTENCE
    VIOLATED PETITIONER-APPELLANT REEVES'S RIGHTS TO
    PROTECTION FROM CRUEL AND UNUSUAL PUNISHMENT,
    DUE PROCESS OF LAW AND EQUAL PROTECTION OF LAW.....36

    THE TRIAL COURT ERRED IN NOT EXCUSING FOR CAUSE
    AN "AUTOMATIC DEATH PENALTY" JUROR.........................7

A JUROR'S FAILURE TO DISCLOSE THAT PETITIONER-APPELLANT'S BROTHER WAS SUSPECTED OF STEALING HER CAR DEPRIVED APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY...................................................38

A JUROR'S FAILURE TO DISCLOSE THAT HE KNEW THE DECEASED DEPRIVED PETITIONER-APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY...................41

THE PROSECUTION'S MISCONDUCT IN THE GUILT PHASE CLOSING ARGUMENT DEPRIVED PETITIONER-APPELLANT REEVES OF RIGHTS GUARANTEED HIM BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.....................................43

THE PROSECUTION'S MISCONDUCT DURING THE PENALTY PHASE OF THE PROCEEDING DEPRIVED PETITIONER-APPELLANT REEVES OF A FUNDAMENTALLY FAIR HEARING AND DUE PROCESS...................................46

THE TRIAL COURT ERRED IN FAILING TO CONSIDER PETITIONER-APPELLANT REEVES' LOW LEVEL OF INTELLIGENCE AS A MITIGATING CIRCUMSTANCE............50

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON REASONABLE DOUBT..............................................51

Conclusion................................................................53

Certificate of Service..................................................53

TABLE OF AUTHORITIES

Cases:

Barclay v. Florida, 463 U.S. 939 (1983)……………………………….......50

Bell v. State, 385 So.2d 78 (Ala.Crim.App. 1980)………....................................36

Berger v. United States, 295 U.S. 78 (1935)…………………………………….44

Bracewell v. State, 506 So.2d 354 (Ala.Crim.App. 1988)...................................38

Brannon v. State, 549 So.2d 532 (Ala.Crim.App. 1989)…...............................28

Brooks v. Francis, 716 F.2d 780 (11th Cir. 1983)…......................................46, 47

Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985)…………………………..44, 47

Caffie v. State, 516 So.2d 822(Ala.Crim.App. 1986)…......................................29

Cage v. Louisiana, 498 U.S. 39 (1990)…....…………………………….......50, 51

Caldwell v. Mississippi, 472 U.S. 320 (1985)…………………………….46, 47

California v. Ramos, 463 U.S. 992 (1983)…......................................…......46

Chavers v. State, 361 So.2d 1106 (Ala. 1978)…………………..…………30,32

Commonwealth v. Spallone, 267 Pa.Super. 486, 406 A.2d 1146 (1979).............30

Connolly v. State, 500  So.2d 57 (Ala.Crim.App. 1985)…...................................30

Coon v. State, 494 So.2d 184 (Ala.Crim.App. 1978)…….............................30, 32

Davis v. Alaska, 415 U.S. 308 (1974)…...…………………………………….35

Douglas v. Alabama, 380 U.S. 415 (1965)…………………………………….35

Draper v. United States, 358 U.S. 307 (1979)…......………………………….28

Eddings v. Oklahoma, 455 U.S. 104 (1982)…......………………….....47, 50

Furman v. Georgia, 408 U.S. 238 (1972)…......………………………….50

Gardner v. Florida, 430 U.S. 349 (1977)…......…………………………….....47

Godfrey v. Georgia, 446 U.S. 420 (1980)...........................................37

Gord v. State, 475 So.2d 900 (Ala.Crim.App. 1985)………………………..28

Gregg v. Georgia, 428 U.S. 153 (1976)……………………………….., 36, 37

Green v. Georgia, 442 U.S. 95 (1979)……………………………………...50

Hance v. Zant, 696 F.2d 940 (11th Cir. 1983)…..……………………46, 47

Henderson v. United States, 425 F.2d 134 (5th Cir. 1970)……………:…45, 47, 49

Henry v. United States, 361 U.S. 98 (1959)…..……………………….......31

Ex parte Hergot, 588 So.2d 911 (Ala. 1991)…………………………….27

Herriot v. State, 337 So.2d 165 (Ala.Crim.App. 1976)…........................27

Illinois v. Rodriquez, 497 U.S. 177 (1990)…..……………………….......27

Katz v. United States, 389 U.S. 347 (1967)…..……………………….......29

Ex parte Kennedy, 486 So.2d 493 (Ala.1980)………………………….:…28

Knight v. State, 675 So.2d 487 (Ala.Crim.App. 1996)…...……………39, 42

Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531
    (Ala. 1991), cert denied, 502 U.S. 886 (1991)………….........................38

Ex parte Lasley, 505 So.2d 1263 (Ala. 1987)…………………....…………40, 42

Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied,
    245 Ala. 539, 18 So.2d 289 (1944)………………………….........40, 42

Ex parte Ledbetter, 404 So.2d 731 (Ala. 1981)……………………….…40, 42

Lockett v. Ohio, 438 U.S. 586 (1978)……………………………45, 46, 47, 49, 50

Martin v. State, 548 So.2d 488 (Ala.Crim.App. 1988), aff'd, 548 So.2d 496
    (Ala.), cert. denied, ____ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383
    (1989)…..…………………………………………….......38

Ex parte McGee, 383 So.2d 205 (Ala. 1980)…………………………....…30, 32

Morgan v. Illinois, 504 U.S. 719 (1992)…..……………………….......38

Murray v. State, 396 So.2d 125 (Ala.Crim.App. 1981)…....…..............................26

Olden v. Kentucky, 488 U.S. 227 (1988)…..........…….........................…...36

Ex parte O'Leary, 438 So.2d 1372 (Ala. 1983)….…….......................…40, 42

Ex parte O'Leary, 417 So.2d 232 (Ala. 1982)…..............…….......…40, 42

Oregon v. Kennedy, 456 U.S. 667 (1982)…....…….....................…....44, 47

Padgett v. State, 668 So.2d 78 (Ala.Crim.App. 1995)…...….....................…...30

People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982)…..................44, 47

People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980)…...........45, 47

Pointer v. Texas, 380 U.S. 400 (1965)…......….…….........................…......35

Scheneckloth v. Bustamonte, 412 U.S. 218 (1973)…..……........................…..27

Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978)…............……....................44, 47

State v. Freeman, 605 So.2d 1258 (Ala.Crim.App. 1992)…...…...............…40, 42

State v. Lindsey, 404 So.2d 466 (La. 1981)…............….…….........…46, 47, 49

Ex parte Stewart, 659 So.2d 122 (Ala. 1993)…….…….........................…...40, 42

Taylor v. Alabama, 457 U.S. 687 (1982)…........…….............…..............…..28

Tucker v. Francis, 732 F.2d 1054 (11th Cir. 1984)….….…….…..…..............….46

Tucker v. Zant, 724 F.2d 882 (11th Cir. 1984)….…….…...........................47, 48

United States v. Lewis, 592 F.2d 1282 (5th Cir. 1979)…....…...................…30, 32

United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974)…...…....................…44, 47

United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973)…..........44, 47

United States v. Matlock, 415 U.S. 164 (1974)…...…….…….......................27

United States v. McDonald, 620 F.2d 559 (5th Cir. 1980)…..........................44, 47

United States v. Mullinelli-Navis, 111 F.3d 983  (1st Cir. 1997)…................36, 50

United States v. Pritchett, 699 F.2d 317 (6th Cir. 1983)..............................36

United States v. Stewart, 93 F.3d 189 (5th Cir. 1996)..........................…........36

United States v. Vargas, 933 F.2d 701 (9th Cir. 1991)........……...................…36

Ex parte Washington, 448 So.2d 404 (Ala. 1984)..........................27, 45, 47

United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977)...........................44, 47

Woodson v. North Carolina, 428 U.S. 280 (1976)......................................47, 57

Zant v. Stephens, 462 U.S. 862 (1983)........................................….......50

Code Sections:

Ala. Code § 12-21-137.......................................................................36

Court Rules:

A.R.E. 611(b)..................................................................................35

A.R.E. 616.....................................................................................35

Law Review Articles:

Sixteenth Annual Review of Criminal Procedure: United States Supreme
    Court and Courts of Appeal 1985-1986, 75 Geo.L.J. 713, 1081
    n. 2509 (1987)..................................................................36

Twenty-Ninth Annual Review of Criminal Prodedure,
    88 Geo.L.J. 1317 (2000)........................................................36

Balske, Prosecutorial Misconduct During Closing Argument: The Art of
    Knowing When and How to Object and Avoiding the "Invited
    Response" Doctrine, 37 Mercer L.Rev. 1033 (1986)...........................44

Celebreeze, Prosecutorial Misconduct: Quelling the Tide of Improper
    Comment to the Jury, 35 Cleveland State L. Rev. 237 (1987)................43

DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443
    (1983)..............................................................................43

Comment, Prosecutorial Misconduct: The Limitations Upon the Prosecutor's
    Role as an Advocate, 14 Suffolk U. L. Rev. 1095 (1980)....................43

## STATEMENT OF THE CASE

Petitioner-Appellant Matthew Reeves was charged with capital murder in an indictment in the Circuit Court of Dallas County.  The indictment charged Reeves with a robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6).  Reeves was found guilty as charged.  (C. 219, R. 1105).  The jury recommended 10-2 that Reeves be put to death.  (C. 220, R. 1227).  The Circuit Court of Dallas County adjudged Reeves guilty of capital murder and sentenced him to death.  (C. 233-239, R. 1232).  The Alabama Court of Criminal Appeals affirmed on August 25, 2000.  On October 27, 2000, the Alabama Court of Criminal Appeals overruled an application for rehearing issuing a substitute opinion.

## ISSUES

1.  <u>Whether items seized from Petitioner-Appellant Reeves' room without a warrant were fruits of a constitutionally infirm search.</u>

<u>Brannon v. State</u>, 549 So.2d 532 (Ala.Crim.App. 1989)

<u>Herriot v. State</u>, 337 So.2d 165 (Ala.Crim.App. 1976)

<u>Illinois v. Rodriquez</u>, 497 U.S. 177 (1990)

<u>Katz v. United States</u>, 389 U.S. 347 (1967)

<u>Murray v. State</u>, 396 So.2d 125 (Ala.Crim.App. 1981)

<u>Scheneckloth v. Bustamonte</u>, 412 U.S. 218 (1973)

<u>United States v. Matlock</u>, 415 U.S. 164 (1974)

<u>Ex parte Washington</u>, 448 So.2d 404 (Ala. 1984)

2. Whether Petitioner-Appellant Reeves' arrest was without probable cause, thus poisoning the police officers' subsequent retrieval of incriminating evidence.

Brannon v. State, 549 So.2d 532 (Ala. 1989)

Caffie v. State, 516 So.2d 822 (Ala.Crim.App. 1986)

Draper v. United States, 358 U.S. 307 (1979)

Gord v. State, 475 So.2d 900 (Ala.Crim.App. 1985)

Henry v. United States, 361 U.S. 98 (1959)

Taylor v. Alabama, 457 U.S. 687 (1982)

3. Whether the trial court erred in refusing to instruct the jury on "theft afterthought."

Chavers v. State, 361 So.2d 1106 (Ala. 1978)

Commonwealth v. Spallone, 267 Pa.Super. 486, 489, 406 A.2d 1146 (1979)

Connolly v. State, 500  So.2d 57 (Ala.Crim.App. 1985)

Coon v. State, 494 So.2d 184 (Ala.Crim.App. 1978)

Ex parte McGee, 383 So.2d 205 (Ala. 1980)

Padgett v. State, 668 So.2d 78 (Ala.Crim.App. 1995)

United States v. Lewis, 592 F.2d 1282 (5th Cir. 1979)

4. Whether the trial court erred in refusing to instruct the jury on complicity.

Chavers v. State, 361 So.2d 1106 (Ala. 1978)

Coon v. State, 494 So.2d 184 (Ala.Crim.App. 1978)

Ex parte McGee, 383 So.2d 205 (Ala. 1980)

United States v. Lewis, 592 F.2d 1282 (5th Cir. 1979)

5. <u>Whether the actions of the trial judge in prohibiting the defense from discrediting a prosecution witness by questioning him about being in jail and having pending criminal charges deprived Petitioner-Appellant Reeves of his right of confrontation and cross examination.</u>

<u>Bell v. State</u>, 385 So.2d 78 (Ala.Crim.App. 1980)

<u>Davis v. Alaska</u>, 415 U.S. 308 (1974)

<u>Douglas v. Alabama</u>, 380 U.S. 415 (1965)

<u>Olden v. Kentucky</u>, 488 U.S. 227 (1988)(per curiam)

<u>Pointer v. Texas</u>, 380 U.S. 400 (1965)

<u>United States v. Mullinelli-Navis</u>, 111 F.3d 983 (1st Cir. 1997)

<u>United States v. Pritchett</u>, 699 F.2d 317, 321 (6th Cir. 1983)

<u>United States v. Stewart</u>, 93 F.3d 189 (5th Cir. 1996)

<u>United States v. Vargas</u>, 933 F.2d 701 (9th Cir. 1991)

Sixth Amendment to the United States Constitution

Article I, § 6, Alabama Constitution of 1901

Ala. Code § 12-21-137

A.R.E. 611(b)

<u>Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1985-1986</u>, 75 Geo.L.J. 713, 1081 n. 2509 (1987)

<u>Twenty-Ninth Annual Review of Criminal Prodedure</u>, 88 Geo.L.J. 1317 (2000)

9

6.  Whether the lack of a standard or measure for determining whether aggravating circumstances so far outweigh mitigating circumstances as to support a death sentence violated Petitioner-Appellant Reeves' rights to protection from cruel and unusual punishment, due process of law and equal protection of the law.

Godfrey v. Georgia, 446 U.S. 420 (1980)

Gregg v. Georgia, 428 U.S. 153 (1976)

7.  Whether the trial court erred in not excusing for cause an "automatic death penalty" juror.

Bracewell v. State, 506 So.2d 354 (Ala.Crim.App. 1988)

Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert denied, 502 U.S. 886 (1991)

Martin v. State, 548 So.2d 488 (Ala. Crim.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, ____ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989)

Morgan v. Illinois, 504 U.S. 719 (1992)

8.  Whether a juror's failure to disclose that Petitioner-Appellant Reeves' brother was suspected of stealing her car deprived Petitioner-Appellant Reeves of his right to an impartial jury.

Knight v. State, 675 So.2d 487 (Ala.Crim.App. 1995)

Ex parte Lasley, 505 So.2d 1263 (Ala. 1987)

Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944)

Ex parte Ledbetter, 404 So.2d 731 (Ala. 1981)

Ex parte O'Leary, 438 So.2d 1372 (Ala. 1983)

Ex parte O'Leary, 417 So.2d 232 (Ala. 1982)

State v. Freeman, 605 So.2d 1258 (Ala.Crim.App. 1992)

Ex parte Stewart, 659 So.2d 122 (Ala. 1993)

9.  Whether a juror's failure to disclose that he knew the deceased deprived Petitioner-Appellant Reeves of his right to an impartial jury.

Knight v. State, 675 So.2d 487 (Ala.Crim.App. 1995)

Ex parte Lasley, 505 So.2d 1263 (Ala. 1987)

Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944)

Ex parte Ledbetter, 404 So.2d 731 (Ala. 1981)

Ex parte O'Leary, 438 So.2d 1372 (Ala. 1983)

Ex parte O'Leary, 417 So.2d 232 (Ala. 1982)

State v. Freeman, 605 So.2d 1258 (Ala.Crim.App. 1992)

Ex parte Stewart, 659 So.2d 122 (Ala. 1993)

10.  Whether the prosecution's misconduct in the guilt phase closing argument deprived Petitioner-Appellant Reeves of rights guaranteed him by the Eighth and Fourteenth Amendments to the United States Constitution.

Berger v. United States, 295 U.S. 78 (1935)

Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985)

Henderson v. United States, 425 F.2d 134 (5th Cir. 1970)

Lockett v. Ohio, 438 U.S. 586 (1978)

Oregon v. Kennedy, 456 U.S. 667 (1982)

People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982)

People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980)

Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978)

State v. Lindsey, 404 So.2d 466 (La. 1981)

United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974)

United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973)

United States v. McDonald, 620 F.2d 559 (5th Cir. 1980)

United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977)

Ex parte Washington, 448 So.2d 404 (Ala. 1984)

Balske, Prosecutorial Misconduct During Closing Argument: The Art of Knowing When and How to Object and Avoiding the "Invited Response" Doctrine, 37 Mercer L.Rev. 1033 (1986)

Celebreeze, Prosecutorial Misconduct: Quelling the Tide of Imrpoer Comment to the Jury, 35 Cleveland State L. Rev. 237 (1987)

DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 448 (1983)

Comment, Prosecutorial Misconduct: The Limitations Upon the Prosecutor's Role as an Advocate, 14 Suffolk U. L. Rev. 1095 (1980)

11.  Whether the prosecution's misconduct during the penalty phase of the proceeding deprived Petitioner-Appellant Reeves of a fundamentally fair hearing and due process.

Brooks v. Francis, 716 F.2d 780 (11th Cir. 1983)

Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985)

Caldwell v. Mississippi, 472 U.S. 320 (1985)

California v. Ramos, 463 U.S. 992 (1983)

Eddings v. Oklahoma, 455 U.S. 104 (1982)

Gardner v. Florida, 430 U.S. 349 (1977)

Hance v. Zant, 696 F.2d 940 (11th Cir. 1983)

Henderson v. United States, 425 F.2d 134 (5th Cir. 1970)

Lockett v. Ohio, 438 U.S. 586 (1978)

Oregon v. Kennedy, 456 U.S. 667 (1982)

People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982)

People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980)

Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978)

State v. Lindsey, 404 So.2d 466 (La. 1981)

Tucker v. Francis, 732 F.2d 1054 (11th Cir. 1984)

Tucker v. Zant, 724 F.2d 882 (11th Cir. 1984)

United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974)

United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973)

United States v. McDonald, 620 F.2d 559 (5th Cir. 1980)

United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977)

Ex parte Washington, 448 So.2d 404 (Ala. 1984)

Woodson v. North Carolina, 428 U.S. 280 (1976)

12.  Whether the trial court erred in failing to consider Petitioner-Appellant

Reeves' low level of intelligence as a mitigating circumstance.

Barclay v. Florida, 463 U.S. 939 (1983)

Eddings v. Oklahoma, 455 U.S. 104 (1984)

Furman v. Georgia, 408 U.S. 238 (1972)

Green v. Georgia, 442 U.S. 95 (1979)

Lockett v. Ohio, 438 U.S. 586 (1978)

Woodson v. North Carolina, 428 U.S. 280 (1976)

Zant v. Stephens, 462 U.S. 862 (1983)

13. Whether the trial court erred instructing the jury on reasonable doubt.

Cage v. Louisiana, 498 U.S. 39 (1990)

## STATEMENT OF FACTS

Petitioner-Appellant Matthew Reeves was charged in Dallas County with robbery murder pursuant to Ala. Code § 13A-5-40(a)(2). (C. 5-6). In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark. This Defendant shot him through the neck and into his chest area killing him practically instantly. Three of them are arrested in a house when they went to a party that afternoon."

(R. 113-114). Jurors were also asked if they knew Appellant Reeves or any member of his family. (R. 93-94). Juror Trotter did not disclose that she knew or knew of Appellant Reeves or his brother Julius. Juror Denmark did not disclose that he knew Mr. Johnson.

In the jury selection process jurors were questioned about their views on capital punishment. The questioning of Juror Parnell was, in part, as follows:

14

THE COURT: ... Ms. Parnell, you understand this is a capital murder case?

MS. PARNELL: Yes.

THE COURT: Do you understand that if there is a conviction or if the Defendant is found guilty, that there are two possible punishments for this offense?

MS. PARNELL: Yes.

THE COURT: One is the death penalty, and the other is life imprisonment without parole.

MS. PARNELL: Yes.

THE COURT: In order for you to qualify to serve as a juror in this case, you must be able to give both the death penalty and life without parole fair consideration and make a recommendation to the Court at the appropriate time; do you understand that?

MS. PARNELL: Yes.

THE COURT: Ms. Parnell, there are people in our society who are totally opposed to the death penalty under any circumstance. They cannot vote to recommend it for any criminal offense. There are people in our society who believe that the death penalty is the only appropriate punishment for certain criminal violations. They cannot consider anything less than the death penalty such as life without parole. And the questions I have for you are designed to determine what you think about all of this. Okay. The first question is easy. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair your ability to serve as a juror in this case? Do you understand that questions? Are you against the death penalty so much that you can't discharge your duties as a juror?

MS. PARNELL: I really – you know, I feel like if he took his life for nothing, you know, that what I feel, he should get the death sentence, you know.

THE COURT: Well, do you know anything about the facts of this case other than what was said to you yesterday?

MS. PARNELL: No, I don't nothing about it. I don't; no, I ain't heard nothing.

15

THE COURT: Let's back up then because my question to you is this. First are you opposed to the death penalty? Do you understand what I am saying? Are you against it? Are you for it?

MS. PARNELL: I would say for it, you know, because he took a life, you know.

THE COURT: The next question is this. You remember I told you that in order to be qualified as a juror you've got to be able to give fair and equal consideration to both the death penalty and the other penalty of life without parole. Are you opposed to anything less then death? Are you opposed to considering life imprisonment without parole if the facts and the law dictate that that should be the sentence in your judgment?

MS. PARNELL: If that's – if they go with that sentence, I will go along with it, you know, in that sense.

THE COURT: So what you're telling me is that you can give both of those alternatives fair consideration? You can be fair and equally weigh the death penalty and life without parole?

MS. PARNELL: Yeah, both of them, yeah.

THE COURT: Can you give both of them fair consideration, is that what you're telling me?

MS. PARNELL: Well, I really don't understand. You know, like I say I've never been on a jury before. See what I'm saying, I wasn't there, you know. I don't know what happened, you know and stuff. But, you know, I don't know what to tell you. I really don't.

THE COURT: The first thing you can tell me is whether you are opposed or in favor of the death penalty. You told me you were in favor of it?

MS. PARNELL: Yes.

THE COURT: The second thing I need to ask you is whether or not you can vote for something other than the death penalty. Can you vote for life without parole if it's appropriate, if it's right, if its proper?

MS. PARNELL: Yeah.

16

THE COURT: You can consider both of them depending upon the facts?

MS. PARNELL: Yes, either one.

THE COURT: You can listen to the law and the facts and apply the law to the facts; can you do that, follow my instructions?

MS. PARNELL: I can follow your instructions.

THE COURT: Okay. You have listened to that facts; you have listened to the law. Do you feel as though you lean towards one more than the other, the death penalty versus life without parole? Do you see what I'm saying?

MS. PARNELL: I have not heard no more than what was told to me.

THE COURT: I'm trying to find out how you feel about the death penalty in your heart. Do you think you can give –

MS PARNELL: I wouldn't like nobody to take nothing – I've got a life of my own, you know, but I can go with, you know, that parole in prison, you know, for the rest of his life, you know, whatever, you know either one, you know. It would depend on – if somebody else told me it's true – if it's true that he did it, you know, I would say the death penalty, you know. That's what I feel.

THE COURT: So you could keep –

MS. PARNELL: If it's something else, I'd say give him life without parole.

THE COURT: So you can keep an open mind; is that right?

MS. PARNELL: Yeah.

THE COURT: And you can hear the facts and follow my instructions?

MS. PARNELL: (Nods head affirmatively).

THE COURT: And then you can give both of those alternative punishments fair consideration; it that correct? Do you understand what I'm saying? You can think about both of the penalties equally; is that right?

17

MS. PARNELL: Right.

THE COURT: And you can recommend to me one of them?

MS. PARNELL: Yes.

THE COURT: You don't have any problem with that?

MS. PARNELL: No.

THE COURT: If you think it should be death, then you don't have a problem voting death, is that right?

MS. PARNELL: No.

THE COURT: If it's life without parole, you think that's a right thing to do, you don't have a problem voting life without parole.

MS. PARNELL: No.

...

MR. GOGGANS: You're going to hear – a jury in this type of proceeding hears evidence. It hears evidence of reasons the prosecution thinks the person should get the death penalty; then you hear other reasons why the person ought to get life without parole. The judge will instruct you on how to weigh those. You have aggravating circumstances that weight in favor of the death penalty, and you have mitigating circumstances that weigh in favor of the sentence of life without parole. Would you, Ms. Parnell, as you're sitting there after having heard everything – you've heard all these instructions because you have found that this person intentionally killed somebody during the robbery; in other words, you found him guilty of capital murder. Would you be able to put aside that personal feeling that you have and that conviction and consider everything and apply that law, or would you still carry that conviction with you and automatically go for the death penalty?

MS. PARNELL: I would go for the death penalty. You shouldn't take a life. My point is my son was shot in the head. He died, you know, but he came back alive; do you see what I'm saying? They didn't do nothing to the guy that did it, shot my son, you know. But I feel like, you know, if you take a life, you know, you should give you life. You can't take nobody's life and give a life. You

cannot give the life back. He's dead, you know. You shouldn't do it. You had no reason to. Do you see what I am saying?

MR. GOGGANS: You feel pretty strongly about that?

MS. PARNELL: Yeah.

MR. GOGGANS: No other questions.

MS. WILSON: If the Judge told you though it was your duty to listen to all of the evidence and to weight the two sentences, to consider life without parole as well as the death penalty and to reserve, not to make a decision until you heard all of the evidence – and there will be a lot of evidence put forth by the defense and by the State. Could you wait until you heard all of that evidence before you make up your mind as to what you thought the appropriate sentence would be?

MS. PARNELL: Yes, because I have never heard the case.

(R. 421-430). A defense motion to excuse Juror Parnell for cause

based upon her death penalty views was denied. (R. 430).

The State's theory of prosecution at trial was essentially that Reeves, his

brother Julius Reeves, and Brenda "Bam-Bam" Suttles had intentionally killed

Willie Johnson by shooting him with a shotgun and robbed him.

Reeves filed motions to suppress evidence. (C. 113-116, 126-127). The

motion to suppress evidence seized in a search of Reeves' residence stated:

"1. In November of 1996, government agents searched the residence of Defendant Matthew reeves and seized certain items therefrom.

"2. The aforementioned search was conducted without probable cause, without a properly issue[d] search warrant, without proper consent or beyond the scope of any consent given."

"3. The seizure of items from Defendant Reeves' residence was a fruit of violations of the proscriptions against unreasonable searches and seizures of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, § 5 of the Alabama

19

Constitution of 1901; Ala. Code § 15-5-1 et seq.; and Rule 4, A.R.Cr.P."

(C. 126).

Evidence at a suppression hearing indicated the following:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found. (R. 542). Grindle said that the dog tracked to the backyard of a house near Petitioner-Appellant Reeves' house and to Appellant Reeves' house. (R. 542-543). Grindle testified that he went to Reeves house. (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door. (R. 544). Matthew Reeves and Julius Reeves were not there. (R. 549, 570). According to Grindle, Marzetta Reeves gave him permission to come and search the house.[1] (R. 545-546). Grindle and other police officers went in and searched throughout the house. They seized a number of items from Matthew and Julius Reeves' bedroom. (R. 548-549). Among those items were blood stained articles of clothing and a shotgun. (R. 548-549). The prosecution did not elicit evidence that Ms. Reeves had authority to consent to the search of Reeves' room.

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles' house. (R. 553-554). Brenda "Bam-Bam" Suttles' sister answered the door. (R. 555). When the door was opened, the officers saw Matthew Reeves asleep on a sofa. (R. 554). They entered immediately and arrested Reeves. (R. 555).

---

[1] Marzetta Reeves' recollection as to the "consent" differed markedly from Grindle's. (R. 568-596).

Reeves was taken in, and, according to Grindle, read his <u>Miranda</u> rights on two occasions.  (R. 552-567).  On the second occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom. (R. 552, 607).

The Circuit Court of Dallas County overruled motions to suppress evidence.  (R. 612-613).

Brenda "Bam-Bam" Suttles, pursuant to a plea bargain agreement with the prosecution, (R. 722-725), testified against Reeves at trial.  She went into great detail as to the events leading up, surrounding, and after Johnson's death.  (R. 682-749).  Among the details she recited were the following:

Johnson had towed them and others – Jason Powell and Emmanuel Suttles – Powell's broken down car from White Hall back to Selma.  (R. 692-694).  She said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley.[2]  (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab.  (R. 693-694).  She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck.  (R. 704).  She said that Julius Reeves jumped out of the truck and said: "Troll

---

[2] With respect to the alley, she said: "He had seen this red car across the street, and he was like I don't feel like being bothered.  He said, I am going to this house up in the alley.  So, I'm going to drop y'all off in the alley."  (R. 702).

[Matthew Reeves], what you done did?" (R. 704). She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets and got everything out. (R. 743). Brenda Suttles recalled telling the police that Matthew Reeves had killed Johnson for nothing. (R. 743). She recalled that during that night Matthew Reeves had said that by killing Johnson he would get a gang tear drop – something given for killing someone. (R. 720).

Jason Powell also testified against The trial court did not allow the defense to question Powell about his being in jail and having criminal charges hanging over him at the time of his testimony. (R. 792-794, 804-806). Powell did say during his testimony that Julius Reeves had said to Matthew Reeves that he had almost shot him. (R. 843).

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

> "She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves. She does not recall whether Matthew was involved. She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle.

> "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case."

(R. 803). Ms. Trotter was then excused from the jury. (R. 803).

22

Juror Denmark was on the trial jury as an alternate. Juror Denmark

disclosed the following in the midst of the trial:

> "I told him [the judge] that I knew him from another guy. I seen
> him with the family. I was thinking that I knew the truck and
> knew the guy. But I never could picture who it really was until I
> saw him and his name is Willie too. He worked for Roy out there.
> I've got a key to Roy's shop. I go up there sometimes and work on
> my truck and whatever. Willie helped him, and he and he and Roy
> were friends. And he'd come up there a lot when I was working
> on my truck before, how I kept things in tune. That's just the only
> way I knew him was from Roy's shop. I didn't even know this had
> happened to him."

(R. 993). Juror Denmark went on to say that he began thinking about the

truck as follows:

> "Last night when they were talking about Tyler because I live out
> there. I couldn't figure out who it was until I saw that other Willie
> today. I asked, what are you doing here? He said, I'm in there
> with the family. So I knew it was the same one. He had always
> hung around with him and was on good terms with Roy. He lives
> out there now."

(R. 993-994). Juror Denmark was an alternate juror and was excused before jury

deliberations. (R. 1104).

During its closing argument, one of the prosecutors put to the jury: "The

Defense is designed and charged with defending this man any way he can." (R.

1079-1080). The defense objected as follows:

> "It seems to me that Mr. Greene [prosecutor] is going to suggest to
> the jury that the only reason I'm making an argument is because
> I've somehow been appointed in this case to represent Mr. Reeves.
> As Mr. Greene well knows I voluntarily took this case. It's
> inappropriate to suggest to this jury that somehow I am making
> this argument just because I've got to. It's a violation of due
> process to suggest that. I ask that the jury be instructed to
> disregard that last remark. "

23

(R. 1080).  The trial court overruled a defense objection to that argument.  (R. 1080).

The trial court refused to give the following written requested defense jury instructions:   Number 33: "An accused is not guilty of capital robbery-murder where the intent to rob was formed only after the deceased was killed." (C. 213, R. 1042-1045, 1047-1048).  Number 34: "A robbery committed as a mere afterthought and unrelated to a murder will not sustain a conviction of capital robbery-murder." (C. 214, 1042-1045, 1047-1048). Number 35: "An accused is not guilty of a capital robbery-murder where the intent to steal was formed only after the deceased was killed."  (C. 215, R. 1042-1045, 1047-1048).  Number 31: "Before a defendant can be held criminally responsible for the conduct of others it is necessary that such defendant have willfully associated himself in some way with the crime and have willfully participated in it.  Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted in the crime.  You must find  beyond a reasonable doubt that a defendant was a willful participant and not merely a knowing spectator."  (C. 211, R. 1037-1038).

The trial court's instruction on reasonable doubt in the guilt phase was as follows:

"The reasonable doubt which entitles an accused to an acquittal, is not a mere, fanciful, vague, conjectural or speculative doubt but a reasonably substantial doubt arising from all or part of the evidence or from a lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair minded and conscientious men and women would entertain under all the circumstances.  Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt

24

but simply beyond all reasonable doubt.  If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092).

Reeves was found guilty as charged.  (C. 219, R. 1105).

At the penalty phase, the prosecution relied upon its evidence in the guilt phase and submitted robbery as an aggravating circumstance.  (R. 1116-1117). Reeves elicited evidence that he was only eighteen years old at the time of the offense, that he grew up in a poor home environment, that he lacked appropriate developmental resources growing up, that his level of intelligence was only borderline, and that when placed in structured environments, he responded positively. (C. 268-519, Defendant's Exhibits 6, 7, 8, 11, 13, 14, R. 1118-1182).

In closing argument in the penalty phase, one of the prosecutor's argued to the jury:  "Now you are called upon to make a tough decision.  You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson.  Death or Life in prison without the possibility of parole.  Who decided Willie Johnson's fate?  Did he have the opportunity to have a five or six day proceeding?"  (R. 1191).  The defense objected as follows: "The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial.  It's an improper comment and is in violation of due process of law in the federal and state constitution.  I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper." (R.

1191). The trial court overruled a defense objection and request for curative instruction. (R. 1192).

The trial court did not charge the jury on any measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty. The defense had requested that the trial court charge the jury: "Before you may return a sentence of death, you must be convinced beyond a reasonable doubt based on the consideration of the aggravating and mitigating circumstances and the evidence introduced in this case at either the innocence/guilt phase o[r] the sentencing phase, that death by electrocution is the appropriate sentence to be imposed on the defendant in this case." (C. 153).

<u>ARGUMENT</u>

1. ITEMS SEIZED FROM PETITIONER-APPELLANT REEVES' ROOM WITHOUT A WARRANT WERE FRUITS OF A CONSTITUTIONALLY INFIRM SEARCH.

Subject to only a few exceptions, the Fourth and Fourteenth Amendments to the United States Constitution dictate that a search without a warrant issued upon probable cause is unreasonable. <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967); <u>Brannon v. State</u>, 549 So.2d 532, 536 (Ala.Crim.App. 1989); <u>Murray v. State</u>, 396 So.2d 125, 128 (Ala.Crim.App. 1981)(hereinafter "Murray"). A warrantless search may be justified upon a showing of valid consent. However, to justify a warrantless search on the basis of consent, the prosecution has the burden of establishing by clear and convincing evidence that the consent was given freely

26

and voluntarily.  Scheneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Murray, 396 So.2d at 129; Herriot v. State, 337 So.2d 165 (Ala.Crim.App. 1976).  Courts have upheld consent by third parties where the third party is found to have joint access or control over the place searched.  See, United States v. Matlock, 415 U.S. 164, 171-172 (1974).  However, the prosecution bears the burden of establishing that common authority exists.  See, Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

In the suppression hearing in this case, the prosecution did not elicit even conflicting evidence that Marzetta. Reeves had authority to consent to the search of Petitioner-Appellant Reeves' room.  This Court in its opinion posited that Reeves had not put the trial court on notice that this was an issue.  That is simply not so. Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. Ex parte Washington, 448 So.2d 404 (Ala. 1984).  In the motion to suppress,  Reeves stated:

> 1. In November of 1996, government agents searched the residence of Defendant Matthew reeves and seized certain items therefrom.
>
> "2. The aforementioned search was conducted without probable cause, without a properly issue[d] search warrant, without proper consent or beyond the scope of any consent given."
>
> "3. The seizure of items from Defendant Reeves' residence was a fruit of violations of the proscriptions against unreasonable searches and seizures of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, § 5 of the Alabama Constitution of 1901; Ala. Code § 15-5-1 et seq.; and Rule 4, A.R.Cr.P."

(C. 126).  It should be beyond question that the prosecution has the burden of proving that a warrantless search was legally justified.  See, Ex parte Hergott, 588

27

So.2d 911 (Ala. 1991); Ex parte Kennedy, 486 So.2d 493 (Ala. 1986). Reeves'
motion was more than sufficient to put the prosecution on notice that it had the
burden of showing Marzetta Reeves' authority to consent to the search and the
trial court on notice that that was an issue. The evidence seized and all fruits
thereof should not have been admitted into evidence. The admission of that
evidence was error both regular and plain.

## 2. PETITIONER-APPELLANT REEVES' ARREST WAS WITHOUT PROBABLE CAUSE THUS POISONING THE POLICE OFFICERS' SUBSEQUENT RETRIEVAL OF INCRIMINATING EVIDENCE.

An arrest is valid only if made upon probable cause. Henry v. United
States, 361 U.S. 98 (1959); Draper v. United States, 358 U.S. 307 (1979).
Evidence obtained after an illegal arrest must be excluded as a fruit of the
poisonous tree unless intervening events break the causal connection so that the
taint is purged. Taylor v. Alabama, 457 U.S. 687 (1982). Petitioner-Appellant
Reeves asserts that his leading police officers to a shotgun shell was the fruit of a
warrantless arrest lacking probable cause.

"An officer has probable cause to make an arrest when, at the time the
arrest is made, the facts and circumstances within his knowledge, and of which he
has reasonably trustworthy information, are sufficient to lead a prudent person to
believe that the suspect is committing or has committed an offense." Gord v.
State, 475 So.2d 900, 902-903 (Ala.Crim.App. 1985). "Mere suspicion in a
police officer's mind that an offense has been committed is not enough to justify a
warrantless arrest." Brannon v. State, 549 so.2d 532 (Ala. 1989). An arrest not

supported by probable cause is violative of the Fourth and Fourteenth Amendments to the United States Constitution.  Caffie v. State, 516 So.2d 822, 828-829 (Ala.Crim.App. 1986), citing, Dunaway v. New York, 442 U.S. 200 (1979).

The suppression hearing evidence was as follows:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found.  (R. 542).  Grindle said that the dog tracked to the backyard of a house near Reeves' house and to Reeves' house. (R. 542-543).  Grindle testified that he went to Reeves house.  (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door.  (R. 544).  Matthew Reeves and Julius Reeves were not there.  (R. 549, 570).  According to Grindle, Marzetta Reeves gave him permission to come and search the house.  (R. 545-546).  Grindle and other police officers went in and searched throughout the house.  They seized a number of items from Matthew and Julius Reeves' bedroom.  (R. 548-549). Among those items were blood stained articles of clothing and a shotgun.  (R. 548-549).

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles's house.  (R. 553-554).  Brenda "Bam-Bam" Suttles' sister answered the door.  (R. 555).  When the door was opened, the officers saw Matthew Reeves asleep on a sofa.  (R. 554).  At that point, they did not have probable cause but only suspicion.  Nevertheless, they entered immediately and arrested Appellant Reeves.  (R. 555).  Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions.  (R. 552-567).  On the second

29

So.2d 911 (Ala. 1991); Ex parte Kennedy, 486 So.2d 493 (Ala. 1986). Reeves'
motion was more than sufficient to put the prosecution on notice that it had the
burden of showing Marzetta Reeves' authority to consent to the search and the
trial court on notice that that was an issue. The evidence seized and all fruits
thereof should not have been admitted into evidence. The admission of that
evidence was error both regular and plain.

## 2. PETITIONER-APPELLANT REEVES' ARREST WAS WITHOUT PROBABLE CAUSE THUS POISONING THE POLICE OFFICERS' SUBSEQUENT RETRIEVAL OF INCRIMINATING EVIDENCE.

An arrest is valid only if made upon probable cause. Henry v. United
States, 361 U.S. 98 (1959); Draper v. United States, 358 U.S. 307 (1979).
Evidence obtained after an illegal arrest must be excluded as a fruit of the
poisonous tree unless intervening events break the causal connection so that the
taint is purged. Taylor v. Alabama, 457 U.S. 687 (1982). Petitioner-Appellant
Reeves asserts that his leading police officers to a shotgun shell was the fruit of a
warrantless arrest lacking probable cause.

"An officer has probable cause to make an arrest when, at the time the
arrest is made, the facts and circumstances within his knowledge, and of which he
has reasonably trustworthy information, are sufficient to lead a prudent person to
believe that the suspect is committing or has committed an offense." Gord v.
State, 475 So.2d 900, 902-903 (Ala.Crim.App. 1985). "Mere suspicion in a
police officer's mind that an offense has been committed is not enough to justify a
warrantless arrest." Brannon v. State, 549 so.2d 532 (Ala. 1989). An arrest not

28

supported by probable cause is violative of the Fourth and Fourteenth Amendments to the United States Constitution.  Caffie v. State, 516 So.2d 822, 828-829 (Ala.Crim.App. 1986), citing, Dunaway v. New York, 442 U.S. 200 (1979).

The suppression hearing evidence was as follows:

Selma Police officer Pat Grindle related that a dog had tracked blood from an alley where Willie Johnson's body was found.  (R. 542).  Grindle said that the dog tracked to the backyard of a house near Reeves' house and to Reeves' house. (R. 542-543).  Grindle testified that he went to Reeves house.  (R. (R. 544). Reeves' mother, Marzetta Reeves, answered the door.  (R. 544).  Matthew Reeves and Julius Reeves were not there.  (R. 549, 570).  According to Grindle, Marzetta Reeves gave him permission to come and search the house.  (R. 545-546).  Grindle and other police officers went in and searched throughout the house.  They seized a number of items from Matthew and Julius Reeves' bedroom.  (R. 548-549). Among those items were blood stained articles of clothing and a shotgun.  (R. 548-549).

From Reeves residence, Grindle and the other officers went to Brenda "Bam-Bam" Suttles's house.  (R. 553-554).  Brenda "Bam-Bam" Suttles' sister answered the door.  (R. 555).  When the door was opened, the officers saw Matthew Reeves asleep on a sofa.  (R. 554).  At that point, they did not have probable cause but only suspicion.  Nevertheless, they entered immediately and arrested Appellant Reeves.  (R. 555).  Reeves was taken in, and, according to Grindle, read his Miranda rights on two occasions.  (R. 552-567).  On the second

29

occasion, Reeves took Grindle and other officers to a shell fired from the shotgun retrieved from his bedroom. (R. 552, 607). This evidence was the fruit of Petitioner-Appellant Reeves' illegal arrest and, thus, should have been suppressed.

## 3. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE "THEFT AFTERTHOUGHT."

The defendant in a criminal case has a due process right to have his jury instructed upon any material hypothesis which the evidence in his favor tends to establish. Ex parte McGee, 383 So.2d 205 (Ala. 1980). In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider a defense, the court must construe the evidence most favorable to the defendant. Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978), citing, United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979). Proper written instructions which are supported by any evidence, however weak, insufficient, or doubtful in credibility must be given. Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978); Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

Here, Petitioner-Appellant Reeves' position at trial was that the theft was a mere afterthought. Under Alabama law, a theft committed as a "mere afterthought" will not sustain a capital murder conviction. A felony is considered an "afterthought" when there is no intent to commit the felony before or at the time of a murder. Therefore, an accused cannot be convicted of capital murder where "he forms felonious intent only after he commits the killing." Connolly v. State, 500 So.2d 57, 62 (Ala.Crim.App. 1985)(quoting, Commonwealth v.

30

Spallone, 267 Pa.Super. 486, 489, 406 A.2d 1146, 1147 (1979)).  See also, Padgett v. State, 668 So.2d 78, 83-85 (Ala.Crim.App. 1995)(where there was evidence in a capital case that the intent to commit the accompanying felony, rape, was formed after the victim was killed, the defendant was entitled to a jury instruction on abuse of a corpse).

The Alabama Court of Criminal Appeals, apparently confusing this issue with a sufficiency of evidence for a conviction issue and referencing previous decisions regarding the sufficiency of evidence for a conviction, recited the prosecution's evidence which supported a contrary position and held that "the trial court did not err in denying … [Petitioner-Appellant Reeves'] request for a specific instruction on 'robbery [as an] afterthought." (October 27, 2000 opinion, p. 46).  But, the standard of review for the sufficiency of the evidence for a conviction is wholly different.  In using the wrong standard, the Alabama Court of Criminal Appeals mixed apples and oranges.

Here, there was some evidentiary support for Reeves' defense that the evidence as to the "robbery" indicates only a "robbery" as an "afterthought." For example, there was evidence Johnson had towed Matthew Reeves, Julius Reeves, Brenda "Bam-Bam" Suttles, Jason Powell and Emmanuel Suttles and Powell's broken down car from White Hall back to Selma.  (R. 692-694).  Brenda Suttles said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley. (R. 700-702).  She remembered that Julius Reeves was in the passenger seat of the truck cab,

that she was on the driver's side of the truck bed, and that Matthew Reeves was

on the passenger side of the truck cab.  (R. 693-694).  She said that she was sitting

with her head down and heard a pow and that when she looked up, Matthew

Reeves was pulling the shotgun back out of the rear window of the truck.  (R.

704).  She said that Julius Reeves jumped out of the truck and said: "Troll

[Matthew Reeves], what you done did?"  (R. 704).  She recalled that she had told

the police that afterwards, Julius Reeves had jumped out of the truck, pulled

Johnson out of the truck, and gone through his pockets and got everything out.

(R. 743).  Brenda Suttles recalled telling the police that Matthew Reeves had

killed Johnson for nothing.  (R. 743).  She recalled that during that night Matthew

Reeves had said that by killing Johnson he would get a gang tear drop –

something given for killing someone.  (R. 720).

   Jason Powell testified that Julius Reeves had said to Matthew Reeves that

he had almost shot him. (R. 843).

   Thus, Reeves was entitled to have the jury so instructed as requested in his

charges numbered 33, 34, 35.


## 4. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON COMPLICITY.

   The defendant in a criminal case has a due process right to have his jury

instructed upon any material hypothesis which the evidence in his favor tends to

establish.  Ex parte McGee, 383 So.2d 205 (Ala. 1980).  In order to determine

whether the evidence is sufficient to necessitate an instruction and allow the jury

to consider a defense, the court must construe the evidence most favorable to the

defendant.  Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978), citing,

United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979).  Proper written

instructions must be given which are supported by any evidence, however weak,

insufficient, or doubtful in credibility.  Chavers v. State, 361 So.2d 1106, 1107

(Ala. 1978);  Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1978).

     In this case, Reeves was charged with capital murder pursuant to Ala.

Code § 13A-5-40(a)(2). (C. 5-6).   Under that Code section, the jury had to be

satisfied that the prosecution has proven beyond a reasonable doubt (1) a

"robbery" in the first degree or an attempt thereof as defined by § 13A-8-41; (2)

an intentional "murder" as defined by § 13A-6-2(a)(1); and (3) that the murder

was committed "during" the robbery in the first degree i.e., that the murder was

committed in the cause of or in connection with the commission of or in the

immediate flight from the commission of the robbery in the first degree.

According to the State's theory of prosecution, Pettiioner-Appellant Reeves,

Julius Reeves, and Brenda "Bam-Bam" Suttles committed the crime.

     But, the Alabama Court of Criminal Appeals recited the prosecution's

evidence which supported a contrary position (October 27, 2000 opinion, p. 40)

and  held that the trial court properly refused to charge the jury on complicity.

(October 27, 2000 opinion, p. 40-41).   Thus, it appears that the Alabama Court of

Criminal Appeals was using a test for review of the sufficiency of the evidence to

support a conviction.  But, the standard of review for the sufficiency of the

evidence for a conviction is wholly different.  In using the wrong standard, the

Alabama Court of Criminal Appeals mixed apples and oranges.

33

The evidence could have supported a defense argument that though Petitioner-Appellant Reeves had killed Johnson he did not rob him along with Julius Reeves and Brenda "Bam-Bam" Suttles. For example, there was evidence Johnson had towed Matthew Reeves, Julius Reeves, Brenda "Bam-Bam" Suttles, Jason Powell and Emmanuel Suttles and Powell's broken down car from White Hall back to Selma. (R. 692-694). Brenda Suttles said that after dropping off Jason Powell and Emmauel Suttles in front of Matthew Reeves's house, Johnson drove the rest of them to pick up a ring for payment to Johnson for his assistance and wound up in an alley. (R. 700-702). She remembered that Julius Reeves was in the passenger seat of the truck cab, that she was on the driver's side of the truck bed, and that Matthew Reeves was on the passenger side of the truck cab. (R. 693-694). She said that she was sitting with her head down and heard a pow and that when she looked up, Matthew Reeves was pulling the shotgun back out of the rear window of the truck. (R. 704). She said that Julius Reeves jumped out of the truck and said: "Troll [Matthew Reeves], what you done did?" (R. 704). She recalled that she had told the police that afterwards, Julius Reeves had jumped out of the truck, pulled Johnson out of the truck, and gone through his pockets and got everything out. (R. 743). Brenda Suttles recalled telling the police that Matthew Reeves had killed Johnson for nothing. (R. 743). She recalled that during that night Matthew Reeves had said that by killing Johnson he would get a gang tear drop – something given for killing someone. (R. 720).

Jason Powell testified that Julius Reeves had said to Matthew Reeves that he had almost shot him. (R. 843).

34

Thus, Petitioner-Appellant Reeves was entitled to a have the jury instructed on complicity as requested in charge 31.


5.  THE ACTIONS OF THE TRIAL JUDGE IN PROHIBITING THE DEFENSE FROM DISCREDITING A PROSECUTION WITNESS BY QUESTIONING HIM ABOUT BEING IN JAIL AND HAVING PENDING CRIMINAL CHARGES DEPRIVED APPELLANT REEVES OF HIS RIGHT OF CONFRONTATION AND CROSS EXAMINATION.

Jason Powell testified against Petitioner-Appellant Reeves.  The trial court did not allow the defense to question Powell about his being in jail and having criminal charges hanging over him at the time of his testimony.  (R. 792-794, 804-806).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to confront witnesses against him. Davis v. Alaska, 415 U.S. 308 (1974); Pointer v. Texas, 380 U.S. 400 (1965). Accord, Article I, § 6, Alabama Constitution of 1901.  A primary interest protected by the right of confrontation is that of cross examination. Davis v. Alaska, 415 U.S. 308 (1974); Douglas v. Alabama, 380 U.S. 415 (1965).  A.R.E. 611(b) provides: "The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness...." A.R.E. 616 provides: "A party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case."

"A trial court's authority to control interrogation of witnesses is limited by the confrontation clause of the Sixth Amendment and the right of confrontation."

Sixteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeal 1985-1986, 75 Geo.L.J. 713, 1081 n. 2509 (1987). See, Bell v. State, 385 So.2d 78 (Ala.Crim.App. 1980).  "When cross-examining a witness, the defendant must be permitted to test both the witness's credibility and the witness's knowledge of the facts bearing on the defendant's guilt or innocence." Twenty-Ninth Annual Review of Criminal Prodedure, 88 Geo.L.J. 1317, 1451-1452 (2000); Olden v. Kentucky, 488 U.S. 227 (1988)(per curiam); Davis v. Alaska, 415 U.S. 308 (1974); United States v. Mullinelli-Navis, 111 F.3d 983, 982 (1st Cir. 1997); United States v. Stewart, 93 F.3d 189, 193 (5th Cir. 1996); United States v. Pritchett, 699 F.2d 317, 321 (6th Cir. 1983); United States v. Vargas, 933 F.2d 701, 706 (9th Cir. 1991).  Recognizing these principles, Ala. Code § 12-21-137 provides: "The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him."  In this case, the actions of the trial court in stopping the defense from discrediting this witness by asking about his being in jail and having pending criminal charges deprived Appellant Reeves of his right to confrontation and cross-examination.

6.  THE LACK OF A STANDARD OR MEASURE FOR DETERMINING WHETHER AGGRAVATING CIRCUMSTANCES SO OUTWEIGH MITIGATING CIRCUMSTANCES AS TO SUPPORT A DEATH SENTENCE VIOLATED PETITIONER-APPELLANT REEVES'S RIGHTS TO PROTECTION FROM CRUEL AND UNUSUAL PUNISHMENT, DUE PROCESS OF LAW AND EQUAL PROTECTION OF THE LAW.

The hallmark of modern death penalty jurisprudence is "guided discretion" afforded to the sentencer.  Gregg v. Georgia, 428 U.S. 153 (1976).  To pass constitutional muster, a capital sentencing scheme must provide: 1) "clear

and objective standards" 2) "specific and detailed guidance," and 3) "an opportunity of rational review of the 'process for imposing a sentence of death'." Godfrey v. Georgia, 446 U.S. 420, 428 (1980). In addition, appropriate appellate review is integral to the constitutionality of any death penalty system. Gregg v. Georgia, 482 U.S. 153 (1976).

Alabama's capital scheme does not specify a measure or standard by which aggravating circumstances must outweigh mitigating circumstances in order to warrant recommendation or imposition of a death penalty. In this case, the trial court did not charge the jury on any measure or standard. The absence of a standard and the trial court's failure to so charge the jury in this case conflicts with the aforementioned requirements of constitutional capital jurisprudence.

Without a measure or standard, jury verdicts and sentencing decisions are certainly based on disparate bases in violation of the right to equal protection of the law under the Fourteenth Amendment to the United States Constitution and Article 1, §§ 1, 6, and 22 of the Alabama Constitution of 1901.

Without a standard in Alabama and in this case, constitutionally required guidance is wholly absent. The result is an arbitrary imposition of the death penalty. This is violative of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 6, and 22 of the Alabama Constitution of 1901.

37

7. THE TRIAL COURT ERRED IN NOT EXCUSING FOR CAUSE AN "AUTOMATIC DEATH PENALTY" JUROR.

In Morgan v. Illinois, 504 U.S. 719 (1992), the Supreme Court of the United States held that in capital cases jury venire members who would automatically vote for the death penalty must be excluded for cause. Accord, Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert denied, 502 U.S. 886 (1991); Martin v. State, 548 So.2d 488 (Ala. Crim.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, ____ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Bracewell v. State, 506 So.2d 354 (Ala.Crim.App. 1988).

Here, Reeves was charged in the Circuit Court of Dallas County with capital murder. (C. 5-6). Juror Parnell's voir dire responses indicated that once she found someone guilty of intentionally killing someone she would consider only the death penalty. (R. 421-430). Nevertheless, the trial court overruled a defense motion to excuse her for cause. (R. 430). That action impermissibly infringed upon Reeves' due process right to a fair and impartial jury under the Fourteenth Amendment to the United States Constitution.

8. A JUROR'S FAILURE TO DISCLOSE THAT PETITIONER-APPELLANT'S BROTHER WAS SUSPECTED OF STEALING HER CAR DEPRIVED APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY.

In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

"We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of

38

> young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark. This Defendant shot him through the neck and into his chest area killing him practically instantly.  Three of them are arrested in a house when they went to a party that afternoon."

(R. 113-114).  Jurors were also asked if they knew Reeves or any member of his family.  (R. 93-94).  Juror Trotter did not disclose that she knew or knew of Reeves or his brother Julius.

The trial court indicated Juror Trotter disclosed the following in the midst of trial:

> "She indicated to me at that time that she had recalled during the course of the last evening that the codefendant Julius Reeves had about six or seven years ago stolen her vehicle and that this was or this started a string of events and thefts that also took place in Bibb County that her family was involved in on an intimate basis I guess you would say and that deeply affected Ms. Trotter and her family, this car theft involving Julius Reeves.  She does not recall whether Matthew was involved.  She does recall the name of Danny Tate and that there were four or maybe five other people involved in the theft and other events that surrounded the theft of the vehicle.

> "Ms. Trotter has indicated to me that she believes that this event and the events that surrounded this theft would have an adverse impact on her ability to be fair and impartial in this case."

(R. 803).

It is a "basic constitutional premise that every person is entitled to an impartial jury.  As stated in the Sixth Amendment to the United States Constitution:  'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury in the state and district wherein the crime shall have been committed.'"  <u>Knight v. State</u>, 672 So.2d 487

39

(Ala.Crim.App. 1995). "It is fundamental to our system of impartial justice that "'[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes.'"" State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992)(hereinafter "Freeman"), quoting, Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala. 1983), quoting in turn, Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982)(hereinafter "O'Leary"). "Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'" Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944). If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions. Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993); O'Leary, 417 So.2d at 240; Freeman, 605 So.2d 1259. This test casts a "light burden" on the defendant. Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987).

Here, Juror Trotter failed to disclose that Reeves' brother was suspected of stealing her car. Under the circumstances, Reeves was prejudiced. The matter inquired about was quite clear. The jurors were asked if they knew any members of Appellant Reeves family. (R. 93-94). Juror Trotter did not say she did. (R. 93-94). As to Juror Trotter, the matter of inquiry was not remote in time. As to Juror Trotter, the matter was very material. According to the State's theory of

prosecution both Matthew Reeves were involved in the capital murder of Willie Johnson.  Juror Trotter obviously harbored ill feelings about the matter.

This record clearly shows possible prejudice to Reeves in the jury selection process.  She remained among the pool of jurors from which the trial jury was selected.  Petitioner-Appellant Reeves was is deprived of his right to challenge for cause and deprived into foregoing his right of peremptory challenge.  Juror Trotter's failure to disclose that Reeves' brother was suspected of stealing her car deprived Petitioner-Appellant Reeves of his right to an impartial jury.  This constituted error and plain error which the Alabama Court of Criminal Appeals failed to recognize as prejudicial .

9.  A JUROR'S FAILURE TO DISCLOSE THAT HE KNEW THE DECEASED DEPRIVED PETITIONER-APPELLANT REEVES OF HIS RIGHT TO AN IMPARTIAL JURY.

In voir dire of prospective jurors, the essential allegations were summarized by one of the prosecutors as follows:

> "We expect the evidence to show that Mr. Johnson was killed on the day before Thanksgiving this past year as he towed a group of young people in from an automobile breakdown out in Tyler, that this Defendant, his brother Julius and Ms. Suttles deemed to rob him of the ring that they were going to pay him with and his paycheck that he had gotten that day after he towed them and delivered their car to Selma to be repaired when he parked in an alley way here near the Compress early in the evening after dark.  This Defendant shot him through the neck and into his chest area killing him practically instantly.  Three of them are arrested in a house when they went to a party that afternoon."

(R. 113-114).

Juror Denmark did not disclose that he knew the deceased.   In the middle of trial, the defense learned that he did.

It is a "basic constitutional premise that every person is entitled to an impartial jury.  As stated in the Sixth Amendment to the United States Constitution:  'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury in the state and district wherein the crime shall have been committed.'"  Knight v. State, 675 So.2d 487 (Ala.Crim.App. 1995).  "It is fundamental to our system of impartial justice that "'[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes.'""  State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App. 1992)(hereinafter "Freeman"), quoting, O'Leary, 438 So.2d at 1373, quoting in turn, Ex parte O'Leary, 417 So.2d 232, 240 (Ala. 1982).  "Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right to challenge for cause, and is deprived into foregoing his right of peremptory challenge.'"  Ex parte Ledbetter, 404 So.2d 731, 733 (Ala. 1981), quoting, Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944).  If a juror fails to truthfully answer voir dire questions, a defendant is entitled to a new trial if he might have been prejudiced by the jurors actions or inactions.  Ex parte Stewart, 659 So.2d 122, 124 (Ala. 1993); Ex parte O'Leary, 417 So.2d at 240; Freeman 605 So.2d 1259.  This test casts a "light burden" on the defendant.  Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987).

42

Juror Denmark remained among the pool of jurors from which the trial jury was selected.  Petitioner-Appellant Reeves was is deprived of his right to challenge for cause and deprived into foregoing his right of peremptory challenge.  Juror Denmark's failure to disclose that he knew the deceased deprived Petitioner-Appellant Reeves of his right to an impartial jury.  This constituted error and plain error which the Alabama Court of Criminal Appeals failed to recognize as prejudicial.

10.  THE PROSECUTION'S MISCONDUCT IN THE GUILT PHASE CLOSING ARGUMENT DEPRIVED PETITIONER-APPELLANT REEVES OF RIGHTS GUARANTEED HIM BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

"The public prosecutor occupies a difficult role in our criminal justice system."  Celebreeze, Prosecutorial Misconduct: Quelling the Tide of Improper Comment to the Jury, 35 Cleveland State L. Rev. 237 (1987).  To be sure the prosecutor must zealously advocate the position of the State.  But, because the prosecutor is advocating the position of the State  -- "a theoretically impartial sovereign," Comment, Prosecutorial Misconduct: The Limitations Upon the Prosecutor's Role as an Advocate, 14 Suffolk U. L. Rev. 1095 (1980) – the prosecutor must exercise the great powers and sanctions of the prosecutorial position with discretion and fairness.  "In short his obligation is to see that 'justice is done.'"  DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 448 (1983)(emphasis added).  Thus, as an advocate, the prosecutor:

"may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper

43

methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Berger v. United States, 295 U.S. 78, 88 (1935).  When a prosecutor's conduct

deprives a defendant of a fair trial, the defendant's right to due process is violated.

See, Berger v. United States, 295 U.S. 78 (1935).

"[B]ecause jurors are impressed with the cloak of state authority in which

judges and prosecutors are wrapped, the impact of [an improper] comment is

likely to be devastating."  Balske, Prosecutorial Misconduct During Closing

Argument: The Art of Knowing When and How to Object and Avoiding the

"Invited Response" Doctrine, 37 Mercer L.Rev. 1033, 1050-1051 (1986).  The

Supreme Court of the United States has stated:

> "It is fair to say that the average jury, in a greater or lesser degree,
> has confidence that these obligations, which so plainly rest upon
> the prosecuting attorney, will be faithfully observed.
> Consequently, improper suggestions, insinuations, and especially,
> assertions of personal knowledge are apt to carry much weight
> against the accused when they should properly carry none."

Berger v. United States, 295 U.S. 78 (1935).

A general category of argument prohibited by courts is that of improperly

spotlighting the defense strategy.  See. e.g., Brooks v. Kemp, 762 F.2d 1383, 1408

(11th Cir. 1985); Oregon v. Kennedy, 456 U.S. 667 (1982); United States v.

McDonald, 620 F.2d 559 (5th Cir. 1980); Semma v. Solem, 573 F.2d 1027 (8th

Cir. 1978); United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977);  United

States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974); United States ex rel. Macon v.

Yeager, 476 F.2d 613 (3d Cir. 1973);  People v. Fabert, 127 Cal.App.3d, 179

44

Cal.Rptr. 702 (1982); <u>People v. Schindler</u>, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980).

In this case, one of the prosecutor's argued to the jury: "The defense is designed and charged with defending this man any way he can." (R. 1079-1080). Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. <u>Washington v. State</u>, 448 So.2d 404 (Ala. 198). The requirement of objections should not be employed woodenly but should be applied where its application will serve the ends for which it was designed rather than being made a trap. <u>See</u>, <u>Henderson v. United States</u>, 425 F.2d 134, 144 (5th Cir. 1970). Here, the defense objected as follows:

> "It seems to me that Mr. Greene [prosecutor] is going to suggest to the jury that the only reason I'm making an argument is because I've somehow been appointed in this case to represent Mr. Reeves. As Mr. Greene well knows I voluntarily took this case. It's inappropriate to suggest to this jury that somehow I am making this argument just because I've got to. It's a violation of due process to suggest that. I ask that the jury be instructed to disregard that last remark. "

This objection was specific enough to point out to the trial judge the error complained of herein so as to allow him to correct the error. In any event, this was plain error. This argument was improper and deprived Reeves of a fair trial in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 6 of the Alabama Constitution of 1901.

Further, because this was a capital proceeding, and because the effect of this comment was to inject an extraneous factors other than "the character and record of the individual offender and the circumstances of the particular offense," <u>See</u>, <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978), a separate Eighth Amendment

45

violation was committed. This is, because there is a risk that this extraneous factor diverted jurors from their primary responsibility, it is possible that the death sentence recommended and imposed was the product of an arbitrary factor. Lcokett v. Ohio, 438 U.S. 586 (1978); State v. Lindsey, 404 So.2d 466 (La. 1981).

Even if not properly objected to, the arguments constituted plain error prejudicial to Petitioner-Appellant Reeves.

## 11.  THE PROSECUTION'S MISCONDUCT DURING THE PENALTY PHASE OF THE PROCEEDING DEPRIVED PETITIONER-APPELLANT REEVES OF A FUNDAMENTALLY FAIR HEARING AND DUE PROCESS.

Under the Eighth Amendment to the United States Constitution, the decision whether a defendant is to live or die must be based upon "consideration of the character and record of the individual offender and the circumstances of the particular offense." Lockett v. Ohio, 438 U.S. 586 (1978). See also, Caldwell v. Mississippi, 472 U.S. 320 (1985). Moreover, the Fourteenth Amendment to the United States Constitution right to a fundamentally fair trial prohibits the prosecutor from urging a jury to impose a sentence of death for improper or irrelevant reasons. Tucker v. Francis, 732 F.2d 1054 (11th Cir. 1984), citing, Brooks v. Francis, 716 F.2d 780 (11th Cir. 1983), and Hance v. Zant, 696 F.2d 940, 951 (11th Cir. 1983).

Closing arguments in capital cases must receive a "greater degree of scrutiny" than those in non-capital cases. Caldwell v. Mississippi, 472 U.S. 320 (1985), quoting, California v. Ramos, 463 U.S. 992, 998-999 (1983). The sentencing process should facilitate the responsible and reliable exercise of

sentencing discretion.  Caldwell v. Mississippi, 105 S.Ct. at 2469-2640 (plurality opinion), citing, Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 349 (1977)(plurality opinion); Gardner v. Florida, 430 U.S. 349 (1977)(plurality opinion); Woodson v. North Carolina, 428 U.S. 280 (1976).  The sentencing decision must not be the product of passion or prejudice.  Gardner v. Florida, 430 U.S. 349, 358 (1977);  In Hance v. Zant, 696 F.2d at 952, the United States Court of Appeals for the Eleventh Circuit stated that "a dramatic appeal to gut emotion has no place in the courtroom, especially in a case involving the penalty of death.  A sentence imposed after such an appeal cannot be carried out."  In so holding, the Eleventh Circuit made clear that the prosecution's argument in sentencing proceedings will be held to a different standard that argument at guilt proceedings.  Tucker v. Zant, 724 F.2d 882, 886 n.2 (11th Cir. 1984).  That is, though a conviction may be upheld in the face of improper argument by the prosecution, a death sentence entered after similar argument may be set aside, because the jury in a capital case must not be influenced by any arbitrary factors.  Brooks v. Francis, 716 F.2d at 788.

The Eleventh Circuit summed up its rule for more closely scrutinized penalty-phase prosecutorial misconduct as follows:

> "The prosecutor's actions at the sentencing phase of this trial are viewed differently [than those at the guilt phase].  At the sentencing phase of the trial, the jury may not be influenced by any arbitrary factors.  A prosecutor may not incite the passions of a jury when a person's life hangs in the balance."

Brooks v. Francis.  Thus, the Constitution will not permit argument on issues extrensic to the crime or the criminal aimed at inflaming the jury's passions,

47

playing on its fears, or otherwise goading it into an emotional state more receptive to a call for imposition of death and 'invit[ing] the jury to decide the life-death verdict in a frenzied and emotional atmosphere.'" Tucker v. Zant, 714 F.2d at 888.

A general category of argument prohibited by courts is that of improperly spotlighting the defendant's exercise of his right to counsel and defense strategy and that it is somehow wrong to provide defendants more procedural safeguards than their victims. See. e.g., Brooks v. Kemp, 762 F.2d 1383, 1408 (11th Cir. 1985); Oregon v. Kennedy, 456 U.S. 667 (1982); United States v. McDonald, 620 F.2d 559 (5th Cir. 1980); Semma v. Solem, 573 F.2d 1027 (8th Cir. 1978); United States v. Williams, 556 F.2d 1242 (D.C.Cir. 1977); United States v. Liddy, 509 F.2d 428 (D.C.Cir. 1974); United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973); People v. Fabert, 127 Cal.App.3d, 179 Cal.Rptr. 702 (1982); People v. Schindler, 114 Cal.App.3d 178, 170 Cal.Rptr. 461 (1980).

In this case, one of the prosecutor's argued to the jury in the penalty phase:

> "Now you are called upon to make a tough decision. You are called upon to decide what is the punishment that this man deserves for doing this to Willie Johnson. Death or Life in prison without the possibility of parole. Who decided Willie Johnson's fate? Did he have the opportunity to have a five or six day proceeding?"

(R. 1191).

Objections need be only be specific enough to point out the alleged error so as to allow the judge to correct the error. Ex parte Washington, 448 So.2d 404 (Ala. 1984). The requirement of objections should not be employed woodenly but

48

should be applied where its application will serve the ends for which it was designed rather than being made a trap.  See, Henderson v. United States, 425 F.2d 134, 144 (5th Cir. 1970).  Here, the defense objected as follows:

> "The prosecution's comments about having a five or six day proceeding is clearly a reference to the Defendant having exercised his constitutional right to a trial.  It's an improper comment and is in violation of due process of law in the federal and state constitution.  I'm also inclined to move for a mistrial, but I do request that the Court instruct the jury to disregard that comment as being improper."

(R. 1191).  This objection was specific enough to point out to the trial judge the error complained of herein so as to allow him to correct the error. In any event, this was plain error.  This argument was improper and deprived Appellant Reeves of a fair trial in violation of the Fourteenth Amendment to the United States  Constitution and Article I, § 6 of the Alabama Constitution of 1901.  Further, because this was a capital proceeding, and because the effect of this comment was to inject an extraneous factors other than "the character and record of the indiyidual offender and the circumstances of the particular offense," See, Lockett v. Ohio, 438 U.S. 586 (1978), a separate Eighth Amendment violation was committed.  This is, because there is a risk that this extraneous factor diverted jurors from their primary responsibility, it is possible that the death sentence recommended and imposed was the product of an arbitrary factor.  Lockett v. Ohio, 438 U.S. 586 (1978); State v. Lindsey, 404 So.2d 466 (La. 1981).

circumstances of the offense that the defendant proffers as the basis for a sentence less than death." See also, Green v. Georgia, 442 U.S. 95 (1979); Eddings v. Oklahoma, 455 U.S. 104 (1984). Thus, relevant mitigating evidence is not limited to statutory mitigating factors, but includes any evidence which may be fit within two general categories mentioned in Lockett.

In this case, the defense presented evidence that level of intelligence was only borderline. (R. 1165). The trial court did not consider this as a mitigating circumstance. This ran afoul of the aforementioned principles.

13. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON REASONABLE DOUBT.

In Cage v. Louisiana, 498 U.S. 39 (1990), the Supreme Court of the United States reversed the defendant's conviction because the trial court unconstitutionally suggested through its instruction a higher degree of doubt than reasonable doubt. The trial court's instruction in that case, which defined reasonable doubt for the jury as an "actual substantial doubt" and stated that what was required was "moral certainty".

The Supreme Court judged that although perhaps jurors could understand the definition of reasonable doubt as a whole as given in the instruction, it was the Court's view that "the instruction was contrary to the 'beyond a reasonable doubt' requirement articulated in In re Winship, 397 U.S. 358, 364 (1970)." The Court explained that the common meaning of the word "substantial" suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. "When those statements are then considered with the reference to 'moral certainty'

51

rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." <u>Cage</u>.

Here, the trial court's instruction or reasonable doubt in the guilt phase was as follows:

> "The reasonable doubt which entitles an accused to an acquittal, is not a mere, fanciful, vague, conjectural or speculative doubt but a reasonably substantial doubt arising from all or part of the evidence or from a lack of the evidence and remaining after a careful consideration of the testimony, such as reasonable, fair minded and conscientious men and women would entertain under all the circumstances. Now you will observe that the State is not required to convince you of the Defendant's guilt beyond all doubt but simply beyond all reasonable doubt. If after comparing and considering all of the evidence you cannot say you have an abiding conviction of the Defendant's guilt, then you are not convinced beyond a reasonable doubt, and the Defendant would be entitled to an acquittal."

(R. 1092). This instruction did not satisfy the requirements of due process. Further, because this was a capital case, a separate Eighth Amendment violation was committed.

CONCLUSION

BASED UPON THE FOREGOING, Petitioner-Appellant Matthew

Reeves urges this Court to proceed under its rules to reverse the Alabama Court of

Criminal Appeals.

Thomas M. Goggans
Ala. S.J.I.S. GOG001
P.O. Box 1307
Montgomery AL 36130
PH: (334)-834-2511
FX: (334)-834-2512

Attorney for Petitioner-Appellant
Matthew Reeves

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

William H. Pryor, Jr.
Thomas F. Parker, IV
Office of the Attorney General
11 South Union Street
Montgomery AL 36130

Lane Mann, Clerk
Alabama Court of Criminal Appeals
P.O. Box 310555
Montgomery AL 36130

by placing the same in the United States mail, first class postage prepaid and

properly addressed on this the 17th day of November, 2000.

Thomas M. Goggans

53