IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MATTHEW REEVES,            :
    Plaintiff,             :
                      :
vs.                        :
                      :    **CIVIL ACTION NO. 17-0061-KD-MU**
JEFFERSON D. DUNN,         :
    Respondent.            :
                      :

## ORDER

Petitioner, Matthew Reeves, a state prisoner currently in the custody of the Alabama Department of Corrections, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Reeves challenges the validity of his 1998 conviction for capital murder in the Circuit Court of Dallas County, Alabama. (Doc. 24). This matter is now before the Court on Reeves's petition, Respondent's answer, and the briefs, responses, and exhibits filed by the parties, as well as the 32-volume record of state-court proceedings. Following a thorough review of the petition and record, the undersigned finds that an evidentiary hearing is not warranted on the issues.[1] For the reasons set forth below, the Court finds that Petitioner Reeves's petition for writ of habeas corpus is due to be **DENIED**, and that if Reeves seeks the issuance of a certificate of appealability, his request be denied, along with any request to appeal *in forma pauperis*.

## I.    Background and Facts.

---

[1]    Because Reeves filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1337 (11th Cir. 2004). Reeves has failed to establish that an evidentiary hearing is warranted in this case. *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc) ("The burden is on the petitioner . . . to establish the need for an evidentiary hearing.").

The Alabama Court of Criminal Appeals found the facts of this case to be as

follows:[2]

"On November 27, 1996, the appellant (who was 18 years old at the time) and his younger brother, Julius, visited Brenda Suttles and Suttles's 15—year—old cousin, Emanuel, at Suttles's house on Lavender Street in Selma. There, according to Suttles, everyone agreed to go out 'looking for some robberies.' (R. 684.) Shortly after noon that day, the foursome left Suttles's house on foot and walked to a nearby McDonald's restaurant, where they saw Jason Powell driving by in his car. The appellant's brother, Julius, flagged Powell down, and Powell agreed to give the group a ride."

"Brenda Suttles and Emanuel Suttles testified that after the foursome got into Powell's car, Julius Reeves suggested that they go to White Hall, a town in neighboring Lowndes County, to rob a drug dealer. According to Brenda Suttles, everyone in the car agreed to the plan. (Powell, who also testified at trial, denied hearing the discussion about a robbery.) Before leaving Selma, the group stopped at an apartment on Broad Street. Julius Reeves went inside the apartment and returned to the car a short time later carrying a shotgun, which he handed to the appellant. With Powell driving, the group then headed for White Hall."

"Before they reached White Hall, however, Powell's car broke down on a dirt road off Highway 80. Shortly thereafter, a passing motorist, Duane Smith, stopped and told the group that he was in a hurry to meet some friends to go hunting, but that he would return around sunset and would take them to get help then. For the next couple of hours, the group sat in Powell's car and listened to music, until another passing motorist, Willie Johnson, stopped in his pickup truck and offered to tow Powell's car to Selma. Using some chains that he kept in his pickup truck, Johnson hooked Powell's car to the back of his truck. With Julius Reeves riding in the truck with him and the others in Powell's car, Johnson towed the car to the Selma residence where the appellant and Julius lived with their mother."

"When they arrived at the Reeveses' house, Julius Reeves got out of Johnson's truck and told the others that Johnson wanted $25 for towing them. However, no one had any money to pay Johnson. Julius Reeves then offered to give Johnson a ring as payment if Johnson would drive him to his

[2]     AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." *Bui v. Haley*, 321 F. 3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." *Id.* (citing *Sumner v. Mata*, 449 U.S. 539, 547, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)). These facts are recited in the memorandum opinion of the Alabama Court of Criminal Appeals on Reeves's direct appeal of his trial and conviction. *See Reeves v. State*, (CR-13,1504), 226 So. 3d 711, 718-22 (Ala. Crim. App. 2016) (Doc. 23-31 at 3-9).

girlfriend's house to get the ring. Johnson agreed and he unhooked Powell's car from his truck. According to Jason Powell and Emanuel Suttles, Julius Reeves at this point told the others that Johnson was going to be their robbery victim. While Jason Powell and Emanuel Suttles stayed behind with Powell's car in front of the Reeveses' house, Julius Reeves got back in the cab of the truck with Johnson, and Brenda Suttles climbed into the rear bed of the truck. Testimony indicated that when Johnson started the truck, the appellant jumped into the rear bed of the truck with the shotgun, hiding the weapon behind his leg as he did so."

"When they arrived at Julius's girlfriend's house in Johnson's truck, Julius went inside and retrieved the ring he had promised to give Johnson as payment. According to Brenda Suttles, when Julius came out of the house, he walked to the rear of Johnson's truck and told her and the appellant that he was not going to let Johnson keep the ring. After Julius got back in the cab of the truck, Johnson drove everyone back to the Reeveses' house.
"Jason Powell and Emanuel Suttles, who had remained at the house with Powell's car, testified that sometime around 7:00 p.m., they saw Johnson's truck drive by the house and turn into an alley -- known as Crockett's Alley -- behind the house. According to Brenda Suttles, who was in the rear bed of the truck with the appellant, just as the truck came to a stop in the alley, she heard a loud 'pow' sound. (R. 704.) Suttles testified that when she looked up, the appellant was withdrawing the barrel of the shotgun from the open rear window of the truck's cab. Johnson had been shot in the neck and was slumped over in the driver's seat. Suttles testified that Julius Reeves jumped out of the truck's cab and asked the appellant what he had done, and that the appellant then told Julius and Suttles to go through Johnson's pockets to 'get his money.' (R. 704.) Suttles stated that Julius then pulled Johnson out of the truck and went through his pockets, giving the money he found in the pockets to the appellant. After Julius had gone through Johnson's pockets, Suttles helped him put Johnson back in the truck's cab. According to Suttles, Johnson was bleeding heavily and making 'gagging' noises. (R. 721.)"

"Jason Powell and Emanuel Suttles testified that they heard the gunshot after Johnson's truck pulled into Crockett's Alley and that a short time later they saw the appellant, Julius Reeves, and Brenda Suttles run out of the alley and into the Reeveses' house. The appellant was carrying a shotgun, they said. They followed the appellant, Julius Reeves, and Brenda Suttles into the Reeveses' house and saw the appellant place the shotgun under a bed in his bedroom. The appellant told Julius and Brenda Suttles to change out of their bloodstained clothes and shoes, and he took the clothes and shoes and stuffed them under a dresser in his bedroom. According to Emanuel Suttles, as the appellant, Julius, and Brenda changed their clothes, they were 'jumping and hollering' and celebrating about 'all the stuff [they] got' from Johnson. (R. 842.) Jason Powell testified that he heard the appellant say, 'I made the money.' (R. 786.)"

"After changing their clothes, the appellant, Julius Reeves, and Brenda Suttles ran to Suttles's house. On the way, the appellant stopped to talk to his girlfriend, telling her that if she should be questioned by the police, to tell them that he had been with her all day. At Suttles's house, the appellant divided the money taken from Johnson -- approximately $360 -- among himself, Julius Reeves, and Brenda Suttles. Testimony indicated that throughout the evening, the appellant continued to brag about having shot Johnson. Several witnesses who were present at Suttles's house that evening testified that they saw the appellant dancing, 'throwing up' gang signs, and pretending to pump a shotgun. Brenda Suttles testified that as the appellant danced, he would jerk his body around in a manner 'mock[ing] the way that Willie Johnson had died.' (R. 713.) The appellant was also heard to say that the shooting would earn him a 'teardrop,' a gang tattoo acquired for killing someone. (R. 720.)"

"Yolanda Blevins, who was present during the post-shooting 'celebration' at Suttles's house, testified that the appellant called her into the kitchen and told her that he had shot a man in a truck after catching a ride with him. Blevins noticed that there was what appeared to be dried blood on the appellant's hands. LaTosha Rodgers, who was also present at Suttles's house, testified that the appellant told her that he had 'just shot somebody' in the alley. (R. 924.)"

"At around 2:00 a.m. on November 28, 1996 (approximately seven hours after the shooting), Selma police received a report of a suspicious vehicle parked in Crockett's Alley. When police officers investigated, they found Johnson's body slumped across the seat of his pickup truck. There was a pool of blood on the ground on the driver's side of the truck. Several coins and a diamond ring were on the ground near the truck. On the floorboard of the truck, police found wadding from a shotgun shell. The pockets of Johnson's pants had been turned inside out and were empty. Testimony at trial indicated that Johnson was a longtime employee of the Selma Housing Authority and that on the afternoon of November 27, 1996, he had cashed his paycheck, which had been in the amount of $500."

"At the shooting scene on the morning of November 28, police also discovered a trail of blood leading from Johnson's truck to the Reeveses' house. Randy Tucker, a canine-patrol officer with the Selma Police Department, testified that his dog tracked the blood trail from the pool of blood next to Johnson's truck, down Crockett's Alley, through the yard at 2126 Selma Avenue (the residence next to the alley), and ultimately to the front steps of the Reeveses' house at 2128 Selma Avenue."

"Pat Grindle, the detective in charge of investigating Johnson's murder, went to the Reeveses' house after learning that the blood trail led there. Det. Grindle testified that he obtained the consent of the appellant's mother, Marzetta Reeves, to search the house. In a bedroom shared by the appellant and Julius, Det. Grindle found bloodstained clothes and

bloodstained shoes; under a bed in this bedroom, Det. Grindle found a shotgun. In searching the kitchen, Det. Grindle found a pair of bloodstained pants. After making these discoveries, Det. Grindle questioned Marzetta Reeves and several other persons who were in the house at that time. Det. Grindle stated that he learned that the bloodstained clothes and shoes belonged to Julius Reeves, Brenda Suttles, and the appellant. Det. Grindle then went to Suttles's house in an attempt to locate the three. At Suttles's house, Det. Grindle found the appellant lying on a couch in a front room. The appellant was placed under arrest, and the officers seized a balled-up bloodstained jacket he was using as a headrest on the couch. Det. Grindle later returned to the Reeveses' residence, where he seized a 12 gauge shotgun shell from a garbage can in the bathroom.

"An autopsy revealed that Johnson had died from a shotgun wound to his neck that severed the carotid artery, causing him to bleed to death over a period of several minutes. Bloodstain patterns in Johnson's truck indicated that he was sitting upright in the driver's seat, facing forward, when he was shot from behind, through the open rear window. The bloodstain patterns also indicated that the driver's side door had been opened and closed shortly after Johnson was shot."

"Testimony indicated that the appellant's fingerprints were found on the shotgun that Det. Grindle had seized from under the bed in the appellant's bedroom. Brenda Suttles's and Julius Reeves's fingerprints were found on a fender of Johnson's truck. Joseph Saloom, a firearms expert with the Alabama Department of Forensic Sciences, testified that the shotgun shell seized from the bathroom at the Reeveses' residence was of the type commonly fired from the shotgun seized from the appellant's bedroom. Saloom stated that shotgun-shell wadding found on the floorboard of Johnson's truck was of the type commonly found in the kind of shotgun shell seized from the bathroom at the Reeveses' residence."

*Reeves v. State*, (CR-13,1504), 226 So. 3d 711, 718-22 (Ala. Crim. App. 2016) (quoting

*Reeves v. State*, 807 So. 2d 18, 24-26 (Ala. Crim. App. 2000) (Doc. 23-31 at 3-9).

In January, 1997, Petitioner Reeves was indicted by the Dallas County, Alabama Grand Jury of capital murder in violation of ALA. CODE § 31A-5-40(a)(2) ("Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant.". (Doc. 23-1 at 10-11; Vol. 1, JR-1, pp. 10-11). Reeves entered a plea of not guilty to the charges (Doc. 23-1 at 27-28; Vol. 1, JR-1, pp. 27-28), and, following a jury trial in the Circuit Court of Dallas County, Alabama, Petitioner was convicted of the

indicted charge. (Doc. 23-8 at 85-86; Vol. 8, JR-19). The trial judge accepted the jury's recommendation and, on August 20, 1998, sentenced Reeves to death. (Doc. 23-8 at 212; Vol. 8; JR-31; Doc. 23-2 at 20-26; Vol. 2; JR-3 at 233-39).

Through representation of counsel, Reeves filed a motion for new trial which was denied on December 8, 1998. On August 22, 2000, the Court of Criminal Appeals upheld Reeves's conviction and death sentence. Reeves filed an application for rehearing that was overruled on October 27, 2000. *See Reeves v. State*, 807 So. 2d 18 (Ala. Crim. App. 2000) (Doc. 23-10 at 43-104; Vol. 10, JR-35). Reeves was denied certiorari review by the Alabama Supreme Court on June 8, 2001, and by the United States Supreme Court on November 13, 2001. (Doc. 23-10 at 106-98; Vol. 10, JR-36; Doc. 23-11 at 136; Vol. 11, JR-41); *see also, Reeves v. Alabama*, 534 U.S. 1026 (2001).

On October 30, 2002, Reeves executed a post-conviction Rule 32 petition. (Doc. 23-12 at 1758; Vol. 12, JR-42). He filed an amended petition on February 26, 2003 (Doc. 23-12 at 124-86; Vol. 12, JR-47) and a second amended and superseding petition on August 31, 2006. (Doc. 23-14 at 149-201; Doc. 23-15 at 1-17; Vol. 14, JR-60; Vol. 15, JR. 60). The State answered the petition on October 28, 2006, and the Circuit Court conducted an evidentiary hearing on the petition on November 28-29, 2006. (Docs. 23-24, 23-25, 23-26 at 1-10; Vols. 24-26, JR-85). On May 7, 2008, the State filed a proposed order denying Reeves's Rule 32 petition (Doc. 23-15 at 174-201, Doc. 23-16 at 1-57; Vols. 15-16, JR-63) and on September 9, 2008, Reeves filed a written objection to the State's proposed order and a brief in support of his Rule 32 petition. (Doc. 23-16 at 58-134; Vol. 16, JR 64). The Circuit Court denied Reeves's Rule 32 Petition on October 26, 2009; however, the Circuit Court Clerk did not serve the denial order on the parties, and the denial order was not

entered into the case docket, until January 7, 2013.[3] (Doc. 23-16 at 135-67; Vol. 16, JR-65).

Reeves was granted an out-of-time appeal on May 30, 2014 (Doc. 23-19 at 95; Vol. 193, JR-82), and on December 10, 2014, appealed the denial of his Rule 32 petition, asserting the following claims:

1. The Circuit Court erroneously adopted verbatim the portion of the State's proposed order addressing his claim of intellectual disability,

2. The Circuit Court erred in denying his claim of intellectual disability under *Atkins*,

3. The Circuit Court erred in denying his claims of ineffective assistance of trial and appellate counsel for:

   (1) not hiring Dr. Goff, or another neuropsychologist, to evaluate Reeves for intellectual disability despite having court-approved funds to do so,

   (2) relying on the testimony of Dr. Ronan, the court-appointed psychologist who examined Reeves to determine his competency to stand trial, to present mitigation evidence during the penalty phase,

   (3) failing to object during the penalty phase to Dr. Ronan's testimony that Reeves was not intellectually disabled,

   (4) failing to conduct an adequate mitigation investigation and presenting the evidence during the penalty phase of the trial,

   (5) failing to preserve claims for direct appeal, including not objecting during the trial to prosecutor's urging to the jury to consider non-statutory aggravating circumstances to impose a death sentence, prosecutor's argument and reference that Reeves was involved in a gang, prosecutor's reference during the penalty phase that the jury's verdict was a recommendation, and the trial court's instruction to the jury during the penalty phase that its verdict was a recommendation,

   (6) failing to raise the aforementioned claims regarding trial counsels' ineffectiveness on appeal.

---

[3]     "The record indicates that the parties were not notified of the circuit court's ruling until January 2013. Reeves then filed another Rule 32 petition pursuant to Rule 32.1(f), Ala. R. Crim. P., requesting an out-of-time appeal from the circuit court's October 26, 2009, order denying his first petition." *Reeves v. State*, 226 So 3d 711, 721 (Ala. Crim. App. 2016).

4. The Circuit Court erred in summarily dismissing his claims of juror misconduct,

5. The Circuit Court erred in denying on procedural grounds that claim that lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment.

(Doc. 23-29 at 2-115; Vol. 29, JR-90). The Criminal Appeals Court affirmed the Circuit Court's judgment and denied the application for rehearing. (Doc. 23-31 at 2-105; Vol. 31, JR-94; *Reeves v. Sta*te, 226 So 3d 711 (Ala. Crim. App. 2016), *rehearing denied by*, (CR-13-1504), 2016 Ala. Crim. App. LEXIS 1011 (Ala. Crim. App., Oct. 14, 2016)). And, Reeves's petition for writ of certiorari in the Supreme Court of Alabama was denied (Docs. 23-31 at 106-299, 23-32 at 1-48; Vols. 31, 32, JR-95; Vol. 32, JR-96), as well as his petition for writ of certiorari in the United States Supreme Court, *Reeves v. Alabama*, __ U.S. __, 138 S. Ct. 22, 199 L. Ed. 2d 341 (2017) (Sotomayor, J., dissenting); (Doc. 23-32 at 288-301; Vol. 32, JR-100).

Reeves timely filed the instant petition for federal habeas relief on February 1, 2017, challenging his 1998 conviction for capital murder. (Docs. 1, 24).

## II. Grounds for Relief.

In his petition for habeas relief, Reeves raises the following grounds for relief:

1. Capital sentence violates the constitutional prohibition on the execution of intellectually disabled persons.

2. Constitutional right to Due Process was denied when the Circuit Court adopted word-for-word language from the State's proposed order denying Reeves's Atkins claim that contained serious factual omissions and relied on inappropriate considerations.

3. Ineffective Assistance of Counsel:

    a. Court of Criminal Appeals unreasonably concluded that counsel's testimony is required to overcome *Strickland's* presumption of sound trial strategy.

b. Counsel failed to investigate his alleged intellectual disability.

c. Counsel failed to retain mitigating expert and failed to present crucial mitigating evidence.

d. Counsel failed to preserve certain arguments for and present on appeal.

4. Denied a fair trial due to juror misconduct.

5. Alabama's method of execution is unconstitutional.

6. Death sentence violates the Eighth Amendment.

7. Death sentence violates the Sixth Amendment.

(Doc. 24). The habeas petition has been fully briefed and is ripe for consideration. The Court will consider each of Reeves' claims in turn.

## III.  Standard of Review.

This Court's review of Reeves's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, "the role of the federal court . . . is strictly limited." *Jones v. Walker*, 496 F.3d 1216, 1226 (11th Cir. 2007). Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d).

According to subsection (1), "[a] federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). "A state court's decision is not 'contrary to ... clearly established Federal law' simply because the court did not cite our opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003). Indeed, "a state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* (internal quotes omitted).

The "clearly established Federal law" contemplated by subsection (1) "refers to the holdings, as opposed to the dicta, of [U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (internal quotes omitted); *accord Greene v. Fisher*, 565 U.S. 34, 37-38, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011). Moreover, review under Section 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).

Importantly, "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (internal quotes omitted, emphasis in original). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (internal quotes omitted). That is, "an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will

not suffice." *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (internal quotes omitted); *Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*.  Rather, that the application must also be *unreasonable*."). "To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (internal quotes omitted).  And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington*, 562 U.S. at 101 (internal quotes omitted).  However, "even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).  The petitioner bears the burden of showing that the state court's ruling was contrary to, or involved an unreasonable application of, controlling Supreme Court precedent. *Harrington*, 562 U.S. at 98; *Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).

Likewise, with respect to §2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013) (internal quotes omitted).  In other words, "if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. . .[T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011);

*see also Greene v. Fisher*, 565 U.S. 34, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011) (AEDPA standard is purposely onerous because "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction") (citations and internal quotation marks omitted); *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) (AEDPA standard "is a difficult to meet ... and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt")(citations and internal quotation marks omitted); *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) ("if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied") (citation omitted).

Accordingly, in evaluating Reeves's § 2254 petition, the Court takes great care to abide by the stricture that "[a] federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own." *Hill v. Humphrey*, 662 F.3d 1335, 1355 (11th Cir. 2011); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286, 2012 U.S. App. LEXIS 6501 (11th Cir. 2012) ("This inquiry is different from determining whether we would decide *de novo* that the petitioner's claim had merit."). "If this standard is difficult to meet, that is because it was meant to be." *Holsey*, 694 F.3d at 1257 (citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation marks omitted).

Additionally, when a state court refuses to decide a federal claim on state procedural grounds, the federal habeas court is generally precluded from reviewing the claim at all. *See, e.g., Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015) ("[I]t is

well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.") (citation omitted); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If, however, the state court's procedural ruling is not adequate to bar federal review, then the federal habeas court must review the claim *de novo*, and is not confined to the state-court record. *See Williams*, 791 F.3d at 1273.

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state law courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights." *Lamarca v. Secretary, Dep't of Corrections*, 568 F.3d 929, 936 (11th Cir. 2009). "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012); *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (exhaustion requirement not satisfied unless "petitioner presented his claims to the state court such that a reasonable reader would understand each claim's ... specific factual foundation") (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). Nor is it sufficient for a petitioner to present federal claims to the state trial court; rather, "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks

omitted); *see also Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) ("Exhaustion requires that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.") (citations and internal quotation marks omitted). That said, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344.

Having established the proper standard of review, the Court turns to the claims asserted in Reeves's petition.

## IV.    **Analysis of Claims**.

In addressing Petitioner Reeves's claims, the Court numbers them as does the Petitioner.

### 1.    **Whether Reeves's Capital Sentence Violates the Constitutional Prohibition of the Execution of Intellectually Disabled Individuals**

Petitioner Reeves asserts that he is intellectually disabled[4] and his capital sentence, thus, violates the Eighth Amendment pursuant to the holding of *Atkins*.  In *Atkins*, the Court held that that execution of intellectually disabled persons contravenes the Eighth Amendment's prohibition on cruel and unusual punishment.  *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); *see also Ford v. Wainwright*, 477 U.S.

---

[4]    In this opinion, the court will use the terms "intellectually disabled" and "intellectual disability" as the legal and medical fields have moved away from the terms "mentally retarded" and "mental retardation."  *See*, e.g., Robert L. Schalock et al., *The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disability*, 45 Intell. & Dev. Disabilities 116, 116-17 (2007); *Hall v. Florida*, __ U.S.__, 134 S. Ct. 1986, *1990, 188 L. Ed. 2d 1007 (2014); *Kilgore v. Sec'y, Floida Dep't of Corr*., 805 F.3d 1301, 1301 n.1 (11th Cir. 2015).  This change in terminology is a change in name only and for the purposes of this opinion, the terms are synonymous, referring to the same condition.

399, 405, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) ("[T]he execution of mentally retarded criminals will [not] measurably advance the deterrent or the retributive purpose of the death penalty. . . [W]e therefore conclude that such punishment is excessive and that the constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender.")(citation omitted).  In reaching its holding, the Court reasoned that intellectually disabled defendants "frequently know the difference in right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id*. at 318.  The *Atkins* noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18"[5] and identified "an IQ between

---

[5]     *Atkins* cited to the following clinical standards:

The American Association on Mental Retardation [now known as the "American Association on Intellectual and Developmental Disabilities" (AAIDD)] defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).
The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes

70 and 75 or lower" as the typical "cutoff IQ score for the intellectual function prong of the mental retardation definition. However, the Court did not dictate a national standard for determining whether a criminal defendant is intellectually disabled and expressly left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Atkins*, 536 U.S. at 309, n.5, 317-18 (internal quotation marks and citation omitted).

In regard to establishing intellectual functioning, the first prong of the *Atkins* analysis, the Supreme Court has instructed that sentencing courts must consider the standard error of measurement ("SEM") when assessing intellectual disability. *See Hall v. Florida*, __ U.S. __, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014). The Supreme Court observed that:

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. See D. Wechsler, The Measurement of Adult Intelligence 133 (3d ed. 1944) (reporting the range of error on an early IQ test). Each IQ test has a "standard error of measurement," *ibid.*, often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014) (identifying the SEM as "one of the most important concepts in measurement theory").

*Hall*, 134 S. Ct. at 1995-96. Accordingly, the Court determined that "a State must afford these test scores the same studied skepticism that those who design and use the tests do,

---

that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 309 n.3; *see also* AAIDD at https://aaidd.org/about-aaidd (last visited October 29, 2018) confirming name change of the American Association on Mental Retardation to the AAIDD.

and understand that an IQ test score represents a range rather than a fixed number. . . . [otherwise, the State] risks executing a person who suffers from intellectual disability." *Id*. at 2000-01. Thus, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits", as well as "medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances."[6] *Id*. at 1994, 2001. Notably, *Hall* was decided in 2014, after the Circuit Court's denial of Reeves's Rule 32 petition.

In light of the reasoning and guidance of *Atkins*, the Alabama Supreme Court set forth its three-prong test for intellectual disability in *Ex parte Perkins*:

> [T]he Alabama Supreme Court has defined the test for mental retardation that rises to the level of prohibiting execution as having three components: (1) significant subaverage intellectual functioning (an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the

---

[6]    In listing the types of evidence which shed light on an individual's adaptive functioning, the Court cited to a brief filed by the American Psychiatric Association and noted that the medical community accepts the following as "substantial and weighty evidence of intellectual disability, including individuals who have an IQ test score above 70": "medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances." *Hall*, 134 S. Ct. at 1994.

In regard to establishing the second prong of *Atkins*, adaptive functioning, the Supreme Court has reiterated that courts must be guided by current medical standards and may not rely on "lay perceptions of intellectual disability"; specifically, the Court discussed that adaptive deficits '[are] not outweighed by the potential strengths in some adaptive skills.' *Moore v. Texas*, __. U.S. __, 137 S. Ct. 1039, 1051, 197 L. Ed. 2d 416 (2017) (quoting AAIDD-11 at 47).

*Moore*, however, was not decided until after the state courts rendered their decisions in this case and *Moore* did not announce a new rule of law that must be applied retroactively. Accordingly, *Moore* is not considered clearly established federal law under AEDPA for purposes of Reeves's petition. *See Kilgore v. Sec'y, Fla. Dep't of Corr*., 805 F.3d 1301, 1310 (11th Cir. 2015) ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003); *Smith v. Dunn*, 2017 U.S. Dist. LEXIS 113682 (Ala. N.D., July 21, 2017).

manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age 18).

*Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002). [7]

Reeves previously presented this claim in his Rule 32 post-conviction proceedings. The Alabama Court of Criminal Appeals, in a memorandum opinion, affirmed the circuit court's denial of Reeves's claim of intellectual disability. Reeves now bears the burden of proving by clear and convincing evidence that the state court's determination that he is not intellectually disabled is objectively unreasonable based on the record. *Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014) (the determination as to whether a person is intellectually disabled is a finding of fact). In accordance with the State's definition for intellectual disability, the Court will review each prong of Alabama's test.

### a. **Significantly Subaverage Intellectual Functioning.**

Reeves argues that the trial court unreasonably determined that he did not have significantly subaverage intellectual functioning because: (1) it misapplied factual evidence, when it ignored his full-scale IQ score of 68, (2) it failed to adjust his scores of 71 and 73 downward for the Flynn Effect and SEM, and (3) it looked beyond the numerical IQ scores to determine his intellectual functioning. Reeves presented the same argument to the Alabama Court of Criminal Appeals during his Rule 32 proceedings, and, in its memorandum opinion affirming the trial court's denial of relief, the court stated:

> In this case, Reeves had full-scale IQ scores of 68, 71, and 73. Considering the SEM [Standard Error of Measurement], these scores indicate that Reeves's IQ could be as low as 63 or as high as 78. Reeves's expert, Dr. Goff, concluded, based on Reeves's IQ scores as well as all other information before him, that Reeves suffered from significantly subaverage

---

[7] Likewise, Alabama's criminal procedure law defines an intellectually disabled person as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardize testing instruments." ALA. CODE § 15-24-2(3) (1975).

intellectual functioning. On the other hand, the State's expert, Dr. King, concluded, based on Reeves's IQ scores and all other information before him, that Reeves falls within the borderline range of intellectual functioning. The circuit court, after considering all the evidence presented at the hearing, and after observing Reeves when Reeves testified at a pretrial hearing, resolved the conflicting expert testimony as to Reeves's intellectual functioning adversely to Reeves, finding that, *although Reeves's intellectual functioning was subaverage, it was not significantly subaverage* as required to meet the first prong of intellectual disability. "Conflicting evidence is always a question for the finder of fact to determine, and a verdict rendered thereon will not be disturbed on appeal." *Padgett v. State*, 668 So. 2d 78, 86 (Ala. Crim. App. 1995). There is ample evidence in the record to support the circuit court's finding and we will not disturb the circuit court's resolution of the conflicting expert testimony. Therefore, we find no abuse of discretion on the part of the circuit court in concluding that Reeves failed to prove by a preponderance of the evidence that he suffered from significantly subaverage intellectual functioning.

*Reeves v. State*, 226 So. 3d 711, 741 (Ala. Crim. App. 2016); Doc. 23-31 at 61-62; Vol. 31, JR-94, pp. 60-61). (emphasis added)

Having reviewed the record in this matter, the Circuit Court did not make an unreasonable factual determination that Reeves did not suffer from significant subaverage intellectual functioning. Nor is the state court decision "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1).

The record evidence, including school, medical, mental health, juvenile-court, and Department of Youth Services records, supports that Reeves functioned in the range of borderline intellectual functioning. The records indicate that Reeves was habitually truant and exhibited emotional and behavioral problems in school. Evidence shows that Reeves began mental health treatment when he was 8 years old, beginning with a diagnosis of attention deficit disorder with hyperactivity, and at that time his intelligence level was "estimated to be low average." (Doc. 23-19 at 1037, Vol. 19-3, JR-84, p. 1515). Although therapy services were terminated after approximately a year and a half due noncompliance (doc. 23-19 at 1061; vol. 19-3, JR-84, p. 1539), Reeves was readmitted approximately 8

months later and "it [wa]s estimated that his intelligence [wa]s somewhat below average, but not within the [intellectual disability] range." (Doc. 23-19 at 1065; Vol. 19-3, JR-84, p. 1543). Reeves was later diagnosed with conduct disorder. (Doc. 23-19 at 1109; Vol. 19-3, JR-84, p. 1587).

The record reveals that Reeves failed and repeated the first, third, and fourth grades and that he was "socially" promoted to the seventh grade when he was 14 years old based only on his "level of maturity." (Doc. 23-20 at 89; Vol. 20, JR-84, p. 1688). According to Reeves's mother, Reeves was tested for placement into the Special Education Program at 11 years old, but he "did not qualify" (Doc. 23-19 at 1065; Vol. 19-3, JR-84, p. 1543.) and was later placed in special-education classes for emotional conflict. (Doc. 23-20 at 55; Vol. 20, JR-84, p. 1654).

Reeves was administered the Wechsler Intelligence Scale for Children, Revised ("WISC-R") when he was 14 and half years old, and he attained a verbal IQ score of 75, a performance IQ score of 74, and a full-scale IQ score of 73, and was classified as being in the borderline range of intellectual functioning. (Doc. 23-20 at 57-58; Vol. 20, JR-84, pp. 1656-58). Reeves was subsequently expelled from school for behavioral reasons in the eighth grade, after a failed attempt at homebound services.[8] When Reeves was 17 years old, the Department of Youth Services reported in its Service Plan Evaluation that "Matthew's background, interview, and test data indicate that he has a conduct disorder

---

[8] A letter from the homebound teacher, Mrs. Betty Johnson indicates that on one visit to the Reeves' home, she arrived prior to Reeves and his brother Julius. Reeves's mother explained to Mrs. Johnson that Julius had been injured by a gunshot wound to his leg from a drive-by-shooting. According to Mrs. Reeves, when Reeves and his brother, Julius, entered the home, Reeves appeared "very angry" and "refused to cooperate with [her] or his mother." (Doc. 23-20 at 191; Vol. 20, JR-84, p.1790). Reeves walked through the house using profanity and repeatedly asking for his gun. Homebound services were ended shortly thereafter. (Doc. 23-20 at 200; Vol. 20; JR-84, p.1799).

with borderline intelligence who is in need of intensive academic/vocational guidance and training in anger management. There was no evidence of a major psychiatric disturbance and he did not display symptoms of ADHD." (Doc. 23-20 at 13; Vol. 20, JR-84, p. 1612).

At the Rule 32 hearing, Dr. King opined that Reeves's exhibited borderline intellectual functioning, despite Reeves's full-scale score of 68 on the administered Wechsler Adult Intelligence Scale, Third ("WAIS-III").[9] In his clinical judgement, Dr. King discredited the validity of the IQ score when compared against the achieved scores of the Wide Range Achievement Test, on which Reeves scored a 75, 74, and 70 for reading (5th grade level), spelling (5th grade level) and arithmetic (4th grade level), respectively.[10] (Doc. 23-25 at 24). According to Dr. King, Reeves's achievement scores "indicate[d] a level of functioning higher than the IQ scores actually indicated" which created a

---

[9]     Reeves argues in his petition that his score of 68 "indisputably satisfies the significantly subaverage intellectual functioning requirement" but was ignored by the trial court, making the court's decision unreasonable based on the facts. (Doc. 24 at 31-32). Indeed, the trial court failed to discuss the score of 68 in its reasoning. *Tarver v. Thomas*, 2012 U.S. Dist. LEXIS 137139, 2012 WL 441710 (S.D. Ala. 2012) (state court's decision to disregard Tarver's IQ scores of 61 and consider only the scores of 72, 76, and 74 was unreasonable determination in light of the facts and because the court disregarded it without explanation); *but cf., Smith v. Dunn*, 2:13-CV-00557-RDP, 2017 U.S. Dist. LEXIS 45274 (N.D. Ala., S.D., March 28, 2017) (disregarded IQ score was clearly reasonable where court detailed why it credited one expert's calculation over another).
     Review of the trial court's order shows that the court articulated Reeves's IQ score of 68 and further provided a summary of Dr. King's evaluation in the court's Rule 32 Findings of Fact, including Dr. King's inability to "reach a definitive conclusion regarding Reeves's intellectual ability" based on the score of 68, alone, and Dr. King's ultimate conclusion that Reeves functioned in the borderline range of intellectual ability. (Doc. 23-16 at 144-45; Vol. 16, JR-65, pp. 10-11). Consequently, it cannot be said that that the court failed to consider the score in its determination. Rather, the court appears to have credited Dr. King's opinion that Reeves functioned in the borderline intelligence range and primarily relied on Reeves's failure to satisfy the adaptive functioning prong of the analysis in reaching its conclusion.

[10]    Dr. King testified that the Wide Range Achievement Test is scored with a base score of 100 as average, like the scoring of an IQ test. Therefore, the scoring can be categorized as a grade level or numerical score. (Doc. 23-25 at 24).

discrepancy making Dr. King unable to reach a conclusion about Reeves's intellectual ability based on those tests alone. (Doc. 23-25 at 25-26). After completing adaptive functioning tests, neurological functioning tests, personally observing Reeves, analyzing Reeves's other IQ scores (of 71, 73, and a partial score of 74 on the verbal portion) and reviewing Reeves's childhood and adolescent academic records, Dr. King concluded that Reeves was functioning in the borderline intellectual range and did not exhibit significant subaverage intellectual functioning.

Dr. Goff, on the other hand, testified that Reeves exhibited subaverage intellectual functioning, with an achieved IQ score of 71 on the administered WAIS-III, on which Reeves attained a verbal IQ score of 71, a performance IQ score of 76, and a full-scale IQ score of 71. (Doc. 23-24 at 43). Dr. Goff opined that Reeves's full-scale score of 71 should be adjusted downward to account for the SEM and the "Flynn Effect",[11] thereby, reflecting an adjusted full-scale IQ score of 66 (subtracting three points for the "Flynn Effect" and an additional two points for the SEM).[12] (Doc. 23-24 at 43). Nonetheless,

[11]     Research has shown that IQ scores tend to increase over time, at a rate of approximately 0.3 points a year after a test is normed - this phenomenon is known as the "Flynn Effect". (Doc. 23-24 at 29-31). According to Dr. Goff, the downward adjustment for the Flynn Effect should be applied to all Reeves's previous IQ scores, including the WISC-R that was administered in 1992 and the WAIS-R, verbal portion, that was administered in 1997 by Dr. Ronan. Dr. Goff testified that the full-scale IQ score of 73 should be adjusted 0.3 points for every year after the test was normed, thus to 67.6. Similarly, the verbal score of 71 should be adjusted to 69.2, making the 1997 score "statically identical" to the 1992 score. (Doc. 23-24 at 45-48).

    However, Dr. Goff admitted on cross examination that the "scoring manual" for the WAIS-III does not require the use of the "Flynn Effect" to get an accurate IQ score, and that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") does not mention the "Flynn Effect". (Doc. 23-24 at 84-85).

[12]     The court's decision not to apply the downward score departure for the Flynn Effect was not contrary to federal or state law. The Supreme Court, to date, has not ruled on such issue, and the law in Alabama is clear - courts may, but are not required to, apply the Flynn Effect in capital cases. *Albarran v. State*, 96 So. 3d 131, 199-200 (Ala. Crim. App. 2011) (stating that, even though an expert testified regarding the Flynn Effect, "the circuit court

Dr. Goff testified that for purposes of diagnosing Reeves as intellectually disabled "[i]t doesn't matter" whether his full-scale IQ score was adjusted "because the criteria is that the IQ score has to be around 70 [and] he qualifies because 71 is around 70." (Doc. 23-24 at 44-45).

> To be entitled to federal habeas relief under § 2254, a petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S.  ,  , 131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011). "A state court's application of clearly established federal law or its determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting Harrington, 562 U.S. at  , 131 S. Ct. at 780).

*Lee v. Comm'r, Ala. Dep't of Corr*. 726 F.3d 1172, 1192 (11th Cir. 2013).

Although Alabama requires all three prongs of the *Perkins* test to be established, when considering the first prong, "a court should not look at a raw IQ score as a precise measurement of intellectual functioning."[13] *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1281

---

could have reasonably rejected the 'Flynn Effect' and determined that Albarran's IQ was 71); *see also Ledford v. Warden, Georgia Diagnostic & Classification Prison*, 818 F.3d 600, 640 (11th Cir. 2016) ("[A] district court is not required to apply a Flynn effect reduction to an individual's IQ score in a death penalty case."). Notably, there is no uniform consensus in the Eleventh Circuit regarding the application of the Flynn Effect. *See Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010); *Ledford*, 818 F.3d at 636. Accordingly, the Circuit Court's determination not to apply the Flynn Effect was not unreasonable or contrary to federal law.

[13] "Intellectual functioning is primarily evaluated using standardized test that measures a person's "Intelligence Quotient," or "IQ." *United States v. Wilson*, 922 F. Supp. 2d 334, 343 (E.D. N.Y. 2013) (quoting AAIDD 2010 Manual at 31).  "At the same time, the AAIDD makes clear that IQ scores themselves do not tell the whole story about someone's intelligence; rather, 'one needs to use clinical judgement' to interpret those scores and other relevant information. *Id*. (quoting AAIDD 2010 Manual at 31).  The term "clinical judgment" referenced by the AAIDD is defined as "a special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive data." *Id*. at 344, n.9 (quoting AAIDD 2010 Manual at 29).

(N.D. Ala., S.D. 2009). The state appellate court correctly noted[14] that Reeves's IQ could be anywhere in the range of 63 to 78[15] and correctly identified the trial court's struggle with conflicting expert testimony as to Reeves's intellectual functioning. In assessing the credibility of the experts, the trial court credited the consistency of Reeves's full-scale IQ scores of 73 (from when he was 14 years old) and 71 (achieved on the test administered by Dr. Goff). *See Ledford v. Warden, Georgia Diagnostic & Classification Prison*, 818 F. 3d 600, 635 (11th Cir. 2016) (When assessing credibility, the court considered the fact that one expert's opinion was corroborated with another expert's opinion.). This reasoning is substantiated by Reeves's school records which indicate, although Reeves performed poorly in school, he was habitually truant and that his struggles stemmed mostly from behavioral and emotional issues, rather than lack of intellectual ability. Likewise, Reeves did not qualify for Special Education classes in school. Additionally, evidence showed that Reeves was capable of attaining and holding a job, of showing up on time, and completing skilled construction tasks. *See Smith v. Dunn*, 2017 U.S. Dist. LEXIS 113862, *15 (N.D. Ala. S.D., July 21, 2017) ("In light of the conflicting evidence, it was reasonable for the Alabama Court of Criminal Appeals to look to Petitioner's demonstrated adaptive

---

[14] The Alabama Court of Criminal Appeals, quoting *Ledford*, correctly explained, that application of the SEM as required by all "is a bi-directional concept that does not carry with it a presumption that an individual's IQ falls to the bottom of his IQ range. *Ledford*, 818 F.3d 600, 641.

[15] Reeves argues that the trial court did not apply the SEM in violation of *Hall*. Notably, the trial court was not bound to apply the SEM at the time of its decision in 2009. *Kilgore v. Sec'y, Florida Dep't of Corr.*, 805 F.3d 1301, 1311 (11th Cir. 2015) ("*Hall*'s holding was not clearly established by *Atkins*," and *Hall* "changed course by requiring the states to recognize a margin of error of five points above or below an IQ score of 70 in assessing intellectual disability."). Review of the court's decision reveals that the court did, however, meet the requirements of *Hall* by allowing Reeves to present evidence of his adaptive functioning. In fact, it is on the determination that Reeves did not exhibit substantial adaptive deficits that the court primarily based its decision.

abilities (or lack thereof) to reconcile the test scores and determine which ones were credible."). In light of the record evidence, the state court's reliance on Dr. King's expert opinion, which was corroborated by the record, cannot be said to be an unreasonable determination based on the facts. [16] *See Smith v. State*, 213 So. 3d 264, 270-71 (Ala. Crim. App. 2009), *remanded on other grounds*, *Ex parte Smith*, 213 So. 3d 313 (Ala. 2010) (court looked beyond test scores to the record evidence in resolving conflicting expert opinions). Thus, the Court cannot say that "no fair minded jurist" could conclude that Reeves failed to establish he suffered from significant sub-average intellectual functioning based on the entirety of the record, and neither was the decision contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Accordingly, under AEDPA this Court is barred from granting habeas relief.

### b. Significant or Substantial Deficits in Adaptive Behavior.

Turning to the second prong of establishing intellectual disability, Reeves must show that he has significant limitations in adaptive functioning in at least two skill areas.

---

[16]     In a factually similar case, *Smith v. State*, 213 So. 3d 264, 270-71 (Ala. Crim. App. 2009), the court resolved conflicting IQ scores and expert testimony by evaluating outside evidentiary support.

Smith had full-scale IQ scores of 67, 68, and 72. The court credited the state's expert's testimony, who opined Smith was of borderline intelligence, over Dr. Goff's, Smith's expert, who opined that Smith was mildly mentally retarded. The experts' opinions primarily differed in the area of adaptive functioning. Dr. Goff interviewed and administered tests to people close to Smith to determine which tasks Smith was capable of performing to evaluate Smith's adaptive functioning. The state's expert's evaluation, on the other hand, included testing Smith, interviewing other individuals with knowledge of Smith's current and past abilities and behavior (including a correctional officer who had close contact with Smith), a review of Smith's work history (which included construction work, general labor and the selling of drugs), and his personal observations of and conversations with Smith. The court concluded that Dr. Goff's assessment focused more of smith's past mental -health functioning rather than his present functioning, in contrast to the state's expert. Additionally, the court observed Smith when he testified and concluded Smith was articulate and found no indication that Smith was mentally retarded. The Court of Criminal Appeals affirmed the court's findings.

Due to Reeves's scores being within the margin of error, *Atkins* and *Hall* require that Reeves be allowed to present evidence of his adaptive functioning – which clearly he was allowed to do evidenced by the two-day evidentiary hearing, briefing opportunities, and the introduction of hundreds of pages of school, medical, mental health, and detention records. In affirming the Circuit Court's dismissal of Reeves's intellectual disability claim, the Alabama Court of Criminal Appeals stated:

> As for the adaptive-functioning prong of intellectual disability, Reeves contends that he "presented evidence of significant deficits in at least six areas of adaptive functioning and therefore [he] meets" the requirements for the second prong of intellectual disability -- significant deficits in at least two areas of adaptive functioning -- and that the circuit court erred in not so finding. (Reeves's brief, p. 45.) Specifically, Reeves asserts that the circuit court "erroneously discounted Dr. Goff's findings by pointing to anecdotal tasks that Mr. Reeves can perform, such as his purported planning of the crime, his earning of Job Corps certificates in welding, brick masonry, and auto mechanics, his extremely brief construction employment, and his purported drug selling activities," none of which, Reeves claims, undermines or refutes Dr. Goff's opinion that Reeves suffers from significant deficits in multiple areas of adaptive functioning. (Reeves's brief, pp. 50-51.) At oral argument, Reeves further argued that even discounting Dr. Goff's testimony, Dr. King testified that on the ABS-RC-II test, Reeves scored in the 25th percentile in the prevocational/vocational, self-direction, and domestic-activity domains, thus conclusively establishing that Reeves suffered significant deficits in those three areas of adaptive functioning. Therefore, Reeves concludes, the circuit court was required to find that he suffered from significant deficits in at least two areas of adaptive functioning.
>
> Reeves's arguments in this regard appear to be based solely on his scores on the ABAS test administered by Dr. Goff and the ABS-RC-II test administered by Dr. King. However, contrary to Reeves's apparent belief, a circuit court is not required to find that a person suffers from significant deficits in adaptive functioning merely because that person's scores on a standardized test indicate such deficits. Just as an IQ test is necessarily imprecise and, therefore, not determinative of the intellectual-functioning prong of intellectual disability, standardized tests for adaptive functioning are also necessarily imprecise and, therefore, are not determinative of the adaptive-functioning prong of intellectual disability. *Cf.*, *United States v. Davis*, 611 F. Supp. 2d 472, 493 (D. Maryland, 2009) (noting that "nearly all methods of assessing an individual's adaptive functioning -- particularly in a retroactive analysis -- are imperfect" and that, therefore, "the typical

approach used in forensic assessments of adaptive functioning is to collect information from a multitude of sources and look for convergence of findings in order to confirm one's conclusions"); and *Singleton v. Astrue*, [No. 2:11CV512-CSC, February 29, 2012) 2012 U.S. Dist. LEXIS 26069 (M.D. Ala. 2012) (not reported) (noting that scores on the ABAS-II test are not determinative as to adaptive functioning for purposes of qualification for social security disability). Although standardized tests for adaptive functioning are certainly useful in assessing a person's adaptive functioning, a court should assess such test scores in light of the circumstances of each case and in light of all other relevant evidence regarding adaptive functioning, including the person's actions at the time of the crime.

In this case, the evidence regarding Reeves's adaptive functioning was conflicting. Although Reeves scored low in the domains of domestic activity, self-direction, and work on the ABS-RC-II test administered by Dr. King and in the areas of self-direction, work, leisure activities, health and safety, self-care, and functional academics on the ABAS test administered by Dr. Goff, thus indicating significant deficits in those areas of adaptive functioning, other evidence was presented that either called into question the validity of those scores and/or indicated that Reeves's deficits in those areas were not, in fact, significant.

For example, Dr. King testified that Reeves scored in the 25th percentile in the domain of domestic activity because Reeves had never been required to do any type of domestic activity growing up and had been incarcerated since he was 18 years old. Dr. Goff testified that it is not unusual for someone who is incarcerated to have low adaptive functioning. Dr. King also testified that he would have scored Reeves higher in the self-direction domain if he had known at the time that he evaluated Reeves that, from an early age, Reeves had been "involved in a lot of drug activity and was actually directing the behaviors and activities of others in this drug related activity." (R. 231-32.) Additionally, Reeves was described in his juvenile mental-health records as "extremely goal-directed," even at a young age. (C. 1556.)

Dr. King further testified that he believed that Reeves's low score in the work domain was because Reeves "did not get to the age where he might be able to master use of complex job tools or equipment" before he went to prison, and because school records indicated that Reeves often missed school and had "pretty poor school habits." (R. 230-31.) Dr. Goff concurred, stating that Reeves's deficit in the work area "may be because he had a lack of opportunity." (R. 62.) Dr. Goff further testified that the validity of Reeves's low score in this area was questionable in light of the fact that Beverly Seroy, the person to whom he administered the ABAS test, had simply guessed on the majority of questions in this area. Additionally, as the circuit court noted in its order, Reeves had obtained certificates in brick masonry, welding, and automobile mechanics, all of which require some level of technical skill, and the record indicates that Reeves held a construction job while his brother was incarcerated and that he was a good

employee. Furthermore, the evidence indicated that Reeves's "poor school habits" were more a product of his defiant behavior in school than of any deficits in adaptive functioning.

Additionally, although Reeves scored low in the health and safety, self-care, and leisure-activity areas on the ABAS test administered by Dr. Goff, on the ABS-RC-II test administered by Dr. King, Reeves achieved the highest score possible in the domain of independent functioning, which included such things as self-care and health and safety, and Reeves also scored high in the domains of responsibility and socialization. Moreover, the evidence indicated that Reeves sold drugs to make money and that he used that money to buy personal belongings for himself, including a car, and to help pay the household bills.

Finally, Reeves scored in the 5th percentile in the area of functional academics on the ABAS test administered by Dr. Goff, and Dr. Goff testified that Reeves was functionally illiterate and could read only at a third-grade level and, therefore, that Reeves suffered from a significant deficit in this area. However, Dr. Goff indicated that the ability to read at about a fifth- or sixth-grade level would not qualify as a significant deficit in functional academics. Dr. King testified that Reeves was able to read at a fifth-grade level, thus indicating that Reeves did not have a significant deficient in functional academics.

Simply put, the circuit court in this case was faced with conflicting evidence regarding Reeves's adaptive functioning, including conflicting expert testimony. Reeves's expert, Dr. Goff, testified that Reeves suffered from significant deficits in six areas of adaptive functioning. On the other hand, the State's expert, Dr. King, indicated that, although Reeves scored low on the ABS-RC-II test in three areas of adaptive functioning, those scores were questionable for various reasons. It was for the circuit court to resolve the conflicting evidence and the conflicting expert testimony, and it obviously resolved the conflicts adversely to Reeves. In doing so, the court appropriately looked at evidence regarding Reeves's adaptive functioning other than the expert testimony -- such as Reeves's technical abilities in brick masonry, welding, and automobile mechanics; Reeves's ability to work construction and do so reliably when he was not around his brother, Julius; Reeves's participation in a drug-sale enterprise in which he was able to make thousands of dollars a week that he then used to purchase personal items and a car; and particularly Reeves's cold and calculated actions surrounding the murder, including planning the robbery with his codefendants, hiding incriminating evidence after he had shot the victim, splitting the proceeds of the robbery with his codefendants, and bragging about the murder, claiming that he would earn a "teardrop" — a gang tattoo indicating that a gang member had killed someone — for the murder *See*, e.g., *Ex parte Smith*, [Ms. 1080973, October 22, 2010] 213 So. 3d 313, 2010 Ala. LEXIS 210 (Ala. 2010) ("We find especially persuasive Smith's behavior during the commission of these murders.") There is ample

> evidence in the record to support the circuit court's finding that Reeves did
> not suffer from significant deficits in at least two areas of adaptive
> functioning, and we will not disturb the circuit court's resolution of the
> conflicting evidence. Therefore, we find no abuse of discretion on the part
> of the circuit court in finding that Reeves failed to prove by a preponderance
> of the evidence that he suffered from significant deficits in at least two areas
> of adaptive functioning.

*Reeves v. State*, 226 So. 3d 711, 741-43 (Ala. Crim. App. 2016).

Having reviewed the record in this matter, the Circuit Court did not make an unreasonable factual determination that Reeves failed to establish significant subaverage intellectual functioning. "Alabama courts routinely look to factors besides test scores to evaluate whether a defendant has met his burden of proving deficiencies in his adaptive behavior." *Smith v. Dunn,* 2:13-CV-00557-RDP, 2017 U.S. Dist. LEXIS 45274, *93-95 (N.D. Ala., S.D., March 28, 2017) (referencing *Ex parte Perkins*, 851 So. 2d at 456 (finding it instructive that Perkins maintained interpersonal relationships and had a job for a short period when analyzing his "adaptive behavior"); *Lewis v. State*, 889 So. 2d 623, 698 (Ala. Crim. App. 2003) ("the nature and circumstances surrounding the crimes in this case — including Lewis's articulate and detailed statement to the police — suggest goal-directed behavior, thus indicating that Lewis does not suffer from deficits in adaptive behavior.")). This practice was supported by Reeves's expert, Dr. Goff, as well. Dr. Goff explained that the concern regarding adaptive functioning "is whether it's an impediment to functioning in the community or to functioning on a day-today basis." (Doc. 23-24 at 54-55, Vol. 24, JR-85, pp. 53-54). Dr. Goff further explained:

> If one has an IQ of 64 but is working at the Coca-cola plant, reads well
> enough to read the newspaper, drives and car, does all of these other things
> and doesn't demonstrate any of these adaptive skills deficits, then you don't
> make the diagnosis. He has to have some deficits in some areas in order for
> the diagnosis to hold.

(Doc. 23-24 at 55; Vol. 24, JR-85, p. 54). Accordingly, the state courts' consideration of the record was neither impermissible nor unreasonable. *See Tharpe v. Warden,* 834 F.3d 1323 (11th Cir. 2016) (overruled on other grounds) (Where expert opinions were conflicting as to defendant's adaptive deficiencies, state courts did not err in viewing the entire record in making a determination regarding adaptive behavior.). Reeves has not shown that the deficiencies in his adaptive functioning were so significant "that no fair minded jurist could reasonably conclude" that he had failed to prove that his impaired behavior qualified him as intellectually disabled for purposes of Alabama's death penalty law.[17] Accordingly, the state court's decision was not unreasonable determination of the facts in light of the evidence presented at the Rule 32 hearing and was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

### c.      Function deficits manifested before age 18.

Reeves argues that his intellectual disability manifested before the age of 18, and Respondent argues that Reeves has failed to prove the same. While the record again

---

[17]      Reeves asserts in his petition that his impairments in functional academics and work are comparable to those of Glenn Holladay, whom the Eleventh Circuit determined was intellectually disabled and ineligible for the death penalty. *Holladay v. Allen*, 555 F.3d 1346 (11th Cir. 2009). The Court finds *Holladay* easily distinguishable. Holladay's "school records present a picture of a child with severe learning difficulties", whereas Reeves's school records are replete with borderline diagnoses, A's and B's earned in repeated grades, and emotional and behavioral placements versus learning disability placements. Similarly, Holladay's work history consisted of "menial jobs" where testimony confirmed that Reeves completed construction work, like "making a roof", was responsible on the job (Doc. 23-25 at 6; Doc. 23-24 at 14; Vol. 16, JR-65, pp. 151, 196) obtained certifications in welding, brick masonry, and auto mechanics through Job Corps (Doc. 23-16 at 152; Vol. 16, JR-65, p.951), and earned enough money selling drugs to purchase a car and provide assistance for his family. (Doc. 23-25 at 7). Indeed, Dr. Goff admitted that selling drugs could be considered work experience "depend[ing] on the level of sophistication of the individual task that is being performed." Drawing the distinction between "retarded people who are standing on the corner passing out things and taking money" and the "fellow who is doing the books." (Doc. 23-24 at 90; Vol. 24, JR-85, p. 89).

reflects conflicting expert testimony on this issue,[18] the state courts failed to address the merits of this prong. Given that Alabama requires a positive finding of all three prongs of the *Perkins* test in order to establish intellectual disability, and the State determined that Reeves has failed to establish two of the prongs (significant subaverage intellectual and adaptive functioning), it is unnecessary for the Court to discuss the merits of the third prong.

**2. Whether the Constitutional Right to Due Process was Denied by the Circuit Court's Verbatim Adoption of Language from the State's Proposed Order Denying Reeves' *Atkins* Claim.**

Petitioner Reeves contends that the Circuit Court adopted, word-for-word, the State's proposed order denying Reeves's intellectual disability claim in its denial of his Rule 32 petition in violation of his right to due process. Reeves presented this claim to the Alabama Court of Criminal Appeals, and, in finding no error in the verbatim adoption, it stated:

> "Alabama courts have consistently held that even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous." *McGahee v. State*, 885 So. 2d 191, 229-30 (Ala. Crim. App. 2003). "While the practice of adopting the state's proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Bell v. State*, 593 So. 2d 123, 126 (Ala. Crim. App. 1991). "[T]he general rule is that, where a trial court does in fact adopt the proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court." *Ex parte Ingram*, 51 So. 3d 1119, 1122 (Ala. 2010). Only "when the record before this Court clearly establishes that the order signed by the trial court denying postconviction relief is not the product of the trial court's independent judgment" will the circuit court's adoption of the State's

---

[18]     Dr. King opined that Reeves functioned in the borderline range prior to the age of 18 (Doc. 23-25 at 46, 58; Vol. 25, JR-85, pp. 245, 257), while Dr. Goff testified that Reeves was intellectually disabled before the age of 18.  (Doc. 23-24 at 65-67; Vol. 24, JR-85, pp. 64-66).

proposed order be held erroneous. *Ex parte Jenkins*, 105 So. 3d 1250, 1260 (Ala. 2012).

*Reeves v. State*, 226 So. 3d. 711, 723-24 (Ala. Crim. App. 2016).

"[T]he practice of adopting verbatim findings of fact prepared by the prevailing party in the context of a death penalty case is especially troublesome, given that factfinding procedures in capital proceedings are to "aspire to a heightened standard of reliability," *Jefferson v. Sellers*, 250 F. Supp. 3d 1340, 1351-1352 (N.D. Ga. 2017) (*citing Ford v. Wignwright*, 477 U.S. 399, 411, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986). While the practice is condemned, reasoning it leads to "an appearance of impartiality", *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997), Reeves offers no authority for the proposition that the practice, in-and-of-itself, by a state postconviction court warrants habeas relief. *Clemons v. Thomas*, 2:10-CV-02218-LSC, 2016 U.S. Dist. LEXIS 40104, *27-28, 2016 WL 1180113 (N.D. Ala., S.D., March 28, 2016). "[W]hen the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 572, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (citation omitted).

A review of the trial court's order reflects that the section titled, "Claim that Reeves is Mentally Retarded" is identical to the state's proposed order. (Doc. 23-26 at 93-95, 105-114; Vol. 26, JR-87, pp. 1-3, 13-21). Reeves therefore contends that the trial court's order was not the independent judgment of the trial court and clearly erroneous, evidenced most strongly by the omission of the mentioning of the IQ score of 68 and contrary to established law because the adopted order was unsolicited and drafted before the Court reached a conclusion on the issue of Reeves's intellectual disability. Reeves relies on the reasoning

of *Anderson* to support that the Alabama Criminal Court of Appeals unreasonably applied federal law in upholding the Circuit Court's verbatim adoption.

In *Anderson*, after a two-day trial, the trial court issued a memorandum explaining the rationale for its findings; the trial court then "requested that petitioner's counsel submit proposed findings of fact and conclusions of law expanding upon those set forth in the memorandum." *Anderson*, 470 U.S. at 568. The trial court then requested and received a response from respondent objecting to the proposed findings. *Id*. The Supreme Court found the trial court's adoption of petitioner's proposed findings of fact and conclusions of law, was not "uncritically accepted findings prepared without judicial guidance by the prevailing party" because

> [t]he court itself provided the framework for the proposed findings when it issued its preliminary memorandum, which set forth its essential findings and directed petitioner's counsel to submit a more detailed set of findings consistent with them. Further, respondent was provided and availed itself of the opportunity to respond at length to the proposed findings. Nor did the District Court simply adopt petitioner's proposed findings: the findings it ultimately issued -- and particularly the crucial findings . . . vary considerably in organization and content from those submitted by petitioner's counsel. Under these circumstances, we see no reason to doubt that the findings issued by the District Court represent the judge's own considered conclusions. There is no reason to subject those findings to a more stringent appellate review than is called for by the applicable rules.

*Id*. at 572-73.

As previously mentioned, the trial court's order is identical to the State's proposed order in the section titled "Claim that Reeves is Mentally Retarded". However, there is sufficient reason to conclude that the trial court's order represents an independent decision based on the additional facts that the trial court articulated in its order denying Reeves's Rule 32 petition. For instance, the trial court expounded on the finding of facts, adding that Brenda Suttles testimony illustrated a premeditated plan on the part of Reeves rather than an impulsive act. (Doc. 23-16 at 136; Vol. 16, JR-65, p. 2). The trial court then

articulated the testimony supporting its reasoning. The trial court's order also contains findings of facts from the penalty phase which are absent from the State's proposed order, and notably summaries of the testimony of Detective Grindle, Marzetta Reeves, and Dr. Kathaleen Ronan. (Doc. 23-16 at 137-141; Vol. 16, JR-65, pp. 3-7). Additionally, the findings of facts from the Rule 32 hearing are completely different in organization and wording and identify Reeves's IQ score of 68. (Doc. 23-16 at 141-145, Vol. 16, JR-65, pp. 7-11). As such, the trial court's inclusion of such necessary facts (explaining the reasoning contained in the adopted portion of the order) indicates that the trial court independently decided the claim and provided the necessary factual evidence of record to support the decision.

Furthermore, in keeping with *Anderson*, the record reveals that both parties (although unsolicited) submitted post-hearing briefs and proposed orders to the circuit court following the Rule 32 evidentiary hearing. Indeed, the State filed its proposed order on May 7, 2008, and by letter waved any objection to Reeves having adequate time to respond. (Doc. 23-15 at 173-201; Doc. 23-16 at 1-57; Vol. 15, JR-62, JR-63). On September 9, 2008, Reeves filed a motion objecting to the State's proposed order (Doc. 23-15 at 168), as well as a brief in support of his Second Amended Rule 32 Petition. (Doc. 23-16 at 58-134; Vol. 16, JR-64). The record reflects that the Circuit Court did not deny the petition until October 2009, over a year from the parties' filings. (Doc. 23-16 at 135-966; Vol. 16, JR-65).

The petitioner has failed to show that the state court decision was contrary to clearly established law or was an unreasonable determination of the facts in light of the evidence presented. Thus, Reeves's claim for habeas relief on this basis is denied.

### 3. Whether Reeves Received Ineffective Assistance of Counsel.

In his petition, Reeves contends that he received and was prejudiced by ineffective assistance of counsel from the outset of his trial through post-conviction proceedings. (Doc. 24 at 51-52). Reeves claims that but for counsels' deficient performance the jury would have been presented with evidence of Reeves's intellectual disability and mitigating factors, leading to a reasonable probability that the jury would have sentenced him to life in prison rather than to death. Furthermore, Reeves's appellate counsel failed to raise meritorious claims on appeal, prejudicing Reeves by denying him the opportunity to have the claims heard.

The Sixth Amendment of the Constitution guarantees every accused "the right . . . to have Assistance of counsel for his defense." U.S. Const. amend. VI. To establish an ineffective assistance claim under the Sixth Amendment, a petitioner must make both showings of the two-prong standard, discussed in *Strickland v. Washington*, that has been adopted by the Supreme Court for evaluating claims of ineffective assistance of counsel. *Strickland*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). That is, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citing *Strickland*, 466 U.S. at 687). Because the failure to demonstrate either deficient performance or prejudice is dispositive of the claim, courts applying the *Strickland* test "are free to dispose of ineffectiveness claims on either of [*Strickland's*] two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998).

In order to satisfy the "performance" prong of the *Strickland* test, a petitioner is required to show that his attorney's representation "fell below an objective standard of reasonableness," which is measured by "reasonableness under prevailing professional

norms." *Strickland*, 466 U.S. at 688. That is, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. In considering such a claim, the court "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F. 3d 1051, 1053 (11th Cir. 1999) (citations omitted). Thus, the petitioner has a difficult burden as to be considered unreasonable, "the performance must be such that 'no competent counsel would have taken the action that [the petitioner's] counsel did take.'" *Ball v. United States*, 271 F. App'x 880 (11th Cir. 2008) (citations omitted).

The petitioner must also satisfy the "prejudice" prong of the *Strickland* test. To that end, the petitioner must show that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The petitioner "must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'" *Butcher v. United States*, 368 F.3d 1290, 1293, 95 F. App'x 1290 (11th Cir. 2004) (citations omitted). Further, it is not enough to satisfy the prejudice prong to merely show that the alleged errors affected the case in some imaginable way. *See id*. at 1293-1294. ("[T]hat the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice") (quoting *Strickland*, 466 U.S. at 693) (internal quotation marks omitted). Thus, "under the exacting rules and presumptions set forth in *Strickland*, 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (citations omitted).

Having set forth the appropriate standard for determining an ineffective counsel claim, the Court turns to Petitioner Reeves's asserted challenges.

> **a. Claim that Alabama Court of Appeals unreasonably concluded that counsel's testimony is required to overcome *Strickland's* presumption of sound strategy.**

Reeves argues that the state courts misapplied the *Strickland* standard in denying his claims of ineffective assistance of counsel by ignoring the ample evidence of ineffective assistance presented and determining his failure to call trial and appellate counsel to testify at the Rule 32 hearing was "fatal" to his claims of ineffective assistance of counsel. (Doc. 24 at 54-56). The Alabama Court of Criminal Appeals, in its memorandum opinion affirming the trial court's denial of relief, stated:

> The record from Reeves's direct appeal indicates that attorneys Blanchard McLeod and Marvin Wiggins were initially appointed to represent Reeves. McLeod withdrew approximately three months before trial, and Thomas Goggans was appointed as a replacement. Reeves was represented at trial by Goggans and Wiggins. Goggans continued to represent Reeves on appeal. At the Rule 32 evidentiary hearing, Reeves did not call McLeod, Goggans, or Wiggins to testify. In its order, the circuit court found that Reeves had failed to prove his claims of ineffective assistance of trial and appellate counsel, in part, because he had failed to call Goggans and Wiggins to testify at the evidentiary hearing. On appeal, Reeves argues that the circuit court erred in finding that his failure to call his attorneys to testify resulted in his failing to prove his ineffective-assistance-of-counsel claims because, he says, "there is no requirement that trial counsel testify." (Reeves's brief, p. 62.) Specifically, Reeves argues that because the *Strickland* test is an objective one, testimony from counsel is not necessary to prove any claim of ineffective assistance of counsel.
>
> However, Reeves's argument fails to take into account the requirement that courts indulge a strong presumption that counsel acted reasonably, a presumption that must be overcome by evidence to the contrary. In *Broadnax v. State*, 130 So. 3d 1232 (Ala. Crim. App. 2013), this Court stated:
>
> > "It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that

occurred outside the record. Indeed, 'trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.' *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). This is so because it is presumed that counsel acted reasonably:

> "'The presumption impacts on the burden of proof and continues throughout the case, not dropping out just because some conflicting evidence is introduced. "Counsel's competence ... is presumed, and the [petitioner] must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 106 S. Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (emphasis added) (citations omitted). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, "where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." *Williams* [*v. Head*,] 185 F.3d [1223,] 1228 [(11th Cir. 1999)]; *see also Waters* [v. *Thomas*,] 46 F.3d [1506,] 1516 [(11th Cir. 1995)] (en banc) (noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).'

"*Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000). "'If the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'" *Dunaway v. State*, 198 So. 3d 530, 547, 2009 Ala. Crim. App. LEXIS 174 (Ala. Crim. App. 2009) (quoting *Howard v. State*, 239 S.W.3d 359, 367 (Tex. App. 2007))."

130 So. 3d at 1255-56.

Subsequently, in *Stallworth v. State*, 171 So. 3d 53 (Ala. Crim. App. 2013) (opinion on return to remand), this Court explained:

> "Further, the presumption that counsel performed effectively "'is like the 'presumption of innocence' in a criminal trial,'" and the petitioner bears the burden of disproving that presumption. *Hunt v. State*, 940 So. 2d 1041, 1059 (Ala.

Crim. App. 2005) (quoting *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc)). 'Never does the government acquire the burden to show competence, even when some evidence to the contrary might be offered by the petitioner.' *Id*. ""An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, "where the record is incomplete or unclear about [counsel]'s actions, [a court] will presume that he did what he should have done, and that he exercised reasonable professional judgment.""" *Hunt*, 940 So. 2d at 1070-71 (quoting *Grayson v. Thompson*, 257 F.3d 1194, 1218 (11th Cir. 2001), quoting in turn *Chandler*, 218 F.3d at 1314 n.15, quoting in turn *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999)). Thus, to overcome the strong presumption of effectiveness, a Rule 32 petitioner must, at his evidentiary hearing, question trial counsel regarding his or her actions and reasoning. *See, e.g., Broadnax v. State*, 130 So. 3d 1232, 1255-56 (Ala. Crim. App. 2013) (recognizing that '[i]t is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record[, and holding that] circuit court correctly found that Broadnax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably'); *Whitson v. State*, 109 So. 3d 665, 676 (Ala. Crim. App. 2012) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question appellate counsel regarding their reasoning); *Brooks v. State*, 929 So. 2d 491, 497 (Ala. Crim. App. 2005) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question trial counsel regarding their reasoning); *McGahee v. State*, 885 So. 2d 191, 221-22 (Ala. Crim. App. 2003) ('[C]ounsel at the Rule 32 hearing did not ask trial counsel any questions about his reasons for not calling the additional witnesses to testify. Because he has failed to present any evidence about counsel's decisions, we view trial counsel's actions as strategic decisions, which are virtually unassailable.'); *Williams v. Head*, 185 F.3d at 1228; *Adams v. Wainwright*, 709 F.2d 1443, 1445-46 (11th Cir. 1983) ('[The petitioner] did not call trial counsel to testify ... [; therefore,] there is no basis in this record for finding that counsel did not sufficiently investigate [the petitioner's] background.'); *Callahan v. Campbell*, 427 F.3d 897, 933 (11th Cir. 2005) ('Because [trial counsel] passed away before

the Rule 32 hearing, we have no evidence of what he did to prepare for the penalty phase of [the petitioner's] trial. In a situation like this, we will presume the attorney "did what he should have done, and that he exercised reasonable professional judgment."')."

171 So. 3d at 92-93 (emphasis added). *See also Clark v. State*, [Ms. CR-12-1965, March 13, 2015] 196 So. 3d 285, 2015 Ala. Crim. App. LEXIS 19 (Ala. Crim. App. 2015) (holding that Rule 32 petitioner had failed to prove that his appellate counsel was ineffective for not raising issues on appeal where the petitioner did not call his appellate counsel to testify at the Rule 32 evidentiary hearing regarding counsel's reasons for not raising those issues).

In this case, Reeves's failure to call his attorneys to testify is fatal to his claims of ineffective assistance of counsel.
. . .

The decisions by counsel that Reeves challenges in claims . . . -- what experts to hire, what witnesses to call to testify, what mitigation evidence to present, what objections to make and what issues to raise at trial, and what issues to raise on appeal -- are typically considered strategic decisions, and do not constitute per se deficient performance. *See, e.g., Walker v. State*, [Ms. CR-11-0241, February 6, 2015] 194 So. 3d 253, 2015 Ala. Crim. App. LEXIS 8 (Ala. Crim. App. 2015) ("'An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy.' *People v. Payne*, 285 Mich. App. 181, 190, 774 N.W.2d 714, 722 (2009). '[I]n general, the "decision not to hire experts falls within the realm of trial strategy."' *State v. Denz*, 232 Ariz. 441, 445, 306 P.3d 98, 102 (2013), quoting *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993)."); *Johnson v. State*, [Ms. CR-05-1805, September 28, 2007]    So. 3d    ,    , 2007 Ala. Crim. App. LEXIS 178 (Ala. Crim. App. 2007) ("'[I]n the context of an ineffective assistance claim, "a decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess."' *Curtis v. State*, 905 N.E.2d 410, 415 (Ind. Ct. App. 2009). '[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.' *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008)."); *Dunaway v. State*, 198 So. 3d 530, 547, 2009 Ala. Crim. App. LEXIS 174 (Ala. Crim. App. 2009) ("'The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.' *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005)."), rev'd on other grounds, [Ms. 1090697, April 18, 2014] 198 So. 3d 567, 2014 Ala. LEXIS 59 (Ala. 2014); *Lane v. State*, 708 So. 2d 206, 209 (Ala. Crim. App. 1997) ("This court has held that '[o]bjections are a matter of trial strategy, and an appellant must overcome the presumption that "conduct falls within the wide range of reasonable professional assistance," that is, the presumption that the challenged action "might be considered sound trial strategy."' *Moore v. State*, 659 So. 2d 205, 209 (Ala. Cr. App. 1994)."); and *Thomas v.*

*State*, 766 So. 2d 860, 876 (Ala. Crim. App. 1998) ("[A]ppellate counsel has no constitutional obligation to raise every nonfrivolous issue. ... Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal."), aff'd, 766 So. 2d 975 (Ala. 2000), overruled on other grounds, *Ex parte Taylor*, 10 So. 3d 1075 (Ala. 2005).

The burden was on Reeves to prove by a preponderance of the evidence that his counsel's challenged decisions were not the result of reasonable strategy, i.e., the burden was on Reeves to present evidence overcoming the strong presumption that counsel acted reasonably. However, because Reeves failed to call his counsel to testify, the record is silent as to the reasons trial counsel (1) chose not to hire Dr. Goff or another neuropsychologist to evaluate Reeves for intellectual disability and chose not to present testimony from such an expert during the penalty phase of the trial that Reeves was intellectually disabled in order to establish a mitigating circumstance; (2) chose to rely during the penalty phase of the trial on the testimony of Dr. Ronan to present mitigation evidence; (3) chose not to object to Dr. Ronan's testimony on cross-examination during the penalty phase of the trial that Reeves was not intellectually disabled; and (4) chose not to object at trial to the prosecutor's allegedly urging the jury during closing arguments at the penalty phase of the trial to consider nonstatutory aggravating circumstances to impose a death sentence, to the prosecutor's introducing evidence and making argument during both the guilt and penalty phases of the trial that Reeves was involved in a gang, to the prosecutor's allegedly referring to the jury's penalty-phase verdict as a recommendation, and to the trial court's instructing the jury that its penalty-phase verdict was a recommendation. The record is also silent as to the reasons appellate counsel chose not to raise on appeal the claims that the prosecutor improperly urged the jury during closing arguments at the penalty phase of the trial to consider non-statutory aggravating circumstances to impose a death sentence, that the prosecutor improperly introduced evidence and argued during both the guilt and penalty phases of the trial that Reeves was involved in a gang, that the prosecutor improperly referred to the jury's penalty-phase verdict as a recommendation, and that the trial court improperly instructed the jury that its penalty-phase verdict was a recommendation. Where """the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.""" *Broadnax*, 130 So. 3d at 1256 (citations omitted).

*Reeves*, 226 So. 3d 711, 746-52.

Reeves has failed to overcome the AEDPA burden of establishing that the state court decision was contrary to or based on an unreasonable application of *Strickland*. *See Cullen v. Pinholster*, 563 U.S. 170, 190, 196 ("The Court of Appeals was required not

simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons Pinholster's counsel may have had for proceeding as they did.'") (alteration in original) (internal citation omitted).

Pursuant to *Strickland,* "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689 (citation omitted). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* "Surmounting *Strickland's* high bar is never an easy task", *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010), but it is even more daunting in the habeas context where state courts have adjudicated the ineffective assistance claim on the merits in post-conviction proceedings, as is the case here, making § 2254(d) applicable. **The question now is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."** *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)(emphasis added). Put another way, Reeves must not only satisfy the two *Strickland* prongs, but he must also "show that the State court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (citations and internal quotation marks omitted). "Although courts may not indulge '*post hoc* rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions, *Wiggins*[ *v. Smith*, 539 U.S. 510], 526-527, 123 S. Ct. 2527, 156 L. Ed. 2d 471[ (2003)], neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington v. Richter*, 562 U.S. 86, 109, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Accordingly, the state court appropriately reviewed Reeves's ineffective assistance claims - giving deference to counsel's decisions, as it must. *Strickland*, *supra* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Without the testimony of counsel explaining their strategy, Reeves was left to show that counsel's decisions were unreasonable and prejudiced the outcome of his case, *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1245 (11th Cir. 2011) ("To give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. . . . and it is the petitioner's burden to persuade us otherwise."), and Reeves failed to carry his burden.

In support of his proposition that counsel's testimony is not required to rebut the presumption of correctness, Reeves relies on *Ex parte Whited* – this reliance, however, is misplaced. Most notably, Whited's trial counsel did testify regarding the decision to wave closing argument. *Ex parte Whited*, 180 So. 3d 69 (Ala. 2015). In that case, trial counsel indicated that he "did not recall" the specifics of that decision, yet he was able to recall other aspects of the case, like the strategy to continue the case until victim was of age, the strategy to present an alibi, and the strategy to impeach the victim's testimony. Based on counsel's testimony, the court was unable to reconcile the challenged decision against the total evidence of the case. Consequently, the court found counsel's testimony failed to support that the decision to waive closing argument was in fact "strategic". *Id*. at 82. In the case at hand, Reeves certainly put forth briefs and argument regarding what trial decisions counsel made; however, this evidence sheds no light on the reasoning behind

counsel's action and, standing alone, this evidence is insufficient to prove counsel was ineffective.[19]

Review of the trial court's decision reveals that the court considered the total evidence of record for each claim and concluded it fell short of objectively establishing deficient performance.[20]  (*See*, *infra*, section IV, 3, b through e discussing the state court's denial of Reeves's claims of ineffective assistance of counsel).  With the record void of evidence (including the testimony of counsel) that the complained of actions were not the result of reasonable strategy, the court interpreted the evidence, as required, with deference to counsel's decisions and competency.  Considering the evidence in such a light demonstrates that counsel's actions "might be considered sound trial strategy." *Strickland*, *supra* at 689.  Thus, it cannot be said that the Alabama Court of Criminal Appeals unreasonably applied the *Strickland* standard to the facts of Reeves's ineffective assistance claims.  *See Wiggins*, 539 U.S. at 520-21 ("The state court's application [of Supreme Court precedent] must have been 'objectively unreasonable'" to obtain habeas relief on a claim

---

[19]     In dissenting to the Unites States Supreme Court's denial for writ of certiorari, Justice Sotomayor concluded that the Alabama Court of Criminal Appeals unreasonably applied *Strickland* by requiring counsel's testimony to establish that his counsel's performance was deficient. *Reeves v. Alabama*, __ U.S. __, 138 S. Ct. 22, 199 L. Ed. 2d 341 (2017)(Sotomayor, J., dissenting).  The dissent explained that "Reeves presented ample evidence in support of his claim that his counsel's performance was deficient, but the court never considered or explained why, in light of that evidence, his counsel's strategic decisions were reasonable.  It rested its decision solely on the fact that Reeves had not called his counsel to testify at the postconviction hearing." 138 S. Ct. at 28.

[20]     In denying Reeves's ineffective assistance of counsel claim, the Circuit Court stated:
        The Court notes at this point that the Petitioner during his Evidentiary Hearing, failed to call either Goggans or Wiggins in support of their claim of ineffective assistance of counsel.  Therefore, this Court will review this claim in light of this failure and consider only that which is in the Record.
(Doc. 23-16 at 154-55, Vol. 16, JR-__, pp. 20-21).

that was previously decided on the merits by the state courts.) (internal citation omitted). Consequently, Reeves's claim for habeas relief on this basis is denied.

### b. Claim that counsel failed to investigate Reeves's alleged intellectual disability.

In his petition, Reeves asserts that trial counsel had a duty to investigate his mental capacity and background where record materials indicated the possibility of mitigating evidence of intellectual disability. (Doc. 24 at 58). Respondent contends the merits of this claim were addressed and denied by the state courts in post-conviction proceedings. In denying the claim in Reeves's Rule 32 petition, the trial court state:

> This Court by Order dated October 20, 1997, approved funds for the purpose of hiring a neuropsychologist. Soon after the funds were approved, Defense Counsel McLeod withdrew, and the Court appointed Goggans and Wiggins.
>
> The Court notes at this point that the Petitioner during his Evidentiary Hearing, failed to call either Goggans or Wiggins in support of their claim of ineffective assistance of counsel. Therefore, this Court will review this claim in light of this failure and consider only which is in the Record.
>
> Trial Counsel made a decision to rely on the testimony of Dr. Kathy Ronan rather than retain Dr. John Goff.
>
> When Dr. Ronan's testimony is considered in its entirety together with the records collected by Trial Counsel, there was no indication of a diagnosis of mental retardation. As a matter of fact, Dr. Ronan on cross-examination by Assistant District Attorney Wilson was asked,
>
> > "Q.     So he wasn't actually mentally retarded?
> >
> > A.     He was not in a level that they would call him mental retardation, no."
>
> Furthermore, the Reeves Trial took place four years before the United States Supreme Court issued its Opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002). Therefore, the Court nor the Jury would have been required to consider mental retardation as a mitigating circumstance. The Court finds that the Petitioner failed to prove by a preponderance of the evidence ineffective

assistance of counsel as alleged in Sec. II(a), Failure to prove necessary
expert assistance.

(Doc. 23-16 at 154-55, Vol. 16, JR-65, pp. 20-21).   The Alabama Court of Criminal

Appeals, in its memorandum opinion affirming the trial court's denial of Reeves's claim,

stated:

> The burden was on Reeves to prove by a preponderance of the evidence that
> his counsel's challenged decisions were not the result of reasonable strategy,
> i.e., the burden was on Reeves to present evidence overcoming the strong
> presumption that counsel acted reasonably. However, because Reeves failed
> to call his counsel to testify, the record is silent as to the reasons trial counsel
> (1) chose not to hire Dr. Goff or another neuropsychologist to evaluate
> Reeves for intellectual disability and chose not to present testimony from
> such an expert during the penalty phase of the trial that Reeves was
> intellectually disabled in order to establish a mitigating circumstance . . .

*Reeves v. State*, 226 So. 2d at 750-51.

 "It is unquestioned that under the prevailing professional norms at the time of

[Reeves's] trial, counsel had an 'obligation to conduct a thorough investigation of the

defendant's background.'"  *Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 175 L.

Ed. 2d 398 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L.

Ed. 2d 389 (2000).   Where counsel has reason to know of potential mitigating evidence

they are required to investigate.  *See Wiggins v. Smith*, 539 U.S. 510, 524-25, 123 S. Ct.

2527, 156 L. Ed. 2d 471 (2003) (held that counsel "fell short of . . . professional standards"

for not expanding their investigation beyond the presentence investigation report and one

set of records they obtained, given the facts discovered in the two documents); *Daniel v.

Comm'r.,* 822 F.3d 1248 (11th Cir. 2016) (counsel's performance was deficient where

mitigation investigation ended after "acquir[ing] only rudimentary knowledge of

[petitioner's] history from a narrow set of sources.").   "In any ineffectiveness case, a

particular decision not to investigate must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*,

466 U.S. at 691. At some point during trial preparation, counsel "will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" *Pinholster*, 131 S. Ct. at 1407 (quoting *Strickland*, 466 U.S. at 691). The "strategic choices [of counsel] made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," while those "made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation." *Strickland*, 466 U.S. at 690-91.

Unlike the cases cited by Reeves in his petition, the record confirms trial counsel engaged in investigating Reeves's mental capacity – thus, this claim more appropriately characterized as a question of the scope of counsel's investigation and trial strategy. It is undisputed from the trial record that counsel obtained substantial evidence of Reeves's educational history, medical history, juvenile correctional experience, family and social history, and work experience. See doc. 23-1 at 2-9, Vol. 1, JR-1 docketing counsel's requests for production of records. In addition, Reeves makes no claim that counsel were unaware of any of the information concerning his background or mental health history contained in these voluminous records. Indeed, these records raised red flags regarding substantial issues, including Reeves's mental capacity, prompting attorneys McLeod and Wiggins to petition the court, on September 16, 1997, for funds to hire an expert, Dr. Goff, to evaluate Reeves and assist in preparation of mitigation evidence for the penalty phase. (*See* Doc. 23-1 at 70-73; Vol. 1, JR-2, pp. 64-67). The trial court initially denied the Motion for Appointment of Clinical Neuropsychologist for Interview, Testing, Evaluation, and Trial Testimony Regarding Defendant and for Funds to Pay Such Expert, and counsel argued in their Application for Rehearing that they "possesse[d] hundreds of pages of psychological, psychometric and behavioral analysis material" and "[t]hat a clinical

neuropsychologist or a person of like standing and expertise [was] the only avenue open to the defense to compile [and] correlate this information, interview [Reeves,] and present this information in an orderly and informative fashion to the jury during the mitigation phase of the trial."  (Doc. 23-1 at 74; Vol. 1, JR-2 p. 68).  Counsel was granted a hearing on the motion to appoint and presented to the court:

> We have, however, filed a motion by recommendation of the Capital Mitigation Resources Program which has been assisting us with this matter because of the tremendous conflicting information we have received through probably I would anticipate more than 150 to 200 pages of material with reference to psychological and psychiatric evaluations, et certera, for the mitigation phase of this proceeding, we would need the services of a neuropsychiatrist and neuropsychologist that has previously been ordered in other capital cases as Mr. Greene so adequately reminded me.  And we are asking for the same because in this instance the State has put us on notice that they are going for the death penalty.  And the amount of material that we have received through discovery from the school and the Department of Youth Services is beyond our ability to deal with and feel that Dr. Goff would be competent to deal with that matter.

(Doc. 23-3 at 91; Vol. 1, JR-5, p. 7).[21]  On October 16, 1997, the court granted counsel's motion and approved the funding for and appointment of John R. Goff, Ph.D.  (Doc. 23-1 at 81; Vol. 1, JR-2, p. 75).  Subsequently, Attorney McLeod withdrew as counsel[22] and was replaced by attorney Thomas Goggans.  (Doc. 23-1 at 3, 78-80, Vol. 1, JR-1, p. 2; Vol.

---

[21]     At the hearing on the motion to appoint, the prosecution argued against the appointment of Dr. Goff reasoning that Dr. Goff was essentially "an expensive helper" and that the defense attorney could read the discovered reports himself.  (Doc. 23-3 at 95, Vol. 1, JR-2, p. 11).  Specifically, the prosecution opined that "ask[ing] Dr. Goff to review school records about [Reeves's] maladjustment" was unproductive and inappropriate spending for "an incidental witness".  (*Id*.).

[22]     Review of Attorney McLeod's motion to withdraw as counsel indicates an inability "to establish a meaningful attorney-client working relationship" as the reason for his withdrawal.  (Doc. 23-1 at 78; Vol. 1, JR-2, p. 72).   According to McLeod, "defendant ha[d] been combative, argumentative and ha[d] totally refused to assist [McLeod] in any manner with the trial of his cause."  (*Id*.).

1, JR-2, pp. 72-75). Attorneys Wiggins and Goggans, thereafter, on December 3, 1997, petitioned the court for and were granted access to the complete mental health records of the Taylor Harden Secure Medical Facility in connection with its evaluation and treatment of Reeves, including the records related to Dr. Kathy Ronan's June 3, 1997, evaluation of Reeves. (Doc. 23-1 at 88, 150; Vol. 1, JR- 2, pp. 82, 144). The record, however, remains silent as to why Wiggins and Goggans never contacted Dr. Goff or hired any other expert to evaluate Reeves for intellectual disability.[23]

As reasoned by the state court and previously discussed, *supra*, the record is void of information related to trial counsel's ultimate decision not to hire Dr. Goff or further investigate Reeves's intellectual disability; the decision is, therefore, presumed reasonable unless rebutted by the total record evidence. In this case, the record reveals that counsel not only obtained extensive documentation from Reeves's childhood and adolescent years but counsel presented the information contained in the documents at the trial and penalty phase. The voluminous records indicate that Reeves was within the borderline range of intellectual functioning (represented by the full-scale score achieved when he was 14 years old and the verbal score achieved from the testing of Dr. Ronan), and these records further evidence that Reeves was denied special education services for intellectual disability and was instead recommended for emotional conflict and behavioral services. As such, Reeves's trial counsel cannot reasonably be faulted for failing to pursue further expert inquiry into Reeves's intellectual functioning where the evidence objectively indicated

---

[23] Dr. Goff testified at the Rule 32 evidentiary hearing that Lucia Penland, from the Rison Project, notified him in 1997 that he his appointment had been approved by the court to interview and evaluate Reeves; however, he was never contacted by counsel. (Doc. 23-24 at 67-68; Vol. 24, JR-85, pp. 66-67). Dr. Goff exclaimed that he assumed the case "had pled out", but years later, during a conversation with Ms. Penland, he inquired about the case and Ms. Penland "said that they just never called [her]. (Doc. 23-24 at 68; Vol. 24, JR-85, p. 67).

Reeves was not intellectually disabled. In light of the total circumstances, trial counsel's decision not to expand its investigation further into Reeves's intellectual disability cannot be viewed as unreasonable, as the question is not "what the best lawyers" or "even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citation omitted). Consequently, Reeves has failed to satisfy the deficient performance prong of establishing ineffective assistance of counsel, and the state court's decision was not contrary to, or involved an unreasonable application of, clearly established federal law, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented.

Additionally, Reeves has failed to show that he was prejudiced by the failure of counsel to hire Dr. Goff or to further investigate his intellectual disability.[24] While "the demonstrated availability of undiscovered mitigating evidence clearly me[ets] the prejudice requirement", *Armstrong v. Dugger*, 833 F.2d 1430, 1434 (11th Cir. 1987), the trial record evidences that Reeves's intellectual functioning was in the borderline range, and the jury was informed of Reeves's lower intellectual functioning multiple times during

---

[24]    Where counsel ignores "red flags" "alerting them to the need for more investigation", counsel performs deficiently. *Rompilla*, 545 U.S. at 392; *see also Jefferson v. Sellers*, 250 F. Supp. 3d 1340 (N.D. Ga. 2017) (counsel was ineffective for failing to obtain neuropsychological testing following mental health expert's recommendation and knowledge of head trauma (petitioner was struck by a car when he was 2 years old)); *Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991) (counsel rendered ineffective assistance where he failed to put forth any mitigating evidence despite that an investigation would have uncovered an impoverished childhood, epileptic seizures, and organic brain damage); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) (counsel's failure to conduct a mitigation investigation beyond petitioner's character was ineffective where "obvious evidence of serious mental illness" was undiscovered). However, Reeves's case is distinguishable from such cases, as Reeves's counsel initiated investigation and discovery of voluminous background information regarding Reeve and presented evidence of the same at trial.

the penalty phase, including in defense counsel's opening statement, through the testimony of Marzetta Reeves and Dr. Kathy Ronan, and during counsel's closing statement. *Daniel v. Comm'r*, 822 F.3d 1248 (11th Cir. 2016) (The Court explained that "borderline intellectual disability that does not rise to the level of intellectual disability under *Atkins* is still powerful mitigation.") (citing *Williams*, 529 U.S. at 398, 120 S. Ct. at 1515 ("[T]he reality that [Mr. Williams] was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."); *Wiggins* 539 U.S. at 535, 123 S. Ct. at 2542 (noting that "diminished mental capacities" is among "the kind of troubled history . . . relevant to assessing a defendant's moral culpability.")).  Because post-conviction investigation further confirmed this borderline level of functioning and the jury was informed of the same, Reeves has failed to carry his burden of establishing that he was prejudiced by counsel's failure to further pursue investigating his intellectually functioning.  For these reasons, the claim for habeas relief on this basis is denied.

### c. Claim that trial counsel failed to retain a mitigation expert and failed to present crucial mitigating evidence.

In his petition, Reeves asserts that trial counsel unreasonably relied on a court-appointed competency expert, Dr. Ronan, to provide mitigation evidence during the penalty phase, rather than retaining an experienced and qualified mitigation expert.  (Doc. 24 at 58-59).  In support of his claim, Reeves argues that Dr. Ronan never interviewed any family members, friends, or professionals in his life, and never spoke with counsel until the day prior to trial.  This claim was previously presented to the Alabama Court of Criminal, which stated, in its memorandum opinion affirming the circuit court's denial of Reeves's Rule 32 petition:

> As for Reeves's claim that his trial counsel were ineffective for not conducting an adequate mitigation investigation and for not presenting what

he claimed was substantial mitigation evidence during the penalty phase of the trial, . . .  we point out that Reeves's claim in this regard is not that counsel failed to conduct any mitigation investigation or that counsel failed to present any mitigation evidence during the penalty phase of the trial. Rather, Reeves's claim is that counsel did not conduct an adequate investigation and either did not present during the penalty phase of the trial all mitigating evidence that may have been available or did not present the mitigating evidence in the manner he believes would have been most appropriate.

"[T]rial counsel's failure to investigate the possibility of mitigating evidence [at all] is, per se, deficient performance." *Ex parte Land*, 775 So. 2d 847, 853 (Ala. 2000), overruled on other grounds, *State v. Martin*, 69 So. 3d 94 (Ala. 2011). However, "counsel is not necessarily ineffective simply because he does not present all possible mitigating evidence." *Pierce v. State*, 851 So. 2d 558, 578 (Ala. Crim. App. 1999), rev'd on other grounds, 851 So. 2d 606 (Ala. 2000).  When the record reflects that counsel presented mitigating evidence during the penalty phase of the trial, as here, the question becomes whether counsel's mitigation investigation and counsel's decisions regarding the presentation of mitigating evidence were reasonable.

> "'[B]efore we can assess the reasonableness of counsel's investigatory efforts, we must first determine the nature and extent of the investigation that took place....' *Lewis v. Horn*, 581 F.3d 92, 115 (3d Cir. 2009). Thus, '[a]lthough [the] claim is that his trial counsel should have done something more, we [must] first look at what the lawyer did in fact.' *Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000)."

*Broadnax*, 130 So. 3d at 1248 (emphasis added).

At the evidentiary hearing, Reeves presented testimony from Karen Salekin, a forensic clinical psychologist who performed a mitigation investigation, regarding the mitigation evidence he believes his counsel should have presented and the manner in which he believes that evidence should have been presented.  However, Reeves presented no evidence at the evidentiary hearing regarding what mitigation investigation his trial counsel conducted, because Reeves failed to call trial counsel to testify. Although Reeves argues that counsel's investigation was not adequate, because the record is silent as to the extent of counsel's actual investigation, we must presume that counsel exercised reasonable professional judgment in conducting the investigation and that counsel's decisions resulting from their investigation were also reasonable. The silent record before this Court regarding counsel's investigation and their resulting decisions as to what evidence to present during the penalty phase of the trial and how to present that evidence is not sufficient to overcome the strong presumption of effective assistance. *See, e.g., Woods v. State*, 13 So. 3d 1, 37 (Ala. Crim. App. 2007) (holding, on

appeal from four capital-murder convictions and a sentence of death, that the appellant had failed to establish that his counsel's mitigation investigation constituted deficient performance where the record contained "no evidence about the scope of counsel's mitigation investigation" but contained indications that counsel had at least conducted some mitigation investigation).

For the reasons set forth above, Reeves failed to satisfy his burden of proof as to his claims of ineffective assistance of counsel. Therefore, the circuit court properly denied those claims.

*Reeves*, 226 So 3d. at 751-52; (Doc. 23-31 at 89-92; Vol. 31, JR-94, pp. 88-91).  After a review of the record, it is clear that Reeves' counsel did present mitigating evidence at the penalty phase.  While more mitigation evidence may have been available, Reeves has failed to present evidence sufficient to rebut the presumption that counsel exercised reasonable professional judgment in constructing their mitigation strategy.

We emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*. 466 U.S., at 689, 80 L Ed 2d 674, 104 S Ct 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.,* at 690-691, 80 L Ed 2d 674, 104 S Ct 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.,* at 691, 80 L Ed 2d 674, 104 S Ct 2052.

*Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Ct. 2527, 2541, 156 L. Ed. 2d 471 (2003) (counsel's failure to investigate defendant's background was unreasonable "in light of the evidence counsel uncovered in the social services records--evidence that would have led a reasonably competent attorney to investigate further"); *see also Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (counsel's failure to review previous conviction files for aggravating details and mitigation leads which might have influenced

the jury's appraisal of petitioner's culpability was unreasonable given that counsel had notice that the prosecution sought to prove petitioner had a violent criminal history).

Review of the record reveals that counsel conducted a mitigation investigation by seeking information related to Reeves's background, evidenced by the various motions filed for Release of Records. (Doc. 23-1 at 5; Vol. 1, JR-1). Counsel further received the records, evidenced by the production of records from Carraway Methodist Medical Center, Selma Public Schools (including disciplinary reports, letters from teachers, standardized tests, special education assessments, and administration records and letters), Cahaba Mental Health Center (including counseling reports), Mobile Group Home. (Doc. 23-2 at 61-221; Doc. 23-3 at 1-85). Counsel comprehended the gravity of establishing a mitigation defense in a capital case, evidenced by counsel's obtained assistance of the Alabama Prison Project's Mitigation and Investigation Program[25] (doc. 23-1 at 17, Vol. 1, JR- 1; Doc. 23-3 at 91; Vol. 1, JR-5, p. 7) and counsel's petition to the court for the hiring of a mitigation expert. (Doc. 23-1a t 70-77). Counsel also presented this information to the jury and judge through the testimony of three witnesses and through its opening and closing statements at the penalty phase. The documents were also admitted into evidence and presented to the Jury as mitigation evidence. (Doc. 23-16 at 159). Thus, without evidence to the contrary, Reeves that the state court decision resulted in a decision contrary to, or involved an unreasonable application of, *Strickland*. Neither has Reeves shown that decision was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings.

---

[25]     On February 10, 1997, attorney McLeod petitioned the court for the approval of funds to obtain assistance from the Alabama Prison Project's Mitigation and Investigation Program. (Doc. 23-1 at 16-18). Counsel asserted that the assistance would be used to evaluate the reports and information received in the case. (*Id*. at 17).

Also, Reeves has failed to establish that he was prejudiced by counsel's failure to retain a mitigation expert. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. In Alabama, the sentencing judge makes the determination as to the existence and weight of aggravating and mitigating circumstances and the punishment, but he must give the jury verdict of life or death "consideration". Ala. Code § 13A-5-46 (1975)(a); *see also Harris v. Alabama*, 513 U.S. 504, 115 S. Ct. 1031, 130 L. Ed. 2d 1004 (1995) (discussing the "weight" that must be afforded to a jury's advisory sentencing verdict). Accordingly, to establish his claim, Reeves must show that but for his counsel's deficiency there is a reasonable probability he would have received a different sentence. In assessing that probability, courts consider "the totality of the available mitigation evidence--both that adduced at trial, and the evidence adduced in the habeas proceeding" --and "reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at 40-41 (quoting *Williams*, *supra*, at 397-398, 120 S. Ct. 1495, 146 L. Ed. 2d 389).

During the penalty phase, trial counsel presented in its opening statement to the jury that evidence would be presented regarding Reeves upbringing, intellectual functioning, and environment that would help explain what would cause Reeves to commit the murder for which he was convicted. (Doc. 23-8 at 92-96). Trial counsel stated:

> You'll hear evidence that Matthew Reeves is what psychologists or psychiatrists call borderline intellectual functioning. . . It means he is right on the borderline of being classified as retarded, not insane or anything like that. But he's on the borderline.
> You will hear that that has a lot to [sic] with how people act in different environmental situations. You'll hear about the environment that

Matthew Reeves grew up in. You will hear about lack of resources from all kinds of different places. You'll hear about lack of parental resources, lack of parental involvement. You'll hear of lack of school resources. The school just ran out of resourced for Matthew Reeves. You'll hear about lack of social services resources. You'll essentially hear about the lack of resources that are needed to raise somebody, to raise somebody up in the way that they will behave the way people should behave. And you put these things together with somebody who is borderline functioning, and you are going to have problems.

Everybody is going to gravitate toward something. Everybody makes choices. The question is how capable is this person of making a choice in any situation. The evidence here will be Matthew Reeves has borderline intellectual functioning. It's probably not going to be great in any sense. But the choices that are made will be influenced by the environment factors, how people are raised, et cetera.

You will hear evidence that people of his mental functioning are going to gravitate towards something. Everybody gravitates towards something, and some people are going to gravitate towards sports or Boy Scouts or church or whatever is out there that the appropriate resources provide for the child growing up. And Matthew Reeves' situation - - all of these things that we might normally think of as every day activities, every day resources you or I might have or we provide for our children weren't there. The thing out there for Matthew Reeves, the only structure of any sort if you can call it that was a structure of violence, gangs, thug life. The other resources just weren't there for him for somebody with borderline intellectual functioning.

(Doc. 23-8 at 94-96; Vol. 8, JR-22, JR23, pp. 1114-1116). Trial counsel then called Detective Grindle, Marzetta Reeves, and Dr. Kathy Ronan to present mitigation testimony.

Detective Grindle testified as to the dilapidated condition of Reeves's family home, which included graffiti on the front door, the lack of interior doors, open sections in the ceiling, and 16 photographs of the house were entered into evidence. (Doc. 23-8 at 98-102).

Marzetta Reeves, Reeves's mother, testified as to Reeves's background. She explained that Reeves has never known his father, indicating that Reeves first met his father around age 14 and once again at 16 years of age. She described that she relied solely on government assistance for income and identified at least ten (10) people who occupied the family's three-bedroom home (as the fourth bedroom was unusable due to a hole in the

roof which leaked water when it rained). According to Ms. Reeves, Matthew Reeves failed several grades, including first and third or fourth, and was socially promoted to seventh grade. She stated that Matthew Reeves began receiving mental health services in second or third grade, namely medication for hyperactivity and some counseling, but that in his early grades teachers would comment that Reeves was "doing really good" and "he was making good grades." (Doc. 23-8 at 108). Ms. Reeves further testified that Reeves was kicked out of school in the eighth grade, although she maintained she was unaware of why. She indicated that Reeves thereafter attended some GED classes, but when he was placed into a group home, he went entered the Job Corps and earned certificates in welding and auto mechanics. Upon his return home, Reeves went to work for Mr. Ellis's construction company, performing roofing and carpentry work. She further detailed that Reeves did well at the job and would wake up at 5:30/6:00 a.m. and be ready when his ride arrived to take him to work. Ms. Reeves further confirmed that approximately three months prior to the committed crime, Reeves was shot in the head on her front porch.

On cross examination, Ms. Reeves admitted Reeves had been in legal trouble multiple times prior to the incident in question for "lots of things", including stealing cars, breaking into homes, assault and drug offenses. The prosecution presented evidence that Reeves had been using marijuana since he was twelve and that he had numerous disciplinary actions at school (including cussing at teachers, threatening teachers, refusing to obey teachers, and hitting students) which caused him to be expelled. Ms. Reeves further opined that Reeves's behavior and conduct was better when Reeves was separated from his brother Julius, i.e., in group homes or when Julius was away in juvenile detention.

Dr. Kathy Ronan, clinical psychologist and forensic expert, then testified as to her examination, diagnosis, and opinion of Reeves.[26] In evaluating Reeves's mental state at the time of the crime and his competency to stand trial, Dr. Ronan stated that she relied on as much information as the parties had available, including investigative reports, police reports, witnesses' statements, coroner's statements, psychiatric history, juvenile history, scholastic history, as well as interviewing the defendant personally. In Reeves's case, she claimed that both the prosecution and defense provided her with these records and she also requested medical records from Carraway Medical Center and Selma Medical Center regarding treatment of Reeves's gunshot wound and psychiatric hospitalization, respectively.[27]

Review of the received records revealed and Dr. Ronan testified that Reeves "came from a very turbulent upbringing", which lacked "structure in the home or guidance or supervision." (Doc. 23-8 at 140; Vol. 8, JR-24, p. 1160). The jury further heard from Dr. Ronan that Reeves "presented with a number of behavioral difficulties in school. There [were] constant attempts on the part of the school to communicate with his mother - - the father was not present in the home - - in order to try and get him into appropriate programs and to control his behaviors." (*Id*.). The school records reviewed indicated "extreme truancy" and it was discovered that Reeves, and his brother, were roaming the streets. (*Id*. at 141). Documentation evidenced Reeves's mother suffered from a drinking problem and

---

[26] Dr. Ronan confirmed she has completed approximately 700 forensic examinations in her eleven (11) years of practice. (Doc. 23-8 at 133).

[27] According to Dr. Ronan, the medical records related to psychiatric treatment at Selma Medical Center were never received, but no information was discovered to indicate that Reeves ever suffered from any type of major psychiatric disorder (doc. 23-8 at 157-58; Vol. 8, JR-24, pp. 1177-78), nor did medical records support that the gunshot wound to Reeves caused any neurological damage (doc. 23-8 at 157; Vol. 8, JR-24, p. 1177).

failed to "follow up" with: school recommendations to come in and discuss problems, mental health counseling appointments, and mental health treatment, including medication for attention deficient disorder. Dr. Ronan described that Reeves was twice placed in a group home by the Department of Youth Services subsequent to being adjudicated as a serious juvenile offender (for assault offenses), and while in the structured environment, Reeves "responded positively". (Doc. 23-8 at 146; Vol. 8, JR-24, p. 1166). Dr. Ronan further described how Reeves often followed the lead of his younger brother, Julius Reeves, and was involved in gang activity – which she explained was "not uncommon . . . to see individuals who may have a lot of loose structure at home become heavily involved in gang activities." (Doc. 23-8 at 147; Vol. 8, JR-24, p. 1167). Dr. Ronan expounded that gangs for such individuals become a "subculture", "[a]nd because this is who they are relating with, you know, going out shooting someone becomes nothing to them. It doesn't have the same meaning as it does for you and me." (Doc. 23-8 at 147-48; Vol. 8., JR-24, pp. 1167-68).

Dr. Ronan further testified that she conducted intellectual testing during her evaluation; specifically, she administered the verbal portion of the adult version of the Wexler Intelligence Scale. (Doc. 23-8 at 144-45; Vol. 8, JR-24, p. 1164-65). Dr. Ronan explained that she gave the verbal portion because it dealt with one's ability to understand and reason more so than the eye, hand coordination portion of the test, on which Reeves scored a 74 and fell within the borderline range of intellectual functioning. (Doc. 23-8 at 145, Vol. 8, JR-24, p. 1165). She opined that this verbal IQ score was comparable to the verbal score of 75 Reeves received when he was administered the child's version of the test at 14 years of age. (*Id*.). When questioned about the affect Reeves's lower intelligence, lack of parenting, and lack of discipline had on Reeves's decision to participate in gang

activity, Dr. Ronan affirmed that such factors "most certainly" made Reeves "more susceptible to [the] influence of gangs." (Doc. 23-8 at 148; Vol. 8. JR-24, p. 1168). She also opined that Reeves developed a personality disorder, which included adaptive paranoia due to his exposure to and need to survive in a dangerous environment, and that this disorder may not have occurred had Reeves been raised in what would be termed a "normal environment". (Doc. 23-8 at 149-50; Vol. 8; JR-24, pp. 1169-70). Dr. Ronan diagnosed Reeves as having a personality disorder mixed with anti-social paranoia (characterized as one who would repeatedly violate legal and social boundaries coupled with a mistrust of things around them) and borderline features (characterized as one who misreads social cues or has difficulty establishing close bonds with people). (*Id*). Dr. Ronan affirmed that the combination of Reeves' environmental and intelligence factors must be considered together when assessing "how [Reeves] got to where he is." (Doc. 23-8 at 151; Vol. 8, JR-24, p. 1171).[28]

---

[28]    As supporting evidence to Reeves's Rule 32 petition, Reeves submitted the affidavit of Dr. Kathy Ronan, in which she affirms that although she testified at Reeves's penalty phase hearing, a more thorough evaluation is necessary for mitigation in a capital case. Specifically, Dr. Ronan stated:

> The evaluation for Capital sentencing would contain different components than those for the trial phase evaluations, and would be more extensive in terms of testing and background investigation. These components were not completed in the case of Mr. Reeves in that I responded to the Court order and completed only evaluation of those areas I was requested to respond to, namely Competence to Stand Trial and Mental State at the Time of Offense.

(Doc. 23-15 at 11; Vol. 15, JR-60, p. 4). Dr. Ronan opined that due to Reeves's borderline intelligence range, an extensive neuropsychological evaluation and thorough background investigation would be clinically appropriate when considering a diagnosis of Mental Retardation and mitigation evidence for Capital sentencing. (Doc. 23-15 at 10-12; Vol. 15, JR-60, pp. 3-5).
The trial court considered Dr. Ronan's affidavit "in it's entirety" and concluded:

> Dr. Ronan's testimony during the sentencing phase of the Trial when considered with all exhibits and documents available to her at the time

Turning to the post-conviction Rule 32 hearing, Reeves presented the testimony of Dr. Karen Salekin, a forensic psychologist, in support of his claim that counsel unreasonably failed to retain a mitigation expert and put forth crucial mitigation evidence. Dr. Salekin opined that the mitigation evidence presented at the penalty phase was "a hodgepodge of information put out without context." (Doc. 23-24 at 132). She noted that testimony was provided as "single items" but "the whole story" was not present, i.e., "how the risk factors come together, how they play out in terms of protective factors and resilience"; according to Dr. Salekin, Dr. Ronan and Marzetta Reeves did not testify as to how the risk factors affected Reeves's development over time. (Doc. 23-24 at 132). In conducting her mitigation investigation, Dr. Salekin reviewed the records of Reeves's childhood and adolescent years, mental health records of Reeves's mother, Marzetta Reeves, criminal court records of Reeves's brother, Julius Reeves, interviewed Reeves's mother, his aunt, his previous employer, Jerry Ellis, and friends of the family, Beverley Seroy and Charles Morgan, and reviewed the trial transcript in her evaluation for mitigation evidence. Dr. Salekin illuminated the importance of early intervention in assisting individuals with numerous risk factors to help them develop coping strategies. (Doc. 23-24 at 134-136). Dr. Salekin identified and expounded on ten developmental risk factors related to Reeves: (1) multi-generational dysfunction, (2) maternal mental illness, (3) home environment, (4) father absence, (5) child neglect, (6) neuropsychological deficits, (7)

---

including the Report prepared by her, establishes that it was reasonable for Defense Counsel to rely on her testimony and work as the sole source of mitigation evidence during the sentencing phase of his Trial. "The fact that Petitioner can find a professional witness years after his Trial that is willing to testify favorably at a post-conviction hearing in no way establishes that Trial Counsel's performance was deficient." *Horsley vs. Alabama*, 45 Fed.3rd 1486, 1495 (11th Cir. 1995).

(Doc. 23-16 at 157; Vol. 16, JR-65, p. 956).

deficient academic performance, (8) childhood psychological disorder, (9) institutionalization during adolescence, and (10) socioeconomic status.

Dr. Salekin testified that Reeves's mother was raised in a dangerous environment of abuse and neglect, with parents involved in illicit activities, and this negative pattern influenced Marzetta Reeves, causing her to develop a mental illness, specifically depression, and the dysfunction perpetuated downward to the next generation. Dr. Salekin testified as to the negative influence Reeves's brother Julius had on him and noted when Reeves was by himself, in group homes, "he had the capacity to be a kind, considerate person, follow[ed] order . . . yet when he got out of that environment and faced with Julius again, the same pattern of behavior came through. And again people attributed that to Julius." (Doc. 23-24 at 141). Salekin's investigation revealed that Reeves was brought up in an overcrowded, physically dilapidated structure that was filthy, rodent infested and falling apart (in part due to a fire that was set by Julius Reeves which rendered a room unusable because of an unfixed hole in the ceiling that went straight to the outdoors) and located in an extremely dangerous part of town referred to as Crack City". (Doc. 23-24 at 143). Ten to fourteen people would occupy the home simultaneously - creating a chaotic, argumentative, confrontational and violent environment, which negatively modeled to Reeves how to be involved in crime and deal with people. (Doc. 23-24 at 145). Weapons, alcohol and illicit substance abuse were mainstays of the house, and it was reported that children in the home often had easy access to guns and alcohol. Dr. Salekin testified that Reeves was often left at home with his grandmother, who did not want Marzetta to have Reeves at the age of 17 and encouraged her to abort him. And, the mental health, counseling records noted that Reeves had no positive reinforcement or emotional support at home or consistent discipline from his mother.

Records further revealed that Marzetta Reeves's depression was often untreated due to her noncompliance with medication, which can render one unable to parent appropriately and hinder the ability of a parent to attach to children. According to Dr. Salekin, Marzetta Reeves admitted, and Marzetta's sister confirmed, that she would often put her needs before her children and was unaware of her children's whereabouts, including their gang activity.

According to Dr. Salekin, Reeves's father, who was absent from Reeves's life until Reeves first had contact with him at age 15 (and once thereafter) was involved in criminal activity including the usage and selling of drugs. Dr. Salekin opined that Reeves likely idolized his father and speculated that Reeves may have modeled his father's criminal behavior. Additionally, Dr. Salekin opined that the three boyfriends of Marzetta Reeves also had a negative impact on Reeves. (Doc. 23-24 at 169-172).

In Dr. Salekin's opinion, these combined factors set Reeves on a path for conduct disorder which impacted his ability to function in school and in society. She explained that the combination of learning difficulties and conduct problems, like Reeves's, require early intervention or "there is a high likelihood that the behavior is going to worsen." (Doc. 23-24 at 178). Dr. Salekin confirmed this is exactly what happened to Reeves; his lower intellectual functioning was looked over and his dysfunctional behavior became the primary focus. Reeves, who was noncompliant with his attention deficit disorder and receiving low grades, began to act out to get attention. (Doc. 23-24 at 184-87). She affirmed that "the end result for someone with so many risk factors is often in the criminal justice system because there is nothing there to support the individual." (Doc. 23-24 at 164).

A comparison of the testimony presented at the penalty phase to that of the Rule 32 hearing demonstrates that the evidence produced in post-conviction proceedings by mitigation expert Dr. Salekin was more detailed but did not reveal completely unknown facts from those presented during the trial.[29] *See Walker v. State*, 194 So. 3d 253, 288 (Ala. Crim. App. 2015) ("[A] claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.") (quoting *Frances v. State*, 143 So. 3d 340, 356 (Fla. 2014). Instead the Rule 32 evidence was merely cumulative to that presented at the penalty phase. *But cf.*, *Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015) ("because the sentencing judge and jury never heard evidence that Mr. Williams was a victim of sexual abuse, such evidence is not 'cumulative'. . . [and] can be powerful mitigating evidence, and is precisely the type of evidence that is 'relevant to assessing a defendant's moral culpability.'") (internal citation omitted).

Additionally, review of the sentencing order in light of the total evidence presented reveals that Reeves has failed to establish prejudice due to the failure of counsel to retain a mitigation expert. A single aggravating factor is articulated in the sentencing order (that being that the capital offense was committed while the defendant was engaged in the commission of a robbery), along with two mitigating factors: (1) that Reeves has no significant history of prior criminal activity, because juvenile adjudications may not be used to rebut the mitigating circumstance, and (2) Reeves' age at the time of the crime. The sentencing judge noted that the evidence was overwhelming that Reeves was the leader

---

[29] Notably, Dr. Salekin identified information related to Marzetta Reeves's life history and expounded on her neglectful parenting; additionally, Reeves's early exposure to guns, alcohol, and drug abuse due to its presence in the home was discussed.

of the crime and that despite Reeves's "low intellectual level, there was no evidence to show that he did not appreciate the criminality of his conduct, and there was no credible evidence presented to show that he could not conform his conduct to the requirements of law." (Doc. 23-2 at 24-25; Vol. 2, JR-3, p. 5-6). While acknowledging that Reeves "grew up in a poor home environment and that he lacked appropriate developmental resources in growing up", the sentencing judge maintained that evidence established "when placed in a structured environment, he responds positively", supporting that Reeves "had the ability to conduct himself properly and not engage in criminal conduct. He, however, voluntarily chose that course of conduct." (Doc. 23-2 at 25; Vol. 2, JR-3, p. 6). This assessment of aggravating and mitigating factors articulated in the sentencing order indicates "the new evidence" in Reeves's case "'would barely have altered the sentencing profile presented to the sentencing judge'", distinguishing this case from those where the "judge and jury at [the] original sentencing heard almost nothing that would humanize [the defendant] or allow them to accurately gauge his moral culpability." *Porter*, 558 U.S. at 41 (quoting *Strickland*, *supra*, at 700); *see also Evans v. Secretary, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (en banc) (To satisfy the prejudice prong, the likelihood of a different result must be substantial, not just conceivable.). After reviewing the omitted mitigation evidence and that which was presented, it cannot be said that counsel was unreasonable in their decision not to retain a mitigation expert nor was Reeves prejudiced by the decision. Therefore, the state court's decision was not contrary to or an unreasonable application of federal law. Consequently, the claim for habeas relief on this basis is denied.

> **d. Claim that counsel failed to preserve error for appellate review and appellate counsel failed to raise claims on direct appeal.**

Reeves challenges in his petition that trial counsel failed to preserve the following errors for appellate review and appellate counsel failed to raise the same arguments on direct appeal: (1) instructional errors by the Circuit Court (that the jury's verdict was advisory); (2) prosecution's misconduct and improper arguments during trial;[30] and (3) unconstitutionality of Alabama's sentencing scheme. (Doc. 24 at 60). Respondent asserts that this claim was addressed and denied by the Alabama Court of Criminal Appeals on post-conviction appeal and, additionally, that the claim lacks merit. (Doc. 25 at 85-89).

The Alabama Court of Criminal Appeals, in its memorandum opinion affirming the circuit court's denial of Reeves's Rule 32 petition, reasoned:

> "The decisions by counsel that Reeves challenges . . what objections to make and what issues to raise at trial, and what issues to raise on appeal - - are typically considered strategic decisions, and do not constitute per se deficient performance. *See, e.g.,* . . .*Lane v. State*, 708 So. 2d 206, 209 (Ala. Crim. App. 1997) ("This court has held that '[o]bjections are a matter of trial strategy, and an appellant must overcome the presumption that "conduct falls within the wide range of reasonable professional assistance," that is, the presumption that the challenged action "might be considered sound trial strategy."' *Moore v. State*, 659 So. 2d 205, 209 (Ala. Cr. App. 1994)."); and *Thomas v. State*, 766 So. 2d 860, 876 (Ala. Crim. App. 1998) ("[A]ppellate counsel has no constitutional obligation to raise every nonfrivolous issue. . . . Appellate counsel is presumed to exercise sound strategy in the selection of issues most likely to afford relief on appeal."), aff'd, 766 So. 2d 975 (Ala. 2000), overruled on other grounds, *Ex parte Taylor*, 10 So. 3d 1075 (Ala. 2005))."

---

[30]    In his habeas petition and response to the State's answer, Reeves fails to specify the "prosecution's misconduct and improper arguments" being challenged (Doc. 24 at 60-61; Doc. 28 at 29-32). Review of Reeves's Rule 32 Petition, where he first presented this claim, raises challenges to the prosecution's reference to Reeves as a gang member during the trial and penalty phase (doc. 23-14 at 189-192; Vol. 14, JR-60, pp. 41-45), to the prosecution's repeated comments and the court's instruction to the jury that its verdict was a recommendation (doc. 23-14 at 193-194; Vol. 14, JR-60, pp. 45-46), and to the prosecution's argument to the jury to consider non-statutory aggravating circumstances (doc. 23-14 at 194-197; Vol. 14, JR-60, pp. 47-49). Given that Reeves's habeas filings provide argument and citation support related only to the questions regarding the comments to the jury diminishing its sentencing role by referring to its verdict as "advisory" and challenges to Alabama's sentencing scheme, the Court, thus, interprets Reeves's ineffective assistance claim to be related to the same.

*Reeves*, 226 So. 3d at 750; Doc. 23-31 at 85; Vol. 31, JR-94, p. 84.  The Court of Criminal

Appeals further stated:

> "[T]he record is silent as to the reasons trial counsel. . . chose not to object at trial to the prosecutor's allegedly urging the jury during closing arguments at the penalty phase of the trial to consider nonstatutory aggravating circumstances to impose a death sentence, to the prosecutor's introducing evidence and making argument during both the guilt and penalty phases of the trial that Reeves was involved in a gang, to the prosecutor's allegedly referring to the jury's penalty-phase verdict as a recommendation, and to the trial court's instructing the jury that its penalty-phase verdict was a recommendation. The record is also silent as to the reasons appellate counsel chose not to raise on appeal the claims that the prosecutor improperly urged the jury during closing arguments at the penalty phase of the trial to consider non-statutory aggravating circumstances to impose a death sentence, that the prosecutor improperly introduced evidence and argued during both the guilt and penalty phases of the trial that Reeves was involved in a gang, that the prosecutor improperly referred to the jury's penalty-phase verdict as a recommendation, and that the trial court improperly instructed the jury that its penalty-phase verdict was a recommendation. Where '"the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'" *Broadnax*, 130 So. 3d at 1256 (citations omitted)."

*Id*. at 751.

> Counsel's competence … is presumed, and the [petitioner] must rebut this presumption by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison,* 477 U.S. 365, 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986) (emphasis added) (citations omitted). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, "where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." *Williams,* 185 F.3d at 1228; *see also Waters,* 46 F.3d at 1516 (en banc)(noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).

*Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (emphasis in

original).   The state court's decision was not contrary to, or involved an unreasonable

application of *Strickland*.

Furthermore, Reeves has failed to establish prejudice under *Strickland*. As discussed, *infra*, at section IV., 6., the trial court's instructions to the jury and the prosecution's comments to the jury that its sentencing verdict was "advisory" or a "recommendation" were in fact accurate based on state law. *Doster v. State*, 72 So. 3d 50 (Ala. Crim. App. 2010) (trial court did not diminish jury's role in sentencing by referring to its verdict as a recommendation), *cert. denied by*, 132 S. Ct. 760, 181 L. Ed. 2d 490 (2011). Moreover, telling the jury that their decision is advisory is not contrary to *Caldwell v. Mississippi*, 472 U.S. 320 (1985). In *Caldwell* the court held it is "constitutionally impermissible to rest a death sentence on a determination made by a **sentencer** who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Caldwell* at 328–29 (emphasis added). In Alabama, the "sentencer" is not the jury, it is the judge. Because the court's instructions to the jury were proper, counsel is not ineffective for failing to object to the instructions at trial or raise such a claim on appeal. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (counsel is not ineffective for failing to raise a non-meritorious objection or claim).

Likewise, as discussed, *infra*, in section IV., 7., an objection to Alabama's "sentencing scheme" would have been without merit. Consequently, Reeves cannot establish that but for counsel's deficient performance, the result of his trial or appeal would have been different. Thus, the state court did not err in its application of *Strickland*.

4. **Whether the Constitutional Right to a Fair Trial was Denied Due to Juror Misconduct.**

Reeves asserts in his petition that he was denied a fair trial, in violation of the Sixth and Fourteenth Amendments, because the jury which convicted him considered extraneous evidence and engaged in extraneous conversations. Thus Reeves concludes that the Criminal Court of Appeals' decision that ruled otherwise, was based on an unreasonable determination of the facts and involved an unreasonable application of Supreme Court precedent. He asserts in his petition that "he is now entitled to relief in this Court and an evidentiary hearing." (Doc. 24 at 69). Specifically, Reeves alleges that during the trial, Juror Jane Doe observed media reports regarding the trial and spoke with her husband about the trial; furthermore, during the penalty phase deliberations, Juror Jane Doe made statements to the jury that it did not matter how the jury voted because the sentencing decision lay with the judge, made statements to the members of the jury that Reeves's family "would "come after" the jurors after the trial[31] and spoke with another juror outside of jury deliberations to persuade her to change her vote. Reeves supports this challenge with the affidavit of Ms. Blackmon, one of the jurors, who avers these same facts. (Doc. 23-15 at 15).

The record reveals that Reeves presented this claim in his post-conviction Rule 32 petition. The Circuit Court, in summarily dismissing the claim and denying Reeves an evidentiary hearing, held that the juror misconduct claim was procedurally barred pursuant to Rules 32.2(a)(3) and (a)(5) of the *Alabama Rules of Criminal Procedure*, because the claim could have been but was not raised at trial or on appeal.[32] (Doc. 23-16 at 20). In

---

[31]     As noted by the Court of Criminal Appeals, Reeves does not allege that "Juror Jane Doe's statement to the jury that Reeves's family would "come after" the jurors after trial was based on extraneous information she had received." *Reeves*, 226 So. 3d at 754, n. 19.

[32]     Juror misconduct claims are cognizable under Rule 32.1(a), Ala. R. Crim. P., as an alleged constitutional violation. *See also, Ex parte Pierce*, 851 So. 2d 606, 613 (Ala. 2000). Such claims are subject to the preclusions of Rule 32.2, including the denial of relief for

affirming the Circuit Court's decision, the Alabama Court of Criminal Appeals found that

the court erred in holding that the claims were procedurally barred pursuant to 32.2(a)(3)

and (a)(5)[33] but determined the error did not require a remand, because Reeves's juror

misconduct "claims were not sufficiently pleaded to warrant an evidentiary hearing and,

therefore, that the circuit court properly refused to allow Reeves to present evidence on this

---

claims which could have been but were not raised at trial or on appeal.  Ala. R. Crim. P. 32.2(a)(3) and (a)(5).

[33]    Citing to *Ex parte Hodge*, 147 So. 3d 973 (Ala. 2011); *Ex parte Harrison*, 61 So. 3d 986 (Ala. 2010); and *Ex parte Burgess*, 21 So. 3d 746 (Ala. 2008), the Court of Criminal Appeals determined that the preclusions of Rule 32.2(a)(3) and (a)(5) were not applicable. Alabama law dictates that these preclusions are only applicable when there is evidence in the record indicating the petitioner should have been aware before filing his motion for a new trial or direct appeal of juror misconduct.  *Ex parte Harrison*, 61 So. 3d 986, 990 (Ala. 2010) ("Placing a requirement on a defendant to uncover any and all possible juror misconduct without reason to know what type of misconduct the defendant might be looking for or, in fact, whether any misconduct occurred, would require criminal defendants to embark on a broad-ranging fishing expedition at the conclusion of every criminal trial or waive the right to complain of any juror misconduct the defendant might ultimately discover." ) (citing *Ex parte Burges*s, 21 So. 3d 746 (Ala. 2008); *see also Waldrop v. Thomas*, 3:08-CV-515-WKW [WO], 2014 U.S. Dist. LEXIS 43168, *302-313 (M.D. Ala., E.D., March 31, 2014) (juror misconduct claim was not procedurally defaulted as "petitioner's counsel was not obligated to undertake a "fishing expedition" in the form of interviews with the jurors in time to raise his claim in a motion for new trial or on direct appeal.").

    A review of the record reveals that in his Rule 32 petition, Reeves plead that "trial counsel could not have objected to jury misconduct during Mr. Reeves' trial and could not have raised it on direct appeal because counsel did not and could not have known about the misconduct" (doc. 23-14 at 187) and further contends in his response to the State's Answer that "counsel became aware of the juror misconduct only during counsel's post-conviction investigation.  (Doc. 23-16 at 131).  The record further shows that the State nor the Circuit Court articulated what further action should have been taken by Reeves to discover his claim sooner, and the record is void of facts to support that counsel was put on notice of juror misconduct during the trial or prior to bringing the claim.  Therefore, there is no evidence in the record indicating that Reeves knew of a potential juror misconduct claim prior to post-conviction proceedings.  *See Ex parte Burgess*, 21 So. 3d 746 (Ala. 2008) (there is no evidence in the record indicating that Burgess should have been aware that some jurors provided untruthful or inaccurate answers during voir dire examination); *Gillis v. Frazier*, 214 So. 3d 1127, 1139-40 (Ala. 2014) (no evidence in record indicating that Gillis had reason to know of juror misconduct earlier than pleaded).  Accordingly, based on state law, it appears that Reeves's juror misconduct claim was not procedurally defaulted pursuant to 32.2(a)(3) and (a)(5).

claim at the Rule 32 hearing."[34]  *Reeves*, 226 So. 3d 711, 753.   The Court of Criminal

Appeals stated in its memorandum opinion:

> Rule 32.3, Ala. R. Crim. P., states that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.6(b), Ala. R. Crim. P., states that "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." To sufficiently plead a claim of juror-misconduct, a Rule 32 petitioner must, at a minimum, identify the juror who the petitioner believes committed the misconduct, must allege specific facts indicating what actions that juror took that the petitioner believes constituted misconduct, and must allege specific facts indicating how that juror's actions denied the petitioner a fair trial. *See, e.g., Moody v. State*, 95 So. 3d 827, 859 (Ala. Crim. App. 2011) (holding that Rule 32 petitioner had failed to satisfy his burden of pleading his claim of juror misconduct when the petitioner "failed to identify a single juror who he believed did not answer questions truthfully during voir dire," failed to "identify which questions he believe[d] the jurors did not answer truthfully," and "failed to plead what 'extraneous' information he believes was considered during the jury's deliberations or how that information prejudiced him.").

> In this case, Reeves failed to identify in his petition the juror he believed committed the misconduct; he referred to the juror only as "Juror Jane Doe." (C. 584-85.) He also failed to identify the juror who allegedly changed her vote during the penalty-phase deliberations after allegedly speaking with Juror Jane Doe privately. G.B.'s affidavit also failed to identify Juror Jane Doe or the juror who allegedly changed her vote during the penalty-phase deliberations. In a footnote in his petition, Reeves admitted that he knew the identity of both jurors; he alleged that "[s]ignificant efforts have been undertaken to identify Juror Jane Doe" and that "by speaking with certain jurors who served on Mr. Reeves's trial and have been willing to speak with Mr. Reeves's current counsel, the identities of these jurors are believed to be known." (C. 585.) Nonetheless, Reeves failed to identify either juror in his petition. In addition, although Reeves alleged that Juror Jane Doe had spoken to her husband about the case and had watched and read media reports about the case, Reeves failed to identify exactly what information Juror Jane Doe received from her husband or from the media reports or how this unidentified information prejudiced him.

---

[34]     "[T]here exists a long-standing and well-reasoned principle that [Criminal Court of Appeals] may affirm the denial of a Rule 32 petition if the denial is correct for any reason." *McNabb v. State*, 991 So. 2d 313, 333 (Ala. Crim. App. 2007).

Because Reeves failed to identify in his petition Juror Jane Doe, the juror he believed was improperly influenced during the penalty phase of the trial, or the specific "extraneous" information he believed Juror Jane Doe improperly considered, all of Reeves's juror-misconduct claims were insufficient to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b). Moreover, Reeves's claim that Juror Jane Doe repeatedly told the other members of the jury that Reeves's family "would 'come after' the jurors after the trial" and stressed to the other jurors that "the decision to impose the death penalty truly belonged to the judge rather than the jury" also fails to state a material issue of fact or law upon which relief could be granted. (C. 585.) Reeves's claim in this regard is based on the debates and discussions of the jury, not on extraneous facts considered by it. As this Court explained in *Bryant v. State*, 181 So. 3d 1087 (Ala. Crim. App. 2011):

> "It is well settled that 'matters that the jurors bring up in their deliberations are simply not improper under Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision.' *Sharrief v. Gerlach*, 798 So. 2d 646, 653 (Ala. 2001). 'Rule 606(b), Ala. R. Evid., recognizes the important "distinction, under Alabama law, between 'extraneous facts,' the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the 'debates and discussions of the jury,' which are protected from inquiry."' *Jackson v. State*, 133 So. 3d 420, 431 (Ala. Crim. App. 2009) (quoting *Sharrief, supra* at 652). '[T]he debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts.' *Sharrief*, 798 So. 2d at 653. Thus, 'affidavit[s or testimony] showing that extraneous facts influenced the jury's deliberations [are] admissible; however, affidavits concerning "the debates and discussions of the case by the jury while deliberating thereon" do not fall within this exception.' *CSX Transp., Inc. v. Dansby*, 659 So. 2d 35, 41 (Ala. 1995) (quoting *Alabama Power Co. v. Turner*, 575 So. 2d 551, 557 (Ala. 1991))."

181 So. 3d at 1126-27. To allow "consideration of this claim of juror misconduct – which is based entirely on the debate and deliberations of the jury – 'would destroy the integrity of the jury system, encourage the introduction of the unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny.'" *Bryant*[ *v. State*], 181 So. 3d [1087,] 1128 [(Ala. Crim. App. 2011) (quoting *Jones v. State*, 753 So. 2d 1174, 1204 (Ala. Crim. App. 1999)).

For these reasons, the circuit court properly dismissed Reeves's claim of juror misconduct without affording Reeves an opportunity to present evidence.

*Reeves*, 226 So. 3d at 753-755.

The Alabama Court or Criminal Appeals based its dismissal of Reeves's juror misconduct claim pursuant to 32.6(b), which is considered an adjudication on the merits. *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011) (a ruling "under Rule 32.6(b) is . . . a ruling on the merits"); *Daniel v. Comm'r Ala. Dep't of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016) (dismissal pursuant to 32.6(b) is evaluated under AEDPA's "contrary to, or involved an unreasonable application of clearly established Federal law' standard); *Frazier v. Bouchard*, 661 F.3d 519, 525 (11th Cir. 2011) ("[B]ecause a dismissal ... for failure to sufficiently plead a claim under Rule 32.6(b) requires an evaluation of the merits of the underlying federal claim, the Court of Criminal Appeals's determination was insufficiently 'independent' to foreclose federal habeas review. Accordingly, the district court was not barred from considering the merits of the relevant claim." (footnote omitted)); *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1208 (11th Cir. 2013) ("We have held repeatedly that a state court's rejection of a claim under the state's heightened-fact pleading rule in Alabama Rule of Criminal Procedure 32.6(b) is a ruling on the merits."); *Alvarez v. Stewart*, 2016 U.S. Dist. LEXIS 124074, *27 (Ala. N.D., Aug. 1, 2016) ("The Eleventh Circuit has concluded that state-court dismissals for failure to plead facts with specificity amounts to a merits determination, not a procedural default."). Under AEDPA, the Court must therefore ask whether "fairminded jurists could disagree on the correctness of the state court's decision", that is that Reeves failed to plead facts sufficient to demonstrate a possibility of constitutional error. *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed, 2d 624 (2011); *see also Daniel*, 822 F.3d at 1261 (Under AEDPA review, the court must "answer two questions to resolve th[e] habeas appeal. First whether [the] . . Rule 32 petition and its attached exhibits pleaded enough specific facts that, if proven,

amount to a valid . . . claim. Second, if we answer the first question in the affirmative, we must determine whether the Alabama Court of Criminal Appeal's decision to the contrary was unreasonable under § 2254(d)).

The Sixth Amendment to the United States Constitution guarantees the right to trial by an impartial jury. U.S. CONST. amend. VI. "[E]mbraced in the constitutional concept of trial by jury" is the requirement that a jury's verdict "must be based upon the evidence developed at the trial." *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S. Ct. 546, 549, 13 L. Ed. 2d 424, 428 (1965) (internal quotation omitted) (a jury must base its verdict on evidence coming "from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."). "[T]here is[, however,] no constitutional right to a perfect trial," *United States v. Alvarez,* 755 F.2d 830, 859 (11th Cir. 1985) (quoting *United States v. Ragsdale,* 438 F.2d 21 (5th Cir. 1971)), as "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Smith v. Phillips,* 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). When a petitioner challenges the impartiality of a jury resulting from juror exposure to extraneous information, he bears the burden of making a colorable showing that the exposure actually occurred. *United States v. Ayarza-Garcia,* 819 F.2d 1043, 1051 (11th Cir. 1987).

> To be sure, where "a colorable showing of extrinsic influence is made, a trial court ... must make sufficient inquiries or conduct a hearing to determine whether the influence was prejudicial." *United States v. Barshov,* 733 F.2d 842, 851 (11th Cir.1984) (citation omitted). But "there is no *per se* rule requiring an inquiry in every instance. The duty to investigate arises only when the party alleging misconduct makes **an adequate showing** of extrinsic influence to overcome the presumption of jury impartiality." *Id.* (citations omitted). Where allegations are "speculative or unsubstantiated," the "burden to investigate" does not arise. *See United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir.1985). "In other words, there must be something more than mere speculation." *Barshov*, 733 F.2d at 851.

*United States v. Alexander*, 782 F.3d 1251, 1258 (11th Cir. 2015) (emphasis added).

Importantly, the burden of pleading is distinguishable from the burden of proof necessary to establish a meritorious claim. *See, e.g., Ex parte Hodges*, 147 So. 3d 973, 976-977 (Ala. 2011) (The burden of pleading requites "a clear and specific statement of the grounds upon which relief is sought"). 'Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d) Ala. R. Crim. P., he is then entitled an opportunity to present evidence in order to satisfy his burden of proof.' *Id*. (quoting *Ford v. State*, 931 So. 2d 641, 644 (Ala. Crim. App. 2001); *see Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief; *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (The party requesting a hearing must first make an initial showing "[t]o justify a post-trial hearing involving the trial's jurors. . . .").

In support of this claim, Reeves presents the affidavit of Juror Ms. Blackmon. The affidavit states in relevant part:

> There was one member of the jury that was very controlling during our deliberations. I do not remember this juror's name, but this juror was female with dark hair. The juror repeatedly stated to the other jurors that she was afraid that Mr. Reeves' family would "come after" the jurors after the trial. This juror also repeatedly stated that she had discussed the case with her husband and had read newspaper articles and watched television news coverage of the case during the trial. This juror stated that she did not care what the judge said regarding not talking about the case with others and not learning about the case from media coverage.

> After our initial deliberations, the jury vote 9-3 in favor of the death penalty. There was a young woman on the jury who was very emotional and crying after the vote. This young woman stated that she did not think that the co-defendants' testimony added up and that there were too many inconsistencies in their testimony.

> At this point, the controlling juror began to try to persuade the young juror to change her vote to death. She repeatedly stated to the entire jury that the

decision regarding a death sentence was really for the judge and not for the jury, so it did not matter how they voted. The controlling juror then suggested that she and the younger juror leave the jury room. She took the young juror into the hallway outside the jury room. I believe they were alone in the hallway because there was no guard and the courthouse was mostly empty because it was a Saturday.

Immediately upon their return to the jury room, the controlling juror suggested that the jury vote again. The result was 10-2 in favor of death, and the young jury had changed her vote from life in prison without the possibility of parole to the death penalty.

As soon as the vote was over, the controlling juror slammed her hands on the table and exclaimed, "Ring the bell, let's go home." She also repeated her statement that the decision regarding the death penalty was up to the judge, not the jury.

(Doc. 23-15 at 15-16).

"[A]llegations of juror misconduct concerning outside influences must be fully investigated to determine the scope of the misconduct and to ensure no prejudice results." *United States v. Bradley*, 644 F.3d 1213, 1276 (11th Cir. 2011). A petitioner, however, is not entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977). To make an 'adequate showing,' a defendant "must show clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred." *Cuthel*, 903 F.2d at 1383 (internal quotations omitted) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989)). The duty to investigate juror misconduct has been described by the Eleventh Circuit as existing on a spectrum. *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985). The duty to investigate is at its nadir when the allegations are speculative or unsubstantiated. *Id*. ("The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate."). Conversely, the duty to investigate reaches its zenith the more certain the allegations. *Id*. ("At one end of the spectrum the cases focus on the certainty that some impropriety has

occurred."). In sum, as the certainty of potential jury contamination increases so too does the duty to investigate. The evidence for Reeves's claim surely rests on the lower end of this spectrum.

Alabama requires that "[e]ach claim in the [Rule 32] petition must contain a clear and specific statement of the grounds upon which relief is sought, **including full disclosure of the factual basis** of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." Ala. R. Crim. P. Rule 32.6(b) (emphasis added). "An evidentiary hearing on a [Rule 32] petition is required only if the petition is 'meritorious on its face.'" *Boyd v. State*, 913 So.2d 1113, 1125 (Ala. Crim. App. 2003) (quoting *Ex parte Boatwright*, 471 So. 2d 1257 (Ala. Crim. App. 1985) (alteration in original). Stated another way, the petitioner must allege facts in the pleading, which if true, entitle a petitioner to relief. *Id*. "'Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.'" *Id*. at 1126 (quoting *Tatum v. State*, 607 So. 2d 383, 384 (Ala. Crim. App. 1992)).

Taking the allegations of Reeves's Rule 32 petition as true, Reeves's pleading lacks sufficient facts to warrant a hearing. Reeves's failure to plead the name of the juror alleged to have engaged in the misconduct[35], coupled with the failure to disclose the subject of the extraneous information that Juror Jane Doe acquired from the media coverage[36] or from

---

[35]     Although Reeves contends he has sufficiently identified characteristics of this juror, the Court finds the facts that the juror was "a female with dark hair" to be demonstrably indistinct and, therefore, insufficient to identify the juror. (Doc. 23-15 at 15).

[36]     Where a juror or jury has been exposed to media coverage, there is no presumed prejudice until "it is shown [that] such information was disclosed in the jury room." *United States v. Gaffney*, 676 F. Supp. 1544, 1551 (11th Cir. 1987). Even then, it may be demonstrated that the extrinsic evidence was not prejudicial. *See United States v. Bolinger*,

conversations with her husband (or even if such information was shared with the other jurors), supports a finding of an insufficient pleading pursuant to 32.6(b). *Accord.*, *Hyde v. State*, 950 So. 2d 344, 356 (ala. Crim. App. 2006) ("The full factual basis for the claim must be included in the petition itself."). The absence of details plead regarding the extrinsic influence creates an unfillable void for the court in determining the nature of what reached the jury or may have influenced the verdict vote. Reeves's blanket assertions are impossible for the State to defend against. *See Brown v. State*, 807 So. 2d 1, 5-7 (Ala. Crim. App. 1999) (Pleading is insufficient pursuant to 32.6(b) where petitioner makes a "blanket assertions that jurors failed to answer questions" and does "not identify specific questions or jurors"); *see also Bryant v. State*, 181 So. 3d 1087 (Ala. Crim. App. 2011) (bare allegations that extraneous information coerced reluctant jurors to vote for death was insufficient to satisfy pleading requirements of 32.3 and 32.6(b)); *Stallworth v. State*, 171 So. 3d 53 (Ala. Crim. App. 2013) (insufficiently pleaded due to failure to identify juror); *Mashburn v. State*, 148 So. 3d 1094 (Ala. Crim. App. 2013) (summary dismissal for bare assertion that "a majority" of the venire had heard about the case but failed to identify a single juror that had read or heard about the case); *Williams v. Alabama*, 2010 U.S. Dist. LEXIS 51850 (N.D. Ala. April 12, 2012) (summary dismissal upheld for failure to state facts to support claim, like which juror was untruthful, . . .); *Woods v. State*, 221 So. 3d 1125 (Ala. Crim. App. 2016) (finding failure to plead adequately where Woods vaguely

---

837 F.2d 436 (11th Cir., *cert. denied*, 486 U.S. 1009, 108 S. Ct. 1737, 100 L. Ed.2d 200 (1988) (juror's reading of a newspaper article containing information that had been suppressed as evidence was not prejudicial to the verdict considering the weight of evidence produced at trial against the defendant); *United States v. Guida*, 792 F.2d 1087, 1094 (11th Cir. 1986); (no prejudice in where extraneous information was merely duplicative of trial evidence); *but cf.*, *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978) (several jurors' hearing television report that defendant had previously been convicted of same offenses was prejudicial).

alleged "all of the jurors" were exposed to pretrial publicity); *United States v. Gaffney*, 676 F. Supp. 1544, 1551 (11th Cir. 1987) ("As a threshold matter, defendants must establish that extraneous material did in fact make its way into the jury room.).

Additionally, Reeves's remaining claims, that Juror Jane Doe improperly communicated with the jury, influencing the verdict, fall under the general exclusionary provision of Ala. R. Evid. 606(b), as the claims do not involve extrinsic or outside information reaching the jury. *Accord*., *Avarza-Garcia*, 819 F.2d at 1051 ("[p]ost-verdict inquiries into the existence of impermissible extraneous influences on a jury's deliberations are allowed under appropriate circumstances, but inquiries that seek to probe the mental processes of jurors are impermissible."). "A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861, (2017) (examining the history of the "no-impeachment rule"). This "near-universal and firmly established common-law rule in the United States flatly prohibit[s] the admission of juror testimony to impeach a jury verdict." *Tanner v. United States,* 483 U.S. 107,]117, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987).

> Courts recognize few exceptions to this common-law rule and allow juror testimony on the jury's activities *only* in situations in which an *extraneous influence* been shown. *Id.* "In situations that did not fall into this exception for external influence, however, the [Supreme] Court [has] adhered to the common-law rule against admitting juror testimony to impeach a verdict." *Id.* On more than one occasion, the Supreme Court has considered and affirmed the wisdom of this approach and in so doing has discussed the numerous and substantial policy considerations supporting this approach. *See, e.g., Tanner,* 483 U.S. at 117-21 (collecting cases). Indeed, the Eleventh Circuit and the Supreme Court have repeatedly found that district courts did not abuse their discretion in denying motions for new trial or in rejecting defendants' demands for the examination of jurors predicated on

arguments of a variety of types of juror misconduct *not encompassing* external influence on the jury.

*United States v. Siegelman*, 467 F. Supp. 2d 1253, 1270 (M.D. Ala. 2006). This common-law rule is supported by Alabama statutory law:

> Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict or indictment.

Ala. R. Evid. Rule 606(b), and federal statutory law:

> **(b) Inquiry into validity of verdict or indictment.**
>
> (1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> (2) *Exceptions.* A juror may testify about whether:
>
> > (A)   extraneous prejudicial information was improperly brought to the jury's attention;
> > (B)     an outside influence was improperly brought to bear upon any juror; or
> > (C)     a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b).[37]

---

[37] Rule 606(b) applies to § 2254 proceedings pursuant to Fed. R. Evid. 1101(e).

In his petition, Reeves claims that Juror Jane Doe stated to the jury that Reeves's family "would come after the jurors after the trial" and that "the decision to impose the death penalty truly belonged to the judge rather than the jury". (Doc. 24 at 68. Reeves contends that these comments injected unfounded speculation into the jury's deliberations. However, he fails to plead or allege that the comments were made based on outside influence or extrinsic information. Therefore, Reeves's allegations are inadmissible pursuant to Rule 606(b). Likewise, Reeves essentially pleads that Juror Jane Doe coerced a "younger juror" into changing her vote, resulting in the verdict vote change to 10-2, in favor of the death penalty, but he fails to allege that any extraneous information was used to sway the vote. Therefore, Reeves has failed to establish that his claims meet an exception to the firm rule that "a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict", and he has failed to sufficiently plead a claim for relief. Ala. R. Evid. Rule 606(b). *See also, Sharrief v. Gerlach*, 798 So.2d 646, 652 (Ala. 2001) (affidavits containing accounts of jurors' discussions did not fall under the extraneous information exception); *United States v. Campbell*, 221 App. D.C. 367, 684 F.2d 141, 151 (D.C. Cir. 1982) (jury's verdict will not be upset on basis of juror's post-trial report of jury deliberations unless extraneous influence is shown; evidence of discussion among jurors, intimidation of one juror by another, and other intra-jury influences on the verdict are not competent to impeach the verdict.); *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir. 1989) (noting that "alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict"); *United States v. Barber*, 668 F.2d 778, 786 (4th Cir. 1982) (no basis to impeach

verdict where juror claimed that foreman "scared [her] to death"); *United States v. Bassler*, 651 F.2d 600, 602 (8th Cir. 1981) ("Intrinsic influences include discussions and even intimidation or harassment among jurors", and intrinsic influences are not competent to impeach verdict).  Consequently, Reeves's juror misconduct claims related to Juror Jane Doe's comments to the jury are excluded from review pursuant to Rule 606(b) as they do not involve extrinsic communications or information affecting the jury's verdict.  Accordingly, the Alabama Court of Criminal Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law, and the claim is denied.

To the extent Reeves seeks an evidentiary hearing in this Court, such relief is denied pursuant to 28 U.S.C. § 2254(e).  According to §2254, the factual determinations made by a State court shall be presumed to be correct, and the failure to develop the factual basis of a claim in State court proceedings will not entitle petitioner to an evidentiary hearing, unless the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence."  §2254(e)(A)(i) and (ii).  Reeves has failed to overcome this threshold and is, thus, barred from a hearing in this Court.

**5.   Whether the State of Alabama's Method of Execution is Unconstitutional.**

In his petition, Reeves argues that the State of Alabama's undisclosed procedures for administering lethal injection, including the risk of improper sedation, pose a substantial risk of inflicting unnecessary pain in violation of the Eighth Amendment. Respondent asserts that this claim: (1) is outside the Court's habeas jurisdiction and is properly raised pursuant to 42 U.S.C. § 1983; (2) lacks merit, and (3) was previously reviewed and denied by the Alabama Court of Criminal Appeals.

"Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983. Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Muhammad* v. *Close,* 540 U.S. 749, 750, 124 S. Ct. 1303, 158 L. Ed. 2d 32 (2004) *(per curiam)* (citing *Preiser*, 411 U.S. at 500, 93 S. Ct. 1827, 36 L. Ed. 2d 439). An inmate's challenge to the circumstances of his confinement, however, may be brought under § 1983. 540 U.S., at 750, 124 S. Ct. 1303, 158 L. Ed. 2d 32.

*Hill v. McDonough*, 547 U.S. 573, 579, 126 S. Ct. 2096, 2101, 165 L. Ed. 2d 44, 51 (2006).

The Eleventh Circuit has explained that "[t]he line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence." *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006). "When an inmate challenges the 'circumstances of his confinement' but not the validity of his conviction and/or sentence, then the claim is properly raised ... under § 1983." *Id.; see also Nelson v. Campbell*, 541 U.S. 637, 124 S. Ct. 2217, 158 L. Ed. 2d 924 (2004) (method-of-execution challenge was properly brought pursuant to § 1983 as success of the claim would not prevent the State from executing inmate); *Hill v. McDonough*, 547 U.S. 573, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006) (challenge to method-of-execution was appropriately brought pursuant to § 1983 because success of the claim would not prevent the State from executing inmate). By contrast, "[f]ederal habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." *Valle v. Secretary, Florida Dep't of Corrections*, 654 F.3d 1266, 1267 (11th Cir. 2011); *see also Heck v. Humphrey*, 512 U.S. 477, 144 S. Ct. 2364, 129 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) (if success of claim would invalidate one's sentence, then the claim is only actionable through a writ of habeas corpus).

Reeves's method-of-execution claim is not attacking the validity of his conviction or death sentence. He is not challenging the fact or duration of his physical imprisonment

by the State of Alabama and is not requesting immediate or speedier release. Rather, Reeves is challenging the manner in which the State of Alabama intends to carry out that sentence, which is plainly a circumstance of his confinement. For this reason, Claim 5 is denied because it is not properly raised in a § 2254 petition.[38]

## 6. Whether Reeves' Death Sentence Violates the Eighth Amendment

Reeves claims in his petition that the trial court's instructions to the jury were constitutionally deficient because they misled the jury about the importance of its sentencing phase deliberation. (Doc. 24 at 73). Specifically, Reeves argues that the trial court's instructions to the jury regarding the "advisory" nature of its verdict were in violation of the Eighth Amendment and Supreme Court precedent because it diminished the jury's sense of responsibility. (*Id.*).

Respondent answered the petition asserting that this claim is procedurally barred from review because Reeves failed to raise the substantive claim at trial, on direct appeal,

---

[38]    In *Hill v. McDonough*, 547 U.S. 573, (2006), the Court concluded inmate's challenge to the adequacy of the first-drug in the lethal injection protocol was properly brought pursuant to 42 U.S.C. § 1983. The Court distinguished claims seeking to permanently enjoin the use of lethal injection, which may challenge the sentence itself, from a question regarding the procedure used in carrying out a lethal injection. *Hill*, 547 U.S. at 579. Following the same reasoning, the Eleventh Circuit has deemed such execution challenges as properly brought pursuant to 42 U.S.C. § 1983 rather than § 2254. *See Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 856 (11th Cir. 2017) (citing *e.g., Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1295 (11th Cir.), cert. denied sub nom. *Jones v. Bryson*, 136 S. Ct. 998, 194 L. Ed. 2d 16 (2016); *Brooks v. Warden*, 810 F.3d 812, 819 (11th Cir.), cert. denied sub nom. *Brooks v. Dunn*, 136 S. Ct. 979, 193 L. Ed. 2d 813 (2016); *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268 (11th Cir. 2016), cert denied sub nom. *Arthur v. Dunn*, 137 S. Ct. 725, 197 L. Ed. 2d 225 (2017)); *see also, McNabb v. Comm'r Ala. Dep't of Corr.*, 722 F.3d 1334, 1344 (11th Cir. 2013)("A § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures.") (internal citation omitted).

in his amended Rule 32 petition, or on appeal from the denial of his Rule 32 petition. (Doc. 25 at 100). Reeves contends, however, that he "asserted – nearly verbatim – his stand-alone Eighth Amendment claim in his Rule 32 petition." (Doc. 28 at 38-39).

A review of the record reveals that Reeves asserted the following related claims in his Rule 32 petition:

(1) that the trial court denied Reeves a fair trial and appropriate sentencing determination when it repeatedly commented and instructed the jury that its sentence decision was only "a recommendation regarding the sentence that Mr. Reeves would receive." (Doc. 23-26 at 60-61),

(2) that the prosecution unconstitutionally diminished the jury's sense of responsibility for its sentencing verdict by referring to the jury's verdict as a "recommendation" in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the constitution,

(3) that trial counsel's failure to object to trial court's instructions and prosecution's comments to jury regarding the jury's sentencing verdict as being merely "advisory" was constitutionally ineffective,

(4) that appellate counsel was ineffective because he failed to challenge "the trial court's charges that diminished the jury's responsibility for its verdict" in violation of the Fifth. Sixth, Eighth, and Fourteenth Amendment of the constitution, and

(5) that Alabama's statutory sentencing scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the constitution.

(Doc. 23-26 at 66-67; Vol. 26, JR-86, pp. 39, 45-46, 49-54).

As to the claims (1), (2), and (5), regarding Alabama's capital sentencing scheme, instructional errors of the trial court to the jury, and the prosecutor's comments to the jury regarding the advisory nature of its sentencing decision, the trial court stated that each claim was "procedurally barred from post-conviction review because it could have been but was not raised at Trial, and because it could have been but was not raised on direct appeal." (Doc. 23-16 at 162-63, 167; Vol. 16, JR-65, pp. 28-29).

As to claims (3) and (4), regarding trial counsel's failure to preserve alleged errors for appellate review and appellate counsel's failure to raise the same on appeal, the trial court determined that such decision by counsel was "often a matter of trial strategy and is presumed to be reasonable" and "[found] that [Reeves] failed to call trial counsel at the Evidentiary Hearing, and further finds that [Reeves] has abandoned these claims for ineffective assistance of counsel." (Doc. 23-16 at 163).

The trial court also determined Reeves's claim regarding appellate counsel was without merit because "it was a correct statement of the law" to inform the jury that its verdict was a recommendation. (Doc. 23-16 at 166). The trial court further maintained that the substantive allegation was without merit as the law in Alabama is well established "that informing jurors their penalty phase verdict is a recommendation, is not improper. There is no impropriety in the trial court's reference to the Jury that its sentencing verdict is a recommendation." (Doc. 23-16 at 165).

On appeal, Reeves claimed that his trial counsel was ineffective for failing to preserve certain arguments for appeal, including:

(1) the instructional errors of the trial court to the jury,

(2) prosecution's misconduct and improper arguments during the trial, and

(3) the unconstitutionality of Alabama's sentencing scheme.

(Doc. 23-29 at 98-99). Similarly, Reeves argued that appellate counsel rendered ineffective assistance by failing raise these same claims on appeal. (*Id*. at 100-102).

Identifying that Reeves challenged the constitutionality of Alabama's sentencing scheme before the trial court and asserted that appellate counsel was ineffective for failing to raise this claim on direct appeal, the Alabama Court of Criminal Appeals noted that "[a] substantive challenge to the constitutionality of a statute is not the same as a claim of

ineffective assistance of counsel." *Reeves*, 226 So. 3d at 749, n.16; (Doc. 23-31 at 85 n.16; Vol. 31, JR-94, p. 84, n. 16).

The Court notes that Reeves presented the constitutionality of Alabama's sentencing claim in his Rule 32 petition, where the trial court denied the claim as procedurally barred because it could have been but was not brought at trial or on direct appeal. However, on appeal of his Rule 32, Reeves failed to raise the substantive claim, arguing only that trial and appellate counsel were deficient in failing to preserve the claim and appeal the claim, respectively. Consequently, issues of both procedural default and exhaustion are implicated.

Pursuant to Rule 32.2(a), Ala. R. Crim. P., a Rule 32 petitioner "will not be given relief under this rule based upon any ground . . . [w]hich could have been but was not raised at trial," or "[w]hich could have been but was not raised on appeal," subject to an exception that has no application here. Rule 32.2(a)(3) & (5), Ala.R.Crim.P. Alabama courts routinely follow the procedural default doctrine of Rule 32.2. *See Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006) ("[T]he Alabama statute of limitation in Rule 32.2 is firmly established and regularly followed for purposes of applying the procedural default doctrine.") (citing *Hurth v. Mitchem*, 400 F.3d 857, 862-63 (11th Cir. 2005) (holding consistently with the earliest prior panel opinion that "Alabama's Rule 32.2(c) statute of limitations is firmly established and regularly followed in the courts of that state")). "[I]t is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Williams v. Alabama*, 791 F.3d 1267, 1272-73 (11th Cir. 2015)(citation omitted); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("a federal habeas court will not review a claim rejected

by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If, however, the state court's procedural ruling is not adequate to bar federal review, then the federal habeas court must review the claim *de novo*, and is not confined to the state-court record. *See Williams*, 791 F.3d at 1273. For a state procedural rule to bar federal review, the rule must be "firmly established and regularly followed" by the state courts. *Lee v. Karmna*, 534 U.S. 362, 375, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348, 104 S. Ct. 1830, 80 L. Ed. 2d 346 (1984).

> There are basically three circumstances in which an otherwise valid state-law ground will *not* bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: *i.e.*, (*i*) where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, *and*, that he was actually "prejudiced" by the alleged constitutional violation; *or* (*ii*) where the state procedural rule was not "firmly established and regularly followed"; *or* (*iii*) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000) (Breyer, J., concurring); *see also, e.g., Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.") (alteration added); *Smith v. Murray*, 477 U.S. 527, 537, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (in turn quoting *Murray*, 477 U.S. at 496)).

*Jenkins v. Allen*, 2016 U.S. Dist. LEXIS 116977, *37-38 (Ala. N.D., Aug. 31, 2016).

Additionally, section 2254, as previously discussed, requires a habeas petitioner to exhaust all available state law remedies prior to receiving federal review. "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012) (citations omitted); *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (to satisfy exhaustion requirement, "we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's ... specific factual foundation") (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Secretary, Dep't of Corrections*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). What is necessary is that "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted). That said, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344. Such clarifications cannot alter the nature or legal theory of the claim. *See, e.g., Pietri v. Florida Dep't of Corrections*, 641 F.3d 1276, 1289 (11th Cir. 2011) (affirming dismissal of unexhausted claim of ineffectiveness of appellate counsel, which was separate and distinct from substantive claim that petitioner had raised in state court).

Reeves's Claim 6 was last reviewed by the Circuit Court on Reeves's Rule 32 petition and was deemed procedurally barred; coupled with Reeves's failure to assert the same substantive claim in his appeal to the Alabama Court of Criminal Appeals, the Court is thus barred from review of Reeves's claim.[39] *See Boyd v. Commissioner, Alabama Dep't.*

---

[39] Reeves makes no argument in attempt to overcome his procedural default or failure

*of Corrs.*, 697 F. 3d 1320, 1355 (11th Cir. 2012) (The Eleventh Circuit has "squarely held that claims barred under Rule 32.2(a)(3) and (a)(5) are procedurally defaulted from federal habeas review." ) (citations omitted); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-43, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999) (holding unexhausted claim was procedurally defaulted pursuant to §2254(c) and barred from federal habeas review). Accordingly, Reeves's claim is due to be dismissed as it is unexhausted and procedurally barred.

In the alternative, Reeves's claim is without merit.

---

to raise the claim in his appeal, rather he contends the claim was fully presented in the state courts. Specifically, Reeves asserts that he raised the claim in his appeal to the Court of Criminal Appeals, citing his brief at Vol. 29, JR-90, pp. 86-87. (Doc. 23-29 at 100-101). A review of Reeves's appeal indicates, however, that the cited portion is in fact under Section B., 5., Appellate Counsel was Deficient in Failing to Raise Claims on Direct Appeal. Without a showing of "cause and prejudice", federal review is precluded.

"[A] habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a fundamental miscarriage of justice." *Borden v. Allen*, 646 F.3d 785, 808 n.26 (11th Cir. 2011); *see also Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013). "As a general matter, 'cause' for procedural default exists if the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Bishop*, 726 F.3d at 1258 (citations and internal quotation marks omitted). While ineffective assistance of counsel can constitute cause, *McCleskey v. Zant*, 499 U.S. 467, 493-94, 111 S. Ct. 1454, 113 L.Ed.2d 517 (1991) ("constitutionally ineffective assistance of counsel is cause"), Reeves must also show prejudice. "To establish 'prejudice,' a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." *Spencer v. Sec'y*, 609 F.3d 1170, 1180 (11th Cir. 2010) (citation omitted); *see also Lucas v. Warden, Georgia Diagnostic and Classification Prison*, 771 F.3d 785, 801 (11th Cir. 2014) ("For prejudice, Lucas must demonstrate a reasonable probability that his conviction or sentence would have been different ...."). As an alternative to showing cause and prejudice, a prisoner may overcome a procedural default by showing a fundamental miscarriage of justice. "For a state prisoner to establish a fundamental miscarriage of justice, he must prove that he is innocent." *Spencer v. United States*, 773 F.3d 1132, 1139 (11th Cir. 2014) (citations omitted).

Notably, Reeves makes no argument that he is innocent and the Court's determination that Reeves's claim lacks merit prevents him from establishing prejudice.

A review of the trial transcript, namely the penalty phase, is replete with references to the jury's verdict as a recommendation or advisory.[40]  According to Reeves, these instructions and comments mislead the jury as to its role in the sentencing process and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and the precedent of *Caldwell*, *Ring*, and *Hurst*.  In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), the Court held the capital sentence was invalid when the sentencing jury was lead to believe that the responsibility for determining the appropriate of a death sentence rested with the appellate court's later review instead of with the jury.  In *Ring v. Arizona*, 536 U.S. 584, 589 (2002) the Court held the aggravating factor necessary for sentencing must be established by jury. And in *Hurst v. Florida*, 577 U.S. __, 136 S. Ct. 616, 622 (2016), the Court held Florida's capital-sentencing scheme was unconstitutional because it authorized a sentence of death based on a finding by the trial judge, rather than by the jury, that an aggravating circumstance existed.  Reeves's claim focuses primarily on the holding in *Caldwell v. Mississippi*.

In *Caldwell*, the Supreme Court "conclude[d] that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328-329, 105 S. Ct. 2633, 2639, 86 L. Ed. 2d 231, 239 (1985).  The jury in *Caldwell* was instructed by the prosecution at trial that their decision was "not the final decision" and that their decision was automatically reviewable by the Supreme Court.  *Id*. at 325-26.  The Court found that

---

[40]    During the penalty phase, the trial court instructed the jury no less than thirteen times that its verdict was a recommendation.  (*See* Doc. 23-8 at 195; Vol. 8, TR 1215, 1221-26)

the prosecution's argument was inaccurate because it was "misleading as to the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentence must perform." *Id*. at 336. The Court further found the prosecution's comments "urged the jurors to view themselves as taking only a preliminary step toward the actual determination of the appropriateness of death - - a determination which would eventually be made by others and for which the jury was not responsible." *Id*.

> To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994) (quoting *Dugger v. Adams*, 489 U.S. 401, 407, 109 S. Ct. 1211, 103 L. Ed. 2d 435 (1989)). "The infirmity identified in *Caldwell* is simply absent" in a case where "the jury was not affirmatively misled regarding its role in the sentencing process." *Romano*, 512 U.S. at 9. In this case, Miller's claim of *Caldwell* error must fail because the court correctly informed the jurors of their advisory function under Alabama law.

*Miller v. Dunn*, No. 2:13-00154-KOB, U.S. Dist. LEXIS 46132, *209, 2017 WL 1164811 (Ala. N.D., March 29, 2017). Reeves fails to establish a *Caldwell* violation as the jury instructions given comply with the Alabama sentencing statute and, thus, did not "affirmatively mislead" the jury in its role nor "improperly describe the role assigned to the jury." *Ramano*, 512 U.S. at 9. The court provided the jury with instructions such as:

> Now you're going to render an advisory verdict recommending one of those two sentences that the Defendant shall receive based on the law I give you now and later and based on the evidence presented to you in this hearing. . . . The final responsibility under the law for sentencing will be mine."

(Doc. 23-8 at 87-88, TR 1107). And,

> Now in the state of Alabama the jury merely makes the recommendation. The ultimate decision is left to the Court as to whether or not the court will follow the jury's recommendation at a later phase in which the jury is not involved."

(Doc. 23-4 at 41; Vol. 4, JR-8, TR 173).  Such instructions correctly state the sentencing law of Alabama which refers to the jury's verdict as a "recommendation".  *See* ALA. CODE § 13A-5-46 (1975) (defining the role of "the jury to return a verdict recommending a sentence").  Notably, until 2017 the statute used the term "advisory verdict" in the place of "verdict" throughout the majority of the statute.  *See id*., amend. notes; *see also Miller v. Dunn*, 2017 U.S. Dist. LEXIS at *209-210, 2017 WL 1164811 (N.D. Ala., S.D., March 29, 2017) (explaining Alabama's sentencing statute as "describing the jury's sentencing role as 'advisory' ten separate times").  None of the instructions or comments made during the trial can be read as misleading the jury as to its responsibility to decide a verdict or diminish the gravity of it.  Indeed, the trial court instructed the jury:

> The fact that the determination of whether ten or more of you can agree to recommend a sentence of death or seven or more of you can agree to recommend a sentence of life in prison without parole can be reached by a single ballot should not influence you to act hastily or without due regard to the seriousness of this proceeding.  You should hear and consider the views of your fellow jurors.  Before you vote you should carefully weigh, sift, and consider the evidence and all of it realizing that a human life is at stake.

(Doc. 23-8 at 204; Vol. 8, JR-28, p. 1224).  "It is well established [in Alabama] that 'the comments of the prosecutor and the instructions of the trial court accurately informing the jury of the extent of its sentencing authority and that its sentence verdict was 'advisory' and a 'recommendation' and that the trial court would make the final decision as to sentence does not violate *Caldwell*.'" *Taylor v. Culliver*, No. 4:09-cv-00251-KOB-TMP, 2012 U.S. Dist. LEXIS 1381021, *293, 2012 WL 4479151 (N.D. Ala., M.D., Sept. 26, 2012)  (citing *Martin v. State*, 548 So.2d 488, 494 (Ala. Crim. App.), *affirmed*, 548 So.2d 496 (Ala. 1988), *cert. denied*, 493 U.S. 970, 110 S. Ct. 419, 107 L. Ed. 2d 383 (1989); *White v. State*, 587 So.2d 1218 (Ala. Crim. App. 1990), *affirmed*, 587 So.2d 1236 (Ala. 1991); *cert. denied*, 502 U.S. 1076, 112 S. Ct. 979, 117 L. Ed. 2d 142 (1992); *Kuenzel v.*

*State*, 577 So.2d 474 (Ala. Crim. App. 1990), *affirmed*, 577 So.2d 531 (Ala. 1991), *cert. denied*, 502 U.S. 886, 112 S. Ct. 242, 116 L. Ed. 2d 197 (1991)).

Accordingly, the court's instruction and the prosecution's comments were not misleading in violation of *Caldwell* nor the Eighth Amendment. *See also, Phillips v. State,* 2018 Ala. LEXIS 105 (prosecutor's statements nor trial court's instructions improperly described jury's role); *Doster v. State*, 72 So. 3d 50 (Ala. Crim. App. 2010) (trial court did not diminish jury's role in sentencing by referring to its verdict as a recommendation), *cert. denied by*, 132 S. Ct. 760, 181 L. Ed. 2d 490 (2011); *Miller v. Dunn,* 2:13-00154-KOB, 2017 U.S. Dist. LEXIS 46132, 2017 WL 1164811 (N.D. Ala., S.D., March 29, 2017) (finding proper the court's instructions to jury that sentencing verdict was "advisory" under Alabama law). Thus, this claim lacks merit.


**7. Whether Death Sentence Violates the Sixth Amendment.**

In his petition, Reeves claims that his death sentence violates the Supreme Court's holding, in *Hurst v. Florida* and *Ring v. Arizona,* that allowing a judge to make the factual findings necessary to support a death sentence violates the Sixth Amendment. (Doc. 24 at 74). Specifically, Reeves argues that "although the jury found Mr. Reeves guilty of capital murder, he was not "death eligible" unless and until one or more aggravating circumstances were found by the court to have been proven beyond a reasonable doubt" and that the jury verdict form does not allow the jury to specify the aggravating factor(s) found. (Doc. 24 at 78). This claim was presented in Reeves's Rule 32 petition, and the state court found it was procedurally barred from post-conviction review because it could have been and was not raised at trial or on direct appeal. (Doc. 23-16 at 167; Vol. 16, JR-65, p. 33).

Affirming the Circuit Court's denial, the Alabama Court of Criminal Appeals stated:

In affirming the circuit court's judgment, we recognize that the United States Supreme Court recently vacated this Court's judgment in *Johnson v. State*, [Ms. CR-10-1606, May 20, 2014] ___ So. 3d ___, 2014 Ala. Crim. App. LEXIS 35 (Ala. Crim. App. 2014), a case in which the death penalty had been imposed, and remanded the cause for further consideration in light of its opinion in *Hurst v. Florida*, 577 U.S. ___, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016). *See Johnson v. Alabama*, ___ U.S. ___, 136 S. Ct. 1837, 194 L. Ed. 2d 828, 2016 U.S. LEXIS 3041 (2016). In *Hurst*, the United States Supreme Court held unconstitutional Florida's capital-sentencing scheme on the ground that it violated its holding in *Ring v. Arizona,* 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), because Florida's statute authorized a sentence of death based on a finding by the trial judge, rather than by the jury, that an aggravating circumstance existed. The impact, if any, of *Hurst* on Alabama's capital-sentencing scheme has not yet been addressed by this Court or by the Alabama Supreme Court. We need not address it here because *Hurst* is not applicable in this case.

The United States Supreme Court's opinion in *Hurst* was based solely on its previous opinion in *Ring*, an opinion the United States Supreme Court held did not apply retroactively on collateral review to cases that were already final when the decision was announced. *See Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004). Because *Ring* does not apply retroactively on collateral review, it follows that *Hurst* also does not apply retroactively on collateral review. Rather, *Hurst* applies only to cases not yet final when that opinion was released, such as *Johnson*, *supra*, a case that was still on direct appeal (specifically, pending certiorari review in the United States Supreme Court) when *Hurst* was released. Reeves's case, however, was final in 2001, 15 years before the opinion in Hurst was released. Therefore, *Hurst* is not applicable here.

Based on the foregoing, the judgment of the circuit court is affirmed.

*Reeves*, 226 So. 3d at 756-57; (Doc. 23-31 at 104-105; Vol. 31, JR-94, p. 103-104).

The Supreme Court has declared that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358, 124 S. Ct. 2519, 159 L.Ed.2d 442 (2004). The *Ring* opinion was handed down on June 24, 2002. By contrast, the U.S. Supreme Court denied Reeves's petition for writ of certiorari, effectively concluding his direct appeals and rendering his conviction

and sentence final on direct review, nearly seven months earlier, on November 13, 2001.[41]

(Doc. 23-11 at 136; Vol. 11, JR-41.)   Thus, as a matter of law, the new procedural rule announced in *Ring* has no retroactive application to Reeves's case, which was already final on direct review when *Ring* was announced. *See, e.g., Battle v. United States*, 419 F.3d 1292, 1301 (11th Cir. 2005) ("*Ring* was decided after Battle's case was final on direct review. And *Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review. ... Thus, *Ring* — even if it otherwise extends to the facts of a case like this one — could not invalidate Battle's conviction and sentence now."); *Sibley v. Culliver*, 377 F.3d 1196, 1208 (11th Cir. 2004) ("[A] petitioner may not ... bring a habeas attack based on *Ring* violations that occurred before *Ring* was handed down."). Accordingly, the Court finds no error in the Alabama courts' rejection of Reeves's *Ring* claim on non-retroactivity grounds.[42]

---

[41]     For purposes of determining retroactivity, "[a] state conviction and sentence become final . . . when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Glock v. Singletary*, 65 F. 3d 878, 838 (11th Cir. 1995) (citation omitted).

[42]     The specific legal effect of *Ring* was to overrule prior Supreme Court jurisprudence that "allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 609.   "The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury." *Lee v. Commissioner, Alabama Dep't of Corrections*, 726 F.3d 1172, 1198 (11th Cir 2013). Indeed, the *Ring* Court made clear that it was not deciding whether the Sixth Amendment (1) required a jury to make findings as to mitigating circumstances, (2) required the jury to make the ultimate determination as to whether to impose a death sentence, or (3) forbade the state court from reweighing aggravating and mitigating circumstances.   *Ring*, 536 U.S. at 597 n.4.

In Reeves's case, by its guilty verdict, the jury found one aggravating circumstance beyond a reasonable doubt, "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of ... robbery …"  Ala. Code § 13A-5-49(4) (Doc. 23-2 at 6-7, 23; Vol. 2, JR-2, TR 219-220, JR-3, TR 236).   Alabama law dictates that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing." Ala. Code § 13A-5-45;

On January 12, 2016,[43] the Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616,

193 L. Ed. 2d 504, 193 L.Ed.3d 504 (2016). In *Hurst*, the Court applied *Ring* to Florida's

capital sentencing scheme and found it to be unconstitutional. The *Hurst* opinion stressed

that "[l]ike Arizona at the time of *Ring*, Florida does not require the jury to make the critical

findings necessary to impose the death penalty. Rather, Florida requires a judge to find

these facts." 136 S. Ct. at 622. Therefore, "[i]n light of *Ring*, we hold that Hurst's sentence

violates the Sixth Amendment." *Id.* The Court reasoned:

> "The Sixth Amendment protects a defendant's right to an impartial jury.
> This right required Florida to base Timothy Hurst's death sentence on a
> jury's verdict, not a judge's factfinding. Florida's sentencing scheme, **which
> required the judge alone to find the existence of an aggravating
> circumstance**, is therefore unconstitutional."

*Id.* at 624 (emphasis added).

The Eleventh Circuit and multiple district court opinions in this Circuit have found,

*Hurst* is not retroactively applicable on collateral review.[44] *See Lambrix v. Secretary,*

---

see also *Lee*, 726 F.3d at 1198 ("Nothing in *Ring* — or any other Supreme Court decision
— forbids the use of an aggravating circumstance implicit in a jury's verdict."). Because
the Alabama capital-sentencing scheme requires the jury to find the existence of at least
one aggravating circumstance as a prerequisite to a death sentence, and because the jury in
this case actually found Reeves guilty beyond a reasonable doubt of Robbery in the first
degree, the state court did not err in finding that Reeves has no viable claim under *Ring*
even if that decision applied to him (which it does not).

[43]     The Alabama Court of Appeals denied Reeves's Rule 32 petition on June 10, 2016.
(Vol. 30, JR-94).

[44]     The framework set forth in *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103
L.Ed.2d 334 (1989) establishes why *Hurst* cannot be applied retroactively. "Under the
*Teague* framework, an old rule applies both on direct and collateral review, but a new rule
is generally applicable only to cases that are still on direct review," with two narrow
exceptions. *Id.* Those exceptions are that "[n]ew *substantive* rules generally apply
retroactively" and that retroactive effect is given to a "small set of watershed rules of
criminal procedure implicating the fundamental fairness and accuracy of the
criminal proceeding." *Schriro v. Summerlin*, 542 U.S. 348, 351-52, 124 S. Ct. 2519, 159
L.Ed.2d 442 (2004) (citations and internal quotation marks omitted). *Hurst* did not
announce a "new rule" at all, but simply applied *Ring v. Arizona* to Florida's capital
sentencing statute. See *Hurst*, 136 S. Ct. at 622 ("In light of *Ring*, we hold that Hurst's

*Florida Dep't of Corrections*, 851 F.3d 1158, 1165 n.2 (11th Cir. 2017) ("Lambrix's two capital convictions and death sentences became final in 1986, sixteen years before *Ring* was decided. ... [T]here is no *Hurst* claim, much less a viable one, because under federal law *Hurst*, like *Ring*, is not retroactively applicable on collateral review."); *Miller v. Dunn*, 2:13-00154-KOB, 2017 U.S. Dist. LEXIS 46132, 2017 WL 1164811, *72 (N.D. Ala. Mar. 29, 2017) ("*Hurst* does not apply retroactively to Miller, because his conviction was final before the decision in *Hurst* was announced. ... *Hurst*, which applied *Ring* in Florida, is not retroactive."); *Smith v. Dunn*, 2:13-CV-00557-RDP, 2017 U.S. Dist. LEXIS 45274, 2017 WL 1150618, *69 (N.D. Ala. Mar. 28, 2017) ("*Hurst* did not articulate a new rule of law; rather, it applied *Ring*'s analysis to Florida's sentencing scheme," such that the retroactivity of *Hurst* tracks that of *Ring*). Thus, the Court finds no error in the Alabama courts' rejection of Reeves's *Hurst* claim on non-retroactivity grounds

Furthermore, *Hurst*, if applied, to Reeves's § 2254 Petition, would not alter the result of Reeves's Claim 7, which appears to stretch the holding of *Hurst*. To be clear, *Hurst* did not say that any capital scheme vesting the final sentencing decision in a judge, rather than a jury, is unconstitutional. *Hurst* did not make sweeping pronouncements that any system of judicial override is *per se* unconstitutional, nor did it hold that advisory verdicts in the penalty phase of capital cases are impermissible. Instead, *Hurst* is properly viewed as striking down one narrow feature of the Florida capital sentencing scheme - that which "required the judge alone to find the existence of an aggravating circumstance." *Hurst*, 136 S. Ct. at 624. To the extent that Reeves would read *Hurst* as standing for a

---

sentence violates the Sixth Amendment."). Because *Hurst v. Florida* is simply a straightforward application of *Ring*, it does not announce a new rule of law; rather, its retroactivity is tethered to *Ring*.

broader proposition or a more sweeping denunciation of judicial-override provisions in capital sentencing statutes, the Court finds such a construction to be unwarranted and unsupported by the clear language of the opinion.

To the detriment of Reeves's claim, the Alabama capital sentencing scheme under which he was sentenced to death is materially different from the Florida statute at issue in *Hurst*. In Alabama, unlike in Florida at the time of *Hurst*, a defendant is not death-eligible unless a jury finds beyond a reasonable doubt the existence of an aggravating circumstance. *See In re Bohannon v. State*, 222 So.3d 525, 534 (Ala. 2016) ("the finding required by *Hurst* to be made by the jury, *i.e.*, the existence of the aggravating factor that makes a defendant death-eligible, is indeed made by the jury, not the judge, in Alabama"). Thus, the portion of the Florida capital sentencing scheme deemed constitutionally objectionable in *Hurst* is simply not present in Alabama. Multiple federal and state courts applying *Hurst* to the Alabama scheme have so concluded.[45]

---

[45]    *See, e.g., Dallas v. Dunn*, 2017 U.S. Dist. LEXIS 109749, 2017 WL 3015690, *28 (M.D. Ala. July 14, 2017) ("What distinguishes Petitioner's trial from the constitutionally defective capital murder trial[] in *Hurst* ... is the fact Petitioner's capital sentencing *jury* made all the factual determinations at the guilt-innocence phase of Petitioner's trial (*unanimously* and *beyond a reasonable doubt*) necessary to render Petitioner eligible for the death penalty under Alabama law .... The jury's factual findings at the guilt-innocence phase of Petitioner's capital murder trial rendered Petitioner *eligible* for the death penalty within the meaning of the Supreme Court's Eighth Amendment jurisprudence."); *Miller*, 2017 U.S. Dist. LEXIS 46132, 2017 WL 1164811, at *72 ("even if *Hurst* were to apply retroactively to Miller, this claim lacks merit" because "Alabama's capital sentencing scheme complies with the Sixth Amendment"); *Smith*, 2017 U.S. Dist. LEXIS 45274, 2017 WL 1150618, at *70 ("*Hurst* found fault with Florida's scheme specifically because Florida trial judges were tasked with independently finding the existence of aggravating circumstances. ... However, consistent with *Ring*, Alabama juries must find an aggravating circumstance beyond a reasonable doubt before a defendant is eligible to receive the death penalty. Alabama's capital sentencing scheme does not run afoul of *Ring* ...."); *Bohannon*, 222 So.3d at 532 ("*Ring* and *Hurst* require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty — the plain language in those cases requires nothing more and nothing less. ... [B]ecause in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-

In Reeves's case, the record reflects he was charged with murder in commission of a robbery in the first degree, in violation of ALA. CODE § 13A-5-40(a)(2). (Doc. 23-1 at 10-11; Vol. 1, JR-1). This capital offense has a corresponding aggravating circumstance in the Alabama statutory scheme. Indeed, the robbery-murder offense described at § 13A-5-40(a)(2) pairs with the statutory aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of ... robbery." ALA. CODE § 13A-5-49(4). By the terms of the Alabama statute, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." ALA. CODE § 13A-5-45(f). What this means is that when Reeves's jury unanimously found beyond a reasonable doubt that he was guilty of robbery-murder under § 13A-5-40(a)(2), they also unanimously found beyond a reasonable doubt the aggravating circumstance set forth at § 13A-5-49(4). Those jury findings as to the existence of aggravating circumstances are what made Reeves death-eligible in the Alabama capital sentencing scheme.[46] Thus, there is no *Hurst v. Florida*

_____

eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment.").

[46]     The jury was specifically instructed by the trial court:

> The law of this state provides a list of aggravating circumstances which may be considered by the jury in deciding the punishment if the jury is convinced beyond a reasonable doubt from the evidence that such aggravating circumstance exists in the case. If the jury is not convinced beyond a reasonable doubt based upon the evidence that one or more of the aggravating circumstances exists, then the jury must sentence the Defendant to life imprisonment without parole regardless of whether there are any mitigating circumstances in the case.
> . . .
> Th[e] issue is for you to determine. The aggravating circumstance which you may consider in this case if you find from the evidence that it has been proven beyond a reasonable doubt is that the capital offense was committed while the Defendant was engaged in the commission of robbery in the first

problem here because Reeves's jury found the aggravating circumstance of robbery (which rendered him eligible for the death penalty) beyond a reasonable doubt. *See Evans v. Sec'y, Fla. Dep't Of Corr.*, 699 F.3d 1249, 1260 (11th Cir. 2012) ("The jury's verdict necessarily contained [findings than an aggravating circumstance existed] because the jury was instructed that it could not recommend a death sentence unless it found beyond a reasonable doubt that one or more aggravating circumstances existed . . . ."); *United States v. Townsend*, 630 F.3d 1003, 1013-14 (11th Cir. 2011) (finding that because the court instructed the jury that it must make a prerequisite finding as to the existence of an element before convicting the defendant, the jury's guilty verdict necessarily meant the jurors found the element).

In his petition, Reeves also generally attacks the constitutionality of Alabama's death penalty statute. Reeves maintains that "Alabama is now an outlier in that it gives a judge the ultimate authority to sentence a defendant to death. Only in Alabama is a judge permitted to impose a death sentence in spite of a contrary jury recommendation." (Doc. 24 at 85). More than two decades ago, the Supreme Court rejected this argument, finding that the Alabama capital sentencing scheme "adequately channels the sentencer's discretion so as to prevent arbitrary results" because "[c]onsistent with established constitutional law, Alabama has chosen to guide the sentencing decision by requiring the jury and judge to weigh aggravating and mitigating circumstances." *Harris v. Alabama*, 513 U.S. 504, 511, 115 S. Ct. 1031, 130 L.Ed.2d 1004 (1995). In so finding, the *Harris* Court expressly held

---

degree. . . .

Your finding that the Defendant is guilty of capital murder entailed the finding that the Defendant was guilty of robbery in the first degree. . . It is for you to determine how much weight to give to that particular matter.

(Doc. 23-8 at 192-94; Vol. 8, JR-28, p. 1212-14).

that "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict." *Id.* at 512.

The Court finds no authority suggesting that the U.S. Supreme Court or the Eleventh Circuit has changed course from the *Harris* holding. *See Waldrop v. Comm'r, Ala. Dep't of Corr.*, 711 F. App'x 900 (11th Cir. 2017), *cert. denied*, 2018 U.S. LEXIS 5613 (U.S. , Oct. 1, 2018) (petitioner's death sentence, imposed by judicial override over the jury's recommended sentence of life imprisonment, was upheld); *Madison v. Comm'r*, 677 F.3d 1333, 1336 (11th Cir. 2012) ("we find that Madison's claim that Alabama's judicial override scheme violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment is foreclosed by precedent"); *Brownlee v. Haley*, 306 F.3d 1043, 1077 (11th Cir. 2002) (recognizing that "Alabama's capital sentencing system is consonant with the Eighth Amendment even though it does not specify the precise weight that a judge must give to the jury's verdict"); *Hays v. State of Ala.*, 85 F.3d 1492, 1501 (11th Cir. 1996) (rejecting petitioner's argument that "the Alabama sentencing scheme dividing the responsibilities of jury and trial judge at the time he was sentenced was standardless," and concluding that "there was adequate channeling of discretion" in the Alabama scheme). Accordingly, this claim is foreclosed by binding precedent.

This claim is, thus, without merit.

## V.     Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) of the Rules Governing 2254 Cases (December 1, 2009).   A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   As to claims

rejected on the merits, a certificate of appealability should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). As to claims rejected on procedural grounds, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* The Court concludes that jurists of reason would not find debatable either the court's procedural rulings or its assessment of the constitutional claims as to Reeves's claims, <u>with the exception of whether Reeves's trial counsel was ineffective for failing to hire an expert to investigate his intellectual disability.</u>

"It is unquestioned that under the prevailing professional norms at the time of [Reeves's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) (internal quotation omitted). It is undisputable that where counsel has reason to know of potential mitigating evidence, they are required to investigate. It is further undisputable that the trial court approved funds to hire an expert to investigate Reeves's intellectual disability, but the approved expert was never contacted. Reeves, thus, argues that counsel was ineffective for failing to investigate his intellectual disability. In dismissing his claim, the Court of Criminal Appeals concluded that based on the totality of the of the evidence before it, Reeves failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and failed to establish that counsel's decision was not a reasonable strategic decision.

*Strickland*, 466 U.S. at 689.  The state court primarily supported its decision on Reeves's failure to present the testimony of trial counsel at the Rule 32 hearing.

The Court concludes that jurists of reason could find it debatable whether Reeves's trial counsel was ineffective pursuant to *Strickland* for failing to hire an expert to investigate his intellectual disability.  This determination is supported by the dissenting opinion of Justice Sotomayor to the United States Supreme Court's denial for writ of certiorari of Reeves's Rule 32 petition.  *Reeves v. Alabama*, __ U.S. __, 138 S. Ct. 22, 199 L. Ed. 2d 341 (2017) (Sotomayor, J., dissenting).  Justice Sotomayor, joined by Justices Ginsburg and Kagan, questioned the reasonableness of counsel's decision not to hire the court approved expert to investigate Reeves's intellectual disability, pursuant to the *Strickland*.  Justice Sotomayor stated, "Reeves presented ample evidence in support of his claim that his counsel's performance was deficient, but the [Court of Criminal Appeals] never considered or explained why, in light of that evidence, his counsel's strategic decisions were reasonable."  *Id*. at 28.  The dissent further reasons that "[t]he Alabama Court of Criminal Appeals was not free to ignore this evidence simply because Reeves did not call his counsel to testify at the postconviction hearing."  *Id*.  Thus, the Court finds that Reeves has meet his burden to demonstrate that reasonable jurists could find debatable the district court's assessment of Reeves's ineffective assistance, Claim 3.b., for failing to hire an expert to investigate his intellectual disability.  Therefore, Reeves is entitled to a Certificate of Appealability as to Claim 3.b.

Accordingly, any certificate of appealability filed by Reeves is DENIED, except as to Claim 3.b., which is hereby GRANTED.  Since the Court has found that Reeves is entitled to a Certificate of Appealability as to Claim 3.b., if he appeals, and if he is indigent, he would be entitled to appeal *in forma pauperis*.

## VI.    Conclusion.

Based on the foregoing, the Court concludes that Reeves's petition for habeas corpus relief be denied, that this action be dismissed, and that judgment be entered in favor of the Respondent, and against the Petitioner, Matthew Reeves.  It is further recommended that any motion for a Certificate of Appealability or for permission to appeal *in forma pauperis* be denied, except as to Claim 3.b., which is granted.

**DONE** and **ORDERED** this the **8th** day of **January**, **2019**.


 s/Kristi K. DuBose
**CHIEF UNITED STATES DISTRICT JUDGE**