# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MATTHEW REEVES,     :
  Plaintiff,     :
           :
vs.          :
           :  **CIVIL ACTION NO. 17-0061-KD-MU**
JEFFERSON D. DUNN,    :
  Respondent.     :
           :

## ORDER

This matter is before the Court on Petitioner's Federal Rule of Civil Procedure 59(e) Motion to Alter or Amend the Court's Judgment denying his Petition for Writ of Habeas Corpus.[1] (Docs. 31, 43). For the reasons discussed herein, the motion is **DENIED**.

### I. Procedural Background.

On January 8, 2019, the undersigned entered an Order (doc. 29) and Judgment (doc. 30) denying Matthew Reeves's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, in its entirety. (Docs. 1, 24). The ruling did grant a certificate of appealability ("COA") on one presented issue, Claim 3.b., whether counsel rendered ineffective assistance for failing to hire an expert to investigate his intellectual disability.

Reeves now moves for reconsideration of three specifically enumerated aspects of the January 8 Order and Judgement. Reeves requests the following relief: (1) reconsideration of the

---

[1] At the same time he filed his Rule 59(e) motion, Petitioner also filed a notice of appeal, which generally divests a district court of jurisdiction to take any action in a case except in aid of the appeal. *United States v. Diveroli*, 729 F.3d 1339, 1341 (11th Cir. 2013). However, the filing of a timely Rule 59(e) motion renders a notice of appeal ineffective until the district court enters an order dismissing the motion. *See* Fed. R. App. P. 4(a)(4)(B)(i); *Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 745-46 (11th Cir. 2014). Thus, a district court retains jurisdiction to consider a timely Rule 59(e) motion despite a Petitioner's filing of a notice of appeal.

finding that Reeves is not intellectually disabled under *Atkins v. Virginia*, 536 U.S. 304 (2002), Claim 1; (2) reconsideration that the Alabama Court of Criminal Appeals reasonably rejected Reeves's claim that he received ineffective assistance of counsel during the penalty phase, Claim 3.c.; and (3) reconsideration that the Alabama Court of Criminal Appeals reasonably rejected Reeves's juror misconduct claim at the pleading stage without an evidentiary hearing, Claim 4. (Docs. 31, 43). Alternatively, Reeves requests that if Rule 59(e) relief is not granted, that the Court expand its Certificate of Appealability to include the presented issues to the Court of Appeals. (*Id.*).

## II.    Legal Standard for Motion to Reconsider.

The Eleventh Circuit has summarized the limited scope of relief that is available to a litigant under Rule 59(e):

> "The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999). "[A] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005).

*Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) ("Reconsidering the merits of a judgment, absent a manifest error of law or fact, is not the purpose of Rule 59."); *Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) ("The purpose of a Rule 59(e) motion is not to raise an argument that was previously available, but not pressed."); *Hughes v. Stryker Sales Corp.*, 2010 U.S. Dist. LEXIS 64439, 2010 WL 2608957, *2 (S.D. Ala. June 28, 2010) (rejecting notion that motions to reconsider "are appropriate whenever the losing party thinks the District Court got it wrong"). "They are neither appeal substitutes nor a 'dry run' to test arguments in anticipation of a forthcoming appeal." *Lee*, 2012 U.S. Dist. LEXIS 107328, 2012 WL 3137901, at *2.

To prevail on a motion to reconsider, '[t]he losing party must do more than show that a grant of the motion might have been warranted; he must demonstrate a justification for relief so compelling that the court was required to grant the motion.' *Maradiaga v. United States*, 679 F.3d 1286, 1291 (11th Cir. 2012) (citations and internal marks omitted)." *Lee v. Thomas*, No. CIV.A. 10-0587-WS-M, 2012 U.S. Dist. LEXIS 107328, 2012 WL 3137901, at *2 n.1 (S.D. Ala. Aug. 1, 2012) (Steele, J.).

### III. Analysis.

Turning to Reeves's current motion, it is imperative to keep in mind the posture of this case – that is, Reeves petitioned this Court for habeas relief pursuant to 28 U.S.C. § 2254. This statute "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." *Shoop v. Hill*, 139 S. Ct. 504, 506, 202 L. Ed. 2d 461 (2019). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011) (citation omitted). Rather, "[t]o obtain habeas relief a state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Evans v. Secretary, Dep't of Corrections*, 703 F.3d 1316, 1326 (1th Cir. 2013) (citations omitted). Under § 2254(d) deference, "only if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents may relief be granted." *Johnson v. Secretary, DOC*, 643 F.3d 907, 910 (11th Cir. 2011) (citation and internal quotation marks omitted); *see also Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) ("if some fairminded jurists could agree with the state court's decision, although others might

disagree, federal habeas relief must be denied") (citation omitted). "If this standard is difficult to meet, that is because it was meant to be." *Holsey*, 694 F.3d at 1257 (citation omitted); *see also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear."). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation marks omitted).

It is under this highly deferential standard that Reeves's habeas petition was denied.

### A. Reconsideration of Intellectual Disability under *Atkins*.

Petitioner Reeves's first ground for seeking relief under Rule 59(e) relates to Claim 1 of his habeas petition. In his habeas petition, Reeves alleges that he is intellectually disabled and his capital sentence, thus, violates the Eighth Amendment pursuant to the holding of *Atkins v. Virginia*, 536 U.S. 304 (2002). The record reveals that Reeves received IQ scores within a standard error of measurement ("SEM") range of 63 to 78, that the experts presented conflicting opinions at the Rule 32 hearing as to whether Reeves is intellectually disabled, and the state court credited the opinion of Dr. King over Dr. Goff in concluding that Reeves is not intellectually disabled. In the January 8 Order, this Court found that Reeves failed to carry his burden of proving that the state court's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Relying primarily on *Moore v. Texas*, for the first time, Reeves asserts in his motion for reconsideration that the Court's rejection of his *Atkins* claim rested on manifest errors of law and fact because it impermissibly

relied on extrinsic factors unrelated to determining intellectual functioning to disregard the lower SEM range of IQ scores[2] and emphasized Reeve's perceived strengths in adaptive functioning over the acknowledged deficits.

In *Moore*, the Supreme Court vacated a Texas Criminal Court of Appeals judgment which determined Moore was not intellectually disabled based on evidentiary factors announced in *Ex parte Briseno*, 135 S.W. 3d 1 (Tex. Crim. App. 2004), rather than current medical diagnostic standards. *Moore v. Texas*, 137 S. Ct. 1039. *Briseno* utilized an outdated definition and diagnostic standard for assessing intellectual disability from the 1992 edition of the American Association on Mental Retardation's ("AAMR") manual. The *Briseno* test required that adaptive deficits be related to intellectual functioning deficits and identified seven evidentiary factors ("without citation to any medical or judicial authority") relevant to determining intellectual disability. 137 S. Ct. at 1046-47. The Texas appellate court utilized the *Briseno* factors in determining Moore failed to prove significant subaverage intellectual functioning with IQ scores of 78 and 74 (rejecting 5 of 7 IQ tests as unreliable). The appellate court "discounted the lower end of the standard-error range associated with" the score of 74 "observ[ing] that Moore's history of academic failure, and the fact that he took the test while 'exhibit[ing] withdrawn and depressive behavior' on death row might have hindered his performance." *Id*. at 1047. The appellate court then concluded Moore failed to prove he suffered significant limitations in adaptive functioning due to Moore's adaptive strengths, which included living on the streets, playing pool and mowing lawns for money, committing the crime in a sophisticated way and then fleeing, testifying and representing himself at trial, and developing skills in prison. *Id*. The Court granted certiorari to

---

[2]     Reeves argues that like *Moore*, the court credited Dr. King's testimony regarding factors unrelated to IQ instead of relying solely on his IQ score of 68. (Doc. 31-1 at 8).

determine whether the appellate court's adherence to superseded medical standards and reliance on *Briseno* complied with the Eighth Amendment and Court precedent and held it did not.

The *Moore* Court found the appellate court considered "the presence of other sources of imprecision in administering the [IQ] test to [Reeves]" and noted that such unique factors "cannot narrow the test-specific standard-error range" and the appellate court was required based on the SEM range "to move on to consider Moore's adaptive functioning". *Id.* at 1049-50. The Court further concluded that the appellate court overemphasized Moore's perceived adaptive strengths in determining he did not suffer significant adaptive deficits. In particular, the Court identified traumatic experiences in Moore's life which the Texas appellate court discounted, like childhood abuse and academic failure, that clinicians consider "risk factors" and rely on in determining intellectual disability. Similarly, the Court found the appellate court "departed from clinical practice by requiring Moore to show that his adaptive deficits were not related to 'a personality disorder'", *id.* at 1051, when the medical community acknowledges the coexistence of personality disorders and mental health issues in the intellectually disabled. Lastly, the Court viewed the *Briseno* factors as "exceedingly subjective" and deemed such factors as "lay perceptions of intellectual disability." *Id.* In rejecting the *Briseno* factors, the Court indicated that no other state legislature approved the *Briseno* factors or anything similar and that Texas itself failed to follow *Briseno* in contexts other than the death penalty. The Court maintained that while states have flexibility in enforcing *Atkins*, they do not have 'unfettered discretion' or 'complete autonomy to define intellectual disability as they wished'. *Id.* at 1053 (quoting *Hall*, 134 S. Ct. at 1998-99). Specifically, "[t]he medical community's current standards supply one constraint on States' leeway in this area." *Id.* The Court thus held that:

> By rejecting the habeas court's application of medical guidance and clinging to the standard it laid out in *Briseno*, including the wholly nonclinical *Briseno* factors, the

CCA failed adequately to inform itself of the "medical community's diagnostic framework," *Hall*, 572 U. S., at ___-___, 134 S. Ct. 1986, 2000, 188 L. Ed. 2d 1007, 1025. Because *Briseno* pervasively infected the CCA's analysis, the decision of that court cannot stand.

*Id*. at 1053.

Notably, the 2017 decision of *Moore* was decided after the trial and appellate court determined Reeves was not intellectually disabled in 2009 and 2016, respectively, and cannot be considered "clearly established law" pursuant to § 2254(d)(1). *See Shoop v. Hill*, __ U.S.__, 139 S. Ct. 504, 502, 202 L. Ed. 2d 461, 465 (2019) ("The Court of Appeals' reliance on *Moore* was plainly improper under § 2254(d)(1), and we therefore vacate that decision and remand so that Hill's claim regarding intellectual disability can be evaluated based solely on holdings of this Court that were clearly established at the relevant time."). Consequently, Reeves's reliance on *Moore v. Texas* is misplaced and improper. Nevertheless, Reeves contends that *Moore* is applicable because the holding did not establish a new rule of law but "merely applied the law that the Supreme Court established in *Hall*." (Doc. 31-1 at 7, n.2). Such suggestion, however, extends *Hall* (and *Atkins*) beyond what the case(s) actually held, and this Court is bound to "determine whether its conclusions can be sustained based strictly on legal rules that were clearly established in the decisions of [the Supreme] Court at the relevant time." *Shoop*, 139 S. Ct. at 509. Accordingly, this Court is required to analyze Reeves's habeas petition and this motion based on that which was "clearly established" at the time the Alabama Court of Criminal Appeals rejected Reeves's intellectual disability claim. 28 U.S.C. § 2254(d)(1).

Based on the laws in place at the time of the state court's decision, denial of Reeves's intellectual disability claim does not rest on manifest errors of law or fact and Reeves's arguments are simply a rehash of old arguments. There is no "binding Supreme Court precedent, [that] *only* IQ tests that account for the SEM are relevant to the first prong [in determining significant

subaverage intellectual functioning.]" [3] (Doc. 31-1 at 9-10) (emphasis added).  Nor did federal law exist condemning consideration of adaptive strengths when evaluating adaptive functioning. Rather, the law at the time of Reeves's decision instructed that:

> [t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is **informed by the medical community's diagnostic framework**. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

*Hall*, 572 U.S. 701, 134 S. Ct. 1986, 2000, 188 L. Ed. 2d 1007 (2014) (emphasis added); *see also Kansas* v. *Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002) ("[T]he science of psychiatry . . . informs but does not control ultimate legal determinations . . .").  Indeed, the record reflects that the state court relied on the expertise of medical professionals, namely Drs. Goff and King, in determining Reeves is not intellectually disabled.  Both doctors testified at the Rule 32 hearing as to their experience, testing procedures, and provided a diagnostic opinion based on clinical judgment.  In accordance with the law at the time, the state court properly recognized that Reeves's IQ fell within "a range of scores on either side of the recorded score" and that his "true IQ score lies" somewhere within this SEM range.  *Hall*, 572 U.S. at 712-13 ("The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should

---

[3]     Reeves contends that IQ tests are the sole measure to be utilized in determining the intellectual functioning of an individual and cites to *Atkins*, *Hall*, and *Brumfield* as support.  Such a rule, however, cannot be drawn from the holding of these cases or dicta within. Notably, *Atkins* recognized that an IQ score of 70 to 75 or lower is typically considered the cutoff IQ score for the intellectual function prong, *Atkins v. Virginia*, 536 U.S. 304, 305 n.5 (2002); *Hall* held that a strict cutoff IQ score of 70 violated the Eighth Amendment and the inherent imprecision of IQ scores meant that when IQ scores fall within the test's standard error of measurement defendant's must be allowed to present additional evidence of intellectual disability, *Hall*, U.S. 572 U.S. 701; and *Brumfield* declared that an IQ score of 75 "was squarely in the range of potential intellectual disability", *Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015).  None held that an IQ test score was the single, deciding factor in a court's determination of a defendant's intellectual functioning.

be read not as a single fixed number but as a range."). Based on this SEM range, as instructed by the established law at the time, Reeves was allowed to "present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id* at 713. The findings of these tests were interpreted by expert medical professionals. The medical experts, however, offered opposing diagnoses based on their clinical judgment,[4] and the court credited Dr. King's testimony over Dr.

---

[4]    The medical community routinely applies clinical judgment in diagnosing intellectual disability. In fact, the most current edition of the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5) provides that:

> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real life situations and mastery of practical tasks. . . . Thus, clinical judgment is needed in interpreting the results of IQ test. . . . Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. . . . Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment.

DSM-5 at 37-38. Reeves's own expert, Dr. Goff, indicated that he too applies clinical judgment when assessing an individual's intellectual disability – he testified that he reviewed school records and medical records "to try and get an understanding of the individual." (Doc. 23-24 at 33). In explaining the necessity for and reasoning behind such review, Dr. Goff stated, "it's difficult to get an understanding of someone just spending five or six hours with them. . . . [S]ince we are talking about his cognitive status, it was important to look at all the school records that we had and any medical records that might reflect on his situation during the developmental period to determine whether or not he was having difficulties during the developmental period." (Doc. 23-24 at 33); *see also* James W. Ellis, *Evaluating Intellectual Disability: Clinical Assessments in Atkins Cases*, 46 Hofstra L. Rev. 1307 (Summer 2018) citing the following support for the need for clinical judgment in intellectual disability assessments:

> Keith F. Widaman, Concepts of Measurement, in The Death Penalty and Intellectual Disability 55, 59 (Edward A. Polloway ed., 2015) ("The need for clinical judgment to combine all information to arrive at important diagnostic decisions is always a component of this assessment task."); Clinical Judgment 2014, supra note 253, at 7 ("The purpose of clinical judgment is to enhance the quality, validity, and precision of the clinician's decision or recommendation in situations related to diagnosis, classification, and planning supports."); *see also* American Educational Research Association, American Psychological Association & National Council on Measurement in Education, Standards for Educational and Psychological Testing, std. 10.1 comment at 164 (2d ed., 2014) ("Test score interpretation requires

Goff's.[5]  Consequently, it cannot be said that the state court's decision (centered on Dr. King's

clinical judgment that Reeves is not intellectually disabled (and that he does not suffer significant

subaverage intellectual functioning nor substantial deficits in adaptive functioning)) was contrary

to establish federal law or based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.[6]

---

professionally responsible judgment that is exercised within the boundaries of knowledge and skill afforded by the professional's education, training, and supervised experience, as well as the context in which the assessment is being performed."); APA, DSM-5, *supra* note 65, at 37 ("Clinical training and judgment are required to interpret test results and assess intellectual performance."); Ruth Luckasson & Robert L. Schalock, Standards to Guide the Use of Clinical Judgment in the Field of Intellectual Disability, 53 Intellectual & Developmental Disabilities 240, 247 (2015) ("The clinical judgment standards … provide the basis for valid and precise decisions and recommendations … .").

James W. Ellis, *Evaluating Intellectual Disability: Clinical Assessments in Atkins Cases*, 46 Hofstra L. Rev. 1307, 1416 n.431 (Summer 2018).

[5]      Recognizing that intellectually disability is a condition, not a number", *Hall*, 572 U.S. at 723, Dr. King applied clinical judgment in diagnosing that Reeves did not suffer significant subaverage intellectual or adaptive functioning and, ultimately, that Reeves was not intellectually disabled.  *See Hall*, 572 U.S. at 723 (instructing that IQ scores are helpful "[b]ut in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do. . .").

[6]      As discussed in the January 8 Order, the trial court credited the consistency of Reeves's full-scale IQ scores of 73 (administered when he was 14 years of age) and 71 (administered by Reeves's expert in preparation for the Rule 32 hearing) and Dr. King's opinion offered at the Rule 32 hearing.  Dr. King testified that Reeves's full-scale IQ score of 68 was inconsistent with the administered Wide Range Achievement Test scores (showing Reeves read and spelled on a fifth-grade level and performed math on a fourth-grade level), suggesting Reeves functioned at a higher level than the IQ score indicated.  (Doc. 23-25 at 24-26).  Based on the WAIS and Wide Range Achievement Test, Dr. King was unable to reach a definitive conclusion regarding Reeves' intellectual ability but stated, "I was leaning in the direction of borderline intellectual functioning. . . . But considering all of the other test data, I came up with a conclusion that he functions in the borderline range of ability." (Doc. 23-25 at 26).  According to Dr. King, the "other test data" included the battery of tests he administered, his clinical interview with Reeves, Dr. Goff's data, previous intellectual tests done on Mr. Reeves, and review of Reeves's records.  (Doc. 23-25 at 35, 46).  Dr. King concluded that Mr. Reeves intellectually functions in the borderline range of intellectual ability, a range of 70-84; such individuals "are able to take care of themselves and are educable and typically end up developing certain kinds of abilities and activities so that they can support themselves independently in society." (Doc. 23-25 at 35).  Dr. King testified that

Reeves has failed to establish newly discovered evidence or manifest errors of law or fact. At best, Reeves reiterates arguments already made, which the Court already rejected. Rule 59(e) is not an appropriate vehicle to "relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Frantz v. Walled*, 513 F. App'x 815, 822 (11th Cir. 2013). In short, Reeves has not set forth any basis for Rule 59(e) relief, and his motion is denied as to this claim. Additionally, Reeves has failed to put forth a substantial showing of the denial of a constitutional right; thus, a Certificate of Appealability is not warranted as to this claim. *Slack v. McDaniel*, 529 U.S. 473, 483-484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000).

### B. Reconsideration of Ineffective Assistance of Counsel during Penalty Phase.

Petitioner Reeves's second ground for seeking relief relates to Claim 3.c. of his habeas petition. Reeves contends that the Court incorrectly concluded that trial counsel's decision not to

---

such a finding was consistent with the previous intellectual tests done. (Doc. 23-25 at 46); *see also Brumfield*, 135 S. Ct. at 2278 (holding IQ score of 75 to be within the range of potential intellectual disability" and finding state court's contrary determination to be unreasonable were there was no "evidence of any higher IQ test score").

In concluding that Reeves does not suffer substantial adaptive deficits, the trial court wrestled with the conflicting opinions of experts and reconciled the discrepancy by analyzing the record evidence beyond administered tests, including:

> [Reeves's] technical abilities in brick masonry, welding, and automobile mechanics; Reeves's ability to work construction and do so reliably when he was not around his brother, Julius; Reeves's participation in a drug-sale enterprise in which he was able to make thousands of dollars a week that he then used to purchase personal items and a car; and particularly Reeves's cold and calculated actions surrounding the murder, including planning the robbery with his codefendants, hiding incriminating evidence after he had shot the victim, splitting the proceeds of the robbery with his codefendants, and bragging about the murder, claiming that he would earn a "teardrop" – a gang tattoo indicating that a gang member had killed someone – for the murder.

(Doc. 29 at 28, quoting the Alabama Court of Criminal Appeals).

hire a mitigation expert was not objectively unreasonable under *Strickland* and that he was not prejudiced by the decision. Specifically, Reeves argues that the Court should reconsider its holding that counsel was not ineffective during the penalty phase of the trial for three reasons: (1) that evidence of the reason for trial counsel's decision is not necessary to establish ineffective assistance of counsel; (2) that ample evidence was presented that established counsel did not make an informed or strategic decision; (3) that counsel possessed records concerning Reeves's background does not preclude a finding of deficient performance. These claims have previously been presented to the Court through Reeves's §2254 habeas petition and appear to be nothing more than an attempt to reargue previously dismissed claims. *Arthur v. King*, 500 F.3d 1335, 1343-44 (11th Cir. 2007) ("A Rule 59(e) motion cannot be used to relitigate old matters…."). The Court finds that relief was properly denied as reasoned in its January 8 Order but briefly addresses Reeves's claims for the sake of clarity.

To start, Reeves contends that the Court "contorted the *Strickland* test when it held Reeves must provide evidence that 'sheds . . . light on the reasoning behind counsel's actions' to prevail on his ineffective-assistance claim" and "that only 'evidence . . . that the complained of actions were not the result of reasonable strategy' can rebut *Strickland's* presumption of reasonableness." (Doc. 31-1 at 13, 15) (quoting the January 8 Order at p. 44). These misquotations of the January 8 Order are out of context and ignore the fundamental analysis conducted therein – that is that Reeves failed to carry his burden of showing that there was "[no] reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). In fact, Reeves misconstrues this Court's review standard pursuant to §2254 in his motion to reconsider.

Importantly, under AEDPA, federal courts are prohibited from granting habeas relief for any claim adjudicated on the merits on state court, unless one of the exceptions listed in § 2254(d) applies. Relevant to Reeves's claim, is §2254(d)(1)'s exception that this Court is permitted to grant habeas relief if the state court decision "was contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1). The applicable federal law in question here is *Strickland*. To establish a claim of ineffective assistance of trial counsel under *Strickland*, the petitioner "must show both deficient performance by counsel and prejudice." *Premo v. Moore*, 562 U.S. 115, 121, 131 S. Ct. 733, 178 L. Ed. 2d 649 (2011) (internal quotes omitted). "To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness," and "[a] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Id.* (internal quotes omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or common custom." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (internal quotes omitted). To establish prejudice for purposes of *Strickland*, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

When challenging counsel's effectiveness pursuant to § 2254(d), as is Reeves, however, the burden of proof is "all the more difficult" because the petitioner must "[e]stablish[] that the state court's application of *Strickland* was unreasonable[.]" *Richter*, 562 U.S. at 105.

The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Lindh* v. *Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. **The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.**

*Id*. (emphasis added).

In the January 8 Order, the Court reviewed the state court decision pursuant to the standard laid out above and determined that counsel conducted a mitigation investigation (obtaining voluminous records related to Reeves's academic, medical, and mental health background) and presented the discovered evidence during the penalty phase, such that there was a reasonable argument that counsel satisfied *Strickland's* deferential standard, and Reeves failed to satisfy his burden of arguing or showing otherwise. The Court explained:

> Without the testimony of counsel explaining their strategy, Reeves was left to show that counsel's decisions were unreasonable and prejudiced the outcome of his case, *Harvey v. Warden, Union Corr., Inst.,* 629 F.3d 1228, 1245 (11th Cir. 2011) ("To give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. . . and it is the petitioner's burden to persuade us otherwise."), and Reeves failed to carry his burden. . . . Reeves certainly [attempted to provide facts to demonstrate counsel's unreasonableness, as he] put forth briefs and argument regarding what trial decisions counsel made; however, this evidence sheds no light on the reasoning behind counsel's action and, standing alone, this evidence is insufficient to prove counsel was ineffective. Review of the trial court's decision reveals that the court considered the total evidence of record for each [ineffective assistance] claim and concluded it fell short of objectively establishing deficient performance. . . . With the record void of evidence (including the testimony of counsel) that the complained of actions were not the result of reasonable strategy, the court interpreted the evidence, as required, with deference to counsel's decisions and competency.

(Doc. 29, 43-44; January 8 Order). In short, the Court concluded that Reeves failed to show that counsel's decision to not hire a mitigation expert was objectively unreasonable given the totality

of the record evidence.[7] Put another way, one could conclude based on the volumes of evidence counsel obtained *and* the contents of those documents, *along with* the evidence actually put forth during the penalty phase, that counsel's decision not to hire a mitigation expert was objectively reasonable. *See Richter*, 562 U.S. at 105 (discussing "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard").

Reeves disputes this conclusion, asserting that counsel's petitioning of funds to hire a mitigation expert and subsequent failure to do so, coupled with counsel's failure to interview Dr. Ronan prior to her testimony confirms "trial counsel could not have reasonably decided to rely on Dr. Ronan's testimony as the sole expert in the penalty phase rather than retaining Dr. Goff or another mitigation expert, as the Court suggests." (Doc. 31-1 at 16). This rationale, however, ignores or overlooks the totality of the facts of record. In determining whether counsel's decision

---

[7]     Relying on *Wiggins* and *Porter*, Reeves asserts that deficient performance can be found despite counsel's testimony that a decision made was a strategic choice, and he argues the Court's holding in the January 8 Order was therefore a manifest error of law. (Doc. 31-1 at 13). In *Wiggins v. Smith,* 539 U.S. 510 (2003), the Supreme Court held the decision not to expand mitigation investigation was unreasonable in light of what was discovered in the records, and the record of the sentencing proceedings underscored the unreasonableness of counsel's conduct and suggested inattention rather than strategic decisions. The Court concluded that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* at 533. In *Porter v. McCullum*, 558 U.S. 30, 40 (2009) (per curiam), reviewing *de novo*, the Court unanimously held counsel's failure to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service was deficient performance.

        Again, Reeves misconstrues the Court's reasoning and his burden of proof. Unlike *Wiggins* and *Porter*, the record shows that Reeves's counsel performed a mitigation investigation and presented substantial mitigating facts to the jury during the penalty phase. While more mitigation evidence may have been available, Reeves has failed to establish that "[c]ounsel's investigation into [his] background did not reflect reasonable professional judgment." *Wiggins*, 539 U.S. at 534. Additionally, the record provides ample support that it was reasonable for counsel to not hire a mitigation expert given the volumes of information counsel obtained, the contents of the information gathered, and that it was presented to the jury during the penalty phase.

to not hire a mitigation expert was ineffective assistance, the Court "begins with the premise that 'under the circumstances, the challenged action[] might be considered sound trial strategy.'" *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Strickland*, *supra*, at 689).

The state court record reflects that Blanchard McLeod, Jr. and Marvin W. Wiggins were appointed as defense counsel for Reeves by the trial court. Attorney McLeod first petitioned the trial court on September 16, 1997, for approval of funds for the hiring of a clinical neuropsychologist, Dr. Goff, "to evaluate, test, and interview [Reeves] for testimony at the trial". (Doc. 23-1 at 70). Argument was heard regarding the motion on September 17, 1997, where Attorney McLeod voiced his reasoning for requesting the funds and the State questioned the value and necessity of such appointment. The following are excerpts from the proceeding:

McLEOD:    We have, however, filed a motion by recommendation of the Capital Mitigation Resources Program which has been assisting us with this matter because of the tremendous conflicting information we have received through probably I would anticipate more than 150 to 200 pages of material with reference to psychological and psychiatric evaluations, et cetera, for the mitigation phase of this proceeding, we would need the services of a neuropsychiatrist and neuropsychologist that has previously been ordered in other capital cases as Mr. Greene so adequately reminded me. And we are asking for the same because in this instance the State has put us on notice that they are going for the death penalty. And the amount of material that we have received through discovery from the school and the Department of Youth Services is beyond our ability to deal with and feel that Dr. Goff would be competent to deal with that matter. . . .
(Doc. 23-3 at 91).
. . .
GREENE [(State Prosecutor)]:    I am still taking the same position. This is a helper. I mean the defense attorney can't read the reports and do whatever he intends to do?
(Doc. 23-3 at 93).
. . .
GREENE:    [M]y point is you are asking for a whole lot of money to what avail, to help this man testify that the kid didn't do well in school or something? I mean you've got teachers who can testify to that if that's true. If all we are doing is hiring a very expensive investigator as to his background and psychology, I think we are wasting everybody's time. And it looks like that's what we did last time. And that's the reason I challenge it. . . . If we are over here to hire you an expensive

helper, I think we are paying the two of y'all who are very competent, especially you with your background.
(Doc. 23-3 at 94-95).

. . .

McLEOD:      To testify to this Defendant's prior problems, to testify as to the prior treatment that has been given to him, to testify as to what logic and justification we can have as to why rather than the death penalty life would be a very - -
(Doc. 23-3 at 96-97).

. . .

GREENE:      I go back to my same point.  [No] psychologist or psychiatrist is going to get up here and testify that this man should or should not get a penalty of death because of some psychological reason.  He can testify about what he found, what problems the man had.  Whatever benefit that has to the jury is fine.  The problem is he's going to be trying to - - what you want to try to do is offer him as some sort of person who is going to tell them because of psychological reasons he should get this or that, and that's for the jury and the Judge.  He's not going to be allowed to testify to that. . . . But you can get that same testimony from whoever prepared these records or whoever did these tests.  You are trying to just get another expensive helper.
(Doc. 23-3 at 97-98).

. . .

McLEOD:      Fifteen years of records of which I can't even - - the State just simply dumped them on me.
(Doc. 23-3 at 98).

The motion was ultimately denied on September 17, 1997.  (Doc. 23-1 at 73).  McLeod, however, filed an Application for Rehearing of the appointment on September 30, 1997, which was granted on October 16, 1997.  (*Id*. at 74-77, 81).  In between the filing of the Application of Rehearing on the Motion to Hire a Neuropsychologist, attorney McLeod filed a motion to withdraw from the case on October 13, 1997 (*id*. at 78-79), and Attorney Thomas Goggans was appointed to replace McLeod on October 27, 1997.  (*Id*. at 80).

In analyzing the objective reasonableness of counsel's decision not to hire a mitigation expert, the record supports that such a hiring cannot be deemed commonplace at the time of

Reeves's trial. First, the motion was initially denied where other petitions for funds were granted.[8]

Second, the exchange between the State prosecutor and defense counsel at the motion hearing evidences that reasonable attorneys could - and did - disagree about the necessity and benefit of such an appointment. Indeed, the State prosecutor implied that the hiring of a mitigation expert would be excessive and nothing more than a hiring a "helper", and defense counsel indicated that he needed assistance in deciphering and sorting through the voluminous records concerning Reeves's background. Additionally, the record reflects that the attorney who desired and pursued the appointment of a mitigation expert, McLeod, withdrew as defense counsel, and attorney Thomas Goggans subsequently petitioned the court to order the release of all of Reeves's mental health records from Taylor Harding Secure Medical Facility, including Dr. Kathy Ronan's court ordered evaluation. (Doc. 23-1 at 88). Attorney Groggans also submitted discovery requests of any and all inculpatory and exculpatory evidence possessed by the State. (Doc. 23-1 at 90-98). One could reasonably conclude, based on Groggans' discovery motions related to obtaining mitigation evidence, that attorney Groggans chose a different route than attorney McLeod and decided to personally be responsible for investigating and putting forth a mitigation defense. Given the totality of the circumstances (including the depth of information contained in the records and the lack of new information discovered by Dr. Goff and Dr. Salekin at the Rule 32 hearing), counsel's actions reveal a thorough investigation into Reeves's background and reasonable professional judgment in construction of their mitigation strategy. *See Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (noting *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence).

---

[8]     The trial court approved the request for extraordinary funds for the services of investigators with the Alabama Prison Project's Mitigation and Investigation Program, as well as funds for the hiring of a criminologist. (Doc. 23-1 at 15, 21, 59).

Reeves also asks this Court to reconsider its ruling that he failed to carry his burden of establishing that he was prejudiced by counsel's decision not to hire a mitigation specialist. Reeves asserts: (1) that if counsel had hired a mitigation specialist, "there is no dispute that the jury would have heard that Reeves is intellectually disabled, which is a mitigating factor under Alabama law, and that Reeves suffered from a number of risk factors that either were never presented to the jury or were inadequately explained"; and (2) that the Court failed to weigh the "totality of mitigating evidence", that is both Drs. Goff and Salekin's testimony, against the evidence in aggravation. (Doc. 43 at 10-12). Reeves argues that had counsel hired a mitigation expert, the judge and jury would have heard the following:

> Weapons, alcohol, and illegal drugs were often present in Reeves's house, giving him easy access to guns and alcohol. (Doc. 23-24 at 146).

> Reeves's mother . . . had depression, which often went untreated and rendered her unable to parent appropriately. (*Id*. at 152-53).

> The three male figures in Reeves's life taught him anti-social and violent behavior, and one of these figures handed him a loaded gun. (Doc. 23-15 at 129-30; Doc. 23-24 at 168-71).

> At a young age, Reeves head banged in order to abuse himself and Reeve's mother failed to follow the recommendations of mental health clinicians, was unaware of how much medication she gave Reeves, and often forgot to provide him with prescribed medication. (Doc. 23-24 at 185; Doc. 23-15 at 136-37).

Reeves contends that there is a "reasonable probability" the jury would have recommended life imprisonment without parole instead of the death penalty had it heard the above testimony. (Doc. 43 at 15-16).

At the penalty phase, counsel informed the jury that it would hear testimony describing Reeves's background and explaining what led him to become a person who could commit murder. (Doc. 23-8 at 92-96). Counsel called three witnesses. First, a detective, who testified to the

deplorable physical conditions of Reeves's home and the neighborhood and environment in which he was raised. Second, his mother, who testified to the family's poverty, his mental health, his academic history, his work history, his criminal history, and his family relationships. Third, Dr. Ronan, who testified as to her psychological opinion of Reeves based on her clinical evaluation for competency, as well as her interview with Reeves, and her full review of the record evidence (including mental health records, scholastic records, juvenile criminal records, and medical records). Through Dr. Ronan's testimony, the judge and jury heard much of the same information provided by Drs. Goff and Salekin. Specifically, Dr. Ronan testified that Reeves's mother was an alcoholic, that his mother "didn't follow up" with the treatment offered from Cahaba Heath Center or in "insuring that he continued to receive the medication" for his diagnosed condition of ADHD. (Doc. 23-8 at 142). Dr. Ronan further explained the chemical imbalance of ADHD and the negative consequences of noncompliance with medication treatment. (*Id*. at 144). The penalty phase judge and jury also heard that Reeves was sent off to jail as a juvenile for stealing cars, breaking in houses, fighting, and drugs (doc. 23-8 at 122); that he had numerous adult arrests for class C felonies (*id*. at 152); that Reeves had been smoking marijuana since he was twelve (*id*. at 123); that Reeves "had a lot of problems at school", like cussing at teachers and hitting other children (*id*. at 123-24); that Reeves's life aspiration was to sell drugs (*id*. at 124).

Dr. Ronan assessed Reeves's intelligence through the administration of the verbal portion of the Wexler Intelligence scale. Her findings were consistent with the results of the only previous IQ test Reeves had taken. (*Id*. at 144-146, 149). She further explained "that a person's intelligence and environment work together in affecting that person's life." (*Id*. at 149). She further opined that Reeves's lower intelligence and environment led to a personality disorder. (*Id*. at 151). This personality disorder included features of "repeatedly . . . violat[ing] legal boundaries or social

boundaries with disregard to consequences;" misreading social cues; difficulties in getting or establishing normal close bonds with people. (Doc. 23-8 at 150-51). She reasoned that his lower intelligence and personality disorder resulted in his being "where he is." (Doc. 23-8 at 151). Additionally, the judge instructed the jury during the penalty phase on the types of evidence it should consider mitigating circumstances, stating:

> I will now read to you a list of some of the mitigating circumstances which you may consider if you find from the evidence in trial or in sentencing hearing that such mitigating circumstances exist in this case, . . . the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law were substantially impaired could be a mitigating circumstance. . . . that the Defendant grew up in a poor home environment, . . . lacked appropriate developmental resources in growing up, . . . that the Defendant's level of intelligence is on the borderline, . . . that the Defendant when placed in a structured environment has responded positively, . . . . In addition to the mitigating circumstances that were specified by the law and those that I just read to you, mitigating circumstances shall include any aspect of a Defendant's character or record and any circumstance through the defense that the Defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

(Doc. 23-8 at 196-97).

The Eleventh Circuit has consistently held that counsel is ineffective for failing to conduct a reasonable investigation, not for failing to seek the assistance of experts. *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1160 (11th Cir. 2017) (citing *Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239, 1244 (11th Cir. 2015) ("When mental health is at issue, counsel does not offer ineffective assistance when it later becomes apparent that an expert who would have testified more favorably than the expert who was actually called may have existed.") (internal citation omitted).[9]

---

[9]     [*S*]*ee also Elledge v. Dugger*, 823 F.2d 1439, 1447 n.17 (11th Cir.), opinion withdrawn in part on denial of reh'g, 833 F.2d 250 (11th Cir. 1987) ("We emphasize that the duty is only to conduct a reasonable investigation. Counsel is not required to 'shop' for a psychiatrist who will testify in a particular way."); *cf. Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003) ("[A] failure to 'shop around' for a favorable expert opinion after an evaluation yields little in mitigating evidence does not constitute ineffective assistance."); *Walls v. Bowersox*, 151 F.3d 827, 835 (8th

Unlike the cases cited by Reeves, this is a case in which the new evidence of Drs. Goff and Salekin "would barely have altered the sentencing profile presented to the sentencing judge." *Strickland*, *supra*, at 700; *see also Glock v. Moore*, 195 F.3d 625, 636 (11th Cir. 1999) (concluding petitioner cannot show prejudice "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial."). While Dr. Ronan may not have discovered or testified to every detail discussed by Dr. Salekin, she did similarly identify many mitigating facts and explain to the jury how Reeves's background and lower intelligence must be considered when assessing how Reeves "got to where he is." (Doc. 23-8 at 151). Despite hearing testimony of Reeves's "dysfunctional" upbringing and home life and being instructed on how such factors are mitigating circumstances to be taken into consideration when determining the sentence to impose on a defendant, the jury nevertheless recommended a sentence of death. (Doc. 23-8 at 149). The distinguishing facts laid out by Drs. Goff and Salekin fail to paint a different picture of Reeves than that known to the jury; at best, their testimony simply adds a few shades of color. *See Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1260-61 (11th Cir. 2012) ("[T]he United States Supreme Court, this Court, and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.").

---

Cir. 1998) ("Counsel is not required to continue looking for experts just because the one he has consulted gave an unfavorable opinion.") (quotation marks omitted); *Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) ("The mere fact that his counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance.").

*Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1160 (11th Cir. 2017).

Consequently, the state court's rejection of Reeves's penalty phase ineffective assistance claim was not an unreasonable application of clearly established law. *White v. Woodall*, 572 U.S. 118, 134 S. Ct. 1377, 1702, 188 L. Ed. 2d 392 (2014) ("[A]n unreasonable application of [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice."); *Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (Under 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

Likewise, the state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance," *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010), or because jurist of reason could disagree about the court's conclusion. *Brumfield v. Cain*, 576 U.S. __, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) ("If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination.") (internal quotation marks and alterations omitted). "[T]he fact that other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitable identify shortcomings in the performance of prior counsel." *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 647 (11th Cir. 2016) (quotation marks omitted).

Accordingly, Reeves has failed to identify manifest errors of law or fact, newly discovered evidence, or changes in law germane to his petition. For these reasons, Reeves's motion to

reconsider Claim 3.c is denied and no Certificate of Appealability is warranted as to this claim for relief.

### C. Reconsideration of Juror-Misconduct Claim.

Petitioner Reeves's final ground for relief relates to Claim 4 of his habeas petition. Reeves argues that the Court misapplied clearly established law and seeks reconsideration of his juror misconduct claim. Specifically, Reeves asserts that the Court reversed the burden applicable to his claim by requiring him to not only plead but *prove* that the alleged juror misconduct affected the verdict by holding in its January 8 Order that "Reeves did not allege 'the nature of what reached the jury or may have influenced the verdict or vote.'" (Doc. 43 at 17). This, however, is a misstatement of the Court's holding.

The state court determined that Reeves's juror misconduct claims were insufficiently plead to warrant an evidentiary hearing pursuant to Ala. R. Crim. P. Rule 32.6(b). Rule 32.6(b) requires a petitioner to plead his claim with specificity, instructing:

> Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

In applying the statutory rule, the Alabama Court of Criminal Appeals relied heavily on *Moody v. State*, 95 So. 3d 827 (Ala. Crim. App. 2011), and concluded that "at a minimum, [Reeves must] identify the juror who . . . committed the misconduct, must allege specific facts indicating what actions that juror took that the petitioner believes constituted the misconduct, and must allege specific facts indicating how that juror's actions denied the petitioner a fair trial." (Doc. 29 at 71). The appellate court reasoned that Reeves, in presenting his juror misconduct claim, failed to satisfy his burden of pleading with specificity when: (1) he failed to identify the juror who committed the

misconduct (other than by the reference of "Juror Jane Doe"); (2) failed to identify the juror who allegedly changed her sentencing vote due to Juror Jane Doe's private communication with he; (3) failed to identify what information Juror Jane Doe received from extraneous sources; and (4) failed to allege how the information prejudiced him. (*Id.*). On federal habeas review, this Court was required to "answer two questions . . . . First, whether [Reeves's] . . . Rule 32 petition and its attached exhibits pleaded enough specific facts that, if proven, amount to a valid . . . claim. Second, if [the court] answer[s] the first question in the affirmative, [it] must determine whether the Alabama Court of Criminal Appeals's decision to the contrary was unreasonable under §2254(d)." *Daniel v. Comm'r.*, 822 F.3d 1248, 1261 (11th Cir. 2016).

"[W]e are mindful that 'at the pleading stage of Rule 32 proceedings in Alabama, a Rule 32 petitioner does not have the burden of proving his claims" and that the facts alleged in his petition are assumed to be true. *Id.* (quotation and alterations omitted). We are also cognizant that "[t]o obtain habeas relief a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (citations omitted). "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F. 3d 1230, 1257 (11th Cir. 2012) (citation omitted). Review of Reeves's claim reveals that the pleading lacks full disclosure of necessary details to make "a colorable showing that the exposure actually occurred." *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1051 (11th Cir. 1987); *accord.*, *Hyde v. State*, 950 So. 2d 344, 356 (Ala. Crim. App. 2006) ("The full factual basis for the claim must be included in the petition itself."). Review also reveals that the state court did not hold, and neither does this Court, that

Reeves must provide or prove any of these factors in his pleading. Instead, the state court pointed out unidentified facts and determined the cumulative vagueness of the affidavit fell on the side of a conclusory allegation rather than full disclosure of the factual basis for the claim (as required by § 32.6(b)) and was insufficient to sustain his pleading burden. This Court explained that the duty to investigate juror misconduct claims exists on a spectrum and concluded the evidence provided by Reeves rested on the lower end of that spectrum. The Court, similarly, identified the missing details from Reeves's pleading and stated that "[t]he absence of details plead regarding the extrinsic influence creates an unfillable void for the court in determining the nature of what reached the jury or may have influenced the verdict vote." (January 8 Order, Doc. 29 at 76-77). In other words, Reeves failed to provide enough specific information to "make[] an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984). The evidence presented supports that fairminded jurists could disagree as to whether or not Reeves provided a "clear and specific statement [of his claim] . . ., including full disclosure of the factual basis" of the claim as required by Alabama's pleading statute; thus, the Court held federal habeas relief was not warranted based on the deferential standard of §2254(d).

In his current Rule 59(e) motion, Reeves fails to identify manifest errors of law or fact, newly discovered evidence, or changes in law germane to his petition. Reeves primarily rehashes previously considered and rejected contentions relating to his claims of ineffective assistance. Rule 59(e) relief is not warranted where a party simply reiterates arguments previously considered and rejected in the underlying ruling. *See, e.g., Mincey v. Head*, 206 F.3d 1106, 1137 n.69 (11th Cir. 2000) (explaining that "[t]he function of a motion to alter or amend a judgment is not to serve as a vehicle to relitigate old matters"); *Atl. Specialty Ins. Co. v. Mr. Charlie Adventures, LLC*, 2015

U.S. Dist. LEXIS 58859, 2015 WL 2095650, at *2 (S.D. Ala. May 5, 2015) (explaining that it "is improper to utilize a motion to reconsider to ask a district court to rethink a decision once made, merely because a litigant disagrees" with the outcome). For these reasons, Rule 59(e) relief is denied.

In the alternative to reconsideration of his juror misconduct claim, Reeves requests that a COA be issued. This motion is also DENIED.

## IV.     Conclusion.

For the foregoing reasons, Petitioner Reeves's Motion to Alter or Amend the Court's Judgment is **DENIED**.

**DONE** and **ORDERED** this the **1st** day of **May**, **2019**.


s/Kristi K. DuBose
**CHIEF UNITED STATES DISTRICT JUDGE**